**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Ohio Coal Association, et al.,

     **and**

Murray Energy Corporation, et al.,

     **Plaintiffs,**

  **v.**

Thomas E. Perez, Secretary of Labor,
and the Mine Safety and Health
Administration,

     **Defendants.**

**Case No. 2:14-cv-2646**

**Related Case: 2:15-cv-448**

**Judge Graham**

**Magistrate Judge Deavers**

## Opinion & Order

Regulated entities are suing their regulator. In two related cases, numerous mining companies and industry associations (collectively, "Plaintiffs"), bring claims against Thomas E. Perez in his official capacity as the Secretary of Labor (the "Secretary") and the Mine Safety and Health Administration (the "MSHA") (collectively, "Defendants"). (Compl., Doc. 1).[1] Plaintiffs complain that a rule promulgated by the Secretary violates the Administrative Procedure Act (the "APA") as well as the Due Process Clause of the United States Constitution. More on the rule later, but for now it is sufficient to say that the rule changes the regulatory environment for coal mine operators.

Defendants move to dismiss the claims for (1) lack of subject-matter jurisdiction, and (2) failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P 12(b)(1), (6); (Defs.' Mem. in Support of Mot. to Dismiss at 1–2, Doc. 26-1). Defendants argue that Plaintiffs cannot challenge the new rule in federal district court because the relevant statute creates a separate, comprehensive review scheme that precludes district courts from exercising jurisdiction. Defendants also argue that even if the Court has jurisdiction, Plaintiffs have not adequately pleaded their claims. Defendants also challenge Plaintiffs' standing. Because the Court does have juris-

---

[1] For ease of reference, the Court refers to the *Ohio Coal* docket unless otherwise indicated. (Case No. 2:14-cv-2646).

diction, Plaintiffs have standing, and Plaintiffs have stated most of their claims with sufficient particularity, Defendants' Motions are granted in part and denied in part.

## I.      Background

### A.      Statutory and regulatory background

#### 1.      History of the Mine Act

In 1977, Congress passed the Federal Mine Safety and Health Act (the "Mine Act"). 30 U.S.C. § 801 *et seq*. "Under the Mine Act, Congress adopted a 'split-enforcement' regime where issues of policy and enforcement are delegated to the Secretary of Labor and issues of adjudication are addressed by an independent review body known as the Federal Mine Safety and Health Review Commission [("the Commission")] and the federal court of appeals." *Armstrong Coal Co. v. U.S. Dep't of Labor*, 927 F. Supp. 2d 457, 461 (W.D. Ky. 2013). The MSHA is an administrative agency within the United States Department of Labor; acting on behalf of the Secretary of Labor, the MSHA implements and enforces the Mine Act. The Secretary establishes health and safety standards for mines, *see* 30 U.S.C. § 811, inspects mines at least annually, 30 U.S.C. § 813(a), and issues citations to mine operators that violate "any mandatory health or safety standard, rule, order, or regulation," 30 U.S.C. § 814(a).

The Secretary does issue citations: 118,619 in 2013 alone. (Compl. at ¶ 32). But not all citations are created equal.  "S&S" violations—those "of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards"—can lead to severe consequences. 30 U.S.C. § 814(e). For example, if an operator has a pattern of S&S violations, the Secretary gives the operator "written notice that such pattern exists"—a "POV Notice." 30 U.S.C. § 814(e)(1). In the next 90 days, if a mine inspector cites the operator for any S&S violation, the mine inspector must then issue a withdrawal order: an order that requires all persons in the affected area of the mine to be removed and not re-enter until the Secretary determines that the violation has been abated. 30 U.S.C. § 814(e). The POV Notice is deemed terminated if, after inspecting the entire mine, an inspector finds no S&S violations. 30 U.S.C. § 814(e)(3). Since the phrase "pattern of violations" is not defined by the Mine Act, Congress required the Secretary to "make such rules as he deems necessary to establish criteria for determining when a pattern of violations . . . exists." 30 U.S.C. § 814(e)(4).

The Secretary promulgated the first POV rule in 1990. *See* Pattern of Violations Rule, 55 Fed. Reg. 31128-01 (July 31, 1990). Under the 1990 POV Rule, the MSHA would use an initial screening process to identify mines "with a potential POV" ("PPOV"). 1990 POV Rule, 30 C.F.R. §§ 104.2(a)(1); 104.3(b) (1990). This screening process allowed mine operators to either appeal the underlying citation(s) or remediate the problem before receiving a POV Notice and risk the shutdown of the mine. Because of this preemptory mechanism (and other reasons), the MSHA never used its authority under the 1990 POV Rule to sanction a single mine for a pattern of violations. Pattern of Violations Rule, 78 Fed. Reg. 5056, 5058 (Jan. 23, 2013) (codified at 30 C.F.R. § 104.1–104.4 (2013)) (citing Office of the Inspector General's Audit Report: *In 32 Years MSHA Has Never Successfully Exercised its Pattern of Violations Authority* (Report No. 05-10-005-06-001)). Plaintiffs assert that while rarely invoked, the 1990 POV Rule dramatically improved safety in the mining industry by helping reduce fatalities and injuries. (Compl. at ¶¶ 49–56).

The OIG report identified limitations the 1990 POV Rule placed "on MSHA's authority, specifically, [r]equiring the use of final citations and orders in determining a PPOV." Pattern of Violations Rule, 78 Fed. Reg. at 5058 (citing OIG Report). Ultimately, the MSHA incorporated many of the report's recommendations into its revised POV rule, which became effective on March 25, 2013 (the "2013 POV Rule"). The 2013 POV Rule, according to MSHA, "simplifies the existing POV criteria, improves consistency in applying the POV criteria, and increases the efficiency and effectiveness in issuance of a POV notice." Pattern of Violations Rule, 78 Fed. Reg. at 5056. According to Plaintiffs, it "eliminates the PPOV notice system, enables MSHA to issue a POV Notice based solely on non-final citations, and, critically, fails to submit the actual POV criteria for notice and comment." (Compl. at ¶ 67).

## 2. The Mine Act's review system

The Mine Act vests jurisdiction with the Commission to hear disputes over Mine Act requirements. Typically, disputes arise after mine inspectors issue citations. Mine operators may contest those citations, and the Commission may affirm, modify, or vacate those citations. 30 U.S.C. § 815(d). Typically, the Commission adjudicates these disputes by appointing an Administrative Law Judge ("ALJ") to conduct the proceedings and render a decision "which constitutes his final disposition of the proceedings." 30 U.S.C. § 823(d)(1). The losing party can administratively appeal the ALJ's decision, filing what the Mine Act calls a "petition for discretionary re-

view," but the Commission has unfettered discretion to hear or ignore the petition. 30 U.S.C. § 823(d)(2)(A)(i). After 40 days without review, the ALJ's decision becomes the final decision of the Commission. 30 U.S.C. § 823(d)(1). Final Commission decisions are subject to appeal in "any United States court of appeals for the circuit in which the violation is alleged to have occurred or in the United States Court of Appeals for the District of Colombia Circuit." 30 U.S.C. § 816(a)(1).

The Mine Act only explicitly vests jurisdiction with the district courts in two circumstances, both of which require the Secretary to initiate the lawsuit against an uncooperative mine operator: (1) if the Secretary seeks injunctive relief for an operator's failure to comply with his orders or interference with his inspection duties, 30 U.S.C. § 818(a)(1); or (2) if the Secretary seeks to recover unpaid civil penalties, 30 U.S.C. § 820(j).

### 3. The 1990 POV Rule

The 1990 POV Rule required the MSHA to conduct an annual review of "the compliance records of mines." Pattern of Violations Rule, 55 Fed. Reg. at 31136 (July 31, 1990). The critical piece of the compliance record was the "mine's history of . . . significant and substantial violations." *Id.* S&S violations were one of the 1990 POV Rule's seven criteria "used to identify those mines with a potential pattern of violations." *Id.* The 1990 POV Rule created a warning for mine operators that exhibited a "potential pattern of violations" by requiring the MSHA to notify them in writing of the potential pattern, give them "a reasonable opportunity" to take steps to review the basis for the POV warning, meet with the MSHA, and take corrective measures. 30 C.F.R. § 104.4(a)(1)–(4) (1990). Only after this potential pattern of violation notice (or "PPOV Notice") could the MSHA initiate the process that could culminate in the MSHA issuing a POV Notice. 30 C.F.R. § 104.4(b) (1990).

