# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OHIO COAL ASSOCIATION,** et al.,

    **v.**                                        Case No. 2:14-cv-2646

**THOMAS E. PEREZ,** et al.,

        Defendants.

**and**

**MURRAY ENERGY CORPORATION,** Case No. 2:15-cv-448
et al.,

                              Judge Graham

        Plaintiffs,

                              Magistrate Judge Deavers

    **v.**

**THOMAS E. PEREZ,** et al.,

        Defendants.

## <u>ADMINISTRATIVE RECORD</u>

### PAGES 00001 – 00238

| CY | No. of Violations Assessed | No. of Assessed Violations Contested* | No. of Contested Violations Disposed* | No. of Final Orders | No. of Disposed Violations with changes to: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Vacated | S&S | Negligence | Persons Affected | Injury Severity | Likelihood | Any |
| 2006 | 135,718 | 9,624 | 8,877 | 134,971 | 587 | 803 | 577 | 132 | 232 | 518 | 1,624 |
| 2007 | 130,134 | 18,816 | 16,828 | 128,146 | 848 | 1,432 | 1,243 | 575 | 580 | 947 | 3,438 |
| 2008 | 198,612 | 46,337 | 31,180 | 183,455 | 1,298 | 2,957 | 2,769 | 1,225 | 1,458 | 2,319 | 7,674 |
| 2009 | 173,717 | 46,396 | 12,278 | 139,599 | 617 | 756 | 1,403 | 500 | 565 | 1,009 | 3,122 |
| 2010 | 166,435 | 39,582 | 922 | 127,775 | 47 | 93 | 138 | 24 | 42 | 90 | 268 |
| Totals | 804,616 | 160,755 | 70,085 | 713,946 | 3,397 | 6,041 | 6,130 | 2,456 | 2,877 | 4,883 | 16,126 |

9%

* Based on year assessed - CY 2010 assessments still being contested.

| CY | No. of Final Orders | No. Not Final as of 1/6/2011 | Percent of Final Orders with changes to: | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Vacated | S&S | Negligence | Persons Affected | Injury Severity | Likelihood | Any |
| 2006 | 134,971 | 747 | 0.4% | 0.6% | 0.4% | 0.1% | 0.2% | 0.4% | 1.2% |
| 2007 | 128,146 | 1,988 | 0.7% | 1.1% | 1.0% | 0.4% | 0.5% | 0.7% | 2.7% |
| 2008 | 183,455 | 15,157 | 0.7% | 1.6% | 1.5% | 0.7% | 0.8% | 1.3% | 4.2% |
| 2009 | 139,599 | 34,118 | 0.4% | 0.5% | 1.0% | 0.4% | 0.4% | 0.7% | 2.2% |
| 2010 | 127,775 | 38,660 | 0.0% | 0.1% | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% |
| Totals | 713,946 | 90,670 | 0.5% | 0.8% | 0.9% | 0.3% | 0.4% | 0.7% | 2.3% |

AB 73-BKG-1

| *Docket No. | Contest Date | *Decision Date | Days to Decision |
|---|---|---|---|
| YORK 2010-78M | 11/25/2009 | 11/1/2010 | 341 |
| KENT 2009-1484 | 8/21/2009 | 11/1/2010 | 437 |
| KENT 2010-832 | 3/16/2010 | 11/1/2010 | 230 |
| KENT 2008-1433 | 8/13/2008 | 11/1/2010 | 810 |
| KENT 2009-327 | 11/26/2008 | 11/1/2010 | 705 |
| WEVA 2009-784 | 2/3/2009 | 11/1/2010 | 636 |
| PENN 2010-412M | 3/30/2010 | 11/1/2010 | 216 |
| KENT 2009-1457 | 8/14/2009 | 11/1/2010 | 444 |
| PENN 2010-505M | 5/11/2010 | 11/1/2010 | 174 |
| KENT 2009-888 | 4/7/2009 | 11/1/2010 | 573 |
| SE 2009-92M | 11/5/2008 | 11/2/2010 | 727 |
| WEVA 2009-825 | 2/10/2009 | 11/2/2010 | 630 |
| WEVA 2009-847 | 2/17/2009 | 11/2/2010 | 623 |
| WEVA 2009-867 | 2/20/2009 | 11/2/2010 | 620 |
| WEVA 2009-940 | 3/11/2009 | 11/2/2010 | 601 |
| WEVA 2009-941 | 3/11/2009 | 11/2/2010 | 601 |
| KENT 2009-1507 | 1/12/2010 | 11/2/2010 | 294 |
| LAKE 2010-286M | 12/31/2009 | 11/2/2010 | 306 |
| LAKE 2010-378M | 2/1/2010 | 11/2/2010 | 274 |
| SE 2010-400M | 1/20/2010 | 11/2/2010 | 286 |
| SE 2010-514M | 3/2/2010 | 11/2/2010 | 245 |
| KENT 2009-831 | 3/25/2009 | 11/2/2010 | 587 |
| WEVA 2009-750 | 1/29/2009 | 11/2/2010 | 642 |
| WEVA 2009-967 | 3/16/2009 | 11/2/2010 | 596 |
| VA 2010-24 | 10/20/2009 | 11/2/2010 | 378 |
| VA 2008-216 | 4/4/2008 | 11/2/2010 | 942 |
| VA 2010-139M | 12/15/2009 | 11/2/2010 | 322 |
| LAKE 2010-96M | 10/27/2009 | 11/2/2010 | 371 |
| PENN 2009-205 | 12/17/2008 | 11/2/2010 | 685 |
| WEVA 2009-925 | 3/5/2009 | 11/2/2010 | 607 |
| LAKE 2010-241M | 12/15/2009 | 11/2/2010 | 322 |
| VA 2010-23 | 10/20/2009 | 11/2/2010 | 378 |
| VA 2010-45 | 10/29/2009 | 11/2/2010 | 369 |
| VA 2010-163 | 12/28/2009 | 11/2/2010 | 309 |
| SE 2010-465M | 2/23/2010 | 11/2/2010 | 252 |
| WEVA 2009-788 | 2/3/2009 | 11/2/2010 | 637 |
| WEVA 2009-965 | 3/13/2009 | 11/2/2010 | 599 |
| WEVA 2008-552 | 2/21/2008 | 11/2/2010 | 985 |
| CENT 2010-647M | 4/21/2010 | 11/2/2010 | 195 |
| KENT 2009-577M | 1/14/2009 | 11/2/2010 | 657 |
| WEVA 2009-775 | 2/4/2009 | 11/2/2010 | 636 |
| WEVA 2009-408 | 12/5/2008 | 11/2/2010 | 697 |
| WEVA 2009-512M | 12/22/2008 | 11/2/2010 | 680 |
| VA 2009-361 | 7/21/2009 | 11/2/2010 | 469 |
| SE 2010-634M | 4/8/2010 | 11/2/2010 | 208 |
| WEVA 2009-773 | 2/3/2009 | 11/2/2010 | 637 |

| | | | |
|---|---|---|---|
| WEVA 2009-789 | 2/3/2009 | 11/2/2010 | 637 |
| WEVA 2009-938 | 3/10/2009 | 11/2/2010 | 602 |
| WEVA 2009-1611M | 6/30/2009 | 11/2/2010 | 490 |
| VA 2010-74 | 11/18/2010 | 11/2/2010 | 349 |
| KENT 2009-285 | 11/21/2008 | 11/2/2010 | 711 |
| KENT 2010-320 | 12/8/2009 | 11/2/2010 | 329 |
| WEVA 2009-846 | 2/17/2009 | 11/2/2010 | 623 |
| WEVA 2009-733 | 1/27/2009 | 11/2/2010 | 644 |
| WEVA 2009-1072 | 3/26/2009 | 11/2/2010 | 586 |
| SE 2010-475M | 2/25/2010 | 11/2/2010 | 250 |
| KENT 2009-876 | 4/7/2009 | 11/2/2010 | 574 |
| WEVA 2009-749 | 1/29/2009 | 11/2/2010 | 642 |
| WEVA 2009-551 | 12/30/2008 | 11/2/2010 | 672 |
| WEVA 2009-720 | 1/23/2009 | 11/2/2010 | 648 |
| WEVA 2009-734 | 1/27/2009 | 11/2/2010 | 644 |
| KENT 2010-347M | 12/15/2009 | 11/2/2010 | 322 |
| LAKE 2010-384M | 2/2/2010 | 11/2/2010 | 273 |
| WEVA 2009-1830 | 8/19/2009 | 11/2/2010 | 440 |
| WEVA 2009-1261 | 4/20/2009 | 11/2/2010 | 561 |
| LAKE 2009-746M | 9/28/2009 | 11/3/2010 | 401 |
| WEST 2009-354M | 1/7/2009 | 11/3/2010 | 665 |
| WEST 2009-355M | 1/7/2009 | 11/3/2010 | 665 |
| WEST 2008-1178M | 6/24/2008 | 11/3/2010 | 862 |
| KENT 2008-1233M | 7/2/2008 | 11/3/2010 | 854 |
| SE 2009-561 | 6/2/2009 | 11/3/2010 | 519 |
| KENT 2008-432 | 1/16/2008 | 11/3/2010 | 1022 |
| KENT 2009-915 | 4/14/2009 | 11/3/2010 | 568 |
| LAKE 2009-566 | 7/16/2009 | 11/3/2010 | 475 |
| WEST 2009-50M | 10/15/2008 | 11/3/2010 | 749 |
| KENT 2008-1193 | 6/25/2008 | 11/3/2010 | 861 |
| WEST 2009-330M | 12/31/2008 | 11/3/2010 | 672 |
| WEST 2009-371M | 1/12/2009 | 11/3/2010 | 660 |
| WEST 2009-390M | 1/14/2009 | 11/3/2010 | 658 |
| WEST 2009-675M | 3/30/2009 | 11/3/2010 | 583 |
| KENT 2009-973 | 4/27/2009 | 11/3/2010 | 555 |
| WEST 2008-1159M | 6/17/2008 | 11/3/2010 | 869 |
| SE 2008-955 | 8/13/2008 | 11/3/2010 | 812 |
| WEVA 2009-19 | 10/2/2008 | 11/3/2010 | 762 |
| CENT 2009-797 | 8/31/2009 | 11/3/2010 | 429 |
| KENT 2009-910 | 4/14/2009 | 11/3/2010 | 568 |
| WEST 2009-372M | 1/12/2009 | 11/3/2010 | 660 |
| KENT 2008-1176M | 6/20/2008 | 11/3/2010 | 866 |
| KENT 2009-181 | 11/4/2008 | 11/3/2010 | 729 |
| WEST 2009-380 | 11/7/2008 | 11/3/2010 | 726 |
| WEST 2009-44M | 10/6/2008 | 11/3/2010 | 758 |
| KENT 2008-1282 | 7/10/2008 | 11/3/2010 | 846 |
| KENT 2009-12 | 10/6/2008 | 11/3/2010 | 758 |

| | | | |
|---|---|---|---|
| LAKE 2010-714 | 8/31/2010 | 11/3/2010 | 64 |
| KENT 2008-1038 | 5/20/2008 | 11/3/2010 | 897 |
| WEST 2009-331M | 12/31/2008 | 11/3/2010 | 672 |
| WEST 2009-389M | 1/14/2009 | 11/3/2010 | 658 |
| SE 2009-712M | 7/17/2009 | 11/3/2010 | 474 |
| KENT 2009-970 | 4/27/2009 | 11/3/2010 | 555 |
| WEVA 2008-518 | 2/1/2008 | 11/3/2010 | 1006 |
| WEST 2009-356M | 1/7/2009 | 11/3/2010 | 665 |
| KENT 2008-685 | 3/14/2008 | 11/3/2010 | 964 |
| KENT 2008-999 | 5/1/2008 | 11/3/2010 | 916 |
| WEST 2009-236M | 11/26/2008 | 11/3/2010 | 707 |
| WEST 2009-778M | 4/24/2009 | 11/4/2010 | 559 |
| KENT 2009-62 | 10/9/2008 | 11/4/2010 | 756 |
| KENT 2009-1565 | 9/24/2009 | 11/4/2010 | 406 |
| KENT 2009-1570 | 9/23/2009 | 11/4/2010 | 407 |
| KENT 2008-880 | 4/23/2008 | 11/5/2010 | 926 |
| WEST 2010-855M | 3/15/2010 | 11/5/2010 | 235 |
| WEVA 2008-381 | 12/28/2007 | 11/5/2010 | 1043 |
| KENT 2008-1447 | 8/14/2008 | 11/5/2010 | 813 |
| SE 2009-788M | 8/3/2009 | 11/5/2010 | 459 |
| WEVA 2007-670 | 8/14/2007 | 11/5/2010 | 1179 |
| KENT 2009-1326 | 7/16/2009 | 11/5/2010 | 477 |
| KENT 2008-879 | 4/23/2008 | 11/5/2010 | 926 |
| VA 2010-427 | 6/14/2010 | 11/8/2010 | 147 |
| VA 2010-318M | 4/2/2010 | 11/8/2010 | 220 |
| VA 2010-285M | 3/15/2010 | 11/8/2010 | 238 |
| VA 2010-399M | 5/24/2010 | 11/8/2010 | 168 |
| YORK 2010-210M | 4/2/2010 | 11/8/2010 | 220 |
| YORK 2010-231M | 5/1/2010 | 11/8/2010 | 191 |
| VA 2009-137 | 1/13/2009 | 11/8/2010 | 664 |
| VA 2010-387M | 5/18/2010 | 11/8/2010 | 174 |
| VA 2010-343 | 4/27/2010 | 11/8/2010 | 195 |
| VA 2010-287M | 3/22/2010 | 11/8/2010 | 231 |
| VA 2010-374 | 5/11/2010 | 11/8/2010 | 181 |
| VA 2010-396 | 5/24/2010 | 11/8/2010 | 168 |
| VA 2010-397 | 5/24/2010 | 11/8/2010 | 168 |
| VA 2010-394 | 5/24/2010 | 11/8/2010 | 168 |
| VA 2010-405M | 5/28/2010 | 11/8/2010 | 164 |
| WEVA 2009-173 | 10/28/2008 | 11/8/2010 | 741 |
| VA 2010-371 | 5/6/2010 | 11/8/2010 | 186 |
| VA 2010-317M | 4/1/2010 | 11/8/2010 | 221 |
| VA 2010-186 | 1/7/2010 | 11/9/2010 | 306 |
| PENN 2010-359 | 3/5/2010 | 11/9/2010 | 249 |
| LAKE 2009-148M | 12/9/2008 | 11/9/2010 | 700 |
| LAKE 2009-724M | 9/21/2009 | 11/9/2010 | 414 |
| LAKE 2010-220M | 12/14/2009 | 11/9/2010 | 330 |
| PENN 2010-453M | 4/13/2010 | 11/9/2010 | 210 |

| | | | |
|---|---|---|---|
| PENN 2010-466M | 4/27/2010 | 11/9/2010 | 196 |
| LAKE 2009-572 | 7/21/2009 | 11/9/2010 | 476 |
| KENT 2008-777 | 3/31/2008 | 11/9/2010 | 953 |
| PENN 2010-364 | 3/5/2010 | 11/9/2010 | 249 |
| PENN 2010-431 | 4/2/2010 | 11/9/2010 | 221 |
| LAKE 2009-695M | 9/3/2009 | 11/9/2010 | 432 |
| LAKE 2010-240M | 12/15/2009 | 11/9/2010 | 329 |
| LAKE 2010-336M | 1/12/2010 | 11/9/2010 | 301 |
| WEST 2010-941M | 3/31/2010 | 11/9/2010 | 223 |
| PENN 2010-421 | 4/2/2010 | 11/9/2010 | 221 |
| LAKE 2010-180M | 11/23/2009 | 11/9/2010 | 351 |
| LAKE 2010-281M | 12/31/2009 | 11/9/2010 | 313 |
| LAKE 2010-327M | 1/8/2010 | 11/9/2010 | 305 |
| KENT 2009-1127 | 5/28/2009 | 11/9/2010 | 530 |
| LAKE 2010-287M | 12/31/2009 | 11/9/2010 | 313 |
| PENN 2010-456M | 4/15/2010 | 11/9/2010 | 208 |
| SE 2007-476 | 9/14/2007 | 11/9/2010 | 1152 |
| CENT 2008-514M | 4/28/2008 | 11/9/2010 | 925 |
| KENT 2009-1098 | 5/22/2009 | 11/9/2010 | 536 |
| LAKE 2008-351M | 10/8/2009 | 11/9/2010 | 397 |
| LAKE 2009-149M | 12/9/2008 | 11/9/2010 | 700 |
| LAKE 2010-125M | 11/4/2009 | 11/9/2010 | 370 |
| LAKE 2010-366M | 1/25/2010 | 11/9/2010 | 288 |
| SE 2009-34M | 10/16/2008 | 11/9/2010 | 754 |
| PENN 2010-371 | 3/5/2010 | 11/9/2010 | 249 |
| WEST 2008-911 | 4/28/2008 | 11/9/2010 | 925 |
| KENT 2009-1317 | 7/15/2009 | 11/9/2010 | 482 |
| LAKE 2009-545M | 7/1/2009 | 11/9/2010 | 496 |
| LAKE 2010-396 | 2/4/2010 | 11/9/2010 | 278 |
| PENN 2010-365 | 3/5/2010 | 11/9/2010 | 249 |
| LAKE 2009-731M | 9/25/2009 | 11/9/2010 | 410 |
| LAKE 2010-155M | 11/16/2009 | 11/9/2010 | 358 |
| LAKE 2010-172M | 11/19/2009 | 11/9/2010 | 355 |
| LAKE 2010-21 | 10/5/2009 | 11/9/2010 | 400 |
| LAKE 2010-331 | 10/14/2009 | 11/9/2010 | 391 |
| LAKE 2010-179M | 11/25/2009 | 11/9/2010 | 349 |
| CENT 2009-20 | 10/17/2008 | 11/10/2010 | 754 |
| CENT 2009-107 | 11/25/2008 | 11/10/2010 | 715 |
| CENT 2009-216 | 1/21/2009 | 11/10/2010 | 658 |
| LAKE 2009-599 | 7/29/2009 | 11/10/2010 | 469 |
| KENT 2009-1461 | 8/18/2009 | 11/10/2010 | 449 |
| CENT 2010-90M | 10/27/2009 | 11/10/2010 | 379 |
| CENT 2008-427 | 3/26/2008 | 11/10/2010 | 959 |
| CENT 2009-218 | 1/21/2009 | 11/10/2010 | 658 |
| CENT 2009-285 | 2/24/2009 | 11/10/2010 | 624 |
| LAKE 2009-460M | 5/11/2009 | 11/10/2010 | 548 |
| CENT 2008-450 | 3/26/2008 | 11/10/2010 | 959 |

| | | | |
|---|---|---|---|
| CENT 2010-16M | 10/5/2009 | 11/10/2010 | 401 |
| LAKE 2009-488 | 5/28/2009 | 11/10/2010 | 531 |
| LAKE 2009-574 | 7/22/2009 | 11/10/2010 | 476 |
| CENT 2009-458M | 5/20/2009 | 11/10/2010 | 539 |
| SE 2008-594M | 4/17/2008 | 11/10/2010 | 937 |
| CENT 2009-396 | 4/24/2009 | 11/10/2010 | 565 |
| KENT 2009-1454 | 8/14/2009 | 11/10/2010 | 453 |
| WEST 2009-469M | 2/2/2009 | 11/10/2010 | 646 |
| CENT 2009-217 | 1/21/2009 | 11/10/2010 | 658 |
| CENT 2009-395 | 4/24/2009 | 11/10/2010 | 565 |
| KENT 2009-99 | 10/16/2008 | 11/10/2010 | 755 |
| CENT 2010-71M | 10/23/2009 | 11/10/2010 | 383 |
| CENT 2010-482 | 2/23/2010 | 11/10/2010 | 260 |
| CENT 2009-274 | 2/18/2009 | 11/10/2010 | 630 |
| CENT 2009-349 | 3/27/2009 | 11/10/2010 | 593 |
| CENT 2010-738M | 5/18/2010 | 11/10/2010 | 176 |
| WEVA 2010-75 | 10/14/2009 | 11/12/2010 | 394 |
| WEVA 2009-1751 | 7/30/2009 | 11/12/2010 | 470 |
| WEVA 2010-26 | 10/2/2009 | 11/12/2010 | 406 |
| WEVA 2009-1610 | 6/30/2009 | 11/12/2010 | 500 |
| WEVA 2009-1753 | 7/30/2009 | 11/12/2010 | 470 |
| WEVA 2010-141M | 10/20/2009 | 11/12/2010 | 388 |
| WEVA 2010-231 | 11/12/2009 | 11/12/2010 | 365 |
| WEVA 2010-252 | 11/17/2009 | 11/12/2010 | 360 |
| WEVA 2009-1603M | 6/26/2009 | 11/12/2010 | 504 |
| WEVA 2009-876 | 2/20/2009 | 11/12/2010 | 630 |
| KENT 2009-869M | 4/2/2009 | 11/15/2010 | 592 |
| PENN 2010-525M | 6/7/2010 | 11/15/2010 | 161 |
| LAKE 2010-694M | 4/28/2010 | 11/15/2010 | 201 |
| WEST 2010-1451M | 6/28/2010 | 11/15/2010 | 140 |
| SE 2010-104M | 10/23/2009 | 11/15/2010 | 388 |
| WEST 2010-1001M | 4/9/2010 | 11/15/2010 | 220 |
| WEST 2010-1520M | 7/8/2010 | 11/15/2010 | 130 |
| WEST 2010-979M | 4/8/2010 | 11/15/2010 | 221 |
| PENN 2009-438 | 4/14/2009 | 11/15/2010 | 580 |
| LAKE 2010-676 | 4/21/2010 | 11/15/2010 | 208 |
| WEST 2010-980M | 4/7/2010 | 11/15/2010 | 222 |
| WEST 2010-1418M | 6/22/2010 | 11/15/2010 | 146 |
| LAKE 2010-693M | 4/28/2010 | 11/15/2010 | 201 |
| WEST 2010-1195M | 5/12/2010 | 11/15/2010 | 187 |
| WEST 2010-1510M | 7/8/2010 | 11/15/2010 | 130 |
| WEST 2010-1554M | 7/16/2010 | 11/15/2010 | 122 |
| LAKE 2009-243 | 1/23/2009 | 11/17/2010 | 663 |
| KENT 2010-755 | 3/2/2010 | 11/17/2010 | 260 |
| KENT 2009-946 | 4/21/2009 | 11/17/2010 | 575 |
| WEST 2009-1436M | 9/25/2009 | 11/17/2010 | 418 |
| SE 2009-268 | 2/10/2009 | 11/17/2010 | 645 |

| | | | |
|---|---|---|---|
| SE 2008-387M | 3/5/2008 | 11/17/2010 | 987 |
| LAKE 2008-119 | 12/28/2007 | 11/17/2010 | 1055 |
| WEVA 2008-1790 | 8/30/2008 | 11/17/2010 | 809 |
| WEVA 2008-1788 | 8/30/2008 | 11/17/2010 | 809 |
| WEVA 2008-1789 | 8/30/2008 | 11/17/2010 | 809 |
| LAKE 2009-438 | 4/24/2009 | 11/17/2010 | 572 |
| LAKE 2009-523 | 6/22/2009 | 11/17/2010 | 513 |
| WEST 2009-1256M | 8/13/2009 | 11/17/2010 | 461 |
| LAKE 2009-501 | 6/3/2009 | 11/17/2010 | 532 |
| SE 2009-93M | 9/17/2008 | 11/17/2010 | 791 |
| WEST 2009-924M | 5/27/2009 | 11/17/2010 | 539 |
| WEVA 2009-1460 | 5/20/2009 | 11/18/2010 | 547 |
| SE 2009-639M | 6/24/2009 | 11/18/2010 | 512 |
| WEST 2008-1330M | 7/28/2008 | 11/18/2010 | 843 |
| WEVA 2009-932 | 3/6/2009 | 11/18/2010 | 622 |
| SE 2009-293M | 9/1/2009 | 11/18/2010 | 443 |
| WEVA 2009-1458 | 5/20/2009 | 11/18/2010 | 547 |
| SE 2009-398M | 4/6/2009 | 11/19/2010 | 592 |
| KENT 2008-397 | 12/26/2007 | 11/19/2010 | 1059 |
| WEST 2009-740M | 4/20/2009 | 11/19/2010 | 578 |
| WEST 2008-1332M | 7/29/2008 | 11/19/2010 | 843 |
| VA 2010-79 | 11/24/2009 | 11/19/2010 | 360 |
| SE 2008-727M | 5/29/2008 | 11/19/2010 | 904 |
| SE 2009-400M | 4/7/2009 | 11/19/2010 | 591 |
| SE 2009-420M | 4/14/2009 | 11/19/2010 | 584 |
| WEVA 2009-799 | 2/5/2009 | 11/19/2010 | 652 |
| WEVA 2008-1623 | 8/8/2008 | 11/19/2010 | 833 |
| WEVA 2009-1924 | 9/8/2009 | 11/19/2010 | 437 |
| WEST 2009-1237M | 8/11/2009 | 11/19/2010 | 465 |
| WEVA 2009-82 | 10/8/2008 | 11/19/2010 | 772 |
| KENT 2008-463 | 1/23/2008 | 11/19/2010 | 1031 |
| WEVA 2010-340 | 12/8/2009 | 11/19/2010 | 346 |
| WEVA 2010-595 | 1/28/2010 | 11/19/2010 | 295 |
| SE 2009-230 | 1/21/2009 | 11/19/2010 | 667 |
| SE 2009-397M | 4/6/2009 | 11/19/2010 | 592 |
| SE 2009-405M | 4/7/2009 | 11/19/2010 | 591 |
| SE 2009-422M | 4/15/2009 | 11/19/2010 | 583 |
| SE 2009-451M | 4/24/2009 | 11/19/2010 | 574 |
| SE 2009-453M | 4/27/2009 | 11/19/2010 | 571 |
| KENT 2009-207 | 11/12/2008 | 11/19/2010 | 737 |
| KENT 2009-1459 | 8/18/2009 | 11/19/2010 | 458 |
| WEVA 2009-1437 | 5/20/2009 | 11/19/2010 | 548 |
| SE 2010-254 | 12/4/2009 | 11/19/2010 | 350 |
| SE 2009-381M | 4/2/2009 | 11/19/2010 | 596 |
| WEVA 2009-1168 | 4/14/2009 | 11/19/2010 | 584 |
| SE 2009-641M | 6/24/2009 | 11/19/2010 | 513 |
| WEVA 2010-594 | 1/28/2010 | 11/19/2010 | 295 |

| | | | |
|---|---|---|---|
| SE 2009-452M | 4/24/2009 | 11/19/2010 | 574 |
| WEVA 2010-597 | 1/28/2010 | 11/19/2010 | 295 |
| WEST 2009-1238M | 8/11/2009 | 11/19/2010 | 465 |
| SE 2009-219 | 1/14/2010 | 11/19/2010 | 674 |
| SE 2009-454M | 4/27/2009 | 11/19/2010 | 571 |
| KENT 2009-174 | 11/3/2008 | 11/19/2010 | 746 |
| WEST 2008-979M | 5/9/2008 | 11/19/2010 | 924 |
| WEVA 2009-1725 | 7/27/2009 | 11/19/2010 | 480 |
| VA 2010-220 | 2/1/2010 | 11/22/2010 | 294 |
| VA 2010-414 | 6/4/2010 | 11/22/2010 | 171 |
| VA 2010-328 | 4/8/2010 | 11/22/2010 | 228 |
| VA 2010-392 | 5/25/2010 | 11/22/2010 | 181 |
| SE 2009-699M | 7/15/2009 | 11/22/2010 | 495 |
| VA 2010-389M | 5/20/2010 | 11/22/2010 | 186 |
| PENN 2010-393 | 3/16/2010 | 11/22/2010 | 251 |
| WEVA 2008-1825 | 6/26/2008 | 11/22/2010 | 879 |
| WEVA 2009-1681 | 7/15/2009 | 11/22/2010 | 495 |
| YORK 2010-204M | 4/1/2010 | 11/22/2010 | 235 |
| VA 2010-378M | 5/27/2010 | 11/22/2010 | 179 |
| KENT 2008-539 | 2/11/2008 | 11/22/2010 | 1015 |
| WEVA 2010-804M | 3/24/2010 | 11/22/2010 | 243 |
| VA 2010-326 | 4/7/2010 | 11/22/2010 | 229 |
| VA 2010-360 | 4/30/2010 | 11/22/2010 | 206 |
| VA 2010-361 | 4/30/2010 | 11/22/2010 | 206 |
| VA 2010-349 | 4/28/2010 | 11/22/2010 | 208 |
| KENT 2009-1498 | 8/27/2009 | 11/22/2010 | 452 |
| KENT 2008-1332 | 7/24/2008 | 11/22/2010 | 851 |
| VA 2010-324 | 4/7/2010 | 11/22/2010 | 229 |
| SE 2009-687M | 11/23/2009 | 11/22/2010 | 364 |
| VA 2010-335 | 4/16/2010 | 11/22/2010 | 220 |
| VA 2010-398 | 5/24/2010 | 11/22/2010 | 182 |
| KENT 2009-15 | 10/6/2008 | 11/22/2010 | 777 |
| SE 2009-598M | 6/10/2009 | 11/22/2010 | 530 |
| WEVA 2010-983M | 4/30/2010 | 11/22/2010 | 206 |
| YORK 2008-59M | 11/14/2007 | 11/23/2010 | 1105 |
| LAKE 2010-489M | 3/2/2010 | 11/23/2010 | 266 |
| WEVA 2009-1654 | 7/10/2009 | 11/23/2010 | 501 |
| WEST 2008-1560M | 9/17/2008 | 11/23/2010 | 797 |
| WEVA 2010-1193 | 6/25/2010 | 11/23/2010 | 151 |
| SE 2008-1020 | 8/26/2008 | 11/23/2010 | 819 |
| WEVA 2010-814 | 3/25/2010 | 11/23/2010 | 243 |
| WEST 2010-965M | 4/1/2010 | 11/23/2010 | 236 |
| SE 2010-162 | 11/19/2009 | 11/23/2010 | 369 |
| PENN 2010-443 | 4/8/2010 | 11/23/2010 | 229 |
| PENN 2010-447 | 4/8/2010 | 11/23/2010 | 229 |
| WEVA 2009-1730 | 7/28/2009 | 11/23/2010 | 483 |
| WEST 2010-1423M | 6/23/2010 | 11/23/2010 | 153 |

| | | | |
|---|---|---|---|
| KENT 2009-286 | 11/18/2008 | 11/23/2010 | 735 |
| KENT 2008-1365 | 7/31/2008 | 11/23/2010 | 845 |
| KENT 2008-1367 | 7/31/2008 | 11/23/2010 | 845 |
| WEVA 2008-703M | 9/4/2008 | 11/23/2010 | 810 |
| WEVA 2009-1651 | 7/10/2009 | 11/23/2010 | 501 |
| WEVA 2009-1653 | 7/10/2009 | 11/23/2010 | 501 |
| VA 2008-53 | 12/12/2007 | 11/23/2010 | 1077 |
| SE 2008-227M | 1/16/2008 | 11/23/2010 | 1042 |
| YORK 2009-25M | 9/24/2008 | 11/23/2010 | 790 |
| KENT 2008-1504 | 8/25/2008 | 11/23/2010 | 820 |
| WEST 2010-956M | 4/1/2010 | 11/23/2010 | 236 |
| WEVA 2009-1731 | 7/28/2009 | 11/23/2010 | 483 |
| YORK 2010-174M | 2/25/2010 | 11/23/2010 | 271 |
| WEST 2010-1005M | 4/13/2010 | 11/23/2010 | 224 |
| SE 2009-583M | 6/3/2009 | 11/23/2010 | 538 |
| SE 2009-21 | 8/19/2008 | 11/23/2010 | 826 |
| VA 2008-71 | 1/9/2008 | 11/23/2010 | 1049 |
| WEVA 2010-891 | 4/8/2010 | 11/23/2010 | 229 |
| SE 2008-1019 | 8/26/2008 | 11/23/2010 | 819 |
| KENT 2009-437 | 12/23/2008 | 11/23/2010 | 700 |
| WEVA 2009-1615 | 7/1/2009 | 11/23/2010 | 510 |
| WEVA 2009-1684 | 7/14/2009 | 11/23/2010 | 497 |
| WEVA 2009-1685 | 7/14/2009 | 11/23/2010 | 497 |
| WEST 2010-1416M | 6/22/2010 | 11/23/2010 | 154 |
| KENT 2009-461 | 12/24/2008 | 11/24/2010 | 700 |
| CENT 2009-473M | 6/1/2009 | 11/24/2010 | 541 |
| CENT 2009-657M | 7/24/2009 | 11/24/2010 | 488 |
| LAKE 2009-271M | 6/19/2009 | 11/24/2010 | 523 |
| SE 2009-831M | 8/19/2009 | 11/24/2010 | 462 |
| KENT 2009-943 | 4/21/2009 | 11/24/2010 | 582 |
| CENT 2010-841M | 6/4/2010 | 11/24/2010 | 173 |
| SE 2009-344 | 3/10/2009 | 11/24/2010 | 624 |
| LAKE 2009-537 | 6/29/2009 | 11/24/2010 | 513 |
| LAKE 2010-230M | 12/15/2009 | 11/24/2010 | 344 |
| CENT 2010-33M | 10/14/2009 | 11/24/2010 | 406 |
| PENN 2009-336 | 2/10/2009 | 11/24/2010 | 652 |
| WEST 2009-1390M | 9/21/2009 | 11/24/2010 | 429 |
| SE 2009-732M | 7/23/2009 | 11/24/2010 | 489 |
| KENT 2009-690 | 2/10/2009 | 11/24/2010 | 652 |
| KENT 2009-749 | 2/26/2009 | 11/24/2010 | 636 |
| CENT 2009-658M | 7/27/2009 | 11/24/2010 | 485 |
| WEST 2008-815M | 4/9/2008 | 11/24/2010 | 959 |
| WEVA 2009-1728 | 7/27/2009 | 11/24/2010 | 485 |
| CENT 2009-474M | 6/1/2009 | 11/24/2010 | 541 |
| WEST 2009-905M | 5/20/2009 | 11/24/2010 | 553 |
| CENT 2010-94M | 10/27/2009 | 11/24/2010 | 393 |
| WEST 2010-68M | 10/16/2009 | 11/24/2010 | 404 |

| | | | |
|---|---|---|---|
| PENN 2009-423M | 4/2/2009 | 11/24/2010 | 601 |
| YORK 2007-89M | 7/31/2007 | 11/24/2010 | 1212 |
| CENT 2009-543M | 7/2/2009 | 11/24/2010 | 510 |
| KENT 2009-1547 | 9/18/2009 | 11/24/2010 | 432 |
| WEST 2010-286M | 11/27/2009 | 11/24/2010 | 362 |
| WEST 2008-473M | 2/22/2008 | 11/24/2010 | 1006 |
| WEVA 2009-1567 | 6/16/2009 | 11/26/2010 | 528 |
| WEVA 2010-193 | 11/2/2009 | 11/26/2010 | 389 |
| WEVA 2009-1451 | 5/22/2009 | 11/26/2010 | 553 |
| WEVA 2009-1552 | 6/10/2009 | 11/26/2010 | 534 |
| WEVA 2009-1413 | 5/15/2009 | 11/26/2010 | 560 |
| KENT 2010-118 | 10/26/2009 | 11/26/2010 | 396 |
| WEVA 2009-1739 | 7/29/2009 | 11/26/2010 | 485 |
| WEVA 2009-1509 | 6/2/2009 | 11/26/2010 | 542 |
| WEVA 2009-1712 | 7/23/2009 | 11/26/2010 | 491 |
| LAKE 2010-410D | 4/21/2010 | 11/26/2010 | 219 |
| SE 2010-155M | 11/16/2009 | 11/28/2010 | 377 |
| SE 2010-156M | 11/17/2009 | 11/28/2010 | 376 |
| SE 2009-559M | 6/2/2009 | 11/28/2010 | 544 |
| SE 2010-65M | 10/13/2009 | 11/28/2010 | 411 |
| VA 2010-181M | 1/5/2010 | 11/29/2010 | 328 |
| CENT 2010-623 | 4/16/2010 | 11/29/2010 | 227 |
| KENT 2009-224 | 11/14/2008 | 11/29/2010 | 745 |
| PENN 2010-382 | 3/12/2010 | 11/29/2010 | 262 |
| PENN 2010-388 | 3/12/2010 | 11/29/2010 | 262 |
| KENT 2008-1115 | 5/30/2008 | 11/29/2010 | 913 |
| KENT 2009-166M | 10/30/2008 | 11/29/2010 | 760 |
| PENN 2010-379M | 3/15/2010 | 11/29/2010 | 259 |
| KENT 2009-146 | 10/28/2008 | 11/29/2010 | 762 |
| PENN 2010-384 | 3/12/2010 | 11/29/2010 | 262 |
| WEVA 2007-201 | 11/10/2009 | 11/29/2010 | 384 |
| KENT 2008-1112 | 5/30/2008 | 11/29/2010 | 913 |
| KENT 2010-34 | 10/7/2009 | 11/29/2010 | 418 |
| KENT 2009-180 | 11/4/2008 | 11/29/2010 | 755 |
| PENN 2010-383 | 3/12/2010 | 11/29/2010 | 262 |
| KENT 2009-162M | 10/30/2008 | 11/29/2010 | 760 |
| VA 2009-196 | 3/11/2009 | 11/29/2010 | 628 |
| PENN 2010-374 | 3/5/2010 | 11/29/2010 | 269 |
| PENN 2010-385 | 3/12/2010 | 11/29/2010 | 262 |
| WEST 2010-769M | 3/2/2010 | 11/29/2010 | 272 |
| SE 2010-7M | 9/28/2009 | 11/29/2010 | 427 |
| SE 2009-806M | 8/10/2009 | 11/29/2010 | 476 |
| SE 2009-428M | 4/20/2009 | 11/29/2010 | 588 |
| WEST 2009-704 | 4/10/2009 | 11/29/2010 | 598 |
| KENT 2008-1113 | 5/30/2008 | 11/29/2010 | 913 |
| VA 2009-195 | 3/11/2009 | 11/29/2010 | 628 |
| SE 2009-707M | 7/14/2009 | 11/29/2010 | 503 |

| | | | |
|---|---|---|---|
| VA 2010-122M | 12/8/2009 | 11/29/2010 | 356 |
| LAKE 2010-543 | 3/18/2010 | 11/29/2010 | 256 |
| SE 2009-154 | 12/4/2008 | 11/30/2010 | 726 |
| VA 2010-372 | 5/5/2010 | 11/30/2010 | 209 |
| WEVA 2009-75 | 10/7/2008 | 11/30/2010 | 784 |
| SE 2008-574M | 4/8/2008 | 11/30/2010 | 966 |
| SE 2008-838M | 7/9/2008 | 11/30/2010 | 874 |
| KENT 2009-1237 | 6/24/2009 | 11/30/2010 | 524 |
| WEVA 2010-786M | 3/17/2010 | 11/30/2010 | 258 |
| SE 2009-141M | 11/26/2008 | 11/30/2010 | 734 |
| VA 2010-219 | 2/1/2010 | 11/30/2010 | 302 |
| SE 2009-805M | 8/10/2009 | 11/30/2010 | 477 |
| KENT 2009-432 | 12/23/2008 | 11/30/2010 | 707 |
| KENT 2009-1394 | 7/31/2009 | 11/30/2010 | 487 |
| SE 2008-398M | 3/12/2008 | 11/30/2010 | 993 |
| SE 2009-11 | 10/6/2008 | 11/30/2010 | 785 |
| KENT 2009-11 | 10/6/2008 | 11/30/2010 | 785 |
| VA 2010-380 | 5/12/2010 | 11/30/2010 | 202 |
| VA 2010-408 | 6/1/2010 | 11/30/2010 | 182 |
| KENT 2009-1434 | 8/11/2009 | 11/30/2010 | 476 |
| | | | 517.9095 |

8/26/2010 *Mines Receiving PPOV Notice*

| # | District | Field Office | Mine ID | Mine Name | Inspection Start Date for Evaluation | Controller Name | Operator Name | Mine Type | Notice from Assessments to Administrator | Letter Sent To Operator | Included in Press Release |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | District 04 | Mt. Hope WV | 4606188 | Chess Processing | 07/16/2007 | Massey Energy Company | Elk Run Coal Company Inc | Facility | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 2 | District 04 | Mt. Hope WV | 4608553 | Black King I North Portal | 07/02/2007 | Massey Energy Company | Elk Run Coal Company Inc | Underground | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 3 | District 04 | Mt. Hope WV | 4608758 | Eagle #1 | 07/02/2007 | Cleveland-Cliffs Inc | Oak Grove Resources LLC | Underground | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 4 | District 07 | Hazard KY | 1509636 | #77 | 07/11/2007 | James River Coal Company | Blue Diamond Coal Company | Underground | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 5 | District 07 | Barbourville KY | 1512564 | Straight Creek #1 Mine | 07/10/2007 | Ben Bennett | Left Fork Mining Co Inc | Underground | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 6 | District 11 | Bessemer AL | 0100851 | Oak Grove Mine | 07/10/2007 | Cleveland-Cliffs Inc | Oak Grove Resources LLC | Underground | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 7 | Northcentral District | Marquette MI | 2000422 | Tilden Mine | 07/10/2007 | Ontario Tilden Company; Cliffs TIOP Inc | Tilden Mining Company L C | Surface | 06/06/2007 | 06/14/2007 | 06/14/2007 |
| 8 | Western District | San Bernardino CA | 0400011 | Oro Grande Quarry | 07/10/2007 | Texas Industries Inc | Riverside Cement Co | Facility | 06/06/2007 | 06/13/2007 | 06/14/2007 |
| 9 | Southeastern District | Lexington KY | 1504469 | KOSMOS CEMENT CO. | 03/03/2008 | Cemex SA | CEMEX INC | Facility | 11/23/2007 | 12/06/2007 | 12/07/2007 |
| 10 | District 03 | St. Clairsville OH | 4601437 | McElroy Mine | 01/07/2008 | CONSOL Energy Inc | McElroy Coal Company | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 11 | District 04 | Madison WV | 4607273 | Justice #1 | 01/07/2008 | Massey Energy Company | Independence Coal Company Inc | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 12 | District 04 | Mt. Hope WV | 4608315 | Brushy Eagle | 01/07/2008 | Massey Energy Company | Marfork Coal Company Inc | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 13 | District 04 | Mt. Hope WV | 4608436 | Upper Big Branch Mine-South | 01/07/2008 | Massey Energy Company | Performance Coal Company | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 14 | District 04 | Mt. Hope WV | 4608645 | Twilight Mtr Surface Mine | 01/07/2008 | Massey Energy Company | Progress Coal | Surface | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 15 | District 04 | Madison WV | 4608890 | Rivers Edge Mine | 01/07/2008 | Patriot Coal Corporation | Rivers Edge Mining Inc | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 16 | District 04 | Logan WV | 4608994 | Deep Mine No. 8 | 01/07/2008 | James H Booth | Argus Energy WV, LLC | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 17 | District 04 | Pineville WV | 4609020 | No 65 | 01/07/2008 | James C Justice II | Double Bonus Coal Company | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 18 | District 05 | Norton VA | 4404946 | No 2 | 01/02/2008 | Alpha Natural Resources LLC | Black Dog Coal Corporation | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 19 | District 05 | Norton VA | 4407029 | No 1 Washer | 02/19/2008 | Charles D Mullins | Commonwealth Mining, LLC | Facility | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 20 | District 05 | Norton VA | 4407081 | No. 2 | 02/01/2008 | Ervin Stiltner | Regent Allied Carbon Energy, Inc. | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 21 | District 06 | Pikeville KY | 1508079 | Mine No 3 | 01/07/2008 | Alliance Resource Partners LP | Excel Mining LLC | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |

W:\ASSMNTS\POV\All PPOV Mines - Inspection Days.xlsx Press Release

AB 73-BKG-2

8/26/2010                            *Mines Receiving PPOV Notice*                            Page 2 of 3

| # | District | Field Office | Mine ID | Mine Name | Inspection Start Date for Evaluation | Controller Name | Operator Name | Mine Type | Notice from Assessments to Administrator | Letter Sent To Operator | Included in Press Release |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 22 | District 06 | Pikeville KY | 1518381 | Taylor Fork Energy | 01/02/2008 | Massey Energy Company | Sidney Coal Co., Inc. | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 23 | District 07 | Barbourville KY | 1502502 | Shamrock #18 Series | 01/15/2008 | James River Coal Company | Shamrock Coal Company Incorporated | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 24 | District 07 | Barbourville KY | 1511065 | #4 | 01/19/2008 | James River Coal Company | Bledsoe Coal Corp | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 25 | District 07 | Harlan KY | 1518182 | D & C Mining Corp, | 01/22/2008 | H. Garrison Hill | D & C Mining Corp | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 26 | District 07 | Barbourville KY | 1518267 | RB #10 | 01/22/2008 | Ben Bennett | Manalapan Mining Company Inc | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 27 | District 07 | Harlan KY | 1518694 | Bardo #1 | 02/27/2008 | James C Justice II | Bardo Mining LLC | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 28 | District 07 | Jacksboro TN | 4003237 | Mine No. 11 | 01/11/2008 | National Coal Corporation | National Coal Corporation | Underground | 12/04/2007 | 12/06/2007 | 12/07/2007 |
| 29 | District 03 | Bridgeport WV | 4608194 | Pleasant Hill Mine | 07/02/2008 | Metinvest B V | Carter Roag Coal Company | Underground | 06/03/2008 | 06/11/2008 | 06/17/2008 |
| 30 | District 04 | Mt. Carbon WV | 4608759 | Eagle Mine | 07/02/2008 | Robert E Ellis | Newtown Energy Inc | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 31 | District 04 | Logan WV | 4608994 | Deep Mine No 8 | 07/17/2008 | James H Booth | Argus Energy WV LLC | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 32 | District 04 | Pineville WV | 4609020 | No 65 | 07/21/2008 | James C Justice II | Double Bonus Coal Company | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 33 | District 05 | Norton VA | 4407137 | No. 2 | 08/25/2008 | Ervin Stiltner; Keith Stiltner | Patriot Mining, LLC | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 34 | District 06 | Martin KY | 1509571 | Mine No 2 | 07/02/2008 | Alliance Resource Partners LP | Excel Mining LLC | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 35 | District 06 | Martin KY | 1510271 | #1 Plant | 07/17/2008 | Clark D Pergrem | N F C Mining Incorporated | Facility | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 36 | District 06 | Pikeville KY | 1517651 | Mine #1 | 07/01/2008 | Massey Energy Company | Rockhouse Energy Mining Company | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 37 | District 07 | Harlan KY | 1517165 | Mine #1 | 07/14/2008 | Richard Gilliam | Stillhouse Mining LLC | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 38 | District 07 | Hazard KY | 1517478 | #75 | 07/11/2008 | James River Coal Company | Blue Diamond Coal Company | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 39 | District 07 | Harlan KY | 1518182 | D & C Mining Corp, | 07/09/2008 | Harrison G Hill | D & C Mining Corp | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 40 | District 07 | Harlan KY | 1518861 | Mine No 1 | 07/09/2008 | James H Hurley | Conshor Mining LLC | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 41 | District 09 | Aztec NM | 0500266 | King I | 07/10/2008 | GCC of America | GCC Energy LLC | Underground | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 42 | Northcentral District | Marquette MI | 2000422 | Tilden Mine | | Ontario Tilden Company; Cliffs TIOP Inc | Tilden Mining Company L C | Surface | 06/03/2008 | 06/12/2008 | 06/17/2008 |
| 43 | Southeastern District | Lexington KY | 1505484 | Plant Black River Operation | | Carmeuse Holding SA; Lafarge SA | Carmeuse Lime and Stone Inc | Facility | 06/03/2008 | 06/16/2008 | 06/17/2008 |
| 44 | District 03 | Bridgeport WV | 4609136 | Broad Run Mine | 04/01/2009 | Richard (Barry) Hale | Big River Mining LLC | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 45 | District 04 | Madison WV | 4603755 | Liberty Processing | 04/07/2009 | Massey Energy Company | Independence Coal Company Inc | Facility | 02/27/2009 | 03/12/2009 | 03/16/2009 |

Background Page 00013                    W:\ASSMNTS\POV\All PPOV Mines - Inspection Days.xlsx Press Release

8/26/2010 — *Mines Receiving PPOV Notice* — Page 3 of 3

| # | District | Field Office | Mine ID | Mine Name | Inspection Start Date for Evaluation | Controller Name | Operator Name | Mine Type | Notice from Assessments to Administrator | Letter Sent To Operator | Included in Press Release |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | District 04 | Mt. Hope WV | 4607009 | Castle Mine | 04/07/2009 | Massey Energy Company | Elk Run Coal Company Inc | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 47 | District 04 | Logan WV | 4608249 | Surface No 1 | 04/06/2009 | Rhonda Marcum | Stollings Trucking Company Inc | Surface | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 48 | District 05 | Vansant VA | 4406685 | Paw Paw Mine | 04/13/2009 | United Company | Banner Blue Coal Company | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 49 | District 05 | Vansant VA | 4406866 | Mine No. 2 | 04/13/2009 | Robin M Lambert; Philip T Lambert | Snapco, Inc. | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 50 | District 05 | Norton VA | 4406947 | #1 Mine | 04/13/2009 | James A Sigmon | Keokee Mining LLC | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 51 | District 06 | Martin KY | 1513061 | #5A | | Carl Kirk | North Star Mining Inc. | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 52 | District 06 | Pikeville KY | 1517651 | Mine #1 | 03/30/2009 | Massey Energy Company | Rockhouse Energy Mining Company | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 53 | District 06 | Hindman KY | 1518793 | #5 | | | Double A Mining, Inc | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 54 | District 07 | Hazard KY | 1509636 | #77 | 04/01/2009 | James River Coal Company | Blue Diamond Coal Company | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 55 | District 07 | Barbourville KY | 1518924 | Butcher Branch | 04/01/2009 | Broe Companies Inc | Century Operations LLC | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 56 | District 09 | Price UT | 4202074 | Horizon Mine | 04/22/2009 | Cecil Ann Walker | Hidden Splendor Resources Inc | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 57 | Western District | San Bernardino CA | 0402848 | Lompoc Plant | 05/28/2009 | Imerys S A | Celite Corp | Surface | 03/18/2009 | 03/16/2009 |  |
| 58 | Western District | Elko NV | 2602512 | Leeville | 06/11/2009 | Newmont Mining Corp | Newmont USA Limited | Underground | 02/27/2009 | 03/12/2009 | 03/16/2009 |
| 59 | South Central District | Rolla-North MO | 2300457 | Buick Mine/Mill | 11/02/2009 | Renco Group | Doe Run Company | Underground | 09/17/2009 | 10/01/2009 | 10/07/2009 |
| 60 | District 04 | Madison WV | 4607908 | Big Mountain No 16 | | Patriot Coal Corporation | Pine Ridge Coal Company LLC | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 61 | District 04 | Logan WV | 4608279 | Anna Branch Surface Mine | 10/21/2009 | Eddie Hurley | Mountain Reclamation & Construction | Surface | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 62 | District 04 | Logan WV | 4608808 | Ruby Energy | 10/21/2009 | Massey Energy Company | Spartan Mining Co., Inc. | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 63 | District 04 | Madison WV | 4608949 | Winifrede 12 Mine | 10/21/2009 | C Ray Peters; Richard N Nester | Laurel Coal Corp. | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 64 | District 04 | Mt. Carbon WV | 4609221 | Slabcamp | 10/22/2009 | Massey Energy Company | Mammoth Coal Co. | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 65 | District 05 | Vansant VA | 4406804 | Tiller No 1 | 10/23/2009 | Massey Energy Company | Knox Creek Coal Corporation | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 66 | District 06 | Phelps KY | 1518775 | Mine #15 | 10/21/2009 | James River Coal Company | McCoy Elkhorn Coal Corp. | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 67 | District 08 | Vincennes IN | 1202010 | Air Quality #1 Mine | 10/26/2009 | Peabody Energy | Black Beauty Coal Company | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |
| 68 | District 10 | Madisonville KY | 1517232 | Richland No 9 | 11/02/2009 | Gary E Peyton | Pleasant View Mining Company Inc | Underground | 09/18/2009 | 10/01/2009 | 10/07/2009 |

W:\ASSMNTS\POV\ All PPOV Mines - Inspection Days.xlsx Press Release

# United Mine Workers of America



TELEPHONE
AREA CODE (202) 842-7200

UNITED MINE WORKERS' BUILDING
900 FIFTEENTH STREET, N. W.
Washington, D.C.
20005

May 6, 1985

<u>HAND-DELIVERED</u>

Ms. Patricia Silvey
U.S. Department of Labor
Mine Safety and Health Administration
Office of Standards, Regulations & Variances
4015 Wilson Boulevard, Room 631
Arlington, VA 22203

Dear Ms. Silvey:

This is in response to the notice published in the February 8, 1985, <u>Federal Register</u>. The United Mine Workers of America wholeheartedly supports MSHA's long overdue decision to develop regulations for implementing section 104(e) of the Federal Mine Safety and Health Act of 1977. Our comments are as follows:

I. <u>Administrative Procedures</u>

A. <u>Initial Identification of Mines</u>

The initial screening procedures employed by MSHA to identify potential pattern violators are critically important to the effective enforcement of section 104(e). The screening process must be broad enough to identify all recidivist violators of the Act. Not only must this process identify operators whose pattern of violations is based upon the receipt of numerous S&S citations, but it must also have the fine-tuned potential to pinpoint those operators who have committed repeated violations of a particular standard or who have a safety record which indicates a lack of attention to a particular area of mine safety or health. Accordingly, the UMWA proposes a bifurcated screening process:

AB93-BKG-3

## 1. <u>Automatic Review</u>

Every quarter those mines whose rate of significant and substantial violations (based upon man-hours worked) over the previous four quarters places them in the 75th percentile for all mines would be placed under review to determine if, based upon specified criteria, they should be subject to a pattern notice. Mines placed under automatic review will not necessarily receive the pattern notice. It is anticipated, however, that most pattern violators will be in the 75th percentile, and the automatic review process will aid in identifying them.

## 2. <u>Selective Review</u>

As the Senate Committee on Human Resources noted in its report, "pattern does not necessarily mean a prescribed number of violations of predetermined standards." S.Rep. 95-181, 95th Cong., 1st Sess. (1977), reprinted in Senate Subcommittee on Labor, Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977 (1978), p. 621. Thus, in keeping with Congress' directive, the Secretary should develop a means for identifying potential pattern violators who do not rank within the 75th percentile for S&S violations. Accordingly, the UMWA proposes that mines be subject to quarterly selective review if they fall within any of the following categories:

> a. The mine was on a section 104(d) unwarrantable failure sequence during the previous quarter.<u>1</u>/

---

<u>1</u>/In the Secretary's advance notice of proposed rulemaking it is envisioned that a section 104(d) sequence will be a prerequisite to any pattern order issued under section 104(e). It would be a mistake, however, to limit pattern notices only to mines which have been on the section 104(d) sequence. Section 104(d) orders are issued when there have been repeated unwarrantable failure citations. Under section 104(e) there is no requirement that violations establishing the pattern be a result of the operator's "unwarrantable failure." Consequently, making the section 104(d) sequence a prerequisite for the 104(e) notice would run counter to the Legislative scheme. <u>See</u> <u>Leg</u>. <u>Hist</u>. at 621-622. Accordingly, while those mines on a section 104(d) sequence should be reviewed, other operations must be reviewed, as well.

-2-

    b.   The mine was placed under a section 107(a) imminent danger order during the previous four quarters.

    c.   The mine has a high accident rate for the previous four quarters.

    d.   There has been a fatality at the mine during the previous four quarters.

    e.   There is a high rate of citations and orders, <u>including non-S&S violations</u>, for the previous four quarters, based on man-hours worked.

These selective review criteria are chosen because they indicate that there is an underlying health and safety problem at the mine. Such mines should be scrutinized for possible pattern of offense despite the fact they may have an S&S rate below the 75th percentile.

    B.  <u>Notice of Review</u>

All mines which are under review for potential pattern of violations, whether automatic or selective, shall be given notice to that effect by the Agency. Notice shall also be sent to the representative of miners.

This notice is designed to give operators the opportunity to take concrete actions to improve the citation history at the mine and to implement a remedial plan. MSHA should evaluate these amd similar company efforts to correct a pattern of violations when the pattern notice conference is held. <u>See</u> Part D, below.

    C.  <u>Identifying Mines Subject to Pattern Notice</u>

Those mines which are under review because they are high rate violators or meet selective review criteria will be identified as subject to a pattern notice if the review indicates one or more of the following:

    1.   A pattern of S&S violations of a particular standard over a period of time.

    2.   A pattern of S&S violations of standards of a similar nature, indicated by a history of violations over an extended period of time,

-3-

such that a continuing hazard in a
particular area of mine safety and health,
such as roof control, electrical,
ventilation, respirable dust, and
escapeways, has not been brought under
control.

3. A mine-wide pattern of S&S violations which
indicates an underlying health and safety
problem throughout the mine.

4. If a mine which is under review was also
under review one or more times during the
previous 365 day period, and there has been
no substantial improvement since the
immediately previous review, then that mine
will be subject to a pattern notice.

D. Letter of Intent and Pre-Notice Conference

When MSHA determines that a mine under review is
subject to a pattern notice, the Agency should inform
the operator and the miners representative of the
Agency's intent to issue a pattern notice. The letter
of intent should specify the basis for the determination
and should give the operator and representative of
miners 15 calendar days after receipt to request a
conference. At the conference there should be a review
of the citation history at the mine. A pattern of
violation notice should be issued after the conference
unless the operator establishes all of the following:

1. Specific actions were taken, following the
notice of review, to improve the citation
history;

2. There has been an improvement of the
citation history at the mine following the
notice of review, and

3. The operator submits a prepared plan to the
Agency outlining the course it will follow
to avoid future violations and improve its
violation record for the long-term.

However, if a mine is identified as subject to a pattern
notice more than once within a 365 day period, no
conference will be held and the pattern notice will
automatically be issued. The scheduling and location of
the conference should accomodate the convenience of the
miners representative who should be given notice of the
conference and suffer no loss of pay for attending.

-4-

### E. Termination of the Notice

Once a mine is placed on a pattern of violation notice, the notice should only be terminated if a regular inspection of the mine indicates that there are no S&S violations. The Agency has solicited comments on administrative procedures that could be adopted for the purpose of terminating pattern notices. The UMWA is reviewing procedural options and giving them serious consideration.

## II. Miscellaneous Concerns

### A. State of mind of operator and extenuating circumstances should not be criteria upon which a pattern determination is based.

The UMWA urges the Secretary not to make an operator's state of mind or intent a factor to be considered prior to the issuance of a section 104(e) notice. The Senate Committee report clearly states Congress' wish that intent or state of mind of the operator not be criteria for determining when a pattern of violation exists. Leg. Hist. at 621. Accordingly, the operator's good faith, absence of negligence, knowledge and any extenuating circumstances should not be factored into the Agency's review. If a review of the citation history indicates a pattern of S&S violations, a notice should issue, regardless of mitigating factors. Certainly the issuance of a single S&S citation, not to mention a string of them, should be enough to alert an operator about a health and safety problem at his mine and present him with the need to take corrective action.

### B. Review by Arlington rather than by District Managers.

In order to ensure that a standard of review will be consistently and fairly applied to all mines, the quarterly review and the issuance of pattern notices should be performed by the Arlington office.

### C. Notice of Representative of Miners

Notice of any decisions or actions taken pursuant to section 104(e) should be provided to the representatives of miners.

-5-

If you have any questions or comments on any matters raised in this letter, please do not hesitate to call me.

Very truly yours,

Joseph Main, Administrator
Department of Occupational
Health and Safety

–6–





Friday
February 8, 1985

# Part II

# Department of Labor

**Mine Safety and Health Administration**

**30 CFR Part 104**
Identification of Mines Having a Pattern
of Violations; Withdrawal of Proposed
Rule and Advance Notice of Proposed
Rulemaking



MAR 1 3 1985

5470    Federal Register / Vol. 50, No. 27 / Friday, February 8, 1985 / Proposed Rules

**DEPARTMENT OF LABOR**

**Mine Safety and Health Administration**

**30 CFR Part 104**

**Pattern of Violations**

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Withdrawal of proposed rule; advance notice of proposed rulemaking.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) is considering rulemaking on criteria and procedures for identifying mines with a pattern of violations of mandatory standards that significantly and substantially contribute to safety and health hazards. On August 15, 1980, MSHA published a proposed rule to establish criteria for identifying mines having a pattern of violations (45 FR 54646). Commenters were generally opposed to the proposal, stating that it was complex, too statistically oriented, and vague. In addition, since that time, administrative litigation resulting in changes in Agency enforcement policies and a 1982 revision of the Agency's civil penalty procedures have affected key provisions of that proposal. The Agency now has experience with these changes and is considering resumption of rulemaking. This notice withdraws the 1980 pattern of violations proposal and outlines for public comment possible criteria and procedures for a new pattern of violations proposal.

**DATES:** This withdrawal is effective February 8, 1985. Comments on the Advance Notice of Proposed Rulemaking must be received by April 9, 1985.

**ADDRESSES:** Office of Standards, Regulations, and Variances, MSHA; Room 631 Ballston Tower No. 3; 4015 Wilson Boulevard; Arlington, Virginia 22203.

**FOR FURTHER INFORMATION CONTACT:** Patricia W. Silvey, Director, Office of Standards, Regulations, and Variances, MSHA, (703) 235-1910.

**SUPPLEMENTARY INFORMATION:** Under section 104(e) of the Federal Mine Safety and Health Act of 1977 (Mine Act), the Secretary of Labor is authorized to issue a notice to a mine operator if the operator's mine has a pattern of violations of mandatory safety or health standards which significantly and substantially contribute to health or safety hazards at the mine. Congress established this provision of the Mine Act to address the problem of mine operators who have recurring violations of health and safety standards.

Under the Mine Act, once a section 104(e) pattern of violations notice is issued, any subsequent inspection within 90 days which reveals another significant and substantial (S&S) violation of mandatory safety or health standards results in the issuance of a withdrawal order until the violation is abated. The Mine Act further provides for withdrawal orders upon any subsequent finding of S&S violations until a complete inspection of the entire mine reveals no S&S violations.

On August 15, 1980 (45 FR 54656), the Mine Safety and Health Administration (MSHA) published a proposal in the Federal Register which would establish criteria for identifying mines which have a pattern of violations. Commenters were generally opposed to the proposal, stating that it was complex, too statistically oriented, overbroad, and vague. In addition, numerous commenters stated that it was inappropriate of MSHA to establish pattern of violations regulations at that time because of litigation pending before the Federal Mine Safety and Health Review Commission (Review Commission) that involved the definition of S&S violations. At that time, MSHA cited all violations as S&S except technical violations and violations that posed only a remote or speculative risk of injury. In April 1981, the Review Commission narrowed the definition of S&S violations. The Review Commission defined S&S violations as those that have a reasonable likelihood of resulting in a reasonably serious injury or illness (*Secretary of Labor* v. *Cement Division, National Gypsum Co.*, 3 FMSHRC 822). MSHA adopted this revised definition in May 1981.

Commenters also stated that review of the Agency's then pending regulations for the assessment of civil penalties could affect provisions of the pattern of violations proposal. In May 1982, MSHA revised its regulations for the assessment of civil penalties (47 FR 22286).

In view of these developments, MSHA is withdrawing the 1980 pattern of violations proposal. However, the Agency has gained sufficient experience with both the revised definition of S&S violations and the changes made in the civil penalty regulations to reconsider rulemaking to establish procedures and criteria for issuance of a pattern notice.

During preliminary development of a new approach for implementing pattern of violations criteria and procedures, MSHA has been guided by the principle expressed in the Mine Act's legislative history that issuance of a section 104(e) pattern of violations notice should be an enforcement tool reserved for dealing

with chronic violators who do not respond to other efforts to bring their mines into compliance with health and safety standards. Congress made it clear that chronic violators demonstrate a disregard for the safety and health of miners by allowing the same work hazards to occur again and again without addressing the underlying problems.

At this point, MSHA believes that pattern of violations criteria should focus on the health and safety record of each mine rather than on a strictly quantitative comparison of each mine to industry-wide norms. In contrast to the 1980 proposal which relied on a statistically-oriented approach, the Agency envisions use of simplified criteria to identify the existence of a pattern of violations, coupled with procedures for fair and full notice. Review and appeal procedures would be the same as for any other citation or order issued under the Mine Act.

To implement this approach, MSHA is considering an enforcement concept which would incorporate the following elements: initial screening to identify any mines which may be developing a pattern of S&S violations; application of criteria to determine whether a pattern of violations exists at an identified mine; and notification to the mine operator of the potential for a pattern of violations notice with an opportunity to respond.

Initial identification of mines with a possible pattern of violations could occur through regular enforcement activities. Once a mine has been identified, MSHA would review conditions at the mine to determine whether or not a pattern of violations exists at the mine. At this point, MSHA envisions the use of two principal criteria. First, are the S&S violations common to a particular health or safety hazard or are there S&S violations throughout the mine which represent an underlying health or safety problem? Second, is the mine on a section 104(d) unwarrantable failure sequence, indicating the other enforcement measures have been ineffective? If these two criteria are met, MSHA would notify the mine operator that the operator's mine is subject to a section 104(e) pattern notice and state the reasons upon which such a determination was based. After allowing the operator an opportunity to respond, and absent a change in the health and safety conditions at the mine, MSHA would then issue a section 104(e) pattern notice. Once a mine is placed on a pattern of violations notice, the notice would be terminated upon an inspection

**Federal Register** / Vol. 50, No. 27 / Friday, February 8, 1985 / Proposed Rules 5471

of the mine by MSHA in which no S&S violations are found.

MSHA considers early public participation in formulating criteria and procedures to be used for issuance of pattern of violations notices to be important. In particular, the Agency would like suggestions on what additional factors, if any, should be used for determining whether a pattern of violation exists. These factors might include work practices or mining conditions at the mine or the mine's accident history. In addition, MSHA would like comments on whether a proposal should include administrative procedures for terminating a pattern notice. The Agency welcomes comments on these and all other issues of concern.

**List of Subjects in 30 CFR Part 104**

Mine safety and health.

Dated January 31, 1985.

**David A. Zegeer,**

*Assistant Secretary for Mine Safety and Health.*

[FR Doc. 85-2929 Filed 2-1-85, 2:43 pm]

**BILLING CODE 4510-43-M**

GPO 913-077

Background Page 00023





FOUNDED 1917
Coal Building
1130 17th St., N.W.
Washington, D.C. 20036
202/463-2625
TWX 710/822-1167

BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.
918 SIXTEENTH STREET, N.W. • SUITE 303
WASHINGTON, D.C. 20006-2971

(202) 783-3195

AMERICAN
MINING
CONGRESS

FOUNDED 1897
Suite 300
1920 N Street N.W.
Washington, D.C. 20036
202/861-2800

August 30, 1989

Ms. Patricia W. Silvey
Director, Office of Standards,
 Regulations and Variances
Mine Safety and Health Administration
4015 Wilson Boulevard
Arlington, VA  22203

Dear Ms. Silvey:

The National Coal Association (NCA), Bituminous Coal
Operators' Association (BCOA), and the American Mining
Congress (AMC) are pleased to respond jointly to the proposed
rulemaking on "Pattern of Violations" (30 CFR Part 104 at 54
F.R. 23156, May 30, 1989).

The member companies of our associations produce most of
the nation's coal, metals, industrial and agricultural
minerals.  Therefore, we have a vital interest in the Mine
Safety and Health Administration's (MSHA) rulemaking effort
to develop the most severe enforcement tool available to the
agency.

The enclosed comments reflect the collective efforts and
expertise of the operations, safety and health, and legal
professionals from the wide range of our member companies.
While our comments contain recommendations within the frame
work established by MSHA, we initially note that this
standard is constitutionally suspect due to its failure to
clearly prescribe prohibited conduct, and its resulting
potential denial of due process.

Furthermore, the need for the rule, currently, is not as
evident as in 1977 when the "pattern" amendment was enacted.
Congress recognized a possible enforcement need at the time
of the 1977 amendments, and directed  the Secretary to make
"such rules has he deems necessary" to establish criteria for
pattern enforcement. (emphases added)  We strongly suggest
that the pattern provision and the proposed regulations are
not necessary and should not be utilized.

*19-1-45*



AUG 3 1 1989

Through enforcement of the 1977 Act, and the cooperative efforts of the industry, MSHA, and labor, great strides have been achieved in mine safety and health. In the period 1975-1977 coal and metal/non-metal mine fatalities averaged 140 and 120 annually, respectively. That average has declined to about 50 annually in each industry. The industry is committed to continuing the trend of reducing mine fatalities and the pattern rule is not necessary to achieve this goal.

Last year was a record year for safety with the lowest number of fatalities for both coal and metal/non-metal mining. The Mine Act is obviously effective, without the pattern of violations enforcement tool. We are convinced that MSHA does not need the "pattern" rule in order to administer the law, and effectuate safety at any mine, as intended by Congress.

The pattern of violations provision in the 1977 Act was based on the Scotia Mine disaster in 1976. At that time, Congress recognized and expressly noted that only a "few" mine operators were so stubbornly disobedient of the law (recalcitrant) as to necessitate the use of a pattern of violations notice. Even in 1976, when the pattern provision was drafted, the "few" operators envisioned by Congress as requiring pattern enforcement did not rise to the level of 27 to 100 mines, as described by MSHA's regulatory analysis document.

Through enforcement of the 1977 Act, the few pre-1977 recalcitrant mine operators are either no longer in business or have improved their health and safety programs. We believe that if there are any remaining recalcitrant mine operators they have not yet been subjected to intense inspections and repeated "unwarrantable failure," "failure to abate," or "imminent danger" closure orders by MSHA. Pattern provision enforcement is simply not necessary when viewed in light of the mining industry in 1989.

We also believe that unless recalcitrance is the controlling factor upon which the pattern enforcement tool is based, the more than, 100,000 significant and substantial citations expected in 1990 could result in every large mine operator being considered a potential pattern candidate despite the efficacy of their safety program. The legislative history of the Mine Act and the significant safety improvements since 1977 clearly indicate that the use of the pattern enforcement tool, if utilized at all, should be extremely limited.

Without prejudice to our position that the Secretary should deem that no rules are necessary to establish criteria

2

for determining when a pattern exists, or that such rules
could be constitutionally suspect, we transmit the enclosed
comments for your consideration.  We commend the agency for
its responsiveness to some of the industry's comments to the
February 8, 1985, Advanced Notice of Proposed Rulemaking.
Unfortunately, as our enclosed comments point out, a number
of crucial elements remain in need of revision.  Of
particular importance are the following recommendations, for
which specific language and/or justifications are contained
in our enclosed comments:

■ <u>Properly Focus Pattern Applicability</u> --
Revise the purpose and scope provision to
incorporate Congress' intent to focus the use
of the pattern of violations provision to
those "few", if any, recalcitrant mine
operators that have not responded to the
other MSHA enforcement tools.

■ <u>End Inconsistent Definitions</u> -- Adopt
regulatory definitions of the terms
"significant and substantial" and
"unwarrantable failure," consistent with
review Commission decisions.

■ <u>End Undocumented Classification of
Violations as S & S</u> -- Eliminate the
"significant and substantial" checkbox from
the citation form and adopt a narrative
analysis format to require inspectors to
apply the Commission's definition.

■ <u>Place Pattern Screening Responsibility At
The National Level</u> -- Adopt procedures that
place initial screening for pattern
candidates and application of pattern
criteria at the Administrator's level,
permitting a consistent, independent,
unbiased review of both national and local
enforcement data. The power of this
enforcement tool, and the complexity which
will attend any criteria used, demands that
the patterns be reviewed only at the highest
levels at MSHA.

■ <u>Properly Limit The Number of Potential
Pattern Candidates</u> -- Adopt an initial
screening process that only results in
identification of mines with serious, repeat
compliance problems, resulting from willful
conduct, reckless disregard of the law, or a
failure to abate cited violations.

3

■ <u>Limit Pattern Application To Justifiable Cases</u> --
Adopt pattern criteria that identifies those "few,"
if any, mines identified as potential pattern
violators, whose recalcitrance and safety performance
justifies imposition of the series of closure orders
that will undoubtedly result from pattern
application.

■ <u>Encourage Safety Not Mine Closures</u> -- Adopt
opportunities for remedial action and administrative
conferences, prior to the institution of a pattern.

■ <u>Reward Improved Safety Instead Of Imposing
An Unmanageable Closure Order Cycle</u> -- Adopt
a pattern termination procedure that permits
improvements in the underlying cause to
terminate the pattern of closure orders.

We believe our suggested revisions will better provide for
compliance with Congressional intent if MSHA adopts a pattern
regulation: first to improve safety; and second to focus
pattern enforcement on "those few recalcitrant operators who
repeatedly thumb their noses at the law" (legislative history
at 1007). To do otherwise would be a misapplication of the
law and serve neither a useful nor appropriate purpose.

Together, we can make great strides as we reach for our
ultimate objective, a fatality-free work environment.
Misapplication of a "pattern" rule would disrupt our efforts
and would frustrate, rather than further, our common
objective.

Sincerely,

Richard L. Lawson
President
NCA

Joseph P. Brennan
President
BCOA

John A. Knebel
President
AMC

4

**PART 104 - PATTERN OF VIOLATIONS**

(Note: Additions are indicated by <u>underscoring</u>)

SECTIONS:
104.1   Purpose and Scope.
104.2   <u>Definitions</u>.
104.3   Initial Screening.
104.4   Pattern Criteria.
104.5   <u>Applicable Enforcement Actions</u>.
104.6   Issuance of Notice.
104.7   Termination of Notice.

Authority:   30 U.S.C. 814(e), 957.

**§ 104.1 Purpose and Scope.**

    This part prescribes the criteria and procedures used by MSHA to determine whether a pattern of <u>significant and substantial</u> violations <u>of mandatory safety and health standards</u> exists at a mine <u>or a portion of a mine</u> for purposes of Section 104(e) of the Federal Mine Safety and Health Act of 1977 (Act).   It addresses mines where <u>recalcitrant</u> operators habitually allow the recurrence of violations of mandatory safety or health standards, which significantly and substantially contribute to the cause and effect of mine safety or health hazards.   <u>The pattern of violations enforcement tool is intended to be applied only to the few recalcitrant mine operators who are chronic violators of the law and who have not responded to the use of the other enforcement tools available to MSHA under the Act</u>.

<u>RATIONALE:</u>

    We commend MSHA for the addition of this section in the proposed rule.   There are, however, additions that are absolutely essential to clarify this important provision and conform it to the Congressional intent.   Our proposal incorporates Congress' intent that the pattern provision be limited in scope to those few recalcitrant operators (of a particular mine) that are not responding to the other enforcement tools already available to MSHA.

    MSHA correctly states in its Background comments to the proposed rule that "The legislative history of the Mine Act emphasizes that the provisions of section 104(e) are intended for use at mines with a record of repeated S&S violations **and** where the other enforcement provisions of the statute have not been effective in bringing the mine into compliance with Federal health and safety standards."   (54 <u>FR</u> 23156) [emphasis added]

MSHA further states in the discussion of the Purpose and Scope of the standard that "The description of the objectives and concerns of the lawmakers who enacted the statute makes it clear that the pattern of violations enforcement provisions are directed at the **few** mine operator who have a history of repeated S&S violations, indicating that they habitually permit such violations to occur" (54 FR 23157) (emphasis added).

The legislative history indicates that the pattern enforcement tool was intended to be used: (1) when "there exists a serious safety and health problem at the mine" (legislative history at 621); and (2) against "those few who repeatedly thumb their noses at the law" (i.e. the recalcitrant) (legislative history at 1077) (emphasis added).

MSHA has recognized that the legislative history supports an application of the pattern provision that is limited to the few recalcitrant mine operators who have not responded to the other enforcement tools provided by the Act. The language of the standard itself should reflect that recognition to make clear that any other application of this provision would be inappropriate. The pattern provision is intended to be an enforcement tool of last resort and must not be the subject of vague regulatory provisions. Therefore, we urge MSHA to adopt our recommended addition to this Section to insure the appropriate use of the pattern of violations enforcement tool.

### § 104.2 Definitions.

(1) Significant and Substantial - A violation is "significant and substantial" if there is a reasonable likelihood that an injury or illness will occur as well as a reasonable likelihood that the injury or illness will be reasonably serious or fatal. The authorized representative of the Secretary will analyze the hazard created by the violation by examining: (i) the hazard that the cited standard was intended to prevent; (ii) the events that must occur to create exposure to such hazard; (iii) the likelihood of the occurrence of these necessary events; and (iv) the likelihood that the occurrence of such events will result in a reasonably serious injury or illness. For violations of health standards, some of the factors that must be evaluated are: the toxicity of the specific substance tested; the variability and accuracy of the sampling instrument and the analytical methods utilized; the time and extent of exposure; the applicable standard; and, the use of personal protective equipment or administrative control. Coal dust exposure violations based on designated occupation samples are presumed to be significant and substantial. The presumption can be rebutted by a lack of personal exposure (e.g. respirators or administrative controls).

(2) Unwarrantable Failure - A violation is the result of an unwarrantable failure to comply if it results from aggravated conduct constituting more than ordinary negligence.

## RATIONALE:

We recommend adding Section 104.2 to accommodate two essential definitions. First, we strongly recommend that MSHA use this rulemaking procedure to adopt the definition of the term "significant and substantial" provided by the Commission in Secretary of Labor, MSHA v. Cement Division, National Gypsum Co., 3 FMSHRC 822, 825 (April 1981); and second, the definition of "unwarrantable failure" provided by the Commission in Emery Mining Corporation v. Secretary of Labor, MSHA, 12 FMSHRC 1997, 2004 (December 1987).

MSHA in its Background comments referred explicitly to the "definition" of S&S in National Gypsum (54 FR 23156 and 23157). We request that the intent of MSHA's preamble language be adopted by the specific inclusion in the standard itself of the above definition for S&S. Such an incorporation is consistent with MSHA's adoption of National Gypsum in the civil penalty standards, 30 CFR §100.4, and is necessary to provide needed guidance to inspectors, regulated parties, and even Review Commission and court judges. The adoption and incorporation of the National Gypsum and Emery definitions would prevent future attempts at circumventing both of these logical definitions and insure the integrity of the Act's graduated enforcement scheme, particularly the statutes most severe sanction, a pattern of violations notice.

In National Gypsum, the Commission issued its general test for determination of significant and substantial violations:

> [A] violation is of such nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard if, based upon the particular facts surrounding that violation, there exists a reasonable likelihood that the hazard contributed to will result in an injury or illness of a reasonably serious nature. (3 FMSHRC at 825)

This language is reflected in the first sentence of the "significant and substantial" definition that we have submitted. The case and the suggested definition requires that inspectors utilize their independent judgment to examine the facts and circumstances surrounding a violation to determine whether or not a violation presents a reasonable probability of a reasonably serious injury or illness.

With the exception of respirable coal dust violations, the definition applies equally to safety and health violations, and requires independent findings by the inspector of both the reasonable probability of: (1) the occurrence of an injury or an illness; and (2) that the injury or illness would be of a reasonably serious nature. See Secretary of Labor, MSHA v. Union Oil Company of California, 11 FMSHRC 289 (March 1989).

The Review Commission further discussed the elements that establish, under National Gypsum, whether a violation of a mandatory safety standard is significant and substantial in Mathies Coal Co., 6 FMSHRC 1 (January 1984), which it stated:

> [T]he Secretary...must prove: (1) the underlying violation of a mandatory safety standard; (2) a discrete safety hazard -- that is, a measure of danger to safety -- contributed to by the violation; (3) a reasonable likelihood that the hazard contributed to will result in an injury; and (4) a reasonable likelihood that the injury in question will be of a reasonably serious nature. (6 FMSHRC at 3-4 (footnote omitted).)

This language is reflected by the four elements noted in the second sentence of the definition that we have submitted.

The third sentence of the definition is essential in order to clearly identify the factors that must be evaluated for violations of a health standard. The following support the inclusion of this sentence:

o   Some components of the same substance have different bio-availability, and, hence toxicity (e.g. lead and lead sulfide);

o   Recent studies have demonstrated and confirmed the time spacial variability of dust exposure in the dynamic mining environment (e.g. Regulatory Implications of Respirable Silica Variability in Underground Coal Mines, Jacqueline M. Villnace, IHIT, January 13, 1989) (unpublished);

o   Grab or instantaneous samplers may be subject to interfering elements and have a differing degree of accuracy than other sampling methods;

o   The analytical and sampling methods utilized must be as close as possible to those used in the dose-response curves from which epidemiologic conclusions were reached.

In Consolidation Coal Co. v. FMSHRC, 829 F.2d 1071 (D.C. Cir. 1987), and more recently in the March 31, 1989, Union Oil decision, the Review Commission addressed violations of mandatory health standards. As MSHA notes in its Background comments to the proposed rule (54 FR 23156), in Consolidation, the Commission applied the Mathies, supra, framework to violations of mandatory health standards:

> Adapting this test to a violation of a mandatory health standard...results in the following formulation of the necessary elements to support a significant and substantial finding:

(1) the underlying violation of a mandatory
health standard; (2) a discreet health hazard
-- contributed to by the violation; (3) a rea-
sonable likelihood that the health hazard con-
tributed to will result in an illness; and (4)
a reasonable likelihood that the illness in
question will be of a reasonably serious
nature.  (8 FMSHRC at 897.)

This language is reflected in the fourth sentence of the
recommended definition.  In Consolidation, the presumption that
violations of the respirable dust standard are significant and
substantial was based on the Mine Act's extensive legislative
history and scientific evidence supporting the presumption.  How-
ever, this presumption is limited to coal dust.

In its Union Oil Company decision, the Commission rejected
the contention that all air contaminant violations are presump-
tively significant and substantial.  Determination as to whether
exposure to a particular air contaminant is significant and sub-
stantial must be made on a case-by-case basis, by considering all
the relevant toxicological considerations.

Inclusion of a definition of S&S in the standard is impor-
tant to ensure appropriate and consistent enforcment of MSHA
standards in the future, and to assist inspectors in indepen-
dently evaluating each violation to determine whether the circum-
stances meet the S&S violation criteria.  The definition of the
term "significant and substantial" has been misapplied to safety
violations and has been essentially ignored with respect to
health violations.  MSHA's current policy has led to vastly dif-
fering applications by different MSHA districts.  Indeed, the
agency's own statistics, which follow, document the problem and,
what many would argue to be discriminatory application.  We would
note that while the following table focuses solely upon FY88 a
similar trend continues to exist in FY89.

### Significant & Substantial Violations FY88

#### COAL

| District | S&S Cited | % of Total |
|---|---|---|
| 1 | 681 | 53.5 |
| 2 | 13,985 | 84.2 |
| 3 | 11,685 | 84.2 |
| 4 | 14,717 | 68.7 |
| 5 | 6,512 | 55.4 |
| 6 | 10,862 | 67.8 |
| 7 | 10,869 | 53.6 |
| 8 | 3,692 | 59.9 |
| 9 | 5,245 | 68.7 |
| 10 | 2,782 | 77.8 |
| | 81,030 | 68.3 |

Background Page 00032

**METAL/NONMETAL**

| District | S&S Cited | % of Total |
|---|---|---|
| N. Eastern | 1,783 | 51.6 |
| S. Eastern | 2,936 | 30.3 |
| N. Central | 2,468 | 33.9 |
| S. Central | 3,827 | 44.1 |
| Rocky Mountain | 2,016 | 35.6 |
| Western | 3,129 | 29.6 |
| | 16,159 | 35.6 |

These percentages contrast sharply with the 1982-1983 national average that ranged below 20% in metal and nonmetal and 30% in coal.

As an additional measure to promote more consistent application of principles for determining what violations are S&S [in accordance with MSHA's expressed desire (54 FR 23157)], we strongly urge MSHA to modify its citation form to replace the "S&S" checkbox. The "S&S" checkbox citation form has often led to the rote marking of citations, without the analysis required by the Commission. A modification of the citation form to require narrative responses in place of the checkbox would promote more thorough inspector analysis of S&S findings. See attached suggested form.

Therefore, we recommend the regulatory adoption of language consistent with Review Commission decisions and the modification of the citation form as steps toward appropriate and consistent enforcement.

The second recommended definition for the term "unwarrantable failure" is fundamental to this rulemaking. In Emery, the Commission defined the term "unwarrantable failure" as used in Section 104(d) of the Mine Act:

> ... unwarrantable failure means aggravated
> conduct, constituting more than ordinary neg-
> ligence, by a mine operator in relation to a
> violation of the Act.  (12 FMSHRC at 1997)

This language is reflected in the unwarrantable definition that we have submitted. Adoption of this definition in the pattern of violations regulations is essential, if unwarrantable failure sanctions are to assume their intended place in the Act's enforcement scheme.

Misapplication of this definition has led to vastly differing enforcement by the various MSHA districts and subdistricts. Indeed, the following MSHA statistics clearly indicate a misunderstanding or misapplication of the Emery decision by the agency.

## 104(d) Citations and Orders

| Calendar Year | Coal | Metal/Nonmetal |
|---|---|---|
| 1987 | 2739 | 86 |
| 1988 | 4383 | 236 |

Notwithstanding the Commission's decision limiting unwarrantable findings by changing the standard from "any" negligence to "high" negligence, the number of unwarrantable failure citations has nearly doubled in coal and tripled in metal and nonmetal. The inappropriateness of these increases is evidenced by a review of recent Commission decisions. During the post Emery timeframe, January 1988 to July 1989, the Commission and its ALJs reversed 63% of the unwarrantable findings addressed by them.

Regional differences complicate the problem. During calendar year 1988 the Morgantown subdistrict issued 876 104(d) citations and orders to coal operators while the Pikeville subdistrict office issued only 47. A similar circumstance arose when during 1988 the Western District issued 83 104(d) citations and orders to metal/nonmetal operators while the Northeastern District issued one.

The drastic increase in the number of 104(d) citations and orders issued from 1987 to 1988 (expected to continue in 1989), when contrasted with a tightening of the definition, the fact that 1988 was the safest year in the mining industry's history, and the Commission's overwhelming rejection of MSHA unwarrantable findings, illustrates the misapplication of the Commission's definition of unwarrantable failure. Also, the statistics illustrate the disparity between the various coal subdistricts, and metal and nonmetal districts.

While these standards are not written to address inconsistent enforcement, it must be either accounted for or corrected before applying the pattern of violations standard. Therefore, we strongly recommend the regulatory adoption of language consistent with the Review Commission decisions. A pattern of violations standard without the recommended definitions would fail to define prohibited activity and would be arbitrary and capricious.

## § 104.3 Initial screening.

(a) At least once each year, the appropriate Administrator shall review the compliance records of each mine and each independent contractor for the current twelve (12) month period, compared to the preceding twelve (12) month period to identify potential pattern violators.

(b) MSHA's review shall be accomplished by examining the computer records for the mine identification

number of the operator, or contractor, for evidence of reckless disregard of the law or intentional or willful misconduct associated with repeated significant and substantial violations of mandatory health and safety standards.

(c) Factors evidencing such potential pattern violators are:

    (1) Repeated Section 104(a) or (d) significant or substantial violations issued with findings of reckless disregard or intentional or willful conduct; and

    (2) Repeated Section § 104(b) closure orders resulting from a failure to abate Section 104(a) significant and substantial violations; and

    (3) Repeated Section 107(a) imminent danger closure orders, issued in conjunction with enforcement actions described in (1) or (2) above.

(d) After the computer screening for potential pattern violators, the initial screening stage shall include a determination of whether there were any extenuating circumstances beyond the operator's control that may have resulted in the identification of the potential pattern violator. Such factors shall include:

    (1) Adverse and unexpected mining conditions;

    (2) Enforcement actions issued against the pattern candidate identification number but caused in whole, or in part, by another entity (i.e. an independent contractor); and

    (3) Any other factors that may mitigate either the evidence of recalcitrance or the severity of the risks posed by the hazards associated with the enforcement actions in the operator's history.

(e) If the Administrator's examination of the initial screening criteria (a)-(d) reveals the repeated presence of each section (c) factors and demonstrates a pervasive and continuing or increasing compliance problem, then the Administrator shall institute a further review pursuant to Section 104.4.

**RATIONALE:**

Our recommended addition of "the appropriate Administrator" in the first sentence of section 104.3, is necessary to identify the MSHA official responsible for the review of each mine on an annual basis. The Administrator has access to all the enforcement data necessary for the initial screening in Section 104.3, and for the application of the pattern criteria in Section 104.4. The severe consequences that can result from the review demand that the initial screening be made by the Administrator. The Administrator would be in a position to provide an independent unbiased determination, whereas, a determination by a field official could be based on incomplete data, and may involve some regional bias.

Our recommended addition of the phrase "for the current 12 month period compared to the preceding 12 month period" is consistent with MSHA's preamble intent to examine a mine for 24 months (54 FR 23158). Adoption of this intent in the regulations is necessary to appropriately define and limit the period of review. Due to continual mine development, dramatic changes in mining conditions, and differing MSHA policies and enforcement emphasis, a review period of more than two years would not accurately reflect the compliance record of a mine.

Paragraph (b) is a viable method for MSHA to conduct the initial screening and it will permit the agency to "see" beyond the more than 100,000 S&S violations that can be expected in FY 1990, and identify potential pattern candidates for further review in section 104.4, pattern criteria. The recommended addition of the phrase "mine identification number of the operator, or independent contractor" is necessary to define the scope of the review. The review should be focused on each individual identification number as a separate entity. Mine operator and independent contractor enforcement activities are separate. Therefore, all review procedures leading to a pattern notice must be separated. Neither a mine operator or independent contractor should be a candidate for a pattern notice based on the recalcitrance of the other.

Section 104(e) of the Act provides MSHA with its strongest enforcement tool. Once placed on a pattern, a mine can expect a succession of closure orders that will render routine operations impossible. As a result, Congress repeatedly indicated its intent to apply the pattern provision to those "few" recalcitrant operators who have not responded to other enforcement tools.

To conform with this Congressional intent, MSHA must recognize that repeated significant and substantial violations alone are simply not enough to place a mine on a "pattern." MSHA statistics indicate that 160,300 violations were cited in 1988 and that approximately 95,000 or 60% were S&S. All large mining operations have a history of repeated S&S violations.

Furthermore, many of the "S&S" violations cited are not the result of operator actions.  The courts have repeatedly held the Mine Act to be a strict liability statute, and "S&S" citations are routinely issued in "no" negligence or "low" negligence situations.

Paragraphs 104.3(c)(1)-(3) list the compliance records that the Administrator should review annually.  A review and analysis of these three categories would identify those mines with serious compliance problems warranting further review.  This procedure would indicate the extent to which all other enforcement tools have been used at a specific mine, and if the use of these enforcement tools has significantly increased during the current year compared to the preceding year.

Congress recognized the intensity of MSHA's enforcement activities and intended the "pattern" violator to be a mine operator whose recalcitrance results in repeated significant and substantial violations.  From the perspective of Mine Act enforcement, recalcitrance is demonstrated by the use of several enforcement tools:  (1) § 104(b) closure orders issued for a failure to abate a § 104(a) violation; (2) reckless disregard of the law or willful, intentional conduct resulting in § 104(a) citations or § 104(d) citations or closure orders; or, (3) § 107 imminent danger closure orders associated with violations caused by willful misconduct or reckless disregard of the law.  For MSHA to apply the pattern sanction in such a manner as to capture only those "few" mine operators who "thumb their nose at the law, "only S&S violations that result from recalcitrant acts of the mine operator should be used as an initial screening device.

Our recommended changes in paragraph 104.3(d) are intended to clarify the proposal.  Factors such as unpredictable geologic changes which effect ground control, methane or water inflows exemplify extraordinary situations that should be considered prior to placing a mine on a pattern notice.  Also, as previously stated, a mine operator should not be a candidate for a pattern notice based on the recalcitrance of other parties.

Our recommended addition of paragraph (e) in § 104.3 will give the Administrator guidance in evaluating the results of the initial screening, and in promoting consistency in the use of the pattern provision.  The provision requires that an operator evidence potential recalcitrance according to each listed factor, prior to the application of pattern criteria under section 104.4. Failure to adopt this paragraph would be arbitrary and capricious, because of its denial of due process resulting from the regulation's failure to define prohibited conduct.

§ 104.4 Pattern Criteria.

(a)  The following four criteria, for which an affirmative finding on all would be required, shall be used to identify a mine, a part of the mine, or a specific hazard with a potential pattern of violations:

(1)  The accident experience, as provided in 30 CFR Part 50.2(h), at the mine demonstrates a serious health and safety problem and a significantly deteriorating trend.

(2)  A direct correlation between the violations and orders examined in the initial screening process and the accidents at the mine.

(3)  There is strong evidence of an operator's lack of good faith in its safety and health efforts, demonstrating the recalcitrance of the operator.

(4)  A history of repeated significant and substantial violations of mandatory health and safety standards caused by the operators' unwarrantable failure to comply along with a current unwarrantable failure cycle in effect at the mine.

(b)  In making any affirmative finding, the Administrator must find the presence of the factors in each of the above categories and must specify, with particularity, supported by documented evidence, the reasons for his finding in each of the above categories.

## RATIONALE:

Our recommended changes to this section are crucial.  The few mines identified by the initial screening process should be analyzed according to criteria that would further identify a potentially recalcitrant operator.  Congress recognized that only a few mines were being operated in a manner that necessitated the use of the patterns of violations provision.

Our recommended addition in Section 104.4(a) of the phrase "for which an affirmative finding would be required" is essential.  The severity of a notice of a pattern of violations, demands that an affirmative finding be required for each criteria.

We also recommended the addition of the phrase "a part of the mine, or a specific hazard" in paragraph 104.4(a).  This permits a focused pattern notice (and termination thereof) based on a particular part of the mine or hazard in the mine (i.e. belt entries, haulage, etc.).

The first two criteria from the MSHA proposal, paragraph 104.3(a)(1) (history of repeated significant and substantial violations of a particular standard) and (a)(2) (history of repeated significant and substantial violations of standards related to the same hazard) would be indicative of any mine, other than a new mine. These two criteria were incorporated in the concept of our recommended initial screening process, but strengthened by requiring that they be caused by recalcitrance. We agree with MSHA's proposed criteria that incorporates unwarrantable failure enforcement actions prior to the institution of

a pattern.  However, we have clarified MSHA's proposal to require a current unwarrantable failure cycle to be in effect at the mine.

With our suggested changes, the pattern criteria could be used to evaluate successfully the mines identified through initial screening to determine the few mines, if any, that may be recalcitrant due to their lack of response to other enforcement tools already available.

An analysis of our four recommended criteria (paragraphs 104.4(a)(1)-(4)) would provide the proper tools to identify a potential recalcitrant operator.  The recommended changes to the pattern criteria would separate the concerned operators that may be experiencing a compliance problem, from the few (if any) recalcitrant operators.  A mine operator that is already responding and cooperating with MSHA to correct the problem at the mine should not be identified as a candidate for a notice.  Such a notice would be contrary to the legislative intent and disruptive and counter-productive.

The recommended addition of paragraph 104.4(b) is essential. The severe ramifications of a potential pattern of violations notice upon an operator demand a well-documented and specific finding by the Administrator.  It is imperative that the mine operator be given notice of the specific shortcomings identified by MSHA so that these areas can be addressed and corrected.  Further, findings by the Administrator may provide the guidance that is necessary to institute a program to avoid repeated significant and substantial violations.

## § 104.5 Applicable Enforcement Actions

Only final citations and orders, <u>issued after the effective date of these regulations and within 24 months prior to the initial screening</u>, shall be used to identify mines with a potential pattern of violations <u>in sections 104.3 and 104.4</u>.

## RATIONALE:

We agree with the MSHA proposal that only final citations and orders should be used to identify mines with a potential pattern of violations under Section 104(e) of the Act.

We insist, however, on the addition of the phrase "issued after the effective date of these regulations" in paragraph (c). Prospective application is a consistent element of all MSHA regulatory changes, and is necessary to achieve fairness and due process.  Furthermore, earlier in our comments, we demonstrated vast regional enforcement differences that emphasize the need for uniform enforcement to ensure fair pattern application.  We note that the vast majority of citations and orders have been accepted by operators on the basis of a business decision that weighs the cost of appeal against the payment of the fine.  Although we recognize that such paid citations and orders are in fact final

orders of the Review Commission, their use to support a pattern
notice may not have been a factor in the operator's past evalua-
tion of whether or not to challenge these enforcement actions.

§ 104.6 Issuance of Notice.

(a)  When a potential pattern of violations is iden-
tified, the Administrator shall notify the District
Manager and provide him with all supporting material.
The District Manager shall notify the mine operator in
writing by certified mail and forward the supporting
materials.  A copy of the notification and all support-
ing materials shall be provided, by MSHA, to a mine
employee who is the representative of miners at the
mine.  If there is no representative of miners, the
notice shall be posted on the mine bulletin board. The
notification shall specify the basis for identifying the
mine, part of the mine or specific hazard involved as
having a potential pattern of violations and give the
mine operator a reasonable opportunity, not to exceed 30
days from the date of notification, to

   (1)  Review all documents upon which the pattern of
   violations evaluation is based.

   (2)  Provide additional information.

   (3)  Submit a written request for a conference with
   the District Manager.  The District Manager shall
   hold any such conference within 30 days of a
   request.  The representative of miners at the mine
   shall be afforded an opportunity to participate in
   the conference.

   (4)  Institute a program to avoid repeated signifi-
   cant and substantial violations at the mine, part
   of the mine, or the specific hazard involved in the
   potential pattern.  The District Manager shall
   allow an additional period of 90 days after the
   conference for determining whether the program
   effectively reduces the occurrence of significant
   and substantial violations at the mine, a part of
   the mine, or for the specific hazard involved.  The
   representative of miners shall be provided an
   opportunity to discuss the program with the Dis-
   trict Manager.

(b)  After the operator's response pursuant to subsec-
tion (a), if the District Manager believes that a poten-
tial pattern of violations exists, he shall prepare a
report that fully evaluates any additional information
provided, any conference held, and the program initiated
by the operator, along with the District Manager's
recommendation.  A copy of the report shall be provided
to the mine operator and representative of the miners at
the mine.  Both parties will have 30 days from receipt

<u>of the report to submit written comments to the District
Manager. The District Manager will send his report and
the comments on the report and all supporting materials
to the Administrator and this will constitute the entire
record</u>.

(c) Within 30 days of receipt of the report from a Dis-
trict Manager, the Administrator shall <u>forward the
report and comments, with his recommendations and all
supporting materials, to the Assistant Secretary of
Labor for MSHA who shall make</u> a decision as to whether
<u>or not</u> the mine <u>or a part thereof</u> is to be issued a
notice of a pattern of violations. <u>A decision to issue
a section 104.6 notice and justification thereof shall
be provided, by certified mail, to the operator and the
representative of the miners. The decision of the
Assistant Secretary shall become final upon the 30th day
after it is served on the operator and representative of
miners, unless a request for a conference has been
filed. The Assistant Secretary shall hold any such con-
ference and issue a final determination within 30 days
of such request</u>.

(d) The mine operator shall post all notifications,
issued, under this part, at the mine.

**<u>RATIONALE:</u>**

Our suggested revisions to §104.6 incorporate consistent
timeframes throughout the process and provide a reasonable oppor-
tunity for all parties to review, and comment upon, the documents
considered in determining whether a pattern exists.

We support the concept contained within paragraph
104.4(a)(4) of the MSHA proposal. This provision will allow the
operator the opportunity to initiate a program to avoid repeated
significant and substantial violations at the mine, prior to the
issuance of a pattern of violations notice.

Our modification to paragraph (b) would afford the mine
operator, and the representative of the miners, an important
opportunity to respond to the District Manager's report, before
it is sent to the Administrator. The Administrator's recommenda-
tions to the Assistant Secretary will be very influential, there-
fore, the principle of equity should apply and he/she should
receive all the relevant information at one time. As proposed by
MSHA, the Administrator would receive the District Manager's
report first, thereby creating the opportunity of a predisposed
decision before the comments arrive. As a matter of fairness,
all the relevant information should be available to the Adminis-
trator at the same time, so that an equitable decision can be
made based on all the arguments.

The legislative history indicates that the final decision to
issue a pattern of violations should be made by the Secretary of
Labor (Legislative History at 1979). We recognize that this may

- 14 -

be impractical, therefore in  paragraph (c) we recommend that the
final determination as to whether a mine shall be placed on a
pattern of violations cycle be rendered by the Assistant Secre-
tary, rather than the Administrator.  The significance of this
determination, considered to be the most severe method of
enforcement, mandates that the decision rest with the Assistant
Secretary, the highest ranking official of the agency.  Likewise,
because of the severe sanctions a pattern notice encompasses, a
final appeal must be incorporated within the standard to allow
due process.  The opportunity for a conference with the Assistant
Secretary before a final determination is essential.  This would
afford all the interested parties the opportunity to arrive at a
solution, before the issuance of a pattern of violations notice.
This would comport with the legislative history, by forcing the
few recalcitrant mine operators to either address the problem at
the mine, or if they continue to "thumb their noses at the law,"
a pattern of violation notice would be issued.

§ 104.7 Termination of Notice.

(a)  Termination of a Section 104(e)(1) pattern of
violations notice shall occur when an inspection by MSHA
results in no significant and substantial violations of
mandatory health and safety standards issued: (1) at the
mine; or (2) the portion of the mine involved in the
pattern; or (3) for the hazard involved that resulted in
the pattern; or (4) 90 days after the issuance of the
pattern if no S&S violations are issued in any of the
three categories described herein.

(b)  The mine operator may request an inspection of the
entire mine, or portion of the mine, or for the hazard
involved in the pattern.  Personnel from a different
field office or district shall perform the inspection if
requested by the operator.  No advance notice of the
inspection shall be provided, and the scope of inspec-
tion shall be determined by MSHA, which shall be no less
than that requested by the operator.  Partial mine
inspections covering the entire mine within 90 days
shall constitute an inspection of the entire mine for
the purposes of this part.

**RATIONALE:**

Our recommended modifications to paragraph (a) are consis-
tent with our recommendations to the previous sections.  This
will allow MSHA and the mine operator to focus their efforts on
the particular part of the mine or hazard that has resulted in
the issuance of the notice.  The purpose of Section 104(e) is to
improve compliance at a mine identified by MSHA as having a pat-
tern of noncompliance.  Paragraph (a), with our recommendations
will accomplish this purpose, in a fashion that permits focused
attention on the source of the pattern.  By focusing the use of
§ 104(e) both MSHA and the operator will encourage reform of the
problems leading to the pattern and be provided with a reasonable

mechanism to terminate the pattern once the underlying problem is solved.

In paragraph (b) we have recommended that the operator have the option of requesting an inspection of the mine by personnel from a different field office or subdistrict. Because of the severe sanctions imposed on the mine operator by a pattern notice, the relationship between the operator and the local inspectors could become severely strained. Further, it can be assumed that local inspectors concurred in establishing a pattern at the mine, therefore, an opportunity for an independent evaluation should be available to the operator. Our recommendations would enhance due process thus avoiding misapplied severe sanctions inherent in a pattern of violation notice. The statute provides MSHA with "broad authority" to issue regulations deemed "necessary to establish criteria for determining when a pattern" exists. MSHA must exercise this authority so that the use of the pattern provision serves the statutory goal of improved safety, without unnecessary closures after the safety objective has been achieved.

Attachment


Delete the significant and substantial check box from the citation form.

Replace the check box with the following series of questions for use in determining whether a citation is S&S:

(a)  What hazard was the standard intended to prevent?

    _____

    _____

(b)  What events must occur to create exposure to the hazard?

    _____

    _____

(c)  What determines the likelihood of the occurrence of the events?

    _____

    _____

(d)  What determines the likelihood that the events will or will not result in a reasonably serious injury or illness?

    _____

    _____

(e)  Based on the above analysis, I conclude:

    _____

    _____

    _____

    _____

    _____





**United Mine Workers of America**

TELEPHONE
AREA CODE (202) 842-7200

UNITED MINE WORKERS' BUILDING
**Washington, D.C.**
20005

**M E M O R A N D U M**                    **DATE:** AUGUST 31, 1989

**TO:**    LINDA RAISOVIC-PARSONS

**FROM:**  MARY LU JORDAN

**RE:**  UMWA COMMENTS ON MSHA'S PROPOSED RULES FOR CITING
        A PATTERN OF VIOLATIONS

    Attached are the comments regarding MSHA's proposed
regulations that I have filed today on behalf of the
UMWA.

                         **\*\*\*\*\*\*\*\*\***

cc: Robert Stropp
    Joe Main
    Bob Scaramozinno



**LEGAL DEPARTMENT**



TELEPHONE
AREA CODE (202) 842-7200

UNITED MINE WORKERS' BUILDING
900 FIFTEENTH STREET, N. W.



20005

**August 31, 1989**

Ms. Patricia Silvey
U.S. Department of Labor
Mie Safety and Health Administration
Office of Standards, Regulations & Variances
4015 Wilson Boulevard - Room 631
Arlington, Virginia  22203

Dear Ms. Silvey:

This is in response to the notice published in the May 30, 1989 <u>Federal Register</u>.  The United Mine Workers of America wholeheartedly supports MSHA's long overdue decision to develop regulations for implementing section 104(e) of the Federal Mine Safety and Health Act of 1977. Our comments are as follows:

<u>Section 104.2 Initial Screening</u>

The proposed rule requires that the compliance record of mines be reviewed at least once each year for indications of a pattern of violations.  The UMWA does not feel that an annual review is frequent enough.  This review should be required at least bi-annually, if not quarterly.  Mines with a chronic history of persistent dangerous violations could continue to operate for an entire year before any action would be taken to restore the mine to a safe and healthful condition.  This is far too much time to permit a potentially disasterous operation to continue unchecked.

Paragraphs (b)((2) and (4) of this section should be eliminated.  The operator's lack of good faith and the existence of mitigating circumstances should not be factors considered prior to the issuance of a Section 104(e) notice.  The Senate Committee report clearly states

Congress' wish that intent or state of mind of the
operator not be criteria for determining when a pattern of
violations exists.  S. Rep. No. 95, 95th Cong. 1st Sess.
33 (1977).  Accordingly, the operator's good faith,
absence of negligence, knowledge and any extenuating
circumstances should not be factored into the Agency's
review.  If a review of the citation history indicates a
pattern of S&S violations, a notice should be issued,
without inquiry into the state of mind of the operator or
the existence of mitigating factors.  Certainly the
issuance of numerous S&S citations, should be enough to
alert an operator about a health and safety problem at
this mine and present him with the need to take corrective
action.

## Section 104.3 Pattern Criteria

     Contrary to the expressed intention of Congress, MSHA
has narrowly limited the situations that would trigger
issuance of a pattern of violations notice.  The Senate
Report clearly indicates that this enforcement mechanism
was not to be limited only to violations of the same
standard, nor to violations which are the result of an
operator's unwarranted failure to comply.  In spite of
this expressed intention by Congress, MSHA has
incorporated these limitations in two of the criteria used
to identify a pattern of violations.  The third criteria
is limited to a "history of repeated significant and
substantial violations of standards related to the same
hazard."  Nowhere is there a mechanism for triggering a
pattern notice at a mine that has had a history of
significant and substantial violations, where the
violations relate to different standards or different
hazards and are not unwarrantable.

     MSHA, of course, should have the ability to issue a
pattern notice where the history of violations relates to
the same standard or the same hazard, or where the
violations are caused by an unwarrantable failure to
comply.  MSHA, should not be restricted to those
situations however.  This section of the regulations
should be amended to include a criteria that would
identify mines with a history of significant and
substantial violations.  Congress clearly expected MSHA to
have the ability to issue a pattern notice where there is
a history of significant and substantial violations even
if the violations are related to different standards or
different hazards, and even if the violations do not meet
the criteria for an unwarrantable failure violation.  In
addition, the regulations should clarify the fact that it

is not necessary to meet all the criteria specified. A mine meeting any one of the criteria (including simply a history of significant and substantial violations) would be subject to a pattern notice.

In addition to the criteria outlined in paragraph (a), MSHA should also consider whether the mine under review has been notified of a potential pattern in the past. If such a mine falls into a gray area regarding whether a pattern exists, MSHA must give due consideration to the fact that the mine has had a pattern of violations in the past. This fact should substantiate the view that the mine has serious health and safety problems.

Paragraph (b) of this section of the proposed rule provides that only final citations and orders will be considered when identifying mines with a potential pattern of violations. The UMWA vehemently opposes this proposal.

If MSHA restricts itself to final citations and orders when identifying mines with a potential pattern, operators will be strongly motivated to challenge every S&S citation they are issued, regardless of the merits of their position. If MSHA waits until the legal challenges are exhausted then MSHA will be trying to determine whether a pattern exists on the basis of conditions that were cited several years previously. Moreover, by filing legal challenges, operators will be able to escape any liability under sec. 104(e), even though the citations and orders are ultimately upheld. This is because MSHA, in considering the mine's history, will probably wind up limiting itself to a certain time frame, i.e. 1 or 2 years. It would certainly be easy enough for a operator to challenge S&S citations, and keep their validity in limbo for that period of time. Once the time period that MSHA used had passed, the operator could safely drop its challenge. The operator would know that even though the citation was now final, it would be too old to be included in an assessment for a pattern notice.

Requiring a sec. 104(e) order to be based only on "final" citations and orders is completely contrary to the rest of the Act's enforcement scheme. A failure to abate order under sec. 104(b) or an unwarrantable failure order under sec. 104(d) are each issued on the basis of previous citations, whether or not those citations have been challenged. Likewise, an operator who disputes an inspector's determination as to whether an imminent danger exists must comply with the sec. 107 order, while he challenges its issuance.

There is absolutely nothing in the legislative history which supports such a different and restrictive approach to the application of sec. 104(e) - indeed the legislative history requires the opposite conclusion. In discussing the sequence for issuing a sec. 104(e) order the Senate Committee noted that the pattern order sequence "parallels the current unwarrantable failure sequence of the Coal Act and the unwarranted failure sequence of sec. 105(c) of the bill.1/ If pattern orders can be based only on "final" citations, its enforcement cannot be said to "parallel" that of sec. 104(d) as Congress intended.

The Committee gave a fairly extensive comparison between the unwarrantable and the pattern order provisions. They explained that the violation which sets into motion the unwarranted failure sequence "must be of a significant and substantial nature and must be the result of the operator's unwarranted failure to comply." In comparison, they pointed out that "there is no requirement that the violations establishing the pattern offense be a result of the operator's unwarranted failure only that they be of a significant and substantial nature." The Committee goes on to describe other ways in which the enforcement provisions parallel each other including the 90 day period for issuance of either order and the requirement of an intervening "clean" inspection before either order can be terminated.

The Committee concludes its discussion by pointing out that 'it is the Committee's intention that the Secretary or his authorized representative may have both enforcement tools available and that they can be used simultaneously if the situation warrants." (Emphasis added). Under MSHA's proposed rule Congress' intention would be completely thwarted. The Secretary could hardly use both enforcement tools simultaneously if an operator's challenge to the underlying citations effectively blocked implementation of one of those tools.

Section 104.4 Issuance of Notice

Section 104.4 establishes guidelines for a review and conference with the District Manager when a pattern notice

_____

1/ Sen. Rep. supra at 33. The reference to sec. 105(c) is a reference to the unwarrantable provision which was ultimately designated as sec. 104(d) in the final bill.

is issued, to provide opportunities for input from mine operators and the miners representative. The citations and orders issued to an operator for repeated S&S violations of standards provide the operator with ample warning of a potential pattern notice. This should signal that serious health and safety problems exist and that a course of action is needed to improve the mine's violation record. If the operator and miner's representative are permitted to provide additional input regarding the information upon which the pattern notice is based, they should do so through written comments, with copies provided to all parties. An opportunity for a conference as provided in the proposed regulations discriminates against miners' representatives, unless such representative is protected against loss of pay.

Such a conference is currently provided by 30 CFR Section 100.6 for review of citations and orders. Although our miners' representatives are afforded an opportunity to participate, they are usually unable to do so. This is because pay is generally not provided to miners representatives for attending these conferences. The conferences requested by mine operators are very frequent and many local unions are not financially solvent enough to pay lost wages for representatives to attend these events so often. This normally leaves the conferences open to the operators' attempts to influence and pressure MSHA to vacate citations and orders. To provide another conference procedure for review of a pattern of violation notice would more than likely result in the same situation. The Union therefore recommends that any input be reduced to writing to provide a fair balance to the procedure unless, as a precondition to requesting a conference, the operator agrees to reimburse the miners' representative for any lost wages.

The Union recommends further that any mine identified as having been subject to a pattern notice in the past should not be afforded the opportunity for further input regarding the information on which a subsequent notice is based. These mines should be subject to an automatic pattern of violations notice if the criteria is met because they have exhibited a continued disregard for the health and safety of miners.

The proposed rule allows the District Manager 120 days to submit his report to the administration. The proposed rule doesn't state whether this 120 day period applies even if the District Manager has not allowed the operator the maximum 90 day period for implementing a program

designed to avoid repeated significant and substantial violations.  If the operator has not implemented such program, or been given a shorter time for implementing such program, then 120 days is inappropriate.  The rules, however, do not provide for a time frame in such situations.

The rules also do not provide any indication of how a program will be determined to have "effectively reduce[d] the occurrence of significant and substantial violations at the mine."  There is a tremendous potential for abuse by operators and/or District Managers under this provision.  A mine which has been identified as having serious problems could never come under the enforcement mechanism set out in section 104(e), simply on the basis of the District Manager determining that a program has effecitvely reduced the occurrence of significant and substantial violations.  The proposed regulations require the District Manager to submit a report if he "continues to believe that a potential pattern of violations exists at the mine ...."  The proposed regulations require no report, however, if the District Manager determines that the program has effectively reduced the occurrence of significant and substantial violations at the mine.  It is more important to require a report in the second situation since the regulations are so general, and do not specify what an effective reduction is.  MSHA must require reports when District Managers determine that a potential pattern no longer exists, if there is to be uniformity in enforcement practices.

What happens if, during the 90-day trial period an operator continues to receive S&S citations but decides to challenge virtually all of them?  Will an MSHA District Manager not count them because they are not "final" and declare there has been an effective reduction in citations?

What about the pressure that may be put on MSHA inspectors, especially during the 90 day trial period, to cite violations as non S&S?  What happens if an operator improves for the 90-day trial period and then slacks off?  Will MSHA start all over again, notifying the operator that there is a "potential" pattern and allowing another 90 days for fine tuning the program?  Such a cycle could go on indefinitely and allow operators with a pattern of violations to escape enforcement under sec. 104(e).

## Section 104.5 Termination of Notice

This section reflects the Act's requirement that once a pattern of violations notice is issued, the notice can only be terminated after an MSHA inspection of the entire mine finds no S&S violations of a mandatory safety or health standard.

Paragraph (b) recognizes partial inspections covering the entire mine over a 90-day period. The 90-day inspection is much too lengthy. Conditions in an underground mine change rapidly and variedly. Consequently, a part of the mine that was inspected and declared "clean" on day one of the inspection may be hazardous by day 90.

A complete inspection of a mine should not take more than 30 days. Therefore, the UMWA recommends that the length of time for a series of partial inspections be limited to 30 days.

Thank you for providing us with the opportunity to comment on the proposed regulations.

Sincerely,

Mary Lu Jordan

MLJ/ss
OPEIU2



**United Mine Workers of America**

TELEPHONE
AREA CODE (202) 842-7200

UNITED MINE WORKERS' BUILDING
900 FIFTEENTH STREET, N. W.
**Washington, D.C.**
20005

December 21, 1989

Ms. Patricia Silvey, Director
Office of Standards, Regulations and Variances
Mine Safety and Health Administration
4015 Wilson Boulevard
Arlington, VA 22203

Dear Ms. Silvey:

The United Mine Workers of America, Department of Occupational Health and Safety has reviewed the transcripts of the public hearings and joint comments submitted by the National Coal Association (NCA), American Mining Congress (AMC) and Bituminous Coal Operators Association (BCOA) in relation to the Proposed Rulemaking for Pattern of Violations and would like to submit the attached post-hearing comments. These comments address many issues raised in the August 30, 1989 comments submitted by the NCA/AMC/BCOA. Our post-hearing submission in response to those comments are as follows:

### §104.1 PURPOSE AND SCOPE

The comments of the NCA/BCOA/AMC recommend incorporation of language in this section that would severely restrict the issuance of a pattern of violations to a limited few operators, described as "chronic violators of the law." The UMWA does not agree that the lawmakers who enacted this statute foresaw or intended such a restrictive application. The Senate Committee clearly intended the pattern provision to be applied to any operator that exhibits a pattern of habitual violations of the Act's requirements. As example, the committee cited the conditions found at Scotia as a pattern of habitual violations of the Act's requirements which would be cited by the inspector and abated by the operator. But the operator would then permit the mine to lapse back into violation, exposing miners to these risks all over again. Such a situation could occur at any mine and would not necessarily be described as "chronic" violators.

AB 93 ea5-6

Ms. Patricia Silvey
December 21, 1989
Page Two

## §104.2 DEFINITIONS

The operators comments recommend the addition of
definitions of "significant and substantial" and "unwarrantable
failure" under this part. Although the UMWA recognizes that
the National Gypsum and Emery decisions influence the
interpretation of these terms, we do not think it necessary or
appropriate to include them in the regulation. MSHA must
instead rely on the legislative history and language of the Act
in determining whether violations are serious enough to warrant
enforcement under §104(e). The guidance provided by the Agency
to inspectors in defining significant and substantial and
unwarrantable failure would more appropriately be accomplished
through policy, as is currently being done.

In support of this recommendation, the operators point out
that the enforcement inconsistencies of S & S violations
throughout the various MSHA Districts justifies a need for
defining S & S in the regulation. However, the UMWA does not
believe that a definition of S & S in the regulation will
clarify the inconsistencies of enforcement in each MSHA
District. The mere inclusion of a definition of S & S in the
regulation cannot guarantee consistent interpretation
throughout MSHA Districts. Instead, continual guidance from
the Agency through policy and other communication modes will
better achieve that end.

The UMWA agrees with MSHA's position that a definition of
what constitutes an S & S violation is not appropriate or
necessary for this regulation. As MSHA points out in the
general discussion, the Agency has been working and will
continue to work with its inspectors toward a consistent
application of principles for determining what violations are
S & S. This is the most logical approach to achieve
consistency of enforcement. As additionally pointed out in the
general discussion, prevailing case law dictates that each
violation must be independently evaluated by inspectors to
determine whether the circumstances meet the S & S criteria.
For these reasons, the UMWA does not recommend defining these
terms in the regulation.

## §104.3 INITIAL SCREENING

The recommendation that the Administrator be the official
responsible for the initial screening for a pattern of
violations is unrealistic. The Administrator is charged with

Ms. Patricia Silvey
December 21, 1989
Page Three

the tremendous responsibility of overseeing an Agency with
thousands of employees.  To expect him to do the screening of
over 15,000 mines is unreasonable.  Further, he would not be
familiar with the history of the mine or other relevant
circumstances that may factor into the pattern evaluation as
would the local MSHA official.

The operators recommend that the screening period be "for
the current 12 month period compared to the preceding 12 month
period".  Their comments indicate that this is consistent with
MSHA's preamble intent to examine a mine for 24 months.
However, the intent of MSHA was to examine a mine's compliance
records overall for a period of two years and not to compare
one to the other.  Further, MSHA has justifiably retained the
flexibility to examine for a longer period if necessary.  As
MSHA points out, interruptions in mining operations, changes in
mine management, or other factors could indicate that this
period should be longer or shorter.

The operators comments recommend that independent
contractors violation records be evaluated separately from the
mine operators.  They maintain that independent contractors are
separate entities and should be evaluated for their individual
records and held accountable for their own actions.  Although
this seems reasonable, mine operators must, to some extent,
retain partial liability for work performed on their property.
The mine operators have the final control over any contracted
work and must accept some accountability for the manner in
which the operation is conducted.  In this light, those
violations cited to any contractor whose work is performed on
mine property must be counted in the overall mine violation
assessment.  On the other hand, any contracted work that is
performed in independent shops or location outside the mine
operator's control or jurisdiction should not be counted.

Lastly, the operators recommend that only S & S violations
that result from recalcitrant acts of the mine operator as
demonstrated by:

    (1) 104b closure orders issued for a failure to abate a
        104(a) violation;

    (2) reckless disregard of the law or willful, intentional
        conduct resulting in a §104(a) citation or 104(d)
        citation or closure order; or

Ms. Patricia Silvey
December 21, 1989
Page Four

      (3) §107 imminent danger orders associated with violations
          caused by willful misconduct or reckless disregard of
          the law be considered in the pattern evaluation.

The Senate Committee who authored the bill containing the
pattern provision did not intend such a restrictive application
of this section. The Committee stated that their intention was
that a pattern may be established by violation of different
standards as well as by violations of a particular standard,
and to provide an effective enforcement tool to protect miners
when operators demonstrate disregard for the health and safety
of miners. Their clear intent was to provide an effective
enforcement provision to check repeated violations that may
have serious consequences. The Committee's intent does not
convey such restrictive consideration to only unwarrantable or
other serious violations as the NCA/AMC/BCOA comments would
lead one to believe. But rather, Congress focused attention
simply on S & S violations.

### §104.4 PATTERN CRITERIA

    The criteria for identifying a pattern of violations must
be focused on a mine's history of repeated S & S violations as
mandated by Congress. Although other factors such as the mine
accident experience should be considered, it cannot be central
to determining that a pattern exists, as recommended by the
NCA/AMC/BCOA. MSHA has rightfully retained the flexibility to
individually evaluate each mine's compliance history along with
other relative circumstances. If the Agency believes that a
pattern has been established and miners safety is in jeopardy,
it must be able to apply this enforcement tool without undue
restrictions.

    The operators proposal would require MSHA to establish a
direct correlation between the mine violation history and
accidents. This approach would be contrary to the intent of
Congress and would be inconsistent with the preventative
purposes of the Mine Act. Congress planned that 104(e) provide
an effective enforcement tool to check those mines, such as
Scotia, that exhibit a repeated violation pattern that could
lead to disaster. The mine's accident rate does not
necessarily influence the existence of a pattern and therefore
cannot be a focal point in identifying mines with a pattern.

    The operators comments further prescribe that a pattern
notice could only be issued at a mine currently with an

Ms. Patricia Silvey
December 21, 1989
Page Five

unwarrantable failure cycle in effect. This was clearly not
the plan of Congress in enacting this provision. In discussing
the sequence for issuing a Section 104(e) order, the Senate
Committee noted that the pattern order sequence "parallels" the
current unwarrantable failure sequence of section 105(c) of the
bill.

The Committee gave a fairly extensive comparison between
the unwarrantable and the pattern order provisions. They
explained that the violation which sets into motion the
unwarranted failure sequence "must be of a significant and
substantial nature and must be the result of the operator's
unwarranted failure to comply". In comparison, they point out
that "there is no requirement that the violations establishing
the pattern offense be a result of the operator's unwarranted
failure only that they be of a significant and substantial
nature". Hence, the Committee clearly did not intend that an
unwarrantable failure sequence be a prerequisite for a pattern
of violations.

### §104.5 APPLICABLE ENFORCEMENT ACTIONS

The operators, as well as MSHA, recommends that only final
citations and orders should be used to identify mines with a
potential pattern of violations. As pointed out in the UMWA's
earlier comments, if MSHA restricts itself to final citations
and orders when identifying mines with a potential pattern,
operators will be strongly motivated to challenge every S & S
citation they are issued, regardless of the merits of their
position. This is clearly evidenced by their comments on this
section: "Although we recognize that paid citations and orders
are in fact final orders of the Review Commission, their use to
support a pattern notice may not have been a factor in the
operator's past evaluation of whether or not to challenge these
enforcement actions". This clearly supports the UMWA's
prediction. If any operator felt that citations were unjustly
issued, they certainly would have challenged them. This
substantiates our concern that S & S citations will be
challenged just to delay or impede the issuance of a pattern
notice.

The UWMA maintains the position that restricting
consideration to final citations and orders is not workable.
If MSHA waits until all legal challenges are exhausted and
citations/orders are considered final, then MSHA will be

Ms. Patricia Silvey
December 21, 1989
Page Six

trying to determine whether a pattern existed on conditions
cited years previously.  The UMWA does not believe that this is
the enforcement tool Congress foresaw.  The clear intent of
this provision was to promptly recognize and draw attention to
developing potentially serious health and safety conditions and
to restore the mine to a safe workplace.  By restricting 104(e)
enforcement to final citations, MSHA will be creating an
effective loophole to avoid a pattern notice.  By filing legal
challenges, operators will be able to escape any liability
under 104(e), even though those citations and orders are
ultimately upheld.  This is because the citation's validity
could be kept in legal limbo until they become too old for
consideration in an assessment for a pattern notice.

Furthermore, requiring a section 104(e) order to be based
only on "final" citations and orders is completely contrary to
the rest of the Act's enforcement scheme.  A failure to abate
order under section 104(b) or an unwarrantable failure order
under section 104(d) are each issued on the basis of previous
citations, whether or not those citations have been
challenged.  Likewise, an operator who disputes an inspector's
determination as to whether an imminent danger exists must
comply with the section 107 order, while he challenges its
issuance.

There is nothing in the legislative history to support such
a restrictive approach to the application of 104(e).  For these
reasons, the UWMA insists that all S & S citations/orders be
considered in the evaluation for a pattern.

## §104.6 ISSUANCE OF NOTICE

The operators proposal suggests incorporation of timeframes
throughout the process that would unnecessarily delay and
impede the enforcement of section 104(e).  The UMWA does not
feel that Congress intended such a delayed approach to 104(e)
enforcement.  The legislative intent clearly was to provide a
prompt means of restoring a mine with evidence of developing
serious health and safety problems back to a safe condition.
The purpose being to prevent another disaster such as at
Scotia.  If the timeframes proposed by the operators is
adopted, a mine could not be put on a pattern notice for a
period of nine months if all avenues of review are exhausted,
even though a pattern of violations have been identified.  The
UMWA does not think this represents the "effective enforcement
tool" Congress foresaw.

Ms. Patricia Silvey
December 21, 1989
Page Seven

Under the operators proposal a pattern order can
potentially be delayed for a total of 270 days.  A summary of
the procedure proposed by NCA/AMC/BCOA is as follows:

| DAYS LAPSED | PROCEDURE FOR PATTERN NOTICE PROPOSED BY NCA/AMC/BCOA | |
|---|---|---|
| 30 | Paragraph (a) | Potential Pattern of Violations is identified by MSHA.  The mine operator is provided 30 days to: |
| | (a) (1) | Review all documents upon which the evaluation was made. |
| | (a) (2) | Provide additional information. |
| +30 | (a) (3) | Submit a written request for a conference with the District Manager to be held within 30 days. |
| +90 | (a) (4) | Institute a program to avoid repeated S & S violations to be in effect for a period of 90 days after the conference outlined in (a) (3) is held. |
| +30 | Paragraph (b) | If the District Manager continues to believe that a pattern exists, he must make recommendations to the Administrator within 30 days. |
| +30 | Paragraph (c) | The Administrator must review all information and make his recommendation to the Assistant Secretary within 30 days. |
| +30 | | The Assistant Secretary's decision shall become final after 30 days unless a conference is requested. |
| +30 | | If a conference is requested, an additional 30 days is permitted in which to hold the conference. |
| 270 Days | or approximately 9 months delay possible from date that a potential pattern of violations is discovered. | |

Ms. Patricia Silvey
December 21, 1989
Page Eight

The UMWA does not think Congress intended that a potentially disasterous operation should be left unchecked for such a long period of time before any enforcement action could be taken.  In contrast, we feel they foresaw and intended just the opposite - a swiftly applied, preventative, enforcement measure.  This could not possibly be achieved under the operators proposal.

Another impractical recommendation under this proposal is the suggestion that the Administrator examine all mines for a potential pattern of violations.  To propose that the Administrator be responsible for examining over 15,000 mines each year for a pattern of violations in conjunction with the tremendous amount of additional responsibilities he has, is unrealistic.  The Agency has placed the responsibility for initial screening with the MSHA District Manager, which is most appropriate.

§104.7 TERMINATION OF NOTICE

The recommendation of the NCA/AMC/BCOA that a pattern of violations notice be terminated based on an inspection of only "the portion of the mine involved in the pattern" is in direct conflict with the requirements of Section 104(e)(3) of the Act.  The language of the Act clearly mandates an inspection of the entire mine in which no S & S violations are found.  The operators rationalize that such a provision will allow MSHA to focus their efforts on the particular part of the mine that resulted in the issuance of the notice.  However, the purpose of 104(e) is to focus on S & S violations and their related hazards and not on a particular part of the mine.  If MSHA restricts itself to a repeat of an S & S violation in only a section of a mine, the whole purpose of 104(e) will be defeated.  The intent of a pattern notice is to prevent the recurrence of related S & S violations and hazards throughout the mine.  To suggest that the focus of the provision be limited to portions of a mine is in complete conflict with the legislative history and language of the Act.  Consequently, MSHA must reject such suggestions.

Lastly, the operators have recommended that a mine on the pattern notice be given the option to request an inspection of the mine by personnel from a different field office or subdistrict.  Their reasoning for such a request being, "because of the severe sanctions imposed on the mine operator by a pattern notice, the relationship between the operator and

Ms. Patricia Silvey
December 21, 1989
Page Nine

the local inspectors could become severely strained".  The UMWA
does not feel that this is a good idea.  The local inspectors
who are most familiar with the history and attitude of the
operator toward safety are the most qualified to make the final
evaluation to determine if a pattern notice should be
terminated.  Therefore, the termination inspection must be
retained at local MSHA jurisdictions.

Sincerely,

Linda Raisovich-Parsons
Special Assistant on Legal
   and Legislative Matters

opeiu2/mm

**30 CFR Part 104**                                                    **1219-AB73**

**PROGRAM POLICY MANUAL, VOL. III**              **1/11/11**

**PART 104 PATTERN OF VIOLATIONS**

On October 1, 1990, regulations to identify mine operators who meet the criteria for a Pattern of Violations as outlined in 30 CFR Part 104 became effective. These regulations include procedures for initial screening of mines that may be developing a Pattern of Violations; criteria for determining whether a Pattern of Violations exists at a mine; procedures for issuance of potential pattern notice and final pattern notice; and procedures for termination of a Notice of Pattern of Violations.

## 104.2 Initial Screening

At least once every year, District personnel are to complete an initial screening of each mine in their respective districts to determine whether there is sufficient cause to apply the pattern criteria for possible issuance of a potential Pattern of Violations notice. At the discretion of the District Manager, screenings may be conducted more frequently.

The final rule does not specify the period of a mine's compliance history to be examined during the initial screening. Generally, a mine's 2-year compliance history will provide sufficient information for an evaluation of the health and safety conditions. In some cases, however, other factors such as interruption of mining activities or changes in mine ownership may suggest that a longer or shorter compliance history be reviewed.

Persons conducting the initial screening should use sources such as computer printouts identifying the mine's compliance history relative to the types of enforcement action noted in 30 CFR 104.2(a); information in mine files such as prior inspection reports and inspector's notes; special assessment and enhanced assessment action; special investigation activities; and other relevant information resulting from inspector debriefings. Only violations and orders issued after October 1, 1990, can be considered in the initial screening process.

The legislative history of Section 104(e) of the Federal Mine Safety and Health Act of 1977 does not support a distinction between large and small operations in establishing a pattern. Also, 30 CFR Part 104 avoids triggering the pattern notice based on a predetermined number of violations of particular standards. Therefore, a quantity of violations that might constitute a pattern at one mine may be insufficient to trigger a pattern notice at another mine. Accordingly, the initial screening criteria in 30 CFR 104.2 are to be applied on a mine-by-mine basis. This screening procedure shall also apply to each independent contractor's compliance history at a specific mine site. Each independent contractor at a mine site shall be screened as a separate entity. An independent contractor's compliance history shall not be collectively screened based on district or national data.

Mitigating circumstances, as referenced in 30 CFR 104.2(b)(4), means causes or circumstances resulting in repeated violations that are beyond the control of the

1

**30 CFR Part 104**                                                      **1219-AB73**

operator, even though the operator has made a diligent effort to comply with the regulations. For example, a severe geological condition may present complex mining problems and should be given full consideration where operators have undertaken methods to control the condition but nevertheless failed to maintain compliance.

### *PPOV Determinations*
*There may be extraordinary occasions when a mine meets the screening criteria by which mines are identified as exhibiting a potential pattern of violations but there are mitigating circumstances that make a potential pattern notification inappropriate. Examples of situations that would be necessary to justify not issuing a PPOV notification are:*
- *Recent bona fide changes in mine ownership or management; or*
- *Reductions in S&S citations/orders during the final quarter of the screening review—*
  - *to at or near the 70% reduction goal for mines receiving a PPOV notification, or*
  - *to at or near the 50% reduction goal for PPOV mines that implement a corrective action programs if mine management has made identifiable health and safety program improvements that achieve the objectives of Appendix B - Guidelines for Corrective Action Programs.*

### *POV Determinations*
*In general, a recommendation to not issue a mine operator a POV notice when the mine has not met the established quantitative goals under the PPOV notice will be based on qualitative information. The types of situations that would be necessary to justify a recommendation that a mine not receive a Pattern of Violations notice or have the notice delayed to reevaluate the conditions in the mine include:*
- *A bona fide change in ownership;*
- *A bona fide change in mine management that brought significant improvements in compliance;*
- *The operator does not meet S&S reduction benchmarks due to conditions outside of the operator's control and despite significant improvements in compliance due to implementation of an effective corrective action program; or*
- *Upon review of facts and evidence, generally occurring after the violations are contested, there are S&S violations that are modified to non-S&S, after which the operator meets the established S&S rate goals.*

A record of the initial screening process for each mine is to be kept in the District until the next screening is conducted.

2

**30 CFR Part 104**                                              **1219-AB73**

## 104.3 Pattern Criteria

The pattern criteria shall be applied to mines identified in the initial screening process as having a compliance problem to determine if these mines demonstrate a potential Pattern of Violations. The objective will be to identify those operators who habitually allow the recurrence of violations. This review shall focus on the mine's history of repeated significant and substantial (S&S) violations of a particular standard, of standards related to the same hazard, or caused by an unwarrantable failure to comply. A pattern evident in any one of these categories may provide a sufficient basis for the issuance of a potential Pattern of Violations notice. It should be noted that violations used for pattern criteria are only those S&S citations/orders issued after October 1, 1990, that have become final either through the assessment process or through litigation.

## 104.4 Issuance of Notice

30 CFR 104.4 addresses two different notification processes. Section 104.4(a) relates to a District Manager's notification of a potential Pattern of Violations. Section 104.4(c) relates to the Administrator's decision on whether to issue a notice of a Pattern of Violations.

The reasons for placing a mine in a potential Pattern of Violations category must be clearly stated in a notice to the mine operator in accordance with 30 CFR 104.4(a). Factors considered in the initial screening process and Pattern of Violations criteria application should be specified in the notice. For example, merely stating that a history of repeated S&S violations of a particular standard exists may not adequately explain to the operator why the mine may be placed on a pattern. The specific standard and the number of times it has been cited should be clearly defined in the notice along with all other supporting information. Furthermore, the District Manager should advise the operator in this notice that if the operator implements a program as specified in 30 CFR 104.4(a)(4), the operator must provide a written program to the District Manager within 20 calendar days or less from receipt of the notice. The notice of potential Pattern of Violations is to be sent to the mine operator by certified mail or hand delivered. The mine operator is required to post this notice on the mine bulletin board. Additionally, a copy of the notice must be sent to the representative of miners and the Pattern of Violations coordinator in headquarters.

If a program is implemented in accordance with 30 CFR 104.4(a)(4), the District Manager may allow additional time to evaluate the effectiveness of the program. This timeframe cannot exceed 90 days, and the District Manager can terminate the evaluation period at any time if the program's purpose is not being achieved.

When notice of a potential Pattern of Violations has been sent to a mine operator, any subsequent action taken by the District Manager to rescind this notice is to be stated in a letter sent to the mine operator, representative of miners, and Pattern of Violations coordinator.

3

**30 CFR Part 104**                                            **1219-AB73**

If an operator resumes the practice that gave rise to the original notification of potential Pattern of Violations, a new notice can be issued to the operator based on the circumstances that resulted in the original notice, as well as the operator's most recent conduct. Under such circumstances, the District Manager would also take into consideration the operator's performance following the previous notification in determining whether to allow the operator another 90-day period to implement a program to reduce S&S violations.

When the District Manager receives a decision from the Administrator to issue a Notice of Pattern of Violations, the District Manager is to send by certified mail, or hand deliver, the Notice of Pattern of Violations to the mine operator. This notice must be posted on the mine bulletin board. A copy of this notice also is to be provided to the representative of miners and the Pattern of Violations coordinator. Following notification to the operator, the District Manager should initiate appropriate inspection activities to ensure that the mine is inspected in its entirety during the following 90-day timeframe.

## 104.5 Termination of Notice

When a Notice of Pattern of Violations is terminated in accordance with 30 CFR 104.5, an authorized representative is to issue a notice of termination to the mine operator and is to provide a copy to the representative of miners and the Pattern of Violations coordinator.

PUBLIC HEARING ON MSHA:

PROPOSED RULE OF PRACTICE FOR

PATTERN OF VIOLATIONS


H E A R I N G

held at The Ramada Inn, Pittsburgh, Pennsylvania, on
Wednesday, November 1, 1989, beginning at the hour of
9:00 a.m.; before Jenifer Pennline, a Professional
Reporter, in and for the said County of Allegheny.

- - - - -

A P P E A R A N C E S

MEMBERS OF THE PANEL:     Richard Zeutenhorst
                          Ernie Teaster
                          Dave McConnell
                          Dale Cavanaugh

- - - - -



*Maxine Jacoby & Associates*

Professional Reporting Service

500 Renshaw Building

9th & Liberty

Pittsburgh, Pennsylvania 15222

(412) 765-3133

NOV 2 0 1989

2

I N D E X

Hearing No. 2

OPENING STATEMENT

RICHARD ZEUTENHORST                          3

WITNESSES

JOEL M. McKEAN                           11

LINDA RAISOVICH-PARSONS                  26

EUGENE C.JENKINS                         41

VIC McNEVLIN                             46

HARRY C. LANE                            49

CHRIS HAMILTON                           57

HARRY TUGGLE                             69

- - -

3

P R O C E E D I N G S

MR. ZEUTENHORST:  Good morning.  I am Richard Zeutenhorst, Associate Director of the Mine Safety and Health Administration's Office of Standards, Regulations, and Variances.  I will be the moderator of this public hearing on MSHA's proposal to establish procedures to identify mines with a pattern of violations.

With me on the panel are:  Program Analyst Ernie Teaster, from MSHA's office of Police Planning and Evaluation; Dave McConnell, from the Labor Department Solicitor's Office; and Dale Cavanaugh, Supervisory Safety and Health Standards Coordinator from my staff.

The purpose of this hearing, as stated in the notice of hearing, is to receive relevant comments and data on MSHA's pattern of violations proposed rule which was published in May of this year.  Most of the major issues arising from that proposal were stated in the October 19, 1989 Federal Register notice announcing this hearing.

This is the first of two public hearings.  The second hearing will be held on Wednesday, November 8, 1989, Denver, Colorado.

Background Page 00068

4

1   These hearings are being held in accordance

2   with Section 101 of the 1977 Federal Mine Safety

3   and Health Act, and it is the practice of this

4   Agency that formal rules of evidence will not

5   apply.  Today's proceeding will be conducted in

6   an informal manner.

7       Those of you who notified MSHA in advance

8   will be able to make your presentations first,

9   and upon request will be followed by others who

10  wish to have an opportunity to speak.

11      Anyone who has not previously requested to

12  speak should indicate their intention to do so

13  by signing the list which has been circulated.

14      During this proceeding the hearing panel

15  will be available to address questions to

16  speakers.  To insure an accurate record, if you

17  do have questions, please come to the podium and

18  begin by clearly stating your name and

19  organization.  In order to clarify certain

20  points, the panel may ask questions of the

21  speakers.

22      Time will also be made available, as is the

23  usual practice in our Agency's hearings, for

24  those wishing to make additional statements.

25      As the moderator, I may exercise discretion

MAXINE JACOBY & ASSOCIATES

5

1 to exclude irrelevant or unduly repetitious

2 material and questions.

3 A verbatim transcript of this hearing is

4 being taken, and it will be made part of the

5 rule-making record. The hearing transcripts,

6 along with all of the comments that MSHA has

7 received to date on the proposed rule will be

8 available for review by the public. However, if

9 you wish a personal copy of the hearing

10 transcript, you may make your own arrangements

11 with the court reporter.

12 MSHA will also accept additional written

13 comments and other appropriate data on the

14 proposed rule from any interested party,

15 including those who have not presented oral

16 statements. These written comments may be

17 submitted to me during this hearing or sent to

18 the address listed on the hearing notice. All

19 written comments and data submitted to MSHA will

20 be included in the rule-making record. The

21 record will remain open until December 8, 1989,

22 to allow for the submission of post-hearing

23 comments and data.

24 By way of background, this proposal was

25 developed to implement Section 104(e) of the

MAXINE JACOBY & ASSOCIATES

6

1977 Mine Act.  This provision addresses mines
with a pattern of violations which are of a
nature that could have significantly and
substantially contributed to the cause of health
or safety hazards.  Section 104(e) requires
that a notice be issued to a mine operator with
a mine that has a pattern of significant and
substantial S&S violations.  Once a Section
104(e) pattern notice is issued, any inspection
within 90 days which reveals another S&S
violation results in an order to withdraw all
persons from the affected area of the mine until
the violation is abated.

The statute further requires that
withdrawal orders continue to be issued for
subsequent S&S violations until an inspection of
the entire mine reveals no further S&S
violations.

The 1977 Mine Act does not define "pattern
of violations," but rather authorizes the
Secretary to make such rules as necessary to
establish criteria for determining when a
pattern exists.  Congress provided the Secretary
broad discretion in determining these criteria.

MSHA first published a proposed rule to

7

implement the statutory pattern of violations provision in 1980.  However, this proposal was withdrawn in February 1985, in an advance notice of proposed rule-making.  The 1985 notice was intended to address many of the concerns expressed about the 1980 proposal, as well as take into consideration the Agency's enforcement experience under the 1977 Act.

On May 30th of this year, MSHA published the proposed rule we are here to discuss.

MSHA believes that two principles are central to this rule-making:  First, based on the legislative history of the 1977 Mine Act, it is clear that the pattern provisions are directed at only a few mines.  This is not a rule with pervasive application.  The mines addressed are those where S&S violations are abated when cited but chronically occur without the mine operator taking effective preventative action.

Congress intended the pattern provision to protect miners from such disregard for their safety and health.  And that is the Agency's intent with this rule-making.

Second, the pattern rule must include

MAXINE JACOBY & ASSOCIATES

8

1  procedures for fair and full notice, allowing
2  all parties to respond to MSHA's determination
3  that a particular mine may have a pattern of
4  violations.
5      Third, to be truly effective, a pattern
6  violations rule must have a strong remedial or
7  corrective effect.  It must get the mine
8  operator's attention with the ultimate goal of
9  restoring safe and healthful working conditions
10 at the mine rather than closing it down.
11     Because S&S violations form the basis for
12 finding a pattern of violations, many commenters
13 have repeatedly stated that a more uniform
14 application of the criteria for determining what
15 violations are S&S is needed in MSHA's
16 enforcement activities.  These commenters have
17 suggested that the criteria for S&S violations
18 be defined in the rule as it was by the Federal
19 Mine Safety and Health Review Commission in the
20 National Gypsum case.
21     MSHA agrees that the definition of S&S
22 violations, which in part form the basis of a
23 pattern determination, must be consistent with
24 the definition of S&S violations established by
25 the Review Commission.

MAXINE JACOBY & ASSOCIATES

9

1    As recently as September 21st of this year,
2    MSHA has reaffirmed this position in policy
3    program memo for metal, nonmetal, and coal mines.
4    That policy letter states in part that:  "In
5    determining whether a violation could
6    'significantly and substantially contribute to
7    the cause and effect of a mine safety or health
8    hazard,' inspectors must first find that:  (1)
9    an injury or illness would be reasonably likely
10   to occur if the violation were not corrected;
11   and (2) if the injury or illness were to occur,
12   it would be reasonably serious.  Both of these
13   findings must be made before a violation can be
14   designated as 'significant and substantial.'"
15       MSHA continues to believe that including a
16   definition in this rule of what constitutes an
17   S&S violation is neither appropriate nor
18   necessary.  In accordance with prevailing case
19   law, each violation must be independently
20   evaluated by the inspector to determine whether
21   the circumstances meet the S&S criteria.  The
22   S&S criteria do involve subjective elements that
23   must be resolved by the best judgment of
24   inspector.  Under any particular circumstances,
25   the inspector's judgment, like that of any of

MAXINE JACOBY & ASSOCIATES

10

1   us, may result in differences of opinion as to

2   the validity of that judgment. In that respect,

3   the citations orders leading to a pattern of

4   violations notice would not differ from those

5   involved in the Agency's other enforcement

6   actions. Although MSHA remains committed to

7   working toward consistent assessment of the

8   degree of hazard posed by violations, and hence

9   more consistency among districts, there will

10  always be some variation from inspector to

11  inspector. The Agency intends, however, that

12  such variation will play no significant role in

13  whether a mine is placed on a pattern of

14  violations. The key element, rather, must be

15  whether the mine has a serious safety and health

16  management problem that is manifested in a

17  chronic cycle of violations and abatements,

18  without any effort being made by mine management

19  to restore the mine to effective, safe and

20  healthful conditions.

21       We will now begin with those speakers who

22  have requested to appear today. As previously

23  stated, if your name does not appear on the

24  list, you will have an opportunity at the end of

25  this hearing to make a presentation.

11

1    On behalf of the Pennsylvania Coal

2  Association, Joel McKean; on behalf of the

3  United Mine Workers of America, Linda

4  Raisovich-Parsons; on behalf of the National

5  Steel Association, Harry Lane; and on behalf of

6  West Virginia Coal Association, Chris Hamilton.

7    As you begin to speak, please come forward

8  and spell your name for the court reporter.  If

9  you have prepared testimony, I would appreciate

10  if you would provide copies to both the reporter

11  and the MSHA panel.

12    We will now have our first witness,

13  Joel McKean, from the Pennsylvania Coal

14  Association.

15    MR. McKEAN:  I am Joel McKean, President of

16  the Pennsylvania Coal Association.  We

17  appreciate this opportunity to comment on the

18  proposed regulations concerning pattern of

19  violations under Section 104(e) of the Federal

20  Mine Safety and Health Act of 1977.

21    PCA is a trade association representing 100

22  producers of bituminous coal in Western and

23  Central Pennsylvania.  Members produce coal from

24  both underground and surface mines that vary in

25  size.  All of PCA's members' Pennsylvania mines

12

are located in MSHA District 2.

PCA has previously submitted written comments to the agency but would like to supplement them with our testimony here.

Our concern is that sufficient procedural and substantive protections be included in the proposed regulations so that only the intended targets of a pattern notice, truly recalcitrant operators, will be subjected to a pattern notice. PCA believes that the proposal will not achieve this.

First, the criteria for determining if a pattern notice is proper are inadequate.

Second, the proposal fails to address fundamental problems in the enforcement of the Act with respect to violations designated as "significant and substantial."

These regulations are of particular concern to PCA members because, historically, MSHA District 2 has the highest rate of significant and substantial violations in the country. District 2 and the adjacent District had S&S rates ins fiscal year 1988 of 84.2 percent. The next-closest District was District 9, with a 77.8 percent rate. The average rate for the

MAXINE JACOBY & ASSOCIATES

13

1   Districts, other than Districts 2 and 3, was

2   63.1 percent.

3       In addition, only one other District,

4   District 4, issued more S&S violations.  We also

5   believe that the S&S rate in District 2 has not

6   changed to any great extent, although we have

7   not yet seen the agency figures for the last

8   fiscal year in this regard.

9       PCA believes that the proposed regulations

10  will have an unwarranted disparate impact on

11  operators in District 2, contrary to the purpose

12  of limiting the application of the pattern of

13  violations to truly recalcitrant operators.  We

14  do not believe that this high S&S rate in

15  District 2 indicates a recalcitrant attitude of

16  the operators in District 2, but rather

17  indicates a historical pattern of disparate

18  enforcement.

19      We are also concerned because it appears to

20  us in the coal industry that the noncoal mines

21  inspected by MSHA do not receive the same

22  intensity of enforcement presently that coal

23  mines do, and thus will be far less likely to be

24  subject to a pattern notice.  Pattern

25  regulations should be applied fairly to all

segments of the mining industry.

        We all recognize that the stakes are high
here.  The imposition of a pattern of violations
will make it virtually impossible for an
affected mine to continue in operation.  Once a
mine receives a pattern notice, termination of
the pattern notice can only occur if the mine
undergoes a complete inspection without
receiving a significant and substantial
violation.  As that term has been employed, it
would be a virtual impossibility for an operator
in a mine of any size to achieve a clean
inspection.

        One need only review a computer printout of
a violation history for any coal mine to
understand the impossibility of achieving a
clean inspection.  If an underground coal mine
is on a pattern, it will probably receive
closure orders on a daily basis; no mine can
survive in today's competitive markets at such a
disadvantage.

        At this point it probably is not
constructive to elaborate upon how the problems
with disparate enforcement and almost universal
use of the S&S designation for all but technical

15

1   violations for coal operators in District 2

2   arose.  It is more useful to address some

3   solutions to these problems so that pattern

4   notices achieve their remedial purpose and do

5   not result in economic capital punishment for

6   operators.

7       It is critical to recognize that as the

8   term "S&S" is currently interpreted and applied,

9   the remedial purpose of pattern regulations can

10   only be achieved before the imposition of the

11   pattern notice.  Once it is imposed, there will

12   be little realistic opportunity for an operator

13   to improve performance sufficiently to escape

14   the pattern.

15       PCA believes that re-examination of certain

16   fundamentals of MSHA's enforcement practices as

17   they pertain to the definition of S&S is

18   essential.  For that reason, we think it

19   necessary to include in the pattern regulations

20   the definition of significant and substantial

21   advocated in the comments by the National Coal

22   Association, Bituminous Coal Operator's

23   Association and American Mining Congress.

24       We recognize that the Agency attempted to

25   do just that by issuing Program Policy Letter

MAXINE JACOBY & ASSOCIATES

16

P89-I-3, which defined as S&S. That letter,
however, seems to have been defensive in nature
and left open the question of what is meant by
the terms "reasonable likelihood," as it
pertains to the occurrence of an injury and
reasonably serious injury or illness.

Inspectors often consider reasonable
likelihood as one which is merely possible.
This is not consistent with commonly understood
or dictionary definitions of these words which
indicate that they suggest probability, as
opposed to mere possibility.  A definition that
indicates that the occurrence of an injury must
be probable would provide inspectors with some
realistic guidance as to the meaning of a term
that is crucial to the determination of whether
a violation is significant and substantial.

My lawyers advise me that this sort of
definition of "likely" and "likelihood" is
consistent with how courts have defined these
terms.

PCA has suggested that "reasonable
likelihood" be defined in the proposed
regulations as:  "that it is more probable than
not that continuation of normal mining

MAXINE JACOBY & ASSOCIATES

17

1   operations would, within the reasonably

2   foreseeable future, result in an injury or

3   illness." This definition would assist an

4   inspector in evaluating what is meant by this

5   term. Often, inspectors rely on an improbable

6   claim of potential occurrences to support an S&S

7   finding.

8       We also suggest that a reasonably serious

9   injury or illness be defined to give an

10  inspector some specific guidance. The Review

11  Commission has not defined this term, but it is

12  necessary for the agency to seek to fill this

13  void.

14      We recognize, however, that it is not

15  possible to achieve complete uniformity of

16  application of any definition, given the wide

17  disparity in enforcement practices in the

18  various Districts. Moreover, we do not believe

19  that defining or redefining these terms will

20  completely remedy the inconsistency and

21  disparity in enforcement practices.

22      For this reason, we believe an effort must

23  be made to take into account the disparity in

24  S&S rates in the various districts and between

25  coal and metal/non-metal operators. One method

18

of doing this would be to compare similar mines in the same district or subdistrict since the disparities in enforcement would not be as great.

Such comparison should be to mines of similar size and type, since older or larger mines are not necessarily comparable in violation rates to newer or smaller mines. We suggested in our written comments examples of the types of provisions that should be considered for inclusion in proposed Section 104.3, outlining the pattern criteria. This approach would tend to avoid the situation where an operator with an artificially high rate of S&S violations, resulting from being in a disparately high S&S rate District, but who is a better operator than an operator in a low S&S rate District, might be subject to a pattern notice merely because his mine is in a high S&S District.

If changes are not made in the proposal, we believe that the pattern notice will be imposed unfairly. Every effort to prevent unfairness must be made at this juncture, because once the regulations are adopted and implemented, it will

Background Page 00083

19

1    be too late for the operator unfairly singled

2    out to remedy the situation.

3        For this reason, PCA believes that it is of

4    utmost importance that the operators be given as

5    much opportunity as possible for notice of a

6    pattern and submission of mitigating

7    information.

8        To this end, we have suggested in our

9    written comments to eliminate unduly restrictive

10   time frames. Along with industry, we suggest

11   that the time frames be expanded. The proposal

12   states that these time frames were short because

13   of the presence of a serious safety hazard.

14   Even recognizing that, they should not be so

15   short as to deprive the operator of due process.

16   The determination that a pattern exists is

17   probably an irreversible and unappealable

18   decision. It should not be driven by

19   unreasonable time frames.

20       Finally, we are concerned with the

21   generality of criteria of the initial screening

22   and issuance of a notice in proposed Sections

23   104.2 and 104.3. Those provisions simply list

24   the factors that will be considered without

25   indicating how they will be weighed. While we

MAXINE JACOBY & ASSOCIATES

20

1    recognize that the identification of

2    recalcitrant operators requires evaluation of

3    subjective and objective factors, we are

4    extremely concerned about the lack of

5    substantive criteria.

6        Given the history of disparate enforcement

7    of the Act, as shown by the S&S rates, we are

8    concerned with the disparate application of

9    these very vague criteria.  We recognize that

10   the 1980 advance notice of proposed rule-making

11   drew criticism as being too mathematical.

12   However, PCA believes that the proposed rules go

13   too far in the opposite direction.  The

14   establishment of thresholds of S&S ratios and

15   other modifications suggested in our written

16   comments will help to avoid the uncertainty and

17   potential for abuse that the existing proposal

18   will create.

19       We also strongly urge that no consideration

20   be given to the violations that existed prior to

21   the effective date of the regulations.  In its

22   discussion, MSHA indicated it would consider

23   prior violations.  We believe this is

24   inappropriate, particularly in light of what we

25   consider as a necessary adjustment in

MAXINE JACOBY & ASSOCIATES

21

1    enforcement policies.

2        Thank you for your careful consideration of

3    these comments. PCA respectfully urges that the

4    proposal be modified in accordance with our

5    suggestions and those of the mining industry

6    generally. The Agency has a most difficult task

7    confronting it. We would hope that in

8    addressing these issues that Agency move to

9    insure that the purpose of the Act be fulfilled.

10   Thank you very much.

11       MR. ZEUTENHORST: Thank you very much,

12   Mr. McKean.

13       The part of your testimony where you talked

14   about inspectors needing more guidance on more

15   reasonable and more serious materials, you

16   probably know on the Police Letter that you

17   referred to in your testimony, it does give some

18   guidance. All of these terms that are in our

19   policy all come down in the final analysis to

20   the judgment of the inspector, and the Agency is

21   making all the effort that we can to make sure

22   that judgment can be consistent, will be

23   consistent. But I think we all have to

24   recognize that there is a judgment call to make,

25   and that is going to rest in your hands.

MR. McKEAN:  I think your introductory
comments were aimed at that, focused on that as
well.  And, certainly, we would agree that there
is some point that is a judgment call; there
have to be some subjective as well as objective
criteria.  We would just like that to go as far
as we can to give guidance to the inspector, so
that we can be as consistent as possible in
application.

MR. ZEUTENHORST:  I would like to clarify,
too, although the Agency fully recognizes,
because of statutory provisions, the pattern of
violation does not need  --  our position has
been that this particular ruling is not the
appropriate point to define S&S violation,
because they occurred in many types of
situations.

A pattern of violation is going to
ultimately affect a few mines.  Defining a
pattern of violation as a rule that will affect
a few mines would have other ramifications
beyond the pattern provision.  That is what I am
trying to define as S&S in this particular rule.
S&S should be consistently applied.  But, we
would prefer the Agency to handle this

23

1    consistency.

2        MR. McKEAN:  I think in the notice schedule

3    that summarizes our concerns.  And that is that,

4    in fact, it is a few mines; it is, in fact,

5    those that are recalcitrant and not a large

6    number, because of the application of S&S

7    violation.  In other words, if you have  --

8    depending on how you issue the S&S violation,

9    you could move from that into a situation where

10   you had many more than you ever expected to be

11   classified as recalcitrant operators.

12       MR. ZEUTENHORST:  You are also familiar

13   with, obviously, the 1988 proposal, and you

14   probably looked at it to prepare for your

15   testimony.  You mentioned some problems with

16   disparity and whatnot of the 1980 proposal, that

17   attempted to at least accommodate different mine

18   sizes and whatnot.

19       Are you proposing we go back to some of

20   that  --  the 1980 statistics  --

21       MR. McKEAN:  I would like some of my

22   experts to add, but I would say that what we are

23   advocating is possibly something in between,

24   recognizing we try to go too far.  We want to

25   include the problem of going too far to the

MAXINE JACOBY & ASSOCIATES

24

1   other extreme. I think it is somewhere in the

2   middle.

3       Mr. Ed Onuscheck, now retired, classifies

4   himself as a golfer and a fisherman. He is here

5   if you would like to add to that?

6       MR. ONUSCHECK: I concur with the situation

7   that Joel is referring to. The 1980 proposal

8   was too far out mathematically, and I think it

9   would have been a mathematical nightmare.

10      But, with the situation that we are dealing

11  with now, we are dealing with, primarily, the

12  S&S situation, and until we feel we have equity

13  in the enforcement arm of MSHA, it will be most

14  difficult to come out with the uniform policy in

15  order to determine who is to be put on a pattern.

16  That is a problem that I think faces MSHA right

17  now, with respect to how the pattern regulation

18  is going to be effected. And, again, the

19  recalcitrant operator is the one that the Act

20  singled out for the pattern regulation.

21      MR. TAYLOR: Hank Taylor from National

22  Institute for Occupational Safety and Health.

23      I would like to clarify on, I guess, two

24  things.

25      First, I understood you to say  --  I want

MAXINE JACOBY & ASSOCIATES

25

to know if this is correct.  I felt there should
be an immediate step continued to exist where a
mine operator is notified that his behavior is
about to fall into a pattern of practice
violation, rather than having someone show up
and say you're a pattern of practice violation.
Is that correct?

MR. McKEAN:  That the operator at least be
given an opportunity to either explain
mitigating circumstances, to talk about it, yes,
I think you have put it in the right terms.

MR. TAYLOR:  You also included in there
some time to correct the situation before the
actual  --

MR. McKEAN:  Yes.

MR. TAYLOR:  I would like a clarification.
The numbers that you stated on presentation of
S&S violation  --

MR. McKEAN:  That is right.

MR. TAYLOR:  The 89 percent indicated that
on 89 percent of the inspection, there is at
least one S&S violation, or does it indicate
that 89 percent of the violation  --

MR. ONUSCHECK:  89 percent of all the
violations issued.  It is a percentage.

26

1     MR. TAYLOR:  That doesn't indicate that

2     there are any times that somebody is going

3     through an inspection without a violation?

4          MR. ZEUTENHORST:  89 percent of all the

5     things written by the inspector being 11 percent

6     non S&S.

7          MR. McKEAN:  Right.

8          MR. TAYLOR:  Thank you.

9          MR. ZEUTENHORST:  Our next speaker, from

10    United Mine Workers of America, is Linda

11    Raisovich-Parsons.

12         MS. RAISOVICH-PARSONS:  My name is Linda

13    Raisovich-Parsons, and I am here today on behalf

14    of the United Mine Workers of America.

15         Let me begin by stating that the UMWA is

16    wholeheartedly in support of MSHA's long overdue

17    decision to develop regulations for implementing

18    Section 104(e) of the Federal Mine Safety and

19    Health Act of 1977.  Congress clearly recognized

20    the need to protect miners when recalcitrant

21    operators demonstrate total disregard for their

22    health and safety.

23         As a means to address this, Congress

24    authorized MSHA to impose stringent sanctions on

25    mines which exhibit a chronic history of

persistent dangerous violations. Section 104(e) was intended as a tool to protect miners from such neglect of mine health and safety. The UMWA will be happy to see this long evaded enforcement tool finally put into effect.

An overview of the proposed rule reveals that MSHA has narrowly limited the situations that would trigger issuance of a pattern of violations notice. The procedures employed by MSHA to identify potential violators are critical to the effective enforcement of Section 104(e). Therefore, the procedure set forth by these regulations is of utmost concern to the UMWA. A summary of our concerns with each section of the proposed rules are as follows:

Section 104.2, Initial Screening: The proposed rule requires that the compliance record of mines be reviewed once each year for indications of a pattern of violations.

We do not feel that an annual review is frequent enough. Under an annual review, a mine could immediately after the review begin to establish a pattern of violations, which would remain undetected for nearly a year. In this situation, a mine could continue to operate with

28

1    a pattern of dangerous health and safety

2    conditions for close to a year before any action

3    would be taken to restore the mine to a safe

4    condition. This is far too long to permit a

5    potentially disastrous operation to continue

6    unchecked. We recommend at least a bi-annual

7    review.

8         Paragraph (b)(2) of this section calls for

9    consideration of whether there is evidence of

10   the mine operator's lack of good faith in

11   correcting the problem that results in repeated

12   S&S violations.

13        Further, (b)(4) provides for consideration

14   of whether mitigation circumstances exist. The

15   UMWA urges the Secretary not to make an

16   operator's state of mind or intent a factor to

17   be considered prior to the issuance of a Section

18   104(e) notice.

19        The Senate Committee report clearly states

20   Congress's wish that intent or state of mind of

21   the mine operator not be criteria for

22   determining when a pattern of violations exists.

23   Accordingly, the operator's good faith, absence

24   of negligence, knowledge and any extenuating

25   circumstances should not be factored into the

29

1    Agency's review.  If a review of the citation

2    history indicates a pattern of S&S violations, a

3    notice should be issued, regardless of

4    mitigating factors.  Certainly the issuance of a

5    single S&S citation, not to mention a string of

6    them, should be enough to alert an operator

7    about a health and safety problem at his mine

8    and present him with the need to take corrective

9    action.

10        Section 104.3, Pattern Criteria:  Once a

11   mine is identified through the initial

12   screening, the provisions of this section would

13   be used to identify those with a potential

14   pattern of violations.  Contrary to the

15   expressed intention of Congress, MSHA has

16   restricted the situations that would trigger a

17   pattern notice.

18        The Senate Committee report clearly

19   indicated that this enforcement mechanism was

20   not to be limited only to violations of the same

21   standard, nor to violations which are the result

22   of an operator's unwarranted failure to comply.

23   Aside from this, MSHA has incorporated these two

24   limitations into the criteria used to identify a

25   pattern of violations.

MAXINE JACOBY & ASSOCIATES

30

1      The third criteria is limited to a history

2  of repeated S&S violations of standards related

3  to the same hazard.  Nowhere in the proposal is

4  there a mechanism for triggering a pattern

5  notice at a mine that has simply had a history

6  of S&S violations.

7      Of course, MSHA should have the ability to

8  issue a pattern notice where the criteria in the

9  proposed rule apply.  However, they should not

10  be restricted to those situations alone.  We

11  recommend that this section include a criteria

12  that would simply identify mines with a history

13  of S&S violations.

14      Congress clearly expected MSHA to have the

15  ability to issue a pattern notice where there is

16  a history of S&S violations, even if the

17  violations are related to different standards or

18  different hazards.

19      The regulations should further clarify the

20  fact that it is not necessary to meet all of

21  these criteria.  A mine meeting any one of the

22  criteria would be subject to a pattern notice.

23      In addition to the criteria in Paragraph

24  (a), MSHA should also give consideration as to

25  whether the mine under review has been placed on

MAXINE JACOBY & ASSOCIATES

31

a pattern in the past. If a mine has been on a pattern before, MSHA should closely monitor these mines to examine whether they have a tendency to become repeat offenders. If any such mine falls into a gray area as to whether a pattern exists, MSHA must give due consideration to the fact that the mine has had a pattern of violations in the past. This should substantiate that the mine has serious health and safety problems.

Paragraph (b) of this section provides that only final citations and orders will be considered when identifying mines with a potential pattern of violations. The UMWA strongly opposes this proposal.

If MSHA restricts itself to final citations and orders when identifying mines with a potential pattern, operators will be strongly motivated to challenge every S&S citation they are issued, regardless of the merits of their position. If MSHA waits until the legal challenges are exhausted, then they will be trying to determine whether a pattern exists on the basis of conditions that were cited several years previously.

1     Moreover, by filing legal challenges,

2     operators will be able to escape any liability

3     under Section 104(e), even though the citations

4     and orders are ultimately upheld. This is

5     because MSHA, in considering the mine's history,

6     will probably wind up limiting itself to a

7     certain time frame, such as one or two years.

8     It would certainly be easy enough for an

9     operator to challenge S&S citations, and keep

10    their validity in limbo for that period of time.

11    Once the time period that MSHA used had

12    passed, the operator could safely drop its

13    challenge. The operator would know that even

14    though the citation was not final, it would be

15    too old to be included in an assessment for a

16    pattern notice.

17    Requiring a Section 104(e) order to be

18    based only on final citations and orders is

19    completely contrary to the rest of the Act's

20    enforcement scheme. A failure to abate an order

21    under Section 104(b), or an unwarrantable

22    failure order under Section 104(d) are each

23    issued on the basis of previous citations,

24    whether or not those citations have been

25    challenged. Likewise, an operator who disputes

33

an inspector's determination as to whether an imminent danger exists must comply with the Section 107 order, while he challenges its issuance.

There is absolutely nothing in the legislative history which supports such a different and restrictive approach to the application of Section 104(e).

Indeed, the legislative history requires the opposite conclusion.  In discussing the sequence for issuing a Section 104(e) order, the Senate Committee noted that the pattern order sequence parallels the current unwarrantable failure sequence of the Coal Act and the unwarranted failure sequence of Section 105(c) of the bill.  If pattern orders can be based only on final citations, its enforcement cannot be said to parallel that of Section 104(d), as Congress intended.

Section 104.4, Issuance of Notice:  This section establishes guidelines for a review and conference with the District Manager when a pattern notice is issued to provide opportunities for input from mine operators and the miners' representative.  The citations and

34

1    orders issued to an operator for repeated S&S

2    violations of standards provide the operator

3    with ample warning of a potential pattern notice.

4    This should signal that serious health and

5    safety problems exist, and that a course of

6    action is needed to improve the mine's violation

7    record.

8        If a procedure is established to provide

9    additional input regarding the information upon

10   which the pattern notice is based, it should be

11   done through written comments, with copies

12   provided to all parties.  An opportunity for a

13   conference as proposed, discriminates against

14   the miners' representatives, unless such

15   representative is protected against pay loss.

16       Such a conference is currently provided by

17   30 CFR Section 100.6 for review of citations and

18   orders.  Although miners' representatives are

19   afforded an opportunity to participate, they are

20   usually unable to do so.  This is because pay is

21   generally not provided to miners' reps for

22   attending these conferences.

23       The conferences requested by mine operators

24   are very frequent and many local unions are not

25   financially able to pay lost wages for

MAXINE JACOBY & ASSOCIATES

35

representatives to attend these events so often.
This normally leaves the conferences open to the
operators' attempts to influence and pressure
MSHA to vacate citations and orders.  To provide
another conference procedure for review of a
pattern of violations notice would more than
likely result in the same situation.

The UMWA, therefore, recommends that any
input be reduced to writing to provide a fair
balance to the procedure unless, as a
precondition to requesting a conference, the
operator agrees to reimburse the miners'
representative for any lost wages.

The Union further recommends that any mine
identified as having been subject to a pattern
notice in the past should not be afforded the
opportunity for further input regarding the
information on which a pattern notice is based.
These mines should be subject to an automatic
pattern of violations notice if the criteria is
met because these operators have already
exhibited a disregard for health and safety in
the past.  This should be sufficient grounds to
implement Section 104(e), without further
review.

MAXINE JACOBY & ASSOCIATES

36

During the time permitted for response to
notification of potential pattern of violations,
the proposed rule provides the operator an
opportunity to institute a program to avoid
repeated S&S violations.  The District Manager
is then given the flexibility to determine
whether this last-ditch effort to avoid 104(e)
enforcement is effective and whether he is going
to recommend the mine be placed on a pattern
notice.

The rules do not provide any indication of
how these programs will be determined to have
effectively reduced the occurrence of S&S
violations at a mine.  There is a tremendous
potential for abuse by operators and District
Managers under this provision.

A mine which has been identified as having
serious problems could never come under the
enforcement mechanism set out in Section 104(e),
simply on the basis of the District Manager
determining that a program has effectively
reduced the occurrence of S&S violations.  The
proposed regulations require the District
Manager to submit a report if he continues to
believe that a potential pattern of violations

37

exists at the mine. The proposed regulations require no report, however, if the District Manager determines that the program has effectively reduced the occurrence of S&S violations at the mine.

It is more important to require a report in the second situation since the regulations are so general, and do not specify what an effective reduction is. MSHA must require reports when District Managers determine that a potential pattern no longer exists, if there is to be uniformity in enforcement practices.

This proposed procedure leaves a number of unanswered questions as to how it will be enforced. What happens if, during the 90-day trial period, an operator continues to receive S&S citations but decides to challenge virtually all of them? Will an MSHA District Manager not count them because they are not final and declare there has been an effective reduction in citations?

What about the pressure that may be put on MSHA inspectors, especially during the 90-day trial period, to cite violations as non S&S? What happens if an operator improves for the

MAXINE JACOBY & ASSOCIATES

38

1  90-day trial period and then slacks off?  Will

2  MSHA start all over again, notifying the

3  operator that there is a potential pattern and

4  allowing another 90 days for fine tuning the

5  program?  Such a cycle could go on indefinitely

6  and allow operators with a pattern of violations

7  to escape enforcement under 104(e).

8      Section 104.5, Termination of Notice:  This

9  section reflects the Act's rquirement that once

10  a pattern of violations notice is issued, the

11  notice can only be terminated after an MSHA

12  inspection of the entire mine finds no S&S

13  violations of a mandatory safety or health

14  standard.

15      Paragraph (b) recognizes partial

16  inspections covering the entire mine over a

17  90-day period.  The 90-day inspection is much

18  too lengthy.  Conditions in an underground mine

19  change rapidly and variedly.  Consequently, a

20  part of the mine that was inspected and declared

21  "clean" on day one of the inspection may be

22  hazardous by day 90.

23      A complete inspection of a mine should not

24  take more than 30 days.  Therefore, the UMWA

25  recommends that the length of time for a series

MAXINE JACOBY & ASSOCIATES

39

1   of partial inspections be limited to 30 days.

2       I appreciate the opportunity to testify

3   today, and if you have any questions, I will be

4   glad to answer them.

5       MR. ZEUTENHORST:  First of all, I want to

6   clarify a point.

7       You were concerned under Section 104.3,

8   Pattern Criteria.  You recommended that just one

9   of those had to be met.  You did not have to

10  have the history of the repeated S&S on one

11  standard.  Any one of those would be sufficient

12  under this proposal to put them on.

13      Further, just a bit of background why we

14  chose, as an agency, to use as the element that

15  linked together violations throughout the mine

16  instead of just going through the history S&S

17  violations.

18      As you know, most large mines would have a

19  history of S&S violations.  What that history

20  would be is if you are talking numbers, then you

21  would have to come up with some sort of

22  qualification of how you would characterize that

23  history to be a pattern.

24      We looked at the unwarrantable as something

25  that would link together unrelated situations

MAXINE JACOBY & ASSOCIATES

40

throughout the mine, that would give some

indication that there is a serious health and

safety management problem in the mine.  That is

why we chose to specify something more specific,

rather than just a general history of S&S.

I have a question for you on -- under the

provisions, we have to allow a District Manager

to advise a mine that they are developing a

pattern, and they should come up with a program

to correct that situation.  Is it your situation

that we should not have that program at all, or

rather that the program, as specified in the

proposal, is not specific enough?

MS. RAISOVICH-PARSONS:  I think, generally,

it is not specific enough; it does not specify

that, one, that 90-day program has been

completed.  What happens then?  Does the

District Manager make the determination whether

or not the program is approved within the

company at the mine, or can he implement another

program?  It is just not clear enough.

MR. ZEUTENHORST:  Again, the reason we had

that is the intent that a pattern has a very

strong corrective action.  Once you do get into

a pattern notice, then you are, basically, in

41

1    our minds, failing to really correct that mine.

2    We are trying to emphasize --

3           MS. RAISOVICH-PARSONS: Our position is

4    that that cycle could go on indefinitely. There

5    will be another 90-day program, and another one.

6    There has to be some limit.

7           MR. ZEUTENHORST: Okay. Thank you.

8           Our next speaker is from United Mine

9    Workers of America, Mr. Eugene Jenkins.

10          MR. JENKINS: My name is Eugene C. Jenkins.

11   I am a member of the United Mine Workers of

12   America, Local 1368.

13          I would like to comment on the patterns of

14   violation. Also, we feel that that need for a

15   pattern violation is evident by the tragedy of

16   the loss of lives at Scotia Mine, occurring in

17   March of 1976. This mine had a chronic history

18   of persistent damage violations cited by MSHA,

19   and abated the operator; but the operator would

20   still permit the mine to lapse back into

21   violation, exposing the miners to the same risks

22   all over again.

23          We don't feel exposing the miners to the

24   same risk over again  --  we don't feel that

25   Section 104(e) of the '77 Act was intended as an

MAXINE JACOBY & ASSOCIATES

42

effective tool to protect miners when the
operator continues to violate health and safety
of mines through continued patterns of
violation.

The lawmakers who enacted the statute make
it clear that a pattern of violation by our
operators who have a history of repeated S&S
violations, and debating  --  but then continued
to let recur without effective preventative
measures being taken is wrong, and something
needs to come to be done to correct this
neglect.

We further feel that Section 104.2, on
initial screening on MSHA's proposal on the rule
of reviewing compiled records of mines, at least
annually is sufficient enough.  We don't believe
our miners should have to wait and work under
conditions let go this long before something is
done.  Each miner is entitled to health and
safety standards which guarantee a safe working
place.

We feel at least twice a year, or even
quarterly, should be used on screening for
pattern violations.  Repeated S&S violations of
the same standard or hazard are probably a

1  result of the chronic conditions of the mines in [43]

2  which violations are abated when cited without

3  correction of the underlying cause of such

4  violation.

5  This suggests that there exists a serious

6  health and safety problem at these mines, and

7  need to be corrected before we have another

8  Scotia.

9  We further feel by a pattern of violation,

10  if issued, the representative, miners, and the

11  mine operators should have input before a

12  pattern of violation notice would be issued.

13  Once a pattern is established, and the miner

14  operator requests a conference with the District

15  Manager, the miners' representative also is

16  given the opportunity to participate.  We feel

17  that miners' representative should be paid by

18  the company for time spent at these conferences.

19  Conferences requested by the operator are very

20  frequent, and many locals cannot pay lost wages

21  to the representatives.  This could result in

22  operators and MSHA conferences, per se, without

23  the miners' representative's input, and the

24  possibility of operators' influence in

25  pressuring MSHA to vacate citations and orders.

MAXINE JACOBY & ASSOCIATES

44

1    We recommend that any input be reduced to

2    writing, to provide a fair balance of procedure

3    of the pre-conditioning continuance.  The

4    operator agreed to reimburse the miners'

5    representatives for lost wages for attendance at

6    these conferences.

7        We also further feel that any mines

8    identified as having a pattern notice in the

9    past should not be afforded the opportunity for

10   further input and continued long periods of time

11   exposing our miners to conditions which are

12   unsafe or hazardous to their health or

13   well-being.  These mines should be brought

14   subject for automatic pattern of violation.

15       I know from my experience in the mines,

16   inspection after inspection, quarterly

17   inspection, we have close-outs, and the same

18   types of violations occur, time and time and

19   time again.  I think it's time that something is

20   done, and those violations do cease before we do

21   have another Scotia or unfortunate incident in

22   the mining industry.

23       It is time that something should be done,

24   because I heard one gentleman comment about

25   S&S-type citations.  Sure, in District 2, all

MAXINE JACOBY & ASSOCIATES

45

1    are S&S, or the majority of them are S&S, and I

2    feel proud that has happened, because I think in

3    the other Districts the inspectors aren't doing

4    their job.

5        If I was a coal operator and got a non-S&S

6    violation, and only had to pay a $20 fine, I

7    wouldn't care if I got a violation or not.  That

8    is the reason why the Union push for S&S-type

9    citations.  We are not after the company to

10   break them for anything else, because we all

11   live there and make a decent wage and earnings,

12   and support our families, but it is time that

13   something is done to prevent these tragedies

14   that are happening to coal miners, which

15   influence their families and everything else.

16       Thank you.

17       MR. ZEUTENHORST:  One question:  You

18   mentioned that there is a lot of recurring

19   violations.  Are those usually the same standard?

20   Are they related, or is there something that

21   ties this together?

22       MR. JENKINS:  There are a lot of them that

23   are the same, quarter after quarter after

24   quarter.  They don't really do anything about

25   them, per se.  Maybe they do.  If there is a

46

```
 1    violation that is electrical or something, maybe
 2    they will call the mechanics in who are supposed
 3    to sign the books and check these conditions.
 4    They will talk to them; then nothing is done.
 5    The next month the same citations reoccur.  It
 6    is just a continuous snowball effect.
 7         MR. ZEUTENHORST:  Thank you, sir.
 8         Our next speaker is Vic McNevlin.
 9         MR. McNEVLIN:  My name is Vic McNevlin,
10    Chairman of Safety, Local 2221 Mine.
11         Gene pretty well shot down my notes.  I am
12    going to try to fill in as best I can.
13         On Part 104, under Section 104.2, the
14    initial screening under a compliance record,
15    they were stated about reviewing once a year.  I
16    would like to see that, like Linda said earlier,
17    bi-annually.  I would even want to see it
18    quarterly.
19         Number two, say, if you have 80 S&S
20    violations and only two non-S&S, say in four
21    months' time, I believe the operator should be
22    alerted at that mine about health and safety.  I
23    do not think they need any more time as far as
24    correcting it.  Using those 80 S&S, say 40 of
25    those were rock dust and spillage, I think they
```

47

1    ought to know they have a problem there.

2         I'm not saying they don't, but as far as

3    UMW stands, I am willing to sit down with them

4    to see what we can do to correct these

5    violations.

6         Number three, 104.3, pattern criteria  --

7    you commented on this before   --  any S&S

8    violation should come into play here.  Maybe you

9    can fill me in on that after I am done here.

10         I believe if it is a ventilation or rock

11    dust, or whatever, I believe one is as serious

12    as the other; and I am sure you do, too.  But,

13    somehow I missed part of that layout before.

14         I am not going to go over "4."  Number 5,

15    104.5, termination of notice, as far as the 90

16    days on the inspection, I feel that is much too

17    long.  I think we have enough people,

18    inspectors, that a complete inspection could be

19    done in 30 days.  It seems to me  --  I could be

20    wrong about this  --  but in my notes, some mine

21    industries or companies in Keystone Mining are

22    asking for conferences on violations recently.

23    I don't know what it is.  I am not going to

24    comment any further on it.  Maybe you could

25    answer that for me, too, as far as:  Are more

Background Page 00112

48

1    conferences being requested within reasonable

2    quarters?

3         That is all I have.

4         MR. ZEUTENHORST:  I do not know of that

5    information.  Let me try and explain what I was

6    mentioning before.

7         It is MSHA's position at the Legislative

8    District, which is not on the Act, but which is

9    the record of what Congress' deliberations on

10   creating are very clear that the pattern

11   violations are to apply to a few operators,

12   Scotia type, as being very correct in saying the

13   beginning of the pattern provision.

14        Just to say that a history of S&S

15   violations should make a mine be put on a place

16   of pattern of violation is sufficient.  You have

17   to define what that history would be, because

18   every mine, a good-size mine, would have a good-

19   size S&S violation.

20        We need to try as an Agency to go beyond

21   that and figure out what is going to distinguish

22   the pattern violator's history of S&S violations

23   from industry.  Is that helpful?

24        MR. McNEVLIN:  Yes.

25        MR. ZEUTENHORST:  Okay.  Thank you.

49

49

1    Our next speaker is Harry Lane.

2    MR. LANE:  Mr. Chairman and members of the

3    Mine Safety and Health Administration panel, I

4    am Harry C. Lane, President of the John S. Lane

5    & Son, Inc. of Westfield, Massachusetts.  I am

6    here today as Chairman of the National Stone

7    Association, a Washington, DC-based trade

8    association that represents producers of crushed

9    stone and other aggregates.

10   There are currently 3,473 active crushed

11   stone quarries in operation in the United

12   States, representing 1,759 companies.  In 1988,

13   the value of crushed stone sold or used in this

14   country totaled $5.6 billion.  Crushed stone is

15   quarried or mined in 49 of the 50 states, and is

16   an essential part of our nation's

17   infrastructure, as well as being vital to the

18   construction of housing, business, and

19   industrial facilities.

20   NSA is pleased that MSHA has decided to

21   hold this public hearing on its proposed

22   regulation for pattern of violations.  When the

23   proposed rule was issued on May 30, 1989,

24   Federal Register, 23156, NSA reviewed it and

25   found a number of provisions that are of great

MAXINE JACOBY & ASSOCIATES

50

50

1   concern to our industry.

2       On August 22, 1989, NSA provided written

3   comments on the proposed rule, explaining in

4   detail our position on this regulation.  A copy

5   of these comments is included with this

6   statement, known as Attachment A.  I would now

7   like to briefly summarize the earlier comments

8   and make some additional observations.

9       NSA shares the concerns of Congress and

10  MSHA about worksite safety, and strongly

11  encourages its members to comply fully with the

12  established mandatory safety and health

13  standards.  To assist our members in complying

14  with these measures, and to keep them up to date

15  on significant regulatory and legislative

16  requirements, NSA has active Health and Safety

17  and Environmental Committees that serve as

18  resource groups and work to stimulate interest

19  in effective occupational health and safety

20  programs.

21      Kenneth Klinger, Director of Safety for the

22  W.W. Boxley Co., Roanoke, Virginia, is Chairman

23  of NSA's Health and Safety Committee.  He is

24  here with me today and will be happy to answer

25  any questions you might have about NSA's

51

51

1  activities in this area.

2      The proposed rule establishes criteria and

3  procedures for identifying mines with a pattern

4  of violations of mandatory standards that

5  significantly and substantially contribute to

6  sfety and health hazards.  The proposed rule

7  would implement Section 104(e) of the Federal

8  Mine Safety and Health Act of 1977.

9      The intent of Congress in enacting the Mine

10  Act was to target those mine operations that

11  have serious and repeated safety and health

12  management problems.  The Mine Act authorized

13  MSHA to impose stringent sanctions on mines that

14  develop a pattern of violations.

15      Section 104(e) of the Mine Act requires

16  that a notice be issued to a mine operator if

17  the mine has a pattern of S&S violations.  After

18  such notice is issued, any inspection within 90

19  days which reveals another S&S violation results

20  in an order to withdraw all persons from the

21  affected area of the mine until the violation is

22  abated.  Withdrawal orders continue to be issued

23  for subsequent S&S violations until an

24  inspection of the entire mine reveals no S&S

25  violations.  A withdrawal order requires all

MAXINE JACOBY & ASSOCIATES

52

1  miners to be removed from the affected area and

2  prohibits entry, with the exception of personnel

3  assigned to eliminate the violation.

4      Under current law, the Mine Act does not

5  define pattern of violations, but authorizes a

6  rule-making process to estblish such criteria.

7  In 1981, MSHA adopted a defnition of S&S

8  violations as those that have a reasonable

9  likelihood of resulting in a reasonably serious

10 injury or illness.

11     In a 1985 Notice of Proposed Rulemaking,

12 MSHA stated its intent to develop a regulation

13 that would focus on the safety and health record

14 of each mine, rather than on strictly

15 quantitative comparisons of mines to industry-

16 wide norms.  The result of this Notice of

17 Proposed Rulemaking is the proposed rule now

18 being excamined.

19     The primary concern of NSA regarding this

20 proposed rule centers on Section 104.3, Pattern

21 Criteria.  As written, the proposed rule seeks

22 to identify potential patterns of violations.

23 NSA believes the word "potential" should be

24 deleted wherever it appears in the rule.

25     The intent of Congress was to target only

MAXINE JACOBY & ASSOCIATES

53

1   those operators who demonstrate disregard for

2   the health and safety of miners through an

3   established pattern of violations (legislative

4   history of  the Federal Mine Safety and Health

5   Act of 1977, page 620).  NSA believes the

6   proposed rule is overly broad and will affect

7   many mining operations that do not fit the true

8   intent of Congress.

9       We feel that the definition of significant

10  and substantial should be more clearly stated in

11  this rule.  NSA advocates including in this rule

12  the definition of S&S provided by the Federal

13  Mine Safety and Health Review Commission in

14  Secretary of Labor, MSHA v. Cement Division,

15  National Gypsum Co., that definition being

16  having a reasonable likelihood of resulting in a

17  reasonably serious injury or illness.

18      NSA also believes that the term

19  "unwarrantable failure," as used in Section

20  104.3(a)(3), should be defined as established by

21  law in Emery Mining Corporation v. Secretary of

22  Labor, MSHA.

23      Similarly, definition is needed for the

24  terms "pattern," "habitually," "history," and

25  "repeated," as stated in the NSA written

MAXINE JACOBY & ASSOCIATES

54

1   comments. The extreme sanctions of the pattern

2   of violations proposed standard beg for clarity

3   of understanding between all parties.

4        In determining a pattern of violations

5   under the proposed rule, MSHA would review a

6   mine's history of S&S violations. NSA believes

7   that MSHA should consider the fact that many

8   operators have traditionally declined to contest

9   citations because the legal expenses involved

10  would significantly outweigh penalties in many

11  cases.

12       Clearly, if such operators were aware at

13  the time that such actions could ultimately

14  result in a pattern finding, they would have

15  contested many of these S&S citations. In many

16  cases, such contested citations would have been

17  reduced to non-significant and substantial

18  citations.

19       Consequently, NSA urges MSHA to revise the

20  wording of Section 104.3 to state: "Only final

21  citations and orders issued after the effective

22  date of these regulations shall be used to

23  identify mines with a pattern of violatiions

24  under this standard."

25       In Section 104.2 of the proposed rule,

MAXINE JACOBY & ASSOCIATES

55

1   initial screening, we believe that the wording

2   should be revised to provide for an annual

3   compliance record review of only those mines

4   having a history of significant and substantial

5   violations.  As written, all mines' records

6   would be reviewed annually.

7       In addition, NSA encourages deletion of the

8   portions of this Section (b)(2), (b)(3), and

9   (b)(4), that call for consideration of evidence

10  of the mine operator's lack of good faith in

11  correcting the problem that results in repeated

12  S&S violations, an accident, injury, or illness

13  record that demonstrates a serious safety or

14  health management problem at the mine, and

15  whether mitigating circumstances exist.  These

16  provisions have no basis in the legislative

17  history of the Mine Act.

18      NSA objects to the length of time provided

19  in the issuance of notice portion of this rule,

20  Section 104.4.  The 20-day period provided for a

21  mine operator to review all documents upon which

22  the pattern of violations evaluation is based,

23  provide additional information, submit a written

24  request for a conference with the MSHA District

25  Manager, and institute a program to avoid

MAXINE JACOBY & ASSOCIATES

56

1  repeated S&S violations is clearly inadequate.

2  The 30-day period, following the District

3  Manager's report, that is provided to the

4  Administrator to sisue a decision as to whether

5  the mine is to be issued a notice of a pattern

6  of violations is also insufficient.

7  Additional time should be provided to

8  comply with the requirements of Section 104.4,

9  and MSHA should also specify that all reports be

10  sent by certified mail.  Mine operators should

11  also be given the opportunity to appeal the

12  Administrator's decision.

13  Section 104.5, Termination of Notice,

14  should be revised to include a provision for

15  termination of notice when an operation is

16  bought or sold, and the ownership changes hands.

17  Finally, NSA believes that an operator

18  should have the option of requesting an

19  inspection of the mine by personnel from a

20  different field office or subdistrictthan that

21  conducting the initial inspection.

22  On behalf of the National Stone

23  Association, I again thank MSHA and this panel

24  for holding a public hearing on this most

25  important subject.  We ask that our statement

57

1    become part of the permanent record on the

2    Pattern of Violations rule-making process.

3    Mr. Klinger and I will try to answer any

4    questions you might have at this time.  If we

5    are unable to immediately provide a response, we

6    will be pleased to promptly submit a written

7    response.

8         MR. ZEUTENHORST:  I think your statement

9    was quite clear.  Thank you for coming, Mr.

10   Lane.

11        Our next speaker is Mr. Chris Hamilton for

12   the West Virginia Coal Association.

13        MR. HAMILTON:  My name is Chris Hamilton.

14   I am Vice-President of the Health and Safety and

15   Environmental Affairs for the Western Union Coal

16   Association.

17        For the record, initially, I would like to

18   endorse the comments made by the Pennsylvania

19   Cooperative Coal Association, relative to the

20   inconsistency, lack of uniform interpretation

21   and application of some of the existing

22   enforcement action, namely, the issuance of S&S

23   violations.

24        The thrust of our comments here today

25   evolves around many of those same concerns

MAXINE JACOBY & ASSOCIATES

58

articulated here earlier today.

The West Virginia Coal Association is a trade association comprised of coal-producing companies who collectively account for approximately 85 percent of West Virginia's underground coal production. Our membership also include equipment manufacturers, service companies, mine supplies, and land corporations.

As an overall comment to MSHA's proposed standards and criteria who identified mines with a pattern of violation, we request the desirability and necessity of this rule-making reporting to implement Section 104(e) of the Mine Act. That position is advanced, and we believe has been bolstered — bolstered more than ever by improving safety performance record in the coal industry, where we as an industry have experienced continual improvement since the passage of the 104(e) nearly 12 years ago.

In fact, the country rates today appears to be about one-third of what they were in 1977. We believe, among other critical factors, such as improved cooperation and increased efficiency level among miners, managers, and inspection personnel alike, coupled with the introduction

MAXINE JACOBY & ASSOCIATES

59

1    of new mine technology, which is resulting in [59]

2    even greater gain in both mine health and safety

3    and overall mine efficiency.

4        This is additionally evident, the

5    effectiveness of our existing and current

6    endorsement practices that are available to

7    MSHA.

8        We have more than adequate administrative

9    controls and enforcement action presently

10   existing to appropriately respond to instances

11   of mine operator recalcitrants, habitual

12   violators of the Mine Health and Safety Act,

13   mine operators experiencing serious safety and

14   health management problems.

15       Nonetheless, if MSHA elects to proceed with

16   a development of these rules, we offer the

17   following comments and recommendations:

18       First and foremost, we believe that to be

19   imperative of the scope and stated purpose of

20   the proposed regulations, we be advised and more

21   accurately reflect the legislative history and

22   congressional intent behind Section 104(e).  The

23   legislative history is clear and supports an

24   application of the pattern provision that is

25   limited to the recalcitrant mine operators who

MAXINE JACOBY & ASSOCIATES

60

1    have not responded to other enforcement action

2    under the Mine Act.

3        The pattern provision is intended to be an

4    endorsement tool of last resort, and must not be

5    the subject of vague regulatory provisions.

6    Therefore, we urge the Agency to adopt the

7    following additional language to Section 104.1.

8        To insure the appropriate use of the

9    patterns and sanctions, and to assure that the

10   goals envisioned by Congress with these sections

11   were adopted or realized.  The pattern of

12   violation enforcement action is intended to be

13   applied to the new recalcitrant operators who

14   are chronic violators of the law, and who have

15   not responded to other enforcement action

16   available to MSHA under the Act.

17       We also recommend adding a new section,

18   104.2, to accommodate the essential definition

19   which we will be submitting for your

20   consideration and for today's hearing record.

21       First, we recommend that MSHA use the rule-

22   making procedure to adopt the definition of a

23   term significant and substantial, provided by

24   the Federal Review Commission and decision of

25   the Secretary of Labor or MSHA, the National

MAXINE JACOBY & ASSOCIATES

61

Gypsum, commonly referred to as Gypsum Decision; and, secondly, the definition of unwarrantable failure provided by the Commission of <u>Emery Mining Corporation v. Secretary of Labor, MSHA</u>.

Our recommended Section 104.2 reads as follows:  Significant and substantial violations of significant and substantial.  If there is a reasonable likelihood that an injury or illness will occur, as well as a reasonable likelihood that the injury or illness will be reasonably serious or fatal, the authorized representative's secretary will analyze the hazards created by the violation by first examining the hazard.

Second, the events that must occur to create the exposure to such hazards; third, the likelihood of the occurrence of these events; and, fourth, the likelihood of the cause of such events will rebut in a reasonably serious injury or illness.

Unwarrantable failure, a violation as a result of an unwarrantable failure could comply as to it results from aggravated conduct, constituting more than ordinary negligence. MSHA, in its background comments, refer

MAXINE JACOBY & ASSOCIATES

62

1    explicitly to the definition of S&S and National

2    Gypsum.

3         We requested that the attempt of MSHA's

4    preamble language be adopted by the specific

5    conclusion and the standard itself of the above

6    definition for S&S, such in a corporation is

7    consistent with MSHA's adoption of National

8    Gypsum and the Civil Service penalty standard

9    under 30 CFR 100.4, and is necessary to provide

10   judgment then to inspectors, regulatory parties,

11   and even Review Commission important judgment.

12        The adoption and incorporation of the

13   National Gypsum and every definition will

14   prevent future attempts, circumventing both of

15   these logical definitions and insure the

16   integrity of the Act, graduated endorsements,

17   particularly the status most severe sanction, a

18   pattern of violation notice.

19        The conclusion in these definitions in the

20   standard is also important to assure an

21   appropriate and consistent enforcement of MSHA

22   standards and to assist inspectors in

23   independently evaluating each violation to

24   determine whether the circumstances meet the S&S

25   violation criteria.

MAXINE JACOBY & ASSOCIATES

63

63

1          The definition of the term "significant and
2     substantial" has been misapplied to safety
3     violations, and has been essentially ignored
4     with respect to health violations.  MSHA's
5     current policy has led to vastly differing
6     applications by different MSHA Districts.  In
7     fact, the Agency within statistics will document
8     the disparity and what many would argue
9     represents discriminatory applications.
10         In support of this statement, we note that
11    the number of percentages of S&S violations
12    issued in West Virginia, particularly Northern
13    West Virginia, MSHA's District 4 out of
14    Morgantown  --  District 3 out of Morgantown,
15    I'm sorry --  and disproportionate in
16    comparison with MSHA's remaining Districts, with
17    the exception of, perhaps, one slightly to the
18    North.
19         This, categorically, appears to have
20    serious health and safety management problems in
21    mines of Northern West Virginia.  We take strong
22    exception to the perception permitted to exist
23    by the numbers and strongly urge MSHA to adopt
24    our recommended of S&S violations from
25    corporations to the rules and regulations.

**MAXINE JACOBY & ASSOCIATES**

64

64

1    In order to bring about increased

2    uniformity, consistently and most importantly,

3    fairness to MSHA enforcement practices, as an

4    additional measure to provoke more consistent

5    application of principles for determining S&S

6    violation, we urge MSHA to modify its citation

7    form to replace or supplement the S&S check box.

8    The nature of this form in and of itself has

9    often led to the marking of citations, without

10    the analysis required by the Commission of the

11    inspector.

12        Modifying this form to require narrative

13    responses in place of a check box would promote

14    more thorough inspector of analysis of each and

15    every S&S finding.  We realize and commend MSHA

16    for responding to some of the glaring problems

17    by recently developing a Policy Letter and

18    Inspector Guidelines for all S&S violations.

19        Review this action as a needed first step,

20    but in and of itself it does not provide the

21    meaning and stability of being memorialized

22    within the regulation itself.

23        Therefore, we recommend the regulatory

24    adoption of definition and language consistent

25    with Review Commission Decision, and the need of

65

65

1   the citation form.  It is steps toward

2   appropriate uniform enforcement.  We firmly

3   believe that this objective should be an

4   elevated priority of MSHA and a fundamental

5   prerequisite before moving forward with the

6   pattern of violation program and regulation.

7       We now move to Section 104.3 and 104.4,

8   initial screening and pattern criteria.

9       The recommendations in those sections are

10  around two basic principles, one to place

11  screening at the national level, at the

12  appropriate -- before the appropriate

13  Administrator; and, secondly, to focus on S&S

14  violations associated with more than ordinary

15  negligence.

16      As proposed, these sections contained

17  loosely-worded and vague criteria for which

18  means are to be evaluated, and determinations

19  made as to which mines are to be considered for

20  pattern of notices.  This lack of administrative

21  guidance and definition had potentially

22  frustrated the administration of the patterns

23  program, and subjects the same to potential

24  misapplication and unintentional abuse of

25  discretionary authority.  This could serve to

66

66

1   further compound existing problems surrounding

2   the key operative terms of the pattern proposal,

3   namely, the S&S violation and the unwarrantable

4   failure to avoid these problems, and more

5   accurately reflect what we believe is the intent

6   behind those provisions.

7       We urge MSHA to adopt the provisions to

8   Section 104.3 and 104.4 that were contained

9   within the written comments filed on behalf of

10  the National Coal Association by two most

11  cooperative associations in the American Mining

12  Congress.

13      The West Virginia Coal Association, in

14  conclusion, wholeheartedly endorses these

15  comments that were previously filed on behalf of

16  the National Coal groups. The remaining

17  provision of MSHA's proposed pattern of

18  violation regulation, specifically those without

19  procedures for the issuance and termination of

20  the pattern of notice, as well as those which

21  will adverse a more detailed Section 104.3 and

22  104.4, will be prevented through testimony next

23  week.

24      Many members of our organization

25  participate on the technical committees and

67

1    regulatory review and drafting committees of

2    those national organizations, and we will be

3    delivering comments with respect to those

4    situations in Denver next week.

5        Thank you very much.

6        MR. ZEUTENHORST:  One of the reasons why,

7    in a proposal MSHA has the initial screening at

8    the District level is felt proposed to the

9    structure. is each mine will be evaluated by its

10   own merits.  If you went to the administrative

11   level, you are more less tied to one step

12   removed from the people that know best of the

13   operations of that mine.

14       The statistical-type analysis of computer

15   printouts, rather than getting out the health

16   and safety management practices at that mine,

17   that is why MSHA is structuring a proposal.  The

18   District level would be higher than the ..

19   subdistrict level and the field office, to

20   provide more consistency, and the Administrator

21   makes decisions in overall circumstances on both

22   control on the metal and the non-metal side.

23       MR. HAMILTON:  We view this more in line

24   with, again, what we believe to be the

25   congressional intent back in 1987.  There are a

MAXINE JACOBY & ASSOCIATES

68

68

1  lot of buzz words that are associated with that

2  intent, habitual violators, recalcitrant

3  operators, those mines that have serious health

4  and safety management problems, evidenced by.

5      We see this as a major significant decision

6  by the industry, inconsistent with our unstable --

7  of the background and congressional intent, we

8  truly envision that there will only be a few

9  mines that are issued the pattern notices

10  following the enactments of the regulation.

11  Given the signifance of this program, and who it is

12  generally or specifically aimed, we believe that

13  it is a decision that should be made at a higher

14  level, absent any local or regional  --  around

15  a level which will insure that all the

16  information surrounding the actual factual

17  circumstances of that operation are factored

18  into the decision-making process.

19      MR. TEASTER:  I have a question.  If I get

20  this wrong  --  I am going to tell you what I

21  think you said, and if I am wrong, please

22  correct me.

23      You made reference to the scope of this

24  rule being limited to operators who have not

25  responded to other enforcement action?

MAXINE JACOBY & ASSOCIATES

69

MR. HAMILTON: Yes.

MR. TEASTER: I was just curious what you meant by not responding to other --

MR. HAMILTON: Recalcitrant, habitual violators thumbing their noses at the Act and at the Agency.

MR. TEASTER: I think the way you said it in the opening statement, I think that we all agree --

MR. HAMILTON: I should point out that we commend the addition to the regulation. I don't believe the advanced notice of the proposal contained such a provision. We think that was, again, a good, needed first step, but we would like to see that expanded to more closely parallel the history and decision that took place around the adoption of those provisions.

MR. ZEUTENHORST: Thank you.

Any other comments?

MR. TUGGLE: My name is Harry Tuggle. I am here on behalf of the United Steel Workers of America. I would like to direct some comments towards some comment that has appeared in the Mine Reporter, that it was highlighted from the Agency as far as those that merit some attention.

MAXINE JACOBY & ASSOCIATES

70

And from those, apparently some industry comments were that the language for the pattern of violation proposed that the rule was too broad and encompassed more than what was intended by Congress is what I think was stated here earlier this morning.

A legislative history does in fact state this particular language on pattern of violation. The Secretary shall have the authority for a necessarily-broad scope to apply this rule.

Also, there were comments in regard to the cost of the proposed rules that were inaccurate, and that MSHA failed to include additional cost litigation, and so forth, which might be staggering.

In essence, if the staggering cost, I think, was directed more at prevention versus after the fact in fighting the issues, the money would be spent in a better direction.

There were also statements that if the S&S violation ultimately contributed to a pattern of violation, those S&S citations would have been contested, and there have been many, many mines come and gone in the last 12 years, to where many of the operators even here that have had

71

1    operations open up and then mine them up, shut

2    them down, and so on.  These situations have

3    come and gone without any cost under the pattern

4    of violation.

5         It goes on to say that the violation should

6    only be applied as of the time stated as this

7    given rule.  No less than a period of time to

8    exceed two years, I think MSHA has already

9    stated in their preamble to these regulations

10   that they may be looking at a two-year area

11   here, where in fact they will, if there are no

12   S&S criteria or no criteria to set up a pattern.

13   They may not back all the way into the history,

14   but it may be  --  two years may be a trigger

15   mechanism to go ahead and look back at the five,

16   six, ten years, whatever it might be.

17        We concur with the fact that the time

18   criteria should not be restricted to any given

19   time frame to come back up into whatever time

20   frame is necessary, to see if a pattern has

21   existed, whether it be under a given operator or

22   a number of operators, or a number of owners.

23   If there is a pattern there, there is a pattern.

24   Then it, apparently, will apply to a given

25   mining membership, given mining group of

72

72

employees, no matter who was at the hilt, but this particular corporation or whatever it might be has a habitual situation of inserting people there that do not have a concept of what is going to become S&S, or what is going to become a concept of a pattern.

Also, there are commenters that suggested that a notice be determined when an inspection by MSHA results in no S&S violations in the area of the mines involved in the pattern. I think it was a clear intent of Congress, and I think it is a clear intent of the application of MSHA to apply that on a mine-wide basis, that once they have an inspection of the mine in its entirety, then that may be a point in time when the pattern system would cease, not just to the given area of where a particular violation begins to cause the pattern itself.

Others believe that the mine operator should have a right to request personnel from different fields or districts or offices to perform final inspection for those who perform the initial inspection. This is getting, I think, quite complicated, by the same token.

The miner representative should have an

73

input into any sort of concept like that, and to
where we would start to say, okay, if you are
going to be calling from other districts, then
what are we going to do?  Are we going to put
them on a strike-name basis, and the companies
strike this and take this from this District,
and the miners' representatives strike this
name?

It does not appear to be a conceivable way
to apply something like that.  It would simply
appear that somebody says we will bring somebody
from outside the District that we are aware that
is less stringent, less technical about the
situation than given people here in our District.
We would not concur with something like that.
The one area of the pattern criteria, where
there are three instances, violations of the
same standard, violations of standard related to
the same hazards, or violations caused by
unwarrantable failure to comply.

From my understanding, from MSHA, is that
if you have a number of violations unrelated to
the same standard in a given mine, the only way
you may link those will be by unwarrantable
failure.

MAXINE JACOBY & ASSOCIATES

74

MR. ZEUTENHORST: That is how it has been proposed, yes.

MR. TUGGLE: It is the Steel Workers' position that there should be a fourth criteria there; and I don't know if you want to play number games or what, but even if there is a great number of S&S violations throughout the operation, it still reverts back to, and it may be lower management problems. It is something that should trigger MSHA, and should trigger the mine operator to evaluate, even though they are not in fact unwarrantable figures. That is something to tie this together.

With that, I have no further comments.

MR. ZEUTENHORST: Just one question: Would you care to comment on the proposed provision to allow the District Manager to put -- to recognize that an operator may be advancing down the pattern road, to put that operator on some written notice that he is developing a pattern of violation but has an opportunity to develop a program, a remedial program and a corrective program.

Do you have a comment on that?

MR. TUGGLE: Yes. The bottom line in this

MAXINE JACOBY & ASSOCIATES

75

1    is to find a way to, number one, correct the

2    problem within any given mining operation but

3    within that system. As was brought out by

4    United Mine Workers, we had a problem with that

5    if in fact it comes in a situation of a District

6    Manager allowing a system to get beyond the

7    scope of what it was intended for, and wind up

8    with repeated 90 days, repeated 90 days, and

9    never ending, to see if in fact a program works.

10       By the same token, along those lines, if an

11   operator is receiving a notice based on the fact

12   that a resolved S&S citation, and he is given

13   notice under a pattern, and it is only based on

14   resolved issues; if in fact he is under notice

15   at a given time, at least any particular S&S

16   citation that comes about during that notice and

17   that 90-day review, I think the District

18   Managers should have the wherewithal to go ahead

19   and advance that to the Administrator, and go

20   from there. Even though it went into a hearing

21   or whatever, it would be an additional trigger

22   that would in fact cause that District Manager

23   to move from correction.

24       There is also a comment to elaborate one

25   point further here about the patterns being on a

76

1    national level. I think if they, by the

2    proposal, they are in fact on a national level.

3    The national screening and national review,

4    someone has got to do to the legwork and the

5    groundwork, and that is by the inspectors, then

6    to the District Managers, which oversee his

7    inspectors; and based on the information he has

8    gathered, it is forwarded then to the

9    Administrator on a national level.

10       Just to say that they should develop a

11   whole new office and new monies should be

12   developed for a whole new department in MSHA for

13   a Pattern Violation Review Board and a review

14   system is not going to serve the purpose in

15   getting the pattern violation across as Congress

16   intended.

17       MR. ZEUTENHORST: Thank you, Mr. Tuggle.

18       Are there any further personnel who would

19   like to make a statement or testimony this

20   morning?

21       In closing, I would like to express our

22   appreciation for you sitting out this morning

23   with the cold room and everything. Your

24   presence here today shows the importance you

25   attach to these activities. On behalf of the

MAXINE JACOBY & ASSOCIATES

77

1    panel, I would like to thank you for coming.

2          This hearing is closed.

3          (Whereupon, at 1:10 p.m., the hearing was

4    concluded.)

5                  - - -

MAXINE JACOBY & ASSOCIATES

78

1                                                                                    78

2

3

4

5                              C E R T I F I C A T E

6

7              I, JENIFER PENNLINE, a Notary Public - Court

8    Reporter for the Commonwealth of Pennsylvania, do hereby

9    certify that the said hearing was taken at the time and

10   place stated herein; and that the said hearing was recorded

11   stenographically by me and then reduced to typewriting under

12   my direction, and constitutes a true record of the testimony

13   given at the time of the hearing.

14

15

16

17                              _____
                                 Jenifer Pennline
18                              MAXINE JACOBY & ASSOCIATES
                                500 Renshaw Building
19                              9th & Liberty
                                Pittsburgh, PA   15222
20                              (412) 765-3133

21   My Commission Expires:

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DEPARTMENT OF LABOR

Public Hearing

on

Proposed Rules for

PATTERN OF VIOLATIONS

12:30 p.m.
November 8, 1989

Stouffers Airport Hotel
Denver, CO

**2 1 NOV 1989**



2

1                          I N D E X

2    SPEAKERS:                           PAGE NO.:

3    John Caylor                            10

4    Henry Moore                            10

5    Ronald Wooten                          25

6    Harold Barnes                          28

7    John Reeves                            57

8    Linda Raisovich-Parsons                66

9    Bob Butero                             75

10   Crecencio Salazar                      82

11   Linda Koile-Fischbeck                  83

12   Larry Neil                             86

13   Harold Barnes                          92

14   Dan Larkin                             96

15

16

17

18

19

20

21

22

23

24

25

3

P R O C E E D I N G S

12:30 p.m.

MR. RICHARD ZEUTENHORST:  Good afternoon.  I am Richard Zeutenhorst, the Associate Director of the Mine Safety and Health Administration's Office of Standards, Regulations, and Variances.  I will be your moderator this afternoon on this public hearing on MSHA's proposal to establish procedures to identify mines with a pattern of violations.

With me on the panel this afternoon are, to my immediate left, Dave McConnell from the Labor Department's Office of the Solicitor; to my immediate right, Ernie Teaster from MSHA's Office of Policy Planning and Evaluation; and, to my far right, Mary Ridley from my office.

The purpose of this hearing, as stated in the Notice of Hearing, is to receive relevant comments and data on MSHA's pattern of violations proposed rule which was published in May of this year.  Most of the major issues arising from the proposal were stated in the October 19th Federal Register notice announcing this hearing.

This is the second of two public hearings.  The first hearing was held last Wednesday, November 1st, in Pittsburgh, Pennsylvania.

These hearings are being held in accordance with Section 101 of the 1977 Federal Mine Safety and Health Act, and it is the practice of this Agency that formal rules

4

1   of evidence will not apply.  Today's proceeding will be

2   conducted in an informal manner.  Those of you who notified

3   MSHA in advance will be able to make your presentations first

4   and upon request will be followed by others who wish to have

5   an opportunity to speak.

6           Anyone who has not previously requested to

7   speak should indicate their intention to do so by notifying

8   the panel.

9           During this proceeding, the hearing panel will

10  be available to address questions from the speakers.  To

11  ensure an accurate record, if you do have questions please

12  come to the podium and begin by clearly stating your name and

13  organization.  In order to clarify certain points, the panel

14  may ask questions of the speakers.  Time will also be made

15  available, as is the usual practice in MSHA's hearings, for

16  those wishing to make additional statements.

17          As moderator, I may exercise discretion to

18  exclude irrelevant or unduly repetitious material and

19  questions.

20          A verbatim transcript of this hearing is being

21  taken, and it will be made a part of the rule-making record.

22  The hearing transcripts, along with all the comments that MSHA

23  has received to date on the proposed rule, will be made

24  available for review by the public.  However, if you wish a

25  personal copy of the hearing transcript, you may wish to make

5

1   your own arrangements with the Reporter.

2           MSHA will also accept additional written

3   comments and other appropriate data on the proposed rule from

4   any interested party, including those who have not presented

5   oral statements.  These written comments may be submitted to

6   me during this hearing or sent to the address listed in the

7   hearing notice.  All written comments and data submitted to

8   MSHA will be included in the rule-making record.  The record

9   will remain open until December 8, 1989, to allow for the

10  submission of post-hearing comments and data.

11          At this point, if there is anybody who was not

12  at this morning's hearing, I would ask that sometime during

13  this afternoon you sign our attendance sheet.

14          By way of background, this proposal was

15  developed to implement Section 104(e) of the 1977 Mine Act.

16  This provision addresses mines with a pattern of violations,

17  which are of a nature that could have significantly and

18  substantially contributed to the cause of health or safety

19  hazards.

20          Section 104(e) requires that a notice be issued

21  to a mine operator with a mine that has a pattern of

22  significant and substantial, or S & S violations.  Once the

23  Section 104(e) pattern notice is issued, any inspection within

24  90 days which reveals another S & S violation results in an

25  order to withdraw all persons from the affected area of the

6

1   mine until the violation is abated.

2              The statute further requires that withdrawal

3   orders continue to be issued for subsequent S & S violations

4   until an inspection of the entire mine reveals no further

5   S & S violations.

6              The 1977 Mine Act does not define "pattern of

7   violations", but rather authorizes the Secretary to make such

8   rules as necessary to establish criteria for determining when

9   a pattern exists.  Congress provided the Secretary broad

10  discretion in determining these criteria.

11             MSHA first published a proposed rule to

12  implement the statutory pattern of violations provisions in

13  1980.  However, this proposal was withdrawn in February, 1985,

14  in an advance notice of proposed rule making.  The 1985 notice

15  was intended to address many of the concerns expressed about

16  the 1980 proposal, as well as to take into consideration the

17  Agency's enforcement experience under the 1977 Act.  On

18  May 30th of this year, MSHA published the proposed rule we are

19  here to discuss.

20             MSHA believes that three principles are central

21  to this rule making.  First, based upon the legislative

22  history of the 1977 Mine Act, it is clear that the pattern

23  provisions are directed at only a few mines.  This is not a

24  rule with pervasive application.  The mines addressed are

25  those where S & S violations are abated when cited, but

7

chronically recur without the mine operator taking effective
preventative action.  Congress intended that the pattern
provision protect miners from such disregard for their safety
and health.  That is the Agency's intent with this rule
making.  Second, the pattern must include procedures for fair
and full notice, allowing all parties to respond to MSHA's
determination that a particular mine may have a pattern of
violations.  Third, to be truly effective, a pattern rule must
have a strong remedial or corrective effect.  It must get the
mine operator's attention with the ultimate goal being to
restore safe and healthful working conditions at the mine,
rather than closing it down.

Because S & S violations form the basis for
finding a pattern of violations, many commenters have
repeatedly stated that a more uniform application of the
criteria for determining what violations are S & S is needed
in MSHA's enforcement activities.  These commenters have
suggested that the criteria for S & S violations be defined in
the rule, as it was by the Federal Mine Safety and Health
Review Commission in the National Gypsum case.  MSHA agrees
that citations for S & S violations, which in part form the
basis of a pattern determination, must be consistent with the
definition of S & S violations established by the Review
Commission.

As recently as September 21st of this year,

8

1  MSHA has reaffirmed this position in a Program Policy Letter

2  for metal, nonmetal, and coal mines.  That policy letter

3  states, in part, that:  "In determining whether a violation

4  could 'significantly and substantially contribute to the cause

5  and effect of a mine safety or health hazard', inspectors must

6  first find that, first, an injury or illness would be

7  reasonably likely to occur if the violation were not

8  corrected; and second, if the injury or illness were to occur,

9  it would be reasonably serious.  Both of these findings must

10  be made before a violation can be designated as 'significant

11  and substantial'."

12        MSHA continues to believe that including a

13  definition in this rule of what constitutes an S & S violation

14  is neither appropriate nor necessary.  In accordance with

15  prevailing case law, each violation must be independently

16  evaluated by the inspector to determine whether the

17  circumstances meet the S & S criteria.  The S & S criteria do

18  involve subjective elements that must be resolved by the best

19  judgment of the inspector.  Under any particular

20  circumstances, the inspector's judgment, like that of any

21  of us, may result in differences of opinion as to the validity

22  of that judgment.  In that respect, the citations and orders

23  leading to a pattern of violations notice would not differ

24  from those involved in the Agency's other enforcement actions.

25        Although MSHA remains committed to working

9

1   toward a consistent assessment of the degree of hazard posed
2   by violations, and hence more consistency among districts,
3   there will always be some variation from inspector to
4   inspector. The Agency intends, however, that such variation
5   will play no significant role in whether a mine is placed on a
6   pattern of violations. The key element, rather, must be
7   whether the mine has a serious safety and health management
8   problem that is manifested in a chronic cycle of violations
9   and abatements without any effort being made by mine
10  management to restore the mine to effective safe and healthful
11  condition.

12          We will now begin with those speakers who have
13  requested to appear today. I will read the entire list so
14  that you may know the order in which your name appears. As
15  previously stated, if your name does not appear on the list,
16  you will have an opportunity at the end of this hearing to
17  make a presentation.

18          This afternoon, we have John Caylor, from
19  Cypress Coal Company; Ron Wooten and Harold Barnes,
20  representing the American Mining Congress, Bituminous Coal
21  Operators' Association, and the National Coal Association;
22  John Reeves from the Midcontinent Resources; representing the
23  United Mine Workers of America, Linda Raisovich-Parson, Bob
24  Butero, Crecencio Salazar, Larry Neil, Linda Koile-Fischbeck;
25  and from Homestake Mining Company, Harold Barnes; and finally,

1   from the Colorado Mining Association, Dan Larkin.

2                   As you begin to speak, please come forward and

3   spell your name for the Reporter.  If you have a prepared

4   testimony, I would appreciate if you would provide the hearing

5   panel a copy and also a copy to the Reporter.

6                   We will now hear from our first witness,

7   Mr. John Caylor from Cypress Coal Company, and Mr. Hank Moore.

8                   MR. JOHN CAYLOR:  I am John Caylor,

9   C-A-Y-L-O-R, Manager of Safety and Industrial Hygiene for

10  Cypress Coal Company.  And appearing with me is Hank Moore

11  with Buchanan and Ingersoll, a law firm out of Pittsburgh,

12  Pennsylvania.

13                  Mr. Chairman and panel, Cypress Coal is

14  engaged, through its subsidiaries and affiliates, in the

15  underground and surface mining of coal at various locations in

16  Colorado, Pennsylvania, Utah, West Virginia, Wyoming, and

17  Kentucky.  We will produce approximately 15 million tons of

18  coal in 1989.  Its operations are located in a number of MSHA

19  districts, including Districts 2, 4, 7 and 9.  We join and

20  generally adopt the comments and testimony submitted jointly

21  by the National Coal Association, the American Mining

22  Congress, and the Bituminous Coal Operators' Association.  In

23  addition, we would also submit the following testimony.

24                  We believe that MSHA is confronted by a task of

25  monumental proportion as it tries to draft regulations

11

concerning pattern of violations that are fundamentally fair
and achieve the purpose of the standard.  In some respects,
this task is made difficult by the factors that are rooted in
the historical enforcement of the Act.  These factors include
the fact that almost all violations can be, in the view of
some inspectors and Agency personnel, designated "significant
and substantial".  And the fact that there is a substantial
disparity between enforcement in various MSHA districts.

It is our firm belief that the imposition of a
patter of violations on a particular mine will be, in effect,
a regulatory "death penalty".  We urge MSHA to use extreme
care in developing regulations pertaining to a pattern of
violations, and order that only the truly recalcitrant
operators, the intended targets of this statutory provision,
be subject to the imposition of a pattern of violations
notice.

There an be no doubt that the impact of the
adoption of a pattern of violations regulations will be great.
It appears to us that the imposition of a pattern notice will
make it virtually impossible for an affected mine to continue
in operation.  Most coal mines that produce over 500,000 tons
of coal a year can reasonably expect to receive between 200
and 500 violations a year.  This figure is expected to
increase in the future.  It is our experience that the number
of inspector days and the number of violations is increasing,

12

1   particularly in the coal industry as mines close and Agency
2   personnel are retained.

3              For example, in District 9 the total number of
4   citations have risen from 1,000 in fiscal year '81-'82 to
5   almost 6900 in fiscal year '87-'88.  A significant increase.
6   S & S citations rose during the same period from 201 to 4,746;
7   an even greater increase.  During the same period, also,
8   orders rose from 47 to 972.  In our company, while working
9   almost the same number of man-hours, inspector days have gone
10  up from 875 in 1986 to an estimated 1,117 in 1989.  One of our
11  operations averages an inspector for almost every working day
12  of the year.  Many mines will experience more inspector days
13  than even that.

14             If such a mine were on a patter, it could
15  reasonably expect to receive one or more S & S citations for
16  every working day of the year.  No mine could remain
17  competitive in such situations, and the imposition of a
18  pattern would inevitably mean the closing of the mine.

19             Section 104(e)(3) of the Act only allows
20  termination of a pattern notice if a mine undergoes a complete
21  inspection without receiving a violation designated as
22  "significant and substantial".  As that term has been
23  generally applied by the Agency, it would be virtually
24  impossible for an operator in a mine of any size to achieve
25  such a "clean inspection".

13

1    Some of the comments referred to in the <u>Federal</u>
2 <u>Register</u> notice for this hearing discussed the issue of
3 whether a clean inspection could be based upon a number of
4 partial inspections of the mine, as opposed to a quarterly
5 complete inspection, as is the case with unwarrantable failure
6 chains.   There were also comments by the UMW that an operator
7 might escape a pattern notice without such a partial
8 inspection, and then go back to get an S & S violations again.
9 Such discussions are purely academic, in our view.   Once on a
10 pattern, no operator will ever escape.

11    The National Coal Association and the American
12 Mining Congress have supplied figures to show that, in some
13 MSHA districts, over 80 percent of the violations issued are
14 S & S.   It is inconceivable that even in districts with lower
15 S & S rates, such as 50 percent, that any mine could survive a
16 complete inspection without getting an S & S violation.

17    Once a pattern were imposed, an operator could
18 engage in a tremendous effort to correct the pattern, but it
19 is highly unlikely that termination of the pattern notice
20 could ever be achieved, unless MSHA begins to consistently and
21 persistently apply the standards of the <u>National Gypsum</u>
22 decision in all of its districts, and return to the 20 percent
23 S & S rate that occurred immediately after the issuance of
24 that decision.

25    Despite the fact that the discussion

14

1   accompanying the proposed regulations suggested that the

2   abatement of violative conditions, not punishment, is the

3   object of the imposition of a pattern, it must be recognized

4   that as S & S is currently interpreted and applied, the

5   remedial purpose can only be accomplished prior to the

6   imposition of the pattern notice.  Once it is imposed, there

7   will be little realistic opportunity for an operator to

8   improve its performance sufficiently to escape the pattern.

9   We doubt that few quarterly inspections at coal mines have

10  ever been conducted without the issuance of an S & S

11  violation, even in the days right after the National Gypsum

12  case was decided.

13          We recognize and understand that the pattern of

14  violation regulations will be implemented by an inspector

15  force that has developed their own entrenched views of what

16  terms, such as significant and substantial, mean.  We expect

17  that it would be very difficult to make major changes in how

18  those terms are interpreted at the mine level.  Such a

19  reduction did occur immediately after the National Gypsum

20  decision, but the S & S rate has returned to the rates that

21  were prevalent prior to that decision.  We think, however,

22  that an effort should be made to provide the inspectors more

23  concrete guidance on what such terms really mean.

24          MSHA has recently sought to provide some

25  guidance to inspectors in Program Policy Letter P89-I-3.  We

1   don't know if these guidelines will, in fact, cause inspectors

2   to more realistically evaluate the potential for hazards

3   caused by a violation.  We suspect it will not do so because

4   of the failure to actually define "reasonable likelihood" and

5   the "reasonably serious injury"; two terms which are integral

6   to the definition of S & S adopted by the Review Commission.

7                    Inspectors often define a "reasonable

8   likelihood" as one which is merely possible.  This is not

9   consistent with the dictionary definition of these words,

10  which would indicate that they suggest probability, as opposed

11  to mere possibility.  A definition indicating that the

12  occurrence of an event must be probable would provide

13  inspectors with some realistic guidance as to the meaning of a

14  term that is crucial to the determination of whether or not a

15  violation is significant and substantial.  This sort of

16  definition of "likely" and "likelihood" is consistent with the

17  way the courts have defined such terms.

18                    The Program Policy Letter suggests that the

19  likelihood of an injury should not be defined in terms of

20  "mathematical chance".  While we do not suggest that

21  percentages of occurrence is the best way to define the terms,

22  we believe that some guidance to the effect that the term

23  "reasonably likely" suggests "a probability of occurrence is

24  required".  Too often an inspector's determination of

25  "reasonable likelihood" is based on a chain of events that is

16

1  highly improbable.

2           For these reasons, we suggest that "reasonable

3  likelihood" be defined as:  "That it is more probable than not

4  that the continuation of normal mining operations would,

5  within the reasonably forseeable future, result in an injury

6  or illness.

7           The Program Policy Letter also provides little

8  guidance in what is a "reasonably serious injury".  The

9  letter essentially appears to suggest what an inspector must

10 find as to the seriousness of an injury in order to sustain an

11 S & S finding, rather than providing guidance as to what is a

12 reasonably serious injury.  It is a defensive definition.

13 Despite the difficulty of definition, some efforts must be

14 made to provide guidance beyond this to the inspectors.

15          What must be avoided is rote determination of

16 S & S.  Many inspectors write all violations of such types --

17 for example, roof control and ventilation -- as S & S.  This

18 sort of blanket characterization must be avoided.  Even the

19 Agency, as a matter of policy, has fallen into this trap by

20 evaluating all respirable dust violations as S & S, without

21 evaluating the level of exposure or the use of respiratory

22 equipment.

23          Despite our concurrence in the industry's

24 attempts to define S & S in a fashion to promote uniformity of

25 enforcement, we do not believe that it is possible to achieve

17

1   complete uniformity of application of any definition of such

2   terms, given the wide disparity in enforcement practices that

3   now exist.  We do not believe that defining, or redefining,

4   these terms will completely remedy the inconsistency of

5   enforcement practices, nor do we believe that rotating

6   district managers will solve this problem.

7                    We are particularly concerned about this issue

8   because our underground coal mines are located in two of the

9   MSHA districts with the highest S & S rates.  We are concerned

10  that mines in these districts will suffer the imposition of a

11  pattern violation, merely because of their location, even if

12  they are not the recalcitrant operators for which the pattern

13  notice is intended.

14                   We believe than an effort must be made to take

15  into account the disparity of S & S and "unwarrantable rates"

16  in the various districts between coal and metal/non-metal

17  operations.  One method of doing this would be to compare

18  similar mines in the same district or subdistrict since the

19  disparities in enforcement would not be as great.  Such

20  comparisons should be to mines of similar size and type.

21  Older mines are necessarily not comparable in violation rates

22  to newer or smaller mines.  We have described examples of this

23  type of provision in our earlier written comments.  Various

24  methods could be used, including comparisons of the district

25  averages of S & S violations.

18

1    We think it of extreme importance that the
2  steps leading to the issuance of a pattern notice provide as
3  much opportunity for notice and provision of information by
4  the operator as possible before the issuance of the pattern
5  notice.  We are concerned that the Agency does not truly grasp
6  the import of what the imposition of a pattern notice will
7  mean.

8    As an example, the Agency has, in the proposed
9  rules, estalished short deadlines for actions by an operator.
10 Twenty days to request a conference after notification of a
11 potential pattern; 10 days to hold such a conference; and 30
12 days for the Administrator to issue a decision.  We suggest,
13 as described in the industry's comments, that such deadlines
14 should be expanded.  The Agency in the proposed rules indicate
15 that these deadlines were short because of the presence of a
16 serious safety hazard.  They should not be so short as to
17 promote the making of hasty decisions.  They should not be so
18 short as to deprive the operator of due process.  The
19 determination that a pattern exists is probably an
20 irreversible and unappealable decision.  No rush to judgment
21 is appropriate under such circumstances.

22    Finally, we are concerned with the generality
23 of criteria in the initial screening, and the criteria for
24 issuance of a notice in proposed Sections 104.2 and 104.3.
25 Those provisions simply list the factors that will be

19

1   considered, without indicating how they would be weighed.

2   While we recognize that the identification of recalcitrant

3   operators requires evaluation of subjective and objective

4   factors, we are extremely concerned with the lack of

5   substantive criteria.  Given the history of unequal

6   enforcement of the Act, as shown by the S & S and

7   unwarrantable rates, we are concerned with unequal application

8   of the very vague criteria outlined in the proposed

9   regulations.  We recognize that the 1980 advance notice of

10  proposed rule making drew criticisms as being too complex and

11  mathematical.  But it seems to us that the proposed rules have

12  gone too far in the opposite direction.

13              The United Mine Workers has suggested in its

14  comments that an operator should be put on a pattern notice

15  based solely on the number of S & S violations at a mine.  In

16  support of these comments, they refer to the legislative

17  history of the Act which suggests that an operator's intent

18  need not be considered.  The difficulty with this is that

19  there is no indication that Congress had any perception of the

20  impact of the pattern notice, given the way that the S & S

21  pragmatism is being administered by MSHA.  If the number of

22  S & S violations were the sole criteria for a pattern notice,

23  every underground coal mine in the country could be placed on

24  a pattern.  Because of the way S & S has been applied, the

25  existence of a high S & S rate is not necessarily indicative

20

1   of a recalcitrant operator.

2           The Agency is faced by a tremendous challenge.

3   It must seek to correct longstanding enforcement practices

4   that deviate from a Congressional intent, and seek to

5   construct an enforcement tool that is consistent with the

6   intent of the Act.

7           Finally, with respect to the specific criteria,

8   we do not believe that 107(a) orders, past violations, or

9   violations that are not final should be considered.  Section

10  107(a) orders may not be issued with accompanying citations,

11  and may, in fact, occur as a result of a natural phenomena

12  which the operator cannot control.  Imminent danger orders

13  should not be used in any part of the pattern process, unless

14  they result from a condition that could have been addressed in

15  advance by the operator.

16          In its discussion, the Agency indicated it

17  would consider prior violations.  It is our belief that the

18  adoption of pattern regulations provides an opportunity for

19  the Agency to reassess its enforcement practices and criteria.

20  Even if this is not done formally by the Agency, it may be

21  that individual inspectors will do so in light of the real

22  potential of the imposition of a pattern notice.  In light of

23  this, it would be more appropriate for all operators to be

24  able to be measured by the same standard, something which has

25  not previously occurred.

21

1      We, therefore, believe that only final
2 violations should be considered.  The UMWA has suggested that
3 an operator will contest all S & S violations in order to
4 avoid a pattern.  Such comment is not realistic.  Even if an
5 operator contested all S & S violations, the success rate of
6 such contest is now in the neighborhood of only 20 to 30
7 percent.  If an operator contested all S & S violations, that
8 rate would decrease, making it unlikely that any operator
9 could avoid a pattern by such device.  Moreover, a contest of
10 S & S citation usually takes less than a year, making it
11 likely that contested violations would be available for
12 consideration in a pattern where two years of violations are
13 considered.

14      Further to consider violations that are not
15 final is to make it possible that an operator could be put on
16 a pattern based on citations or orders that were not valid,
17 and such an approach to a pattern would be fundamentally
18 unfair.

19      In conclusion, we recognize that the Agency
20 will move forward with the pattern regulations.  We urge to
21 consider carefully the safeguards necessary to prevent the
22 imposition of an improper pattern notice.  Imposition of the
23 sanction of the magnitude of a pattern notice requires
24 deliberate and careful consideration.

25      We trust that our comments that have been

22

1  offered here will be accepted and considered in the light in

2  which they were given, one of constructive review.  It is

3  imperative that such important proposals be given every

4  consideration to become good regulations that are fairly and

5  consistently applied.

6         Thank you for the opportunity for this

7  discussion.

8         MR. ZEUTENHORST:  Thank you.

9         Early on in your statement, you stated that it

10  is your belief that many inspectors only look at possibility,

11  in judging S & S.  I'm sure you know, although we don't use

12  the term "probable" in the Program Policy Letter P89-I-3,

13  MSHA's official policy is stated there that, quote, "It is not

14  enough to find that an injury or illness is only possible".

15  We're working hard on getting a more uniform application, but

16  as I said in the opening statement, it's a long haul.  But we

17  are looking beyond, on S & S, as something more than is merely

18  possible.

19         You also made some statements about the need to

20  compare mines of similar sizes.  We did some of that, as you

21  know, back in 1980.  One of the reasons that the Agency has

22  not chosen to pursue that course of action thus far in the

23  rule making, is that, as we stated in -- I think in both the

24  advance notice and the proposed rule -- keeping in mind

25  Congressional intent were targeting a few mines, we wanted to

23

1   look at each mine on its own record, and not come up with a

2   quota system.  When you begin to quantify mines as "X" number

3   of this tonnage and that tonnage, you begin to shift into an

4   area where it looks as if there should be a certain percentage

5   always on pattern.  We don't look at it that way.  We look at

6   it that the pattern mine is going to be evident, and should be

7   dealt with on its own merits, rather than on how it fits into

8   any sort of statistical system.

9           Do you have any questions?

10          MR. ERNIE TEASTER:  No, I'd just like to, if

11  Mr. Caylor would give me an opinion, he indicated that some

12  mines are going to get from 2 to 500 violations.

13          Do you have any opinion as to how many of those

14  citations that are issued would be issued and corrected on the

15  spot?

16          MR. CAYLOR:  No, I don't.  I would imagine that

17  a great percentage of them would be.

18          MR. TEASTER:  Thank you.

19          MR. CAYLOR:  In addition to that, a great many

20  of those that were corrected on the spot would be S & S

21  violations.

22          MR. TEASTER:  Well, I guess what I'm after, if

23  we're finding them and fixing them right there on the spot,

24  then if you were in the pattern that would not have any effect

25  on that portion of the citation, because you're stopping the

24

1   piece of equipment or the affected area of the mine and making

2   the correction on the spot.  And that's what you would be

3   doing under a pattern.

4                 MR. CAYLOR:  Okay.

5                 MR. TEASTER:  Thank you.

6                 MR. CAYLOR:  But, without knowing what the real

7   numbers are, you always have the opportunity for those not to

8   be able to be corrected on the spot --

9                 MR. TEASTER:  Yes, I understand that.

10                 MR. CAYLOR:  -- and not knowing the number,

11  I'd --

12                 MR. TEASTER:  I was just curious as to what

13  percentages we're talking about.

14                 MR. CAYLOR:  Right.  No, I don't know the

15  percentages.

16                 MR. TEASTER:  All right.

17                 MR. DAVE MCCONNELL:  I'd like to state for the

18  record, you had indicated earlier that the Agency doesn't take

19  into account the use of personal protective equipment in

20  designating respirable dust citations as S & S, and Richard

21  mentioned the new Program Policy Letter the Agency issued in,

22  I think, September.  That policy indicates, also, that the

23  proper use of personal protective equipment should be taken

24  into account, as well as any other evidence that miners were

25  not exposed to the "hazard posed by the excessive

1  concentration of the harmful substance".

2  MR. CAYLOR:  You still have, on the record

3  though, the policy of how health violations are to be treated,

4  and unless I'm wrong, the policy still is that the health

5  violations will be S & S violations.

6  MR. MCCONNELL:  I think that's generally true,

7  yes.

8  MR. ZEUTENHORST:  Thank you, Mr. Caylor.

9  Our next speakers are representing the National

10  Coal Association, Bituminous Coal Operators' Association, and

11  the American Mining Congress.  And they're Mr. Ron Wooten and

12  Mr. Harold Barnes.

13  MR. RONALD WOOTEN:  Thank you, Mr. Chairman.

14  My name is Ronald L. Wooten, and that's

15  W-O-O-T-E-N.  I'm the Vice President of Safety, Consolidation

16  Coal Company and Vice Chairman of the National Coal

17  Association, Coal Safety and Health Committee.  Sharing the

18  responsibility with me for presenting the industry position is

19  Harold Barnes, Corporate Manager, Health and Safety, Homestake

20  Mining Company, and Chairman of the American Mining Congress

21  Metal/Non-Metal Safety Committee.  Mr. Barnes and I will be

22  alternating our presentations this afternoon.

23  Accompanying us are Kevin R. Burns, Counsel for

24  the American Mining Congress; Robert L. Vines, Vice President,

25  Health and Safety, Bituminous Coal Operators' Association,

1  Inc.; and Bruce Watzman, Vice President, Health, Safety and

2  Human Resources, National Coal Association.

3  On behalf of the American Mining Congress,

4  Bituminous Coal Operators' Association, Inc., and National

5  Coal Association, we greatly appreciate this opportunity to

6  present our views on the Agency's proposal to promulgate the

7  rules and regulations for pattern of violations.

8  The member companies of these associations

9  produce most of the nation's coal, metals, industrial and

10  agricultural minerals.  Therefore, we have a vital interest in

11  the Mine Safety and Health Administration's rule making effort

12  to develop the most severe enforcement tool available to the

13  Agency.  While our comments contain recommendations within the

14  framework established by MSHA, we strongly suggest that the

15  proposed regulations are not necessary.  MSHA's existing

16  enforcement tools are sufficient.

17  The need for this rule, currently, is not as

18  evident as in 1977 when the "pattern" amendment was enacted.

19  Through enforcement of the 1977 Act, and the collective

20  efforts of the industry, MSHA, and labor, great strides have

21  been achieved in the mine safety and health.

22  Through enforcement of the 1977 Act, the few

23  pre-1977 recalcitrant mine operators are either no longer in

24  business or have improved their health and safety programs.

25  We believe that if there are any remaining recalcitrant mine

27

1   operators, they have not yet been subjected to the intense

2   inspections and repeated and unwarrantable failure, failure

3   to abate, or imminent danger closure orders available to MSHA.

4   Pattern provision enforcement is simply not necesssary when

5   viewed in light of the mining industry in 1989.

6              Without prejudice to our position that the

7   Secretary should deem that no rules are necessary to establish

8   criteria for determining when a pattern exists, or that such

9   rules could be constitutionally suspect, we will present the

10  following comments for your consideration.

11             More than 100,000 S & S citations are expected

12  in 1990.  These citations are issued as a matter of course in

13  many MSHA districts, and they have come to be applied to

14  violations and alleged violations which are not significant

15  and substantial in a sense envisioned by Congress.  We believe

16  that unless recalcitrance iss the controlling factor upon

17  which the pattern enforcement tool is based, every large mine

18  operator could be considered a potential pattern candidate,

19  despite the effectiveness of their safety programs.

20             The legislative history of the Mine Act, and

21  the significant safety improvements since 1977, clearly

22  indicate that the use of the pattern enforcement tool, if

23  utilized at all, should be extremely limited.

24             We have prepared an outline of our position

25  concerning the proposed pattern of violations standard, and

28

1    our presentation today will follow this outline.

2                    At this point, I would like to introduce

3    Mr. Harold Barnes to present the next portion of the

4    industry's testimony.

5                    MR. HAROLD BARNES:  Thank you, Ron.

6                    Mr. Chairman and panel, we believe that

7    Congress intended to limit Section 104(e), pattern of

8    violations, enforcement to those few, if any, recalcitrant

9    mine operators that have not responded to other MSHA

10   enforcement tools.

11                   In the absence of imminent danger, Congress

12   intended for MSHA to use its closure authority sparingly.

13   Congress made it clear that MSHA's authority to issue

14   withdrawal orders, based on Section 104(e) pattern of

15   violations, should be limited to cases where the mine operator

16   repeatedly ignored the law.  The 1977 Senate report states,

17   and I quote:

18                   "The Committee's intention is to provide

19                   an effective enforcement tool to protect

20                   miners where the operator demonstrates his

21                   disregard for the health and safety of

22                   miners through an established pattern of

23                   violations."

24                   Senator Schweiker, the principal author of

25   Section 104(e) made the following statements during the 1977

29

1   Senate debate:

2           "Mr. President, this amendment originated

3           for two reasons.

4               First, we had a series of hearings on

5           Scotia, Kentucky, where we lost people

6           because there were repeated violations of

7           known safety rules, and there was a

8           concentrated effort not to comply with the

9           law in case after case.  We lost a lot of

10          men because someone decided that they could

11          ignore the law.

12              Second, we asked for computer printouts

13          of the companies that had been assessed

14          certain fines . . . [G]etting those

15          computer printouts of the violations that

16          have occurred end on end alerted me to the

17          fact that we are not trying to police the

18          good guys, because there are a lot of good

19          guys who have complied with the law, who

20          met those standards of the law and were

21          in good faith trying to fulfill the law.

22          But there were also a few who repeatedly

23          thumbed their noses at the law, and that is

24          exactly what we were trying to address here.

25              In fact, the bad guys, in essence,

30

1       bring it about for the good guys, and I say
2       it is time we get the bad guys and not keep
3       hitting the good guys.  That is really the
4       intent of it, and that is what it should do,
5       and hopefully that is what the standard
6       will say when we get it established."
7       A similar point was made during the 1977 House
8  debate by Representative Perkins:
9       "Repeated violations of the same degree
10      of potential hazard could result in the
11      closure of the mine.  This provision is
12      directed to the Scotia-type operator.  It
13      is intended to give unquestioned authority
14      to the inspector to deal with the reckless
15      operator who operated his mine without
16      regard for the safety or health of his
17      miners."
18      It is clear from these statements that Congress
19 intended for MSHA to use its Section 104(e) authority only
20 against those few recalcitrant mine operators who repeatedly
21 ignored the law.  The pattern of violations standard must
22 include safeguards to ensure that it is appropriately limited,
23 as intended by Congress.  We believe MSHA's proposal fails in
24 this regard.
25      Our proposed modifications to the Purpose and

1   Scope incorporates Congress' intent that the pattern provision

2   be limited in scope to those few recalcitrant mine operators

3   that are not responding to other enforcement tools already

4   available to MSHA.

5                 Our proposed alternative reads as follows:

6                 "This part prescribes the criteria and

7                 procedures used by MSHA to determine whether

8                 a pattern of significant and substantial

9                 violations of mandatory safety and health

10                standards exist at a mine or a portion of

11                a mine for purposes of Section 104(e) of

12                the Federal Mine Safety and Health Act of

13                1977.  It addresses mines where

14                recalcitrant operators habitually allow

15                the recurrence of violations of mandatory

16                safety and health standards which

17                significantly and substantially

18                contribute to the cause and effect of

19                mine safety and health hazards.  The

20                pattern of violations enforcement tool

21                is intended to be applied only to the

22                recalcitrant mine operators who are

23                chronic violators of the law, and who

24                have not responded to the use of the

25                other enforcement tools available to

32

1    MSHA under the Act."

2    Ron will now provide some additional comments.

3    MR. WOOTEN:  Mr. Chairman, we further believe

4  that the pattern of violations standard must provide criteria

5  for identifying significant and substantial, S & S,

6  violations.

7    It is a fundamental principle of due process

8  that operators must have reasonable notice of conduct for

9  which sanctions can be imposed, and objective protection

10  against arbitrary enforcement.  The courts have applied this

11  rule in the occupational safety and health context.  In

12  Diebold, Inc. v. Marshall, the Sixth Circuit Court of Appeals

13  stated:

14    "Among the myriad applications of the

15    due process clause is the fundamental

16    principle that statutes and regulations

17    which purport to govern conduct must

18    give an adequate warning of what they

19    command or forbid . . . Even a regulation

20    which governs purely economic or

21    commercial activities, if its violation

22    can engender penalties, must be so

23    framed as to provide a constitutionally

24    adequate warning to those whose

25    activities are governed."

33

1    MSHA's proposal runs afoul of this fundamental

2 principle by failing to provide criteria that inspectors must

3 apply to determine whether a violation is significant and

4 substantial.  In failing to provide clear identification of

5 violations that can lead to closure, MSHA's proposal

6 eliminates a primary Congressional safeguard against abuse of

7 Section 104(e) authority.  Congress was extremely concerned

8 that Section 104(e) might allow issuance of withdrawal orders

9 solely at the whim of an MSHA inspector.  Senator McClure

10 expressed this fear during the 1977 Senate debate:

11    "What this provision really means is

12    that the Secretary's representative or

13    an inspector can make an ex parte

14    decision as to what constitutes a

15    'pattern' of violations in a mine.

16    The way to deal with enforcement is

17    not to throw out the book on due

18    process and fairness . . ."

19    MSHA cannot provide the protection against

20 arbitrary enforcement without providing specific criteria that

21 inspectors must use to identify S & S violations.  The key

22 decisions that need to be incorporated into the rule making

23 are:  MSHA v. Cement Division, National Gypsum Co., MSHA

24 v. Union Oil Company of California, MSHA v. Mathies Coal

25 Co., and Consolidation Coal Company v. The Federal Mine

34

1  Safety and Health Review Commission.

2          Our proposed definition incorporates the

3  concept of these cases to allow the proper S & S designations

4  for both safety and health violations.

5          The citation form must be modified to comply

6  with the Review Commission decisions regarding S & S

7  findings.  The S & S checkbox on the citation form should be

8  deleted and the form modified to require narrative responses

9  that would promote a thorough analysis of S & S findings by an

10  inspector.

11          MSHA's recent Program Policy Letter is a step

12  in the right direction.  However, this definition must be

13  incorporated into the standards in order to provide operators

14  with adequate notice of prohibited conduct and to protect the

15  operators from arbitrary enforcement.

16          The criteria for establishing patterns

17  correctly includes "unwarrantable failure" violations.

18  However, MSHA must incorporate the definition of

19  "unwarrantable failure", adopted by the Review Commission.

20  Our proposed definition is derived from Emery.Mining Corp.

21  v. MSHA.

22          We recommend adding Section 104.2 to

23  accommodate our recommended definitions, which are included in

24  our written comments on Page 2, with additional rationale on

25  Pages 3 and 7.

35

1    I'll turn it back to Mr. Barnes for further

2    comments.

3    MR. BARNES:  Well, the next comments I would

4    like to make are relative to screening for a pattern.

5    We believe that pattern screening should be

6    done at the national level.  The severe consequences that can

7    result from this review demands that the initial screening be

8    made by the Administrator.  The Administrator has access to

9    all the enforcement information, and is in a position to

10   request and receive any additional information he would need

11   to complete his analysis.  Further, the Administrator is

12   removed from the initial enforcement actions; therefore, he or

13   she would be in a position to independently evaluate all of

14   the information.

15   The initial screening process should be focused

16   on S & S violations that are associated with more than an

17   ordinary degree of negligence.

18   Congress recognized the need to limit 104(e)

19   enforcement to those few, if any, mine operators whose

20   recalcitrance results in repeated S & S violations.  MSHA must

21   recognize that at large mining operations, it's impossible to

22   avoid repeated S & S violations, given MSHA's vigorous

23   enforcement practices coupled with the continuing

24   liberalization of the term "significant and substantial".

25   Therefore, we have recommended a viable method

36

1   for MSHA to conduct the initial screening and identify

2   potential pattern candidates for further review in Section

3   104.4, pattern criteria.  A review and analysis, as

4   recommended, would identify those mines with serious

5   compliance problems warranting further review.

6              Our alternative method is included in the

7   written comments we have provided you.  We would be happy to

8   answer any questions the panel may have concerning our

9   alternative at this time, or in the future.

10             Our recommended Paragraph (b) is a viable

11  method for MSHA to conduct the initial screening, and it will

12  enable the Agency to evaluate the thousands of S & S

13  violations that can be expected in FY 1990, and identify,

14  through that evaluation, potential pattern candidates for

15  further review in Section 104.4, pattern criteria.

16             The majority of citations and orders are often

17  accepted by operators on the basis of a business decision that

18  weighs the cost of a legal appeal, against the payment of a

19  fine.  Unless the initial screening process is focused on

20  S & S violations that are associated with more than an

21  ordinary degree of negligence, then additional litigation

22  involving S & S citations can be expected.  A recommended

23  addition of the phrase "mine identification number of the

24  operator, or independent contractor" we believe is necessary

25  to define the scope of the review.  The review should be

37

focused on each individual identification number as a separate
entity. Mine operator and independent contractor enforcement
activities are separate. Therefore, all review procedures
leading to a pattern notice must be separated. Neither a mine
operator nor independent contractor should be a candidate for
a pattern notice based on the recalcitrance of the other.

Section 104(e) of the Act provides MSHA with
its strongest enforcement tool. Once placed on a pattern, a
mine can expect a succession of closure orders that will
render routine operations impossible. As a result of this
effect, Congress repeatedly indicated its intent to apply the
pattern provision to those few recalcitrant operators who have
not responded to other enforcement tools.

To conform with this Congressional intent, MSHA
must recognized that repeated significant and substantial
violations alone are simply not enough to place a mine on a
pattern. Many of the S & S violations cited are not the
result of operator actions. The courts have repeatedly held
the Mine Act to be a strict liability statute, and S & S
citations are routinely issued in "no" negligence and "low"
negligence situations.

Our recommended paragraphs in our written
material provided to you, 104.3(c)(1) through (3), lists the
compliance records that we believe the Administrator should
review annually. A review and analysis of these three

38

categories would identify those mines with serious compliance problems warranting further review. This procedure would indicate the extent to which all other enforcement tools have been used at a specific mine, and if the use of these enforcement tools has significantly increased during the current year compared to the preceding year.

Congress recognized the intensity of MSHA's enforcement activities, and intended the pattern violator to be a mine operator whose recalcitrance results in repeated significant and substantial violations. From the perspective of the Mine Act enforcement, recalcitrance is demonstrated by the use of several enforcement tools: One, a 104(b) closure order issued for failure to abate; two, reckless disregard of the law or willful, intentional conduct which results in a 104(a) citation, or 104(d) citation or closure order; and, three, a 107 imminent danger closure order associated with violations caused by willful misconduct or reckless disregard for the law. For MSHA to apply the pattern sanction in such a manner as to capture only those few operators who thumb their nose at the law, only S & S violations that result from recalcitrant acts of the mine operator should be used as an initial screening device.

Our recommended addition of Paragraph 104.3(e) will give the Administrator guidance in evaluating the results of initial screening and will promote consistency in the use

39

1    of the pattern provision.

2              Our recommended Paragraph 104.3(e) reads as

3    follows; this is on Page 8 of the written material that we

4    provided to you:

5                   "If the Administrator's examination of

6                   initial screening criteria (a) through

7                   (d) reveals the repeated presence of

8                   each Section (c) factors and demonstrates

9                   a pervasive and continuing or increasing

10                  compliance problem, then the

11                  Administrator shall institute a further

12                  review pursuant to Section 104.4."

13             This provision requires that an operator

14   evidence potential recalcitrance according to each listed

15   factor, prior to the application of pattern criteria under

16   104.4.  MSHA's proposal does not include necessary findings.

17   To meet the statutory intent, all of the criteria should be

18   met so that recalcitrance is demonstrated.  Failure to adopt

19   our proposal would be arbitrary and capricious, contrary to

20   the statute, and would result in a denial of due process.

21             Ron?

22             MR. WOOTEN:  Further, Mr. Chairman, it is the

23   industry's position that pattern criteria should differentiate

24   between potential recalcitrant operators and concerned

25   operators that may be experiencing a temporary compliance

40

1   problem.

2          Issuance of a potential pattern of violations

3   notice to a mine operator already responding and cooperating

4   with MSHA to correct a problem at the mine would be

5   disruptive, counterproductive, and contrary to the legislative

6   intent.  If S & S violations are merely counted and viewed in

7   a vacuum, this unfair and unfortunate scenario could result to

8   the detriment of the health and safety of the miners.  With

9   our suggested changes, the pattern criteria could be used to

10  evaluate successfully the mines identified through initial

11  screening to determine the few mines, if any, that may be

12  recalcitrant due to their lack of response to other

13  enforcement tools already available.

14         An analysis of our four recommended criteria

15  (Paragraphs 104.4(a)(1) through (4) on Page 11 of our written

16  comments) would provide the proper tools to identify a

17  potential recalcitrant operator.  The recommended changes to

18  the pattern criteria would separate the concerned operators

19  that may be experiencing a temporary compliance problem from

20  the few, if any, recalcitrant operators.

21         A well-documented and specific affirmative

22  finding by the Administrator is essential.  Such a document

23  would give the mine operator notice of the specific

24  shortcomings identified by MSHA, so that these areas can be

25  addressed.  Further, the findings by the Administrator may

41

1   provide guidance that is necessary to institute a program to

2   avoid repeated S & S violations and improve health and safety.

3            Harold?

4            MR. BARNES:  Mr. Chairman and panel, we believe

5   that only final citations and orders issued after the

6   effective date of these regulations should be used for a

7   pattern of violations review.

8            Prospective application is a consistent element

9   of all MSHA regulatory changes.  Fairness and due process

10  demand that regulations that govern conduct must give an

11  adequate warning of what they command or what they forbid.

12  Once a final rule is published, then, and only then, will the

13  operators and the miners have proper notice of conduct for

14  which sanctions can be imposed.  There is no compelling reason

15  to break with precedent and apply this standard retroactively.

16           MSHA's proposed retrospective application of

17  the regulations is contrary to the Mine Act and inconsistent

18  with the principles of fairness contained in the due process

19  clause of the Fifth Amendment.  It is a long-established

20  principle that the retroactive application of statutes is

21  disfavored and will not be sustained unless clearly

22  contemplated by Congress.  In Union Pacific Railroad v.

23  Laramie Stock Yards Company, the court stated:

24           "The rule has been expressed in varying

25            degrees of strength, but always of one

42

```
 1              import, that a retroactive operations will

 2              not be given to a statute that interferes

 3              with antecedent rights, or by which human

 4              action is regulaated, unless such be the

 5              unequivocal and inflexible import of the

 6              terms and the manifest intention of the

 7              legislature."

 8              It is also very clear, in our opinion, that the

 9      same principles applicable to analyzing the retroactivity of

10      statutes are applicable to administrative regulations.   In

11      Green v. United States, (1964); Springdale Convalescent

12      Center v. Mathews in 1977 in the Fifth Circuit Court.

13              We submit that neither the text nor the

14      legislative history of Section 104(e) provides support for

15      such retroactive application.

16              MSHA's proposal to apply the pattern of

17      violations regulations retroactively is fundamentally unfair

18      to the mine operators and thus violates the due process clause

19      of the Fifth Amendment.   The mine operators will not have

20      proper notice of prohibited activity until the final

21      regulations and criteria are published.   The mine operators

22      may have decided to challenge more of the citations that they

23      believed were improperly issued, if they knew that these

24      violations would be applicable to the pattern of violations

25      standard.   This would, therefore, deprive the operators of
```

43

1  their opportunity to exercise the review procedures provided

2  by the Act.  Ultimately, retroactive application of this

3  standard will penalize companies for violations that were

4  improperly issued, which would be fundamentally unfair and in

5  violation of due process.

6               Only final citations within 24 months prior to

7  the initial screening should be used in a pattern standard.

8               It is necessary to clearly define the period of

9  review.  A review of more than two years would not accurately

10  identify a potential pattern of violations candidate, or a

11  current problem that should be reviewed by MSHA.  Mine

12  conditions can change substantially in a period of more than

13  two years.  Further, MSHA's policies and enforcement emphasis

14  could change dramatically, as they have in the past.

15               The procedures leading to the issuance of a

16  notice, Paragraph 104.6(b) of our written comments, should

17  provide all parties with an opportunity for review and

18  comment.

19               As a matter of fairness, all relevant

20  information should be availaable to the Administrator before

21  he begins to make his decision.

22               The Assistant Secretary of Labor should make

23  the final determination as to whether a mine should be placed

24  on a pattern of violation cycle.

25               Legislative history indicates that the final

44

1    decision should be made by the Secretary of Labor.  We

2    recognize that this may be impractical, therefore we recommend

3    that the Assistant Secretary of Labor, for MSHA, should be

4    delegated this decision.  The significance of this

5    determination, the most severe method of enforcement, mandates

6    that the decision rest with the Assistant Secretary, the

7    highest ranking official of the Agency.

8                   An opportunity for a conference with the

9    Assistant Secretary, before the decision becomes final, must

10   be made available to afford all interested parties the

11   opportunity to arrive at a solution before the issuance of a

12   pattern of violations notice.

13                  Congress' intent, and we believe it's MSHA's

14   intent, is that the pattern of violations standard be remedial

15   and corrective, not punitive.  This recommendation would

16   comport with these goals by allowing all parties to arrive at

17   a solution and restore health and safety at the mine.  If an

18   operator continues to thumb their nose at the law, then the

19   appropriate remedial solution would clearly be an issuance of

20   a pattern of violations notice.

21                  Ron?

22                  MR. WOOTEN:  Finally, Mr. Chairman, the

23   termination of notice should allow MSHA and the operator to

24   focus their efforts on a particular part of the mine, or the

25   hazard that resulted in the issuance of the notice.  This

45

1    will encourage and allow operators to address and correct

2    the problems leading to the pattern notice.

3              All other areas of the mine shall continue to

4    receive the same level of attention.  However, increased

5    efforts can be focused on the problems identified by MSHA.

6    This will benefit health and safety by allowing MSHA and the

7    operator to focus on the real health and safety hazards at the

8    mine.  The mine operators and MSHA do not have unlimited

9    resources.  Therefore, these resources should have some

10   direction.  The ultimate goal of Section 104(e) is to

11   restore health and safety, not to punish the mine operator.

12   Our recommended modification to this section will allow MSHA

13   and the operator to focus their increased efforts on the

14   problems leading to the pattern, and provide a reasonable

15   mechanism to terminate the pattern once the underlying problem

16   is corrected.

17             At this time, we feel it is incumbent for us to

18   respond to some of the issues raised by other commenters to

19   this proposal.

20             First, we agree with MSHA that only final

21   citations and orders should be used to identify mines with a

22   potential pattern of violations pursuant to Section 104(e) of

23   the Act.  The inspectors' statements reflect only their

24   opinions, and do not prove the occurrence of a violation.

25   Considering these statements, prior to the the time that the

46

1   citations and orders become final would be inconsistent with

2   the statute and would deprive the operators of the benefits of

3   the review procedures provided by the Act.  We firmly believe

4   that MSHA's proposal to consider only final citations is

5   fundamentally fair and is necessary to protect the mine

6   operators from being penalized for citations that are

7   ultimately proven to be invalid.

8              The Senate Committee made a fairly extensive

9   comparison of the unwarrantable and the pattern provision.

10  However, the Committee's discussion of parallel or

11  simultaneous use of these enforcement tools was focused upon

12  enforcement subsequent to a 104(e) pattern notice and 104(d)

13  unwarrantable failure order.  Only after a pattern notice is

14  issued do these enforcement tools parallel.

15             There is absolutely nothing in the legislative

16  history to support the commenter's position that the citations

17  and orders used to identify mines with a potential pattern of

18  violations should not be limited to final citations.  Once

19  again, we agree with MSHA that only final citations and orders

20  should be applicable to the pattern of violations standards.

21             Mr. Chairman, and members of the panel, we have

22  put a great deal of effort into our response to this proposal,

23  and we hope that our comments will be of assistance to you in

24  this rule making.  The objective theme or goal of our comments

25  is to ensure balance and fairness in the application of the

47

1   pattern of violations standards.  We recognize and appreciate

2   the efforts of the panel that developed MSHA's proposal.  As

3   always, we look forward to working cooperatively with MSHA so

4   that we may achieve our common goal of protecting the health

5   and safety of the nation's miners.

6                    That concludes our presentation on behalf of

7   the American Mining Congress, the Bituminous Coal Operators'

8   Association, Inc., and the National Coal Association.  We

9   thank you for this opportunity to testify.

10                   MR. ZEUTENHORST:  Thank you, gentlemen.

11                   You mentioned, on at least two occasions, that

12  you believe that the proposal, as it now stands, runs afoul to

13  the principle of due process.

14                   The first instance you mentioned it was the

15  lack of a definition of S & S violation in the rule.  As you

16  know, MSHA has never placed a mine on a pattern of violations;

17  therefore, there's no litigation, no court history, no case

18  history behind whether that is, indeed, a fundamental

19  infirmaty of the rule.

20                   What I would ask you, though, if indeed it is

21  necessary to define S & S in the rule for the purpose of due

22  process?  Are you aware of any case history for the 104(d)

23  unwarrantable, which also relies upon a finding of significant

24  and substantial?

25                   MR. WOOTEN:  Let me try to understand the

48

1    question.  Are we aware of any case history that --

2              MR. ZEUTENHORST:  It seems to me that an

3    important point you're trying to make is that S & S needs to

4    be defined in pattern of violations.  Otherwise, the operator

5    will not have due process.  He will not know what an S & S

6    violation is.

7              If that is, indeed, an infirmity, would not

8    that be an infirmity under any citations and orders that were

9    written under (d)(1), which also relies upon a finding of a

10   significant and substantial violation?

11             MR. WOOTEN:  I see your point.  Let me make a

12   comment, first.  Not only on the S & S issue, but also on the

13   unwarrantable.

14             We feel that both the unwarrantable failure and

15   a significant and substantial definitions need to be included.

16   Perhaps the unwarrantable failure definition, and certainly

17   the industry has requested that an unwarrantable failure

18   definition be included in numerous other rule makings.

19             As the two definitions, or lack thereof,

20   continue to be revised through the courts, they represent a

21   moving target for the operator, if you will.  One day the

22   definition may be changed by the courts, and all of a sudden

23   we have a separate test.  That's why we are very adamant in

24   our position that both the definition of significant and

25   substantial, as it exists today, and a definition of

1  unwarrantable failure, as it exists today, needs to be

2  included in these regulations to eliminate this moving target.

3          In response to your questions on case

4  history, I don't know of any off the top of my head.  Perhaps

5  Harold does, but we will be happy to research it and respond

6  in writing at a later point.

7          MR. ZEUTENHORST:  Okay.

8          What you suggested for definition of S & S

9  is, indeed, based upon the National Gypsum.  That was a

10  Review Commission case, and we've heard testimony this

11  morning that certain terms need to be further defined.

12          Do you believe that in defining them in the

13  rule for pattern of violations, which is specific to a

14  finding of pattern of violations, will fix the target, or

15  will the courts still have an opportunity -- I mean, I'm not

16  certain that placing the definition in a rule that is

17  specific to pattern of violations will fix the target?

18  Inasmuch as we're targeting a few mines, the issue of S & S

19  violations has much more implication to a greater number of

20  mines outside of the pattern context, so that that definition

21  would not be controlling, I believe, over what the Agency

22  does for S & S violations only in such instances as we then

23  place a mine on an actual pattern.

24          I'm trying to explain a little bit of the

25  reluctance of the Agency to sort of fix in time something that

50

1   is evolving; that is subject to further interpretation.  We've

2   done this by policy memo.  We're attempting to come up with a

3   more uniform application.

4                   MR. WOOTEN:  I understand your point.  However,

5   I would reiterate once again that we feel very strongly that

6   an S & S definition, whether it's in the pattern of violations

7   regulations, recognizing that they're going to be used in very

8   few instances, nevertheless, the regulatory perfection, if you

9   will, of that definition is very important to us in some

10  regulation, somewhere.

11                  MR. ZEUTENHORST:  Okay.

12                  I'd like to ask a couple questions on the

13  initial screening criteria that you referenced this morning.

14  This is, in your draft, 104.3, Paragraph (b).  In that, you

15  use the term "willful misconduct".

16                  Could you direct us to someplace in the

17  legislative history of the statute.  Is that coming out of the

18  legislative history of the statute, or is that coming out of

19  your interpretation of the Congressional intent?

20                  MR. WOOTEN:  I would hesitate to speak for the

21  entire industry, but I will.  It seems, by my recollection,

22  that that is, in fact, our interpretation of what reflects

23  recalcitrance.  And we would find anyone hard pressed to

24  disagree with that particular assessment or definition.

25  Harold, you may want to elaborate further on that.  And we can

51

1    certainly, if I'm off base on this, straighten it up with some

2    written comments at a later date.

3                    MR. ZEUTENHORST: Okay.

4                    Earlier this morning, we heard testimony that

5    107(a) and the danger closure order should have no place in

6    any pattern determination.

7                    Under your Paragraph (c), and further reference

8    under Paragraph (e); that's Section 104.3 -- under (e), it

9    says, "If the Administrator's examination of the initial

10   screening criteria (a) through (d) reveals that the repeated

11   presence of each Section (e) factors" -- that's where I want to

12   horn in on the Section (e) factors.

13                   In other words, in the initial screening,

14   Section (c), includes a fact of repeated Section 107(a),

15   "imminent danger closure orders issued in conjunction with the

16   enforcement actions described above".

17                   That seems to be telling me that the industry's

18   recommending, in this instance, that 107 should be a necessary

19   precursor to a proceeding to identify a mine on a pattern;

20   that each of those has to be there, and it very clearly says

21   "and" after each of these; a pattern mine is going to have

22   107's, is that correct?

23                   MR. WOOTEN: Two points on that. The cogent

24   language there, if you will, is issued in conjunction with

25   enforcement actions described in 1 or 2, above. And we're

52

1    talking about not only the existence of an imminent danger,
2    but the existence of an imminent danger with an underlying
3    104(a) S & S violation with findings of reckless disregard, or
4    intentional, or willful conduct.
5              MR. ZEUTENHORST:  But let's take the first two
6    criteria.  Let's say you have an operator who has repeated
7    104(a) or (d) S & S violations with reckless disregard, for
8    the sake of argument.  And, also, you have 104(b) closure
9    orders, but without any 107(a) imminent dangers.  That would,
10   effectively, under your recommendation preclude MSHA from
11   further assessment of that operator of having a pattern of
12   violations.  Is that a fair assessment?
13             MR. WOOTEN:  I see your point.  I'll let Harold
14   answer that one.
15             MR. BARNES:  I think we would need to get back
16   to you on that.
17             MR. ZEUTENHORST:  Okay.  Very good.
18             MR. BARNES:  I see the point that you're
19   making.
20             MR. ZEUTENHORST:  I've got another question on
21   the pattern criteria, 104.4; that would be Paragraph (a)(4).
22   It's the fourth criteria, "an affirmative action upon the
23   finding would be required".
24             You would require a history repeated S & S
25   violations of mandatory health and safety standards caused by

1   unwarrantable failure to comply with the current unwarrantable

2   failure cycle in effect at the mine. So, you would make the

3   104(d), unwarrantable failure, as a definite precursor to

4   being on a pattern, is that correct?

5                   MR. WOOTEN:  That's correct.

6                   MR. ZEUTENHORST:  Okay.

7                   One of the things the Agency has been dealing

8   with, or attempting to deal with, is the legislative history

9   and you have obviously been through as much as we have. It,

10  at one point, says that both the 104(d) and the 104(e)

11  enforcement tools should be available to the inspector.

12                  Do you see any sort of contradiction here, or

13  how would you rationalize this?

14                  MR. WOOTEN:  Well, I'll speak first and then

15  let Harold speak.

16                  I don't see any inconsistency. Once you're on

17  the cycle, regardless when you find another similar violation,

18  the statute requires the issuance of another (d) order --

19  (d)(2) order.

20                  That does not preclude, however, once you are

21  on the cycle, the issuance of an (a) notice, or an (a) order,

22  whatever.

23                  MR. ZEUTENHORST:  In effect, though, this again

24  would be a mine that -- and this is very hypothetical. I

25  would tend to agree that if a mine is a pattern violator that

54

1   you would probably find evidence in the unwarrantable failure

2   citations, as at Scotia.  But it would, hypothetically,

3   preclude a mine from being placed on a pattern, unless it had

4   first been on a 104(d) sequence, right?

5               MR. WOOTEN:  (Whereupon, Mr. Wooten nods his

6   head to the affirmative.)

7               MR. ZEUTENHORST:  Okay.

8               One final question that I have goes with the

9   termination of notice.

10              You've stated, and I'll quote 104.7,

11  "Termination of Notice", Paragraph (a), "Termination of a

12  Section 104(e)(1) pattern of violations notice shall occur

13  when an inspection by MSHA results in no significant and

14  substantial violations of mandatory health and safety

15  standards issued (1) at the mine, or (2) the portion of the

16  mine involved in the pattern, or (3) for the hazard involved

17  that resulted in the pattern, or (4) 90 days after the

18  issuance of the pattern if no S & S violations are issued in

19  any of the three categories described herein.

20              The Agency has found the portion of the statute

21  which talks about no S & S violations in an inspection of the

22  entire mine to be one of the clearest parts of the

23  Congressional intent.

24              Could you tell me how this would comport with a

25  clear reading of the statutory language that it has to be in

1   the entire mine?  Under yours, we could go in and find if

2   there was a pattern of violations of ventilation standards,

3   then we could go in and find a clean inspection for the S & S

4   ventilation citations.  However, there could be roof control

5   S & S, and so on and so forth.  Is there an inherent

6   contradiction between a proposal such as this and an

7   inspection of the entire mine?

8                   MR. WOOTEN:  Well, I think there is a

9   contradiction, to a certain extent at least by the way you're

10  reading it.  We don't exactly read it that way.  We feel that

11  a pattern notice and/or a pattern notice or order could be

12  issued, based on a hazard based on one particular standard, or

13  based on one particular area of the mine.

14                  MR. ZEUTENHORST:  Agreed on that part, yes.

15                  MR. WOOTEN:  Okay.  Now, if we don't see the

16  necessity -- it doesn't make sense, and we don't believe that

17  Congress intended that the mine has to be absolutely purged of

18  all S & S violations before you come off the pattern.

19  Especially, if the pattern resulted from the issuance of, for

20  instance, ventilation violations, or the pattern resulted from

21  conditions or unsafe practices, or recalcitrant type

22  operations in a segment of the mine, why the rest of the

23  mine should have to be clean, if you will, of S & S.

24                  We've heard testimony today, and I suspect

25  we'll hear it again, that it's going to be virtually

56

1   impossible to go through a large coal mine in this country, or

2   metal/non-metal mine in this country, at any time, day or

3   night, and not find an S & S violation.

4           So, if that's the standard, then I suspect that

5   that mine will be on a pattern ad infinitum.

6           MR. ZEUTENHORST:  How likely do you think it is

7   that the true pattern violator, the recalcitrant operator is

8   the term you used and I believe the legislative history uses

9   recalcitrant numerous times -- how likely do you think it

10  would be that that operator would have a pattern.  I mean,

11  obviously, the Agency could use ventilation standards as

12  establishing the pattern, but it would seem to me, through the

13  legislative history, that there's a pervasive management

14  problem that would carry over into other areas.  And merely

15  correcting that one area, would that, in your opinion, show

16  that the operator has turned over a new leaf, as it goes?

17          We're dealing with a very clear -- 104(e)(3)

18  says, "If upon an inspection of the entire mine the authorized

19  representative finds no violation", it's a very difficult

20  reading to sort of get what you've come on here.  The way the

21  Agency has dealt with this is we've set as our goal in pattern

22  that before that mine actually is placed on pattern is to do

23  all we can to get the health and safety conditions at that

24  mine improved.  Failing that, we find our hands pretty much

25  tied, and failing that the operator has probably demonstrated

57

1   no desire to change the management style of the mine.

2                   I'm just talking on here, but that's to give

3   you a little bit of the idea --

4                   MR. WOOTEN:  Right.

5                   MR. ZEUTENHORST:  -- of the thoughts behind the

6   Agency's position.

7                   Any questions?

8                   Okay.  Thank you, gentlemen.

9                   MR. WOOTEN:  Thank you.

10                  MR. ZEUTENHORST:  Our next speakers this

11  afternoon is Mr. John Reeves from Mid-Contintent Resources.

12                  MR. JOHN REEVES:  Mr. Chairman, we thank you

13  for the opportunity of letting us have the privilege of giving

14  you our comments.  My name is John Reeves.  I am President of

15  Mid-Continent Resources, and I appreciate this opportunity to

16  comment on the proposed pattern of violation regulations, and

17  Section 104(e) of the Federal Mine Safety and Health Act of

18  1977.

19                  We, generally, concur with the American Mining

20  Congress recommendations, and with the Colorado Mining

21  Association recommendations concerning the pattern of

22  violations.

23                  Mid-Continent Resources operates the Dutch

24  Creek Mine in Coal Basin, Pitkin County, Colorado.  We are a

25  small operation.  We operate only advancing longwalls at our

58

1  mine, and in fact it's the only advancing longwall in the
2  United States.  It's our intention to go to all advanced
3  mining at our property.  We do this primarily for reasons of
4  safety, because under heavy cover advanced mining is the
5  safest method of mining coal known in the world today.
6          The Dutch Creek Mine has some of the most
7  difficult mining conditions in underground coal mines in the
8  United States.  We operate two seams; these two seams are 500
9  feet apart.  The outcrop of the coal seams is at an elevation
10 of approximately 10,000 feet above sea level.  The deeper seam
11 has approximately 3,000 feet of overburden, or cover.  The
12 coal seams are steeply pitching, approximately at about 13
13 degrees.  Because of the depth of the coal seams, they are
14 gassy and prone to outbursts and mountain bumps.  The coal is
15 very soft and pliable; has an index of about 115.
16          Other mines, perhaps, have more extremes of
17 these conditions.  Collectively, however, we believe we have
18 certainly among the most difficult mining conditions in any
19 underground coal mine in the United States.  In fact, we are
20 the only gas outbursting coal mine that I know of in the free
21 world which is producing coal on the competitive market.
22          I served in the U. S. Navy during World War II,
23 after completing an NROTC program at the University of
24 Colorado.  After World War II, I graduated from the University
25 of Utah with a degree in mining engineering.  I've been

59

1   involved in underground coal mining all of my adult life; have

2   observed underground coal mining both in the United States and

3   abroad for nearly five decades.

4           I believe the domestic coal industry is facing

5   major changes. Much of the easy coal is disappearing. In the

6   not-too-distant future, perhaps as early as the 21st Century,

7   deep mines will be the norm of our domestic coal industry,

8   just like in Europe. These mines will face most, if not all,

9   of the problems encountered by Mid-Continent in the Dutch

10  Creek Mine as they go under more cover. Unfortunately, I

11  sense that a difficult mine is too readily regarded as a

12  problem mine.

13          MSHA must also prepare for this change. In my

14  judgment its focus should be on the change which must be the

15  agenda if our domestic U. S. coal industry is to survive. The

16  Agency norm, its present focus, in my judgment, is like war

17  college curricula. The war college fights the last war.

18  Enforcement focuses on the norms of the easy coal. Easy coal

19  norms are not a fair measurement for difficult coal mining

20  conditions.

21          In the past two years, beginning in September

22  of 1987 and continuing until April of 1989, Mid-Continent was

23  subjected to the most intense, protracted, microscopic

24  inspection scrutiny of any coal operator of which I am aware

25  in the United States. During this 18-month saturation

60

1  inspection, more than 2,000 citations and orders were issued.
2  At the height of the saturation, there were 373 inspection
3  days in a single calendar month.  During this 18-month
4  saturation period, more than 250 Section 104(d) citations and
5  orders were issued.  At one point, we were litigating more
6  than 200 citations and orders.  A complete waste of the
7  resources of both the Federal Government and Mid-Continent.
8             The constant complaint Mid-Continent heard from
9  MSHA was, "We never see you producing coal.  When our
10  inspectors go up to the mine, the sections are shut down.  We
11  are not comfortable with the way you do things".  I don't find
12  this convincing.  Production in the calendar year 1988
13  increased more than 20 percent over calendar year 1987.
14  Further, the majority of the violations written were issued in
15  outby areas, non-face areas.  Finally, we found when working
16  sections were shut down that much of this was due to a
17  conscious effort by mining personnel to correct conditions
18  under necessary situations, without the necessity of a
19  citation or an order.
20             The consequence of this protracted saturation
21  inspection was that MSHA assumed virtual control of
22  Mid-Continent operations.  It cost Mid-Continent people their
23  jobs.  Hourly and salary people were demoralized and many
24  quit.  It nearly put Mid-Continent out of business.
25             What resulted was that Mid-Continent had proof

61

1   that MSHA could put us out of business.  We suspected that

2   before this saturation inspection.  MSHA learned, we believe,

3   that Mid-Continent has some of the most difficult mining

4   conditions and some of the best coal miners in the United

5   States, and we do a pretty good job despite some mighty

6   difficult mining conditions.

7             For example, we have recording methane monitors

8   on every one of our operating sections, which record the

9   percentage of methane in the lamphouse, so any interested

10  person can come up and see what the percentage of methane is

11  on the face and in the last open crosscut.  These monitors

12  kicked the power on the section, in its entirety, at 1

13  percent.

14            In addition, we practice probably the best

15  outburst control techniques anyplace in the United States.  We

16  have an elaborate and sophisticated outburst control program.

17            In spite of that, we still have an inspector at

18  the mine each operating shift that anybody works at the mine.

19            To me, the long saturation inspection proved

20  that MSHA, unquestionably, has the power to put us, or

21  virtually any other coal operator, out of business.  But a

22  little operator makes a convenient target and a statistic to

23  show just how vigorous an enforcement agency can be.  I can

24  think of no greater agency power than its ability to put a

25  regulated company out of business.  This power,

1  unquestionably, exists under the 104(d) of the 1977 Mine Act.

2         With the 1977 Mine Act, Section 104(d) powers,

3  a pattern of violations sanction is like strategic nuclear

4  stockpiling.  If there is an existing ability to annihilate

5  someone, it really makes little sense to arm to the capacity

6  to annihilate the same person twenty, or two, times over.

7  Perhaps "overkill" has a legitimate place in global conflict.

8  I fail to see its application in a regulatory scheme.

9         I realize that the 1977 Mine Act contains a

10  Congressional mandate for pattern of violations, and it cannot

11  be ignored.  However, the 1977 Mine Act, and its enforcement,

12  as we have experienced, moot any need for pattern of

13  violations.  I submit to you that this fact should be known to

14  Congress by the Agency, and the Agency should seek repeal of

15  this section as legislative overkill.  I believe the private

16  sector would support this effort; certainly we would.

17         Pattern of violations is like pornography.

18  Everybody thinks they know what it is, but the proposed

19  regulations fail to satisfactorily define it.  The conceptual

20  notions expressed in the present proposed regulations do not

21  adequately define what conduct is to be proscribed.

22         After reading the proposed pattern of violation

23  regulations, I do not know what conduct will constitute a

24  pattern of violations.  I cannot tell my superintendents and

25  foremen what a pattern of violation is.  I see a number of

63

1    criteria which will be taken into consideration, but I see

2    nothing in the proposed regulations which describes how those

3    criteria will be applied, or what criteria actually

4    constitutes a pattern.

5              To shift the matter to another perspective, I

6    asked myself if I were an Administrative Law Judge, how would

7    I know whether a certain conduct constituted a pattern.  I

8    found nothing in the proposed regulations which satisfactorily

9    answered two essentials.  First, an ascertainable definition

10   or standard which was a pattern.  And, second, any measurable

11   mark by which a determination of a pattern could be tested as

12   correct.

13             When Congress adopted the pattern of violations

14   section of the 1977 Mine Act, it left MSHA to define what

15   actually constitutes a proscribed pattern.  In my judgment,

16   MSHA has failed to do this.  The proposed regulations provide

17   more questions than answers and promise years of litigation

18   and uncertainty.

19             The legislative history surrounding pattern of

20   violations, Congress gave me the impression that there were

21   only a few operators in the United States that should be

22   subjected to a pattern sanction.  We see nothing in the

23   proposed regulation justification that suggests Congress'

24   appraisal was in error.

25             The proposed regulations appear to multiply

1  this predication by a factor of nine.  This suggests that the

2  potential of a beauty contest in and among the nine MSHA

3  districts.  Unless there is some justification for district

4  pattern determinations, unless MSHA has failed to improve the

5  safety climate in the domestic coal industry, we believe the

6  concern is small, national in character, and the determination

7  should be by the Administrator.

8              Further, we believe there should be adequate

9  procedural safeguards, such as notice to an operator of a

10 potential pattern, an opportunity to formally present

11 evidence, a requirement that evidence presented by an operator

12 is considered, and that a requirement that the pattern

13 determination be based upon all the evidence.  A pattern

14 determination is an adjudicatory process.  The proposed

15 regulations contain no adjudicatory safeguards.

16             In closing, we want to thank you for this

17 opportunity, and I can assure you that we look forward to

18 working cooperatively with MSHA.

19             MR. ZEUTENHORST:  Thank you, Mr. Reeves.

20             I would just like to make one point about the

21 MSHA proposal.  It was the Agency's intent that when the

22 District Manager would notify a mine, in writing, that they

23 may be developing a potential pattern, that that notification

24 would spell out, in detail, the basis for the Agency's

25 determination that a pattern may, indeed, either be developing

65

1    or exist.  And at that point, both the operator and miner's

2    representative would be given a chance to look over these

3    documents and to make a response to the District Manager.

4              MR. REEVES:  Thank you.

5              My point is, though, that frequently -- say if

6    you have a deep mine that outbursts, now pillars are what

7    usually outburst in a coal mine, naturally.  So, we have what

8    we call a yielding pillar in our mine, because a yielding

9    pillar does not accumulate energy, and therefore it does not

10   outburst.  A yielding pillar, by definition, must slough or

11   yield its weight off.  By the same token, though, a certain

12   inspector can come up and cite you constantly for having coal

13   sloughage on pillars.  And in some cases we've actually made

14   situations unsafe because we just kept loading out pillars,

15   loading out pillars, to comply with the law, and yet you could

16   say we had developed a pattern of violating the law because we

17   kept having pillars which sloughed.

18             Well, I don't see how you can mine coal under

19   3,000 feet of cover and not develop some patterns with a few

20   problems, and rib sloughage is one of them.

21             MR. ZEUTENHORST:  Thank you, Mr. Reeves.

22             MR. REEVES:  Thank you.

23             MR. ZEUTENHORST:  Our next speakers are

24   representatives of the United Mine Workers of America.  First

25   we have Linda Raisovich-Parsons.

66

1        MS. LINDA RAISOVICH-PARSONS:  Good afternoon.
2  My name is Linda Raisovich-Parsons, and I'm here today on
3  behalf of the United Mine Workers of America.
4        Let me begin by stating that the UMWA is in
5  total support of MSHA's long-overdue decision to issue
6  regulations for implementing Section 104(e) of the Act.
7  Congress recognized the need for strong enforcement measures
8  after its investigation of the tragic Scotia disaster in 1976.
9  Their investigation revealed that the Scotia Mine, as well as
10  others, had a history of recurrent violations which the
11  existing enforcement scheme was unable to adequately address.
12  When enacting the 1977 Mine Act, Congress set forth a
13  provision which authorized MSHA to impose stringent
14  enforcement sanctions for those recalcitrant mine operators
15  who thumb their nose at mine health and safety.  The UMWA is
16  glad to see this long-evaded enforcement tool finally put into
17  effect.
18        An overview of the proposed rules reveals the
19  proposal stops short of providing the effective enforcement
20  tool which Congress wished.  Many areas are too vague or
21  contradict the expressed intent of Congress.  The proposal
22  provides many escape routes through which a mine operator can
23  elude Section 104(e) enforcement.  The UMWA does not feel
24  these rules totally reflect the sanction which Congress
25  foresaw.

67

A prime example of this is included in Section
104.3 of the proposal. This provision provides that only
final citations and orders will be considered when identifying
mines for the potential pattern of violations. If MSHA
restricts itself to final citations and orders, operators will
be strongly motivated to challenge every S & S citation they
are issued, regardless of the merits of their position. Such
legal challenges can drag on for years before all appeals are
exhausted. Under this situation, MSHA will be trying to
determine whether a pattern exists on the basis of conditions
that were cited several years previously. This will subvert
the whole intent of Section 104(e), which is to identify those
mines with serious health and safety management problems, and
promptly restore them to a safe workplace. If a pattern is
finally determined to exist, the danger to miners will have
been in existence for an unnecessarily long period of time
before any action can be taken to correct the condition.

Further, if MSHA limits itself to a certain
time frame for considering the mine's history, it would be
very easy for an operator to completely escape a liability
under Section 104(e). It would certainly be easy enough for
an operator to challenge all S & S citations and keep their
validity in legal limbo until the time period for evaluation
expires. Once that time period passes, the operator would
safely drop its challenge. The operator would know that even

68

1  though the citation was now final, it would be too old to be

2  included in the assessment for a pattern notice.

3            Requiring a Section 104(e) order to be based

4  only on final citations and orders is completely contrary to

5  the rest of the Act's enforcement scheme.  A failure to abate

6  order under Section 104(b), or an unwarrantable failure order

7  under Section 104(d), are each issued on the basis of previous

8  citations, whether or not those citations have been

9  challenged.

10            Likewise, an operator who disputes an

11  inspector's determination as to whether an imminent danger

12  exists must comply with the Section 107 order, while he

13  challenges its issuance.

14            There is absolutely nothing in the legislative

15  history which supports such a different and restrictive

16  approach to the application of Section 104(e).  Indeed, the

17  legislative history requires the opposite conclusion.  In

18  discussing the sequence for issuing a Section 104(e) order,

19  the Senate Committee noted that the pattern order sequence

20  parallels the current unwarrantable failure sequence of the

21  Coal Act, and the unwarrantable failure sequence of Section

22  105(c) of that Bill.  If pattern orders can be based only on

23  final citations, its enforcement cannot be said to parallel

24  that of Section 104(d), as Congress intended.

25            The Senate Committee gave a fairly extensive

1  comparison between the unwarrantable and the pattern

2  provisions.  They explained that the violations which set into

3  motion the unwarrantable failure sequence must be of a

4  significant and substantial nature and must be the result of

5  the operator's unwarrantable failure to comply.  In

6  comparison, they point out that there is no requirement that

7  the violations establishing the pattern offense be a result of

8  the operator's unwarranted failure; only that they be of a

9  significant and substantial nature.  The Committee further

10 describes other ways in which the enforcement provisions

11 parallel each other, including the 90-day period for issuance

12 of either order, and the requirement of an intervening clean

13 inspection before either order can be terminated.

14          The Committee concluded its discussion by

15 pointing out that it was the Committee's intention that the

16 Secretary, or his authorized representative, may have both

17 enforcement tools available, and that they can be used

18 simultaneously if the situation warrants.  Under this proposed

19 rule, Congress' intention would be completely thwarted.  The

20 Secretary could hardly use both enforcement tools

21 simulaneously if an operator's challenge to the underlying

22 citations effectively blocked implementation of one of those

23 tools.

24          Another area of concern to the UMWA is the

25 procedure set forth in Section 104.4 for the issuance of a

70

1  notice and review with the District Manager.  Although we do

2  not completely oppose the procedure established by this

3  section, we feel that changes are necessary to provide a fair

4  balance to the review process.  This section establishes

5  guidelines for review and conference with the District Manager

6  when a pattern notice is issued.  If such a procedure is

7  established, to provide additional input regarding the

8  information upon which the pattern notice is based, it should

9  be done through written comments with copies provided to all

10  parties.  An opportunity for a conference, as proposed,

11  discriminates against the miner's representative, unless the

12  representative is protected against loss of pay.

13          Such a conference is currently provided by 30

14  CFR, Section 100.6, for review of citations and orders.

15  Although miner's representatives are afforded an opportunity

16  to participate, they are usually unable to do so.  This is

17  because pay is not provided to the representatives for

18  attending these conferences.  Mine operators frequently

19  exercise this privilege, and many local unions are not

20  financially able to pay lost wages for representatives to

21  attend these events so often.  This normally leaves the

22  conferences open to the operator's attempts to influence and

23  pressure MSHA to vacate citations and orders.

24          To provide another conference procedure for

25  review of a pattern of violations notice would result in the

71

1   same situation.  Therefore, the UMWA recommends that any input

2   be reduced to writing to provide a fair balance to the

3   procedure, unless as a precondition to requesting a

4   conference, the operator agrees to reimburse the miner's

5   representative for any lost wages.

6            The Union further recommends that any mine

7   identified as having been subject to a pattern notice in the

8   past should not be afforded the opportunity for further input.

9   These mines should be subject to an automatic pattern of

10  violations notice if the criteria is met, because these

11  operators have already exhibited a disregard for health and

12  safety in the past.  This should be sufficient grounds to

13  implement 104(e) without further review.

14           Lastly, but most importantly, the Union has

15  serious concerns regarding the provision which provides an

16  operator the opportunity to implement a program to avoid

17  repeated S & S violations.  Although we do not wish to deny a

18  final effort on the operator's part to restore his mine to a

19  safe and healthful environment, the structure of this

20  provision must be tightened up to avoid abuse.

21           The District Manager is given the authority,

22  under this procedure, to determine if the program is effective

23  in reducing the number of S & S citations issued at the mine

24  in question.  If he determines that it is not effective, the

25  District Manager then submits a report to the Administrator

72

1   and would include the evaluation made under the proposed

2   regulations.  However, if the District Manager determines that

3   a program is effective, no report is required.  Furthermore,

4   the rules do not provide any indication of how these programs

5   will be determined to have effectively reduced the occurrence

6   of S & S violations at the mine.

7            The UMWA feels that there is a tremendous

8   potential for abuse under this provision.  The mine, which has

9   been identified as having serious problems, could never come

10  under the enforcement mechanism set out under Section 104(e)

11  simply on the basis of the District Manager determining that a

12  program has effectively reduced the occurrence of S & S

13  violations.  We feel it is more important to require the

14  District Manager to detail how the program has been effective

15  in reducing the number of S & S violations, and what he has

16  determined an effective production to be.  Then, all parties

17  will have information as to how the District Manager arrived

18  at his decision and be able to provide comments if they

19  disagree.

20           The procedure must also clarify several

21  unanswered issues as to how it would be administered.  First,

22  it must specify that the length of the program cannot exceed

23  90 days, and that the program can only be applied once during

24  any pattern of violations notice.  It must also provide

25  consideration and insulate MSHA inspectors from external

73

1    pressure during the 90-day trial period to cite violations as

2    non-S & S.  It must specify that citations and orders issued

3    during the 90-day trial period must not be final to be

4    considered.  If not, what would happen if, during this period,

5    an operator continues to receive S & S citations, but decides

6    to challenge virtually all of them?  Will an MSHA District

7    Manager not count them because they are not final, and

8    declare there has been an effective reduction in citations?

9    These are just a few examples of the abuses with the program

10   the UMWA can foresee if clarifications are not provided.

11           For this reason, we urge the Secretary to adopt

12   the UMWA's recommendations provided in our written comments,

13   and I appreciate this opportunity to testify and will answer

14   any questions you may have now.

15           MR. ZEUTENHORST:  I've got one question for you

16   on the conferencing.

17           I think you've indicated that if a mine has

18   been identified as having been subject to a pattern notice in

19   the past, it should not be afforded an opportunity for further

20   input in conferencing.  What sort of situation are you

21   invisioning there?  The mine had been on a pattern of

22   violations and gotten off, or --

23           MS. RAISOVICH-PARSONS:  If it has either been

24   on a pattern, or it has exhibited a pattern of violations of

25   the same nature in the past, and they've repeated the same.

74

1          MR. ZEUTENHORST:  So, you would invision a

2 situation where the pattern violator, who was given the notice

3 by the Agency, could have a clean inspection to get off?

4          What we've been hearing is that one of the

5 difficulties with pattern is that once you're on, you're never

6 off.

7          MS. RAISOVICH-PARSONS:  Yes?

8          MR. ZEUTENHORST:  This seems to indicate that

9 you would invision a situation where the operator could get

10 off the pattern?

11          MS. RAISOVICH-PARSONS:  Yes, I think they

12 could.

13          MR. ZEUTENHORST:  Through?

14          MS. RAISOVICH-PARSONS:  A clean inspection.

15          MR. ZEUTENHORST:  Through a clean inspection,

16 okay.

17          In the written comments we received, you

18 mentioned it this afternoon, that a clean inspection should

19 not take more than 30 days.

20          MS. RAISOVICH-PARSONS:  Right.

21          MR. ZEUTENHORST:  If you had a large

22 underground mine, would you invision that MSHA would then send

23 in a team of inspectors?  It's difficult to accomplish an

24 inspection of an entire mine with a typical inspection team, I

25 believe, in 30 days.  Is that basically correct?

75

1          MS. RAISOVICH-PARSONS:  Well, I think you would

2    give special considerations to those mines that are on a

3    pattern, and you would send a team of inspectors to that mine

4    to be able to accomplish it.

5          MR. ZEUTENHORST:  Okay.  Thank you.

6          Mr. Butero?

7          MR. BOB BUTERO:  Yes.  My name is Bob Butero.

8    I'm with the United Mine Workers.  B-U-T-E-R-O.

9          First of all, I'd like to talk about, on the

10   S & S citation and such.  In the early 80's my experience has

11   been out there in the field, and with the inspectors, and was

12   that the inspector was almost using the criteria to determine

13   S & S as the same criteria that he was using imminent danger.

14   And that was a fact that under the S & S citation, you would

15   almost have to have a person in an imminent danger situation

16   to issue an S & S citation.

17         And, the problem with that is that we were just

18   getting a few of the citations issued S & S, and the rest were

19   of a $20 fine nature, and we were seeing a lot more violations

20   of such.

21         I think since MSHA has upgraded their S & S,

22   and they've instituted more S & S, I think the overall

23   citations have been better corrected, and the levels have been

24   -- as far as negligence, and all that -- has been reduced.

25         One of the problems also in relating to this is

76

1   the fact that -- and one comparison was made earlier -- in

2   1980, or so, we had so many violations issued out here in, I

3   believe, MSHA District 9. And then, in '87-'88, we had an

4   increase in that. I think one of them was the change of an

5   Administrator in that department, and the way he administered

6   the law, compared to the District Manager who administered the

7   law before that. Now, whether their success rate is any

8   different than that, I really haven't looked at the statistics

9   to actually see the overall effectiveness. But it's my

10  opinion at this time that the one that took effect in '87-'88

11  has had some input, and has been more effective than the

12  Administrator previous to that.

13          One other thing, you get into a pattern of

14  violations, and I believe that many mines out there take on

15  their business of having programs to better their mine. They

16  have people set aside to rock dust their belt lines, to clean

17  their belt lines; to make sure that this is in compliance.

18  They have people who take regular permissability checks. They

19  have their operators do a pre-shift examination of their

20  equipment to see if there are any of the abuses of the

21  permissability. They have section mechanics who check the

22  power centers in outby areas. And these people who do this,

23  and do it on a continuous basis, have very few violations, and

24  these are the people who won't have one.

25          But if a person doesn't have a program, and

77

1  their only program at that mine is to abate citations, well,
2  yes, they're going to get into trouble.  And I think Congress'
3  intent was, after Scotia, was that if you have violations of
4  the same nature that could lead to a disaster, or lead to
5  people getting seriously hurt, that they should be put under
6  the 104(e).  I really believe that if an operator takes his
7  operation and commits the time and the effort and establishes
8  programs at each of these mines, through education and
9  training and through the actual assignment of these work
10  duties, I think it would be very hard for an operator to get
11  under the pattern of violations under the 104(e).  But, once
12  they're under it, I think it would be tough to get from
13  underneath it.
14          But, I think overall, as they operate that
15  mine, that this would be a hard area to get into.
16          Also, there might be a way of determining a set
17  number.  If people wanted to find out how many numbers -- what
18  your proposal says is "a history of violations".  Maybe that's
19  something that could be looked at in 30 CFR, Part 103(c),
20  Table 6 there, as far as maybe so many citations per
21  inspection shift.  And that way it might give you, not based
22  on the size of the mine; not based on its production or any of
23  that, the number of actual citations that are being written by
24  that inspector during each inspection shift.  If you have a
25  big mine that produces a lot of coal, well of course you're

78

1  going to have more inspection shifts. But the average would

2  be the same if you had a one-section mine that works one shift

3  a day, that inspector's only going to spend so many days

4  there. So, you might look into that, to maybe give a better

5  idea of what those numbers could be, instead of looking at

6  overall tonnage, and such.

7          Also, we mentioned earlier here about tying it

8  up to the final decision. We really believe that if an

9  inspector goes in and issues a 104(d) citation and then he

10  follows that with an order, he's doing that without a review

11  or court case. And I think you'd tie their hands up by having

12  to wait until a court decision is issued before he can go back

13  and correct the mine's way of doing things.

14          And, also, on this inspection, as far as

15  allowing the company to request this inspection to come in, we

16  feel, like I said earlier, if a company's going to stay off a

17  pattern and fix his mine where they have programs, then these

18  programs would be instituted at all times. And if a person

19  gets into that pattern, I think then they have to concentrate

20  their efforts on getting these programs in place and

21  guaranteeing that every shift of every day that that mine

22  works, that these things are being answered. And hopefully,

23  through that, if that is being done, then they might have a

24  chance of getting off the pattern. So, we think that that

25  should be dcne over the quarterly inspection that is done, and

79

1   any 103(i) spots that are there on underground, and then any

2   bi-annual inspections that happen on a surface or open-pit

3   mine, to get off of the citation.

4              So, I think in order for the pattern to go in,

5   the mine has failed to institute programs to guarantee safety.

6   If they do that, then I think they deserve to be on a pattern

7   and go with that.

8              That's my testimony for today.

9              MR. ZEUTENHORST:  Thank you.

10             You expressed concern at the beginning of your

11  statement that S & S at one point, in your opinion, was at the

12  other end of the spectrum -- too few being written.

13             MR. BUTERO:  Right.

14             MR. ZEUTENHORST:  Have you seen the latest

15  Program Policy Memo on S & S violations?  It, basically, is

16  the National Gypsum criteria?

17             MR. BUTERO:  Yes.

18             MR. ZEUTENHORST:  Do you find that adequate?

19             MR. BUTERO:  Generally speaking, yes.  I feel

20  that most of it is adequate.  The situation that we do not

21  want to get into is that the inspector has to determine if

22  there was a citation, and then he has to determine if that

23  citation itself is going to cause serious injury to an

24  individual.  In a broader sense, if that citation is to exist,

25  say if you have a dirty belt line which can cause either a

80

1   fire or explosion, then it's going to affect the people in the

2   area.

3        I believe that would be more on the S & S

4   citation area, because if that danger does happen to turn into

5   an accident, then we're going to have a serious situation

6   there.

7        What these inspectors were doing, to me, was

8   they were going out; if they found an accumulation of gas in

9   the face, instead of being more or less in an imminent danger

10  type situation, they'd be looking at it as an S & S instead of

11  that.

12       I really feel that, yes, as long as the

13  inspector knows what he is considering.  And, like I said, I

14  haven't read all of the guidelines, but, yes, I think it would

15  be close to it.

16       MR. ZEUTENHORST:  Would you concur that the

17  inspector in looking at any particular violation should not

18  immediately say, "Oh, it's a roof control standard";

19  automatically S & S, but he needs to look at the conditions of

20  that violation?  That's my statement; would you concur with

21  that statement?

22       MR. BUTERO:  I would think that if that is in

23  the active workings, then that would almost constitute an

24  S & S.  You know, if there was a probability that somebody can

25  be under that roof condition within that eight hours --

81

1          MR. ZEUTENHORST:  Right.

2          MR. BUTERO:  -- then that would constitute an

3  S & S.

4          Now, if it's in an inactive working area, or

5  such --

6          MR. ZEUTENHORST:  Right.

7          MR. BUTERO:  -- and he finds that, then maybe

8  that situation would not really constitute an S & S because

9  it's not likely that anybody will be in that area for some

10 period of time.

11         But, if, within a reasonable time, somebody is

12 likely to be exposed to that violation; whether it be that

13 shift, the next shift, or even a couple days down the line,

14 then I would say that would be an S & S.

15         MR. ZEUTENHORST:  That still implies some sort

16 of assessment of the hazard that's here, and whether people

17 would be exposed to it or not, right?  What I'm getting at is

18 that we've heard some criticism that in certain inspections

19 all underground roof control standards, if it's in the 200

20 series, is automatically S & S without any further assessment

21 of what the actual hazard to the miners is.

22         MR. BUTERO:  I would say that there could be

23 situations where that would not be.

24         MR. ZEUTENHORST:  Okay.  Thank you.  Thank you

25 very much.

82

1    Our next speakers, from the United Mine

2  Workers, are Crecencio Salazar and Linda Koile-Fischbeck?

3    MR. CRECENCIO SALAZAR:  Chairman, Board, my

4  name is Crecencio Salazar, S-A-L-A-Z-A-R.  I am a

5  representative of the United Mine Workers, Local 1799 and

6  Safety member, and I'm employed at Cypress Empire Corporation

7  with 12 years experience at Eagle No. 5.

8    Pattern of violations in Sections 104.2, the

9  United Mine Workers would like to see the mine inspected in

10  compliance with the records of the mine, at least biannually,

11  and not just annually.

12    I don't think any operator should ever let

13  their mines fall into the history of patterns of violations.

14  I believe that MSHA should have a procedure to have the

15  operator start correcting violations immediately, and not put

16  a time period on the violations.  If there is a time period

17  put on these violations, then have more inspections during

18  this period to see if the violations are getting corrected.

19    For example, some violations:  Ground cables

20  being disconnected on plugs or nips or cat heads around power

21  centers.  Guards around feeders, belt drives, tail pieces.

22  Incorrect labeling on equipment.  Accumulation of float dust

23  on machines.  CO and NO checks on diesel equipment.

24  Telephones not being maintained.  Markings on returns and

25  escapeways with proper reflectors.  Not enough velocity of air

83

1   movement over diesel equipment with plenty of horsepower in

2   different sections.   Rubber matting around power centers.

3                 And I could go on with other violations that I

4   have written down that seem like they just exist year after

5   year.   These are just some of them that I've written down;

6   since I've been there 12 years, and it's probably not just

7   Cypress because I've worked at the same mine for 12 years and

8   there have been three different owners.

9                 But, I'd like to turn the rest of it over to

10  Linda at this point, and she'll continue.

11                MS. LINDA KOILE-FISCHBECK:   I'm Linda L.

12  Koile-Fischbeck; that's K-O-I-L-E, hyphen, F-I-S-C-H-B-E-C-K.

13  I'm a Safety Committee person, UMWA 1799, District 15, Craig,

14  Colorado, and I work for Cypress Empire Corporation.

15                Mr. Chairman and panel, a plan is needed to

16  address mines where operators habitually operate and allow the

17  occurrence of violations of mandatory safety and health

18  standards which significantly and substantially contribute to

19  the cause and effect of mine health and safety dangers.

20                Such operators appear to focus on abatement of

21  the violations as they are cited, and then fall into the cycle

22  again from violation to citation to abatement.

23                A plan is in order to restore the mine to safe

24  conditions, therefore breaking the cycle.   The emphasis is not

25  to expose the miners to the same risks over and over again.

84

1    Regarding the 104.2 initial screening, mines

2  with chronic history of S & S violations need to be reviewed

3  more than once a year.

4    Regarding the 104.3(b) of pattern criteria,

5  identifying mines with a continuous pattern of violations, and

6  limiting to final citations and orders, operators may

7  challenge every S & S citation and keep it in a legal time

8  warp.

9    I think MSHA should be hard on chronic health

10  and safety hazard patterns, and recognize that such mine

11  operators have exhibited a continued disregard for the health

12  and safety of miners.

13    Thank you.

14    MR. ZEUTENHORST:  One point of clarification in

15  both your testimonies on the issue of how frequently mines

16  should be looked at for a pattern.  I think I've heard two

17  different things.  One, the Agency basically in the proposal

18  said that all mines would be looked at at least once a year,

19  and I think, Mr. Salazar, you said that you thought all mines

20  should be looked at twice a year?

21    MR. SALAZAR:  Yes.

22    MR. ZEUTENHORST:  And Ms. Fischbeck, you said

23  that chronic violators should be looked at more frequently.

24    One of the things the Agency is trying to deal

25  with is the best use of our resources.  When we say all mines

85

1    are looked at, from an inspector's point of view -- if it's an

2    underground mine, four times a year.  You can rest assured

3    when an inspector, before he goes out, he's looking at the

4    previous inspection reports.  But we put in once a year

5    because that was to look at specifically for a pattern

6    violator.  Saying that, we didn't intend that all mines would

7    be suspect pattern violators.  We intend to target our

8    enforcement activities to those operators that are truly going

9    to be a pattern violator.

10                So, you were saying, Ms. Fischbeck, that you

11   would want those chronic violators to be looked at more

12   closely.  Does that make sense to you?

13                MR. SALAZAR:  Yes.

14                MS. KOILE-FISCHBECK:  I would like to see at

15   least more than one time --

16                MR. ZEUTENHORST:  Okay.

17                MS. KOILE-FISCHBECK:  -- on reviewing.

18                MR. ZEUTENHORST:  Okay.

19                MS. KOILE-FISCHBECK:  I think the citations

20   speak for themselves.

21                MR. ZEUTENHORST:  Okay.  Thank you very much.

22                MS. KOILE-FISCHBECK:  Thank you.

23                MR. SALAZAR:  Thanks.

24                MR. ZEUTENHORST:  Our next speaker from the

25   United Mine Workers of America is Mr. Larry Neil?

86

1          MR. LARRY NEIL:  My name is Larry Neil,

2     N-E-I-L.  I'm a representative of the miners for Deserado Mine

3     in Rangely, Colorado, and I'm a member of Local 1984, United

4     Mine Workers of America.

5          Under the purpose, I think MSHA should keep in

6     mind the Senate Committee report, which stated that Section

7     104(e) of the 1977 Act was intended as an effective tool to

8     protect miners when the operator demonstrates his disregard

9     for the health and safety of miners, through an established

10    pattern of violations.

11         I heard commenters suggest that only those

12    operators who thumb their noses at the law should be

13    considered for a pattern of violations notice.  I suggest that

14    operators who allow a hazard to exist, over and over again,

15    exposing miners to these same hazards repeatedly because they

16    simply allow the hazard to exist and merely abate citations

17    when they are written, but do nothing to correct the hazard,

18    should also be included.

19         As an example:  Rib slabbing in an area where

20    miners would travel.  Because you're constantly advancing, you

21    would be exposed to new areas.  And, say you have bad rib

22    slabbing, and you get a citation because of the hazard

23    exposing these miners, and you merely scale it down to abate

24    the citation, but then do nothing in order to control these

25    ribs from slabbing in the future, when you're exposed to new

87

1    areas, they could result in the same situation.

2              Under 104.2, initial screening, the proposed

3    rule states that at least once each year, MSHA shall review

4    the compliance records of mines.  I would rather see it at

5    least twice a year, and I think that would be real fair,

6    simply because you would have at least two quarterly

7    inspections conducted at that mine, plus any spot inspections

8    that were conducted at that mine during that two-quarter

9    period, and you could make a comparison of the two quarters.

10   And I think that that could go a long ways in establishing

11   that a pattern may exist.

12             104.2(b)(2) and (4), evidence of the mine

13   operator's lack of good faith in correcting a problem and

14   whether mitigating circumstances exist, that would be real

15   hard to determine in the first place.  And, also, the Senate

16   Committee report clearly stated that a pattern does not

17   presuppose any element of an intent or state of mind of the

18   operator.  I think when you start including these as criteria

19   in order to establish whether a pattern existed, would only

20   tie the hands of the inspectors and eliminate the hazards that

21   we need to be looking at.

22             Section 104.3, pattern criteria.  Contrary to

23   the expressed intention of Congress, MSHA has limited this to

24   situations which would trigger issuance of a pattern of

25   violations notice.  The criteria, in the proposed rules, the

88

1   history of repeated S & S violations of a particular standard,

2   and the history of repeated S & S violation standards related

3   to the same hazard, and a history of repeated S & S

4   violations caused by an unwarrantable failure to comply.

5   These are fine, but they don't go far enough.  And, again,

6   relating to the Senate report, it clearly indicates that the

7   enforcement mechanism was not to be limited only to violations

8   of the same standard, nor to violations which are the result

9   of an operator's unwarrantable failure to comply.

10          Under the proposed rules, 104.3(b), it states

11  "only final citations and orders shall be used to identify

12  mines with the potential pattern of violations".  This, again,

13  would severely restrict inspectors to be able to use 104(e) of

14  the Act, and it would also delay, for months if not a year or

15  more, establishing that a pattern existed when the need to

16  establish it is at the time.  You can't allow a situation

17  that's hazardous to miners, in a year from now after you fight

18  it through the courts, say, "Oh, yeah, it existed a year ago".

19  We can't help those people then.

20          I also feel that by including this, the

21  operators will be strongly motivated to challenge all S & S

22  citations.

23          And it is also against the Act's enforcement

24  scheme if you compare it to 104(b) and 104(d) orders in the

25  Act, where they act upon the citation, as written, and the

1  judgment of the inspector, regardless of whether it's

2  challenged or not.

3          Okay.  Section 104.4 under the proposed rules,

4  issuance of notice, it establishes guidelines for a review and

5  conference with the District Manager when a pattern notice is

6  issued.

7          The citations and orders issued to an operator

8  for a repeated S & S violation of standards provide the

9  operator with ample warning of a potential pattern in itself.

10  And an opportunity for conference, as provided in the proposed

11  regulations, discriminates against the miner's

12  representatives, because such a conference is currently

13  provided under 30 CFR, Section 100.6 for review of citations

14  and orders.  And although we are afforded an opportunity to

15  attend these conferences, they are often located away from the

16  mine site, many miles, and they are numerous -- as many as two

17  conferences, on a normal quarterly inspection, as indicated at

18  our mine.  And that's a huge burden for the miners to expect

19  to pick up, and you want to add more.

20          The proposed regulations require that the

21  District Manager submit a report if he continues to believe

22  that a potential pattern of violations exist at the mine.  The

23  proposed regulations require no report, however, if the

24  District Manager determines that the program has effectively

25  reduced the occurrence of significant and substantial

90

1    violations at the mine.

2              I don't understand why we would not have a

3    report for that, also.

4              Earlier I heard comments suggesting that the

5    time limit should not be imposed on the operators falling

6    under a possible pattern of violations notice.  Yet, earlier

7    today, these same commenters wanted to impose time limits on

8    MSHA and Administrative Law Judges in making their decisions.

9              I support MSHA's decision to develop

10   regulations for implementing Section 104(e) of the Act.

11   However, I hope that the final rulings will be more consistent

12   with the intent of Congress, and remember the purpose of the

13   Act, and that the coal and other mining industry is to the

14   health and safety of its most precious resource, the miner.

15             Thank you.

16             MR. ZEUTENHORST:  Thank you, Mr. Neil.

17             You had made one comment expressing concern

18   over the use of evidence of good faith in the initial

19   screening.

20             By way of background, keep in mind that MSHA's

21   intent with pattern -- the ultimate intent, I believe, of the

22   Mine Safety and Health Act, is to provide a safer, more

23   healthful workplace for the miners.  We were looking at the

24   legislative history, as you obviously have done, in a great

25   deal of detail, and we were looking at the Senate report that

1   states that the pattern provision should show that "a serious

2   safety and health management problem exists at the mine".

3          This was, if you will, the flip-side of the

4   coin.  We didn't think we should be targeting an operator who

5   seems to be making an effort not to violate the law.  We want

6   to target the operators who are consistently violating the

7   law, allowing the citations to occur.  This is why we were

8   looking at this as an element in the screening, even though it

9   doesn't have any part in the pattern.

10         On the pattern criteria; just to make clear.  I

11  think you understand the way it's structured now, you could

12  have any one of three patterns.  You don't have to have all

13  three.  You could have a pattern of a single standard.  You

14  could have a pattern of standards relating to the same hazard.

15  On the third one, where we've heard some concern expressed

16  before, we looked for a history of repeated violations caused

17  by unwarrantable failure to comply.

18         What we were trying to address here was, where

19  you would have S & S violations sprinkled throughout the mine

20  that don't seem to have any sort of pattern to them, other

21  than the fact that there's a lot of them; they're recurring,

22  and what would tie them together would be the unwarrantable

23  aspect.  We tried to define a pattern by the unwarrantable;

24  where the other two would be clear.  It's the same hazard or

25  the same standard that keeps recurring.  That's just the

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-3 Filed: 08/10/16 Page: 236 of 239 PAGEID #: 1506

92

1   reason why we were proposing this particular aspect.

2                    Thank you for your testimony.

3                    Our next speaker this afternoon is Mr. Harold

4   Barnes from Homestake Mining Company.

5                    MR. HAROLD BARNES:  My name is Harold Barnes,

6   B-A-R-N-E-S.  I am the Corporate Manager of Health and Safety

7   for Homestake Mining Company.

8                    Mr. Chairman, panel, Homestake Mining Company

9   is one of North America's largest producers of gold, silver,

10  lead, zinc, and other metals.  Our largest domestic operation

11  employs approximately 1400 miners.  This operation has been in

12  continuous operation, except for a short period of time during

13  World War II, for over 110 years.

14                   Many of the mine's facilities, equipment, and

15  mining methods, in past years, are not the same as they are

16  today.  To a person not familiar with the hazards of these

17  previous methods, or the acceptability of these previous

18  methods, they often don't appear to conform with the

19  specification-type regulations and standards that we currently

20  have to comply with in the mining industry.

21                   Sometimes citations are issued; often those

22  citations are S & S.  Many times, we don't contest these

23  citations for a variety of reasons.  One being the cost of

24  resources to contest such citations after they've been

25  written, and a strong underlying belief in our company that

Background Page 00235

93

1  safety and health has to be the number one item in this

2  business.  A commitment shared from the Chairman of our Board

3  through all of our employees.  So, therefore, we simply pay

4  citations of that nature.

5          We don't desire to apply our limited critical

6  resources to resolving differences of opinions on S & S

7  citations, and the related hazards.  We would much rather

8  apply these resources to improve safety and health in the

9  workplace for our employees.

10          Without question, 104(e) of the Act provides

11  MSHA with its strongest enforcement tool.  Once placed on a

12  pattern, a mine can expect a succession of closure orders that

13  would render routine operations impossible.

14          As a result, Congress repeated indicated its

15  intent to apply the pattern provision to those few

16  recalcitrant operators who have not responded to other

17  enforcement tools.  To conform with this Congressional intent,

18  MSHA must recognize that repeated S & S violations, alone, are

19  simply not enough to place a mine on a pattern.  MSHA's

20  statistics indicate that over 160,000 violations were cited in

21  1988, and that approximately 95,000, or 60 percent, were

22  S & S.  All large mining operations have a history of repeated

23  S & S violations.

24          Furthermore, many of the S & S violations cited

25  are not the result of operator actions.  The courts have

94

1 repeatedly held the Mine Act to be a strict liability statute,

2 and S & S citations are routinely issued in "no" negligence,

3 or "low" negligence situations.

4          Congress recognized this intensity of MSHA's

5 enforcement activities, and intended the pattern violator to

6 be a mine operator whose recalcitrance results in repeated

7 significant and substantial violations.

8          We believe that it's important and critical

9 that an S & S definition, and a definition for unwarrantable

10 be included in this regulation, to provide a clearer

11 understanding of the requirements.  These pattern regulations

12 are not comparable to routine, unwarrantable enforcement.

13          These are specific regulations for a pattern

14 mandated by Congress which established an enforcement tool.

15 In order to provide adequate notice to an operator, MSHA

16 routinely includes such necessary definitions.  In fact, in

17 Part 100, MSHA adopted the National Gypsum definition for

18 minimum penalties.

19          The question of a mine coming off of a pattern

20 of violations, or terminating a pattern of violations, and to

21 whether the entire mine would have to go through an inspection

22 or a part thereof, an additional comment on that point.  It's

23 our belief that MSHA has the ability to interpret the statute

24 in a method that achieves the statutory intent -- improved

25 safety for miners.

1       When the Act speaks of no S & S violation at

2  the entire mine, the only interpretation that makes sense is

3  no S & S violations of the type that created the pattern.  Any

4  other interpretation would keep a large mine on a pattern

5  forever, given the 100,000, plus, S & S violations per year,

6  and the number of violations at any mine routinely.  The only

7  logical interpretation is the interpretation presented by the

8  American Mining Congress, NCA, and BCOA in their presentation.

9       We support, generally, the recommendations made

10  by the industry, and that is all the testimony that I have for

11  Homestake.

12       Thank you.

13       MR. ZEUTENHORST:  Thank you, Mr. Barnes.

14       While I have you here, and since you've

15  provided me with a copy of the comments you submitted to the

16  Agency on August 28th, I've just got a question for you.

17       On Page 4, the statement says, "For example,

18  prior to 1989, 91 percent of all metal and non-metal

19  violations were categorized as S & S", although earlier, as

20  you restated today, 60 percent were S & S, and later on as low

21  as 30 percent in one metal/non-metal district were S & S.

22       Is that correct, the 91 percent?  Or was that

23  -- could you explain the context there just for the record?

24       MR. BARNES:  That's a '79 figure, instead of

25  an '89 figure --