# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OHIO COAL ASSOCIATION,** et al.,

    **v.**                    Case No. 2:14-cv-2646

**THOMAS E. PEREZ,** et al.,

        Defendants.

**and**

**MURRAY ENERGY CORPORATION,** Case No. 2:15-cv-448
et al.,

                         Judge Graham

        Plaintiffs,

                         Magistrate Judge Deavers

    **v.**

**THOMAS E. PEREZ,** et al.,

        Defendants.

## ADMINISTRATIVE RECORD

### PAGES 00722 – 00928

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 4 (01/01/07- 12/31/08)



Improvement in S&S Rate After PPOV Notice
Mine ID 1509636
James River Coal Company - #77 (Coal - Underground)
PPOV Monitoring Start Date = 04/01/09
Starting S&S Rate = 10.02

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 4 (01/01/07- 12/31/08)



**Improvement in S&S Rate After PPOV Notice**
**Mine ID 1518924**
**Broe Companies Inc - Butcher Branch (Coal - Underground)**
**PPOV Monitoring Start Date = 04/01/09**
**Starting S&S Rate = 11.84**



Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Douglas McClain and Jim Miceli became the Controller of this mine on 07/28/2010.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

61

Background Page 00723

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 4 (01/01/07- 12/31/08)

**Improvement in S&S Rate After PPOV Notice**
**Mine ID 4202074**
**America West Resources, Inc. - Horizon Mine (Coal - Underground)**
**PPOV Monitoring Start Date = 04/22/09**
**Starting S&S Rate = 14.56**



Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

62

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 4 (01/01/07- 12/31/08)



Improvement in S&S Rate After PPOV Notice
Mine ID 0402848
Imerys S A - Lompoc Plant (MNM - Surface)
PPOV Monitoring Start Date = 05/19/09
Starting S&S Rate = 7.50

Notes:  The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification



Cycle 4 (01/01/07- 12/31/08)

Improvement in S&S Rate After PPOV Notice
Mine ID 2602512
Newmont Mining Corp. - Leeville (MNM - Underground)
PPOV Monitoring Start Date = 05/27/09
Starting S&S Rate = 6.82

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside or below each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

Background Page 00726

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification



Cycle 5 (09/01/07 - 08/31/09)

Improvement in S&S Rate After PPOV Notice
Mine ID 2300457
Renco Group - Buick Mine/Mill (MNM - Underground)
PPOV Monitoring Start Date = 11/02/09
Starting S&S Rate = 5.95

Legend:
- Percent Improvement in S&S Rate from PPOV Notice
- 30% improvement to 4.17
- Improvement to Reach Industry Average of 4.44

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

Background Page 00727

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 5 (09/01/07 - 08/31/09)

**Improvement in S&S Rate After PPOV Notice**
**Mine ID 4608808**
**Massey Energy Company - Ruby Energy (Coal - Underground)**
**PPOV Monitoring Start Date = 10/21/09**
**Starting S&S Rate = 20.32**



Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification



Cycle 5 (09/01/07 - 08/31/09)

Improvement in S&S Rate After PPOV Notice
Mine ID 4608949
Clarence R Peters; Richard N Nester - Winifrede 12 Mine (Coal - Underground)
PPOV Monitoring Start Date = 10/21/09
Starting S&S Rate = 11.13

Notes:  The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

67

Background Page 00729

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification



Cycle 5 (09/01/07 - 08/31/09)

Improvement in S&S Rate After PPOV Notice
Mine ID 4609221
Massey Energy Company - Slabcamp (Coal - Underground)
PPOV Monitoring Start Date = 10/22/09
Starting S&S Rate = 9.53

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

Background Page 00730

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification



Cycle 5 (09/01/07 - 08/31/09)

**Improvement in S&S Rate After PPOV Notice**
**Mine ID 4406804**
**Massey Energy Company - Tiller No 1 (Coal - Underground)**
**PPOV Monitoring Start Date = 10/23/09**
**Starting S&S Rate = 13.79**

Legend:
- Percent Improvement in S&S Rate from PPOV Notice
- Improvement to Reach Industry Average of 6.22
- 30% Improvement to 9.65

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 5 (09/01/07 - 08/31/09)







Notes:  The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

Background Page 00732

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification



Cycle 5 (09/01/07 - 08/31/09)

Improvement in S&S Rate After PPOV Notice
Mine ID 1202010
Peabody Energy - Air Quality #1 Mine (Coal - Underground)
PPOV Monitoring Start Date = 10/01/09
Starting S&S Rate = 9.30

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

Background Page 00733

U.S. Department of Labor – Office of Inspector General

**Exhibit 5, Continued**

## Graphs of S&S Rates Subsequent to Receipt of Potential POV Notification

Cycle 5 (09/01/07 - 08/31/09)



Improvement in S&S Rate After PPOV Notice
Mine ID 1517232
Gary E Peyton - Richland No 9 (Coal - Underground)
PPOV Monitoring Start Date = 11/02/09
Starting S&S Rate = 10.23

Notes: The number presented above each bar of the graph is the actual rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

The number presented inside each bar of the graph represents the percent reduction in the mine's rate of S&S violations from the "Monitoring Start Date" shown in the heading through the ending date of the inspection period.

Dates shown along the bottom of the graph represent the ending date of each inspection period.

Improvement Rates for Potential POV Mines
Report No 05-11-002-06-001.

Background Page 00734

**Table 1.1.9. Implicit Price Deflators for Gross Domestic Product**
[Index numbers, 2005=100]
Annual data from 1929 To 2009
Bureau of Economic Analysis
Data published May 27, 2010
File created 5/26/2010 8:22:01 AM

| Line | | | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|---|---|------|------|------|------|------|------|------|------|------|------|
| 1 | **Gross domestic product** | A191RD3 | 88.647 | 90.650 | 92.118 | 94.100 | 96.770 | 100.000 | 103.257 | 106.214 | 108.483 | 109.770 |
| 2 | **Personal consumption expenditures** | DPCERD3 | 89.777 | 91.488 | 92.736 | 94.622 | 97.098 | 100.000 | 102.746 | 105.502 | 109.031 | 109.247 |
| 3 | Goods | DGDSRD3 | 97.520 | 97.429 | 96.430 | 96.380 | 97.867 | 100.000 | 101.508 | 102.789 | 106.150 | 103.532 |
| 4 | Durable goods | DDURRD3 | 111.693 | 109.479 | 106.672 | 102.907 | 101.005 | 100.000 | 98.488 | 96.713 | 95.537 | 93.977 |
| 5 | Nondurable goods | DNDGRD3 | 90.006 | 90.952 | 90.878 | 92.791 | 96.120 | 100.000 | 103.215 | 106.250 | 112.188 | 108.994 |
| 6 | Services | DSERRD3 | 85.824 | 88.428 | 90.807 | 93.692 | 96.688 | 100.000 | 103.411 | 106.964 | 110.582 | 112.254 |
| 7 | **Gross private domestic investment** | A006RD3 | 89.947 | 90.721 | 91.145 | 92.417 | 95.642 | 100.000 | 104.339 | 106.630 | 107.370 | 106.623 |
| 8 | Fixed investment | A007RD3 | 89.751 | 90.553 | 90.924 | 92.301 | 95.541 | 100.000 | 104.418 | 106.718 | 107.550 | 106.163 |
| 9 | Nonresidential | A008RD3 | 96.219 | 95.788 | 95.363 | 95.355 | 96.834 | 100.000 | 103.534 | 106.210 | 107.897 | 107.575 |
| 10 | Structures | A009RD3 | 72.298 | 76.087 | 79.292 | 82.174 | 88.441 | 100.000 | 112.922 | 121.275 | 125.207 | 122.968 |
| 11 | Equipment and software | A010RD3 | 106.114 | 103.603 | 101.494 | 100.287 | 99.897 | 100.000 | 100.194 | 100.715 | 101.455 | 102.038 |
| 12 | Residential | A011RD3 | 77.415 | 80.994 | 83.002 | 86.953 | 93.296 | 100.000 | 106.081 | 107.513 | 105.778 | 100.626 |
| 13 | Change in private inventories | ZZZZZZ3 | ..... | ..... | ..... | ..... | ..... | ..... | ..... | ..... | ..... | ..... |
| 14 | **Net exports of goods and services** | ZZZZZZ3 | ..... | ..... | ..... | ..... | ..... | ..... | ..... | ..... | ..... | ..... |
| 15 | Exports | A020RD3 | 92.000 | 91.627 | 91.253 | 93.217 | 96.517 | 100.000 | 103.447 | 107.103 | 112.389 | 106.237 |
| 16 | Goods | A253RD3 | 92.897 | 92.321 | 91.719 | 93.522 | 96.926 | 100.000 | 103.328 | 107.015 | 112.366 | 104.878 |
| 17 | Services | A646RD3 | 89.920 | 90.042 | 90.202 | 92.533 | 95.598 | 100.000 | 103.719 | 107.305 | 112.445 | 109.240 |
| 18 | Imports | A021RD3 | 89.963 | 87.762 | 86.784 | 89.796 | 94.145 | 100.000 | 104.108 | 108.017 | 119.559 | 107.036 |
| 19 | Goods | A255RD3 | 91.128 | 88.482 | 86.930 | 89.476 | 93.872 | 100.000 | 104.207 | 108.046 | 120.323 | 106.167 |
| 20 | Services | A656RD3 | 84.209 | 84.219 | 86.089 | 91.469 | 95.573 | 100.000 | 103.806 | 107.863 | 115.682 | 110.926 |
| 21 | **Government consumption expenditures and gross investm** | A822RD3 | 82.513 | 84.764 | 87.003 | 90.660 | 94.630 | 100.000 | 104.842 | 109.552 | 114.602 | 114.278 |
| 22 | Federal | A823RD3 | 82.524 | 84.201 | 87.318 | 91.024 | 95.335 | 100.000 | 104.107 | 107.754 | 110.938 | 111.514 |
| 23 | National defense | A824RD3 | 81.821 | 83.484 | 86.624 | 90.659 | 94.895 | 100.000 | 104.421 | 108.286 | 111.913 | 112.086 |
| 24 | Nondefense | A825RD3 | 83.907 | 85.612 | 88.689 | 91.774 | 96.234 | 100.000 | 103.468 | 106.672 | 108.934 | 110.357 |
| 25 | State and local | A829RD3 | 82.482 | 85.019 | 86.810 | 90.425 | 94.062 | 100.000 | 105.276 | 110.615 | 116.642 | 115.895 |
|  | Addendum: | | | | | | | | | | | |
| 26 | Gross national product | A001RD3 | 88.645 | 90.648 | 92.113 | 94.096 | 96.767 | 100.000 | 103.260 | 106.215 | 108.486 | 109.764 |

**Mackey v. Montrym, 443 U.S. 1 (1979)**

99 S.Ct. 2612, 61 L.Ed.2d 321

99 S.Ct. 2612
Supreme Court of the United States

Alan MACKEY, Registrar of Motor Vehicles of
Massachusetts, Appellant,
v.
Donald E. MONTRYM, etc.

No. 77-69. | Argued Nov. 29, 1978. | Decided June
25, 1979.

Driver's licensee brought a class action challenging the
constitutionality of the Massachusetts Implied Consent
Law. A three-judge panel of the United States District
Court for the District of Massachusetts, 429 F.Supp. 393,
declared the statute unconstitutional, enjoined its
enforcement and, 438 F.Supp. 1157, denied a motion for
reconsideration. Massachusetts Registrar of Motor
Vehicles appealed. The Supreme Court, Mr. Chief Justice
Burger, held that the statute, which mandated suspension
of a driver's license because of a licensee's refusal to take
a breath-analysis test upon arrest for driving while under
the influence of intoxicating liquor, did not violate the due
process clause.

Reversed and remanded.

Mr. Justice Stewart filed a dissenting opinion in which
Mr. Justice Brennan, Mr. Justice Marshall, and Mr.
Justice Stevens joined.

West Headnotes (2)

[1]     **Automobiles**
        Constitutional and Statutory Provisions
        **Constitutional Law**

        Alcohol and Drug-Related Issues;     Testing

        Massachusetts statute mandating suspension of
        driver's license for licensee's refusal to take
        Breath-analysis test upon arrest for operating
        motor vehicle while under influence of
        intoxicating liquor did not violate due process
        clause. U.S.C.A.Const. Amend. 14; M.G.L.A. c.
        90 § 24(1)(f).

        381 Cases that cite this headnote

[2]     **Constitutional Law**
        Factors Considered;     Flexibility and
        Balancing

        Though primary function of legal process is to
        minimize risk of erroneous decisions, due
        process clause does not mandate that all
        governmental decision-making comply with
        standards that assure perfect, error-free
        determinations. U.S.C.A.Const. Amend. 14.

        219 Cases that cite this headnote

**\*\*2612 *Syllabus*[\*]**

**\*1** A Massachusetts statute mandates suspension of a
driver's license for refusing to take a breath-analysis test
upon arrest for operating a motor vehicle while under the
influence of intoxicating liquor. The Registrar of Motor
Vehicles must order a 90-day suspension upon receipt of
the police report of the licensee's refusal to take such test;
the licensee, after surrendering his license, is entitled to
an immediate hearing before the Registrar. Appellee,
whose license was suspended under the statute, brought a
class action in Federal District Court alleging that the
Massachusetts statute was unconstitutional on its face and
as applied in that it authorized the suspension of his
license without affording him a presuspension hearing.
The District Court held that appellee was entitled as a
matter of due process to some sort of presuspension
hearing, declared the statute unconstitutional on its face as
violative of the Due Process Clause of the Fourteenth
Amendment, and granted injunctive relief.

*Held* : The Massachusetts statute is not void on its face as
violative of the Due Process Clause. Cf. *Dixon v. Love,*
431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172. Pp. 2617-
2621.

(a) Suspension of a driver's license for statutorily defined
cause implicates a property interest protected by the Due
Process Clause. Resolution of the question of what
process is due to protect against an erroneous deprivation
of a protectible property interest requires consideration **\*2**
of (i) the nature and weight of the private interest **\*\*2613**
affected by the official action challenged; (ii) the risk of
an erroneous deprivation of such interest as a

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

AB73-2BKG-29

**Mackey v. Montrym, 443 U.S. 1 (1979)**

99 S.Ct. 2612, 61 L.Ed.2d 321

consequence of the summary procedures used; and (iii) the governmental function involved and state interests served by such procedures, as well as the administrative and fiscal burdens, if any, that would result from the substitute procedures sought. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18. Pp. 2617-2618.

(b) Here, neither the nature of the private interest involved-the licensee's interest in the continued possession and use of his license pending the outcome of the hearing due him-nor its weight compels a conclusion that the summary suspension procedures are unconstitutional, particularly in view of the postsuspension hearing immediately available and of the fact that the suspension is for a maximum of only 90 days. Pp. 2617-2618.

(c) Nor is the risk of error inherent in the presuspension procedure so substantial in itself as to require a departure from the "ordinary principle" that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Dixon v. Love, supra*, 431 U.S., at 113, 97 S.Ct., at 1728. The risk of erroneous observation or deliberate misrepresentation by the reporting police officer of the facts forming the basis for the suspension is insubstantial. When there are disputed facts, the risk of error inherent in the statute's initial reliance on the reporting officer's representations is not so substantial in itself as to require the Commonwealth to stay its hand pending the outcome of any evidentiary hearing necessary to resolve questions of credibility or conflicts in the evidence. Pp. 2618-2620.

(d) Finally, the compelling interest in highway safety justifies Massachusetts in making a summary suspension effective pending the outcome of the available prompt postsuspension hearing. Such interest is substantially served by the summary suspension because (i) it acts as a deterrent to drunk driving; (ii) provides an inducement to take the breath-analysis test, permitting the Commonwealth to obtain a reliable form of evidence for use in subsequent criminal proceedings; and (iii) summarily removes from the road licensees arrested for drunk driving who refuse to take the test. Conversely, a presuspension hearing would substantially undermine the Commonwealth's interest in public safety by giving drivers an incentive to refuse the breath-analysis test and demand such a hearing as a dilatory tactic, which in turn would cause a sharp increase in the number of hearings sought and thus impose a substantial fiscal and administrative burden on the Commonwealth. Nor is it any answer to the Commonwealth's interest in public safety *3 promoted by the summary sanction that such interest could be served as well in other ways. A state has

the right to offer incentives for taking the breath-analysis test and, in exercising its police powers, is not required by the Due Process Clause to adopt an "all or nothing" approach to the acute safety hazard posed by drunk drivers. Pp. 2620-2621.

429 F.Supp. 393, reversed and remanded.

**Attorneys and Law Firms**

Mitchell J. Sikora, Jr., Boston, Mass., for appellant.

Robert W. Hagopian, Cambridge, Mass., for appellee.

**Opinion**

Mr. Chief Justice BURGER delivered the opinion of the Court.

The question presented by this appeal is whether a Massachusetts statute that mandates suspension of a driver's license because of his refusal to take a breath-analysis test upon arrest for driving while under the influence of intoxicating liquor is void on its face as violative of the Due Process Clause of the Fourteenth Amendment.

Commonly known as the implied consent law, the Massachusetts statute provides:
"Whoever operates a motor vehicle upon any [public] way . . . shall be deemed to have consented to submit to a chemical test or analysis of his breath in **2614 the event that he is arrested for operating a motor vehicle while under the influence of intoxicating liquor. . . . If the person arrested refuses to submit to such test or analysis, after *4 having been informed that his license . . . to operate motor vehicles . . . in the commonwealth shall be suspended for a period of ninety days for such refusal, no such test or analysis shall be made, but the police officer before whom such refusal was made shall immediately prepare a written report of such refusal[, which] . . . shall be endorsed by a third person who shall have witnessed such refusal [,] . . . shall be sworn to under the penalties of perjury by the police officer before whom such refusal was made[,] . . . shall set forth the grounds for the officer's belief that the person arrested had been driving a motor vehicle . . . while under the influence of intoxicating liquor, and shall state that such person had refused to submit to such chemical test or analysis which requested by such police officer to do so. Each such report shall be endorsed by the police chief . . . and shall be sent forthwith to the registrar. Upon receipt of such report, the registrar shall suspend any license or permit to

Background Page 00737

Mackey v. Montrym, 443 U.S. 1 (1979)
99 S.Ct. 2612, 61 L.Ed.2d 321

operate motor vehicles issued to such person . . . for a period of ninety days." Mass.Gen.Laws Ann., ch. 90, § 24(1)(f) (West Supp.1979).

## I

While driving a vehicle in Acton, Mass., appellee Donald Montrym was involved in a collision about 8:15 p. m. on May 15, 1976. Upon arrival at the scene of the accident an Acton police officer observed, as he wrote in his official report, that Montrym was "glassy eyed," unsteady on his feet, slurring his speech, and emitting a strong alcoholic odor from his person. The officer arrested Montrym at 8:30 p. m. for operating his vehicle while under the influence of intoxicating liquor, driving to endanger, and failing to produce his motor vehicle registration upon request. Montrym was then taken to the Acton police station.

*5 There, Montrym was asked to take a breath-analysis examination at 8:45 p. m. He refused to do so.[1] Twenty minutes after refusing to take the test and shortly after consulting his lawyer, Montrym apparently sought to retract his prior refusal by asking the police to administer a breath-analysis test. The police declined to comply with Montrym's belated request. The statute leaves an officer no discretion once a breath-analysis test has been refused: "If the person arrested refuses to submit to such test or analysis, . . . the police officer before whom such refusal was made *shall immediately* prepare a written report of such refusal." § 24(1)(f) (emphasis added). The arresting officer completed a report of the events, including the refusal to take the test.

As mandated by the statute, the officer's report recited (a) the fact of Montrym's arrest for driving while under the influence of intoxicating liquor, (b) the grounds supporting that arrest, and (c) the fact of his refusal to take the breath-analysis examination. As required by the statute, the officer's report was sworn to under penalties of perjury, and endorsed by the arresting officer and another officer present when Montrym refused to take the test; it was counterendorsed by the chief of police. The report was then sent to the Massachusetts Registrar of Motor Vehicles pursuant to the statute.

On June 2, 1976, a state court dismissed the complaint brought against Montrym for driving while under the influence of intoxicating liquor.[2] Dismissal apparently was **2615 predicated on the refusal of the police to administer a breath-analysis test at Montrym's request

after he sought to retract his initial *6 refusal to take the test. The dismissal order of the state court cryptically recites:

"Dismissed. Breathalyzer refused when requested within ½ hr of arrest at station. See affidavit & memorandum."

According to Montrym's affidavit incorporated by reference in the state court's dismissal order, he was visited by an attorney at 9:05 o'clock on the night of his arrest; and, after consulting with counsel, he requested a breath-analysis test. The police, however, refused the requests made by Montrym and his counsel between 9:07 and 10:07 p. m.

Montrym's attorney immediately advised the Registrar by letter of the dismissal of this charge and asked that the Registrar stay any suspension of Montrym's driver's license. Enclosed with the letter was a copy of Montrym's affidavit attesting to the officer's refusals to administer a breath-analysis test at his request. However, Montrym's attorney did not enclose a certified copy of the state court's order dismissing the charge.

The Registrar, who has no discretionary authority to stay a suspension mandated by the statute,[3] formally suspended Montrym's license for 90 days on June 7, 1976. The suspension notice stated that it was effective upon its issuance and directed Montrym to return his license at once. It advised Montrym of his right to appeal the suspension.[4]

*7 When Montrym received the suspension notice, his attorney requested an appeal on the question of whether Montrym had in fact refused a breath-analysis test within the meaning of the statute. Montrym surrendered his license by mail on June 8, 1976.

Under the Massachusetts statute, Montrym could have obtained an *immediate* hearing before the Registrar at any time after he had surrendered his license; that hearing would have resolved all questions as to whether grounds existed for the suspension.[5] For reasons not explained, but **2616 presumably *8 on advice of counsel, Montrym failed to exercise his right to a hearing before the Registrar; instead, he took an appeal to the Board of Appeal. On June 24, 1976, the Board of Appeal advised Montrym by letter that a hearing of his appeal would be held on July 6, 1976.

Four days later, Montrym's counsel made demand upon the Registrar by letter for the return of his driver's license. The letter reiterated Montrym's acquittal of the driving-under-the-influence charge, asserted that the state court's finding that the officer had refused to administer a breath-analysis test was binding on the Registrar, and declared that suspension of Montrym's license without first

Background Page 00738

Mackey v. Montrym, 443 U.S. 1 (1979)
99 S.Ct. 2612, 61 L.Ed.2d 321

holding a hearing violated his right to due process. The letter did not contain a copy of the state court's dismissal order, but did threaten the Registrar with suit if the license were not returned immediately. Had Montrym's counsel enclosed a copy of the order dismissing the drunken-driving charge, the entire matter might well have been disposed of at that stage without more.

Thereafter, forgoing his administrative appeal scheduled for hearing on July 6, Montrym brought this action asking the convening of a three-judge United States District Court. The complaint alleges that § 24(1)(f) is unconstitutional on its face and as applied in that it authorized the suspension of Montrym's driver's license without affording him an opportunity for a presuspension hearing. Montrym sought a temporary restraining order enjoining the suspension of his license, compensatory and punitive damages, and declaratory and injunctive relief on behalf of all persons whose licenses had been suspended pursuant to the statute without a prior hearing.

On July 9, 1976, a single District Judge issued the temporary restraining order sought by Montrym and directed *9 the Registrar to return Montrym's license pending further order of the court. Subsequently, a three-judge District Court was convened pursuant to 28 U.S.C. §§ 2281 (1970 ed.), 2284, and Montrym moved for partial summary judgment on stipulated facts.

With one judge dissenting, the three-judge District Court granted Montrym's motion. Relying principally on this Court's decision in Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the District Court concluded that Montrym was entitled as a matter of due process to some sort of a presuspension hearing before the Registrar to contest the allegation of his refusal to take the test. In a partial summary judgment order issued on April 4, and a final judgment order issued on April 12, the District Court certified the suit under Fed.Rule Civ.Proc. 23(b)(2) as a class action on behalf of all persons whose licenses to operate a motor vehicle had been suspended pursuant to Mass.Gen.Laws Ann., ch. 90, § 24(1)(f) (West Supp.1979). The court then declared the statute unconstitutional on its face as violative of the Due Process Clause, permanently enjoined the Registrar from further enforcing the statute, and directed him to return the driver's licenses of the plaintiff class members. Montrym v. Panora, 429 F.Supp. 393 (Mass.1977).

After taking timely appeals from the District Court's judgment orders, the Registrar moved the District Court for a stay and modification of its judgment, which motions were denied. After release of our opinion in Dixon v. Love, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977), upholding the constitutionality of an Illinois

statute authorizing the summary suspension of a driver's license prior to any evidentiary hearing, the Registrar moved for reconsideration of his motions for a stay and modification of judgment.

In a second opinion issued October 6, 1977, the District Court reasoned that Love was distinguishable on several grounds and denied the Registrar's motion to reconsider; the *10 dissenting judge thought Love controlled. Montrym v. Panora, 438 F.Supp. 1157 (Mass.1977). **2617 We noted probable jurisdiction following the submission of supplemental briefs by the parties. Sub nom. Panora v. Montrym, 435 U.S. 967, 98 S.Ct. 1603, 56 L.Ed.2d 58 (1978). We reverse.[6]

II

[1] The Registrar concedes here that suspension of a driver's license for statutorily defined cause implicates a protectible property interest;[7] accordingly, the only question presented by this appeal is what process is due to protect against an erroneous deprivation of that interest. Resolution of this inquiry requires consideration of a number of factors:

"first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

*11 Applying this balancing test, the District Court concluded due process required an opportunity for hearing before suspension of a license. 429 F.Supp., at 398-400. Later, the court further held that our decision in Dixon v. Love, supra, did not control. Love was thought distinguishable because the potential for irreparable personal and economic hardship was regarded as greater under the Massachusetts statutory scheme than the Illinois scheme; the risk of error was deemed more substantial as well; and requiring a hearing before suspending a driver's license for refusing to take a breath-analysis test was believed not to offend the state interest in safe highways. 438 F.Supp., at 1159-1161.

We conclude that Love cannot be materially distinguished from the case before us. Both cases involve the

Mackey v. Montrym, 443 U.S. 1 (1979)
99 S.Ct. 2612, 61 L.Ed.2d 321

constitutionality of a statutory scheme for administrative suspension of a driver's license for statutorily defined cause without a pre-suspension hearing. In each, the sole question presented is the appropriate timing of the legal process due a licensee. And, in both cases, that question must be determined by reference to the factors set forth in *Eldridge.*

**A**

The first step in the balancing process mandated by *Eldridge* is identification of the nature and weight of the private interest affected by the official action challenged. Here, as in *Love,* the private interest affected is the granted license to operate a motor vehicle. More particularly, the driver's interest is in continued possession and use of his license pending the outcome of the hearing due him. As we recognized in *Love,* that interest is a substantial one, for the Commonwealth will not be able to make a driver whole for any personal inconvenience and economic hardship suffered by reason of any delay in redressing an erroneous suspension through postsuspension review procedures. 431 U.S., at 113, 97 S.Ct., at 1728.

But, however substantial Montrym's property interest may *12 be, it is surely no **2618 more substantial than the interest involved in *Love.* The private interest involved here actually is *less* substantial, for the Massachusetts statute authorizes suspension for a maximum of only 90 days, while the Illinois scheme permitted suspension for as long as a year and even allowed for the possibility of indefinite revocation of a license.

To be sure, as the District Court observed, the Illinois statute in *Love* contained provisions for hardship relief unavailable under the Massachusetts statute. Though we adverted to the existence of such provisions in *Love,* they were in no sense the "controlling" factor in our decision that the District Court believed them to be. 438 F.Supp., at 1159. Hardship relief was available under the Illinois scheme only *after* a driver had been suspended and had demonstrated his eligibility for such relief. See *Dixon v. Love,* 431 U.S., at 114 n. 10, 97 S.Ct., at 1728 n. 10. The bearing such provisions had in *Love* stemmed from the delay involved in providing a postsuspension hearing. Here, unlike the situation in *Love,* a postsuspension hearing is available *immediately* upon a driver's suspension and may be initiated by him simply by walking into one of the Registrar's local offices and requesting a hearing. The *Love* statute, in contrast, did not

mandate that a date be set for a postsuspension hearing until 20 days after a written request for such a hearing was received from the affected driver. *Id.,* at 109-110, 97 S.Ct., at 1726.

The duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the impact of official action on the private interest involved. *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975). The District Court's failure to consider the relative length of the suspension periods involved in *Love* and the case at bar, as well as the relative timeliness of the postsuspension review available to a suspended driver, was erroneous. Neither the nature nor the weight of the private interest involved in this case compels a result contrary to that reached in *Love.*

**\*13 B**

[2] Because a primary function of legal process is to minimize the risk of erroneous decisions. *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 12-13, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979), the second stage of the *Eldridge* inquiry requires consideration of the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used. And, although this aspect of the *Eldridge* test further requires an assessment of the relative reliability of the procedures used and the substitute procedures sought, the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible "property" or "liberty" interest be so comprehensive as to preclude any possibility of error. The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations. *Greenholtz v. Nebraska Penal Inmates, supra,* 442 U.S., at 7, 99 S.Ct., at 2103. Thus, even though our legal tradition regards the adversary process as the best means of ascertaining truth and minimizing the risk of error, the "ordinary principle" established by our prior decisions is that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Dixon v. Love, supra,* 431 U.S., at 113, 97 S.Ct., at 1728. And, when prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be. See, *e. g., Barry v. Barchi,* 443 U.S. 55, 64-65, 99 S.Ct. 2642, 2649,

Background Page 00740

**Mackey v. Montrym, 443 U.S. 1 (1979)**

99 S.Ct. 2612, 61 L.Ed.2d 321

61 L.Ed.2d 365 (1979); *Mathews v. Eldridge*, 424 U.S., at 334, 96 S.Ct., at 902.

As was the case in *Love*, the predicates for a driver's suspension under the Massachusetts scheme are objective facts either **2619 within the personal knowledge of an impartial government official or readily ascertainable by him. Cause arises for license suspension if the driver has been arrested for *14 driving while under the influence of an intoxicant, probable cause exists for arrest, and the driver refuses to take a breath-analysis test. The facts of the arrest and the driver's refusal will inevitably be within the personal knowledge of the reporting officer; indeed, Massachusetts requires that the driver's refusal be witnessed by two officers. At the very least, the arresting officer ordinarily will have provided the driver with an informal opportunity to tell his side of the story and, as here, will have had the opportunity to observe the driver's condition and behavior before effecting any arrest.

The District Court, in holding that the Due Process Clause mandates that an opportunity for a further hearing before the Registrar *precede* a driver's suspension, overstated the risk of error inherent in the statute's initial reliance on the corroborated affidavit of a law enforcement officer. The officer whose report of refusal triggers a driver's suspension is a trained observer and investigator. He is, by reason of his training and experience, well suited for the role the statute accords him in the presuspension process. And, as he is personally subject to civil liability for an unlawful arrest and to criminal penalties for willful misrepresentation of the facts, he has every incentive to ascertain accurately and truthfully report the facts. The specific dictates of due process must be shaped by "the risk of error inherent in the truthfinding process as applied to the generality of cases" rather than the "rare exceptions." *Mathews v. Eldridge, supra,* at 344, 96 S.Ct., at 907. And, the risk of erroneous observation or deliberate misrepresentation of the facts by the reporting officer in the ordinary case seems insubstantial.

Moreover, as this case illustrates, there will rarely be any genuine dispute as to the historical facts providing cause for a suspension. It is significant that Montrym does *not* dispute that he was arrested, or that probable cause existed for his arrest, or that he initially refused to take the breath-analysis test at the arresting officer's request. The allegedly "factual" *15 dispute that he claims a constitutional right to raise and have determined by the Registrar prior to his suspension really presents questions of law; namely, whether the state court's subsequent finding that the police *later* refused to administer a breath-analysis test at Montrym's request is binding on the Registrar as a matter of collateral estoppel; and, if so,

whether that finding undermines the validity of Montrym's suspension, which may well be justified under the statute solely on the basis of Montrym's initial refusal to take the breath-analysis test and notwithstanding the officer's subsequent refusal to honor Montrym's belated request for the test.[8] The Commonwealth must have the authority, if it is to protect people from drunken drivers, to require that the breath-analysis test record the alcoholic content of the bloodstream at the earliest possible moment.

Finally, even when disputes as to the historical facts do arise, we are not persuaded that the risk of error inherent in the statute's initial reliance on the representations of the reporting officer is so substantial in itself as to require that the Commonwealth stay its hand pending the outcome of any evidentiary hearing necessary to resolve questions of credibility or conflicts in the evidence. Cf. *Barry v. Barchi*, 443 U.S. at 64-65, 99 S.Ct., at 2649. All that Montrym seeks was available to him immediately upon his suspension, and we believe that the "same day" hearing before the Registrar available under § 24(1)(g) provides an appropriately timely opportunity for the licensee **2620 to tell his side of the story to the Registrar, to obtain correction of clerical errors, and to seek prompt resolution of any factual disputes he raises as to the accuracy of the officer's report of refusal.

*16 Nor would the avowedly "nonevidentiary" presuspension hearing contemplated by the District Court substantially enhance the reliability of the presuspension process. Clerical errors and deficiencies in the officer's report of refusal, of course, could be called to the Registrar's attention if the driver were provided with an opportunity to respond to the report in writing prior to suspension. But if such errors and deficiencies are genuinely material they already will have been noted by the Registrar in the ordinary course of his review of the report. Just as the Registrar has no power to stay a suspension upon receipt of a report of refusal that complies on its face with statutory requirements, he has no power to suspend a license if the report is materially defective. Necessarily, then, the Registrar must submit the officer's report to his independent scrutiny. This independent review of the report of refusal by a detached public officer should suffice in the ordinary case to minimize the only type of error that could be corrected by something less than an evidentiary hearing.

The only other purpose that might be served by an opportunity to respond to the report of refusal prior to a driver's suspension would be alerting the Registrar to the existence of factual disputes between the driver and the reporting officer. This would be an exercise in futility, for the Registrar has no discretion to stay a suspension

Mackey v. Montrym, 443 U.S. 1 (1979)

99 S.Ct. 2612, 61 L.Ed.2d 321

pending the outcome of an evidentiary hearing. And, it simply begs the question of a driver's right to a presuspension *evidentiary* hearing to suggest, as did the District Court, that the Registrar be given such discretion. The Massachusetts Legislature has already made the discretionary determination that the District Court apparently would have the Registrar make on a case-by-case basis. It has determined that the Registrar, who is further removed in time and place from the operative facts than the reporting officer, should treat a report of refusal that complies on its face with the statutory requirements as presumptively accurate notwithstanding any factual disputes raised by a driver. Simply put, it has determined that the *17 Registrar is not in a position to make an informed probable-cause determination or exercise of discretion *prior* to an evidentiary hearing. We cannot say the legislature's judgment in this matter is irrational.

In summary, we conclude here, as in *Love*, that the risk of error inherent in the presuspension procedures chosen by the legislature is not so substantial in itself as to require us to depart from the "ordinary principle" that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." 431 U.S., at 113, 97 S.Ct., at 1728. We fail to see how reliability would be materially enhanced by mandating the presuspension "hearing" deemed necessary by the District Court.

### C

The third leg of the *Eldridge* balancing test requires us to identify the governmental function involved; also, to weigh in the balance the state interests served by the summary procedures used, as well as the administrative and fiscal burdens, if any, that would result from the substitute procedures sought.

Here, as in *Love*, the statute involved was enacted in aid of the Commonwealth's police function for the purpose of protecting the safety of its people. As we observed in *Love*, the paramount interest the Commonwealth has in preserving the safety of its public highways, standing alone, fully distinguishes this case from *Bell v. Burson*, 402 U.S., at 539, 91 S.Ct., at 1589, on which Montrym and the District Court place principal reliance. See 431 U.S., at 114-115, 97 S.Ct., at 1728, 1729. We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety. States surely have at least as much interest in removing drunken drivers from their highways as in summarily seizing mislabeled drugs or destroying **2621 spoiled foodstuffs.[9] *E.g., Ewing v.* *18 *Myitinger & Casselberry,*

*Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *North American Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908).

The Commonwealth's interest in public safety is substantially served by the summary suspension of those who refuse in several ways to take a breath-analysis test upon arrest. First, the very existence of the summary sanction of the statute serves as a deterrent to drunken driving. Second, it provides strong inducement to take the breath-analysis test and thus effectuates the Commonwealth's interest in obtaining reliable and relevant evidence for use in subsequent criminal proceedings. Third, in promptly removing such drivers from the road, the summary sanction of the statute contributes to the safety of public highways.

The summary and automatic character of the suspension sanction available under the statute is critical to attainment of these objectives. A presuspension hearing would substantially undermine the state interest in public safety by giving drivers significant incentive to refuse the breath-analysis test and demand a presuspension hearing as a dilatory tactic. Moreover, the incentive to delay arising from the availability of a presuspension hearing would generate a sharp increase in the number of hearings sought and therefore impose a substantial fiscal and administrative burden on the Commonwealth. *Dixon v. Love, supra*, 431 U.S., at 114, 97 S.Ct., at 1728.

Nor is it any answer to the Commonwealth's interest in public safety that its interest could be served as well in other ways. The fact that the Commonwealth, for policy reasons of its own, elects not to summarily suspend those drivers who *19 do take the breath-analysis test does not, as the District Court erroneously suggested, in any way undermine the Commonwealth's strong interest in summarily removing from the road those who refuse to take the test. A state plainly has the right to offer incentives for taking a test that provides the most reliable form of evidence of intoxication for use in subsequent proceedings. Indeed, in many cases, the test results could lead to prompt release of the driver with no charge being made on the "drunken driving" issue. And, in exercising its police powers, the Commonwealth is not required by the Due Process Clause to adopt an "all or nothing" approach to the acute safety hazards posed by drunken drivers.

We conclude, as we did in *Love*, that the compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available.

Accordingly, the judgment of the District Court is

Background Page 00742

reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice STEWART, with whom Mr. Justice BRENNAN, Mr. Justice MARSHALL, and Mr. Justice STEVENS join, dissenting.

The question in this case, simply put, is whether a person who is subject to losing his driver's license for three months as a penalty for allegedly refusing a demand to take a breath-analysis test is constitutionally entitled to some sort of hearing before his license is taken away. In Massachusetts, such suspensions are effected by the **2622 Registrar of Motor Vehicles solely upon the strength of a policeman's affidavit recounting *his* version of an encounter between the police and the motorist. Mass.Gen.Laws Ann., ch. 90, § 24(1)(f), (West Supp.1979). The driver is afforded no opportunity, before this deprivation occurs, to present his side of the story in a forum *20 other than a police station. He is given no notice of any entitlement he might have to a "same day" hearing before the Registrar. The suspension penalty itself is concededly imposed not as an emergency measure to remove unsafe drivers from the roads, but as a sanction to induce drivers to submit to breath-analysis tests. In short, the critical fact that triggers the suspension is noncooperation with the police, not drunken driving. In my view, the most elemental principles of due process forbid a State from extracting this penalty without first affording the driver an opportunity to be heard.

### A

Our decisions in *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90, and *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172, made clear that a person's interest in his driver's license is "property" that a State may not take away without satisfying the requirements of the due process guarantee of the Fourteenth Amendment. And the constitutional guarantee of procedural due process has always been understood to embody a presumptive requirement of notice and a meaningful opportunity to be heard *before* the State acts finally to deprive a person of his property. *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865; *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556; *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113; *Bell v. Burson, supra,* 402 U.S., at 542, 91 S.Ct., at 1591;

*Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 16, 19, 98 S.Ct. 1554, 1563, 1565, 56 L.Ed.2d 30.

This settled principle serves to ensure that the person threatened with loss has an opportunity to present his side of the story to a neutral decisionmaker "at a time when the deprivation can still be prevented." *Fuentes v. Shevin, supra,* 407 U.S., at 81-82, 92 S.Ct., at 1994. It protects not simply against the risk of an erroneous decision. It also protects a "vulnerable citizenry from the overbearing concern for efficiency . . . that may characterize praiseworthy government officials no less . . . than mediocre ones." *Stanley v. Illinois,* 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551. Cf. *Memphis Light, Gas & Water Div. v. Craft, supra,* 436 U.S., at 21 n. 28, 98 S.Ct., at 1566 n. 28. The very act of dealing with what purports to be *21 an "individual case" without first affording the person involved the protection of a hearing offends the concept of basic fairness that underlies the constitutional due process guarantee.

When a deprivation is irreversible-as is the case with a license suspension that can at best be shortened but cannot be undone-the requirement of some kind of hearing before a final deprivation takes effect is all the more important. Thus, in *Bell v. Burson,* the Court deemed it fundamental that "except in emergency situations" the State must afford a prior hearing before a driver's license termination becomes effective. 402 U.S., at 542, 91 S.Ct., at 1591.[1] In *Bell,* the State did provide a **2623 presuspension administrative hearing, but the Court held that the State could not, while purporting to condition a suspension in part on fault, exclude the element of fault from consideration in that hearing. The dimensions of a prior hearing may, of course, vary depending upon the nature of the case, the interests affected, and the prompt availability of adequate postdeprivation procedures. *Boddie v. Connecticut, supra; Mathews v. Eldridge,* 424 U.S. 319, 334-335, 96 S.Ct. 893, 902-903, 47 L.Ed.2d 18. But when adjudicative facts are involved, when no valid governmental interest would demonstrably be disserved by delay, and when full retroactive relief cannot be provided, an after-the-fact *22 evidentiary hearing on a critical issue is not constitutionally sufficient. Compare *Mathews v. Eldridge, supra,* with *Bell v. Burson, supra.*

The case of *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172, is not, as the Court seems to suggest, to the contrary. At issue in *Love* was a statute permitting the summary revocation of the license of a repeat traffic offender on the strength of a cumulative record of traffic convictions and suspensions. The Court in *Love* stressed that the appellee had not contested the factual basis for his license revocation and had not contested the procedures

Mackey v. Montrym, 443 U.S. 1 (1979)

99 S.Ct. 2612, 61 L.Ed.2d 321

followed in securing his previous convictions. Instead, the *Love* appellee had merely asserted a right to appear in person in advance to ask for leniency. *Id.*, 431 U.S., at 114, 97 S.Ct., at 1728. Under these circumstances, the Court held that summary suspension was permissible, for the "appellee had the opportunity for a *full judicial hearing* in connection with each of the traffic convictions on which the . . . decision was based." *id.*, at 113, 97 S.Ct., at 1728 (emphasis added). *Love*, then, involved an instance in which a revocation followed virtually automatically from the fact of duly obtained convictions for a stated number of traffic offenses. It established no broad exception to the normal presumption in favor of a prior hearing. See *Memphis Light, Gas & Water Div. v. Craft, supra*, 436 U.S., at 19 n. 24, 98 S.Ct., at 1565 n. 24.

**B**

The Court likens this driver's license revocation to the suspension at issue in *Love%i, but in my view that analogy simply cannot be drawn. The Massachusetts breath-analysis suspension statute, in clear contrast to the* Love *statute, affords the driver no prior hearing of any kind to contest the critical factual allegations upon which the suspension is based. Those allegations can hardly be equated with routinely kept records of serious traffic offense* convictions.

A breath-analysis suspension is premised upon three factors: *23 reasonable grounds for an arrest for driving while intoxicated; a proper request by the officer that the driver submit to a breath-analysis test; and a refusal to do so by the driver. Mass.Gen.Laws Ann., ch. 90, § 24(1)(f) (West Supp.1979). The appellee in this case was indeed arrested, after a collision in which his car was struck in the rear by a motorcycle, for driving while intoxicated. Moreover, he admitted that he initially refused to take a breath-analysis test. But he consistently contended that he was not informed of the sanction, as is required by § 24(1)(f), and he vigorously disputed the accuracy of the police affidavit that said he was so informed. His further claim-that he requested a test as soon as he learned by inadvertence of the sanction, and that the police then refused to administer the test-was apparently accepted by the Massachusetts judge who subsequently dismissed the drunken-driving charge against him. Thus, there was clearly a significant factual dispute in this case.

That dispute, as in *Bell v. Burson*, concerned a critical element of the statutory basis for a suspension-in this instance whether there was indeed a refusal to take a breath-analysis test after a proper demand. The Court

suggests nonetheless that the "fact" of a informed refusal, as well as the other statutory factual bases for a suspension, is somehow so routine, objective, and reliable as to be equivalent to routinely maintained official records of criminal convictions. I find this equation highly dubious. Initial deprivations of liberty based upon *ex parte* probable-cause determinations **2624 by the police are, of course, not unusual, *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54; *ex parte* probable-cause determinations by neutral magistrates relying upon properly corroborated police affidavits to determine whether arrest or search warrants should issue are likewise commonly made. *E. g., Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. But these practices, to the extent that they permit *ex parte* deprivations of liberty or property, are clearly necessitated by the exigencies of law enforcement. They supply no support *24 for the proposition that a police affidavit can provide a constitutionally sufficient basis for the deprivation of property in a civil proceeding, when there is ample time to give the owner an opportunity to be heard in an impartial forum before an impartial decisionmaker.

Moreover, there is a vast difference between the record of duly adjudicated convictions at issue in *Love* and the historical facts of the encounter between the police and a motorist that form the basis for the driver's license suspension in the present case. To be sure, these relatively uncomplicated facts are unquestionably within "the personal knowledge of the reporting officer." *Ante*, at 2619. But they are also within the knowledge of the driver. This Court has yet to hold that the police version of a disputed encounter between the police and a private citizen is inevitably accurate and reliable.[2]

I am not persuaded that the relative infrequency with which a driver may be able successfully to show that he did not refuse to take a breath-analysis test should excuse the State from the constitutional need to afford a prior hearing to any person who wishes to make such a challenge. The question whether or not there was such a refusal is one classically subject to adjudicative factfinding, and one that plainly involves issues of credibility and veracity. *Mathews v. Eldridge*, 424 U.S., at 343-344, 96 S.Ct., at 907. The driver's "opportunity to tell his side of the story" to "the arresting officer," *ante*, at 2619, surely *25 cannot seriously be deemed a "meaningful opportunity to be heard" in the due process sense. There is simply no escaping the fact that the *first* hearing Massachusetts supplies on a breath-analysis suspension comes *after* the license of the driver has been taken away. And it is clear that the suspension itself effects a final deprivation of property that no subsequent proceeding can restore. Cf. *Mathews v. Eldridge, supra*, 424 U.S., at 340, 96 S.Ct., at 905.[3]

Mackey v. Montrym, 443 U.S. 1 (1979)

99 S.Ct. 2612, 61 L.Ed.2d 321

**\*\*2625** The State has urged, and the Court seems to agree, *ante*, at 2620-2621, that summary procedures are nevertheless required to further the State's interest in protecting the public from unsafe drivers. It cannot be doubted that the interest in "removing drunken drivers from the road" is significant. But the precedents supporting *ex parte* action have not turned simply on the significance of the governmental interest asserted. To the contrary, they have relied upon the extent to which that interest will be frustrated by the delay necessitated by a prior hearing. *E. g., North American Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed.2d 195 (allegedly spoiled food), and cases **\*26** cited in n.1, *supra*. The breath-analysis test is plainly not designed to remove an irresponsible driver from the road as swiftly as possible. For if a motorist *submits* to the test and fails it, he keeps his driver's license-a result wholly at odds with any notion that summary suspension upon refusal to take the test serves an emergency protective purpose. A suspension for refusal to take the test is obviously premised not on intoxication, but on noncooperation with the police.

The State's basic justification for its summary suspension scheme, as the Court recognizes, *ante*, at 2621, lies in the unremarkable idea that a prior hearing might give drivers a significant incentive to refuse to take the test. Related to this argument is the suggestion that the availability of a prior hearing might encourage a driver to demand such a hearing as a "dilatory" tactic, and thus might increase administrative costs by generating a "sharp increase in the number of hearings." *Ante*, at 2621. In sum, the State defends the *ex parte* suspension as essential to enlist the cooperation of drivers and also as a cost-saving device. I cannot accept either argument.

The 3-month driver's license suspension alone is obviously sufficient to promote the widespread use of the breath-analysis test, if drivers are informed not only of this sanction for a refusal but also realize that cooperation may conclude the entire case in their favor. Moreover, as is generally the case when a person's ability to protect his interests will ultimately depend upon a swearing contest with a law enforcement officer, the deck is already stacked heavily against the motorist under this statute. This point will not be lost upon the motorist. The State's position boils down to the thesis that the failure to afford an opportunity for a prior hearing can itself be part of the stacked deck. But there is no room for this type of argument in our constitutional system. A State is simply not free to manipulate Fourteenth Amendment procedural rights to coerce a person into compliance with its substantive rules, however important it may **\*27** consider those rules to be. The argument that a prior hearing might encourage "dilatory" tactics on the part of the motorist,

true as it might be to human nature, is likewise wholly inconsistent with the simple Fourteenth Amendment guarantee that every "person" is entitled to be heard, before he may be deprived of his property by the State. Finally, the all too familiar cost-saving arguments raised by the State have regularly been made here and have as regularly been rejected as a justification for dispensing with the guarantees of the Fourteenth Amendment. For if costs were the criterion, the basic procedural protections of the Fourteenth Amendment could be read out of the Constitution. Happily, the Constitution recognizes higher values than "speed and efficiency." *Stanley v. Illinois, supra*, 405 U.S., at 656, 92 S.Ct., at 1215.[4]

C

The Court's holding that the Massachusetts breath-analysis suspension scheme satisfies the Constitution seems to be premised in large part on the assumption that a prompt postsuspension hearing is available. But even assuming that such an after-the-fact procedure would be constitutionally sufficient in this situation, the so-called "prompt postsuspension" remedy afforded by Massachusetts is, so far as I can tell, largely fictional. First, the State does not notify the driver of the availability of any **\*\*2626** such remedy.[4] And without notice, the remedy, even if it exists, is hardly a meaningful safeguard. Only last Term we reaffirmed that "reasonable" notice of a **\*28** procedural right is itself integral to due process. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S., at 13-15, 98 S.Ct., at 1562-1563. This inherent principle has long been established, see *Mullane v. Central Hanover Trust Co.*, 339 U.S., at 314, 70 S.Ct., at 657, and Massachusetts clearly has not honored it.

Quite apart from the failure of Massachusetts to inform the driver of any entitlement to a "walk-in" hearing, that remedy cannot-as the Court recognizes-provide immediate relief to the driver who contests the police report of his refusal to take a test. To resolve such a factual dispute, a "meaningful hearing" before an impartial decisionmaker would require the presence of the officer who filed the report, the attesting officer, and any witnesses the driver might wish to call. But the State has provided no mechanism for scheduling any such immediate postsuspension evidentiary hearing.[5] The fact is that the "walk-in" procedure provides little more than a right to request the scheduling of a later hearing. In the meantime, the license suspension continues, for the Registrar is without statutory power to stay a suspension founded upon a technically correct affidavit pending the outcome of an evidentiary hearing.

Mackey v. Montrym, 443 U.S. 1 (1979)

99 S.Ct. 2612, 61 L.Ed.2d 321

Finally, the Registrar-according to the Court's own description of the Massachusetts scheme-quite possibly does not have authority to resolve even the most basic questions that might be raised about the validity of a breath-analysis suspension. *Ante*, at 2619 n. 8. And, if the Registrar has no final authority to resolve the "legal" question the Court perceives in this case,[6] it can hardly be concluded that there **\*29** exists the prompt postsuspension relief that is said to excuse the State from any need to provide a prior hearing. For, if a prompt postsuspension hearing is even to be eligible for consideration as minimally adequate to satisfy the demands of procedural due process, it must provide for an impartial decisionmaker with authority to resolve the basic dispute and to provide prompt relief. See *Memphis Light, Gas & Water Div. v. Craft, supra*, 436 U.S., at 18, 98 S.Ct., at 1564.[7]

### **\*30 \*\*2627 D**

The Court has never subscribed to the general view "that a wrong may be done if it can be undone," *Stanley v. Illinois*, 405 U.S., at 647, 92 S.Ct., at 1210. We should, in my opinion, be even less enchanted by the proposition that due process is satisfied by delay when the wrong cannot be undone at all, but at most can be limited in duration. Even a day's loss of a driver's license can inflict grave injury upon a person who depends upon an automobile for continued employment in his job.

I do not mean to minimize the importance of breath-analysis testing as part of a state effort to identify, prosecute, and rehabilitate the alcohol-ridden motorist. I cannot, however, agree that the summary suspension of a driver's license authorized by this Massachusetts law is a constitutionally permissible method to further those objectives. For, on the sole basis of a policeman's affidavit, the license is summarily suspended, and it is suspended not for drunken driving but only for failure to cooperate with the police. The State-in my view-has totally failed to demonstrate that this summary suspension falls within any recognized exception to the established protections of the Fourteenth Amendment. Accordingly, I respectfully dissent.

**Parallel Citations**

99 S.Ct. 2612, 61 L.Ed.2d 321

Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    Montrym does not deny having refused the test; he claims that he was not advised of the mandatory 90-day suspension penalty prior to his refusal, as required by the statute; however, the officer's report of refusal asserts that Montrym was given the required prior warning.

2    Montrym was also acquitted on the driving-to-endanger charge but was found guilty on the registration charge and fined $15.

3    It provides in relevant part:
     "Upon receipt of such report [or refusal], the registrar *shall* suspend any license . . . issued to such person . . . for a period of ninety days." Mass.Gen.Laws Ann., ch. 90, § 24(1)(f) (West Supp.1979) (emphasis added).

4    Massachusetts Gen.Laws Ann., ch. 90, § 28 (West 1969), provides that any person aggrieved by a ruling of the Registrar may appeal such ruling to the Board of Appeal, which may, after a hearing, order such ruling to be affirmed, modified, or annulled. However, no such appeal shall operate to stay any ruling of the Registrar. In turn, the Board's decision is subject to judicial review. Mass.Gen.Laws Ann., ch. 30A, § 14 (West 1979).

5    Massachusetts Gen.Laws Ann., ch. 90, § 24(1)(g) (West 1969) provides:
     "Any person whose license, permit or right to operate has been suspended under paragraph (*f*) shall be entitled to a hearing before the registrar which shall be limited to the following issues: (1) did the police officer have reasonable grounds to believe that such person had been operating a motor vehicle while under the influence of intoxicating liquor upon any [public] way . . . , (2) was such person placed under arrest, and (3) did such person refuse to submit to such test or analysis. If, after such hearing, the registrar finds on any one of the said issues in the negative, the registrar shall reinstate such license, permit or right to operate."
     As stipulated by the parties, the § 24(1)(g) hearing is available the moment the driver surrenders his license. At the hearing, the suspended driver may be represented by counsel. Upon request, a hearing officer will examine the report of refusal and return the driver's license immediately if the report does not comply with the requirements of § 24(1)(f). If the report complies with those requirements, the burden is on the driver to show either that he was not arrested, that there was no probable cause for arrest, or that

**Mackey v. Montrym, 443 U.S. 1 (1979)**

99 S.Ct. 2612, 61 L.Ed.2d 321

he did not refuse to take the breath-analysis test. The hearing may be adjourned at the request of the driver or *sua sponte* by the hearing officer in order to permit the attendance of witnesses or for the gathering of relevant evidence. Witnesses at the hearing are subject to cross-examination by the driver or his attorney, and he may appeal an adverse decision of the Registrar to the Board of Appeal pursuant to § 28.

The Registrar has represented to the Court that a driver can obtain a decision from the hearing officer within one or two days following the driver's receipt of the suspension notice. Montrym asserts that greater delay will occur if the driver raises factual issues requiring the taking of evidence. But, even under his more pessimistic view, which takes into account the possibility of intervening weekends, the driver will obtain a decision from the hearing officer within 7 to 10 days.

6   Because the District Court held the statute unconstitutional on its face and granted class-wide relief, it never reached the "as applied" challenge raised in Montrym's complaint; nor do we. The validity of that challenge, and the resolution of any contested factual issues relevant to it, must be determined by the District Court on remand in light of our opinion.

Also, the question of whether the Commonwealth is constitutionally required to give notice of the § 24(1)(g) hearing procedure independent of the notice given by the statute itself was neither framed by the pleadings nor decided by the District Court; it is not properly before us notwithstanding the observations of the dissenting opinion on this issue. See *post*, at 2626.

7   That the Due Process Clause applies to a state's suspension or revocation of a driver's license is clear from our decisions in *Dixon v. Love*, 431 U.S. 105, 112, 97 S.Ct. 1723, 1727, 52 L.Ed.2d 172 (1977), and *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).

8   An evidentiary hearing into the historical facts would be ill suited for resolution of such questions of law. Indeed, it is not clear whether the Registrar even has the plenary authority to resolve such questions. Ultimately, any legal questions must be resolved finally by the Massachusetts courts on judicial review of the decision of the Board of Appeal after any appeal taken from the ruling of the Registrar. See n. 4, *supra*.

9   Drunken drivers accounted for 283 of the 884 traffic fatalities in Massachusetts during 1975 alone and must have been responsible for countless other injuries to persons and property. App. 31. More people were killed in alcohol-related traffic accidents in a year in this one State than were killed in the tragic DC-10 crash at O'Hare Airport in May 1979. Traffic deaths commonly exceed 50,000 annually in the United States, and approximately one-half of these fatalities are alcohol related. See U.S. Dept. of Transportation, 1977 Highway Safety Act Report App. A-9 (Table A-1); U.S. Dept. of Health, Education, and Welfare, Third Special Report on Alcohol and Health 61 (1978).

1   Emergency situations have generally been defined as those in which swift action is necessary to protect public health, safety, revenue or the integrity of public institutions. See, *e. g., Central Union Trust Co. v. Garvan*, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403 (emergency action during wartime); *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (seizure of misbranded drugs); *North American Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (seizure of allegedly diseased poultry); *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (effective tax collection); *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (emergency bank management); cf. *Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (to protect a public institution from a continuing danger). See generally J. Freedman, Crisis and Legitimacy: The Administrative Process and American Government (1978); L. Tribe, American Constitutional Law § 10-14 (1978).

2   Contrary to the Court's suggestion, the case of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, provides no precedential support for the *ex parte* suspension procedure followed by Massachusetts. The disability-benefit termination procedures upheld in *Mathews* did not involve an "*ex parte* " deprivation of property. To the contrary, the Court in *Mathews* stressed that the recipient had been afforded an opportunity to make extensive written submissions to the decisionmaker before any initial termination decision was made. *Id.*, at 344, 345, 96 S.Ct., at 907, 908. Given the amenability of the critical issue to written presentation and the clear availability of a prompt posttermination evidentiary hearing, this prior opportunity to be heard-albeit in writing-was deemed constitutionally sufficient.

3   The Court stresses that a presumption evidentiary hearing would be futile since the Registrar has no discretion to stay a suspension pending that hearing. The Court also emphasizes that the decision not to give the Registrar such discretion reflects a "rational" legislative choice. *Ante*, at 2620. I fail to see how these observations answer the procedural due process claim in this case. The choice that the Massachusetts Legislature has made is merely a part of its decision to dispense with a presumption hearing that is here under constitutional challenge. To be sure, that choice might well be "rational" in the equal protection sense. But the "rationality" of a legislative decision to dispense with the procedural safeguards that constitutionally must precede state deprivation of a person's interest has never been deemed controlling. The Court may, of course, be suggesting that the legislature has established a presumption that a driver who refuses a breath-analysis test is *per se* an unsafe driver. But the State has not made this argument, and indeed it would be a strange one in the context of this statute. For the state law expressly provides that an alleged refusal to take a breath-analysis test is not admissible as evidence in a prosecution for driving while intoxicated. Mass.Gen.Laws Ann., ch. 90, § 24(1)(e) (West Supp.1979).

**Mackey v. Montrym, 443 U.S. 1 (1979)**

99 S.Ct. 2612, 61 L.Ed.2d 321

4     To be sure, the statute states that a driver is entitled to a limited hearing before the Registrar, see Mass.Gen.Laws Ann., ch. 90, § 24(1)(g) (West 1969), and the parties have stipulated that under Massachusetts practice the driver may schedule this hearing by "walking in" to a Registry Office. The only postdeprivation remedy mentioned in the suspension notice sent to the driver, however, is a right to take "an appeal" within 10 days to the Board of Appeal on Motor Vehicle Liability. The unexplained reason for the appellee's failure to exercise his right to the putative "walk-in" hearing, *ante*, at 2615-2616, thus may lie in the failure of the State to notify him of any such right.

5     An obvious mechanism is suggested by the procedures generally followed for routine traffic offenses. The driver is immediately notified by summons of his right to request a judicial hearing. If a request is made, a date is set, the driver and the police are notified, and the question of liability is then resolved in a single proceeding.

6     The legal question identified by the Court is whether a delayed offer to cooperate on the driver's part should excuse the suspension penalty. In this case, that question presumably would not arise if the delay had in fact been attributable to the failure on the part of the police to comply with the statutory requirement that the driver be informed of the sanction. If, as the appellee has claimed, this is what happened, the question would be whether a refusal after an improper demand is legally sufficient to justify a suspension.

7     Indeed, under the Court's description of the postsuspension relief available under the statute, it appears that the appellee was by no means "assured a prompt proceeding *and a prompt disposition of the outstanding issues between [him] and the State.*" *Barry v. Barchi*, 443 U.S. 55, 66, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (emphasis added). This precise constitutional infirmity has led the Court in *Barry v. Barchi*, to sustain the Fourteenth Amendment claim of a horse trainer whose trainer's racing license was summarily suspended upon a probable-cause showing that his horse was drugged before a race. Here, as in *Barchi*, the appellee was not notified of any right to prompt postsuspension relief. Here, as in *Barchi*, the hearing available upon "appeal" from the administrative summary suspension, see Mass.Gen.Laws Ann., ch. 90, § 28 (West 1969), appears to be the only meaningful postsuspension evidentiary hearing afforded. As in *Barchi*, the statute involved here does not specify when this review must begin, does not require that the suspension be stayed during review, and does not require the Board of Appeal to reach a prompt decision. Further, in view of the Registrar's apparent lack of authority to make any definitive determination of the issues in any evidentiary hearing that the driver might schedule by "walking in," there seems to be no "assurance" under this statute that the driver will receive prompt postsuspension relief from a "trial level" hearing examiner. In sum, under the principle established in *Barchi*, the District Court upon remand for consideration of this appellee's "as applied" challenge to his suspension, *ante*, at 2617 n. 6, will be required to sustain that challenge, unless the courts find that the appellee was in fact given advance notice of his right to an immediate postsuspension hearing and was "assured" under the statute of an immediate and definitive resolution of the contested issues in his case.

---

End of Document                         © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Background Page 00748

342 F.Supp.2d 1
United States District Court,
District of Columbia.

CENTER FOR AUTO SAFETY, INC. and Public
Citizen, Inc., Plaintiffs,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY
ADMINISTRATION, Defendant.

No. CIV.04–392(ESH). | Sept. 30, 2004.

**Synopsis**
**Background:** Non-profit consumer organizations brought action under National Traffic and Motor Vehicle Safety Act and Administrative Procedure Act (APA) challenging policy of National Highway Traffic Safety Administration (NHTSA) permitting regional recalls of defective motor vehicles. Organizations moved for summary judgment, and NHTSA moved to dismiss.

**Holdings:** The District Court, Huvelle, J., held that:

[1] organizations had standing to bring action;

[2] Safety Act did not preclude NHTSA from permitting regional recalls; and

[3] NHTSA's letter announcing policy was not subject to APA's notice and comment procedures.

Government's motion granted.

West Headnotes (9)

[1] **Federal Courts**
    ⚹Parties and Process

To meet constitutional standing requirements, plaintiff must show that: (1) he has suffered injury which is concrete and particularized, as well as actual or imminent rather than conjectural or hypothetical; (2) there is causal connection between alleged injury and conduct that is fairly traceable to defendant; and (3) it is likely, as opposed to merely speculative, that injury will be redressed by favorable decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[2] **Antitrust and Trade Regulation**
    ⚹Private Entities or Individuals

Non-profit consumer organizations had associational standing to bring action under National Traffic and Motor Vehicle Safety Act and Administrative Procedure Act (APA) challenging policy of National Highway Traffic Safety Administration (NHTSA) permitting regional recalls of defective motor vehicles, where organizations' members lived in states that were excluded from automobile manufacturers' regional recalls, it was likely that nationwide recalls would have been made but for NHTSA's policy of allowing regional recalls, and harm alleged could have been redressed by elimination of regional recalls. U.S.C.A. Const. Art. 3, § 2, cl. 1; 5 U.S.C.A. § 706(2)(A); 49 U.S.C.A. § 30162(a)(2).

[3] **Federal Courts**
    ⚹Parties and Process

In determining whether plaintiffs have prudential standing to bring suit, court must discern interests arguably to be protected by statutory provision and then determine if plaintiffs' interests are among them.

[4] **Antitrust and Trade Regulation**
    ⚹Private Entities or Individuals

Non-profit consumer organizations had prudential standing to bring action under National Traffic and Motor Vehicle Safety Act

Background Page 00749

AB73-2BKG-30

challenging policy of National Highway Traffic Safety Administration (NHTSA) permitting regional recalls of defective motor vehicles, where Act allowed "any interested person" to petition NHTSA to commence defect investigation or to determine whether manufacturer had reasonably met its notice and remedy provisions. 49 U.S.C.A. §§ 30101, 30118(e), 30120(e), 30162(a).

[5]  **Antitrust and Trade Regulation**
⟜Private Entities or Individuals

Non-profit consumer organizations had procedural standing to challenge National Highway Traffic Safety Administration's (NHTSA) failure to follow notice and comment procedures before issuing letter permitting regional recalls of defective motor vehicles, even if organizations could not assert with certainty that notice-and-comment rulemaking process would have altered NHTSA's decision, where organizations' members' interests fell within zone of interests protected by National Traffic and Motor Vehicle Safety Act, and opportunity to comment on NHTSA's regional recall policy was linked to their alleged injuries resulting from regional recalls. 49 U.S.C.A. §§ 30101, 30118(e), 30120(e), 30162(a).

[6]  **Antitrust and Trade Regulation**
⟜Judicial Review

National Highway Traffic Safety Administration's (NHTSA) adoption of general policy permitting automobile manufacturers to conduct regional recalls of defective motor vehicles did not implicate NHTSA's enforcement discretion in specific case, and thus was subject to judicial review, where suit attacking NHTSA's regional recall policy was divorced from any specific regional recall or factual scenario. 49 U.S.C.A. §§ 30101, 30118(e), 30120(e), 30162(a).

1 Cases that cite this headnote

[7]  **Antitrust and Trade Regulation**
⟜Motor Vehicles

National Traffic and Motor Vehicle Safety Act did not preclude National Highway Traffic Safety Administration (NHTSA) from permitting regional recalls of defective motor vehicles; Act provided that determination of whether recall was required would be fact-specific, NHTSA had to consider vehicle's "performance," and it was logical to consider weather conditions in particular region in determining whether vehicle contained safety-related defect. 49 U.S.C.A. §§ 30102(a)(8), 30118(b)(1).

[8]  **Antitrust and Trade Regulation**
⟜Rules and Rulemaking

Letter from National Highway Traffic Safety Administration (NHTSA) detailing when automobile manufacturers could conduct regional, rather than nationwide, recalls of defective motor vehicles was general statement of policy, rather than de facto legislative rule, and thus was not subject to Administrative Procedure Act's (APA) notice and comment procedures, even though letter required manufacturers to discuss possibility of limiting recall's geographic scope with agency, identified twenty states and District of Columbia as necessary inclusions for corrosion-related regional recalls, and permitted "disclaimers" in notice letters, where letter characterized its contents as "policy guidelines," letter left NHTSA free to exercise its discretion as to whether safety-related defect existed, agency did not treat letter as binding, and regulations permitted disclaimers regarding weather-related conditions. 5 U.S.C.A. § 553; 49 U.S.C.A. § 30118; 49 C.F.R. § 577.8(a).

1 Cases that cite this headnote

Center For Auto Safety, Inc. v. National Highway Traffic..., 342 F.Supp.2d 1 (2004)

[9]    **Antitrust and Trade Regulation**
       Judicial Review

Letter issued by National Highway Traffic Safety Administration (NHTSA) adopting general policy permitting automobile manufacturers to conduct regional recalls of defective motor vehicles did not constitute "final agency action," thus was not subject to judicial review under Administrative Procedure Act's (APA) abuse of discretion standard, where letter reflected non-binding prospective enforcement policies designed to inform industry and agency personnel regarding how NHTSA intended to exercise its enforcement discretion, and left NHTSA free to exercise its discretion in enforcing regional recalls, neither requiring nor ordering manufacturers to do anything. 5 U.S.C.A. §§ 704, 706(2)(A).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*3** Bonnie I. Robin–Vergeer, Public Citizen Litigation Group, Washington, DC, for Plaintiffs.

Jane M. Lyons, United States Attorney's Office, Washington, DC, for Defendant.

**Opinion**

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs challenge the policy of the National Highway Traffic Safety Administration ("NHTSA"), including its 1998 letter to manufacturers, permitting "regional recalls" of defective motor vehicles. Plaintiffs ask the Court to invalidate the 1998 letter and the practice of regional recalls and to enjoin NHTSA from approving future regional recalls. They contend that: (1) the practice of allowing regional recalls violates the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. § 30101 *et seq.*; (2) the 1998 letter amounts to a *de facto* legislative rule issued without the benefit of notice and

comment in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553 and 706(2)(D); and (3) the 1998 letter is arbitrary and capricious and an abuse of discretion in violation of the APA, 5 U.S.C. § 706(2)(A). (Compl. ¶¶ 27–32.)

Plaintiffs have moved for summary judgment on these claims, and defendant has moved to dismiss, arguing that plaintiffs lack standing and fail to state a claim. For the reasons stated below, the Court will grant defendant's motion to dismiss and deny plaintiffs' motion for summary judgment.

## FACTUAL AND STATUTORY BACKGROUND

### I. The Parties

The Center for Auto Safety and Public Citizen are non-profit consumer organizations that advocate for strong federal safety standards to protect drivers and passengers. (Compl. ¶¶ 2–3.) They bring this action on behalf of their members who have been excluded from recalls because of the location of their residence. The Department of Transportation ("DOT") is the federal agency charged with ensuring safe transportation, and NHTSA, an agency within DOT, is charged with carrying out the Safety Act. 49 C.F.R. § 1.50(a).

### II. Statutory Framework

The Safety Act seeks to ensure the safety of motor vehicles, and it authorizes the Secretary of Transportation to undertake various activities to that end.[1] 49 U.S.C. § 30101 ("The purpose of this chapter is to reduce traffic accidents and deaths and injuries resulting from traffic accidents.") For example, the Safety Act directs the Secretary of Transportation to issue motor vehicle safety standards. 49 U.S.C. § 30111(a). No motor vehicle or motor vehicle equipment may be sold unless it complies with these safety standards. 49 U.S.C. §§ 30112(a), 30115.

At issue here are the Safety Act's notification and remedy—or "recall"—procedures, which are triggered when a "defect"[2] related to "motor vehicle safety"[3] is **\*4** identified. A defect may be identified—and thus notification and remedy requirements may be triggered—in one of two ways: (1) by the manufacturer or (2) by NHTSA. 49 U.S.C. §§ 30118(b)(2), (c). First, the statute requires a manufacturer who "learns [that] the vehicle or equipment contains a defect and decides in good faith that

the *defect is related to motor vehicle safety* " to notify "the owners, purchasers, and dealers." 49 U.S.C. § 30118(c)(1) (emphasis added).[4]

Alternatively, a defect may be identified by NHTSA through its broad investigatory powers. *See* 49 U.S.C. § 30166(b)(1)(A) (authorizing NHTSA to conduct any inspection or investigation necessary to enforce the statute). NHTSA collects information about possible motor vehicle and equipment defects through a variety of sources, including manufacturers' reports of defects and proposed recalls. 49 C.F.R. §§ 579.2, 573.6. An office within NHTSA—the Office of Defects Investigation ("ODI")—considers all available information and determines whether to investigate potential defects. 49 C.F.R. § 554.5 (ODI "elicits from every available source and evaluates on a continuing basis any information suggesting the existence of a safety-related defect."). An investigation may lead to administrative enforcement proceedings, which may in turn culminate in an order to the manufacturer to notify consumers of the safety-related defect and to provide a remedy. 49 U.S.C. §§ 30118(b)(1) & (2).

Specifically, if after an investigation the manufacturer has not decided to voluntarily issue a 573 Report and conduct a recall, but the agency makes an initial determination that the vehicle contains a safety-related defect, NHTSA must immediately notify the manufacturer of its initial determination. 49 U.S.C. § 30118(a). Then, the manufacturer and any interested party may present, at a public hearing or in writing, "information, views, and arguments showing that there is no defect ... or that the defect does not affect motor vehicle safety." 49 U.S.C. § 30118(b)(1); *see also* 49 C.F.R. § 554.10(b). After considering these arguments, the agency may affirm its initial decision that a motor vehicle or equipment contains a safety-related defect and order the manufacturer to provide notice and a remedy. § 30118(b).

When a defect is identified, regardless of whether it was identified by the manufacturer or the agency, the statute mandates consumer notification. *See* § 30118(b)(2)(A) (requiring notification after the agency makes a final defect determination); § 30118(c) (requiring notification when a manufacturer identifies a defect related to motor vehicle safety). Notification is intended to inform vehicle owners about safety-related defects and to encourage them to have the defects remedied as quickly as possible. 49 C.F.R. § 577.2. The statute lays out specific **\*5** requirements to meet this goal. For example, the notice must clearly describe the defect, assess the risk to motor vehicle safety, describe measures to be taken to remedy the defect, and inform the consumer that the manufacturer

will provide a remedy free of charge.[5] 49 U.S.C. § 30119(a). When describing the defect, the notice must identify the vehicle system or equipment affected, and it must describe the malfunction that may occur as a result of the defect, "any operating or other conditions that may cause the malfunction to occur," and any precautions that might reduce the risk of malfunction. 49 C.F.R. §§ 577.5(e)(1)-(4). "When the manufacturer determines that the defect ... *may* not exist in each such vehicle ..., he may include an additional statement to that effect." 49 C.F.R. § 577.5(d) (emphasis added). However, the notice may not include any other disclaimer indicating that "there is no defect, that the defect does not relate to motor vehicle safety, or that the defect is not present in the owner's or lessee's vehicle." 49 C.F.R. § 577.8(a).

Notification about a safety-related defect must be sent to "each person registered under State law as the owner and whose name and address are reasonably ascertainable by the manufacturer" or "to the most recent purchaser known to the manufacturer." 49 U.S.C. § 30119(d).[6] If NHTSA determines that the notice did not result in an "adequate number of motor vehicles or items of replacement equipment" being "returned for remedy," it may order the manufacturer to send a second notice. § 30119(e).

To determine whether the manufacturer has reasonably met the notification requirements, the agency is authorized to conduct a hearing at which "[a]ny interested person" may "make written and oral presentations of information, views, and arguments on whether the manufacturer has reasonably met the notification requirements." § 30118(e). If NHTSA determines that the manufacturer has not reasonably met the notification requirements, it may order the manufacturer to take appropriate action. *Id.*

When notification is required—that is, when a safety-related defect is present, regardless of whether it was identified by the agency through a hearing or the manufacturer through a 573 Report—the manufacturer must also "remedy the defect ... without charge" by repairing or replacing the vehicle or providing a refund. 49 U.S.C.A. § 30120(a)(1); *see also* § 30118(b)(2)(B). At a hearing, the manufacturer and interested persons may present information, views, and argument on, and NHTSA may decide, whether the manufacturer reasonably met the remedy requirements. § 30120(e). If a manufacturer fails to meet the remedy requirements, NHTSA has the authority to order specific action by the manufacturer. *Id.*

There are two exceptions to the Safety Act's recall requirements. First, a free remedy is not required "if the

motor vehicle or replacement equipment was bought by the first purchaser more than 10 calendar years" before notice is given. § 30120(g). Additionally, upon application by the manufacturer, NHTSA may exempt a manufacturer if a defect is "inconsequential to motor vehicle safety," but interested *6 persons must be given an opportunity to provide input on the exemption. § 30120(h).

Interested persons may initiate or challenge a recall by petitioning the agency to take action. First, an interested person may ask the agency to decide whether a motor vehicle contains a defect related to motor vehicle safety, and thus, whether to order a recall. 49 U.S.C. § 30162(a)(2); 49 C.F.R. §§ 552.1, 552.3(b). If the petition is granted, the agency initiates an investigation. 49 C.F.R. § 554.6(a). In addition, interested persons may petition NHTSA to hold a hearing to determine whether a manufacturer has reasonably fulfilled its obligations to provide notice and a remedy.[7] 49 U.S.C. §§ 30118(e), 30120(e); 49 C.F.R. § 557.3.

### III. Regional Recalls

At issue in this case is the situation where a manufacturer identifies a safety-related defect and then conducts a regional recall to address it. This practice began in the mid–1980s. At that time NHTSA permitted manufacturers to conduct recalls in states or regions partly of their own choosing. Between 1992 and 1998, there were eighteen regional recalls, and since the issuance of the NHTSA letter, there have been twenty-two regional recalls. (Pls.' Opp. to Def.'s Mot. to Dismiss ["Pls.' Opp."] Second Decl. of Clarence M. Ditlow ["Second Ditlow Decl."] ¶ 2; Def.'s Opp. to Pls.' Mot. for Summ. J. ["Def.'s Opp."] Decl. of Kenneth N. Weinstein ["Weinstein Decl."] ¶ 9.)[8] All of these have been initiated by manufacturers. (Def.'s Opp. at 5; Pls.' Mot. for Summ. J. ["Pls.' Mot."] at 16.) In contrast, during the period from 1992 to 2002, manufacturers initiated approximately 3,000 nationwide recalls. (Weinstein Decl. ¶ 9.) Accordingly, regional recalls represent roughly one percent of all vehicle recalls.

### IV. NHTSA Letters

To address the ad hoc nature of manufacturer-initiated regional recalls, NHTSA sent manufacturers a letter in 1997 addressing its "concerns" over recalls structured to remedy "safety-related defects in vehicles located in select regions of the United States." (Pls.' Mot. Decl. of Clarence M. Ditlow ["Ditlow Decl."] Ex. 10 (1997 Letter from NHTSA to manufacturers ["NHTSA 1997 Letter"] at 1.)) NHTSA advised that "safety-related defects should

be remedied on a nationwide basis, except where manufacturers can demonstrate otherwise," and that its "policy will be to request manufacturers seeking to conduct such recalls to discuss the need for limiting a recall's geographic scope with the agency before the manufacturer makes a public statement concerning the scope of the recall." (Id.) Furthermore, NHTSA planned to audit all regional recalls to "verify the effectiveness of the recall and to identify the number of vehicles that received the remedy." (Id.)

In 1998, NHTSA sent another letter to manufacturers setting out "policy guidelines" for regional recalls. (Ditlow Decl. Ex. 2 (1998 Letter from NHTSA to manufacturers ["NHTSA 1998 letter"] ); see also id. Ex. 11 (Letter of Aug. 12, 1998 from NHTSA to Ford) ["Ford Letter"] (describing the "agency's general policy").) *7 [9] This letter reiterates the 1997 letter's statement that "as a general matter, safety-related defects must be remedied on a nationwide basis, unless the manufacturer can justify a limited geographic scope." (NHTSA 1998 Letter at 1.) The letter then describes two categories of weather-related defects: (1) those likely to manifest themselves after just a short-term or single exposure to a particular weather condition, and (2) those likely to occur only after long-term or recurring exposure.[10] (Id. at 1–2.) The agency determined that regional recalls would not be appropriate for the former category because an uncommon weather event or a brief visit to an area where the particular condition was common could trigger the safety hazard. (Id. at 1–2.) However, as to the latter category, the letter states that the agency "will approve" a regional recall "if the manufacturer is able to demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion than in the rest of the United States." (Id. at 2.) Thus, the manufacturer need only provide notice and a free remedy to those in the identified region, but since it is possible that other vehicles may be exposed to the weather condition—for example, persons living in "border states" may frequently travel into the identified region—manufacturers must ensure that vehicles from outside the region that experience the problem are "taken care of appropriately." (Id.)

In addition to these weather-related regional recalls, NHTSA's 1998 letter addresses "safety problems caused by corrosion from long-term exposure to road salt." (Id.) A corrosion-related regional recall must include, "at a minimum," vehicles originally sold or currently registered in one of twenty listed states or the District of Columbia. (Id. at 2–3 (emphasis added).)[11] To protect motor vehicle owners who move into an area covered by a regional recall, the agency "will require manufacturers to conduct

at least one follow-up notification, usually after two or three years." (*Id.* at 2.) The letter concluded by reiterating that manufacturers must discuss all regional recalls with the agency before making any public statements regarding the scope. (*Id.* at 3.)

On May 15, 2002, CAS wrote to NHTSA criticizing the agency's regional recall policy, and arguing that when manufacturers conduct regional recalls, they often draw illogical distinctions between included and excluded states. (Ditlow Decl. Ex. 23 (Letter from CAS to NHTSA (May 15, 2002) ["CAS 2002 Letter"] ).) NHTSA responded, acknowledging that inconsistencies in the way regional recalls were administered prior to 1998 had prompted it, in its 1998 letter, to "clarify[ ] NHTSA's policy" with respect to regional recalls. (*Id.* Ex. 24 (Letter from NHTSA to CAS (Nov. 1, 2002) ["NHTSA 2002 Letter"] ) at **8 1.) NHTSA stated that "[u]nder that policy, in each instance in which a manufacturer proposes to conduct a regional recall," ODI "reviews the nature of the defect, the proposed scope of the recall, and the problem[s] experience [d]" to ensure that such a recall is appropriate under the particular circumstances. (*Id.* at 1–2.) After reiterating the policy set out in its 1998 letter, the agency explained that it did not violate the applicable statute or regulations, since a defect that creates problems only in the presence of certain weather conditions does not constitute a "defect that relates to motor vehicle safety," and thus, pursuant to the Safety Act, it would not necessitate a recall because such a defect would not "lead to failures or crashes." (*Id.* at 2.) NHTSA further noted that "if we subsequently become aware of a significant number of failures outside of the covered region, we can open a recall query investigation to consider whether to compel the manufacturer to broaden the geographic coverage of the recall." (*Id.* at 3.) Moreover, the agency responded that it did not violate the regulations' prohibition on disclaimers by sanctioning the practice of including in a national recall notice language describing the likely scope of short-term exposure defects. (*Id.*) It also noted that since 1997, the agency had conducted more than ten investigations to ensure that proposed regional recalls were appropriate, resulting in at least two expansions of proposed regional recalls. (*Id.*)

Plaintiffs now bring suit to invalidate NHTSA's regional recall policy. First, they argue that regional recalls contravene the statute and should be prohibited. In the alternative, they argue that even if regional recalls are permitted under the statute, the agency's 1998 letter amounts to a *de facto* legislative rule that must be subject to notice-and-comment rulemaking and should be set aside as arbitrary and capricious agency action. 5 U.S.C. §§ 706(2)(A) & (D). While defendant challenges each of

these arguments in its motion to dismiss, it also argues that plaintiffs lack standing to raise these claims. In particular, defendant argues that plaintiffs have failed to satisfy the constitutional and prudential standards for establishing their standing to raise their substantive and procedural claims. The Court will first turn to these standing arguments and then to defendant's grounds for dismissal.

## LEGAL ANALYSIS

### I. Standing

#### A. Constitutional Limits

[1] The question of standing involves both limitations placed on federal court jurisdiction by Article III of the United States Constitution and prudential limitations on its exercise. *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). To meet the constitutional requirements, a plaintiff must show that: (1) he has suffered an injury which is concrete and particularized, as well as actual or imminent rather than conjectural or hypothetical; (2) there is a causal connection between the alleged injury and conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Utility Air Regulatory Group v. EPA,* 320 F.3d 272, 277 (D.C.Cir.2003).[12]

**9 [2] Plaintiff's standing is based on the doctrine of associational standing recognized in *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).[13] The Supreme Court has articulated the requirements for associational standing as follows:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. To survive this challenge, plaintiffs "must show that at least one of its members meets the irreducible constitutional minimum of standing," *Nuclear Energy Inst., Inc. v. EPA,* 373 F.3d 1251, 1265 (D.C.Cir.2004) (internal citation and

quotation marks omitted), by showing that at least one member suffered an injury that was fairly traceable to NHTSA's 1998 letter and likely to be redressed by a judicial decision declaring regional recalls to be unlawful and enjoining their use.[14] Plaintiffs have met this test.

The declarations of members and leaders of plaintiffs' organizations demonstrate plaintiffs' injury. (*See* Pls.' Mot. Decl. of Mary Ann Morgan ["Morgan Decl."]; Pls.' Opp. Decl. of Grady Stone ["Stone Decl."].) For example, Mary Ann Morgan, a CAS member and original purchaser of a 1995 Ford Mercury Tracer, was excluded from a regional recall. (Morgan Decl. ¶¶ 2, 5.) The Tracer's cracked gas tank, which her vehicle experienced, was the subject of Ford's recall in certain hot-weather states, but because her car was registered in Missouri—a state excluded from Ford's list—she was not notified of the defect, despite living thirty miles from an included state, and she was left to pay the full cost of a remedy.[15] (*Id.* ¶¶ 3–7.) *Cf. Utility Air,* 320 F.3d at 277–78 (no standing where plaintiff failed to identify any instances in which any member was adversely affected by the agency action). Likewise, Grady Stone, a Public Citizen member who *10 owned a 1993 Ford Taurus was excluded from four recalls in 1997 and 1998 because he lived in Georgia, a state excluded from all four recalls. (Stone Decl. ¶¶ 4–5.) Because he "received no notice from Ford of any kind regarding these regional recalls" or any remedy (*id.* ¶ 5), he has also alleged a concrete injury.[16]

Defendant also contends that because plaintiffs' claims "hinge on the independent choices of the regulated third party"—the manufacturers—plaintiffs' injuries are not fairly traceable to NHTSA's actions and could not be redressed by the remedies they seek. (Def.'s Mot. to Dismiss ["Def.'s Mot."] at 16.) However, it is by no means impossible to establish causation and redressability where plaintiff's injury stems from government regulation of a third party. *See Lujan,* 504 U.S. at 562, 112 S.Ct. 2130; *Competitive Enter.,* 901 F.2d at 113 ("petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality" suffices "even in cases where the injury hinges" on conduct of regulated third parties). Causation "is satisfied by a demonstration that an administrative agency authorized the injurious conduct." *America's Cmty. Bankers v. FDIC,* 200 F.3d 822, 827 (D.C.Cir.2000); *see also Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426, 441 (D.C.Cir.1998) (harm was fairly traceable to regulation, which plaintiff alleged permitted third party conduct that would have been illegal absent the regulation). Here, even if defendant is correct in its assertion that NHTSA's role is not to "approve" regional recalls (Def.'s Mot. at 17), plaintiffs' injuries are

still fairly traceable to NHTSA's policy of allowing regional recalls since, had NHTSA disallowed regional recalls, nationwide recalls would surely have been the norm and plaintiffs' injuries stemming from the limited scope of regional recalls would not have resulted.

Moreover, the harm plaintiffs allege from regional recalls would surely be redressed if the Court were to grant plaintiffs' request to invalidate regional recalls and enjoin NHTSA from approving them in the future. Speculation that manufacturers would persist in conducting regional recalls in the face of such a ruling is insufficient to defeat standing. *Animal Legal Def. Fund,* 154 F.3d at 441 ("only by taking extraordinary measures—*i.e.,* violating the law ...—could third parties prevent redress" of petitioners' injuries) (internal citation and quotation marks omitted). In other words, causation and redressability are satisfied in this case because the manufacturers' regional recalls are not independent of NHTSA's policy. *Cf. Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,* 366 F.3d 930, 940–42 (D.C.Cir.2004) (schools' decisions to eliminate mens' sports programs were independent of agency's regulation governing funding for equal sports opportunities).[17]

### *11 B. Prudential Limits

[3] Defendant also contends that plaintiffs lack prudential standing because they fall outside the zone of interests protected by the Safety Act. The prudential requirements for standing are judicially imposed limits on the exercise of federal jurisdiction. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). This includes the "requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). A court must discern the interests arguably to be protected by the statutory provision and then determine if the plaintiffs' interests are among them. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *cf. Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 389, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (no prudential standing where plaintiff's interests are so "marginally related to ... the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit"). This test is "not demanding." *PDK Labs., Inc. v. DEA,* 362 F.3d 786, 791 (D.C.Cir.2004).

[4] Although "Congress's purposes in enacting the *overall* statutory scheme are relevant *only* insofar as they may help reveal its purpose in enacting the particular provision," *Grand Council of the Crees v. FERC,* 198

Center For Auto Safety, Inc. v. National Highway Traffic..., 342 F.Supp.2d 1 (2004)

F.3d 950, 956 (D.C.Cir.2000) (emphasis in original), the Safety Act's purpose of "reduc[ing] traffic accidents and deaths and injuries resulting from traffic accidents," 49 U.S.C. § 30101, certainly reveals Congress' reasons for enacting the statute's notice provisions. Defendant's argument that only those persons permitted to petition NHTSA to commence an investigative proceeding fall within the statute's zone of interests is unconvincing. (Def.'s Mot. at 20; Def.'s Reply at 14.) But even accepting defendant's argument, Congress allows "any interested person" to petition NHTSA to commence a defect investigation or to determine whether a manufacturer has reasonably met the statute's notice and remedy provisions. 49 U.S.C. §§ 30162(a), 30118(e), 30120(e). Thus, it is beyond dispute that the interests of plaintiffs' members who were allegedly deprived of notification of safety-related defects in their motor vehicles are within the statute's zone of interests. *Int'l Bhd. of Teamsters v. Pena,* 17 F.3d 1478, 1483 (D.C.Cir.1994) (interest of truck drivers' union in "highway safety is indisputably one that the [Commercial Motor Vehicle] Safety Act ... seek[s] to advance, and so the union plainly has [prudential] standing" to challenge an implementing rule as violative of the statute.)

**C. Procedural Standing**

[5] Defendant also alleges that plaintiffs lack standing to challenge NHTSA's failure to follow notice and comment procedures before issuing its 1998 letter. A *12 special standing doctrine applies when litigants attempt to vindicate procedural rights, such as the right to have notice of proposed regulatory action and to offer comments relating to such action. *Sugar Cane Growers Coop. of Florida v. Veneman,* 289 F.3d 89, 94–95 (D.C.Cir.2002). The Supreme Court has held that "where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs," they can establish standing "without meeting all the normal standards for redressability and immediacy." *Lujan,* 504 U.S. at 572 & n. 7, 112 S.Ct. 2130.

> In addition to a particularized injury (not just an abstract desire to see the government follow its own procedural rules), a plaintiff asserting a procedural violation must show a "causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."

*Iyengar v. Barnhart,* 233 F.Supp.2d 5, 13 (D.D.C.2002) (quoting *Fla. Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996)). In other words, "a party within the zone

of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority"—such as the APA's notice and comment requirements—"at least if the procedure is intended to enhance the quality of the substantive decision." *Teamsters,* 17 F.3d at 1484. Plaintiffs acknowledge that they "cannot assert with certainty that the notice-and-comment rulemaking process would have altered NHTSA's decision about whether to authorize automakers to conduct regional recalls," (Pls.' Opp. at 27), but that is not necessary. Because plaintiffs' interests fall within the zone of interests protected by the Safety Act, and because the opportunity to comment on NHTSA's regional recall policy is linked to their alleged injuries resulting from regional recalls, they have satisfied the necessary causation and injury requirements. The Court will now turn to the merits of defendant's motion to dismiss.

**II. Validity of Regional Recalls Under the Safety Act**
Plaintiffs argue that "NHTSA's practice of permitting manufacturers to conduct regional recalls violates the Safety Act." (Compl.¶ 28.) As an initial matter, defendant claims that NHTSA's policy is not reviewable since it would encroach on the agency's enforcement authority under the Safety Act, which is "presumptively unreviewable" by the courts under the doctrine enunciated in *Heckler v. Chaney,* 470 U.S. 821, 832, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). (Def.'s Opp. at 10–11; *see also* Def.'s Mot. at 29 (anything NHTSA does after receiving a 573 Report from a manufacturer is "subject to its considerable enforcement discretion which may not be the subject of judicial review").) Under *Heckler,* "an agency's decision not to prosecute or enforce, whether through civil or criminal process," is shielded from review under the APA because that is "a decision generally committed to an agency's absolute discretion." 470 U.S. at 831, 105 S.Ct. 1649. This argument must be rejected, since it is based on a misapprehension of plaintiffs' claim.

[6] In contrast to an agency's exercise of its enforcement discretion in a specific case, "an agency's adoption of a general enforcement policy is subject to review," *OSG Bulk Ships, Inc. v. United States,* 132 F.3d 808, 812 (D.C.Cir.1998), for such a policy is not the same as a "single-shot non-enforcement decision." *Crowley Caribbean Transp., Inc. v. Pena,* 37 F.3d 671, 676 (D.C.Cir.1994). Thus, an "agency's statement of a general enforcement policy *13 may be reviewable for legal sufficiency where the agency has ... articulated it in some form of universal policy statement." *Crowley,* 37 F.3d at 676.[18] Because plaintiffs' attack on NHTSA's regional recall policy is divorced from any specific regional recall

or factual scenario, *Heckler* does not preclude review. *Edison Elec. Inst. v. EPA,* 996 F.2d 326, 333 (D.C.Cir.1993) ("Clearly, [the agency's] interpretation has to do with the substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that *Heckler* shields from judicial review."); *see also OSG,* 132 F.3d at 812 (because the agency's action was not a "single-shot non-enforcement decision," general jurisdiction statutes afforded jurisdiction to review the agency's action).

Turning now to the merits of defendant's argument that plaintiffs' claim should be dismissed, the Court must consider whether the Safety Act precludes regional recalls. Because this question is presented in the abstract—that is, plaintiffs do not challenge a regional recall in the context of any particular set of facts—the Court must determine whether regional recalls constitute a *per se* violation of the statute.

"The first traditional tool of statutory construction focuses on the language of the statute." *Bell Atlantic Tel. Cos. v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997). Here, the Safety Act's recall procedures are triggered—and the entire recall procedure begins—when a "defect related to motor vehicle safety" is identified. 49 U.S.C. § 30118(a) & (b). The Safety Act defines these two critical terms. It defines "defect," in a circular manner, as "any defect in performance, construction, a component, or material of a motor vehicle or motor vehicle equipment." 49 U.S.C. § 30102(a)(2). And "motor vehicle safety" is "the performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle." § 30102(a)(8).

The statute is silent on the issue of whether recalls must be nationwide. It does, however, provide that the determination of whether a recall is required will be fact-specific, and thus, subject to the agency's expertise and judgment. § 30118(b)(1) (the "*Secretary may* make a final decision that a motor vehicle or replacement equipment contains a defect related to motor vehicle safety" only after giving the manufacturer and other interested parties an opportunity to provide input). As part of this fact-bound determination, the agency must consider a vehicle's "performance," which clearly implies that consideration must be given to the manner in which the vehicle is used. Thus, the D.C. Circuit found, considering both the statute's language and its legislative history, that a motor vehicle or component contains a " 'defect' if it is

subject to a *significant number of failures* in *normal operation,*" including those failures occurring during *14 "specified use" or resulting from predictable abuse, but not including those resulting from normal deterioration due to age and wear. *United States v. Gen. Motors,* 518 F.2d 420, 427 (1975) ("*Wheels* ") (emphasis added). Thus, usage is clearly relevant to a determination of whether a vehicle contains a safety-related defect, and "[i]t is possible that the same component may contain a defect in performance relating to motor vehicle safety in one class of vehicle *or use* but not in another." *Id.* at 439 n. 88 (emphasis added).[19]

[7] With this in mind, it becomes readily apparent that the statute does not outlaw regional recalls; rather, it envisions that the agency will exercise its discretion to determine whether a safety-related defect exists in a given scenario. To this end, it is logical to include a vehicle's locale of operation when considering its "use" and "normal operation." In other words, a motor vehicle may contain a safety-related defect when used in some states but not in others, and so if a vehicle experiences a significant number of failures in a specific climate, it is fair to conclude that the vehicle has a safety-related defect related to performance. Consider, for example, a "defect" that manifests itself after long-term exposure to snow. Such a "defect" is "related to motor vehicle safety" in cold weather states, but it is not so in hot-weather states, where it would not adversely affect "the performance of a motor vehicle" in a way that contributes to an "unreasonable risk of death or injury in an accident." § 30102(a)(8) (defining "motor vehicle safety"). Such an interpretation is plainly consistent with the Safety Act's purpose, which is to "reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101.[20]

Common sense dictates the same result. It would defy logic to find that the Safety Act, which strives to reduce traffic-related safety risks, would require a recall for *all* defects, even those that would not reasonably lead to a reduction in traffic accidents. The D.C. Circuit has agreed, finding that the statute's linkage of the terms "defect" and "motor vehicle safety" invites a "commonsense approach" to the meaning of "defect," and reflects an awareness that "costs must be considered in determining what safety measures are required by the Act." *Wheels,* 518 F.2d at 435–36 (citing *Hearings on Traffic Safety Before the Senate Commerce Comm.,* 89th Cong.2d Sess. 1 (1966) (opening remarks of Sen. Magnuson), and finding that the "motor vehicle safety" definition addressed "unreasonable risks" and thus, "signif[ied] a 'commonsense' balancing of safety benefits and economic *15 cost"). Recognizing that even though

Background Page 00757

"some margin of safety must be built-in," the Court concluded that "manufacturers are not required to design ... vehicles that never fail," and the cause of a "defect" must be considered in determining whether a recall is required. *Id.* at 436. A regional recall is consistent with this commonsense approach. It considers the usage of a vehicle and the cause of any "defect" in determining the appropriate scope of a recall.[21]

Plaintiffs counter by arguing that regional recalls involve not defects in "performance"—which may contemplate usage—but rather defects in "construction, components, or materials," and from this, they conclude that all defects necessitate national recalls because, regardless of where or how the vehicle is used, the car would be defective. (Pls.' Reply at 3–4 (citing *Clarke v. TRW, Inc.,* 921 F.Supp. 927, 933–34 (N.D.N.Y.1996)).) This argument is, however, unconvincing. Climate-related recalls are inherently performance-related, whereas component or construction defects manifest themselves regardless of weather conditions. Moreover, the case cited by plaintiffs does not support a conclusion that national recalls are statutorily required. In *Clarke,* the court found that while the determination that a vehicle contains a *performance-*related defect requires consideration of the number of actual vehicle failures, a defect in *construction* and *components* may not. *Id.* But the court went on to note the commonsense notion that determining whether any "defect" relates to "motor vehicle safety" requires a balancing of safety benefits and economic costs. *Id.* at 934 ("motor vehicle safety" contemplates protecting the public against an "unreasonable risk"). "An unreasonable risk, then, is a significant risk that can be remedied at a proportionate cost, and without a corresponding sacrifice of public safety." *Id.* (internal citation and quotation marks omitted). Although some safety risks clearly warrant nationwide recalls due to the nature of the risk, *see United States v. Gen. Motors Corp.,* 565 F.2d 754, 760 (D.C.Cir.1977) ( "*Carburetors* ") (requiring notification where faulty construction "will in the future cause at least some operators and passengers to be confronted with the clear dangers attending a sudden fire in the engine"), plaintiffs' contention that the identification of *any* faulty component or construction must trigger a nationwide recall is not material to the resolution of the pertinent question here: whether weather-related safety defects must be remedied nationwide.[22]

Likewise, plaintiffs' citation to the requirement that "each person" (regardless *16 of where he or she lives) who owns one of a class of vehicles subject to the recall is "entitled to notice" and a remedy does not assist in resolving the question before the Court. (Pls.' Reply at 2

(citing 49 U.S.C. § 30119(d)(1)(A).) Section 30119 sets out procedures directing that "[n]otification required under section 30118 ... about a motor vehicle *shall* be sent ... to each person registered ... as the owner," or barring that, to "the most recent purchaser." §§ 30119(d)(1)(A) & (B). Thus, section 30119 refers to section 30118 to determine under what circumstances a notice must be sent. Section 30118, in turn, mandates notice once a determination has been made that "the vehicle" contains a "defect related to motor vehicle safety." §§ 30118(b)(2)(A) (if the agency makes a final safety-related defect determination, the Secretary "shall order" notification) and (c) (if the manufacturer identifies the defect, it "shall notify" owners). Thus, the requirement for notice turns on whether "the vehicle" contains a safety-related defect, not on who owns the vehicle or where that person lives. Accordingly, even if the "each person" language in section 30119(d)(1)(A) invites no exceptions (Pls.' Opp. at 30)—an issue this Court need not resolve—plaintiffs' argument skirts the fundamental query of what triggers the notice requirement. Since the Court has already determined that weather conditions in a particular region may be considered in determining whether a vehicle contains a safety-related defect, plaintiffs' argument regarding notice must be rejected.

Accordingly, the Court concludes that regional recalls are not prohibited by statute. Rather, the Safety Act incorporates the notion that it is for the agency, in the exercise of its discretion and expertise, to determine, based on the specific facts presented, whether a safety-related defect exists in a vehicle.[23]

### III. Notice and Comment

The APA requires an agency to follow certain procedures—known as "notice and comment"—before promulgating a rule. 5 U.S.C. § 553(b).[24] Plaintiffs claim that NHTSA's 1998 letter to manufacturers violates this APA requirement because it "sets forth a de facto legislative rule." (Compl.¶ 32.) In response, defendant claims that the letter is a "policy statement" within the meaning of the APA,[25] *17 and as such, is exempt from the APA's notice and comment procedures. Thus, whether the 1998 letter should have been subjected to notice and comment procedures turns on whether the letter is a legislative rule or a general statement of policy.

In general, the case law reflects two related formulations for determining whether a challenged action is a rule or a general policy statement. The first "focuses on the effects of the agency action." *CropLife Am. v. EPA,* 329 F.3d 876, 883 (D.C.Cir.2003). It requires the Court to consider whether the agency action (1) "impose[s] any rights and

Background Page 00758

obligations," and (2) "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Cmty. Nutrition Inst. v. Young ("CNI"),* 818 F.2d 943, 946 (D.C.Cir.1987); *see also Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1046 (D.C.Cir.1987). The other line of analysis "focuses on the agency's expressed intentions." *CropLife,* 329 F.3d at 883. That is, it requires consideration of three factors: "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Molycorp, Inc. v. EPA,* 197 F.3d 543, 545 (D.C.Cir.1999). "[T]he ultimate focus of [this] inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, *i.e.,* that it has the force of law." *Id.* "The two tests overlap at step three of the *Molycorp* formulation— in which the court determines whether the agency action *binds private parties or the agency itself with the force of law.*" *Gen. Elec. v. EPA,* 290 F.3d 377, 383 (D.C.Cir.2002) (emphasis added).

[8] Although the demarcation between a binding rule and a general statement of policy may be "tenuous" or even "enshrouded in considerable smog," *CNI,* 818 F.2d at 946, NHTSA's 1998 letter easily falls on the "policy" side of the line. On its face, the 1998 letter leaves NHTSA free to exercise its discretion. The 1998 letter characterizes its contents as "*policy guidelines* with respect to … 'regional recalls.'" (NHTSA 1998 Letter at 1 (emphasis added).) Although "[t]he agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the force of law," *CropLife,* 329 F.3d at 883, that is not the case here. First, the letter does not suggest that regional recalls will be rubber-stamped. If a manufacturer files a Part 573 Report that includes a regional recall that the agency considers to be inadequate, NHTSA may investigate the matter. The language of the 1998 letter clearly preserves this discretion. Indeed, it warns manufacturers that "as a general matter, safety-related defects must be remedied on a nationwide basis, unless the manufacturer can justify a limited geographic scope." (NHTSA 1998 Letter at 1.) And, it informs manufacturers that they must "demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion in the area proposed for inclusion than in the rest of the United States," and that the "manufacturer's justification for such a proposal should be based on objective factors, and not merely on differences in complaint rates among the states." (*Id.* at 2.) Also, it "reiterate[s] that, as [the agency] noted in [its 1997] letter …, manufacturers must discuss all proposals to limit the geographic scope of any recall with ODI prior

to making any public statements regarding the scope." (NHTSA 1998 Letter at 3.)

Plaintiffs argue nonetheless that the letter's mandatory language makes it a binding rule rather than a general policy **\*18** statement. While the use of mandatory language suggests the "rigor of a rule, not the pliancy of a policy," *McLouth Steel Prods. Corp. v. Thomas,* 838 F.2d 1317, 1320–21 (D.C.Cir.1988); *see also CNI,* 818 F.2d at 946, the letter's use of these words cannot be read in isolation. *Guardian Fed. Savings & Loan Ass'n v. Fed. Savings & Loan Ins. Corp.,* 589 F.2d 658, 666 (D.C.Cir.1978) ("The form of a regulation is obviously not controlling; substance and effect will determine whether a rule is a 'general statement of policy.'"). When read in context, it is clear that these apparently mandatory word choices were not intended to bind the agency. For example, the letter states that "*if* the manufacturer is able to demonstrate that the relevant environmental factor (or factors) is significantly more likely to exist in the area proposed for inclusion than in the rest of the United States, NHTSA will approve a regional recall." (NHTSA 1998 Letter at 2 (emphasis added).)[26] Moreover, the letters' statements—that "the manufacturer *will be required*" to notify owners of vehicles registered in the relevant states, and "*will* only have to provide the free recall remedy to those vehicles"—only reiterate the statute's requirement that, once a safety-related defect is identified, the manufacturer must send a notice and provide a remedy to those affected vehicles. (*Id.* (emphasis added).) The letter does nothing to limit the agency's discretion to determine *whether* a safety-related defect exists. Where, as here, the agency's language is "replete with indications that the Secretary retained his discretion," it is a policy, not a binding rule. *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 538 (D.C.Cir.1986) (describing situations in which enforcement is "ordinarily appropriate," and providing criteria that "as a general rule" will apply to determine the operator's responsibility for independent contractors' actions).

NHTSA's 2002 letter confirms the agency's continued intent to maintain its discretion. Referring to its 1998 letter, NHTSA notes that "[u]nder that policy, in each instance in which a manufacturer proposes to conduct a regional recall, [ODI] reviews the nature of the defect, the proposed scope of the recall, and the problem[s] experience[d] to assure that such a recall is appropriate under the particular circumstances." (NHTSA 2002 Letter at 1–2.) The 2002 letter also indicates that "if we subsequently become aware of a significant number of failures outside of the covered region, we can open a recall query investigation to consider whether to compel

the manufacturer to broaden the geographic coverage of the recall." (*Id.* at 3.) Thus, far from "cabining" its discretion to enforce the Safety Act's notice requirements, *CNI,* 818 F.2d at 948, NHTSA's letters evince an intention to continue to evaluate each regional recall on a case-by-case basis and to exercise its authority to enforce the notice requirements when appropriate. *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n,* 506 F.2d 33, 39 (D.C.Cir.1974) ("When the agency states that in subsequent proceedings it will thoroughly consider not only the policy's applicability to the facts of a given case but also the underlying validity of the policy itself, then the agency intends to treat the order as a general statement of policy"); *cf. Gen. Elec.,* 290 F.3d at 384 (agency guidance **\*19** was a binding rule because it sent a clear message to the reader that it "will not be open to considering approaches other than those prescribed in the Document").[27]

Nor has it been the agency's practice to treat the 1998 letter as binding. "[A]n agency pronouncement will be considered binding as a practical matter if it ... is *applied* by the agency in a way that indicates it is binding." *Gen. Elec.,* 290 F.3d at 383 (emphasis added); *see also Guardian,* 589 F.2d at 666 ("When the agency applies the policy in a particular situation, it must be prepared to defend it, and cannot claim that the matter is foreclosed by the prior policy statement."); *cf. McLouth,* 838 F.2d at 1321 ("More critically than [the agency's] language ..., its later conduct applying it confirms its binding character."). Rather than applying the 1998 letter as a binding rule, NHTSA has in fact exercised its discretion to expand proposed regional recalls if it, in its discretion, concludes that a manufacturer's proposed scope is too limited. For example, in its 1998 letter, NHTSA notified Ford that four of its previous regional recalls addressed a single-exposure safety defect, and accordingly, the agency "urg[ed]" Ford to notify all owners nationwide. (Ford Letter at 5.) With respect to a fifth regional recall, NHTSA notified Ford that the scope must be expanded to include hot-weather U.S. territories. (*Id.*)[28] This was not an isolated instance. Similarly, General Motors initiated a corrosion-related regional recall in 2000 limited to fifteen states. (White Decl. Ex. 7.) However, upon "ODI's prompting, the recall was expanded to 20 states. (*Id.* ¶ 21 & Ex. 7.) And in 1999, Volkswagen proposed a regional recall. (White Decl. ¶ 20 & Ex. 6.) NHTSA reminded Volkswagen by letter that "NHTSA's policy is to require manufacturers to discuss the possibility of limiting a recall's geographic scope with the agency," and that "NHTSA will audit safety recalls with a limited geographic scope to ascertain the effectiveness of the recall." (White Decl. Ex. 6 (Letter of June 7, 1999 from NHTSA to Volkswagen at 1).) To this end, NHTSA

submitted an information request to Volkswagen. (*Id.*) After a meeting with NHTSA, Volkswagen agreed to expand the notification nationwide. (White Decl. Ex. 6 (ODI Resume at 2).)[29] The fact that NHTSA has enjoyed success in obtaining voluntary compliance through informal means does not mean that it has treated its policy as binding. Indeed, there is no evidence that NHTSA has *ordered* expansion of a regional recall under section 30118(b)(2) (pursuant to which the agency "shall order" a recall upon making a final determination that a safety-related defect exists). Instead, NHTSA's 1998 letter explained to manufacturers how it proposed to exercise its discretion in determining the propriety of future regional recalls, and in practice the agency has in fact applied this policy flexibly.

**\*20** It is thus evident that NHTSA has treated its 1998 letter as enforcement guidelines to advise agency personnel and manufacturers about how NHTSA intends to use its discretion with respect to regional recalls. This is exactly what was contemplated by the 1947 Attorney General's Manual on the APA when it explained that "general statements of policy," which are excepted from notice and comment procedures, include "statements issued by an agency to *advise the public prospectively* of the manner in which the agency *proposes to exercise a discretionary power.*" *United States Department of Justice Attorney General's Manual on the Administrative Procedure Act* § 4, at 30 n. 3, *available at* http://www.oalj.dol.gov/public/apa/refmc/ag03.htm (last visited Sept. 29, 2004) (emphasis added); *see also Am. Hosp. Ass'n,* 834 F.2d at 1046 (a general policy statement "allow[s] agencies to announce their tentative intentions for the future, without binding themselves") (internal citation and quotation marks omitted). Consistent with this approach, courts have uniformly construed enforcement guidelines as policy statements. For example, in *Guardian,* the plaintiff challenged the procedural validity of a rule issued without notice and comment. The rule used "directive language" in specifying the bank audit criteria that would satisfy a previously promulgated regulation, but it left the agency's Chief Examiner with discretion to accept any non-conforming audits, and he later exercised this discretion. 589 F.2d at 666–67. "The mandatory tone of the specifications for audits and auditors doubtless encourages compliance," but "an opportunity for an individualized determination [was] afforded." *Id.* at 667. Likewise, in *Brock,* the Supreme Court found that an "Enforcement Policy and Guidelines" document, which was to be "used by inspectors as guidance in making individual enforcement decisions" about whether to hold a mine operator responsible for an independent contractor's safety violations, established non-binding

norms and was not subject to notice and comment. 796 F.2d at 538. Despite stating that operators were responsible for "assuring compliance" by independent contractors, the document, when taken as a whole, "announced [the agency's] tentative intentions for the future," leaving the agency "free to exercise [its] informed discretion in individual enforcement actions." *Id.; see also Pac. Gas & Elec.*, 506 F.2d at 45 (a Federal Power Commission order setting forth its view of the proper priority schedule for supplying natural gas to certain customers in the hypothetical event of a shortage was a policy statement); *Molycorp*, 197 F.3d at 546 (non-binding statements of the agency's view of particular activities are best described as a policy statement).

The D.C. Circuit has recognized the practical wisdom and "not inconsiderable benefits" inherent in policy statements that "appris[e] the regulated community of the agency's intentions as well as inform[ ] the exercise of discretion by agents and officers in the field." *CNI*, 818 F.2d at 949. The advance-notice function of policy statements "yields significant informational benefits, because policy statements give the public a chance to contemplate an agency's views before those views are applied to particular factual circumstances," and it "facilitates long range planning within the regulated industry and promotes uniformity." *Panhandle E. Pipe Line Co. v. FERC*, 198 F.3d 266, 269 (D.C.Cir.1999). The NHTSA letter did just that. It provided guidance to the manufacturers and ODI as to how NHTSA intended to encourage uniformity and statutory compliance with respect to regional recalls. The intent was not to increase the use of such recalls, but rather to establish **\*21** the minimum requirements that must be met before a regional recall could be considered as permissible under the statute and not potentially subject to an enforcement action. But by issuing this guidance, NHTSA did not surrender its discretion to assess each regional recall on an individualized basis. It simply regularized its previously ad hoc practice and thereby gave manufacturers the opportunity to anticipate the agency's actions so as to facilitate planning on their part and to promote uniformity and efficiency on the agency's part.

In contrast, in *General Electric*, guidance was found to be binding because the agency "d[id] not contend that in practice it has not treated the Guidance Document as binding." 290 F.3d at 385. There, a statute prohibited the production of a certain chemical unless the process posed no unreasonable health risk. An EPA regulation identified generic methods for testing risk, but it allowed parties to apply to use an alternate method. A guidance document then described two acceptable methods, which the agency had treated as binding in practice. *Id.* at 383, 385. Thus, if

a company produced this product, it was in effect required to use one of the two agency testing methods. *Id.* at 385. As found by the Court, because the guidance document purported to bind applicants and the agency, and it was treated by the agency as binding, it had the force of law. *Id.* at 385. That is not the situation here. Not only has NHTSA treated its policy as non-binding, but also, rather than imposing a mandate on the regulated party (as the EPA did in *General Electric* ), the NHTSA letter simply provides its views on how it intends to analyze regional recalls.

Plaintiffs disagree. They argue that NHTSA's identification of twenty states and the District of Columbia as necessary inclusions for corrosion-related regional recalls is akin to a binding norm, for a manufacturer that notifies vehicle owners in those states of a corrosion-related safety defect "would likely be immune to many of the enforcement tools in NHTSA's arsenal." (Pls.' Opp. at 37–38.) The letter, however, states that "[w]e have reviewed several factors, ... and have determined that, *at a minimum,* vehicles originally sold in or currently registered in the following states must be included in any regional recall related to corrosion caused by road salt." (NHTSA 1998 Letter at 2–3 (emphasis added).) Although plaintiffs cite evidence showing that NHTSA has persuaded manufacturers to conduct corrosion-related recalls in all twenty delineated states (Pls.' Reply at 10–11 (citing General Motors Recall); *see also* note 29, *supra,* and White Decl. Exs. 6 & 7), this does not demonstrate that NHTSA fails to exercise its discretion in each recall to determine if a defect is safety-related if the vehicle is exposed to salt conditions, and certainly, since the letter only establishes the minimum number of states, the agency can always require, as it has in fact done, more. *Cf. Molycorp,* 197 F.3d at 546 (counsel's reference to a document's "advisory role" in enforcement proceedings did not mean that the "document itself would be given any weight at all in enforcement proceedings").[30]

**\*22** Plaintiffs also argue that a statement in NHTSA's 1998 letter significantly alters the previously-adopted regulation prohibiting "disclaimers" in notice letters, thus necessitating notice and comment. (Pls.' Mot. at 36–37; Pls.' Reply at 12–13.) This argument is unpersuasive. "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. Dist. of Columbia Arena,* 117 F.3d 579, 586 (D.C.Cir.1997). Defendant's regulations provide that, when notice is required due to a safety-related defect, the notice shall not,

Center For Auto Safety, Inc. v. National Highway Traffic..., 342 F.Supp.2d 1 (2004)

except [as otherwise provided in the regulations,] contain any statement or implication that there is no defect, that the defect does not relate to motor vehicle safety, or that the defect is not present in the owner's or lessee's vehicle or item of replacement equipment.

49 C.F.R. § 577.8(a) (emphasis added).

Plaintiffs argue that the 1998 letter significantly changes this requirement. The letter recognizes that the "likelihood of experiencing a safety problem" as the result of a short-term exposure safety defect "is relatively low in certain regions of the country," and thus, "notwithstanding 49 C.F.R. § 577.8," manufacturers may "include language in the letters to owners of vehicles in 'low-risk' states" indicating that the "defect is unlikely to cause a safety problem if the vehicle is not exposed to the meteorological condition at issue." (1998 Letter at 1–2.) In its 2002 letter, NHTSA clarified that such a notice could include language "that describes the likely scope of the defect" (NHTSA 2002 Letter at 3), and that this was consistent with the regulations allowing a manufacturer that voluntarily initiates a recall and "determines that the defect ... *may not exist in each such vehicle*" to "include an additional statement to that effect." 49 C.F.R. § 577.5(d) (emphasis added). In other words, because a given "defect" may be weather-related, it "may not exist in each" vehicle, particularly those registered in a state that does not frequently experience the relevant weather condition. This is a reasonable reading of the two regulations, and thus, the 1998 letter did not constitute a regulatory change that would have required notice and comment.

In sum, because the policy embodied in NHTSA's 1998 letter was "neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications," *Panhandle,* 198 F.3d at 269 (internal citation and quotation marks omitted), it was not subject to notice and comment procedures.

**IV. Arbitrary and Capricious**

Finally, plaintiffs claim that "NHTSA's rule setting forth the circumstances under which regional recalls will be permitted ... is arbitrary, capricious, and an abuse of discretion" in violation of the APA, 5 U.S.C. § 706(2)(A). (Compl. ¶ 30.) Under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." § 704. Thus, the Court must initially determine whether NHTSA's 1998 letter constitutes a "final agency action." A "final agency action" *23 is one (1) that is final, that is, it "mark[s] the

consummation of the agency's decisionmaking process," and (2) from which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett,* 520 U.S. at 177–78, 117 S.Ct. 1154 (internal citation and quotation marks omitted); *Indep. Equip. Dealers Ass'n v. EPA,* 372 F.3d 420, 426 (D.C.Cir.2004) ("*IEDA* "); *see also Alaska Dept. of Envtl. Conservation v. EPA,* 540 U.S. 461, 124 S.Ct. 983, 998–99, 157 L.Ed.2d 967 (2004).

When considering whether letters issued by an agency constitute final agency actions, the D.C. Circuit has recently emphasized that—much like the determination of whether agency action constitutes a rule or a policy—the question hinges on whether the agency's statement was binding. For example, in *General Motors Corp. v. EPA,* 363 F.3d 442, 447 (D.C.Cir.2004), GM sought review of EPA letters to automobile manufacturers in which the agency interpreted the relevant statute's definition of "solid waste" to include certain automobile paint solvents, thus exposing these solvents to stringent disposal standards under EPA's regulations. Rather than representing the culmination of the EPA's position on the issue, the letters restated a previously settled position, and no legal consequences flowed from them, for they compelled no one to do anything. *Id.* at 450–51. The letters, which were "merely preliminary enforcement statements made as part of an informal agency-industry dialogue and, of themselves, finally determine no rights or obligations of involved parties," did not constitute a final agency action. *Id.* at 453. Likewise, in *IEDA,* the EPA responded to the petitioner's inquiry about whether destination-specific labeling of imported engines violated EPA emissions certification requirements. 372 F.3d at 424–25. EPA conceded that the letter was final, but it contended that its letter had no legal consequences. *Id.* at 426–27. In evaluating the letter, the Circuit framed its inquiry as whether the letter setting out the agency's interpretation "constitutes reviewable agency action." *Id.* at 427. The answer was "obvious" upon an examination of the letter's "concrete impact ... in short, none whatsoever." *Id.* The letter merely restated EPA's longstanding interpretation, which had been set out in previous industry guidance and letters, and it was "purely informational in nature," imposing "no obligations and den[ying] no relief." *Id.* "Compelling no one to do anything, the letter had no binding effect whatsoever—not on the agency and not on the regulated community." *Id.* It was merely a "workaday advice letter." *Id.*

[9] From these decisions, it is apparent that whether NHTSA's letter amounts to final agency action depends on whether it is binding—does it impose obligations or fix legal consequences, and does it state a new policy

Background Page 00762

rather than restate a longstanding agency interpretation? According to plaintiffs, NHTSA's letter is analogous to the guidance document in *Appalachian Power Co. v. EPA,* 208 F.3d 1015, 1022–23 (D.C.Cir.2000), which determined obligations and had legal consequences for the regulated party. There, the EPA issued a guidance document requiring states to conduct periodic monitoring of certain pollution sources for which they issued operating permits. *Id.* at 1019–20. The guidance represented "the agency's settled position, a position it plan [ned] to follow in reviewing State-issued permits, a position it [insisted] State and local authorities comply with ..., [and] a position EPA officials in the field [were] bound to apply." *Id.* at 1022. The "entire Guidance ... read[ ] like a ukase. It command[ed], it require[ed], it order[ed], it dictate [d]," and through the document EPA gave states their "marching **\*24** orders," which all but two obeyed. *Id.* at 1023. Here, as this Court has already determined, unlike EPA's guidance in *Appalachian Power,* NHTSA's letters are not binding. Like the *General Motors* and *IEDA* letters, NHTSA's 1998 letter left it free to exercise its discretion in enforcing regional recalls, neither requiring nor ordering the manufacturers to do anything. The letter reflects non-binding prospective enforcement policies designed to inform the industry and agency personnel regarding how the agency intends to exercise its enforcement discretion. *Cf. Pennsylvania Mun. Auth. Ass'n v. Horinko,* 292 F.Supp.2d 95, 104–06 (D.D.C.2003) (decision regarding issuance of a specific permit *was* binding, but guidance issued by EPA regional authorities was *not* binding "until something more happens").

Contrary to plaintiffs' argument, NHTSA's 1998 letter does not represent a new regulatory scheme. Regional recalls date back to the 1980s and at least as early as 1997, the agency informed the industry of its intent to encourage uniformity and effectiveness in regional recalls. (NHTSA 1997 Letter at 1.) Previously there had been no guidance regarding regional recalls, and they had occurred on an ad hoc basis for over a decade. For example, prior to 1998, Ford had conducted a regional recall of Aerostars in thirteen states, while corrosion-related recalls from Chrysler, GM, and Nissan included fifteen, fourteen, and nineteen states, respectively. (White Decl. ¶¶ 18, 19; Ditlow Decl. Ex. 3 at 12, 19.) The 1998 letter reiterated that recalls should be conducted on a nationwide basis except where a manufacturer could justify a more limited scope. (NHTSA 1998 Letter at 1; *see also* NHTSA 1997 Letter at 1.) It also sought to encourage a coherent approach to regional recalls by establishing a floor (*not* a ceiling) for the number of states

to be included in recalls relating to corrosion due to road salt, limiting the use of regional recalls in the case of short-term or single exposure, and establishing limits on the previously unrestrained use of regional recalls. (NHTSA 1998 Letter at 2–3.)

Because NHTSA's letter simply reiterated a previously stated agency policy of allowing regional recalls and because it imposed no binding obligations, it does not constitute final agency action. As such, it is not reviewable under the APA's abuse of discretion standard. 5 U.S.C. §§ 704, 706(2)(A). Thus, plaintiffs' claim that the policy is arbitrary and capricious must fail.

## CONCLUSION

For the reasons stated above, the Court finds that regional recalls do not violate the Safety Act, and that NHTSA's 1998 letter constituted a non-binding policy statement rather than a final agency action. As such, it was not subject to the APA's notice and comment procedures, nor was it amenable to review by this Court to determine whether it is arbitrary and capricious.

Accordingly, defendant's motion to dismiss will be granted and plaintiffs' motion for summary judgment will be dismissed. A separate Order accompanies this Memorandum Opinion.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendant's motion to dismiss is **GRANTED;** and it is

**FURTHER ORDERED** that plaintiffs' motion for summary judgment is **DENIED;** and it is

**FURTHER ORDERED** that this case is dismissed with prejudice.

**SO ORDERED.**

Footnotes

Center For Auto Safety, Inc. v. National Highway Traffic..., 342 F.Supp.2d 1 (2004)

1   In turn, the Secretary of Transportation has delegated most of the functions that are at issue in this action to the Administrator of NHTSA. 49 C.F.R. § 1.50.

2   The Safety Act defines "defect" as "any defect in performance, construction, or material of a motor vehicle or motor vehicle equipment." 49 U.S.C. § 30102(a)(2).

3   "Motor vehicle safety" means "performance of a motor vehicle or motor vehicle equipment in a way that protects the public against unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle, and against unreasonable risk of death or injury in an accident, and includes nonoperational safety of a motor vehicle." 49 U.S.C. § 30102(a)(8).

4   This process is initiated by the manufacturer with the filing of a "573 Report" to NHTSA. 49 C.F.R. § 573.6. The report is named for the section of the regulation that governs it, and it must provide, *inter alia*, the manufacturer's name, identification of the vehicles (*e.g.*, make, line, model, and year) containing the defect, the number of vehicles affected, and descriptions of the defect, the events leading to the manufacturer's conclusion that the defect was safety-related, and the plan for remedying the defect. *Id.*

5   Moreover, regulations implementing the Safety Act mandate particular words and typefaces to be used in the notice. 49 C.F.R. § 577.5(a).

6   Notification about replacement equipment or tires must be sent to the most recent purchaser, or under certain circumstances, public notice may be required. §§ 30119(d)(2) & (3).

7   If a petition is denied, notice must be published in the Federal Register. 49 U.S.C. § 30162(d); 49 U.S.C. § 557.6(c).

8   In their papers, the parties refer to thirty-nine total regional recalls, but in a supplemental declaration, Mr. Ditlow cited forty regional recalls since 1992, which includes Ford's recent July 2004 regional recall. (Second Ditlow Decl. ¶ 2.)

9   NHTSA mailed slightly different versions of the letter to various manufacturers. (*Compare* NHTSA 1998 Letter (the form letter) *with* the Ford Letter and Ditlow Decl. Ex. 12 (1998 Letter from NHTSA to Chrysler ["Chrysler Letter"] ).)

10  An example of the latter category is "a recall for a defect related to corrosion caused by road salt, but it also includes defects related to long-term exposure to temperature extremes or other environmental factors." (NHTSA 1998 Letter at 1.)

11  Prior to 1998, manufacturers had conducted corrosion-related regional recalls that included far fewer states. For example, in 1993 General Motors ("GM") recalled Chevrolet Caprice cars in fourteen states to correct a corrosion-related defect. (Ditlow Decl. Ex. 3 at 12.) And in 1998, prior to NHTSA's letter, Chrysler initiated a corrosion-related recall that covered only fifteen states and the District of Columbia. (Def.'s Opp. Decl. of Jonathan White ["White Decl."] ¶ 19 & Ex. 5.)

12  *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C.Cir.1996) ("For each claim, if constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim.").

13  Defendant refers to this doctrine as "representative standing" (*see, e.g.*, Def.s' Mot. at 12); but following the Supreme Court's holding in *Hunt*, this Court will refer to it as "associational standing." 432 U.S. at 343, 97 S.Ct. 2434.

14  "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal ...." *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C.Cir.1990) (the Court's "standing determination must not be confused with our assessment of whether the party could succeed on the merits").

15  Defendant's quibbles with the timing of plaintiffs' injuries are simply inapposite. Defendant contends that Ms. Morgan could not possibly have suffered an injury due to NHTSA's 1998 letter since Ford's recall was initiated in 1997. (Def.'s Reply in Support of Mot. to Dismiss ["Def.'s Reply"] at 8.) This argument misses the mark. First, NHTSA's 1998 letter to Ford specifically addresses the 1995 Mercury Tracer recall of which Ms. Morgan complains, concluding that Ford's designated region was underinclusive, and requiring certain hot-weather U.S. territories—but not Ms. Morgan's home state of Missouri—to be covered by the recall, and thus, her injury could be said to flow from that letter. (Ford Letter at 3, 5 (acquiescing in Ford's recall criteria, but requiring inclusion of U.S. territories meeting that criteria).) But more importantly, although plaintiffs challenge NHTSA's 1998 letter embodying its regional recall policy, their broader attack is on the policy itself (Compl.¶ 32), and thus, the particular date of the recall that Ms. Morgan protests is irrelevant. She has alleged that she was injured by a regional recall, and that is enough.

16  Defendant's argument that the Safety Act no longer applied to Mr. Stone's vehicle at the time plaintiffs filed their complaint lacks merit, as the statute only excludes a remedy for a purchaser who bought a vehicle "more than 10 calendar years ... before" the

Center For Auto Safety, Inc. v. National Highway Traffic..., 342 F.Supp.2d 1 (2004)

manufacturer gave notice of the defect. 49 U.S.C. § 30120(g). Since the recalls took place in 1997 and 1998, the ten-year limit did not exclude Mr. Stone, who purchased his Taurus in 1992. (Stone Decl. ¶ 2).

17    Defendant also challenges plaintiffs' standing by characterizing their claims as a "broad programmatic attack," which the Supreme Court recently rejected as a grounds for finding standing in *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). (Def.'s Mot. at 9–10.) This argument completely misconstrues plaintiffs' complaint. In *Southern Utah,* the plaintiffs alleged that the Bureau of Land Management failed to act to protect public land from off-road vehicle use in contravention of its statutory mandate to manage the land in a manner suitable to preservation as a wilderness. 124 S.Ct. at 2377–78. Plaintiffs sought, under the APA, to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Court disagreed, finding that such a claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" 124 S.Ct. at 2379 (emphasis in original). Here, plaintiffs seek not to *compel* any agency action specifically demanded by law, for they do not launch a programmatic attack on NHTSA's administration of the statute; rather, they challenge NHTSA's specific and concrete policy that permits certain regional recalls. (Compl. ¶ 32 asking the Court to declare unlawful the practice of recalls and to enjoin NHTSA from approving future recalls).)

18    As explained in *Crowley:*

> By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as [*Heckler v. Chaney* ] recognizes, peculiarly within the agency's expertise and discretion.
>
> *Id.* at 677.

19    In *Wheels,* the Circuit considered whether GM had complied with the statute's notice requirements when it failed to notify truck owners after learning that a large number of wheel failures had occurred. 518 F.2d at 426. Determining that there were unresolved issues of fact regarding whether the failures were due to gross abuse, the Circuit remanded the case for trial. *Id.* at 446–47.

20    The Court notes that the legislative history proffered by plaintiffs does not yield a different result. Plaintiffs first argue that because the statute's drafters intended to impose a "rigorous, mandatory procedure on manufacturers of defective vehicles," and later amendments made "safety recalls more inclusive," it must follow that regional recalls are impermissible. (Pls.' Mot. at 19.) While it is true that the Senate Report cited by plaintiffs evidences an intent to impose stringent notice standards, it does not indicate that nationwide recalls are required to meet this goal. *See* S.Rep. No. 89–1301, *reprinted in* 1966 U.S.C.C.A.N. 2709, 2712. Likewise, later amendments extending the free remedy to ten years (49 U.S.C. § 30120(g)(1)) and requiring reimbursement for repairs made prior to the recall (49 U.S.C. § 30120(d)) are simply irrelevant to the issue of whether recalls may be conducted on a regional basis.

21    Plaintiffs seem to argue that because vehicles registered in an excluded state may sometimes be driven into an included state, regional recalls are impermissible because this is within the vehicle's expected range of operation. (Reply in Support of Pls.' Mot. ["Pls.' Reply"] at 3 (citing *Wheels,* 518 F.2d at 439).) But manufacturers need not ensure that no vehicle ever fails; rather, they must protect against a significant number of failures in normal operation. *Wheels,* 518 F.2d at 436. This must be determined on a case-by-case basis. Thus, even if some failures of vehicles in border states are due to the weather conditions, it cannot be said that this necessitates nationwide recalls in *all* instances. Moreover, if a significant numbers of vehicles in "border states" fail due to exposure to the weather conditions, the regional recall can be expanded. (NHTSA 2002 Letter at 3.)

22    Plaintiffs also point out that all regional recalls thus far have been manufacturer-initiated. In plaintiffs' view, this amounts to an admission by the manufacturer "that the vehicles are defective and subject to the recall provisions." (Pls.' Mot. at 16.) However, plaintiffs read the last five words out of the operative phrase—a manufacturer need only notify consumers of a "defect *related to motor vehicle safety.*" 49 U.S.C. § 30118(a)-(c) (emphasis added).

23    Plaintiffs also contend that NHTSA exceeded its statutory authority by adopting the regional recall policy embodied in the 1998 letter. They argue that an agency "does not have the power to adopt a policy that directly conflicts with its governing statute." (Pls.' Opp. at 32 (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc..* 497 U.S. 116, 134–35, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990)).) Because the Court has determined that regional recalls do not contravene the Safety Act, this argument must also fail.

24    The APA's notice and comment requirements are found in 5 U.S.C. § 553(b):

> General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
> > (1) a statement of the time, place, and nature of public rule making proceedings;
> > (2) reference to the legal authority under which the rule is proposed; and
> > (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
> *Id.*

Center For Auto Safety, Inc. v. National Highway Traffic..., 342 F.Supp.2d 1 (2004)

25   The exceptions to the APA's notice and comment requirements are also found in 5 U.S.C. § 553(b):
          Except when notice or hearing is required by statute, this subsection does not apply—
             (A) to interpretative rules, *general statements of policy,* or rules of agency organization, procedure, or practice ....
       *Id.* (emphasis added).

26   Contrary to plaintiffs' argument, this statement cannot be read to mean that the agency has ceded its discretion. Quite the opposite.
       The agency, consistent with the statute, is telegraphing the need for the manufacturer to justify, "based on objective factors," its
       exemption from the general rule that "safety-related defects must be remedied on a nationwide basis," and only if this is done to
       the agency's satisfaction, will it permit a regional recall. (*Id.* at 1–2.)

27   Moreover, the agency did not publish its policy in the Federal Register, further evincing its intent that the policy was *not* meant to
       be a binding rule. *Brock,* 796 F.2d at 538 (failure to publish in the Federal Register indicates that "the statement in question was
       *not* meant to be a regulation") (emphasis in original).

28   NHTSA notified Ford that if it did not comply with its suggestions and expand the specified recalls, NHTSA "*may* " commence a
       hearing under 49 U.S.C. §§ 30118(e) or 30120(e) to determine whether Ford reasonably complied with the Safety Act's notice and
       remedy requirements. (Ford Letter at 5.)

29   Other proposed recalls have been expanded to include NHTSA's delineated states. For example, in 1998 Ford expanded a 1993
       recall to include the delineated states. (White Decl. ¶ 16.) And in 2002 and 2004, Ford also conducted recalls that included at least
       the delineated states. (Def.'s Reply Decl. of Kathleen C. DeMeter ¶¶ 3–4.)

30   Indeed, it appears that NHTSA has not always applied the salt-belt requirement to all corrosion-related recalls. Prior to NHTSA's
       1998 letter, Chrysler initiated a recall and proposed to limit it to fifteen states plus the District of Columbia, and in 1999, it
       expanded the recall to include more makes and models. (White Decl. ¶ 19 & Ex. 5.) In December 1999, NHTSA asked Chrysler to
       include five additional states in the 1999 recall, but Chrysler refused, explaining that of the 102 complaints it had received
       regarding the make and model subject to the recall, only five originated outside the fifteen states it identified. (White Decl. Ex. 5
       (Letters of Dec. 23, 1999 and May 10, 2000 from Chrysler to NHTSA).) Plaintiffs argue that NHTSA would not have been able to
       retroactively apply its policy to Chrysler's recall, which was first initiated prior to NHTSA's issuance of its letter. (Pls.' Reply at
       11 n. 5.) But even if this argument were credited, the fact that Chrysler initially challenged the twenty-state requirement reflects the
       manufacturers' view that the policy was not set in stone.

---

**End of Document**                                        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Background Page 00766

Westlaw.

70 S.Ct. 870                                                                    Page 1
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
(Cite as: 339 U.S. 594, 70 S.Ct. 870)

▷

Supreme Court of the United States
EWING, Federal Security Administrator, et al.
v.
MYTINGER & CASSELBERRY, Inc.

No. 568.
Argued April 19-20, 1950.
Decided May 29, 1950.
Rehearing Denied Oct. 16, 1950.

See 71 S.Ct. 69.

Action by Mytinger & Casselberry, Inc., a California corporation, against Oscar R. Ewing, Federal Security Administrator, and others, for an injunction to restrain enforcement of section 304(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. s 334(a), for alleged repugnance to the due process clause of the Fifth Amendment. From a judgment of the District Court for the District of Columbia, sitting as a three-judge court, Per Curiam, 87 F.Supp. 650, in favor of plaintiff, the defendants appealed. The Supreme Court, Mr. Justice Douglas, held that the challenged statute, which permits multiple seizures of misbranded articles on a finding of probable cause by Administrator, without hearing, is not unconstitutional under the due process clause.

Reversed.

Mr. Justice Jackson and Mr. Justice Frankfurter dissented.

West Headnotes

[1] Constitutional Law 92 ⬿4027

92 Constitutional Law
    92XXVII Due Process
        92XXVII(F) Administrative Agencies and Proceedings in General
            92k4027 k. Hearings and Adjudications. Most Cited Cases
            (Formerly 92k318(1), 92k318)

Where a preliminary decision by an agency is a step in an administrative proceeding, no hearing at preliminary stage is required by due process, as long as requisite hearing is held before final administrative order becomes effective. U.S.C.A.Const. Amend. 5.

[2] Constitutional Law 92 ⬿3912

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
            92k3912 k. Duration and Timing of Deprivation; Pre- or Post-Deprivation Remedies. Most Cited Cases
            (Formerly 92k318(7), 92k318)

Due process does not require that judicial inquiry be made before discretion of an official can be exercised, and it is sufficient, where only property rights are concerned, that there is at some stage an opportunity for hearing and a judicial determination.

[3] Food 178 ⬿1.1

178 Food
    178k1 Power to Make Regulations
        178k1.1 k. In General. Most Cited Cases
        (Formerly 178k1, 92k303)

Provision of Federal Food, Drug, and Cosmetic Act permitting multiple seizures of misbranded articles when Administrator has probable cause to believe from facts found, without hearing, that misbranded article would be in a material respect misleading to injury or damage of purchaser is not unconstitutional under due process clause of Fifth Amendment, in view of fact that administrative finding of probable cause is merely statutory prerequisite to bringing of law suit in which owner has opportunity to appear as claimant and have full hearing before the court. Federal Food, Drug, and Cosmetic Act, § 304(a, b), as amended, 21 U.S.C.A. § 334(a, b); U.S.C.A. Const.Amend. 5.

[4] Administrative Law and Procedure 15A

70 S.Ct. 870
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
**(Cite as: 339 U.S. 594, 70 S.Ct. 870)**

Page 2

☞657.1

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(A) In General
         15Ak657 Nature and Form of Remedy
           15Ak657.1 k. In General. Most Cited Cases
      (Formerly 15Ak657)

**Administrative Law and Procedure 15A ☞661**

15A Administrative Law and Procedure
   15AV Judicial Review of Administrative Decisions
      15AV(A) In General
         15Ak657 Nature and Form of Remedy
           15Ak661 k. Suit to Enjoin or Set Aside. Most Cited Cases

**Federal Courts 170B ☞178.5**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(B) Cases Arising Under the Constitution
         170Bk178 Particular Cases and Questions, Due Process or Equal Protection
           170Bk178.5 k. In General. Most Cited Cases
      (Formerly 170Bk178, 106k282.2(3))

**Food 178 ☞24(2.1)**

178 Food
   178k24 Searches, Seizures, and Forfeitures
      178k24(2) Condemnation or Forfeiture Proceedings
         178k24(2.1) k. In General. Most Cited Cases
      (Formerly 178k24(2), 178k24)

Under provision of Federal Food, Drug, and Cosmetic Act permitting multiple seizures of misbranded articles, on a finding of probable cause by the Administrator, administrative determination of probable cause is not subject to judicial review, other than in libel suit which is thereafter brought in discretion of Attorney General, and is not subject to review

by district court in action by owner for injunction to restrain enforcement of Act for alleged repugnance to due process clause of Fifth Amendment. Federal Food, Drug, and Cosmetic Act, § 304(a, b), as amended, 21 U.S.C.A. § 334(a, b); U.S.C.A. Const.Amend. 5.

**[5] Food 178 ☞24(1)**

178 Food
   178k24 Searches, Seizures, and Forfeitures
      178k24(1) k. In General. Most Cited Cases
      (Formerly 178k24)

Purpose of provision in the Federal Food, Drug, and Cosmetic Act permitting multiple seizures of misbranded articles on a finding of probable cause by Administrator, is to arrest distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. Federal Food, Drug, and Cosmetic Act, § 304(a), as amended, 21 U.S.C.A. § 334(a).

**\*\*870 \*595 Mr. Robert L. Stern, Washington, D.C., for appellants.**

Mr. Charles S. Rhyne, Washington, D.C., for appellee.

**\*\*871 Mr. Justice DOUGLAS delivered the opinion of the Court.**

This is an appeal[FN1] from a three-judge District Court specially constituted on appellee's application for an injunction to restrain enforcement of a portion of an Act of Congress for repugnance to the Due Process Clause of the Fifth Amendment.[FN2]

   FN1. 62 Stat. 928, 961, 28 U.S.C. ss 1253, 2101, 28 U.S.C.A. ss 1253, 2101.

   FN2. 62 Stat. 968, 28 U.S.C. ss 2282, 2284, 28 U.S.C.A. ss 2282, 2284.

Section 304(a) of the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1044, 21 U.S.C. s 334(a), as amended, 62 Stat. 582, 21 U.S.C.Supp. III s 334(a), 21 U.S.C.A. s 334(a), permits multiple seizures of misbranded articles 'when the Administrator has probable cause to believe from facts found, without

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

70 S.Ct. 870
Page 3
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
**(Cite as: 339 U.S. 594, 70 S.Ct. 870)**

hearing, by him or any officer or employee of the Agency that the misbranded article is dangerous to health, or that the labeling of the misbranded article is fraudulent, or would be in a material respect misleading *596 to the injury or damage of the purchaser or consumer.'[FN3]

> FN3. The provision of which the quoted portion is a part reads as follows:

> 'Any article of food, drug, device, or cosmetic that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of section 404 or 505, be introduced into interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States within the jurisdiction of which the article is found: Provided, however, That no libel for condemnation shall be instituted under this Act, for any alleged misbranding if there is pending in any court a libel for condemnation proceeding under this Act based upon the same alleged misbranding, and not more than one such proceeding shall be instituted if no such proceeding is so pending, except that such limitation shall not apply (1) when such misbranding has been the basis of a prior judgment in favor of the United States, in a criminal, injunction, or libel for condemnation proceeding under this Act, or (2) when the Administrator has probable cause to believe from facts found, without hearing, by him or any officer or employee of the Agency that the misbranded article is dangerous to health, or that the labeling of the misbranded article is fraudulent, or would be in a material respect misleading to the injury or damage of the purchaser or consumer.'

Appellee is the exclusive national distributor of Nutrilite Food Supplement, an encapsulated concentrate of alfalfa, water cress, parsley, and synthetic vitamins combined in a package with mineral tablets. There is no claim that the ingredients of the preparation are harmful or dangerous to health. The sole claim is that the labeling was, to use the statutory words, 'misleading to the injury or damage of the purchaser or consumer' and that therefore the preparation was 'misbranded' when introduced into interstate commerce.

This was indeed the administrative finding behind eleven seizures resulting in that number of libel suits, between September and December, 1948. The misbranding, it was found, resulted from the booklet which *597 accompanied the preparation.[FN4] Shortly **872 thereafter the present suit was instituted to have the multiple seizure provision of s 304(a) declared unconstitutional and to *598 dismiss all libel cases except the first one instituted. The District Court held that appellants had acted arbitrarily and capriciously in violation of the Fifth Amendment in instituting multiple libel suits without first affording the appellee a hearing on the probable cause issue; that the multiple seizure provision of s 304(a) was unconstitutional under the Due Process Clause of the Fifth Amendment; and that appellants should be permanently enjoined from instituting any action raising a claim that the booklet accompanying the preparation was a misbranding since it was not fraudulent, false, or misleading. D.C., 87 F.Supp. 650.

> FN4. The Booklet, How to Get Well and Stay Well, is used by salesmen in soliciting prospective customers. A version of the booklet in use in 1947 represented that Nutrilite had 'cured or greatly helped' such 'common ailments' as 'Low blood pressure, Ulcers, Mental depression, Pyorrhea, Muscular twitching, Rickets, Worry over small things, Tonsilitis, Hay Fever, Sensitiveness to noise, Underweight, Easily tired, Gas in Stomach, Cuts heal slowly, Faulty vision, Headache, Constipation, anemia, Boils, Flabby Hysterical tendency, Eczema, Overweight, Faulty memory, Lack of ambition, Certain bone conditions, Nervousness, Nosebleed, Insomnia (sleeplessness), Allergies, Asthma, Restlessness, Bad skin color, Poor appetite, Biliousness, Neuritis, Night blindness, Migraine, High blood pressure, Sinus trouble, Lack of concentration, Dental caries, Irregular heartbeat, Colitis, Craving for sour foods, Arthritis (rheumatism), Neuralgia, Deafness, Subject to colds.' This version is the basis for an indictment now pend-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

70 S.Ct. 870                                                                                              Page 4
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
**(Cite as: 339 U.S. 594, 70 S.Ct. 870)**

ing in the Southern District of California charging Lee S. Mytinger and William, S. Casselberry with the misbranding of Nutrilite in violation of the Federal Food, Drug, and Cosmetic Act.

After a hearing prior to the indictment, appellee revised the booklet. Direct curative claims were eliminated. But pages 41-52 of the revised booklet were devoted to case histories explaining that Nutrilite brought relief from such ailments as diabetes, feeblemindedness, stomach pains, sneezing and weeping. Appellant Crawford, Associate Commissioner of Food and Drugs, concluded that there was probable cause to believe and that he did believe that this version of the booklet was misleading. On September 28 and 30, 1948, he recommended seizures of Nutrilite shipments.

Appellee thereafter ordered its salesmen to remove pages 37-58 which contained the case histories. The pages which remained pointed to the dangers and prevalence of illness, described the discovery of Nutrilite, and recommended the booklet to those who wanted to get well and stay well. On December 2, 1948, appellant Larrick, Assistant Commissioner of Foods and Drugs, made a probable cause determination on these pages of the booklet and recommended seizure.

Six new pages were thereafter added to the booklet. On December 9, 1948, appellant Dunbar, Commissioner of Foods and Drugs, made a probable cause determination on that version of the booklet and recommended further seizures.

First. The administrative finding of probable cause required by s 304(a) is merely the statutory prerequisite to the bringing of the lawsuit. When the libels are filed the owner has an opportunity to appear as a claimant and to have a full hearing before the court.[FN5] This hearing, we conclude, satisfies the requirements of due process.

FN5. s 304(b) provides in part:

'The article shall be liable to seizure by

process pursuant to the libel, and the procedure in cases under this section shall conform, as nearly as may be, to the procedure in admiralty; except that on demand of either party any issue of fact joined in any such case shall be tried by jury.'

[1] At times a preliminary decision by an agency is a step in an administrative proceeding. We have repeatedly held that no hearing at the preliminary stage is required by due process so long as the requisite hearing is held before the final administrative order becomes effective. See Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694; Inland Empire Council v. Millis, 325 U.S. 697, 65 S.Ct. 1316, 89 L.Ed. 1877; Opp Cotton Mills v. Administrator of Wage & Hour Division of Dept. of Labor, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624.

But this case does not go as far. Here an administrative agency is merely determining whether a judicial proceeding should be instituted. Moreover, its finding of probable cause, while a necessary prerequisite to multiple seizures, has no effect in and of itself. All proceedings*599 for the enforcement of the Act or to restrain violations of it must be brought by and in the name of the United States. s 307. Whether a suit will be instituted depends on the Attorney General, not on the administrative agency. He may or may not accept the agency's recommendation. If **873 he does, seizures are made and libels are instituted. But the seizures and suits are dependent on the discretion of the Attorney General.

[2] It is said that these multiple seizure decisions of the Administrator can cause irreparable damage to a business. And so they can. The impact of the initiation of judicial proceedings is often serious. Take the case of the grant jury. It returns an indictment against a man without a hearing. It does not determine his guilt; it only determines whether there is probable cause to believe he is guilty. But that determination is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial. See Beavers v. Henkel, 194 U.S. 73, 85, 24 S.Ct. 605, 607, 48 L.Ed. 882; Ex parte United States, 287 U.S. 241, 250, 53 S.Ct. 129, 131, 77 L.Ed. 283. The impact of an indictment is on the reputation or liberty of a man. The same is true where a prosecutor files an information charging violations of the law. The harm to property and business can also be incalculable by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

70 S.Ct. 870                                                                              Page 5
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
(Cite as: 339 U.S. 594, 70 S.Ct. 870)

the mere institution of proceedings. Yet it has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination. Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 596-597, 51 S.Ct. 608, 611, 75 L.Ed. 1289; Bowles v. Willingham, 321 U.S. 503, 520, 64 S.Ct. 641, 650, 88 S.Ct. 892; Yakus v. United States, 321 U.S. 414, 442-443, 64 S.Ct. 660, 675, 676, 88 L.Ed. 834.

[3] One of the oldest examples is the summary destruction of property without prior notice or hearing for the protection*600 of public health. There is no constitutional reason why Congress in the interests of consumer protection may not extend that area of control. It may conclude, as it did here, that public damage may result even from harmless articles if they are allowed to be sold as panaceas for man's ills. A requirement for a hearing, as a matter of constitutional right, does not arise merely because the danger of injury may be more apparent or immediate in the one case than in the other. For all we know the most damage may come from misleading or fraudulent labels. That is a decision for Congress, not for us. The decision of Congress was that the administrative determination to make multiple seizures should be made without a hearing. We cannot say that due process requires one at that stage.

[4] Second. The District Court had no jurisdiction to review the administrative determination of probable cause.

The determination of probable cause in and of itself had no binding legal consequence any more than did the final valuation made by the Interstate Commerce Commission in United States v. Los Angeles & S.L.R. Co., 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651. It took the place of discretion on the part of the Attorney General, as we have pointed out above, to bring it into play against appellee's business. Judicial review of such a preliminary step in a judicial proceeding is so unique that we are not willing easily to infer that it exists.

Judicial review of this preliminary phase of the administrative procedure does not fit the statutory scheme nor serve the policy of the Act. Congress made numerous administrative determinations under the Act reviewable by the courts. [FN6] But it did not place the finding of probable cause under s 304(a) in that category. This highly *601 selective manner in which Congress has **874 provided for judicial review reinforces the inference that the only review of the issue of probable cause which Congress granted was the one provided in the libel suit. Cf. Switchmen's Union of North American v. National Mediation Board, 320 U.S. 297, 305-306, 64 S.Ct. 95, 99, 88 L.Ed. 61.

FN6. Review of an order of the Administrator refusing to permit an application for a new drug to become effective or suspending the effectiveness of an application is authorized in s 505(h), 21 U.S.C. s 355(h), 21 U.S.C.A. s 355(h). Orders of the Administrator in connection with issuing, amending, or repealing regulations under ss 401, 403(j), 404(a), 406(a) and (b), 501(b), 502(d), 502(h), 504, 604 are expressly made reviewable by s 701(e) and (f), 21 U.S.C. s 371(e) and (f), 21 U.S.C.A. s 371(e, f).

[5] The purpose of the multiple seizure provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of seizures, and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by multiple seizures. It is not enough to say that the vitamin preparation in the present case is not dangerous to health. This preparation may be relatively innocuous. But the statutory scheme treats every 'misbranded article' the same in this respect-whether it is 'dangerous to health,' or its labeling is 'fraudulent,' or materially 'misleading to the injury or damage of the purchaser or consumer.'[FN7] What we do today determines the jurisdiction of the District Court in all the case in that category. If the court in the present case can halt all multiple seizures but one, so can the court in other cases. The means which Congress provided to protect

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

70 S.Ct. 870
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
(**Cite as: 339 U.S. 594, 70 S.Ct. 870**)

consumers against the injurious consequences of protracted proceedings would then be seriously impaired. Congress weighed the potential injury to the public from misbranded articles against the injury to the purveyor of the article from a temporary interference with its distribution and decided in favor of the speedy, preventive device of multiple seizures. We would impair or destroy the effectiveness *602 of that device if we sanctioned the interference which a grant of jurisdiction to the District Court would entail. Multiple seizures are the means of protection afforded the public. Consolidation of all the libel suits so that one trial may be had[FN8] is the relief afforded the distributors of the articles.[FN9]

FN7. See s 304(a) note 3, supra.

FN8. Sec. 304(b) provides in part:

'When libel for condemnation proceedings under this section, involving the same claimant and the same issues of adulteration or misbranding, such pending in two or more jurisdictions, such pending proceedings, upon application of the claimant seasonably made to the court of one such jurisdiction, shall be consolidated for trial by order of such courts, and tried in (1) any district selected by the claimant where one of such proceedings is pending; or (2) a district agreed upon by stipulation between the parties. If no order for consolidation is so made within a reasonable time, the claimant may apply to the court of one such jurisdiction, and such court (after giving the United States attorney for such district reasonable notice and opportunity to be heard) shall by order, unless good cause to the contrary is shown, specify a district of reasonable proximity to the claimant's principal place of business, in which all such pending proceedings shall be consolidated for trial and tried. Such order of consolidation shall not apply so as to require the removal of any case the date for trial of which has been fixed. The court granting such order shall give prompt notification thereof to the other courts having jurisdiction of the cases covered thereby.'

FN9. Congress has granted distributors

through the provision for consolidation of all libel suits the measure of relief which courts at times grant through a stay of multiple actions. See Landis v. North American Co., 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153.

Reversed.

Mr. Justice BURTON concurs in the result.
**875 Mr. Justice CLARK took no part in the consideration or decision of this case.

Mr. Justice FRANKFURTER, dissenting.
    While I agree with the Court as to the constitutional and statutory issues canvassed in its opinion, I am unable *603 to answer Mr. Justice JACKSON'S dissent, and I must therefore yield to it.

    Of course Congress may constitutionally vest judicially unreviewable discretion in an executive agency to initiate multiple suits in order to stop trafficking in pernicious drugs or even in those that are harmless, where efficacy is misrepresented. I agree that it has done so in the Federal Food, Drug, and Cosmetic Act of 1938. 52 Stat. 1040, 21 U.S.C. s 301 et seq., 21 U.S.C.A. s 301 et seq. But it does not at all follow that Congress has thereby cut off the right of access to the courts to prove that the enforcing agency has not acted within the broadest bounds of fair discretion, rare as the occasion may be for such an attempt and however improbable its success.

    Such I understand to be the nature of the proceedings below and such the basis of the District Court's decree. Unless we can say, as I cannot, that the findings in support of it have no support in the evidence, we should not hold that the court below was without jurisdiction to entertain the suit.

    The limited claim which the District Court sustained falls precisely within the qualification left open by this Court in a leading case sustaining the power of Congress to vest unreviewable discretion in executive agencies. When the Court was urged to deny this power of Congress and 'extreme cases' were put showing 'how reckless and arbitrary might be the action of Executive officers,' the Court made this answer:

    'It will be time enough to deal with such cases as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

70 S.Ct. 870
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088
**(Cite as: 339 U.S. 594, 70 S.Ct. 870)**

and when they arise. Suffice it to say that the courts have rarely, if ever, felt themselves so restrained by technical rules that they could not find some remedy, consistent with the law, for acts whether done by government or by individual persons, that violated natural justice or were hostile to the fundamental *604 principles devised for the protection of the essential rights of property.' Monongahela Bridge Co. v. United States, 216 U.S. 177, 195, 30 S.Ct. 356, 361, 54 L.Ed. 435.

Mr. Justice Harlan, speaking for the Court, cast its thought in the language current at the time. But the thought behind the words is not outmoded and controls, I believe, the case before us.
Mr. Justice JACKSON, dissenting.
The Court does not deal at all with what appears to be the ultimate issue decided by the court below.

The trial court of three judges wrote no opinion but made forty-three detailed findings of fact which would require twenty of these printed pages to reproduce and which summarize a 1,500-page record of a long trial. Those findings are made largely on undisputed evidence and on evidence from government sources. This Court does not criticize or reverse any of them.

The substance of these is to find that the Government instituted a multiplicity of court actions, with seizures in widely separated parts of the country, with a purpose to harass appellee and its dealers and intending that these actions and the attendant publicity would injure appellee's business before any of the issues in such cases could be tried. This, the court held, was justified by no emergency, the product being, at worst, harmless and having been marketed for years with knowledge of the Department.

Assuming as I do that the Act on its face is not constitutionally defective, the question remains whether it has been so misused by refusal of administrative hearing, together with such irreparable injury **876 in anticipation of judicial hearing, as to deny appellee due process of law or to amount to an abuse of process of the courts.

The Government has sought and received from this Court protection against a multiplicity of suits under *605 circumstances where injury was less apparent than in this. Landis v. North American Co.,

299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153. The holding of the court below and the contention of the appellee here that the Government is not entitled to so apply the statute as to bring multiple actions designed to destroy a business before it can be heard in its own defense is not frivolous, to say the least.

I am constrained to withhold assent to a decision that passes in silence what I think presents a serious issue.

U.S. 1950.
Ewing v. Mytinger & Casselberry
339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Panhandle Eastern Pipe Line Co. v. F.E.R.C., 198 F.3d 266 (1999)

339 U.S.App.D.C. 94

198 F.3d 266
United States Court of Appeals,
District of Columbia Circuit.

PANHANDLE EASTERN PIPE LINE COMPANY,
Petitioner,
v.
FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.
Semco Energy Gas Company, et al., Intervenors

No. 98–1409. | Argued Nov. 12, 1999. | Decided Dec.
14, 1999.

Natural gas pipeline filed petition seeking vacation of
orders issued by the Federal Energy Regulatory
Commission (FERC) in rate cases. The Court of Appeals,
Harry T. Edwards, Chief Judge, held that: (1) rule of *U.S.
Bancorp that,* absent extraordinary circumstances, a
federal court will not vacate a judgment that has been
rendered moot by voluntary settlement, did not apply, but
(2) pipeline was not "aggrieved" under the Natural Gas
Act, and lacked standing to appear in federal court, where
cases had been settled, so that FERC never issued final
judgments disposing of the rate filings.

Petition denied.

West Headnotes (6)

[1]     **Gas**
        ⚖Persons Entitled to Relief; Parties

        Natural gas pipeline was not "aggrieved" under
        the Natural Gas Act, and lacked standing to
        appear in federal court, for purposes of seeking
        vacation of orders of the Federal Energy
        Regulatory Commission (FERC) relating to
        numerous issues concerning pipeline's proposed
        rates, where, while requests for rehearing were
        pending before FERC, pipeline settled with
        customers and FERC approved the settlement,
        so that FERC never issued final judgments
        disposing of the rate filings, as the mere
        continued publication of the opinions as policy
        statements caused pipeline no harm. U.S.C.A.
        Const. Art. 3, § 1 et seq.; 5 U.S.C.A. §
        553(b)(A); Natural Gas Act, § 19(b), 15

U.S.C.A. § 717r(b).

1 Cases that cite this headnote

[2]     **Administrative Law and Procedure**
        ⚖Moot Decisions

        Rule of *U.S. Bancorp* that, absent extraordinary
        circumstances, a federal court will not vacate a
        judgment that has been rendered moot by
        voluntary settlement applies only to determine
        the jurisdiction of Article III courts, not
        administrative agencies, and to instruct when an
        opinion must be vacated after a federal court
        loses its jurisdiction, and thus did not apply
        where the disputed issues were rendered moot
        while the case was still before the agency and
        before any jurisdiction was found in federal
        court.

        1 Cases that cite this headnote

[3]     **Public Utilities**
        ⚖Right of Review

        Party aggrieved by order of the Federal Energy
        Regulatory Commission (FERC) for purposes of
        judicial review must also satisfy the
        requirements of constitutional standing, and thus
        must establish at a minimum, injury in fact to a
        protected interest. U.S.C.A. Const. Art. 3, § 1 et
        seq.; Natural Gas Act, § 19(b), 15 U.S.C.A. §
        717r(b).

        1 Cases that cite this headnote

[4]     **Federal Civil Procedure**
        ⚖In General;   Injury or Interest

        A party establishes an "injury-in-fact" under
        Article III by alleging an invasion of a legally
        protected interest that is both concrete and
        particularized and actual or imminent, not
        conjectural or hypothetical. U.S.C.A. Const. Art.

Panhandle Eastern Pipe Line Co. v. F.E.R.C., 198 F.3d 266 (1999)

339 U.S.App.D.C. 94

3, § 1 et seq.

1 Cases that cite this headnote

[5]    **Administrative Law and Procedure**
       Persons Aggrieved or Affected
       **Administrative Law and Procedure**
       Decisions and Acts Reviewable

       Judicial review of administrative orders is
       limited to orders of definitive impact, where
       judicial abstention would result in irreparable
       injury to a party.

[6]    **Administrative Law and Procedure**
       Nature and Scope

       An agency's general statement of policy differs
       from a substantive rule in that a policy statement
       is neither a rule nor a precedent but is merely an
       announcement to the public of the policy which
       the agency hopes to implement in future
       rulemakings or adjudications. 5 U.S.C.A. §
       553(b)(A).

       7 Cases that cite this headnote

**\*267 \*\*95** On Petition for Review of Orders of the
Federal Energy Regulatory Commission.

### Attorneys and Law Firms

Lawrence G. Acker argued the cause for petitioner. With
him on the briefs were Mary A. Murphy and Merlin E.
Remmenga. F. Nan Todd Wagoner and Richard J. Kruse,
Jr., entered appearances.

Judith A. Albert, Attorney, Federal Energy Regulatory
Commission, argued the cause for respondent. With her
on the brief were Jay L. Witkin, Solicitor, and Susan J.
Court, Special Counsel.

Before: EDWARDS, Chief Judge, SILBERMAN and
ROGERS, Circuit Judges.

### Opinion

Opinion for the Court filed by Chief Judge EDWARDS.

Harry T. EDWARDS, Chief Judge:

Petitioner, Panhandle Eastern Pipe Line Co.
("Panhandle"), implores this court to vacate two opinions
of the Federal Energy Regulatory Commission ("FERC"
or the "Commission") that have been rendered moot by a
settlement entered into between Panhandle and a group of
its customers. Panhandle argues that, because FERC
concedes that the two opinions do not reflect final orders
and because the settlement ensures that the challenged
opinions will never become final, this court should
remand the opinions to FERC with instructions to vacate
them.

[1] FERC responds that, because Panhandle is not an
"aggrieved" party, as required by Section 19(b) of the
Natural Gas Act ("NGA"), *see* 15 U.S.C. § 717r(b)
(1994), the court has no jurisdiction over the instant case.
In other words, FERC claims that the now moot opinions
are nothing more than general statements of policy that
give rise to no justiciable claims. Alternatively, FERC
contends that, under *U.S. Bancorp Mortgage Co. v.
Bonner Mall Partnership*, 513 U.S. 18, 115 S.Ct. 386, 130
L.Ed.2d 233 (1994), absent extraordinary circumstances,
a federal court will not vacate a judgment that has been
rendered moot by voluntary settlement. FERC is right on
the first count; accordingly, we deny Panhandle's petition
for review.

[2] We reject FERC's alternative argument resting on *U.S.
Bancorp.* This case differs from *U.S. Bancorp*, because
the disputed issues here were rendered moot while the
case was still before the agency and before any
jurisdiction was found in federal court. *U.S. Bancorp* and
other such cases apply only to determine the jurisdiction
of Article III courts, not administrative agencies, and to
instruct when an opinion must be vacated after a federal
court loses its jurisdiction. For example, in *American
Family Life Assurance Co. v. FCC*, 129 F.3d 625
(D.C.Cir.1997), we held that "federal courts should vacate
agency orders they decline to review on grounds of
mootness." *Id.* at 630. Here, however, no federal court has
had jurisdiction over the instant case, because the agency
never issued a final, appealable order. In short, there are
no "unreviewed administrative orders" extant. *Id.*
Therefore, *U.S. Bancorp* and *American Family Life* have

Panhandle Eastern Pipe Line Co. v. F.E.R.C., 198 F.3d 266 (1999)

339 U.S.App.D.C. 94

no sway in the resolution of this matter.

## I. BACKGROUND

In September 1991, Panhandle initiated a rate proceeding under Section 4 of the NGA. FERC accepted and suspended the filing, and set the proposed rates for hearing. In August 1994, an Administrative Law Judge issued an initial decision relating to numerous issues concerning Panhandle's *268 **96 proposed rates. Unhappy with many of the judge's conclusions, "[v]arious parties filed exceptions to most of the [Administrative Law Judge's] rulings." *Panhandle Eastern Pipe Line Co.,* 83 F.E.R.C. ¶ 61,353, at 62,419 (1998). On May 25, 1995, the Commission addressed these exceptions in *Panhandle Eastern Pipe Line,* 71 F.E.R.C. ¶ 61,228, at 61,819 (1995) ( "Opinion No. 395"), the first of the two challenged opinions. Panhandle and several of its customers were dissatisfied, and they requested rehearing.

In May 1992, while the fate of its first filing was still pending, Panhandle initiated a second Section 4 rate proceeding. Just as it had with the first filing, the Commission accepted and suspended the filing, and set the proposed rates for hearing. In December 1994, the Administrative Law Judge in this second case issued an initial decision, which, like its predecessor, met with exceptions. On February 5, 1996, FERC issued *Panhandle Eastern Pipe Line Co.,* 74 F.E.R.C. ¶ 61,109, at 61,351 (1996) ("Opinion No. 404"), the second of the challenged opinions. A petition for rehearing followed.

The Commission never had the opportunity, however, to address either of the pending requests for rehearing. In September 1996, while both requests were still pending, and before any final orders were issued by the agency, Panhandle and a group of its customers filed a settlement aimed at resolving both of the previous rate cases and related proceedings. On December 20, 1996, the Commission approved the settlement "as a fair and equitable resolution." *Panhandle Eastern Pipe Line Co.,* 83 F.E.R.C. ¶ 61,353, at 62,419. On December 2, 1997, Panhandle filed a motion to vacate the challenged opinions. On April 1, 1998, the Commission denied Panhandle's motion to vacate, holding that, because vacatur is an equitable remedy, it is unjustified when the party seeking vacatur has settled the underlying case and thus rendered it moot. *See Panhandle Eastern Pipe Line Co.,* 83 F.E.R.C. ¶ 61,008, at 61,029–31 (1998) (citing *U.S. Bancorp,* 513 U.S. at 18, 115 S.Ct. 386). The Commission also noted that it had invested significant resources in conducting hearings and that the challenged opinions offered useful discussions of recurring issues. *See id.* at 61,030. On May 1, 1998, Panhandle sought rehearing on FERC's refusal to vacate the opinions. On June 30, 1998, FERC denied Panhandle's request. *See Panhandle,* 83 F.E.R.C. ¶ 61,353, at 62,418. This petition for review followed.

## II. ANALYSIS

[3] [4] [5] Section 19(b) of the NGA requires a party seeking judicial review to be "aggrieved." *See* 15 U.S.C. § 717r(b); *see also El Paso Natural Gas Co. v. FERC,* 50 F.3d 23, 26 (D.C.Cir.1995) ("[O]nly a party that is 'aggrieved' by an order issued under the Act may obtain judicial review thereof."). Because such a party must also satisfy the requirements of constitutional standing, a petitioner must establish "at a minimum, 'injury in fact' to a protected interest." *El Paso,* 50 F.3d at 26 (quoting *Shell Oil Co. v. FERC,* 47 F.3d 1186, 1200 (D.C.Cir.1995)). A party establishes an injury-in-fact under Article III by alleging "an invasion of legally protected interests that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* In addition, "[j]udicial review is limited to 'orders of definitive impact, where judicial abstention would result in irreparable injury to a party.' " *CNG Transmission Corp. v. FERC,* 40 F.3d 1289, 1292 (D.C.Cir.1994) (quoting *Papago Tribal Util. Auth. v. FERC,* 628 F.2d 235, 238 (D.C.Cir.1980)).

Panhandle's problem in this case is twofold: It is not an aggrieved party under the NGA, and it lacks standing to appear in federal court. There is no aggrievement in this case, because FERC never issued final judgments disposing of Panhandle's rate filings. Both filings were pending rehearing when Panhandle voluntarily entered into a settlement that rendered *269 **97 moot the claims before FERC. Thus, there was no "order issued by the Commission" from which Panhandle could obtain judicial review under 15 U.S.C. § 717r(b).

Panhandle resists this conclusion by arguing that it was "injured" enough to satisfy both section 19(b) and Article III standing requirements when FERC refused to vacate the contested opinions that were pending rehearing. FERC, in turn, contends that the disputed opinions are nothing more than "policy statements," binding on no party and having no precedential effect. On this view, FERC asserts that the mere existence of the disputed opinions causes Panhandle no harm. FERC surely has the better argument.

Background Page 00776

Panhandle Eastern Pipe Line Co. v. F.E.R.C., 198 F.3d 266 (1999)

339 U.S.App.D.C. 94

[6] In *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33 (D.C.Cir.1974), this court delineated the distinction between a substantive rule and a policy statement. The court noted that 5 U.S.C. § 553(b)(A) allows an agency to issue a general statement of policy, which differs from a substantive rule in that a policy statement is "neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications." *Id.* at 38. In this sense, a policy statement is "like a press release" in that it "presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications." *Id.; see also American Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1046–47 (D.C.Cir.1987) (analyzing the nature of policy statements).

This advance-notice function of policy statements yields significant informational benefits, because policy statements give the public a chance to contemplate an agency's views before those views are applied to particular factual circumstances. This opportunity to anticipate the agency's actions "facilitates long range planning within the regulated industry and promotes uniformity in areas of national concern." *Pacific Gas,* 506 F.2d at 38. This period of foreshadowing is made even more useful by the fact that, unlike substantive rules,

> [a] general statement of policy ... does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.

*Id.* at 38–39 (footnotes omitted). In other words, a policy

statement has neither the force of a substantive rule adopted pursuant to rulemaking nor the binding effect of an order following an adjudication.

The Commission has confused matters somewhat in this case by noting the "ongoing precedential value" of the challenged opinions, Br. for Respondent FERC at 16, as if to suggest that the opinions serve as binding precedent. *See also Panhandle Eastern Pipe Line Co.,* 83 F.E.R.C. ¶ 61,353, at 62,420 (noting that the parts of the challenged opinions that "contain discussions of issues that appear before the Commission time and time again ... can and do serve as precedent"). More telling, however, is FERC's failure to issue final judgments on the merits of Panhandle's claims and the agency's acceptance of the settlement to moot the pending claims. In its brief to this court, FERC conceded that the challenged opinions serve only as policy statements that have no binding effect. *See* Br. for Respondent at 17 ("[T]he only colorable effect, if any, of *Opinion Nos. 395* and *404* is that they leave in public *270 **98 view statements of Commission policy which would not be judicially reviewable until the Commission has applied it in a concrete situation."). And, during oral argument, Government counsel acknowledged unhesitatingly that the disputed opinions have no precedential value. In short, for the most part, the Commission has been unwavering in explaining that the challenged opinions are "the functional equivalent of a Commission policy statement." *Id.* at 27; *see also Panhandle Eastern Pipe Line Co.,* 83 F.E.R.C. ¶ 61,008, at 61,031 ("In future cases, Panhandle or any other person may seek an outcome contrary to Opinion Nos. 395 and 404, either based on arguments similar to those contained in the requests for rehearing of Opinion Nos. 395 and 404 or for other reasons, and the Commission will consider those contentions.").

In light of the record at hand, it is clear that Panhandle can cite no injury-in-fact in support of standing. Panhandle's rates for the relevant time periods were set by the settlement agreement, so they were unaffected by the challenged opinions. And there is no recognizable residual harm that can result from FERC's continued publication of the opinions as policy statements. FERC concedes that the challenged opinions now serve only as policy statements that have no binding effect on Panhandle. Thus, because Panhandle can point to no harm that can be redressed by this court, it fails to satisfy the requirements of section 19(b) of the NGA and Article III standing.

## III. CONCLUSION

**Panhandle Eastern Pipe Line Co. v. F.E.R.C., 198 F.3d 266 (1999)**

339 U.S.App.D.C. 94

The challenged opinions are non-binding policy statements. As a result, Panhandle is not aggrieved and has not suffered an injury-in-fact. We therefore deny Panhandle's petition for review.

**Parallel Citations**

339 U.S.App.D.C. 94

---

End of Document

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

Background Page 00778

# Proposed Rules

**Federal Register**

Vol. 76, No. 22

Wednesday, February 2, 2011

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

## DEPARTMENT OF LABOR

### Mine Safety and Health Administration

### 30 CFR Part 104

### RIN 1219–AB73

### Pattern of Violations

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Proposed rule; notice of close of comment period.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) is proposing to revise the Agency's existing regulation for pattern of violations (POV). MSHA has determined that the existing regulation does not adequately achieve the intent of the Federal Mine Safety and Health Act of 1977 (Mine Act) that the POV provision be used to address operators who have demonstrated a disregard for the safety and health of miners. Congress included the POV provision in the Mine Act so that operators would manage safety and health conditions at mines and find and fix the root causes of significant and substantial (S&S) violations to protect the safety and health of miners. The proposal would simplify the existing POV criteria, improve consistency in applying the POV criteria, and more adequately achieve the statutory intent. It would also encourage chronic violators to comply with the Mine Act and MSHA's safety and health standards.

**DATES:** MSHA must receive comments by midnight Eastern Standard Time on April 4, 2011.

**ADDRESSES:** Comments must be identified with "RIN 1219–AB73" and may be sent to MSHA by any of the following methods:

• *Federal E-Rulemaking Portal:* http://www.regulations.gov. Follow the on-line instructions for submitting comments.

• *Electronic mail:* zzMSHAcomments@dol.gov. Include "RIN 1219–AB73" in the subject line of the message.

• *Facsimile:* 202–693–9441. Include "RIN 1219–AB73" in the subject line of the message.

• *Regular Mail:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia 22209–3939.

• *Hand Delivery or Courier:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia. Sign in at the receptionist's desk on the 21st floor.

*Information Collection Requirements:* Comments concerning the information collection requirements of this proposed rule must be clearly identified with "RIN 1219–AB73" and sent to both the Office of Management and Budget (OMB) and MSHA. Comments to OMB may be sent by mail addressed to the Office of Information and Regulatory Affairs, Office of Management and Budget, New Executive Office Building, 725 17th Street, NW., Washington, DC 20503, Attn: Desk Officer for MSHA. Comments to MSHA may be transmitted by any of the methods listed above in this section.

**FOR FURTHER INFORMATION CONTACT:** April E. Nelson, Acting Director, Office of Standards, Regulations, and Variances, MSHA, at nelson.april@dol.gov (e-mail); 202–693–9440 (voice); or 202–693–9441 (facsimile).

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Introduction
II. Background and Regulatory History
III. Section-by-Section Analysis
IV. Preliminary Regulatory Economic Analysis
V. Feasibility
VI. Regulatory Flexibility Analysis and Small Business Regulatory Enforcement Fairness Act (SBREFA)
VII. Paperwork Reduction Act of 1995
VIII. Other Regulatory Considerations
IX. References

## I. Introduction

### Availability of Information

*Public Comments:* MSHA will post all comments on the Internet without change, including any personal information provided. Access comments electronically at *http://www.msha.gov/regsinfo.htm.* Review comments in person at the Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia. Sign in at the receptionist's desk on the 21st floor.

*E-mail notification:* MSHA maintains a list that enables subscribers to receive e-mail notification when the Agency publishes rulemaking documents in the **Federal Register**. To subscribe, go to *http://www.msha.gov/subscriptions/subscribe.aspx.*

*Information Collection Supporting Statement:* A copy of the information collection package can be obtained from the Department of Labor by electronic mail request to Michel Smyth at *smyth.michel@dol.gov* or by phone request to 202–693–4129.

## II. Background and Regulatory History

### A. Statutory Provision

In enacting the Mine Act, Congress included the pattern of violations (POV) provision in section 104(e) to provide MSHA with an additional enforcement tool to protect miners when the operator demonstrated a disregard for the safety and health of miners. The need for such a provision was forcefully demonstrated during the investigation of the Scotia Mine disaster, which occurred in 1976 in Eastern Kentucky. (S. Rep. No. 181, 95th Cong., 1st Sess. at 32.) As a result of explosions on March 9 and 11, 1976, caused by dangerous accumulations of methane, 23 miners and three mine inspectors lost their lives. The Scotia Mine had a chronic history of persistent, serious violations that were cited over and over by MSHA. After abating the violations, the operator would permit the same violations to recur, repeatedly exposing miners to the same hazards. The accident investigation showed that MSHA's then-existing enforcement program was unable to address the Scotia Mine's history of recurring violations.

The Mine Act places the ultimate responsibility for ensuring the safety and health of miners on mine operators. The legislative history of the Mine Act emphasizes that Congress reserved the POV provision for mine operators with a record of repeated S&S violations. Congress intended the POV sanction to attain remedial action from operators "who have not responded to the Agency's other enforcement efforts." (55 FR 31129) The legislative history states that Congress believed that the existence of a pattern would signal to both the

AB73-FK-1

mine operator and the Secretary that "there is a need to restore the mine to effective safe and healthful conditions and that the mere abatement of violations as they are cited is insufficient." (S. Rep. No. 181, *supra* at 33.)

The Mine Act does not define "pattern of violations," but section 104(e)(4) authorizes the Secretary to establish criteria for determining when a pattern of violations of mandatory safety or health standards exists. Congress provided the Secretary with broad discretion in establishing pattern criteria, recognizing that MSHA may need to modify the criteria as experience dictates.

### B. Regulatory History

MSHA first proposed a POV regulation in 1980 (45 FR 54656). That proposal included: Purpose and scope, initial screening, pattern criteria, issuance of notice, and termination of notice. Commenters were generally opposed to the 1980 proposal. They stated that the proposal was complex, too statistically oriented, overbroad, and vague. In addition, they stated that the rulemaking was untimely because of litigation then pending before the Federal Mine Safety and Health Review Commission (Commission) concerning MSHA's interpretation of the S&S provisions of the Mine Act. Commenters also stated that review of the Agency's then pending regulation for assessment of civil penalties could affect the POV proposal.

On February 8, 1985 (50 FR 5470), MSHA announced its withdrawal of the 1980 proposed rule and issued an advance notice of proposed rulemaking (ANPRM) that addressed many of the concerns expressed about the 1980 proposal. In the 1985 ANPRM, MSHA stated that it intended to focus on the safety and health record of each mine rather than on a strictly quantitative comparison of mines to industry-wide norms. In the ANPRM, MSHA stated that the Agency envisioned simplified criteria, focusing on two principal areas:

(1) Were S&S violations common to a particular hazard or did S&S violations throughout the mine represent an underlying health and safety problem, and

(2) Is the mine on a section 104(d) unwarrantable failure sequence, indicating that other enforcement measures had been ineffective.

MSHA requested suggestions for additional factors the Agency should use in determining whether a POV exists and requested ideas on administrative procedures for terminating a pattern notice.

MSHA published a second proposed rule on May 30, 1989 (54 FR 23156), which included criteria and procedures for identifying mines with a pattern of S&S violations. The 1989 proposal included procedures for initial identification of mines developing a pattern of violations; criteria for determining whether a pattern of violations exists at a mine; notification procedures that would provide both the mine operator and miners' representative an opportunity to respond to the Agency's evaluation that a pattern of violations may exist; and procedures for terminating a pattern notice. The 1989 proposal addressed the major issues raised by commenters. Commenters' primary concerns were MSHA's policies for enforcing the S&S provisions of the Mine Act, the civil penalty regulation, and MSHA's enforcement of the unwarrantable failure provision of the Mine Act. MSHA held two public hearings and issued a final rule on July 31, 1990 (55 FR 31128).

The existing rule established MSHA's criteria and procedures for identifying mines with a POV. The existing rule reflected MSHA's belief that Congress intended the POV sanction to be directed at restoring mines to a safe and healthful condition.

Until mid-2007, POV screening was decentralized and lacked a consistent, structured approach. MSHA District offices were responsible for conducting the required annual POV screening of mines. Following the accidents at the Sago, Darby, and Aracoma mines in early 2006, MSHA began developing a centralized, quantifiable POV screening process. MSHA initiated its newly developed *Pattern of Violations Screening Criteria and Scoring Model* in mid-2007 and updated and revised the screening criteria and procedures in 2010. MSHA uses a computer program based on this screening criteria and scoring model to generate lists of mines with a potential pattern of violations (PPOV).

### III. Section-by-Section Analysis

MSHA is proposing the following changes to its existing pattern of violations regulation.

### A. Section 104.1 Purpose and Scope

Proposed § 104.1 would provide the purpose and scope of the proposal and is unchanged from the existing provision.

### B. Section 104.2 Pattern Criteria

Proposed § 104.2 would combine existing §§ 104.2 and 104.3. It would specify the general criteria that MSHA

would use to identify mines with a pattern of violations. MSHA would review compliance, accident, injury, and illness records. MSHA believes that the proposed rule would simplify the process for determining whether a mine has a pattern of violations and would more accurately reflect the statutory intent. Consistent with the Mine Act, the proposed rule would eliminate all references to initial screening criteria.

Proposed § 104.2(a) would provide that the specific criteria (*e.g.*, number of S&S violations issued in the previous year) used in the review to identify mines with a pattern of S&S violations would be posted on MSHA's website at *http://www.msha.gov*. MSHA requests specific comments on how the agency should obtain comment during the development of, and periodic revision to, the POV screening criteria. MSHA also requests comments on the best methods for notifying mine operators of changes to these criteria. Under the proposal, MSHA would review:

(1) Citations for significant and substantial violations;

(2) Orders under section 104(b) of the Act for not abating significant and substantial violations;

(3) Citations and withdrawal orders under section 104(d) of the Act, resulting from the operator's unwarrantable failure to comply;

(4) Imminent danger orders under section 107(a) of the Act;

(5) Orders under section 104(g) of the Act requiring withdrawal of miners who have not received training and who the inspector declares to be a hazard to themselves and others;

(6) Enforcement measures, other than section 104(e) of the Act, which have been applied at the mine;

(7) Other information that demonstrates a serious safety or health management problem at the mine, such as accident, injury, and illness records; and

(8) Mitigating circumstances.

MSHA believes that posting the specific criteria and compliance data that the Agency would use on the website would allow mine operators to monitor their compliance record against the proposed POV criteria. Some mines have personnel who, currently, are requesting this information from MSHA. This website would reduce the effort for these mine operators. Access to this information through a searchable database would provide operators an opportunity to evaluate their record and determine whether they are approaching proposed POV criteria levels. This would enable operators to proactively implement measures to improve safety and health at their mines and to bring

their mines into compliance. Posting the specific pattern criteria on MSHA's website will promote openness and transparency and encourage operators to examine their compliance record more closely, ascertain whether they have any recurring problems, and enhance the safety and health of miners. MSHA believes that sharing this information facilitates a more proactive approach to safety and health on the part of all involved with miner safety and health. In addition, MSHA believes that the ready availability of compliance data will eliminate the need to inform operators of a potential pattern of violations (PPOV). MSHA believes that this is an improvement over the existing process because it allows operators to continually evaluate their compliance performance.

Under proposed § 104.2(a)(1), like the existing provision, MSHA would consider a mine's S&S violations.

Like the existing provision, proposed § 104.2(a)(2) would require MSHA to consider closure orders issued under section 104(b) of the Mine Act that resulted from S&S violations.

Proposed § 104.2(a)(3), like existing § 104.3(a)(3), would require MSHA to consider unwarrantable failure citations and withdrawal orders issued under sections 104(d)(1) and (d)(2) of the Mine Act. Unwarrantable failure citations and orders often constitute S&S violations that are the types of serious, repeated violations that Congress intended to address in a POV regulation.

Proposed § 104.2(a)(4), like existing § 104.2(a)(3), would require MSHA to consider imminent danger withdrawal orders issued under section 107(a) of the Mine Act.

Proposed § 104.2(a)(5), derived from existing § 104.2(b)(1), would require MSHA to consider orders issued under section 104(g) of the Act.

Proposed § 104.2(a)(6), like existing § 104.2(b)(1), would require that MSHA consider enforcement measures other than section 104(e) of the Act, which have been applied at the mine.

Proposed § 104.2(a)(7) would clarify MSHA's intent that the proposed POV criteria include consideration of operations with serious safety and health management problems. It is derived from the existing regulation and the legislative history of the Mine Act.[1] It would require MSHA to consider other information, such as accident, injury, and illness records, that may reveal a serious safety or health

management problem at a mine. This other information may also include: Enforcement measures, other than POV, applied at the mine; evidence of the operator's lack of good faith in correcting the problem that results in repeated S&S violations; repeated S&S violations of a particular standard; repeated S&S violations of standards related to the same hazard; and any other relevant information. This is essentially the same information addressed in existing §§ 104.2(b)(2) to (b)(3) and 104.3(a)(1) and (a)(2). In addition, in making a determination under this aspect of the proposal, MSHA would consider: knowing and willful S&S violations; citations and orders issued in conjunction with an accident, including orders under sections 103(j) and (k) of the Mine Act; and S&S violations of safety and health standards that contribute to the cause of accidents and injuries. MSHA data and experience show that violations of approval, training, or recordkeeping regulations, for example, can significantly and substantially contribute to safety or health hazards. This is especially true where the mine operator allows similar violations to occur repeatedly.

Under proposed § 104.2(a)(8), like existing § 104.2(b)(4), MSHA would consider mitigating circumstances. Under this proposed provision, MSHA would consider the causes of repeated violations that may be beyond the operator's control, such as changes in mine ownership or mine management, and whether conditions at the mine show a trend of significant improvement.

Under this proposed provision and consistent with the legislative history, MSHA would allow operators to take proactive measures to bring their mines into compliance. For example, operators who compare their compliance record with the POV criteria and determine that they are approaching a pattern of violations level may work with MSHA to bring their mines into compliance to avoid a POV notice. Under the proposal, an operator may submit a written safety and health management program to the District Manager for approval. To obtain approval, operators should structure safety and health management programs so that MSHA can determine whether the program's parameters would result in meaningful, measurable, and significant reductions in S&S violations. The operator should develop a process and program with measurable benchmarks for abating specific violations that could lead to a POV and addressing these hazardous conditions at their mines. Using these benchmarks,

operators would be able to use the MSHA database accessible through the Agency's Web site to monitor their safety and health record. Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance.

The proposed rule would eliminate the existing requirement in § 104.3(b) that only citations and orders that have become final are to be used to identify mines with a potential pattern of violations. This proposal is consistent with the language of section 104(e), the legislative history of the Mine Act, and the purpose of section 104(e). In explaining the need for the POV enforcement tool, Congress pointed out that "the Scotia mine, as well as other mines, had an inspection history of recurrent violations, some of which were tragically related to the disasters, which the existing enforcement scheme was unable to address." (S. Rep. No. 181, 95th Cong., 1st Sess. at 32.) The use of the phrase "inspection history" indicates Congress' intent that POV determinations be based on inspection histories, *i.e.*, violations found by MSHA during inspections, rather than only on final citations and orders.

The Senate Report specifically noted similarities between sections 104(d) and 104(e) of the Mine Act and stated that the POV "sequence parallels the current unwarrantable failure sequence." (S. Rep. No. 181, *supra*, at 33.) This reflects Congress's intent that POV determinations, like section 104(d)(1) and (d)(2) determinations, need not be final orders. In addition, the Senate Report stated that it was "* * * the Committee's intention that the Secretary or his authorized representative [] have both [Section 104(d) and Section 104(e)] enforcement tools available, and that they [] be used simultaneously if the situation warrants." (*Id* at 34.) The proposal to consider non-final citations and orders to identify mines with a POV is consistent with the Mine Act.

The existing provision limiting MSHA's consideration of citations and orders to those that are final restricts MSHA's ability to achieve the purpose of the POV provision, consistent with Congressional intent. As stated in the Mine Act and its legislative history, the Secretary is given broad discretion to "make such rules as [she] deems necessary to establish criteria for determining when a pattern of violations" exists. (30 U.S.C. 814(e)(4)) Congress stated that the Secretary should "continually evaluate and modify the pattern of violations criteria as she deems necessary." (S. Rep. No.

---

[1] The Committee views the 105(d)(1) [now 104(e)] notice as indicating to both the mine operator and the Secretary that there exists at mine a serious safety and health management problem. (Legislative History, Committee Report, p. 620).

181, *supra* at 33.) MSHA's experience with enforcing section 104(e) has led the Agency to conclude that it is necessary to modify the final order criteria in its existing POV regulation.

In November 2010, there was a backlog of approximately 88,000 contested violations pending before the Commission. For cases disposed during November, 2010, it took, on average, 518 days for contested violations to become final. For a mine with contested citations and orders that have not become final, the final order provision does not allow MSHA to review the mine's complete recent compliance history when assessing whether a POV exists and hinders MSHA's ability to effectively enforce section 104(e) of the Mine Act. It can allow chronic violators to avoid or delay the POV sanction and to continue their repeated pattern of noncompliance with health and safety standards, without correcting the underlying problem. The final order provision in the existing regulation provides an incentive for operators to contest S&S violations to avoid being placed under a POV.

The fact that the Mine Act requires an operator to abate a hazard prior to contesting a violation provides further support for the proposed rule. Mine operators must correct the hazardous condition within the time set by the MSHA inspector, even if they challenge the violation. The proposal to eliminate the existing requirement that only final orders be used for POV determination would greatly enhance safety and health of miners. Fewer than one percent of citations are reversed. Over 700,000 violations were assessed civil penalties that became final orders during the five-year period 2006 through 2010, with 3,400 vacated after they were contested. During the same timeframe, 6,000 of the contested violations were modified from S&S to non-S&S.

Proposed § 104.2(b) would increase the frequency of MSHA's review of a mine for a POV from at least once per year under the existing regulation to at least twice per year. MSHA determined that an annual review would not adequately allow the Agency to identify mines with recurring S&S violations. The increased frequency of review would allow MSHA to more promptly identify mines with recurring S&S violations and take appropriate action. This proposal would also encourage operators to more closely examine their compliance records to determine whether greater efforts are necessary to comply with the Mine Act and MSHA's standards and regulations.

*C. Section 104.3 Issuance of Notice*

Proposed § 104.3, renumbered from existing § 104.4, would simplify the requirements for issuing a POV notice.

Proposed § 104.3(a) is similar to existing § 104.4(a). The proposal would provide that, when a mine has a POV, the District Manager will issue a POV notice to the mine operator that specifies the basis for the Agency's action. The District Manager will also provide a copy of the POV notice to the representative of miners. The proposed provision would delete all references to a PPOV; otherwise it is essentially unchanged from the existing requirement.

MSHA believes that this proposed action would allow the Agency to more effectively implement the POV provision in the Mine Act, consistent with legislative intent. MSHA's experience and data reveal that over the past 3 years, mine operators who received a PPOV letter reduced their S&S violations by at least 30 percent. In this same period, 6 of 62 operators received more than one PPOV letter. These mine operators temporarily reduced their S&S violations, but reverted back to allowing the same hazards to occur again and again without addressing the underlying causes.

Proposed § 104.3(b), essentially the same as existing § 104.4(d), would require that the mine operator post a copy of the POV notice on the mine bulletin board and that the notice remain posted until MSHA terminates the POV notice. Existing § 104.4(d) requires the operator to post all notifications issued under 30 CFR part 104 at the mine. The proposal would clarify that the operator post notifications issued under this part on the mine bulletin board.

Proposed § 104.3(c) is a new provision that would restate the intent of the Mine Act when a POV notice is issued. It essentially restates section 104(e)(1) of the Mine Act and would require MSHA to issue an order withdrawing all persons from the affected area of the mine if an authorized representative of the Secretary finds any S&S violation within 90 days after the issuance of the POV notice. No one would be allowed to enter the area affected by the violation until the condition has been abated, except those persons referred to in section 104(c) of the Mine Act who must enter the affected area to correct the violation.

Proposed § 104.3(d) is a new provision that would specifically restate the intent of the Mine Act when a POV notice is issued. It would provide that if a withdrawal order is issued under proposed § 104.3(c), any subsequent S&S violation will result in an order withdrawing all persons from the affected area of the mine until the authorized representative of the Secretary determines that the violation has been abated, except those persons identified in section 104(c) of the Mine Act.

*D. Section 104.4 Termination of Notice*

Proposed § 104.4, renumbered from existing § 104.5, addresses the termination of a POV notice and continues to provide that a POV notice will be terminated if MSHA finds no S&S violations during an inspection of the entire mine, or if no withdrawal order for S&S violations under section 104(e)(1) of the Mine Act has been issued within 90 days of the issuance of the POV notice. MSHA's Pattern of Violations (POV) Procedures Summary, posted on MSHA's website, also includes requirements for MSHA to conduct a complete inspection of the entire mine within 90 days of issuing the POV notice. The Procedures Summary states, in part, the following:

Following notification to the operator of the issuance of a Notice of Pattern of Violations, the District Manager shall initiate appropriate inspection activities to ensure that the mine is inspected in its entirety during the following 90-day period and each succeeding inspection cycle until the POV notice is terminated.

Proposed § 104.4(b), renumbered from existing § 104.5(b), is unchanged.

**IV. Preliminary Regulatory Economic Analysis**

*A. Executive Order 12866: Regulatory Planning and Review*

Under Executive Order (E.O.) 12866, the Agency must determine whether a regulatory action is "significant" and subject to review by the Office of Management and Budget (OMB). Section 3(f) of E.O. 12866 defines a "significant regulatory action" as an action that is likely to result in a rule: (1) Having an annual effect on the economy of $100 million or more, or adversely and materially affecting a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as "economically significant"); (2) creating serious inconsistency or otherwise interfering with an action taken or planned by another agency; (3) materially altering the budgetary impacts of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients

thereof; or (4) raising novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive Order.

MSHA has determined that this proposed rule would not have an annual effect of $100 million or more on the economy, and is not an economically "significant regulatory action" pursuant to section 3(f) of E.O. 12866. However, the proposed rule is a "significant" regulatory action because it would likely raise novel legal or policy issues. MSHA requests comments on the estimates of costs and benefits presented in this proposed rule.

MSHA has not prepared a separate preliminary regulatory economic analysis for this rulemaking. Rather, the analysis is presented below.

*B. Industry Profile and Population at Risk*

The proposed rule applies to all mines in the United States. MSHA divides the mining industry into two major sectors based on commodity: (1) coal mines and (2) metal and nonmetal mines. Each sector is further divided by type of operation, *e.g.*, underground mines or surface mines. The Agency maintains data on the number of mines and on mining employment by mine

type and size. MSHA also collects data on the number of independent contractor firms and their employees. Each independent contractor is issued one MSHA contractor identification number, but may work at any mine.

For the 12 months ending January 2010, the average number of mines in operation was 14,100. These mines employed 297,000 miners, including contract workers and excluding office workers. There were 8,770 mine contractor firms with 88,000 employees, excluding office workers. Table IV–1 presents the total number of all mines and miners, by size of mine.

TABLE IV–1—AVERAGE 2009 NUMBER OF MINES AND EMPLOYMENT (EXCLUDING OFFICE EMPLOYEES), BY EMPLOYMENT SIZE

| Size of mine | All mines | Employment at all mines, excluding office employees |
|---|---|---|
| 1–19 Employees | 11,816 | 56,489 |
| 20–500 Employees | 2,234 | 123,181 |
| 501+ Employees | 48 | 29,402 |
| Contractors | | 87,740 |
| Total | 14,098 | 296,812 |

The estimated value of coal produced in U.S. coal mines in 2009 was $35.7 billion of which $18.5 billion was from underground coal and $17.2 billion from surface coal. The value of coal was estimated from the amount of coal produced and the price of coal. MSHA obtained the coal production estimates from the Agency's MSIS system and the price per ton for coal from the Department of Energy (DOE), Energy

Information Administration (EIA), *Annual Coal Report 2009*, October 2010, Table 28.

The value of the U.S. mining industry's metal and nonmetal (M/NM) output in 2009 was estimated to be approximately $57.1 billion. Metal mining contributed an estimated $21.3 billion to the total while the nonmetal mining sector contributed an estimated $35.8 billion. The value of production

estimates are from U.S. Department of the Interior (DOI), U.S. Geological Survey (USGS), *Mineral Commodity Summaries 2010*, January 2010, page 8.

The combined value of production from all U.S. mines in 2009 was $92.8 billion. Table IV–2 presents the estimated revenues for all mines, by size of mine.

TABLE IV–2—REVENUES AT ALL MINES, BY EMPLOYMENT SIZE, IN 2009

| Size of mine | Revenues at all mines (million dollars) |
|---|---|
| 1–19 Employees | $17,450 |
| 20–500 Employees | 54,478 |
| 501+ Employees | 20,856 |
| Total | 92,784 |

*C. Benefits*

Although MSHA does not have an historical basis from which to estimate the effects of placing a mine on a pattern of violations (POV), the Agency does have some experience with issuing potential pattern of violations (PPOV) notifications to operators. MSHA's data reveal that although most mine operators significantly improve health and safety conditions at their mines after receiving the PPOV notification, many later experienced both a decline

in health and safety and an increase in S&S violations.

During June 2007 through September 2009, MSHA made PPOV evaluations on an average of every six to nine months. During that period, MSHA sent 68 PPOV notification letters to 62 mine operators (6 operators received more than one notification). After receiving the notification letter, of the mines that remained in operation to the next evaluation, 94 percent reduced the rate of S&S citations and orders by at least

30 percent and 77 percent reduced the rate of S&S citations and orders to levels at or below the national average for similar mines. However, as discussed previously in the preamble, improvements at some mines declined over time. Of the 62 mine operators that received PPOV notification letters during the review period, 6 received a second PPOV notification letter. In addition to the 6 mines that received two letters, 7 mines were identified in more than one evaluation as meeting the

PPOV criteria but were only sent one letter generally due to mitigating circumstances. Compliance at 13 of the 62 mines that received PPOV notification letters (21 percent) deteriorated such that each of these mines either was sent or could have been sent a second letter.

Under the existing rule, MSHA identifies mines that meet the screening criteria for PPOV. MSHA conducts a review to determine if there are mitigating circumstances and issues PPOV notification letters as appropriate. The proposed rule would delete the screening process as well as all references to a PPOV.

The proposed rule would establish general criteria that MSHA would use to identify mines with a pattern of S&S violations. MSHA would post specific criteria that MSHA would use in making POV determinations, including a searchable database of mine operator compliance information, on the Agency's website. Operators would be able to use the specific criteria and the information in the database to continually monitor their safety and health performance and determine whether they are approaching proposed POV criteria levels.

Under the proposed rule, MSHA would allow operators to take proactive measures to bring their mines into compliance. MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance when it comes to placing a mine on a POV.

Under the proposed rule, MSHA projects that operators would continually monitor their performance and, if they believe that they are approaching a POV, would take action to improve their safety and health performance. MSHA projects that, under the proposed rule, most mine operators who see that their mines are close to a POV would institute an MSHA-approved safety and health management program to lessen the probability of being placed on a POV and the possibility of being issued closures. MSHA projects that this would result in more mines taking action than those issued PPOV notifications under the existing procedure.

Closure orders can have a substantial impact on the ability of a mine to conduct its business. The threat of closure provides a strong incentive for operators to ensure that S&S violations do not recur. MSHA projects that few operators would risk such an occurrence.

MSHA projects that under the proposal, which would increase the frequency of MSHA's review of a mine for a POV from once to twice per year, on average, approximately 50 mine operators per year would submit a safety and health management program to MSHA for approval as a mitigating circumstance. Under the proposed rule, MSHA would allow operators to take proactive measures to bring their mines into compliance with MSHA standards and regulations, reducing the probability of these mines being on a POV. MSHA further projects that an average of approximately 10 mines per year (i.e., those that would not take proactive action, such as instituting an MSHA-approved safety and health management program) would be issued POV notifications. MSHA requests comments on these estimates which are likely to vary from year to year.

MSHA used the Agency's experience with PPOV notification letters to estimate the impact that the proposed mitigating circumstance provision (including the opportunity for operators to submit safety and health management programs) would have on the number of nonfatal injuries at mines. MSHA determined that 62 mines which received PPOV notification letters (6 received two notifications) during the June 2007 through September 2009 period experienced, on average, 11 nonfatal injuries during the year prior to receiving the letter and eight nonfatal injuries during the year after receiving the letter. MSHA used the one year period before and after PPOV notification as a basis for comparison because, as was previously noted, improvements at some mines declined over time and because a longer period was not available for some mines (i.e., mines that were issued PPOV notifications in September 2009).

Based on the projection that 50 mines per year would average three fewer nonfatal injuries in the first year after implementing an MSHA-approved safety and health management program, MSHA projects that the number of nonfatal injuries would be reduced by a minimum of 150 (50 mines × 3 nonfatal injuries per mine) per year. MSHA believes that this is a low estimate for the following reasons:

• It is likely that including measurable benchmarks for abating specific violations and addressing hazardous conditions in the MSHA-approved safety and health management programs would make these programs more effective than the measures that recipients of the PPOV notification letters have historically instituted.

• The estimate does not include any reductions in the number of fatalities. Because mine fatalities occur on a less frequent basis than do injuries, the Agency does not believe that it has a reliable basis upon which to project a reduction in fatalities. However, the Agency believes that the implementation of an MSHA-approved safety and health management program would reduce fatalities.

• The estimate does not include any projected improvement at the 10 mines that would not institute an MSHA-approved safety and health management program and would be placed on a POV. However, due to the high threshold for getting off a POV under the proposed rule, there would likely be injury reductions for this category.

MSHA also anticipates longer lasting improvements under the proposed rule. Of the 62 mines that received PPOV notification letters from June 2007 through September 2009, 13 did not have a full second year of data following receipt of the PPOV notification letter. Of the 49 mines that had two full years of data following receipt of the PPOV notification letter, 19 (39%) experienced an increase in the number of injuries in the second year following receipt of the PPOV notification letter compared to the first. MSHA believes that, under the proposed rule, fewer mines will experience such increases. Mines that have effectively implemented an MSHA-approved safety and health management program (to avoid being placed on a POV) would have procedures in place to continuously address hazardous conditions. Mines that successfully get off of a POV would have increased incentive (see the cost analysis) to remain off and would likely institute continuing measures to minimize violations and address hazardous conditions.

MSHA based its estimates of the monetary values for the benefits associated with the proposed rule on relevant literature. To estimate the monetary values of the reductions in nonfatal injuries, MSHA performed an analysis of the imputed value of injuries avoided based on a willingness-to-pay approach. This approach relies on the theory of compensating wage differentials (i.e., the wage premium paid to workers to accept the risk associated with various jobs) in the labor market. A number of studies have shown a correlation between higher job risk and higher wages, suggesting that employees demand monetary compensation in return for incurring a greater risk.

Viscusi & Aldy (2003) conducted an analysis of studies that use a willingness-to-pay methodology to estimate the imputed value of life-saving programs (i.e., meta-analysis) and

found that the value of each lost work-day injury prevented was approximately $50,000 in 2000 dollars. Using the GDP Deflator (U.S. Bureau of Economic Analysis, 2010), this yields an estimate of $62,000 for each lost work-day injury avoided in 2009 dollars.

MSHA recognizes that willingness-to-pay estimates involve uncertainty and imprecision. Although MSHA is using the Viscusi & Aldy (2003) study as the basis for monetizing the expected benefits of the proposed rule, the Agency does so with several reservations, given the methodological difficulties involved in estimating the compensating wage differentials (see Hintermann, Alberini, and Markandya, 2008). Furthermore, these estimates pooled across different industries may not capture the unique circumstances faced by miners. For example, some have suggested that the models be disaggregated to account for different levels of risk, as might occur in coal mining (see Sunstein, 2004). In addition, miners may have few options of alternative employers and, in some cases, only one employer (near-monopsony or monopsony) that may depress wages below those in a more competitive labor market. In the future, MSHA plans to work with other agencies to refine the approach taken in this proposed rule.

Based on the estimated prevention of 150 nonfatal injuries per year, the proposed rule would result in monetized benefits of approximately $9.3 million per year (150 nonfatal injuries × $62,000 per injury). MSHA believes that this is a low estimate for the total benefits of the proposed rule for the reasons stated above. MSHA solicits comments on the benefit estimates.

### D. Compliance Costs

Proposed § 104.3(c) would require MSHA to issue an order withdrawing all persons from the affected area of the mine if any S&S violation is found within 90 days after the issuance of the POV notice. No one would be allowed to enter the area affected by the violation until the condition has been abated, except those persons who must enter the affected area to correct the violation.

Under proposed § 104.3(d), if a withdrawal order is issued under proposed § 104.3(c), any subsequent S&S violation would result in an order withdrawing all persons from the affected area of the mine until the authorized representative of the Secretary determines that the violation has been abated, except those persons

who must enter the affected area to correct the violation.

Closure orders can have a substantial effect on the ability of a mine to conduct its business. The threat of closure provides a strong incentive for operators to ensure that S&S violations do not recur. As was noted under benefits, MSHA anticipates that few operators would risk such an occurrence. Rather than risking a POV and the possibility of a closure, MSHA projects that mine operators would monitor their compliance record against the proposed POV criteria using the Agency's website. MSHA estimates that it will take a supervisor an average of 5 minutes each month to monitor each mine's performance using the Agency's website. Based on the average supervisory wage rate for all mining in 2009 of $65.05 per hour, MSHA estimates that the yearly cost for all mine operators to monitor their performance would be about $0.9 million (14,098 mines × 5/60 hours per month × 12 months per year × $65.05 per hour).

However, MSHA believes that this may be an overestimate. As was noted above, some operators are currently requesting this information from MSHA. Making the information available on the Agency's Web site would reduce the costs for these mine operators. MSHA requests comments on the burden that monitoring compliance record against the proposed POV criteria using the Agency's Web site would place on mine operators.

MSHA projects that approximately 50 mine operators each year would submit a safety and health management program to MSHA for approval as a mitigating circumstance. MSHA believes that it would take management working with miners to develop and implement an effective safety and health management program. MSHA projects that developing such a program with meaningful and measurable benchmarks would take about 80 hours of a supervisor's time and 80 hours of miners' time. MSHA projects that it would take an additional 40 hours of a supervisor's time and 40 hours of miners' time during the approval process and that the cost for copying and mailing the program and revisions would be about $100. MSHA projects it will take 40 hours of a supervisor's time to implementing the program plus 120 hours of miners' time to run the program (based on an average size mine in terms of employment).

Although the proposed rule applies to all mining, based on the Agency's experience and due to the nature of the mining conditions, MSHA projects that

the proposed rule would have a greater impact on underground coal mining than any other mining sector. During the period June 2007 through September 2009, underground coal mine operators received nearly 80 percent of the PPOV notifications. Rather than using the wage rates for all mining as was done to estimate the costs for monitoring mine performance, MSHA used the 2009 underground coal mine hourly wage rates of $84.70 for a supervisor and $35.30 for a miner to estimate these costs. Since the hourly wage rates in underground coal mining are higher than those in surface coal and metal/nonmetal mining, this approach could overstate the estimated costs.

The average cost of developing and implementing an approved safety and health program at a mine would be approximately $22,100 (160 hours of a supervisor's time × $84.70 per hour + 240 hours of miners' time × $35.30 per hour + $100). MSHA anticipates that, each year, the projected 50 mines that would choose to implement an MSHA-approved safety and health management program would incur costs of approximately $1.1 million.

Although MSHA does not have a historical basis from which to estimate the potential costs that would be incurred by a mine on a POV, MSHA determined that a good proxy for these costs would be the potential production lost during mine closures while the operators take the necessary actions to correct the safety and health violations. MSHA projects that a typical mine would lose about 0.5 percent of revenue as the result of closures (about 1 or 2 days for a large mine and a day or less for a small mine) and that lost revenue due to the closures would likely vary considerably among mines depending on the specific conditions in the mine. Some mines would likely incur greater than average losses while others would incur less than average losses.

As was noted above, based on the Agency's experience and due to the nature of the mining conditions, MSHA projects that the proposed rule would affect underground coal mining more than any other mining sector. MSHA, therefore, used the revenue in the underground coal sector to estimate potential production losses. The average number of underground coal mines in operation during a month in 2009 was 424. These mines generated an estimated $18.5 billion in revenue in 2009, an average of approximately $43.6 million per mine. One-half percent of an average mine's revenue is about $218,000.

MSHA estimates that the projected 10 mines that would be on a POV each year

would potentially incur about $2.2 million in production losses (10 mines × $218,000 per mine). Since the average revenue per underground coal mine is significantly higher than the average revenue produced by a mine in the entire mining industry (i.e., $6.6 million per mine = $92.8 billion/14,098 mines), this approach could overstate the estimated costs.

MSHA estimates that the total yearly cost of the proposed rule would be $4.2 million; $0.9 million for monitoring the performance of each mine, $1.1 million for 50 mines developing and implementing MSHA-approved safety and health management programs, plus $2.2 million for 10 mines operating under a POV. MSHA's estimates do not include the cost of coming into compliance with the underlying regulatory requirements. Although these costs can be substantial, they were previously attributed to compliance with MSHA's existing regulations and are not new compliance costs resulting from the proposed rule. MSHA solicits comments on the cost estimates.

### E. Net Benefits

This section presents a summary of the estimated net benefits of the proposed rule for informational purposes only. Under the Mine Act, MSHA is not required to use estimated net benefits as the basis for its decision to promulgate a rule.

Based on the estimated prevention of 150 nonfatal injuries per year, MSHA estimates that the proposed rule would result in monetized benefits of $9.3 million per year (150 nonfatal injuries per year × $62,000 per injury) compared to estimated costs of $4.2 million per year, for an estimated net benefit of approximately $5.1 million per year. MSHA solicits comments on the net benefit estimate.

### V. Feasibility

MSHA has concluded that the requirements of the pattern of violations proposed rule are technologically and economically feasible.

#### A. Technological Feasibility

MSHA concludes that this proposed rule is technologically feasible. The proposed rule is not technology-forcing. In order to avoid a POV, mine operators would have to comply with existing MSHA regulations, which have previously been determined to be technologically feasible.

#### B. Economic Feasibility

MSHA also concludes that this proposed rule is economically feasible. Mine operators can avoid the expenses

of being placed on a pattern of violations by complying with existing MSHA regulations, all of which have previously been found to be economically feasible. For those mine operators who are in danger of being placed on a POV, MSHA will consider the institution of an approved safety and health management program as a mitigating circumstance. MSHA expects few mines (about 10 per year) would incur the potential expenses associated with closures while on a POV.

MSHA has traditionally used a revenue screening test—whether the yearly compliance costs of a regulation are less than one percent of revenues—to establish presumptively that compliance with the regulation is economically feasible for the mining community. Based on this test, MSHA has concluded that the requirements of the proposed rule are economically feasible. The estimated annual compliance costs of the proposed rule to mine operators are $4.2 million, which are insignificant compared to total annual revenue of $92.8 billion for the mining industry (i.e., significantly less that one percent of the mining industry's $92.8 billion revenue, which is $928 million). Even if all of the costs were borne by the underground coal industry, the estimated $4.2 million cost of the proposed rule is about 0.02 percent of the underground coal industry's 2009 revenue of $18.5 billion. MSHA, therefore, concludes that compliance with the provisions of the proposed rule would be economically feasible for the mining industry.

### VI. Regulatory Flexibility Act and Small Business Regulatory Enforcement Fairness Act (SBREFA)

Pursuant to the Regulatory Flexibility Act (RFA) of 1980, as amended by SBREFA, MSHA has analyzed the impact of the proposed rule on small businesses. Based on that analysis, MSHA has notified the Chief Counsel for Advocacy, Small Business Administration (SBA), and made the certification under the RFA at 5 U.S.C. 605(b) that the proposed rule would not have a significant economic impact on a substantial number of small entities. The factual basis for this certification is presented below.

#### A. Definition of a Small Mine

Under the RFA, in analyzing the impact of the proposed rule on small entities, MSHA must use the SBA definition for a small entity or, after consultation with the SBA Office of Advocacy, establish an alternative definition for the mining industry by publishing that definition in the **Federal**

**Register** for notice and comment. MSHA has not taken such an action and is required to use the SBA definition. The SBA defines a small entity in the mining industry as an establishment with 500 or fewer employees.

In addition to examining small entities as defined by SBA, MSHA has also looked at the impact of this proposed rule on mines with fewer than 20 employees, which MSHA and the mining community have traditionally referred to as "small mines." These small mines differ from larger mines not only in the number of employees, but also in economies of scale in material produced, in the type and amount of production equipment, and in supply inventory. The costs of complying with the proposed rule and the impact of the proposed rule on small mines will also be different. It is for this reason that small mines are of special concern to MSHA.

MSHA concludes that it can certify that the proposed rule would not have a significant economic impact on a substantial number of small entities that would be covered by this proposed rule. The Agency has determined that this is the case both for mines with fewer than 20 employees and for mines with 500 or fewer employees.

#### B. Factual Basis for Certification

Mine operators can avoid the expenses of being placed on a POV by complying with MSHA regulations. Under the proposed rule, MSHA will consider the institution of an approved safety and health management program as a mitigating circumstance for those mine operators who are placed on a pattern. MSHA expects few mines (about 10 per year) would incur the potential expenses associated with closure orders under a POV.

MSHA initially evaluates the impacts on "small entities" by comparing the estimated compliance costs of a rule for small entities in the sector affected by the rule to the estimated revenues for the affected sector. When estimated compliance costs are less than one percent of the estimated revenues, the Agency believes it is generally appropriate to conclude that there is no significant economic impact on a substantial number of small entities. When estimated compliance costs exceed one percent of revenues, MSHA investigates whether a further analysis is required. Since it was not possible to accurately project the distribution of mines that would incur the estimated $4.2 million to comply with the proposed rule by commodity and size, MSHA examined the impact using several alternative assumptions.

The average number of mines in operation during a month in 2009 with 500 or fewer employees was 14,050. These mines generated an estimated $71.9 billion in revenue in 2009. Even if all of the costs were incurred by mines with 500 or fewer employees, the estimated $4.2 million in compliance costs would be less than 0.006 percent of the revenue generated by all small mines according to the SBA's definition.

The average number of underground coal mines in operation during a month in 2009 with 500 or fewer employees was 412. These mines generated an estimated $13.7 billion in revenue in 2009. Even if all of the costs were incurred by underground coal mines with 500 or fewer employees, the $4.2 million in compliance costs would be about 0.03 percent of the revenue generated by small underground coal mines according to the SBA's definition.

The average number of mines in operation during a month in 2009 with 1–19 employees was 11,816. These mines generated an estimated $17.4 billion in revenue in 2009. Even if all of the costs were incurred by mines with 1–19 employees, the estimated $4.2 million compliance costs would be about 0.02 percent of the revenue generated by all small mines with fewer than 20 employees.

The average number of underground coal mines in operation during a month in 2009 with 1–19 employees was 81. These mines generated an estimated $920 million in revenue in 2009. Even if all of the $4.2 million in compliance costs were incurred by underground coal mines with 1–19 employees, the costs would be about 0.45 percent of the revenue generated by small underground coal mines with fewer than 20 employees.

Moreover, mine operators can avoid any costs associated with being on a POV simply by complying with the law. If an operator has trouble complying and is in danger of being on POV, under the proposed rule, the implementation of an approved safety and health management program would serve as a mitigating circumstance.

Accordingly, MSHA has certified that the proposed rule would not have a significant economic impact on a substantial number of small entities.

## VII. Paperwork Reduction Act of 1995

### A. Summary

This proposed rule contains a collection-of-information requirement subject to review and approval by OMB under the Paperwork Reduction Act (PRA). MSHA estimates that under the proposed rule about 50 mines each year

would develop and implement approved safety and health management programs. This would impose information collection requirements related to mitigating circumstances under proposed § 104.2(a)(8).

MSHA expects that developing an approved program with meaningful and measurable benchmarks would take about 160 hours of a supervisor's time at an hourly wage of $84.70 and 240 hours of miners' time at an hourly wage of $35.30. Costs for copying and mailing the program and revisions are estimated to be $100 per program.

The burden of developing and implementing an approved safety and health program is 400 hours per mine (160 + 240) and the average cost is approximately $22,100 (160 hours of a supervisor's time × $84.70 per hour + 240 hours of miners' time × $35.30 per hour + $100).

*Burden Hours:* 50 mines × 400 hours per mine = 20,000 hours.

*Burden Costs:* 50 mines × $100 per mine = $5,000.

### B. Procedural Details

The information collection package for this proposed rule has been submitted to OMB for review under 44 U.S.C. 3504, paragraph (h) of the Paperwork Reduction Act of 1995, as amended (44 U.S.C. 3501 *et seq.*). MSHA requests comments to:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

Comments on the information collection requirements should be sent to both OMB and MSHA. Addresses for both offices can be found in the **ADDRESSES** section of this preamble. The regulated community is not required to respond to any collection of information unless it displays a current, valid, OMB control number. MSHA displays the OMB control numbers for the

information collection requirements in its regulations in 30 CFR part 3.

## VIII. Other Regulatory Considerations

### A. The Unfunded Mandates Reform Act of 1995

MSHA has reviewed the proposed rule under the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1501 *et seq.*). MSHA has determined that this proposed rule would not include any federal mandate that may result in increased expenditures by State, local, or tribal governments; nor would it increase private sector expenditures by more than $100 million in any one year or significantly or uniquely affect small governments. Accordingly, the Unfunded Mandates Reform Act of 1995 requires no further Agency action or analysis.

### B. Executive Order 13132: Federalism

This proposed rule would not have "federalism implications" because it would not "have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." Accordingly, under E.O. 13132, no further Agency action or analysis is required.

### C. The Treasury and General Government Appropriations Act of 1999: Assessment of Federal Regulations and Policies on Families

Section 654 of the Treasury and General Government Appropriations Act of 1999 (5 U.S.C. 601 note) requires agencies to assess the impact of Agency action on family well-being. MSHA has determined that this proposed rule would have no effect on family stability or safety, marital commitment, parental rights and authority, or income or poverty of families and children. This proposed rule impacts only the mining industry. Accordingly, MSHA certifies that this proposed rule would not impact family well-being.

### D. Executive Order 12630: Government Actions and Interference With Constitutionally Protected Property Rights

The proposed rule would not implement a policy with takings implications. Accordingly, under E.O. 12630, no further Agency action or analysis is required.

### E. Executive Order 12988: Civil Justice Reform

This proposed rule was written to provide a clear legal standard for affected conduct and was carefully

reviewed to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. Accordingly, this proposed rule would meet the applicable standards provided in section 3 of E.O. 12988, Civil Justice Reform.

*F. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This proposed rule would have no adverse impact on children. Accordingly, under E.O. 13045, no further Agency action or analysis is required.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This proposed rule would not have "tribal implications" because it would not "have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes." Accordingly, under E.O. 13175, no further Agency action or analysis is required.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Executive Order 13211 requires agencies to publish a statement of energy effects when a rule has a significant energy action (*i.e.,* it adversely affects energy supply, distribution or use). MSHA has reviewed this proposed rule for its energy effects because the proposed rule applies to the coal mining sector. Because this proposed rule would result in annual costs of approximately $4.2 million, most of which would be incurred in the coal mining industry, relative to annual coal mining industry revenues of $35.7 billion in 2009, MSHA has concluded that it is not a significant energy action because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. Accordingly, under this analysis, no further Agency action or analysis is required.

*I. Executive Order 13272: Proper Consideration of Small Entities in Agency Rulemaking*

MSHA has reviewed the proposed rule to assess and take appropriate account of its potential impact on small businesses, small governmental jurisdictions, and small organizations.

MSHA has determined and certified that the proposed rule would not have a significant economic impact on a substantial number of small entities.

## IX. References

Hintermann, B., Alberini, A., Markandya, A. (2010). "Estimating the Value of Safety with Labor Market Data: Are the Results Trustworthy?" *Applied Economics.* 42(9):1085–1100. Published electronically in July 2008.

Sunstein, C. (2004). "Valuing Life: A Plea for Disaggregation." *Duke Law Journal,* 54 (November 2004): 385–445.

U.S. Bureau of Economic Analysis (2010). National Income and Product Accounts Table: Table 1.1.9. Implicit Price Deflators for Gross Domestic Product [Index numbers, 2005 = 100]. Revised May 27, 2010. *http://www.bea.gov/national/nipaweb/TableView.asp?SelectedTable=13&Freq=Qtr&FirstYear=2006&LastYear=2008.*

Viscusi, W. and Aldy, J. (2003). "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," *Journal of Risk and Uncertainty,* (27:5–76).

## List of Subjects in 30 CFR Part 104

Administrative practice and procedure, Law enforcement, Mine safety and health, Reporting and recordkeeping requirements.

Dated: January 28, 2011.

**Joseph A. Main,**

*Assistant Secretary of Labor for Mine Safety and Health.*

For the reasons set out in the preamble, and under the authority of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006, MSHA is proposing to amend chapter I of title 30 of the Code of Federal Regulations by revising part 104 as follows:

## PART 104—PATTERN OF VIOLATIONS

Sec.
104.1   Purpose and scope.
104.2   Pattern criteria.
104.3   Issuance of notice.
104.4   Termination of notice.

**Authority:** 30 U.S.C. 814(e), 957.

### § 104.1   Purpose and scope.

This part establishes the criteria and procedures for determining whether a mine operator has established a pattern of significant and substantial (S&S) violations at a mine. It implements section 104(e) of the Federal Mine Safety and Health Act of 1977 (Act) by addressing mines with an inspection history of recurrent S&S violations of mandatory safety or health standards that demonstrate a mine operator's disregard for the safety and health of

miners. The purpose of the procedures in this part is the restoration of effective safe and healthful conditions at such mines.

### § 104.2   Pattern criteria.

(a) Specific pattern criteria will be posted on MSHA's Web site at *http://www.msha.gov* and used in the review to identify mines with a pattern of S&S violations. The review will include:

(1) Citations for significant and substantial violations;

(2) Orders under section 104(b) of the Act for not abating significant and substantial violations;

(3) Citations and withdrawal orders under section 104(d) of the Act, resulting from the operator's unwarrantable failure to comply;

(4) Imminent danger orders under section 107(a) of the Act;

(5) Orders under section 104(g) of the Act requiring withdrawal of miners who have not received training and who the inspector declares to be a hazard to themselves and others;

(6) Enforcement measures, other than section 104(e) of the Act, which have been applied at the mine;

(7) Other information that demonstrates a serious safety or health management problem at the mine such as accident, injury, and illness records; and

(8) Mitigating circumstances.

(b) At least two times each year, MSHA will review the compliance and accident, injury, and illness records of mines to determine if any mines meet the criteria posted on MSHA's Web site.

### § 104.3   Issuance of notice.

(a) When a mine has a pattern of violations, the District Manager will issue a pattern of violations notice to the mine operator that specifies the basis for the Agency's action. The District Manager will also provide a copy of this notice to the representative of miners.

(b) The mine operator shall post a copy of the notice on the mine bulletin board. The notice shall remain posted at the mine until it is terminated under § 104.4 of this part.

(c) If, on any inspection within 90 days after issuance of the pattern notice, an authorized representative of the Secretary finds any S&S violation, he shall issue an order for the withdrawal of all persons from the affected area, except those persons referred to in section 104(c) of the Act, until the condition has been abated.

(d) If a withdrawal order is issued under paragraph (c) of this section, any subsequent S&S violation will result in a withdrawal order that shall remain in effect until the authorized

representative of the Secretary determines that the violation has been abated.

### § 104.4 Termination of notice.

(a) Termination of a section 104(e)(1) pattern of violations notice shall occur when an MSHA inspection of the entire mine finds no S&S violations, or if no withdrawal order is issued by MSHA in accordance with section 104(e)(1) of the Act within 90 days of the issuance of the pattern notice.

(b) The mine operator may request an inspection of the entire mine or portion of the mine. No advance notice of the inspection shall be provided, and the scope of inspection shall be determined by MSHA. Partial mine inspections-covering the entire mine within 90 days shall constitute an inspection of the entire mine for the purposes of this part.

[FR Doc. 2011–2255 Filed 1–31–11; 8:45 am]

**BILLING CODE 4510–43–P**

---

## DEPARTMENT OF DEFENSE

### Office of the Secretary

### 32 CFR Part 156

[DOD–2008–OS–0160; RIN 0790–AI42]

### Department of Defense Personnel Security Program (PSP)

**AGENCY:** Department of Defense.
**ACTION:** Proposed rule.

**SUMMARY:** This rule would update policies and responsibilities for the Department of Defense (DoD) Personnel Security Program (PSP) in accordance with the provisions of current U.S. Code, Public Laws, and Executive Orders (E.O.).

**DATES:** Comments must be received by April 4, 2011.

**ADDRESSES:** You may submit comments, identified by docket number and/or Regulatory Information Number (RIN) number and title, by any of the following methods:

• *Federal Rulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Federal Docket Management System Office, 1160 Defense Pentagon, OSD Mailroom 3C843, Washington, DC 20301–1160.

*Instructions:* All submissions received must include the agency name and docket number or Regulatory Information Number (RIN) for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available

for public viewing on the Internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** Stacey Jefferson, (703) 604–1236.

**SUPPLEMENTARY INFORMATION:** The Department of Defense Directive (DoDD) 5200.2, Personnel Security Program (PSP), codified at 32 CFR 156, was issued April 9, 1999. The Department is reissuing the DoD Directive as a DoD Instruction to update existing policy regarding the DoD Personnel Security Program and also incorporate new policy related to Homeland Security Presidential Directive-12 (HSPD–12).

This rule provides PSP policy fundamental to preventing unauthorized disclosure of sensitive and classified information that could cause irreparable damage to national security. The policy portion relating to HSPD–12 implements investigative and adjudicative policy for the Department's personal identity verification credential.

Updates to the policy reflect Joint Security and Suitability Reform Team efforts to incorporate the foundational policy changes needed to implement reform. The Intelligence Reform and Terrorism Prevention Act of 2004, E.O. 13467, E.O. 12968, E.O. 10865, and HSPD–12 are some of the current Federal laws, directives and statutes that impact the DoD PSP. Since this rule was last published, additional executive orders have been issued directing alignment of security, suitability and reciprocal acceptance of prior investigations and favorable determinations.

The procedural guidance for the DoD PSP is currently being updated and will subsequently be proposed as rule codified at 32 CFR part 154. The investigative and adjudication procedural guidance for the DoD Federal personal identity verification credential pursuant HSPD–12 is undergoing coordination and will also be proposed a separate rule.

### E.O. 12866, "Regulatory Planning and Review"

It has been certified that 32 CFR part 156 does not:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy; a section of the economy; productivity; competition; jobs; the environment; public health or safety; or State, local, or tribunal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another Agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs, or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this E.O.

### Section 202, Public Law 104–4, "Unfunded Mandates Reform Act"

It has been certified that 32 CFR part 156 does not contain a Federal mandate that may result in the expenditure by State, local and tribunal governments, in aggregate, or by the private sector, of $100 million or more in any one year.

### Public Law 96–354, "Regulatory Flexibility Act" (5 U.S.C. 601)

It has been certified that 32 CFR part 156 is not subject to the Regulatory Flexibility Act (5 U.S.C. 601) because it would not, if promulgated, have a significant economic impact on a substantial number of small entities.

### Public Law 96–511, "Paperwork Reduction Act" (44 U.S.C. Chapter 35)

It has been certified that 32 CFR part 156 does not impose reporting or recordkeeping requirements under the Paperwork Reduction Act of 1995.

### E.O. 13132, "Federalism"

It has been certified that 32 CFR part 156 does not have federalism implications, as set forth in E.O. 13132. This rule does not have substantial direct effects on:

(1) The States;
(2) The relationship between the National Government and the States; or
(3) The distribution of power and responsibilities among the various levels of Government.

### List of Subjects in 32 CFR Part 156

Government employees; Security measures.

Accordingly, 32 CFR part 156 is revised to read as follows.

## PART 156—DEPARTMENT OF DEFENSE PERSONNEL SECURITY PROGRAM (PSP)

Sec.
156.1   Purpose.
156.2   Applicability.
156.3   Definitions.
156.4   Policy.
156.5   Responsibilities.
156.6   Procedures-sensitive positions, duties, and classified access.
156.7   Procedures—common access card investigation and adjudication.

The Commission recognizes the concern expressed in comments regarding the use of TACs. Additionally, the Commission also recognizes the potential benefit of a TAC, particularly when addressing a complex or technical regulation. While the Commission agrees with those comments suggesting a regulation may not be necessary, the Commission will consider drafting a policy guiding the development of a TAC, member selection, and meeting rules. The Commission anticipates that a TAC policy will be developed during 2011. The process for developing a TAC policy will be consistent with the NIGC's Tribal Consultation policy.

### B. Communication Policy

The NOI asked whether the NIGC should consider developing a regulation or include as part of a regulation a process for determining how it communicates with Tribes. The NOI noted that NIGC communicates directly with the Tribal Gaming Regulatory Agency (TGRA) or Tribal Gaming Commission (TGC) as well as directly with the tribal government. The NOI asked whether the NIGC should consider promulgating a regulation or policy establishing a default method of communication unless otherwise directed by tribal resolution.

Many comments recommended that the Commission should not consider adopting a universal standard for communicating with Tribes. Tribes noted the variety in government structures and methods used by Tribes when taking official action. However, Tribes also noted the need for more effective communication with all affected parties, including the elected government officials, TGC, TGRA and the gaming operation. While the Commission agrees with those comments suggesting a regulation may not be necessary, the Commission will consider drafting a policy guiding how the Commission communicates with Tribes, their gaming regulatory bodies, and the gaming operation. This Commission anticipates that a policy will be developed over the course of the regulatory review process outlined above. The process for developing a Communication policy will be consistent with NIGC's Tribal Consultation policy.

### C. Other Regulations

During this review process, the Commission attempted to identify those regulations identified by Tribes and/or the Commission in most need of review. However, the Commission reserves the right to review other regulations if needed throughout this review process.

Review of regulations not specifically identified in this Notice will be reviewed utilizing the process described in Section IIB of this Notice.

**Authority:** 25 U.S.C. 2706(b)(10); E.O. 13175.

Dated: March 30, 2011, Washington, DC.

**Tracie L. Stevens,**
*Chairwoman.*
**Steffani A. Cochran,**
*Vice-Chairwoman.*
**Daniel J. Little,**
*Associate Commissioner.*
[FR Doc. 2011–7912 Filed 4–1–11; 8:45 am]

**BILLING CODE 7565–01–P**

---

## DEPARTMENT OF LABOR

## Mine Safety and Health Administration

### 30 CFR Part 104

**RIN 1219–AB73**

### Pattern of Violations

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Proposed rule; extension of comment period.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) is extending the comment period on the proposed rule addressing Pattern of Violations (POV). This extension gives commenters additional time to review and comment on the proposed rule.

**DATES:** All comments must be received or postmarked by midnight Eastern Daylight Savings Time on April 18, 2011.

**ADDRESSES:** Submit comments by any of the following methods. Comments must be identified with "RIN 1219–AB73" in the subject line of the message.

• *Federal e-Rulemaking Portal:* *http://www.regulations.gov.* Follow the on-line instructions for submitting comments.

• *Electronic mail:* zzMSHA-comments@dol.gov.

• *Facsimile:* 202–693–9441.

• *Regular Mail or Courier:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia 22209–3939. Courier must sign in at the receptionist's desk on the 21st floor.

**FOR FURTHER INFORMATION CONTACT:** Roslyn B. Fontaine, Chief, Regulatory Development Division, Office of Standards, Regulations, and Variances, MSHA, at *fontaine.roslyn@dol.gov* (e-mail); 202–693–9440 (voice); or 202–693–9441 (facsimile).

**SUPPLEMENTARY INFORMATION:**

### Availability of Information

*View Public Comments:* MSHA will post all comments on the Internet without change, including any personal information provided. Access comments electronically at *http://www.msha.gov/ REGS/Comments/2011-2255/POV.asp* or at *http://www.regulations.gov.* Review comments in person at MSHA, Office of Standards, Regulations, and Variances, at the address in the **ADDRESSES** section above.

*E-mail notification:* To subscribe to receive e-mail notification when the Agency publishes rulemaking documents in the **Federal Register**, go to: *http://www.msha.gov/subscriptions/ subscribe.aspx.*

### Extension of Comment Period and Request for Comments

On February 2, 2011 (76 FR 5719), MSHA published a proposed rule on Pattern of Violations (POV). In response to requests from interested parties, MSHA is extending the comment period from April 4, 2011, to April 18, 2011. MSHA solicits comments from the mining community on all aspects of the proposed rule. The proposed rule is available on MSHA's Web site at *http://www.msha.gov/REGS/FEDREG/ PROPOSED/2011PROP/2011-2255.pdf.*

Dated: March 30, 2011.

**Joseph A. Main,**
*Assistant Secretary of Labor for Mine Safety and Health.*
[FR Doc. 2011–7975 Filed 4–1–11; 8:45 am]

**BILLING CODE 4510–43–P**

---

## DEPARTMENT OF THE INTERIOR

## Office of Surface Mining Reclamation and Enforcement

### 30 CFR Part 938

**[SATS No. PA–156–FOR; Docket ID: OSM 2010–0004]**

### Pennsylvania Regulatory Program

**AGENCY:** Office of Surface Mining Reclamation and Enforcement (OSM), Interior.

**ACTION:** Proposed rule; reopening of the public comment period.

**SUMMARY:** We are reopening the public comment period related to an amendment to the Pennsylvania regulatory program (the "Pennsylvania program") under the Surface Mining Control and Reclamation Act of 1977 (SMCRA or the Act). The amendment is in response to fourteen required program amendments and the remining financial guarantee program. The

AB13-FR-2

• All Conforming Rules
[FR Doc. 2011–10884 Filed 5–3–11; 8:45 am]
**BILLING CODE 6351–01–P**

# DEPARTMENT OF LABOR

## Mine Safety and Health Administration

**30 CFR Parts 70, 71, 72, 75, and 90**

**RIN 1219–AB64**

### Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Proposed rule; extension of comment period.

**SUMMARY:** In response to requests from interested parties, the Mine Safety and Health Administration (MSHA) is extending the comment period on the proposed rule addressing Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors. This extension gives commenters additional time to review and comment on the proposed rule. The proposal was published on October 19, 2010 (75 FR 64412).

**DATES:** All comments must be received or postmarked by midnight Eastern Daylight Saving Time on May 31, 2011.

**ADDRESSES:** Comments must be identified with "RIN 1219–AB64" and may be sent by any of the following methods:

(1) *Federal e-Rulemaking Portal:* http://www.regulations.gov. Follow the instructions for submitting comments.

(2) *Facsimile:* 202–693–9441. Include "RIN 1219–AB64" in the subject line of the message.

(3) *Regular Mail:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia 22209–3939.

(4) *Hand Delivery or Courier:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia. Sign in at the receptionist's desk on the 21st floor.

MSHA will post all comments without change, including any personal information provided. Access comments electronically on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/currentcomments.asp.* Review comments in person at the Office of Standards, Regulations, and Variances, 1100 Wilson Boulevard, Room 2350, Arlington, Virginia. Sign in at the receptionist's desk on the 21st floor.

MSHA maintains a list that enables subscribers to receive e-mail notification when the Agency publishes rulemaking documents in the **Federal Register.** To subscribe, go to *http://www.msha.gov/subscriptions/subscribe.aspx.*

**FOR FURTHER INFORMATION CONTACT:** Roslyn B. Fontaine, Acting Director, Office of Standards, Regulations and Variances, MSHA, at *Fontaine.Roslyn@dol.gov* (E-mail), (202) 693–9440 (Voice), or (202) 693–9441 (Fax).

**SUPPLEMENTARY INFORMATION:**

### Extension of Comment Period

On October 19, 2010 (75 FR 64412), MSHA published a proposed rule, Lowering Miners' Exposure to Respirable Coal Mine Dust, Including Continuous Personal Dust Monitors. In response to requests from interested parties, MSHA is extending the comment period from May 2, 2011 to May 31, 2011. All comments and supporting documentation must be received or postmarked by May 31, 2011.

Dated: April 28, 2011.

**Joseph A. Main,**
*Assistant Secretary of Labor for Mine Safety and Health.*

[FR Doc. 2011–10780 Filed 4–29–11; 4:15 pm]
**BILLING CODE 4510–43–P**

# DEPARTMENT OF LABOR

## Mine Safety and Health Administration

**30 CFR Parts 75 and 104**

**RIN 1219–AB75, 1219–AB73**

### Examinations of Work Areas in Underground Coal Mines and Pattern of Violations

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Proposed rule; notice of public hearings; notice of re-opening and close of comment period.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) will hold four public hearings on the Agency's proposed rules for Examinations of Work Areas in Underground Coal Mines (Examinations of Work Areas) and for Pattern of Violations. Each hearing will cover the major issues raised by commenters in response to the respective proposed rules.

**DATES:** Hearings will be held on June 2, 7, 9, and 15, 2011, at the locations listed in the **SUPPLEMENTARY INFORMATION** section of this document.

Post-hearing comments must be received or postmarked by midnight Eastern Daylight Saving Time on June 30, 2011.

**ADDRESSES:** Comments, requests to speak, and informational materials for the rulemaking record may be sent to MSHA by any of the following methods. Clearly identify all submissions with "RIN 1219–AB75" for Examinations of Work Areas in Underground Coal Mines' submissions, and with "RIN 1219–AB73" for Pattern of Violations' submissions.

• *Federal E-Rulemaking Portal:* http://www.regulations.gov. Follow the on-line instructions for submitting comments.

• *Facsimile:* 202–693–9441.

• *Mail or Hand Delivery:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Blvd., Room 2350, Arlington, VA 22209–3939. For hand delivery, sign in at the receptionist's desk on the 21st floor.

**FOR FURTHER INFORMATION CONTACT:** Roslyn B. Fontaine, Acting Director, Office of Standards, Regulations, and Variances, MSHA, at *fontaine.roslyn@dol.gov* (e-mail); 202–693–9440 (voice); or 202–693–9441 (facsimile).

**SUPPLEMENTARY INFORMATION:**

### I. Availability of Information

*Federal Register* Publications: The proposed rule for Examinations of Work Areas in Underground Coal Mines, published on December 27, 2010 (75 FR 81165), and the proposed rule for Pattern of Violations, published on February 2, 2011 (76 FR 5719), are available on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/REGSPROP.HTM.*

*Public Comments:* MSHA posts all comments without change, including any personal information provided. Access comments electronically on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/currentcomments.asp.* Review comments in person at the Office of Standards, Regulations, and Variances, 1100 Wilson Blvd., Room 2350, Arlington, VA. Sign in at the receptionist's desk on the 21st floor.

*E-mail Notification:* To subscribe to receive e-mail notification when MSHA publishes rulemaking documents in the **Federal Register,** go to *http://www.msha.gov/subscriptions/subscribe.aspx.*

### II. Public Hearings

MSHA will hold four public hearings on its proposed rules for Examinations of Work Areas in Underground Coal

AB73-FR-3

Mines and for Pattern of Violations. Requests to speak at a hearing should be made prior to the hearing date. You do not have to make a written request to speak; however, persons and organizations wishing to speak are encouraged to notify MSHA in advance for scheduling purposes. MSHA

requests that parties making presentations at the hearings submit their presentations to MSHA, including any documentation, no later than 5 days prior to the hearing.

The public hearings for the Examinations of Work Areas proposal will begin at 8:30 a.m. on each date.

The public hearings for the Pattern of Violations proposal will begin immediately following the conclusion of all testimony on the Examinations of Work Areas proposal.

MSHA is holding the two hearings on each of the following dates at the locations indicated:

| Date | Location | Contact No. |
|------|----------|-------------|
| June 2 .......... | Embassy Suites Denver, 4444 N. Havana Street, Denver, CO 80239 ................................................. | 303–375–0400 |
| June 7 .......... | Clay Center for the Arts and Sciences of West Virginia, Walker Theater (*use this entrance*), One Clay Square, Charleston, WV 25301. | 304–561–3560 |
| June 9 .......... | Sheraton Birmingham, 2101 Richard Arrington, Jr. Blvd. North, Birmingham, AL 35203 ...................... | 205–324–5000 |
| June 15 ........ | Department of Labor, Mine Safety and Health Administration Headquarters, 1100 Wilson Boulevard, 25th Floor, Arlington, VA 22209–3939. | 202–693–9440 |

Each hearing will begin with an opening statement from MSHA, followed by an opportunity for members of the public to make oral presentations. The hearings will be conducted in an informal manner. Formal rules of evidence will not apply. The hearing panel may ask questions of speakers. Speakers and other attendees may present information to MSHA for inclusion in the rulemaking record. MSHA also will accept written comments and other appropriate information for the record from any interested party, including those not presenting oral statements, until the close of the comment period on June 30, 2011.

MSHA will have a verbatim transcript of the proceedings taken for each hearing. Copies of the transcripts will be available to the public on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/tscripts.htm*.

### III. Pattern of Violations: Clarification

Section 104.2(a) of the Pattern of Violations (POV) proposed rule would provide that the specific criteria used in the review to identify mines with a pattern of significant and substantial violations would be posted on MSHA's Web site. In the preamble, MSHA requested specific comments on how the Agency should obtain comment during the development of, and periodic revision to, the POV screening criteria. At this point in the rulemaking, MSHA plans to provide any change to the specific criteria to the public, via posting on the Agency's Web site, for comment before MSHA uses it to review a mine for a POV. MSHA plans to review and respond to comments, and revise, as appropriate, the specific criteria, and post it on the Agency's Web site. MSHA requests comments on this proposed approach to obtaining public

input into revisions to the specific POV criteria.

Under § 104.2(a)(8) of the POV proposal, MSHA stated in the preamble that an operator may submit a written safety and health management program to the district manager for approval so that MSHA can determine whether the program's parameters would result in meaningful, measurable, and significant reductions in significant and substantial violations. MSHA would like to clarify that the Agency did not intend that these safety and health management programs be the same as those referenced in the Agency's rulemaking on comprehensive safety and health management programs (RIN 1219–AB71). Rather, a safety and health management program that would be considered by MSHA as a mitigating circumstance in the POV proposal would be one that: (1) Includes measurable benchmarks for abating specific violations that could lead to a POV at a specific mine; and (2) addresses hazardous conditions at that mine.

### IV. Request for Comments

MSHA solicits comments from the mining community on all aspects of the proposed rules and is particularly interested in comments that address alternatives to key provisions in the proposals. Commenters are requested to be specific in their comments and submit detailed rationale and supporting documentation for any comment or suggested alternative.

Dated: April 28, 2011.

**Joseph A. Main,**

*Assistant Secretary of Labor for Mine Safety and Health.*

[FR Doc. 2011–10788 Filed 4–29–11; 4:15 pm]

**BILLING CODE 4510–43–P**

## DEPARTMENT OF HOMELAND SECURITY

**Coast Guard**

**33 CFR Part 165**

[Docket No. USCG–2011–0279]

**RIN 1625–AA00**

**Safety Zone; TriMet Bridge Project, Willamette River; Portland, OR**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The U.S. Coast Guard is proposing the establishment of a safety zone during the construction of the TriMet Bridge on the Willamette River, in Portland, OR. This action is necessary to ensure the safety of recreational vessels and commercial vessels transiting in close proximity to cranes and overhead work associated with this construction project. During the enforcement period, all vessels will be required to transit through the area at a no wake speed and at a safe distance from the work being conducted.

**DATES:** Comments and related material must be received by the Coast Guard on or before June 20, 2011.

**ADDRESSES:** You may submit comments identified by docket number USCG–2011–0279 using any one of the following methods:

(1) *Federal eRulemaking Portal: http://www.regulations.gov*.

(2) *Fax:* 202–493–2251.

(3) *Mail:* Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590–0001.

(4) *Hand delivery:* Same as mail address above, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The telephone number is 202–366–9329.

Airspace Designations and Reporting Points, dated August 18, 2010, effective September 15, 2010, is amended as follows:

*Paragraph 6005 Class E airspace areas extending upward from 700 feet or more above the surface of the earth.*

\* \* \* \* \*

**ASO NC E5 Shelby, NC [AMENDED]**

Shelby-Cleveland County Regional Airport, NC

(Lat. 35°15′21″ N., long. 81°36′02″ W.)

That airspace extending upward from 700 feet above the surface within a 7.8-mile radius of Shelby-Cleveland County Regional Airport.

Issued in College Park, Georgia, on June 1, 2011.

**Mark D. Ward,**

*Manager, Operations Support Group, Eastern Service Center, Air Traffic Organization.*

[FR Doc. 2011–15110 Filed 6–17–11; 8:45 am]

**BILLING CODE 4910-13-P**

---

**DEPARTMENT OF LABOR**

**Mine Safety and Health Administration**

**30 CFR Parts 75 and 104**

**RIN 1219–AB75, 1219–AB73**

**Examinations of Work Areas in Underground Coal Mines and Pattern of Violations**

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Proposed rule; notice of public hearing; notice of extension of comment period.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) will hold additional public hearings on the Agency's proposed rules for Examinations of Work Areas in Underground Coal Mines (Examinations of Work Areas) and for Pattern of Violations.

**DATES:** The hearings will be held on July 12, 2011, at the location listed in the **ADDRESSES** section of this document.

Post-hearing comments must be received or postmarked by midnight Eastern Daylight Saving Time on August 1, 2011.

**ADDRESSES:** The public hearings will be held at The Forum at the Hal Rogers Center, 101 Bulldog Lane, Hazard, Kentucky.

Comments, requests to speak, and informational materials for the rulemaking record may be sent to MSHA by any of the following methods. Clearly identify all submissions with "RIN 1219–AB75" for Examinations of Work Areas in Underground Coal Mines' submissions, and with "RIN 1219–AB73" for Pattern of Violations' submissions.

• *Federal E-Rulemaking Portal:* http://www.regulations.gov. Follow the on-line instructions for submitting comments.

• *Electronic mail:* http://zzMSHA-comments@dol.gov. Include "RIN 1219–AB75" in the subject line of the message for Examinations of Work Areas in Underground Coal Mines and "RIN 1219–AB73" for Pattern of Violations.

• *Facsimile:* 202–693–9441.

• *Mail or Hand Delivery:* MSHA, Office of Standards, Regulations, and Variances, 1100 Wilson Blvd., Room 2350, Arlington, VA 22209–3939. For hand delivery, sign in at the receptionist's desk on the 21st floor.

**FOR FURTHER INFORMATION CONTACT:** Roslyn B. Fontaine, Acting Director, Office of Standards, Regulations, and Variances, MSHA, at *fontaine.roslyn@dol.gov* (e-mail); 202–693–9440 (voice); or 202–693–9441 (facsimile).

**SUPPLEMENTARY INFORMATION:**

**I. Availability of Information**

**Federal Register Publications:** The proposed rule for Examinations of Work Areas in Underground Coal Mines, published on December 27, 2010 (75 FR 81165), and the proposed rule for Pattern of Violations, published on February 2, 2011 (76 FR 5719), are available on http://www.regulations.gov

and on MSHA's Web site at *http://www.msha.gov/REGSPROP.HTM.*

*Public Comments:* MSHA posts all comments without change, including any personal information provided. Access comments electronically on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/currentcomments.asp.* Review comments in person at the Office of Standards, Regulations, and Variances, 1100 Wilson Blvd., Room 2350, Arlington, VA. Sign in at the receptionist's desk on the 21st floor.

*E-mail Notification:* To subscribe to receive e-mail notification when MSHA publishes rulemaking documents in the **Federal Register**, go to *http://www.msha.gov/subscriptions/subscribe.aspx.*

**II. Public Hearings**

MSHA held four public hearings on its proposed rules for Examinations of Work Areas in Underground Coal Mines and for Pattern of Violations. In response to a request from the public, MSHA will hold one additional public hearing on its proposed rules for Examinations of Work Areas in Underground Coal Mines and for Pattern of Violations. Requests to speak at a hearing should be made prior to the hearing date. You do not have to make a written request to speak; however, persons and organizations wishing to speak are encouraged to notify MSHA in advance for scheduling purposes. MSHA requests that parties making presentations at the hearings submit their presentations to MSHA, including any documentation, no later than 5 days prior to the hearing.

The public hearing for the Examinations of Work Areas proposal will begin at 8:30 a.m. and the public hearing for the Pattern of Violations proposal will begin immediately following the conclusion of the public hearing on the Examinations of Work Areas proposal.

MSHA is holding the two hearings on Tuesday, July 12, 2011, at the following location:

| Date | Location | Contact No. |
|---|---|---|
| Tuesday, July 12, 2011 ...................... | The Forum at the Hal Rogers Center, 101 Bulldog Lane, Hazard, Kentucky 41701. | City Hall: 606–436–3171. |

Each hearing will begin with an opening statement from MSHA, followed by an opportunity for members of the public to make oral presentations. The hearings will be conducted in an informal manner. Formal rules of evidence will not apply. The hearing

panel may ask questions of speakers and speakers may ask questions of the hearing panel. Speakers and other attendees may present information to MSHA for inclusion in the rulemaking record. MSHA also will accept written comments and other appropriate

information for the record from any interested party, including those not presenting oral statements, until the close of the comment period on August 1, 2011.

MSHA will have a verbatim transcript of the proceedings taken for each

AB73-FR-4

**35802** Federal Register / Vol. 76, No. 118 / Monday, June 20, 2011 / Proposed Rules

hearing. Copies of the transcripts will be available to the public on *http://www.regulations.gov* and on MSHA's Web site at *http://www.msha.gov/tscripts.htm.*

## III. Pattern of Violations: Clarification

Section 104.2(a) of the Pattern of Violations (POV) proposed rule would provide that the specific criteria used in the review to identify mines with a pattern of significant and substantial violations would be posted on MSHA's website. In the preamble, MSHA requested specific comments on how the Agency should obtain comment during the development of, and periodic revision to, the POV screening criteria. At this point in the rulemaking, MSHA plans to provide any change to the specific criteria to the public, via posting on the Agency's Web site, for comment before MSHA uses it to review a mine for a POV. MSHA plans to review and respond to comments, and revise, as appropriate, the specific criteria, and post its response to the comments on the Agency's website. MSHA requests comments on this proposed approach to obtaining public input into revisions to the specific POV criteria.

Under § 104.2(a)(8) of the POV proposal, MSHA stated in the preamble that an operator may submit a written safety and health management program to the district manager for approval so that MSHA can determine whether the program's parameters would result in meaningful, measurable, and significant reductions in significant and substantial violations. MSHA would like to clarify that the Agency did not intend that these safety and health management programs be the same as those referenced in the Agency's rulemaking on comprehensive safety and health management programs (RIN 1219–AB71), which has not yet been published as a proposed rule. Rather, a safety and health management program that would be considered by MSHA as a mitigating circumstance in the POV proposal would be one that: (1) Includes measurable benchmarks for abating specific violations that could lead to a POV at a specific mine; and (2) addresses hazardous conditions at that mine.

## IV. Request for Comments

MSHA solicits comments from the mining community on all aspects of the proposed rules and is particularly interested in comments that address alternatives to key provisions in the proposals. Commenters are requested to be specific in their comments and submit detailed rationale and supporting documentation for any comment or suggested alternative.

Dated: June 15, 2011.

Joseph A. Main,

*Assistant Secretary of Labor for Mine Safety and Health.*

[FR Doc. 2011–15250 Filed 6–17–11; 8:45 am]

**BILLING CODE 4510–43–P**

## DEPARTMENT OF HOMELAND SECURITY

**Coast Guard**

**33 CFR Part 100**

**[Docket No. USCG–2011–0266]**

**RIN 1625–AA08**

**Special Local Regulations for Marine Events; Patuxent River, Solomons, MD**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to establish special local regulations during the "Chesapeake Challenge" power boat races, a marine event to be held on the waters of the Patuxent River, near Solomons, MD on September 24 and 25, 2011. These special local regulations are necessary to provide for the safety of life on navigable waters during the event. This action is intended to temporarily restrict vessel traffic in a portion of the Patuxent River during the event.

**DATES:** Comments and related material must be received by the Coast Guard on or before July 20, 2011. Requests for public meetings must be received by the Coast Guard on or before the end of the comment period.

**ADDRESSES:** You may submit comments identified by docket number USCG–2011–0266 using any one of the following methods:

(1) *Federal eRulemaking Portal: http://www.regulations.gov.*

(2) *Fax:* 202–493–2251.

(3) *Mail:* Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590–0001.

(4) *Hand delivery:* Same as mail address above, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The telephone number is 202–366–9329.

To avoid duplication, please use only one of these four methods. See the "Public Participation and Request for Comments" portion of the **SUPPLEMENTARY INFORMATION** section

below for instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this proposed rule, call or e-mail Mr. Ronald Houck, U.S. Coast Guard Sector Baltimore, MD; telephone 410–576–2674, e-mail *Ronald.L.Houck@uscg.mil.* If you have questions on viewing or submitting material to the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

## Public Participation and Request for Comments

We encourage you to participate in this rulemaking by submitting comments and related materials. All comments received will be posted without change to *http://www.regulations.gov* and will include any personal information you have provided.

### Submitting Comments

If you submit a comment, please include the docket number for this rulemaking (USCG–2011–0266), indicate the specific section of this document to which each comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online (via *http://www.regulations.gov*) or by fax, mail, or hand delivery, but please use only one of these means. If you submit a comment online via *http://www.regulations.gov,* it will be considered received by the Coast Guard when you successfully transmit the comment. If you fax, hand deliver, or mail your comment, it will be considered as having been received by the Coast Guard when it is received at the Docket Management Facility. We recommend that you include your name and a mailing address, an e-mail address, or a telephone number in the body of your document so that we can contact you if we have questions regarding your submission.

To submit your comment online, go to *http://www.regulations.gov,* click on the "submit a comment" box, which will then become highlighted in blue. In the "Document Type" drop down menu select "Proposed Rule" and insert "USCG–2011–0266" in the "Keyword" box. Click "Search" then click on the balloon shape in the "Actions" column. If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit comments by mail and would like to



# FEDERAL REGISTER

| Vol. 78 | Wednesday, |
| No. 15 | January 23, 2013 |

Part IV

## Department of Labor

Mine Safety and Health Administration

30 CFR Part 104
Pattern of Violations; Final Rule

AB73-2FR-1

**5056** Federal Register / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

## DEPARTMENT OF LABOR

**Mine Safety and Health Administration**

**30 CFR Part 104**

**RIN 1219–AB73**

**Pattern of Violations**

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Final rule.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) is revising the Agency's existing regulation for pattern of violations (POV). MSHA has determined that the existing regulation does not adequately achieve the intent of the Federal Mine Safety and Health Act of 1977 (Mine Act) that the POV provision be used to address mine operators who have demonstrated a disregard for the health and safety of miners. Congress included the POV provision in the Mine Act so that mine operators would manage health and safety conditions at mines and find and fix the root causes of significant and substantial (S&S) violations, protecting the health and safety of miners. The final rule simplifies the existing POV criteria, improves consistency in applying the POV criteria, and more effectively achieves the Mine Act's statutory intent. It also encourages chronic safety violators to comply with the Mine Act and MSHA's health and safety standards.

**DATES:** The final rule is effective on March 25, 2013.

**FOR FURTHER INFORMATION CONTACT:** George F. Triebsch, Director, Office of Standards, Regulations, and Variances, MSHA, at *triebsch.george@dol.gov* (email); 202–693–9440 (voice); or 202–693–9441 (facsimile). (These are not toll-free numbers.)

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
II. Background
III. Section-by-Section Analysis
IV. Regulatory Economic Analysis
V. Feasibility
VI. Regulatory Flexibility Analysis and Small Business Regulatory Enforcement Fairness Act
VII. Paperwork Reduction Act of 1995
VIII. Other Regulatory Considerations
IX. References

### Availability of Information

Access rulemaking documents electronically at *http://www.msha.gov/regsinfo.htm* or *http://www.regulations.gov* on the day following publication of this notice in the **Federal Register**.

## I. Executive Summary

### A. Purpose of the Regulatory Action

Congress enacted the pattern of violations (POV) provision to provide MSHA with an additional enforcement tool, when other tools had proven ineffective. The final rule implements the statutory and legislative intent that safe and healthful conditions be restored at noncompliant mines.

This rule will have both quantitative and qualitative benefits and will reduce accidents, injuries, and fatalities in mines. This final rule is responsive to recommendations in the Office of the Inspector General's Report (OIG Report) on MSHA's implementation of its POV authority. The safety and health conditions that led to the accident at the Upper Big Branch (UBB) mine on April 5, 2010, further demonstrated the need to revise the POV regulation.

The POV final rule is one of MSHA's highest priority regulatory initiatives. It strengthens MSHA's ability to focus on those mine operators who demonstrate a disregard for the health and safety of miners through a recurring pattern of significant and substantial (S&S) violations. This final rule allows MSHA to focus on the most troubling mines, provide those operators with notice that they are out of compliance, and review their health and safety conditions until they are improved. This rule will not affect the vast majority of mines that operate in compliance with the Federal Mine Safety and Health Act of 1977 (Mine Act).

Congress intended that MSHA act quickly to address mines with recurring safety and health violations. MSHA's existing POV regulation limits the Agency's effective use of the POV provision, resulting in delays in taking action against chronic violators and depriving miners of necessary safety and health protections.

### B. Summary of Major Provisions

The final rule simplifies the existing POV criteria, improves consistency in applying the POV criteria, and increases the efficiency and effectiveness in issuance of a POV notice. The final POV rule:

• Retains the existing regulatory requirement that MSHA review all mines for a POV at least once each year;

• Eliminates the initial screening and the potential pattern of violations (PPOV) notice and review process;

• Eliminates the existing requirement that MSHA can consider only final orders in its POV review;

• Like the existing rule, establishes general criteria that MSHA will use to identify mines with a pattern of

significant and substantial (S&S) violations;

• Provides for posting, on MSHA's Web site, the specific criteria (e.g., the number or rate of S&S violations) that MSHA will use in making POV determinations. This is consistent with existing practice; and

• Mirrors the provision in the Mine Act for termination of a POV.

In addition, in response to commenter concerns, the preamble to the final rule addresses:

• MSHA's Monthly Monitoring Tool for Pattern of Violations that operators can use to monitor their compliance performance;

• MSHA's commitment to requesting stakeholder input to revisions of the specific criteria; and

• MSHA's response to commenters' due process concerns;

(1) Operator can submit a corrective action program;

(2) Operator can request a meeting with the District Manager to discuss discrepancies in MSHA data; and

(3) Operator can request expedited temporary relief from a POV closure order.

### C. Projected Costs and Benefits

This rule is not economically significant. Net benefits are approximately $6.7 million. Total annualized benefits are $12.6 million and total annualized costs are $5.9 million. The final rule will not have a significant economic impact on a substantial number of small mining operations.

MSHA estimates that the final rule will prevent 1,796 non-fatal and non-disabling injuries over 10 years.

MSHA expects that qualitative benefits will:

• Encourage chronic violators to more effectively and quickly comply with safety and health standards;

• Provide for a more open and transparent process;

• Promote a culture of safety and health at mines and hold operators more accountable; and

• Simplify MSHA's procedures to improve consistency.

## II. Background

### A. Statutory Provision

In enacting the Federal Mine Safety and Health Act of 1977 (Mine Act), Congress included the pattern of violations (POV) provision in section 104(e) to provide MSHA with an additional enforcement tool to protect miners when the mine operator demonstrated a disregard for the health and safety of miners. The need for such

a provision was forcefully demonstrated during the investigation of the Scotia Mine disaster, which occurred in 1976 in Eastern Kentucky (S. Rep. No. 181, 95th Cong., 1st Sess. at 32]. As a result of explosions on March 9 and 11, 1976, caused by dangerous accumulations of methane, 23 miners and three mine inspectors lost their lives. The Scotia Mine had a chronic history of persistent, serious violations that were repeatedly cited by MSHA. After abating the violations, the mine operator would permit the same violations to recur, repeatedly exposing miners to the same hazards. The accident investigation showed that MSHA's then existing enforcement program had been unable to address the Scotia Mine's history of recurring violations.

The Mine Act places the responsibility for ensuring the health and safety of miners on mine operators. The legislative history of the Mine Act emphasizes that Congress reserved the POV provision for mine operators with a record of repeated significant and substantial (S&S) violations. Congress intended the POV provision to be used for mine operators who have not responded to the Agency's other enforcement efforts. The legislative history states that Congress believed that the existence of a pattern would signal to both the mine operator and the Secretary that "there is a need to restore the mine to effective safe and healthful conditions and that the mere abatement of violations as they are cited is insufficient" (S. Rep. No. 181, supra at 33].

The Mine Act does not define pattern of violations. Section 104(e)(4) authorizes the Secretary "to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists." Congress provided the Secretary with broad discretion in establishing these criteria, recognizing that MSHA may need to modify the criteria as experience dictates.

*B. Regulatory History*

MSHA proposed a POV regulation in 1980 (45 FR 54656). That proposal included: purpose and scope, initial screening, pattern criteria, issuance of notice, and termination of notice. Commenters were generally opposed to the 1980 proposal and it was never finalized.

On February 8, 1985 (50 FR 5470), MSHA announced its withdrawal of the 1980 proposed rule and issued an advance notice of proposed rulemaking (ANPRM) that addressed many of the concerns expressed about the 1980 proposal. In the 1985 ANPRM, MSHA

stated that it intended to focus on the health and safety record of each mine rather than on a strictly quantitative comparison of mines to industry-wide norms. In the ANPRM, MSHA stated that the Agency envisioned simplified criteria, focusing on two principal questions:

• Were S&S violations common to a particular hazard or did S&S violations throughout the mine represent an underlying health and safety problem?

• Is the mine on a § 104(d) unwarrantable failure sequence, indicating that other enforcement measures had been ineffective? MSHA requested suggestions for additional factors the Agency should use in determining whether a POV exists and requested ideas on administrative procedures for terminating a pattern notice.

Based on the comments on the 1985 ANPRM, MSHA published a new proposed rule on May 30, 1989 (54 FR 23156), which included criteria and procedures for identifying mines with a pattern of S&S violations. The 1989 proposal included procedures for initial identification of mines developing a POV; criteria for determining whether a POV exists at a mine; notification procedures that would provide both the mine operator and miners' representative an opportunity to respond to the Agency's evaluation that a POV may exist; and procedures for terminating a POV notice. The 1989 proposal addressed the major issues raised by commenters on the 1980 proposal and the 1985 ANPRM. Commenters' primary concerns were MSHA's policies for enforcing the S&S provisions of the Mine Act, the civil penalty regulation, and MSHA's enforcement of the unwarrantable failure provision of the Mine Act. MSHA held two public hearings. After consideration of the information and data in the rulemaking record, MSHA issued a final rule on July 31, 1990 (55 FR 31128).

MSHA proposed revisions to its POV rule on February 2, 2011 (76 FR 5719). The Agency held five public hearings: June 2 in Denver, CO; June 7 in Charleston, WV; June 9 in Birmingham, AL; June 15 in Arlington, VA; and July 12 in Hazard, KY. MSHA also extended the comment period three times to April 18, June 30, and August 1, 2011.

*C. Enforcement History*

Until mid-2007, POV screening was decentralized; MSHA District offices were responsible for conducting the required annual POV screening of mines. Following the accidents at the Sago, Darby, and Aracoma mines in

2006, MSHA developed a centralized POV screening process.

MSHA initiated a newly developed "Pattern of Violations Screening Criteria and Scoring Model" in mid-2007, using a computer program based on the screening criteria and scoring model to generate lists of mines with a potential pattern of violations (PPOV). In late 2009, MSHA determined that the Agency needed to revise its POV regulation and placed Part 104—Pattern of Violations on the Agency's 2010 Spring Semi-annual Regulatory Agenda. The safety and health conditions at the Upper Big Branch (UBB) mine that led to the accident on April 5, 2010, further demonstrated the need to update the POV regulation. As one commenter stated, the UBB mine avoided being placed on a POV despite an egregious record of noncompliance.

In order to increase transparency, the Agency also created a user-friendly, "Monthly Monitoring Tool for Pattern of Violations" (on-line Monthly Monitoring Tool) that provides mine operators, on a monthly basis, a statement of their performance with respect to each of the PPOV screening criteria posted on MSHA's Web site.

Prior to MSHA's creation of the on-line Monthly Monitoring Tool, mine operators had to track each mine's compliance performance and calculate the statistics to determine whether the mine met each of the specific screening criteria. Many mine operators relied on MSHA to issue a PPOV notice. Now, with MSHA's on-line Monthly Monitoring Tool, they do not have to calculate the statistics. Operators, including those that own multiple mines, can easily monitor their performance.

MSHA's on-line Monthly Monitoring Tool is quick and easy to use; it does not require extra skill or training. To use the on-line Monthly Monitoring Tool, mine operators enter their mine ID number, view their mine's performance, and see whether that performance triggers the applicable threshold for each of the screening criteria. The mine operator:

(1) Goes to MSHA's Web site at *http://www.msha.gov*;

(2) Goes to the Pattern of Violations Single Source Page;

(3) Enters the mine ID number under the "Monthly Monitoring Tool for Pattern of Violations;" and

(4) Clicks on the "Search" button. The on-line Monthly Monitoring Tool reports results in clear, color-coded indicators of the mine's performance (red YES = meets criterion, green NO = does not trigger criterion) for each criteria and a mine's overall performance.

**5058** **Federal Register** / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

In 2010, the U.S. Department of Labor's Office of the Inspector General (OIG) audited MSHA's POV program. On September 29, 2010, the OIG published its audit report titled, "In 32 Years MSHA Has Never Successfully Exercised Its Pattern of Violations Authority" (Report No. 05–10–005–06–001). The OIG found that the existing POV regulation created limitations on MSHA's authority that were not present in the Mine Act, specifically,

• Requiring the use of final citations and orders in determining a PPOV, and

• Creating a PPOV warning to mine operators and a subsequent period of further evaluation before exercising its POV authority.

The final rule allows MSHA to focus on the most troubling mines that disregard safety and health conditions and will not affect the vast majority of mines, which operate substantially in compliance with the Mine Act.

### III. Section-by-Section Analysis

#### A. § 104.1 Purpose and Scope

Final § 104.1 provides the purpose and scope of the rule and is substantively unchanged from the existing provision.

Commenters suggested that the scope be changed to exclude those mines with effective safety and health management programs that have already demonstrated proactive measures to protect the health and safety of miners. Other commenters suggested that MSHA exempt salt mines that have an exemplary record of safety.

Consistent with the Mine Act, the final rule covers all mines. MSHA acknowledges, however, that the majority of mine operators are conscientious about providing a safe and healthful work environment for their miners. The POV regulation is not directed at these mine operators. Consistent with the legislative history, it is directed at those few operators who have demonstrated a repeated disregard for the health and safety of miners and the health and safety standards issued under the Mine Act. The final rule addresses situations where a mine operator allows violations to occur and hazardous conditions to develop repeatedly without taking action to ensure that the underlying causes of the violations are corrected.

#### B. § 104.2 Pattern Analysis

Like the proposal, final § 104.2 combines existing §§ 104.2 and 104.3 into a single provision. In combining existing §§ 104.2 and 104.3, the final rule eliminates the initial screening review process and the PPOV

notification. Like the proposal, the final rule eliminates the requirement that MSHA consider only final orders when evaluating mines for a POV. Final § 104.2 specifies the general criteria that MSHA will use to identify mines with a POV. The final rule simplifies the process for determining whether a mine has a POV and more accurately reflects the statutory intent.

#### 1. § 104.2—Elimination of Potential Pattern of Violations Initial Screening and Notification

Final § 104.2, like the proposal, does not include a provision for a PPOV. Commenters in support of eliminating the PPOV stated that mine operators should know the details of their compliance history; there is no need for MSHA to warn an operator in advance that a mine may be subject to enhanced enforcement measures. Commenters said that eliminating the PPOV process would remove the incentive for mine operators to make just enough short-term improvements to get off the PPOV list, but then backslide and wait for MSHA to issue the next PPOV notice. Commenters stated that the elimination of the PPOV process should serve to effect greater improvements for more miners, at more operations, and on a longer-term basis.

Many commenters opposed the proposed elimination of the PPOV process. These commenters stated that elimination of the PPOV provisions denies mine operators their constitutional rights to adequate notice and a fair opportunity to be heard before MSHA issues one of its toughest sanctions. They also stated that elimination of the PPOV process further aggravates the impact of basing POV decisions on violations issued rather than on final orders.

Many commenters stated that eliminating the existing PPOV notice worsens the impact of any inaccurate data on which the POV is based. Some commenters stated that self-monitoring is unlikely to result in the prompt action that a PPOV notice would have triggered. Some stated that the problem in relying on self-monitoring is that MSHA and mine operators often reach different conclusions based on the same data. In their view, the existing PPOV notice process is straightforward and provides an opportunity for mine operators to address differences with MSHA. Some commenters stated that the elimination of PPOV also eliminates an element of transparency, as well as any chance of discussing the basis for the POV with MSHA before suffering loss due to inaccurate information or data.

Commenters pointed out that 94 percent of mine operators who received the PPOV notice reduced their S&S citations by at least 30 percent and 77 percent reduced S&S citations to levels at or below the national average for similar mines. These commenters stated that the initial screening is effective in identifying poor performance. Some said that the PPOV process has been effective at rehabilitating a significant number of problem mines and should not be changed. Commenters urged MSHA to focus efforts on those few mine operators who fail to improve performance, to not eliminate a program that allows mine operators and MSHA to work together, and to retain the existing two-step process.

Beginning in June 2007 through September 2009, MSHA conducted seven cycles of PPOV evaluations, on an average of every 6 to 9 months. In each cycle, eight to 20 of all mines met the criteria for issuance of a PPOV. During that period, MSHA sent 68 PPOV letters to 62 mine operators (six mine operators received more than one notification). After receiving the PPOV, 94 percent of the mines that remained in operation to the next evaluation reduced the rate of S&S citations and orders by at least 30 percent, and 77 percent of the mines reduced the rate of S&S citations and orders to levels at or below the national average for similar mines. These improvements declined over time at some mines. Compliance at 21 percent (13/62 = 0.21) of the 62 mines that received PPOV letters deteriorated enough over approximately a 24-month period to warrant a second PPOV letter (MSHA Assessment data). Six of these mines were actually sent a second PPOV letter, while the other seven (of the 13) could have received a second letter but did not, generally due to mitigating circumstances. MSHA believes that the final rule will result in more sustained improvements in mines that may have conditions that approach the POV criteria.

Commenters stated that MSHA already possesses the graduated enforcement tools necessary to shut down all or any part of unsafe operations through the use of unwarrantable failure to comply, imminent danger, and other elevated enforcement actions. Commenters also stated that MSHA fell short by not requiring mines receiving a PPOV to make fundamental safety process changes as part of their corrective actions. Commenters recognized that long-term continuous safety improvement requires fundamental changes in an organization's culture,

performance processes, and safety leadership.

Some commenters stated that elimination of PPOV places a greater burden on small, remote mine operators that do not have computers or internet access. These operators will likely be unable to access the MSHA on-line databases on a timely basis to track their compliance performance. One commenter stated that MSHA should continue to provide written notification to mines in danger of establishing a pattern of violations unless a company requests that it not be sent.

MSHA's existing POV rule was developed before the widespread use of the Internet or even computers in many mines. Now, with MSHA's on-line Monthly Monitoring Tool, operators, including those that own multiple mines, can easily and frequently monitor their compliance performance. MSHA believes that the final rule is an improvement over the PPOV screening process in the existing regulation. The final rule encourages mine operators to continually evaluate their compliance performance and respond appropriately. Through MSHA's on-line Monthly Monitoring Tool, mine operators now have information readily available regarding each mine, the level of violations compared with the criteria, and an indication of whether the mine in question has triggered any of the POV criteria. This information eliminates uncertainty surrounding POV status and the need for MSHA to inform mine operators of a PPOV, since mine operators are able to access that information at any time. In addition, MSHA does not believe that eliminating the PPOV notice poses a burden on mine operators who may not have access to a computer or the internet. In the rare situations where mine operators do not have access to a computer or the internet, they may request periodic POV status updates from MSHA and the Agency will provide this information to them at no cost. Alternatively, MSHA can assist small or remote mine operators by providing them this information at the opening conference of each inspection visit.

Mine operators are responsible for operating their mines in compliance with all applicable standards and regulations. The on-line Monthly Monitoring Tool, which is currently available, will continue to provide mine operators, on a monthly basis, their performance status relative to the POV screening criteria posted on MSHA's Web site. MSHA developed the on-line Monthly Monitoring Tool based on feedback from the mining industry. MSHA conducted a stakeholder meeting

prior to announcing the implementation of the "Monthly Monitoring Tool for Pattern of Violations" on April 6, 2011. At this meeting, MSHA demonstrated use of the on-line Monthly Monitoring Tool. The POV Single Source Page at *http://www.msha.gov/POV/POVsinglesource.asp* contains the Monthly Monitoring Tool; Pattern of Violations Screening Criteria; Pattern of Violations (POV) Procedures Summary; a copy of the applicable regulations; and contact information to request assistance. MSHA receives and responds to requests for information about the screening criteria, the procedures, and mine-specific data related to the POV procedures and will continue to do so.

Using the enforcement data and specific POV criteria on MSHA's Web site, mine operators can perform the same review of their compliance and accident data as MSHA. MSHA's on-line Monthly Monitoring Tool is self-effectuating, quick, and easy to use; it does not require extra skill or training, technical assistance, or interpretation. Indeed, MSHA data indicate that operators are already making frequent use of the tool—there are nearly 2,200 hits per month on the on-line Monthly Monitoring Tool on the POV single source page.

Elimination of PPOV underscores the mine operators' responsibility to monitor their own compliance records and encourages them to verify that the information on MSHA's Web site is accurate. This is consistent with the Mine Act's premise that the mine operator has the authority, control, and primary responsibility for the health and safety conditions at their mines.

As stated earlier, the OIG concluded, and MSHA agrees, that the existing PPOV and final order provisions are impediments to MSHA's POV authority that were not required by the Mine Act. Experience has shown that the existing PPOV provision created the unintended consequence of encouraging some mine operators to achieve short-term improvements instead of adopting systemic, long-term improvements in their health and safety management culture. MSHA believes that eliminating the initial screening and PPOV provisions will create an additional incentive for mine operators to address the root causes of recurrent S&S violations and will facilitate long-term compliance at mines with a repeated history of S&S violations. Based on the Agency's experience under the existing regulation, MSHA has concluded that incentivizing greater use of the on-line Monthly Monitoring Tool by mine

operators facilitates a more proactive approach to health and safety.

## 2. § 104.2—Elimination of the Final Order Requirement

Final § 104.2 eliminates existing § 104.3(b), which provides that—

> Only citations and orders issued after October 1, 1990, and that have become final shall be used to identify mines with a potential pattern of violations under this section.

As discussed in the proposal, the final order requirement has proven itself to be an impediment to MSHA's use of section 104(e) of the Mine Act as contemplated by Congress. Given the number of cases pending before the Federal Mine Safety and Health Review Commission (Commission), the final order requirement limits MSHA's ability to consider a mine's recent compliance record when it evaluates mines for a POV. For example, at the end of CY 2005, there were approximately 1,000 cases containing just over 4,000 citations and orders in contest. Currently, the number of open contested cases is 10,730 containing close to 59,000 citations and orders. The amount of time required to litigate these cases increased in each year from CY 2006 through CY 2011, increasing from an average of 214 days (7 months) from contest to decision in CY 2005 to 601 days (20 months) in CY 2011. The final rule removes this impediment by eliminating the requirement to consider only final orders and aligns the POV provision with the intent of the Mine Act.

Several commenters supported MSHA's proposal to eliminate the final order requirement. Some agreed with MSHA's conclusion that the existing regulation impedes MSHA's ability to use the POV enforcement tool in the manner intended by Congress. Some commenters stated that the final order requirement makes it impossible to use the POV tool to address serious current health and safety problems at mines. They stated that by the time a citation becomes final, the health and safety conditions at the mine may bear no relationship to what they were when the hazard was originally identified and cited.

Commenters supporting elimination of the final order requirement stated that the plain language of the Mine Act and its legislative history do not require MSHA to rely on final orders when identifying a pattern of violations. These commenters stated that the language of the Mine Act and its legislative history support MSHA's decision to consider citations and orders as issued, rather

than final orders, when determining whether a mine has demonstrated a pattern of S&S violations. The commenters cited portions of the legislative history where Congress made clear that it intended MSHA to use the pattern sanction simultaneously with other provisions of the Act when it is necessary to bring a mine into compliance. The commenters agreed with MSHA's conclusion that the final order requirement interferes with MSHA's ability to use the pattern sanction in conjunction with the Mine Act's other enforcement provisions.

Based on Agency experience with the existing regulation, the final rule, like the proposal, includes all citations and orders issued by MSHA in the Agency's POV determination. This is consistent with the language, legislative history, and purpose of the Mine Act's POV provision. Section 104(e)(1) of the Mine Act states that an operator shall be given a POV notice—

\* \* \* if it has a pattern of violations of mandatory health or safety standards. \* \* \* which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards. (30 U.S.C. 814(e)(1))

Nothing in section 104(e) of the Mine Act or the legislative history states that POV determinations may only be based on final citations and orders.

Not only does the language of section 104(e) contain nothing that prohibits the Secretary from basing POV determinations on non-final citations and orders, but section 104(e)(4) explicitly provides that the Secretary "shall make such rules as [s]he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists".

Because Congress explicitly delegated to the Secretary the authority to establish POV criteria, and because nothing in the language of section 104(e) explicitly limits the Secretary's discretion to base POV determinations on non-final citations and orders, the Secretary's interpretation that she may do so must be given "controlling weight" (*Eagle Broadcasting Group LTC v. FCC*, 563 F.3d 543, 551–52 (D.C. Cir. 2009)).

The elimination of the final order provision in the final rule is also consistent with the legislative history. The Senate Report accompanying the Mine Act states that section 104(e) was enacted in response to the Scotia mine disaster, an accident that "forcefully demonstrated" the need for such a provision (S. Rep. No. 181, 95th Cong., 1st Sess. 32, reprinted in Legislative

History of the Federal Mine Safety and Health Act of 1977). The Report noted that the Senate's investigation of that disaster revealed that—

\* \* \* the Scotia mine, as well as other mines, had an inspection history of recurrent violations, some of which were tragically related to the disasters, which the existing enforcement scheme was unable to address. (Id. at 32)

The Senate Report's use of the phrase "inspection history" rather than the phrase "violation history" indicates Congress' intent that POV determinations should be based on inspection histories, i.e., findings by the Secretary of violations during inspections, rather than only on adjudicated violations.

The Senate Report also specifically referenced the similarities between section 104(e) and 104(d) of the Mine Act and stated that the POV sequence parallels the existing unwarrantable failure sequence (Id. at 33). That statement reflects Congress' intent that POV determinations, like section 104(d)(1) and (2) withdrawal orders, should be based on non-final citations and orders.

In addition, the Senate Report stated that the Secretary have both section 104(d) and 104(e) enforcement tools available for use simultaneously if the situation warrants (Id. at 34). Congress specifically indicated its intent that the Secretary use the POV enforcement tool as a last resort when other enforcement tools (available to the Secretary) fail to bring an operator into compliance. This underscores Congress' intent that all enforcement tools be used together, and in the same manner, that is, use of issued citations and orders, as opposed to final orders.

Finally, the Senate Report emphasized Congress' intention that the Secretary have "broad discretion" in establishing criteria for determining when a pattern exists, and that the Secretary continually evaluate and modify the POV criteria as she deems necessary (Id. at 33). This specific grant of discretion to the Secretary supports the Agency's action in the final rule to eliminate the use of only final orders in making a POV determination. The final rule supports the enforcement structure in the Mine Act that the Secretary use non-final citations and orders as the basis for section 104(e) withdrawal orders.

Interpreting section 104(e) to permit the Secretary to rely on non-final citations and orders in determining POV status is consistent with the purpose of section 104(e)—protecting miners working in mines operated by habitual

offenders whose chronic S&S violations have not been deterred by the Secretary's other enforcement tools. The Secretary has determined that the final order requirement in the existing rule has prevented the Secretary from using section 104(e) as the effective enforcement tool that Congress intended. Some S&S citations and orders do not reach the final order stage for years.

The average number of days from contest to disposal (the time it currently takes for a typical citation to make it all the way through the appeals process) was 534 days in calendar year 2011 (about 1.5 years). The number of citations disposed of in less than two years was 131,000 (or 82%). Fourteen percent were disposed of within two to three years, 3% were disposed of within three to four years, and 1% were disposed of in four or more years.

The contest rate for S&S violations increased greatly following MSHA's revision of its civil penalty regulations in 2007, pursuant to the Mine Improvement and New Emergency Response Act (MINER Act) of 2006. The backlog of contested cases at the FMSHRC has grown so large that even with an increase in the numbers of cases disposed of in 2011, final orders may not be issued for two or three years. As stated by one commenter, the delay caused by the backlog allows POV sanctions to be postponed or avoided altogether. This often leaves the Secretary unable to base POV determinations on mine operators' recent compliance history—no matter how egregious that history may be. Interpreting section 104(e) to permit the Secretary to base compliance determinations on non-final citations or orders will allow the Secretary to protect miners working in mines where there is a recent history of S&S violations and where the mine is operated by habitual offenders who have been undeterred by other enforcement sanctions—precisely the type of circumstances section 104(e) was intended to correct.

Many commenters opposed the Agency's proposal to eliminate the final order requirement. Some stated that the proposal violates mine operators' due process rights under the Fifth Amendment to the United States Constitution. Commenters stated that the use of violations issued to trigger punitive POV sanctions without a meaningful opportunity for prior independent review, together with the proposed rule's elimination of the PPOV provisions, denies mine operators the constitutional right to notice and the opportunity to be heard.

Commenters who opposed elimination of the final order requirement were concerned with the possibility of the erroneous deprivation of property that may occur without adequate procedural protections. They stated that the property interest at stake—the economic viability of a mine—is so jeopardized by the threat of the POV sanction that MSHA must provide maximum protection to mine operators before it exercises POV authority. Some commenters stated that the proposed rule, as written, does not provide adequate procedural protections. They cited cases from the U.S. Supreme Court and other federal courts to support their position that due process requires MSHA to provide notice and a hearing to mine operators before imposing the POV sanction.

MSHA does not agree with commenters who stated that elimination of the PPOV and final order provisions violate mine operators' due process rights under the U.S. Constitution. Citations and orders, together with notice of the POV criteria posted on the Web site, and the on-line Monthly Monitoring Tool, will provide sufficient notice to alert operators of the possibility that they may be subject to a POV. Under existing MSHA procedures, mine operators can discuss citations and orders with the inspector both during the inspection and at the closeout conference. They also can request a safety and health conference with the field office supervisor or the district manager to review citations and orders and present any additional relevant information. Additionally, mine operators who may be approaching POV status have the opportunity to implement a corrective action program, and MSHA considers a mine operator's effective implementation of an MSHA-approved corrective action program as a mitigating circumstance in its POV review.

The Supreme Court has held that adequate post-deprivation procedures are sufficient to satisfy due process where public health and safety are at stake. See *Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U.S. 594, 595–596 (1950) (affirming the FDA's seizure and destruction of mislabeled drugs as "misleading to the injury or damage of the purchaser or consumer" without the opportunity for a pre-deprivation hearing, even though the particular drugs seized were not hazardous); *Mackey* v. *Montrym*, 443 U.S. 1 (1979) (holding that a state law depriving drivers of their licenses on suspicion of operating under the influence of alcohol was constitutional without a pre-

deprivation hearing, due to the compelling interest in highway safety). Where prompt post-deprivation review is available to correct any administrative error, generally no more is required than that the pre-deprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible government official warrants them to be. *Mackey, supra*, at 13.

The Mine Act guarantees due process for mine operators subject to MSHA enforcement actions. A mine operator may seek expedited temporary relief under section 105(b)(2) of the Mine Act from a pattern designation provided a withdrawal order is issued under section 104(e). Operators must have at least one withdrawal order in order to contest the pattern designation. Requests for temporary relief are reviewed within 72 hours and assigned to a Commission Administrative Law Judge as a matter of procedure, provided the request raises issues that require expedited review. The Mine Act's expedited review procedure satisfies the Constitution's due process requirements. *United Mine Workers* v. *Andrus*, 581 F.2d 888 (D.C. Cir. 1978).

The on-line Monthly Monitoring Tool will allow operators to review their compliance information on a monthly basis and bring to MSHA's attention any data discrepancies in the POV database as it is updated each month. Mine operators will have an opportunity to meet with District Managers for the purpose of correcting any discrepancies after MSHA conducts its POV screenings and issues a POV. As with all citations and orders issued under the Mine Act, mine operators have the right to contest any citation or order before the FMSHRC and operators may seek expedited review of a POV closure order.

### 3. § 104.2(a)—POV Review at Least Annually

Final § 104.2(a), like the existing rule, provides that MSHA will review the compliance records of mines at least once each year to determine if any mines meet the specific POV criteria posted on MSHA's Web site at *http://www.msha.gov/POV/POVsinglesource.asp*. The proposed rule would have increased the frequency of MSHA's review to at least twice per year. Commenters stated that the proposed provision for at least two reviews per year was unnecessary; MSHA can conduct multiple reviews per year under the existing rule, which provided for a POV review at least once a year. Some commenters stated that the

reviews should be automated and data adjusted essentially in real time so that MSHA could respond quickly, e.g., when an inspector issues an inordinately large number of citations during an inspection of a bad actor. Some commenters supported the proposed twice-a-year review, stating that more frequent reviews provide mine operators an incentive to monitor their compliance more closely.

After reviewing all comments, the final rule retains the once-a-year review in the existing rule. Under the final rule, the Agency could conduct more than one review a year if conditions warrant, as it has done under the existing rule.

### 4. § 104.2(a)(1) to (8)—General Pattern of Violations Criteria for MSHA Periodic Review

Final § 104.2(a), like the proposal, contains the criteria that MSHA will consider in evaluating whether a mine exhibits a POV. These criteria do not include numerical measures. MSHA will post the specific criteria, with numerical data, on the Agency's Web site at *http://www.msha.gov/POV/POVsinglesource.asp* for use by mine operators in evaluating their mine's performance. As stated during the proposed rulemaking, when MSHA revises the specific criteria, the Agency will post the revised specific criteria on the Agency's Web site for comment (see section III.B.7 of this preamble).

#### Multiple Violations

Commenters stated that MSHA seems to be basing POV determinations on multiple unrelated violations. They stated that a POV must be based on repeated violations of the same or related standards.

The Mine Act does not require that MSHA base POV decisions on repeated violations of the same and related standards. The pattern criteria in the existing regulation for a PPOV include repeated S&S violations of a particular standard or standards related to the same hazard that are final orders of the FMSHRC. Like the existing rule, under the final rule, MSHA will base POV decisions on a complete review of a mine's health and safety conditions, not only on repeated violations of the same or related standards as recommended by some commenters. MSHA believes that limiting the scope of the POV regulation to repeated violations of the same or related standards would unnecessarily hinder MSHA's ability to address chronic violators and would ignore the reality that, in dangerous safety situations there are often multiple contributing violations.

**5062** Federal Register / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

Length of Review Period

Some commenters stated that the review must be limited, e.g., to citations issued within the previous 2 years. Some commenters expressed concern that, because of the Commission's heavy case load, many citations could be adjudicated at the same time causing an unfair surge in citations in one review period. Some commenters stated that a mine's POV status can be threatened by a single inspection or a few inspections with few citations followed by one with a lot of citations. These commenters stated that MSHA should not be able to issue a POV notice based on only a few inspections, one of which had many citations. According to one commenter, in these situations, posting the specific criteria on a Web site does not warn a mine operator that the mine's compliance history is approaching a POV. In support of this position, the commenter provided an example of a mine operator undergoing one inspection and receiving a smaller number of S&S citations, followed by another inspection within the next several months with a much larger number of S&S citations.

MSHA will continue the existing policy of reviewing a mine's compliance history over a 12-month period of time. MSHA believes that this provides the best opportunity for the Agency to evaluate whether a mine has a POV. Under the final rule, mine operators have the responsibility to constantly monitor their compliance performance and to assure that health and safety conditions are addressed in a timely manner. MSHA suggests that mines receiving an inordinate number of S&S violations over a short period of time may need to develop a corrective action program designed to address the root causes of any recent increases in S&S citations.

Interpretation of Significant and Substantial (S&S)

Commenters also expressed concern about how MSHA interpreted S&S. Many commenters emphasized that the mine operator and MSHA inspector often disagree. Some stated that inexperienced or insufficiently trained inspectors mark many citations as S&S when there is no likelihood of an injury or illness, and no negligence. They stated that MSHA must clarify what constitutes an S&S violation.

MSHA's interpretation of what constitutes an S&S violation is posted on MSHA's Web site at *http://www.msha.gov/PROGRAMS/assess/citationsandorders.asp* and is consistent with the Federal Mine Safety and Health Review Commission's definition of S&S (*Mathies Coal Co.,* 6 FMSHRC 1 (January 1984)). With respect to inspector training, MSHA is constantly updating and improving new inspector training, journeymen training, and supervisor training to improve consistency in the application of S&S. In addition, MSHA has implemented an improved pre-assessment conferencing process to facilitate early resolution of enforcement disputes that relate to S&S and other issues.

5. § 104.2(a)(7)—Other Information

Final § 104.2(a)(7), like the proposal, provides that MSHA will consider other information that demonstrates a serious safety or health management problem at the mine. It includes the information addressed in existing §§ 104.2(b)(2)–(b)(3) and 104.3(a)(1)–(a)(2). Under the final rule, this other information may include, but is not limited to, the following:

• Evidence of the mine operator's lack of good faith in correcting the problem that results in repeated S&S violations;

• Repeated S&S violations of a particular standard or standards related to the same hazard;

• Knowing and willful S&S violations;

• Citations and orders issued in conjunction with an accident, including orders under sections 103(j) and (k) of the Mine Act; and

• S&S violations of health and safety standards that contribute to the cause of accidents and injuries.

Commenters were concerned that MSHA's consideration of other information in the POV review criteria gives the Agency almost limitless discretion to include anything the Agency wants to consider. Some stated that unless the basis for this determination is clearly defined, it is too broad and subjective.

Some commenters also stated that MSHA already possesses the authority to shut down a mine for a variety of reasons, such as an imminent danger or an unwarrantable failure to comply, and does not need the POV sanction to stop operations at dangerous mine sites. According to these commenters, in these situations, mine operators must immediately comply with the order and withdraw miners until the hazard is eliminated or the violation is abated, though the mine operator still has the right to challenge MSHA's issuance of the order. They stated that, in addition, MSHA can seek a restraining order in the appropriate federal district court under section 108(a)(2) of the Mine Act whenever the Agency believes that the mine operator is engaged in a pattern of violations that constitutes a continuing hazard to the health or safety of the miners. For these reasons, commenters stated that MSHA has no basis to dispense with the notice and comment process in a manner contrary to due process and the statutory enforcement scheme of the Mine Act in exercising the Agency's POV authority. (See discussion on the elimination of the PPOV and final order provisions above in sections III.B.1. and 2. of this preamble.)

Other commenters were concerned that MSHA's consideration of injuries and illness might cause some mine operators to not report them. These commenters stated that MSHA should not penalize mine operators for reporting accidents, injuries, and illnesses by considering them in the Agency's POV review. These commenters stated that a pattern of injuries does not mean a pattern of violations and that injuries and illnesses are not well correlated either quantitatively or qualitatively with violations. MSHA data do not reveal a direct statistical correlation between citations and injuries. However, as a general matter, since passage of the Mine Act and MSHA's enforcement of health and safety standards at mines, annual mining fatalities and injuries have steadily declined. In 1977, there were 273 mining fatalities and 40,000 injuries. In 2011, there were 37 fatalities and less than 9,000 injuries. Moreover, among mines that have been placed on PPOV status in prior years, data generally show both a reduction in violations and a corresponding decrease in injuries in the year after mines were placed on that status.

One commenter stated that including injuries in POV determinations can only diminish the value of the POV in identifying truly dangerous mine operations. Another commenter stated that MSHA's data are unreliable because of underreporting and suggested that MSHA conduct a part 50 audit as part of a POV review. This commenter recommended that MSHA weigh heavily any information that shows a mine operator failed to report or is trying to cover up underreporting or violations.

Consistent with MSHA's position that the Agency will consider a variety of sources of information bearing on a mine's health and safety record when it conducts POV evaluations, this provision of the final rule restates the other information that the Agency may consider in determining whether a mine has a POV. MSHA data and experience show that violations of approval,

training, or recordkeeping regulations, for example, can significantly and substantially contribute to health or safety hazards, and may be a contributing cause of an accident. This is especially true where the mine operator allows similar violations to occur repeatedly. Under the final rule, MSHA intends to exercise its enforcement authority consistent with Agency experience and statutory intent.

### 6. § 104.2(a)(8)—Mitigating Circumstances

In this final rule, MSHA states what it considers mitigating circumstances and, based on its experience, provides more explanation for how the Agency considers mitigating circumstances in its POV decisions.

Many commenters stated that MSHA should provide more information about the role that mitigating circumstances play in the POV review process. Some commenters responded as though MSHA will issue a POV notice automatically if the criteria on the MSHA Web site are met. These commenters stated that final § 104.3 requires the District Manager to issue a pattern of violations notice when a mine has a pattern of violations; however, the discussion of mitigating circumstances states that MSHA has discretion to consider other factors before determining whether a POV notice is necessary. One commenter stated that the mining community needs to know more about what mitigating factors MSHA will consider and how the presence of mitigating factors could remove an operation from POV status. This commenter urged MSHA to consider only objective measures that demonstrate significant improvements in mine health and safety for mitigation purposes. This commenter was concerned that MSHA may relieve a mine operator from a POV determination based on short-term improvements without an objective commitment to long-term change. Other commenters stated that the proposed rule did not prescribe a specific procedure for MSHA consideration of mitigating circumstances prior to issuance of the POV notice. They requested that MSHA provide more information about the means for presenting mitigating information to the Agency and include the mechanism for this approach in the rule.

Under the existing rule, MSHA considers mitigating circumstances before issuing a POV notice. Under the final rule, this will not change; however, MSHA will no longer provide a notice to mine operators that a mine's violation history is approaching a pattern of S&S

violations. Under the final rule, the mine operator is responsible for knowing if the mine's violation history is approaching a pattern of S&S violations. As stated above, MSHA exercises caution and considers all relevant information, including any mitigating information, before it exercises its POV authority. There may be extraordinary occasions when a mine meets the POV criteria, but mitigating circumstances make a POV notice inappropriate. The mine operator will have to establish mitigating circumstances with MSHA before the Agency issues a POV notice. The types of mitigating circumstances that could justify a decision to not issue a POV notice, or to postpone the issuance of a POV notice to reevaluate conditions in the mine, may include, but are not limited to, the following:

• An approved and implemented corrective action program to address the repeated S&S violations accompanied by positive results in reducing S&S violations;

• A bona fide change in mine ownership that resulted in demonstrated improvements in compliance; and

• MSHA verification that the mine has become inactive.

MSHA will continue to consider only the enforcement record of the current operator of the mine in determining whether the mine meets the POV criteria. MSHA, in coordination with the Office of the Solicitor, when necessary, determines whether there has been a change in the mine operator that warrants the start of a new violation history at a mine. Mines that have undergone bona fide changes in ownership may have POV notices postponed while MSHA determines if the new owner is achieving measurable improvements in compliance. Mines at which POV enforcement actions have been postponed due to a change to inactive status will immediately be subject to further POV enforcement once the mines resume production.

Although the final rule does not establish a specific procedure for mine operators to present mitigating circumstances to MSHA prior to the issuance of a POV notice, mine operators can present information to support mitigating circumstances to the District Manager at any time. (See MSHA's discussion of its on-line Monthly Monitoring Tool, for monitoring a mine's compliance history, under section III.B.1. of this preamble.)

### Corrective Action Program

Commenters misunderstood MSHA's use of the term "safety and health

program" in the proposed rule. Several commenters suggested that MSHA use another term, such as remedial plan or targeted remedial plan, to avoid confusion. One commenter stated that including comprehensive safety and health management programs in the final rule, as these programs are typically understood, will establish a detrimental precedent that safety and health programs are merely compliance. This commenter offered to support the development of expertise in MSHA staff so that MSHA could work cooperatively with mine operators approaching POV status to enable them to develop safety and health programs, stating that anything short of such a measure demeans the value of a safety and health program.

In response to comments, MSHA clarified in its notices of public hearings and its opening statements at the public hearings that the Agency did not intend that these safety and health management programs be the same as those referenced in the Agency's rulemaking on comprehensive safety and health management programs (RIN 1219–AB71). The public hearing notice further stated that MSHA would consider a safety and health management program as a mitigating circumstance in the pattern of violations proposal when it: (1) Includes measurable benchmarks for abating specific violations that could lead to a pattern of violations at a specific mine; and (2) addresses hazardous conditions at that mine. MSHA's use of the term "safety and health program" in relation to mitigating circumstances in the POV proposal is related to corrective action programs focused on reducing S&S violations at a particular mine. Further, MSHA clarified that its rulemaking on safety and health programs is a totally separate action, unrelated to the POV rulemaking. MSHA also stated that these programs referenced in the POV rulemaking would have to be approved by the Agency prior to the issuance of a POV notice. To avoid any confusion, the final rule uses only the term "corrective action program", it does not address safety and health management programs at all.

MSHA will evaluate the mine operator's corrective action program to determine if it is structured so that MSHA can determine whether the program's parameters are likely to result in meaningful, measurable, and significant reductions in S&S violations. MSHA has guidelines for corrective action programs on the Agency's Web site at *http://www.msha.gov/POV/POVsinglesource.asp* under *Pattern of Violations (POV) Procedures*

**5064** Federal Register / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

*Summary—2010, Appendix B—* Guidelines for Corrective Action Programs. In general, programs must contain concrete, meaningful measures that can reasonably be expected to reduce the number of S&S violations at the mine; the measures should be specifically tailored to the compliance problems at the mine; and the measures should contain achievable benchmarks and milestones for implementation. More specific guidance is contained in the aforementioned document.

MSHA will consider an operator's effective implementation of an MSHA-approved corrective action program as a mitigating circumstance that may justify postponing a POV notice. Like the Agency's policy under the existing rule, the program must set measurable benchmarks for evaluating the program's effectiveness and show measurable improvements in compliance to warrant postponement of a POV notice.

Under the final rule, if a mine operator is close to meeting the POV criteria, the mine operator may submit to MSHA for approval a corrective action program to be implemented at the mine. If requested, MSHA will assist mine operators in developing an appropriate corrective action program.

### 7. § 104.2(b)—Specific Criteria

Final § 104.2(b), proposed as § 104.2(a), provides that MSHA will post, on its Web site at *http:// www.msha.gov/POV/ POVsinglesource.asp,* the specific criteria, with numerical data, that the Agency will use to identify mines with a pattern of S&S violations. MSHA has determined that posting the specific criteria on its Web site, together with each mine's compliance data, will allow mine operators to monitor their compliance records to determine if they are approaching POV status. In addition, mine operators, as well as other members of the public, can monitor the data to identify any inaccuracies and notify MSHA of such inaccuracies. As stated earlier, MSHA believes that it is the mine operator's responsibility to constantly monitor their compliance performance and to assure that health and safety conditions at their mines are proactively addressed. Access to the specific POV criteria and the compliance data provides mine operators the means to evaluate their own records and determine whether they are approaching the criteria levels for a POV. This access also enables mine operators to be proactive in implementing measures to improve health and safety conditions at their mines and to bring their mines into compliance, which will enhance the health and safety of miners.

As stated in the proposed rule and at the public hearings, to provide transparency and to put operators on notice of how the Agency will determine if a mine has a POV, MSHA will continue to post specific criteria on the Agency's Web site. The specific criteria can be found at *http:// www.msha.gov/POV/ POVScreeningCriteria2011.pdf.* Further, as stated during the rulemaking, MSHA will seek stakeholder input when revising POV criteria. To involve stakeholders in the process of revising the specific criteria, MSHA will publish proposed changes on the Agency's Web site and solicit public comment. MSHA also will notify those on the Agency's email subscription list that the criteria are posted for comment. MSHA will consider revising the criteria based on comments.

The specific criteria are an important element in MSHA's POV evaluation process. MSHA agrees with the commenters who stated that the Agency may from time to time need to modify thresholds and other factors to assure mine operators of fair and equitable criteria that take into account different mine sizes, mine types, and commodities. The final rule retains the Agency's longstanding practice of developing specific criteria through policy and provides the flexibility to adapt the specific criteria as changing conditions and factors dictate.

MSHA considers the specific POV criteria on its Web site to be a discretionary statement of Agency policy. Posting the specific POV criteria on MSHA's Web site promotes openness and transparency by encouraging mine operators to examine their own compliance records more closely and ascertain whether they have recurring S&S violations. Many mine operators are currently monitoring their compliance performance against the specific criteria posted on MSHA's Web site.

In the preamble to the proposed rule, MSHA requested comments on how the Agency should obtain input from stakeholders during the development and periodic revision of the Agency's specific POV criteria and the best methods for notifying mine operators of changes to the specific criteria. MSHA also stated that the Agency plans to provide any change to the specific criteria to the public, via posting on the Agency's Web site, for comment before MSHA uses it to review a mine for a pattern of violations.

Some commenters opposed MSHA's proposed approach to revise the specific criteria. Commenters stated that MSHA's POV screening criteria are not interpretive, are not a statement of policy, and do not constitute a logical outgrowth of the proposed rule. Instead, they stated that these criteria constitute rulemaking and require formal notice and comment under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*). Some stated that the specific criteria must be clearly defined and published in the **Federal Register** before the proposal becomes final so the public can provide meaningful comments. These commenters said that the proposal deprives mine operators of the opportunity to comment, stating that they had no basis to comment on the specific criteria because the criteria were not included in the proposal. Several commenters stated that MSHA should withdraw the proposed rule and re-propose it with the specific criteria. They stated that MSHA is not establishing any criteria in the proposal, but reserving discretion to change them from time to time in the future without notice and comment. Commenters stated that the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and wanted to know what, if any, objective factors would guide that discretion.

Commenters stated that the specific criteria should not be a moving target, but should be fixed in the final rule so that stakeholders will know what is expected of them to avoid a pattern notice. They stated further that promising to obtain public comment before establishing specific criteria is not the same as putting the criteria in the rule and going through the notice-and-comment rulemaking process. Commenters also stated that specific numerical criteria need to be included in the rule so that they can comment on the impact of the proposal, numbers of mines affected, or costs. They stated that the OIG specifically recommended that MSHA seek stakeholder input on POV screening criteria.

Some commenters requested that MSHA include specific numbers in the final rule for how the general criteria will be measured. Other commenters suggested that MSHA not use absolute numbers as the control for the criteria—large mines should not be compared with small mines and vice versa; they stated that inspection hours provides a better basis for comparison. Some commenters stated that there is a disproportionately large number of inspection hours at large unionized mines, where miners are encouraged to point out all violations to inspectors,

and that the inspection history, in this case, reflects a safer mine not a POV.

Some commenters agreed with MSHA's proposed approach to revise the specific criteria. They stated that MSHA has many years of experience with developing POV criteria and possesses the necessary expertise to determine what specific criteria should be used to identify problem mines. They recommended that MSHA post this information in a single location on the Agency's Web site so that mine operators and other interested parties are able to view all of the relevant information at once by entering the mine ID number.

After reviewing all comments, based on Agency experience, the final rule, like the proposal, does not include specific POV criteria. This provides the Agency with necessary flexibility in establishing criteria for POV evaluations. By retaining the specific pattern of violations criteria as a statement of Agency policy, as has always been the case under the existing regulation, the Agency has flexibility to adjust the specific criteria, as necessary, to accomplish its mission and to provide relief to mine operators. Such relief might be necessary if, for example, the results of the application of the specific criteria have unintended consequences on a particular mine sector or mine size. In this case, MSHA might determine that the existing specific criteria are not fairly or properly evaluating a mine's compliance record for a pattern of violations. The Agency might determine that the existing specific criteria are no longer an appropriate measure of elevated risk to miners. If this were to occur, mine operators and miners would be unfairly impacted by inappropriate criteria. This could also have an adverse or punitive impact on mine operators. MSHA understands the importance of getting input from all of its stakeholders whenever the Agency considers revision of the specific criteria, and would provide opportunity for stakeholder input (76 FR 35801).

This aspect of the final rule is consistent with the legislative history of section 104(e), which stated that a "pattern does not necessarily mean a prescribed number of violations of predetermined standards" (S. Rep. No. 181, supra at 32–33). MSHA recognizes that a certain number of violations that might constitute a pattern at one mine may be insufficient to trigger a pattern at another.

MSHA considers the specific POV criteria to be a statement of Agency policy that is designed to provide guidance to MSHA personnel when making POV decisions. A mine that meets the specific criteria's numerical thresholds is not automatically placed in POV status. Rather, MSHA retains the discretion to consider mitigating circumstances for each individual mine and may choose not to use the POV sanction even if a mine meets the specific criteria. Federal courts have consistently held that nonbinding statements of agency policy do not require notice and comment rulemaking (*See, e.g., Panhandle E. Pipe Line* v. *FERC*, 198 F.3d 266, 269 (DC Cir. 1999); see also *Center for Auto Safety, Inc.* v. *National Highway Traffic Safety Admin.*, 342 F.Supp.2d 1 (D.D.C. 2004)). As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a legislative rule that is subject to notice and comment (*National Mining Association* v. *Secretary of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009)).

### C. § 104.3 Issuance of Notice

Final § 104.3 simplifies the requirements for issuing a POV notice and is essentially unchanged from the proposal. MSHA believes that it allows the Agency to more effectively implement the POV provision in a manner consistent with legislative intent. As stated earlier, some mines made initial safety improvements, however, these improvements declined over time. MSHA's experience and data reveal that some mine operators who received PPOV letters temporarily reduced their S&S violations, but reverted back to allowing the same hazards to occur repeatedly without adequately addressing the underlying causes. MSHA believes that operators who greatly reduced violations after receiving a PPOV letter and maintained this improved level of compliance are likely to continue monitoring their own performance under the final rule.

### 1. § 104.3(a) and (b)—Issuance and Posting of POV Notice

Final § 104.3(a), like the proposal, provides that, when a mine has a POV, the District Manager will issue a POV notice to the mine operator that specifies the basis for the Agency's action. The District Manager will also provide a copy of the POV notice to the representative of miners. Final § 104.3(b) requires that the mine operator post the POV notice on the mine bulletin board and that it remain posted until MSHA terminates the POV. After the operator receives the POV notice, MSHA's web site Data Retrieval System will list the POV notice, along with other enforcement actions, for the affected mine.

Some commenters stated that some of the data MSHA uses to screen operators for PPOV (or POV) is inaccurate, and that mine operators should have an opportunity to meet with MSHA to question underlying data after being notified of a POV. As discussed earlier, commenters were concerned that, without procedural safeguards and mine operator input, MSHA could issue a POV notice based on inaccurate data; they thought data inaccuracies were a common occurrence in the overloaded MSHA database. Commenters were also concerned that MSHA would be less inclined to conference once the POV notice was issued. To relieve these concerns, some commenters suggested that MSHA provide mine operators an informal warning and a short period of time to review data and demonstrate that the underlying violations may be invalid or otherwise flawed for purposes of POV consideration. Commenters stated that removing this informal step would result in more inaccurate POV determinations and unnecessary expenditure of resources. Some commenters suggested that MSHA provide mine operators an opportunity to present their case to the District Manager that the mine operator (1) has, or can implement immediately, a corrective action program to address the Agency's concerns; or (2) can demonstrate that, unknown to MSHA, the mine operator has been taking steps to address violations. Other commenters opposed a warning step stating that the threat of closure must be real for it to be an effective deterrent.

MSHA will continue to adhere to its policy of holding informal closeout conferences following an inspection, when the mine operator and the MSHA inspector discuss citations and orders. The operator can also request a conference with the field office supervisor or district manager.

In addition, in response to comments, and to ensure that all data are accurate, MSHA will also provide mine operators an opportunity to meet with the district manager for the limited purpose of discussing discrepancies (e.g., citations that are entered incorrectly or have not yet been updated in MSHA's computer system, Commission decisions rendered, but not yet recorded, on contested citations, and citations issued in error to a mine operator instead of an independent contractor at the mine) in the data. A mine operator may request a meeting with the District Manager for the sole purpose of presenting discrepancies in MSHA data. At this meeting, mine operators will have an

opportunity to question the underlying data on which the POV is based, and provide documentation to support their position. MSHA will make changes, as appropriate, which could result in rescission of the POV notice if MSHA verifies data discrepancies and the mine no longer meets the criteria for a POV. The time to request, schedule, and hold this meeting does not affect the 90-day schedule for abatement of the POV. In addition, consistent with existing policy, field office supervisors and district managers will continue to review all violations. This would include S&S violations issued to mine operators with a POV.

As stated previously, mine operators have the responsibility to monitor their own compliance record. MSHA encourages mine operators and contractors to monitor their compliance records using the POV on-line Monthly Monitoring Tool and notify MSHA as soon as possible if they believe any information on the POV web database is inaccurate. MSHA anticipates that operators will constantly monitor their performance using the on-line Monthly Monitoring Tool and inform the Agency of any discrepancies between their data and data posted on MSHA's Web site. Like under the existing rule, MSHA will correct inaccurate information after verifying it. MSHA believes that ongoing operator monitoring of Agency compliance data will minimize the potential for inaccurate POV determinations. The District Manager will rescind a POV notice if the Agency determines that it was based on inaccurate data and that the mine did not meet the criteria for a POV.

One commenter stated that posting the POV notice on the mine bulletin board is necessary for informing those most affected that their workplace exhibits substandard health and safety conditions so they can be attentive in protecting themselves and their fellow miners.

Under the final rule, mine operators are required to post the POV notice on the mine bulletin board and to keep it posted until MSHA terminates the POV. Additionally, the operator is required to provide a copy of the POV notice to the representative of miners.

2. § 104.3(c) and (d)—Withdrawal of Persons From Area of Mine Affected by Subsequent S&S Violations After Issuance of POV Notice

Final § 104.3(c) and (d) are the same as proposed. They restate the requirements in the Mine Act for MSHA actions after a POV notice is issued. Final § 104.3(c) requires MSHA to issue an order withdrawing all persons from

the affected area of the mine if the Agency finds any S&S violation within 90 days after the issuance of the POV notice. Final § 104.3(d) provides that if a withdrawal order is issued under § 104.3(c), any subsequent S&S violation will result in an order withdrawing all persons, except those responsible for correcting the cited condition, from the affected area of the mine until MSHA determines that the violation has been abated. Commenters stated that MSHA must clarify that a subsequent withdrawal order must apply only to persons in the specific area who are exposed to risk of harm from the cited violation.

As stated previously, MSHA considers 30 CFR part 104—Pattern of Violations—as a procedural regulation that promotes transparency. It informs mine operators and others about the steps MSHA will follow in implementing section 104(e) of the Mine Act. This final rule does not require additional compliance by mine operators. Rather, it places the primary responsibility on the mine operator and allows the mine operator to be more proactive in eliminating hazards. Through this more proactive approach, mine operators will monitor their compliance performance against MSHA records, reconcile discrepancies, and seek MSHA assistance in correcting ineffective procedures, practices, and policies. Likewise, as is existing MSHA practice, a withdrawal order usually will apply only to persons in the specific area who are exposed to risk of harm from the cited violation. MSHA, however, has the authority to withdraw miners whenever, in the judgement of the inspector at the mine, there is an imminent risk of harm to miners.

D. § 104.4 Termination of Notice

Final § 104.4 addresses the termination of a POV notice and is unchanged from the proposal. MSHA's POV Procedures Summary, posted on MSHA's Web site at *http:// www.msha.gov/POV/ POVsinglesource.asp,* includes provisions for MSHA to conduct a complete inspection of the entire mine within 90 days of issuing the POV notice.

Commenters expressed concern that, once a POV notice is issued, it is practically impossible to terminate, especially for large mines. Commenters said that it is highly unlikely that any operation could go 90 days without an S&S violation. One commenter pointed out that the seasonal nature of operations in Alaska makes it infeasible or impossible to conduct timely follow-up inspections.

Commenters also stated that MSHA must clarify how the Agency will handle POV status when citations or orders that form the basis for the POV status are vacated or reduced to non-S&S. Many commenters urged MSHA to set up an expedited process to review POV status if citations or orders on which the status is based are subsequently vacated or reduced in severity, in settlement or by litigation, so that the mine no longer meets the POV criteria. Many commenters stated that MSHA must terminate the POV status if the mine no longer meets the criteria for the POV status.

The requirements for termination of a POV notice are provided in section 104(e)(3) of the Mine Act. A POV notice will be terminated if MSHA finds no S&S violations during an inspection of the entire mine. Final § 104.4 merely restates the requirements at 30 U.S.C. 814(e)(3) for terminating a pattern notice. Final paragraph (b) is revised to make nonsubstantive changes to clarify that partial inspections of the mine, within 90 days, taken together constitute an inspection of the entire mine.

As previously mentioned, mine operators may challenge section 104(e) withdrawal orders, as well as the underlying POV designation, before the Commission. Section 105(b)(2) of the Mine Act provides for expedited Commission review of requests for temporary relief from the issuance of POV withdrawal orders. Under Commission procedural rules, and subject to judges' availability, it is possible for a hearing to occur as early as four days from the date of the request for an expedited hearing. For this reason, it is unnecessary for MSHA to establish a similar administrative process.

Under the statute, to be removed from POV status, a mine must receive a complete inspection with no S&S violations cited. In CY 2010, CY 2011, and the first quarter of CY 2012, MSHA conducted 48,397 regular, complete inspections. No S&S violations were cited during 26,124 (54%) of these inspections. 9,430 inspections resulted in no violations cited at all. (**Note:** for underground coal mines, for the same period, of the 5,192 regular inspections, 1,256 (24%) resulted in no S&S citations).

With respect to seasonal operations that operate on an intermittent basis, the Mine Act requires inspections for intermittent operations. As with mines that change to inactive status after receipt of a POV notice, MSHA would temporarily postpone enforcement while the mine is inactive, but would

**5067**

resume POV enforcement once the seasonal operation restarts production.

*E. Alternatives Suggested by Commenters*

Many commenters urged MSHA to consider a mine's injury prevention effectiveness as well as enforcement performance, saying they should be given equal weight. These commenters stated that injury prevention is a core value that should be MSHA's primary focus—how well a mine prevents injuries—and that enforcement performance does not equal safety. Other commenters suggested that rates and measures must be normalized for mine size and type, stating that severity measures can skew injury rates for small mines. Some commenters suggested that MSHA use the Safety Performance Index (SPI), also known as the Grayson Model, as one viable POV model that uses injury prevention and enforcement criteria in equal measures. It normalizes the criteria and provides a holistic view (i.e., analysis of a whole system rather than only its individual components) of a mine's safety performance so that it is predictive in nature.

MSHA reviewed the SPI model when the Agency was considering changes to the specific criteria used in its POV procedures summary which provides the basis for the Agency's on-line Monthly Monitoring Tool. MSHA found that the model places a high degree of emphasis on accident and injury data reported by the mine operators, more than MSHA believed was appropriate. MSHA's existing POV criteria, however, contain elements similar to some of those in the SPI model (i.e., normalized S&S citations and orders and injury severity measures). As previously stated in this preamble, under this final rule, mine operators will have the opportunity to comment on any future POV criteria that MSHA posts for comment on its Web site at *http://www.msha.gov/POV/POVsinglesource.asp.*

**IV. Regulatory Economic Analysis**

MSHA has not prepared a separate regulatory economic analysis for this rulemaking. Rather, the analysis is presented below.

*A. Executive Order 12866: Regulatory Planning and Review; and Executive Order 13563: Improving Regulation and Regulatory Review*

Under Executive Order (E.O.) 12866, the Agency must determine whether a regulatory action is "significant" and subject to review by the Office of Management and Budget (OMB).

MSHA has determined that this final rule will not have an annual effect of $100 million or more on the economy, and is not an economically "significant regulatory action" pursuant to section 3(f) of E.O. 12866. MSHA used a 10-year analysis period and a 7 percent discount rate to calculate $6.7 million in annualized net benefits ($12.6 million in annualized benefits minus $5.9 million in annualized costs). However, OMB has determined that the final rule is a "significant" regulatory action because it will likely raise novel legal or policy issues.

Executive Order 13563 directs agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility to minimize burden. MSHA has determined that this rule does not add a significant cumulative effect. The rule imposes requirements only on mines that have not complied with existing MSHA standards. The analysis identifies costs for mine operators who voluntarily choose to routinely monitor their citation data and undertake corrective

action programs to prevent being placed on a POV.

Commenters stated that the proposed rule failed to consider the interplay between the POV rule and other Agency rules as required by E.O. 13563, which requires agencies to regulate industry in the least burdensome manner and to take into account the costs of cumulative regulations. Commenters stated that the cumulative effect of changes to other rules, such as respirable dust, examinations, and rock dust, on the POV regulation, will likely cause an increase in the numbers of S&S citations and, consequently, could result in more mines meeting the criteria for a POV notice. In response to commenters' concerns, MSHA clarifies that this final rule will achieve the legislative intent and impact only those mines that show a disregard for miners' health and safety. This rule does not add to the number of S&S citations. Mines can avoid costs associated with POV status by complying with MSHA's health and safety standards.

*B. Industry Profile and Population at Risk*

The final rule applies to all mines in the United States. MSHA divides the mining industry into two major sectors based on commodity: (1) coal mines and (2) metal and nonmetal mines. Each sector is further divided by type of operation, e.g., underground mines or surface mines. The Agency maintains data on the number of mines and on mining employment by mine type and size. MSHA also collects data on the number of independent contractor firms and their employees providing mining related services. Each independent contractor is issued one MSHA contractor identification number, but may work at any mine.

In 2010, there were 14,283 mines with employees. Table 1 presents the number of mines in 2010 by type and size of mine.

TABLE 1—2010 NUMBER OF MINES, BY TYPE OF MINE AND EMPLOYMENT SIZE GROUP

| Mine size | Employment size group | | | Total |
|---|---|---|---|---|
| | 1–19 | 20–500 | 501+ | |
| Underground Coal | 168 | 383 | 15 | 566 |
| Surface Coal | 901 | 475 | 4 | 1,380 |
| Underground M/NM | 110 | 132 | 6 | 248 |
| Surface M/NM | 10,837 | 1,231 | 21 | 12,089 |
| Total | 12,016 | 2,221 | 46 | 14,283 |

The estimated value of coal produced in U.S. coal mines in 2010 was $36.2 billion: $18.8 billion from underground coal and $17.4 billion from surface coal. The estimated value of coal production was calculated from the amount of coal

**5068** **Federal Register** / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

produced and the average price per ton. MSHA obtained the coal production data from mine operator reports to MSHA under 30 CFR part 50 and the price per ton for coal from the U.S. Department of Energy (DOE), Energy Information Administration (EIA), *Annual Coal Report 2010*, November 2011, Table 28.

The value of the U.S. mining industry's metal and nonmetal (M/NM) output in 2010 was estimated to be approximately $64.0 billion. Metal mining contributed an estimated $29.1 billion to the total while the nonmetal mining sector contributed an estimated $34.9 billion. The values of production estimates are from the U.S. Department

of the Interior (DOI), U.S. Geological Survey (USGS), *Mineral Commodity Summaries 2011*, January 2011, page 8.

The combined value of production from all U.S. mines in 2010 was $100.2 billion. Table 2 presents the estimated revenues for all mines by size of mine.

TABLE 2—2010 REVENUES AT ALL MINES BY EMPLOYMENT SIZE GROUP

| Size of mine | Revenues— coal mines (millions) | Revenues— MNM mines (millions) | Total revenues (millions) |
|---|---|---|---|
| 1–19 Employees | $224 | $14,800 | $15,000 |
| 20–500 Employees | 15,100 | 43,300 | 58,400 |
| 501+ Employees | 20,900 | 5,900 | 26,800 |
| Total* | 36,200 | 64,000 | 100,200 |

* Discrepancies are due to rounding.

*C. Benefits*

This final rule provides MSHA a more effective use of its POV tool to ensure that operators improve their compliance with existing health and safety standards. Based on 2010 mine employment data, effective use of this enforcement tool will provide improvement in the conditions for 319,247 miners. These workers are found in underground coal mines (51,228), surface coal mines (70,178), underground metal/nonmetal mines (22,930), and surface metal/nonmetal mines (174,911).

The Agency used its experience under the existing POV rule to estimate benefits under the final rule. Specifically, the Agency used safety results derived after PPOV notices were issued to mine operators. MSHA's data reveal that improvements declined over time at about a fifth of the mines that received PPOV notices, based on MSHA's data over the last four years.

Beginning in June 2007 through September 2009, MSHA conducted seven cycles of PPOV evaluations, on an average of every 6 to 9 months. In each cycle, eight to 20 of all mines met the criteria for issuance of a PPOV. During that period, MSHA sent 68 PPOV letters to 62 mine operators (six mine operators received more than one notification). After receiving the PPOV, 94 percent of the mines that remained in operation to the next evaluation reduced the rate of S&S citations and orders by at least 30 percent, and 77 percent of the mines reduced the rate of S&S citations and orders to levels at or below the national average for similar mines. These improvements declined over time at some mines. Compliance at 21 percent (13/62 = 0.21) of the 62 mines that

received PPOV letters deteriorated enough over approximately a 24-month period to warrant a second PPOV letter. Six of these mines were actually sent a second PPOV letter, while the other seven (of the 13) could have received a second letter but did not, generally due to mitigating circumstances.

In the proposed rule, MSHA estimated that 50 mines would submit corrective action programs in the first year. After reviewing public comments on the proposed rule, the Agency performed a POV analysis to review the 12-month violation history of all active mines for each of the five months from September 2011 to January 2012. The analysis used the existing PPOV screening criteria except for the final order criteria. Of the over 14,000 mines under MSHA jurisdiction, MSHA identified 313 mines that either met all of the initial screening criteria or all but one of the initial screening criteria. MSHA believes that most mine operators in this situation will submit and implement corrective action programs. MSHA believes that almost 90 percent (or 275) of these mines will submit corrective action programs in the first year under the final rule. MSHA believes operators will improve compliance over time but lacks any historical basis for a data driven estimate. Rather, the Agency selected a 10-percent reduction each year as a reasonable assumption based on its data and experience with the issuance of PPOV notices under the existing regulation. The costs for the corrective action programs include this 10-percent reduction each year in operators submitting corrective action programs.

Under the final rule, operators can submit corrective action programs as evidence of mitigating circumstances to

demonstrate their commitment to improve health and safety at their mines. Mines who submit effective corrective action programs will reduce the number of S&S violations, thereby reducing the probability of injuries and of being placed on a POV. MSHA reviewed the five 12-month periods ending on September 30, 2011; October 31, 2011; November 30, 2011; December 31, 2011; and January 31, 2012, which resulted in an average of 12 mines that met all of the POV screening criteria. Based on this data, MSHA projects that 12 mines will meet all of the POV criteria in the first year under the final rule. As previously stated, of the 90 percent or 11 mines that implement a corrective action program, MSHA estimates that 80 percent will successfully reduce S&S violations. Therefore, 20 percent or two of the mines that implement a corrective action program will be issued a POV notice, primarily because they did not successfully implement a corrective action program or the corrective action program did not achieve the results intended in reduced S&S citations to avoid a POV. MSHA further estimates that 10 percent or one mine will not have implemented a corrective action program and will be issued a POV notice. Therefore, MSHA estimates that a total of three mines will be issued POV notices annually.

MSHA estimated the impact that the final mitigating circumstances provision in the final rule (including the opportunity for mine operators to submit corrective action programs) will have on the number of nonfatal injuries at mines. MSHA determined that the 62 mines, which received PPOV letters from June 2007 through September

2009, experienced 11 total nonfatal injuries during the year prior to receiving the PPOV letter and eight total nonfatal injuries during the year after receiving the PPOV letter, for an overall reduction in nonfatal injuries of 30 percent per year.

One commenter stated that MSHA had provided no rational basis for its estimate that the proposed rule would reduce the number of nonfatal injuries per mine by an average of three per year. In response to the comment, MSHA's estimate for reduced non-fatal injuries per year in the proposed rule was based on Agency experience under the existing rule. However, MSHA has reduced the estimate of non-fatal injuries avoided per year from three in the proposed rule to one in the final rule.

MSHA reviewed 10 years of accident data for all mines using the Agency's Open Government Initiative Accident Injuries dataset at *http://www.msha.gov/ OpenGovernmentData/DataSets/ Accidents.zip*. MSHA examined data from 2002 to 2011. For the mines with accidents, MSHA found that the average number of nonfatal, non-permanently disabling injuries with lost time was 3.7 annually per mine. Using an average of 3.7 injuries per mine annually and MSHA's experience with PPOV (roughly a 30 percent reduction in non-fatal injuries), MSHA reduced its estimate for nonfatal injuries avoided at mines that successfully implement an effective, MSHA-approved, corrective action program, from three to one per year. MSHA has included a more conservative value in the final rule. It is likely that operators who include measurable benchmarks for abating specific violations to address hazardous conditions in the MSHA-approved corrective action programs will achieve more effective systemic results than those achieved under the existing rule. As mentioned previously in the preamble, MSHA believes that the POV will be a more effective deterrent to operators by encouraging them to continually evaluate their compliance performance and respond appropriately.

MSHA does not believe that it has a reliable basis on which to quantify a reduction in fatalities or disabling injuries. MSHA believes, however, that the implementation of an MSHA-approved corrective action program will reduce fatalities and disabling injuries. Although MSHA has not quantified a reduction in injuries at the three mines estimated to be placed on a POV each year, the Agency believes that there will likely be injury reductions at these mines.

In the first year following receipt of the PPOV, mines receiving PPOV letters showed reductions in S&S violations and injuries. Unfortunately, some mines failed to sustain these improvements in the second year. Of the 62 mines receiving PPOV letters from June 2007 through September 2009, 49 mines had two full years of data following receipt of the PPOV letter. Of these 49 mines, 19 (39%) experienced an increase in the number of injuries in the second year following receipt of the PPOV letter compared to the first.

MSHA expects that, under the final rule, more mines will sustain improvements in health and safety. MSHA expects that operators that proactively implement effective MSHA-approved corrective action programs will have health and safety systems that allow them to continuously monitor hazardous conditions and sustain improvements. Mines that meet the conditions for termination of a POV will have increased incentive to remain off (see the cost analysis) and will likely implement continuing, proactive measures to prevent S&S violations.

MSHA based its estimates of the monetary values for the benefits associated with the final rule on the work of Viscusi and Aldy (2003). Viscusi and Aldy's work on willingness-to-pay is widely recognized and accepted by the Department of Labor and other federal agencies. Viscusi and Aldy conducted an analysis of studies that use a willingness-to-pay methodology to estimate the value of life-saving programs (i.e., meta-analysis) and found that each fatality avoided was valued at approximately $7 million and each lost work-day injury was approximately $50,000 in 2000 dollars. Using the Gross Domestic Product (GDP) Deflator (U.S. Bureau of Economic Analysis, 2010), this yields an estimate of $8.7 million for each fatality avoided and $62,000 for each lost work-day injury avoided in 2009 dollars. As a conservative estimate, MSHA has used the lost work-day injury value for all nonfatal injuries as there is insufficient data to separately estimate permanently disabling injuries.

MSHA recognizes that willingness-to-pay estimates involve some uncertainty and imprecision. Although MSHA is using the Viscusi and Aldy (2003) study as the basis for monetizing the expected benefits of the final rule, the Agency does so with several reservations, given the methodological difficulties in estimating the compensating wage differentials (see Hintermann, Alberini, and Markandya, 2008). Furthermore, these estimates pooled across different industries may not capture the unique circumstances faced by miners. For example, some have suggested that the models be disaggregated to account for different levels of risk, as might occur in coal mining (see Sunstein, 2004). In addition, miners may have few options of alternative employers and, in some cases, only one employer (near-monopsony or monopsony) that may depress wages below those in a more competitive labor market.

MSHA estimates a reduction of 1,796 injuries over the 10-year period. This value is based on the estimated prevention of 275 nonfatal injuries in year one (first year 275 mines with corrective action programs times 1 injury reduction per mine) and a 10 percent reduction in mines submitting programs and corresponding reduction in non-fatal injuries in each successive year. This reduction results in an estimated 107 mine operators submitting programs in the 10th year. The monetized benefits are calculated by multiplying the reduction in each year by $62,000 per lost work-day injury. This reduction in injuries, due to this final rule, will result in a 10-year monetary benefit of $111.4 million which when annualized at 7 percent equals $12.6 million. MSHA believes that this is a low estimate for the total benefits of the final rule as no monetary benefit for potential avoided fatalities was included and avoided injuries were all assumed to be less serious than a disabling injury.

### D. Compliance Costs

MSHA estimates this rule will result in total compliance costs of $54.4 million over 10 years. The total 10-year estimated costs are comprised of costs for monitoring compliance or enforcement data ($11.6 million), costs for developing and submitting corrective action programs ($20.1 million), and lost production when a POV and withdrawal order are issued ($22.7 million). The costs, when annualized at 7 percent, are $5.9 million. These costs are described below. MSHA's estimates do not include the cost of compliance with MSHA's health or safety standards. Although these costs can be substantial, they are addressed in rulemakings related to MSHA's existing health and safety standards, and are not included in this analysis.

The final rule mirrors the statutory provision in section 104(e) of the Mine Act for issuing a POV notice. Final § 104.3(c) provides that MSHA will issue an order withdrawing all persons from the affected area of the mine if any S&S violation is found within 90 days after the issuance of a POV notice. No

**5070** Federal Register / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

one will be allowed to enter the area affected by the violation until the condition has been abated, except for those persons who must enter the affected area to correct the violation. Under final rule § 104.3(d), any subsequent S&S violation will also result in a withdrawal order.

The Congress intended that the POV tool be used to cause operators of unsafe mines to bring them into compliance, even if this meant shutting down production. Withdrawal orders issued under the final rule can stop production until the condition has been abated. The threat of a withdrawal order provides a strong incentive for mine operators to ensure that S&S violations do not recur. MSHA expects that, rather than risking a POV and the possibility of a closure, mine operators will monitor their compliance record against the POV criteria using the on-line Monthly Monitoring Tool on the Agency's Web site. MSHA estimates that it will take a supervisor an average of 0.08 hour (5 minutes) each month to monitor a mine's performance using the Agency's on-line Monthly Monitoring Tool.

Commenters both supported and disagreed with the time, ease of use, and frequency associated with monitoring the on-line Monthly Monitoring Tool referenced in the proposed rule. Commenters stated that MSHA's estimate of 5 minutes to monitor the Web data was too low. Besides the time required for monitoring, commenters also stated concern about the ease of use of MSHA's on-line Monthly Monitoring Tool.

After reviewing the comments, MSHA has determined that, due to the broad range in mine sizes and types affected by this rule, an average of 5 minutes per month is an appropriate time for an operator to monitor a mine's compliance performance. Some large mines may take much longer; many mine operators may monitor the on-line Monthly Monitoring Tool only a few times a year and incur lower costs. Mine operators may also request this information directly from MSHA. As support for its estimates, MSHA believes that its on-line Monthly Monitoring Tool can be easily used by mine operators and without the need for special skills or training.

MSHA calculated the average supervisory wage, including benefits, for all mining in 2010 at $81.27 per hour. MSHA estimates that the yearly cost for all mine operators to monitor their performance will be approximately $1.1 million (14,283 mines × 0.08 hours (5 minutes) per month × 12 months per year × $81.27 per hour).

With respect to compliance performance, MSHA's experience reveals that the vast majority of mines operate substantially in compliance with the Mine Act. As mentioned above, MSHA identified 313 mines that either met all or all but one of the initial screening criteria. MSHA projects that almost 90 percent of these 313 mines (or 275) will submit corrective action programs in the first year under the final rule. Under the final rule, MSHA projects that these 275 operators, after monitoring their compliance performance, will submit corrective action programs to MSHA as evidence of mitigating circumstances to demonstrate their commitment to improve their compliance performance. MSHA estimates that mine operators will improve their compliance performance and the number of corrective action programs will gradually decrease. After the final rule becomes effective, MSHA projects increased compliance and applied a 10 percent reduction per year to the number of mines submitting corrective action programs. This results in an estimated 107 submissions in year 10.

MSHA estimates that, on average, it will take a total of 128 hours of a supervisor's time to develop an effective corrective action program with meaningful and measurable benchmarks, obtain the Agency's approval of the program, and implement the program. The 128 hours of supervisory time is comprised of 80 hours for development of the program, 8 hours for submittal and approval, and 40 hours for implementation. MSHA estimates that 8 hours of miners' time will be associated with implementation of the program. MSHA re-evaluated and reduced the estimated hours based on public comments. The cost for any copying and mailing of the corrective action program documents and revisions will be about $100.

The final rule applies to all mines. Because underground coal mines generally receive more S&S violations (50% of all S&S violations in 2011) than other types of mines, MSHA projects that the final rule will affect underground coal mines more than any other mining sector. From June 2007 through November 2011, underground coal mine operators received nearly 80 percent of the PPOV letters. MSHA used the 2010 underground coal mine hourly wage rates, including benefits, of $84.69 for a supervisor and $36.92 for a miner to estimate the corrective action program costs.

MSHA received a public comment that individual mines had different wage rates. MSHA recognizes that

wages, and therefore costs, will vary across mines, with some higher and some lower than the average. This evaluation uses average underground coal mine wage rates to estimate the overall costs. Since hourly wage rates in underground coal mining are higher than those in surface coal and metal/nonmetal mining, MSHA believes this approach may overestimate the costs.

In the final rule, MSHA clarified that the corrective action programs that mine operators may submit to MSHA for consideration as mitigating circumstances will not need to be comprehensive in nature. The corrective action programs referenced in the final rule need to cover only health and safety issues reflected in the citations and orders that result in a POV. The costs related to the proposed rule were based on a comprehensive safety and health program, which would be more extensive and address all health and safety issues at the mine and involve more extensive miner participation to develop. With this clarification, MSHA estimates that the costs to develop the corrective action program will be $11,200, as opposed to $22,100 in the proposed rule. The revised average cost to develop and implement an approved corrective action program at a mine will be approximately $11,200 ((128 hours of a supervisor's time × $84.69 per hour) + (8 hours of miners' time × $36.92 per hour) + $100). MSHA anticipates that the cost to mine operators developing and implementing an MSHA-approved corrective action program will be approximately $20.1 million over 10 years (1,796 mines develop and implement program × $11,200 per mine).

Several commenters provided estimates of $14,000–$44,000 per hour of shutdown at large mines. These commenters suggested that shutdowns would be from 4 hours to 2 days and the number of citations could raise costs by between $3.5 and $7 million per year. MSHA does not have an historical basis from which to estimate the potential costs that will be incurred by a mine on POV. MSHA believes that a reasonable estimate of shutdown costs is the potential production lost when miners are withdrawn while the mine operator takes the necessary actions to correct the health and safety violations. Lost revenue due to the withdrawal orders will vary considerably.

As noted above, MSHA expects that the final rule will affect underground coal mining more than any other mining sector. MSHA, therefore, used underground coal mine revenue to estimate potential production losses. In 2010, 566 underground coal mines

generated an estimated $18.8 billion in revenue resulting in an average of approximately $33.2 million per mine. Average underground coal mine revenue per day is estimated at $151,000 ($33.2 million/220 work days).

The majority of the S&S violations issued in underground coal mines are abated immediately, or within hours, and have no impact on production. A smaller percentage of violations may take an extended period of time and will impact production. Based on MSHA experience, the Agency estimates an average of 5 days lost production for a mine on POV. MSHA estimates the cost of lost production at $755,000 ($151,000 lost revenue per day × 5 days). Based on the 3 mines per year that MSHA estimates will be placed on a POV, the total annual lost revenue is estimated at $2.3 million. Some mines may incur greater than average losses while others may incur less than average losses. The small number of large mines relative to the number of small mines would result in a lower overall cost than those suggested by commenters.

The rule does not require that every S&S violation result in a shutdown of the entire mine. Only miners from the affected area are withdrawn. Withdrawal of miners does not always result in a loss of production.

Since the average revenue per underground coal mine ($33.2 million) is significantly higher than the average revenue produced by all mines ($7.0 million), MSHA believes this approach may overstate the estimated costs.

*E. Net Benefits*

Under the Mine Act, MSHA is not required to use estimated net benefits as the basis for its decision to promulgate a rule. Based on the estimated prevention of 1,796 lost injuries over 10 years, MSHA estimates that the final rule will result in annualized (7%) monetized benefits of $12.6 million. The 10-year annualized (7%) costs are $5.9 million. The net benefit is approximately $6.7 million per year.

**V. Feasibility**

MSHA has concluded that the requirements of the pattern of violations final rule are technologically and economically feasible.

*A. Technological Feasibility*

MSHA concludes that this final rule is technologically feasible because it is not technology-forcing. In order to avoid a POV, mine operators will have to comply with existing MSHA health and safety standards, which have previously been determined to be technologically feasible.

*B. Economic Feasibility*

MSHA also concludes that this final rule is economically feasible because mine operators can avoid the expenses of being placed on a POV by complying with MSHA's existing health and safety standards, all of which have previously been found to be economically feasible. For those mine operators who are in danger of a POV, MSHA will consider the implementation of an approved corrective action program, among other factors, as a mitigating circumstance. MSHA expects about three mines per year will incur the potential expenses associated with closures while on a POV.

MSHA has traditionally used a revenue screening test—whether the yearly compliance costs of a regulation are less than one percent of revenues—to establish presumptively that compliance with the regulation is economically feasible for the mining community. Based on this test, MSHA has concluded that the requirements of the final rule are economically feasible. The first year compliance cost to mine operators is the highest year at $6.5 million. This is insignificant compared to total annual revenue of $100.2 billion for the mining industry (i.e., costs are significantly less than one percent). Each year beyond the first year has lower total costs and, therefore, even less economic impact. Even if all of the costs were borne by the underground coal industry, the estimated $6.5 million first year cost of the final rule is about 0.03 percent of the underground coal industry's 2010 revenue of $18.8 billion. MSHA, therefore, concludes that compliance with the provisions of the final rule will be economically feasible for the mining industry.

**VI. Regulatory Flexibility Act and Small Business Regulatory Enforcement Fairness Act**

Pursuant to the Regulatory Flexibility Act (RFA) of 1980, as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA), MSHA has analyzed the impact of the final rule on small businesses. Based on that analysis, MSHA has notified the Chief Counsel for Advocacy, Small Business Administration (SBA), and made the certification under the RFA at 5 U.S.C. 605(b) that the final rule will not have a significant economic impact on a substantial number of small entities. The factual basis for this certification is presented below.

*A. Definition of a Small Mine*

Under the RFA, in analyzing the impact of the final rule on small

entities, MSHA must use the SBA definition for a small entity or, after consultation with the SBA Office of Advocacy, establish an alternative definition for the mining industry by publishing that definition in the **Federal Register** for notice and comment. MSHA has not taken such an action and is required to use the SBA definition. The SBA defines a small entity in the mining industry as an establishment with 500 or fewer employees.

In addition to examining small entities as defined by SBA, MSHA has also looked at the impact of this final rule on mines with fewer than 20 employees, which MSHA and the mining community have traditionally referred to as small mines. These small mines differ from larger mines not only in the number of employees, but also in economies of scale in material produced, in the type and amount of production equipment, and in supply inventory. The costs of complying with the final rule and the impact of the final rule on small mines will also be different. It is for this reason that small mines are of special concern to MSHA.

MSHA concludes that it can certify that the final rule will not have a significant economic impact on a substantial number of small entities that will be covered by this final rule. The Agency has determined that this is the case both for mines with fewer than 20 employees and for mines with 500 or fewer employees.

*B. Factual Basis for Certification*

Mine operators can avoid the expenses of being placed on a POV by complying with existing MSHA health and safety standards. Under the final rule, MSHA may consider the implementation of a corrective action program, coupled with improved compliance levels, as a mitigating circumstance for those mine operators who are subject to being placed on a POV. MSHA expects few mines, if any, will choose to incur the potential expenses associated with closures under a POV.

MSHA initially evaluates the impacts on small entities by comparing the estimated compliance costs of a rule for small entities in the sector affected by the rule to the estimated revenues for the affected sector. When estimated compliance costs are less than one percent of the estimated revenues, the Agency believes it is generally appropriate to conclude that there is no significant economic impact on a substantial number of small entities. When estimated compliance costs exceed one percent of revenues, MSHA investigates whether a further analysis

**5072**     **Federal Register** / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

is required. Since it was not possible to accurately project the distribution of mines that will incur the estimated $6.5 million to comply with the final rule by commodity and size, MSHA examined the impact using several alternative assumptions as a sensitivity or threshold analysis.

If the total estimated compliance cost of $6.5 million were incurred by small mines, the impact would be as summarized below.

| Small mine group | Number of mines | Revenue (millions) | Cost as percent of revenue |
|---|---|---|---|
| MSHA Definition (1–19 employees) ................................................ | 12,016 | $15,000 | 0.04 |
| SBA Definition (≤ 500 employees) ................................................ | 14,237 | 73,400 | 0.01 |

The final rule, therefore, will not have a significant economic impact on a substantial number of small mining operations.

One commenter stated that the average cost of the rule, as calculated by MSHA for the typical mine, would likely put some small mines, especially placer gold mines, out of business. The cost for such small mines, which typically employ one to three miners, is likely to be less than the average cost that MSHA calculated for an average-sized small mine. For example, a corrective action program would require fewer hours to develop and implement.

Accordingly, MSHA has certified that the final rule will not have a significant economic impact on a substantial number of small entities.

## VII. Paperwork Reduction Act of 1995

*A. Summary*

This final rule contains a collection-of-information requirement subject to review and approval by OMB under the Paperwork Reduction Act (PRA).

MSHA estimates that under the final rule approximately 275 mines will develop and implement MSHA-approved corrective action programs in the first year. MSHA believes this number will decrease by 10 percent in each subsequent year. The average number of mines that will develop and implement MSHA-approved corrective action programs per year over 3 years is 249 ((275 + 248 + 223)/3). The development and MSHA approval of a corrective action program will impose information collection requirements related to mitigating circumstances under final § 104.2(a)(8).

MSHA expects that developing such a program with meaningful and measurable benchmarks will take about 128 hours of a supervisor's time and 8 hours of miners' time. Costs for copying and mailing the program and revisions are estimated to be $100 per program.

The burden of developing and implementing an approved corrective action program is 136 hours per mine (128 + 8) plus an additional cost of $100 per mine for copying and mailing.
*Burden Hours:*

- Supervisors: 249 mines × 128 hr/mine = 31,872 hr
- Miners: 249 mines × 8 hr/mine = 1,992 hr

*Burden Hour Costs:*
- 31,872 hr × $84.69/hr = $2,699,240
- 1,992 hr × $36.92/hr = $73,545

*Copying and Mailing Costs:*
- 249 mines × $100/mine = $24,900

*Total Burden Cost:* $2,797,685.

*B. Procedural Details*

The information collection package for this final rule has been submitted to OMB for review under 44 U.S.C. 3504(h) of the Paperwork Reduction Act of 1995, as amended (44 U.S.C. 3501 et seq.).

A Federal agency generally cannot conduct or sponsor a collection of information, and the public is generally not required to respond to an information collection, unless it is approved by the OMB under the PRA and displays a currently valid OMB Control Number. In addition, notwithstanding any other provisions of law, no person shall generally be subject to penalty for failing to comply with a collection of information if the collection of information does not display a valid OMB Control Number. See 5 CFR 1320.5(a) and 1320.6.

The Department has submitted the information collections contained in this final rule for review under the PRA to the OMB. The Department will publish an additional Notice to announce OMB's action on the request and when the information collection requirements will take effect. The regulated community is not required to respond to any collection of information unless it displays a current, valid, OMB control number. MSHA displays the OMB control numbers for the information collection requirements in its regulations in 30 CFR part 3.

## VIII. Other Regulatory Considerations

*A. The Unfunded Mandates Reform Act of 1995*

MSHA has reviewed the final rule under the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1501 et seq.). MSHA has determined that this final rule will not include any federal

mandate that may result in increased expenditures by State, local, or tribal governments; nor will it increase private sector expenditures by more than $100 million (adjusted for inflation) in any one year or significantly or uniquely affect small governments. Accordingly, the Unfunded Mandates Reform Act of 1995 requires no further Agency action or analysis.

*B. Executive Order 13132: Federalism*

This final rule will not have federalism implications because it will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, under E.O. 13132, no further Agency action or analysis is required.

*C. The Treasury and General Government Appropriations Act of 1999: Assessment of Federal Regulations and Policies on Families*

Section 654 of the Treasury and General Government Appropriations Act of 1999 (5 U.S.C. 601 note) requires agencies to assess the impact of Agency action on family well-being. MSHA has determined that this final rule will have no effect on family stability or safety, marital commitment, parental rights and authority, or income or poverty of families and children. This final rule impacts only the mining industry. Accordingly, MSHA certifies that this final rule will not impact family well-being.

One commenter stated that if mines are put out of business because they cannot pay MSHA fines, then lack of jobs would put families and children into poverty. As explained above, MSHA has concluded that compliance with the provisions of the final rule will be economically feasible for the mining industry. This final rule will not impose additional compliance costs on the mining industry, thus, it will not put mines out of business.

*D. Executive Order 12630: Government Actions and Interference With Constitutionally Protected Property Rights*

The final rule will not implement a policy with takings implications. Accordingly, under E.O. 12630, no further Agency action or analysis is required.

*E. Executive Order 12988: Civil Justice Reform*

This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. Accordingly, this final rule will meet the applicable standards provided in section 3 of E.O. 12988, Civil Justice Reform.

*F. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This final rule will have no adverse impact on children. Accordingly, under E.O. 13045, no further Agency action or analysis is required.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This final rule will not have tribal implications because it will not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes. Accordingly, under E.O. 13175, no further Agency action or analysis is required.

One commenter asserted that the rule could have impacts on Alaska Regional and Village Corporations that have royalty agreements with mining companies. Within E.O. 13175 guidelines, effects on royalties are not considered a direct effect of the rule and, therefore, they are not included.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Executive Order 13211 requires agencies to publish a statement of energy effects when a rule has a significant energy action (i.e., it adversely affects energy supply, distribution, or use). MSHA has reviewed this final rule for its energy effects because the final rule applies to the coal mining sector. Even if the entire annualized cost of this final rule of approximately $5.9 million were

incurred by the coal mining industry, MSHA has concluded that, relative to annual coal mining industry revenues of $36.2 billion in 2010, it is not a significant energy action because it is not likely to have a significant adverse affect on the supply, distribution, or use of energy. Accordingly, under this analysis, no further Agency action or analysis is required.

*I. Executive Order 13272: Proper Consideration of Small Entities in Agency Rulemaking*

MSHA has reviewed the final rule to assess and take appropriate account of its potential impact on small businesses, small governmental jurisdictions, and small organizations. MSHA has determined and certified that the final rule will not have a significant economic impact on a substantial number of small entities.

## IX. References

Hintermann, B., A. Alberini, and A. Markandya (2010). "Estimating the Value of Safety with Labor Market Data: Are the Results Trustworthy?" *Applied Economics*, 42(9):1085–1100. Published electronically in July 2008.

Sunstein, C. (2004). "Valuing Life: A Plea for Disaggregation." *Duke Law Journal*, 54(November 2004):385–445.

U.S. Bureau of Economic Analysis (2010). "National Income and Product Accounts Table: Table 1.1.9. Implicit Price Deflators for Gross Domestic Product" [Index numbers, 2005 = 100]. Revised May 27, 2010. *http://www.bea.gov/national/nipaweb/TableView.asp?SelectedTable=13&Freq=Qtr&FirstYear=2006&LastYear=2008*

U.S. Department of Labor, Office of the Inspector General. "In 32 Years MSHA Has Never Successfully Exercised Its Pattern of Violations Authority," Report No. 05–10–005–06–001 (September 29, 2010).

Viscusi, W. and J. Aldy (2003). "The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World," *Journal of Risk and Uncertainty*, 27:5–76.

## List of Subjects in 30 CFR Part 104

Administrative practice and procedure, Law enforcement, Mine safety and health, Reporting and recordkeeping requirements.

Dated: January 17, 2013.

**Joseph A. Main,**
*Assistant Secretary of Labor for Mine Safety and Health.*

For the reasons set out in the preamble, and under the authority of the Federal Mine Safety and Health Act of 1977 as amended by the Mine Improvement and New Emergency Response Act of 2006, MSHA is amending chapter I of title 30 of the Code of Federal Regulations by revising part 104 to read as follows:

## PART 104—PATTERN OF VIOLATIONS

Sec.
104.1   Purpose and scope.
104.2   Pattern criteria.
104.3   Issuance of notice.
104.4   Termination of notice.

**Authority:** 30 U.S.C. 814(e), 957.

### § 104.1   Purpose and scope.

This part establishes the criteria and procedures for determining whether a mine operator has established a pattern of significant and substantial (S&S) violations at a mine. It implements section 104(e) of the Federal Mine Safety and Health Act of 1977 (Mine Act) by addressing mines with an inspection history of recurrent S&S violations of mandatory safety or health standards that demonstrate a mine operator's disregard for the health and safety of miners. The purpose of the procedures in this part is the restoration of effective safe and healthful conditions at such mines.

### § 104.2   Pattern criteria.

(a) At least once each year, MSHA will review the compliance and accident, injury, and illness records of mines to determine if any mines meet the pattern of violations criteria. MSHA's review to identify mines with a pattern of S&S violations will include:

(1) Citations for S&S violations;

(2) Orders under section 104(b) of the Mine Act for not abating S&S violations;

(3) Citations and withdrawal orders under section 104(d) of the Mine Act, resulting from the mine operator's unwarrantable failure to comply;

(4) Imminent danger orders under section 107(a) of the Mine Act;

(5) Orders under section 104(g) of the Mine Act requiring withdrawal of miners who have not received training and who MSHA declares to be a hazard to themselves and others;

(6) Enforcement measures, other than section 104(e) of the Mine Act, that have been applied at the mine;

(7) Other information that demonstrates a serious safety or health management problem at the mine, such as accident, injury, and illness records; and

(8) Mitigating circumstances.

(b) MSHA will post the specific pattern criteria on its Web site.

### § 104.3   Issuance of notice.

(a) When a mine has a pattern of violations, the District Manager will issue a pattern of violations notice to the mine operator that specifies the basis for the Agency's action. The District Manager will also provide a copy of this notice to the representative of miners.

**5074** **Federal Register** / Vol. 78, No. 15 / Wednesday, January 23, 2013 / Rules and Regulations

(b) The mine operator shall post the pattern of violations notice issued under this part on the mine bulletin board. The pattern of violations notice shall remain posted at the mine until MSHA terminates it under § 104.4 of this part.

(c) If MSHA finds any S&S violation within 90 days after issuance of the pattern notice, MSHA will issue an order for the withdrawal of all persons from the affected area, except those persons referred to in section 104(c) of the Mine Act, until the violation has been abated.

(d) If a withdrawal order is issued under paragraph (c) of this section, any subsequent S&S violation will result in a withdrawal order that will remain in effect until MSHA determines that the violation has been abated.

### § 104.4 Termination of notice.

(a) Termination of a section 104(e)(1) pattern of violations notice shall occur when an MSHA inspection of the entire mine finds no S&S violations or if MSHA does not issue a withdrawal order in accordance with section 104(e)(1) of the Mine Act within 90 days after the issuance of the pattern of violations notice.

(b) The mine operator may request an inspection of the entire mine or portion of the mine. MSHA will not provide advance notice of the inspection and will determine the scope of the inspection. Inspections of portions of the mine, within 90 days, that together cover the entire mine shall constitute an inspection of the entire mine for the purposes of this part.

[FR Doc. 2013–01250 Filed 1–17–13; 11:15 am]

**BILLING CODE 4510–43–P**

FEB 1 5 2011

gcline@clarktesting.com

Dear Mr. Cline,

We have received your e-mail of February 4, 2011, requesting a public hearing on the Mine Safety and Health Administration's (MSHA's) proposed rule on Pattern of Violations (RIN 1219-AB73). MSHA is considering your request. If a decision is made to hold public hearings, we will publish a notice in the *Federal Register* with the relevant information. We encourage you to submit comments on the proposed rule at this time, and testify at the public hearing should one be held.

Thank you for your interest in mine safety and health.

April E. Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration

AB73-CORR-1

# APPALACHIAN CITIZENS' LAW CENTER, INC.
317 MAIN STREET
WHITESBURG, KENTUCKY 41858
606-633-3929  1-877-637-3929
FAX 606-633-3925
www.appalachianlawcenter.org

STEPHEN A. SANDERS
Director
steve@appalachianlawcenter.org

MARY CROMER*
Staff Attorney
mary@appalachianlawcenter.org
*Also Admitted in VA

2011 JUN -5 A 11: 10

WES ADDINGTON
Deputy Director
wes@appalachianlawcenter.org

May 10, 2011

Joseph Main
Assistant Secretary of Labor
Mine Safety and Health Administration
1100 Wilson Blvd., 21st Floor
Arlington, VA 22209-3939

Dear Mr. Main:

I recently learned that MSHA will hold public hearings on the proposed rules for Examinations of Work Areas in Underground Coal Mines (Examinations of Work Areas) and for Pattern of Violations. I was disappointed to learn that none of these public hearings will be held in eastern Kentucky considering that the first operation placed on a Pattern of Violations was in Leslie County and many operations in this area are perilously close to being placed on a "Pattern" according to the online PPOV Monitoring Tool.

I am writing to ask that MSHA schedule an additional hearing in the eastern Kentucky region. I suggest that a hearing be held in Harlan or Hazard, which are central locations and easily accessible by eastern Kentucky miners.

Thank you for your attention to this matter.

Sincerely,

Wes Addington
Attorney at Law

–WORKING FOR JUSTICE IN THE APPALACHIAN COALFIELDS–



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p 202 624-2500 ▪ f 202 628-5116

October 31, 2011

**VIA EMAIL AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

The Honorable Joseph A. Main
Assistant Secretary of Labor for Mine Safety and Health
United States Department of Labor
Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, VA 22209-3939

Re: **Request for Your Expedited Reconsideration of Proposed Pattern of**
    **Violations Notification Letters of August 30, 2011 Sent**
    **to the Justice # 1 and the Randolph Mines of Alpha Natural Resources, Inc.**

Dear Mr. Secretary:

**Introduction**

On behalf of our clients, Independence Coal Company and Inman Energy, subsidiaries of Alpha Natural Resources, Inc. (hereinafter referred to collectively as "Alpha" or independently as "Independence" or "Inman"), the purpose of this letter is to tell you that the August 30, 2011 Proposed Pattern of Violation ("PPOV") notification letters from your Coal Mine Safety and Health District 4 Manager, Charles E. Carpenter, to Mr. Lewis Sheppard, Jr., with regard to (1) the Justice # 1 Mine operated by Independence, and (2) the Randolph Mine, operated by Inman, are not in accord with the "Pattern of Violation" regulations of 30 C.F.R. Part 104 (hereinafter the "POV Regulations"). Nor do these letters comport with the "Pattern of Violations (POV) Procedures Summary" (hereinafter the "POV Procedures Summary") published on the Mine Safety and Health Administration ("MSHA") website as the agency's informal procedural guidelines for implementing the POV regulations.

As discussed more fully below, Alpha urgently requests your expedited reconsideration of these notification letters. In addition, Alpha is so distressed about the arbitrary and capricious nature of these letters that it feels compelled to ask you to reopen the comment period on MSHA's Proposed Rule on Pattern of Violations for at least thirty days to provide it the opportunity to file supplemental comments on how these two letters clearly demonstrate why any new POV Rules, including the so-called "screening criteria," must be fully set forth as legislative rules in the Code of Federal Regulations itself, rather than informal interpretive guidelines such as are contained in the current POV Procedures Summary.

Crowell & Moring LLP ▪ www.crowell.com ▪ Washington, DC ▪ New York ▪ San Francisco ▪ Los Angeles ▪ Orange County ▪ Anchorage ▪ London ▪ Brussels

AB73 - CORR-3

The Honorable Joseph A. Main
October 31, 2011
Page 2

Mr. Secretary, in accordance with the precepts of Alpha's Running Right ® Program, please know that Alpha is dedicated to conducting its business safely, ethically, honestly, and with integrity at all times. It is because of this dedication that Alpha is especially aggrieved about these PPOV notification letters. Alpha is working hard to instill the virtues of its Running Right® Program in all of its business operations, including the mines acquired on June 1, 2011 as part of Alpha's purchase of Massey Energy Company. Alpha wants to work constructively with you to show you why these letters are erroneous. In this regard, if you re-examine the notification letters to ensure they were issued on the merits, in full accord with the substance and procedure of the current POV regulatory regime, Alpha is confident you will agree the letters should be rescinded.

However, please know that while working constructively with you is Alpha's preferred course of action, should these efforts come to naught, Alpha is prepared to seek redress of our grievances in any and every appropriate way, including, as necessary, pursuing our judicial remedies, communicating with our Congressional representatives, and asking the Inspector General of the Department of Labor to investigate the circumstances under which these notification letters were issued. In that regard, Alpha is in the process of analyzing MSHA PPOV determinations at other mines to see for ourselves whether the POV Regulations, the POV Procedures Summary, and the POV Screening Criteria were uniformly and even-handedly applied.

### Alpha Urgently Requests Your Expedited Reconsideration of the August 30 PPOV Notifications

In the cases of the Justice # 1 and Randolph Mines (hereinafter the "Mines"), for the reasons set forth in detail below, Alpha believes that these August 30 PPOV notifications failed to consider "any mitigating circumstances," as called for in the initial screening provisions of 30 C.F.R. § 104.2 (b), and especially § 104.2 (b) (4). These notifications also do not demonstrate that MSHA applied the provisions of "Appendix A – Mitigating Circumstances" set forth in the POV Procedures Summary. Nor do the August 30 notification letters show whether or how MSHA followed any of the other provisions of the POV Procedures Summary in its determinations. Alpha, therefore, has concluded that these two PPOV determinations are clearly erroneous and must be withdrawn.

As you may know, management personnel from the Mines met with District 4 Manager Charles Carpenter and other key District 4 officials on September 16 to discuss the August 30 notifications. In addition, in an effort to maintain a working dialogue with the District, and as we were invited to do in the August 30 letters, the Mines have provided District 4 with several iterations of corrective action programs ("CAPs"). The most recent correspondence from the Mines regarding the CAPs was sent to Mr. Carpenter on September 27. That correspondence also requested Mr. Carpenter's reconsideration of the decisions to place the Mines on PPOV status. As of the date of this letter, the CAPs for the Mines have been acknowledged to be "acceptable." However, no information has been provided to the Mines regarding the requests for reconsideration of PPOV status. In light of Mr. Carpenter's failure to respond to this fundamental issue, and because you, Mr. Secretary, are the ultimate decision-maker for MSHA

The Honorable Joseph A. Main
October 31, 2011
Page 3

on the merits of the August 30 PPOV notifications, Alpha hereby respectfully and urgently requests that you reconsider these two notifications on an expedited basis.

*As part of your reconsideration, we request the opportunity to meet with you and representatives of those MSHA components involved in making PPOV recommendations and determinations, as specified in the POV Procedures Summary. Our purpose in seeking this meeting is to provide you with the opportunity to see and hear for yourself how sincerely we believe that the two PPOV notifications are incorrect.[1]*

### Alpha Requests that You Re-open the Comment Period on MSHA's Proposed Rule on Pattern of Violations (RIN 1219—AB73) for at Least Thirty Days

Alpha believes that these two notification determinations constitute a classic example of arbitrary and capricious agency action in denial of Alpha's due process rights. Therefore, Alpha also requests and urges you to re-open the public comment period for at least 30-days with regard to your proposed rule for Pattern of Violations (RIN 1219–AB73), published in the Federal Register for February 2, 2011.[2] Alpha firmly believes that MSHA's actions in issuing these notification letters demonstrate exceptionally well why any new POV rules must, following an opportunity for notice and comment, be fully set forth as legislative rules in the Code of Federal Regulations. The informal, interpretive procedural guidance contained in the POV Procedures Summary is poorly suited and inappropriate for an enforcement tool as powerful as the pattern of violations "(POV)" sanction can be, or even just the PPOV designation, which, under the current Part 104, is a prerequisite to a POV.

Of course, the POV Procedures Summary requires MSHA's review and evaluation of the POV screening criteria also posted on the MSHA website. Those criteria also should be subject to notice and comment rulemaking. In this regard, as a member of the National Mining Association (NMA"), Alpha refers you to the NMA comments on this issue, provided to MSHA by letter of April 18, 2011 from NMA senior vice president Bruce Watzman on the Agency's proposal to re-write the POV Regulations. In those comments, NMA urged that POV screening criteria should be subject to notice and comment rulemaking procedures. More specifically, NMA commented: "While [MSHA] has broad discretion to establish criteria for determining when a pattern of violations exists, that discretion does not extend to establishing POV screening criteria without notice and comment rulemaking."[3] NMA commented further that "by not identifying . . . any specific criteria in a final POV rule, . . . MSHA is granting itself the ability to constantly change the rules of the POV process with no public notice or comment period. Such an approach is not only fundamentally unfair, but it also blatantly lacks the very transparency

---

[1] Even if Mr. Carpenter were to reject these requests for reconsideration, Alpha would still seek your favorable reconsideration in your capacity as the head of MSHA.

[2] 76 Fed. Reg. 5,719.

[3] NMA Comments (AB73 – COMM – 73) at 11.

**Crowell & Moring LLP** ▪ www.crowell.com ▪ **Washington, DC** ▪ **California** ▪ **New York** ▪ **London** ▪ **Brussels**

Correspondence Page 00819

The Honorable Joseph A. Main
October 31, 2011
Page 4

MSHA purportedly seeks to achieve with this rule revision. MSHA should remedy this issue by adopting a formal rulemaking process by which POV screening criteria must be established."[4]

Because Alpha wholeheartedly endorses the NMA comments, and because of Alpha's belief that the August 30 PPOV notifications warrant the reopening of the comment period for the February 2 proposed rule, I am sending a copy of this letter to Mr. Cass Sunstein, Director of the Office of Management and Budget's Office of Information and Regulatory Affairs. Alpha will seek a meeting with Director Sunstein to discuss this situation and our reasons for requesting that the comment period on the February 2 proposed rule should be reopened.

*As noted above, prior to seeking that meeting with Director Sunstein, we would first seek to meet with you about our very grave concerns and brief you on the reasons we believe these two mines should not have been notified that they are on PPOV status.* Of course, we understand that any meeting we may have with Director Sunstein would be attended by key MSHA personnel.

### Alpha's September 23 FOIA Request

Alpha is so troubled about these erroneous PPOV notifications that I was authorized to file a Freedom of Information Act ("FOIA") letter, including a request for expedited processing, with MSHA's FOIA Officer on September 23. The purpose of that FOIA request (a copy of which is attached to this letter for your convenience) is to try to get to the bottom of why and how MSHA decided to issue the two PPOV notification letters. To date, I have received an October 7 acknowledgment from your Ms. Jane Tarr (copy attached). We appreciated receiving that preliminary response, however it was disappointing that the letter states that MSHA did not believe my September 23 request met the Labor Department's regulations for expedited processing and it was even more disappointing that the acknowledgment letter estimated a response to my letter would not be forthcoming *for as long as 120 days* from October 7. Per Ms. Tarr's letter, I sent her another letter of October 17, with additional details as to why expedited processing is necessary. A copy of that letter is also attached. Alpha expects that MSHA will expedite a responsive and thorough reply to my FOIA letter. I am looking forward to receiving that response promptly.

*I now turn to a discussion of how the August 30 PPOV notification letters fail to consider mitigating circumstances present at both the Justice # 1 and Randolph Mines. I then follow with Alpha's view, based on the information currently available to it, as to how the PPOV notification letters otherwise fail to show whether or how MSHA abided by its own POV Procedures Summary. To reemphasize, both of these agency failures compel you, in Alpha's view, to withdraw these notification determinations.*

---

[4] Id. at 12.

The Honorable Joseph A. Main
October 31, 2011
Page 5

### The August 30 PPOV Notification Letters Fail to Demonstrate that MSHA Considered Any Mitigating Circumstances as required by 30 C.F.R. § 104 (2) (b) (4)

As you well know, on June 1, 2011, Alpha acquired ownership of the Mines as part of its overall purchase of Massey Energy Company. Alpha strongly believes that this change in ownership and the dramatic changes already made and continuing to be made in the management of the Mines regarding the safety and health of the miners constitute exactly the kinds of mitigating circumstances" contemplated by the current POV Regulations for the initial screening of mines. More specifically, § 104.2 (b) provides, in pertinent part, that as part of the initial screening regarding whether a mine should be placed on PPOV status, the agency shall consider a number of factors, including "any mitigating circumstances." The August 30 letters fail to show that MSHA considered this requirement.

What is meant by mitigating circumstances is illuminated by the preamble to the final POV Regulations published in the Federal Register for July 31, 1990.[5] Thus, the preamble reviewed the legislative history of the pattern of violations provision of § 104 (e) of the Federal Mine Safety and Health Act of 1977 ("Mine Act")[6], emphasizing that § 104 (e) was "intended for use at mines with a record of repeated [significant and substantial] violations and where the other enforcement provisions of the statute have not been effective in bringing the mine into compliance with Federal health and safety standards."[7] The preamble noted that the Mine Act did not define "pattern of violations," but rather authorized MSHA to "make such rules as necessary to establish criteria for determining when a pattern exists."[8] In discussing the initial screening provisions of § 104.2, the preamble stated that in some cases, "changes in mine management or ownership" could indicate that the period for examination of a mine's compliance record could, on a case-by-case-basis, be shorter or longer.[9] Furthermore, in connection with termination of a pattern of violations notice under § 104.5 of the Rules, the preamble described MSHA's agreement with the proposition that "under most circumstances, a pattern notice should not remain in effect if mine management changes.[10] More specifically:

> In the Agency's view, Congress intended section 104(e) to enable MSHA to address mines with serious safety and health management problems. Therefore, under normal circumstances, *if mine management changes, the new management should not be presumed to have the same inability or unwillingness to manage compliance with applicable safety and health standards as the previous mine management.* This view is consistent with the application of section 104(e) to

[5] 55 Fed. Reg. 31,128.

[6] 30 U.S.C. §§ 801, 814 (e).

[7] 55 Fed. Reg. 31,128.

[8] Id.

[9] Id. 31,130.

[10] Id. 31,135.

The Honorable Joseph A. Main
October 31, 2011
Page 6

mine operators at particular mine sites and not to the mines themselves. Thus, when mine management changes while a pattern notice is in effect, MSHA will consider, on a case-by-case basis, terminating a pattern notice in order to allow the new mine management to demonstrate to MSHA its ability to provide to miners at the mine a safe and healthful workplace.[11]

Italics added.

In addition to this preamble discussion, MSHA's POV Procedures Summary squarely addresses the application of mitigating circumstances as a reason for "postponing or not issuing a PPOV notification."[12] Thus, early in the PPOV review process, once the Office of Assessments has prepared a memorandum listing the names of mines exhibiting a PPOV, for those coal mines listed, the Administrator for Coal Mine Safety and Health must issue a memorandum to each of his district managers who has any PPOV candidates with instructions for reviewing those mines.[13] In turn, the district manager must "respond within seven days, reporting facts about the designated mines relevant to whether there are *extraordinary mitigating conditions* that meet the criteria in **Appendix A – Mitigating Circumstances**." (Italics added.)[14] In turn, Appendix A specifically provides: "There may be *extraordinary occasions* when a mine meets the screening criteria by which mines are identified as exhibiting a [PPOV] but there are mitigating circumstances that would make a potential pattern notification inappropriate. *Examples of situations that would be necessary to justify not issuing a PPOV notification [include] . . . .[r]ecent bona fide changes in mine ownership or management. . . .*"[15] (Italics added.) Alpha has not been provided with the Office of Assessments memorandum, the memorandum from the Administrator for Coal Mine Safety and Health to District Manager Carpenter, or District Manager Carpenter's response to the Administrator. Those documents are among the information I have requested in my September 23 FOIA letter. At this time, however, Alpha has absolutely no idea of how or whether MSHA complied with its own POV Procedures.

For its part, Mr. Secretary, the firmly held position of Alpha is that our acquisition of the Justice # 1 and Randolph Mines on June 1 (as part of the overall acquisition of all the mines that had been operated by Massey Energy Company) represents precisely the kind of "bona fide change" in *both* mine ownership and mine management contemplated by Appendix A. Any fair, rational application of Appendix A should have led MSHA (and must now compel you) to conclude that the PPOV notifications issued to the Mines are erroneous.

---

[11] Id.

[12] POV Procedures Summary at 1.

[13] Id.

[14] Id.

[15] Id. at 7.

The Honorable Joseph A. Main
October 31, 2011
Page 7

It goes without saying much more that the *ownership* change which took place on June 1, all by itself was "extraordinary." As for *management* changes, very specifically not only does the former chief executive officer of Massey Energy Company have absolutely no role in Alpha, but also none of the former members of the Massey board of directors have anything to do with Alpha. Just a review of the Alpha management that supports the Business Unit management reveals an almost complete change in leadership:

- Kurt Kost        President

- Mark Schuerger       Senior VP (operations include Randolph and Justice #1)

- Randy McMillion    EVP (with Running Right responsibilities)

- Michael Peelish      EVP ( with Safety and HR responsibilities)

- John Gallick        VP Safety & Health

In fact, not only has new ownership brought a complete overhaul of corporate management, but, additionally, at the subsidiary operator and mine level Alpha has made substantial changes. More specifically, no former Massey senior officers have been retained with any indirect oversight of the Mines; nor have any former Massey directors of the Board been retained having any oversight of the Mines. With regard to the Justice # 1 Mine, the following mine level management positions have changed since June 1, 2011:

- Business Unit President;

- Business Unit Vice President—Operations;

- Business Unit Underground General Manager;

- Business Unit Safety Director;

- Business Unit Technical Services Manager;

- Justice # 1 Mine Safety Manager; and

- Three Justice # 1 Safety Technicians.

As for the Randolph Mine, since June 1, 2011, the following mine level positions have changed:

- Business Unit President;

- Business Unit Vice President of Operations;

- Business Unit Underground General Manager;

- Business Unit Safety Director;

The Honorable Joseph A. Main
October 31, 2011
Page 8

- Business Unit Technical Services Manager;

- Randolph Mine Superintendent;

- Randolph General Mine Foreman;

- Randolph Mine Safety Manager; and

- Two Randolph Safety Technicians

Indeed, Mr. Secretary, Alpha brought these management changes to MSHA's attention in earlier discussions throughout the merger process including a formal meeting on August 30th when we received the official PPOV notice and more recently in its September 27 letters to Mr. Carpenter. Throughout the formal and informal discussions with all levels of MSHA management, Alpha personnel kept MSHA informed of the changes in management and the other activities in which Alpha was involved regarding the acquisition.

Furthermore, Alpha is in the process of implanting its "culture of safety" into the Mines as well as all of the Massey mines acquired on June 1. That culture of safety is tangibly embodied in Alpha's Running Right® Program. Knowing your deep and abiding interest in the building of cultures of safety in the mining industry, one of the primary reasons Alpha seeks to meet with you is to brief you on Running Right®. To begin, however, I ask that you consider the following summary of Running Right®

### Summary of Running Right®

Creating a culture of safety, in Alpha's experience, takes a visible, tangible, and demonstrable commitment not only at the highest levels of an organization, but also a systemic vigilance for safe working conditions and behaviors at all levels—management and hourly employees alike. A safety culture requires a clear plan or process by which commitment and vigilance can be managed, measured, and continuously improved. Alpha's Running Right® model works to accomplish this goal by promoting a collaborative culture built upon teamwork and fact-based decision making, where all employees have an opportunity to not only contribute, but to actually drive Running Right ® itself—a true bottom-up approach supported by management leadership. In addition, please know that while Running Right® had its origins in safety, it is now the platform for how Alpha conducts all of its business activities, including environmental stewardship and continuous improvement, and, generally, how Alpha expects its employees to treat each other and the communities in which it operates.

Running Right® was initially implemented at Alpha in 2004 and has matured significantly since then. At its core, the framework of Running Right ® is constructed to protect the safety and health of Alpha employees by empowering every employee to personally champion the safety process and approach work on the basis that all accidents are preventable. Employee training and development in the Program is continuous and constitutes a significant commitment by Alpha and its affiliate operations. With particular regard to Alpha's employees who worked at mines formerly operated by Massey Energy, the first round of Running Right ® training has been completed. Subsequent rounds will continue. In addition, Alpha is now in the

The Honorable Joseph A. Main
October 31, 2011
Page 9

process of carrying out a "Leading Right" training session for all management employees. The projected completion date for that training is the end of the first quarter of 2012.

Following training, a key application of our Program is the Running Right® observation process, the objective of which is to encourage all employees to participate in conducting safety observations in order to eliminate at-risk behaviors. Reports of potential at-risk behaviors are recorded on observation cards, which are placed in secured receptacles at each of Alpha's mines. Importantly, however, the reports are both voluntary and anonymous (in order to avoid any fear of discipline), with the identifications of the observer and observed not part of the process. The process, therefore, is a management tool to deal with the concerns of employees by encouraging employee involvement. That objective is achieved by bringing issues that need to be addressed to the attention of the operation itself and eventually to the entire business unit via a Performance Group meeting. Just to give you the flavor of the Program, prior to June 1, over 10,000 observation cards were filled out monthly at our operations.

Once submitted, observation cards are reviewed by an Employment Involvement Group ("EIG") teams at individual operations. Generally led by hourly employees, EIG teams work with management to review observation cards at the particular operation and to develop solutions to the issues and problems identified. Specifically, each EIG team meets monthly to discuss all citations, accidents, situations that could have become a safety problem, observations, and any other safety concern identified at their particular mine. Of course, any card that presents an imminent danger is dealt with immediately and is then shared with the EIG at its monthly meeting. EIG leaders then present both their team findings and preventative actions taken to mine management. EIG teams develop safety meeting materials, and actively encourage the participation of all employees in the observation process. EIG teams have the flexibility to choose multiple methods of involvement. For example some teams also perform mine-site examinations to reinforce Running Right® and to review regulatory compliance activities.

### The August 30 PPOV Notification Letters Fail to Show Whether or How MSHA Abided by its Own POV Procedures Summary

In addition to the fundamental error of failing to demonstrate that the agency considered any mitigating circumstances, as required by 30 C.F.R. §104.2 (b) (4), and Appendix A of the POV Procedures Summary, the August 30 letters also fail to show whether or how MSHA complied with other fundamentally important provisions of the POV Procedures Summary. Indeed, this critical failure is so central both to the merits of the PPOV notifications and to whether the Mines were afforded the requisite due process in the agency decision-making that resulted in the notifications that we felt compelled to send MSHA my September 23 FOIA letter, discussed above.

Simply put, fair and even-handed implementation of the POV Regulations is a basic tenet of the validity of any PPOV notification. The need for MSHA to satisfy this key precept is clearly demonstrated in the 1990 preamble to the POV Regulations. There, in discussing 30 C.F.R. § 104.3 (b), which requires that only citations and orders which have become final shall be used to identify mines with a PPOV, the preamble aptly pointed out that ". . . this approach will provide clear notice to mine operators of which citations and orders will be considered in

The Honorable Joseph A. Main
October 31, 2011
Page 10

identifying mines with a [PPOV]. [Such] *notice . . . is of paramount importance given the extraordinary nature of the pattern violation.*" (Emphasis added.)[16]  We certainly agree with this important statement.  However, Alpha believes that the need for clear notice applies across-the-board not only when it comes to the POV Regulations, but also to the POV Procedures Summary itself, because it is the POV Regulations and the POV Procedures Summary, in their entirety, which provide MSHA's framework for implementing Mine Act § 104 (e).

In this regard, as you can surmise from the requests for documents made in the September 23 FOIA letter, Alpha finds the opaqueness of the August 30 letters to be extraordinarily frustrating in trying to understand whether or how MSHA obeyed its own POV Procedures Summary.  MSHA's "slow-roll" FOIA acknowledgment letter of October 7 provides Alpha no relief from this frustration.  Simply put, until the agency provides Alpha with the records sought by the September 23 FOIA letter, Apha has simply no way of knowing how or whether MSHA complied with its own POV Procedures Summary.

Indeed, the August 30 letters contain virtually no explanation or even any mention of the key procedural steps spelled out in the POV Procedures Summary regarding how the agency reaches PPOV determinations.  It is the height of irony for MSHA to say in its August 30 letters that Alpha has an opportunity to "[r]eview all documents upon which the pattern of violations evaluation is based,"[17] but not to provide the key documents related to the preliminary PPOV determination.

Such a "Catch-22" rubric also flies directly in the face of President Obama's January 21, 2009 Memorandum for the Heads of Executive Departments and Agencies, entitled "Transparency and Open Government,"[18] as follows: "My Administration is committed to creating an unprecedented level of openness in Government.  We will work together to ensure the public trust and establish a system of transparency, public participation, and collaboration. . . . *Government should be transparent.* Transparency promotes accountability . . . ."[19] (Italics in original.)  The August 30 notification letters entirely miss the mark of the President's Memorandum.

Furthermore, the need for transparency is especially acute in the case of the Mines because of the acknowledgement by MSHA of the irregularity of its determinations.  The letters state that at the time of the initial review in November 2010, the Mines did not meet the injury severity measure criterion.  It was only after a "subsequent audit in accordance with 30 CFR Part 50," resulting in the identification of unreported injuries that the PPOV notification letters were issued.  MSHA asserted that if the Mines had reported these injuries the agency would have issued the PPOV notifications in November 2010.

---

[16] 55 Fed. Reg. 31,132.

[17] See August 30 letters at 2.

[18] 74 Fed. Reg. 4,685.

[19] Id.

The Honorable Joseph A. Main
October 31, 2011
Page 11

Frankly, these statements are terribly disingenuous and disappointing. Under their previous ownership, the Mines had resisted the audits in question, as Alpha understands it, based on the view that the information sought by the agency was beyond the scope of 30 C.F. R. Part 50. Alpha officials, however, had reason to believe, based on informal discussions with Agency officials (as part of a good faith effort to work with MSHA, prior to and following June 1) that the change in ownership of the Mines would be favorably considered to be a mitigating circumstance. It was with this understanding, then, that Alpha provided the records in question to MSHA. If anything, such good faith voluntary action is an important and reinforcing example of the kind of mitigating circumstance which should have been credited to the Mines – not only is there new ownership and management, but right out of the box this new leadership was demonstrating its desire to work with MSHA and instill a new culture of safety and cooperation. Instead MSHA decided to use the records to punish the Mines.

To say that we feel deceived by this outcome would be a gross understatement. Alpha deserves to know if MSHA complied with the POV Procedures Summary in reaching its decision to issue the August 30 notification letters; or whether those procedures were ignored in a rush to issue these notifications based on considerations other than the POV Regulations and the POV Procedures Summary. It is these issues that we wish to discuss with you at the meeting we are seeking in the hope and expectation that you will provide us with an understanding of why and how it was determined to issue the August 30 notifications. Once we discuss these issues with you, Alpha believes you will agree with us concerning the redress Alpha is owed on this fundamentally important interpretation.

Thank you for your attention to this letter. I will contact your office soon to identify dates and times for the meeting we are seeking.

Sincerely,

*Edward M. Green*

Edward M. Green
Counsel for Alpha

Attachments
DCACTIVE-16515038.1

cc:    Kevin Stricklin, Administrator for Coal Mine Safety and Health
       Charles E. Carpenter, District Manager for Coal Mine Safety and Health District 4
       Jane Tarr, Chief, Office of Management for Coal Mine Safety and Health
       Heidi W. Strassler, Esq., Associate Solicitor of Labor for Mine Safety and Health
       Cass Sunstein, Director, Office of Information and Regulatory Affairs, Office of
       Management and Budget



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p 202 624-2500 ▪ f 202 628-5116

September 23, 2011

VIA EMAIL

Ms. Lanesia Washington
MSHA Freedom of Information Act Officer
Office of Standards, Regulations and Variances
Mine Safety and Health Administration
1100 Wilson Boulevard, Room 2316
Arlington, VA  22209-3939

   Re: **Freedom of Information Act Request; Including Request for Expedited Processing**

Dear Ms. Washington:

   On behalf of our client, Alpha Natural Resources, Inc. ("Alpha"), this request, including our request for expedited processing, is made pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and the Department of Labor's ("Department") regulations implementing FOIA, 29 C.F.R. Part 70 *et. seq.*

   In connection with the two letters of August 30, 2011 from Charles E. Carpenter, District Manager of MSHA Coal Mine Safety and Health District 4 to Mr. Lewis Sheppard, Jr., in his capacity as Safety Director of the Justice #1 Mine (MSHA ID No. 4607273) operated by Alpha subsidiary Independence Coal Company, Inc., and the Randolph Mine (MSHA ID No. 4609244) operated by Alpha subsidiary Inman Energy, notifying Mr. Sheppard of MSHA's decision that a potential pattern of violations ("PPOV") exists at both mines, I hereby request copies of documents gathered or prepared by MSHA in relation to the following:

- the pattern of violation ("POV") screening conducted by MSHA for both mines of accident and employment records for the 12-month period ending June 30, 2010, as specified in the first paragraph on page one of both letters;

- following the November 2010 initial screening review, the "subsequent audits in accordance with 30 C.F.R. Part 50," of each of the two mine's injury and employment records, conducted by MSHA, as specified in the second paragraph on page one of both letters;

I also hereby request copies of the following documents:

- as specified in paragraph two of page one of MSHA's "Pattern of Violations (POV) Procedures Summary (hereinafter "POV Procedures Summary"), attached to each of the

DCACTIVE-16167055.1
**Crowell & Moring LLP** ▪ www.crowell.com ▪ Washington, DC ▪ New York ▪ San Francisco ▪ Los Angeles ▪ Orange County ▪ Anchorage ▪ London ▪ Brussels

Correspondence Page 00828

Ms. Lanesia Washington
September 23, 2011
Page 2

August 30 letters, for each of the two mines, the memorandum prepared by the Office of Assessments to the Administrator for Coal Mine Safety and Health, regarding the list of mines identified as exhibiting a PPOV, along with the criteria and data used, including (as specified in paragraph three of page one of the POV Procedures Summary)--

- o the list of all PPOV candidates identified in the memorandum;
- o the criteria and data associated with the list;
- o the number, by standard, of repeated violations that became final orders of the Federal Mine Safety and Health Review Commission during the review period; and
- o any additional mines added to such list after verification of the accuracy and completeness of injury data;

- as specified in paragraph four of page one of the POV Procedures Summary, with respect to each of the two mines, the memorandum or memoranda issued by the Administrator for Coal Mine Safety and Health to the Coal Mine Safety and Health District 4 District Manager identifying the two mines as a PPOV candidate, to include the instructions to the District Manager for reviewing the two mines;

- as specified in paragraph four of page one of the POV Procedures Summary, with respect to each of the two mines, the District Manager's response to each of the two memoranda reporting facts about the designated mines relevant to whether there are there are "extraordinary mitigating conditions that meet the criteria in **Appendix A - Mitigating Circumstances** for postponing or not issuing a PPOV notification" (emphasis in original)—and to include, in accordance with paragraph five of page one of the POV Procedures Summary, the "detailed information about any possible mitigating circumstances relevant to the decision to postpone or not issue a PPOV notification" which must be included in the District Manager's response;

- pursuant to paragraph six of page one of the POV Procedures Summary (carried over to lines one through seven of page two), for each of the two mines, the reports of the "POV panel consisting of personnel from Coal [Mine Safety and Health], MNM [Metal and Nonmetal Mine Safety and Health], and PEIR [Program Evaluation and Information Resources]," provided to the Assistant Secretary for Mine Safety and Health and the Administrators for Coal Mine Safety and Health and Metal and Nonmetal Mine Safety and Health with the POV panel's findings as to whether such mines "should be excluded from PPOV Notification or have their PPOV notification postponed due to mitigating circumstances," including "any additional necessary information" considered by the POV panel in making its determination;

- pursuant to lines four through seven of page two of the POV Procedures Summary, any policies, procedures, reports, and any other documents prepared by or utilized by PEIR for "providing administrative services to the [POV] panel and ensuring consistency in the application of the policy and adequate documentation of decisions to postpone or not issue a PPOV notification";

- as specified in paragraph one on page two of the POV Procedures Summary, with regard to each of the two mines, the notification issued to the Coal Mine Safety and Health

Ms. Lanesia Washington
September 23, 2011
Page 3

District 4 District Manager by the Administrator for Coal Mine Safety and Health that such mines "meet the criteria and have no extraordinary mitigating circumstances";

- any and all other documents in the actual or constructive possession of the Mine Safety and Health Administration which relate in any other way to the review and determination by MSHA that the Justice #1 Mine and the Randolph Mine should be placed on PPOV status.

Finally, I request any and all documents related to any and all mines screened since the effective date of 30 C.F.R. Part 104 (July 31, 1990) that were excluded from being identified as having a potential pattern of violations because of any mitigating circumstances, as specified in 30 C.F.R. § 104.2 (b) (4).

For purposes of this FOIA request, the term "documents" refers to all written or graphic matter, however produced or reproduced, including but not limited to correspondence, emails, notes, interoffice communications, reports, memoranda, minutes, summaries, telephone records, telephone message logs or slips, PowerPoint presentations, spreadsheets, maps, photographs, video or audio recordings, data compilations, calendars, or diaries.

As noted at the outset of this letter, I also seek expedited processing of this FOIA request, pursuant to the Department's regulations at 29 C.F.R. § 70.25 (d) because Alpha firmly believes that the August 30 PPOV notifications are erroneous applications of MSHA's "Pattern of Violations" rules at 30 C.F.R. Part 104 and the Agency's guidance documents for applying Part 104. Alpha intends to avail itself of its legal rights with regard to these erroneous notifications. Unless expedited processing of this FOIA request occurs, Alpha will suffer a substantial loss of due process. *See* 29 C.F.R. § 70.25 (d) (1) (iii).

I also wish to remind MSHA about President Obama's Memorandum of January 21, 2009 (see 74 Fed. Reg. 4,683) which directs the heads of Executive Departments and Agencies to administer FOIA "with a clear presumption: In the face of doubt, openness prevails." More specifically, the Memorandum provides: "All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. *The presumption of disclosure should be applied to all decisions involving FOIA.*" Emphasis added. I also call to MSHA's attention the Attorney General's Memorandum of March 19, 2009 to the Heads of Executive Departments and Agencies, reaffirming and explaining further the President's Memorandum. Discussing the presumption of openness, the Attorney General states as follows:

*First, an agency should not withhold information simply because it may do so legally. I strongly encourage agencies to make discretionary disclosures of information. An agency should not withhold records merely because it can demonstrate, as a technical matter, that the records fall within the scope of a FOIA exemption.*

Second, whenever an agency determines that it cannot make full disclosure of a requested record, it must consider whether it can make partial disclosure.

Ms. Lanesia Washington
September 23, 2011
Page 4

Agencies should always be mindful that the FOIA requires them to take reasonable steps to segregate and release nonexempt information. Even if some parts of a record must be withheld, other parts either may not be covered by a statutory exemption, or may be covered only in a technical sense unrelated to the actual impact of a disclosure.

Emphasis added.

I also direct you to the President's companion Memorandum for the Heads of Executive Departments and Agencies, entitled "Transparency and Open Government," also published in the Federal Register of January 21, 2009 (id. at 4,685).

It is my hope and expectation that MSHA will honor the letter and spirit of these principles of openness and transparency in responding to this FOIA request. However, if you determine that any portion of the requested documents or records qualify for withholding under an exemption to the FOIA disclosure requirements and that such materials are not to be made available through discretionary release, I request prompt release of all reasonably segregable information. Thus, for all material withheld from release, I respectfully request that you (1) identify the withheld material; (2) indicate the FOIA exemption under which material is being exempted; and (3) explain the application of the exemption to the withheld material.

I agree to pay reasonable FOIA fees, as described in the Department's regulations.

Thank you for your prompt attention to this letter. If you have any questions, please contact me at (202) 624-2922.

Sincerely,

Edward M. Green

Edward M. Green
Counsel for Alpha Natural Resources, Inc.

cc:     The Honorable Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health
        Kevin Stricklin, Administrator for Coal Mine Safety and Health
        Charles E. Carpenter, District Manager for Coal Mine Safety and Health District 4
        Jane Tarr, Chief, Office of Management for Coal Mine Safety and Health
        Heidi W. Strassler, Esq., Associate Solicitor of Labor for Mine Safety and Health

DCACTIVE-16167055.1

**U.S. Department of Labor**      Mine Safety and Health Administration
                                  1100 Wilson Boulevard
                                  Arlington, Virginia 22209-3939



OCT 7 2011

Mr. Edward M. Green
Crowell Moring
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595

Re: Freedom of Information Act Request Acknowledgement – Tracking No. 660872

Dear Mr. Green:

This letter is to acknowledge receipt of your September 23, 2011, Freedom of Information Act
(FOIA) request for records concerning the August 30, 2011, decisions of MSHA to notify two of
Alpha's mines (the Justice #1 and Randolph Mine) that a potential pattern of violations
("PPOV") exists at each of the mines. A copy of your request is attached for your reference.

As part of your request, you asked for expedited processing. Departmental regulations at 29
C.F.R. § 70.25(d) provide that requests will be taken out of order and expedited whenever it is
determined that they involve:

  1) Circumstances in which the lack of expedited treatment could reasonably be expected
  to pose an imminent threat to the life or physical safety of an individual;

  2) An urgency to inform the public about an actual or alleged federal government
  activity, if made by a person primarily engaged in disseminating information;

  3) The loss of substantial due process rights; or

  4) A matter of widespread and exceptional media interest in which there exists
  possible questions about the government's integrity which affect public confidence.
  Please note that under both the FOIA and the Department's implementing regulations, a
  requester seeking expedited processing "must submit a statement, certified to be true and
  correct to the best of that person's knowledge and belief, explaining in detail the basis for
  requesting expedited processing." 29 C.F.R. § 70.25(d)(3).

Although we do not believe that your request meets these criteria for expedited handling, you
may provide us with more information upon which to make that decision if you so choose within
10 days of the date of this letter.

Based on a preliminary review of your request, we estimate that the fees chargeable for this
request will be $280.00 which includes the following:

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

Search Time – Clerical
            (2 hours @ $20.00 per hour)        $   40.00
Review Time –Professional
            (6 hours @ $40.00 per hour)        <u>$ 240.00</u>
Total Estimated Charges                    $ 280.00

In order for us to further process your request, we request that you agree to pay the estimated billable processing costs reflected above. The actual, final, charges could be lower, or substantially higher. We will not proceed further with your request until an agreement to pay fees is received from you. We will presume that you do not want to proceed with your FOIA request, and we will close the matter if your agreement to pay fees is not received within 10 days from the date of this letter.

Due to the unusual circumstances surrounding the records you are seeking, the statutory time limits for processing your request cannot be met. There is a need to consult with other program areas. Based on these unusual circumstances, we estimate that you will receive a response within 120 days of the date of this letter. If you would like to modify your request so that it may be processed within the statutory time limits, or to arrange an alternative time period for processing the request, please contact Michelle Seider at (202) 693-9442.

Please note that FOIA applies to existing records and does not require agencies to conduct research or generate documents based on that research. The FOIA requires that agencies generally disclose records unless agencies are required to withhold requested records, either in whole or part due to one or more of the nine established exemptions

If you have any questions, please contact Michelle Seider at 202-693-9442.

Sincerely,

Jane Tarr
Management Officer
Coal Mine Safety and Health

1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p202.624.2500 ▪ f202 628-5116



egreen@crowell.com
(202) 624-2922

October 17, 2011

<u>VIA EMAIL</u>

Ms. Jane Tarr
Management Officer
Coal Mine Safety and Health
Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, VA 22209-3939

Re: **Reply to Freedom of Information Act Request Acknowledgment -- Tracking No. 660872**

Dear Ms. Tarr:

On behalf of our client, Alpha Natural Resources, Inc. ("Alpha"), thank you for your letter of October 7 acknowledging receipt of my Freedom of Information Act ("FOIA") letter of September 23, 2011, requesting records gathered or prepared by MSHA concerning the August 30, 2011 MSHA decisions to notify Alpha's Justice # 1 and Randolph Mines that a potential pattern of violations ("PPOV") exists at these mines.

The purpose of this letter is twofold. *First, Alpha agrees to pay the estimated billable processing costs of $280 identified in your letter.* Second, it is downright astonishing that you assert my FOIA request involves such "unusual circumstances" ( which you describe as "a need to consult with other program areas") that you estimate that it will take up to 120 days from the date of your October 7 letter before I receive a response to my letter. I am also disappointed that you claim you need additional information in order to determine why I sought expedited processing of my FOIA request. I say that because I do not know what could be more clear than the statement in my September 23 letter that:

- Alpha firmly believes the August 30 PPOV decisions are erroneous applications of MSHA's "Pattern of Violations" Rules at 30 C.F.R Part 104 and the agency's guidance documents for applying Part 104;

Correspondence Page 00834

Ms. Jane Tarr
October 17, 2011
Page 2

- Alpha intends to avail itself of its legal rights with regard to these erroneous applications; and
- Alpha will suffer a substantial loss of due process rights unless expedited processing of the September 23 request occurs.

Indeed, I suggest to you that the very fact that it will take up to 120 days from October 7 for MSHA to send me a response to my letter constitutes, *per se*, a continuing loss of substantial due process rights. Nevertheless, I explain this request for expedited processing in more detail below. Furthermore, as you state is required by the Labor Department's FOIA regulations at 29 C.F.R. § 70.25 (d) (3), *I hereby certify that my explanation is true and correct to the best of my knowledge and belief.*

The August 30 letters place the Justice # 1 and Randolph Mines in clear jeopardy of being issued pattern of violations notices under 30 C.F.R. § 104.4. There can be no dispute that being placed on a pattern of violations is the most stringent enforcement sanction available to MSHA under the Federal Mine Safety and Health Act of 1977. However, Alpha has a pending request with District Manager Carpenter for reconsideration of the August 30 notifications. Alpha is so convinced that the August 30 letters do not comport with MSHA's POV regulatory regime that we intend to pursue this request vigorously and expect to take it to MSHA's highest levels-- and beyond to the courts, the Congress, and the Labor Department's Inspector General, as may be necessary. Chief among the reasons why Alpha believes the August 30 determinations are incorrect is that they fail to show how or whether "any mitigating circumstances" were considered, as is mandated by the initial POV screening provisions of 30 C.F.R § 104.2 (b), and especially § 104.2 (b) (4). Similarly, the notifications do not show how or whether the agency applied the provisions of "Appendix A -- Mitigating Circumstances" set forth in MSHA's "Pattern of Violations (POV) Procedure Summary (the "POV Procedures Summary") or any of its other provisions. Thus, these two notification letters constitute a classic example of arbitrary and capricious agency action in denial of Alpha's due process rights.

By way of example, Appendix A specifically provides: "There may be *extraordinary* occasions when a mine meets the screening criteria by which mines are identified as exhibiting a [PPOV] but there are mitigating circumstances that would make a potential pattern notification inappropriate. *Examples of situations that would be necessary to justify not issuing a PPOV Notification [include] . . . [r]ecent bona fide changes in mine ownership or management . . . .*" (Emphasis added.) The bona fide changes in ownership that occurred on June 1, 2011, when Alpha acquired these two mines, as well as the other mines of Massey Energy Company, along with the changes in mine management that began on June 1 and continue to this date, fit precisely into the kind of extraordinary mitigating circumstances contemplated by Appendix A. The failure of MSHA to explain how or whether those ownership and management changes were considered, as is required by Appendix A, demonstrates that MSHA did not comply with its own POV guidance. That failure constitutes a denial of Alpha's right to due process.

DCACTIVE-16356480.1
Crowell & Moring LLP ■ www.crowell.com ■ Washington, DC ■ New York ■ San Francisco ■ Los Angeles ■ Orange County ■ Anchorage ■ London ■ Brussels

Correspondence Page 00835

Ms. Jane Tarr
October 17, 2011
Page 3

Looking forward to your favorable decision on the question of expedited processing, please contact me at (202) 624-2922 should you have any questions.

Sincerely,

*Edward M. Green*

Edward M. Green
Counsel for Alpha Natural Resources, Inc.

cc:     The Honorable Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health
        Kevin Stricklin, Administrator for Coal Mine Safety and Health
        Charles E. Carpenter, District Manager for Coal Mine Safety and Health, District 4
        Heidi W. Strassler, Esq., Associate Solicitor of Labor for Mine Safety and Health

**U.S. Department of Labor**     Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



FEB 1 0 2012

Mr. Edward M. Green, Esq.
Counsel for Alpha Natural Resources, Inc.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW.
Washington, DC 20004-2595

Dear Mr. Green,

In response to your letter of October 31, 2011, on behalf of Alpha Natural
Resources, Inc., MSHA has considered your request to reopen the record on
MSHA's proposed rule on Pattern of Violations (POV) (RIN 1219-AB73). MSHA
is denying Alpha's request.

The POV proposed rule was published on February 2, 2011, and provided the
public with a 60-day comment period, until April 4, 2011, to submit comments.
MSHA subsequently extended the comment period until August 1, 2011, to
provide stakeholders and the public additional time to submit data and comments
for the record. During the comment period, MSHA held five public hearings on
the proposal, providing stakeholders and the public sufficient opportunity to
submit written comments or to provide testimony at a public hearing.

The concerns expressed by Alpha regarding MSHA's administration of the
potential pattern of violations (PPOV) process under the existing POV rule,
30 C.F.R. Part 104, are not a basis for reopening the record for additional
comments on the proposed rule. MSHA will carefully consider the comments
submitted by the National Mining Association, which you echo in your letter, as
we prepare the final rule.

I appreciate your interest in protecting the safety and health of our Nation's
miners and look forward to your participation in future rulemakings.

Sincerely,

Roslyn B. Fontaine

Roslyn B. Fontaine
Acting Director, Office of Standards,
  Regulations and Variances

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

AB73-CORR-4

30 CFR Part 104  
RIN: 1219-AB73

ICR REFERENCE NUMBER: 201101-1219-008

## SUPPORTING STATEMENT

### Pattern of Violations

## OMB Control Number: 1219 -0150

## General Instructions

A Supporting Statement, including the text of the notice to the public required by 5 CFR 1320.5(a)(i)(iv) and its actual or estimated date of publication in the Federal Register, must accompany each request for approval of a collection of information. The Supporting Statement must be prepared in the format described below, and must contain the information specified in Section A below. If an item is not applicable, provide a brief explanation. When Item 17 or the OMB Form 83-I is checked "Yes", Section B of the Supporting Statement must be completed. OMB reserves the right to require the submission of additional information with respect to any request for approval.

## Specific Instructions

### A. Justification

**1. Explain the circumstances that make the collection of information necessary. Identify any legal or administrative requirements that necessitate the collection. Attach a copy of the appropriate section of each statute and regulation mandating or authorizing the collection of information.**

The Federal Mine Safety and Health Act of 1977 (Mine Act), as amended, places the ultimate responsibility on mine operators for ensuring the safety and health of miners. The legislative history of the Mine Act emphasizes that Congress reserved the pattern of violations (POV) provision for mine operators who demonstrated a disregard for the safety and health of miners through a recurring pattern of significant and substantial (S&S) violations. MSHA was to use the POV provision in situations where other enforcement provisions of the statute had been ineffective at bringing the mine into compliance with safety and health standards.

This final rule revises the existing rule to simplify the POV criteria, improve consistency in applying the POV criteria, and more adequately achieve the statutory intent. It also will encourage chronic violators to comply with the Mine Act and MSHA's safety and health standards. This final rule contains a provision subject to review and approval by OMB under the Paperwork Reduction Act of 1995 (PRA). MSHA is submitting this information collection package to OMB for review under 44 U.S.C. 3504, paragraph (h) of the PRA, as amended (44 U.S.C. 3501 et seq.).

Specifically, new Final Rule 30 CFR 104.2(a)(8) provides that MSHA will consider mitigating circumstances in determining whether to issue a POV Notice. Among the items MSHA could consider is an approved corrective action program to reduce S&S violations accompanied by positive results.

AB73-PRA-1

30 CFR Part 104                          ICR REFERENCE NUMBER:  201101-1219-008
RIN:  1219-AB73

The Department notes the posting requirement in new Final Rule § 104.3(b) is not an information collection for purposes of the Paperwork Reduction Act, as the agency has provided the information for purposes of disclosure to the public.  See 5 CFR 1320.3(c)(2).

The existing rule included mitigating circumstances as § 104.2(b)(4) under the initial screening criteria for issuing a potential pattern of violations (PPOV) notice.  The existing rule does not define mitigating circumstances, but MSHA explains its intent in policy.  The final rule eliminates the PPOV notice and incorporates the initial screening criteria into the pattern criteria for placing a mine in a POV status.  The preamble to the final rule discusses the types of situations and conditions that MSHA will consider as mitigating circumstances in determining whether to issue a POV notice.  During the hearings on the proposed rule, MSHA clarified that it will consider an operator's effective implementation of an MSHA-approved corrective action program as a mitigating circumstance.  Other mitigating circumstances could be MSHA's verification that the mine is abandoned or that there has been a legitimate change in mine ownership.  MSHA expects that most mine operators, who compare their compliance record with the POV criteria on MSHA's website and determine that they are approaching a POV level, would work with MSHA to bring their mines into compliance to avoid being issued a POV notice, which could result in the temporary closure of the mine or sections of the mine.  MSHA expects that these operators will submit a written corrective action program to the District Manager for approval.

The final rule is designed to encourage operators to take proactive measures to bring their mines into compliance.  MSHA believes that an operator who implements a corrective action program is demonstrating a commitment to complying with MSHA's standards and regulations, and restoring safe and healthful conditions for miners.

**2.  Indicate how, by whom, and for what purpose the information is to be used. Except for a new collection, indicate the actual use the agency has made of the information received from the current collection.**

The respondents are mine operators.  Mine operators, miners, and state and federal mine inspectors use the written corrective action programs to monitor the progress and effectiveness of the operators' efforts to restore the mine to a safe and healthful condition.  This program encourages operators to take proactive measures to find and fix the root causes of violations before they become a hazard to miners.  Unlike the existing rule, the final rule signals to operators that the mere abatement of violations as they are cited is insufficient.

30 CFR Part 104
RIN: 1219-AB73

**3. Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses, and the basis for the decision for adopting this means of collection. Also describe any consideration of using information technology to reduce burden.**

The final rule does not specify how the written program is to be kept or how it is to be submitted to MSHA. Operators can keep the program in the traditional manner (print/hard copy) and submit it through the mail, or store and submit it electronically. MSHA encourages mine operators to store records electronically to allow for frequent retrieval and updating. No information technology has been identified that would further reduce the paperwork burden.

**4. Describe efforts to identify duplication. Show specifically why any similar information already available cannot be used or modified for use for the purposes described in Item 2 above.**

The corrective action program addresses specific conditions at an individual mine over a limited period of time. No other duplicative information exists.

**5. If the collection of information impacts small businesses or other small entities (Item 5 of OMB Form 83-I), describe any methods used to minimize burden.**

The information collection provisions of the final rule apply to all operations, both large and small. Congress intended that the Secretary enforce the law at all mining operations within its jurisdiction regardless of size and that information collection and recordkeeping requirements be consistent with efficient and effective enforcement of the Mine Act. [See Rep. No. 181, 95th Cong., 1st Sess. 28 (1977)]. Section 103(e) of the Mine Act directs the Secretary of Labor not to impose an unreasonable burden on small businesses when obtaining any information under the Act. MSHA took the burden on small mines into consideration when developing the final rule.

**6. Describe the consequence to Federal program or policy activities if the collection is not conducted or is conducted less frequently, as well as any technical or legal obstacles to reducing burden.**

Because mining conditions are constantly changing, miners could be exposed to hazards or violations of health and safety standards that develop as mining progresses. MSHA believes that the development of a corrective action program is necessary to ensure that operators maintain safety and health conditions in their mines to protect miners. Reduction in these requirements may result in unsafe conditions developing or remaining uncorrected, thus jeopardizing the safety and health of miners.

30 CFR Part 104                          ICR REFERENCE NUMBER:  201101-1219-008
RIN:  1219-AB73

**7.  Explain any special circumstances that would cause an information collection to be conducted in a manner:**

- **Requiring respondents to report information to the agency more often than quarterly;**
- **Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;**
- **Requiring respondents to submit more than an original and two copies of any document;**
- **Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records for more than three years;**
- **In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;**
- **Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;**
- **That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or**
- **Requiring respondents to submit proprietary trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.**

This collection of information is consistent with the guidelines in 5 CFR 1320.5.

**8.  If applicable, provide a copy and identify the data and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB.  Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments.  Specifically address comments received on cost and hour burden.**

**Describe efforts to consult with persons outside the agency to obtain their views on the availability of data, frequency of collection, the clarity of instructions and recordkeeping, disclosure, or reporting format (if any), and on the data elements to be recorded, disclosed, or reported.**

**Consultation with representatives of those from whom information is to be obtained or those who must compile records should occur at least once every 3 years -- even if the collection of information activity is the same as in prior periods. There may be circumstances that may preclude consultation in a specific situation. These circumstances should be explained.**

MSHA published a proposed rule on February 2, 2011, soliciting comments on the information collection requirements and gave interested persons 60 days to submit comments.  MSHA received no comments specifically citing the paperwork for

30 CFR Part 104                                  ICR REFERENCE NUMBER: 201101-1219-008
RIN: 1219-AB73

developing a corrective action program, getting MSHA approval, or implementing it. Commenters expressed confusion as to the extent of the content of the program. In response to commenters' concerns, MSHA referenced the Agency's guidelines for corrective action programs on its website and its commitment to helping operators.

> MSHA has guidelines for corrective action programs on the Agency's website at *http://www.msha.gov/POV/POVsinglesource.asp* under *Pattern of Violations (POV) Procedures Summary – 2010*, Appendix B - Guidelines for Corrective Action Programs.  In general, programs must contain concrete, meaningful measures that can reasonably be expected to reduce the number of S&S violations at the mine; the measures should be specifically tailored to the compliance problems at the mine; and the measures should contain achievable benchmarks and milestones for implementation.  * * * * * If requested, MSHA will assist mine operators in developing an appropriate corrective action program.

**9.  Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

MSHA provides no payments or gifts to the respondents.

**10.  Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation, or agency policy.**

MSHA provides no assurance of confidentiality to respondents.

**11.  Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private.  This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

There are no questions of a sensitive nature.

**12.  Provide estimates of the hour burden of the collection of information.  The statement should:**

- **Indicate the number of respondents, frequency of response, annual hour burden, and an explanation of how the burden was estimated. Unless directed to do so, agencies should not conduct special surveys to obtain information on which to base hour burden estimates. Consultation with a sample (fewer than 10) of potential respondents is desirable. If the hour burden on respondents is expected to vary widely because of differences in activity, size, or complexity, show the range of estimated hour burden, and explain the reasons for the variance.  Generally, estimates should not include burden hours for customary and usual business practices.**

30 CFR Part 104             ICR REFERENCE NUMBER: <u>201101-1219-008</u>
RIN: 1219-AB73

- **If this request for approval covers more than one form, provide separate hour burden estimates for each form and aggregate the hour burdens in Item 13 of OMB Form 83-I.**
- **Provide estimates of annualized cost to respondents for the hour burdens for collections of information, identifying and using appropriate wage rate categories. The cost of contracting out or paying outside parties for information collection activities should not be included here. Instead, this cost should be included in Item 14.**

### § 104.2(a)(8) – Approved Corrective Action Programs as a Mitigating Circumstance

This final rule contains a collection-of-information requirement subject to review and approval by OMB under the Paperwork Reduction Act (PRA). The Department believes that mine operators would disclose most mitigating circumstances (e.g., a change in mine ownership or notice that a mine is inactive) to MSHA as a routine business practice or under the Agency's regulation in 30 CFR part 41 – Notification of Legal Identity. Were a POV notice imminent, the rule imposes no unique burden under the PRA. See 5 CFR 1320.3(b)(2). However, development of a corrective action plan does impose burden under the PRA.

MSHA estimates that under the final rule approximately 275 mines will develop and implement MSHA-approved corrective action programs in the first year. MSHA believes this number will decrease by 10% in each subsequent year. The average number of mines over 3 years is 249 [(275+248+223)/3]. This will impose information collection requirements related to mitigating circumstances under final § 104.2(a)(8).

MSHA expects that developing such a program with meaningful and measurable benchmarks will take about 128 hours of a supervisor's time and 8 hours of miners' time. Costs for copying and mailing the program and revisions are estimated to be $100 per program.

The burden of developing and implementing an approved corrective action program is 136 hours per mine (128 + 8) plus an additional cost of $100 per mine for supplies and postage.

Burden Hours:
- 249 mines x 128 supervisor hours per mine      =      31,872 hrs
- 249 mines x 8 miner hours per mine      =      <u>1,992 hrs</u>

**Total Burden Hours**      =      **33,864 hrs**

Burden Hour Costs:
- 31,872 hrs x $84.69/hr      =      $2,699,240
- 1,992 hrs x $36.92/hr      =      $ <u>73,545</u>

**Total Burden Cost**      =      **$2,772,785**

30 CFR Part 104
RIN: 1219-AB73

ICR REFERENCE NUMBER: 201101-1219-008

**13. Provide an estimate of the total annual cost burden to respondents or recordkeepers resulting from the collection of information. (Do not include the cost of any hour burden shown in Items 12 and 14).**

- **The cost estimate should be split into two components: (a) a total capital and start-up cost component (annualized over its expected useful life); and (b) a total operation and maintenance and purchase of services component. The estimates should take into account costs associated with generating, maintaining, and disclosing or providing the information. Include descriptions of methods used to estimate major cost factors including system and technology acquisition, expected useful life of capital equipment, the discount rate(s), and the time period over which costs will be incurred. Capital and start-up costs include, among other items, preparations for collecting information such as purchasing computers and software; monitoring, sampling, drilling and testing equipment; and record storage facilities.**

- **If cost estimates are expected to vary widely, agencies should present ranges of cost burdens and explain the reasons for the variance. The cost of purchasing or contracting out information collection services should be a part of this cost burden estimate. In developing cost burden estimates, agencies may consult with a sample of respondents (fewer than 10), utilize the 60-day pre-OMB submission public comment process and use existing economic or regulatory impact analysis associated with the rulemaking containing the information collection, as appropriate.**

- **Generally, estimates should not include purchases of equipment or services, or portions thereof, made: (1) prior to October 1, 1995, (2) to achieve regulatory compliance with requirements not associated with the information collection, (3) for reasons other than to provide information or keep records for the government, or (4) as part of customary and usual business or private practices.**

Costs for copying supplies and postage for mailing the program and revisions are estimated to be $100 per program. While MSHA is encouraging electronic submission, it is not required. For purposes of this calculation it is assumed that all operators submitting a corrective action program will submit the program by mail.

<u>Total Annual Cost Burden</u>:

- 249 mines x $100 per mine                =              $24,900

**14. Provide estimates of annualized cost to the Federal government. Also, provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment, overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information. Agencies also may aggregate cost estimates from Items 12, 13, and 14 in a single table.**

30 CFR Part 104  ICR REFERENCE NUMBER: 201101-1219-008
RIN: 1219-AB73

<u>Annual Cost to the Federal Government for Review and Approval of Operators'
Corrective Action Programs</u>

MSHA estimates that a safety and health specialist would take an average of
16 hours initially plus 8 hours after the operator revises the program in response to
MSHA comments to review a corrective action program for the District Manager. A
clerical person would spend a total of 2 hours preparing the specialist's comments,
making copies, and sending the comments, and then the approved program, back to
the mine operator. The burden hours would be 26 hours per program. MSHA
estimates that the average health and safety specialist earns $56.42 per hour at the
GS-12 pay level and the average clerical person earns $42.18 per hour at the GS-9
pay level. The Wage rates shown above come from Office of Personnel Management
(OPM) 2010 data and the hourly wage includes benefits.

<u>Total Annual Burden Hours</u>:
- 249 programs x 24 hr/program = 5,976 hours
- 249 programs x 2 hr/program = <u>498 hours</u>

**Total Burden Hours** = **6,474 hours**

<u>Total Annual Burden Hour Costs</u>:
- 5,976 hours x $56.42 = $337,166
- 498 hours x $42.18 = $21,006

**Total Burden Hour Cost** = **$358,172**

**15. Explain the reasons for any program changes or adjustments reported in Items
13 or 14 of the OMB Form 83-I.**

The final rule simplifies the existing POV criteria, improves consistency in applying the
POV criteria, and more effectively achieves the statutory intent. It also encourages
chronic violators to comply with the Mine Act and MSHA's safety and health
standards.

In mid-2007, MSHA centralized its POV screening. Since that time, MSHA has
updated and revised its potential pattern of violations (PPOV) screening criteria and
procedures; developed a web tool to help mine operators determine their compliance
performance compared to these criteria; and issued its first PPOV notices.

Under the final rule, MSHA projects that more mine operators will develop and submit
corrective action programs to MSHA for approval as a mitigating circumstance, based
on their monitoring of their compliance performance. MSHA believes that mine
operators will improve their compliance, and the need for corrective action programs
will gradually decrease by about 10 percent each following year.

**16. For collections of information whose results will be published, outline plans
for tabulation, and publication. Address any complex analytical techniques that**

30 CFR Part 104
RIN: 1219-AB73

ICR REFERENCE NUMBER: <u>201101-1219-008</u>

**will be used. Provide the time schedule for the entire project, including beginning and ending dates of the collection of information, completion of report, publication dates, and other actions.**

MSHA does not intend to publish the results of this information collection.

**17. If seeking approval to not display the expiration date for OMB approval of the information collection, explain the reasons that display would be inappropriate.**

MSHA is not seeking approval to not display the expiration date for OMB approval of this information collection.

**18. Explain each exception to the certification statement identified in Item 19, "Certification for Paperwork Reduction Act Submission," of OMB 83-I.**

There are no certification exceptions identified with this information collection.

**B. <u>Collection of Information Employment Statistical Methods</u>**

This collection of information does not employ statistical methods.

30 CFR Part 104
RIN:  1219-AB73

ICR REFERENCE NUMBER:  <u>201101-1219-008</u>

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date    02/08/2013

Department of Labor
Mine Safety and Health Administration

FOR CERTIFYING OFFICIAL:     Dawn Leaf
FOR CLEARANCE OFFICER:       Michel Smyth

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received
02/08/2013

ACTION REQUESTED:    Revision of a currently approved collection
TYPE OF REVIEW REQUESTED:    Regular
ICR REFERENCE NUMBER:    201302-1219-001
AGENCY ICR TRACKING NUMBER:

TITLE:    Pattern of Violations
LIST OF INFORMATION COLLECTIONS:  See next page

OMB ACTION:  Approved without change
OMB CONTROL NUMBER:    1219-0150
The agency is required to display the OMB Control Number and inform respondents of its legal significance in
accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  02/29/2016                DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 0 | 0 | 0 |
| New | 249 | 33,864 | 24,900 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 249 | 33,864 | 24,900 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:

OMB Authorizing Official:     Dominic J. Mancini
                             Acting Deputy Administrator,
                             Office Of Information And Regulatory Affairs

PB73-PRA-2

| List of ICs | | | |
|---|---|---|---|
| IC Title | Form No. | Form Name | CFR Citation |
| Patern of Violations | | | 30 CFR Part 104 |

2011 FEB -4 P 4: 25

**From:** Scott Higdon [mailto:SHigdon@standardsand.com]
**Sent:** Friday, February 04, 2011 1:49 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73 Pattern of Violations

*"**Due Process** is the principal that the government must respect all of the legal rights that are owed to a person according to the law. Due process holds the government subservient to the law of the land protecting individual persons from the state. When a government harms a person, without following the exact course of the law, then that is a due process violation which offends the rule of the law".*
*"In the United States, <u>due process</u> refers to a set of established legal principles, derived from the Constitution, that seek to protect the rights of citizens. This is done to insure that government treats individuals fairly and does not abuse it's power by action against it's citizens in an arbitrary, oppressive, or capricious manner."*
*"At it's most fundamental level, due process prohibits the government from taking action against an individual that would result in a loss of liberty or property, without first affording that individual notice of the pending action, and an opportunity to be heard."*
The proposed rule changes to 30 CFR in this document completely disregard the principal of due process as set forth in the Constitution. What about our right to contest a citation and have it ruled on in a timely manner? What about the concept of 'innocent until proven guilty'. The wording *Congress' intent* is used numerous times in this document. I don't believe that it was Congress' intent for the Department of Labor to deprive mine operators of their Constitutional Rights. Section 104.3(b) of 30 CFR states *"only citations and orders that have become final shall be used to identify mines with a potential pattern of violations under this section".* Has someone arbitrarily decided that Congress' intent is now different than what it was when this section was first written in 1989?
You don't have to try and interpret Congress' intent when it comes to MSHA's responsibility to inform operators of a potential pattern of violations. In section 104(e)(1) of the Federal Mine Safety and Health Act of 1977, Congress clearly states that *"an operator shall be given written notice that such a pattern exists".* Publishing something on a website is not giving written notice. Oftentimes information in the mine data retrieval system on MSHA's website is inaccurate and not posted in a timely manner. I know small mine operators that do not have computers or internet access. Is MSHA requiring that all mine operators buy a computer and purchase internet access?
Could MSHA be attempting to deprive mine operators of their Constitutional Rights in order to make their own job easier? It's not the operators' fault that the Review Commission has a backlog of cases. A start would be for MSHA to stop writing frivolous citations and focus on legitimate safety problems. The concept is for mine operators and MSHA to work together to create a safer workplace. But that isn't the case. It's an adversarial relationship due in large part to MSHA's heavy handed and arrogant attitude. The proposed rule changes posted in this document only contribute to this adversarial relationship.

**Scott Higdon**

Safety Director
Standard Sand & Silica, Co.
Cell: 863-557-9411
Office: 863-422-7100 Ext 234

AB73-COMM-1

Fax: 863-421-8304
shigdon@standardsand.com

Walsdorf Metal Works, LLC
State Certified Building Contractor
License #: CBC 059249
Cell: 863-557-9411
Office: 863-422-1244
Fax: 863-422-4036
shigdon@walsdorfworks.com

-----Original Message-----
From: Gary Cline [mailto:gcline@clarktesting.com]
Sent: Friday, February 04, 2011 4:11 PM
To: zzMSHA-Standards - Comments to Fed Reg Group
Subject:

*2011 FEB -4 P 4: 25*

I respectfully request a national public hearing in regards to the proposed
RIN 1219-AB-73. I feel the industry and the people have a right to be heard
under the law. Non-finalized S&S citations are allegations and do not
reflect the intent of "Case Law". I feel most citations I have witnessed are
written without the intent of fulfilling the law.
Alleged violations are just that, the burden of proof is the duty of MSHA,
and The Dept. of Labor.
I respectfully submit that the industry does not need additional laws or
regulations, what is needed from MSHA is for the enforcement agency to
properly, constitutionally, enforce the intent of the law we now have fairly
and uniformly.


    Respectfully,


    Gary W. Cline

*AB73-COMM-2*

**From:** DON GHOST [mailto:DONGHOST@USASERVICESINC.COM]
**Sent:** Sunday, February 06, 2011 9:49 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** MSHA Proposed POV Rule

2011 FEB -7  A 10: 27

I would like to comment, as a we are subject to US DOT as well as US MSHA requirements. The DOT has a rigid schedule of what generates the requirements to schedule an audit. They have a pattern of what to check.  I presently work for a very safety orientated company...but several years ago I worked for a outfit that used DOT's rigid scheduling to their advantage and often to unsafe shortcuts.  I have worked, for the past several years, for a trucking company that works at Mine Sites and had an well above average safety record. In our company......a employee never knows when one of our safety people will show up at the job site. They never know management will be double checking from week to week and it makes a real difference in how our crews work and how individuals work when away from the main office. I strongly recommend that you allow the inspectors to walk in any time and check anything, if you want the MSHA safety record to continue to reduce injuries and fatalities. I also suggest that you have every outfit with a MSHA number to have an administrative paperwork review at least every other year....and as I said before......a lot of walk in visits in the field at the actual working site/area.

AB73- COMM-3

**From:** Jim Smiser [mailto:jsmizer@alamocement.com]
**Sent:** Monday, February 07, 2011 9:35 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Cc:** jssmiser@cs.com
**Subject:** "RIN 1219-AB73"

2011 FEB -7  A 10: 27

RIN 1219-AB73

THE COMMENTS ARE FROM THE POSTING IN THE FEDERAL REGISTER/
VOL. 76, NO. 22/WENESDAY 2, 2011/PROPOSED RULES:

PAGE 5721
THIRD COLUMN, SECOND PARAGRAPH:
"The proposed rule would eliminate the existing requirement in 104.3(b)
That only citations and orders that have become final are to used to
Identify mines with a potential pattern of violations".

I oppose this concept.  The citations or orders have not been ordered by
the Courts and doing this would be putting the cart before the horse.
You are assuming that the inspector is always right in the assignment of
Gravity and Negligence.  This is far from the truth.  The inspection force
Is directed by the district in how the citations are to be written and how
many are to be issued.  In the year 2010 the inspection force was mandated
to "write citations/orders on every inspection, or they would go back to
the property with their supervisor until they wrote the required number of
citations/orders".  The requirement at that time was at least 2.8 citations
per inspection.  The employee appraisal is dependent upon this requirement
as one of the elements for a successful rating.  This idea of taking the citation
or order prior to the CLR conference and court action is denying the mining
companies
their legal right to a fair ruling.   This proposal would NOT greatly enhance
safety and
health of miners.  This program would only enhance the general fund of the
government
and put a number of miners out of work.

PAGE 5722
THIRD COLUMN/SECTION 104.4 Termination of Notice:
"If MSHA finds no S&S violations during an inspection of the entire mine-------".

Under the current mandate of all inspections will be made with
citations/orders
Issued, this idea of termination of notice will be nonexistent.

AB73-COMM-4

PAGE 5725
SECOND COLUMN, FIRST PARAGRAPH:
"Based on the average supervisory wage rate for all mining in 2009 of $65.05 per
hour-------".

I do not know where these hourly rates were found, the rate in this part of the mining area is closer to about half of the rate shown.

PAGE 5725
THIRD COLUMN, FIRST PARAGRAPH:
"MSHA used the 2009 underground coal mine hourly wage rates of $84.70 for a Supervisor and $35.30 for a miner to estimate these costs."

These rates are way out of mining rates for this part of the mining area. The supervisor rate will be less than half of the rate shown, and the miner rate will be less than half of the rate shown. The rates used in the rule making are not represented correctly for the entire country.

PAGE 5726
FIRST COLUMN, SIXTH PARAGRAPH, V. FEASIBILITY, A. TECHNOLOGICAL FEASIBILITY
"MSHA concludes that this proposed rule is technologically feasible. The proposed rule
is not technology-forcing."

Correct, the proposal is not technology-forcing, it IS economically-forcing. The proposal will create an economical hardship on the mining companies In the payment of exorbitant fines that will take away from the wages to their workers.

PAGE 5727
THIRD COLUMN, THIRD PARAGRAPH, C. THE TREASURY AND GENERAL GOVERNMENT
APPROPRIATIONS ACT OF 1999: ASSESSMENT OF FEDERAL REGULATIONS AND POLICIES
ON FAMILIES.
"MSHA has determined that this propsed rule would have no effect on family stability or safety, marital commitment,
Parental rights and authority, or income or poverty of families and children. This proposed rule impacts only the mining
Industry. Accordingly, MSHA certifies that this proposed rule would not impact family well-being."

The above statement is not correct. The statement of not impacting poverty of families and children is notcorrect. The

miners that work for the mining companies make up the families and families with children.  The above proposal
states that the impact will only effect the mining industry, who are the miners?  If the mining companies are priced out
of business due to MSHA fining the companies to the extent, that miners are terminated due to a lack of funds, does
this not create a loss of income, and effecting the well-being of the famlies and children?  The lack of a job creates a loss
of income and poverty.  This would most definitely would impact family well-being.

J.S. SMISER
02/04/2011



CORPORATE HEADQUARTERS

P.O. Box 1900 • Morgantown, WV 26507-1900 • (304) 296-1751 • FAX (304) 594-3467
The Greer Mansion • 598 Canyon Road
www.greerindustries.com

2011 MAR 10 P 2: 13

March 7, 2011

MSHA, Office of Standards,
Regulations, and Variances
1100 Wilson Boulevard
Room 2350
Arlington, VA 22209-3939

Re: RIN 1219-AB73

Dear MSHA:

This letter is the Commentary of Greer Industries, Inc. to the above-referenced Proposed Rule. It is our fervent hope that MSHA will give serious consideration to these comments in the spirit that they are intended. Our Company's number one priority is, and has always been, miner safety and health always come first; however, the newest proposed rule does not and will not increase the safety and health of the mining community. Conversely, the new proposed rule (1) violates the Due Process Clause of the Fifth Amendment to the United States Constitution; and (2) contradicts one of the most basic concepts in our American justice systems, the "presumption of innocence." Moreover, MSHA already possesses adequate enforcement tools in its graduated enforcement scheme, which if properly and prudently utilized, would adequately address the concerns expressed by the agency in proposing the changes included in this rulemaking process.

First, the Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Specifically, the principals behind the Due Process Clause point to the fact that government officials can only take away a person's rights, goods, lands, life or freedom in accordance with well established laws. In short, the accused must be granted what is "due" him/her, meaning his or her right to have a fair legal process and not an arbitrary and capricious one created at the whims of a government official or agency involved.

Proposed rule - Section 104.2(a) would provide that "[s]pecific pattern criteria will be posted . . . and used in the review to identify mines with a pattern of S&S violations" which include "[c]itations for significant and substantial violations." This portion of the proposed rule would eliminate the existing requirement in Section 104(3)(b) that only citations and orders that have become "final" are to be used to

AB73-COMM-5

identify mines with a potential pattern of violations. Any person who has worked in the mining industry knows that the issuance of an S&S citation to an operator is an extremely subjective matter. In other words, what one person may perceive as an S&S violation, another may defend as non S&S, or not even a violation at all. In fact, many mine operators have been successful in challenging the S&S designations of violations by exercising their right to procedural due process.

Further, just because an inspector subjectively believes that a citation should be issued as S&S does not establish proof of such violation. On the contrary, the actual issuance of a citation can be the direct result of an individual inspector receiving undo pressure from his/her supervisor to issue more S&S citations because the inspector's or his MSHA district's violation rate is below the national standards. In addition, there can also be situations as simple as personality conflicts, or a phenomenon called a "new sheriff in town," that can cause an individual inspector to issue more citations (and more S&S designations) than a mine actually deserves. Also, for pure political reasons, an increase of S&S violations and/or elevated enforcement actions, such as alleged unwarrantable failure 104(d)(1) citations, typically emerge after a well publicized mine disaster, irrespective of the actual safety of a particular mine. Due to the subjective and arbitrary nature of the issuance of citations, and the designations of gravity and negligence factors in such citations, major inconsistencies have become a mainstay in the mining industry. Unfortunately for the operator wrongfully accused of an unwarrantable failure enforcement action (a 104(d) issuance), a cessation of an operation and withdrawal of personnel have resulted merely due to the allegation. Even if MSHA's position is found to be legally non defensible and reversed, the mere allegation results in substantial disruption to the operation in the form of lost time and expense, and distracts from the operation's overall safety that is not accounted for but only partly protected by legal challenge.

As a result of the subjective issuances of violations (and subjective designations such as S&S or unwarrantable failure) by inspectors, mine operators are forced to expend substantial resources (including the time of safety professionals and money) to challenge arbitrary violations through the use of the legal process. Notably, many mine operators, including our company, have been extremely successful in these challenges. However, under the new rule, mine operators would be (1) forced to pay a penalty, and (2) labeled a mine operator with a "pattern of significant and substantial violations," prior to a formal hearing and prior to an inspector's allegations being substantiated. Essentially, what the new proposed rule does is to move the actual process of a legal proceeding subsequent to the imposition of the fines and punishment. In other words, under the new proposed rule, a mine operator's property becomes a "taking" prior to due process of law, a direct violation of the Fifth Amendment. When coupled with the elevated enforcement tools already available to the agency that is simply an unnecessary and far too heavy-handed weapon to add to the agency's enforcement arsenal.

Second, the concept of the presumption of innocence is one of the most basic in our American justice system and applies to civil laws as well as criminal laws. This basic right comes to us from English jurisprudence, and has been a part of that system for so long, that it is considered common law. The basic concept, as applied to the mine act, is

that prior to the imposition of a penalty or fine, the government has the burden of proving that a mine operator actually violated a specific provision of the mine act. Clearly, the burden of proof remains on the government, and there is no requirement that a mine operator prove its innocence.

As a mine safety professional for over thirty years, I have successfully challenged a large number of citations (or designations of S&S, gravity and negligence) where the government was unable to meet its burden of proof. Although citations were issued, the government failed to meet its burden. As a result, the mine operator was not required to pay the penalty and fine originally assessed. The new proposed rule essentially takes the right to the presumption of innocence away from the accused and requires the accused to now prove its innocence to recover property that was taken without due process. This should never happen to any mine operator or to any citizen of the United States.

Lastly, the agency already possesses the graduated enforcement tools necessary to shut down all or any part of unsafe operations (through the use of unwarrantable failure to comply, imminent danger, and other elevated enforcement actions). However, part of the problem is that the agency has in many instances improperly and improvidently utilized its elevated enforcement tools to the point that operators are distracted from legitimate safety activities to address the whims of inspectors. Perhaps additional training of inspectors concerning the proper use and issuance of graduated enforcement tools already in place would be a far more efficient and effective use of resources rather than seeking to take away legal due process rights of operators. When properly issued and not overwritten, enforcement actions are not challenged and time, resources and attention remain focused on the primary goal of miners' health and safety.

Based on the foregoing, the new proposed rule should not be promulgated in that it violates the Due Process Clause of the Fifth Amendment and contradicts the presumption of innocence. In addition, MSHA already possesses adequate enforcement tools in its graduated enforcement scheme.

Sincerely,

Mark A. Wilson
Vice President Greer Industries, Inc.

132921_1

**From:** Arnolds, David M. (dmarnolds) [mailto:dmarnolds@chevron.com]
**Sent:** Thursday, March 10, 2011 5:02 PM                    2011 MAR 10  P 5: 18
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Cc:** Premo, Mark G. (MPremo); Partridge, Dave; Knapp, Judith (JudithKnapp); Warkentin, Linda S.
**Subject:** RIN 1219-AB73 Chevron Mining Inc.'s Comments on Pattern of Violations proposed Regulations

Chevron Mining Inc. respectfully submits the attached comments to the Proposed Rules on Pattern of
Violations.


**DAVID M. ARNOLDS**
Senior Counsel
dmarnolds@chevron.com

**Chevron Mining Inc.**
116 Inverness Drive East
Englewood, CO 80112
Tel: 303-930-4040  Fax: 303-930-4189

AB73-COMM-6

2011 MAR 10  P 5: 18

# COMMENTS OF

# CHEVRON MINING INC.

## TO THE
## MINE SAFETY AND HEALTH ADMINISTRATION

## ON THE
## PROPOSED AMENDMENTS TO THE
## PATTERN OF VIOLATIONS REGULATIONS

**March 10, 2011**

E-Mailed to MSHA  March 10, 2011 : zzMSHAcomments@dol.gov

Regulatory Information Number (RIN 1219-AB73)

Chevron Mining inc. (CMI) appreciates this opportunity to comment on the proposed amendments to the Pattern of Violations ("POV") regulations, 30 CFR Part 104, published February 2, 2011 in the Federal Register (Vo.76, No. 22 beginning at page 5719.)

CMI shares MSHA's concern for protecting the health and safety of all miners. CMI strives to improve mine safety for our employees and the industry. We support any initiatives by MSHA or the industry that will, in fact, enhance safety of our miners. We also recognize that there are some operators who do not share these values and will respond only to effective enforcement action. Congress established the Pattern of Violation provisions in order to enable MSHA to deal effectively with those very few operators.

CMI applauds MSHA's efforts to amend Part 104 in order to better implement Congress's intent in providing for the powerful enforcement tool of declaring a recalcitrant operator to have a POV. CMI further recognizes the challenges of implementing the POV provisions in an effective but fair manner. CMI

Chevron Mining Inc.
Comments on Amendments to Pattern of Violations Regulations
Page 2 of 4
3/10/2011

supports MSHA's proposals (1) to post individual mine history on the website and (2) to provide the opportunity for operators facing the possibility of a POV notice to submit a safety and health management program to the District Manager for approval.

CMI has three concerns with the proposed amendments. First, the proposed amendments fail to establish the criteria for finding a POV. Second, the proposed amendments would allow MSHA to impose a POV on the basis of citations issued even though not final, apparently leaving the operator with no legal redress. Third MSHA has greatly underestimated the adverse impact of the POV imposition.

## § 104.2 Pattern Criteria

Lack of Criteria

Section 104.2 of the proposed amendments states in the first sentence:

> (a) Specific pattern criteria will be posted on MSHA's website at www.MSHA.gov and used in the review to identify mines with a pattern of S&S violations.

CMI understands this to mean that MSHA is not establishing any criteria at all in this rulemaking but, rather, is proposing to reserve the discretion to establish those criteria at any time and from time to time without public notice and comment. Clear criteria for what constitutes a POV are essential and a lack of them is defective and unconstitutional. MSHA's posting them on the MSHA website does not save this defect unless it is done through the formal rulemaking process under the Administrative Procedures Act.

Use of Issued Rather Than Final Citations & Orders

Section 104.2 further lists the categories of citations and orders MSHA will review to determine "if any mines meet the criteria posted on MSHA's website." MSHA makes clear in its discussion at page 5721 that MSHA will consider all issued citations and orders, not just those that are final. Although the huge backlog of contested enforcement actions has frustrated the use of the POV notice, the proposed amendments provide no opportunity for an operator to contest MSHA's action. An operator on a POV notice would likely suffer millions of dollars in lost revenue (as CMI address in the next comment) even if the underlying citations were to be subsequently vacated or reduced to non-S&S.

In its discussion at page 5722 MSHA noted that over 700,000 citations were assessed civil penalties that became final orders during the years of 2006 through 2010, with 3,400 vacated after they were contested and 6,000

Chevron Mining Inc.
Comments on Amendments to Pattern of Violations Regulations
Page 3 of 4
3/10/2011

modified from S&S to non-S&S. Thus, 9,400 would have been considered in imposing a POV even though they were subsequently found not to qualify. Further, the 700,000 number is misleading. The number of S&S citations that were issued during that time frame is relevant. During the period of 2000 through 2009 an average of 38 percent of all citations issued to coal mines were S&S. Applying that percentage, there would have been 245,000 S&S citations, of which 9,400 should not have qualified for consideration of a POV notice.

CMI submits that there must be some reasonable avenue of appeal to the imposition of a POV. CMI suggests that an operator have the right to an expedited contest proceeding in front of a Review Commission judge and have the right to contest both the imposition of the POV and any citations on which it was based. Through this procedure MSHA could impose the POV on the basis of issued citations without the delay until they become final, but the operator would have a right to prompt judicial review.

## Estimated Cost Impact of a POV

The imposition of a POV results in closure orders for every violation deemed by an inspector to be significant & substantial. Employees must be withdrawn from the affected part of the mine until the alleged violative condition is abated. This will continue until the entire mine is inspected with no S&S closure orders issued, which is highly unlikely. MSHA stated at page 5725 that it has no historical basis from which to estimate the potential costs that would be incurred by a mine on a POV. However, MSHA then proceeded, with no stated basis, to project "that a typical mine would lose about 0.5 percent of revenue as a result of closures (about 1 or 2 days for a large mine and a day or less for a small mine) ... ." MSHA then calculated that 0.5% of an average mine's revenue would be about $218,000 in annual lost revenues.

CMI submits that MSHA has a plethora of historical data on which to estimate much more accurately the likely lost production time due to closure orders. Each citation and order MSHA issues has the date and time it was issued and terminated. This is the time a closure order would be in place. More directly, MSHA has over 30 years of history of issuing closure orders under section 104(d) of the Act, all of which have a record of the date and time of issuance and of termination.

Although abatement times vary depending on the specific conditions and circumstances, CMI estimates that the average time at its North River Mine is between 4 and 8 hours. CMI received 58 S&S citations in 2009 and 68 in 2010 at that Mine - an average of 63 per year. The Mine's idle time costs are about $14,000 per hour, which would result in lost production revenue of between $56,000 and $112,000 per closure order, or about $3,500,000 to $7,000,000 per year. This is 16 to 32 times higher than MSHA's estimated

Chevron Mining Inc.
Comments on Amendments to Pattern of Violations Regulations
Page 4 of 4
3/10/2011

cost impact.  Further, the North River Mine had a VPID rate of only 0.517 for the period of September 30, 2008 to December 31, 2009 and 0.455 during the period of September 30, 2009 to December 31, 2010, which is well below the industry average of about 1.0.   Hence, other mines could be affected much more severely, especially those that have a POV and, therefore, by definition, have a large number of S&S citations.

Conclusion

CMI proposes that (1) MSHA establish the specific criteria for a POV, and change them, only through formal rulemaking and (2) MSHA provide for the right of an expedited hearing by an operator upon receipt of a POV notice. CMI also requests that MSHA revisit its estimate of an operator's likely cost of a POV notice.

CMI appreciates the opportunity to submit these comments and also supports the comments submitted by the National Mining Association.

Respectfully Submitted

Mark Premo
President
Chevron Mining Inc.

**From:** Hampton, Mike (Salt Lake City) [mailto:mhampton@barrick.com]
**Sent:** Thursday, March 17, 2011 12:23 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219–AB73

2011 MAR 17 P 5: 23

Please find attached our comments on the proposed rule on Pattern of Violations.

Best regards,

*Mike Hampton, CSP, ARM*
*Regional Director, Safety & Health*
*Barrick Gold of North America*
*Office:  (801) 990-3861*
*Cell:  (801) 834-8713*
*mhampton@barrick.com*

AB73– COMM–7

Barrick Gold of North America has reviewed the proposed modifications to 30 CFR 104, *Pattern of Violations* and offers these comments for incorporation into the official response from the Nevada Mining Association.

104.2 Initial Screening (Current rule)

The proposed rule deletes the mechanism of "initial screening" of an operator to determine if a potential POV exists. This initial step encourages the agency to methodically and carefully review the compliance history of the operator prior to entering into any formal action. The gravity and potential impact on the lives of miners and operators demands accuracy when considering POV sanctions. Removal of this step could potentially decrease accuracy resulting in unnecessary action on the part of the agency and the operator.

Proposed 104.2 Pattern Criteria
When linked with the proposal to eliminate the notice of approaching a POV, it becomes extremely critical that the criteria for determining a POV be clearly defined. Posting these criteria on the web and eliminating any notice of impending action places a greater burden on the operator especially the small mining company. Much like speed zones and speeding citations, the standard for compliance must be clearly stated in order for the citizen to know where the line is. At the very least, MSHA should publish this criteria prior to the issuance of any rulemaking to allow operators to participate in the process.

Proposed 104.2(a)(7)
Reference is made to clarification of MSHA's intent to include "serious safety and health management" problems in the evaluation criteria. Unless the basis for this determination is clearly defined, it is too broad and subjective as written.

Continuing under the analysis of this section, MSHA states that operators approaching a POV may "proactively" submit a written plan to District Manager for "approval". This approach is highly dependent on the operator knowing the status of his operation, based on clear and concise evaluation criteria and the timely availability of MSHA to act on this request.

Proposed 104.3(b)
The proposal to open up POV evaluation to all citations whether final or not, appears to run counter to the basis of our justice system of "innocent until proven guilty". It appears that the assumption is made immediately upon issuance of the citation or order that the operator is clearly and unarguably in violation of a standard which may have grave consequences on the viability of the operation and the livelihood of many miners. The subjective nature of "significant & substantial" creates a point of contention in many cases even where a POV notice isn't an issue. Consideration should be given to modifying the existing citation review system in order to improve consistency and accuracy in applying the POV provisions prior to making this change.

Proposed 104.8(b)
The current regulations state that "at least once each year, MSHA shall review compliance records of mines." Modifying this requirement to a "semi-annual" minimum requirement does not seem to add any real value as this option already exists in the current standard.

Proposed 104.3(a)

As stated, the proposed rule eliminates the provision for providing any form of notice to the operator that problems are detected and therefore giving the operator an opportunity to take action in a proactive manner. In the section by section analysis, MSHA states that operators receiving the PPOV notice reduced their S&S citations by at least 30%. The analysis goes on to state that some operators receive more than one PPOV notice and that these operators fail to consistently control and reduce S&S violations. This information would indicate that the PPOV does work as a "notice" of poor performance. For operators failing to improve performance, we would suggest that an evaluation of the current system of issuing repeat PPOV notices needs to be completed and emphasis placed where it is needed and not spread across all operators.

The proposed changes to this section also eliminates the mandatory opportunity to request a conference with the District Manager in an effort to improve performance. It is anticipated that the agency would continue to encourage conferencing however with the removal of this mandate, MSHA may not be as open to accepting these requests in a timely fashion to avoid a POV notice. Proactive communications should be encouraged between all interested and affected parties.

Proposed 104.3(c)

The information stated in this proposed change is currently stated in the Act and is redundant in nature.

**From:** Bob Bak Construction [mailto:bakconst@mncomm.com]
**Sent:** Thursday, March 17, 2011 3:33 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 MAR 17 P 5:23

Gentlemen:  We are opposed to the proposed rule as referenced
above and request a public hearing to be scheduled so that we
can voice our disapproval.

We will be looking forward to reading all the public comments, concerning this matter, as they are
posted on the Internet.

Robert Bak, Owner
Bob Bak Construction

AB73-COMM-8



2011 MAR 21  P 3:01

March 21, 2011

April E. Nelson, Acting Director
Office of Standards, Regulations & Variances
U.S. Department of Labor
Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, VA 22209-3939

**RIN: 1219-AB73**

Dear Ms. Nelson:

These comments are submitted by Arch Coal, Inc. (Arch).  Arch is the second largest coal
producer in the United States with corporate offices in St. Louis, Missouri.  We have
approximately 4,700 employees and operate both underground and surface mines in
Colorado, Utah, Kentucky, Virginia, West Virginia and Wyoming.

These comments are submitted in response to the Proposed Rule issued by the Mine
Safety and Health Administration (MSHA) on February 2, 2011 titled *Pattern of
Violations (Proposed Rule)*. As stated in the announcement, the Proposed Rule is
intended to revise the existing regulation for Pattern of Violations (POV). MSHA has
determined that the existing POV regulation fails to adequately achieve the intent of the
Federal Mine Safety and Health Act of 1977 (Mine Act).

The Agency's request for comments on the Proposed Rule states that the purpose of the
POV as framed by the Mine Act is intended to be used as a tool to address operators who
have demonstrated a disregard for the health and safety of miners. Section 104 (e) (1) of
the Mine Act specifically states that --- **"If an operator has a pattern of violations of
mandatory health and safety standards in the coal or other mine which are of such a
nature as could have significantly and substantially contributed to the cause and
effect of coal or other mine health and safety standards, he shall be given written
notice that such a pattern exists."**

Section 104 (e) The Mine Act continues by describing the enforcement consequences for
an operator if they are assigned POV status. It also defines the general requirements for
terminating POV status. The consequences of being assigned POV status are significant.
Being designated a POV operation can have a critical impact on the ability of a mine to

1

AB73-Comm-9

continue to operate. These consequences are so significant that many view POV status as a "death sentence," particularly with regard to a large underground mine.

Congress intended the POV requirement to serve as an enforcement mechanism to identify and re-direct "bad actors." The POV requirements are intended to target mine operators whose practices demonstrate a disregard for the health and safety of miners. This is a worthy objective. It's an objective that Arch supports. "Bad actors" not only pose a threat to the miners who work for them, they also tarnish the image of the Mining Industry.

From a safety standpoint, the Mining Industry has made significant strides to improve performance. Injury incident rates have continued to improve over time. In addition, the Mining Industry's safety performance compares favorably to other industrial sectors. While the Mining Industry's safety accomplishments are significant, they are largely over shadowed in the eyes of regulators, politicians, and the media by the poor performance of a few "bad actors." This is unfortunate. It has contributed to regulations being written for the "worst-of-the-worst." Regulations that focus on the worst performers tend to inhibit the ability of "good actors" to take the proactive steps necessary to continually improve performance.

In our view, the Proposed Rule falls into this trap. It fails to focus on how the Mining Industry's safety performance can be improved. It is an attempt to build a better enforcement mousetrap to catch "bad actors." Unfortunately, the proposed POV "mouse trap" is constructed in a manner likely to ensnare "good" along with "bad" actors."

Arch supports the POV's objectives. We think the Industry would benefit from identifying and re-directing the safety performance of operators who disregard safety. We maintain, however, that the Proposed Rule falls short of the mark. It falls short because it:

- Lacks transparency;
- Eliminates due process;
- Eliminates the initial POV screening step that has helped to rehabilitate some operators;
- Threatens to have an unfair impact on large mines;
- Is supported by a questionable cost-benefit analysis; and
- Fails to utilize holistic performance indicators that truly measure a mine's safety performance.

### The Proposed POV Regulation Lacks Transparency

The current administration has stressed the importance of government acting in a transparent manner when developing and implementing regulations. It has also stressed the importance of engaging stakeholders when developing new regulations. In fact, a recent Executive Order issued by President Obama stressed both of these concepts.

2

The Proposed Rule falls short in regard to both principles. It is neither transparent, nor is it based on input gathered from the stakeholders. The National Mining Association, the Mining Industry's Trade Association, made numerous attempts to discuss how to revise the POV criteria with MSHA. On several occasions in 2010, the Industry attempted to discuss a holistic POV model designed by Dr. Larry Grayson from Penn State University. This model, which is referred to as the Safety Performance Index (SPI) is based on equal measures of enforcement and injury prevention criteria. In our opinion, it would serve as an effective tool for identifying legitimate "bad" actors. Despite these proactive efforts, MSHA proceeded to develop the Proposed Rule without input from the Industry.

More troubling is the lack of transparency in the process used to develop the Proposed Rule. The Proposed Rule only references the "general" criteria the Agency will use to determine which mines are assigned POV status. It states that MSHA will design (without direct input from stakeholder) and post the "specific" POV criteria on the Agency's web site. The Agency requests comments on how it should develop and periodically revise the specific POV criteria.

Arch strongly objects to this approach. There are significant consequences for a mine assigned POV status. Because of these consequences it is critical that the "specific" POV criteria be clearly defined in the Final Rule. These criteria should be holistic in nature. They should provide equal weight to a mine's injury prevention, as well as their enforcement performance. While MSHA mentions injury and illness performance as general POV criteria, it is only one of the eight general factors listed in the Proposed Rule.

The Agency says in the Proposed Rule that they will publish POV criteria and related information on its web site. While we agree with this concept, we don't think it goes far enough. We feel that MSHA should identify and publicize the "specific" criteria in the Final Rule. Mine operators should know exactly what the POV rules consist of at the start of the game. MSHA should not be able to develop and revise the specific rules after the game starts. This would be tantamount to giving a referee at a sporting event the authority to make up rules as the game progresses. This is fundamentally unfair, lacks transparency, and contradicts our country's basic principles.

**The Proposed POV Regulation Eliminates Due Process**

Due process is a fundamental principle in this country. The Agency's Proposed Rule eliminates "due process" by eliminating "final orders" as a determining factor and replaces this factor with citations/orders "issued." From a POV standpoint, an operator will now be guilty when an inspector accuses him/her of violating the MSHA regulations. Under this proposal, an operator will be deprived of their right to challenge unwarranted citations or orders or defend the level of negligence alleged by the MSHA inspector, for purposes of avoiding POV consequences. Such a process is out of step with the fundamental rights we enjoy in all areas of law enforcement in our country and is patently unfair.

3

Since 2006, the Agency has been increasingly aggressive in their approach to the inspection process. In our opinion, inspectors are writing more citations as S&S that are not S&S. They are assigning higher degrees of negligence to violations than seems warranted. In addition, we are seeing more unwarrantable violations for factual circumstances that were not previously viewed as unwarrantable.

We are concerned about these overly aggressive enforcement trends. We are also concerned that violations issued under the "Rules to Live By" seem to be automatically categorized as high level enforcement actions, regardless of whether the underlying facts support these claims. In addition, we are concerned that many types of violations that fall into the "repeat" category occur under broad regulations like 75.400 and 75.403 that are very subjective in nature. Whether they are actual violations (and the degree to which they are serious) varies greatly from inspector to inspector. These inconsistent enforcement patterns make it paramount that MSHA retain due process in the Final Rule.

Eliminating "due process" in this type of enforcement atmosphere is troubling. This concern is exacerbated by the elimination of the Conference Process. This informal process not only served as an effective means of resolving many types of enforcement disputes but also provided an effective feedback and teaching tool for both inspectors and mine operators. Moreover, the conference tool helped to promote consistency in enforcement and assisted mine operators to better understand the Agency's enforcement expectations. Unfortunately, this means of resolving disputes is not currently available.

MSHA states in the Preamble of the Proposed Rule that only 1% of the violations mine operators contest get reversed. This may be true, but how many of the violations "issued" are modified? How many are reduced from S&S to non-S&S? How many unwarrantable violations are reduced to 104 (a) citations?

Since 2006, our subsidiary operations have gradually increased the number of violations they contest by 4-5%. They currently contest about 12% of the total violations issued. This is partly a result of MSHA being more aggressive in the inspection process. It is also due to the demise of the conference process. It should be noted that a very high percentage of our contested violations get modified. They are reduced to lower levels of negligence, modified from S&S to non-S&S; and/or changed from an elevated enforcement action to a less serious action.

These modifications in violations "issued" are the result of the operator exercising the right of due process. Modification in violations "issued" may mean the difference between a mine being assigned, or not being assigned, POV status. The 1% of violations that MSHA acknowledges they vacate could also determine whether an operator is assigned POV status. Given the seriousness of the POV consequence, access to "due process" could legitimately determine whether a mine stays in business and its miners stay employed.

MSHA has not proposed a remedy for a mine assigned POV status because of an improperly issued violation. The Agency has not assigned a remedy for a mine assigned

4

POV status if an inexperienced inspector gets overly aggressive. There is no compensation proposed if an operator is later vindicated by an Administrative Law Judge or the Federal Mine Safety & Health Review Commission. The inspector is not always right. That's why due process is so important.

We acknowledge that some operators take advantage of the system. The Proposed Rule fails to address this problem directly. The Agency's solution, eliminating the use of "final" orders, will only create a bigger problem. If a few operators are "gaming the system" by contesting all of the violations they are issued, we need to deal with that specific problem. The Agency should address that particular abuse in a manner that preserves due process for the vast majority of mine operators. The actions of a few should not be used as justification to eliminate the rights of the majority.

**Eliminating the Initial Screening Criteria Compounds the Due Process Issue**

The Proposed Rule eliminates the initial POV screening criteria. It also removes the "fair warning" step of designating a mine as Potential POV candidate. When you couple elimination of the "fair warning" step with the elimination of due process (i.e., eliminating the use of final orders) the result is an enforcement tool excessive in nature.

The objective of assigning a mine POV status is to identify operators in need of safety improvement. This should be coupled with a legitimate opportunity for the designated mine to improve. We do not believe that Congress intended POV as a means to drive operators out of business and miners out of work.

The POV process should include a "fair warning" step designed to put designated mine operators on notice of the need to improve. MSHA acknowledges in the Preamble of the Proposed Rule that very few operators who received the Potential POV notice received a second notice. As a consequence, it would appear that most mines given "fair notice" of their deficiency respond by attempting to improve. From that perspective, it would appear that the initial screening criteria are somewhat effective.

In our view, the existing POV process fell short by not requiring Potential POV mines to make fundamental safety process changes as part of the corrective action required by the Agency. Instead of insisting that these mines make changes in the way they managed their safety process, MSHA was satisfied if they adopted "safety awareness" programs. As a general rule, safety awareness programs do not have a long-term impact. They tend to produce short term results. Long term continuous safety improvement requires fundamental changes in an organization's culture, performance processes, and safety leadership. These are the types of long-term changes Potential POV mines should be encouraged to adopt.

MSHA should not implement regulations with the potential effect of unfairly forcing operators out of business. Operators should be given "fair notice" of Potential POV status, and the opportunity to improve their performance. If they fail to respond, the

5

consequences should be greater. Recalcitrant operators should face the POV consequences outlined in the Mine Act.

**The Proposed POV Regulation Will Have an Unfair Impact on Larger Mines**

It goes without saying that a large mine has more area to maintain than a small mine. A large underground mine has more belt line, travelways, escapeways, equipment, etc. to examine and maintain. They also have more territory inspected by MSHA. A large mine sees more inspector shifts and enforcement activity than a small mine. As a result, it stands to reason that a larger mine with the same safety standards as a small mine will see more violations issued by MSHA.

The common sense of this situation dictates that all criteria used to determine POV status should be normalized. The existing criteria used by MSHA to determine Potential POV and POV status includes certain factors based on the total number of S&S citations/orders issued, the number of elevated enforcement actions, etc. We disagree with these types of whole number criteria. MSHA should normalize all POV measures to level the playing field for all operators (i.e., large, medium, and small).

In the current enforcement environment, it would be devastating for a large underground mine to be assigned POV status. Once designated as a POV mine, it would be virtually impossible for a large underground mine to be relieved of POV status. I can't imagine a large underground operation working a complete inspection without a single S&S violation. Given the Agency's current overly-aggressive enforcement posture, POV status could well be a "death sentence" for a large underground mine.

**The Proposed Rule's Cost-Benefit Analysis is Questionable**

Arch views the Agency's cost-benefit analysis as seriously flawed. From a benefit standpoint, we believe that the savings are overstated. Our perspective is that increased enforcement does not equate to improved safety performance. Improved safety performance occurs when organizations develop strong safety cultures that encourage miners to do the right thing. Improved safety performance and fewer injuries are byproducts of strong safety leadership and creating performance structures that encouraging problem solving and employee involvement. Improved safety performance does not come from merely putting more "cops on the beat" with "bigger night sticks." While enforcement helps operators achieve safety standards at minimum levels, it does not foster continuous improvement.

The Agency's cost estimates for developing effective safety programs are also underestimated. From Arch's experience, we know that developing and implementing an effective safety process occurs over time. It involves a lot more time, money, management leadership, and employee involvement than outlined in the Preamble of the Proposed Rule. We would welcome the opportunity to discuss this issue with MSHA in more detail. Another alternative would be to review Arch's comments to the MSHA

6

Panel on effective management safety systems at the Omni - William Penn Hotel in Pittsburgh, PA on October 10, 2010.

**MSHA Should Adopt a Holistic Approach to Identify Potential POV Candidates**

Compliance indicators alone are not good predictors of safety performance. In developing criteria to identify Potential POV candidates, a mine's injury performance measures should be provided the same weight as enforcement measures. In identifying Potential POV mines, the Agency should attempt to obtain a holistic snapshot of a mine's overall safety profile. This can't be done by looking at enforcement statistics in a vacuum.

One good example that enforcement does not equate to safety is our Sufco mine in Utah. In 2010, Sufco made the Agency's "Impact Inspection" list because of a "Rules to Live By" violation. For some reason totally unrelated to safety, an MSHA press release publicized the fact that they made this list. Despite this negative publicity, the employees at Sufco (a large underground longwall mine), worked the entire year without a reportable injury. They had zero medical and zero lost time incidents for the entire year.

In our view, a mine's injury performance should play a larger role in determining whether an operator achieves POV status. At Arch, preventing injuries is the primary focus of our safety process. Our goal is "Home Safely! Everyone! Every Day! MSHA compliance is an important part of our process, but injury prevention is a core value. We feel the Proposed Rule should reflect a similar emphasis on injury prevention. This process shouldn't be about how many violations a mine operator is issued. It should be about how well they return people home safely everyday.

The current criteria for POV assignment uses a mine's Injury Severity Measure (SM) as one determining factor. This factor is important, but it should be balanced by also considering a mine's lost time injury and reportable injury rates. A small or medium-sized mine with a good overall injury prevention rate could have their SM skewed by one serious injury. We encourage the use of a set of balanced, holistic, and normalized safety performance indicators to determine which mines are assigned POV status.

The Safety Performance Index (SPI) or Grayson Model is one viable POV model that MSHA should consider. It uses injury prevention and enforcement criteria in equal measures. It normalizes the criteria and provides a holistic view of a mine's safety performance that is predictive in nature.

**Closing**

We appreciate the opportunity to share our views on this important safety issue. In our opinion, a properly designed POV regulation could be as a valuable tool to identify "bad actors" and improve overall safety performance. In order to be effective, however, the Final Rule needs to be transparent. It needs to afford mine operators due process. In addition, operators need to be provided "fair notice" and the opportunity to improve.

An effective POV Rule should be developed through a cooperative effort involving input from all stakeholders. The POV selection criteria should be transparent and based on holistic, normalized indicators. From a remedial standpoint, targeted operators should be encouraged (and where necessary assisted) to adopt safety process initiatives capable of producing long-term, continuous improvement. This should be a performance improvement tool that punishes recalcitrant operators when necessary. The overriding emphasis, however, should be on how we all get better at returning all miners home in the same condition as when they reported to work.

Sincerely,

Anthony S. Bumbico
Vice President of Safety
Arch Coal, Inc.

8

**From:** feist@montanamining.org
**Sent:** Tuesday, March 22, 2011 4:20 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 MAR 22 ℗ 5: 22

**Attachments:** Scanned letter to Health and Safety.pdf


Scanned letter to
Health and S...

Attached please find the Montana Mining Association's comments.

AB73-Comm-10

# MONTANA MINING ASSOCIATION

Office Address: 2301 Colonial Drive, Suite 3A ~ Helena, MT 59601
Mailing Address: P.O. Box 5567 ~ Helena, MT 59604
Telephone: (406) 495-1444   Fax: (406) 495-8484
Email: info@montanamining.org
Website: http://www.montanamining.org

*March 10, 2011*

To: Mine Safety and Health Administration
   30 CFR 104
   RIN 1219-AB73
   Pattern of Violations

From: Montana Mining Association (Debbie Shea, Executive Director)

RE: Comments

The Montana Mining Association Safety Committee would like to comment on MSHA proposing to revise the Agency's existing regulations for pattern of violations (POV).

First, the Agency has asked the Mining Industry to comment on a proposal which is lacking details on the criteria the Agency will use to enforce POV. Full and fair notice of what the criteria are should be made available prior to revising the POV.

Second, public hearings should be held to allow Industry to comment in a public forum with the Agency before revisions are made.

*Section 104.2*

While the Agency would review a number of criteria listed under Section 104.2 to determine if an Operator meets the POV criteria, it is currently unknown what the criteria will be under this proposal. Again, we are unable to comment on criteria that have yet to be divulged.

The Agency is proposing to eliminate the existing requirements of 104.3(b) which requires that only citations and orders that have become final are to be used to identify mines with a pattern of violations. They believe the proposal to consider non-final citations and orders to identify mines with a POV is consistent with the Mine Act. The Agency uses the logic that there is a backlog in contested cases and it takes an average of 518 days for a contested violation to become final is sound reasoning to eliminate due process in the POV criteria. Serious citations are always written at the whim of a subjective opinion by an individual. The industry has a right to its day in court as the Mine Act intended before we are judged as guilty by the Agency. The Agency should consider methods to streamline the contesting process if that system functions poorly and not use it as tool to enforce POV.

The Agency believes Operators have an incentive to contest S&S violations to avoid being placed under a POV. Regardless if citations are contested, they all become finalized at some point and with the Agency's proposal to review a mine twice per year it is simply a matter of time before citations/orders are finalized and will be counted in the review. Under the current Part 100 penalty system, the Agency has installed a punitive method to punish mines for enacting their rights to contest citations by subjecting them to higher fines once a citation/order becomes final. The Agency has increased the percentage of S&S citations being issued nation wide, installed a punitive penalty for contesting citations, and now proposes to eliminate due process in the POV criteria.

*Section 104.3*

Currently, the Potential Pattern of Violation (PPOV) provides mines with notification that they are approaching the POV and gives an opportunity for mines to work cooperatively with MSHA to reduce S&S citations before they are placed on a POV and subjected to closure orders for each S&S issued. Under the Agency's statistics, 56 of 62 (90%) who received a PPOV notice reduced their S&S violations by at least 30%. The Montana Mining Association Safety Committee believes MSHA should not eliminate a process that allows Mine Operators and the Agency to work cooperatively.

Comment Page 00878

**From:** Callaghan, Beth (Rago) [mailto:BCallaghan@PattonBoggs.com] **On Behalf Of** Chajet, Henry

**Sent:** Friday, March 25, 2011 2:03 PM

2011 MAR 25 P 3: 21

**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Cc:** hchajet@pattonboggs.com
**Subject:** RIN 1219-AB73

Attached are the Mining Awareness Resource Group's (MARG) comments on the Proposed Pattern of Violations Rule.  If you have any questions, please contact me.

Regards,
Henry Chajet
Partner
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
202-457-6511
Fax 202-457-6315

AB73-COMM-11

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

2550 M Street, NW
Washington, DC 20037-1350
202-457-6000

Facsimile 202-457-6315
www.pattonboggs.com

March 23, 2011

Henry Chajet
202-457-6511
HChajet@pattonboggs.com

The Honorable Joseph Main
Assistant Secretary of Labor for Mine Safety
and Health
c/o The Office of Standards, Regulations, and
Variances
U. S. Department of Labor
1100 Wilson Boulevard
Room 2350
Arlington, Virginia 22209-3939

Re:     Pattern of Violations RIN: 1219-AB73

Dear Assistant Secretary Main:

The Mining Awareness Resource Group (MARG), a coalition of mining companies, is writing to
alert you to the agency's failure to propose a transparent and comprehensible rule for the use of
its most severe penalty and enforcement tool:  closure orders resulting from a "pattern of
significant and substantial (S & S) violations." 76 FR 5719 (February 2, 2011).

We endorse the use of proper rulemaking if the current regulations (30 CFR Part 104) are to be
amended, but we believe the proposed rule is contrary to law and must be re-proposed because:

> ➤ The proposed rule withholds for future web posting the actual criteria the agency will use
>    for pattern determinations, thereby preventing analysis of its impact and a meaningful
>    opportunity to comment on the proposal.
> ➤ The proposed rule violates the Administrative Procedures Act (APA) and Mine Act
>    rulemaking mandates,  and exceeds the Secretary's specific authority regarding patterns,
>    by not disclosing the criteria while simultaneously adopting rules to " establish criteria for
>    determining when a pattern…exists," under Section 104(e)(4) of the Act.

**PATTON BOGGS** LLP
ATTORNEYS AT LAW

Joe Main
March 23, 2011
Page 2

> The proposed rule will result in closure orders issued against employment sites, before the employer has an opportunity to:
> (1) discuss the alleged pattern with the agency;
> (2) contest the validity of alleged citations or orders used to identify a pattern;
> (3) address the accuracy of agency data used for pattern identification; or
> (4) obtain Review Commission and judicial review of the alleged pattern identification "notice," prior to closure orders imposed by MSHA inspectors.

> The proposed rule will deny employers Mine Act Section 105 citation and penalty contest rights, and due process of law, by using contested, alleged violations to impose closure order penalties, using the pattern of violation provisions of the Mine Act.

> The proposed rule will impose requirements for the submission of "safety and health management programs," for MSHA approval, to gain MSHA consideration of "mitigating circumstances" in the future that might prevent pattern closure order issuance. By so doing, the proposed rule imposes a new pattern penalty and requirement, not authorized by the Mine Act, before any pattern has been formally identified by MSHA.

> The safety and health management program submission requirement, as a pattern mitigation trigger, circumvents Mine Act and APA rulemaking mandates for the adoption of mandatory standards. The separate rulemaking both OSHA and MSHA announced to determine if such safety program mandates are warranted and, if so, what program mandates should be included, demonstrates this "end run" around proper rulemaking procedures.

Mr. Secretary, we understand the need for fair and equitable use of MSHA enforcement tools when necessary to achieve safety, as well as the need to reform the MSHA troubled enforcement system. We do not believe, however, that this flawed proposal will enhance safety since it denies the regulated community the opportunity to comprehend its application and submit meaningful comments, while circumventing mandatory procedures aimed at fostering transparent and accountable government. We urge you to revoke, revise and re-propose this rule to address the flaws described above.

Sincerely,

Henry Chajet
Counsel for MARG



WA REG # SIEGMEC R9          2011 MAR 25 P  3: 5b          CCB 128312

Road Construction

Portable Crushing

3-25-2011

**Neal Merrifield**

**Office of the Administrator**

Rock Hauling

**1100 Wilson Blvd. Room 2470**

**Arlington, VA 22209-3939**

Land Clearing

It has come to our attention that MSHA is suggesting new interpretations on Patterns of Violations.

Logging

We believe that MSHA needs to provide the criteria for POV in order to adequately assess the rule.  One of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commentors on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

Utilities

Bridges

Ponds

MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.

Wireless Site Work

Heavy Hauling

*AB73-Comm-12*

P.O. Box 840 • Stayton, OR 97383 • Phone (503) 769-6280 • Fax (503) 769-1834 • www.siegmundexcavation.com



WA REG # SIEGMEC R9                    CCB 128312

Road Construction

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

Portable Crushing

Rock Hauling

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

Land Clearing

Logging

Utilities

MSHA needs to explain how vacated citations/orders will affect POV status.

Bridges

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if -due to the vacating of citations/orders - they no longer meet the initial POV criteria.

Ponds

Wireless Site Work

Heavy Hauling



EXCAVATION & CONSTRUCTION

WA REG # SIEGMEC R9                              CCB 128312

Road Construction

MSHA should clarify the proposed rule's provisions on mitigating circumstances.

Portable Crushing

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically. The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs". MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71. MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considerers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management program from being made arbitrarily.

Rock Hauling

Land Clearing

Logging

Utilities

Bridges

Finally, any change in legislation that imposes a further burden on citizens should require a public hearing.

Ponds

Sincerely,

Wireless Site Work

Andrew Siegmund

Heavy Hauling



2011 MAR 28 P 3: 56

Oregon Independent Aggregate Association

P.O. Box 571

Stayton, Oregon 97383

Mine Safety and Health Administration

Mr. Neal Merrifleld

1100 Wilson Blvd. Room 2470

Arlington, VA 22209-3939

Mr. Merrifleld,                                              March 26, 2011

It has come to my attention that MSHA is suggesting new interpretations on Patterns of Violations. OIAA opposes this proposal.

I believe that MSHA needs to provide the criteria for POV in order to adequately assess the rule. One of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.

*AB73-Comm-13*

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed' POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

MSHA needs to explain how vacated citations/orders will affect POV status.

MSHA has not clarified in the proposal how it will deal with the situation where "issued' citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if -due to the vacating of citations/orders - they no longer meet the initial POV criteria.

MSHA should clarify the proposed rule's provisions on mitigating circumstances.

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for

POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.  The proposed rule also states an eighth factor: "mitigating circumstances.'  Under the proposal, MSHA would consider an operator-s effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance.  MSHA has, of course, embarked on a separate rulemaking regarding "safety ad health management programs. '  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71.  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considerers "effective implementation' of a health and safety management program, or how it would prevent decisions to approve or disapprove a management program from being made arbitrarily.

Finally, any change in legislation that imposes a further burden on citizens should require a public hearing.

Sincerely,

Mary McNatt

Mary McNatt

Chairperson, OIAA

**From:** Annie Bessert [mailto:Annie.Bessert@Newmont.com]
**Sent:** Tuesday, March 29, 2011 3:46 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Cc:** Richard Matthews
**Subject:** RIN 1219-AB73

2011 MAR 29 P 5: 22



**Annie Bessert**
Executive Assistant
North America Operations

**T** 775.778.4653
**F** 775.778.2513
www.newmont.com

**Newmont Mining Corporation**
1655 Mountain City Highway
Elko, Nevada 89801

*AB73 - Comm - 14*



**Newmont Mining Corporation**
1655 Mountain City Highway
Elko, Nevada 89801-2800
**Phone** 775.778.4000
**Facsimile** 775.778.4757
www.newmont.com

March 29, 2011 2011 MAR 29 P

Ms. April E. Nelson
Acting Director
Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re: **RIN 1219-AB73**
**Comments on MSHA's Proposed Rule for Pattern of Violations**

Dear Ms. Nelson:

Newmont USA Limited is pleased to offer the following comments to the Mine Safety and Health Administration concerning its Proposed Rule for Pattern of Violations ("POV") under § 104(e) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 801, 814(e). The proposed regulation was published at 76 *Fed. Reg.* 5719 (Feb. 2, 2011).

Newmont USA Limited ("Newmont") is a subsidiary of Newmont Mining Corporation. Newmont operates six underground mines and four major open pit mines in Northern Nevada, employing 3,450 people in the process. Newmont operations represent vital economic relief to a state with the highest unemployment rate in the country.

Newmont recognizes the significance of the POV sanction to the effective enforcement of the Mine Act and supports transparency and the simplification of this process to achieve the mutual goal of effectively protecting the health and safety of the miners. To this end, Newmont is supportive of the proposal. However, there are provisions in the proposal that Newmont would seek further reform and clarification on as follows:

1. **The proposed rule should include specific criteria for POV status.**

This proposal contains only generic criteria for determining POV status at Section 104.2. The actual screening criteria are not included in the proposal. Rather, the proposal speaks to seeking comment on how it should develop and periodically revise the POV criteria. 76 *Fed. Reg.* 5719, 5720 (February 2, 2011). This does not appear to comport with notice and comment rulemaking under the Administrative Procedures Act, the Mine Act, and is inconsistent with transparency that the agency has represented it will provide to stakeholders. Newmont respectfully requests that the proposal be reissued with screening criteria included so that meaningful comment and dialogue can be held. It is impossible to comment on criteria that have not been shared in the proposal. The Office of Inspector General of the U.S. Department of Labor ("OIG") also specifically recommended that MSHA seek stakeholder input of the POV screening criteria in its report dated September 29, 2010, pages 3, 24. MSHA has not

Ms. April E. Nelson
March 29, 2011
Page 2

accomplished this in its proposal and anticipating a system that continuously changes screening criteria creates a barrier to stakeholders in understanding the conduct required of the regulated community in order to avoid enforcement under this provision. The process anticipated by MSHA appears to run afoul of minimal notice and due process requirements.

**2.      The proposed rule should include a meaningful opportunity to address mitigation before a notice is issued.**

Section 104.3 of the proposal contemplates the automatic issuance of a pattern notice and eliminates the opportunity to address the potential for a pattern before it is issued. At the same time, it references consideration of "mitigating" criteria which appears to be an approved safety and health program to address deficiencies. It would be more appropriate to reinstate the opportunity to discuss avoiding a pattern notice so that mitigation has meaning. Consideration of mitigation before the notice is issued based on unspecified and potentially changing criteria compounds the vagaries of the proposal. The safety and health of miners would not be adversely affected by providing an opportunity to implement corrective measures that effectively address safety issues.

Newmont urges MSHA to reissue its proposal to provide a period for discussing mitigating circumstances prior to an automatic issuance of a pattern notice

**3.      The proposed rule should base the issuance of POV status on final orders.**

Currently, 30 C.F.R. § 104.3(b) states that only citations and orders which have become final shall be used to identify mines with a potential pattern of violations. The proposed regulation changes this approach to base the pattern notice review on "violations issued" to make POV determinations.

The risk of an erroneous deprivation of the property interest such as a withdrawal order affecting a mine or parts thereof is significant. According to information released by MSHA's Office of Assessments on January 31, 2011, almost 19% of the violations issued as "significant and substantial," which were litigated in fiscal years 2009 and 2010, were vacated or modified to "non-significant and substantial" as a result of the litigation process.

Similarly, when § 104(d) violations, which alleged an "unwarrantable failure" to comply were litigated in the same period, almost 33% of those violations were either vacated or modified to a § 104(a) violation. Clearly, relying on "violations issued" to impose the punitive sanction of § 814(e) of the Mine Act could well result in erroneous application of the pattern enforcement.

There is also a very real possibility of MSHA erroneously tabulating a mine's inspection history when considering the risk of an erroneous deprivation. The OIG recently reported on the accuracy of MSHA's efforts to screen mines for POV sanctions.

{D0699337.1}                                            2

Ms. April E. Nelson
March 29, 2011
Page 3

    For the five POV screenings performed from 2007-2009, MSHA district managers sent potential pattern of violations letters to 68 mines. Following the completion of the evaluation period provided by the current 30 C.F.R. Part 104, those same district managers recommended that 9 mines be given a POV notice. However, upon further evaluation of the underlying violations by MSHA attorneys or review by the Federal Mine Safety and Health Administration, MSHA determined that 6 of the 9 (66%) mines no longer met the POV criteria. *In 32 Years MSHA Has Never Successfully Exercised Its Pattern of Violations Authority*, DOL OIG Report dated September 29, 2010, page 13. Therefore, in the absence of meaningful review of the underlying violations, it is <u>more likely than not</u> that any mine placed on a POV will be sanctioned when such action is not authorized by 30 U.S.C. § 814(e).

    In addition, the same OIG's report found that MSHA's POV computer application used from 2007 to 2009 generated unreliable results on each of the five occasions it was used by MSHA to screen for POV status. For example, the OIG found that on all five occasions, the MSHA application contained a value which could have caused a vacated citation to be counted as a valid final citation. As a result, the program could have over-counted citations for a specific mine. *Id.* at p. 17. Similarly, citations and orders which had been issued to a prior owner of a mine could be associated with the current owner and have resulted in an over-count of citations for a specific mine. *Id.* And finally, the program was found to incorrectly sum two columns that represented "unwarrantable failure" orders in such a manner as to incorrectly include a mine that did not meet the screening criteria for "significant and substantial" § 104(d) final orders. *Id.*

    Finally, in the absence of some independent review of an inspectors exercise of discretion while issuing enforcement actions, the risk of an erroneous application of the pattern notice and resulting withdrawal orders may be increased by MSHA's failure to provide its journeyman inspectors with periodic retraining. Lack of periodic retraining reduces the assurance that MSHA mine inspectors are adequately trained to conduct their inspection duties and to properly apply classifications, such as "significant and substantial" and/or "unwarrantable failure", to violations they encounter. According to the OIG, 56% of MSHA journeyman inspectors did not attend the required refresher training in FY 2006 or 2007. *Journeyman Mine Inspectors Do Not Receive Required Periodic Retraining*, DOL OIG Report dated March 10, 2010, page 6. Moreover, MSHA training records show that 65% of the MSHA journeyman inspectors who failed to attend the required retraining sessions in FY 2006 or 2007 had still not completed retraining by the end of fiscal year 2009! *Id.* at p. 7. Over 27% of the 264 journeyman inspectors who responded to the OIG's survey stated that MSHA did not provide them with the technical training they needed to effectively perform their duties. *Id.* at p. 3.

    This data reinforces the notion that challenges to erroneously issued or characterized enforcement action, either in severity or gravity, are not baseless efforts to avoid more severe sanctions. The Mine Act provided a mechanism for appeal through the Federal Mine Safety and Health Review Commission in order to ensure due process and to avoid unreviewable agency

Ms. April E. Nelson
March 29, 2011
Page 4

action. The informal conferencing process under Part 100 has been all but eliminated by MSHA over the past three years, and a backlog of cases has developed that makes fundamental due process difficult to obtain in the system.

For these reasons, Newmont urges that the Secretary reconsider her proposal to use "issued violations" as the basis for determining the existence of a pattern notice.

Sincerely,

Randy Squires
Newmont USA Limited
Regional Manager, Safety Relations

| | |
|---|---|
| **From:** | Judy Rivlin [jrivlin@umwa.org] |
| **Sent:** | Tuesday, March 29, 2011 1:42 PM |
| **To:** | zzMSHA-Standards - Comments to Fed Reg Group |
| **Subject:** | request for extension; POV rulemaking |

2011 MAR 29 P 3 00

Please be advised that the United Mine Workers of America hereby seeks an extension in the
filing deadline for the Pattern Of Violation rulemaking, now scheduled to close on April
4, 2011. We would appreciate an extension of two weeks, until April 18.
In advance, we appreciate your attention and a prompt reply.

Judith Rivlin, Assoc. Gen'l Counsel
United Mine Workers of America
18354 Quantico Gateway Drive, Suite 200
Triangle, VA 22172-1779
Tel:  703-291-2429
FAX:  703-291-2448

Comment Page 00893

AB73-Comm-15

# PUBLIC SUBMISSION

2011 MAR 30  A 10: 59

As of: March 30, 2011

Status: Pending_Post
Tracking No. 80c1334e
Comments Due: April 04, 2011
Submission Type: Web

**Docket:** MSHA-2011-0001
Proposed Rule on Pattern of Violations

**Comment On:** MSHA-2011-0001-0001
Federal Register; notice of close of comment period

**Document:** MSHA-2011-0001-DRAFT-0020
Comment from Laura Patruno, EP Minerals, LLC

---

## Submitter Information

**Name:** Laura Patruno
**Address:**
    9785 Gateway Drive
    Reno,  NV,  89521
**Email:** laura.patruno@epminerals.com
**Organization:** EP Minerals, LLC

---

## General Comment

See attached file(s)

EP Minerals, LLC supports the position paper submitted by IMA-NA regarding the Proposed Rule. (copy attached)

---

## Attachments

**MSHA-2011-0001-DRAFT-0020.1:**  Comment from Laura Patruno, EP Minerals, LLC

AB 73-COMM-16



**Industrial Minerals Association — North America**

March 28, 2011

Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, VA  22209-3939

**RE:  Proposed Rule, Pattern of Violations, RIN 1219-AB73**

Dear Sir or Madam:

The Industrial Minerals Association – North America (IMA-NA) appreciates the opportunity to comment on the Mine Safety and Health Administration's (MSHA) proposed rule on Pattern of Violations ("POV") (76 FR 5719 et seq.; February 2, 2011).

IMA-NA is a Washington, DC-based trade association created to advance the interests of North American companies that mine or process minerals used throughout the manufacturing and agricultural industries.  Its producer membership is comprised of companies that are leaders in the ball clay, barite, bentonite, borates, calcium carbonate, diatomite, feldspar, industrial sand, kaolin, magnesia, mica, soda ash (trona), talc, wollastonite and other industrial minerals industries.  In addition, IMA-NA represents associate member companies that provide equipment and services to the industrial minerals industry.  Additional information on IMA-NA can be accessed through the following hyperlink:  http://www.ima-na.org.

IMA-NA and its members recognize that the first priority and concern of all in the mining industry must be the health and safety of its most important and precious resource – the miner.  Since its inception in 2002, IMA-NA has sought to work cooperatively with MSHA to continuously improve safety in the mining industry.  IMA-NA appreciates the past and present opportunities and efforts to work with MSHA on our mutual goal of achieving a mining industry in the United States that is as safe as possible for all who work in and around mines.

**General Comments on the Proposed Rule**

IMA-NA supports MSHA's expressed intent to improve the POV program to "simplify the existing POV criteria, improve consistency in applying the POV criteria, and more adequately achieve the statutory intent...[for] the POV sanction to attain remedial action from operators 'who have not responded to the Agency's other enforcement efforts.'" (76 FR 5719, February 2, 2011).

The POV program is among the most potent sanctions that MSHA has under the Federal Mine Safety and Health Act of 1977 ("Mine Act")(30 USC § 801 et seq.). It therefore is particularly important that the POV program be carefully crafted so that it effectively protects the safety of workers where mine operators repeatedly have failed to live up to their obligations to provide miners with a safe place to work, while at the same time providing assurance of fair treatment and due process to mine operators and their employees whose jobs and livelihood depend on continued mine operations.

Reaching that balance is not simple. It is worth recognizing that the Senators who initially included the POV provision in the 1977 Mine Act debated at length how such a provision could be crafted so as to achieve their goal of targeting the "bad apples" without unfairly jeopardizing the "good apples," and finally gave the task to MSHA to determine how to target a POV program. (See, e.g., Senate floor debate, *Legis. Hist.* at 1068-1082).

IMA-NA supports MSHA's effort to develop an accessible, effective and transparent POV program. However, IMA-NA is concerned that there are significant gaps in the proposed rule, as discussed below. Therefore, IMA-NA requests that MSHA re-propose the rule to address these gaps and to allow operators and other stakeholders a fair opportunity to comment on the proposed POV program as a whole.

## Specific Comments on the Proposed Rule

**MSHA needs to provide the criteria for POV so that others may adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet, MSHA asks for comments on the program without having disclosed these criteria, except in very general terms. (Section 104.2). It is thus very difficult, if not impossible, for commenters on the proposed rule, including IMA-NA, to be able to thoroughly understand and assess the impact and appropriateness of the proposed program. We believe that MSHA should -- in fact it must under accepted principles of administrative law[1] -- re-propose the rule to include the criteria it proposes to use in determining that a POV exists in order to give the affected parties adequate notice and opportunity to comment on the rule.

In the preamble to the proposed rule, MSHA "requests comments on how the agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." (76 FR 5720; February 2, 2011). We welcome and appreciate MSHA's expressed desire for comments on the screening criteria. This is a major step in the right direction given the significance of the criteria to the proposed rule. However, merely committing to a process for comments regarding yet un-disclosed criteria is vague and inadequate. Moreover, IMA-NA believes it is insufficient as a matter of law.

Based on past iterations, the POV screening criteria is not interpretive, is not a statement of policy, and does not constitute a "logical outgrowth" of the proposed rule. Instead, promulgation

---

[1] See, e.g., *National Mining Assn v. MSHA*, 116 F.3d 520, 531, (D.C. Cir. 1997).

2

of these criteria constitutes rulemaking of general application necessitating formal notice and comment under the Administrative Procedure Act (5 USC § 551 et seq.). Therefore, failure to publish the screening criteria as part of the proposed rule and failure to subject the screening criteria to full notice and comment constitutes improper rulemaking. We appreciate MSHA's expressed intention to "obtain comment" for the screening criteria in the future. However, it is not clear if MSHA envisions this as full notice and comment or something short of the proper rulemaking process. It is unclear why, if MSHA plans to use notice and public comment to develop screening criteria, those criteria should not be included in the proposed rule now so that commenters can assess the entire program in the same rulemaking. We urge the agency to re-propose the rule and include the criteria it proposes to use in determining that a POV exists and give the affected parties adequate notice and opportunity to comment on the entire rule.

IMA-NA appreciates and supports MSHA's proposal to eventually provide the POV criteria on MSHA's website in an accessible format that will allow mine operators to determine how a particular mine's record compares with the POV criteria. However, promising to make the criteria available later and potentially committing to "obtain comment" does not substitute for putting the criteria in the rule and allowing notice and public comment on the criteria along with the rest of the rule of which the criteria are an integral part. Furthermore, there needs to be an opportunity for commenters to see how those criteria were developed, and the basis for them, in order to fully evaluate the proposal.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders.**

IMA-NA believes that the imposition of punitive sanctions based on "issued" citations for which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed would constitute a denial of an operator's constitutional right to due process.

We understand MSHA's concern that delays in the adjudicative process on individual citations may hamper MSHA's ability to use POV as a timely tool to address current problems, particularly in light of the backlog of cases at the Federal Mine Safety and Health Review Commission in recent years. Certainly we do not support any operator hiding behind delays in the adjudicative process to avoid making necessary corrections to assure safe working conditions for miners. We do not believe that that is the reason why, in the vast majority of cases, operators decide to contest citations. We believe that MSHA has tools currently available to it to assure that miners' safety is protected, without violating operators' due process rights. Furthermore we, along with others, have suggested steps that we believe that MSHA could and should take to address the backlog issue.

The proposed rule not only removes the due process protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV notification that allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed, there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not

been subject to any opportunity for a hearing or other procedural protections required by due process considerations.

It is certainly clear to our members, and we assume that it also is clear to MSHA, that inspectors are not infallible when they write citations. It should not be necessary here to give examples of citations that were written as "S&S" or as an elevated action under section 104(d), section 104(b), section 104(g), or section 107(a) of the Mine Act that subsequently were vacated or reduced in severity or negligence upon further review either by MSHA or by the Commission. Depending again on the criteria that MSHA would use to determine POV, a single "bad" inspection could trigger a closure order of a portion or all of a mine under POV for an extended period of time, without the operator having had any opportunity to contest the validity of the citations or their alleged seriousness.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

One of the reasons that IMA-NA believes it is necessary to include the actual criteria for POV in the proposed rule is that, as currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.

The proposed rule (Section 104.2 (a)) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically. The proposed rule also states an eighth factor: "mitigating circumstances." Our concern with that factor being included would be less but for the discussion of what MSHA intends by that term in the preamble to the proposed rule: "Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance." (76 FR 5721; February 2, 2011).

MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71. MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management program from being made arbitrarily at the District level.

The proposed rule also is confusing in that regulatory text reads as though POV status would be "automatic" if criteria (to be published on the MSHA website) are met. Section 104.3 states that "[w]hen a mine has a pattern of violations, the District Manager *will* issue a pattern of violations notice…." [Emphasis added]. However, the last criteria, and the discussion about it in the preamble to the proposed rule, suggests discretion on the part of MSHA (the District Manager?) to consider other factors before determining whether a POV notice is necessary.

A less confusing, more straightforward approach would be to retain the current POV program's "two step" process of notifying mine operators of "proposed" pattern of violations, and then, as is currently the case, providing an opportunity for the mine operator and MSHA to consider mitigating circumstances, including agreement on a remedial plan. We would encourage MSHA

4

Comment Page 00898

not to eliminate the current two-step process for those mines meeting whatever numerical criteria for POV are eventually established.

As the proposal now stands, the agency can make a unilateral decision based on unknown and arbitrary criteria to place a mine under POV, without any procedural protections in place to allow an operator to seek review or reconsideration of such decision. This is simply unacceptable.

## Conclusion

We commend MSHA on embarking on an effort to improve the POV program. However, by not including the criteria for POV in the proposed rule, and eliminating all procedural safeguards against erroneous or arbitrary imposition of POV findings, MSHA has made it impossible for our association and our members to assess and be able to comment on or support the program as a whole. We request that MSHA re-propose the rule and include the criteria that it plans to use. We also request that MSHA address the concern about the lack of due process that may occur under the rule as proposed. Finally, we request that MSHA re-institute the "proposed" POV under the new rule in order both to clarify the procedure and to allow the mine operator an opportunity to show mitigating circumstances before POV sanctions automatically would go into effect.

IMA-NA is pleased to have had the opportunity to comment on MSHA's proposed rule on Pattern of Violations and it stands ready to assist in developing an effective rule in a constructive manner. Please do not hesitate to contact me should you have any questions, comments or suggestions regarding this matter.

Sincerely,

Mark G. Ellis
President

5

# PUBLIC SUBMISSION

2011 MAR 30  A 10: 59

**As of:** March 30, 2011

**Status:** Pending_Post
**Tracking No.** 80c124ab
**Comments Due:** April 04, 2011
**Submission Type:** Web

**Docket:** MSHA-2011-0001
Proposed Rule on Pattern of Violations

**Comment On:** MSHA-2011-0001-0001
Federal Register; notice of close of comment period

**Document:** MSHA-2011-0001-DRAFT-0023
Comment from Brian Slobodow, U.S. Silica

## Submitter Information

**Name:** Brian Slobodow
**Address:**
   8490 Progress Drive
   Suite 300
   Frederick,  21701
**Email:** slobodow@ussilica.com
**Phone:** 301-682-0655
**Organization:** U.S. Silica

## General Comment

On behalf of U.S. Silica, I would like to re-affirm the comments provided by the IMA-NA on the matter at hand. We commend MSHA on embarking on an effort to improve the POV program. However, by not including the criteria for POV in the proposed rule, and eliminating all procedural safeguards against erroneous or arbitrary imposition of POV findings, MSHA has made it impossible for U.S. Silica and fellow IMA-NA members to assess and comment on or support the program as a whole. We request that MSHA re-propose the rule and include the criteria that it plans to use. We also request that MSHA address the concern about the lack of due process that may occur under the rule as proposed. Finally, we request that MSHA re-institute the "proposed" POV under the new rule in order both to clarify the procedure and to allow the mine operator an opportunity to show mitigating circumstances before POV sanctions automatically would go into effect.

- Brian Slobodow, CEO, U.S. Silica

# PUBLIC SUBMISSION

2011 MAR 30 A 10: 59

As of: March 30, 2011

Status: Pending_Post
Tracking No. 80bd8cb8
Comments Due: April 04, 2011
Submission Type: Web

**Docket:** MSHA-2011-0001
Proposed Rule on Pattern of Violations

**Comment On:** MSHA-2011-0001-0001
Federal Register; notice of close of comment period

**Document:** MSHA-2011-0001-DRAFT-0018
Comment from Randy Dossey, Four Corners Materials

## Submitter Information

**Name:** Randy Dossey
**Organization:** Four Corners Materials

## General Comment

The proposed rule would eliminate the existing requirement in § 104.3(b)
that only citations and orders that have become final are to be used to identify
mines with a potential pattern of violations.

This is the same as being declared guilty before trial.
This concern could be eliminated by MSHA moving forward in a timely manner on contestants
made regarding any citations. Some contested citation take a year or more before settled and
agreed upon, why should MSHA be able to use citations against a mine operator before the
settlement occurs.

*AB73-COMM-18*

# PUBLIC SUBMISSION

2011 MAR 30  A 11: 00

| As of: March 30, 2011 |
| Status: Pending_Post |
| Tracking No. 80bf7447 |
| Comments Due: April 04, 2011 |
| Submission Type: Web |

**Docket:** MSHA-2011-0001
Proposed Rule on Pattern of Violations

**Comment On:** MSHA-2011-0001-0001
Federal Register; notice of close of comment period

**Document:** MSHA-2011-0001-DRAFT-0022
Comment from Bethany Brown, Georgetown University Law Center - Law Student

---

## Submitter Information

**Name:** Bethany Brown
**Address:**
    Washington, DC,
**Organization:** Georgetown University Law Center - Law Student

---

## General Comment

See attached file(s)

---

## Attachments

**MSHA-2011-0001-DRAFT-0022.1:** Comment from Bethany Brown, Georgetown University Law Center - Law Student

I would like to thank you for taking the time and effort to update the process for punishing repeat violators of mine safety regulations. I noticed in the proposed rule that this effort was motivated by the 2006 accidents at Sago, Darby, and Aracoma, but this seems also particularly timely and relevant due to the accident at Upper Big Branch last year. It is my understanding that Massey was prone to utilizing the appeals process to prevent safety shutdowns at that mine, and I am happy to see that you are working to close this loophole.

I would like to submit a couple of comments of general concern as well as a couple of quick comments pertaining to issues for which you specifically requested comment.

Generally speaking, I think that the proposal to utilize an on-line system pertaining to the POV screening criteria is an excellent idea. I agree that this will better enable mine operators to monitor safety concerns within their mines to ensure compliance independent of the reviews. Any plan to make information more accessible to those whom it affects is a step in the right direction. Your proposal mentioned multiple times that the threat of closure provided by a POV status will incentivize operators to independently ensure compliance prior to reaching POV status. I agree, but I would add that the threat of closure must be real for this system of incentives to be effective. Thus, I also applaud the steps taken under this proposal to ensure that the threat of closure will be taken seriously, including an increase to two reviews annually and abandonment of the PPOV.

That being said, I am slightly concerned that the MSHA-approved safety and health management program will replace the appeals process as a manner by which to evade punishment for violations. I do, of course, understand that the program will be a much more inclusive and active process than the appeals process, with the utilization of concrete benchmarks and with miners participating in the development of the program. However, I would urge a strict plan for reporting on and ensuring compliance with the program once it is in place, including providing continuing forums for miner participation into the compliance phase. Miners seem to be in the best position to advocate for compliance as they are best able to observe the safety conditions of the mine and, as they are most affected by dangerous conditions within the mine, have the strongest incentive to ensure that safety precautions do not fail.

As to your request for comments regarding the best method for notifying mine operators of changes to POV screening criteria, I should think that e-mail and posting updates to criteria on the website would be best. Taking advantage of this technology is the most cost-efficient, timely manner of distribution. Additionally, as mines would be able to submit more than one e-mail address to add to the distribution list, the dissemination of information will occur much more quickly than were notice to occur through the mail or other such method. I know that most if not all of the federal district courts use a system of e-mail and on-line notification for motions and other court filings, so it would seem that electronic notification does not offend any notions of fair process.

Finally, you requested comments specifically directed to the burden that monitoring compliance record against the proposed POV criteria using the Agency's Web site would place on mine operators. I found your analysis regarding the actual cost of the labor required to monitor the website to be convincing. Though five minutes per month seems like a short amount of time to monitor the website, I trust your expertise on the issue. I feel strongly that this cost should accrue

to the mine for two primary reasons. The first is that any alternative I can imagine would require the MSHA to strengthen compliance monitoring. Because this would be much less convenient and much more time consuming, likely requiring either reports to be submitted by the mines – taking up more of the operator's time – or requiring MSHA officials to travel to the mines – costing much more time and money, requiring mines to monitor compliance electronically appears to be the most efficient possibility. Secondly, as this is a cost of ensuring the safety of the mine, this cost should be internalized to the mine's operations. Were the cost to be subsumed by the public via government intervention, the mine's books would not accurately reflect the full cost of mining, and the market for mined products would be artificially high.

**From:** Mark Ellis [mailto:markellis@ima-na.org]
**Sent:** Wednesday, March 30, 2011 9:11 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73          2011 MAR 30  A 11: 00
**Importance:** High

Dear Sir or Madam:

Please find attached the comments of the Industrial Minerals Association — North America (IMA-NA) on the Mine Safety and Health Administration's (MSHA) Pattern of Violations (POV) notice of proposed rulemaking.

Mark G. Ellis
President
Industrial Minerals Association - North America
National Industrial Sand Association
2011 Pennsylvania Avenue, NW, Suite 301
Washington, DC 20006
(202) 457-0200
(202) 457-0287 (Fax)
markellis@ima-na.org
markellis@sand.org



AB73-COMM-20



**Industrial Minerals Association — North America**

March 28, 2011

Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, VA  22209-3939

**RE:  Proposed Rule, Pattern of Violations, RIN 1219-AB73**

Dear Sir or Madam:

The Industrial Minerals Association – North America (IMA-NA) appreciates the opportunity to comment on the Mine Safety and Health Administration's (MSHA) proposed rule on Pattern of Violations ("POV") (76 FR 5719 et seq.; February 2, 2011).

IMA-NA is a Washington, DC-based trade association created to advance the interests of North American companies that mine or process minerals used throughout the manufacturing and agricultural industries.  Its producer membership is comprised of companies that are leaders in the ball clay, barite, bentonite, borates, calcium carbonate, diatomite, feldspar, industrial sand, kaolin, magnesia, mica, soda ash (trona), talc, wollastonite and other industrial minerals industries.  In addition, IMA-NA represents associate member companies that provide equipment and services to the industrial minerals industry.  Additional information on IMA-NA can be accessed through the following hyperlink:  http://www.ima-na.org.

IMA-NA and its members recognize that the first priority and concern of all in the mining industry must be the health and safety of its most important and precious resource – the miner. Since its inception in 2002, IMA-NA has sought to work cooperatively with MSHA to continuously improve safety in the mining industry.  IMA-NA appreciates the past and present opportunities and efforts to work with MSHA on our mutual goal of achieving a mining industry in the United States that is as safe as possible for all who work in and around mines.

**General Comments on the Proposed Rule**

IMA-NA supports MSHA's expressed intent to improve the POV program to "simplify the existing POV criteria, improve consistency in applying the POV criteria, and more adequately achieve the statutory intent…[for] the POV sanction to attain remedial action from operators 'who have not responded to the Agency's other enforcement efforts.'" (76 FR 5719, February 2, 2011).

The POV program is among the most potent sanctions that MSHA has under the Federal Mine Safety and Health Act of 1977 ("Mine Act")(30 USC § 801 et seq.). It therefore is particularly important that the POV program be carefully crafted so that it effectively protects the safety of workers where mine operators repeatedly have failed to live up to their obligations to provide miners with a safe place to work, while at the same time providing assurance of fair treatment and due process to mine operators and their employees whose jobs and livelihood depend on continued mine operations.

Reaching that balance is not simple. It is worth recognizing that the Senators who initially included the POV provision in the 1977 Mine Act debated at length how such a provision could be crafted so as to achieve their goal of targeting the "bad apples" without unfairly jeopardizing the "good apples," and finally gave the task to MSHA to determine how to target a POV program. (See, e.g., Senate floor debate, *Legis. Hist.* at 1068-1082).

IMA-NA supports MSHA's effort to develop an accessible, effective and transparent POV program. However, IMA-NA is concerned that there are significant gaps in the proposed rule, as discussed below. Therefore, IMA-NA requests that MSHA re-propose the rule to address these gaps and to allow operators and other stakeholders a fair opportunity to comment on the proposed POV program as a whole.

**Specific Comments on the Proposed Rule**

**MSHA needs to provide the criteria for POV so that others may adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet, MSHA asks for comments on the program without having disclosed these criteria, except in very general terms. (Section 104.2). It is thus very difficult, if not impossible, for commenters on the proposed rule, including IMA-NA, to be able to thoroughly understand and assess the impact and appropriateness of the proposed program. We believe that MSHA should -- in fact it must under accepted principles of administrative law[1] -- re-propose the rule to include the criteria it proposes to use in determining that a POV exists in order to give the affected parties adequate notice and opportunity to comment on the rule.

In the preamble to the proposed rule, MSHA "requests comments on how the agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." (76 FR 5720; February 2, 2011). We welcome and appreciate MSHA's expressed desire for comments on the screening criteria. This is a major step in the right direction given the significance of the criteria to the proposed rule. However, merely committing to a process for comments regarding yet un-disclosed criteria is vague and inadequate. Moreover, IMA-NA believes it is insufficient as a matter of law.

Based on past iterations, the POV screening criteria is not interpretive, is not a statement of policy, and does not constitute a "logical outgrowth" of the proposed rule. Instead, promulgation

---

[1] See, e.g., *National Mining Assn v. MSHA*, 116 F.3d 520, 531, (D.C. Cir. 1997).

2

of these criteria constitutes rulemaking of general application necessitating formal notice and comment under the Administrative Procedure Act (5 USC § 551 et seq.). Therefore, failure to publish the screening criteria as part of the proposed rule and failure to subject the screening criteria to full notice and comment constitutes improper rulemaking. We appreciate MSHA's expressed intention to "obtain comment" for the screening criteria in the future. However, it is not clear if MSHA envisions this as full notice and comment or something short of the proper rulemaking process. It is unclear why, if MSHA plans to use notice and public comment to develop screening criteria, those criteria should not be included in the proposed rule now so that commenters can assess the entire program in the same rulemaking. We urge the agency to re-propose the rule and include the criteria it proposes to use in determining that a POV exists and give the affected parties adequate notice and opportunity to comment on the entire rule.

IMA-NA appreciates and supports MSHA's proposal to eventually provide the POV criteria on MSHA's website in an accessible format that will allow mine operators to determine how a particular mine's record compares with the POV criteria. However, promising to make the criteria available later and potentially committing to "obtain comment" does not substitute for putting the criteria in the rule and allowing notice and public comment on the criteria along with the rest of the rule of which the criteria are an integral part. Furthermore, there needs to be an opportunity for commenters to see how those criteria were developed, and the basis for them, in order to fully evaluate the proposal.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders.**

IMA-NA believes that the imposition of punitive sanctions based on "issued" citations for which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed would constitute a denial of an operator's constitutional right to due process.

We understand MSHA's concern that delays in the adjudicative process on individual citations may hamper MSHA's ability to use POV as a timely tool to address current problems, particularly in light of the backlog of cases at the Federal Mine Safety and Health Review Commission in recent years. Certainly we do not support any operator hiding behind delays in the adjudicative process to avoid making necessary corrections to assure safe working conditions for miners. We do not believe that that is the reason why, in the vast majority of cases, operators decide to contest citations. We believe that MSHA has tools currently available to it to assure that miners' safety is protected, without violating operators' due process rights. Furthermore we, along with others, have suggested steps that we believe that MSHA could and should take to address the backlog issue.

The proposed rule not only removes the due process protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV notification that allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed, there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not

3

been subject to any opportunity for a hearing or other procedural protections required by due process considerations.

It is certainly clear to our members, and we assume that it also is clear to MSHA, that inspectors are not infallible when they write citations. It should not be necessary here to give examples of citations that were written as "S&S" or as an elevated action under section 104(d), section 104(b), section 104(g), or section 107(a) of the Mine Act that subsequently were vacated or reduced in severity or negligence upon further review either by MSHA or by the Commission. Depending again on the criteria that MSHA would use to determine POV, a single "bad" inspection could trigger a closure order of a portion or all of a mine under POV for an extended period of time, without the operator having had any opportunity to contest the validity of the citations or their alleged seriousness.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

One of the reasons that IMA-NA believes it is necessary to include the actual criteria for POV in the proposed rule is that, as currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.

The proposed rule (Section 104.2 (a)) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically. The proposed rule also states an eighth factor: "mitigating circumstances." Our concern with that factor being included would be less but for the discussion of what MSHA intends by that term in the preamble to the proposed rule: "Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance." (76 FR 5721; February 2, 2011).

MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71. MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management program from being made arbitrarily at the District level.

The proposed rule also is confusing in that regulatory text reads as though POV status would be "automatic" if criteria (to be published on the MSHA website) are met. Section 104.3 states that "[w]hen a mine has a pattern of violations, the District Manager *will* issue a pattern of violations notice…." [Emphasis added]. However, the last criteria, and the discussion about it in the preamble to the proposed rule, suggests discretion on the part of MSHA (the District Manager?) to consider other factors before determining whether a POV notice is necessary.

A less confusing, more straightforward approach would be to retain the current POV program's "two step" process of notifying mine operators of "proposed" pattern of violations, and then, as is currently the case, providing an opportunity for the mine operator and MSHA to consider mitigating circumstances, including agreement on a remedial plan. We would encourage MSHA

4

not to eliminate the current two-step process for those mines meeting whatever numerical criteria for POV are eventually established.

As the proposal now stands, the agency can make a unilateral decision based on unknown and arbitrary criteria to place a mine under POV, without any procedural protections in place to allow an operator to seek review or reconsideration of such decision. This is simply unacceptable.

## Conclusion

We commend MSHA on embarking on an effort to improve the POV program. However, by not including the criteria for POV in the proposed rule, and eliminating all procedural safeguards against erroneous or arbitrary imposition of POV findings, MSHA has made it impossible for our association and our members to assess and be able to comment on or support the program as a whole. We request that MSHA re-propose the rule and include the criteria that it plans to use. We also request that MSHA address the concern about the lack of due process that may occur under the rule as proposed. Finally, we request that MSHA re-institute the "proposed" POV under the new rule in order both to clarify the procedure and to allow the mine operator an opportunity to show mitigating circumstances before POV sanctions automatically would go into effect.

IMA-NA is pleased to have had the opportunity to comment on MSHA's proposed rule on Pattern of Violations and it stands ready to assist in developing an effective rule in a constructive manner. Please do not hesitate to contact me should you have any questions, comments or suggestions regarding this matter.

Sincerely,

Mark G. Ellis
President

2011 Pennsylvania Avenue, NW, Suite 301, Washington, DC 20006 | 202-457-0200 | fax 202-457-0287 | www.ima-na.org
Comment Page 00910



2011 APR -1 A 9



P.O. Box 326
Frankfort, KY 40602
Phone: Toll Free 888-234-5272 or 502-223-2379
Fax: 502-223-2370

# Fax

| | | | |
|---|---|---|---|
| **To:** M4HA | | **From:** RON GIZAY | |
| **Fax:** 202-693-9441 | | **Date:** 4/1/11 | |
| **Phone:** | | **Pages:** 4 | |
| **Re:** RIN 1219-AB73 | | **CC:** | |

☐ **Urgent** ☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Recycle**

•**Comments:**

AB73-Comm-21



2011 APR -1 A 9: 30

March 31, 2011

U.S. Mine Safety and Health Administration
Office of Standards, Regulations and Variances
100 Wilson Boulevard, Room 2350
Arlington, VA 22209-3939

RE: RIN 1219-AB73
       Proposed Rule, Pattern of Violations

To Whom It May Concern:

The Kentucky Crushed Stone Association, Inc. (KCSA) is pleased to be allowed to offer
the following comments on behalf of the aggregates industry in Kentucky. KCSA
represents thirty-one (31) producer members with over 100 crushed stone, sand, and
gravel operations. We believe our industry has demonstrated a commitment to worker
safety and health by falling rates of injury and illness.

KCSA would hope that any changes made to the Mine Act's Pattern of Violations (POV)
provision would target mine operators that have repeatedly failed to live up to their
obligations to provide their employees with a safe place to work.

KCSA is concerned about deficiencies in the POV proposal and would request that
MSHA address these deficiencies in a revised proposal that allows operators a fair
opportunity to comment on the proposed POV program. This rulemaking proposal should
include public hearings.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what
criteria will be used to determine whether a POV exists. Yet MSHA asks for comments
on the program without having disclosed those criteria, except in very general terms.
(Sec. 104.2) It is thus very difficult if not impossible for those commenting on the
proposed rule to be able to thoroughly understand and assess the proposed program.
MSHA must re-propose the rule to include the criteria it proposes to use in determining
that a POV exists, in order to give the affected parties adequate notice and opportunity to
comment on the rule.

Kentucky Crushed Stone Association, Inc.    •    119 W. Broadway    •    P.O. Box 326    •    Frankfort, KY 40602
Phone: 502-223-2379   •   FAX: 502-223-2370

Comment Page 00912

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-7 Filed: 08/10/16 Page: 193 of 208  PAGEID #: 2188

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. KCSA has not seen what MSHA has determined to be "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

We appreciate the opportunity to comment on the Proposed Rule regarding Pattern of Violations.

Sincerely,

Ronald H. Gray
Executive Director

**From:** Ballou, Tom [mailto:tbballou@SherwinAlumina.com]
**Sent:** Friday, April 01, 2011 4:28 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** Public hearing
**Importance:** High

2011 APR -1  P 4: 30

I am hereby requesting that MSHA hold a public hearing, preferably a series of public hearings in the various regions, on the Pattern Of Violations Rule.

Sincerely,

**_Tom Ballou, Jr._**
_Sherwin Alumina Company_
_P.O. Box 9911_
_Corpus Christi, TX 78469_
_ofc 361-777-2352; fax361-777-2684_
_cell 361-232-7575/361-549-6795_

AB73- COMM-22

**From:**    lweblaster@aol.com
**Sent:**    Friday, April 01, 2011 5:08 PM
**To:**      zzMSHA-Standards - Comments to Fed Reg Group       2011 APR -1  P 5:20
**Subject:** (no subject)

I am absolutely opposed to this rule change as being unconstitutional and a means for MSHA to consolidate it
overreaching  authority over mine operators.

Christopher M. Hyle
109 Star Lane
Butte, MT. 59701

AB73-COMM-23

**From:** Dossey, Randy (Four Corners Materials) [mailto:randy.dossey@4cornersmaterials.com]
**Sent:** Friday, April 01, 2011 3:52 PM
**Subject:** MSHA (POV)

2011 APR -1 P 4: 30

Piling injustice on insult, MSHA's pattern of violations (POV) proposal would strip affected mines of their constitutional due process rights to challenge POV-contributing violations. Adding injury to the mix, the proposal would provide no redress whatsoever if eventually the mine proved it should never have been subject to the harsh POV sanction in the first place. We know of no other example within the federal government of such an egregious attempt at abuse of power. If a mine is patterned unjustifiably, MSHA can duck out the back door unscathed, while the operator is left with trying to pick up the pieces of its broken business. "POV status could well be a 'death sentence' for a large underground mine." The context was his argument that MSHA needed to normalize its criteria to account for mine size to avoid unfairly discriminating against larger operations. The Agency also had the audacity to encourage operators nearing POV status to develop safety and health management plans. Here again, no criteria are set forth, other than that MSHA expects to see "a process and program with measurable benchmarks for abating specific violations." Even though MSHA cannot or will not say what such a plan must entail, the Agency is proposing it be given authority to approve or disapprove such plans. In its submittal, the Methane Awareness Resource Group (MARG) described this mandate as an illegal 'end run' around proper rulemaking procedures.

MSHA's POV proposal is an insult, and injustice. If this rule goes through as proposed, it will be tantamount to a game being imposed on operators by an opponent with a rulebook they have not been allowed to see before the contest begins. As the match proceeds, MSHA is permitted to change the rules as it deems fit. Operators will have no redress until after the game is over, the score posted, and the other side inevitably proclaimed the victor. Only after the 'loser' finds its reputation damaged, its stock price depleted and its very survival threatened is it permitted to seek review of its opponent's actions before an impartial panel. Even if the ruling is favorable, the victory will be hollow because the cost of litigation is high and no restitution is possible.

Randy

Comment Page 00917

AB73-COMM-24

**From:** Mark Eslinger [mailto:m.eslinger@blackpantherminingllc.com]
**Sent:** Monday, April 04, 2011 7:36 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR -4 A 9:00

Please find attached my comments on the proposed Pattern of Violations rule.

Mark O. Eslinger

AB73 - CMM - 25

# MSHA RIN 1219-AB73

**Pattern of Violations**

**The following comments are submitted by:**

**Mark O. Eslinger, P.E., General Safety Manager**

**Five Star Mining, Inc.**          **Black Panther Mining, LLC**
**6594 West State Road 56**          **12661 North Agricare Road**
**Petersburg, IN 47567**          **Oaktown, IN 47561**
**812-354-6883**          **812-745-2920**

### Sec. 104.1 Purpose and scope.

This part establishes the criteria and procedures for determining whether a mine operator has established a pattern of significant and substantial (S&S) violations at a mine. It implements section 104(e) of the Federal Mine Safety and Health Act of 1977 (Act) by addressing mines with an inspection history of recurrent S&S violations of mandatory safety or health standards that demonstrate a mine operator's disregard for the safety and health of miners. The purpose of the procedures in this part is the restoration of effective safe and healthful conditions at such mines.

### Sec. 104.2 Pattern criteria.

(a) Specific pattern criteria will be posted on MSHA's Web site at http://www.msha.gov and used in the review to identify mines with a pattern of S&S violations. The review will include:

(1) Citations for significant and substantial violations;

(2) Orders under section 104(b) of the Act for not abating significant and substantial violations;

(3) Citations and withdrawal orders under section 104(d) of the Act, resulting from the operator's unwarrantable failure to comply;

(4) Imminent danger orders under section 107(a) of the Act;

(5) Orders under section 104(g) of the Act requiring withdrawal of miners who have not received training and who the inspector declares to be a hazard to themselves and others;

(6) Enforcement measures, other than section 104(e) of the Act, which have been applied at the mine;

(7) Other information that demonstrates a serious safety or

## MSHA RIN 1219-AB73
## Pattern of Violations

### Mark O. Eslinger, P.E., General Safety Manager, Five Star Mining, Inc., Black Panther Mining, LLC

health management problem at the mine such as accident, injury, and illness records; and
    (8) Mitigating circumstances.

*Comment:  Stating that the "Specific pattern criteria will be posted on MSHA's Web site" gives no indication of what the criteria will be.  This proposed section does list things that will be considered but does not give any indication of what criteria an operator will be judged against.  The specific criteria need to be part of the proposed rule so that mine operators will afforded the opportunity to comment on the proposed criteria.  An operator must know what criteria the mine is being judged against.  Additionally, if the criteria only need be posted on MSHA's website, the criteria can change any time that the Mine Safety and Health Administration (MSHA) wishes to change the criteria.  Thus, the rule can change without MSHA going through the proper rule making process.  The rule is open ended.*

*Citations and orders used in determining the whether a mine should be put on a Pattern of Violations (POV) must be final.  A mine operator must be afforded the opportunity to contest citations and orders that the operator deems invalid before being considered in deciding whether the operator should be put on a POV.*

    (b) At least two times each year, MSHA will review the compliance and accident, injury, and illness records of mines to determine if any mines meet the criteria posted on MSHA's Web site.

### Sec. 104.3 Issuance of notice.

    (a) When a mine has a pattern of violations, the District Manager will issue a pattern of violations notice to the mine operator that specifies the basis for the Agency's action. The District Manager will also provide a copy of this notice to the representative of miners.
    (b) The mine operator shall post a copy of the notice on the mine bulletin board. The notice shall remain posted at the mine until it is terminated under Sec. 104.4 of this part.
    (c) If, on any inspection within 90 days after issuance of

**MSHA RIN 1219–AB73**
**Pattern of Violations**

### Mark O. Eslinger, P.E., General Safety Manager, Five Star Mining, Inc., Black Panther Mining, LLC

the pattern notice, an authorized representative of the Secretary finds any S&S violation, he shall issue an order for the withdrawal of all persons from the affected area, except those persons referred to in section 104(c) of the Act, until the condition has been abated.

(d) If a withdrawal order is issued under paragraph (c) of this section, any subsequent S&S violation will result in a withdrawal order that shall remain in effect until the authorized representative of the Secretary determines that the violation has been abated.


**Sec. 104.4 Termination of notice.**

(a) Termination of a section 104(e)(1) pattern of violations notice shall occur when an MSHA inspection of the entire mine finds no S&S violations, or if no withdrawal order is issued by MSHA in accordance with section 104(e)(1) of the Act within 90 days of the issuance of the pattern notice.

(b) The mine operator may request an inspection of the entire mine or portion of the mine. No advance notice of the inspection shall be provided, and the scope of inspection shall be determined by MSHA. Partial mine inspections-covering the entire mine within 90 days shall constitute an inspection of the entire mine for the purposes of this part.


*Comment:  If termination of a section 104(e)(1) pattern of violations notice occurs only when an MSHA inspection of the entire mine finds no S&S violations it will be almost impossible to get off the POV.  Very few, if any, large underground coal mines go through an entire E01 Regular Inspection and receive no Significant and Substantial Violations.*

March 25, 2011

2011 APR -4 A 10:31

Neal Merrifield
Office of the Administrator
1100 Wilson Blvd. Room 2470
Arlington VA 22209-3939

Mr. Merrifield,

It has come to my attention that MSHA is suggesting new interpretations on Patterns of Violations.

I believe that MSHA needs to provide the criteria for POV in order to adequately assess the rule. One of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenter's on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

MSHA needs to explain how vacated citations/orders will affect POV status.

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if -due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB 73-COMM-26

MSHA should clarify the proposed rule's provisions on mitigating circumstances.

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically. The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety ad health management programs. " MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71. MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considerers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management program from being made arbitrarily.

Finally, any change in legislation that imposes a further burden on citizens should require a public hearing.

Sincerely,

Jerry Davidson

J. Davidson and Sons Construction Co. Inc



# ALASKA MINERS ASSOCIATION, INC.

3305 Arctic Blvd., #105, Anchorage, Alaska 99503 • 907) 563-9229 • FAX: (907) 563-9225 • www.alaskaminers.org

2011 APR -4 P 3: 46

April 4, 2011

MSHA                                                    FAX 202-693-9441
Office of Standards, Regulations, and Variances
1100 Wilson Blvd., Room 2350
Arlington, VA 22209-3939                                MSHAcomments@dol.gov

RE: **RIN 1219-AB73** MSHA Comments on Proposed Rule on "Pattern of Violations"

Thank you for the opportunity to comment on the proposed rule entitled "Pattern of Violations" (POV). The Alaska Miners Association (AMA) is a non-profit membership organization established in 1939 to represent the mining industry.  The AMA is composed of more than 1200 individual prospectors, geologists and engineers, vendors, small family miners, junior mining companies, and major mining companies.  Our members look for and produce small gold, silver, platinum, diamonds, lead, zinc, copper, coal, limestone, sand and gravel, crushed stone, armor rock, etc.  Many of our members operate small, family operated placer mines, gravel pits and quarries.  All of our members are concerned about how the proposed rule will affect them and in some cases their very ability to continue in business.

**Background:**
Alaska's current mining industry consists of 3 underground and two surface hardrock mines each with 200 to 550 employees,  one surface coal mine employing 130, approximately 120 active rock quarries and sand and gravel operations, and approximately 200 small mechanized placer and suction dredge gold mines.  The majority of the placer mines are small family- wned and operated, and employ three or fewer individuals.  Total direct mine (FTE) employment in Alaska is estimated to be 3500 with an additional 2000 jobs indirectly attributed to the industry.  Most of the placer mines operate seasonally and many are in remote regions of Alaska with little infrastructure (roads, communication, power, etc.) available.

**We have several major concerns with  the proposed rule:**

- **MSHA has lost its way.**  <u>MSHA is no longer focused on the health and safety of mine workers</u> and this current proposed rulemaking on pattern of violations is just one more example.  <u>MSHA's primary focus is now to penalize companies.</u>  MSHA betrays this fact on a routine basis by their actions, comments and attitudes.  We frequently receive reports from large and small mines like the following:
  - If inspectors do not write "enough" citations they are taken back to the mine by their supervisors, and sometimes district managers, and the supervisors and managers write citations to prove to the negligent inspector that he had not done his job.
  - Some inspectors carry a huge chip on their shoulder and are intoxicated with the power that they have to order others around.
  - On occasion inspectors will not communicate with the mine operators and have told them to "shut up", "if you do not like it you can appeal it."  And then MSHA tells the Congress that the rules for appealing citations are too lax and that companies are abusing the appeal process.
  - In some cases inspectors have not allowed mine officials to brief them on items such as mine policies and new traffic patterns before the inspector goes into the mine.

1

AB 73-Comm-27

- MSHA inspectors in some cases will tell you that they are under tremendous pressure to issue citations, citations, citations. They will also tell you that morale in the agency is terrible and if they could find a job somewhere else they would leave.
- The presence of multiple MSHA inspectors, and/or inspectors on site over extended periods of time (sometimes every day for several weeks, including weekends), in and of itself results in a serious safety hazard. During such inspections the focus of everyone at the mine is on the inspectors, not on safety. Furthermore, the mine supervisors and safety personnel are dedicated to accompanying the inspectors and this detracts from their jobs. The result is that employee safety is compromised during such inspections.
- If MSHA was truly interested in improving health and safety, it would propose rules to decrease the inspection frequency at mines with the best safety records and propose rules that would reward companies for no lost time accidents.

- **The proposed rule gives MSHA too much power and lacks opportunity for redress by companies.** The proposal to use non-final citations and orders to identify mines with a pattern of violations has the effect of establishing a new standard: "guilty until proven innocent" with the additional caveat that even if you are innocent you will have already suffered the consequences of being guilty without recourse. Despite MSHA data that indicates less than 1% of the citations are reversed, reversals do occur.

- **Mines operating in remote areas of Alaska will not be unable to access the MSHA on-line data bases on a timely basis to track their pattern of violations.** MSHA should continue to provide written notification to mines in danger of establishing a "pattern of violation" unless a company requests that it not be sent.

- **Many of the small mines in Alaska (typically 1-3 person operations) lack the expertise and resources to develop mine health and safety plans.** MSHA trainers in Alaska do have generic plans that offer a starting point. However, they are not site specific and may not pertain directly to the types of mining being conducted (such as suction dredging in marine and fluvial environments, operating in extreme cold, etc.). We suggest that a working group consisting of MSHA certified trainers, MSHA personnel, and industry representatives be established to develop applicable health and safety plans that would address these unique conditions. Short courses could be provided at AMA conventions to assist small miners in complying.

- **The Termination of Notice procedure will be difficult to implement for small mines in Alaska.** The seasonal nature and remote locations of many operations will make it unfeasible if not impossible to conduct follow-up inspections.

- **AMA believes that the proposed action is both an economic and regulatory significant action as it will negatively and selectively affect much of the small-scale mining sector in Alaska.**

- **Increasing the frequency of MSHA visits to 2 per year will be costly and difficult in Alaska due to mine locations in remote areas, weather patterns, and the seasonal nature of the operations.**

- **Compliance Costs.**
  - 104.3(c) requiring MSHA to issue an order withdrawing all persons from the affected area of a mine if any S&S violation is found within 90 days after the issuance of the POV notice is not logical. The general public has the right to access public lands and waters

2

including those falling within claim boundaries so long as they do not interfere with the mining operation. Suction dredge operations occur on waterways that are also used by rafters and kayakers. Other operations are located adjacent to recreational trails used by hunters, hikers, ATV operators, etc.

o The average cost of developing and implementing an approved safety and health program ($22,100), if correct, is an unreasonable burden for many small mines.

o AMA believes the estimated cost to implement the proposed rule is too low. However, even if it is in the actual cost range, the onus of the cost will be born differentially by small mines and it will likely be put some small mine out of business due to the cost prohibitive nature of the rule.

o The proposed rule, based on MSHA calculations, would cost more than the threshold of 1% of revenues. Most placer mines in Alaska produce less than 200 ounces of gold/year and employ three or less. Even at current prices in the neighborhood of $1400/ounce ($1100/ounce of raw placer gold) 1% would be $2200. MSHA estimates the average implementation cost to be $22,100 which far exceeds the 1% threshold.

**Executive Order: 13175: Consultation and Coordination with Indian Tribal Governments.** Implementation of this rule could have impacts on Alaska Regional and Village Corporations, several of whom have royalty agreements with mining companies.

**Executive Order 13272: Proper Consideration of Small Entities in Agency Rulemaking.** We do not agree with the conclusion by MSHA that the proposed rule will not have a significant economic impact on a substantial number of small entities. The majority of the estimated 200 placer mines in Alaska would be negatively and substantially impacted economically.

Sincerely,

Steven C. Borell, P.E.
Executive Director

Cc:     Office of Information and Regulatory Affairs
        Office of Management and Budget
        New Executive Management Building
        Attention: Desk Officer for MSHA Re: **RIN 1219-AB73**
        725 17th Street N.W.
        Washington, D.C. 20503

        Senator Lisa Murkowski
        Senator Mark Begich
        Congressman Don Young
        Governor Sean Parnell

3

**From:** Ben Godwin [mailto:Ben.Godwin@OXBOW.COM]
**Sent:** Monday, April 04, 2011 4:46 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR -4 P 4: 46

These comments are directed to RIN 1219-AB73 Pattern of Violations

1. Although MSHA has listed pattern criteria that will be reviewed, there has been no publication of the specific criteria, i.e. the number of S&S citations, or the number in a certain period of time, or the number that have been marked fatal, etc. It is inappropriate to solicit comments on a program when that program has not been defined yet. MSHA is overreaching its authority when it proposes a law of such a vague nature. MSHA should establish the criteria in a more specific way and re-propose this rule and reopen a comment period.

2. MSHA needs to reinstate the requirement under Sec. 104.3(b) that only final orders and citation be used in determining POV status. To do otherwise is to eliminate the due process that protects citizens from the abusive power of the state. The proposed rule uses the backlog of cases as evidence that POV status would be hindered if only final orders were used in the criteria and MSHA has consistently blamed the backlog of cases on operators. In fact, the huge backlog has not always existed. MSHA has aided in creating this backlog by eliminating the conferencing process. MSHA has also trained instructors in Beckley to "check the highest degree of gravity so that there is room to negotiate later". MSHA inspectors have told operators "I don't know if it is correct or not, but you can conference it later". This arrogant, adversarial attitude does nothing to improve the health and safety of miners, it only creates more citations to be contested.

3. There is no mention of any system that would remove an operator from a POV status if citations or orders have been vacated or modified and the POV status is no longer valid. This is another reason that only final orders should be used. It would eliminate the false prosecution of operators.

Ben Godwin

AB 73 - COMM - 28



**KCA**

Kentucky Coal Association

*Leadership for the Coal Industry*

2011 APR -4 P 4:47

April 4, 2011

Ms. April Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re: RIN 1219-AB73; Comments on MSHA's Proposed Rule for Pattern of Violations

Dear Ms. Nelson:

The Kentucky Coal Association (KCA) would like to submit these comments to the Mine Safety and Health Administration (MSHA) regarding its proposed rule for "Pattern of Violations" (POV) under 30 CFR Part 104.

KCA is the state's leading organization dedicated to advancing the interests of the coal industry across Kentucky. KCA's member companies are drawn from throughout Eastern and Western Kentucky, from underground as well as surface producers. This diversity enriches the Association and allows it to build consensus as we work to resolve the complex problems confronting the 21st Century coal industry. Now, more than ever, the KCA is critical to maintaining the visibility of Kentucky's coal industry and, thereby, the economy of our Commonwealth.

KCA recognizes the importance of safety in the workplace. Kentucky has been mining coal for more than 175 years, and in that timespan mining has become a high-tech modernized industry. When analyzing data associated with Kentucky's coal mining industry, fatalities have dramatically decreased over the last several decades. In 1950, Kentucky recorded 81 deaths in mining, but in 2007 recorded only 2. Most importantly about 2007, Kentucky's underground coal mining sector recorded zero deaths for the first time. Please know that zero fatalities remain our goal.

In the current system established by Congress, the POV process can only be established after a "citation or order" has been adjudicated and a potential pattern of violation(s) is affirmed. The current process will be changed to allow for a mine operator to be found guilty of a specific MSHA violation before he/she has a chance to

---

340 South Broadway, Suite 100 ● Lexington, KY 40508-2553 ● 859.233.4743 ● FAX 859.233.4745 ● www.kentuckycoal.org

AB73- COMM- 29