### 4. The 2013 POV Rule

In 2013, the Secretary made significant changes to the POV rule. First, the 2013 POV Rule allows the MSHA to consider a mine's history of S&S "citations" rather than violations. Pattern of Violations Rule, 30 C.F.R. § 104.2(a)(1). Second, the 2013 POV Rule eliminates the PPOV system. *See* 30 C.F.R. § 104.3 (Issuance of Notice). Third, the 2013 POV Rule expands the criteria the MSHA may use to identify mines with a pattern of S&S violations. *See* 30 C.F.R. § 104.2(a) (Pattern Criteria). Fourth, the 2013 POV Rule eliminates the option of a mine operator to "[i]nstitute a program to avoid repeated . . . violations," *compare* 30 C.F.R. § 104.1–4 (2013)

*with* 30 C.F.R. § 104.4(a)(4) (1990), but the MSHA issued informal guidance that it would accept what it called "Corrective Action Programs," the adoption of which could delay a POV Notice, 78 Fed. Reg. 5063; (Compl. at ¶ 68). Fifth, the 2013 POV Rule announced that "MSHA would post specific pattern criteria on its Web site." 30 C.F.R. 104.2(b) (2013).

### B. Related Cases

The 2013 POV Rule spawned a number of lawsuits. Two were filed here, in the Southern District of Ohio; both present the same questions. *See Ohio Coal Ass'n v. Sec'y of Labor*, 2:14-cv-2646; *Murray Energy Corp. v. Sec'y of Labor*, 2:15-cv-448.[2] Other parties challenged the 2013 POV Rule directly in the United States Court of Appeals for the Sixth Circuit, raising the same issues; their claims were dismissed for lack of subject-matter jurisdiction. *Nat'l Mining Ass'n v. Sec'y of Labor*, 763 F.3d 627 (6th Cir. 2014). The Sixth Circuit held that the 2013 POV Rule was not a "mandatory health or safety standard"—the only type of standard immediately reviewable in the courts of appeals—and therefore the court lacked subject-matter jurisdiction. *Id.* at 633. The Sixth Circuit declined to transfer the case to any district court because the petitioners failed to "explain[] why doing so would be 'in the interest of justice'" or "identify the district court where the action or appeal could have been brought at the time it was filed or noticed." *Id.* at 635 (quoting 28 U.S.C. § 1631 (Transfer to cure want of jurisdiction)). Since the Sixth Circuit declined to transfer the case because of these threshold issues, it did not explicitly "reach the question of whether the district court's jurisdiction over [the] challenge [was] precluded by the Mine Act's administrative review scheme." *Id.* Even so, the court concluded "that jurisdiction over initial review of regulations is proper in the district court when the statute does not explicitly vest jurisdiction in the court of appeals." *Id.* at 632. When analyzing Congress's chosen method of judicial review, especially of challenges under the APA, the court focused on the "general federal question jurisdiction" of district courts and stated that the "normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *Id.* (quoting 28 U.S.C. § 1331; *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007)) (quotation marks omitted).

Two similar cases challenging the 2013 POV Rule were brought before the Commission. The first began when Brody Mining, LLC ("Brody Mining") received a POV Notice on October 24, 2013. Brody Mining contested the POV Notice itself, its supporting S&S citations, and chal-

---

[2] *Murray Energy* was reassigned to this Court under a Related Case Memorandum Order. (Doc. 11).

lenged the validity of the 2013 POV Rule. An ALJ dismissed Brody Mining's challenge to the POV Notice itself, holding that the Commission (and the ALJs it appoints) could only adjudicate "contests," and the Mine Act did not give him the authority to adjudicate the POV Notice itself. *Brody Mining, LLC v. Sec'y of Labor Mine Safety and Health Admin. (MSHA)*, 36 FMSHRC 284, 287 (Jan. 30, 2014). The ALJ upheld the 2013 POV Rule, rejecting many of the same arguments Plaintiffs make here. *Id.* at 301–316. Brody Mining appealed the ALJ's decision to the Commission, and the Commission affirmed, remanding for further proceedings. *Brody Mining, LLC v. Sec'y of Labor Mine Safety and Health Admin. (MSHA)*, 36 FMSHRC 2027, 2027–28 (August 28, 2014) (4-1 decision) (finding the 2013 POV Rule to be valid under the some of the same criticisms Plaintiffs allege here). Brody Mining appealed the Commission decision to the D.C. Circuit on September 8, 2014 but withdrew the appeal on November  2, 2015. (Pls.' Notice, Doc. 23).

In a related docket, a different ALJ dismissed the POV Notice, holding that the Secretary had violated the petitioners' right to procedural due process by failing to identify in advance the criteria on which the POV Notice was based. *Brody Mining, LLC v. Sec'y of Labor Mine Safety and Health Admin. (MSHA)*, 36 FMSHRC 2941, 2958–59 (November 3, 2014). Shortly thereafter, the ALJ granted the Secretary's Motion for Certification for Interlocutory Review. *Brody Mining, LLC v. Sec'y of Labor Mine Safety and Health Admin. (MSHA)*, 36 FMSHRC 3355, 3362 (December 30, 2014). On interlocutory review, the Commission held that the ALJ erred in dismissing the POV Notice and that the Secretary's definition of a POV was reasonable and entitled to deference, remanding the case for further proceedings. *Brody Mining, LLC v. Sec'y of Labor Mine Safety and Health Admin. (MSHA)*, 37 FMSHRC 1914, 1914–16 (September 29, 2015).

Pocahontas Coal Company has raised similar challenges to the 2013 POV Rule. Pocahontas Coal received a POV Notice on October 24, 2013, and shortly thereafter began receiving withdrawal orders. (Notice Ex. 1, Doc. 24-1). It challenged the withdrawal orders, and it settled all but one of the citations with the MSHA. Pocahontas Coal and the MSHA filed Motions for Summary Decision on the issue of whether the POV Notice was valid. (*Id.* at 1). The ALJ denied Pocahontas Coal's Motion and granted the Secretary's Motion, upholding the POV Notice. (*Id.*). Pocahontas Coal appealed in January of 2016, and that case is still pending before the Commission. *Cases Currently on Review Before the Commission*, Federal Mine Safety and Health Re-

view Commission (last updated May 9, 2016), http://www.fmshrc.gov/content/cases-currently-review-commission-2.

The Commission, in a separate but closely related docket involving Pocahontas Coal, held that the Commission lacked jurisdiction to hear a direct challenge to a POV Notice without a contested withdrawal order. *Sec'y of Labor, Mine Safety and Health Admin. (MSHA) v. Pocahontas Coal Co., LLC*, 38 FMSHRC 176, 177–78 (February 16, 2016). There, the Commission considered whether the issue before it was moot because of the parallel case that arrived before the Commission just a month before; the Commission found that the issue was still justiciable. *Id.* at 179 n.6. It was a situation that was capable of repetition but evading review because of the likelihood of mine operators receiving withdrawal orders after receiving a POV Notice, thus making it unlikely that an operator could ever challenge the POV Notice without first incurring a withdrawal order. *Id.* The Commission held that it could decide the challenge to the 2013 POV Rule, but only in the context of a POV Notice followed by a section 104(e) withdrawal order. *Id.* at 184–85.

### C. Plaintiffs' claims

The pending motions turn on how Plaintiffs' claims are characterized; therefore, a detailed discussion of those claims is warranted. The *Ohio Coal* Plaintiffs are trade associations that represent the interest of mining companies all over the country. (*Ohio Coal* Compl. at ¶¶ 12–16). The *Murray Energy* Plaintiffs are underground coal mine operators. (*Murray Energy* Compl. at ¶ 4). Plaintiffs allege three claims under the APA and one under the Due Process Clause. Plaintiffs also allege, in slightly different terms, a claim under the Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201–02. All Plaintiffs seek declaratory judgments under their APA and Due Process Clause claims, (*Ohio Coal* Compl. at 27; *Murray Energy* Compl. at 27), but the *Ohio Coal* Plaintiffs allege a separate claim for declaratory judgment. (*Ohio Coal* Compl. at ¶¶ 120–27). The following are descriptions of the five claims.

First: the 2013 POV Rule exceeds the statutory authority granted to the MSHA by the Mine Act; therefore, the rule violates the APA. (*Ohio Coal* Compl. at ¶¶ 95–100; *Murray Energy* Compl. at ¶¶ 86–91). Plaintiffs assert that the Mine Act requires the Secretary to use finalized violations to determine whether a pattern of violations exists. (*Ohio Coal* Compl. at ¶¶ 97–98 (citing 30 U.S.C. § 814(e)). But instead of using patterns of *violations*, the 2013 POV Rule allows the MSHA to use patterns of *citations* to issue Pattern-of-Violations Notices. Plaintiffs also

allege Defendants exceeded their statutory authority when they announced new POV criteria on MSHA's website without subjecting the new criteria to formal notice-and-comment rulemaking as required by the APA. (*Murray Energy* Compl. at ¶¶ 87, 90).

Second: the APA requires administrative agencies to subject proposed rules to notice-and-comment rulemaking procedures, but MSHA did not subject the POV and CAP[3] criteria to notice-and-comment rulemaking and instead simply posted the criteria on its website. (*Ohio Coal* Compl. at ¶¶ 85–94; *Murray Energy* Compl. at ¶¶ 92–101). While the MSHA did subject the 2013 POV Rule to general notice-and-comment procedures, neither the POV nor the CAP criteria were part of the rule submitted for comment. (*Murray Energy* Compl. at ¶ 96).

Third: the 2013 POV Rule violates the Due Process Clause. (*Ohio Coal* Compl. at ¶¶ 111–19; *Murray Energy* Compl. at ¶¶ 102–11). Plaintiffs assert that the 2013 POV Rule violates their procedural due process rights because it eliminates the procedural safeguards that were in place under the 1990 POV Rule. With those safeguards removed, the new rule violates Plaintiffs' procedural due process rights by failing to provide notice and a hearing before depriving them of their property rights when a withdrawal order is issued based on non-final citations.

Fourth: the 2013 POV Rule's promulgation was arbitrary and capricious, which violates the APA. (*Ohio Coal* Compl. at ¶¶ 101–10; *Murray Energy* Compl. at ¶¶ 112–22). Specifically, the *Murray Energy* Plaintiffs allege that MSHA's rulemaking was arbitrary and capricious because "the Agency's decision to [change the rule] ran counter to the evidence before it, and because it announced no sound reason for the complete reversal of the rationale underlying the existing rule." (*Murray Energy* Compl. at ¶ 115).

Fifth: The *Ohio Coal* Plaintiffs assert a separate claim for declaratory judgment under 28 U.S.C. § 2201. They seek a declaration by the Court invalidating the 2013 POV Rule because of the above-described deficiencies. (*Ohio Coal* Compl. at ¶¶ 120–27). The *Murray Energy* Plaintiffs make no discrete declaratory-judgment claim, but all their claims seek declaratory judgments.

## II.    Legal Standards

The legal standards governing dismissal under Rule 12(b)(1) and 12(b)(6) differ somewhat. *See RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).

---

[3] Mine operators may undertake Corrective Action Programs (or, "CAP"s), to delay the issuance of a POV notice.

Any challenge to subject-matter jurisdiction must be resolved before moving to the 12(b)(6) motion, which amounts to a ruling on the merits. *Bell v. Hood*, 327 U.S. 678, 682 (1946).

### A. Federal Rule of Civil Procedure 12(b)(1)

There are two types of challenges to subject-matter jurisdiction under Rule 12(b)(1): facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Facial attacks challenge "the sufficiency of the pleading itself." *Id.* When presented with this type of attack, "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Id.* A factual attack challenges the facts supporting the existence of subject-matter jurisdiction; therefore, courts do not presume plaintiff's allegations to be true. *Id.*

Here, Defendants bring what appears to be a facial attack on the Court's subject-matter jurisdiction; therefore, the Court must take the material allegations of the complaint as true and construe them in the light most favorable to Plaintiffs.

### B. Federal Rule of Civil Procedure 12(b)(6)

A party may assert by motion the defense of "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A claim upon which relief can be granted is a claim that is facially plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face if it contains enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While the Court need not accept legal conclusions as true, it must do so with all factual allegations. *Iqbal*, 556 U.S. at 678. The defendant bears the burden of showing that the plaintiff has failed to state a claim. *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015).

## III. Discussion

Defendants present three reasons the Court should dismiss Plaintiffs' claims: (1) the Court lacks subject-matter jurisdiction because the Mine Act created an exclusive review scheme that precludes district-court jurisdiction, (Defs.' Mem. in Support of Mot. to Dismiss at 9–16, Doc. 26-1); (2) Plaintiffs lack standing to bring the claims because they lack an injury in fact, (*Id.* at 16–18); and (3) Plaintiffs fail to state a claim on which relief may be granted. (*Id.* at 18–26).

### A. Federal Rule of Civil Procedure 12(b)(1) – The Mine Act does not provide the exclusive avenue to judicial review for Plaintiffs' claims

In support of their first basis to dismiss Plaintiffs' claims, Defendants argue that (1) the Mine Act precludes district-court jurisdiction, (2) other parties have challenged the 2013 POV Rule through the Commission, so it has jurisdiction, and (3) Plaintiffs' claims are not "wholly collateral" to the Mine Act. Plaintiffs contend that the Mine Act's review scheme is designed to adjudicate "contests," they do not contest any order or citation, and therefore their claims are wholly collateral to the Mine Act's review scheme and district-court jurisdiction is proper.

Generally, federal trial courts have jurisdiction over generic APA and due process claims. *See Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014) (holding that federal question statute confers jurisdiction over APA claims); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). But this does not end the inquiry. "The question, then, is not whether [the statute] confers jurisdiction, but whether [the statute] removes the jurisdiction given to the federal courts . . . ." *Whitman v. Dep't of Transp.*, 547 U.S. 512, 514 (2006); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) ("[T]he text does not expressly limit the jurisdiction that other statutes confer on district courts. *See, e.g.*, 28 U.S.C. §§ 1331, 2201. Nor does it do so implicitly.").

For the claims at issue here, the Mine Act does not expressly prohibit or grant jurisdiction to the district courts. The question, then, in the absence of an explicit grant or denial of district-court jurisdiction, what's a district court to do? It depends. When a statute "intends to preclude judicial review of constitutional claims [,] its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). But when "Congress simply channels judicial review of a constitutional claim to a particular court" through delayed judicial review, *Elgin v. Dept. of Treasury*, 132 S.Ct. 2126, 2132 (2012), Congress's intent to preclude district-court jurisdiction need only be "fairly discernible in the statutory scheme," *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). Since the Court finds that such intent is not even fairly discernible in the statute, the Court need not decide whether *Webster*'s heightened standard applies.[4]

---

[4] Courts still worry about the availability of judicial review under the "fairly discernible" standard, as *Thunder Basin* makes clear. *See id.* at 212–13.

To determine whether such intent is "fairly discernible," the Court analyzes "the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207 (citation omitted). If a claim is "wholly collateral to a statute's review provisions and outside the agency's expertise particularly where a finding of preclusion could foreclose all meaningful judicial review," district courts have jurisdiction. *Id.* at 212–13 (quotation marks omitted) (internal citations omitted) (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)). This preclusion requires analysis of the particular issues presented, the parties involved, and the statutory scheme. *See Block*, 467 U.S. at 349 ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."). The *Thunder Basin* analysis asks three questions: (1) Will a finding of preclusion foreclose all meaningful judicial review? (2) Are these claims outside the agency's expertise? (3) Are these claims wholly collateral to the Mine Act's review provisions? *Thunder Basin*, 510 U.S. at 212–13.

Context for the analysis requires a thorough discussion of *Thunder Basin*. The Mine Act allows both the mine operator and the miners to each select a representative to both accompany the mine inspector during a "walk-around" inspection and to meet with the inspector before and after the inspection. 30 U.S.C. § 813(f). The mine operator must post the miners' representatives' information on the mine's bulletin board. Posting at mine, 30 C.F.R. § 40.4. In *Thunder Basin*, the non-union miners selected two nonemployee local union members to be their representatives at the walk-around inspection. *Id.* at 204. The mine operator refused to post the representatives' information, instead complaining to the MSHA that doing so "compromised its rights under the National Labor Relations Act (NLRA)." *Id.* The MSHA sent the mine operator a letter ordering it to post the miners' representatives' information. *Id.* Before it received the MSHA letter, the mine operator sued in federal district court for "pre-enforcement injunctive relief." *Id.* at 205.

The Court held "that the Mine Act preclude[d] district court jurisdiction over the pre-enforcement challenge." *Id.* at 207. The Court concluded that the Mine Act clearly gives the Commission jurisdiction over challenges to agency enforcement proceedings, but it was "facially silent with respect to pre-enforcement claims." *Id.* at 208. Lacking explicit language indicating whether Congress intended to limit or expand the district courts' jurisdiction, the Court held that "[t]he structure of the Mine Act, however, demonstrate[d] that Congress intended to preclude

challenges such as the present one." *Id.* Allowing a pre-enforcement claim would permit mine operators to do an end-run around the statutory review framework by suing in federal court. *See id.* at 216 ("Nothing in the language and structure of the Act or its legislative history suggests that Congress intended to allow mine operators to evade the statutory-review process by enjoining the Secretary from commencing enforcement proceedings . . . .").

In summary, the Mine Act precludes district court jurisdiction over pre-enforcement claims that attempt to preempt the Mine Act's review scheme. *Id.* at 207. But, *Thunder Basin* allows district courts to exercise jurisdiction over "claims considered wholly collateral to a statute's review provisions and outside the agency's expertise particularly where a finding of preclusion could foreclose all meaningful judicial review." *Id.* at 212–13 (internal quotation marks omitted) (citations omitted).

### 1. Foreclosing all meaningful judicial review

The Mine Act describes a system of delayed judicial review of administrative decisions. But without some order or citation by the MSHA, a mine operator cannot start the administrative review process. The Mine Act provides a channel for judicial review that starts with a citation and ends in the courts of appeals, generally.

The Mine Act allows mine operators only two avenues into federal court as plaintiffs[5]— only one is relevant here[6]: if they are "adversely affected or aggrieved by an order of the Commission," they may "obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or in the United States Court of Appeals for the District of Colombia Circuit." 30 U.S.C. § 816(a)(1) (Judicial review of Commission orders). Orders of the Commission stem from "contest proceedings" where mine operators may "contest the issuance or modification of an order issued under section 814 . . . or citation or a notification of proposed assessment of a penalty . . . or the reasonableness of the length of abatement time fixed in a citation . . . ." 30 U.S.C. § 815(d). Orders issued under section 814 stem from inspections. And if "upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pur-

---

[5] There are, however, two instances where the Secretary can enforce its penalties against mine operators by suing in federal district court.

[6] Other, similar plaintiffs attempted the other path to federal court and lost. *See Nat'l Mining Ass'n*, 763 F.3d at 627.

suant to this chapter, he shall, with reasonable promptness, issue a citation to the operator." 30 U.S.C. § 814(a).

The citation is the starting point for Mine Act litigation. Without a citation, a mine operator has nothing to contest; with nothing to contest, it has no decision to appeal to the Commission; with no Commission decision, it has no order of which it can obtain review in the federal courts of appeals. Under Defendants' reasoning, the Mine Act does appear to foreclose all judicial review of a rule that is not a mandatory health or safety standard by plaintiffs who have not incurred a withdrawal order to contest.

The Commission itself has cited these Mine Act provisions and repeatedly stated, when defining its jurisdiction, that it is authorized to "adjudicate contested orders," *see Sec'y of Labor, Mine Safety and Health Admin. v. Brody Mining, LLC*, 36 FMSHRC 2027, 2035 (August 28, 2014), and it lacks the jurisdiction to adjudicate a POV Notice because it lacks the specific authority under the Mine Act to do so. *Sec'y of Labor, Mine Safety and Health Admin. v. Pocahontas Coal Co., LLC*, 38 FMSHRC 176, 181–82 (February 16, 2016).

The courts of appeals lack subject-matter jurisdiction to hear these claims. *See Nat'l Mining Ass'n*, 763 F.3d at 633. The Commission lacks subject-matter jurisdiction to hear these claims. *See* 38 FMSHRC at 176. Who can hear Plaintiffs' claims?

Defendants suggest that mine operators could simply incur a citation; then, Plaintiffs would be free to contest it before the Commission and raise their APA and constitutional arguments there. (Defs.' Mem. in Support at 12 ("[T]here is no reason why individual operators cannot challenge the POV rule if the Secretary seeks to apply it to them—as Brody Mining and Pocahontas Coal are in the process of doing.")). The Supreme Court rejected this "solution," holding that "[w]e normally do not require plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the validity of the law.'" *Free Enter. Fund*, 561 U.S. at 490 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007)). In *Free Enterprise Fund*, testing the validity of the law would have required petitioners to incur a "sanction (such as a sizable fine)." *Id.*

Here, Defendants' solution would not only require Plaintiffs to incur a POV Notice, but to await a withdrawal order before contesting the validity of the 2013 POV Rule. *See Sec'y of Labor, Mine Safety and Health Admin. (MSHA) v. Pocahontas Coal Co.*, 38 FMSHRC at 185 ("[T]he Commission does not have jurisdiction under section 105(d) to review a direct challenge

to a POV notice independent of a section 104(e) withdrawal order."). A withdrawal order is tantamount to "betting the farm." The Court does "not consider this a 'meaningful' avenue of relief." *Free Enter. Fund*, 561 U.S. at 490–91 (quoting *Thunder Basin*, 510 U.S. at 212).[7] In short, to find that the Mine Act precludes this Court's jurisdiction would foreclose all meaningful review of Plaintiffs' claims.[8]

### 2. Outside the agency's expertise

"Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures 'are to be exclusive.'" *Free Enter. Fund*, 561 U.S. at 489 (quoting *Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)) (finding a challenge to the Sarbanes-Oxley Act "wholly collateral" to statutory review scheme). The Mine Act created the procedures that allow the Commission to adjudicate contested enforcement actions by the MSHA. In these contests, the Commission's expertise is at its zenith. For example, many contest proceedings turn on detailed questions of coal mining and the MSHA's regulations. Claims within the MSHA's expertise include: "fact-based, particularized disputes over mine-ventilation plans," *Elk Run Coal Co., Inc. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 32 (D.D.C. 2011); hybrid labor-law, Mine Act, and constitutional claims, *see Thunder Basin*, 510 U.S. at 214; and generally, "statutory claims [that] at root require interpretation of the parties' rights and duties under . . . the Mine Act," *id.* at 214. These are "ordinary challenges under the Mine Act." *Id.* at 211. And while constitutional issues are not ordinary challenges and generally outside the jurisdiction of administrative agencies, agencies may pass on Constitutional issues if the claims germinate from an issue within the agency's statutory grant of jurisdiction. *Id.* at 215 (holding that rule against agencies adjudicating constitutional issues "is not mandatory" and finding that the Commission had "addressed constitutional questions" before).

Here, while Plaintiffs' claims all germinate from the 2013 POV Rule, the claims are for violation of the APA and the Due Process Clause. The Commission has no particular expertise

---

[7] While the Mine Act does provide for expedited review of withdrawal orders, 30 U.S.C. § 815(d), and a mine operator may request temporary relief from a withdrawal order, 30 U.S.C § 815(b)(2), there is no automatic stay of a withdrawal order.

[8] Defendants argue that these general APA and constitutional claims about the 2013 POV Rule have been brought through the Mine Act's review process and can be heard by the courts of appeals, which is true. But Plaintiffs cannot do so without a citation to contest. While adopting Defendants' position would not foreclose all judicial review over the *types* of claims Plaintiffs bring, it would prevent these Plaintiffs from bringing *these* claims under these circumstances.

with the APA or the Due Process Clause. Plaintiffs do not present questions "such as whether a particular ventilation device is appropriate for the conditions or an individual mine," but present "higher-level procedural questions" about the MSHA's rulemaking procedure. *Elk Run*, 804 F.Supp. 2d at 32 (exercising jurisdiction over high-level questions and declining to exercise jurisdiction over particularized disputes). The APA and constitutional claims all revolve around the promulgation of the 2013 POV Rule; whether that rulemaking was improper is a high-level procedural question, one not well-aided by the Commission's particular expertise.

But just because a claim's ultimate question is outside of an agency's expertise may not matter. If "many threshold questions . . . accompany a constitutional claim . . . to which the [agency] can apply its expertise," especially if "preliminary questions unique to the [agency's area of expertise] may obviate the need to address the constitutional challenge[,]" the agency may have exclusive jurisdiction. *Elgin*, 132 S. Ct. at 2140.

Here, there is little agency expertise that could be brought to bear on the ultimate questions at issue in this case. Furthermore, there are no dispositive threshold questions that accompany Plaintiffs' claims to which the MSHA could apply its expertise. Resolving this dispute does not require a coal-mining-safety expert; therefore, the Court finds that the instant claims are outside of the Commission's expertise.

### 3.  Wholly collateral to the statute's review provisions

The Court now "turn[s] to the question whether petitioner's claims are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. The statutory structure of the Mine Act is a "comprehensive review process [that] does not distinguish between preenforcement and postenforcement challenges, but applies to all violations of the Act and its regulations." *Id.* at 208–09. *Thunder Basin*'s holding does not apply to these Plaintiffs' claims because their claims do not germinate from a "violation[] of the Act and its regulations." *Id.* A discussion of similar cases will shed some light on this conclusion.

In *Elk Run*, coal mine operators brought one constitutional and several APA claims against the MSHA for its lack of a procedure to resolve disputes over mine-ventilation plans. 804 F.Supp. 2d at 11–12. The district court there held that the constitutional claim was "wholly collateral" to the Mine Act but held that the APA claims were not. *Id.* at 22, 32. The *Elk Run* court found that it had jurisdiction over the due process claim because, unlike the APA claims, it was "not tied to any individual enforcement challenge[]" and did "not seek redress for any individual

ventilation-plan disputes," *id.* at 22, but instead alleged the defendants "systematically, and without regard to the conditions and mining system of the individual mines, disapproved or failed to approve the Plaintiffs' ventilation plans," *id.* at 14. Important to the *Elk Run* court was the allegation that "the Mine Act provides no dispute-resolution process when [the mine operator's] ventilation-plan negotiations are at an impasse," which could lead to an unsavory result where "Plaintiffs will be denied all judicial review." *Id.* at 22. In contrast to the constitutional claim, the *Elk Run* court held that "Plaintiffs' APA and *ultra vires* claims [were] not wholly collateral to the Mine Act's administrative review regime" because the APA and *ultra vires* claims presented "[q]uestions such as whether a particular ventilation device [was] appropriate for the conditions of an individual mine." *Id.* at 32. These "fact-based disputes over individual mine-ventilation plans 'are of the type [of claims] Congress intended to be reviewed within th[e] statutory structure.'" *Id.* at 32 (quoting *Thunder Basin*, 510 U.S. at 212) (alteration in original).

The *Elk Run* APA claims are distinct from those presented here. Here, Plaintiffs present administrative-law and constitutional claims about the MSHA's rulemaking and statutory authority—not fact-based disputes about individual coal mines. Plaintiffs' claims are wholly collateral to the Mine Act's review scheme because they challenge a rule-making procedure and the new rule's content, not an enforcement action taken by the MSHA.

In a similar case, former government employees challenged, on due-process grounds, an adverse employment action. *Elgin*, 132 S. Ct. at 2130. In *Elgin*, the Court held the comprehensive statutory review scheme of the Civil Service Reform Act of 1978 ("CSRA") provided the exclusive path of review, even for constitutional claims. *Id.* at 2132. As with the Court's concern in *Thunder Basin*, an opposite holding in *Elgin* would have "seriously undermined" the CSRA's "objective of creating an integrated scheme of review . . . if . . . a covered employee could challenge a covered employment action first in a district court, and then again in one of the courts of appeals." *Id.* at 2135. In *Elgin*, the plaintiffs' claims were not wholly collateral to the CSRA's review scheme because, regardless of broad labels, the claims challenged the exact type of action regulated by the CSRA, sought the exact type of relief offered by the CSRA, and were brought by just the type of employee the CSRA was designed to cover. *Id.* at 2139–40.

The claims in *Elgin* are distinct from those presented here, but the statutory schemes are similar. The CSRA provides for adjudication of disputes when a federal employee is terminated; the Mine Act provides for adjudication of disputes when the MSHA takes some enforcement ac-

tion against a mine operator. *See Thunder Basin*, 510 U.S. at 209 (holding that review scheme applies to "all violations of the Act and its regulations").

In *Bituminous Coal Operators' Association, Incorporated v. Marshall*, plaintiff, a representative of a "large number of coal mine operators," brought constitutional and APA claims against the Secretary of Labor, attacking his promulgation of an "Interpretative Bulletin" in the Federal Register. 82 F.R.D. 350, 351–52 (D.D.C. 1979). The court held that "Congress intended that all legal challenges to the Act, to its enforcement and to any regulations promulgated thereunder be heard by the Federal Courts of Appeals, not by the Federal District Courts." *Id.* at 352. The Court gave six reasons for its holding: (1) all actions by the Secretary are reviewable if a mine operator receives a citation and contests it, *id.* at 353; (2) the Mine Act doesn't expressly limit the types of issues the Commission can hear, *id.* at 353–54; (3) the Mine Act does expressly delineate two instances in which the district courts do have jurisdiction, *id.* at 354; (4) the Mine Act's legislative history indicates that Congress didn't want district courts meddling in the review of citations and orders against operators, *id.*; (5) the questions posed by the action were "typical of the questions which Congress wished the Commission to decide in the first instance," *id.*; and (6) the issues were not sufficiently ripe for determination in federal court, *id.*

*Bituminous Coal* does not control the Court's decision, it is not persuasive, and it is factually distinct in key aspects. The Court will address each reason for the *Bituminous Coal* court's holding in turn. First: forcing a mine operator to first receive a POV Notice before contesting the 2013 POV Rule is a solution foreclosed by *Free Enterprise Fund*. 561 U.S. at 490 ("We normally do not require plaintiffs to bet the farm . . . before testing the validity of the law . . . .") (internal quotation marks omitted) (quoting *MedImmune*, 549 U.S. at 129). Second: while the Mine Act may not expressly forbid the Commission from deciding constitutional issues, constitutional claims are generally outside of the jurisdiction of administrative agencies even if they do occasionally decide constitutional questions that accompany ordinary disputes. *See Thunder Basin*, 510 U.S. at 215. Third: the Mine Act's grant of jurisdiction over specific actions to the district courts does not foreclose jurisdiction over all other actions. Fourth: correct—Congress does not want district courts meddling in the review of the MSHA's citations, and that would not happen here. Fifth: the questions posed here are Constitutional, administrative-law, and statutory-interpretation questions regarding the Mine Act's grant of regulation-making power to the MSHA—these are not typical of the coal-mining-safety questions the MSHA and the Commis-

sion were designed to decide. Sixth: the Court discusses issues of justiciability in the following section. *Bituminous Coal* is inapposite.

In another statutory-review-scheme case, Sturm Ruger, an entity regulated by the Occupational Safety and Health Administration ("OSHA"), was issued citations by OSHA, and Sturm Ruger challenged those citations through OSHA's statutory review scheme. *Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 874 (D.C. Cir. 2002). While doing so, it sued the Secretary of Labor and the Assistant Secretary responsible for OSHA in federal court. *Id.* at 870. Sturm Ruger alleged OSHA had violated the APA, its own enabling Act (the Occupational Safety and Health Act), and the Fourth Amendment. *Id.* It sought a declaratory judgment and an injunction. *Id.* The court held that "[l]ike the statutory claims at issue in *Thunder Basin,* Sturm Ruger's claim that [OHSA's annual data-collection survey] violates the OSH Act because it is not authorized by regulation is not 'wholly collateral' to the OSH Act's review provisions." *Id.* at 874 (quoting *Thunder Basin* at 214). A key concern raised by the court was that "Sturm Ruger sought to make an end run around th[e] process by going directly to district court." *Id.* at 876. The *Sturm Ruger* court also focused on the ultimate availability of judicial review of a pending Commission decision.

*Sturm Ruger* is distinct from the instant case: here, Plaintiffs are not shopping for a different forum to adjudicate their disputes over citations, nor do they seek to do an end-run around the statutory review process. Again, there is no available forum for Plaintiffs' claims unless they first incur a withdrawal order. While the causes of action brought in *Sturm Ruger* are nearly identical to those brought here, the factual predicates for the claims are distinct.

Since here, Plaintiffs might be afforded no judicial review of their claims without "betting the farm" and incurring a violation, and Plaintiffs have no pending violations, their APA and Due Process Clause claims are wholly collateral to the Mine Act and not the type of claims Congress intended to be heard exclusively through the Mine Act's review scheme. The Mine Act provides the exclusive avenue for contesting citations issued to mine operators, and it does not matter if those contests are couched as constitutional claims, APA claims, or otherwise. If a claim would preempt a citation or effectively contest an existing citation, the Commission has exclusive jurisdiction. But the claims here do not contest an order of the MSHA. They contest the Secretary's promulgation of the 2013 POV Rule. But without an adverse order by their regulator, do the Plaintiffs have standing to challenge the 2013 POV Rule?

18

**B.  Federal Rule of Civil Procedure 12(b)(1) – Plaintiffs have standing**

Defendants argue that the Court should dismiss the complaint for lack of subject-matter jurisdiction because Plaintiffs lack standing. (Defs.' Mem. in Support at 16–18). Specifically, Defendants point to Plaintiffs' failure to plead an "injury in fact." (*Id.*). Plaintiffs' own allegations show they are not subject to a POV Notice, and they are not at risk for a POV Notice.[9] (*Id.* at 18). Thus, Defendants argue, it is "'merely speculative' that Plaintiffs would ever suffer any injury." (*Id.*).

The *Ohio Coal* Plaintiffs and the *Murray Energy* Plaintiffs present slightly different facts on this issue. The *Ohio Coal* Plaintiffs are industry representatives of coal mine operators. This requires an additional step in the standing analysis for the *Ohio Coal* Plaintiffs: representational standing. "A voluntary membership organization has standing to sue on behalf of its members 'when (a) its members [would] otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit.'" *ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 489 (6th Cir. 2004) (quoting *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 343 (1977)).

Two of the three requirements are met; the other is not so clear. Here, the *Ohio Coal* Plaintiffs, national and regional trade associations, allege they represent the interests of their members and seek to protect mine operators (and those who benefit from their continued operation) by challenging the 2013 POV Rule. Neither the claims asserted—APA and due process claims—nor the relief requested—declaratory judgments—require the participation of their constituent members in the lawsuit. Defendants do not dispute these allegations. Therefore, the *Ohio Coal* Plaintiffs have met these two requirement for organizational standing.

The only question is whether the *Ohio Coal* Plaintiffs' members have standing to sue in their own right. And since the *Ohio Coal* Plaintiffs represent coal mine operators—operators similar to the *Murray Energy* Plaintiffs—if the *Murray Energy* Plaintiffs have standing, the *Ohio Coal* Plaintiffs do too.

Article III standing presents the greatest hurdle for Plaintiffs. "Standing to sue requires an individual to demonstrate (1) actual or threatened injury which is (2) fairly traceable to the chal-

---

[9] The *Ohio Coal* Plaintiffs represent multiple mine operators that *have* received withdrawal orders and POV Notices and have contested those before the Commission. However, Plaintiffs do not contest any of those citations or orders in this case and have pursued those contests before the Commission.

lenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury." *ACLU of* Ohio, 375 F.3d at 488–89 (quoting *Adland v. Russ*, 307 F.3d 471, 477–78 (6th Cir. 2002)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted) (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147, 1150 n. 5 (2013)).

Defendants only contest the injury-in-fact prong of Article III's standing requirements. Plaintiffs rely on what could be called "regulated-party standing:" that the improperly promulgated 2013 POV Rule injured them "because the regulation[] shape[s] the environment in which Plaintiffs must operate." *Shays v. Fed. Election Comm.*, 414 F.3d 76, 82 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting from and agreeing with the district court's conclusion); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) ("[T]here is ordinarily little question that the [government's] action or inaction has caused [Plaintiffs'] injury and that a judgment preventing or requiring the action will redress it."). Plaintiffs provide two concrete examples of their injuries: (1) increased compliance costs, and (2) violation of procedural rights.

"In many cases, a plaintiff's 'standing to seek review of administrative action is self-evident' . . . ." *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 108 (D.D.C. 2011) (quoting *Sierra Club v. Envtl. Prot. Agency,* 292 F.3d 895, 900 (D.C. Cir. 2002)). It is self-evident because usually "the complainant is 'an object of the action (or forgone action) at issue'—as is the case usually in review of a rulemaking and nearly always in review of an adjudication." *Sierra Club*, 292 F.3d at 900 (quoting *Lujan*, 504 U.S. at 561). But like many things considered "self-evident," when challenged, their explanation defies easy illustration.

One way in which courts have addressed this is through the concept of procedural-violation standing. Under this doctrine, "the violation of a procedural right can constitute an injury in fact 'so long as the procedures in question are designed to protect some threatened concrete interest of [the petitioner] that is the ultimate basis of his standing.'" *Iowa League of Cities v. Envtl. Prot. Agency*, 711 F.3d 844, 870–71 (8th Cir. 2013) (alteration in original) (quoting *Lujan*, 504 U.S. at 573 n. 8) (discussing Article III standing). Regulated industries have a concrete interest "in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them." *Id.* at 871. And "[n]otice and comment procedures for . . . rulemaking . . . were undoubtedly designed to protect the concrete interests of such regulated entities by ensuring that

20

they are treated with fairness and transparency after due consideration and industry participation." *Id.* (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979)). Put another way, the requirements of the APA, like notice-and-comment rulemaking for example, give regulated parties the important opportunity to argue that the agency's policy is wrong before the policy is adopted. *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 677 (6th Cir. 2005) (holding that regulated party had Article III standing based on party's interest in continuing business with the Bureau of Prisons and agency's failure to subject policy threatening that interest to notice-and-comment rulemaking).

Here, Plaintiffs' claims arise under the APA, which protects their concrete interest. Because Plaintiffs allege the 2013 POV Rule reshaped the regulatory environment in which Plaintiffs operate, they allege they have incurred "major capital expenditures and personnel changes" as they anticipate POV Notices and prepare corrective action plans. (*Murray Energy* Resp. in Opp'n at 11); (*Ohio Coal* Compl. at ¶ 72). These additional compliance burdens may serve as an injury in fact. *See All. for Nat'l Health US v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011) (finding increased compliance costs imposed by new regulations served as basis for injury in fact).

Defendants counter that the risk of being issued a POV Notice is slight: it issued only four POV notices in the first year and none in the second year of the 2013 POV Rule's existence. (Defs.' Reply at 11, Doc. 37). And any injury due to an incorrect POV Notice is purely speculative, and thus not a proper basis for Article III standing. Defendants also argue that the 2013 POV Rule imposes no additional compliance burdens and does not directly regulate Plaintiffs at all since it is directed at the Secretary and not the regulated entities. *See Warshak v. United States*, 532 U.S. 521, 531 (6th Cir. 2008) ("Because the Act does not purport to regulate his primary conduct at all, much less impose criminal and civil penalties for non-compliance, it does not put Warshak in an untenable bind between undertaking an irreversible burden or risking criminal indictment.").

For now, the Court has to look at the complaints. Plaintiffs allege the MSHA identified at least 313 mines that would meet all or all but one of the POV screening criteria. (*Ohio Coal* Compl. at ¶ 70). This, coupled with the allegedly improper criteria, presents a substantial risk of the improper imposition of the Mine Act's most severe sanctions, including withdrawal orders. (*Murray Energy* Compl. at ¶ 110). Plaintiffs also allege they have and will continue to incur ad-

ditional compliance and litigation costs. (*Ohio Coal* Compl. at ¶ 72). Plaintiffs also allege a general violated interest in "avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them." *Iowa League of Cities*, 711 F.3d at 870–71. And while the language of the 2013 POV Rule is directed at the Secretary and not regulated parties, regulated parties that want to avoid sanction will seek to conform their behavior to avoid a POV Notice, so the rule has a direct effect on Plaintiffs. Plaintiffs have a concrete interest in the continuous operation of their mines, something the 2013 POV Rule threatens, and they allege the 2013 POV Rule was promulgated improperly. These allegations are sufficient to plead an injury-in-fact; therefore, Plaintiffs have established they have Article III standing.

"[Section] 10 of the APA requires that the plaintiff also demonstrate that it has prudential standing." *Dismas Charities*, 401 F.3d at 671. The APA confers a cause of action on any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. "Prudential standing to assert procedural protections depends on whom the procedural protections were designed to protect." *Dismas Charities*, 401 F.3d at 678. Broadly, the APA grants prudential standing to regulated parties challenging agency action. *See Bangura v. Hansen*, 434 F.3d 487, 498–99 (6th Cir. 2006) (holding that section 702 of APA grants "adversely affected or aggrieved" parties prudential standing). The APA thus incorporates the broad "zone of interest" test under which an adversely affected or aggrieved party need only "establish that the interest he or she seeks to protect, 'is *arguably* within the zone of interests to be protected [ ] by the statute' under which the plaintiff sues." *Bangura*, 434 F.3d at 499 (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank*, 522 U.S. 479, 492 (1998)).

Defendants make no attempt to address prudential standing.

Here, Plaintiffs allege they have (and will be) adversely affected by the Secretary's action in promulgating the 2013 POV Rule. Plaintiffs sue under the APA and the Due Process Clause, and the procedural protections those laws contain were designed to protect people (and regulated entities) from unfair agency actions. This is enough to satisfy the requirements of prudential standing. Plaintiffs have adequately pleaded both Article III and prudential standing.

## C.  Federal Rule of Civil Procedure Rule 12(b)(6)

Defendants argue that Plaintiffs' due process claim and *ultra vires* claim fail under Federal Rule of Civil Procedure 12(b)(6), (Defs.' Reply at 17, *Murray Energy* Doc. 20), because

both claims are governed by an insurmountably high standard for facial challenges where Plaintiffs "must establish that no set of circumstances exists under which the [regulation] would be valid.[10] *See Reno v. Flores*, 507 U.S. 292, 301 (1993) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) (applying no-set-of-circumstances test to First Amendment facial challenge to anti-begging statute); *Coleman v. DeWitt*, 282 F.3d 908, 914 (6th Cir. 2002) (applying no-set-of-circumstances test to substantive-due-process challenge to Ohio's involuntary manslaughter statute).

Plaintiffs argue that *Salerno* is no longer good law. *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30 (D.D.C. 2003) (discussing confusion surrounding no-set-of-circumstances test and holding that "neither the Supreme Court nor the D.C. Circuit has consistently utilized the *Salerno* standard to review statutory challenges to administrative rules."). The Supreme Court itself has appeared to back away from *Salerno*, *see, e.g.*, *Pub. Lands Council v. Babbitt*, 529 U.S. 728, 747 (2000) (holding in response to facial challenge, without making reference to *Salerno* or *Reno*, that Secretary of the Interior did not exceed his scope of authority under statute in promulgating regulations), and individual justices have questioned its use, *see, e.g.*, *Janklow v. Planned Parenthood Sioux Falls Clinic*, 517 U.S. 1174, 1175–76 (1996) (Stevens, J., mem. opinion denying cert.) ("*Salerno*'s rigid and unwise dictum has been properly ignored in subsequent cases . . . ."). The Sixth Circuit does not always apply the test. *See Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F.3d 662 (6th Cir. 2013) (applying APA language to facial, APA challenge to regulation); *but see Speet*, 726 F.3d at 872 (applying no-set-of-circumstances test to constitutional challenge to statute). But Plaintiffs do not persuade the Court that *Salerno* has been abrogated or overruled, at least with respect to facial, constitutional challenges. In both *National Truck Equipment* and *Public Lands Council*, petitioners brought facial challenges based on specific statutory—not constitutional—violations. The no-set-of-circumstances test applies to Plaintiffs' constitutional claims.

But what about an APA challenge to a regulation? Plaintiffs argue that the no-set-of-circumstances test is based purely on dicta in *Salerno* and has never been applied to an APA challenge. (Pls.' Resp. in Opp'n at 21 n. 10, Doc. 32). The Court agrees with Plaintiffs, for if the no-set-of-circumstances test applied to APA challenges, it would gut the APA causes of action of

---

[10] Plaintiffs do not dispute that they raise a facial challenge to the 2013 POV Rule.

their power, rendering them useless. The no-set-of-circumstances test does not apply to Plaintiffs' *ultra vires* claims brought under the APA.

## 1. Due process claim

Plaintiffs allege that the 2013 POV Rule's application will deprive Plaintiffs of property interests without due process of law—it will cost them money without the benefit of the procedural protections that made the 1990 POV Rule constitutional. Those procedural protections include the PPOV notices and the requirement of final orders—and not merely oft-overturned citations—to serve as the basis for POV Notices. Specifically, Plaintiffs allege they have:

> constitutionally-protected interests, that include the right to operate one's business, an operator's ownership interest in a mine, the property interest in its revenues, and the dues and fees paid to Plaintiff associations from revenues of the mines they represent, all of which constitute significant property rights subject to due process protections.

(Compl. at ¶ 113). The no-set-of-circumstances test is insurmountable here because, assuming *arguendo* that Plaintiffs' allegations are true, there is a set of circumstances where the 2013 POV Rule could be valid: when a POV Notice is based only on finalized citations and orders.

Plaintiffs respond that this theoretical set of circumstances is not reality; reality is that the MSHA does base POV status on non-final citations because the Rule demands MSHA to consider non-final citations. Plaintiffs cite the 2013 POV Rule's language, which in context says, "MSHA's review to identify mines with a pattern of S & S violations will include: (1) Citations for S & S violations . . . ." Pattern Criteria, 30 C.F.R. § 104.2. The rule lists seven other criteria, including "imminent danger orders" and "mitigating circumstances." *Id.* But what if there are only finalized violations and the other seven factors weigh in favor of issuing a POV Notice? Plaintiffs' reading of the rule leads to the conclusion that the Secretary could not issue a POV Notice unless he considered at least one non-final S&S citation. The statute can be read to avoid this absurd result. Surely the Secretary could issue a POV Notice to a mine operator even if the operator had not received an "imminent danger order under section 107(a) of the Mine Act" or, conversely, had no "mitigating circumstances." *Id.* This argument is unavailing. Similarly, Plaintiffs' example of a case where MSHA based a POV Notice on non-final citations (*Brody Mining*) is equally unavailing—even if the rule has been applied in a way that Plaintiffs argue is illegal, Plaintiffs must show that the rule cannot be applied legally for their claim to survive.

Therefore, because there is a set of circumstances, under which the 2013 POV Rule could be constitutionally applied, Plaintiffs' facial, constitutional challenge fails.

## 2. APA claims

The APA grants "[a] person suffering legal wrong because of agency action . . . judicial review thereof." 5 U.S.C. § 702. The APA grants reviewing courts the power to "hold unlawful and set aside agency action . . . found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory . . . authority . . . ; (D) without observance of procedure required by law." 5 U.S.C. § 706(2). Plaintiffs have adequately pleaded their three APA claims.

### a. *Ultra Vires* (in excess of statutory authority)

Plaintiffs allege Defendants acted *ultra vires*, that is, they acted in excess of their statutory authority when promulgating the 2013 POV Rule. (Compl. at ¶¶ 95–100). Specifically, Plaintiffs claim that the Secretary acted in excess of his statutory authority to make rules to establish POV criteria by establishing criteria for a pattern of *citations* rather than a pattern of *violations*. The Secretary does not have this authority; therefore, the Secretary's promulgation of the 2013 POV Rule was *ultra vires*.

The Mine Act requires the Secretary to issue notices to operators that have a "pattern of violations." 30 U.S.C. § 814(e)(1). The Mine Act also requires "[t]he Secretary [to] make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists." 30 U.S.C. § 814(e)(4). The question, then, is whether the Mine Act gives the Secretary the leeway to make a rule that allows the MSHA to consider non-finalized citations as one of the POV criteria. Plaintiffs argue that the Mine Act does not provide this flexibility, pointing to the plain meaning of "violations" and its use throughout the Mine Act.

Defendants rightly observe that the Mine Act gives broad authority to the Secretary to promulgate regulations, but Plaintiffs allege that the Secretary promulgated what amounts to a "Pattern of Citations" rule rather than what it was statutorily authorized to promulgate: a "Pattern of Violations" rule. The plain language of the rule makes Plaintiffs' claims plausible. Plaintiffs adequately allege that this action was in excess of Defendants' statutory authority.

### b. No notice-and-comment

Plaintiffs claim that the Secretary violated the APA by failing to submit the POV and CAP criteria to notice-and-comment rulemaking.[11] (Compl. at ¶ 89). Instead of promulgating the POV and CAP criteria through the 2013 POV Rule, which was itself subject to notice-and-comment rulemaking, the Secretary published the POV and CAP criteria on its website. Defendants argue that the POV and CAP criteria are policy statements not subject to the APA's notice-and-comment requirements for agency rulemaking. Plaintiffs argue that if the 1990 POV Rule, which included the POV criteria, was a "rule" that went through the APA-required rulemaking procedure, then if the Secretary wants to amend that criteria, he must do so through notice-and-comment rulemaking.

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706. The APA requires a procedure for agency rulemaking: notice-and-comment. *See* 5 U.S.C. § 553. When agencies make rules, they are required to give notice of the proposed rule by publishing it, along with some ancillary information, in the Federal Register. 5 U.S.C. § 553(b). This is "notice." The agency then must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). This is "comment." Agencies must comply with both when promulgating rules. However, notice-and-comment rulemaking does not apply "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 533(b)(3)(A).

"In order to determine whether a particular statement is a binding rule or a general, non-binding policy statement, courts must examine both the language of the statement and the purpose it serves. If a pronouncement implements a statute by enacting a legislative-type rule affecting individual rights and obligations, it is likely to be a substantive rule." *Dyer v. Sec'y of Health & Human Servs.*, 889 F.2d 682, 685 (6th Cir. 1989). "A statement is also likely to be considered binding if it narrowly circumscribes administrative discretion in all future cases, and if it finally and conclusively determines the issues to which it relates. A policy statement is a pronounce-

---

[11] The 2013 POV Rule did include eight pattern criteria, but it also provided that "MSHA will post the specific pattern criteria on its Web site." 30 C.F.R. § 104.2. Defendants refer to the criteria on its website as the "numerical screening criteria." (Defs.' Mem. in Support at 19).

ment that simply advises the public what the agency's prospective position on an issue is likely to be." *Id.* (citations omitted).

Distinguishing policy statements from legislative rules is no simple task. The "most important factor" is the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). That is, does the action "create[] new rights or impose[] new obligations on regulated parties[?]" *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015). This question is best answered by analyzing four other questions:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

Here, the actual legal effect of the POV screening criteria is that mine operators have a known safe harbor from being at risk of a POV Notice. While Plaintiffs portray the POV screening criteria as creating a new compliance regime, the system allows mine operator to track their screening status on the MSHA's website. And without the POV screening criteria, there still exists an adequate legislative basis for enforcement action: the POV Criteria published in the rule. *See* 30 C.F.R. § 104.2. The Secretary published the new POV criteria in the Code of Federal Regulations, but the screening criteria only receive a passing mention. *See id.* at § 104.2(b) ("MSHA will post the specific pattern criteria on its Web site."). The agency invoked its specific legislative authority granted by the Mine Act to make rules to determine when a pattern of violations exists. *See* 30 U.S.C. § 814(e)(4). The POV screening criteria do effectively amend the 1990 POV Rule by eliminating the PPOV system, which operated as a screening process itself. Another factor is the agency's own characterization of the guidance it issues. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d at 252. Here, the agency characterized the POV screening criteria and CAP criteria as policy statements and not legislative rules.

This analysis is against the important backdrop of the Mine Act itself, which requires the Secretary to make "such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists." 30 U.S.C. § 814(e)(4). The statute seems to require the Secretary to establish POV criteria (even screening criteria) by mak-

ing rules only. However, as Defendants observe, the Mine Act does not prescribe what type of rule the Secretary must make, and at least one type of rule—an interpretative rule—is expressly exempted from the notice-and-comment requirements of the APA.

It is unclear whether the POV and CAP criteria are rules subject to notice-and-comment rulemaking requirements. The POV criteria affect individual rights and obligations because the criteria delineate the threshold for POV status consideration by the MSHA. The criteria also circumscribe administrative discretion by setting numerical thresholds under which the Secretary cannot consider a mine operator for a POV Notice. However, Defendants are correct that the screening criteria do not appear to automatically generate a POV Notice. And while Defendants make a good point that the criteria function to relieve a burdensome administrative task that the MSHA could complete under its regulatory authority anyways, the screening criteria appear to limit the MSHA's discretion. In another sense, the POV screening criteria actually provide a safe harbor for mine operators that do not meet the criteria. Furthermore, the screening criteria are directed at the agency, which is typical of a policy statement or internal rule of procedure.

The Court will reserve this issue for later disposition after the benefit of focused briefing and in light of the entire record.

### c.  Arbitrary and capricious

Plaintiffs allege that the 2013 POV Rule is arbitrary, capricious, and an abuse of discretion because it is not based on the reasoned analysis required by the APA. (Compl. at ¶ 103). Specifically, Plaintiffs point to the high rate of contested citations that are eventually overturned and the Secretary's flawed economic analysis as two pieces of evidence that the 2013 POV Rule is arbitrary and capricious. Defendants argue that Plaintiffs fail to identify any specific rulemaking requirements they violated with their economic analysis that accompanied the 2013 POV Rule, and that absent a more concrete allegation, Plaintiffs' claim is too vague and must be dismissed.

Plaintiffs respond that the 2013 POV Rule failed to consider evidence or offer explanations in three ways. First: the MSHA ignored evidence that S&S citations are overturned at a rate approaching one third of all contested citations. Second: the 2013 POV Rule eliminated without explanation the "potential POV" process in favor of a "sanctions-only" approach when empirical studies showed the PPOV process produced significant improvements in miner safety. Third: the economic analysis underpinning the 2013 POV Rule was flawed and failed to provide a reasoned

basis for the regulation. Plaintiffs assert that Defendants undercounted costs, inflated benefits, and made sweeping assumptions that discredit its economic analysis.

> [Agency] process is considered arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Truck Equip. Ass'n*, 711 F.3d at 667 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). All that is required is a "rational connection between the facts found and the choice made." *Id.* (quoting *All. for Cmty. Media v. F.C.C.*, 529 F.3d 763, 786 (6th Cir. 2008)).

Plaintiffs allege Defendants ignored numerous (and costly) implications of the 2013 POV Rule in their economic analysis. (Compl. at ¶ 23). Accepting Plaintiffs' allegations as true—that the Secretary had a thumb on the scale of the economic analysis—is enough to adequately plead an arbitrary-and-capricious claim under the APA.

## IV.    Conclusion

Plaintiffs' claims are wholly collateral to the Mine Act's review scheme, so the Court has subject-matter jurisdiction. Plaintiffs also have standing to bring their claims. And finally, Plaintiffs' have adequately pleaded their APA claims, but they have not adequately pleaded a due process claim. Therefore, Defendants' Motions to Dismiss are **GRANTED** as to Plaintiffs' due process claims. The balance of Defendants' Motions is **DENIED**. (*Ohio Coal* Doc. 26; *Murray Energy* Doc. 13).

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE:  June 16, 2016