# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OHIO COAL ASSOCIATION,** et al.,

    **v.**                                   Case No. 2:14-cv-2646

**THOMAS E. PEREZ,** et al.,

           Defendants.

**and**

**MURRAY ENERGY CORPORATION,**  Case No. 2:15-cv-448
et al.,

                              Judge Graham

          Plaintiffs,

                              Magistrate Judge Deavers

    **v.**

**THOMAS E. PEREZ,** et al.,

           Defendants.

## ADMINISTRATIVE RECORD

### PAGES 00929-01291

due process. This lack of appeal would give MSHA absolute power that creates a horrific legal quandary.

Under this new proposed rule, MSHA inspectors would be given the power to shut down an entire, or parts of an operation, at his/her own discretion. An inspector could concoct enough citations or orders to meet the criteria and establish a "Pattern of Violation." After an operation uses its appeals process and an administrative law judge vacates a previous citation or order, the company is still being punished as having a previous status of POV. In essence, the company is treated as a guilty defendant before a final judgment is issued.

Another damaging aspect of this proposed rule is deleting the requirement for an operation to receive written notice of MSHA's consideration that it might be placed on POV status. Currently, if an operation does receive a letter stating MSHA's perceived determination that it's under consideration to be placed on POV status, that operation then can evaluate and correct those designated citations. No prior notification would further eliminate an element of transparency by MSHA.

Unchecked federal authority will create a heightened level of uncertainty throughout the mining community. Under the proposed rule, an operation that is placed on POV status, will find no mechanism in place that allows them to dispute MSHA's finding. Furthermore, a ninety day window is created, in which any inspector that might find any significant and substantial (S & S) violation within that timeframe can/will issue an "order of withdrawal" for all individuals in a designated area and order cessation of operations at that time. In the current regulatory mindset of MSHA inspectors, it is regarded that all mine inspectors view most violations as S & S regardless of the situation. Hence, the likelihood that any operation could go ninety days without an S & S violation is highly unlikely.

The Kentucky coal industry always sees a need for improvement but that commitment always needs a high degree of transparency from those regulatory agencies that monitor all activities. The Fifth Amendment under the U.S. Constitution defines a level of checks and balances and this proposed rule is viewed as an encroachment of individual/property rights. This level of security afforded by the Constitution is sometimes referred to as unalienable rights. This due process afforded to every individual would be greatly diminished under the proposed rule. The current POV rule allows for mediation during the process and to do away with that would empower the executive branch with unchecked power. This is unacceptable.

In conclusion, the mining community does believe that more power should be allotted to the Department of Labor. The laws and regulations set forth by the United States Congress are sufficient to maintain and regulate all coal mining in the United States. Coal mining had an unfortunate tragedy in 2010. But industry experts state that MSHA already possesses the power to shut down a mine if an "imminent danger" is deemed present. And the current backlog of cases currently being adjudicated is a greater hindrance versus MSHA needing additional executive powers.

In Kentucky, we currently have more than 17,000 miners employed in our industry, and for every one job created three are created indirectly. The coal industry in Appalachia has been drastically hampered by the Federal regulatory uncertainty created during the last three years by the EPA. Coal mining permits have been trickling through but most are still caught in a regulatory blackhole, which stifles production. Ultimately, our goal is a continued level of cooperation between industry employees and those regulators at the state and federal level. MSHA's new proposed rule on POV moves everyone in the wrong direction. It creates a further exacerbating opinion that the administration in Washington D.C. is trying to slowly bankrupt the Appalachian coal industry by adding additional regulations. KCA believes this new rule is a major step in the wrong direction.

Sincerely,

Bill Bissett
President
Kentucky Coal Association



*2011 APR -4 P 4: 41*

**Coal Operators & Associates, Inc.**
**PO Box 3158**
**Pikeville, KY 41502-3158**
**Phone 606-432-2161**
**Fax 606-432-2162**

April 4, 2011

Ms. April E. Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re:    **RIN 1219-AB73: Comments on MSHA's Proposed Rule for Pattern of Violations**

Dear Ms. Nelson:

Coal Operators & Associates, Inc. (COA) is pleased to offer the following comments to the Mine Safety and Health Administration (MSHA or "Agency") concerning its Proposed Rule for Pattern of Violations under § 104(e) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 801, 814(e).

COA is a trade association in Eastern Kentucky that includes the producers of most of the regions coal; the manufacturers of mining processing machinery, equipment and supplies; and the engineering and consulting firms, financial institutions and other firms serving the mining industry.  The issues discussed in this Proposed Rule are of extreme importance to COA's members, as our member companies are subject to the regulations promulgated pursuant to the Mine Act, and mine operators are significantly impacted by any alterations to the existing regulatory scheme.

COA recognizes the importance of the pattern of violations (POV) sanction to the effective enforcement of the Mine Act, and supports the goal of improving transparency and simplifying the POV process both in terms of agency implementation and stakeholder understanding.  However, as proposed, this rule would instead make the POV process less transparent and more complex while

*AB73-COMM-3 Q*

depriving mining companies of their right to due process under the law. In light of the fact that the POV sanction is among the most potent enforcement tools that MSHA has under the Mine Act, the Agency must utilize it so as to protect the health and safety of miners while still ensuring that mine operators receive fair treatment and due process.

## I. The Proposed Regulation Violates the Principles of Due Process and Fundamental Fairness

### a. The Current POV Process

Currently, 30 C.F.R. § 104.3(b) states that only citations and orders that have become final shall be used to identify mines with a potential pattern of violations. The proposed rule changes this approach, which has been followed since 1991, and instead allows POV determinations to be based on "violations issued." For purposes of POV calculations, then, an operator will now be presumed guilty as soon as an inspector accuses him of violating an MSHA regulation. The proposed rule also deletes those provisions granting prior warning to mine operators before the issuance of a pattern notice, and fails to proscribe a means by which operators can present mitigating factors and, where possible, develop a plan with MSHA to avoid the imposition of this onerous sanction. MSHA claims these changes are necessary in light of the large backlog of contested violations pending before the Federal Mine Safety Health Review Commission ("Commission"), and, according to MSHA, only a fraction of such contested violations get vacated or modified to non-significant and substantial (S&S). MSHA argues that because of this backlog, the final order and notice provisions contained in the current rule hinder enforcement and do not allow the Agency to review a mine's complete recent compliance history.

As an initial matter, COA disagrees with MSHA's characterization of the current POV process, as well as its rationale for changing the criteria upon which POV status may be based. It is well understood in administrative law that federal agencies at different times exercise executive, legislative and judicial powers. In other words, federal agencies are the judge, jury and executioner in the promulgation and enforcement of federal regulations. Given this powerful leverage MSHA has over mine operators, it seems particularly unfair for MSHA to then bypass legitimate challenges to alleged citations and impose admittedly the most onerous enforcement action under the Mine Act before a finding of guilt is made. Indeed, MSHA's primary justification for this change is the Agency's need to circumvent the normal adjudicatory process to permit the Agency to consider backlog cases as part of a mines history for POV purposes. Unfortunately, the Agency has contributed to the backlog by eliminating the conference process and leaving operators with no choice other than the formal hearing process before the Commission. Given this understanding, it is therefore difficult to see any justification for MSHA responding to the slow operation of the adjudicatory

system by denying mine operators their fundamental right to be heard before being sentenced.

Furthermore, MSHA's claim that only a fractional number of contested violations are vacated or modified is both inaccurate and irrelevant. According to information released by MSHA's Office of Assessments on January 31, 2011, almost 20 percent of violations issued as S&S, which were litigated in fiscal years 2009 and 2010, were vacated or modified to "non-S&S" as a result of the litigation process. Similarly, when § 104(d) violations, which alleged an "unwarrantable failure" to comply, were litigated in the same period, almost 33 percent of those violations were either vacated or modified to a § 104(a) violation. Clearly, then, relying on "violations issued" to impose the punitive sanction of § 814(e) of the Mine Act could well result in erroneous application of the pattern enforcement mechanism. Moreover, as discussed in greater detail below, because the proposal is silent on the number of violations that it will take to establish a POV, it is likely that almost any margin of error could result in multiple mines being erroneously subjected to this stringent penalty. MSHA's reliance on this statistic, therefore, does not address the serious concern of mines being mistakenly placed on the pattern of violations list.

There is also a very real possibility of MSHA erroneously tabulating a mine's inspection history. The Office of Inspector General of the U.S. Department of Labor (OIG) recently reported on the accuracy of MSHA's efforts to screen mines for POV sanctions. During the five POV screenings performed from 2007-2009, MSHA district managers sent potential POV letters to 68 mines. Following the completion of the evaluation period provided by the current 30 C.F.R. Part 104, those same district managers recommended that 9 mines be given a POV notice. However, upon further evaluation of the underlying violations by MSHA attorneys or review by the Federal Mine Safety and Health Administration, the Agency determined that 6 of the 9 mines (66 percent) no longer met the POV criteria.

Additionally, the same Inspector General's report found that MSHA's POV computer application used from 2007 to 2009 generated unreliable results on each of the five occasions it was used to screen for POV status. For example, OIG found that on all five occasions the MSHA application contained a value which could have caused a vacated citation to be counted as a valid final citation. As a result, the program could have over-counted citations for a specific mine. Similarly, citations and orders which had been issued to a prior owner of a mine could be associated with the current owner, resulting in an over-count of citations. The program was also found to incorrectly sum two columns that represented "unwarrantable failure" orders in such a manner as to incorrectly include a mine that did not meet the screening criteria for S&S § 104(d) final orders.

Finally, in the absence of any independent review, the risk of an erroneous application of the pattern notice and resulting withdrawal orders may be

increased by MSHA's failure to provide its journeyman inspectors with periodic retraining. Lack of periodic retraining reduces the assurance that MSHA mine inspectors are adequately trained to conduct their duties and properly apply classifications, such as S&S and "unwarrantable failure," to violations they encounter. According to the OIG, 56 percent of MSHA journeyman inspectors did not attend the required refresher training in FY 2006 or 2007.[1] Moreover, MSHA training records show that 65 percent of the MSHA journeyman inspectors who failed to attend the required retraining sessions in FY 2006 or 2007 had still not completed retraining by the end of fiscal year 2009.[2] Over 27 percent of the 264 journeyman inspectors who responded to the OIG's survey stated that MSHA did not provide them with the technical training they needed to effectively perform their duties.[3]

The information above indicates that the POV rule should not be altered in the manner proposed, as MSHA has shown no adequate justification for these substantial changes. Not only does MSHA point to operational issues of its own hearings system as reason to deny notice and meaningful opportunity to be heard to mine operators, but MSHA also bases its changes on the false assumption that citations are rarely issued in error, and that contested violations are infrequently overturned or modified. Inspectors are not always right. Indeed, the above data belies the publicly articulated belief of the Agency that some mine operators contest enforcement actions to avoid pattern notices. There are clearly a number of legitimate legal reasons to administratively challenge enforcement actions, which is a statutory right granted by the Mine Act, and those challenges have been frequently met with success. For these reasons alone, MSHA should not adopt the proposed changes to the POV rule.

### b. The Fifth Amendment's Guarantee of Due Process of Law

Perhaps even more importantly, the proposed rule clearly runs afoul of the Constitutional right to due process. The Fifth Amendment of the U.S. Constitution guarantees, in relevant part, that "[n]o person shall be…deprived of life, liberty, or property, without due process of law…" The use of "violations issued" to trigger the POV punitive sanction absent a meaningful opportunity for prior independent review or hearing, as well as the proposed rule's elimination of notice provisions, deny mine operators this Constitutional right to notice and the opportunity to be heard.

When considering due process issues, courts "must determine whether [a party] was deprived of a protected interest, and, if so, what process was his due…"[4] It is clear in the case of the POV sanction that shutting down a mining

---

[1] *Journeyman Mine Inspectors Do Not Receive Required Periodic Retraining*, DOL OIG Report, Mar. 10, 2010, o. 6.
[2] *Id.* at p. 7.
[3] *Id.* at p. 3.
[4] *See, e.g.,* Logan v. Zimmerman, 455 U.S. 422.

operation amounts to a substantial deprivation of property – both physical property as well as the economic benefits that accrue from mining operations – deserving of Fifth Amendment protections.[5] Mine operators, therefore, must be afforded due process protections in the adopted regulatory POV scheme.[6]

In determining what process is sufficient to satisfy the due process guarantee of the Fifth Amendment, courts have routinely held that "there can be no doubt that at a minimum [the words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."[7] The Supreme Court has also stated that "process which is mere gesture is not due process."[8] Although the exact procedure needed to satisfy due process changes with context, the Supreme Court has held that the extent of prior evidentiary hearing required before a deprivation of property occurs is determined by three factors: 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used; and 3) the government's interest.[9]

As discussed above, the private interest affected in this instance is the ability of a mine operator to manage a mine free from interference by federal officials. This is a substantial interest which, under the proposed POV regulations, MSHA would be permitted to deny without *any* prior hearing. Furthermore, as already shown in detail above, the risk of erroneous deprivation of that property interest is significant given the potential for mistaken issuance of citations and POV calculations.[10] This risk is exacerbated by the fact that even a relatively small number of mistakes on the part of MSHA inspectors can result in mines being erroneously placed in POV status.

---

[5] Licenses of multiple types have been held to constitute property warranting due process protections by the courts. *See, e.g.*, Bell v. Burson, 402 U.S. 535 (Supreme Court held that the state violated a motorist's due process rights by denying him a meaningful prior hearing before suspending his driver's license); Dixon v. Love, 431 U.S. 105 (Supreme Court held that a truck driver could have his license suspended or revoked prior to an administrative hearing where that revocation was based on final convictions of traffic offenses and where a full administrative hearing was available within 20 days of the revocation).

[6] *See, e.g.* Goss et al. v. Lopez et al., 419 U.S. 565 ("In determining 'whether due process requirements apply in the first place, we must look not to the weight but to the nature of the interest at stake'…the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, 'is not decisive on the basic right' to a hearing of some kind. The Court's view has been that as long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause.")

[7] Mullane v. Central Hanover Bank & Trust Co. et al., 339 U.S. 306. *See also* Grannies v. Ordean, 234 U.S. 385, 394 ("The fundamental requisite of due process of law is the opportunity to be heard").

[8] Mullane v. Central Hanover at _____.

[9] Matthews v. Eldridge, 424 U.S. 319.

[10] *See also, e.g.*, Goss et al. v. Lopez et al., 419 U.S. 565 (In addressing a school disciplinary process, the Supreme Court stated that "…the concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case…the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against…The [Due Process] Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct…").

The final factor utilized in determining what process is required to satisfy procedural due process is the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would impose. Unquestionably, the government has a substantial interest in seeing that the enforcement scheme found in § 104(e) of the Mine Act is successfully implemented. However, even in the face of such a compelling government interest, due process must be afforded to those parties directly affected by government action. Indeed, Congress, while routinely recognizing the importance of MSHA's mission, nevertheless established an enforcement scheme in the Mine Act that specifically grants mine operators the right to contest the issuance of any citation, order or proposed civil penalty within 30 days of its issuance. The proposed rule, however, while maintaining the right to contest a citation, grants the Agency authority to impose the most severe enforcement tool provided for under the Act long before the mine operator has a chance to be heard. Such a system cannot possibly afford adequate procedural protections to mine operators.

MSHA's actions are particularly unwarranted given the fact that the POV sanction is not a tool designed to address emergency situations. While it is true that courts have found exceptions to the general requirement of prior notice and a hearing in emergency situations where a significant government interest justifies delay of a hearing until after the seizure of property rights, no such exception exists in the case of POV violations. Congress has empowered MSHA with ample authority to protect the health and safety of miners in emergencies under the Mine Act. Section 107(a) gives MSHA authority to close a mine without a prior hearing whenever an "imminent danger" exists. These imminent danger orders remain in effect until the "...condition or practice which caused such imminent danger no longer exist[s]." 30 U.S.C. § 817(a). In addition, MSHA can seek a temporary restraining order, temporary injunction and permanent injunction in the appropriate federal district court whenever "...the Secretary believes that the operator...is engaged in a pattern of violation of the mandatory health or safety standards of this Act, which in the judgment of the Secretary constitutes a continuing hazard to the health or safety of the miners." § 108(a)(2); 30 U.S.C. § 818(a)(2). In light of such ample authority to stop operations at dangerous mine sites, MSHA may not then dispense with the notice and hearing procedures during the § 104(e) POV process in a manner contrary to due process and the statutory enforcement scheme of the Mine Act.

The important private interest at stake, the high likelihood of erroneous deprivation of that property interest and the compelling but non-emergency government interest involved all lead to the conclusion that MSHA must provide notice and a hearing to mine operators before imposing a POV sanction. To do otherwise would violate the Fifth Amendment's guarantee of due process under the law.

## II. The Final POV Rule Must Ensure that Mine Operators Receive Adequate Notice and a Fair Opportunity to be Heard

### a. POV Sanctions Should be Based Only on Final Orders, and MSHA Should Retain the Notice Provisions Contained in the Current POV Rule

COA finds MSHA's own previous due process considerations during the POV rulemaking process informative on the issue of what notice and hearing provisions should be included in the POV regulations. In the publication of the current version of the POV Final Rule, MSHA stated that "in order to avoid inequities regarding which mines are placed on a pattern, *the Agency must make ample provision for due process* when applying the broad framework established by Congress...MSHA will consider *only final citations and orders* when identifying mines with a potential pattern of violations." 55 Fed. Reg. 31129, July 31, 1990 (emphasis added).

Additionally, MSHA reasoned that "the initial screening factors are coupled with procedures affording parties *full and fair notice* of the Agency's initial determination that a potential pattern may exist at a mine. Application of these procedures will ensure that operators are made aware well in advance of the circumstances giving rise to the issuance of a pattern notice and will have a *reasonable opportunity to address these circumstances*...A number of commenters stated that fairness requires prospective application of the initial screening process. The Agency agrees." *Id.*

The Assistant Secretary himself, in his capacity as Administrator for safety and health at the United Mine Workers of America (UMWA), commented on the importance of the notice provisions contained in the current POV Rule. In his letter to MSHA regarding the proposed version of the current POV Rule, Asst. Sec. Main stated that "all mines which are under review for potential pattern of violations...shall be given notice to that effect by the Agency...This notice is designed to give operators the opportunity to take concrete actions to improve the citation history at the mine and to implement a remedial plan. MSHA should evaluate these [and] similar company efforts to correct a pattern of violations when the pattern notice conference is held." He further stated that "when MSHA determines that a mine under review is subject to a pattern notice, the Agency should inform the operator...of the Agency's intent to issue a pattern notice. The letter...should specify the basis for the determination and should give the operator...15 calendar days after receipt to request a conference. At the conference there should be a review of the citation history..."

It is clear, then, that MSHA included the current notice and procedural safeguards, including basing POV decisions only on final orders, to ensure

fairness to mine operators. Deleting those provisions without establishing alternative measures denies operators that fundamental fairness, and violates the Fifth Amendment. Nothing has occurred to warrant these changes other than the Agency's need to develop a political response to the tragic events of 2010 that shields itself from its failure to use the tools Congress previously provided.

MSHA also acknowledged, in the current rule, the potentially substantial loss of property that a POV violation can entail when drafting the current rule. Importantly, MSHA stated that "the Agency realizes that the statutory requirements for terminating a pattern of violations sequence place a great burden on the operator of the mine. An inspection of the entire mine, particularly a large underground mine, that reveals no violations of a significant and substantial nature may be difficult to achieve." MSHA itself therefore admitted that, once a mine is placed on POV status, it is virtually impossible to avoid a withdrawal order. As previously mentioned, MSHA has ample authority to shut down mines and protect miners in emergency situations. There is thus no adequate justification for MSHA to streamline the POV process in such a way as to eliminate all procedural safeguards for mine operators.

### b. At a Minimum, Notice and a Hearing Are Required Before a Mine Operator Can be Deprived of His Property

If MSHA will not continue its current practice of only basing POV decisions on final orders and citations, MSHA must at an absolute minimum promulgate a POV rule that provides mine operators with sufficient notice and an opportunity to be heard before a POV order may be issued.[11]

COA understands MSHA's concerns regarding the current backlog of cases and slow-moving adjudication process. However, altering the POV process in the manner proposed is neither an appropriate nor a fair response. Rather, MSHA and the Federal Mine Safety and Health Review Commission should adopt, through notice and comment rulemaking, formal measures allowing expedited considerations of those cases involving mines at risk of being placed on POV status. A formal mechanism to consolidate and expedite issued violations being contested by potential POV operators would allow MSHA to review a mine operator's entire recent violation history within a reasonable timeframe, while still affording mine operators adequate opportunity to contest potentially erroneous citations before becoming subject to stringent penalties. In other words, MSHA would have a means to penalize the "bad actors" in the system without violating the due process rights of ALL mine operators. Additionally, this could be accomplished easily within the framework of the existing adjudicatory system.

---

[11] Mathews v. Eldridge, 424 U.S. 319, 333 ("The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society").

It is clear that the Due Process Clause of the Fifth Amendment requires MSHA to put procedural mechanisms in place in any Final POV Rule that provides mine operators with adequate notice and an opportunity to be heard. While the current POV rule ensures fairness and the right to be tried before being convicted, the proposed rule takes out nearly every single procedural protection contained in the current rule. Instead, mine operators can be issued withdrawal orders when an inspector merely alleges a safety infraction, and are given no prior notice of a potential POV sanction. Such a system is in clear violation of the law. Rather than change the POV process, MSHA should instead address the underlying issue – a backlog of cases causing prolonged adjudicatory periods – by formalizing a procedure to expedite the full and fair hearing of cases ripe for POV review. Alternatively, should MSHA make changes to the POV Rule, MSHA must retain adequate notice provisions and establish a pre-sanction hearing process in which mine operators are given a fair opportunity to present their case to an independent reviewer. To do otherwise would violate the due process rights guaranteed by the Fifth Amendment.

### III. POV Criteria Should be Subject to Notice and Comment Rulemaking Procedures

MSHA is seeking comment on "how the Agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." 76 Fed. Reg. 5719, 5720 (February 2, 2011). Simply put, all such criteria should be published in the Federal Register and be subject to the notice and comment provisions of the Administrative Procedures Act and the Mine Act. Section 104.2 of the proposed rule lists only generic categories of information that will be reviewed, without quantifying or explaining how such data will be applied to issue a pattern notice. The proposed rule also seems to anticipate that POV criteria will be fluid and subject to change without any established method for notice and comment rulemaking. While it is impossible to comment on POV criteria that have not yet been listed in the proposal, COA strongly objects to this suggested criteria method, as it is neither transparent nor simple. Rather, the proposed rule blatantly fails to inform stakeholders of what is expected of them to avoid a pattern notice, and offers no opportunity for comment on specific criteria before the rule becomes effective. Given the serious consequences stemming from being placed on a POV, this lack of transparency is extremely troubling.

While the Secretary of Labor has broad discretion to establish criteria for determining when a pattern of violations exists, that discretion does not extend to establishing POV criteria without notice and comment rulemaking. Section 104(e)(4), 30 U.S.C. § 814(e)(4), requires that the "…Secretary shall make such *rules* as he deems necessary to establish criteria for determining when a pattern of violations…exists" (emphasis added). The Office of Inspector General has also specifically recommended that MSHA seek stakeholder input on the POV screening criteria in its report dated September 29, 2010, pages 3, 24. MSHA has clearly not adopted this approach in the proposed rule. Rather, by not

9

identifying or publicizing any specific criteria in a Final POV Rule, and by instead providing for the periodic development and revision of specific criteria, MSHA is granting itself the ability to constantly change the rules of the POV process with no public notice or comment period. Such an approach is not only fundamentally unfair, but it also blatantly lacks the very transparency MSHA seeks to achieve with this rule revision. MSHA should remedy this issue by adopting a formal rulemaking process by which POV criteria must be established.

Our concern with the failure of the proposal to establish a rulemaking process for POV criteria is exacerbated by the fact that the proposed rule eliminates any potential for discussion of how the specific criteria should be applied to a mine before the issuance of a pattern notice. Section 104.3. Rather, it appears that the rule anticipates an "automated" process for the issuance of a pattern notice based on a mine operator's monitoring of criteria posted on MSHA's website. Furthermore, no specific procedure is described for consideration of mitigating criteria prior to the issuance of the notice. In other words, operators could be subjected to immediate withdrawal orders in non-emergency situations without having had any opportunity to discuss the underlying violations, application of the POV criteria (let alone the initial listing of such criteria) or means in which the operator might avoid the imposition of the sanction.

COA urges MSHA to reissue its proposal, and to include in that proposal the criteria to be used in the POV process, as well as an established mechanism by which mitigating circumstances are discussed prior to any issuance of a pattern notice. Such a proposal would be efficient, transparent and consistent with the Agency's and industry's goal of protecting the safety and health of miners.

## IV. Economic Analysis

A review of MSHA's cost/benefit analysis in the proposed rule also indicates that the Secretary has both overestimated the presumed benefits and underestimated the costs associated with the rule.

The stated benefits of the proposed rule are based on the premise that specific POV criteria will be posted on MSHA's webpage, and that MSHA will develop a searchable database of compliance information which will then be used to determine whether a mine is approaching proposed POV criteria levels. Similarly, the estimated costs are based upon an unrealistic estimate of the time it will take for a mine operator to evaluate its enforcement history and extrapolate forward to the end of the POV cycle. The proposed rule further significantly understates the costs to a mine placed on a POV.

MSHA has the ability to more accurately estimate both the cost and the benefits of the proposed rule. In the interest of transparency, and in light of

10

President Obama's Executive Order 13563, "Improving Regulation and Regulatory Review," it must do so.

### a. Benefits

MSHA's estimation of benefits is based upon the supposition that mine operators who see that their mine is approaching a POV will institute an MSHA-approved safety and health management program to lessen the probability of being placed on a POV. MSHA estimates that implementation of such a plan will result in approximately 50 mines per year averaging three fewer nonfatal injuries in the first year after implementation of the MSHA-approved plan. Utilizing a "willingness-to-pay" methodology, MSHA calculates that the proposed rule will result in monetized benefits of approximately $9.3 million per year.

MSHA's analysis is flawed in that it is based upon an assumption that the specific criteria for issuance of a POV notice will only be applied prospectively. However, the proposed rule does not limit MSHA to prospective application of the specific criteria, and historically MSHA has consistently applied POV specific criteria *only retroactively*. For example, in the most recent POV cycle, MSHA announced the specific POV criteria on September 28, 2010 and applied it retroactively over a 12-month period ending August 31, 2010.

The failure of the proposed rule to limit retroactive application of specific POV criteria renders MSHA's estimate of benefits meaningless. It is based upon a premise which is not stated in the proposed rule and which is contrary to MSHA's historical practice.

Additionally, the proposed rule speculates that MSHA will successfully develop a searchable database of compliance information which can be used by mine operators to determine whether their mine is approaching proposed POV criteria levels. Historically, MSHA has had problems bringing computer programs online on a reliable schedule. The repeated delay in implementation of the MSHA Standardized Information System, for example, demonstrates MSHA's inability to fulfill promises of timely, reliable computer development. It is simply inappropriate for MSHA to base its estimation of benefits on a speculative promise to develop a computer program that will allow mine operators to track their exposure to the specific POV criteria.

Lastly, and most importantly, the Agency provides no rational basis for its assessment that implementation of a safety and health management program will result in three fewer nonfatal injuries. MSHA has no basis to analyze the effectiveness of such programs as the Agency itself is still grappling with the very question of what constitutes an effective safety and health management program. Moreover, to assume that injury reductions at mines having received

11

PPOV letters were attributable to receipt of the PPOV letter is without basis and is not sufficient justification for calculating perceived benefit to be derived from the proposed rule.

### b. Costs

MSHA's cost analysis is similarly flawed. MSHA estimates that the yearly cost for all mine operators to monitor their POV performance will be less than $1 million per year. This was based upon the assumption that it will take a supervisor an average of 5 minutes per month to monitor each mine's performance using MSHA's website. Such an assumption is patently unrealistic. Five minutes would be the minimum time that it would take a person familiar with MSHA's webpage to access the relevant data. It would certainly take much longer for that individual to then study the data and extrapolate the potential impact of future MSHA inspections. At a minimum, MSHA should expect that accessing the MSHA database would only be the first step in a more involved analytical process which would consume a significantly greater amount of time than MSHA has assumed.

Another issue with MSHA's analysis is the assumption that such a monitoring process would only need to be performed monthly. For many underground mines MSHA enforcement activity occurs weekly, if not daily. It would be more reasonable for MSHA to assume that a mine operator would update his POV exposure analysis following any MSHA enforcement activity that occurs at the mine, given that they will no longer be afforded "due protection" rights before POV sanctions are implemented.

MSHA acknowledged that it "does not have an historical basis from which to estimate the potential costs that would be incurred by a mine on a POV." Nevertheless, MSHA has projected that a typical mine would lose about one-half of one percent of revenue as the result of closures resulting from placement on a POV by MSHA. MSHA stated that the closures would result in one or two days of closure for a large mine and one day or less for a small mine, and that as a result of these closures, "a typical mine would lose about 0.5 percent of revenue" which "is about $218,000." Unfortunately the Agency has grossly underestimated the potential cost of the proposal.

MSHA's estimations also grossly understate the economic impact of the POV withdrawal order sanction. For example, in underground coal mines in 2010, the most frequently cited standard was 30 C.F.R §75.400, which typically involves an accumulation of combustible material along conveyor belt lines. MSHA issued 8,995 violations for §75.400 in 2010, and those violations were almost always marked as "significant and substantial." Withdrawal orders issued for violations of §75.400 would result in the loss of all production occurring on that beltline, the impact of which MSHA failed to adequately consider. Similarly,

12

many other frequently cited standards, including those contained in the Rules to Live By Enforcement Initiative in Metal/Nonmetal Mines and Coal Mines, are also virtually automatically listed as S&S, and could likewise result in a very costly withdrawal order. MSHA must take these considerations into account when assessing the costs of the proposed rule.

In comments submitted to MSHA on the proposed regulations to lower miner's exposure to respirable coal mine dust, E$^x$ponent Engineering and Scientific Consultants valued the loss of 1-hour of production from an underground longwall mine at $43,668. Applying this calculation, revenue loss at a mine would exceed more than $1 million per day, almost 5 times the Agency's estimate of the revenue for an average mine. As such, one underground longwall coal mine closed for 2-days as a result of being placed on POV would incur revenue losses equal to the Agency's entire estimate for the 10 mines the agency projects will be placed on POV.

MSHA has also failed to contemplate the adverse economic impact that this proposal would inflict upon small mine operators subjected to the POV withdrawal order sanction. By their very size and nature of ownership such mines can ill afford the loss of production that would be imposed by MSHA. They oftentimes do not have the necessary financial resources in reserve to withstand such an interference with production. Additionally, many such operators would be at a loss to navigate the searchable database the proposal anticipates to determine their possible POV status

MSHA has the historical data available to provide stakeholders and the public with a much more accurate estimation of the effective cost of the planned POV sanction. It should do so before proceeding further.

## V. Conclusion

We understand the need for regulation, and support MSHA using all of the enforcement tools Congress provided in the Mine Act when necessary to achieve safety. However, the proposed rule will do little to advance safety. COA believes there is a need for reform of the POV system but we cannot support reforms that deprive mine operators of the protections afforded them under the Constitution and circumvent mandatory procedures aimed at fostering transparent and accountable government. The proposed rule will worsen an already broken system and we urge the agency to revoke this proposal.

Sincerely,

David A. Gooch

President

13



2011 APR -4 P 4: 4

April 4, 2011

OFFICERS

CHAIRMAN
John Mudge

CHAIRMAN ELECT

VICE CHAIRMAN
Greg Lang

PAST CHAIRMAN
Bill Goodhard

PRESIDENT
Tim Crowley

DIRECTORS
Michael Brown
Doug Taylor
Bruce Hansen
Mary Kaye Cashman
Mary Beth Donnelly
Don Deines
Randy Griffin
Duane Peck
Bill Zisch
Cindy Jones
Dennis McHarness
John Burrows
Nigel Bain
James T. O'Neil, Jr
Tony Sanchez
Paul Thomsen
Jeff Thompson
John Burrows
Paul Huet
Steve Antonini
Dan Anderson

9210 Prototype Drive
Suite 200
Reno, NV 89521
(775) 829-2121 TEL
(775) 852-2631 FAX
www.nevadamining.org

Ms. April E. Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

RE: RIN 1219-AB73; Comments on MSHA's Proposed Rule for Pattern of Violations

Dear Ms. Nelson:

The Nevada Mining Association submits the following comments regarding the proposed Pattern of Violation (POV) rulemaking.

The NVMA is comprised of operating mining companies; exploration companies; suppliers of industry equipment, goods and services; counselors and consultants; and individuals interested in the well-being of the industry. The Association's objective is to maintain a business and operating environment that will encourage exploration for the development and production of minerals in Nevada using safe and environmentally conscious methods.

While the NVMA supports the goals the POV regulations have to protect health and safety of miners, the Association opposes the elimination of due process. Further, we maintain the proposed regulations do not clearly show all criteria that will be used to determine POV.

With the proposal to eliminate the notice of approaching a POV, it becomes essential that the criteria for determining a POV are clearly defined. Posting the criteria on the web and eliminating any notice of impending action is insufficient. Doing so places a greater burden on operators and small remote mining operations.

Should significant and substantial (S&S) violations be used as the criteria for POV then the agency must clarify what constitutes an S&S violation. Currently, it is up to the inspector to determine whether a citation could result in a serious accident. Too much autonomy is ultimately given to one inspector with no checks or balances in place. An operator has no opportunity to show any mitigating circumstances before being placed on POV. Furthermore, not having the chance to have the citation reviewed by a higher authority prior to being placed on POV would violate the Fifth Amendment of the U.S. Constitution stating "No person shall...nor be deprived of life, liberty, or property, without due process of law...".

AB73-COMM-31

The Association's comments regarding termination of notice are generally the same as above. Without review and relief by either a field office supervisor or district manager prior to the final issuance of the S&S violation, it may become impossible to get off the pattern of violation status.

The NVMA recommends that the agency develop POV criteria that is meaningful to both the industry and MSHA, and avoid placing unnecessary burdens on the companies with effective safety and health programs. Finally the NVMA urges the agency to establish a committee made up of representatives from industry, MSHA, and the DOL to develop POV criteria for mines.

The NVMA supports enhancing regulations to improve safety and looks forward to working with MSHA to make meaningful changes to the proposed regulations that accomplish this essential goal.

Sincerely,

Tim Crowley
President



2011 APR -5 P 3: 00

# *U.S. Silver Corporation*
# **FAX COVER SHEET**

| DATE: April 5, 2011 | PAGE 1 of *5 w/ cover* |
|---|---|
| FROM: *Executive Assistant Heather Bailey-Foster* | TO: *Roslyn B. Fontaine, Chief, Regulatory Dev. Division* |

| COMPANY NAME: | COMPANY NAME: |
|---|---|
| *U.S. Silver Corporation* | |
| *P.O. Box 440* | *MSHA* |
| *Wallace, ID 83873* | |

| PHONE NUMBER: | FAX NUMBER: |
|---|---|
| (208)752-1116 EXT. *221* | *202-693-9441* |

| FAX NUMBER: | |
|---|---|
| (208)556-1587 *Galena Mine* | |

MESSAGE: *"RIN-1219-AB73"*
*(Comments on MSHA Proposed Rule of Pattern of Violations)*
*Thank you.*

*AB73-Comm-32*



U.S. Silver Idaho, Inc.
Galena Mine
PO Box 440
Wallace, ID 83873

208.752.1116
F 208.556.1587

us-silver.com

April 4, 2011

**BY US MAIL**

Ms. April E. Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re:     **RIN 1219-AB73; Comments on MSHA's Proposed Rule for Pattern of Violations**

Dear Ms. Nelson:

U.S. Silver – Idaho, Inc. ("U.S. Silver") offers the following comments to the Mine Safety and Health Administration (MSHA or "Agency") concerning its Proposed Rule for Pattern of Violations under § 104(e) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 801, 814(e).

U.S. Silver owns and operates the Galena Mine and Mill, the Coeur Mine and Mill and the Caladay Project in the historic silver valley of North Idaho. The Galena Mine has a history dating back to 1887. The issues discussed herein are extremely important to U.S. Silver, as our mines could be significantly impacted by any alterations to the existing regulatory scheme.

U.S. Silver supports the goal of improving transparency and simplifying the POV process both in terms of agency implementation and stakeholder understanding. However, as proposed, this rule would instead make the POV process less transparent and more complex while depriving mining companies of their right to due process under the law. In light of the fact that the POV sanction is among the most potent enforcement tools that MSHA has under the Mine Act, the Agency must utilize it so as to protect the health and safety of miners while still ensuring that mine operators receive fair treatment and due process. Therefore, U.S. Silver requests that MSHA re-

546222



**U.S. Silver** · Idaho, Inc
Galena Mine
PO Box 440
Wallace, ID 83873

208.752.1116
f 208.556.1587

us-silver.com

April 4, 2011
Page 2

propose the rule to address these issues, and allow operators a fair opportunity to comment on the fully proposed POV program, as a whole.

Moreover, U.S. Silver endorses the use of proper rulemaking if the current regulations (30 CFR Part 104) are to be amended, but we believe the proposed rule is contrary to law and must be re-proposed because:

> ➤ The proposed rule withholds for future web posting the actual criteria the agency will use for pattern determinations, thereby preventing analysis of its impact and a meaningful opportunity to comment on the proposal.

> ➤ The proposed rule violates the Administrative Procedures Act (APA) and Mine Act rulemaking mandates, and exceeds the Secretary's specific authority regarding patterns, by not disclosing the criteria while simultaneously adopting rules to " establish criteria for determining when a pattern...exists," under Section 104(e)(4) of the Act.

> ➤ The proposed rule will result in closure orders issued against employment sites, before the employer has an opportunity to:
>   (1) discuss the alleged pattern with the agency;
>   (2) contest the validity of alleged citations or orders used to identify a pattern;
>   (3) address the accuracy of agency data used for pattern identification; or
>   (4) obtain Review Commission and judicial review of the alleged pattern identification "notice," prior to closure orders imposed by MSHA inspectors.

> ➤ The proposed rule will deny employers Mine Act Section 105 citation and penalty contest rights, and due process of law, by using contested, alleged violations to impose closure order penalties, using the pattern of violation provisions of the Mine Act.

> ➤ The proposed rule will impose requirements for the submission of "safety and health management programs," for MSHA approval, to gain MSHA consideration of "mitigating circumstances" in the future that might prevent pattern closure order issuance. By so doing, the proposed rule imposes a new pattern penalty and requirement, not authorized by the Mine Act, before any pattern has been formally identified by MSHA.

> ➤ The safety and health management program submission requirement, as a pattern mitigation trigger, circumvents Mine Act and APA rulemaking mandates for the adoption of mandatory standards. The separate rulemaking both OSHA and MSHA announced to determine if such safety program mandates are warranted and, if so, what program mandates should be included, demonstrates this "end run" around proper rulemaking procedures.



**U.S. Silver** - Idaho, Inc.
Galena Mine
PO Box 440
Wallace, ID 83873

208.752.1116
f 208.556.1587

us-silver.com

April 4, 2011
Page 3

Of particular concern to U.S. Silver are two matters: PPOV status and whether POV status will be based on final orders. As MSHA notes, Congress intended for the POV program to apply to "mine operators with a record of repeated S&S violations" "who have not responded to the Agency's other enforcement efforts." We are concerned that the proposed rule does not adequately reflect the legislative intent that POV is intended for circumstances of repeated violations by unresponsive operators.

Under the current proposal, a facility can be placed into PPOV status as a result of a single inspection with multiple citations, or as a result of one or two inspections with few citations, followed by one with a large number of citations. This is clearly not the Congressional intent for the POV tool, and a revision of the rule should squarely address this problem. In contrast, under the current rule and criteria, a single inspection with multiple citations and orders can place a mine into PPOV status. However, a facility is not currently placed into full POV status unless it fails to improve its performance over a period of time. While this still does not necessarily capture mines that are repeated violators, it at least means that POV status is based on a series of inspections.

If there is to be no official PPOV status under the proposed rule, the problem is that it may be difficult, if not impossible, for a mine to determine if it is threatened with POV status. The preamble discussion imagines that a facility will be able to tell if it is close to POV status by reviewing MSHA's data. If POV status can be triggered by a single inspection, then no mine operator can feel confident that it is not threatened with POV status.

Moreover, determination of an operator's POV status must be based solely on those citations that are fully adjudicated. U.S. Silver understands MSHA's preference to base POV status on citations and orders issued, as opposed to final orders, because there can be a substantial delay in the final determination of a citation or order challenged by an operator. It is essential to note, however, that if actions are to be based upon non-final orders, they may not be punitive in nature without violating the operator's due process rights. The Fourteenth Amendment prohibits the federal government from depriving citizens of liberty or property without due process of law— and this means that actions that are punitive cannot be taken without appropriate access to review. For example, U.S. Silver is currently litigating several ground control citations that it believes have no merit – and this belief has been confirmed by outside experts with advance degrees in mine engineering and numerous years of rock mechanics experience. Were U.S. Silver subject to POV status based on those meritless citations, it would be subject to that status without due cause. MSHA's proposal could easily lead to a situation where the alleged violations that lead to placing a mine on POV status could be vacated or modified after the mine has already been placed into the POV process without any mechanism to remove the mine from



**U.S. Silver** Idaho, Inc.
Galena Mine
PO Box 440
Wallace, ID 83873

208.752.1116
f 208.556.1587

us-silver.com

April 4, 2011
Page 4

POV status after that has occurred. The net result would be to continue to take punitive action against a mine that has ultimately been found not to have been a pattern violator after all.

This does not mean that MSHA can take no actions prior to a final order. Certainly it can take actions designed to protect miners from harm, and it certainly has the discretion to increase its level of scrutiny of a mine with repeated citations or orders. Such measures are not punitive. U.S. Silver understands the need for fair and equitable use of MSHA enforcement tools when necessary to achieve safety. This proposal, however, will not enhance safety since it denies the regulated community the opportunity to comprehend its application and submit meaningful comments, while circumventing mandatory procedures aimed at fostering transparent and accountable government. We urge you to revoke, revise and re-propose this rule to address the flaws described above.

Thank you for your consideration.

Sincerely,

Thomas Parker
President and CEO



National Lime Association

# L I M E

The Versatile Chemical

2011 APR -5 P 5: 07

April 5, 2011

Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Blvd., Room 2350
Arlington, Virginia 22209-3939

> **RE:    Proposed Rule, Pattern of Violations (RIN 1219-AB73)**

The National Lime Association (NLA) is pleased to present its comments on the proposed Pattern of Violations (POV) rule. NLA is the trade association for manufacturers of calcium oxide and calcium hydroxide, collectively referred to as "lime." NLA's members operate both surface and underground mines under the jurisdiction of MSHA.

NLA commends MSHA for its efforts to make the POV process more transparent and effective. We strongly feel that this program should be carefully crafted so it targets those mine operators who repeatedly fail to live up to their obligations to provide miners with a safe place to work. As explained below, we believe that although the proposed rule (along with other measures MSHA has already taken) takes several important steps in achieving this goal, there are a number of significant improvements that must be made to the rule before it is finalized.

## Comments

## The Rule Should Not Be Finalized Without an Opportunity for Comments on the New POV Criteria

MSHA proposes to list new criteria for POV status on the Agency's website at some future date, but not to include the criteria in the rule itself, nor are the the new criteria specified in the preamble. The preamble asks for

> specific comments on how the agency should obtain comment during the development of, and periodic revision to, the POV screening criteria. MSHA also requests comments on the best methods for notifying mine operators of changes to these criteria.

76 FR 5720. The POV criteria should be specified in the rule itself, and changes should be made through notice and comment rulemaking. These criteria are not simply guidance, but are binding, and determine whether mines are subject to substantially increased enforcement scrutiny. Especially if operators are expected to monitor their own performance to avoid POV

AB73- COMM-33

status, it is essential that the criteria should not be a moving target. Stakeholders should have a full and fair opportunity to comment on changes to the criteria, and this can best be provided through rulemaking, subject to standard rules and practices.

MSHA's current POV rules do not contain specific criteria. Instead, the numerical criteria are published on MSHA's website. There is no documentation available, as far as NLA is aware, of why the numerical thresholds were chosen—something that should be provided if stakeholders are to comment effectively. A rulemaking with a reviewable docket would address this concern.

At the very least, MSHA's new POV criteria should be published, made available online, and included in the docket before comments are closed for this rulemaking. There are numerous elements of the proposed rule that cannot be adequately evaluated without an understanding of the criteria. For example, MSHA asks for comments on its projections of the number of mines likely to be subject to POV status under the new rule, and what the projected costs to the mining industry might be. It is impossible to make such estimates without knowing what the POV criteria will be. Obviously, the criteria will be different from the current criteria (which include final orders), but MSHA has not revealed what the new criteria will actually be. As a result, the cost estimates in the proposed rule appear to be entirely speculative.

## MSHA Should Retain the PPOV Step

While NLA applauds MSHA's plan to make the POV criteria transparent and to have POV data available on MSHA's website, NLA believes that the Potential POV notification step should be retained.

First, NLA believes that MSHA has overestimated the degree to which mine operators will be able to determine if they are "close" to POV status. As explained in a later section of these comments, the current POV criteria (and presumably, the new criteria), can be triggered by even one problematic inspection. While all mine operators should be monitoring their compliance status and working to improve, MSHA's rule contemplates that operators will take special actions to avert POV status, such as submitting safety and health management programs to MSHA for approval. NLA believes that the PPOV notification serves a useful purpose as a clear trigger for these special actions.

Second, the current PPOV step includes an opportunity for a mine operator to confer with MSHA about whether PPOV (and POV) status is actually warranted. This valuable opportunity—for both the operator and for MSHA—would be eliminated under the proposal.

Finally, the current approach, with the PPOV step, can be effective as long as it is consistently and actively pursued by MSHA. If a mine operator receives a PPOV notice, and takes active steps to rectify the problems identified, the outcome of avoiding full POV status should be viewed as a success for this approach, not a failure. If some operators "backslide" after making those changes, this is an argument for continued monitoring of their progress, not for an abandonment of the approach.

## The POV Criteria Should Be Clear and Easy to Access

NLA strongly agrees with MSHA's proposal to provide clear, transparent, and accessible POV criteria. Each mine should be able to immediately determine its potential POV status by viewing publicly available information on MSHA's website. We recommend that this information be collected in a single location, and that mine operators (and other interested parties) be able to view all of the relevant information at once by entering the mine ID number. (We note that only such a centralized process could justify MSHA's estimate that monitoring of this information will only take 5 minutes. 76 FR 5725. )

This will require the creation of a computer program that can properly compile and display this information. We strongly urge MSHA to pilot any such program with the assistance of mine operators and other stakeholders, to ensure that the information and calculations it provides are accurate, timely, and usable. MSHA should also review the data quality control measures it uses for its data retrieval system, to ensure that the data provided are of sufficient accuracy (and timeliness) to allow mine operators and others to depend on the results. Under MSHA's proposal, these data can have significant consequences for operators, and thus accuracy is essential.

We note that the necessity for accurate information also makes it unlikely that monitoring of this information will take only 5 minutes, because operators will likely review their own records and other MSHA data to verify it, especially if it suggests that POV status is imminent.

## POV Status Should Only Result from Repeated Violations

As MSHA notes, Congress intended for the POV program to apply to "mine operators with a record of repeated S&S violations" "who have not responded to the Agency's other enforcement efforts." NLA is concerned that the proposed rule (and MSHA's current screening criteria) do not adequately reflect the legislative intent that POV is intended for circumstances of repeated violations by unresponsive operators.

Rather, MSHA's current criteria are based on *multiple* violations, as opposed to *repeated* violations. Thus, a mine can be placed into PPOV status as a result of a single inspection with multiple citations, or as a result of one or two inspections with few citations, followed by one with a large number of citations. This is clearly not the Congressional intent for the POV tool, and a revision of the rule should squarely address this problem.

Under the current rule and the current criteria, a single inspection with multiple citations and orders can place a mine into PPOV status. However, a mine is not currently placed into full POV status unless it fails to improve its performance over a period of time. While this still does not necessarily capture mines that are repeated violators, it at least means that POV status is based on a series of inspections.

As noted above, if there is to be no official PPOV status under the proposed rule, it may be difficult, if not impossible, for a mine to determine if it is threatened with POV status. The preamble discussion imagines that a mine will be able to tell if it is close to POV status by

reviewing MSHA's data. But how close is close? If POV status can be triggered by a single inspection, then no mine operator can feel confident that it is not threatened with POV status.

NLA believes that the criteria for POV status should require a significant number of S&S citations or orders in the course of at least two inspections separated by a significant amount of time. For example, if one of the criteria for POV status is to be 50 S&S citations, the criterion could require that there be at least 25 S&S citations in each of at least two inspections separated by at least two months. This would mean, in this example, that a mine receiving 25 S&S citations in a single inspection should be considering the risk of POV status—while one receiving 10 would not. Under the present criteria (and apparently under the proposed rule), the mine with 10 citations could be swept into POV if a new inspection included 40 S&S citations, even if no previous inspection had revealed such a degree of problem.

Of course, it is difficult to comment on exactly how the criteria should reflect the need to address repeated violations, as opposed to multiple violations, without knowing what criteria MSHA proposes to apply.

### If POV Status Is Not Based on Final Orders, Punitive Elements Violate Due Process Rights

NLA recognizes MSHA's preference to base POV status on citations and orders *issued*, as opposed to *final* orders, because there can be a substantial delay in the final determination of a citation or order challenged by an operator. This delay hampers MSHA's ability to use POV as a timely tool to address current problems.

However, it is important to note that if actions are to be based upon non-final orders, they cannot be punitive in nature without violating the operator's due process rights. The Fourteenth Amendment to the Constitution prohibits the federal government from depriving citizens of liberty or property without due process of law—and this means that actions that are punitive cannot be taken without appropriate access to review.

This does not mean that MSHA can take no actions prior to a final order. Certainly it can take actions designed to protect miners from harm, and it certainly has the discretion to increase its level of scrutiny of a mine with repeated citations or orders. Such measures are not punitive.

The preamble, however, shows some confusion about this, when it refers to the POV process as a "sanction" (76 FR 5722), and when it suggests that the closure orders authorized under section 104.3(c), are intended (at least in part) to impose punitive costs upon the operator in order to force compliance:

> Closure orders can have a substantial impact on the ability of a mine to conduct its business. The threat of closure provides a strong incentive for operators to ensure that S&S violations do not recur. MSHA projects that few operators would risk such an occurrence.

76 FR 5724.  This language is inappropriate, because it may suggest to inspectors and other MSHA personnel that the POV process is to be used to punish operators, and to use that punishment to coerce compliance.  As noted above, this is not permissible under the Constitution if POV status is to be based upon citations or orders that have not become final orders.  The preamble should make clear that measures taken under POV are to be protective only.

Accordingly, for example, MSHA should clarify that the removal orders described in proposed section 104.3(c) of "all persons from the affected area" must only apply to persons in the specific area potentially exposed to risk of harm from the particular cited violation.  Thus (for example) if a catwalk lacked an adequate handrail, it would be appropriate to require miners to be removed from the area immediately around the catwalk, but not from the entire section of the mine containing the catwalk.  Any wider exclusion would be punitive in nature, and cannot be imposed without violating due process rights.

### POV Status Must Be Terminated If Underlying Citations or Orders Are Vacated

The proposed rule calls for terminating POV status only if an inspection of the entire mine reveals no S&S violations.  However, because the proposal calls for basing POV status on non-final orders, POV status must also be terminated if enough citations or orders upon which the status is based are subsequently reversed, or reduced in severity, so as to drop the mine below the threshold levels for POV.

### Remedial Plans Should Not Be Confused with Comprehensive Safety and Health Management Programs

MSHA indicates in the preamble that a mine operator finding that a mine is at risk of POV status may submit a "written safety and health management program" to MSHA for approval, and that such a program may serve as a mitigating circumstance that may avoid POV status.  NLA does not object to the concept of a mine operator working with MSHA to develop a remedial plan to address problems that could lead to POV.  However, NLA is concerned that the language in the preamble may suggest that MSHA will require comprehensive safety and health management programs that go beyond the particular concerns that underlie the potential for POV status.  This impression is strengthened by language elsewhere in the preamble, such as the following:

> Mines that have effectively implemented an MSHA-approved safety and health management program (to avoid being placed on a POV) would have procedures in place to continuously address hazardous conditions.

76 FR 5724.  This wording does not suggest a remedial plan targeted at specific violations, but rather suggests a comprehensive program.

The POV process is not the appropriate mechanism to impose the requirement for comprehensive safety and health management programs.  MSHA has announced that it intends to propose a rule requiring such programs, and the proposal will provide all stakeholders the opportunity to provide comments on the necessity for such a requirement, and for the contents of

5

such programs. MSHA should not circumvent that rulemaking with a "back door" requirement for these programs.

Accordingly, NLA suggests that if MSHA intends to use this approach, that it avoid confusion by using a different term, such as "targeted remedial plan" as opposed to "safety and health management program."

We also note that while the preamble states that "under the proposal" operators may submit these plans for approval, there is no mention of this approach in the proposed rule language. Important elements of a rule should be included in the rule language itself, and not only in preamble language that may not be as readily accessible to interested parties.

## Conclusion

The proposed rule, and MSHA's other recent actions on POV, are a good start toward developing a program that will be transparent and effective. However, more work needs to be done. In addition to the general changes suggested above, MSHA should add the criteria it intends to use under the new rule to the rulemaking docket, along with background information explaining how those criteria were developed, and request that stakeholders provide comments on the criteria (and the costs) in this rulemaking. The comment period should be extended to accommodate the additional information and further comments.

NLA appreciates the opportunity to comment on these important issues.

Very truly yours,

/s/

Hunter L. Prillaman
Director, Government Affairs
National Lime Association
200 N. Glebe Road
Arlington, VA 22203
703-908-0748
hprillaman@lime.org

6

**From:** Holcomb, Thurman [mailto:THolcomb@archcoal.com]
**Sent:** Tuesday, April 05, 2011 4:17 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR -5  P 5: 0

MSHA

I would like to offer the following comments to the proposed changes to Pattern of Violations rules:

1. The proposed rule does not treat large mines or multi-section mines equitably with small mines. By basing part of the selection criteria on the number of S&S citations issued unfairly favors small mines or mines with smaller outby areas (less opportunity for citations). The same logic applies to repeated citations of the particular section of law or with the more severe citations. Larger and older mines, and mines with multiple units, offer increased opportunities for these citations. To be fair, the regulation should account for the differences in mines in all qualifying criteria.

2. The proposed rule inappropriately uses all citations, instead of ones that have become final. Many times, citations are issued in error (as proven thru the litigation process) and as MSHA continues to hire and train new inspectors, this problem will continue. The severity and negligence ratings are often proven to be issued in error thru the litigation process. Utilizing citations that are not final yet will place mines in the "pattern" status when ultimately they should not be in that status following litigation. With the "pattern" designation bringing very severe consequences, this improper designation may well dictate that the mine cease operations, when in fact some of the qualifying citations may ultimately be proven wrong.

3. Rather than use citations that are not yet final, I recommend re-establishing the local conference program where many disputed citations can be resolved.

4. I believe the current POV program works very well to put operators on notice when they are not compliant to the expected level. The biggest problem lies with the inability to contest improper citations, and this can be solved thru the local

AB73 - COMM -34

conference process that existed for so many years.  The local conferences not only worked out many improper citations, but it also served as a timely training tool for inspectors to educate them in the citation process.

Thurman Holcomb

**From:** Mark Compton [mailto:mcompton@nwma.org]
**Sent:** Tuesday, April 05, 2011 2:26 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR -5 P 5: 14

Attached please find comments from the Northwest Mining Association

Thank you.


Mark Compton
Government Affairs Manager
Northwest Mining Association
10 N. Post St., Suite 305
Spokane, WA 99201
Phone: 509-624-1158, ext. 15
Cell: 509-954-0683
Fax: 509-623-1241
E-mail: mcompton@nwma.org

AB73 - COMM -35



*Our membership and services span the globe*

10 N Post St Ste 305 | Spokane WA 99201-0705
Phone: 509.624.1158 | Fax 509.623.1241
E-mail: nwma_info@nwma.org | Web www.nwma.org

April 4, 2011

Ms. April E. Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re: **RIN 1219-AB73; Comments on MSHA's Proposed Rule for Pattern of Violations**

Dear Ms. Nelson:

The Northwest Mining Association (NWMA) appreciates the opportunity to comment on the Mine Safety and Health Administration's (MSHA) Proposed Rule for Pattern of Violations under § 104(e) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. §§ 801, 814(e).

NWMA is a 116 year old, 2,000 member, non-profit, non-partisan trade association based in Spokane, Washington. NWMA members reside in 42 states and are actively involved in exploration and mining operations on public and private lands, especially in the West. Our diverse membership includes every facet of the mining industry including geology, exploration, mining, engineering, equipment manufacturing, technical services, and sales of equipment and supplies. NWMA's broad membership represents a true cross-section of the American mining community from small miners and exploration geologists to both junior and large mining companies. More than 90% of our members are small businesses or work for small businesses. Most of our members are individual citizens.

The issues discussed in this Proposed Rule are of extreme importance to NWMA's members, as mining operations nation-wide are subject to the regulations promulgated pursuant to the Mine Act, and mine operators are significantly impacted by any alterations to the existing regulatory scheme.

NWMA recognizes the importance of the pattern of violations (POV) sanction to the effective enforcement of the Mine Act, and supports the goal of improving transparency and simplifying the POV process both in terms of agency implementation and stakeholder understanding. However, as proposed, this rule would make the POV process less transparent and more complex while depriving mining companies of their right to due process under the law. In light of the fact that the POV sanction is among the most potent enforcement tools that MSHA has under the Mine Act, the Agency must utilize it so as to protect the health and safety of miners while still ensuring that mine operators receive fair treatment and due process.

**The Proposed Regulation Violates the Principles of Due Process and Fundamental Fairness**

Currently, 30 C.F.R. § 104.3(b) states that only citations and orders that have become final shall be used to identify mines with a potential pattern of violations. The proposed rule changes this approach, which has been followed since 1991, and instead allows POV determinations to be based on "violations issued." For purposes of POV calculations, an operator will now be presumed guilty as soon as an inspector accuses him of violating an MSHA regulation. The proposed rule also deletes those provisions granting prior warning to mine operators before the issuance of a pattern notice, and fails to proscribe a means by which operators can present mitigating factors and, where possible, develop a plan with MSHA to avoid the imposition of this onerous sanction. MSHA claims these changes are necessary in light of the large backlog of contested violations pending before the Federal Mine Safety Health Review Commission (Commission), and, according to MSHA, only a fraction of such contested violations get vacated or modified to non-significant and substantial (S&S). MSHA argues that because of this backlog, the final order and notice provisions contained in the current rule hinder enforcement and do not allow the Agency to review a mine's complete recent compliance history.

NWMA disagrees with MSHA's characterization of the current POV process, as well as its rationale for changing the criteria upon which POV status may be based. It is well understood in administrative law that federal agencies at different times exercise executive, legislative and judicial powers. In other words, federal agencies are the judge, jury and executioner in the promulgation and enforcement of federal regulations. Given this powerful leverage MSHA has over mine operators, it seems particularly unfair for MSHA to then bypass legitimate challenges to alleged citations and impose admittedly the most onerous enforcement action under the Mine Act before a finding of guilt is made.

Indeed, MSHA's primary justification for this change is the Agency's need to circumvent the normal adjudicatory process to permit the Agency to consider backlog cases as part of a mine's history for POV purposes. Unfortunately, the Agency has contributed to the backlog by eliminating the conference process and leaving operators with no choice other than the formal hearing process before the Commission. Given this understanding, it is therefore difficult to see any justification for MSHA responding to the slow operation of the adjudicatory system by denying mine operators their fundamental right to be heard before being sentenced.

Furthermore, MSHA's claim that only a fractional number of contested violations are vacated or modified is both inaccurate and irrelevant. According to information released by MSHA's Office of Assessments on January 31, 2011, almost 20 percent of violations issued as S&S, which were litigated in fiscal years 2009 and 2010, were vacated or modified to "non-S&S" as a result of the litigation process. Similarly, when § 104(d) violations, which alleged an "unwarrantable failure" to comply, were litigated in the same period, almost 33 percent of those violations were either vacated or modified to a § 104(a) violation. Therefore, relying on "violations issued" to impose the punitive sanction of § 814(e) of the Mine Act could well result in erroneous application of the pattern enforcement mechanism. Moreover, because the proposal is silent on the number of violations that it will take to establish a POV, it is likely that almost any margin of error could result in multiple mines being erroneously subjected to this stringent penalty. MSHA's reliance on this statistic, therefore, does not address the serious concern of mines being mistakenly placed on the pattern of violations list.

There is also a very real possibility of MSHA erroneously tabulating a mine's inspection history. The Office of Inspector General of the U.S. Department of Labor (OIG) recently reported on the accuracy of MSHA's efforts to screen mines for POV sanctions. During the five POV screenings performed from 2007-2009, MSHA district managers sent potential POV letters to 68 mines.

Following the completion of the evaluation period provided by the current 30 C.F.R. Part 104, those same district managers recommended that 9 mines be given a POV notice. However, upon further evaluation of the underlying violations by MSHA attorneys or review by the Federal Mine Safety and Health Administration, the Agency determined that 6 of the 9 mines (66 percent) no longer met the POV criteria.

Additionally, the same Inspector General's report found that MSHA's POV computer application used from 2007 to 2009 generated unreliable results on each of the five occasions it was used to screen for POV status. For example, OIG found that on all five occasions the MSHA application contained a value which could have caused a vacated citation to be counted as a valid final citation. As a result, the program could have over-counted citations for a specific mine. Similarly, citations and orders which had been issued to a prior owner of a mine could be associated with the current owner, resulting in an over-count of citations. The program also was found to incorrectly sum two columns that represented "unwarrantable failure" orders in such a manner as to incorrectly include a mine that did not meet the screening criteria for S&S § 104(d) final orders.

Finally, in the absence of any independent review, the risk of an erroneous application of the pattern notice and resulting withdrawal orders may be increased by MSHA's failure to provide its journeyman inspectors with periodic retraining. Lack of periodic retraining reduces the assurance that MSHA mine inspectors are adequately trained to conduct their duties and properly apply classifications, such as S&S and "unwarrantable failure," to violations they encounter. According to the OIG, 56 percent of MSHA journeyman inspectors did not attend the required refresher training in FY 2006 or 2007. Moreover, MSHA training records show that 65 percent of the MSHA journeyman inspectors who failed to attend the required retraining sessions in FY 2006 or 2007 had still not completed retraining by the end of fiscal year 2009. Over 27 percent of the 264 journeyman inspectors who responded to the OIG's survey stated that MSHA did not provide them with the technical training they needed to effectively perform their duties.

The information above indicates the POV rule should not be altered in the manner proposed, as MSHA has shown no adequate justification for these substantial changes. Not only does MSHA point to operational issues of its own hearings system as reason to deny notice and meaningful opportunity to be heard to mine operators, but MSHA also bases its changes on the false assumption that citations are rarely issued in error, and that contested violations are infrequently overturned or modified. Inspectors are not always right. Indeed, the above data belies the publicly articulated belief of the Agency that some mine operators contest enforcement actions to avoid pattern notices. There are clearly a number of legitimate legal reasons to administratively challenge enforcement actions, which is a statutory right granted by the Mine Act, and those challenges have been frequently met with success. For these reasons alone, MSHA should not adopt the proposed changes to the POV rule.

**The Fifth Amendment's Guarantee of Due Process of Law**

Perhaps even more importantly, the proposed rule clearly runs afoul of the Constitutional right to due process. The Fifth Amendment of the U.S. Constitution guarantees, in relevant part, that "[n]o person shall be…deprived of life, liberty, or property, without due process of law…" The use of "violations issued" to trigger the POV punitive sanction absent a meaningful opportunity for prior independent review or hearing, as well as the proposed rule's elimination of notice provisions, deny mine operators this Constitutional right to notice and the opportunity to be heard.

It is clear in the case of the POV sanction that shutting down a mining operation amounts to a substantial deprivation of property – both physical property as well as the economic benefits that accrue from mining operations – deserving of Fifth Amendment protections. Mine operators, therefore, must be afforded due process protections in the adopted regulatory POV scheme.

In determining what process is sufficient to satisfy the due process guarantee of the Fifth Amendment, courts have routinely held that "there can be no doubt that at a minimum [the words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."[1] The Supreme Court has also stated that "process which is mere gesture is not due process."[2] Although the exact procedure needed to satisfy due process changes with context, the Supreme Court has held that the extent of prior evidentiary hearing required before a deprivation of property occurs is determined by three factors: 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used; and 3) the government's interest.[3]

As discussed above, the private interest affected in this instance is the ability of a mine operator to manage a mine free from interference by federal officials. This is a substantial interest which, under the proposed POV regulations, MSHA would be permitted to deny without *any* prior hearing. Furthermore, as already shown in detail above, the risk of erroneous deprivation of that property interest is significant given the potential for mistaken issuance of citations and POV calculations. This risk is exacerbated by the fact that even a relatively small number of mistakes on the part of MSHA inspectors can result in mines being erroneously placed in POV status.

The final factor utilized in determining what process is required to satisfy procedural due process is the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would impose. Unquestionably, the government has a substantial interest in seeing that the enforcement scheme found in §104(e) of the Mine Act is successfully implemented. However, even in the face of such a compelling government interest, due process must be afforded to those parties directly affected by government action. Indeed, Congress, while routinely recognizing the importance of MSHA's mission, nevertheless established an enforcement scheme in the Mine Act that specifically grants mine operators the right to contest the issuance of any citation, order or proposed civil penalty within 30 days of its issuance. The proposed rule, however, while maintaining the right to contest a citation, grants the Agency authority to impose the most severe enforcement tool provided for under the Act long before the mine operator has a chance to be heard. Such a system cannot possibly afford adequate procedural protections to mine operators.

MSHA's actions are particularly unwarranted given the fact that the POV sanction is not a tool designed to address emergency situations. While it is true that courts have found exceptions to the general requirement of prior notice and a hearing in emergency situations where a significant government interest justifies delay of a hearing until after the seizure of property rights, no such exception exists in the case of POV violations. Congress has empowered MSHA with ample authority to protect the health and safety of miners in emergencies under the Mine Act. Section 107(a) gives MSHA authority to close a mine without a prior hearing whenever an "imminent danger" exists. These imminent danger orders remain in effect until the "...condition or practice which caused such imminent danger no longer exist[s]." 30 U.S.C. § 817(a). In addition, MSHA

---

[1] Mullane v. Central Hanover Bank & Trust Co. et al., 339 U.S. 306. *See also* Grannies v. Ordean, 234 U.S. 385, 394 ("The fundamental requisite of due process of law is the opportunity to be heard").

[2] Mullane v. Central Hanover at ______.

[3] Matthews v. Eldridge, 424 U.S. 319.

can seek a temporary restraining order, temporary injunction and permanent injunction in the appropriate federal district court whenever "...the Secretary believes that the operator...is engaged in a pattern of violation of the mandatory health or safety standards of this Act, which in the judgment of the Secretary constitutes a continuing hazard to the health or safety of the miners." § 108(a)(2); 30 U.S.C. § 818(a)(2). In light of such ample authority to stop operations at dangerous mine sites, MSHA may not then dispense with the notice and hearing procedures during the § 104(e) POV process in a manner contrary to due process and the statutory enforcement scheme of the Mine Act.

The important private interest at stake, the high likelihood of erroneous deprivation of that property interest and the compelling but non-emergency government interest involved all lead to the conclusion that MSHA must provide notice and a hearing to mine operators before imposing a POV sanction. To do otherwise would violate the Fifth Amendment's guarantee of due process under the law.

**The Final POV Rule Must Ensure that Mine Operators Receive Adequate Notice and a Fair Opportunity to be Heard**

NWMA finds MSHA's own previous due process considerations during the POV rulemaking process informative on the issue of what notice and hearing provisions should be included in the POV regulations. In the publication of the current version of the POV Final Rule, MSHA stated that "in order to avoid inequities regarding which mines are placed on a pattern, *the Agency must make ample provision for due process* when applying the broad framework established by Congress...MSHA will consider *only final citations and orders* when identifying mines with a potential pattern of violations." 55 Fed. Reg. 31129, July 31, 1990 (emphasis added).

Additionally, MSHA reasoned that "the initial screening factors are coupled with procedures affording parties *full and fair notice* of the Agency's initial determination that a potential pattern may exist at a mine. Application of these procedures will ensure that operators are made aware well in advance of the circumstances giving rise to the issuance of a pattern notice and will have a *reasonable opportunity to address these circumstances*...A number of commenters stated that fairness requires prospective application of the initial screening process. The Agency agrees." *Id.*

The Assistant Secretary himself, in his capacity as Administrator for safety and health at the United Mine Workers of America (UMWA), commented on the importance of the notice provisions contained in the current POV Rule. In his letter to MSHA regarding the proposed version of the current POV Rule, Asst. Sec. Main stated that "all mines which are under review for potential pattern of violations...shall be given notice to that effect by the Agency...This notice is designed to give operators the opportunity to take concrete actions to improve the citation history at the mine and to implement a remedial plan. MSHA should evaluate these [and] similar company efforts to correct a pattern of violations when the pattern notice conference is held." He further stated that "when MSHA determines that a mine under review is subject to a pattern notice, the Agency should inform the operator...of the Agency's intent to issue a pattern notice. The letter...should specify the basis for the determination and should give the operator...15 calendar days after receipt to request a conference. At the conference there should be a review of the citation history..."

It is clear, then, that MSHA included the current notice and procedural safeguards, including basing POV decisions only on final orders, to ensure fairness to mine operators. Deleting those provisions without establishing alternative measures denies operators that fundamental fairness, and violates the Fifth Amendment. Nothing has occurred to warrant these changes other than the

Agency's need to develop a political response to the tragic events of 2010 that shields itself from its failure to use the tools Congress previously provided.

MSHA also acknowledged, in the current rule, the potentially substantial loss of property that a POV violation can entail when drafting the current rule. Importantly, MSHA stated that "the Agency realizes that the statutory requirements for terminating a pattern of violations sequence place a great burden on the operator of the mine. An inspection of the entire mine, particularly a large underground mine, that reveals no violations of a significant and substantial nature may be difficult to achieve." MSHA itself therefore admitted that, once a mine is placed on POV status, it is virtually impossible to avoid a withdrawal order. As previously mentioned, MSHA has ample authority to shut down mines and protect miners in emergency situations. There is thus no adequate justification for MSHA to streamline the POV process in such a way as to eliminate all procedural safeguards for mine operators.

If MSHA will not continue its current practice of only basing POV decisions on final orders and citations, MSHA must at an absolute minimum promulgate a POV rule that provides mine operators with sufficient notice and an opportunity to be heard before a POV order may be issued.

NWMA understands MSHA's concerns regarding the current backlog of cases and slow-moving adjudication process. However, altering the POV process in the manner proposed is neither an appropriate nor a fair response. Rather, MSHA and the Federal Mine Safety and Health Review Commission should adopt, through notice and comment rulemaking, formal measures allowing expedited considerations of those cases involving mines at risk of being placed on POV status. A formal mechanism to consolidate and expedite issued violations being contested by potential POV operators would allow MSHA to review a mine operator's entire recent violation history within a reasonable timeframe, while still affording mine operators adequate opportunity to contest potentially erroneous citations before becoming subject to stringent penalties. In other words, MSHA would have a means to penalize the "bad actors" in the system without violating the due process rights of ALL mine operators. Additionally, this could be accomplished easily within the framework of the existing adjudicatory system.

It is clear that the Due Process Clause of the Fifth Amendment requires MSHA to put procedural mechanisms in place in any Final POV Rule that provides mine operators with adequate notice and an opportunity to be heard. While the current POV rule ensures fairness and the right to be tried before being convicted, the proposed rule takes out nearly every single procedural protection contained in the current rule. Instead, mine operators can be issued withdrawal orders when an inspector merely alleges a safety infraction, and are given no prior notice of a potential POV sanction. Such a system is in clear violation of the law. Rather than change the POV process, MSHA should instead address the underlying issue – a backlog of cases causing prolonged adjudicatory periods – by formalizing a procedure to expedite the full and fair hearing of cases ripe for POV review. Alternatively, should MSHA make changes to the POV Rule, MSHA must retain adequate notice provisions and establish a pre-sanction hearing process in which mine operators are given a fair opportunity to present their case to an independent reviewer. To do otherwise would violate the due process rights guaranteed by the Fifth Amendment.

**POV Criteria Should be Subject to Notice and Comment Rulemaking Procedures**

MSHA is seeking comment on "how the Agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." 76 Fed. Reg. 5719, 5720 (February 2, 2011). All such criteria should be published in the Federal Register and be subject to the notice

and comment provisions of the Administrative Procedures Act and the Mine Act. Section 104.2 of the proposed rule lists only generic categories of information that will be reviewed, without quantifying or explaining how such data will be applied to issue a pattern notice. The proposed rule also seems to anticipate that POV criteria will be fluid and subject to change without any established method for notice and comment rulemaking. While it is impossible to comment on POV criteria that have not yet been listed in the proposal, NWMA strongly objects to this suggested criteria method, as it is neither transparent nor simple. Rather, the proposed rule blatantly fails to inform stakeholders of what is expected of them to avoid a pattern notice, and offers no opportunity for comment on specific criteria before the rule becomes effective. Given the serious consequences stemming from being placed on a POV, this lack of transparency is extremely troubling.

While the Secretary of Labor has broad discretion to establish criteria for determining when a pattern of violations exists, that discretion does not extend to establishing POV criteria without notice and comment rulemaking. Section 104(e)(4), 30 U.S.C. § 814(e)(4), requires that the "...Secretary shall make such *rules* as he deems necessary to establish criteria for determining when a pattern of violations...exists" (emphasis added). The Office of Inspector General also specifically recommended that MSHA seek stakeholder input on the POV screening criteria in its report dated September 29, 2010, pages 3, 24. MSHA has clearly not adopted this approach in the proposed rule. Rather, by not identifying or publicizing any specific criteria in a Final POV Rule, and by instead providing for the periodic development and revision of specific criteria, MSHA is granting itself the ability to constantly change the rules of the POV process with no public notice or comment period. Such an approach is not only fundamentally unfair, but it also blatantly lacks the very transparency MSHA seeks to achieve with this rule revision. MSHA should remedy this issue by adopting a formal rulemaking process by which POV criteria must be established.

NWMA's concern with the failure of the proposal to establish a rulemaking process for POV criteria is exacerbated by the fact that the proposed rule eliminates any potential for discussion of how the specific criteria should be applied to a mine before the issuance of a pattern notice. Rather, it appears that the rule anticipates an "automated" process for the issuance of a pattern notice based on a mine operator's monitoring of criteria posted on MSHA's website. Furthermore, no specific procedure is described for consideration of mitigating criteria prior to the issuance of the notice. In other words, operators could be subjected to immediate withdrawal orders in non-emergency situations without having had any opportunity to discuss the underlying violations, application of the POV criteria (let alone the initial listing of such criteria) or means in which the operator might avoid the imposition of the sanction.

NWMA urges MSHA to reissue its proposal, and to include in that proposal the criteria to be used in the POV process, as well as an established mechanism by which mitigating circumstances are discussed prior to any issuance of a pattern notice. Such a proposal would be efficient, transparent and consistent with the Agency's and industry's goal of protecting the safety and health of miners.

## Economic Analysis

A review of MSHA's cost/benefit analysis in the proposed rule also indicates that the Secretary has both overestimated the presumed benefits and underestimated the costs associated with the rule.

The stated benefits of the proposed rule are based on the premise that specific POV criteria will be posted on MSHA's webpage, and that MSHA will develop a searchable database of

compliance information which will then be used to determine whether a mine is approaching proposed POV criteria levels. Similarly, the estimated costs are based upon an unrealistic estimate of the time it will take for a mine operator to evaluate its enforcement history and extrapolate forward to the end of the POV cycle. The proposed rule further significantly understates the costs to a mine placed on a POV.

MSHA has the ability to more accurately estimate both the cost and the benefits of the proposed rule. In the interest of transparency, and in light of President Obama's Executive Order 13563, "Improving Regulation and Regulatory Review," it must do so.

MSHA's estimation of benefits is based upon the supposition that mine operators who see that their mine is approaching a POV will institute an MSHA-approved safety and health management program to lessen the probability of being placed on a POV. MSHA estimates that implementation of such a plan will result in approximately 50 mines per year averaging three fewer nonfatal injuries in the first year after implementation of the MSHA-approved plan. Utilizing a "willingness-to-pay" methodology, MSHA calculates that the proposed rule will result in monetized benefits of approximately $9.3 million per year.

MSHA's analysis is flawed in that it is based upon an assumption that the specific criteria for issuance of a POV notice will only be applied prospectively. However, the proposed rule does not limit MSHA to prospective application of the specific criteria, and historically MSHA has consistently applied POV specific criteria *only retroactively*. For example, in the most recent POV cycle, MSHA announced the specific POV criteria on September 28, 2010 and applied it retroactively over a 12-month period ending August 31, 2010.

The failure of the proposed rule to limit retroactive application of specific POV criteria renders MSHA's estimate of benefits meaningless. It is based upon a premise which is not stated in the proposed rule and which is contrary to MSHA's historical practice.

Additionally, the proposed rule speculates that MSHA will successfully develop a searchable database of compliance information which can be used by mine operators to determine whether their mine is approaching proposed POV criteria levels. Historically, MSHA has had problems bringing computer programs online on a reliable schedule. The repeated delay in implementation of the MSHA Standardized Information System, for example, demonstrates MSHA's inability to fulfill promises of timely, reliable computer development. It is simply inappropriate for MSHA to base its estimation of benefits on a speculative promise to develop a computer program that will allow mine operators to track their exposure to the specific POV criteria.

Lastly, and most importantly, the Agency provides no rational basis for its assessment that implementation of a safety and health management program will result in three fewer nonfatal injuries. MSHA has no basis to analyze the effectiveness of such programs as the Agency itself is still grappling with the very question of what constitutes an effective safety and health management program. Moreover, to assume that injury reductions at mines having received PPOV letters were attributable to receipt of the PPOV letter is without basis and is not sufficient justification for calculating perceived benefit to be derived from the proposed rule.

MSHA's cost analysis is similarly flawed. MSHA estimates that the yearly cost for all mine operators to monitor their POV performance will be less than $1 million per year. This was based upon the assumption that it will take a supervisor an average of 5 minutes per month to monitor each mine's performance using MSHA's website. Such an assumption is patently unrealistic. Five minutes would be the minimum time that it would take a person familiar with MSHA's webpage to access the relevant data. It would certainly take much longer for that

individual to then study the data and extrapolate the potential impact of future MSHA inspections. At a minimum, MSHA should expect that accessing the MSHA database would only be the first step in a more involved analytical process which would consume a significantly greater amount of time than MSHA has assumed.

Another issue with MSHA's analysis is the assumption that such a monitoring process would only need to be performed monthly. For many underground mines MSHA enforcement activity occurs weekly, if not daily. It would be more reasonable for MSHA to assume that a mine operator would update his POV exposure analysis following any MSHA enforcement activity that occurs at the mine, given that they will no longer be afforded "due protection" rights before POV sanctions are implemented.

MSHA acknowledged that it "does not have an historical basis from which to estimate the potential costs that would be incurred by a mine on a POV." Nevertheless, MSHA has projected that a typical mine would lose about one-half of one percent of revenue as the result of closures resulting from placement on a POV by MSHA. MSHA stated that the closures would result in one or two days of closure for a large mine and one day or less for a small mine, and that as a result of these closures, "a typical mine would lose about 0.5 percent of revenue" which "is about $218,000." Unfortunately, the Agency has grossly underestimated the potential cost of the proposal.

MSHA has the historical data available to provide stakeholders and the public with a much more accurate estimation of the effective cost of the planned POV sanction. It should do so before proceeding further.

**Conclusion**

We understand the need for regulation, and support MSHA using all of the enforcement tools Congress provided in the Mine Act when necessary to achieve safety. However, the proposed rule will do little to advance safety. NWMA cannot support reforms that deprive mine operators of the protections afforded them under the Constitution and circumvent mandatory procedures aimed at fostering transparent and accountable government. The proposed rule will worsen an already broken system and we urge the agency to revoke this proposal.

Thank you for considering our comments.

Sincerely,

*Laura Skaer*

Laura Skaer
Executive Director



**Salt Institute**

April 8, 2011

2011 APR -8 P 5: 26

The Honorable Joseph Main
Assistant Secretary of Labor for Mine Safety and Health
c/o The Office of Standards, Regulations and Variances
US Department of Labor
1100 Wilson Boulevard, Rm. 2350
Arlington, VA 22209-3939

Re: Pattern of Violations RIN: 1219-AB73 (30 CFR Part 104)

Dear Assistant Secretary Main:

The Salt Institute represents the major rock salt mining companies in the United States. We are writing to comment upon the Proposed Rule on Pattern of Violations described in 30 CFR Part 104 - RIN 1219-AB73.

We are not in agreement with the Proposed Rule for the following reasons:

- We believe the proposed Rule is deliberately ambiguous, particularly when referring the criteria and mitigating circumstances upon which 'patterns' of violation will be based. Since they are the functional core of the rule, how is it possible to provide any meaningful comments in the absence of well-defined criteria?

- How is it possible to adopt rules while the criteria upon which the rules depend remain undefined?

- Salt mines by their geologic nature are inherently safer than others because most are not classified as gassy and salt dust is neither explosive nor siliceous. The 'one size fits all' grouping of mines into the Proposed Rule ignores the exemplary safety record of salt mines and commits MSHA resources to a mining sector with an extremely unlikely potential for POV status.

- The Proposed Rule may result in closure orders issued against mine sites, before the operator has an opportunity to discuss, assess or contest the validity or merit of the alleged citations. Inclusion of questionable and contested S&S (significant and substantial) citations effectively prevents a mine operator obtaining legal due process. Since the proposed rule does not allow an appeal process the Proposed Rule would create significant legal activity.

- The proposed Rule states that once a mine site is placed on POV status it must achieve no S&S citations in an ensuing quarterly inspection in order to be removed from that status. For all practical purposes, achievement of no S&S citations in any comprehensive quarterly inspection is virtually unheard of. As it stands, the Proposed Rule is understood by the regulated mining community to mean that once placed on POV status, it will be impossible to be removed.

*700 NORTH FAIRFAX STREET · FAIRFAX PLAZA, SUITE 600 · ALEXANDRIA, VA 22314-2040*
*703/549-4648 · FAX: 703/548-2194 · email: morton@saltinstitute.org*

AB73-COMM-36

April 8, 2011

The Salt Institute understands the need for equitable and effective use of MSHA regulatory tools in order to achieve safety in the mining environment. However, the Proposed Rule as it stands will not achieve these goals. At a very minimum, in good faith, we recommend the following amendments:

- The Proposed Rule should provide clear, explicit POV criteria.

- The Proposed Rule should describe the scope and provide specific parameters for a "written safety and health management program" and codify this in 30 CFR Part 104.

- The Proposed Rule should consider those mine sites which have traditionally achieved exemplary compliance, accident, injury & illness records and thus already demonstrated no POV.

- The Proposed Rule should exclude salt mines from the POV regulation. The salt mining industry safety rate is 77% better than that of the mining industry generally. In fact, the safety record for salt mines is almost on par with all industry. Salt mines should not be evaluated more than once per year and MSHA should develop separate and specific POV criteria for the various mining sectors – coal, metal, nonmetal, surface mines, underground mines, etc.

In summary, the Salt Institute does not believe that this flawed Proposed Rule will enhance safety as it stands. It denies the regulated mining community the ability to clearly comprehend its application bypasses well-established procedures aimed at fostering transparent and accountable government, not to mention a globally-competitive industry sector. The Salt Institute urges you to revise and re-propose this rule to address the flaws described above.

Sincerely,

Lori Roman
President
Salt Institute

**From:** Dennis C. Parker [mailto:D.Parker@activeminerals.com]
**Sent:** Thursday, April 14, 2011 11:39 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** MSHA Pattern of Violation Issue

2011 APR 14 P 1: 00

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73-COMM-37

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

**Dennis C Parker**
**President and CEO**
**Active Minerals International, LLC**
*Integrity, Innovation, Teamwork, Execution*
**Phone: +1-410-512-4104**
*Cell: +1-443-956-3937*

**From:** Sara E. Conn [mailto:S.Conn@activeminerals.com]
**Sent:** Thursday, April 14, 2011 11:48 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 1:00

Good morning,

I am an employee of a mining company.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73-COMM-38

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

**Sara Conn**
Communications Coordinator
s.conn@activeminerals.com
410-825-2920



**ActiveMinerals**
INTERNATIONAL, LLC®
*Integrity. Innovation. Teamwork. Execution.*
6 North Park Drive Suite 105
Hunt Valley, MD 21030

**From:** Daniel E. Barnes [mailto:D.Barnes@activeminerals.com]
**Sent:** Thursday, April 14, 2011 11:50 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 1: 00

Good morning,

I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible to give comments on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73-COMM-39

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,
Daniel Barnes
MIS Manager
Active Minerals International, LLC

**From:** Lauren E. Parker [mailto:L.Parker@activeminerals.com]
**Sent:** Thursday, April 14, 2011 11:54 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 1: 00

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73 - Comm - 40

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Lauren Parker
HRIS/HR Administrator
Active Minerals International, LLC

**Lauren Parker**
HRIS/HR Administrator
l.parker@activeminerals.com
6 North Park Drive, Suite 100
Hunt Valley, Maryland 21030
410-512-4106 phone
410-825-1164 secure fax

**From:** Monte D. Trotter [mailto:M.Trotter@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:00 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group          2011 APR 14 P 1:00
**Subject:** FW: RIN 1219-AB73 MSHA

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenter's on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73-COMM-41

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Monte Trotter
433 Brittany Downs
Macon GA 31210
478.737.3208 cell

**From:** Jennifer D. Markey [mailto:J.Markey@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:01 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 1:00

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73-COMM-42

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,
Jennifer Markey
Active Minerals International, LLC
j.markey@activeminerals.com

**From:** Randy C. Graham [mailto:R.Graham@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:02 PM          2011 APR 14  P 1:00
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** MSHA Pattern of Violence Issue

Good morning,

I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73-COMM-43

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

**Randy Graham**
**Plant Accountant**
**Active Minerals International, LLC**
*Integrity, Innovation, Teamwork, Execution*
**Phone: +1-478-628-5293**

**From:** Steve J. VanDeventer [mailto:S.VanDeventer@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:03 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group   2011 APR 14 P 1:00
**Subject:** RIN 1219-AB73

Good morning,

I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process. The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73-COMM-44

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Steve VanDeventer
Operations Manager – Aiken SC
Active Minerals International, LLC

**From:** Keith D. Mills [mailto:K.Mills@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:13 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** MSHA Pattern of Violation Issue

2011 APR 14 P 1:01

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73-Comm-45

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,

**Keith Mills**
**Chief Customer Officer**
**Active Minerals International, LLC®**

**From:** Karla J. McClintock [mailto:K.McClintock@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:15 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group 2011 APR 14 P 1:01
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73-COMM-46

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

      As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

      The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Karla McClintock
Executive Administrator
Active Minerals International, LLC
6 North Park Drive, Suite 100
Hunt Valley, Maryland 21030
410.512.4120 direct

**From:** Donna S. Kidd [mailto:D.Kidd@activeminerals.com] 2011 APR 14 P 1:01
**Sent:** Thursday, April 14, 2011 12:44 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** FW: MSHA Pattern of Violation Issue

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB 73 - COMM - 47

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Donna Kidd
Logistics Manager
Active Minerals International, LLC
Phone: 410-512-4125

**From:** Roberto R. Valdes [mailto:R.Valdes@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:49 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group       2011 APR 14 P 1: 01
**Subject:** MSHA Pattern of Violation Issue

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

A873-COMM-48

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,


Roberto Valdés
Sales Manager Latin America
Active Minerals International, LLC


Phone: 55-5679-5222
Cel: 55-9106-1617
eFax: 55-5004-4536
r.valdes@activeminerals.com

www.activeminerals.com

**From:** Ryan W. Ernest [mailto:R.Ernest@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:50 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group 2011 APR 14 P 1: 01
**Subject:** Pattern of Violation Rule

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

A873-COMM-49

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank You,

Ryan W. Ernest
Staff Engineer
Active Minerals International, LLC
r.ernest@activeminerals.com
(704) 575-8634

**From:** Chris K. Harris [mailto:C.Harris@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:50 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** Comments on POV Proposal

2011 APR 14 P 1: 01

Good Afternoon,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73-COMM-50

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,
Chris Harris
Plant Manager
AMI Gordon, GA

**From:** Jeff B. Carr [mailto:J.Carr@activeminerals.com]
**Sent:** Thursday, April 14, 2011 12:57 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 1:45

Good morning,

I have been in the mining industry for several companies over the past 25+ years. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit

AB73 - COMM - **51**

down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

**Jeff Carr**
Director, Business Development
North America
6 North Park Drive, Suite 105
Hunt Valley, MD 21030

Mobile: 267-939-8342

**From:** Christina A. Sumner [mailto:c.sumner@activeminerals.com]
**Sent:** Thursday, April 14, 2011 1:15 PM  2011 APR 14 P 1: 46
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73-COMM-52

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Christina Sumner
Customer Service Representative
Active Minerals International

478-628-5301 x 203 (phone)
478-628-1368 (fax)

**From:** Sandra M. Howard [mailto:S.Howard@activeminerals.com]
**Sent:** Thursday, April 14, 2011 1:28 PM    2011 APR 14 P 1: 46
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** Pattern of Violation Rule

Good morning,

I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

*AB73-Comm-53*

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

S. Michelle Howard
Logistics Coordinator / Operations Assistant
Active Minerals Int'l – Aiken
1369 Reynolds Pond Rd
Aiken, SC 29801
(803) 649-2527 ext 203/202
(803) 649-0411 fax
s.howard@activeminerals.com



**ActiveMinerals**
INTERNATIONAL, LLC®

*Integrity. Innovation.*
*Teamwork. Execution.*

**From:** Lydia K. Bogar [mailto:L.Bogar@activeminerals.com]      2011 APR 14 P 1:46
**Sent:** Thursday, April 14, 2011 1:28 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73-COMM-54

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Lydia Bogar
HR & Operations Coordinator
Active Minerals International, LLC
Ph: 803-649-2527 x 202

**From:** Deon K. Dunbar [mailto:D.Dunbar@activeminerals.com]
**Sent:** Thursday, April 14, 2011 1:31 PM          2011 APR 14  P 1: 46
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Hello,

 I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

        It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

        The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
        The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

        MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73- COMM-55

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Regards,
Deon Dunbar
Customer Service
1369 Reynolds Pond Road
Aiken, SC 29805
803-648-3248 Ext 203
803-649-5701 Fax
d.dunbar@activeminerals.com

**From:** Dianne T. Sanford [mailto:D.Sanford@activeminerals.com]
**Sent:** Thursday, April 14, 2011 1:42 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 1:46

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73-COMM-56

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

*Thank You,*
*Dianne Sanford*

*Active Minerals International, LLC*
*Accounting Assistant*
*(478)628-5293*

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

2011 APR 14 P 1:46

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,


Nick John
Production/Process Manager
Active Minerals International- Attapulgite Division
Office 229-465-4011
Cell 850-274-5549

AB73 - COMM - 57

**From:** Chuck T. Pettit [mailto:C.Pettit@activeminerals.com]
**Sent:** Thursday, April 14, 2011 2:16 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group    2011 APR 14  P 3: 30
**Subject:** RIN 1219-AB73
**Importance:** High

**Importance:** High

Good morning,

I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

     It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

     The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
     The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

     MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine

AB73-COMM-58

operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,
Chuck T. Pettit
General Manager of Operations
Active Minerals International, LLC

**From:** Charles R. Snow [mailto:C.Snow@activeminerals.com]
**Sent:** Thursday, April 14, 2011 2:20 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 14 P 3: 30

Good Afternoon,

I am a geologist, miner, and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue:

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenter's on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73 - COMM - 59

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what-if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Regards,

Charles R. Snow
Quality Manager  /  Process Supervisor
Active Minerals International
Attapulgite Division
Office:        850.875.5585
Bus. Cell:     850.868.0062

---

**From:** Richard C. Southerland [mailto:R.Southerland@activeminerals.com] ⊡ 2011 APR 14 ⊡ 3: 30
**Sent:** Thursday, April 14, 2011 2:07 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** PoV Comments

Good morning,

I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation,

AB73 - COMM-60

and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Richard C. Southerland
Sr. V.P. Engineering
Active Minerals International, LLC
4931 Riverside Drive
Building 200; Suite A
Macon, GA 31210

**From:** Jack H. Whiteford [mailto:J.Whiteford@activeminerals.com]
**Sent:** Thursday, April 14, 2011 9:19 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group 2011 APR 15  A 10: 42
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation,

AB73-Comm-61

and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Best Regards,

*Jack Whiteford*

Jack Whiteford
Senior Vice President - Global Business Development and Marketing
Active Minerals International, LLC ®
Skype user name: jakroc
6 North Park Dr. Suite 105, Hunt Valley MD 21030
Cell: +1-410-702-5765

Please consider the environment before printing this email

**From:** Charles W. Cunard [mailto:C.Cunard@activeminerals.com]
**Sent:** Thursday, April 14, 2011 7:49 PM         2011 APR 15  A 10: 42
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

*AB73-COMM-62*

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,
Charles W. Cunard, CSP
Corporate Safety Manager
Active Minerals International, LLC

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-8 Filed: 08/10/16 Page: 96 of 364 PAGEID #: 2299

18354 Quantico Gateway Drive, Suite 200
Triangle, VA 22172-1779
703-291-2424 -telephone
703-291-2446 - fax



*APR 15 P 2:51*

# Fax

| **To:** | Mine Safety & Health Administration | **From:** | Linda Raisovich-Parsons, UMWA |
|---|---|---|---|
| **Fax:** | 202-693-9441 | **Pages:** | 12 (including cover) |
| **Phone:** | 202-693-9440 | **Date:** | April 15, 2011 |
| **Re:** | RIN 1219-AB73 | **cc:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:** Attached are the comments of the United Mine Workers of America on the Proposed Rule for Pattern of Violations. Please forward these comments to the appropriate persons in your Agency for consideration. I also forwarded a copy by Electronic Mail but because we receive no confirmation when sent by email, I am also faxing a copy just to make sure they have been received. I thank you in advance for your cooperation in this matter.

*AB73-COMM-63*

**Linda Parsons**

| | |
|---|---|
| **From:** | Linda Parsons [lparsons@umwa.org] |
| **Sent:** | Friday, April 15, 2011 1:20 PM |
| **To:** | 'zzMSHAcomments@dol.gov' |
| **Cc:** | 'Judy Rivlin'; 'Dennis ODell'; 'umwarbowersox@yahoo.com'; 'dkane@umwa.org'; 'rairhart@umwa.org'; 'croberts@umwa.org'; 'bscaramozzino@umwa.org' |
| **Subject:** | RIN 1219-AB73 |
| **Attachments:** | RIN 1219-AB73  UMWA's Comments on the Proposed Rule for Pattern of Violations.pdf |

Dear Sir/Madam,

Attached for the record are the comments of the United Mine Workers of America on the Proposed Rule for Pattern of Violations.  Please forward these comments to the appropriate persons in your Agency for consideration.  I thank you in advance for your cooperation in this matter.

Sincerely,
Linda Raisovich-Parsons, Deputy Administrator
UMWA Department of Occupational Health and Safety

1

**United Mine Workers of America
Comments on the
Mine Safety and Health Administration's
Proposed Rule:
Pattern of Violations
RIN 1219-AB73**

*The United Mine Workers of America (UMWA or Union) is pleased to have the opportunity to offer these comments on the Mine Safety and Health Administration's (MSHA or Agency) Proposed Rule on Pattern of Violations.*

*The UMWA generally supports the Rule proposed by MSHA and reported in the Federal Register, Vol. 76, No. 22; pp. 5719-5729, February 2, 2011. However, we have certain concerns about the proposal, which are set forth below.*

*By way of background, the Pattern of Violations (POV) enforcement tool has been in Section 104 (e) of the Mine Act since 1977, yet MSHA's use of it was essentially nonexistent until very recently. We believe the POV mechanism represents an important means for protecting miners' health and safety. Accordingly, we encourage MSHA to maintain a POV procedure that is easy for both the regulated community to understand and appreciate, and for MSHA to utilize when operations demonstrate extraordinarily unsafe or unhealthy conditions. Further, the post-disaster records of the recent past (including Sago, Aracoma, Darby, Crandall Canyon, and Upper Big Branch) reveal that the Agency long-suffered from inconsistent and inadequate enforcement: unless that changes on an on-going basis, even these suggested improvements will not make enough of a difference.*

*For purposes of this document, we will first set forth MSHA's newly proposed language, and then offer our comments on the proposals.*

<u>Section 104.1 Purpose and scope.</u> This part establishes the criteria and procedures for determining whether a mine operator has established a pattern of significant and substantial (S&S) violations at a mine. It implements section 104(e) of the Federal Mine Safety and Health Act of 1977 (Act) by addressing mines with an inspection history of recurrent S&S violations of mandatory safety or health standards that demonstrate a mine operator's disregard for the safety and health of miners. The purpose of the procedures in this part is the restoration of effective safe and healthful conditions at such mines.

Comment:
    *This section, as proposed, includes no changes.*

*We generally agree with the stated purpose, but also note that the plain language of the Mine Act, in Section 104(e), does not limit the use of this POV enforcement tool to an operation's record of S & S violations. Rather, the Act speaks of a pattern of any/all violations that could significantly and substantially contribute to mine health or safety hazards. Most often S&S violations provide a reliable indicator of*

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-8 Filed: 08/10/16 Page: 99 of 364 PAGEID #: 2302

*the kind of significant hazards that warrant use of the POV enforcement tools. However, MSHA need not limit its analysis to only S&S violations.*

<u>**Section 104.2 Pattern criteria.**</u>  (a) Specific pattern criteria will be posted on MSHA's Web site at http://www.msha.gov and used in the review to identify mines with a pattern of S&S violations. The review will include:

(1) Citations for significant and substantial violations;

(2) Orders under section 104(b) of the Act for not abating significant and substantial violations;

(3) Citations and withdrawal orders under section 104(d) of the Act, resulting from the operator's unwarrantable failure to comply;

(4) Imminent danger orders under section 107(a) of the Act;

(5) Orders under section 104(g) of the Act requiring withdrawal of miners who have not received training and who the inspector declares to be a hazard to themselves and others;

(6) Enforcement measures, other than section 104(e) of the Act, which have been applied at the mine;

(7) Other information that demonstrates a serious safety or health management problem at the mine such as accident, injury, and illness records; and

(8) Mitigating circumstances.

(b) At least two times each year, MSHA will review the compliance and accident, injury, and illness records of mines to determine if any mines meet the criteria posted on MSHA's Web site.


Comment:

*This section combines what has been in subsections 2 and 3 of the regulation.*

*The UMWA agrees with eliminating initial screening criteria that MSHA has used to provide an operator with an advanced written warning about an operation being vulnerable to imposition of the pattern of violations procedures. Operators should have an on-going awareness about their own health and safety practices and experience, and shortcomings in these regards. They should know when problems with their health and safety programs require more resources and/or attention. Accordingly, there should be no need for the government to provide a specific advance warning about an operation's substandard health and safety record and the heightened enforcement attention that may follow. We thus support eliminating what is now in 104.3, the provisions for determining which operations meet a <u>Potential</u> Pattern of Violation (PPOV).*

*We are aware of evidence that some operations made reasonably quick improvements to their health and safety programs upon receiving an MSHA notice of PPOV; some commenters suggest that kind of PPOV evidence indicates that the PPOV notice alone can serve to improve the "worst" actors' health and safety programs, such that the PPOV may be all that's needed in most cases. We disagree. If MSHA will stop providing PPOV notices then all operations will have a greater incentive to become*

*more pro-active about their health and safety practices on an on-going basis. Further, there is evidence that some of those that received a PPOV improved their health and safety programs in the very short term -- just enough to satisfy the immediate goal of getting off the POV list -- but then slipped back to their inadequate practices, again jeopardizing miners' health and safety. Making the proposed change (to eliminate the PPOV step) should serve to effect greater improvements: for more miners, at more operations, and on a longer-term basis. Operators will no longer be able to sit back and wait for MSHA to advise them that they have been targeted for special enforcement action, as all operations will be equally accountable and vulnerable if and when their practices warrant greater enforcement.*

*We also agree with simplifying the POV procedures and making them more transparent. We support, among other things, posting on the web (or any comparable publicly accessible system) both an operation's particular MSHA enforcement experience, and information that would allow an operator to compare its own experience with MSHA's POV screening criteria. MSHA's recent launch of its on-line monitoring tool for POV serves as a user-friendly tool that will allow all operators to monitor their own records vis-à-vis MSHA's records and to determine how close an operation may be to meeting MSHA's criteria, which would lead to MSHA's application of its heightened POV enforcement tools. With MSHA's monthly updating of these records, operators will be able to regularly identify any significant changes or trends; it will also allow them to communicate with the Agency if their respective records differ from MSHA's so any such discrepancies can be resolved promptly, before any unwarranted POV action would be initiated. Having this information made available by MSHA during this comment period helps to alleviate concerns and uncertainty about how the site works: parties can now see that elimination of the PPOV would not actually leave them in the dark about the likelihood an operation would meet the POV criteria.*

*Another critical change that would be accomplished by this proposed language concerns the removal of the current limitation that MSHA only consider "final" orders for purposes of POV. Under this proposal, citations and orders would be considered for possible POV enforcement during the review period after the citations and orders are issued, but while any legal challenges remain pending. The problem with the current system that limits a POV analysis to only <u>final</u> orders is that it can take years to resolve a contested citation. And by the time such a citation becomes final, the health and safety conditions at the mine may bear no relationship to what they were when the hazard was identified and citation first issued. Meanwhile, miners may be exposed to extraordinarily unhealthy or unsafe mine conditions by a chronic and persistent violator of MSHA regulations.*

*Insofar as the Mine Act has always been dedicated primarily to miners' health and safety, the current POV procedure - limited to final orders - has completely de-railed a primary enforcement tool Congress designed for MSHA. By limiting its POV procedures to only final citations and orders, the Agency got itself stuck in the morass of lengthy litigation processes, which does not serve, but harms, miners' health and*

3

safety. In fact, in comments the UMWA submitted in 1989 when MSHA promulgated the current regulation, the Union warned MSHA against restricting itself to final citations and orders when identifying mines with a _potential_ pattern because that would motivate operators to contest S&S violations (regardless of the merits) in order to escape liability under the POV system. As the UMWA predicted and the recent past demonstrates, with the 2 year window period MSHA now uses for analyzing POV, many contested citations and orders are caught up in the FMSHRC backlog preventing MSHA from applying this Sec. 104(e) POV tool to some operations that MSHA cited for very numerous S&S violations.

We now respond to the comments of those who claim it would not be fair to allow a POV system based on issued-but-contested citations and orders, and those who allege that operators' due process would be compromised by allowing MSHA to consider non-final citations and orders for POV determinations:

First and foremost, the plain language of the Mine Act does not require MSHA to consider only final citations and orders for it to use POV. Secondly, the Mine Act includes many sections that require an operator to immediately correct problems MSHA identifies without exhausting challenge procedures. Due process protections will still be included, just later in time through contest procedures. For example, a failure to abate order under Sec. 104(b), and an unwarrantable failure order under Sec. 104(d), are issued on the basis of previous citations, whether or not those citations have been challenged. Likewise, an operator that disputes an inspector's determination as to whether an imminent danger exists must immediately comply with the Sec. 107 order and withdraw miners, though it still has the right to challenge MSHA's issuance of the order.

Indeed, the legislative history supports _not_ requiring final orders for POV purposes. In discussing the sequence for issuing a Sec. 104(e) order, the Senate Committee noted that the pattern order sequence "parallels the current unwarrantable failure sequence of the Coal Act, and the unwarranted failure sequence of sec. 105(c) of the bill."[1] If the pattern orders are based only on "final" citations, MSHA's enforcement cannot be said to "parallel" that of Sec. 104(d), as Congress intended.

The Senate Committee gave a fairly extensive comparison between the "unwarrantable" and the POV provisions. It explained that the violation setting into motion the unwarranted failure sequence "must be of a significant and substantial nature and must be the result of the operator's 'unwarranted failure' to comply." S. Rep. No. 181, 95th Cong., 1st Sess. at 33. In comparison, it pointed out "there is no requirement that the violations establishing the pattern offense be a result of the operator's 'unwarranted failure,' only that they be of a 'significant and substantial' nature." _Id._ The Committee also described other ways in which the enforcement provisions parallel each other, including the 90-day period for issuance of the orders

---

[1] S. Rep. No. 181, 95th Cong., 1st Sess. at 33. The reference to Sec. 105(c) is a reference to the unwarrantable provision that was ultimately designated as Sec. 104(d) in the final bill.

and the requirement that there be an intervening "clean" inspection before either order can be terminated.

The Senate Committee concluded its discussion by pointing out that "it is the Committee's intention that the Secretary or his authorized representative may have both enforcement tools available and that they can be used _simultaneously_ if the situation warrants." (Emphasis added). Under MSHA's current rule -- with its need for finality -- Congress' intention has been thwarted. Indeed, the Secretary cannot use both enforcement tools simultaneously if an operator's challenge to the underlying citations effectively blocks implementation of this POV tool.

Further, courts reviewing due process issues balance the private interest of the party claiming a deprivation of due process against both a) the nature and importance of the government's interest and b) the risk of the government making a mistake when depriving due process and the consequences any such mistake would entail. When there is a compelling government interest at stake-- as miners' health and safety surely is, and as the Mine Act's first purpose unequivocally states -- the courts find that an after-the-fact hearing satisfies due process. Given the clear Congressional directive to protect miners' health and safety, the UMWA believes that any due process concerns are adequately protected by the FMSHRC and judicial review procedures. That said, we would suggest that MSHA include a provision stating that if any citations or orders MSHA used to impose a Sec. 104 (e) POV are later reduced (whether by settlement or litigation) to non-S&S, or vacated, those changes would constitute mitigating circumstances, which MSHA would consider (though such changes might not have any affect on the underlying POV determination).

Making the proposed change to allow the Agency to consider outstanding citations and orders and not just final ones, will help to correct the backlog problem that has hamstrung MSHA. There is a substantial backlog of cases at the FMSHRC that has even provoked Congressional hearings in 2010. Contested citations can easily take longer to resolve than is the entire two-year window period provided in the current POV structure. And the backlog problem is not going to disappear anytime soon. For example, under the current procedures, MSHA could confront the conundrum of whether it should place a mine in POV in 2011 based on citations it issued in 2009. This doesn't make sense and does not further the purposes of POV, which is to effect _immediate_ changes when an operation's conditions are especially dangerous. If a mine experiences poor conditions in 2011 then that is the time when POV should apply, not years later. MSHA largely forfeited its use of this POV provision in the Act when it required finality, and the substantial backlog developed. By eliminating the "finality requirement," MSHA will be able to use its 104(e) POV procedure in a timely manner.

This proposal anticipates having MSHA periodically revise its POV criteria through informal, administrative action. We oppose that. Instead, we believe the Agency should collect and consider the suggestions and comments submitted in response to this proposed rule to set criteria for purposes of POV. The criteria should

*then be fixed, at least until there is another opportunity for public discourse on any changes that may be warranted in the criteria. A subsequent notice and comment process to adjust the criteria could be utilized if MSHA later determines that changes to its criteria are warranted.*

*We recognize the legislative history quoted in the proposed rule indicates Congress granted the Secretary "broad discretion in establishing criteria for determining when a pattern of violation exists" S. Rep. at 33. However, there has been over 30 years since the Act first became law and MSHA has gained experience using different criteria. We suggest that MSHA has accumulated enough experience over the intervening time to now set criteria and still satisfy the discretion Congress reserved for the Secretary.*

*The eight criteria listed in the proposed rule represent appropriate factors for MSHA to consider for purposes of POV. We believe that the first seven items in subsection (a) represent meaningful ways to measure an operation's health and safety problems, but we recommend that these be further explained, and elaborated upon. For example, information about fatal and non-fatal accidents, and injury and illness data are important measures of the human costs of mining, and represent consequences of unsafe and unhealthy mining practices. How each of the seven negative factors will be considered or weighted should be established at the outset. There also must be an Agency commitment to apply the criteria in a consistent manner.*

*Consistent with the legislative history granting the Secretary certain discretion, no operator should be required or expected to have experience with each of the seven factors before coming under POV scrutiny. A cumulative record of unusually unsafe or unhealthy conditions/practices should suffice for MSHA to use this Sec. 104(e) POV enforcement procedure.*

*We also believe that absolute numbers should not control for the criteria. The records for large mines should not be compared with the records of small mines, and vice versa. For example, having a set number of elevated citations or orders alone should neither be required nor trigger a POV. Rather, the experiences of mines should be compared to those of comparable mines, and viewed according to comparable inspection hours, when evaluating their relative health and safety records.*

*Having criteria that is based on MSHA inspection hours helps bring some fairness to the system. Union-represented mines generally have better health and safety records (based, for example, on the number of fatal accidents), yet they often are issued a disproportionately large number of citations because the contractual protections serve to encourage miners to show inspectors any and all violations. This helps to find and correct problems before accidents occur. Also, a disproportionately high number of inspection hours are devoted to the large, unionized operations. It is important that such operations do not get unfairly targeted for POV procedures just because union miners and unionized operations may receive relatively large numbers of citations and orders, when they tend to be more attentive to their health and safety practices.*

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-8 Filed: 08/10/16 Page: 104 of 364  PAGEID #: 2307

One problem we know is that the injury reporting data MSHA relies upon for comparing the health and safety records of various mines is unreliable. Injury reporting depends on operator reports, but we have long known about chronic under-reporting. Some employers maintain programs that serve to reduce the reporting of injuries. Some simply fail to report reportable accidents. One recent and public example arose in connection with the television show COAL on Spike TV. In its first episode a miner was injured and carried away by ambulance, obviously missing some work that subsequent episodes confirmed. While the accident should have been a reported time-lost accident, our review of the POV monitoring for Cobalt Coal does not show any such accidents were reported. Under-reporting is a frequent problem that demonstrates the problem with relying on accident reports to understand an operation's actual experience and measure for POV. We suggest that fatality rates should generally be weighted more heavily than injury rates.

As a component of this POV program, MSHA should also aggressively utilize its Part 50 audits to determine whether operators are maintaining records and reporting accidents, injuries, and illnesses, as required. When shortcomings are found, they should be weighted heavily for POV purposes. If MSHA learns that an operator is using uncertified personnel for pre-shift exams, as was recently publicized in connection with the Upper Big Branch investigation, these facts must also be considered within the POV criteria.

MSHA criteria should also heavily weigh any information that suggests an operator is covering up violations in an effort to mislead MSHA. Testimony of Gary Quarles after the 4.5.10 Upper Big Branch disaster, and the recent indictment of the head of security at Upper Big Branch for his allegedly encouraging the giving of advance notice of safety inspections indicate the problem of advance notice is a serious one.

Likewise MSHA's experience uncovering unusually large numbers of S&S violations during the impact inspections it has performed over the last year suggests that the Agency's routine inspections may not be providing a realistic view of all mines' health and safety practices. Thus, while our primary concern remains focused on miners' health and safety, it is not fair for operations trying to comply with MSHA requirements to have to compete against those using short cuts at the expense of miners' health and safety. Whenever inaccurate or incomplete accident and injury reports are discovered, including when MSHA learns that operators are not adequately training all miners, or any material information is inaccurately or incompletely conveyed to MSHA, the fact of such unreliability must be weighted most heavily to discourage the creation and remittance of misleading data.

We also need to know more about what mitigating factors MSHA will consider, and to what effect? This must be fully explained, and consistently applied. In the preamble (at p. 5721, middle column), several examples of mitigating factors are offered: changes in mine ownership or management, and when conditions at the mine

7

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-8 Filed: 08/10/16 Page: 105 of 364 PAGEID #: 2308

*show trends of significant improvement. However, the Agency should only use for purposes of mitigation those circumstances that objectively demonstrate significant improvements to miners' health and safety can be expected in the very near future. A change in a mine's ownership or management should not relieve the operation from the enhanced POV enforcement, unless the changed ownership or management includes a significant and objective commitment to improvements in miners' health and safety. Such a significant and objective commitment to improvements in miners' health and safety could be met by an operator's creation of a safety and health management program involving management and miners alike that will effect "meaningful, measurable, and significant reductions in S&S violations," Id., along with MSHA's initial approval of the program, and the operator's continuing adherence to such a program, as verified by MSHA. If the operation's conduct reverts to one of noncompliance, then the POV should quickly apply. Miners' heath and safety must always be the top priority.*

*Questions that remain open are: how will the presence of mitigating factors remove an operation from POV status? If so, for how long? Does MSHA contemplate using any sort of probationary status? We think it should: if an operation is placed on POV but then meets certain benchmarks to get off POV, but its practices then deteriorate within a relatively short time – we suggest 18 months represents a fair time period for measuring whether improvements have staying power -- then there should be abbreviated criteria to reinstate POV. For if the operation has not successfully adopted and incorporated new procedures to operate the mine in a safe and healthful manner, then it should receive heightened enforcement attention from MSHA. During the 18-month post-POV monitoring period we are suggesting, we also recommend that the District Manager be available to oversee the monitoring: the District Manager should be aware of the base-line conditions and be prepared to mediate if an operator, for example, contends that different inspectors are citing things differently. The District Manager will be best equipped to observe any changes in the operation's health and safety practices. There should be relatively few operations on POV status at any time so this should not burden the District Manager, while also offering some relief to an operator complaining of uneven treatment when the POV consequences are substantial. Finally, whenever there are designated miners' representatives at operations placed on POV, the miners' representatives should be included in any meetings between the mine management and the District Manager.*

*Also, what if an operation indicates it will pursue certain mitigating practices, but then reneges? Again, MSHA should use this powerful enforcement mechanism to coerce compliance. Miners' health and safety demand this level and any doubts should serve to favor miners.*

*Relieving an operation from a POV determination based on modest short-term improvements in the first seven criteria, without an objective commitment to long-term changes aimed at improving miners' health and safety, should not constitute mitigating circumstances to remove the POV procedures for an operation otherwise targeted. This is because operators should not allow themselves to become vulnerable to POV scrutiny in the first place; therefore, relief should be sparingly afforded and doubts should*

8

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-8 Filed: 08/10/16 Page: 106 of 364  PAGEID #: 2309

*always fall on the side of stronger enforcement and more aggressive protections for miners.*

*We urge MSHA to use this rulemaking process to explain how it will weigh all eight of the listed factors for purposes of determining when a particular operation will be susceptible to, or relieved from, POV enforcement procedures.*

*Finally, we agree that the health and safety record of each operation should be reviewed vis-à-vis the criteria at least every six months to ensure that MSHA is keeping abreast of any material deterioration in health and safety conditions. We believe that quarterly reviews would be even better, but think that semi-annual reviews should be adequate given the other enforcement mechanisms also within MSHA's authority.*

**Sec. 104.3 Issuance of notice.**   (a) When a mine has a pattern of violations, the District Manager will issue a pattern of violations notice to the mine operator that specifies the basis for the Agency's action. The District Manager will also provide a copy of this notice to the representative of miners.

(b) The mine operator shall post a copy of the notice on the mine bulletin board. The notice shall remain posted at the mine until it is terminated under Sec. 104.4 of this part.

(c) If, on any inspection within 90 days after issuance of the pattern notice, an authorized representative of the Secretary finds any S&S violation, he shall issue an order for the withdrawal of all persons from the affected area, except those persons referred to in section 104(c) of the Act, until the condition has been abated.

(d) If a withdrawal order is issued under paragraph (c) of this section, any subsequent S&S violation will result in a withdrawal order that shall remain in effect until the authorized representative of the Secretary determines that the violation has been abated.

Comment:

*This is renumbered and replaces what has been in subsection 4.*

*Other than removing the PPOV references there are no substantive changes in this section, but it offers greater simplicity, which we favor.*

*Providing the operator with this notice is what Congress established in the statute, as opposed to the PPOV that some have suggested. Providing miners with specific notice of the POV and its consequences, both through the miners' designated representative and by posting on the mine bulletin board, is important for informing those most affected that their workplace exhibits substandard health and safety conditions. If miners see such a notice, they can be extraordinarily attentive to protect themselves and their fellow miners, and they will be able to better appreciate that the consequences can be weighty.*

**Sec. 104.4 Termination of notice.**   (a) Termination of a section 104(e)(1) pattern of violations notice shall occur when an MSHA inspection of the entire mine finds no S&S violations, or if no withdrawal order is issued by MSHA in accordance with

section 104(e)(1) of the Act within 90 days of the issuance of the pattern notice.

(b) The mine operator may request an inspection of the entire mine or portion of the mine. No advance notice of the inspection shall be provided, and the scope of inspection shall be determined by MSHA. Partial mine inspections-covering the entire mine within 90 days shall constitute an inspection of the entire mine for the purposes of this part.

Comment:

*This section includes no substantive change from what has been in subsection 5.*

*As proposed this accurately states the statutory requirements, and we support this language.*

*We appreciate the opportunity to submit these comments and believe this regulatory change is critically important and necessary to restore to MSHA the powers Congress intended it to have in Section 104(e) of the Mine Act, but which section of the Act was rendered largely ineffective by virtue of the existing regulation.*

**10**

**From:** Roger Metcalf [mailto:rlm42@aol.com]
**Sent:** Friday, April 15, 2011 6:27 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 APR 15 P 6: 31

Dear Sir/Madam:

Please see our letter below regarding RIN 1219-AB73 - MSHA Proposed Rule
on Pattern of Violations (POV)

# TIGARD SAND & GRAVEL, LLC

Physical Location: 21455 SW 120th Ave.     Tualatin, OR
Mailing Address:  P. O. Box 4810     Tualatin, OR 97062
Telephone (503) 254-5517
Facsimile (503) 255-6147

April 15, 2011

FAX (202) 693-9441
Mine safety and Health Administration
Arlington, Virginia

Re:  RIN 1219-AB73  -  MSHA Proposed Rule on Pattern of Violations (POV)

Dear Sir/Madam:

We have been in the aggregate producing business for over 60 years.  We have
had our aggregate producing equipment inspected by MSHA inspectors since
they decided to expand from the coal industry into the aggregate industry. On a
side note, we do not believe our safety operations should be assessed under the
same rules as the coal mining industry since they are so vastly different from our
industry, with the exception of maybe a coal strip mine.  We do not operate
underground.  We believe that the accidents and fatalities that have occurred in
underground mines have caused increased scrutiny, and rightly so on
underground mining, but surface mining such as ours has not experienced the
accidents and fatalities to the magnitude of underground mining.  We believe this
difference in mining has made it difficult for MSHA to apply a "standardization"
when it comes to inspections, the application of codes, and issuance of citations
for violations.

AB73-Comm-64

This creates a real problem for the mine operators because every inspector seems to have a different idea of what the code or standard should be. Rather than be a professionally conducted and informative inspection, each individual inspector causes great disruption to operations and seems to operate based on personal opinion rather than concrete codes. For instance, one inspector will "approve" the guarding on a conveyor but the next inspector tells us that it is not adequate and will give us a citation. There are no specific standards as to what is acceptable and what is not. When we have complained about this lack of standardization, we have been told by the supervisors that they cannot be responsible for their inspectors' interruptions. We have also been told that if we did not receive a citation/violation from the previous inspector, that we should have. This is the main reason why we are against the Proposed Rule on Pattern of Violation (POV) as we can be cited multiple times because a new inspector has a different opinion on what is acceptable for guarding. This has actually happened to us. We recently received a citation for a guarding not being acceptable. The fine on that citation amounted to $4,689.00. In the past a guarding citation would typically be a fine of approximately $200.00 to $300.00. The fine was increased 15 to 23 times the normal amount because MSHA claimed we had a POV. However, the only reason we had a POV was because MSHA kept changing the rules as to what was acceptable guarding. This is the problem with a POV penalty, it is totally in their discretion. If there was some standard that said if you guard this way you will be deemed safe and will not be cited, we could live with that kind of a system because there would be a standard and not be at the discretion of the inspector.

We have always operated in a safe manner and want to continue to do so. There is absolutely no way that we want any of our employees to be injured. Our employees, no matter what capacity they are employed in, have always had strict orders (no matter how small the unsafe condition is), that is they see an unsafe condition, to shut down the whole operation until repairs can be made. Our company is not unsafe now and never has been in its 60+ years of existence. Again, we are always deeply concerned about the safety and health of our employees. The problem comes from that we feel we have provided a safe environment for our employees to work in but MSHA believes that their ideas about how to provide a safe environment are better. Let me give you another real life example. The purpose of guarding should be to prevent accidental contact with a moving part. We had an inspector cite us on a guarding point where he lay on his back and reached up under a conveyor and said he can make contact with the moving part. This should not have been a citation because no one would "accidently" lay on their back and stick their hand up that far to reach the moving part while the conveyor is running. And again, the guarding that we had on that conveyor had been like that for many years and no previous inspector had a problem with it. This makes the situation totally out of our control. How can we be expected to stay in compliance with any safety standard if that is how the inspectors operate?

From our standpoint, it appears that the impetus behind MSHA's motives may be financially motivated rather than one that is motivated by safety concerns. According to information we have received, the number of penalties increased from 128,000 in 2005 to 199,000 in 2008 and the dollar amount of penalties increased from $25,000,000 in 2005 to $194,000,000 in 2008. That is an increase of almost 8 times the dollar amount in 3 years. It is our opinion that in the past 10 years or so, what was intended to be beneficial in terms of safety for the industry, has expanded into an expensive nightmare. Our non-crushing operations, our vendors, and our customers have been pulled into this bureaucratic oversight, thus causing considerable turmoil for all involved. If MSHA's concern was really for safety on not for more dollars, they would still be operating the way they did 30 years ago when at the beginning of each year, before we started the crushing plants after winter shutdown, we would call MSHA for an inspection to make sure everything would be in compliance. We are not allowed to do that anymore. When we have asked MSHA about that, we were told they can't do that anymore. If they come out to your site and see anything not right, they are required to issue a citation – even if you ask them to come out and inspect your equipment. How is that helping to improve safety if that is their real goal?

In summary, we are against this rule change and any rule change that gives MSHA any more power than it already has. We believe they are totally out of control now. A small aggregate operation on the west coast is most likely four to five employee, and we can guarantee this proposed rule change will have a significant economic impact on those businesses. In MSHA's summary of their POV Rule, they also stated that they believe the new rule will not have a significant economic impact on small mines. We're not sure how they define a significant economic impact but a $4,689.00 penalty for one guarding citation is a very significant impact to this small mine. With this proposed rule change, MSHA will be able to shut down small operations because the operators can't afford to pay the excessive fines that can be manipulated by MSHA by just writing multiple citations for issues like guarding that are totally at their discretion and then claim the operator has a POV problem.

We would welcome the opportunity to have further discussions with you on this subject.

Sincerely,

Tigard Sand & Gravel LLC

Anthony J. Urbanek
President

**From:** Harman, Thomas [mailto:tharman@cement.org]     2011 APR 18  A  9: 40
**Sent:** Monday, April 18, 2011 4:30 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

The comments on the subject pattern of violations proposal are attached.

Best regards,

Thomas (Tom)
Harman
Regulatory Affairs
Portland Cement Association
500 New Jersey NW, 7th Floor
Washington, DC  20001
Phone office 202-408-9494
Phone mobile 202-870-2548
email tharman@cement.org
web www.cement.org

AB73-COMM-65



**PCA**
Portland Cement Association

April 18, 2011

Ms. April Nelson, Acting Director
Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard
Room 2350
Arlington, Virginia  22209-3939

Dear Ms. Nelson:

Re:    Proposed Rule, 30 CFR Part 104, RIN 1219-AB73, Federal Register Vol.76, No. 22,
       Pattern of Violations

The Portland Cement Association (PCA) appreciates the opportunity to comment on this
proposed rule. PCA is a trade association representing companies that produce portland cement
in the United States and Canada.  PCA's U.S. membership consists of twenty-five (25)
companies operating ninety-seven (97) plants in thirty-six (36) states and distribution centers in
all fifty (50) states servicing nearly every Congressional district.  PCA members account for
slightly more than ninety-seven percent (97.1%) of cement-making capacity in the United States
and one hundred percent (100%) in Canada.  PCA's members employ more than thirteen
thousand (13,000) individuals at cement plants, and the industry is interested in the subject
collection of information and its potential impact on cement company operations.

Portland cement is an essential construction material and a basic component of our
nation's infrastructure. It is utilized in numerous markets, including the construction of
highways, streets, bridges, airports, mass transit systems, commercial and residential buildings,
dams, and water resource systems and facilities.  The universal availability of portland cement
ensures that concrete remains one of the world's most essential and widely used construction
materials.

PCA believes that the pattern of violations (POV) enforcement action may be an effective
tool for MSHA to use to correct and restore compliance with mandatory mine safety and health
standards at operations identified as POV violators.  However, the subject proposal fails to

1

provide enough information for mine operators to make an objective assessment of how regulated facilities would be affected by the rule if it is finalized.

The key points that PCA discusses in these comments are summarized in the following.

1. MSHA claims that the existing regulation incentivizes operators to avoid pattern of violations (POV) enforcement by contesting citations (*FR* p 5722[1]); however, there is an indisputably positive correlation between increased civil penalties and increased operator contests since MSHA finalized its Title 30 <u>Code of Federal Regulations</u> Part 104 (30 CFR 104) standard.

2. The searchable database that mine operators can regularly access to monitor compliance at facilities, as well as to compare individual facility compliance with some currently unstated threshold POV criteria, must be maintained with up-to-date, accurate enforcement and accident data.  There is ample evidence to suggest that the logic errors in MSHA's previous POV computer application *"resulted in mine operators and the public having an incorrect understanding of the screening criteria being used by MSHA to identify mines with a potential POV."*[2]

3. The proposal states that mine operators may be required to submit a safety and health management plan to the agency to avoid placement in POV status.  While the agency may intend in the proposal for the programs to aid operators in restoring compliance and therefore avoid POV enforcement, the discretionary nature of "mitigating circumstances" that the agency would maintain with such a requirement is arguably too broad.

4. The proposal removes the potential pattern of violations notification (PPOV).  The PPOV currently provides an opportunity for mine operators to discuss, in a detailed manner, the enforcement actions that led to the PPOV notification.  Removing the PPOV requirement and immediately enforcing POV may lead to unwarranted shutdowns if MSHA's enforcement data is not accurate.

5. The estimates regarding how much time operators will spend monitoring the POV database and the amount of lost revenues and increased expenses POV-identified operators will incur fail to take into account several factors one must consider when making such determinations.  Consequently, the economic analysis significantly underestimates the true economic cost of the rule.

6. MSHA's proposal to consider *non-final* citations and orders as a contribution to a pattern of violations (POV) would be unconstitutional, and is inconsistent with the Mine Act as MSHA claims.

---

[1] The Federal Register, Vol. 76, No. 22, p 5722
[2] U.S. Department of Labor, Office of Inspector General, MSHA's Pattern of Violations Authority, Report No. 05-10-005-06-001, September 29, 2010, p 18.

2

<u>Issue 1:  Impact of Changes to Civil Penalties on Contested Citations</u>

PCA is dubious about the agency's claim that *"[T]he final order provision in the existing regulation provides an incentive for operators to contest S & S violations to avoid being placed under a POV."*[3]  However, PCA presents in this comment the fact that there exists a direct and positive correlation between the number of contested cases before the Commission and the increase in civil assessment penalties after the Mine Improvement and New Emergency Response Act of 2006 (MINER Act) became law.  Specifically, in 2005, which is the last full calendar year of citation and penalty data before the revised penalty framework became effective, there were 116,674 civil penalty assessments totaling \$24,850,248,[4] and there were 1,865[5] contest cases filed at the Commission.  Then, in 2008, the first full calendar year after the revised penalty tables became effective, there were 198,700 citations with assessments totaling \$194.3 million,[6] and there were 9,473[7] contest cases filed at the Commission.

To summarize, when comparing CY 2005 and CY 2008, there was a 170% increase in the number of citations issued to mine operators and contractors; a 782% increase in assessment penalties from MSHA; and a 508% increase in cases filed at the Commission.  These substantial increases occurred as direct consequences of the revised Title 30 CFR Part 100 standards.  PCA encourages MSHA to recognize that an 8-fold increase in assessed penalties when the revised penalty protocol was adopted is the primary contributor to operator contests before the Commission.

In retrospect, MSHA assumed in the 2007 proposed rule to revise the criteria for civil penalty assessments that assessments across all mining sectors would increase to \$68.5 million from the real assessment of \$24.9 million if operators made no compliance response to improve performance.  Therefore, a rise of \$43.6 million (68.5 − 24.9) translated to a 176%[8] increase from the baseline.  As evidenced from the real increases in assessed penalties between 2005 and 2008, the agency significantly underestimated not only the effects on litigation before the Commission, but also the real assessment penalties.

A basis for operators to contest a citation is because of a disagreement with the Secretary or her designated [inspector] representative with the facts as stated in the citation, or because of the amount of the penalty as determined by the citation's gravity, which is most usually determined

---

[3] The Federal Register, Vol. 76, No. 22, p 5722
[4] The Federal Register, Vol. 71, No. 174, p 53065
[5] Freedom of Information request, Federal Mine Safety and Health Review Commission, March 7, 2011
[6] Office of Assessments, Mine Safety and Health Administration, March 15, 2011
[7] http://www.fmshrc.gov/new/docketreports.htm, March 15, 2011
[8] *Ibid*, p 53067

3

by the facts stated in the citation. Items such as operator negligence and likelihood of event carry categorical designations from "no negligence" through "reckless disregard" and "no likelihood" through "occurred." Each designation increases the penalty amount. The POV proposal theorizes that the current system allows mine operators to contest violations and therefore avoid POV enforcement; however, the claim ignores clear evidence that mine operators disagree with the facts in the citation as stated by the inspector and/or with the penalty amount.

Indeed, auditors in MSHA's Office of Accountability reported that inspectors in 20 of 25 MSHA-audited field offices *"did not properly evaluate the gravity and negligence of mine operator safety and health violations."*[9] Similarly, in the final rule that codified Part 104 in 1990, MSHA stated that it would continue to rely on prevailing case law as it related to 'S & S' and 'unwarrantable', and also acknowledged that *"the Agency has been working, and will continue to work with its inspectors toward a consistent application of principles for determining whether violations are S & S or unwarrantable."*[10]

For more than twenty years after Part 104 was finalized, the same challenges appear to continue to exist among the MSHA inspectorate about how to consistently cite S & S violations. With S & S as the cornerstone of section 104(e) pattern enforcement, a central objective in POV enforcement must be for inspectors to be consistent in citing practices and conditions. This model of inconsistency in enforcement under which the agency has appeared to operate for some time underscores the fact that operators contest violations because of a disagreement with the Secretary or her designee, and also how extraordinarily important it is for MSHA to fix the lack of consistency among its inspectorate in citing S & S.

Issue 2: Problems with POV Database

The searchable database that MSHA has developed can result in unintended consequences because of unreliable data. Faced with the possibility of shutdown, mine operators, MSHA, industry employees and the public must have confidence that POV determinations are based on reliably accurate data. Public misinformation contained in the database will have detrimental effects for mine operators and their employees as well as for MSHA. A program that MSHA has previously used to determine POV eligibility was criticized in a Department of Labor report for the significant logic errors[11] contained in the program. Even though the Labor Department's Inspector General (IG) noted that MSHA did not intend to use the current system in future analyses,[12] one cannot ignore the fact that the IG report explicitly stated that: "4 of 46 sub-queries in Basic query of the Repeat category contained a value that could have caused a vacated citation to be counted as if it were a valid, final citation;" "5 of 46 sub-queries in the Basic query

---

[9] Ward, Ken Jr., "Report Details MSHA's Lapses Prior to [UBB] Disaster", The Charleston Gazette, March 2, 2011
[10] The Federal Register, Vol. 55, No. 147, p 31130
[11] *Op cit*, U. S. Department of Labor, Office of Inspector General, p 17
[12] *Op cit*, U. S. Department of Labor, Office of Inspector General, p 16

4

were missing a value that could have caused citations and orders associated with a prior owner of the mine to be counted;" "the electronic spreadsheet formula intended to provide the total number of S & S 104(d) final orders at each mine for the 24-month review period incorrectly sums two columns that represent the 104(d) final orders that may contain 104(d) orders that are not S & S."[13] With this level of significant errors in MSHA's former POV program database, it is difficult to see how the agency can develop a framework that provides factual, accurate up-to-date information about enforcement history at the approximately 14,500[14] mining facilities regulated by MSHA.

PCA strongly recommends that MSHA undertake a pilot program before making it publically available should the agency move forward with using the current database. The pilot program should be in effect for at least one year, and should include a review by impacted stakeholders from all mining sectors. The objective of the program must be to ensure data accuracy so that information contained in the database is reliable and will not lead to unwarranted POV claims and facility shutdowns.

<u>Issue 3: Potential Imposition of Safety and Health Management Plans</u>

The proposal does not list parameters for safety and health management plans that operators may develop and file with the agency to avoid a POV action. Although a set of guidelines would remove the guesswork that causes uncertainty within the regulated community about what should be included in the plans, mine operators still do not know how to measure the effects of such a mandate unless they know which elements would be required by the agency. Elements contained in the plans may differ to some degree, but all plans contain some common elements. For example, a common provision is a statistical measurement of accident rates, like the non fatal days lost (NFDL) rate that MSHA monitors and maintains. Similarly, employee education is a common element, but safety observation may be unique to just a few.

The discretionary nature of safety and health management plans that MSHA proposes in the POV rule carries uncertainty about what may be required of operators. In September 2010, MSHA published a notice to hold public hearings to collect information about "Safety and Health Management Programs for Mines." The notice listed four organizations that provide guidelines for these types of programs, and these guidelines contain typical safety and health management program elements – i.e. statistics, education and training, health surveys, and so on.

In addition, Section 202 of the "Robert C. Byrd Miner Safety and Health Act of 2010," lists requirements for "mitigating circumstances," and a "remediation order." The remediation

---

[13] *Op cit,* U. S. Department of Labor, Office of Inspector General, p 17
[14] Testimony of Assistant Secretary Joseph Main, Subcommittee on Education and the Workforce hearing, March 4, 2011

5

order contains a requirement for filing a safety and health management program approved by the Secretary, including *"the employment of safety professionals, certified persons, and adequate numbers of personnel for the mine, as may be required by the Secretary."[15]* The guidelines for safety and health management plans that operators will follow must be clearly specified in the notice and comment period. If MSHA plans to include a requirement to hire additional personnel in safety and health management plans, then stakeholders like PCA must know this before a standard is finalized, and be given the opportunity to provide comment. The agency must state specifically what it will require operators to include in management plans.

Issue 4:  Removal of PPOV process

Another noteworthy (and negative) provision in the POV proposal has to do with removing the PPOV notification to operators; this elimination is directly connected to the database accuracy issue. For example, in the current Part 104 protocol, which includes a PPOV notification letter, operators have an opportunity to analyze the accuracy of the data presented by the agency in its historical review and clear any erroneous data from operator records. Consequently, if MSHA relies on inaccurate data as part of its historical review, the incorrect data is made accurate, and the operator's record is corrected. Eliminating the PPOV operator notification can result in the unintended consequence of stopping production based on erroneous data which could have been discovered upon closer scrutiny.

The House Education and Labor Committee released a list of 48 mine facilities in April 2010, and the press release stated that if not for the number of contested citations, then these 48 operations would be POV violators.[16] The published list contained at least one error that misidentified an operator as being POV-eligible, when in fact, the operator was not in jeopardy of being a POV violator. This inaccuracy was likely caused by a lack of review, and the review would have occurred if the listed operator had an opportunity to analyze the data during a PPOV notification process.

PCA encourages MSHA to include a notification of PPOV in any final rule the agency may adopt. Fair and adequate notice from the agency should be a cornerstone of the POV framework. The extraordinary nature of the POV enforcement action requires this. The prospective application of a set of PPOV guidelines provides operators with an opportunity to restore compliance with standard. Removing the PPOV notification as determined by an initial screening process while at the same time eliminating the requirement that only final orders be considered create an untenable circumstance for cement plant operators.

---

[15] 111th Congress, 2nd Session, Amendment in the Nature of a Substitute to H.R. 5663, Offered by Mr. George Miller, p 21, lines 12 – 16
[16] U. S. House of Representatives Education and Labor Committee, 111th Congress, 2nd Session, *Chair Miller Releases List of Dangerous Mines Escaping Tighter Scrutiny*, April 14, 2010

6

<u>Issue 5:  Proposal Understates the Rule's Cost</u>

The proposal understates compliance costs and the overall economic effects on facility operations.  The agency estimates in the proposal that *"it will take a supervisor an average of 5 minutes each month to monitor each mine's performance using the Agency's website."*  Multiple individuals working at cement plants, including production managers, safety and health personnel, and individuals on the safety committee, will monitor the database with greater frequency than once a month for five minutes.  In addition to lost production revenue, facilities will incur associated amortization and depreciation costs.

<u>Issue 6:  Legal Status of Non-Final Citations</u>

MSHA's proposal to consider *non-final* citations and orders to identify mines with a pattern of violations (POV) would be unconstitutional, and is also clearly not consistent with the Mine Act as MSHA claims.  The NPRM proposes to eliminate MSHA's current requirement in 30 CFR 104.3(b) which provides "that only citations and orders that have become final are to be used to identify mines with a potential pattern of violations." 76 Fed. Reg. at 5721.  The NPRM further explains that the proposed change "is consistent with the language of section 104(e), the legislative history of the Mine Act, and the purpose of section 104(e)." *Id.*  PCA disagrees with MSHA's claims of the legitimacy and lawfulness of its proposed action, and we are opposed to the revision that MSHA is proposing to section 104.3(b).

The NPRM's claim that the proposed change is "consistent with the language of section 104(e)," is based entirely on MSHA's reliance on section 104's legislative history and, in particular, a selective reading of that legislative history.  However, MSHA's claims are unfounded, and its reliance on legislative history to explain and support its interpretation of section 104(e) is at odds with Supreme Court decisions addressing the reliability of legislative history for construing statutory language.

In the latter instance, the Supreme Court's decision in *Exxon Mobile Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) (*Allapattah*) is extremely instructive in its admonishment of legislative history:

> As we have *repeatedly held*, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material.  Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.  Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is

7

itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in "'looking over a crowd and picking out your friends.'" See Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 214 (1983). Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists— both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text.

545 U.S. at 568-69 (emphasis supplied). While the Court, in *Allapattah*, went on to say, "[w]e need not comment here on whether these problems are sufficiently prevalent to render legislative history inherently unreliable in all circumstances," *id.,* the Court's conclusion in that case, " that in this instance both criticisms are right on the mark," *id.* at 569, is equally applicable here, as we demonstrate below.

First and foremost, while asserting the need to look to the legislative history of the Mine Act to understand the meaning of section 104(e), MSHA has provided no explanation whatsoever in the NPRM to demonstrate why such a need is necessary in the first place.[17] As the Court, in *Allapattah*, made clear, "the authoritative statement is the statutory text." 545 U.S. at 568. It is only when a statute's text has been demonstrated to be ambiguous that the resort to extrinsic materials, including legislative history, should even be considered, let alone relied upon.

MSHA has failed to demonstrate, let alone even discuss in the NPRM, any ambiguity in the language of section 104(e). Instead, the NPRM cites to the phrase "inspection histories" used in S. Rep. No. 181, 95th Cong., 1st Sess. at 32, as evidencing "Congress' intent that POV determinations be based on inspection histories, *i.e.,* violations found by MSHA during inspections, rather than only on final citations and orders." 76 Fed. Reg. at 5721. Perhaps MSHA's citation to and reliance upon this specific phrase in the legislative history would be justified, had MSHA first demonstrated why it is even relevant. However, not only does section 104(e) *not* include the phrase "inspection histories,"[18] the use of that term in the Senate Report still does not demonstrate the conclusion that MSHA has reached, *i.e.,* that POV determinations can be based solely on inspections rather than final citations and orders.

In fact, the language of section 104(e)(1) is clear and straight forward:

If an operator has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as *could have* significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards, he shall be given written notice that

---

[17] It is significant and noteworthy that the NPRM does not claim that MSHA has no means to address operators that demonstrate an indifference to regulatory compliance *unless* the proposed rule is adopted. Rather, the NPRM merely asserts, albeit erroneously, that "the existing regulation does not adequately achieve the intent of the Mine Act." Fed. Reg. at 5719.

[18] Neither does section 104(d), which the NPRM also cites, contain this phrase. According to the NPRM, the Senate Report specifically noted "similarities between section 104(d) and 104(e) of the Mine Act," 76 Fed. Reg. at 5721.

such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health or safety standard which *could* significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c), to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(Emphasis supplied.) In other words, section 104(e) directs that *after* a pattern of violations *has been determined to exist* based on citations and orders which have become "final," either because they were not contested or the Review Commission found that the challenge(s) had no merit, can MSHA rely upon an alleged violation arising from an inspection to impose the shut-down penalty authorized by section 104(e).[19]

Under the statutory construction that MSHA is now proposing to adopt, MSHA's proposed elimination of the need for a POV to be established only after citations and orders have "finalized" would effectively deprive mine operators of their due process rights. Among other things, MSHA's statutory interpretation would result in a presumption of a mine operator's guilt, *i.e.,* a presumption of a pattern of violations based entirely on an inspector's allegations, and in so doing would shift the evidentiary burden from the government to prove violations, onto the mine operator to disprove that the pattern of violations had occurred. Under the Constitution, however, a law must presume innocence and the government has the burden to prove that violations have occurred. MSHA's statutory interpretation would also deprive mine operators of their rights to an impartial jury and to confront their accuser.

In conclusion, PCA recommends the following:
1. Maintain the current framework that requires final orders from the Commission to be used in identifying potential POV violators.
2. Maintain the requirement that MSHA identify potential POV violators, and issue PPOV notifications.
3. Conduct a year-long pilot program to ensure that accurate enforcement and accident data is maintained in the searchable POV database.

---

[19] MSHA's 1990 final rule effectively acknowledged that section 104(e) was intended to be used "at mines with a record of repeated S&S violations *and* where the other enforcement provisions of the statute have not been effective in bringing the mine into compliance with Federal health and safety standards." 55 Fed. Reg. 31128 (emphasis supplied). In other words, the 1990 final rule acknowledged that the penalties imposed under each successive subsection of section 104 were not only designed to be more severe than the preceding subsection, but also that the subsections were intended to be applied sequentially, *i.e.,* from the least severe to the most severe, thereby giving purpose and functionality to each subsection 104. Under the statutory construction that MSHA is now proposing to adopt, however, MSHA's proposed elimination of the need for a POV to be established before citations are made final by the Commission would effectively also eliminate the need for section 104(d) to even exist.

9

4. Provide more detail to the public about the elements in a safety and health management plan that the agency will require mine operators to include as part of correcting and restoring compliance.
5. Conduct a thorough economic analysis of the effects the rule would have on each major sector (coal and metal/non metal).
6. Withdraw and re-propose the POV rule to address the issues raised herein.

PCA appreciates the agency's consideration of PCA's perspectives on this proposal.  Please do not hesitate to contact me, tharman@cement.org, if you have questions.

Very truly yours,

Thomas Harman
Regulatory Affairs
Portland Cement Association

Robert Hirsch, Esquire
Regulatory Affairs
Portland Cement Association

10

# APPALACHIAN CITIZENS' LAW CENTER, INC.
317 MAIN STREET
WHITESBURG, KENTUCKY 41858
606-633-3929   1-877-637-3929
FAX 606-633-3925
www.appalachianlawcenter.org

2011 APR 18   A 10: 04

STEPHEN A. SANDERS
 Director
 steve@appalachianlawcenter.org

WES ADDINGTON
 Deputy Director
 wes@appalachianlawcenter.org

MARY CROMER*
 Staff Attorney
 mary@appalachianlawcenter.org
 *Also Admitted in VA

April 18, 2011

April E. Nelson, Acting Director
Office of Standards, Regulations and Variances
Mine Safety and Health Administration
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

**RE:  Proposed Rule:  Pattern of Violations**
**RIN 1219-AB73**

Dear Ms. Nelson:

The Appalachian Citizens' Law Center submits the following comments to the Mine Safety and Health Administration ("MSHA") regarding the proposed rule amending the "Pattern of Violations" regulation at 30 C.F.R. Part 104.

The Law Center is a non-profit law firm that represents miners and their families on mine safety and health issues. The Law Center is based in Whitesburg, Kentucky, which is centrally located in the Appalachian coalfields.  At the Law Center, I operate the Mine Safety Project, which works to improve safety conditions for miners in the coalfields.  Primarily, the Mine Safety Project represents miners that suffer workplace discrimination for making protected safety complaints.  In addition to mine safety, we also focus on the area of miners' health where we represent disabled miners afflicted with black lung disease and miners' widows whose husbands have died from the disease.

The Law Center applauds MSHA's work on the proposed rule, which will finally bring the regulatory framework in line with the statutory intent of the pattern of violations provision of Section 104(e) of the Mine Act.  This rulemaking is far too long overdue.

In response to the Scotia Mine Disaster in Letcher County, Kentucky, which killed 23 miners and 3 mine inspectors in 1976, Congress sought to address chronic and repeat violators and prevent operators from continually piling up citations for dangerous conditions.  The result was section 104(e) of the Mine Act which substantially increased

*AB73-COMM-66*

the penalties for any operator that has a "pattern of violations."[1]  It's clear from the legislative history that Congress believed the "pattern of violations" provision would be a strong enforcement tool to go after the worst violators:

> Section [104(e)] provides a new sanction which requires the issuance of a withdrawal order to an operator who has an established pattern of health and safety violations which are of such a nature as could significantly and substantially contribute to the cause and effect of mine health and safety hazards. The need for such a provision was forcefully demonstrated during the investigation by the Subcommittee on Labor of the Scotia mine disaster…. That investigation showed that the Scotia mine, as well as other mines, had an inspection history of recurrent violations, some of which were tragically related to the disasters, which the existing enforcement scheme was unable to address. The Committee's intention is to provide an effective enforcement tool to protect miners when the operator demonstrates his disregard for the health and safety of miners through an established pattern of violations.[2]

They also believed it would send a strong signal:

> The Committee believes that this additional sequence and closure sanction is necessary to deal with continuing violations of the Act's standards. The Committee views the [104(e)(1)] notice as indicating to both the mine operator and the Secretary that there exists at that mine a serious safety and health management problem, one which permits continued violations of safety and health standards. *The existence of such a pattern, should signal to both the operator and the Secretary that there is a need to restore the mine to effective safe and healthful conditions and that **the mere abatement of violations as they are cited is insufficient.***[3](emphasis added).

Finally, they felt that they provided flexibility, so a rigid standard wouldn't constrain the agency's use of the provision:

> It is the Committee's intention to grant the Secretary in Section [104(e)(4)] broad discretion in establishing criteria for determining when a pattern of violations exists…. The Committee intends that the criteria make clear that a pattern may be established by violations of different standards, as well as by violations of a particular standards. Moreover… pattern does not necessarily mean a prescribed number of violations of predetermined standards…. As experience with this provision increases, the Secretary may find it necessary to modify the criteria, and the Committee intends

---

[1] 30 U.S.C. § 814(e).
[2] S. Rep. No. 95-181, 95th Cong. 1st Sess. 36 (1977).
[3] S. Rep. No. 95-181, 95th Cong. 1st Sess. 36 (1977).

that the Secretary continually evaluate the criteria, for this purpose.

Yet, for 33 years and after more than a dozen mine disasters, MSHA had never issued a "pattern of violations" under the Mine Act.[4]  The implementing regulation is currently framed so that it is nearly impossible for a repeat violator to be subjected to the enhanced enforcement intended in the statutory provision.  Thus, the proposed rule is necessary if MSHA is to adequately address repeat violators and protect the nation's miners against demonstrated disregard for their health and safety by outlaw operators.

## Section 104.1  Purpose and Scope

As this section is unchanged from the current provision and it adequately addresses the purpose and scope of the proposed rule we are not opposed to its current form.

## Section 104.2  Pattern Criteria

We support the combination and simplification of current sections 104.2 and 104.3 in the proposed section 104.2.  Most importantly, we support the elimination of the existing requirement in section 104.3(b) that only citations and orders that have become final are to be used to indentify mines for pattern of violations status.  The fact that, on average, a contested violation takes 518 days to become final irreparably impairs MSHA's ability to adequately address repeat violators.  Because only a statistically negligible number of contested violations are reversed or modified downward in the operator's favor, the arguments from the industry against removal of this provision are not truly rooted in "due process," but simply indicate their preference that MSHA return to the days when pattern of violations were never issued.[5]

We also support the increase in the frequency of MSHA's review of a mine for a pattern of violations to at least twice per year.  Frankly, we think the agency could devise a system of weekly or even daily review.  Section 104.2(a)(1-6) reviews should be automated and adjusted essentially in "real-time."  We see little reason why Section 104.2(a)(7-8) reviews couldn't occur on short notice, especially in response to an operator that has received an inordinate amount of citations and orders during an

---

[4] In 2011, for the first time, MSHA issued two pattern of violations notices.

[5] Based on the logic of the industry argument, if a driver was issued a significant speeding ticket every single day, but the first ticket wasn't "final" for 518 days, action shouldn't be taken against the driver despite a horrendous record of repeat violations, because theoretically, the vast majority of the 518 citations "could" be overturned.  This analogy isn't hyperbole.  The Ruby Energy Mine, MSHA ID 46-08808, amassed 584 S&S violations when the 24-month screening criterion was only 20.  Incredibly, it also received 78 "elevated actions" [i.e. 104(b), 104(d), or 107(a)] when the screening criterion was only 2.  <u>See</u> October 1, 2009 letter from Robert G. Hardman to Spartan Mining.  Of course, the Ruby Energy Mine was not placed on a pattern of violations.

inspection, which may easily place the operator on a pattern of violations if a review were conducted. Obviously, two pattern of violations reviews is sufficient for most operators, but we hope the agency review process is nimble enough to respond immediately to chronic violators.

## Section 104.3 Issuance of Notice

We support the deletion of all references to a "potential" pattern of violations in the proposed rule. The plain language of the Mine Act, as well as its legislative history, mandates MSHA to notify an operator whenever a pattern of violation exists. The current regulation promulgated by MSHA – which merely **warns** the operator that it might be placed on a pattern if it doesn't improve its safety performance – in our view, contradicts the plain language of the statute and, moreover, defeats the intent of the provision. By only **warning** an outlaw operator, MSHA is effectively telling the operator how to avoid being placed on a pattern of violations and thus how to avoid stricter scrutiny of its compliance with the law. We think it akin to an MSHA inspector observing a violation, but improperly warning the operator if the violation is not corrected in a designated period of time, that a citation will be issued. Thus, not only do we support removing any reference to a "potential" pattern of violations in the proposed rule, we think removal is required for MSHA to comply with the Mine Act.

Finally, we support the addition of Section 104.3(c) & (d), as they clearly state the intent of the Mine Act when a pattern of violations is issued. Since proposed Section 104.4 concerns the termination of a pattern of violations notice, the addition of proposed 104.3(c) & (d) properly balance the proposed regulation by also addressing the procedure under the notice.

## Section 104.4 Termination of the Notice

As this section is unchanged from the current provision, we are not opposed to its current form.

Sincerely,

Wes Addington
Attorney at Law
Appalachian Citizens' Law Center
317 Main Street
Whitesburg, KY 41858

Tony Oppegard
Attorney at Law
P.O. Box 22446
Lexington, KY 40522

# THE VIRGINIA COAL ASSOCIATION, INC.

W. THOMAS HUDSON
PRESIDENT

JOHN T. HEARD
LEGISLATIVE COUNSEL

THORNTON L. NEWLON
LEGISLATIVE COUNSEL

2011 APR 18 P 3: 54

1001 EAST BROAD ST.
SUITE 425
OLD CITY HALL
RICHMOND, VIRGINIA 23219
804 / 643-6697

April 15, 2011

**Provided Via Electronic Delivery To:  http://www.regulations.gov**

Ms. April E. Nelson
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re:  **RIN 1219-AB73;   Comments on MSHA's Proposed Rule for Pattern of Violations**

Dear Ms. Nelson:

The Virginia Coal Association (VCA) is pleased to offer the following comments to the Mine Safety and Health Administration (MSHA) concerning its Proposed Rule for Pattern of Violations under § 104(e) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), 30 U.S.C. §§ 801, 814(e).  The VCA also specifically incorporates herein by reference the comments of the National Mining Association which are submitted on this proposed rule.

The VCA represents coal companies that produce approximately 90% of the coal mined annually on Virginia and our members will be significantly impacted by the provisions contained in this proposed rule if they become effective as currently proposed.  While we recognize the importance of the pattern of violations (POV) sanction to the effective enforcement of the Mine Act and support the goal of improving transparency and simplifying the POV process both in terms of agency implementation and stakeholder understanding, this rule as proposed would make the POV process less transparent, more complex, and deprive coal companies of their right to due process under the law.  We believe that since the POV sanction is among the most potent enforcement tools that the Agency has under the Mine Act, MSHA must utilize it so as to protect the health and safety of miners while still ensuring that mine operators receive fair treatment and due process.

*A B73 - C OMM - 67*

## I.  The Proposed Regulation Violates the Principles of Due Process and Fundamental Fairness

### a.  The Current POV Process

Currently, 30 C.F.R. § 104.3(b) states that only citations and orders that have become final shall be used to identify mines with a potential pattern of violations.  The proposed rule changes this approach, which has been followed since 1991, and instead allows POV determinations to be based on "violations issued."  Consequently, for purposes of POV calculations, an operator will now be presumed guilty as soon as an inspector accuses him of violating an MSHA regulation.  The proposed rule also deletes those provisions granting prior warning to mine operators before the issuance of a pattern notice, and fails to proscribe a means by which operators can present mitigating factors and, where possible, develop a plan with MSHA to avoid the imposition of this onerous sanction.  MSHA claims these changes are necessary in light of the large backlog of contested violations pending before the Federal Mine Safety Health Review Commission ("Commission"), and, according to MSHA, only a fraction of such contested violations get vacated or modified to non-significant and substantial (S&S).  MSHA argues that because of this backlog, the final order and notice provisions contained in the current rule hinder enforcement and do not allow the Agency to review a mine's complete recent compliance history.

The VCA disagrees with MSHA's characterization of the current POV process and with the Agency's rationale for changing the criteria upon which POV status may be based.  It is well understood in administrative law that federal agencies at different times exercise executive, legislative and judicial powers.  In other words, federal agencies are the judge, jury and executioner in the promulgation and enforcement of federal regulations.  Given this powerful leverage MSHA has over mine operators, it seems particularly unfair for MSHA to then bypass legitimate challenges to alleged citations and impose the most onerous enforcement action possible under the Mine Act before a finding of guilt is made.  MSHA's primary justification for this change is the Agency's need to circumvent the normal adjudicatory process to permit the Agency to consider backlog cases as part of a mines history for POV purposes.  Unfortunately, the Agency has contributed to the backlog by eliminating the conference process and leaving operators with no choice other than the formal hearing process before the Commission.  Given this factual background, it is difficult to see any justification for MSHA responding to the slow operation of the adjudicatory system by denying mine operators their fundamental right to be heard before being sentenced.

Additionally, MSHA's claim that only a fractional number of contested violations are vacated or modified is both inaccurate and irrelevant.  According to information released by MSHA's Office of Assessments on January 31, 2011, almost 20 percent of violations issued as S&S, which were litigated in fiscal years 2009 and 2010, were vacated or modified to "non-S&S" as a result of the litigation process.  Similarly, when § 104(d) violations, which alleged an "unwarrantable failure" to comply, were litigated in the same period, almost 33 percent of those violations were either vacated or modified to a § 104(a) violation.  Clearly, then, relying on "violations issued" to impose the punitive sanction of § 814(e) of the Mine Act could well result in erroneous application of the pattern enforcement mechanism.  Moreover, as discussed in

greater detail below, because the proposal is silent on the number of violations that it will take to establish a POV, it is likely that almost any margin of error could result in multiple mines being erroneously subjected to this stringent penalty. MSHA's reliance on this statistic, therefore, does not address the serious concern of mines being mistakenly placed on the pattern of violations list.

There is also a very real possibility of MSHA erroneously tabulating a mine's inspection history. The Office of Inspector General of the U.S. Department of Labor (OIG) recently reported on the accuracy of MSHA's efforts to screen mines for POV sanctions. During the five POV screenings performed from 2007-2009, MSHA district managers sent potential POV letters to 68 mines. Following the completion of the evaluation period provided by the current 30 C.F.R. Part 104, those same district managers recommended that 9 mines be given a POV notice. However, upon further evaluation of the underlying violations by MSHA attorneys or review by the Federal Mine Safety and Health Administration, the Agency determined that 6 of the 9 mines (66 percent) no longer met the POV criteria.

The same Inspector General's report also found that MSHA's POV computer application used from 2007 to 2009 generated unreliable results on each of the five occasions it was used to screen for POV status. OIG found that on all five occasions the MSHA application contained a value which could have caused a vacated citation to be counted as a valid final citation. As a result, the program could have over-counted citations for a specific mine. Similarly, citations and orders which had been issued to a prior owner of a mine could be associated with the current owner, resulting in an over-count of citations. The program was also found to incorrectly sum two columns that represented "unwarrantable failure" orders in such a manner as to incorrectly include a mine that did not meet the screening criteria for S&S § 104(d) final orders.

Finally, in the absence of any independent review, the risk of an erroneous application of the pattern notice and resulting withdrawal orders may be increased by MSHA's failure to provide its journeyman inspectors with periodic retraining. Lack of periodic retraining reduces the assurance that MSHA mine inspectors are adequately trained to conduct their duties and properly apply classifications, such as S&S and "unwarrantable failure," to violations they encounter. According to the OIG, 56 percent of MSHA journeyman inspectors did not attend the required refresher training in FY 2006 or 2007.[1] Moreover, MSHA training records show that 65 percent of the MSHA journeyman inspectors who failed to attend the required retraining sessions in FY 2006 or 2007 had still not completed retraining by the end of fiscal year 2009.[2] Over 27 percent of the 264 journeyman inspectors who responded to the OIG's survey stated that MSHA did not provide them with the technical training they needed to effectively perform their duties.[3]

The foregoing information indicates that the POV rule should not be altered in the manner proposed, as MSHA has not provided adequate justification for these substantial changes. Not only does MSHA point to operational issues of its own hearings system as reason to deny notice and meaningful opportunity to be heard to mine operators, but MSHA also bases its changes on the false assumption that citations are rarely issued in error, and that contested

---

[1] *Journeyman Mine Inspectors Do Not Receive Required Periodic Retraining*, DOL OIG Report, Mar. 10, 2010, o. 6.
[2] *Id.* at p. 7.
[3] *Id.* at p. 3.

violations are infrequently overturned or modified. Inspectors are not always right. Indeed, the above data belies the publicly articulated belief of the Agency that some mine operators contest enforcement actions to avoid pattern notices. There are clearly a number of legitimate legal reasons to administratively challenge enforcement actions, which is a statutory right granted by the Mine Act, and those challenges have frequently been successful. For these reasons alone, MSHA should not adopt the proposed changes to the POV rule.

### b. The Fifth Amendment's Guarantee of Due Process of Law

Perhaps even more importantly, the proposed rule clearly runs afoul of the Constitutional right to due process. The Fifth Amendment of the U.S. Constitution guarantees, in relevant part, that "[n]o person shall be...deprived of life, liberty, or property, without due process of law..." The use of "violations issued" to trigger the POV punitive sanction absent a meaningful opportunity for prior independent review or hearing, as well as the proposed rule's elimination of notice provisions, deny mine operators this Constitutional right to notice and the opportunity to be heard.

When considering due process issues, courts "must determine whether [a party] was deprived of a protected interest, and, if so, what process was his due..."[4] It is clear in the case of the POV sanction that shutting down a mining operation amounts to a substantial deprivation of property – both physical property as well as the economic benefits that accrue from mining operations – deserving of Fifth Amendment protections.[5] Mine operators, therefore, must be afforded due process protections in the adopted regulatory POV scheme.[6]

In determining what process is sufficient to satisfy the due process guarantee of the Fifth Amendment, courts have routinely held that "there can be no doubt that at a minimum [the words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."[7] Although the exact procedure needed to satisfy due process changes with context, the Supreme Court has held that the extent of prior evidentiary hearing required before a deprivation of property occurs is determined by three factors: 1) the private interest that will be affected by the official action;

---

[4] *See, e.g.,* Logan v. Zimmerman, 455 U.S. 422.
[5] Licenses of multiple types have been held to constitute property warranting due process protections by the courts. *See, e.g.,* Bell v. Burson, 402 U.S. 535 (Supreme Court held that the state violated a motorist's due process rights by denying him a meaningful prior hearing before suspending his driver's license); Dixon v. Love, 431 U.S. 105 (Supreme Court held that a truck driver could have his license suspended or revoked prior to an administrative hearing where that revocation was based on final convictions of traffic offenses and where a full administrative hearing was available within 20 days of the revocation).
[6] *See, e.g.* Goss et al. v. Lopez et al., 419 U.S. 565 ("In determining 'whether due process requirements apply in the first place, we must look not to the weight but to the nature of the interest at stake'...the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, 'is not decisive on the basic right' to a hearing of some kind. The Court's view has been that as long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause.")
[7] Mullane v. Central Hanover Bank & Trust Co. et al., 339 U.S. 306. *See also* Grannies v. Ordean, 234 U.S. 385, 394 ("The fundamental requisite of due process of law is the opportunity to be heard").

2) the risk of an erroneous deprivation of such interest through the procedures used; and 3) the government's interest.[8]

As discussed above, the private interest affected in this instance is the ability of a mine operator to manage a mine free from interference by federal officials. This is a substantial interest which, under the proposed POV regulations, MSHA would be permitted to deny without *any* prior hearing. Furthermore, as already shown in detail above, the risk of erroneous deprivation of that property interest is significant given the potential for mistaken issuance of citations and POV calculations.[9] This risk is exacerbated by the fact that even a relatively small number of mistakes on the part of MSHA inspectors can result in mines being erroneously placed in POV status.

The final factor utilized in determining what process is required to satisfy procedural due process is the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would impose. Unquestionably, the government has a substantial interest in seeing that the enforcement scheme found in § 104(e) of the Mine Act is successfully implemented. However, even in the face of such a compelling government interest, due process must be afforded to those parties directly affected by government action. Indeed, Congress, while routinely recognizing the importance of MSHA's mission, nevertheless established an enforcement scheme in the Mine Act that specifically grants mine operators the right to contest the issuance of any citation, order or proposed civil penalty within 30 days of its issuance. The proposed rule, however, while maintaining the right to contest a citation, grants the Agency authority to impose the most severe enforcement tool provided for under the Act long before the mine operator has a chance to be heard. Such a system cannot possibly afford adequate procedural protections to mine operators.

MSHA's actions are particularly unwarranted given the fact that the POV sanction is not a tool designed to address emergency situations. While it is true that courts have found exceptions to the general requirement of prior notice and a hearing in emergency situations where a significant government interest justifies delay of a hearing until after the seizure of property rights, no such exception exists in the case of POV violations. Congress has empowered MSHA with ample authority to protect the health and safety of miners in emergencies under the Mine Act. Section 107(a) gives MSHA authority to close a mine without a prior hearing whenever an "imminent danger" exists. These imminent danger orders remain in effect until the "...condition or practice which caused such imminent danger no longer exist[s]." 30 U.S.C. § 817(a). In addition, MSHA can seek a temporary restraining order, temporary injunction and permanent injunction in the appropriate federal district court whenever "...the Secretary believes that the operator...is engaged in a pattern of violation of the mandatory health or safety standards of this Act, which in the judgment of the Secretary constitutes a continuing hazard to the health or safety of the miners." § 108(a)(2); 30 U.S.C. § 818(a)(2). In light of such

---

[8] Matthews v. Eldridge, 424 U.S. 319.

[9] *See also, e.g.,* Goss et al. v. Lopez et al., 419 U.S. 565 (In addressing a school disciplinary process, the Supreme Court stated that "...the concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, this is not the case...the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against...The [Due Process] Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct...").

ample authority to stop operations at dangerous mine sites, MSHA may not then dispense with the notice and hearing procedures during the § 104(e) POV process in a manner contrary to due process and the statutory enforcement scheme of the Mine Act.

The important private interest at stake, the high likelihood of erroneous deprivation of that property interest, and the compelling but non-emergency government interest involved all lead to the conclusion that MSHA must provide notice and a hearing to mine operators before imposing a POV sanction. To do otherwise would violate the Fifth Amendment's guarantee of due process under the law.

## II. The Final POV Rule Must Ensure that Mine Operators Receive Adequate Notice and a Fair Opportunity to be Heard

### a. POV Sanctions Should be Based Only on Final Orders, and MSHA Should Retain the Notice Provisions Contained in the Current POV Rule

The VCA believes that MSHA's own previous due process considerations during the POV rulemaking process are informative on the issue of what notice and hearing provisions should be included in the POV regulations. In the publication of the current version of the POV Final Rule, MSHA stated that "in order to avoid inequities regarding which mines are placed on a pattern, *the Agency must make ample provision for due process* when applying the broad framework established by Congress…MSHA will consider *only final citations and orders* when identifying mines with a potential pattern of violations." 55 Fed. Reg. 31129, July 31, 1990 (emphasis added).

Additionally, MSHA reasoned that "the initial screening factors are coupled with procedures affording parties *full and fair notice* of the Agency's initial determination that a potential pattern may exist at a mine. Application of these procedures will ensure that operators are made aware well in advance of the circumstances giving rise to the issuance of a pattern notice and will have a *reasonable opportunity to address these circumstances*…A number of commenters stated that fairness requires prospective application of the initial screening process. The Agency agrees." *Id.*

It is clear that MSHA included the current notice and procedural safeguards, including basing POV decisions only on final orders, to ensure fairness to mine operators. Deleting those provisions without establishing alternative measures denies operators that fundamental fairness and violates the Fifth Amendment. Nothing has occurred to warrant these changes other than the Agency's need to develop a political response to the tragic events of 2010 that shields itself from its failure to use the tools Congress previously provided.

MSHA also acknowledged, in the current rule, the potentially substantial loss of property that a POV violation can entail when drafting the current rule. Importantly, MSHA stated that "the Agency realizes that the statutory requirements for terminating a pattern of violations sequence place a great burden on the operator of the mine. An inspection of the entire mine,

particularly a large underground mine, that reveals no violations of a significant and substantial nature may be difficult to achieve." MSHA itself therefore admitted that, once a mine is placed on POV status, it is virtually impossible to avoid a withdrawal order. As previously mentioned, MSHA has ample authority to shut down mines and protect miners in emergency situations. There is thus no adequate justification for MSHA to streamline the POV process in such a way as to eliminate all procedural safeguards for mine operators.

### b. At a Minimum, Notice and a Hearing Are Required Before a Mine Operator Can be Deprived of His Property

If MSHA will not continue its current practice of only basing POV decisions on final orders and citations, MSHA must at an absolute minimum promulgate a POV rule that provides mine operators with sufficient notice and an opportunity to be heard before a POV order may be issued.[10]

While the VCA understands MSHA's concerns regarding the current backlog of cases and slow-moving adjudication process, altering the POV process in the manner proposed is neither an appropriate nor fair response. Rather, MSHA and the Federal Mine Safety and Health Review Commission should adopt, through notice and comment rulemaking, formal measures allowing expedited considerations of those cases involving mines at risk of being placed on POV status. A formal mechanism to consolidate and expedite issued violations being contested by potential POV operators would allow MSHA to review a mine operator's entire recent violation history within a reasonable timeframe while still affording mine operators adequate opportunity to contest potentially erroneous citations before becoming subject to stringent penalties. In other words, MSHA would have a means to penalize the "bad actors" in the system without violating the due process rights of ALL mine operators. Additionally, this could be accomplished easily within the framework of the existing adjudicatory system.

While the VCA strongly endorses the approach suggested above, MSHA could alternatively adopt a system similar to that established under another major mining statute containing a POV sanction – the Surface Mining Control and Reclamation Act (SMCRA), which is enforced by the Office of Surface Mining Reclamation and Enforcement (OSM). Under the SMCRA POV process, OSM must issue a show cause order to a mine operator if the agency determines that a mine has demonstrated a POV. 30 CFR Sec. 843.13; 43 CFR Sec. 4.1193. After the show cause order is issued, a mine operator can then request a hearing to contest an imposition of the POV sanction. At such a hearing, OSM is first required to establish a prima facia case for suspension or revocation of a permit based on a POV, which the mine operator can then contest. A written decision must be given as to whether a pattern of violations exists within 60 days after the hearing. Although such an approach would require much more substantial procedural changes than that proposed by the VCA, while at the same time affording mine operators with fewer due process protections, it would at least provide for some type of notice and opportunity to be heard before the imposition of the strict POV penalty.

---

[10] Mathews v. Eldridge, 424 U.S. 319, 333 ("The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society").

It is clear that the Due Process Clause of the Fifth Amendment requires MSHA to put procedural mechanisms in place in any Final POV Rule that provides mine operators with adequate notice and an opportunity to be heard. While the current POV rule ensures fairness and the right to be tried before being convicted, the proposed rule takes out nearly every single procedural protection contained in the current rule. Instead, mine operators can be issued withdrawal orders when an inspector merely alleges a safety infraction, and are given no prior notice of a potential POV sanction. Such a system is in clear violation of the law. Rather than change the POV process, MSHA should instead address the underlying issue – a backlog of cases causing prolonged adjudicatory periods – by formalizing a procedure to expedite the full and fair hearing of cases ripe for POV review. Alternatively, should MSHA make changes to the POV Rule, MSHA must retain adequate notice provisions and establish a pre-sanction hearing process in which mine operators are given a fair opportunity to present their case to an independent reviewer. To do otherwise would violate the due process rights guaranteed by the Fifth Amendment.

### III. POV Criteria Should be Subject to Notice and Comment Rulemaking Procedures

MSHA is seeking comment on "how the Agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." 76 Fed. Reg. 5719, 5720 (February 2, 2011). Simply put, all such criteria should be published in the Federal Register and be subject to the notice and comment provisions of the Administrative Procedures Act and the Mine Act. Section 104.2 of the proposed rule lists only generic categories of information that will be reviewed, without quantifying or explaining how such data will be applied to issue a pattern notice. The proposed rule also seems to anticipate that POV criteria will be fluid and subject to change without any established method for notice and comment rulemaking. While it is impossible to comment on POV criteria that have not yet been listed in the proposal, the VCA strongly objects to this suggested criteria method, as it is neither transparent nor simple. Rather, the proposed rule blatantly fails to inform stakeholders of what is expected of them to avoid a pattern notice and offers no opportunity for comment on specific criteria before the rule becomes effective. Given the serious consequences stemming from being placed on a POV, this lack of transparency is extremely troubling.

While the Secretary of Labor has broad discretion to establish criteria for determining when a pattern of violations exists, that discretion does not extend to establishing POV criteria without notice and comment rulemaking. Section 104(e)(4), 30 U.S.C. § 814(e)(4), requires that the "...Secretary shall make such *rules* as he deems necessary to establish criteria for determining when a pattern of violations...exists" (emphasis added). The Office of Inspector General has also specifically recommended that MSHA seek stakeholder input on the POV screening criteria in its report dated September 29, 2010, pages 3, 24. MSHA has clearly not adopted this approach in the proposed rule. Rather, by not identifying or publicizing any specific criteria in a Final POV Rule, and by instead providing for the periodic development and revision of specific criteria, MSHA is granting itself the ability to constantly change the rules of the POV process with no public notice or comment period. Such an approach is not only fundamentally unfair, but it also blatantly lacks the very transparency MSHA seeks to achieve with this rule revision. MSHA should remedy this issue by adopting a formal rulemaking process by which POV criteria must be established.

NMA's concern with the failure of the proposal to establish a rulemaking process for POV criteria is exacerbated by the fact that the proposed rule eliminates any potential for discussion of how the specific criteria should be applied to a mine before the issuance of a pattern notice. Section 104.3. Rather, it appears that the rule anticipates an "automated" process for the issuance of a pattern notice based on a mine operator's monitoring of criteria posted on MSHA's website. Furthermore, no specific procedure is described for consideration of mitigating criteria prior to the issuance of the notice. In other words, operators could be subjected to immediate withdrawal orders in non-emergency situations without having had any opportunity to discuss the underlying violations, application of the POV criteria (let alone the initial listing of such criteria) or means in which the operator might avoid the imposition of the sanction.

The VCA urges MSHA to reissue its proposal, and to include in that proposal the criteria to be used in the POV process, as well as an established mechanism by which mitigating circumstances are discussed prior to any issuance of a pattern notice. Such a proposal would be efficient, transparent and consistent with the Agency's and industry's goal of protecting the safety and health of miners.

## IV. Economic Analysis

A review of MSHA's cost/benefit analysis in the proposed rule indicates that the Secretary has both overestimated the presumed benefits and underestimated the costs associated with the rule. The stated benefits of the proposed rule are based on the premise that specific POV criteria will be posted on MSHA's webpage and that MSHA will develop a searchable database of compliance information which will then be used to determine whether a mine is approaching proposed POV criteria levels. Similarly, the estimated costs are based upon an unrealistic estimate of the time it will take for a mine operator to evaluate its enforcement history and extrapolate forward to the end of the POV cycle. The proposed rule further significantly understates the costs to a mine placed on a POV. MSHA has the ability to more accurately estimate both the cost and the benefits of the proposed rule. In the interest of transparency, and in light of President Obama's Executive Order 13563, "Improving Regulation and Regulatory Review," it must do so.

### a. Benefits

MSHA's estimation of benefits is based upon the supposition that mine operators who see that their mine is approaching a POV will institute an MSHA-approved safety and health management program to lessen the probability of being placed on a POV. MSHA estimates that implementation of such a plan will result in approximately 50 mines per year averaging three fewer nonfatal injuries in the first year after implementation of the MSHA-approved plan. Utilizing a "willingness-to-pay" methodology, MSHA calculates that the proposed rule will result in monetized benefits of approximately $9.3 million per year.

MSHA's analysis is flawed in that it is based upon an assumption that the specific criteria for issuance of a POV notice will only be applied prospectively. However, the proposed rule

does not limit MSHA to prospective application of the specific criteria, and historically MSHA has consistently applied POV specific criteria *only retroactively.* For example, in the most recent POV cycle, MSHA announced the specific POV criteria on September 28, 2010 and applied it retroactively over a 12-month period ending August 31, 2010.

The failure of the proposed rule to limit retroactive application of specific POV criteria renders MSHA's estimate of benefits meaningless. It is based upon a premise which is not stated in the proposed rule and which is contrary to MSHA's historical practice.

Additionally, the proposed rule speculates that MSHA will successfully develop a searchable database of compliance information which can be used by mine operators to determine whether their mine is approaching proposed POV criteria levels. Historically, MSHA has had problems bringing computer programs online on a reliable schedule. The repeated delay in implementation of the MSHA Standardized Information System, for example, demonstrates MSHA's inability to fulfill promises of timely, reliable computer development. It is simply inappropriate for MSHA to base its estimation of benefits on a speculative promise to develop a computer program that will allow mine operators to track their exposure to the specific POV criteria.

Lastly and most importantly, the Agency provides no rational basis for its assessment that implementation of a safety and health management program will result in three fewer nonfatal injuries. MSHA has no basis to analyze the effectiveness of such programs as the Agency itself is still grappling with the very question of what constitutes an effective safety and health management program. Moreover, to assume that injury reductions at mines having received PPOV letters were attributable to receipt of the PPOV letter is without basis and is not sufficient justification for calculating perceived benefit to be derived from the proposed rule.

### b. Costs

MSHA's cost analysis is similarly flawed. MSHA estimates that the yearly cost for all mine operators to monitor their POV performance will be less than $1 million per year. This was based upon the assumption that it will take a supervisor an average of 5 minutes per month to monitor each mine's performance using MSHA's website. Such an assumption is patently unrealistic. Five minutes would be the minimum time that it would take a person familiar with MSHA's webpage to access the relevant data. It would certainly take much longer for that individual to then study the data and extrapolate the potential impact of future MSHA inspections. At a minimum, MSHA should expect that accessing the MSHA database would only be the first step in a more involved analytical process which would consume a significantly greater amount of time than MSHA has assumed.

Another issue with MSHA's analysis is the assumption that such a monitoring process would only need to be performed monthly. For many underground mines MSHA enforcement activity occurs weekly, if not daily. It would be more reasonable for MSHA to assume that a mine operator would update his POV exposure analysis following any MSHA enforcement activity that occurs at the mine, given that they will no longer be afforded "due protection" rights before POV sanctions are implemented.

MSHA acknowledged that it "does not have an historical basis from which to estimate the potential costs that would be incurred by a mine on a POV." Nevertheless, MSHA has projected that a typical mine would lose about one-half of one percent of revenue as the result of closures resulting from placement on a POV by MSHA. MSHA stated that the closures would result in one or two days of closure for a large mine and one day or less for a small mine, and that as a result of these closures, "a typical mine would lose about 0.5 percent of revenue" which "is about $218,000." Unfortunately the Agency has grossly underestimated the potential cost of the proposal.

MSHA's estimations also grossly understate the economic impact of the POV withdrawal order sanction. For example, in underground coal mines in 2010, the most frequently cited standard was 30 C.F.R §75.400, which typically involves an accumulation of combustible material along conveyor belt lines. MSHA issued 8,995 violations for §75.400 in 2010, and those violations were almost always marked as "significant and substantial." Withdrawal orders issued for violations of §75.400 would result in the loss of all production occurring on that beltline, the impact of which MSHA failed to adequately consider. Similarly, many other frequently cited standards, including those contained in the Rules to Live By Enforcement Initiative in Metal/Nonmetal Mines and Coal Mines, are also virtually automatically listed as S&S, and could likewise result in a very costly withdrawal order. MSHA must take these considerations into account when assessing the costs of the proposed rule.

In comments submitted to MSHA on the proposed regulations to lower miner's exposure to respirable coal mine dust, $E^x$ponent Engineering and Scientific Consultants valued the loss of 1-hour of production from an underground longwall mine at $43,668. Applying this calculation, revenue loss at a mine would exceed more than $1 million per day, almost 5 times the Agency's estimate of the revenue for an average mine. As such, one underground longwall coal mine closed for 2-days as a result of being placed on POV would incur revenue losses equal to the Agency's entire estimate for the 10 mines the agency projects will be placed on POV.

MSHA has the historical data available to provide stakeholders and the public with a much more accurate estimation of the effective cost of the planned POV sanction. It should do so before proceeding further.

## V. Conclusion

While the VCA understands the need for regulation and supports MSHA using all of the enforcement tools Congress provided in the Mine Act when necessary to achieve safety, this proposed rule will do little to advance safety. The VCA cannot support the proposed POV reforms that deprive mine operators of the protections afforded them under the Constitution and circumvent mandatory procedures aimed at fostering transparent and accountable government. The proposed rule will worsen an already broken system and we urge the agency to revoke this proposal.

Sincerely,

John T. Heard
Legislative Counsel

**From:** Steven A. Handlos [mailto:S.Handlos@activeminerals.com]
**Sent:** Monday, April 18, 2011 11:03 AM        2011 APR 18 P 3: 54
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73 - COMM-68

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

      As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

      The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,
Steven A. Handlos, Jr
Operations Manager
Active Minerals International, LLC

**From:** Mike J. Spadarotto [mailto:M.Spadarotto@activeminerals.com]
**Sent:** Monday, April 18, 2011 11:05 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group          2011 APR 18  P 3: 54
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

AB73 - COMM - 69

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Mike Spadarotto
Active Minerals International, LLC

**From:** Diane R. McSwain [mailto:D.McSwain@activeminerals.com]
**Sent:** Monday, April 18, 2011 11:08 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73          2011 APR 18  P 3:54

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73-Comm-70

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

*Diane R. McSwain*
*Accounting & HR Assistant*
*Active Minerals International, LLC*
*Attapulgite Division*
*850-875-5580 (Direct Line)*
*850-627-6016 (Fax Line)*

**From:** Jeffery T. Arthur [mailto:J.Arthur@activeminerals.com]
**Sent:** Monday, April 18, 2011 11:08 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Cc:** Dennis C. Parker
**Subject:** MSHA POV

2011 APR 18 P 3:54

Good morning,

I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

MSHA needs to provide the criteria for POV in order to adequately assess the rule.

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.
The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

MSHA needs to explain how vacated citations/orders will affect POV status.

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

MSHA should clarify the proposed rule's provisions on mitigating circumstances.

AB73-COMM-71

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,

Trent Arthur
Quincy Lab
851-875-4160

**From:** Tommie L. Thomas [mailto:T.Thomas@activeminerals.com]
**Sent:** Monday, April 18, 2011 12:23 PM     2011 APR 18  P 3: 54
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Good morning,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process. The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the

AB73-COMM-72

agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.


Thank you,


Tommie Thomas
Active Minerals International,LLC
Production Supervisor
Direct Line (850) 875-5584
Cell # (229) 220-7896

2011 APR 18 P 3: 54

**From:** Watzman,Bruce [mailto:BWatzman@nma.org]
**Sent:** Monday, April 18, 2011 12:57 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

Attached are the comments and accompanying document submitted by the National Mining Association in response to the Notice of Proposed Rulemaking to amend 30 CFR Part 104, Pattern of Violations.

Bruce Watzman
Sr. Vice President
Regulatory Affairs
National Mining Association
(w) 202-463-2657
(c)  202-731-8341

AB73-COMM- 73



BRUCE WATZMAN
*Senior Vice President, Regulatory Affairs*

April 18, 2011

Ms. Roslyn Fontaine
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

Re:    **RIN 1219-AB73;  Comments on MSHA's Proposed Rule for Pattern of Violations**

Dear Ms. Fontaine:

The National Mining Association (NMA) is pleased to offer the following comments to the Mine Safety and Health Administration (MSHA) concerning its Proposed Rule for Pattern of Violations under § 104(e) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. §§ 801, 814(e).

NMA is a national trade association that includes the producers of most of the nation's coal, metals, industrial and agricultural minerals; the manufacturers of mining and mineral processing machinery, equipment and supplies; and the engineering and consulting firms, financial institutions and other organizations serving the mining industry.  The issues discussed in this Proposed Rule are of extreme importance to NMA's members, as mining operations nation-wide are subject to the regulations promulgated pursuant to the Mine Act, and mine operators are significantly impacted by any alterations to the existing regulatory scheme.

NMA recognizes the importance of the pattern of violations (POV) sanction to the effective enforcement of the Mine Act and supports the goal of improving transparency and simplifying the POV process, both in terms of agency implementation and stakeholder understanding.  However, as proposed, this rule would instead make the POV process less transparent and more complex while depriving mine operators of their right to due process under the law.  In light of the fact that the POV sanction is among the most potent enforcement tools that MSHA

1

has under the Mine Act, the agency must utilize it so as to protect the health and safety of miners while still ensuring that mine operators receive fair treatment and due process.

## I. The Proposed Regulation Violates the Principles of Due Process and Fundamental Fairness

### a. The Current POV Process

Currently, 30 C.F.R. § 104.3(b) states that only citations and orders that have become final shall be used to identify mines with a potential pattern of violations. The proposed rule changes this approach, which has been followed since 1991, and instead allows POV determinations to be based on "violations issued." For purposes of POV calculations, an operator will now be presumed guilty as soon as an inspector accuses him of violating an MSHA regulation, and regardless of whether or not the presumed violation has any correlation to injuries or illnesses that have occurred at the mine.[1]  The proposed rule also deletes those provisions granting prior warning to mine operators before the issuance of a pattern notice, and fails to prescribe a means by which operators can present mitigating factors and, where possible, develop a plan with MSHA to avoid the imposition of this onerous sanction. MSHA claims that these changes are necessary in light of the large backlog of contested violations pending before the Federal Mine Safety Health Review Commission (Review Commission), as well as the fact that, according to MSHA, only a fraction of such contested violations get vacated or modified to non-significant and substantial (S&S). MSHA argues that because of this backlog, the final order and notice provisions contained in the current rule hinder enforcement and do not allow the agency to review a mine's complete recent compliance history.

As an initial matter, NMA disagrees with MSHA's characterization of the current POV process, as well as its rationale for changing the criteria upon which POV status may be based. It is well understood in administrative law that federal agencies at different times exercise executive, legislative and judicial powers. In other words, federal agencies can at times act as the judge, jury and executioner in the promulgation and enforcement of federal regulations. Given this powerful leverage that MSHA has over mine operators, it seems particularly unfair for MSHA to then bypass legitimate challenges to alleged citations and impose admittedly the most onerous enforcement sanction under the Mine Act before a finding of guilt is made. Indeed, MSHA's primary justification for this change is the agency's need to circumvent the normal adjudicatory process to in order to consider backlog cases as part of a mine's history for POV purposes. This is a strawman argument that points fingers at both the independent Review Commission and at operators who choose to exercise their rights of due process as the two sources of the problem. The

---

[1] ICF Consulting, Mine Inspection Program Evaluation, Sept. 2003 ("...data indicate that the numbers and types of days lost injuries occurring over the past 5 to 10 years are not well correlated either quantitatively or qualitatively with the citations issued through inspection enforcement activities").

2

unfortunate reality, though, is that MSHA itself has been the primary contributor to the backlog by issuing substantially more citations and orders, of questionable validity, over the last few years while at the same time eliminating the conference process, thereby leaving operators with no recourse in contested cases other than to undergo a formal hearing process before the commission. Indeed, in testimony before the House Education and Labor Committee, Assistant Secretary Joseph Main recognized that inconsistent enforcement is a contributing factor to the dramatic increase in citations and orders.[2] Given this understanding, it is therefore difficult to see any justification for MSHA responding to the slow operation of the adjudicatory system by denying mine operators their fundamental right to be heard before being sentenced.

Furthermore, MSHA's claim that only a fraction of contested violations are vacated or modified is both inaccurate and irrelevant. According to information released by MSHA's Office of Assessments on Jan. 31, 2011, almost 20 percent of violations issued as S&S, which were litigated in fiscal years 2009 and 2010 and vacated or modified to "non-S&S" as a result of the litigation process. Similarly, when § 104(d) violations, which alleged an "unwarrantable failure" to comply, were litigated in the same period and almost 33 percent of those violations were either vacated or modified to a § 104(a) violation. Important to note is the fact that these are industry averages. POV sanctioning, however, is based on an individual operation's record, and at least some of those individual operators will likely have an even higher number of citations improperly designated as S&S or unwarrantable. Such operations are clearly at risk of being erroneously placed in the front of the POV line, especially as MSHA is proposing to base POV review on a relatively short time span where the misapplication of the S&S criteria by an inspector will have a potentially heavy impact on the total number of citations issued at a mine. Clearly, then, relying on "violations issued" to impose the punitive sanction of § 104(e) of the Mine Act could well result in erroneous application of the pattern enforcement mechanism. Moreover, as discussed in greater detail below, because the proposal is silent as to the number of violations that it will take to establish a POV, it is likely that almost any margin of error could result in multiple mines being erroneously subjected to this stringent penalty. MSHA's reliance on this statistic, therefore, does not address the serious concern of mines being mistakenly placed on the pattern of violations list.

There is also a very real possibility of MSHA erroneously tabulating a mine's inspection history. The Office of Inspector General at the U.S. Department of Labor (OIG) recently reported on the accuracy of MSHA's efforts to screen mines for POV sanctions. During the five POV screenings performed from 2007-2009, MSHA district managers sent potential POV letters to 68 mines. Following the completion of the evaluation period provided by the current 30 C.F.R. Part 104, those same district managers recommended that nine mines be given a POV notice. However, upon further evaluation of the underlying violations by MSHA attorneys or review by

---

[2] Testimony of Joseph A. Main, Assistant Secretary for Mine Safety and Health before the Committee on Education and Labor, U.S. House of Representatives, February 23, 2010.

3

MSHA staff, the agency determined that six of the nine mines (66 percent) did not meet the POV criteria.

Additionally, the same Inspector General's report found that MSHA's POV computer application used from 2007-2009 generated unreliable results on each of the five occasions it was used to screen for POV status. For example, the OIG found that on all five occasions, the MSHA application contained a value that could have caused a vacated citation to be counted as a valid final citation. As a result, the program could have over-counted citations for a specific mine. Similarly, citations and orders that had been issued to a prior owner of a mine could be associated with the current owner, resulting in an over-count of citations. The program was also found to incorrectly sum two columns that represented "unwarrantable failure" orders in such a manner as to incorrectly include a mine that did not meet the screening criteria for S&S § 104(d) final orders.

Finally, in the absence of any independent review, the risk of an erroneous application of the pattern notice and resulting withdrawal orders may be increased by MSHA's failure to provide its journeyman inspectors with periodic retraining. Lack of periodic retraining reduces the assurance that MSHA mine inspectors are adequately trained to conduct their duties and properly apply classifications, such as S&S and "unwarrantable failure," to violations they encounter. According to the OIG, 56 percent of MSHA journeyman inspectors did not attend the required refresher training in FY 2006 or 2007.[3] Moreover, MSHA training records show that 65 percent of the MSHA journeyman inspectors who failed to attend the required retraining sessions in FY 2006 or 2007 had still not completed retraining by the end of fiscal year 2009.[4] More than 27 percent of the 264 journeyman inspectors who responded to the OIG's survey stated that MSHA did not provide them with the technical training they needed to effectively perform their duties.[5]

The information above indicates that the POV rule should not be altered in the manner proposed, as MSHA has shown no adequate justification for these substantial changes. Not only does MSHA point to operational issues of a third party hearings system as reason to deny notice and meaningful opportunity to be heard to mine operators, but it also bases its changes on the false assumption that citations are rarely issued in error, and that contested violations are infrequently overturned or modified. Inspectors are not always right. Indeed, the above data belies MSHA's publicly articulated belief that some mine operators contest enforcement actions to avoid pattern notices. There are clearly a number of legitimate legal reasons to administratively challenge enforcement actions, which is a statutory right granted by the Mine Act, and those challenges have frequently met with success. For these reasons alone, MSHA should not adopt the proposed changes to the POV rule.

---

[3] *Journeyman Mine Inspectors Do Not Receive Required Periodic Retraining*, DOL OIG Report, Mar. 10, 2010, p. 6.
[4] *Id.* at p. 7.
[5] *Id.* at p. 3.

### b. The Fifth Amendment's Guarantee of Due Process of Law

Perhaps even more importantly, the proposed rule clearly runs afoul of the constitutional right to due process. The Fifth Amendment of the U.S. Constitution guarantees, in relevant part, that "[n]o person shall be...deprived of life, liberty, or property, without due process of law..." The use of "violations issued" to trigger the POV punitive sanctions absent a meaningful opportunity for prior independent review or hearing, as well as the proposed rule's elimination of notice provisions, denies mine operators this constitutional right to notice and the opportunity to be heard.

When considering due process issues, courts "must determine whether [a party] was deprived of a protected interest, and, if so, what process was his due..."[6] It is clear in the case of the POV sanction that shutting down a mining operation amounts to a substantial deprivation of property – both physical property as well as the economic benefits that accrue from mining operations – deserving of Fifth Amendment protections.[7] Mine operators therefore must be afforded due process protections in the adopted regulatory POV scheme.[8]

In determining what process is sufficient to satisfy the due process guarantee of the Fifth Amendment, courts have routinely held that "there can be no doubt that at a minimum [the words of the Due Process Clause] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."[9] The Supreme Court has also stated that "process which is mere gesture is not due process,"[10] and that "the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."[11] Although the exact procedure needed to satisfy due process changes

---

[6] *See, e.g., Logan v. Zimmerman,* 455 U.S. 422, 428.

[7] Licenses of multiple types have been held to constitute property warranting due process protections by the courts. *See, e.g.,* Bell v. Burson, 402 U.S. 535 (Supreme Court held that the state violated a motorist's due process rights by denying him a meaningful prior hearing before suspending his driver's license); Dixon v. Love, 431 U.S. 105 (Supreme Court held that a truck driver could have his license suspended or revoked prior to an administrative hearing where that revocation was based on final convictions of traffic offenses and where a full administrative hearing was available within 20 days of the revocation).

[8] *See, e.g.* Goss et al. v. Lopez et al., 419 U.S. 565, 575-576 ("In determining 'whether due process requirements apply in the first place, we must look not to the weight but to the nature of the interest at stake'...the length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of hearing, 'is not decisive on the basic right' to a hearing of some kind. The Court's view has been that as long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause.")

[9] Mullane v. Central Hanover Bank & Trust Co. et al., 339 U.S. 306, 313. *See also* Grannies v. Ordean, 234 U.S. 385, 394 ("The fundamental requisite of due process of law is the opportunity to be heard").

[10] Mullane v. Central Hanover at 315.

[11] Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), 105 S. Ct. 1487, 1493. Cited by the U.S. Court of Appeals for the Sixth Circuit in striking down a provision of the Mine Act in Southern Ohio Coal Company v. Raymond Donovan, Sec. of Labor et al., 774 F.2d 693, 704 ("Indeed, the Supreme Court's most recent

5

with context, the Supreme Court has held that the extent of the prior evidentiary hearing required before a deprivation of property occurs is determined by three factors: 1) the private interest that will be affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used; and 3) the government's interest.[12]

As discussed above, the private interest affected in this instance is the operation and economic viability of a mine – a property interest that is impinged upon by the constant closure orders that accompany POV status. MSHA itself acknowledged this fact when it published the final version of the current rule, stating that "the Agency realizes that the statutory requirements for terminating a pattern of violations sequence place a great burden on the operator of the mine. An inspection of the entire mine, particularly a large underground mine, that reveals no violations of a significant and substantial nature may be difficult to achieve." 55 Fed. Reg. 31128, 31129 (July 31, 1990). In other words, MSHA admitted that once a mine is placed on POV status, it is virtually impossible to avoid a withdrawal order. Therefore, the interest at stake is a substantial one which, under the proposed POV regulations, MSHA would be permitted to deprive operators of without *any* prior hearing.

Furthermore, as already shown in detail above, the risk of erroneous deprivation of that property interest is significant given the potential for mistaken issuance of citations and POV calculations, and it could be made even worse by the vague and potentially ever-changing pattern criteria proposed in the rule (discussed below).[13] The absence of any conference or hearing procedures before imposition of a sanction further complicates the matter, as the U.S. Supreme Court has stated that "some opportunity for [a party] to present his side...is recurringly of obvious value in reaching an accurate decision."[14] This risk is also exacerbated by the fact that even a relatively small number of mistakes on the part of MSHA inspectors may result in mines being erroneously placed on POV status.

The final factor utilized in determining what process is required to satisfy procedural due process is the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would impose. Unquestionably, the government has a

---

pronouncement concerning due process requirements, *Cleveland Board of Education v. Loudermill*...strongly supports the mine operators' arguments that the Secretary should provide them at least some kind of *pre-deprivation* hearing").

[12] Matthews v. Eldridge, 424 U.S. 319, 332-335.
[13] *See also, e.g.,* Goss et al. v. Lopez et al., 419 U.S. 565, 579-581 (In addressing a school disciplinary process, the Supreme Court stated that "...the concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, this is not the case...the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against...The [Due Process] Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct...").
[14] Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), 105 S. Ct. 1487, 1494 (referring to the rights of employees to present their side of a case in dismissal actions).

6

substantial interest in seeing that the enforcement scheme found in § 104(e) of the Mine Act is successfully implemented.  However, even in the face of such a compelling government interest, due process must be afforded to those parties directly affected by government action.  Indeed, Congress, while routinely recognizing the importance of MSHA's mission, nevertheless established an enforcement scheme in the Mine Act that specifically grants mine operators the right to contest the issuance of any citation, order or proposed civil penalty within 30 days of its issuance before an independent tribunal.  The proposed rule, while not actually depriving the operator of the right to contest a citation at the Review Commission (which it cannot, since that right is guaranteed under the Mine Act), nonetheless vitiates the review process by granting MSHA the authority to impose the most severe enforcement tool provided under the Mine Act long before the mine operator has a chance to be heard.  Such a system does not afford adequate procedural protections to mine operators.

MSHA's actions are particularly unwarranted given the fact that the POV sanction is not a tool intended by Congress to address emergency situations.  While it is true that courts have found exceptions to the general requirement of prior notice and a hearing in emergency situations where a significant government interest justifies delay of a hearing until after the seizure of property rights, no such exception exists in the case of POV violations.  Congress has empowered MSHA with ample authority to protect the health and safety of miners in emergencies under the Mine Act.  Section 107(a) gives MSHA authority to close a mine by ordering the withdrawal of miners without a prior hearing whenever an "imminent danger" exists.  These imminent danger orders remain in effect until the "...condition or practice which caused such imminent danger no longer exist[s]." 30 U.S.C. § 817(a).  In addition, MSHA already takes the position that it can seek a temporary restraining order, temporary injunction and permanent injunction in the appropriate federal district court whenever "...the Secretary believes that the operator...is engaged in a pattern of violation of the mandatory health or safety standards of this Act, which in the judgment of the Secretary constitutes a continuing hazard to the health or safety of the miners." Mine Act § 108(a)(2); 30 U.S.C. § 818(a)(2).  In light of such ample existing authority to stop operations at dangerous mine sites without resorting to the POV sanction, there is no basis for MSHA to dispense with the notice and hearing procedures of the § 104(e) POV process in a manner contrary to due process and the statutory enforcement scheme of the Mine Act.  It is just stacking the deck − clear and simple.

The important private interest at stake, the high likelihood of erroneous deprivation of that property interest and the compelling but non-emergency government interest involved all lead to the conclusion that MSHA must provide notice and a hearing to mine operators before imposing a POV sanction.  To do otherwise would violate the Fifth Amendment's guarantee of due process under the law.

7

### II. The Final POV Rule Must Ensure that Mine Operators Receive Adequate Notice and a Fair Opportunity to be Heard

#### a. POV Sanctions Should be Based Only on Final Orders, and MSHA Should Retain the Notice Provisions Contained in the Current POV Rule

NMA finds MSHA's own previous due process considerations during the POV rulemaking process informative on the issue of what notice and hearing provisions should be included in the POV regulations.  In the publication of the current version of the POV Final Rule, MSHA stated that "in order to avoid inequities regarding which mines are placed on a pattern, *the Agency must make ample provision for due process* when applying the broad framework established by Congress…MSHA will consider *only final citations and orders* when identifying mines with a potential pattern of violations."  55 Fed. Reg. 31128, 31132 (July 31, 1990, emphasis added).

Additionally, MSHA reasoned that "the initial screening factors are coupled with procedures affording parties *full and fair notice* of the agency's initial determination that a potential pattern may exist at a mine.  Application of these procedures will ensure that operators are made aware well in advance of the circumstances giving rise to the issuance of a pattern notice and will have a *reasonable opportunity to address these circumstances*…. A number of commenters stated that fairness requires prospective application of the initial screening process. MSHA agrees." *Id.* at 31131.

The current assistant secretary himself, when he served as administrator for the Department of Occupational Health and Safety at the United Mine Workers of America (UMWA), commented on the importance of the notice provisions contained in the current POV Rule.  In his letter to MSHA regarding the proposed version of the current POV Rule, Assistant Secretary Main stated that "all mines which are under review for potential pattern of violations…shall be given notice to that effect by the Agency…This notice is designed to give operators the opportunity to take concrete actions to improve the citation history at the mine and to implement a remedial plan.  MSHA should evaluate these [and] similar company efforts to correct a pattern of violations when the pattern notice conference is held."  He further stated that "when MSHA determines that a mine under review is subject to a pattern notice, the Agency should inform the operator…of the Agency's intent to issue a pattern notice.  The letter…should specify the basis for the determination and should give the operator…15 calendar days after receipt to request a conference.  At the conference there should be a review of the citation history…"  A copy of Main's letter is attached to this document.

It is clear that MSHA included the current notice and procedural safeguards, such as basing POV decisions only on final orders, to ensure fairness to mine operators.  Nothing has occurred to warrant the proposed changes, aside from MSHA's desire for administrative convenience in the face of a growing number of

8

cases at the independent Review Commission.  Just as courts and prosecutors are not permitted to suspend the rights of litigants when they get overloaded with cases, so too must MSHA refrain from punishing mine operators who are merely exercising their rights under the law, particularly in light of the interests at stake in the POV process and MSHA's abandonment of procedures that allowed cases to be more efficiently managed.  Eliminating all procedural safeguard provisions without establishing alternative measures will undoubtedly deny mine operators their right to fundamental fairness and violate the Fifth Amendment.[15]

Furthermore, while not adopting a specific time period for consideration of pattern criteria in the current rule, MSHA previously noted that "the Agency believes that, in practice, most violations considered under the pattern criteria will normally have been issued within the preceding 2 years."  55 Fed. Reg. 31128, 31133.  The current backlog of cases before the commission has led to the pending resolution of a large number of longstanding cases for many mining operators.  These cases tend to be decided or settled en masse, which leads to citations issued over the course of several years becoming final all at once.  While NMA understands that MSHA did not want to "unduly restrict" its ability to consider cases relevant to a POV determination in the previous rulemaking, in light of this change in circumstances, MSHA should include in the new rule a set timeframe for consideration of citations of only those issued within the previous two years.  This limitation would allow MSHA to consider relevant citations without exposing mine operators to the risk of having the effects of their compliance efforts grossly skewed by a POV calculation that could include citations issued four to five years prior.  Again, NMA stresses that such a time limitation in the new rule is necessitated by the slow operation of the adjudication system, for which mine operators should not be penalized.

### b. At a Minimum, Notice and a Hearing Are Required Before a Mine Operator Can be Deprived of His Property

If MSHA will not continue its current practice of only basing POV decisions on final orders and citations, MSHA must, at an absolute minimum, promulgate a POV rule that provides mine operators with sufficient notice and a comment opportunity

---

[15] *See, e.g.,* Blackhawk Mining Company, Inc. v. Cecil D. Andrus, Secretary, Dep't of the Interior, 711 F.2d 753 (6th Cir., July 20, 1983) (The U.S. Court of Appeals for the 6th Circuit upheld a provision of the Surface Mining Control and Reclamation Act requiring prepayment of proposed penalty assessments into escrow as a condition for formal review, but only because the "procedural safeguards in connection with the…escrow requirement" were sufficient to satisfy the demands of due process, particularly in light of the fact that there was only a "slight" potential deprivation of property and risk of erroneous deprivation given the procedural safeguards.  Specifically, in determining that due process had been met, the court pointed to the right of a mine operator to have a public hearing before the Secretary determines whether a violation of the Act has occurred, the right of a mine operator to submit relevant information to the Office of Surface Mining's Assessment Office within ten days of service of a Notice of Violation which the Assessment Office must consider, and the right of a mine operator to have an informal conference – without any prepayment prerequisite - to review the amount of a proposed penalty within 15 days of receipt of a Notice of Proposed Assessment wherein an operator may be represented by counsel.  All of these safeguards are implemented before imposition of the ultimate sanction under the SMCRA regulatory scheme.)

9

before a POV order may be issued.[16]  Indeed, courts have previously held that a provision of the Mine Act was unconstitutional because it failed to provide mine operators with a pre-deprivation hearing before the imposition of sanctions.[17] Importantly, the U.S. District Court for the Southern District of Ohio, Eastern Division noted that "it is only where the nature of the potential deprivation does not indicate a likelihood of serious loss, and where procedures followed in reaching a decision to act are sufficiently reliable that the risk of erroneous deprivation is minimal that government may act without 'some kind of hearing' prior to the time a person is deprived of his property interest."[18]  As previously discussed in detail, such is not the case with the POV penalty.

NMA understands MSHA's concerns regarding the current backlog of cases and slow-moving adjudication process.  However, altering the POV process in the manner proposed is neither an appropriate nor a fair response.  Rather, MSHA and the Review Commission should adopt, through notice and comment rulemaking, formal measures allowing expedited considerations of those cases involving mines at risk of being placed on POV status.  A formal mechanism to consolidate and expedite issued violations being contested by potential POV operators would allow MSHA to review a mine operator's entire recent violation history within a reasonable timeframe, while still affording mine operators adequate opportunity to contest potentially erroneous citations before becoming subject to stringent penalties.  In other words, MSHA would have a means to penalize the "bad actors" in the system without violating the due process rights of *all* mine operators.  Additionally, this change could be accomplished easily within the framework of the existing adjudicatory system.

The due process clause of the Fifth Amendment requires MSHA to put procedural mechanisms in place in any final POV rule that provides mine operators with adequate notice and an opportunity to be heard.  While the current POV rule ensures fairness and the right to be heard at the commission before being placed

---

[16] Mathews v. Eldridge, 424 U.S. 319, 333 ("The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society").  *See, e.g.*, the POV process in the Surface Mining Control and Reclamation Act (SMCRA), enforced by the Office of Surface Mining Reclamation and Enforcement (OSM).  Under the SMCRA POV process, OSM must issue a show cause order to a mine operator if the agency determines that a mine has demonstrated a POV.  30 CFR Sec. 843.13; 43 CFR Sec. 4.1193.  After the show cause order is issued, a mine operator can then request a hearing to contest an imposition of the POV sanction.  At such a hearing, OSM is first required to establish a prima facia case for suspension or revocation of a permit based on a POV, which the mine operator can then contest.  A written decision must be given as to whether a pattern of violations exists within 60 days after the hearing.

[17] Southern Ohio Coal Company v. Raymond Donovan et al., 774 F.2d 693 (Oct. 2, 1985) (The U.S. District Court for the Southern District of Ohio, Eastern Division – later upheld by the U.S. Court of Appeals for the Sixth Circuit – concluded that a section in the Mine Act allowing for *ex parte* reinstatement of a miner under the Act's whistleblower protection provisions violated the 5th Amendment right to due process.  Applying the *Matthews v. Eldridge* factors, the court found that the compelling interest of a mine operator in not being required to employ a discharged man, small administrative burden of a pre-hearing, and lack of reliability in *ex parte* administrative investigations supported the requirement of an evidentiary hearing "prior to adverse administrative action").

[18] Southern Ohio Coal Comp. v. Donovan, 593 F.Supp. 1014, 1023 (referencing the U.S. Supreme Court case of Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19).

on the potential POV list, the proposed rule takes out nearly every procedural protection contained in the current rule. Instead, mine operators can be issued withdrawal orders when an inspector merely alleges a safety infraction, and they are given no opportunity to demonstrate that they should not be hit with the POV sanction. Such a system would be in clear violation of the law. Rather than gut the procedural protections in the current POV scheme, MSHA should address the underlying issues and: (1) reinstate and commit resources to the conference process; (2) make certain its inspectors are fully informed as to the legal standards for S&S and unwarrantable failure special findings; and (3) work with the commission to address the backlog of cases causing prolonged adjudicatory periods – for example, by formalizing through concurrent rulemaking with the commission a procedure to expedite the full and fair hearing of citations and orders ripe for POV review. Alternatively, should MSHA make changes to the POV Rule, MSHA must retain adequate notice provisions and establish a pre-sanction hearing process in which mine operators are given a fair opportunity to present their case to an independent reviewer. To do otherwise would violate the due process rights guaranteed by the Fifth Amendment.[19]

### III.   POV Screening Criteria Should be Subject to Notice and Comment Rulemaking Procedures

MSHA is seeking comment on "how the Agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." 76 Fed. Reg. 5719, 5720 (February 2, 2011). Simply put, all such criteria should be published in the *Federal Register* and be subject to the notice and comment provisions of the Administrative Procedures Act and the Mine Act.

Section 104.2 of the proposed rule lists only generic categories of information that will be reviewed, without quantifying or explaining how such data will be applied to issue a pattern notice. The proposed rule also seems to anticipate that POV screening criteria will be fluid and subject to change without any established method for notice and comment rulemaking. While it is impossible to comment on POV screening criteria that have not yet been listed in the proposal, NMA strongly objects to this suggested ever-changing criteria method, as it is neither transparent nor simple. Rather, the proposed rule fails to inform stakeholders of what is expected of them in order to avoid a pattern notice, and it offers no opportunity for comment on specific criteria before the rule becomes effective. Given the serious consequences stemming from being placed on a POV, this lack of transparency is extremely troubling.

While the secretary of labor has broad discretion to establish criteria for determining when a pattern of violations exists, that discretion does not extend to establishing POV screening criteria without notice and comment rulemaking. Section 104(e)(4), 30 U.S.C. § 814(e)(4), requires that the "...Secretary shall make such *rules* as he deems necessary to establish criteria for determining when a

---

[19] *See, e.g.,* <u>Southern Ohio Coal Company v. Ray Donovan, Sec. of Labor,</u> *id.*

11

pattern of violations…exists" (emphasis added).  The Office of Inspector General has also specifically recommended that MSHA seek stakeholder input on the POV screening criteria in its report dated Sept. 29, 2010, pages 3, 24.  MSHA has clearly not adopted this approach in the proposed rule.  Rather, by not identifying or publicizing any specific criteria in a final POV rule and instead providing for the periodic development and revision of specific criteria, MSHA is granting itself the ability to constantly change the rules of the POV process with no public notice or comment period.  Such an approach is not only fundamentally unfair, but it also blatantly lacks the very transparency MSHA purportedly seeks to achieve with this rule revision.  MSHA should remedy this issue by adopting a formal rulemaking process by which POV screening criteria must be established.

NMA's concern with the failure of the proposal to establish a rulemaking process for POV screening criteria is exacerbated by the fact that the proposed rule eliminates any potential for discussion of how the specific criteria should be applied to a mine before the issuance of a pattern notice.  Proposed Section 104.3.  Rather, it appears that the rule anticipates an "automated" process for the issuance of a pattern notice based on a mine operator's monitoring of data posted on MSHA's website.  Furthermore, no specific procedure is described for consideration of mitigating criteria prior to the issuance of the notice.  In other words, operators could be subjected to withdrawal orders in non-emergency situations without having had any opportunity to discuss the underlying violations, application of the POV screening criteria (let alone the initial listing of such criteria), or the means by which the operator might avoid the imposition of the sanction.

NMA urges MSHA to reissue its proposal and to include in that proposal the criteria to be used in the POV screening process, as well as an established mechanism by which mitigating circumstances are discussed prior to any issuance of a pattern notice.  Such a proposal would be more efficient, transparent and consistent with the mutual goal of the agency and industry in protecting the safety and health of miners.

## IV.    Economic Analysis

A review of MSHA's cost/benefit analysis in the proposed rule indicates that the secretary has both overestimated the presumed benefits and underestimated the actual costs associated with the rule.

The stated benefits of the proposed rule are based on the unproven premise that specific POV screening criteria will be posted on MSHA's website, and that MSHA will develop a searchable database of compliance information that will then be used to determine whether a mine is approaching proposed POV criteria levels.  The estimated costs are based upon an unrealistic estimate of the time it will take for a mine operator to evaluate its enforcement history once MSHA has posted the data and extrapolate forward to the end of the POV cycle.  The proposed rule also significantly understates the costs to a mine placed on a POV.

12

MSHA has the ability to more accurately estimate both the cost and the benefits of the proposed rule.  In the interest of transparency, and in light of President Obama's Executive Order 13563, "Improving Regulation and Regulatory Review," it must do so.

### a. Benefits

MSHA's estimation of benefits is based upon the supposition that a mine operator who sees that its mine is approaching a POV will institute an MSHA-approved safety and health management program to lessen the probability of being placed on POV status.  MSHA estimates that implementation of such a plan will result in approximately 50 mines per year averaging three fewer nonfatal injuries in the first year after implementation of the MSHA-approved plan.  Utilizing a "willingness-to-pay" methodology, MSHA calculates that the proposed rule will result in monetized benefits of approximately $9.3 million per year.

MSHA's analysis is flawed in that it is based upon an assumption that the specific screening criteria for issuance of a POV notice will only be applied prospectively.  However, the proposed rule does not limit MSHA to prospective application of the specific criteria, and historically, MSHA has consistently applied POV specific criteria *only retroactively*.  For example, in the most recent POV cycle, MSHA announced the specific POV criteria on Sept. 28, 2010, and applied it retroactively over a 12-month period ending Aug. 31, 2010.  The failure of the proposed rule to limit retroactive application of specific POV criteria renders MSHA's estimate of benefits meaningless.  It is based upon a premise that is not stated in the proposed rule and is contrary to MSHA's historical practice.

Additionally, the proposed rule posits that MSHA can successfully develop a searchable database of compliance information that can be used by mine operators to determine whether a mine is approaching proposed POV criteria levels. While such a tool is now available, its accuracy and timeliness remain untested. Historically, MSHA has had problems bringing computer programs online on a reliable schedule.  It is simply inappropriate for MSHA to base its estimation of benefits on an untested computer program that will allow mine operators to track their exposure to the specific POV criteria.

Lastly, and most importantly, MSHA provides no rational basis for its assessment that implementation of an agency-imposed safety and health management program will result in three fewer nonfatal injuries per year. MSHA has no basis upon which to analyze the effectiveness of such programs, as the agency itself is still grappling with the very question of what constitutes an effective safety and health management program. Moreover, to assume that injury reductions at mines receiving proposed POV letters were attributable to receipt of the PPOV letter is without basis and is not a sufficient justification for calculating perceived benefit to be derived from the proposed rule.

13

**b. Costs**

MSHA's cost analysis is similarly flawed. MSHA estimates that the yearly cost for all mine operators to monitor their POV performance will be less than $1 million per year. This was based upon the assumption that it will take a supervisor an average of five minutes per month to monitor each mine's performance using MSHA's website. Such an assumption is patently unrealistic. Five minutes would be the minimum time that it would take a person familiar with MSHA's website to access the relevant data. It would certainly take much longer for that individual to then study the data and extrapolate the potential impact of future MSHA inspections. At a minimum, MSHA should expect that accessing the agency database would only be the first step in a more involved analytical process, which would consume a significantly greater amount of time than MSHA has assumed.

Another issue with MSHA's analysis is the assumption that such a monitoring process would only need to be performed monthly. For many underground mines MSHA enforcement activity occurs daily or weekly. It would be more reasonable for MSHA to assume that a mine operator would update his POV exposure analysis following any MSHA enforcement activity that occurs at the mine, particularly given that under MSHA's proposed rule mine operators will no longer be afforded notice before POV sanctions are implemented.

MSHA has also acknowledged that it "does not have an historical basis from which to estimate the potential costs that would be incurred by a mine on a POV." Nevertheless, MSHA has projected that a typical mine would lose about one-half of one percent of revenue as the result of closures resulting from placement on a POV by MSHA. MSHA stated that the closures would entail one or two days of closure for a large mine and one day or less for a small mine, and that as a result of these closures, "a typical mine would lose about 0.5 percent of revenue" which "is about $218,000." Unfortunately, the agency has grossly underestimated the potential cost of the proposal.

In comments submitted to MSHA on the proposed regulations to lower miner's exposure to respirable coal mine dust, E$^x$ponent Engineering and Scientific Consultants valued the loss of one-hour of production from an underground longwall mine at $43,668. Applying this calculation, revenue loss at a mine would exceed more than $1 million per day, almost five times the agencies estimate of the revenue for an average mine. As such, one underground longwall coal mine closed for two days as a result of being placed on POV would incur revenue losses equal to the agency's entire estimate for the 10 mines projected to be placed on POV.

MSHA's estimations also significantly understate the economic impact of the POV withdrawal order sanction. For example, in underground coal mines in 2010, the most frequently cited standard was 30 C.F.R §75.400, which typically involves an accumulation of combustible material along conveyor belt lines. MSHA issued 8,995 violations for §75.400 in 2010 and those violations were almost always

14

marked as "S&S." Withdrawal orders issued for violations of §75.400 would result in the loss of all production occurring on that beltline, the impact of which MSHA failed to adequately consider. Similarly, many other frequently cited standards, including those contained in the Rules to Live by Enforcement Initiative in Metal/Nonmetal Mines and Coal Mines, are also virtually automatically listed as S&S and could likewise result in a very costly withdrawal order. MSHA has also recently expanded the areas affected by withdrawal orders to include, in many cases, areas situated miles away from the cited location. MSHA must take these considerations into account when assessing the costs of the proposed rule.

MSHA has the historical data available to provide stakeholders and the public with a much more accurate estimation of the effective cost of the planned POV sanction. It should do so before proceeding further.

## V. Conclusion

NMA understands the need for regulation, and it supports MSHA's utilization of all of the enforcement tools provided by Congress in the Mine Act when necessary to achieve our mutual goal of miner safety. However, the proposed rule will do little to advance safety. NMA is on record regarding the need for reform of the POV system, but it cannot support reforms that deprive mine operators of the protections afforded them under the Constitution and circumvent mandatory procedures aimed at fostering transparent and accountable government. The proposed rule will worsen an already broken system and NMA urges the MSHA to revoke this proposal. Given the import of the proposed rule, we also request that a series of public hearings be held regarding the proposed rule.

Sincerely,

Bruce Watzman
Senior Vice President, Regulatory Affairs
National Mining Association

15

## United Mine Workers of America



TELEPHONE
AREA CODE (202) 842-7200

UNITED MINE WORKERS' BUILDING
900 FIFTEENTH STREET, N. W.

### Washington, D.C.
20005

May 6, 1985

<u>HAND-DELIVERED</u>

Ms. Patricia Silvey
U.S. Department of Labor
Mine Safety and Health Administration
Office of Standards, Regulations & Variances
4015 Wilson Boulevard, Room 631
Arlington, VA 22203

Dear Ms. Silvey:

This is in response to the notice published in the
February 8, 1985, <u>Federal Register</u>. The United Mine
Workers of America wholeheartedly supports MSHA's long
overdue decision to develop regulations for implementing
section 104(e) of the Federal Mine Safety and Health Act
of 1977. Our comments are as follows:

I. <u>Administrative Procedures</u>

A. <u>Initial Identification of Mines</u>

The initial screening procedures employed by MSHA to
identify potential pattern violators are critically
important to the effective enforcement of section
104(e). The screening process must be broad enough to
identify all recidivist violators of the Act. Not only
must this process identify operators whose pattern of
violations is based upon the receipt of numerous S&S
citations, but it must also have the fine-tuned
potential to pinpoint those operators who have committed
repeated violations of a particular standard or who have
a safety record which indicates a lack of attention to a
particular area of mine safety or health. Accordingly,
the UMWA proposes a bifurcated screening process:

### 1.  Automatic Review

Every quarter those mines whose rate of significant and substantial violations (based upon man-hours worked) over the previous four quarters places them in the 75th percentile for all mines would be placed under review to determine if, based upon specified criteria, they should be subject to a pattern notice.  Mines placed under automatic review will not necessarily receive the pattern notice.  It is anticipated, however, that most pattern violators will be in the 75th percentile, and the automatic review process will aid in identifying them.

### 2.  Selective Review

As the Senate Committee on Human Resources noted in its report, "pattern does not necessarily mean a prescribed number of violations of predetermined standards."  S.Rep. 95-181, 95th Cong., 1st Sess. (1977), reprinted in Senate Subcommittee on Labor, Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977 (1978), p. 621.  Thus, in keeping with Congress' directive, the Secretary should develop a means for identifying potential pattern violators who do not rank within the 75th percentile for S&S violations. Accordingly, the UMWA proposes that mines be subject to quarterly selective review if they fall within any of the following categories:

> a. The mine was on a section 104(d) unwarrantable failure sequence during the previous quarter.1/

---

1/In the Secretary's advance notice of proposed rulemaking it is envisioned that a section 104(d) sequence will be a prerequisite to any pattern order issued under section 104(e).  It would be a mistake, however, to limit pattern notices only to mines which have been on the section 104(d) sequence.  Section 104(d) orders are issued when there have been repeated unwarrantable failure citations.  Under section 104(e) there is no requirement that violations establishing the pattern be a result of the operator's "unwarrantable failure."  Consequently, making the section 104(d) sequence a prerequisite for the 104(e) notice would run counter to the Legislative scheme.  See Leg. Hist. at 621-622.  Accordingly, while those mines on a section 104(d) sequence should be reviewed, other operations must be reviewed, as well.

-2-

b.  The mine was placed under a section 107(a) imminent danger order during the previous four quarters.

c.  The mine has a high accident rate for the previous four quarters.

d.  There has been a fatality at the mine during the previous four quarters.

e.  There is a high rate of citations and orders, <u>including non-S&S violations</u>, for the previous four quarters, based on man-hours worked.

These selective review criteria are chosen because they indicate that there is an underlying health and safety problem at the mine.  Such mines should be scrutinized for possible pattern of offense despite the fact they may have an S&S rate below the 75th percentile.

B.  <u>Notice of Review</u>

All mines which are under review for potential pattern of violations, whether automatic or selective, shall be given notice to that effect by the Agency. Notice shall also be sent to the representative of miners.

This notice is designed to give operators the opportunity to take concrete actions to improve the citation history at the mine and to implement a remedial plan.  MSHA should evaluate these amd similar company efforts to correct a pattern of violations when the pattern notice conference is held.  <u>See</u> Part D, below.

C.  <u>Identifying Mines Subject to Pattern Notice</u>

Those mines which are under review because they are high rate violators or meet selective review criteria will be identified as subject to a pattern notice if the review indicates one or more of the following:

1.  A pattern of S&S violations of a particular standard over a period of time.

2.  A pattern of S&S violations of standards of a similar nature, indicated by a history of violations over an extended period of time,

-3-

such that a continuing hazard in a
particular area of mine safety and health,
such as roof control, electrical,
ventilation, respirable dust, and
escapeways, has not been brought under
control.

3.  A mine-wide pattern of S&S violations which
indicates an underlying health and safety
problem throughout the mine.

4.  If a mine which is under review was also
under review one or more times during the
previous 365 day period, and there has been
no substantial improvement since the
immediately previous review, then that mine
will be subject to a pattern notice.

D.  <u>Letter of Intent and Pre-Notice Conference</u>

When MSHA determines that a mine under review is
subject to a pattern notice, the Agency should inform
the operator and the miners representative of the
Agency's intent to issue a pattern notice.  The letter
of intent should specify the basis for the determination
and should give the operator and representative of
miners 15 calendar days after receipt to request a
conference.  At the conference there should be a review
of the citation history at the mine.  A pattern of
violation notice should be issued after the conference
unless the operator establishes all of the following:

1.  Specific actions were taken, following the
notice of review, to improve the citation
history;

2.  There has been an improvement of the
citation history at the mine following the
notice of review, and

3.  The operator submits a prepared plan to the
Agency outlining the course it will follow
to avoid future violations and improve its
violation record for the long-term.

However, if a mine is identified as subject to a pattern
notice more than once within a 365 day period, no
conference will be held and the pattern notice will
automatically be issued.  The scheduling and location of
the conference should accomodate the convenience of the
miners representative who should be given notice of the
conference and suffer no loss of pay for attending.

-4-

E.  Termination of the Notice

Once a mine is placed on a pattern of violation
notice, the notice should only be terminated if a
regular inspection of the mine indicates that there are
no S&S violations.  The Agency has solicited comments on
administrative procedures that could be adopted for the
purpose of terminating pattern notices.  The UMWA is
reviewing procedural options and giving them serious
consideration.

II.  Miscellaneous Concerns

A.  State of mind of operator and extenuating
circumstances should not be criteria upon which
a pattern determination is based.

The UMWA urges the Secretary not to make an
operator's state of mind or intent a factor to be
considered prior to the issuance of a section 104(e)
notice.  The Senate Committee report clearly states
Congress' wish that intent or state of mind of the
operator not be criteria for determining when a pattern
of violation exists.  Leg. Hist. at 621.  Accordingly,
the operator's good faith, absence of negligence,
knowledge and any extenuating circumstances should not
be factored into the Agency's review.  If a review of
the citation history indicates a pattern of S&S
violations, a notice should issue, regardless of
mitigating factors.  Certainly the issuance of a single
S&S citation, not to mention a string of them, should be
enough to alert an operator about a health and safety
problem at his mine and present him with the need to
take corrective action.

B.  Review by Arlington rather than by District
Managers.

In order to ensure that a standard of review will be
consistently and fairly applied to all mines, the
quarterly review and the issuance of pattern notices
should be performed by the Arlington office.

C.  Notice of Representative of Miners

Notice of any decisions or actions taken pursuant to
section 104(e) should be provided to the representatives
of miners.

-5-

If you have any questions or comments on any matters raised in this letter, please do not hesitate to call me.

Very truly yours,

Joseph Main, Administrator
Department of Occupational
Health and Safety

–6–





federal register

Friday
February 8, 1985

Part II

# Department of Labor

Mine Safety and Health Administration

**30 CFR Part 104**
Identification of Mines Having a Pattern
of Violations; Withdrawal of Proposed
Rule and Advance Notice of Proposed
Rulemaking

MAR 1 3 1985

DEPARTMENT OF LABOR

Mine Safety and Health Administration

30 CFR Part 104

Pattern of Violations

**AGENCY:** Mine Safety and Health Administration, Labor.

**ACTION:** Withdrawal of proposed rule; advance notice of proposed rulemaking.

**SUMMARY:** The Mine Safety and Health Administration (MSHA) is considering rulemaking on criteria and procedures for identifying mines with a pattern of violations of mandatory standards that significantly and substantially contribute to safety and health hazards. On August 15, 1980, MSHA published a proposed rule to establish criteria for identifying mines having a pattern of violations (45 FR 54646). Commenters were generally opposed to the proposal, stating that it was complex, too statistically oriented, and vague. In addition, since that time, administrative litigation resulting in changes in Agency enforcement policies and a 1982 revision of the Agency's civil penalty procedures have affected key provisions of that proposal. The Agency now has experience with these changes and is considering resumption of rulemaking. This notice withdraws the 1980 pattern of violations proposal and outlines for public comment possible criteria and procedures for a new pattern of violations proposal.

**DATES:** This withdrawal is effective February 8, 1985. Comments on the Advance Notice of Proposed Rulemaking must be received by April 9, 1985.

**ADDRESSES:** Office of Standards, Regulations, and Variances, MSHA; Room 631 Ballston Tower No. 3; 4015 Wilson Boulevard; Arlington, Virginia 22203.

**FOR FURTHER INFORMATION CONTACT:** Patricia W. Silvey, Director, Office of Standards, Regulations, and Variances, MSHA, (703) 235–1910.

**SUPPLEMENTARY INFORMATION:** Under section 104(e) of the Federal Mine Safety and Health Act of 1977 (Mine Act), the Secretary of Labor is authorized to issue a notice to a mine operator if the operator's mine has a pattern of violations of mandatory safety or health standards which significantly and substantially contribute to health or safety hazards at the mine. Congress established this provision of the Mine Act to address the problem of mine operators who have recurring violations of health and safety standards.

Under the Mine Act, once a section 104(e) pattern of violations notice is issued, any subsequent inspection within 90 days which reveals another significant and substantial (S&S) violation of mandatory safety or health standards results in the issuance of a withdrawal order until the violation is abated. The Mine Act further provides for withdrawal orders upon any subsequent finding of S&S violations until a complete inspection of the entire mine reveals no S&S violations.

On August 15, 1980 (45 FR 54656), the Mine Safety and Health Administration (MSHA) published a proposal in the Federal Register which would establish criteria for identifying mines which have a pattern of violations. Commenters were generally opposed to the proposal, stating that it was complex, too statistically oriented, overbroad, and vague. In addition, numerous commenters stated that it was inappropriate for MSHA to establish pattern of violations regulations at that time because of litigation pending before the Federal Mine Safety and Health Review Commission (Review Commission) that involved the definition of S&S violations. At that time, MSHA cited all violations as S&S except technical violations and violations that posed only a remote or speculative risk of injury. In April 1981, the Review Commission narrowed the definition of S&S violations. The Review Commission defined S&S violations as those that have a reasonable likelihood of resulting in a reasonably serious injury or illness (*Secretary of Labor v. Cement Division, National Gypsum Co.,* 3 FMSHRC 822). MSHA adopted this revised definition in May 1981.

Commenters also stated that review of the Agency's then pending regulations for the assessment of civil penalties could affect provisions of the pattern of violations proposal. In May 1982, MSHA revised its regulations for the assessment of civil penalties (47 FR 22286).

In view of these developments, MSHA is withdrawing the 1980 pattern of violations proposal. However, the Agency has gained sufficient experience with both the revised definition of S&S violations and the changes made in the civil penalty regulations to reconsider rulemaking to establish procedures and criteria for issuance of a pattern notice.

During preliminary development of a new approach for implementing pattern of violations criteria and procedures, MSHA has been guided by the principle expressed in the Mine Act's legislative history that issuance of a section 104(e) pattern of violations notice should be an enforcement tool reserved for dealing

with chronic violators who do not respond to other efforts to bring their mines into compliance with health and safety standards. Congress made it clear that chronic violators demonstrate a disregard for the safety and health of miners by allowing the same work hazards to occur again and again without addressing the underlying problems.

At this point, MSHA believes that pattern of violations criteria should focus on the health and safety record of each mine rather than on a strictly quantitative comparison of each mine to industry-wide norms. In contrast to the 1980 proposal which relied on a statistically-oriented approach, the Agency envisions use of simplified criteria to identify the existence of a pattern of violations, coupled with procedures for fair and full notice. Review and appeal procedures would be the same as for any other citation or order issued under the Mine Act.

To implement this approach, MSHA is considering an enforcement concept which would incorporate the following elements: initial screening to identify any mines which may be developing a pattern of S&S violations; application of criteria to determine whether a pattern of violations exists at an identified mine; and notification to the mine operator of the potential for a pattern of violations notice with an opportunity to respond.

Initial identification of mines with a possible pattern of violations could occur through regular enforcement activities. Once a mine has been identified, MSHA would review conditions at the mine to determine whether or not a pattern of violations exists at the mine. At this point, MSHA envisions the use of two principal criteria. First, are the S&S violations common to a particular health or safety hazard or are there S&S violations throughout the mine which represent an underlying health or safety problem? Second, is the mine on a section 104(d) unwarrantable failure sequence, indicating the other enforcement measures have been ineffective? If these two criteria are met, MSHA would notify the mine operator that the operator's mine is subject to a section 104(e) pattern notice and state the reasons upon which such a determination was based. After allowing the operator an opportunity to respond, and absent a change in the health and safety conditions at the mine, MSHA would then issue a section 104(e) pattern notice. Once a mine is placed on a pattern of violations notice, the notice would be terminated upon an inspection

Federal Register / Vol. 50, No. 27 / Friday, February 8, 1985 / Proposed Rules

5471

of the mine by MSHA in which no S&S violations are found.

MSHA considers early public participation in formulating criteria and procedures to be used for issuance of pattern of violations notices to be important. In particular, the Agency would like suggestions on what additional factors, if any, should be used for determining whether a pattern of violation exists. These factors might include work practices or mining conditions at the mine or the mine's accident history. In addition, MSHA would like comments on whether a proposal should include administrative procedures for terminating a pattern notice. The Agency welcomes comments on these and all other issues of concern.

List of Subjects in 30 CFR Part 104

Mine safety and health.

Dated January 31, 1985.

David A. Zegeer,

*Assistant Secretary for Mine Safety and Health.*

[FR Doc. 85-2929 Filed 2-1-85, 2 43 pm]

BILLING CODE 4510-43-M

GPO 913-077

**From:** Green, Edward [mailto:EGreen@crowell.com]          2011 APR 18 P 3: 54
**Sent:** Monday, April 18, 2011 2:21 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group; Fontaine, Roslyn B - MSHA
**Subject:** Comments on Pattern of Violations Proposed Rule (RIN 1219-AB73)
**Importance:** High


Please find attached the comments of BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy (the "Companies") on MSHA's proposed revision of 30 C.F.R. Part 104, Pattern of Violations, RIN 1219-AB73. On behalf of the Companies, we appreciate the opportunity to provide you with these comments.

Sincerely,

Edward M. Green
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595
(202) 624-2922 - Direct
(202) 628-5116 - Fax
(202) 236-3358 - Cell Phone
egreen@crowell.com

AB73-COMM-74



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p 202 624-2500 ▪ f 202 628-5116

April 18, 2011

Ms. Roslyn B. Fontaine, Chief
Regulatory Development Division
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
U.S. Department of Labor
1100 Wilson Boulevard, Room 2350
Arlington, VA 22209-3939

> Re: **Comments of BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy on MSHA's Proposed Rule on Pattern of Violations: RIN 1219-AB73**

Dear Ms. Fontaine:

**Introduction and Overview**

Please find below the comments of BHP Billiton, Murray Energy Corporation, and Peabody Energy (hereinafter "the Companies") on MSHA's Proposed Rule on Pattern of Violations (30 C.F.R. Part 104), published in the Federal Register for February 2, 2011. 76 Fed. Reg. 5,719.

By way of introduction of the Companies, BHP Billiton ("BHP") is the world's largest diversified natural resources company, with more than 100 operations in approximately 25 countries throughout North and South America, Africa, Asia, and Australia. In the United States, BHP's New Mexico Coal Operations, located in the Four Corners area of Northwestern New Mexico, are comprised of two coal mines: (1) the Navajo Mine, a large surface coal mine located within the boundaries of the Navajo Reservation; and (2) the San Juan Mine, an underground longwall operation. About 65% of the salaried and hourly workforce of 1,000 employees of BHP New Mexico Coal is comprised of Native Americans. The two mines produce about 15 million tons of coal annually and are the sole suppliers of coal for the Four Corners and San Juan Generating Stations, which furnish electricity to New Mexico, Colorado, Utah, Arizona, and California. BHP's approach to miners' safety and health is grounded on compliance with the requirements of federal and state law and a systematic risk-based program comprised of detailed safety process components and a safety process matrix to address identified risks.

Murray Energy Corporation ("MEC") is the largest privately-owned coal company in America, producing approximately 30 million tons of bituminous coal annually that provides affordable energy to households and businesses across the country. MEC's subsidiaries operate eight underground and surface mining operations in Southern Illinois and Southern Ohio,

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 2

Western Kentucky, and Utah, plus 40 subsidiary and support companies. Transporting coal via truck, rail, and waterways, MEC operates the second-largest fleet of longwall mining units in the country. With a support team of 3,000 hard-working, dedicated, and talented employees in six states, MEC's affordable high-quality coal is mined safely and efficiently, and is supplied to leading producers of electricity, both domestically and abroad.

Headquartered in St. Louis, Missouri, Peabody Energy ("Peabody") is the world's largest private-sector coal company. Peabody's operations are geographically diverse within the United States and around the world, with locations on five continents. In the United States, Peabody operates 17 coal mining complexes, employing more than 8,200 miners, and is the leading coal producer in the Powder River Basin, the Southwest, the Illinois Basin, and Colorado, with U.S. coal production of 189 million tons, fueling 10 percent of U.S. electricity generation. Peabody's employees are the company's most highly-valued resource and their safety and health is a core value that is integrated into all areas of Peabody's business.

The Companies appreciate MSHA's recognition that its pattern of violations ("POV") regulations are in need of revision. We support the appropriate use of this targeted enforcement sanction against mine operators who flout the law. The Companies, however, must tell you in the strongest terms possible that MSHA's proposed approach is terribly misguided, taking needed reform in a totally wrong direction, and for fundamentally flawed reasons. Accordingly, as set forth in more detail below, the Companies respectfully urge MSHA to withdraw this proposed rule and re-propose it in a fashion that incorporates these comments. In short, we believe the proposal:

• violates the Federal Mine Safety and Health Act of 1977 (the "Mine Act") and the Administrative Procedure Act (the "APA") by failing to publish in the Federal Register and seek public comment on the "specific" pattern criteria that will be used by MSHA as the basis for issuing POV notices—and instead deciding that MSHA will merely post those criteria on the Agency's website;

• violates the Mine Act and constitutional due process protections by eliminating the requirement that only final, adjudicated citations and orders be considered for POV review;

• imprudently takes away an operator's chance to correct its safety and health performance before being placed on POV status by eliminating the existing right to receive notice of a *potential* POV and the opportunity to take corrective action to avoid POV status;

• will result in too many mines being placed on POV status because of failure to consider the interplay with other proposed rules and differences in mine characteristics; and

• fails to consider the real compliance costs.

Below, we provide a more thorough discussion of each of these flaws. In addition, as members of the National Mining Association ("NMA"), the Companies also wish to endorse the NMA's comments on this proposed rule and we incorporate those comments by reference herein as though fully set forth.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 3

## The Proposal Would Violate the Mine Act and the APA by Failing to Publish in the Federal Register and Seek Public Comment on the "Specific" Pattern Criteria that Will Be Used by MSHA as the Basis for Issuing POV Notices

Structurally, the new Part 104 regulations will combine the provisions of current sections 30 C.F.R. 104.2 (initial screening) and 104.3 (pattern criteria). As they currently exist, the "screening" criteria are used to narrow down the pool of mines subject to further POV scrutiny; then, out of that pool, mines that meet the "pattern" criteria are issued a notification of a *potential* pattern of violations ("PPOV").

Of great concern to the Companies in this proposal is MSHA's continued unwillingness to publish in the Federal Register for comment the "specific" pattern criteria that it will use to determine whether to issue a POV notice. This is not a change from how the system currently works, but it is a fundamental flaw in the proposal and, frankly, a missed opportunity to improve upon an existing deficiency. It also severely undermines MSHA's claim that its new POV regulations will be more transparent. Precepts of administrative law, as well as the requirements of the Mine Act itself, mandate that specific pattern criteria should be contained in the text of the rule itself.

To explain further, currently, Part 104 lists, as noted above, screening and pattern criteria, but these criteria are very general and vague. The *proposed* rule makes these general criteria even vaguer. For example, under proposed new section 104.2(7), the wording of current rule section 104.2(b)(3) will be expanded from simply consideration of "An accident, injury, or illness record that demonstrates a serious safety or health management problem at the mine" to consideration of "*Other information* that demonstrates a serious safety or health management problem at the mine *such as* accident, injury, and illness records" (emphasis added). 76 Fed. Reg. 5,728. "Other information" appears to be a catchall provision, and the preamble to the proposed rule specifically refers to non-POV enforcement measures at a mine; evidence of a lack of good faith in correcting problems leading to repeated significant and substantial ("S&S") violations; repeated S&S violations of the same standard or related to the same hazard; and "any other relevant information." *Id.* 5,721. The "other information" change thus seemingly affords MSHA almost limitless discretion to consider *any* other relevant information. MSHA's discretion is not so limitless.

In the current rule, these general criteria do not identify with specificity what quantity of any particular type of event (*e.g.*, number of repeated S&S violations of the same standard) might trigger a POV notification. Rather, those specific criteria are posted on MSHA's website. MSHA follows this approach with the new proposed rule. While posting specific criteria on the Agency's website is certainly better than keeping them completely hidden from view, as was the case in previous years,[1] it is not the same as treating them as an integral portion of the

---

[1] For many years, of course, the entire Part 104 program was more or less dormant, but in light of the 2006 Sago, Aracoma, and Darby Mine accidents and the MINER Act, the program received

(continued...)

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 4

regulations themselves and not only subjecting them to public scrutiny and comment, but also making certain that they are published as part of the rule itself. Posting these specific criteria on MSHA's website, even in the age of the internet and instantaneous electronic communications is simply not a substitute for the fundamental protections afforded by proper notice-and-comment rulemaking. And in the case of these specific criteria, they cry out for Mine Act and APA notice-and-comment rulemaking.

Failure to include specific pattern criteria in the rule itself, and to expose them to the rigorous discipline of public scrutiny, does not comport with Congress' mandate in the Mine Act that "The Secretary shall make such *rules* as [s]he deems necessary to establish *criteria* for determining *when* a pattern of violations of mandatory health or safety standards exists." Mine Act § 104(e)(4) (emphasis added). The proposed rule is nothing more than a skeleton of factors (akin to a topical outline) to consider in developing the actual pattern criteria. There is no way for an operator to read the proposal and understand the circumstances for when, how, or why MSHA will deem a POV to exist at a mine. This vagueness in the proposed rule exists despite the fact that Congress empowered the Secretary to "make such *rules* as [she] deems necessary" to determine when a POV exists.[2] (Emphasis added.) More importantly, this vagueness undermines the very efficacy of the entire rulemaking – the agency is essentially asking for comments on nothing more than a broad outline without giving the public any opportunity to comment on the actual substantive "guts" of the program, the details of which will be of great importance and consequence to all mine operators.

Simply stated, when Congress directed the Secretary to promulgate "rules," it meant actual rules, not electronic website postings. In order for MSHA to satisfy its obligation to make rules for determining when a POV exists, it is critical that specific pattern criteria be thoroughly described and published as part of the rule itself, and the Agency must seek public comment on these criteria.

MSHA's failure to propose rules regarding the specific pattern criteria also violates the Administrative Procedure Act's requirements for notice-and-comment rulemaking. The specific criteria are at the very heart of the rule and have independent legal significance, so they should go through rulemaking. MSHA claims that the actual criteria posted on its website will be so complete, thorough, and precise that mine operators will be able to compare their compliance

---

(continued...)

increased attention from Congress, which in turn put pressure on MSHA to revitalize the program.

[2] Although Congress gave the Secretary some latitude through the use of the phrase "as [she] deems necessary," the Secretary obviously, and correctly, deems more than what is in the proposed rule to be necessary to determine when a POV exists, or else there would be no need to develop more specific pattern criteria and post them on MSHA's website.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 5

history to the criteria and in *five minutes* know whether or not they are close to being issued a POV notice. 76 Fed. Reg. 5,725 (Feb. 2, 2011). This observation buttresses our point, because it is hornbook law that where standards are imposed with "mathematical or technical" precision, "this typically requires the formal requisites of APA notice and comment." Steven Ferrey, Examples & Explanations: Environmental Law 46 (5th ed. 2010). The specific pattern criteria, therefore, are legislative or substantive rules subject to notice and comment procedures, and not a general statement of agency policy.

### The Proposal Would Violate the Mine Act and Constitutional Due Process Protections by Eliminating the Requirement that Only Final Adjudicated Orders and Citations are Considered for POV Review

One of the most wrong-headed, dramatic, and consequential changes contained in the proposal is the elimination of the requirement that only *final* citations and orders be used as part of the pattern criteria to identify mines with a potential POV. This change would allow the POV sanction to be invoked at the very early stage following the issuance of citations for alleged S&S violations of mandatory standards. Such a situation is analogous to allowing a driver's license to be suspended merely upon the issuance of a traffic citation by a police officer.

Although the conditions underlying the citations that MSHA inspectors issue must, in most cases, be abated by mine operators, the Mine Act provides for appeals of citations to the independent Federal Mine Safety and Health Review Commission ("Review Commission"). In spite of this statutory appeals process, as MSHA states it in the preamble, the Agency believes consideration of non-final citations and orders for POV criteria is not only consistent with the Mine Act, but also its experience with enforcement of Mine Act § 104(e) has led MSHA to conclude that elimination of the final order requirement is necessary. As the primary rationale for this proposal, MSHA points to the huge backlog of Review Commission cases and takes the position that, in light of the backlog, the final order provision does not allow MSHA to review the complete, recent compliance history of mines when assessing whether a POV exists. MSHA even asserts that the current requirement for final adjudication of citations and orders actually provides an incentive for operators to contest S&S violations to delay or avoid being issued a POV notice. 76 Fed. Reg. 5,722. There are two overarching problems with this analysis.

First, there is no empirical data to support the assertion that operators, following the perverse incentive articulated by MSHA, are the cause of the Review Commission backlog. If anything, the passage of time and witnesses' faded memories of events actually hurt operators when cases are finally heard. The real reason for the significant uptick in contested citations and orders that has led to the backlog is that MSHA has for several years (due in large part to the MINER Act) been issuing many more citations and orders than it has historically. During this same period, MSHA – to the great consternation and bewilderment of the industry – has largely eschewed the informal conferencing process that for years provided an effective means of addressing grievances without the need for litigation. Making matters worse is the fact that many of the citations and orders that have been written over this time period have been "overwritten" (*e.g.*, arbitrarily alleging S&S when there is no realistic likelihood of injury) by inexperienced and insufficiently trained mine inspectors.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 6

Second, for at least the past year, since the horrible tragedy at the Upper Big Branch Mine, the industry has been on the receiving end of what can only be described in kindest terms as a relentless, non-stop campaign of misinformation and disingenuousness by MSHA and various anti-mining (and largely anti-coal mining at that) spokespersons (or, the so-called mine safety and health "experts" as dubbed by the media reporting on the issue) about operators' motives for contesting citations and orders. It is galling to the Companies that what was once properly understood as "due process" is now described by Secretary Main and others as a "loophole": to wit, the right to contest a violation and/or a proposed penalty before a neutral tribunal. Overlooked in this one-sided conversation about workplace safety and health at our nation's mines is the fact that Congress established the independent Review Commission so as to remove the taint of housing the enforcement agency and review tribunal in the same agency, as had been the case under the Coal Act.

Foregoing the hearing process and jumping straight to POV status based on allegations alone is no less repugnant to traditional notions of fairness and due process than imprisoning a criminal defendant based on a grand jury indictment alone because the court system is too backed up with other criminal matters to give his case any attention. Fair process is not always efficient but, under our system of laws, it is always due, and no less than MSHA recognized this when it promulgated the current POV regulations in 1990, pointing out at the time that it "must make ample provision for due process" when applying the harsh § 104(e) penalty "in order to avoid inequities." 55 Fed. Reg. 31,129 (July 31, 1990).[3]

A.     As Proposed, the Rule Violates the Mine Act

Regardless of MSHA's frustration with delays before the Review Commission, this proposed change violates the text of the Mine Act. There is a significant difference between a citation and a final order of the Review Commission. By themselves, citations (and MSHA orders) are nothing more than the allegations of a single mine inspector. *See, e.g., Wyoming Fuel*, 14 FMSHRC 1282, 1289 (Aug. 1992) ("Section 104(a) citations are essentially 'complaints' by the Secretary alleging violations of mandatory safety standards."). While it has long been recognized that, in most cases, operators must abate alleged violations prior to obtaining impartial review, there is no reason to believe that such post-hoc due process should be countenanced with regard to an operator's placement on POV status.

Mine Act § 104(e)(1) requires that an operator "be given written notice that such pattern exists" when "an operator *has a pattern of violations* of mandatory health or safety standards in the coal or other mine." Congress used the phrase "has a pattern of violations," not, "has a

---

[3] Even within the current POV scheme, which does not require MSHA to consider only final orders when determining whether an operator who has already been given notice of a PPOV should be placed on POV status, there is recognition that a pre-POV hearing on the merits of the alleged S&S violations is desirable. *See, e.g., Rockhouse Energy Mining Co.*, 30 FMSHRC 1125, 1131 (Dec. 2008)(ALJ).

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 7

pattern of *alleged* violations." In Mine Act § 104(a), Congress used that alternate terminology of "allegations" and "beliefs" to describe the citations that authorized representatives of the Secretary issue. This difference in terminology is critical. *See, e.g., Russello v. United States*, 464 U.S. 16, 23 (1983) (stating that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). If Congress had wanted to impose the harsh operational constraints on operators that flow from being on POV status to mere alleged violations, it would have used language similar to that used in § 104(a). Congress knew the difference.

The Secretary's position in the preamble that Congress did not intend to limit POV status to be based on final orders, 76 Fed. Reg 5,721, is misinformed, placing undue (and nonsensical) emphasis on the reference in the legislative history to the "inspection history" at the Scotia mine. The rather general phrase "inspection history" was followed by a reference to "recurrent violations." Those "recurrent violations" were presumably final. Indeed, when the Commission assesses civil penalties based on "the operator's history of previous violations," the Commission only considers final violations. Mine Act § 110(i). The preamble goes on to note that the "Senate Report noted similarities between sections 104(d) and 104(e) of the Mine Act and stated that the POV 'sequence parallels the current unwarrantable failure sequence.'" This assertion takes the legislative history out of context. Overlooked is that the Senate Report went on to state that the "sequence" referred to was the "sequence of the issuance of orders." S. Rep. No. 95-181, at 34 (1977). The sequence of the issuance of withdrawal orders is different from and *follows* the POV determination. Thus, the legislative history does not support the Secretary's conclusion that "This reflects Congress's intent that POV *determinations*, like section 104(d)(1) and (d)(2) determinations, need not be final orders." 76 Fed. Reg. 5,721 (emphasis added).

Similarly, the Secretary misconstrues the legislative history when she cites the "'Committee's intention that the Secretary or his authorized representative [] have both [Section 104(d) and Section 104(e)] enforcement tools available, and that they [] be used simultaneously if the situation warrants,'" as support for the Secretary's conclusion that the "proposal to consider non-final citations and orders to *identify* mines with a POV is consistent with the Mine Act." *Id.* (emphasis added.) We say this because the next sentence of the Senate Report following the sentence quoted in the preamble states: "For example, where an operator *has been given* a [unwarrantable failure] citation and a [POV] notice, and *thereafter* an inspection discloses a violation of a 'significant and substantial' nature and which is also 'unwarranted', the operator will be issued both an order under [the unwarrantable failure provision] and an order under [the POV provision]." S. Rep. No. 95-181, at 34 (1977) (emphasis added). Thus, the use of the words "an operator has been given" and "thereafter" indicate that the Senate Report was addressing the possibility of simultaneous unwarrantable failure and POV withdrawal order chains *after* an operator has already been placed on those respective statuses. The Senate Report does not support the Secretary's conclusion that the prior step of *identifying* mines with a POV status can use non-final citations and orders in the same manner as identifying mines to be placed on an unwarrantable failure chain.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 8

Furthermore, the analogy to § 104(d) is overstated. As written in the Mine Act, § 104(d) builds upon the procedures of § 104(a), and no one can seriously doubt that the enforcement documents issued under § 104(d), no less than those issued under § 104(a), requires the inspector to state the standard *allegedly* violated. While § 104(d) does not expressly refer to the standard "alleged to have been violated" as does § 104(a), the procedure an MSHA inspector follows in filling out Form 7000-3 is the same for both (except to the extent the § 104(d) documentation is alleged to be the result of an unwarrantable failure to comply with the cited standard). *See generally* MSHA Handbook PH08-I-1, "Citation and Order Writing Handbook for Coal Mines and Metal and Nonmetal Mines," Ch. 4. The text of the Mine Act supports this conclusion, because it says the unwarrantable failure chain shall be triggered if "upon any inspection of a coal or other mine, an authorized representative of the Secretary *finds* that there has been a violation . . . ." Mine Act § 104(d)(1) (emphasis added). The use of the word *finds* means that an inspector need only be *convinced* that an unwarrantable failure violation occurred – similar to *believing* that a violation has occurred under Mine Act § 104(a). *See Emerald Mines Co. v. Fed. Mine Safety & Health Review Comm'n*, 863 F.2d 51, 54 (1988). That only a *single inspector* need be *convinced* that an unwarrantable failure violation occurred depicts a far different type of scheme than the one created by Congress for issuing an operator POV notice, which can only occur "[i]f an operator *has* a pattern of violations." Mine Act § 104(e)(1) (emphasis added).

Moreover, § 104(e), in contrast to both § 104(a) and § 104(d), is not concerned with individual alleged violations, but with an entirely different status placed on a mine as a result of a *pattern* – a status that by its imposition changes the regulatory effect of standard fare S&S citations by an order of magnitude. The distinction is highlighted by the mandates of § 104(d) to issue withdrawal orders "forthwith" and "promptly," 30 U.S.C. § 814(d)(1), (2), whereas § 104(e) mandates notice and further inspection before a POV status determination is made. *Id.* § 814(e). Congress clearly intended the "pattern" determination to be more deliberate than the individual violation determinations.

Lastly, it is presumed that Congress writes statutes with a construction in mind that is compatible with the Constitution. *See, e.g., Edward J. DeBartalo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 588 (1988). As discussed below, the statutory construction of Mine Act § 104(e) on which MSHA bases this proposed change would violate fundamental principles of fairness and due process. It is far more reasonable to presume that Congress intended Mine Act § 104(e) to require final violations than a construction that would lead to constitutional doubt.

**B.     As Proposed, the Rule Violates Due Process Guarantees**

Imposing POV status on an operator prior to some type of review will deprive an operator of a property interest without process of law. A procedural due process claim requires: (1) a deprivation; (2) of life, liberty, or property; (3) without due process of law. The federal government violates the due process rights guaranteed by the Fifth Amendment to the United States Constitution when it deprives a company of protected property or liberty interests without due process of law. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993).

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 9

A POV notice effects a deprivation of constitutionally protected property interests. Section 104(e) is an *enforcement* provision and a POV notice dramatically changes a mine operator's allocation of resources, forcing these resources to be dedicated to preventing future withdrawal orders – indeed, that is the main point of POV status.[4] In addition to requiring a massive overhaul in the allocation of resources, being in POV status changes the effects of S&S citations, inasmuch as they serve as withdrawal orders. The withdrawal orders result in lost production and idle miners – directly affecting an operator's bottom line, potentially significantly so. Moreover, given the difficult operational constraints such status would impose, the affected operator will likely need to commit substantial capital up front to fend off alleged S&S violations. Either way, the resource and capital commitment will be great.

These costs of compliance resulting from a POV notice and the damages associated with withdrawal orders are constitutionally protected property interests. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 113 (D.C. Cir. 2010) (an EPA unilateral administrative order enforcement regime "implicates constitutionally protected property interests by imposing *compliance costs* and threatening fines and punitive *damages*").[5] POV status thus results in a deprivation of an operator's constitutionally protected property interests.

In addition to a POV notice depriving an operator of constitutionally protected property interests, being placed on POV status would likely deprive an operator of constitutionally protected liberty interests. Due process is required when there is harm to reputation if it is accompanied by a tangible detriment, such as loss of employment. *Owen v. City of Independence*, 445 U.S. 622, 661 (1980). A POV notice does both. It may harm an operator's reputation in the public's eye, making the operator a pariah and lessening the operator's ability to raise funds in the capital markets,[6] and it has the direct tangible detriments discussed above in terms of increased resources devoted to fending off or addressing more frequent withdrawal orders. Thus, the harm to reputation accompanied with tangible detriment resulting from POV status would also deprive an operator of constitutionally protected liberty interests.

---

[4] S. Rep. No. 95-181, at 32 (1977) ("The Committee's intention is to provide an effective enforcement tool to protect miners . . . .").

[5] Unlike in *GE*, however, the proposed POV rule provides no mechanism for POV recipients to obtain a pre-deprivation hearing by refusing to comply with a POV and forcing MSHA to sue to enforce the POV notice. *Id.* at 115.

[6] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1503, 124 Stat. 1376, 2218-20 (2010) requires publicly traded mine operators or companies with mine operator subsidiaries to file a current report on Form 8-K upon receipt of written notice from MSHA that the mine has a pattern of violations, or a potential pattern of violations.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 10

To be clear, the Companies are not suggesting that these tangible detriments would never be justified and thus have to be borne by the operator – it is our position, though, that they should only be borne after the affected operator has had a fair opportunity to be heard, should it so desire. Because a POV notice deprives an operator of constitutionally protected property and liberty interests, the Fifth Amendment requires the government to provide prior due process of law to challenge the basis for that deprivation. Included in due process of law are procedural protections.

> [P]rocedural protections are required under the due process clause when there is a possible issue about *how the law applies to a specific person.* . . . In other words, procedural due process must be provided when (a) there is a deprivation of life, liberty, or property; and (b) *potential factual issues exist* concerning a particular individual or group. Procedural due process issues generally are not present when there is a challenge to the constitutionality of a statute or regulation and the issue is not the *fairness of the process* being followed. These challenges are commonly brought under substantive due process or under the specific constitutional right at issue.

Erwin Chemerinsky, Constitutional Law: Principles and Policies 556-57 (2d ed. 2002) (emphasis added). When a POV notice is issued, "potential factual issues exist" concerning whether the particular operator actually exhibits a pattern of *violations*. Moreover, the "fairness of the process being followed" to place an operator on POV status is at the heart of the problem with MSHA's new approach. While MSHA can enact generally applicable POV regulations, those enforcement regulations cannot be applied to severely clamp down on a particular operator without due process protections.

"[C]ourts have enormous discretion in evaluating each of [these] three factors and especially how to balance them." Erwin Chemerinsky, Constitutional Law: Principles and Policies 559 (2d ed. 2002). While there may be some discretion on the Secretary's part to determine in the first instance how best to effectuate the due process owed to a mine operator before placing it on POV status based on unproven allegations, such protections cannot be outright ignored. Discussed below are some suggested approaches that involve use of Department of Labor ALJs and appeal to federal courts of appeal from there.

### By Eliminating PPOV and Going Directly to POV, the Proposal Would Imprudently Take Away Operators' Chance to Fix Their Mines Before Being Placed on POV Status

One of MSHA's purported intents with the proposed rule is to make POV criteria information continually available to operators (and others) so that they can police themselves to avoid falling into a POV situation. To that end, a searchable compliance database, available to the public, will be placed and maintained on MSHA's website to allow operators and the public to monitor every mine's compliance record and determine whether it is approaching POV criteria levels. The proposed rule contemplates that operators approaching a POV level may work with MSHA to bring their mines into compliance to avoid a POV notice. Under the proposal, an operator may submit a written safety and health management program to the District Manager

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 11

for approval.[7] The program would be required to have measurable benchmarks. Effective implementation of the program will be considered a mitigating circumstance that could spare a mine from being issued a POV notice. Thus, in spite of the Agency's limited resources in terms of both the numbers and qualifications of its personnel, MSHA is proposing one more intrusion into the management prerogatives of mine operators in an area where it arguably possesses scant expertise.

This aforementioned searchable database is one justification for MSHA eliminating the existing PPOV notification process.[8] Under the proposed rule (section 104.3), when a mine triggers the specific pattern criteria within a rolling 12-month look-back window, the District Manager will issue a written POV notice to the operator. *See* 76 Fed. Reg. 5,728. The onus will therefore be on operators to continually self-evaluate their performance.[9]

There are better ways to craft a legitimate POV program without short-circuiting due process. The explanation in the preamble of the enormous lag time between issuance of citations and orders and their final adjudication by the Review Commission, aggravated by the backlog of cases at the Review Commission, may warrant a change in how the POV program is structured, but surely not at the expense of notice and due process. Eliminating the PPOV and going directly to POV, with its draconian consequences of withdrawal orders for each S&S citation, is not the optimal, or even a decent, solution. Under the current Part 104 scheme, MSHA cannot "cock the pistol" until a "pattern" of finally adjudicated enforcement actions exists. The proposal, however, would allow the hammer to be cocked and dropped, and the pistol to be fired so quickly that there is no opportunity to dodge an errant bullet, with grave consequences for

---

[7] During a conference call on January 31, 2011, MSHA Deputy Assistant Secretary for Operations Patricia Silvey stated in response to a question that the "management program" contemplated by the proposed POV rule is different from the "management program" that would be developed pursuant to a separate MSHA rulemaking addressing "Safety and Health Management Programs for Mines" (RIN 1219-AB71). See discussion *infra* for proposals to harmonize these programs.

[8] During the January 31, 2011, conference call, in response to the question of whether mine operators will have an opportunity to identify and point out errors in MSHA's database prior to the issuance of a POV notice, Assistant Secretary Joe Main reiterated that "mitigating circumstances" can be taken into account to avoid issuance of a POV, and that operators can track their own compliance history online and should proactively let MSHA know of errors in the database at any given time. While the ability to continually let MSHA know of errors in its database may constitute an opportunity to be heard to a certain degree, it does not satisfy the due process requirements of notice and opportunity to be heard regarding the specific enforcement action of POV status.

[9] And what is to become of the requirement of Dodd-Frank Wall Street Reform and Consumer Protection Act § 1503 requiring operators to include PPOV notices in their relevant SEC filings?

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 12

mine operators.  Following are alternatives that could allow MSHA to swiftly "ready, aim" this powerful weapon, but not "fire" until the targeted mine operator has had an opportunity and a reasonable period of time to show MSHA that it should not have been, or should no longer be, placed in the bull's-eye.

### 1.    Enhanced and Expedited Conferencing

One alternative would be enhanced and expedited conferencing between MSHA and mine operators of citations and other enforcement actions factoring into the POV calculus.  An important advantage of this concept is that it would actually come into play prior to any POV review.  *By enhanced and expedited conferencing, we mean a process that would be transparent and independent of the District Manager and focused on those enforcement actions specific to the POV calculus that could be invoked in a timely manner to stay ahead of POV enforcement.*  Transparency is critical so that all stakeholders and the public can have confidence in the process.  Independence from the District Manager is important so that conference officers are not subject to pressure from the same MSHA managers who supervise the inspectors whose citations/orders are being conferenced.  Possible approaches could be to have conference officers report to the respective Administrators of Coal Mine Safety and Health or Metal-Nonmetal Mine Safety and Health, or to dedicated experts within the Office of the Assistant Secretary (*e.g.*, the Office of Accountability).

This conferencing process would not preclude a subsequent right to review by the Commission, but would at least provide an up-front opportunity for the operator to review the issues with the appropriate agency official.  Moreover, because the process would be interactive, it would be a substantial improvement over the proposal for MSHA to consider "mitigating circumstances" – a vaguely defined process which, from all appearances, does not necessarily even involve the operator.

### 2.    POV Warning

A variation on the preceding alternative would be for the District Manager to issue an *informal POV warning* to the operator and provide the operator with a short, but reasonable number of days (something of shorter duration than the existing POV review period) to demonstrate to the appropriate ranking MSHA official in Arlington headquarters that the underlying violations are invalid or otherwise flawed for purposes of POV consideration, akin to responding to a show cause order.  Because of the massive number of citations involved in a POV, the operator might have to select key violations for the ranking official's review.

### 3.    Expedited Review

Better still, to enhance the due process protections of either of the first two alternatives, if the designated agency official affirms the POV warning, the operator should be allowed to seek expedited review of the underlying alleged violations at the Review Commission.  Although this alternative would require the Review Commission to promulgate a conforming rulemaking of its own, the Companies would willingly pursue a petition for rulemaking to that end if MSHA were

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 13

to embrace this concept. We might envision the Review Commission creating a "rocket docket" of sorts, pursuant to which a select number of the administrative law judges would be dedicated to POV expedited review. At the very least, the process could be modeled along the lines of the expedited review process currently in place for emergency response plan disputes.

### 4.    Department of Labor ALJ Review

Another alternative would be to permit operators to appeal the *POV determination itself* to the Department of Labor's Office of Administrative Law Judges, modeled on the procedures in Part 44 for adjudicating proposed petitions for modification, albeit in more expedited fashion.

### 5.    Demonstration of Corrective Action

In addition to all of the review alternatives noted above, MSHA should also provide operators with an opportunity to present a prima facie case to the District Manager that the operator has or can implement immediately a corrective action plan to address the Agency's concerns. In substance, this would be a lot like the corrective action plan already used under the existing POV scheme. We recognize MSHA's position on this is that operators should be constantly monitoring their compliance and thus not need any additional time to take corrective action, but it is part and parcel to our due process concerns. Even assuming we Companies, for example, are tracking our compliance, we may well disagree with MSHA's data or certain citations underlying the POV notice (or warning, if some warning system is adopted, as we propose). In addition to seeking some type of review of these citations, we would also want an opportunity to present our case to the District Manager that we have a corrective action plan in place and that it is working. Indeed, if nothing else, that would provide an opportunity to demonstrate to MSHA steps we have been taking that the Agency may well not be aware of because – if the proposed rule is implemented in its current form – it does not provide for any other opportunity for the Agency and the operator to come together to discuss the issues of concern.

The key point to be made is that, as proposed, POV status would turn on data crunching alone. There is nothing in the proposal that indicates MSHA is actually going to consult with an operator prior to placing it on POV status. Even the amorphous "mitigating circumstances" criterion is a black box, and Assistant Secretary Main's largely non-responsive response on the January 31, 2011, conference call held on the proposed rule to the question of whether operators would have a right to question MSHA's data did nothing to assuage our anxiety. As proposed, this POV rule would be a step in the wrong direction even from the existing regulations.

<div align="center">*     *     *</div>

Finally, and importantly, any such process provided by MSHA should be proposed as part of the actual rule, reflecting the binding rights and obligations and ground rules for MSHA and operators alike. This is too important not to incorporate into the notice and comment process. We therefore urge MSHA to reconsider its current proposal, withdraw it, and re-

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 14

propose a newer iteration that provides for due process and an opportunity for the public to comment on the specifics of that proposal.

## The Proposal Would Result In Too Many Mines Being Placed On POV Status, Because of Failure to Consider Interplay with Other Proposed Rules and Differences in Mine Characteristics

The Companies are also very concerned that the proposal would result in too many mines being placed on POV status, because of failure to consider interplay with other proposed rules. MSHA's Preliminary Regulatory Economic Analysis ("PREA") predicts that more POVs will likely occur under the new rule. MSHA's current prediction is to go from *zero to ten* POVs per year. 76 Fed. Reg. 5,724 (Feb. 2, 2011).[10] While ten POVs is a lot after decades without any, MSHA fails to consider the interplay with other proposed rules that will result in even more POVs being issued.

Throwing the proposed respirable dust standards into the mix, for example, will likely result in even more POVs. 75 Fed. Reg. 64,412 (Oct. 19, 2010). If respirable dust compliance sampling goes to single shift and miners wear continuous personal dust monitors for various miner occupations/roles, there will likely be upwards of 250,000 to 300,000 new citations per year (see the National Mining Association's February 15, 2011, testimony on the proposed respirable dust standards). These respirable dust citations are also likely to be S&S, because they are health-related, which makes them automatically S&S unless the operator can prove that there was no actual exposure. The interplay between these new rules, therefore, will likely lead to many more mines being placed on POV status. Note, too, that this unprecedented number of citations may lead to another surge in the backlog at the Review Commission, just (as we understand it) as the upward curve of the backlog is beginning to slowly diminish. In addition, any uptick in the number of S&S citations issued will not only make it easier to fall into POV status, but much more difficult to get out of a POV status.

MSHA's proposed rule on "examinations of work areas in underground coal mines for violations of mandatory health or safety standards" will also likely result in even more POVs. The proposed rule would require operators to identify, record, and correct violations of mandatory health or safety standards found during preshift, on-shift, weekly, or supplemental examinations. 75 Fed. Reg. 81,165 (Dec. 27, 2010). Underground coal mine operators are

---

[10] In accord with MSHA's overall theme of ratcheting up the number of POVs issued, MSHA proposes to revise current section 104.2(b) to increase the frequency of POV review from once per year to twice per year. The current rule already allows MSHA to screen twice per year. It states, "*At least* once each year, MSHA shall review the compliance records of mines." 30 C.F.R. § 104.2 (emphasis added). It is unclear why MSHA feels it necessary to change the rule to *require* itself to perform POV review "[a]t least two times each year," when MSHA has already not availed itself of that option. 76 Fed. Reg. 5,728.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 15

concerned that if they record not just hazards, but all violations, in their exam books, MSHA will review the books and then issue legions of citations.

In addition to failing to consider the true cumulative effects, and the resulting costs, of other proposed rules, the proposal fails to consider the benefits of other proposed rules that would make the proposal less necessary. For example, the proposed rule's preamble does not say much at all about what should go into safety and health management programs used as a mitigating factor in POV review, other than "measurable benchmarks for abating specific violations that could lead to a POV and addressing these hazardous conditions at [the] mine[]." 76 Fed. Reg. 5,721.[11] Without more explanation of the requirements of safety and health management programs, the proposed rule suffers the fundamental flaw of being too vague both for purposes of giving operators a reasonable opportunity to comment on it and for its downstream enforcement as a mandatory standard.

There is also a parallel MSHA rulemaking presently underway on safety and health management programs. MSHA has not yet published a proposed rule, but has held public meetings to gather information about effective, comprehensive safety and health management programs at mines. 75 Fed. Reg. 54,804 (Sept. 9, 2010). MSHA's notice of public meetings included some guidelines for components of effective safety and health management programs:

1. Management Commitment;
2. Worker Involvement;
3. Hazard Identification (including workplace inspections for violations of mandatory health and safety standards);
4. Hazard Prevention and Control;
5. Safety and Health Training; and
6. Program Evaluation.

*Id.* 54,805. Inasmuch as the cursory guidelines listed in a simple notice of public meetings for a not-yet-proposed rule on safety and health management programs provide more detail than the description of safety and health management programs provided in the proposed POV rule, the proposed rule is woefully deficient on this score.

Moreover, in its notice of public meetings, MSHA proceeded to explain that:

Year after year, many companies experience low injury and illness rates and low violation rates. For these companies, preventing harm to their workers is more than compliance with safety and health requirements; it reflects the

---

[11] MSHA's current "POV Procedures Summary" also discusses the use of corrective action programs to reduce S&S violations being considered a mitigating circumstance. It is unclear whether the safety and health management programs discussed in the current rule are related to or meant to replace corrective action programs.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 16

embodiment of a culture of safety – from the CEO to the worker to the contractor. This culture of safety derives from a commitment to a systematic, effective, comprehensive safety and health management program, implemented with the full participation of all workers. MSHA understands that many companies have developed and implemented effective safety and health management programs.

*Id.*

As MSHA stated, many mining companies have already developed safety and health management programs.[12] To the extent that these programs are similar to what MSHA envisions for POV mitigation purposes, MSHA should allow companies to use their existing program, or modify it to more specifically apply to the POV criteria. A safety and health management program that satisfies this yet-to-be-proposed rule should also satisfy the proposed POV rule for purposes of mitigating factors. Moreover, development (or major modification) of safety and health management plans should operate as a bar to being placed on POV status. In summary, MSHA's POV proposal is extremely vague regarding the requirements of safety and health management programs, and fails to consider the benefits of the proposed safety and health management programs rule when considering whether a stricter POV rule is even necessary.

MSHA's failure to consider the interplay between the proposed POV rule and other proposed rules does not comport with the admonition of President Obama's new Executive Order ("E.O.") 13,563, "Improving Regulation and Regulatory Review," which stresses the desire of this Administration to regulate industry in the least burdensome manner and to take into account "the costs of *cumulative* regulations." *See* 76 Fed. Reg. 3,821 (Jan. 21, 2011) (emphasis added).

MSHA should also take mine size and type into consideration in crafting the POV review criteria. MSHA did so when it originally proposed its POV regulations in 1980. 45 Fed. Reg. 54,656 (Aug. 15, 1980). In that proposal, MSHA classified different mine sizes based on annual hours worked at metal/nonmetal mines and the annual tonnage of coal mines. MSHA further categorized different mine types (e.g. underground, surface, and preparation plant coal mine operations). Mines of similar size and type category were compared to each other and ranked numerically, based on each mine's average number of S&S violations cited per inspection day. Then, mines with the highest 10% of violations as compared to mines of similar size and type were considered to have a chronic recurrence of S&S violations. 45 Fed. Reg. 54,658 (Aug. 15, 1980).

Because the proposed rule is so vague, it is not clear MSHA intends to take mine size and type into consideration again. But it should re-propose the rule to do so expressly, and invite further comment.

---

[12] See mining company comments on their safety and health management programs at: http://www.msha.gov/REGS/Comments/2010-22403/SafetyHealth.asp.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 17

## The Proposal Fails to Consider the Real Compliance Costs

MSHA's Preliminary Regulatory Economic Analysis ("PREA") estimates that the proposed rule will cost industry a total of $4.2 million annually. 76 Fed. Reg. 5,726. MSHA attributes $900,000 to monitoring costs, $1.1 million to an estimated 50 mines that would have to develop a safety and health management plan to mitigate away from being placed on POV status, and about $2.2 million for an estimated 10 mines operating under a POV. *Id.* This cost analysis is much lower than can reasonably be expected.

Upon scrutiny, it is plain that MSHA's "Compliance Costs" analysis in the PREA is based on some absurdly low assumptions. For example: "Rather than risking a POV and the possibility of a closure, MSHA projects that mine operators would monitor their compliance record against the proposed POV criteria using the Agency's website. MSHA estimates that it will take a supervisor an *average of 5 minutes each month* to monitor each mine's performance using the Agency's website." 76 Fed. Reg. 5,725 (emphasis added). According to the language of the proposed rule, "Specific pattern criteria will be posted on MSHA's Web site [sic] at *http://www.msha.gov* and used in the review to identify mines with a pattern of S&S violations. The review will include" the eight review factors listed in the proposed rule, some of which are extremely broad, such as factors 6, 7, and 8.[13]

It is simplistic to think an operator will spend only five minutes per month to monitor its compliance with the POV criteria. If the MSHA website is to be truly informative on these important issues, then beyond the time it takes to review the data on the various criteria (more than five minutes in its own right), the operator will need to verify the data against its own records, process that information for internal review and discussion among management, and most importantly – make strategic management decisions based on the available information. This may very well be a worthwhile process, but it is nothing that can be accomplished meaningfully in five minutes, and MSHA should calculate the costs of this time accordingly. And while MSHA is to be credited with requesting comments on the true burdens of monitoring, we respectfully submit that it is impossible to make any specific, sensible comments when the criteria themselves remain so ill-defined.

Another absurdly low assumption in the PREA is: "MSHA projects that a typical mine [on POV status] would lose about 0.5 percent of revenue as the result of closures (about 1 or 2 days for a large mine and a day or less for a small mine)." *Id.* 5,725. One to two days a year is

---

[13] (6) Enforcement measures, other than section 104(e) of the Act, which have been applied at the mine; (7) Other information that demonstrates a serious safety or health management problem at the mine such as accident, injury, and illness records; and (8) Mitigating circumstances. 76 Fed. Reg. 5,728. To further complicate the review process, the preamble to the rule indicates that "other information" in factor seven includes a bucket of possible considerations. *Id.* 5,721.

Ms. Roslyn B. Fontaine, Chief
April 18, 2011
Page 18

not a realistic estimate of lost time as a result of a mine being placed on POV status. POV status will result in a withdrawal order being issued for any S&S violation, which order shall remain in effect until the condition is abated to the satisfaction of an MSHA inspector. *Id.* 5,728-29. While the Mine Act does not define S&S, over the years through MSHA interpretation and adjudication, the threshold for what constitutes an S&S violation has been set so low by MSHA that it is very common for any inspection to result in S&S citations. Thus if a mine were to fall into a POV status, emerging from it would be exceptionally difficult. Indeed, in the complex, dynamic industrial settings of mining, especially underground coal mines, it is virtually impossible to obtain a clean inspection. Moreover, a mine that has just been placed on POV status will likely have many S&S violations occurring and will, thus, likely lose far more than one to two days of production time as a result of closures.

## CONCLUSION

The POV rule does indeed raise novel legal or policy issues, *id.* 5,723, and, if promulgated as written, will have enormous adverse effects bearing upon the entire mining industry. The Companies appreciate the opportunity to identify our major concerns with the proposal and to suggest some alternative solutions that, we believe, would make for a better rule.

Sincerely,

*Edward M. Green*

Edward M. Green
Daniel W. Wolff
Counsel for the Companies

DCACTIVE-15014643.1

**From:** Dave Heidorn [mailto:dheidorn@asse.org]
**Sent:** Monday, April 18, 2011 3:18 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** ASSE Comment on Pattern of Violation Proposed Rule (RIN 1219-AB73)

2011 APR 18 P 3: 54

Please include in the record of MSHA's Proposed Rule *Pattern of Violation* (RIN 1219-AB73) the attached comments of the American Society of Safety Engineers.

<<041211MSHAPOVcomment2 esig.docx>>

Thank you for your time.

Dave Heidorn

Dave Heidorn, JD

Manager, Gov't Affairs and Policy

American Society of Safety Engineers

dheidorn@asse.org

(o) 847/768-3406

(m) 847/909-4558

*AB73 - COMM - 75*



## AMERICAN SOCIETY
## OF SAFETY ENGINEERS
1800 East Oakton Street
Des Plaines, Illinois 60018-2187
847.699.2929
FAX 847.296.3769
www.asse.org

April 18, 2011

Joseph A. Main
Assistant Secretary of Labor
Mine Safety and Health Administration
c/o Office of Standards, Regulations, and Variances
1100 Wilson Boulevard, Room 2350
Arlington, Virginia 22209-3939

By email to zzMSHA-comments@dol.gov

RE: Proposed Rule *Pattern of Violation*;
RIN 1219-AB73

Dear Assistant Secretary Main:

On behalf of the members of the American Society of Safety Engineers
(ASSE) engaged in helping miners return home safe and healthy from their
work each day, we respectfully ask that you consider the following comments
offered in response to the Mine Safety and Health Administration's Proposed
Rule *Pattern of Violation*(76 Federal Register 5719; February 2, 2011).

Our members agree that the provisions in 104(e) of the Mine Safety and
Health Act (Mine Act) concerning pattern of violations (POV) are important
in allowing MSHA the flexibility to identify mines with a recurring pattern of
violations that lend justification toward a higher degree of oversight. POV
allows for greater resource utilization on the part of the agency and, when

properly applied, satisfies the regulatory intent of pursuing those mine operators who are not committed to protecting workers while establishing an effective incentive for other operators to avoid a pattern of violations that might land them on this list.

Much of the direction MSHA proposes to take in strengthening its POV program is positive. ASSE would like to support MSHA's efforts through proposed Section 104.2 to specify the general criteria MSHA would use to identify mines with a pattern of violations. Developing a clear quantitative rubric can help operators understand the agency's expectations and make adjustments in their efforts to provide safe and healthy workplaces. ASSE also would like to support MSHA on its effort to provide transparency in the POV program in Proposed Section 104.2(a). With specific criteria, posting to the Internet those mines that have been found to have a pattern of significant and substantial (S&S) violations would give operators, miners, families and interested groups access to a mine's performance with regard to attaining or working its way off of POV status. With open access to such information, management can develop plans that will correct their deficiencies before being placed under a POV, and interested parties can ask educated questions or offer targeted recommendations. Transparency not only adds credibility to the process, it also creates an avenue for interested parties to become involved in improving conditions in the mine. However, as our following comments detail, the effectiveness of this effort will depend on criteria that are meaningful and based on MSHA approaches that both encourage operator commitment to safety and health and provide tough enforcement for those who ignore that commitment.

In general, ASSE is not opposed to expanding the enforcement actions that can be considered in determining a POV. Considering a mine's S&S violations [Proposed Section 104(a)(1)], closure orders under Section 104(b) [Proposed Section 104.2(a)(2)], unwarrantable failure citations and withdrawal orders issued under sections 104(d)(1) and (d)(2) [Proposed Section 104.2(a)(3)], Section 107(a) imminent danger withdrawal orders [Proposed Section 104.2(a)(4)], 104(g) orders [Proposed Section 104.2(a)(5)] and other enforcement measures than Section 104(e) [Proposed Section 104(a)(6)] are acceptable considerations to be included in making POV determinations.

ASSE, however, cannot support including enforcement actions that have not reached final action in order to determine POV status and opposes eliminating the existing requirement in Section 104.3(b) that only citations and orders that have become final are to be used to identify mines with a potential POV. Our members are fundamentally opposed to the idea that a mine operator, the vast majority of whom have a well meaning intent to have safe and healthy mines, could under any circumstances be considered guilty of a citation without the opportunity to contest that citation fully. Safety and health professionals dedicate considerable resources in working with MSHA directly to help see that a mine adheres to MSHA standards. More often than is commonly understood, the actions our members need to take in response to MSHA's concerns are an effort to address situations that are not violations under the standards and are questionably beneficial to a mine's safety

effort. Their view is that the time they have to take to address such situations takes away from their ability to do work that can contribute to a mine's overall safety effort. When citations that could end up being rejected through the legal process could be used in further enforcement efforts, they view such a result as an especially frustrating affront to their good faith effort to work with MSHA and mine operators to help ensure safe and healthy mines.

To be sure, ASSE shares MSHA's concern that the current delays between detection of a violation through final decision now being experienced prohibits MSHA from being able to develop a timely and appropriate pattern of violations. It is not surprising to our members that the elimination of pre-contest conferences using Conference and Litigation Representatives (CLR) procedures has resulted in less violations being settled early in the process and a greater number of cases falling into the hands of attorneys working to represent both operators and the agency and a reported backlog of 19,000 cases sitting before the Federal Mine Safety and Health Review Commission. However, the answer to the current problem is not to base MSHA actions on a legally questionable approach as a means to avoid the problem. Rather, we urge MSHA to work, perhaps with the National Institute for Occupational Safety and Health (NIOSH), to compare the effectiveness of the process before and after the CLR procedures were changed and measure the effect these changes and the resulting delays have had on mine deaths and injuries. If decreasing deaths and injuries is the goal we all share for mines, then the MSHA's resources should go to ways that actually address safety and health in mines and not the legal process. Our members fear that focus is being lost in the debates that have become more and more legal arguments and less and less about mine safety and health.

ASSE is similarly concerned with the open-ended nature of important issues in the Proposed Rule. No criteria for the numbers of citations, orders and elevated actions that would trigger POV status are given. Proposed Section 104.2(a)(7) would allow "(o)ther information that demonstrates a serious health or safety management problem at the mine such as accident, injury or illness records" to be considered in making POV determinations. Regardless of how broadly Congress may have intended for MSHA to develop POV criteria, there is no suggestion that the criteria go beyond "pattern of violations" to a "pattern of injuries and illnesses." Mine safety and health professionals encourage employers to report injuries and illnesses in order to help us help operators determine where risks in a mine exist and measures to address those risks. We preach taking ownership of safety. Subjecting that very basic safety and health strategy to enforcement could have the unintended consequence of encouraging avoidance of appropriate reporting among some operators, making our job that much more difficult in the very mines where injuries may be occurring and most is to be gained by learning from those injuries in order to stop them. Injuries occur for many reasons. Injuries do not equal violations. Including them in POV determinations can only diminish the value of the POV in identifying truly dangerous mine operations.

ASSE is also deeply concerned with Proposed Section 104.2(a)(8) concerning mitigating circumstances. MSHA should be applauded for its recent efforts to ensure that mine operators institute safety and health programs. Establishment of a safety and health program that first identifies risks and then establishes a plan to address those risks is the way our members help employers in every industry manage safety and health. It is the most effective tool in helping develop a commitment to safety and health to which both employers and employees can be committed. In most cases, an effective program results in risk-based efforts that go far beyond regulatory standards or enforcement concerns. For that reason, we must strongly oppose the requirement here that operators who may be approaching a POV level have a written safety and health management program approved by a District Manager.

We cannot imagine a better way to trivialize and make ineffective a safety and health program than to require operators to develop a program simply to meet outside requirements. A safety and health program only works if the mine operator and miners are involved in its development and implementation. Ownership of identified risks and the means to address them makes a program work. This measure takes that ownership away. If included in the final rule, MSHA will establish a wholly detrimental precedent that safety and health programs program are merely compliance, increasing greatly the chances that programs will sit on a shelf ignored in the very operations where the best understanding of a program's value is needed most. Instead of this measure, we would like to support the development of expertise in MSHA staff to work cooperatively with mine operators nearing POV status so they can themselves develop safety and health programs. Anything short of such a measure demeans the value of a safety and health program.

Thank you for the inclusion of ASSE's comments in the record of this rulemaking.

Sincerely,

Darryl C. Hill, Ph.D., CSP
President

**From:** Kenneth W. Davis [mailto:K.Davis@activeminerals.com]
**Sent:** Monday, April 18, 2011 10:26 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

*2011 APR 18  P 3: 39*

Good morning,

I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

*AB73-COMM-76*

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Kenny Davis
Quality Manager
Active Minerals International
(478-628-5293 ext 209) Office
(478-456-3058 Cell

**From:** Allison E. Long [mailto:A.Long@activeminerals.com]
**Sent:** Monday, April 18, 2011 10:29 AM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:**

2011 APR 18 P 3: 39

Good morning,

      I am a miner and a safety professional.  I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule.**

      It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists.  Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms.  (Sec. 104.2)  It is thus very difficult if not impossible for commenters on the proposed rule to be able to thoroughly understand and assess the proposed program.  MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

      The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

      The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV.  Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations.  MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

      MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or in litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

AB73-COMM-77

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion.  The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances."  Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs."  MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71  MSHA does not explain how it intends the two rulemakings to intersect.  MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

## Allison E. Long

Kaolin Division
121 Milledgeville Rd.
Gordon, GA 31031

tel: 478.628.5293  x222
cell: 478.233.2188



Integrity. Innovation.
Teamwork. Execution.

www.activeminerals.com

**From:** nathan-roberta [mailto:nathan-roberta@runnells-reed.com]
**Sent:** Monday, April 18, 2011 10:20 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73 - Comments on Proposed POV Rule

2011 APR 19 A 9:34

Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Boulevard
Room 2350
Arlington, Virginia 22209-3939

RE: RIN 1219-AB73 - Proposed Rule - Pattern of Violations

Thank you for the opportunity to comment on this proposed rule. Please consider the following comments:

**MSHA needs to provide the criteria for POV in order to adequately assess this rule.**

Section 104.2 of the proposed rule addresses criteria for Pattern of Violation in only the most general terms, giving the categories that will be considered, but not specific criteria within these categories. Without this information, it is not possible for commentators to thoroughly understand and assess the proposed program. In other words, one cannot comment on something that does not exist. MSHA should re-propose the rule and include the specific criteria it proposes to use to determine that a POV exists, in order to give effected parties adequate notice and opportunity to comment.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The proposed practice to use issued citations, rather than final orders, for determining POV status creates a punitive sanction whereby the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, and constitutes a denial of the operator's constitutional right to due process.

The narrative on this rule states that fewer than 1% of citations are reversed. However, it does not discuss how many citations are reduced or modified in some other way. At a minimum, reducing a citation from S&S to non-S&S will have an effect on potential POV status as well, and this number is likely far higher than the 1% quoted for vacated citations, so use of issued citations rather than final order can, in fact, make a difference of whether or not POV status is accurately determined.

In addition, the proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the proposed rule there is no assurance that a mine operator would not suffer punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process. MSHA can easily make mistakes in assigning POV status, and there are no procedural safeguards in the proposed rule for a "second look" at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders

AB73-CCMM- 78

that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if due to the vacating of orders/citations they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. Section 104.2(a) of the proposed rule lists seven items to be used as criteria for establishing POV, but provides no detail (like numeric criteria) beyond the initial list itself. An additional criteria, "mitigating circumstances" is also listed, but no detailed information is provided regarding what might be considered mitigating circumstances, which makes it impossible to make comment. It is presumed that effective implementation of an MSHA-approved safety and health management program would be a mitigating circumstance, but no information is provided regarding what would be considered to be an "effective" program.

**As written, the proposed rule is vague and does not allow for meaningful dialogue.**

The lack of detail provided in the proposed rule suggests that MSHA has not determined the exact processes and criteria it desires to include in this rule. This in turn suggests that the notice of proposed rulemaking and request for comment is premature; the public and other interested parties cannot adequately comment on detail that does not exist. As a result, interested parties are effectively denied their ability (right) to participate in the rulemaking process. In addition, "passing the rule now and filling in the detail later" leaves open the possibility for arbitrary and capricious implementation, WITHOUT the benefit of comment from outside parties.

Because of the lack of information supplied in the proposed rule and due to the potential effects, at the very least, a public hearing should be held prior to taking of any action. More appropriately, MSHA should reissue the proposed rule providing the necessary detail, and allow the public another opportunity to comment on the true detail of the proposal.

Thank you for the opportunity to comment on this proposed rule. Should you require additional information or clarification, please feel free to contact me at this email address.

Sincerely,

Roberta A. Reed, CSP, QEP

NATIONAL STONE, SAND & GRAVEL ASSOCIATION



*Natural building blocks for quality of life*

2011 APR 19 A 10: 03

April 15, 2011

U.S. Mine Safety and Health Administration
Office of Standards, Regulations and Variances
1100 Wilson Boulevard, Room 2350
Arlington, VA 22209-3939

RE:   Proposed Rule, Pattern of Violations, RIN 1219-AB73

Dear Madam or Sir:

NSSGA is the world's largest mining association by product volume. Its member companies
represent more than 92 percent of the crushed stone and 75 percent of the sand and gravel (or
aggregates) produced annually in the U.S. and approximately 118,000 working men and women
in the aggregates industry. During 2010, a total of nearly 1.9 billion metric tons of aggregates,
valued at $17 billion, were produced and sold in the United States. The aggregates industry has
demonstrated a steadfast commitment to worker safety and health, resulting in nine
consecutive years of falling rates of injury and illness in the aggregates industry. This includes
a continual decrease in number of fatalities amongst aggregates operator employees. Both are
at historically low levels.

On behalf of the National Stone, Sand & Gravel Association (NSSGA), we provide the following
comments on the proposed rule on Pattern of Violations (POV).

This program should be carefully crafted so that it targets those mine operators that repeatedly
fail to live up to their obligations to provide miners with a safe place to work. Although the
proposed rule takes several important steps toward this goal, there are a number of significant
improvements that must be made before it is finalized.

NSSGA is concerned that there are significant gaps in the proposal. Currently, it is impossible
for commenters to thoroughly understand and assess the proposal.
Therefore, NSSGA requests that MSHA re-propose the rule to address these gaps, and allow
operators a fair opportunity to comment on the fully proposed POV program, as a whole. Also,
this rulemaking should include public hearings. Following is the summation of primary areas
of concern:

The POV Criteria Should Be Specified in the Rule

MSHA proposes to list its specific criteria for POV status on the Agency's website, but has not
included specific criteria in the rule itself.

1605 KING STREET ■ ALEXANDRIA, VA 22314
703 525 8788 ■ 800 342 1415 ■ FAX 703 525 7782
WWW.NSSGA.ORG

AB73-COMM-79

2

NSSGA believes that the specific POV criteria to be used for selecting operators for POV should be detailed in the proposal itself. These criteria are not simply guidance, but are intended to be binding criteria that will determine whether mines are subject to substantially increased enforcement. It is essential that the criteria not be a moving target especially if operators are expected to monitor their own performance to avoid POV status.

NSSGA notes that MSHA asks for comments on its projections of the number of mines likely to be subject to POV status under the new rule, and what the projected costs to the mining industry might be. It is impossible to make such estimates without knowing what the specific POV selection criteria will be.

<u>The POV Criteria Should Be Clear and Easy to Access</u>

NSSGA agrees with MSHA's stated goal to provide clear, transparent, and accessible POV criteria. Each mine should be able to immediately determine its potential POV status by viewing publicly available information on MSHA's website. We recommend that this information be collected in a single location, and that mine operators (and other interested parties) be able to view all of the relevant information at once by entering the mine ID number.

This will necessitate the creation of a computer program that can properly and accurately compile and display this information. We strongly urge MSHA to pilot any such program with the assistance of mine operators and other stakeholders, in order to ensure that the information and calculations it provides are accurate, timely, and usable. MSHA should also review the data quality control measures it uses for its data retrieval system, to ensure that the data provided are of sufficient accuracy and timeliness to allow mine operators and others to depend on the results. These data can have significant consequences for operators, and thus accuracy is essential. (We note that the necessity for accurate information also makes it unlikely that monitoring of this information will take only five minutes, because operators will likely review their own records and other MSHA data to verify it, especially if it is suggests that POV status is imminent.) If there is inaccuracy, irreparable harm can come to operators erroneously placed onto pattern when their operation's citation history doesn't warrant it.

Further, we are struck that the proposal deletes the current provision allowing for "proposed" POV notification of a facility allowing for remedial steps to be taken, as well as an opportunity for the operator to meet with a district manager to review the basis for a proposed POV designation.

<u>POV Status Should Only Result from Repeated Violations</u>

As MSHA notes, Congress intended for the POV program to apply to "mine operators with a record of repeated S&S violations" "who have not responded to the Agency's other enforcement efforts." We are concerned that the proposed rule does not adequately reflect the legislative intent that POV is intended for circumstances of repeated violations by unresponsive operators.

Rather, MSHA's criteria are based on multiple violations. Thus, under the current proposal, a facility can be placed into PPOV status as a result of a single inspection with multiple citations, or as a result of one or two inspections with few citations, followed by one with a large number

3

of citations. This is clearly not the Congressional intent for the POV tool, and a revision of the rule should squarely address this problem.

Under the current rule and criteria, a single inspection with multiple citations and orders can place a mine into PPOV status. However, a facility is not currently placed into full POV status unless it fails to improve its performance over a period of time. While this still does not necessarily capture mines that are repeated violators, it at least means that POV status is based on a series of inspections.

If there is to be no official PPOV status under the proposed rule, the problem is that it may be difficult, if not impossible, for a mine to determine if it is threatened with POV status. The preamble discussion imagines that a facility will be able to tell if it is close to POV status by reviewing MSHA's data. But how close is close? If POV status can be triggered by a single inspection, then no mine operator can feel confident that it is not threatened with POV status.

It is difficult to comment on exactly how the criteria should reflect the need to address repeated violations, as opposed to multiple violations, without knowing what criteria MSHA proposes to apply.

If POV Status Is Not Based on Final Orders, Punitive Elements Violate Due Process Rights

NSSGA understands MSHA's preference to base POV status on citations and orders issued, as opposed to final orders, because there can be a substantial delay in the final determination of a citation or order challenged by an operator. This delay hampers MSHA's ability to use POV as a timely tool to address current problems.

However, it is essential to note that, if actions are to be based upon non-final orders, they may not be punitive in nature without violating the operator's due process rights. The Fourteenth Amendment prohibits the federal government from depriving citizens of liberty or property without due process of law—and this means that actions that are punitive cannot be taken without appropriate access to review.

This does not mean that MSHA can take no actions prior to a final order. Certainly it can take actions designed to protect miners from harm, and it certainly has the discretion to increase its level of scrutiny of a mine with repeated citations or orders. Such measures are not punitive.

If POV Status is Based on Citations Subsequently Vacated, POV Status Must Be Terminated

The proposed rule calls for terminating POV status only if an inspection of the entire mine reveals no S&S violations. However, because the proposal calls for basing POV status on non-final orders, POV status must also be terminated if citations or orders upon which the status is based are subsequently reversed, or reduced in severity.

Remedial Plans Should Not Be Confused with Comprehensive Safety and Health Management Programs

4

MSHA indicates in the preamble that a mine operator finding that a mine is at risk of POV status may submit a "written safety and health management program" to MSHA for approval, and that such a program may serve as a mitigating circumstance that may avoid POV status. NSSGA does not object to the concept of a mine operator working with MSHA to develop a remedial plan to address problems that could lead to POV. However, NSSGA is concerned that the language in the preamble may suggest that MSHA will require comprehensive safety and health management programs that go beyond the particular concerns that underlie the potential for POV status.

The proposed rule stands as a positive effort toward developing a program that will be transparent and effective. However, more work needs to be done. MSHA should re-propose the rule and include the criteria that it plans to use, to allow operators and other stakeholders to comment on the proposed program as a whole. In particular, reasonable cost estimates cannot be performed without an understanding of the POV criteria that will actually be imposed. Also, determination of an operator's POV status must be based solely on those citations that are fully adjudicated. Also, we believe that this rulemaking should include public hearings.

Thank you for this opportunity to comment. If you have any questions, please feel free to contact me at (703) 526-1074.

Sincerely,

Joseph Casper
VP, Safety

Dear MSHA,

I am a miner and a safety professional. I would like to offer the following comments regarding the subject rule and the proposed Pattern of Violations issue.

**MSHA needs to provide the criteria for POV in order to adequately assess the rule** 2011 MAY -4 A 11: 39

It is obvious that one of the most important aspects of the POV program is what criteria will be used to determine whether a POV exists. Yet MSHA asks for comments on the program without having disclosed those criteria, except in very general terms. (Sec. 104.2) It is thus very difficult if not impossible for commenter's on the proposed rule to be able to thoroughly understand and assess the proposed program. MSHA must re-propose the rule to include the criteria it proposes to use in determining that a POV exists, in order to give the affected parties adequate notice and opportunity to comment on the rule.

**MSHA should restrict or delete the provision whereby POV status is based on issued citations rather than final orders, and should restore PPOV.**

The imposition of punitive sanctions based on issued citations on which the operator has not been given an opportunity to have independent review or hearing before the sanctions are imposed, would constitute a denial of an operator's constitutional right to due process.

The proposed rule not only removes the protection that requires that only final orders are counted in determining a POV, but also deletes the current provision for "proposed" POV (PPOV) notification, which currently allows the mine operator to sit down with a District Manager and review the basis for the proposed POV. Under the rule as proposed there is no assurance that a mine operator would not suffer the punitive sanctions of POV status based upon citations that have not been subject to any opportunity for a hearing or other procedural protections required by due process considerations. MSHA can easily make mistakes in assigning an operator to POV, and there are no procedural safeguards in the proposed rule for a second look at POV status.

**MSHA needs to explain how vacated citations/orders will affect POV status.**

MSHA has not clarified in the proposal how it will deal with the situation where "issued" citations/orders that form the basis for a POV finding are subsequently vacated while the mine operator is still under POV status. There needs to be an expedited procedure to review POV status once triggering citations/orders are vacated by the agency in settlement or by litigation, and to remove operators from such status if - due to the vacating of citations/orders - they no longer meet the initial POV criteria.

**MSHA should clarify the proposed rule's provisions on mitigating circumstances.**

As currently written, the proposed rule is unclear and confusing about how much discretion MSHA would retain in deciding whether a given mine is subject to POV sanctions, and what, if any, objective factors would guide that discretion. The proposed rule, section 104.2 (a) lists seven items that would be taken into account in determining the criteria for POV, all of which, it appears, will (when MSHA develops the actual criteria) be expressed numerically.

The proposed rule also states an eighth factor: "mitigating circumstances." Under the proposal, MSHA would consider an operator's effective implementation of an MSHA-approved safety and health management program as a mitigating circumstance. MSHA has, of course, embarked on a separate rulemaking regarding "safety and health management programs." MSHA Fall 2010 Regulatory Agenda, RIN: 1219-AB71 MSHA does not explain how it intends the two rulemakings to intersect. MSHA has not, to our awareness, determined what it considers "effective implementation" of a health and safety management program, or how it would prevent decisions to approve or disapprove a management programs from being made arbitrarily.

Thank you,

Robert J. Purcell, Jr.
Senior Vice President Sales and Business Development
Active Minerals International, LLC

AB73-COMM-80

# PUBLIC SUBMISSION

**As of:** May 10, 2011

**Status:**
**Posted:**
**Tracking No.** 80c1b57b
**Comments Due:** June 30, 2011
**Submission Type:** Web

**Docket:** MSHA-2011-0001
Proposed Rule on Pattern of Violations

**Comment On:** MSHA-2011-0001-0001
Federal Register; notice of close of comment period

**Document:** MSHA-2011-0001-0026
Comment from Morton Satin, Salt Institute

---

## Submitter Information

**Name:** Morton Satin
**Address:**
   700 N. Fairfax St.
   Suite 600
   Alexandria, VA, 22314
**Email:** morton@saltinstitute.org
**Phone:** 703-549-4648
**Organization:** Salt Institute

---

## General Comment

RIN: 1219-AB73

The Salt Institute represents the major rock salt mining companies in the United States and is not in agreement with the Proposed Rule (PR) for the following reasons:

- The PR is deliberately ambiguous, particularly when referring the criteria and mitigating circumstances upon which 'patterns' of violation will be based. How is it possible to adopt rules while the criteria upon which the rules depend remain undefined?

- Salt mines are by nature inherently safer than others because most are not classified as gassy and salt dust is neither explosive nor siliceous. Salt mines should be excluded from the POV regulation because their safety record is almost on par with all industry and is 77% better than mining in general.

- The PR may result in closure orders issued against mine sites before operators have a chance to discuss, assess or contest the validity/merit of the alleged citations, thereby effectively preventing

AB73- COMM-81

legal due process.

- The PR, requiring no S&S citations in any following comprehensive quarter makes it almost impossible for a mine to be removed from POV status once placed on it.

In summary, the Salt Institute does not believe that this flawed Proposed Rule will enhance safety as it stands. It denies the regulated mining community the ability to clearly comprehend its application bypasses well-established procedures aimed at fostering transparent and accountable government, not to mention a globally-competitive industry sector. The Salt Institute urges you to revise and re-propose this rule to address the flaws described above.

Lori Roman
President
Salt Institute

---

# Attachments

**MSHA-2011-0001-0026.1:** Comment from Morton Satin, Salt Institute



**Salt Institute**

2011 MAY 10  A 10: 34

May 10, 2011

The Honorable Joseph Main
Assistant Secretary of Labor for Mine Safety and Health
c/o The Office of Standards, Regulations and Variances
US Department of Labor
1100 Wilson Boulevard, Rm. 2350
Arlington, VA  22209-3939

Re: Pattern of Violations RIN: 1219-AB73 (30 CFR Part 104)

Dear Assistant Secretary Main:


The Salt Institute represents the major rock salt mining companies in the United States. We are writing to comment upon the Proposed Rule on Pattern of Violations described in 30 CFR Part 104 - RIN 1219-AB73.

We are not in agreement with the Proposed Rule for the following reasons:

- We believe the proposed Rule is deliberately ambiguous, particularly when referring to the criteria and mitigating circumstances upon which 'patterns' of violation will be based. Since they are the functional core of the rule, how is it possible to provide any meaningful comments in the absence of well-defined criteria?

- How is it possible to adopt rules while the criteria upon which the rules depend remain undefined?

- Salt mines by their geologic nature are inherently safer than others because most are not classified as gassy and salt dust is neither explosive nor siliceous.  The 'one size fits all' grouping of mines into the Proposed Rule ignores the exemplary safety record of salt mines and commits MSHA resources to a mining sector with an extremely unlikely potential for POV status.

- The Proposed Rule may result in closure orders issued against mine sites, before the operator has an opportunity to discuss, assess or contest the validity or merit of the alleged citations. Inclusion of questionable and contested S&S (significant and substantial) citations effectively prevents a mine operator obtaining legal due process. Since the proposed rule does not allow an appeal process the Proposed Rule would create significant legal activity.

- The proposed Rule states that once a mine site is placed on POV status it must achieve no S&S citations in an ensuing quarterly inspection in order to be removed from that status. For all practical purposes, achievement of no S&S citations in any comprehensive quarterly inspection is virtually unheard of.  As it stands, the Proposed Rule is understood by the regulated mining community to mean that once placed on POV status, it will be impossible to be removed.

*700 NORTH FAIRFAX STREET · FAIRFAX PLAZA, SUITE 600 · ALEXANDRIA, VA  22314-2040*
*703/549-4648  ·  FAX: 703/548-2194  ·  email: morton@saltinstitute.org*

Comment Page 01137

– 2 –                                          May 10, 2011

The Salt Institute understands the need for equitable and effective use of MSHA regulatory tools in order to achieve safety in the mining environment. However, the Proposed Rule as it stands will not achieve these goals. At a very minimum, in good faith, we recommend the following amendments:

- The Proposed Rule should provide clear, explicit POV criteria.
- The Proposed Rule should describe the scope and provide specific parameters for a "written safety and health management program" and codify this in 30 CFR Part 104.
- The Proposed Rule should consider those mine sites which have traditionally achieved exemplary compliance, accident, injury & illness records and thus already demonstrated no POV.
- The Proposed Rule should exclude salt mines from the POV regulation. The salt mining industry safety rate is 77% better than that of the mining industry generally. In fact, the safety record for salt mines is almost on par with all industry. Salt mines should not be evaluated more than once per year and MSHA should develop separate and specific POV criteria for the various mining sectors – coal, metal, nonmetal, surface mines, underground mines, etc.

In summary, the Salt Institute does not believe that this flawed Proposed Rule will enhance safety as it stands. It denies the regulated mining community the ability to clearly comprehend its application bypasses well-established procedures aimed at fostering transparent and accountable government, not to mention a globally-competitive industry sector. The Salt Institute urges you to revise and re-propose this rule to address the flaws described above.

Sincerely,

Lori Roman
President
Salt Institute

**From:** D'Elia, John [mailto:John.D'Elia@mail.house.gov]
**Sent:** Thursday, June 23, 2011 5:34 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** Comments of Rep. George Miller on MSHA's Proposed Rule (RIN 1219-AB73)

*2011 JUN 23 P 5: 40*

To Whom It May Concern:

Please find attached: The statement of Rep. George Miller, Senior Democratic Member on the Committee on Education and the Workforce, U.S. House of Representatives on MSHA's Proposed Rule Concerning Pattern of Violations (RIN 1219-AB73).

Please contact Richard Miller on the staff of the Committee on Education and the Workforce at Richard.Miller@mail.house.gov or at (202) 225 – 3725 with any questions or concerns.

Please confirm receipt of this email message and attachment.

Thank You,

John M. D'Elia
Staff Assistant
Democratic Staff
Committee on Education & the Workforce
2101 Rayburn House Office Building
Telephone: (202) 225-3725 Fax: (202) 226-5398
Email: John.D'Elia@mail.house.gov
democrats.edworkforce.house.gov

Please consider the environment before printing this e-mail.



*AB73-COMM-82*

**Statement of George Miller**
**Senior Democratic Member**
**Committee on Education and the Workforce**
**U.S. House of Representatives**
**On MSHA's Proposed Rule Concerning Pattern of Violations (RIN 1219-AB73)**
**June 24, 2011**

## Introduction

The Upper Big Branch mine disaster in Montcoal, West Virginia, which took the lives of 29
miners in a massive blast on April 5, 2010, revealed a broken Pattern of Violations (POV)
process which allowed Massey Energy to escape being placed on the POV despite an egregious
record of non-compliance, including 515 violations and 48 unwarrantable failure orders in 2009.
Hearings before the House Education and Labor Committee in 2010 revealed that a number of
mine operators who chronically violate the Mine Act are able to game the current system to
evade being placed on a Pattern of Violations.

Following the issuance of new civil penalty rules under 30 CFR Part 100 in 2007 and MSHA's
decision to initiate POV screening in 2007, many mine operators decided to contest many or all
of the citations for penalties. The contest rate for significant and substantial (S&S) violations
skyrocketed from 9% to 46% between 2004 and 2009 (a 500% increase). Today, the backlog of
contested cases has grown so large that even with a major increase in funding provided to the
Federal Mine Safety & Health Review Commission (FMSHRC) and the Solicitor of Labor, final
orders for citations will not be issued for two and sometimes three years. Given that the current
POV rule requires final orders for S&S violations before past history can be considered for
placing a repeat violator on POV, the delays caused by the backlog allows POV sanctions to be
postponed or evaded altogether.

Under the current POV regulation mine operators who are serial recidivists can keep placing
miners at unacceptable risk for years on end, while MSHA is handcuffed in placing chronic
violators on the POV in a timely manner. Hearings before our Committee revealed an urgent
need for legislative reforms to deal with repeat violators, and MSHA is to be commended for
working to fix a broken system using the legal authorities currently provided in the Mine Act.
However, this regulatory reform is not a substitute for legislative reforms needed to change the
culture and incentives of chronic violators who repeatedly endanger miners.

## MSHA's Proposed Regulation is Consistent with the Mine Act and Solves a Major Problem

The proposed POV regulation would eliminate the existing requirement in 30 CFR §104.3(b)
which requires that only citations and orders that have become final are to be used to identify
mines with a potential pattern of violations. In its place, MSHA would use citations as a basis

for evaluating the history of non compliance for purposes of POV. The rule also eliminates the existing provisions for a *potential* POV notice.[1]

As a member of the House Education and Labor Committee when House-Senate hearings were held on the 1976 Scotia Mine Disaster and Congress adopted legislative reforms, including the Pattern of Violations provision, it is my view that the proposed MSHA Pattern of Violations regulation published on February 2, 2011 is squarely in line with the language and intent of Section 104(e) of the Federal Mine Safety and Health Act of 1977.

In explaining the need for POV enforcement tool during the passage of the Federal Mine Safety Act in 1977, Congress pointed out that "the Scotia mine, as well as other mines, had an inspection history of recurrent violations, some of which were tragically related to the disaster which the existing enforcement scheme was unable to address."[2] The use of the phrase "inspection history" indicates Congress' intent that POV determinations be based on inspection histories such as violations found by MSHA during inspections, rather than only on final citations and orders.

In 1989, MSHA held hearings on its proposed POV rule, and one of the issues is whether MSHA should place a mine on POV based on citations or final orders. The United Mine Workers Union repeatedly warned in its comments that if MSHA adopted a final order requirement, mine operators would "be strongly motivated to challenge every S&S citation, regardless of the merits of their position." The UMWA pointed out that waiting for final orders would not be "workable," because by the time the orders were final and appeals had been exhausted, "then MSHA will be trying to determine whether a pattern existed on conditions cited years previously." UMWA's comments concluded: "By restricting Section 104(e) enforcement to final citations, MSHA will be creating an effective loophole to avoid pattern notice."[3]

At an MSHA field hearing, John Caylor, on behalf of Cypress Coal, countered the UMWA's prediction that operators will contest all S&S violations in order to avoid a pattern. He said:

> "Such a comment is not realistic. Even if an operator contested all S&S violations, the success rate of such contest is now in the neighborhood of only 20-30 percent. If an operator contests all S&S violations, that rate would decrease, making it unlikely any operator could avoid pattern by such device. Moreover a contest of an S&S citation

---

[1] The *Federal Register* notice for this rule notes that MSHA now posts to its web site the specific criteria and compliance data that the Agency would use for placing a mine on POV; this allows operators to monitor each mine's compliance record against the proposed POV criteria. This transparency effort assures ample advance notice that a mine's history of violations or accidents is potentially placing them at risk of a POV sanction.
[2] S. Rep. No. 181, 95th Cong., 1st Sess. at 32.
[3] Post Hearing Comments of the United Mine Workers Union, December 21, 1989

usually takes less than a year, making it likely that contests violations would be available for consideration in a pattern where two years are considered."[4]

That posture has been plainly discredited. Today, there is a massive and growing backlog of 19,000 contested mine safety enforcement cases; delays are endemic. The average unwarrantable failure violation took 841 days from issuance to final order in 2010, according to MSHA data. By the time a final order is issued, the conditions in the mine may bear no relationship to what the conditions might have been almost three years earlier. With extensive delays associated with securing final orders, MSHA cannot take timely action to protect miners.

In response to a Congressional request[5], DOL Inspector General (DOL-IG) was tasked to find out what was wrong with MSHA's POV processes. The DOL-IG's report, *In 32 Years MSHA Has Never Successfully Exercised Its Pattern of Violations Authority,* found that the POV regulations MSHA implemented in 1990 created limitations on MSHA's "authority that were not present in the enabling legislation, specifically, requiring only the use of final citations and orders in determining a POV, and creating a 'potential' POV warning to mine operators and a subsequent period of further evaluation before exercising the POV authority."

The report made several recommendations one of which was that the Assistant Secretary for MSHA "evaluate the appropriateness of eliminating or modifying limitations in the current regulations, including the use of only final orders in determining a pattern of violations and the issuance of a warning notice prior to exercising POV authority."[6] These recommendations were accepted by Assistant Secretary Joe Main and the proposed POV regulation is the result.

Comments on MSHA's proposed rule by mine operators and their trade associations contend that if citations are used instead of final orders, mine operators will suffer a deprivation of "due process rights," because if mines are placed on POV based on citations, and such citations are subsequently vacated or reduced in gravity on appeal to FMSHRC, the mine's placement on POV status would have been in error and the mine operator would suffer sanctions without the opportunity to first exhaust their appeal rights.

Some in the mine industry argue that they are at risk of erroneous enforcement actions causing them harm. According to MSHA data, 4% of citations are ultimately vacated/withdrawn, and 15% of the S&S citations are reduced in severity so the citations would not be counted for purposes of putting a mine on POV.[7] Stripped of its rhetoric, the nub of this industry objection is

---

[4] Transcript of public hearing on MSHA's proposed Pattern of Violation Rule, November 8, 1989, pp 21.
[5] Letter from U.S. Representatives George Miller, Lynn Woolsey and Nick Rahall to DOL Inspector General, April 13, 2010
[6] U.S. Department of Labor Office of Inspector General-Office of Audit, *In 32 Years MSHA Has Never Successfully Exercised Its Pattern of Violation Authority,* September 29, 2010.
[7] MSHA Statistics on Contested Penalties, "All S&S Penalty Cases Modified to non-S&S Disposed of in FY 2009 and 2010," Submitted to staff of the Committee on Education and the Workforce, March 2011

3

not that there are no due process rights, but rather, that the opportunity for appeals should be fully exhausted before MSHA is able to count a violation for purposes of determining if there is a Pattern of Violations.

Beyond the policy justification for taking timely action, this objection is legally weak.

- First, the Mine Act does not require MSHA to use "final orders" for POV. The "final order" requirement in MSHA's current regulations was inserted in 1989, apparently at the urging of the mining industry. The DOL Inspector General, as noted above, found that using final orders instead of citations imposed limitations on MSHA's authority "that were not present in the enabling legislation."[8]

- Second, the Mine Act relies extensively upon citations as a predicate for elevated enforcement actions, including withdrawal orders. Elevated enforcement actions can be taken without waiting for a final order from FMSHRC. For example, a "failure-to-abate" order under Section 104(b) and an "unwarrantable failure" order under Section 104(d) both involve the withdrawal of miners—the same sanction that is provided under Section 104(e)-- and are issued on the basis of previously issued citations, whether or not those citations have been challenged. Due process is afforded in these elevated enforcement cases after the citations and withdrawal orders have been issued, through normal contest proceedings. The legislative history from the 1977 Act makes clear that MSHA should use the same approach for POV.

- Third, mine operators have the right under Section 105(b)(2) of the Mine Act to seek a "temporary order" suspending a POV designation in an expedited hearing before a FMSHRC administrative law judge, if the operator can show that (1) there is a "substantial likelihood" they will prevail in challenging the citations used to place them on a POV, and (2) can show that the health and safety of miners will not be adversely impacted by staying a POV designation.[9] Requests for temporary orders are reviewed within 72 hours and assigned to a judge as a matter of procedure, if the matter raises issues that require an expedited review. This expedited review cures the industry's due process concerns because any potential deprivation of due process rights can be cured in a timely way, provided the operator meets the dual prongs of Section 105(b)(2).

- Fourth, courts reviewing due process issues must balance the private interests of the party claiming deprivation of due process against (a) the nature and importance of the

---

[8] In 32 Years MSHA has Never Successfully Exercised its Pattern of Violations Authority, U.S. DOL-IG Audit Report No. 05-10-005-06-001, September 29, 2010.
[9] Section 105(b)(2) of the Mine Act authorizes the filing of petitions with FMSHRC for a temporary order. The FMSHRC ALJ may grant relief if a hearing was held in which all parties were given an opportunity to be heard; the applicant shows that there is a substantial likelihood that the findings of the Commission will be favorable; and such relief would not adversely affect the health and safety of miners.

4

government's interest, and (b) the risk of the government making a mistake when depriving due process and the consequences such mistake would entail.  When there is a compelling government interest at stake--as miners' safety and health surely is, and as the Mine Act declares--the courts have found that an after-the-fact hearing satisfies due process.[10]

- o  For example, the Supreme Court has found that state highway safety laws which allow the state to take away a driver's license if they are suspected of operating under the influence of alcohol are Constitutional even though the driver had not had the opportunity for an evidentiary hearing before the license was removed. The Supreme Court found that the compelling interest in highway safety justifies making a summary suspension of a drivers license effective pending the outcome of a prompt post-suspension hearing.[11]  MSHA's POV regulation parallels this framework, with prompt due process available under the Section 105(b)(2) of the Mine Act after the mine has been placed on elevated sanctions.

- • Finally, mine operators have not offered an alternative to unacceptable status quo, where miners can be repeatedly exposed to dangers for years on end while operators litigate over whether certain violations can be counted for establishing a Pattern of Violations. Some mine operators have candidly conceded to our Committee that they will contest citations without regard to merit simply to try to avoid having violations that could count towards POV sanctions. This lawful gaming of the system needlessly endangers miners.

While the chance is 15% or less that an operator will be placed on a POV in error, to cure the due process concerns, we respectfully suggest that the temporary order procedures under §105(b)(2) of the Mine Act should be provided as a remedy for mine operators who believe MSHA has erred in issuing citations that could cause them to be erroneously placed on POV.

---

[10] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) states: "More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;  and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
[11] *Mackey v. Montrym*, 443 U.S. 1, 2 (1979), which extends the principles of *Mathews v. Eldridge*, states: "When there are disputed facts, the risk of error inherent in the statute's initial reliance on the reporting officer's representations is not so substantial in itself as to require the Commonwealth to stay its hand pending the outcome of any evidentiary hearing necessary to resolve questions of credibility or conflicts in the evidence." Further, "[T]he summary and automatic character of the [drivers license] suspension sanction available under the statute is critical to attainment of these objectives [highway safety].  A presuspension hearing would substantially undermine the state interest in public safety by giving drivers significant incentive to refuse the breath-analysis test and demand a presuspension hearing as a dilatory tactic. Moreover, the incentive to delay arising from the availability of a presuspension hearing would generate a sharp increase in the number of hearings sought and therefore impose a substantial fiscal and administrative burden on the Commonwealth." (at 19)

**Conclusion**

I believe that MSHA's proposed regulation is well founded as a matter of law and policy, and is consistent with the legislative intent of the Mine Act. Due process concerns raised in industry comments can be fairly addressed in a timely manner through Section 105(b)(2) of the Mine Act. Thank you for providing an opportunity to comment on the proposed rule entitled "Pattern of Violations" (POV) to amend 30 CFR Part 104.

**From:** Marion Loomis [mailto:loomis@vcn.com]
**Sent:** Thursday, June 30, 2011 7:02 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** WMA Letter Re POV

*2011 JUL -1  A 9: 26*

Please find attached a letter from the Wyoming Mining Association regarding Patter of Violations RIN 1219-AB73.

Thank you.

Marion Loomis
Wyoming Mining Association

*AB73- COMM -83*

**Physical Address**
2601 Central Avenue
Cheyenne, WY 82007

Ph 307 635 0331

# WM
# WYOMING MINING
# ASSOCIATION

**Mailing Address**
PO Box 866
Cheyenne, WY 82003

Fx 307 778 6240

June 30, 2011

Mine Safety Health Administration
Office of Standards, Regulations and Variances
1100 Wilson Blvd, Room 2350
Arlington, VA 22209-393

Re:  RIN 1219-AB75" Examinations of Work Areas in Underground Coal Mines and ``RIN 1219-AB73" for Pattern of Violations

Dear Sir or Madam:

The Wyoming Mining Association (WMA) appreciates the opportunity to comment on the Mine Safety and Health Administration's (MSHA) proposed rule on Patter of Violations ("POV") RIN 1219-AB73, 76 FR 5917.  The Wyoming Mining Association represents and advocates for 39 mining company members producing bentonite, coal, trona and uranium, as well as companies exploring for gold and rare earth minerals.  Wyoming leads the nation in production of all four of those produced minerals.  WMA also represents 129 associate member companies, two railroads and 180 individual members.

The WMA shares with MSHA a genuine concern for the safety of our miners.  Each mining company in Wyoming has multi-pronged approaches to enhance the safety and health of miners and their work place.  As a trade association, representing significant, safety conscious mining interests, the WMA respectfully requests that the agency revoke the current rulemaking and a full, detailed rule be opened for comment.  Following are specific comments on the current proposed rule.

Comments on the Proposed Rule

The WMA supports MSHA's expressed intent to improve the POV program to "simplify the existing POV criteria, improve consistency in applying the POV criteria, and more adequately achieve the statutory intent of the POV sanction against mine operators who have not responded to the Agency's other enforcement efforts.

However, the WMA seeks a transparent and fair rule for the use of MSHA's most severe civil enforcement tool:  closure orders resulting from a "pattern" of S&S violations.  Transparency has been touted as a cornerstone of this administration.  Unfortunately, the proposed rule is neither transparent nor fair, is contrary to law and must be re-proposed as this rulemaking excludes the specifics for POV determination.
Section 104.2 states it would "specify the general criteria" that MSHA would use to identify mines with a pattern of violations.  MSHA has asked for comments on how the agency should obtain comment during the development of and periodic revision to the POV screening criteria.  Obviously this tells us the Agency expects the POV regulation to be a moving target.  Since the latest "retooling" of the criteria, it is difficult to believe that the agency doesn't already have a desired criteria formula in mind.  The current rule has specific benchmarks in each category.  If the agency intends to adjust those numbers and

formulas, there should be a public comment period and rulemaking process prior to any and all adjustments.

The fundamental problem with the MSHA proposal is that it withholds "for future web posting", the actual criteria the agency will use for pattern determinations. By not disclosing, proposing and adopting the criteria through notice and comment rulemaking, MSHA prevents a full analysis of the rule's impact and a meaningful opportunity for interested parties to comment on the proposal.

As a result, we believe that the proposed rule violates the Administrative Procedures Act (APA) and Mine Act rulemaking mandates. For example, Section 104(e) (4) of the Mine Act authorizes the Secretary to: "*make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists.*" By not disclosing the criteria and publishing them for comment, MSHA exceeds it authority and violates its Mine Act mandate.

If adopted, the proposed rule will result in closure orders issued against employment sites before the employer has an opportunity to:
(1) Discuss the alleged pattern with the agency;
(2) Contest the validity of alleged citations or orders used to identify a pattern;
(3) Address the accuracy of agency data used for pattern identification; or
(4) Obtain judicial review of alleged violations constituting a pattern.

As far as pattern of violation of the same standard is concerned; surface coal operators' largest citation category is 77.404(a) which is a catchall standard for mobile and stationary equipment. At large operations with more than 400 pieces of mobile equipment, violations are written under 404(a), when no other standard fits. Metal / Non Metal operations with hundreds of pieces of machinery, tools and equipment experience the same issue with 56/57.14100(b) as a catch-all standard where no other standard applies. A quick glance by the standard numbers might indicate a pattern of repeat violations. However, if you drill down and read the description of each violation, they are nearly all written for totally different conditions. This application of the above standards could be considered a pattern of violation, when in all reality it is not.

The proposed rule, if adopted, will deny mine operators Mine Act Section 105 citation and penalty contest rights and due process of law, by permitting the use of contested violations to impose pattern closure orders. The contest provisions of the Act provide critical protections against improperly issued citations. MSHA's elimination of contest rights and the protection they provide is not authorized by the Mine Act. The elimination of Mine Act Section 105 due process is in direct conflict with the 5th Amendment to the Constitution of the United States of America which prevents individuals from being deprived of life, liberty or property without due process.

Due process extends to all persons and corporate entities to protect against abuse of government authority. Our system of justice has always worked on the premise that a person is innocent until proven guilty! The past 235 year history of our country proves that it's been an extremely important part of our constitutional rights. By allowing an MSHA inspector to issue a citation or order without the possibility of due process as to validity of the citation or order, will allow the inspector to become the judge, jury and executioner for an operation that is nearing POV status.

MSHA must also consider the reasons for the large number of citations under contest. This could be due to "regulatory creep". That is when inspectors in the field continue to stretch the reach of the regulation. The Wyoming Mining Industry has done a good job over the years at eliminating hazards and violations, though the inspectors seem to feel a need or feel pressure to write more citations. Therefore, we observe a "stretch" of the true intent of a regulation in order to write citations. Inspectors are not right every time and are currently under considerable pressure to write more citations, more S&S citations and higher negligence. Specific examples of this ever-changing interpretation can be heard in many instances involving the Metal/Non Metal guarding standard application.

MSHA must reinstate the provision that only final orders be used in determination of a Pattern of Violation.

The proposed rule will also eliminate the current rule's notice of a proposed pattern, and the established opportunities to demonstrate to MSHA that the proposed pattern is based on erroneous data, a common occurrence in the overloaded MSHA data base. This current system has proven critical to prevent inapplicable and incorrect pattern enforcement and invalid mine closure orders. Further, contrary to the purpose of the Mine Act, the proposed rule's elimination of the notice of potential pattern of violation (PPOV) will deny mine operators and their employees an opportunity to improve their performance, and thereby their safety record.

Between November and December of 2010, the agency put 14 mines on a potential pattern of violation. 10 of those operations have made enormous improvements in their S&S rates. One operation had an 87% reduction. The least improved in this group showed an improvement of 39%. This is a tremendous success story! With these types of results, why wouldn't MSHA want to keep this tool? Is MSHA's mission to improve safety in our nation's mines or is to close down mining operations? A large underground mine might well be handed a "death sentence" if not afforded the notice of the PPOV. Any inspector, on any given day, can find what they can effectively argue, a Significant and Substantial citation for loose ground; thereby keeping an underground operation in the pattern status.

MSHA has proven that notifying mining operations of their "potential" is extremely effective. The agency must keep the Potential Pattern of Violation notice in the toolbox. Although the current rule has some misgivings, it has recently proven its effectiveness.

If adopted, the proposed rule will also require mine operators to submit "safety and health management programs" to MSHA for approval, if they wish to gain future MSHA consideration of "mitigating circumstances" prior to pattern closure order issuance. By so doing, the proposed rule seeks to impose a new, substantive safety standard program mandate, bypassing the rulemaking provisions of the Act.

Separate and distinct rulemaking procedures have been announced at both OSHA and MSHA to determine if company safety program mandates should be required and, if so, what program mandates should be adopted through those separate rulemaking procedures. By seeking to adopt safety program mandates, through this unrelated Pattern rulemaking, MSHA engages in an "end run" around Mine Act Section 101 mandatory rulemaking for safety and health standards.

The very concept of determining whether there is a pattern of violations "which are of such nature as could have significantly and substantially contributed to the cause and effect of …mine health or safety hazards" requires the consideration of the circumstances surrounding the citations and possible hazards, including the impact of the safety program in place at the mine.  Mandating MSHA advance approval of a safety program, as proposed in this pattern rulemaking, violates the agency's duty to consider the mine's safety program as a hazard "mitigating circumstance," regardless of whether MSHA knew of the program – let alone approved it – in advance.  MSHA does not have authority to attach such a pre-condition, with its associated mine operator burden, to the exercise of its statutory duty to evaluate the circumstances surrounding suspected violations, before issuing closure orders.

We understand the need for fair and equitable use of MSHA enforcement tools to achieve safety, as well as the need to reform the troubled MSHA enforcement system.  We do not believe, however, that this flawed proposal will enhance safety nor comply with the mandates of the Mine Act, the APA and the due process protections of the Constitution. We urge you to revoke, revise and re-propose this rule.

The Wyoming Mining Association appreciates this opportunity to comment.

Sincerely,
WYOMING MINING ASSOCIATION

Marion Loomis
Executive Director

**From:** Harman, Thomas [mailto:tharman@cement.org]
**Sent:** Thursday, July 28, 2011 1:17 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB73

2011 JUL 28  P 4: 49

Please see subject comments attached.

Best regards,

Thomas (Tom) Harman
Regulatory Affairs
Portland Cement Association
500 New Jersey NW, 7th Floor
Washington, DC  20001
Phone office 202-408-9494
Phone mobile 202-870-2548
email tharman@cement.org
web www.cement.org

AB73-Comm-84



Portland Cement Association

July 28, 2011

Ms. Roslyn B. Fontaine, Acting Director
Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
Room 2350
1100 Wilson Boulevard
Arlington, Virginia  22209-3939

Dear Ms. Fontaine:

  Re: <u>Supplemental Comments of Portland Cement Association re RIN 1219-AB73:</u> *Pattern of*
     *Violations*

   Enclosed are the supplemental comments of Portland Cement Association (PCA) in response to
the above-referenced proposed rulemaking and the Mine Safety and Health Administration (MSHA) published in the *Federal Register* on May 4, 2011, to announce the re-opening of the comment period. 76 Fed. Reg. 25277.

   PCA submitted comments previously to this docket, in response to the earlier Notice of Proposed Rulemaking (NPRM) that MSHA published in the *Federal Register* on February 2, 2011, at 76 Fed. Reg. 5719.  PCA's comments were posted in the docket on April 18, 2011 and assigned the identification number AB73-COMM-65.  PCA reiterates those comments here, especially as they relate to addressing the final order requirement when determining history for pattern of violations enforcement, and to retaining the standard for sending a potential POV notification letter to mine operators.

   These supplemental comments are offered in response to MSHA's May 4th notice, which, among other things, requested the mining industry to submit comments, with supporting documentation, suggesting alternatives to the key pattern of violation (POV) provisions that MSHA had proposed in its February 2, 2011 NPRM.  The focus of our supplemental comments is on one particular "key" provision; specifically, the criteria that MSHA uses for determining whether a mine operator has established a pattern of significant and substantial violations at a particular mine.

   MSHA's official POV criteria are set forth in 30 C.F.R. § 104.2.  However, the MSHA's implementation of the codified criteria is based upon "initial screening criteria" that MSHA issued in 2010 to explain and clarify when a particular mine will have met the official § 104.2 POV criteria.  As we explain below, PCA believes a number of changes need to be made to MSHA's informal initial screen criteria.  PCA also believes that the majority of our concerns and recommendations can be adequately and effectively addressed with modifications to the initial screening criteria, without the need for MSHA to amend § 104.2 and codify the modifications to the informal initial screening criteria.

   A.  <u>MSHA needs to explain the basis for each initial screening criterion</u>.  Currently, MSHA has two distinct sets of initial screening criteria.  The two sets have been set forth by MSHA in the alternative.  In other words, if a mine's performance meets either set of criteria it will be "further considered for exhibiting a potential pattern of violations."

The first set consists of four criteria. The second set consists of two criteria. However, the basis for each set of criteria, *i.e.,* the rationale of the specific criteria under each set, has never been explained by MSHA.

For example, the first criterion of the first set requires that a mine have "[a]t least 50 citations/orders for significant and substantial (S&S) violations issued in the most recent 12 months." Each of the remaining criteria under both sets likewise establishes a minimum threshold. PCA is not suggesting that the setting of minimum thresholds is in-and-of-itself unreasonable. However, because of MSHA's failure to explain why each specific threshold was selected, it can only be assumed that the Agency's selections were arbitrary.

Therefore, PCA's first recommendation is that MSHA provide an explanation of the rationale for each of its initial screening criteria. At the same time, before MSHA explains its initial screening criteria, there is also a need for MSHA to modify its initial screening criteria in order to make them more reflective of mining operations and thus more effective in terms of achieving the NPRM's stated objective "to protect miners when the operator demonstrated a disregard for the safety and health of miners." 76 Fed. Reg. 5719.

 B. MSHA's initial screening criteria need to be augmented to better, or more equitably, reflect mine operations. Currently, MSHA's initial screening criteria apply "one-size-fits-all" thresholds. Regardless of what may have been MSHA's intent, the result of this is that the current thresholds unfairly discriminate against larger mines, by effectively giving smaller mines the benefit of a presumption of safety that might not be warranted.

Under the current system, because of a particular mine operation's scope and size, a larger mine has a greater potential to receive more citations/orders, as well as be the subject of 100 inspection hours, than would a small mine, under the first set of screening criteria. Thus larger mines are more likely to meet the citations/orders and inspection hour thresholds than would smaller mines, or, at the very least, larger mines are more likely to meet the thresholds sooner than a small mine would, especially during a 12-month period. Because the second set of criteria also applies a 12-month timeframe, smaller mines are also favored under the second set of criteria.

Therefore, PCA's second recommendation is that MSHA modify its current initial screening criteria thresholds to take into account a mine's size and operations.

While PCA is not going as far in these comments to recommend any specific threshold(s) that may be appropriate and therefore should be adopted for mine sizes and categories, we believe that, at the very least, MSHA should have two size categories ("large" and small") and, therefore, at least two different minimum threshold levels based on the size of a mine. At the same time, it may be more reasonable, and practical, to establish three size categories ("large," "medium," and "small"), each with its own thresholds.

For the same reasons, PCA also recommends that MSHA discontinue its current approach of treating all mine operations as though they are the same and thus present the same level of risk and safety exposure. MSHA's initial screening criteria should therefore be modified to recognize at least two categories of mines ("underground" and "aboveground"), with two different thresholds for each category of mine operation. In fact, the precedent for the initial screening criteria to distinguish between mine types for POV purposes already exists. Although MSHA's current initial screening criteria do not go as

2

far as PCA is recommending here, the appropriateness of distinguishing between mine types, albeit in a limited form, is already recognized and embraced by the 12-month Injury Severity Measure.[1]

     C.  <u>MSHA needs to retain its issuance of PPOV letters</u>.  MSHA's proposed elimination of the potential pattern of violations (PPOV) notification to operators is misguided and, if adopted, will jeopardize miners' safety and health.

     The sole reason MSHA has provided to support its proposed elimination of the current PPOV notification is that, during the three-year period June 2007 through September 2009, six of 62 operators (21 percent of the total) who received a PPOV letter received more than one PPOV letter. 76 Fed. Reg. at 5722. The NPRM further explained: "These mine operators temporarily reduced their S&S violations, but reverted back to allowing the same hazards to occur again and again without addressing the underlying problem." *Id.*  MSHA ignored, however, that the vast majority of those operators who did receive a PPOV letter during that period of time – 79 percent – engaged in the corrective action which the letter had intended when they were issued.  Sadly, MSHA's section-by-section analysis' justification seems to have ignored this, and also ignored the following additional impressive results that the same PPOV letters also triggered; results which the NPRM's preliminary regulatory economic analysis did acknowledge:

        After receiving the notification letter, of the mines that
        remained in operation to the next evaluation, 94 percent reduced the rate
        of S&S citations and orders by at least 30 percent and 77 percent reduced
        the rate of S&S citations and orders to levels at or below the national
        average for similar mines.

76 Fed. Reg. at 5723.  For MSHA to ignore its own statistics demonstrating the overwhelming benefits that have resulted from issuing PPOV letters, and instead eliminate their issuance solely because a substantial minority of operators failed to act more aggressively, is clearly arbitrary and capricious.

     What is especially troubling about the proposed elimination of the PPOV letters is MSHA's belief that it would be sufficient to expect "that operators would continually monitor their performance and, *if they believe that they are approaching a POV*, would take action to improve their safety and health performance." 76 Fed. Reg. at 5724 (emphasis supplied).  However, MSHA does not explain how such self-monitoring would prevent from occurring the very same reactions of the six operators MSHA cited as its reason for eliminating the PPOV letter; or why self-monitoring will incent those operators to now act when they were not sufficiently motivated to act after receiving a PPOV letter.

     Neither has MSHA taken into account the fact that, after monitoring their data, operators will not always reach the same conclusions as MSHA would.   In fact, the likelihood of this occurring is supported by the statistical data that MSHA cited in the NPRM.  As the NPRM acknowledged, during the five-year period 2006 through 2010, MSHA vacated 3,400 citations and modified 6,000 others from S&S to non-S&S.  While the NPRM appears to assert that these are insignificant numbers in relation to the 700,000 violations assessed penalties, from the vantage point of operators, especially those whose citations were vacated or reduced, these are substantial statistics.  If nothing else, MSHA's statistics demonstrate that MSHA inspectors do make mistakes when issuing citations.  Thus, when operators have good faith reasons to believe that an inspector's particular citations were improperly issued, it is reasonable to

---

[1] The fourth of MSHA's first set of initial screening criteria states: A 12-month Injury Measure (SM) for the mine that is greater than the overall Industry SM *for all mines in the same mine type and classification* over the most recent five years." (Emphasis supplied.)

3

conclude that those operators might also have good reason *not* to "believe they are approaching a POV" after monitoring their data because the data may, in fact, be erroneous.

In other words, the weak link in MSHA's proposed reliance on self-monitoring in lieu of issuing PPOV letters is how each operator will interpret its data compared to MSHA. MSHA's proposed elimination of the PPOV letter ignores the fact that, as long as MSHA and operators can and often do, in fact, reach different conclusions based upon the same data, MSHA's reliance on self-monitoring is problematic, because those same operators are also likely to exclude those citations from consideration when analyzing its data.

MSHA's issuance of a PPOV letter, on the other hand, eliminates the possibility of this from happening as a practical matter, by advising the operator in no uncertain terms that MSHA believes the operator is approaching a POV. The operator's difference of opinion will effectively not matter. At the same time, however, if a disagreement does exist, under the current framework there would still be an ample opportunity for the operator and MSHA's agents to discuss the issue and resolve the disagreement. The PPOV letter therefore takes away the prospect of subjecting operators to the "guessing game" that self-monitoring would otherwise promote, even if unintentionally.

MSHA also ignores another benefit of PPOV letters. Upon their receipt of a letter, the vast majority of operators – 79 percent according the NPRM – will initiate timely remedial actions. Self-monitoring, on the other hand, is likely to result in even the most conscientious of operators refraining from initiating the remedial actions that a PPOV letter would have triggered, due to the fact that, after monitoring their data, they *do not* "believe they are approaching a POV."

Clearly, these are consequences that MSHA would not want to occur. Clearly also, MSHA can prevent them from happening by continuing its current practice of issuing PPOV letters rather than doing away with such letters as MSHA has proposed.

Respectfully submitted,

Robert A. Hirsch
Director, Regulatory Affairs

Thomas Harman
Director of Regulatory Affairs

4

-----Original Message-----
From: Casper, Joseph S. [mailto:jcasper@nssga.org]
Sent: Friday, July 29, 2011 12:27 PM                2011 JUL 29  P 12: 45
To: Davis, Leah - MSHA
Cc: Tucker, Helen A - MSHA
Subject: NSSGA Comment on POV

Ms. Davis, Please find attached additional NSSGA comment on the POV rule
proposal. Thank you.

Joe Casper

AB73- COMM-85

NATIONAL STONE, SAND & GRAVEL ASSOCIATION



*Natural building blocks for quality of life*

July 28, 2011

Ms. April Nelson
Acting Director, Office of Standards
Mine Safety & Health Administration
1100 Wilson Boulevard
Arlington, VA  22209

RE: RIN 1219-AB73

Dear Ms. Nelson:

This letter is submitted as further comment by the National Stone Sand and Gravel Association concerning the proposed rulemaking on pattern of violations (POV).

While NSSGA appreciates the fact that MSHA will comply with the earlier-stated request to make available for public comment the agency's precise criteria for selection of operations for POV status, NSSGA urges that the request and final determination be made in the rulemaking itself, as opposed to just on the website.

NSSGA believes that this important process must formally be a part of the rulemaking so that, going forward, operators will be able to rest assured that they know what the criteria will be.

Thank you, and let me know of any questions, please. I can be reached at (703) 526-1074 / jcasper@nssga.org.

Sincerely,

Joseph Casper

VP, Safety

Comment Page 01157

**From:** Mike Crum [mailto:MIKE.CRUM@fmc.com]
**Sent:** Friday, July 29, 2011 12:47 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Cc:** Fred von Ahrens; ron.hughes@solvay.com; Randy Pitts (rpitts@tatachemicals.com); Hohn, Mike; Rowdy.Heiser@solvay.com; dmcgillvray@genchem.com; ggomez@ocichemical.com; Mike Crum
**Subject:** RIN 1219-AB73

2011 JUL 29 P 3: 22

Mike Crum, CSP
FMC Health and Safety
PO Box 872
Green River, WY 82935
(307)872-2251 (office)
(307)871-4809 (cell)
(866)938-3996 (fax to PC)

Comment Page 01158

AB73-COMM-86

**Wyoming Trona Producers**

Dear Sir or Madam:

The Wyoming Trona Producers appreciate the opportunity to comment on the Mine Safety and Health Administration's (MSHA) proposed rule on Patter of Violations ("POV") RIN 1219-AB73, 76 FR 5917.

We share with MSHA a genuine concern for the safety of our miners. Each of our companies in Southwest Wyoming have multi-pronged approaches to enhance the safety and health of miners and their work place. We respectfully request that the agency revoke the current rulemaking and a full, detailed rule be opened for comment. Following are specific comments on the current proposed rule.

<u>Comments on the Proposed Rule</u>

We support MSHA's expressed intent to improve the POV program to "simplify the existing POV criteria, improve consistency in applying the POV criteria, and more adequately achieve the statutory intent of the POV sanction against mine operators who have not responded to the Agency's other enforcement efforts.
However, the Trona producers seek a transparent and fair rule for the use of MSHA's most severe civil enforcement tool: closure orders resulting from a "pattern" of S&S violations. Transparency has been touted as a cornerstone of this administration. Unfortunately, the proposed rule is neither transparent nor fair, is contrary to law and must be re-proposed as this rulemaking excludes the specifics for POV determination.

Section 104.2 states it would "specify the general criteria" that MSHA would use to identify mines with a pattern of violations. MSHA has asked for comments on how the agency should obtain comment during the development of and periodic revision to the POV screening criteria. Obviously this tells us the Agency expects the POV regulation to be a moving target. Since the latest "retooling" of the criteria, it is difficult to believe that the agency doesn't already have a desired criteria formula in mind. The current rule has specific benchmarks in each category. If the agency intends to adjust those numbers and formulas, there should be a public comment period and rulemaking process prior to any and all adjustments.

The fundamental problem with the MSHA proposal is that it withholds "for future web posting", the actual criteria the agency will use for pattern determinations. By not disclosing, proposing and adopting the criteria through notice and comment

rulemaking, MSHA prevents a full analysis of the rule's impact and a meaningful opportunity for interested parties to comment on the proposal.

As a result, we believe that the proposed rule violates the Administrative Procedures Act (APA) and Mine Act rulemaking mandates. For example, Section 104(e) (4) of the Mine Act authorizes the Secretary to: *"make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists."* By not disclosing the criteria and publishing them for comment, MSHA exceeds it authority and violates its Mine Act mandate.

If adopted, the proposed rule will result in closure orders issued against employment sites before the employer has an opportunity to:
(1) Discuss the alleged pattern with the agency;
(2) Contest the validity of alleged citations or orders used to identify a pattern;
(3) Address the accuracy of agency data used for pattern identification; or
(4) Obtain judicial review of alleged violations constituting a pattern.

As far as pattern of violation of the same standard is concerned; these large underground metal / non metal operations' largest citation category is 56/57.14100(b) which is a catchall standard for machinery, tools and equipment. A quick glance by the standard numbers might indicate a pattern of repeat violations. However, if you drill down and read the description of each violation, they are nearly all written for totally different conditions. This application of the above standards could be considered a pattern of violation, when in all reality it is not.

The proposed rule, if adopted, will deny mine operators Mine Act Section 105 citation and penalty contest rights and due process of law, by permitting the use of contested violations to impose pattern closure orders. The contest provisions of the Act provide critical protections against improperly issued citations. MSHA's elimination of contest rights and the protection they provide is not authorized by the Mine Act. The elimination of Mine Act Section 105 due process is in direct conflict with the 5th Amendment to the Constitution of the United States of America which prevents individuals from being deprived of life, liberty or property without due process.

Due process extends to all persons and corporate entities to protect against abuse of government authority. Our system of justice has always worked on the premise that a person is innocent until proven guilty! The past 235 year history of our country proves that it's been an extremely important part of our constitutional rights. By allowing an MSHA inspector to issue a citation or order without the possibility of due process as to validity of the citation or order, will allow the inspector to become the judge, jury and executioner for an operation that is nearing POV status.

MSHA must also consider the reasons for the large number of citations under contest. This could be due to "regulatory creep". That is when inspectors in the field continue to stretch the reach of the regulation. The Wyoming Trona industry has done a good job over the years at eliminating hazards, injuries and violations, though the inspectors seem to feel a need or feel pressure to write more citations. Therefore, we observe a "stretch" of the true intent of a regulation in order to write citations. Inspectors are not right every time and are currently under considerable pressure to write more citations, more S&S citations and higher negligence. Specific examples of this ever-changing interpretation can be heard in many instances involving the Metal/Non Metal guarding standard application.

MSHA must reinstate the provision that only final orders be used in determination of a Pattern of Violation.

The proposed rule will also eliminate the current rule's notice of a proposed pattern, and the established opportunities to demonstrate to MSHA that the proposed pattern is based on erroneous data, a common occurrence in the overloaded MSHA data base. This current system has proven critical to prevent inapplicable and incorrect pattern enforcement and invalid mine closure orders. Further, contrary to the purpose of the Mine Act, the proposed rule's elimination of the notice of potential pattern of violation (PPOV) will deny mine operators and their employees an opportunity to improve their performance, and thereby their safety record.

Between November and December of 2010, the agency put 14 mines on a potential pattern of violation. 10 of those operations have made enormous improvements in their S&S rates. One operation had an 87% reduction. The least improved in this group showed an improvement of 39%. This is a tremendous success story! With these types of results, why wouldn't MSHA want to keep this tool? Is MSHA's mission to improve safety in our nation's mines or is to close down mining operations? A large underground mine might well be handed a "death sentence" if not afforded the notice of the PPOV.  Any inspector, on any given day, can find what they can effectively argue, a Significant and Substantial citation for loose ground; thereby keeping an underground operation in the pattern status.

MSHA has proven that notifying mining operations of their "potential" is extremely effective. The agency must keep the Potential Pattern of Violation notice in the toolbox. Although the current rule has some misgivings, it has recently proven its effectiveness.

If adopted, the proposed rule will also require mine operators to submit "safety and health management programs" to MSHA for approval, if they wish to gain future MSHA consideration of "mitigating circumstances" prior to pattern closure order issuance. By so doing, the proposed rule seeks to impose a new, substantive safety standard program mandate, bypassing the rulemaking provisions of the Act.

Separate and distinct rulemaking procedures have been announced at both OSHA and MSHA to determine if company safety program mandates should be required and, if so, what program mandates should be adopted through those separate rulemaking procedures. By seeking to adopt safety program mandates, through this unrelated Pattern rulemaking, MSHA engages in an "end run" around Mine Act Section 101 mandatory rulemaking for safety and health standards.

The very concept of determining whether there is a pattern of violations "which are of such nature as could have significantly and substantially contributed to the cause and effect of … mine health or safety hazards" requires the consideration of the circumstances surrounding the citations and possible hazards, including the impact of the safety program in place at the mine. Mandating MSHA advance approval of a safety program, as proposed in this pattern rulemaking, violates the agency's duty to consider the mine's safety program as a hazard "mitigating circumstance," regardless of whether MSHA knew of the program – let alone approved it – in advance. MSHA does not have authority to attach such a pre-condition, with its associated mine operator burden, to the exercise of its statutory duty to evaluate the circumstances surrounding suspected violations, before issuing closure orders.

We understand the need for fair and equitable use of MSHA enforcement tools to achieve safety, as well as the need to reform the troubled MSHA enforcement system. We do not believe, however, that this flawed proposal will enhance safety nor comply with the mandates of the Mine Act, the APA and the due process protections of the Constitution. We urge you to revoke, revise and re-propose this rule. The Wyoming Trona Producers appreciates this opportunity to comment.

| | | | |
|---|---|---|---|
| Fred von Ahrens | Ron Hughes | Randy Pitts | Mike Hohn |
| Resident Manager | Senior VP, Site Manager | Plant Manager | Site Manager |
| FMC Corporation | Solvay Chemicals | TaTa Chemicals | OCI Wyoming |

**From:** Green, Edward [mailto:EGreen@crowell.com]
**Sent:** Monday, August 01, 2011 4:04 PM     2011 AUG -1 P 5: 15
**To:** zzMSHA-Standards - Comments to Fed Reg Group; Fontaine, Roslyn B - MSHA
**Subject:** RIN 1219-AB73: Supplemental Comments of BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy on MSHA's Proposed Rule on Patterns of Violations
**Importance:** High

Pursuant to MSHA's notice published in the Federal Register for June 20 (76 Fed. Reg. 35,801), attached please find the supplemental comments of BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy on RIN 1219-AB73: MSHA's Proposed Rule on Patterns of Violations. We thank you for the opportunity to provide additional comments on the proposal.

Sincerely,

Edward M. Green
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595
(202) 624-2922 - Direct
(202) 628-5116 - Fax
(202) 236-3358 - Cell Phone
egreen@crowell.com

AB73- COMM-87



1001 Pennsylvania Avenue, NW, Washington, DC 20004-2595 ▪ p 202 624-2500 ▪ f 202 628-5116

August 1, 2011


Ms. Roslyn B. Fontaine
Acting Director
Office of Standards, Regulations, and Variances
Mine Safety and Health Administration
U.S. Department of Labor
1100 Wilson Boulevard
Arlington, VA 22209-3939

> Re: **Supplemental Comments of BHP Billiton New Mexico Coal,
> Murray Energy Corporation, and Peabody Energy on MSHA's
> Proposed Rule on Patterns of Violations: RIN 1219-AB73**

Dear Ms. Fontaine:

### Introduction

Pursuant to the notice published in the Federal Register for June 20, 2011 (76 Fed. Reg. 35,801), announcing an additional public hearing and an extension of the post-hearing comment period until August 1, 2011, please find below the comments of BHP Billiton New Mexico Coal, Murray Energy Corporation, and Peabody Energy (hereinafter "the Companies") supplementing the Companies' initial comments of April 18, 2011 (AB73-COMM-74) on MSHA's Proposed Rule on Patterns of Violation (30 C.F.R. Part 104) (the "NPR"), published in the Federal Register for February 2, 2011 (76 Fed. Reg. 5,719). In section III of the June 20 notice, MSHA published a "clarification" of the Pattern of Violations ("POV") proposal. It is on this clarification that our supplemental comments will focus. More specifically, our supplemental comments will address--

- the Agency's current idea about how it should go about obtaining public comment on the development of, and periodic revision to, the POV screening criteria; and

- MSHA's clarification of what would constitute a safety and health management program for consideration by the Agency as a mitigating circumstance in the POV proposal.

Crowell & Moring LLP ▪ www.crowell.com ▪ Washington, DC ▪ New York ▪ San Francisco ▪ Los Angeles ▪ Orange County ▪ Anchorage ▪ London ▪ Brussels

Comment Page 01164

Ms. Roslyn B. Fontaine
August 1, 2011
Page 2

## The POV Screening Criteria

In the June 20 notice, MSHA solicited comments on how it should obtain comment from the public during the development of, and periodic revision to, the POV screening criteria, saying that it currently "plans to provide any change to the specific criteria to the public, via posting on the Agency's Web site, for comment before MSHA uses it to review a mine for a POV."[1] The notice continued as follows: "MSHA plans to review and respond to comments, and revise, as appropriate, the specific criteria, and post its response to the comments and the revised specific criteria on the Agency's website."[2]

As we discussed in our initial April 18 comments on this NPR, the Companies are strongly opposed to this sort of plan. We remain firmly of the view that the specific criteria that MSHA will use to decide whether to issue a POV notice must be published in the Federal Register for comment, in accordance with the rulemaking requirements of the Federal Mine Safety and Health Act of 1977, as amended (the "Mine Act"), and the Administrative Procedure Act ("APA"). The Companies discussed our position at length in our aforementioned initial comments, and we will not repeat that discussion in these supplemental comments.[3] Simply put, however, the instantaneous communications of the internet age are emphatically not a substitute for the fundamental due process protections afforded the public by proper Mine Act and APA notice-and-comment rulemaking.

## Mitigating Safety and Health Management Programs

The June 20 notice also attempts to clarify what MSHA believes would constitute a safety and health management program for consideration by the Agency as a mitigating circumstance for purposes of the POV NPR. Thus, the notice specifies that "MSHA would like to clarify that the Agency did not intend that these safety and health management programs be the same as those referenced in the Agency's rulemaking on comprehensive safety and health management programs (RIN 1219-AB71), which has not yet been published as a proposed rule."[4] Going on, the notice said that "a safety and health management program that would be considered by MSHA as a mitigating circumstance in the POV proposal would be one that: (1) Includes measureable benchmarks for abating specific violations that could lead to a POV at a specific mine; and (2) addresses hazardous conditions at the mine."[5]

---

[1] 76 Fed. Reg. 35,802.

[2] *Id.*

[3] *See* AB73-COMM-74 at 3-5.

[4] 76 Fed. Reg. 35,802.

[5] *Id.*

Ms. Roslyn B. Fontaine
August 1, 2011
Page 3

The Companies are interested to learn about this clarification because, in our initial comments, we were concerned about the vagueness of the NPR and its relationship, if any, to RIN 1219-AB71.[6] Thus, it is helpful for the Companies to understand that what MSHA is thinking about in the context of the POV NPR is different than the comprehensive program referenced in its yet-to-be-published rule. However, other than noting that difference, the remaining portion of the clarification statement merely repeats what the preamble to the February 2, 2011 proposed rule has already stated, *i.e.,* the safety and health management program used as a mitigating factor in POV review will consist of "measureable benchmarks for abating specific violations that could lead to a POV and addressing these hazardous conditions at [the] mine[]."[7] Consequently, the Agency's thinking remains fraught with the seeds of confusion and unnecessary duplication since without further explanation of the requirements for the mitigating health and safety management program, as we said in our April 18, 2011 comments, the proposed rule "suffers the fundamental flaw of being too vague both for giving operators a reasonable opportunity to comment on it and for its downstream enforcement as a mandatory standard"[8].

The Companies must ask MSHA to explain what is the justification for two kinds of safety and health management programs? Is the program described in the February 2 proposal and the June 20 notice truly a safety and health management program? We think our questions are not just rhetorical. They merit serious thinking by MSHA. This is especially true in light of the difficulty MSHA currently has in timely and effectively dealing with issues such as ventilation plans. How will the Agency be able to deal with two kinds of safety and health management programs, an area where, to begin with, we seriously question MSHA's fundamental expertise and judgment abilities? In this regard, the Companies note that in its recently published semi-annual regulatory agenda, MSHA has said that in September, it intends to hold "additional public meetings to gather more extensive information" on its plan to develop proposed regulations for comprehensive safety and health management programs.[9]

To avoid confusion and unnecessary duplication and to comport with the President's instructions in his January 2011 Executive Order 13,563, that industry should be regulated in the least burdensome fashion, with the costs of cumulative regulations taken into account, we reiterate our initial comments about allowing companies with existing safety and health management programs to obtain credit for them in the POV context.[10]

---

[6] AB73-COMM-74 at 15 and 16.

[7] 76 Fed. Reg. 5,721.

[8] AB73-COMM-74 at 15.

[9] http://www.msha.gov/REGS/UNIFIED/July2011/1219-AB71.asp

[10] AB73-COMM-74 at 16.

Ms. Roslyn B. Fontaine
August 1, 2011
Page 4

   The Companies appreciate the opportunity to provide these supplemental comments to
MSHA and hope you find them to be of use.

Sincerely,

Edward M. Green
Counsel for the Companies

DCACTIVE-15802006.1

**From:** Chris Hamilton [mailto:CHamilton@wvcoal.com]
**Sent:** Tuesday, August 02, 2011 9:25 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** RIN 1219-AB75" in the subject line of the message for Examinations of Work Areas in
Underground Coal Mines and ``RIN 1219-AB73" for Pattern of Violations.

2011 AUG -3  A 9: 20

Please accept these written comments on behalf of the West Virginia Coal Association.  These
comments are similar to the ones presented at the June 7th Public Hearing in Charleston WV.

Thank you .

Chris Hamilton

AB73-LATE-COMM-1

<div align="center">

**West Virginia Coal Association**
**Comments on the**
**Mine Safety & Health Administration's**
**Proposed Rule:**
**Pattern of Violations**
**"RIN 1219-AB73"**

</div>

2011 AUG -3 A 9: 21

The West Virginia Coal Association (WVCA or Association) respectfully submits the following comments on the Mine Safety and Health Administration's (MSHA or Agency) Pattern of Violations; Proposed Rule concerning § 104(e) of the Federal Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. §§ 801, 814(e).

WVCA recognizes the importance of agency's pattern of violations (POV) power to effectively carry out the intent of the Mine Act. However, WVCA believes strongly that the POV system should be (1) simplified, (2) transparent, (3) fundamentally fair, and (4) uniformly applied before changes to the current process are made. Therefore, WVCA must oppose MSHA's proposed changes to existing POV procedure for the following reasons.

## I.  MSHA's Proposed Rule Violates Mine Operators' Due Process Rights and Principles of Fundamental Fairness

### a.  The Current Process

Current POV procedure requires that only citations and orders that become *final* will be used to identify mines with potential POV issues. MSHA's proposal would change this approach and allow POV determinations to be made solely off of *violations issued*. While WVCA fundamentally agrees in the purpose of the POV power, one need not strain to see that this extension of the rule would leave an operator presumed guilty rather than innocent until proven guilty and is unfair.

MSHA believes that this change is absolutely necessary to cure a large backlog of cases pending before the Federal Mine Safety and Health Review Commission (Commission). This, coupled with the MSHA's belief that only a small fraction of significant and substantial (S&S) violations are ever modified or vacated, is the main reason for MSHA's proposed evisceration of due process. Most troubling is the fact that MSHA itself has contributed to the backlog of cases more than any other single factor because of a substantial increase in questionable citations issued by inspectors. This proposed rule is nothing more than an irresponsible attempt by MSHA to clean up its own inconsistencies while leaving operators no chance at being heard.

Given this lack of justification[1], the current POV rule should not be altered. MSHA should not have the authority to end-run such a sacred constitutional right as due process—no matter how busy they are nor for any other reason.

---

[1] Indeed there is much less justification. For an in depth analysis, see the National Mining Association's Comment to this proposed rule.

**b. The Fifth Amendment's Guarantee of Due Process**

At the heart of due process is an individual's right to his/her property.  The Fifth Amendment of the U.S. Constitution holds that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."  Issuing punitive POV sanctions for *violations issued* instead of *final* adjudications on contested citations or orders is an absolute denial of this right.

To constitute a due process violation, a party must be deprived of a protected interest, and, if so, the court must determine what process is due.  Surely the shutting down of a mine operation and the economic detriment that would attach would qualify for due process protections as envisioned by the Fifth Amendment.  Congress was well aware of such dangers when it passed the Mine Act and created a way for mine operators to be heard.  All of this protection was designed to prevent "erroneous deprivation" and, though slow, the current system prevents this deprivation.  In fact, MSHA stated during the formal rulemaking process for the current POV rule that in order to avoid inequities regarding which mines are placed on a pattern, the *Agency must make ample provision for due process* when applying the broad framework established by Congress . . . MSHA will consider *only final citations and orders* when identifying mines with a potential of violations."[2]  MSHA has completely changed its position apparently in favor of inequities in the POV process.

## II.    The POV Rule Must Ensure that Mine Operators Receive Adequate Notice and a Fair Opportunity to be Heard

With this proposed rule MSHA would also have the current practice of full and fair notice to operators removed.  Fundamental fairness requires that operators be made aware of circumstances giving rise to the issuance of a POV, thereby, giving the operator a reasonable opportunity to address any condition that might alleviate the situation altogether.  Even Secretary Main has lamented on the necessity of fair and adequate notice.  He once stated in a letter to MSHA regarding the proposed version of the current POV Rule that

"all mines which are under review for potential pattern of violations . . . shall be given notice to that effect by the Agency . . . This notice is designed to give operators the opportunity to take concrete actions to improve the citation history at the mine and to implement a remedial plan.  MSHA should evaluate these [and] similar company efforts to correct a pattern of violations when the pattern notice conference is held."

It is well established that courts and prosecutors are not allowed to suspend the rights of its litigants just because they may be overworked.  Likewise, MSHA should not be allowed to do so.  There has been absolutely nothing to warrant the proposed changes to this rule.  This is

---

[2] 55 Fed. Reg. 31128, 31132 (July 31, 1990) (emphasis added).

nothing more than an attempt by MSHA to enact administrative conveniences at the expense of mine operators' rights.

At a minimum, MSHA should provide a pre-deprivation hearing to operators. MSHA and the Commission should adopt a formal system that would consolidate and expedite violations being contested in a way that affords operators reasonable opportunity to contest erroneous penalties.

## III.     The Potential for Unchecked Malfeasance on the Part of MSHA Inspectors

Allowing MSHA inspectors to write S&S violations that can be added to a POV without a hearing is unfair in numerous other ways as well. For example, it may not have been considered by many, but under this proposed rule, if an MSHA inspector truly wishes to place a mine operator on a POV, they can accomplish this in a matter of months. Assuming that there was just one inspector with a personal vendetta against a mine, they could singlehandedly bankrupt a mine operator under the proposed rule. As MSHA has largely abandoned the conference system, this proposed system leaves no avenue to challenge bad citations and orders.

There would be no safeguards for this kind of activity, and to allow this loophole to exist is the height of irresponsibility. In fact, the only kind of safeguard available for this scenario is not much of a safeguard at all. MSHA may argue that one check on an inspector with a personal vendetta against a mine is the gravity of the harm requirement for writing an S&S violation which must be at least "reasonably likely." However, should an inspector improperly place the gravity of the harm as "reasonably likely" there would be no recourse for the operator before being placed on a POV under the proposed rule because an operator would not have been afforded a hearing on the improper gravity mark before the violation is added to the POV.

This concern is exacerbated due to: 1. the current adversarial relationship that exists today between  MSHA inspectors and mine operators; 2. the inexperience level of a number of new MSHA inspectors; and, 3. the documented lack of training that a number of new MSHA inspectors receive.

## IV.     Calculating Inspector Time

One of the screening criteria for POV determination involves a calculation using the inspector's on-site hours. Therefore, shouldn't MSHA be using the on-site hours of all authorized representatives (AR), including supervisors, Assistant District Managers, and even District Managers since they carry AR cards? Particularly in view of Section 104 (a) of the Mine Act which requires all ARs to issue citations or Orders when they believe a violation exists.

## V. Additional Comments relative to Section 104(a) of the Mine Act

Section 103(a) of the Federal Mine Safety and Health Act of 1977 ("Mine Act") directs Authorized Representatives ("ARs") of the Secretary of Labor ("Secretary") to conduct frequent inspections of coal or other mines. The Mine Safety and Health Administration ("MSHA") Program Policy Manual ("PPM") elaborates and outlines MSHA's policy regarding ARs

3

Case: 2:14-cv-02646-JLG-EPD Doc #: 64-8 Filed: 08/10/16 Page: 245 of 364  PAGEID #: 2448

conducting such inspections and investigations of coal mines. The PPM, consistent with the Mine Act, states that these inspections must be conducted only by persons who have been authorized by the Secretary to conduct such inspections or investigations.

From there, Section 104(a) of the Mine Act directs ARs to issue citations and orders when he or she believes that a violation of the Mine Act or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to the Mine Act has occurred. The PPM again provides policy related to the issuance of 104(a) Citations and Orders consistent with Section 104(a) of the Mine Act. In short, citations and orders are a major tool for obtaining compliance with the Mine Act, and its mandatory health or safety standards, rules, orders, or regulations. Violations shall be cited by the AR, giving the operator time for abatement of the violation(s).

The MSHA Supervisor's Handbook reinforces the obligation and authority of the Mine Act, as it states in part that, "[i]f, upon inspection or investigation, an AR believes that a mine operator has committed a violation of the Mine Act or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to the Mine Act, he or she must issue a citation or order to the mine operator. Each citation or order must be in writing and shall describe with particularity the nature of the violation, including reference to the provision of the Mine Act."

The General Coal Mine Inspection & Inspection Tracking System Handbook (PH-08-V-1), released January 14, 2008, states in part that the Administrator for Coal Mine Safety and Health has the primary responsibility for enforcing the Act and implementing the regulations as they relate to coal mines. The Handbook further states that responsibility ultimately rests with the ARs. The ARs are responsible for conducting thorough inspections and investigations.

The clear intent of the Mine Act was, and is, for each AR to issue citations and/or orders for conditions that, in each individual AR's independent judgment, constitute a violation.

One of the Initial Screening Criteria used by MSHA to evaluate mines for a potential pattern of violations ("POV") involves calculating the number of onsite inspection hours spent by ARs at each mine. Specifically, under this particular screening criterion MSHA calculates the ratio of the S&S citations/orders issued per 100 inspection hours at a mine over the course of the most recent 12 months.

In order to properly calculate this ratio, MSHA *should* be considering the onsite inspection hours of each and every AR, including Supervisory Inspectors, Assistant District Managers and District Managers (collectively referred to herein as "Supervisory Personnel"). Presently, however, MSHA does not include all supervisory onsite hours in statistics used in Inspection Day calculations. The result is an artificial, erroneous and detrimental increase of mine ratios of S&S citations/orders per 100 inspection hours during POV screening.

Section 104(a) of the Federal Mine Safety and Health Act of 1977 ("the Mine Act") specifically requires all ARs to issue citations or orders when they believe a violation of the Mine Act has occurred. The legal obligation and responsibility is the same regardless of whether the AR is Non-Supervisory or Supervisory Personnel; no distinction existed under Section 104(a) of the Mine Act. Moreover, and as noted in MSHA's own internal reviews and directives following

4

Comment Page 01172

major mining accidents from 2006 to 2008, Supervisory Personnel are _required_ to conduct regular onsite mine visits to determine if the level of compliance is consistent with existing conditions at a given mine.  In short, the inspection activities and hours of Supervisory Personnel are just as relevant and important as the inspection activities and hours of Non-Supervisory Personnel.  The Mine Act carves out no exception.  Similarly, the Mine Act does not provide for Administrative Time Sheets where a supervisor can indicate a 'task code' to relieve him/herself of duties as an AR.

Consider a situation in which both a Supervisory Inspector and a Coal Mine Inspector ("CMI") (both of whom are ARs) visit a mine site for a supervisory review.  During the course of the inspection, if the CMI fails to recognize a condition which constitutes a violation, the Supervisory Inspector is required by the Mine Act to insure a citation or order is issued for the violation.  An additional example would be when a Supervisory Inspector and a CMI are traveling together during inspection activities and the Supervisory Inspector highlights a condition which he or she feels is a violation of a subjective standard, such as 30 C.F.R. § 75.400, but the CMI disagrees that a violation exists.  In such cases, the Supervisory Inspector is required to issue the violation, even if the CMI disagrees with the Supervisory Inspector's conclusion, according to the clear language of the Mine Act.

Ultimately, MSHA should consider the onsite inspection hours of _all_ ARs, including Supervisory Personnel, when calculating Inspection Hours, since Section 104(a) of the Mine Act specifically requires all ARs to issue citations or orders when they believe a violation has occurred, regardless of the ARs' role within MSHA.


## VI.   Safety Performance Index (SPI)

In lieu of proceeding forward with the current rule, we would urge MSHA to factor our concerns articulated herein into any subsequent rule revision and given the significance of the POV program, we further call upon the agency to convene a forum of industry experts to determine whether more fundamental changes to the POV program are needed.  Toward this end, there were a number of programmatic changes discussed last year before Congress including the inclusion of a means to more accurately and objectively assess a mine's overall safety performance known as the Safe Performance Index or Grayson Model.  We would alternatively suggest that you develop those safety principles and administrative tools through a participatory process with all stakeholders.

## VII.   Conclusion

WVCA agrees that the POV can be a useful tool to ensure compliance with the Mine Act.  However, the proposed rule on the table now is simply too far-reaching to be approved.  It is our position that this is being proposed as an administrative convenience for dealing with a self-imposed problem and it aims to shamelessly destroy basic civil liberties.  For the reasons already stated, WVCA respectfully opposes the implementation of this rule.

**From:** Douglas Larch [mailto:douglas.larch@gmail.com]
**Sent:** Saturday, August 13, 2011 10:43 PM
**To:** zzMSHA-Standards - Comments to Fed Reg Group
**Subject:** Pattern of violations

2011 AUG 15  A 11: 49

I would reccomend enforcing the rules you already have. If the inspectors used the tools at their disposal consistently and correctly you would not need additional rules. Ensuring that all inspectors go to Beckley as the Act requires would be a terrific starting point. Then making sure you inspectors are consistent in their enforcement effort would be next. Finally consistent supervision and guidance for inspectors is the final piece to your reletively simple puzzle.

AB73 - LATE-Comm-2

# TRANSCRIPT OF PROCEEDINGS

```
IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )
```

```
Pages:     1 through 117

Place:     Denver, Colorado

Date:      June 2, 2011
```

# ANTHONY & ASSOCIATES, INC.

770. 590. 7570

ANTHONY & ASSOCIATES, INC.
770. 590. 7570

AB73-PH-1

IN THE MINE SAFETY AND HEALTH ADMINISTRATION


IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )


                        Denver, Colorado

                        Thursday
                        June 2, 2011


        APPEARANCES


        MSHA Panel:  PATRICIA W. SILVEY, JAY MATTOS,
CHERIE HUTCHISON, ANTHONY JONES


        Speakers:

        MIKE CRUM, Safety Team Leader, FMC Corporation,
FMC Westvaco Mine; Chairman of the Mining Awareness
Resource Group
        MARK SAVIT, Counsel, Mining Awareness Resource
Group
        MATTHEW PEDERSEN-HOWARD, Director of Health and
Safety, Rio Tinto Minerals
        JERRY GLYNN, Financial and Safety Manager for the
Expanded Shale & Clay Group, Texas Industries
        ROBERT BUTERO, United Mine Workers
        TIM McCREARY, Safety Manager, Thunder Basin Coal
Company


                **ANTHONY & ASSOCIATES, INC.**
                **770.590.7570**

1                    P R O C E E D I N G S

2                                          (10:36 a.m.)

3            MODERATOR SILVEY:  Again, good morning.

4            AUDIENCE:  Good morning.

5            MODERATOR SILVEY:  My name is Patricia W.

6   Silvey.  I'm the Deputy Assistant Secretary for

7   Operations for the Mine Safety and Health Administration.

8   And I will be the Moderator of this public hearing on

9   MSHA's Proposed Rule on Pattern of Violations.

10           On behalf of Assistant Secretary of Labor,

11  Joseph A. Main, I would like to welcome all of you here

12  today.

13           At this point, I would like to introduce the

14  members of the MSHA panel.  To my left, Jay Mattos, who

15  is the Chair of the Pattern Rulemaking Committee; to my

16  right, Cherie Hutchison, who is with the Office of

17  Standards and Regulations; and to her right, Anthony

18  Jones, who is with the Department of Labor, Office of the

19  Solicitor -- in other words, our lawyer on the project.

20           In response to requests from the public, MSHA

21  is holding public hearings on its Pattern of Violations

22  proposed rule.  This is the first of four public hearings

23  on the proposed rule.

24           As you heard me say in the prior hearings,

25  because this hearing is being held in tandem with the

4

1    Proposed Rule on Examination Of Work Areas, so it's at

2    Charleston, West Virginia on June 7th; in Birmingham,

3    Alabama on June 9th; and in Arlington, Virginia on

4    June 15th.

5              The Pattern of Violations proposal applies to

6    all mines -- coal and metal and nonmetal, surface and

7    underground.  In the back of the room, we have copies of

8    the Federal Register that contains the proposal.

9              The purpose of the hearing is to receive

10   information from the public that will help MSHA evaluate

11   the requirements in the proposal and produce a final rule

12   that will improve safety and health conditions in mines.

13             Each hearing will be conducted in an informal

14   manner.  Formal rules -- as many of you who have

15   participated in MSHA hearings know, formal Rules of

16   Evidence will not apply.

17             The hearing panel may ask questions of the

18   speakers.  And, quite frankly, the speakers can ask

19   questions of the hearing panel.  Speakers and other

20   attendees may present information to the court reporter

21   for inclusion in the rulemaking record.

22             MSHA will accept written comments and other

23   appropriate information for the record from any

24   interested party, including those who are not presenting

25   oral statements.  We ask that everyone in attendance sign

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    the attendance sheet, as I stated earlier, so that we

2    will at least have a record of people who attended the

3    hearing, even though they may not have spoken.

4         Those of you who notified MSHA in advance of

5    your intent to speak will make your presentations first,

6    but others who wish to speak will be given an opportunity

7    to do so.  If you have a hard copy or electronic version

8    of your presentation, please provide a copy to the court

9    reporter.

10        The post-hearing comments for the proposed rule

11   ends June 30th.  MSHA must receive your comments by

12   midnight, Eastern Daylight Savings Time on that date.  As

13   you know, MSHA provides -- is proposing to revise the

14   Agency's existing regulations for Pattern of Violations.

15   MSHA determined that the existing Pattern of Violations

16   regulation does not adequately achieve the intent of the

17   Federal Mine Safety and Health Act of 1977, or the Mine

18   Act.

19        Congress included the Pattern of Violations

20   provision, which you know was a new provision, in the

21   1977 Mine Act.  Congress included that provision so that

22   operators would manage safety and health conditions at

23   their mines and find and fix the root causes of

24   significant and substantial, or S&S, violations to

25   protect the safety and health of mines.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    Congress intended that MSHA use the Pattern of

2 Violations provision to address operators who have

3 demonstrated a disregard for the safety and health of

4 miners.  MSHA intended that the proposal would simplify

5 the existing Pattern of Violations criteria, improve

6 consistency in applying the Pattern of Violations

7 criteria, and more adequately achieve the statutory

8 intent.

9    The proposal would also encourage chronic

10 violators to comply with the Mine Act and MSHA's safety

11 and health standards.  MSHA requested comments from the

12 mining community on all aspects of the proposed rule and

13 is particularly interested in comments that address

14 alternatives to key provisions in the proposal.

15    The preamble to the proposal discusses the

16 provisions in the rule and includes a number of specific

17 requests for comment and information.  The proposed rule

18 would provide that the specific criteria, as you know --

19 let me back up.  The proposed rule includes the general

20 criteria that MSHA would use to review a mine for a

21 pattern of violation.

22    Then the proposed rule would provide that the

23 specific criteria used in the review to identify mines

24 with a pattern of significant and substantial violations

25 would be posted on MSHA's website.  In the preamble to

1  the proposal, MSHA requested suggestions on how the

2  Agency should obtain comments from mine operators and

3  miners during the development of and periodic revision to

4  the specific POV criteria.

5  MSHA also requested comments on the best

6  methods for notifying mine operators of changes to these

7  criteria.  MSHA has received a number of comments on the

8  Pattern of Violations proposal.  So in the public hearing

9  notice, we refined our position further.

10  And as stated in the public hearing notice, for

11  those of you who read the notice, MSHA plans to provide

12  any change to the specific criteria to the public for

13  comment via posting on the Agency's website before MSHA

14  uses it to review a mine for a Pattern of Violations.

15  So, in other words, we would obtain comments from

16  stakeholders before we revise the specific criteria and

17  use it to review a mine for a Pattern of Violations.

18  MSHA plans to review and respond to any

19  comments received and revise, as appropriate, the

20  specific criteria and post it on the Agency's website.

21  In other words, we would post our response to any

22  comments.  And we would also post any revised specific

23  criteria on the Agency's website.  MSHA requests comments

24  on this approach -- proposed approach to obtaining public

25  input into revisions to the specific Pattern of

1    Violations criteria.

2             MSHA also requested comments on the burden

3    that monitoring a mine's compliance record against the

4    proposed specific POV criteria using the Agency's website

5    would place on mine operators.  MSHA asked that

6    comments -- commenters include detailed rationale and

7    supporting documentation for any comment or suggested

8    alternative.

9             And, at this point, I do want to bring to you

10   alls' attention that you -- most of you know -- some of

11   you know that MSHA has developed a web tool that

12   operators can use to, basically, put in their mine ID

13   number.  And then it will populate the data for that

14   particular mine would be populated on this web tool.  And

15   it will show you where you are within the range

16   of approaching the specific POV criteria, so ...

17            And I hope that at least some of you have found

18   that useful.  And we have gotten some responses from some

19   mine operators.  And they are, indeed, using it.  I

20   gathered that a week ago on our website and determined

21   how many people by the number of hits that we've gotten

22   on that particular tool.

23            MR. MATTOS:  And it's been about 800 a week.

24            MODERATOR SILVEY:  Okay.  Thank you.

25            To be considered as a mitigating circumstance,

1 the proposed rule would provide that an operator may

2 submit a written safety and health management program to

3 the District Manager for approval.  MSHA would review the

4 program to determine whether the program parameters would

5 result in meaningful, measurable, and significant

6 reductions in S&S violations.

7    MSHA would like to clarify at this point,

8 because we've gotten some comments on this issue so far

9 so we would like to clarify that the Agency did not

10 intend that these safety and health management programs

11 be the same as those referenced in the Agency's

12 rulemaking on comprehensive safety and health management

13 programs.

14    Rather, MSHA would consider a safety and health

15 management program as a mitigating circumstance in the

16 Pattern of Violations proposal when it (1) includes

17 measurable benchmarks for abating specific violations

18 that could lead to a Pattern of Violations at a specific

19 mine, and (2) addresses hazardous conditions at that

20 mine.

21    MSHA also requested detailed information and

22 data on the cost, benefits, and feasibility of

23 implementing the proposed provisions.  MSHA requested

24 specific comments on its estimates of numbers of mines

25 affected, which are likely to vary from year to year.

```
 1              As you address the proposed provisions, either
 2      in your testimony to us today or in your written
 3      comments, please be as specific as possible about how
 4      changes would affect the safety and health of mines.  But
 5      also, if you have -- and you heard me say this in the
 6      prior hearing, those of you who were here, if you have
 7      specific alternatives to the provisions we've proposed,
 8      please be as specific as possible in your alternatives,
 9      in your -- any suggested rationale for your alternatives,
10      in the impact or the benefit to the health and safety of
11      miners, and any information that you might have on cost
12      data or other data in that regard.
13              MSHA will make available transcripts of all the
14      public hearings approximately two weeks after the
15      completion of the hearing and, as you all know, you may
16      view the transcripts on www.regulations.gov or on MSHA's
17      website at www.msha.gov.
18              And we will now begin the testimony.  And
19      please begin by clearly stating your name and
20      organization and spelling your name so the court reporter
21      will have an accurate record.
22              And now we will go to our first speaker.  Our
23      first speaker is Mike Crum on behalf of MARG, which I
24      believe is the Methane Awareness Resources Group.  You
25      know, everybody likes to use acronyms.  We are not
```

```
 1    in D.C. now, so spell out your organization.  That was
 2    humor, so in case you all don't know that.  And Mark
 3    Savit, who is MARG's -- MARG -- M-A-R-G, apostrophe
 4    "s" -- who is their learned counsel.  That was a little
 5    humor too.  The --
 6              MR. SAVIT:  I --
 7              MODERATOR SILVEY:  The learned part.
 8              MR. SAVIT:  I laughed -- for the record,
 9    I laughed.
10              MODERATOR SILVEY:  Okay.  Okay.
11              MR. MATTOS:  I think it was more of a chuckle,
12    but --
13              MODERATOR SILVEY:  Okay.  Thank you.  All
14    right.  We can -- we will begin.
15              MR. CRUM:  Good morning.  My name is Mike
16    Crum -- M-I-K-E, C-R-U-M.  I'm employed by FMC
17    Corporation as a safety team leader at the FMC Westvaco
18    Mine.  And I serve as Chairman of the Mining Awareness
19    Resource Group, or MARG.
20              MARG is a coalition dedicated to protecting its
21    employees and the environment.  MARG members include FMC;
22    Cargill Salt; Detroit Salt; Morton Salt; Mosaic Potash;
23    Tata Chemicals, formerly known as General Chemical; and
24    other mining interests that support our efforts.
25              MARG seeks to ensure that the laws and
```

1    regulations are feasible, effective, based on sound

2    science, and implemented and enforced fairly.  MARG

3    represents its members in select matters, which impact

4    the mining industry before the Federal agencies, the

5    Congress, and the Courts.  MARG also serves its members

6    by providing a forum for communication and the exchange

7    of information and by creating coalitions to assist in

8    achieving common goals.

9            Today, I present MARG's comments on the MSHA

10   proposed rule on patterns of significant and substantial,

11   S&S, violations.  MARG seeks a transparent and fair rule

12   for the use of MSHA's most severe civil enforcement tool,

13   closure orders resulting from a pattern of S&S

14   violations.  Unfortunately, the proposed rule is neither

15   transparent, nor fair, is contrary to law, and must be

16   reopened and reproposed.

17           The first fundamental problem with the MSHA

18   proposal is that it withholds for future web posting the

19   actual criteria the Agency will use for pattern

20   determinations.  By not disclosing, proposing, and

21   adopting the criteria through notice and comment

22   rulemaking, MSHA prevents full analysis of the rule's

23   impact and a meaningful opportunity for interested

24   parties to comment on the proposal.

25           As a result, we believe that the proposed rule

```
 1   violates the Administrative Procedures Act, APA, and Mine
 2   Act rulemaking mandates.  For example, Section 104(e)(4)
 3   of the Mine Act authorizes the secretary to "make such
 4   rules as he deems necessary to establish criteria for
 5   determining when a Pattern of Violations of mandatory
 6   health or safety standards exists."  By not disclosing
 7   the criteria and publishing them for comment, MSHA
 8   exceeds its authority and violates its Mine Act mandate.
 9            Second, if adopted, the proposed rule will
10   result in closure orders issued against employment sites
11   before the employer has an opportunity to:  (1) discuss
12   the alleged pattern with the Agency; (2) contest the
13   validity of alleged citations or orders used to identify
14   a pattern; (3) address the accuracy of Agency data used
15   for pattern identification; or (4) obtain a judicial
16   review of alleged violations constituting a pattern.
17            The proposed rule, if adopted, will deny mine
18   operators Mine Act Section 105 citation and penalty
19   contest rights and due process of law by permitting the
20   use of contested violations to impose pattern closure
21   orders.  The contest provisions of the Act provide
22   critical protections against improperly issued citations.
23   MSHA's elimination of contest rights and the protection
24   they provide is not authorized by the Mine Act.
25            In addition, the proposed rule will eliminate
```

1    the current rule's notice of a proposed pattern and the

2    established opportunities to demonstrate to MSHA that the

3    proposed pattern is based on erroneous data, a common

4    occurrence in the overloaded MSHA database.  This current

5    system has proven critical to prevent inapplicable and

6    incorrect pattern enforcement and invalid mine closure

7    orders.

8          Further, contrary to the purpose of the Mine

9    Act, the proposed rule's elimination of the Notice of

10    Potential Pattern will deny mine operators and their

11    employees an opportunity to improve their performance and

12    then -- and, thereby, their safety record.

13          If adopted, the proposed rule will require mine

14    operators, if they wish to gain future MSHA consideration

15    of mitigating circumstances prior to pattern closure

16    order issuance, to submit safety and health management

17    programs to MSHA for approval.  By doing so, the proposed

18    rule seeks to impose a new substantive safety standard

19    program mandate, bypassing the rulemaking provisions of

20    the Act.

21          Separate and distinct rulemaking procedures

22    have been announced at both OSHA and MSHA to determine if

23    company safety program mandates should be required and,

24    if so, what program mandates should be adopted through

25    those separate rulemaking procedures.  By seeking to

1    adopt safety program mandates through this unrelated

2    pattern rulemaking, MSHA engages in an end run around

3    Mine Act Section 101 mandatory rulemaking for safety and

4    health standards.

5           The very concept of determining whether there

6    is a Pattern of Violations, which are of such nature as

7    could have significantly and substantially contributed to

8    the cause and effect of mine health or safety hazards,

9    requires the consideration of the circumstances

10   surrounding the citations and possible hazards, including

11   the impact of the safety program in place at the mine.

12           Mandating MSHA advance approval of a safety

13   program, as proposed in this pattern rulemaking, violates

14   the Agency's duty to consider the mine's safety program

15   as a hazard mitigating circumstance, regardless of

16   whether MSHA knew of the program, let alone approved it,

17   in advance.

18           MSHA does not have authority to attach such a

19   precondition, with its associated mine operator burden,

20   to the exercise of its statutory duty to evaluate the

21   circumstances surrounding suspected violations before

22   issuing closure orders.

23           We understand the need for fair and equitable

24   use of MSHA enforcement tools to achieve safety, as well

25   as a need to reform the troubled MSHA enforcement system.

1   We do not believe, however, that this flawed proposal

2   will enhance safety, nor comply with the mandates of the

3   Mine Act, the APA, and the due process protections of the

4   Constitution.

5          We urge you to revoke, revise, and repropose

6   this rule.  Thank you for allowing me to testify on

7   behalf of MARG.

8          MODERATOR SILVEY:  Thank you.

9          MR. SAVIT:  My name is --

10         MODERATOR SILVEY:  I'll have comments at the

11  end of both of yours.

12         MR. SAVIT:  Okay.  My name is Mark Savit.

13  M-A-R-K; S-A-V, like Victor, I-T.  And I also represent

14  the Mining Awareness Resources Group as counsel.

15         And I wasn't here really to testify about what

16  has already been said in the written remarks, which we'll

17  be glad to provide to the reporter at the close of our

18  testimony.

19         However, there are a couple of issues that have

20  come up based on the notice of the hearing, which

21  Ms. Silvey mentioned, that I'd like to address and a

22  couple other issues that I'd like to just bring to the

23  panel's attention, as well as raising a question or two

24  of the panel with regard to some of the representations

25  in the proposed rule.

1          The first one that I'd like to bring to the

2    panel's attention is that the panel has now -- or the

3    Agency has now announced in its Notice of Hearing two

4    different things; one about safety and health management

5    programs, and one about making criteria available for

6    comment.

7          It seems to me that the rulemaking, at the very

8    least, needs to be reopened so that those who are not

9    here to make direct comments through oral testimony have

10   an opportunity to comment on what the Agency said when

11   it filed its Notice of Hearing with regard to announcing

12   criteria, enforcing comment, and what type of safety and

13   health management program would be.

14         It is not -- it doesn't comply with the

15   Administrative Procedure Act for the Agency to give

16   rolling targets to comment on and then not provide

17   general comment periods for the entire industry, or all

18   the stakeholders to provide --

19         MODERATOR SILVEY:  Yeah.  I would disagree with

20   you on that.  But we are not going to argue that point

21   here.

22         MR. SAVIT:  Well --

23         MODERATOR SILVEY:  The -- no.

24         MR. SAVIT:  Okay.

25         MODERATOR SILVEY:  Let me just -- the notice

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    was given to everybody broadly in the public hearing

2    notice.  The opportunity for a public hearing is for that

3    portion of the mining industry who wishes to avail

4    themselves, either who requested to come to the public

5    hearing or who wishes to avail themselves of the

6    opportunity for a public hearing.

7              But we provided through the mechanism that is

8    required by the Administrative Procedure Act -- I'm just

9    saying this for the benefit of everybody in here and --

10   by the Administrative Procedure Act and the Mine Act.  We

11   provide the form for proper notice of a government to

12   provide any notice to the public.  And that was through

13   the Federal Register.

14             So in any event -- and, obviously, that's why

15   they have lawyers in the world because people disagree on

16   various approaches that one can take.  But, in any event,

17   if you would proceed with your testimony, Mr. Savit.

18             MR. SAVIT:  Clearly, we disagree.  But I need

19   to --

20             MODERATOR SILVEY:  Okay.  But I said -- yeah,

21   we are -- obviously, we are not going to argue that

22   point.  So if you would --

23             MR. SAVIT:  But I didn't ask to argue it.

24             MODERATOR SILVEY:  No, I understand.

25             MR. SAVIT:  But I needed to put that point on

1  the record --

2          MODERATOR SILVEY:  Okay.  I said --

3          MR. SAVIT:  -- because it's not otherwise in

4  it.

5          MODERATOR SILVEY:  -- if you would proceed with

6  your testimony.

7          MR. SAVIT:  Let me offer a comment or two on

8  both of those issues.

9          First of all, with regard to the Agency's offer

10  to -- which it doesn't seem to be codified anywhere,

11  although it's an offer that's made in the Notice of

12  Hearing, but doesn't appear in the proposed rule, to

13  provide some comment period and some notice of what the

14  criteria would be.

15          My first impression of why that doesn't

16  suffice, based on the testimony we gave, is because the

17  criteria would not be subject to challenge under the APA

18  if the Agency considers them not to be a part of the

19  substantive rule, but merely measurements of how you

20  would comply with the rule.  And the Agency has taken

21  that position over and over and over again.

22          We would submit that it is those criteria that

23  need to be challengeable because the rest of the rule

24  really doesn't have any substance.  And if you propose

25  criteria, no matter whether you offer a comment period or

1    not, you've tried to exclude those criteria from formal

2    challenge.  And that is an inadequacy.

3            The second piece I want to address is this

4    issue about safety and health management plans.  It is in

5    my opinion -- and we will undoubtedly disagree, so

6    I'll let you know you disagree with me in advance.

7            MODERATOR SILVEY:  No, I don't know.  I haven't

8    heard -- I haven't heard --

9            MR. SAVIT:  Oh, you will.

10           MODERATOR SILVEY:  I haven't heard your opinion

11   yet.

12           MR. SAVIT:  Ms. Silvey, we've known each other

13   a long time.

14           MODERATOR SILVEY:  I know.

15           MR. SAVIT:  I know you'll disagree with it

16   that --

17           MODERATOR SILVEY:  He knows.

18           MR. SAVIT:  -- that it is disingenuous of the

19   Agency to say on the one hand, here is a request for a

20   comment asking all of the stakeholders to tell us what

21   ought to be in a comprehensive safety and health

22   management plan; and then to say, here are criteria for

23   safety and health management plans, which would be

24   considered mitigating circumstances under this rule.

25           What that means is that the Agency has already

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    determined that some criteria, other than those which are

2    a little bit hazy and, once again, not promulgated and

3    not proposed as a rule, show criteria other than those

4    that would be used by the District Managers to approve

5    safety and health management plans as mitigating

6    circumstances under the Pattern of Violations rule would

7    be added to any other requirements for a safety and

8    health management plan that is on which comments are now

9    being solicited.

10          So to say, we want all your comments and

11   we'll -- we will take them to heart, and we'll act on

12   them, but we want you to use these other safety and

13   health management programs, which may -- which won't be

14   the same as the ones we're soliciting comments on means

15   the Agency has already made its decision that criteria

16   other than those, or in addition to those, that would be

17   required to be considered by the District Managers of

18   mitigation have to be -- would have to be included in a

19   comprehensive safety and health management plan that

20   would be adopted under the other rule.

21          The -- those, I think, are a bit technical

22   legal points.  I would ask -- I would just make a couple

23   comments and ask a question.

24          The first comment is, I personally have availed

25   myself of the new web tool with regard to Pattern of

ANTHONY & ASSOCIATES, INC.
770.590.7570

1  Violations and found it to have been in error at least

2  once in a very major way --

3            MODERATOR SILVEY:  Okay.

4            MR. SAVIT:  -- where a mine did not meet all of

5  the criteria under category A, but yet the answer in the

6  right-hand column said, *yes,* anyway.  That leaves me to

7  think that maybe the Agency is ignoring some of the

8  criteria or maybe they're reading it way different than I

9  am.

10           But in a case where in category A is no -- or

11  one of the criteria is that a certain percentage of S&S

12  citations must meet heightened negligence requirements.

13  The mine was well below that; but yet it said, Yes, you

14  meet all the criteria in category A.

15           MODERATOR SILVEY:  Did you bring that to

16  anybody's attention at MSHA?

17           MR. SAVIT:  Well --

18           MODERATOR SILVEY:  Particularly, Mr. Mattos?

19           MR. SAVIT:  I haven't yet.

20           MODERATOR SILVEY:  Can you give us that

21  specific incident?

22           MR. SAVIT:  I'll be glad to talk to you --

23           MODERATOR SILVEY:  Okay.

24           MR. SAVIT:  -- about that specific person --

25           MODERATOR SILVEY:  Okay.

1          MR. SAVIT:  -- but off the record.  I don't

2   want to put that mine's name --

3          MODERATOR SILVEY:  No.

4          MR. SAVIT:  -- in play in a -- in a --

5          MODERATOR SILVEY:  Okay.  Well, off the record,

6   though, if you would just let us know.  We --

7          MR. SAVIT:  -- public hearing.

8          MODERATOR SILVEY:  I think we would like to

9   know that.  I mean, not think.  I know we would like to

10  know that.

11         MR. SAVIT:  It is --

12         MODERATOR SILVEY:  Okay.

13         MR. SAVIT:  Okay.  It's --

14         MODERATOR SILVEY:  Okay.  No.  And I don't want

15  it to do any --

16         MR. SAVIT:  It is incorrect on at least once.

17         MODERATOR SILVEY:  -- any harm to that

18  particular mine either.  Yeah.

19         MR. SAVIT:  And that brings me to the next

20  point about economic impacts.  One of the things that the

21  Agency has failed to consider that has, in fact, occurred

22  is that when the POV notice, coupled with the Dodd-Frank

23  reporting requirements --

24         MODERATOR SILVEY:  Uh-huh.

25         MR. SAVIT:  -- have come out, we actually

1    represent a non-MARG member who was on the potential POV

2    list in the last draft.

3              MODERATOR SILVEY:  Uh-huh.  Uh-huh.

4              MR. SAVIT:  They did not get a Pattern of

5    Violations notice.  When -- they actually are not even

6    a U.S. stocks filer, but they made the announcement

7    anyway.  After making the announcement, their stock

8    dropped 15 percent.  That economic impact is nowhere

9    addressed --

10             MODERATOR SILVEY:  Yeah.

11             MR. SAVIT:  -- in any of this, in any of the

12   materials.  And I needed to say that it far exceeds any

13   economic harm that could have resulted from the

14   imposition of the debtor.

15             MODERATOR SILVEY:  It could -- it could

16   possibly be unlimited.  It could be -- it could possibly

17   be unquantifiable, in my opinion, in terms of -- you know

18   what I'm trying to say.  I -- that --

19             MR. SAVIT:  I understand what you're saying,

20   but --

21             MODERATOR SILVEY:  -- that I don't know what

22   the projection is.  But on that issue, the

23   Dodd-Frank Act --

24             Who passed the Dodd-Frank Act?

25             MR. SAVIT:  I, I don't -- we don't need to --

1         MODERATOR SILVEY:  I know.  That was -- that

2    was -- no.

3         MR. SAVIT:  -- engage in a dialogue about this.

4         MODERATOR SILVEY:  That was a little -- that

5    was a little rhetorical, but only a little.

6         All I'm saying on the Dodd -- really.  Only --

7    seriously, only a little rhetorical.

8         The Dodd-Frank Act was passed by Congress.

9    That's all I'm saying.

10        MR. SAVIT:  I understand that.

11        MODERATOR SILVEY:  Okay.  All right.

12        MR. SAVIT:  However, however, this company

13   isn't even a U.S. filer --

14        MODERATOR SILVEY:  Well --

15        MR. SAVIT:  -- and under current rules isn't

16   required to make a disclosure under Dodd-Frank.

17        MODERATOR SILVEY:  I don't know.  I don't know

18   the --

19        MR. SAVIT:  No.  I'm just telling you the

20   facts.

21        MODERATOR SILVEY:  Yeah.

22        MR. SAVIT:  And, yet, because of the --

23        MODERATOR SILVEY:  Well --

24        MR. SAVIT:  -- press releases and announcements

25   that the Agency has made about Potential Pattern of

1   Violations, their stock dropped 15 percent.

2          MODERATOR SILVEY: Okay. Well, that --

3          MR. SAVIT: I understand maybe --

4          MODERATOR SILVEY: Yeah.

5          MR. SAVIT: -- unquantifiable, but it needs to

6   be taken into account --

7          MODERATOR SILVEY: But -- yeah. But you

8   understand --

9          MR. SAVIT: -- in some -- in some way. That,

10   that's where I -- that's what I'm trying to say.

11          The last question I would ask is in -- I

12   have -- let me make one more comment and then ask the

13   question.

14          The elimination of the Notice of Potential

15   Pattern, I think, bothers everybody, including the MARG

16   group, more than almost anything else.

17          And the rationale for it seems to be, based on

18   what I have read from the Agency, that too many companies

19   who receive pattern notices actually do what the Agency

20   wants them to do and improve their performance. And,

21   therefore, the Agency isn't issuing enough Section 104(e)

22   pattern violations.

23          And this seems like a way in which enforcement

24   is glorified above the goal that it is intended to

25   achieve, which is to induce the companies that get the

 1   potential pattern to change their behavior.  That goal is

 2   being accomplished almost 100 percent by the potential

 3   notice.  And, yet, the Agency proposes to eliminate it

 4   for reasons that I can't fathom based on the data that's

 5   been presented.

 6           Speaking of data, the last bit of data I would

 7   like to see from the Agency is on page 5721 of the

 8   proposed rule.  And it says that MSHA data and experience

 9   show that violations of approval, training, or

10   record-keeping regulations, for example, can

11   significantly and substantially contribute to safety or

12   health hazards.

13           I would respectfully request at this time that

14   that data be released and the experience be described

15   with some particularity.  Thank you.

16           MODERATOR SILVEY:  Okay.  Thank you.

17           Now, I have a few comments.  And I'm going to

18   say this to everybody, not meaning that -- I would ask

19   people -- obviously, these are public hearings and people

20   can make whatever comments they wish to me, whether they

21   have a basis in fact or no basis in fact.  That's why we

22   are here.

23           But I would ask you to please repeat -- read

24   the proposed rule, read MSHA's -- any further

25   representations MSHA makes at each advanced stage in the

1     process. People who deal with notice and comment

2     rulemaking know how the process is done. They know, in

3     fact, that the Agency can refine its position at either

4     step, at either point in time.

5           Obviously, people can agree or disagree with

6     the Agency. But I ask you to look at it in an objective

7     manner, in a non-emotional manner, and to provide us

8     as clearly as you can your comments.

9           Now, in regard to that, let me go back

10    and start to see if we can bring a little clarity to the

11    comments so far, because all I've heard is that the

12    proposed rule we issued -- all I've heard are legal

13    principles, sort of.

14          Now, for those of you who don't happen to

15    know -- and I don't know why I say this either. I happen

16    to be a lawyer, but not MSHA's lawyer. And I hasten to

17    tell that to everybody because I have never, but I've

18    heard that the proposed rule violates the Mine Act,

19    the APA, and the due process clause of the Constitution.

20          And I will go back and say that -- and when we

21    proposed this rule, we intended to hopefully bring some

22    clarity to a process, to a tool that the Congress

23    included in 1977; and that the Congress, indeed, intended

24    for the Agency to use. But we hope to fashion a rule

25    that could be used in a more consistent and in a more

1    clear manner.

2          But that's one reason agencies go through

3    rulemaking.  They go through rulemaking to hear comments

4    from the public and to try to get alternatives, specific

5    alternatives, to a proposal published by the Agency.

6    And any specific comments that would help us would be

7    alternatives to what we proposed.

8          So with that being said, in terms of a -- I go

9    back first to Mr. Crum.  There were a few things in

10   your comments that I wanted -- if at all possible, if you

11   could clarify.  And that is at one point you gave four

12   things that this rule would not allow you all to do, one

13   of which was to discuss allege -- if you can remember

14   your four points.

15         It was in this place in your testimony.  You

16   said discuss alleged patterns with the Agency.

17         Do you remember when you said that?

18         MR. CRUM:  Yep.

19         MODERATOR SILVEY:  Can you repeat those four

20   things for me again, please?

21         MR. CRUM:  (1) Discuss the alleged pattern with

22   the Agency; (2) contest the validity of alleged citations

23   or orders used to identify a pattern; (3) address the

24   accuracy of Agency data used for pattern identification;

25   or, (4) obtain judicial review of alleged violations

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    constituting a pattern.

2            MODERATOR SILVEY:  Okay.  Let's go -- let's

3    take those, each one.

4            When you say would not allow to discuss alleged

5    patterns with the Agency, what did you mean there,

6    please?  Just, you know, for the record so I'll fully

7    understand what you meant.

8            MR. CRUM:  Well, as we understand the rule,

9    the pattern letter comes to the operator right now, and

10   you have to start the process of defending yourself.  So

11   there's no up-front warning.  There's no up-front notice

12   saying: Hey, you guys are getting close; you need to make

13   some changes, or we need to review your data.

14           MODERATOR SILVEY:  Well, that was the purpose,

15   though, of doing the web too.  But when you say discuss

16   alleged pattern with the Agency, in point of fact, under

17   the existing -- you can discuss the pattern, the alleged

18   pattern, with the Agency.

19           There is -- there -- you know, there is a

20   process for -- even if you get a pattern letter, the -- I

21   just -- I couldn't understand exactly what you meant

22   there.  That's what I'm trying to figure out, exactly

23   when you say discuss alleged pattern with the Agency.

24           And the second was what?  Give me the second

25   one?

1              MR. CRUM:  Contest the validity of alleged

2    citations orders --

3              MODERATOR SILVEY:  Okay.

4              MR. CRUM:  -- used to identify a pattern.

5              MODERATOR SILVEY:  And the third one was --

6              MR. CRUM:  Address the accuracy of Agency data

7    used for pattern identification.

8              MODERATOR SILVEY:  And what did you mean by

9    that one?  Address the accuracy --

10             MR. CRUM:  Oh.  Just --

11             MODERATOR SILVEY:  -- of the data?

12             MR. CRUM:  Mr. Savit pointed out a discrepancy

13   that he has already found within the web tool.

14             MODERATOR SILVEY:  So that's the -- that's an

15   example of what you're talking about there.  Because

16   later on in your testimony, you said also something about

17   based on erroneous data.  And I wanted -- do you remember

18   that statement?  And I would like you to explain that.

19   You know, you -- I was trying to make notes where there

20   were parts that I didn't understand.  So I don't know

21   exactly where it was in your testimony.

22             MR. CRUM:  Would --

23             MODERATOR SILVEY:  Something about based on

24   erroneous data.  So just if you could give me an example

25   if -- so then we can try to get to at least know what

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    you're talking about so we can fix --

2              MR. SAVIT:  If the panel would allow me to

3    answer that --

4              MODERATOR SILVEY:  Okay.  Okay.

5              MR. SAVIT:  -- on behalf of MARG.  I will speak

6    from personal experience involving non-MARG members.

7              MODERATOR SILVEY:  Uh-huh.

8              MR. SAVIT:  I've represented four or five mines

9    that have received potential pattern notices.  Every one

10   of them has contained either erroneous numbers of

11   citations, included contractor citations that weren't to

12   be included with the operator, had mistakes in the

13   severity rate or reporting issues, or otherwise had

14   included vacated citations or modified citations.

15             MODERATOR SILVEY:  Okay.  Uh-huh.

16             MR. SAVIT:  I have never found one in which all

17   of the data were entirely accurate.

18             MODERATOR SILVEY:  Okay.

19             MR. SAVIT:  And that discussion prior to the

20   issuance of a notice would be eliminated in the proposed

21   rule because the notice -- there would be no notice of a

22   potential pattern.

23             MODERATOR SILVEY:  Uh-huh.  Okay.  But --

24             And in response to Mr. Crum and Mr. Savit, just

25   so everybody knows, the reason that the Agency proposed

1   to eliminate Potential Pattern of Violations is because

2   when you look at the plain -- even though it is in the

3   existing rule, when you look at the plain language of the

4   Mine Act, the Mine Act says a Pattern of Violations.

5           The Mine Act does not say anything about a

6   Potential Pattern of Violations.  Obviously -- and I will

7   say to you all because the comments are on MSHA's

8   website, and you can go and look at them.  We have gotten

9   a lot of comments about the proposed elimination of that

10  provision.

11          So just so you and so -- and your concern about

12  it or some -- let me put it this way.  Maybe not concerns

13  from everybody, but concerns from some members of the

14  mining community.  But the comments are public record, so

15  everybody can go and look at them.

16          MR. CRUM:  Ms. Silvey?

17          MODERATOR SILVEY:  Yes?

18          MR. CRUM:  I'd also like to bring to the

19  panel's attention probably three or four or maybe five

20  years ago when numerous mining operations across the

21  country received the pattern notice erroneously, that

22  came through out of the MSHA database, which was

23  subsequently rescinded and notification provided.

24          MODERATOR SILVEY:  A pattern notice or a

25  potential pattern notice?

1          MR. CRUM:  A potential pattern notice.

2          MODERATOR SILVEY:  A potential pattern notice.

3     I was going to say not a pattern notice.

4          MR. CRUM:  Right.  Excuse me.

5          MODERATOR SILVEY:  Okay.  Let's get out --

6     yeah.  Okay.  The next point I would like to turn to --

7     and this is kind of -- it's for both of you.  If --

8     because it seems to me that there is still some confusion

9     on this issue of safety.

10          And, Mr. Crum, you've mentioned it in your

11    testimony.  And then Mr. Savit mentioned it again, the

12    safety and health management program.

13          So as not to confuse the safety and health

14    management program that's referenced in this proposed

15    pattern rulemaking with the safety and health --

16    comprehensive safety and health -- and I'll try to

17    clarify that -- with the comprehensive safety and health

18    management program that was the subject of public

19    meetings about a year ago in MSHA.  Those are two

20    separate entities.

21          That rulemaking may or may not go forward, that

22    safe -- comprehensive safety and health management

23    program.  Those are by purpose intended to be different

24    programs.  That comprehensive safety and health

25    management program was intended to address a safety and

1    health management program of an entire company.

2              As I said this morning -- from earlier this

3    morning from the person who works on the shops, the

4    responsibilities of the person who works on the shop

5    floor up to and including the CEO for addressing safety

6    and health at that mine overall globally.

7              This safety and health management program is

8    intended to be directed -- it's a different -- one has

9    nothing to do with the other.  It's intended to be -- and

10   it's elective.  That's the most significant thing I want

11   to say to people here.  I wrote that down somewhere.

12   It's elective.

13             It's for operators -- only operators who

14   wish -- who may see -- who may -- who may see that they

15   may be approaching a Pattern of Violations and wish to

16   come in to MSHA and avail themselves of that mitigating

17   circumstance provision in the proposed rule, whatever

18   section it was -- something, something, something 88, I

19   think.

20             And I forget what the -- what 104 something 88,

21   if I'm not mistaken -- who wish to avail -- see that they

22   are approaching a Pattern of Violations and come into

23   MSHA and say, I want to submit to you, MSHA, Mr. District

24   Manager, a safety and health management program aimed at

25   the areas in which my mine is experiencing S&S violations

1    that draw me within the ambit of this specific criteria;

2    albeit, as you said, Mr. Savit, the specific criteria

3    that's not included in the proposed rule.

4            Now, I've given you that one because that is

5    the way the rule is so constituted.  And we -- I'm going

6    to discuss that in a few minutes.  But if an operator --

7    if Joe Blow operator sees that he's within, you know, who

8    knows?  He's as close as 85 percent to what the specific

9    criteria are, and then says:  Well, I'll -- I may get to

10   a hundred; I may fall within that in the next month; but,

11   rather than do that, I'm going to come up with -- maybe

12   my -- I look at it, and my areas are S&S violations in

13   roof control and ventilation and combustibles.

14           I'm making this up.  I'm going to go in to MSHA

15   with a safety and health management program aimed at

16   those areas, the areas of the S&S violations where I'm

17   having the problems.  And I say, I'm going to reduce

18   these, MSHA; and this is my plan for reducing these and

19   blah-blah-blah-blah-blah.  And we said it had to have

20   meaningful benchmarks, measurable, meaningful, and that

21   type of thing.

22           So that's what that safety and health

23   management program is aimed on.  But if an operator just

24   wants to go on and not do anything, an operator can

25   choose to do that if the operator doesn't want to avail

1    himself or herself of that mitigating circumstance

2    provision.  That's what that was meant to be.

3              It was in no case intended to be an end run

4    around rulemaking.  It was in no case meant to be a

5    rulemaking at all.  As I said, if an operator wished to

6    do so, the operator could.  If the operator chooses not

7    to do so, the operator doesn't have to.  So, you know, I

8    hope that that clarifies -- that I clarified that because

9    that has troubled me.

10             And so the next thing I heard that troubled me

11   was -- I'm sorry -- that didn't trouble me.  But I think

12   Mr. Crum mentioned this -- troubled MSHA enforcement or

13   some kind of MSHA enforcement.  What exactly were you

14   talking about there?

15             MR. CRUM:  I think we all understand the

16   scrutiny that the Agency is under following all the

17   tragic mine disasters.  And when we look at the safety

18   and health of our membership mines, we consistently -- we

19   are consistently at or below national average.  And

20   that's hats off to all the operators, miners, and

21   management for progressing their safety and health

22   programs and the safety of their miners.

23             When we look at the pattern issue and we talk

24   about the Agency's scrutiny for higher paper, higher

25   negligence, more S&S violations; and we all know that's

```
1    there.  I mean, I hear it from the guys.  And we are
2    starting to see significant changing interpretations in
3    enforcement.  A great example is guarding.
4            MODERATOR SILVEY:  I was going to say when you
5    say you hear, you -- what -- and I'm reading between the
6    lines.  And I don't like to do that.  But what I think
7    I'm hearing you say is that you hear that there is some
8    mandate for higher -- for more paper?  Higher paper?
9            MR. CRUM:  Yep.
10           MODERATOR SILVEY:  Can -- do you  -- is that
11   some rumor you are hearing?  Or do you have specific
12   examples of that?  If you have specific examples, I would
13   ask that you give those to me.
14           MR. CRUM:  Well, when we -- I'll give you a
15   great example.  When we look at citations that are
16   written --
17           MODERATOR SILVEY:  Uh-huh.
18           MR. CRUM:  -- the mine inspectors today start
19   everything basically at high negligence.  And they've got
20   to justify moving that lower.  So most of our citations
21   we see today are moderate negligence -- moderate
22   negligence or higher.
23           MODERATOR SILVEY:  Okay.  Wait a minute.  Wait.
24           MR. CRUM:  When we -- let me finish.
25           MODERATOR SILVEY:  Yeah.
```

1          MR. CRUM:  When we start talking about the

2    negligence level with the inspector in the field,

3    there's --

4          MODERATOR SILVEY:  Is the Metal/Nonmetal

5    District Manager here?

6          MALE SPEAKER:  Yes.

7          MODERATOR SILVEY:  Still here?  Thank you.

8          MR. CRUM:  There is --

9          MODERATOR SILVEY:  You listen to this.

10          MR. CRUM:  There is very little conversation

11    that happens when we start talking about whether or not

12    anybody's been in the area, whether or not anybody's done

13    a workplace exam because they don't work in that area

14    during that shift where you would expect a low negligence

15    citation to arise out of that situation, very little

16    conversation around low negligence, and from more

17    than just the guys in our area.

18          We hear it all across the country from our

19    membership.  I will have to write a novel to justify low

20    negligence.

21          MODERATOR SILVEY:  But you were going to give

22    me, I thought -- see, when you said, let me finish, I

23    thought you were going to giving me a specific concrete

24    example to -- an example of what you -- of your

25    proposition.

1        MR. CRUM:  Inch-and-a-half shaft sticking out

2  of a mortar, over six feet above the ground,

3  automatically S&S.  Whereas, in the past, based on MSHA's

4  guarding handbook, not necessarily be guarded.

5        MODERATOR SILVEY:  How high up did you say it

6  was?

7        MR. CRUM:  Over 6 feet.  Smooth shafts who --

8  which we have dealt with for eons in our industry.

9        MODERATOR SILVEY:  Uh-huh.

10        MR. CRUM:  We always had half the diameter of

11  the shaft sticking out, a smooth shaft.  No hazard

12  exists.  No need to guard.  Change in interpretation.

13        Now, when we talk about program policy manual,

14  we talk about the MSHA's guarding handbook, which MSHA

15  has referred to in numerous citations that I've received,

16  we don't talk about it.

17        That's the inspector's interpretation.  That's

18  the way we're going.  We're done.  If you need to

19  conference it, you know your conference rights.

20        MODERATOR SILVEY:  Well, I would like to -- I

21  mean, thank you for that specific example.  But I would

22  like it if you have any examples because it was -- it's a

23  general statement, if you would provide those to us.  I'm

24  ask -- and anybody else that you were mentioning, if

25  that's going to come up in your testimony, if you would

1    do that. Because that's the only way we can address

2    certain things, is deal with specific examples. On

3    the --

4            MR. SAVIT: Can I -- before -- can I add one

5    thing to it?

6            MODERATOR SILVEY: Uh-huh. Yes.

7            MR. SAVIT: What we said in the testimony was

8    we too understand the need for fair and equitable use of

9    MSHA enforcement tools to achieve safety, as well as the

10    need to reform the troubled MSHA enforcement system.

11            Let me just refer the panel back to Mr. Main's

12    repeated testimony that the system needs to be reformed

13    and new legislation needs to be passed because they say

14    MSHA doesn't have adequate tools to do its job.

15            If Mr. Main is saying that -- and I'm not going

16    to make any comments on my own -- it's hard for us not to

17    determine that the Agency, itself, thinks there is

18    something wrong with the enforcement system.

19            MODERATOR SILVEY: Okay. But you used it in

20    the context of you said it -- troubled. And I just want

21    to -- with all due respect to what Mr. Main said, I want

22    an explanation of what you meant by saying that. Okay.

23            I do want to, at this point -- and those of you

24    who were here earlier heard me say that -- I want to

25    say because this is coal and metal/non-metal, I want to

1    also recognize the tremendous safety improvements that

2    have been made in the mining industry and say that -- and

3    say again that that was through the combined efforts of

4    operators, miners, and everybody at the state

5    government -- everybody who had a role in safety and

6    health.

7            And I think people are to be commended and --

8    you know, in the metal/non-metal industry, we don't have

9    the same concept for mine examiners as we do in the coal

10   industry.  But there is the concept that the workplace be

11   examined.

12           So the people who do the examinations, I think

13   the people who do it day in and day out who do them,

14   while not under the same structure as in the coal

15   industry, they still carry on a deep and a solemn

16   responsibility.  And I think we do give our appreciation

17   to those people.

18           MR. SAVIT:  Absolutely.

19           MODERATOR SILVEY:  Yeah.

20           MR. SAVIT:  We join in that.

21           MODERATOR SILVEY:  Right.  And because -- and

22   the bottom line our goal is to try to fashion the best

23   rule that's consistent with the legislative intent, but

24   it's also fair and equitable.

25           Along that line, I just have one other comment;

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   and that is that we, recognizing that the way the

2   proposed rule is structured, the general criteria in the

3   rule, the specific criteria on the website right now, and

4   we said that if we made any change to it and before we

5   made -- we would make any change and use that changed

6   specific criteria -- and for lack of a better word, I'll

7   just call it the formula.

8         It's embodied in the formula. Before we would

9   change it and use that changed criteria to review a mine

10   for a pattern, we would make that changed criteria

11   available to the public; post it on the website; allow

12   the public to have the opportunity to comment; respond to

13   the comment; post our response to the comment; and if we

14   made any revisions in response to the public's comment;

15   we would do that all on the website.

16         So from you all what I'm hearing, I think I've

17   probably explained it as clearly as I can. Would you add

18   anything to it?

19         MR. MATTOS: I -- that's -- that's the --

20         MODERATOR SILVEY: -- plan.

21         MR. MATTOS: -- that's the plan.

22         MODERATOR SILVEY: From you all, what I'm

23   hearing is that our plan is not really -- that you have

24   problems with our plan.

25         MR. SAVIT: I don't see any -- I don't -- were

1   a mine to receive a pattern notice -- and there's no

2   warning under your proposed system -- there's no

3   potential pattern warning.

4            MODERATOR SILVEY:  Right.

5            MR. SAVIT:  So were you to receive a pattern

6   notice -- and we haven't -- we don't know this yet

7   because there haven't been very many of them --

8            MODERATOR SILVEY:  Right.

9            MR. SAVIT:  -- but anyone worthy of earning his

10  or her pay would want to challenge the basis for the

11  adoption of the criteria.  If the criteria are subject to

12  public comment and posted on the web and made subject to

13  comment and so on and so forth, that allows a comment.

14  I'm certainly going to concede that, although it does not

15  hold the Agency to any APA standard for consideration of

16  the comments --

17           MODERATOR SILVEY:  Uh-huh.

18           MR. SAVIT:  -- or adoption of the comments.

19           MODERATOR SILVEY:  No, I hear you.  I'm --

20  yeah.

21           MR. SAVIT:  It's just a courtesy that the

22  Agency is extending.

23           MODERATOR SILVEY:  Yeah.

24           MR. SAVIT:  So the Agency is absolutely free to

25  say:  Well, we heard your comments and too bad; we're

1    going to adopt what we said we're going to adopt.

2              MODERATOR SILVEY:  Uh-huh.  Yeah.

3              MR. SAVIT:  Now, once the notice is issued

4    anyone worth his or her pay, we'd want to challenge the

5    criteria or the adoption procedure for the criteria.  But

6    if the Agency is going through this informal process and

7    adopting them as criteria, they may not be subject to

8    challenge under the provisions of the Act where you can

9    challenge the rulemaking.

10             MODERATOR SILVEY:  Uh-huh.

11             MR. SAVIT:  And that was my point.

12             MODERATOR SILVEY:  Uh-huh.  Okay.

13             MR. SAVIT:  They have to be subject to

14   challenge.

15             MODERATOR SILVEY:  No, I understood with that

16   one.

17             MR. SAVIT:  And that's where I am.

18             MODERATOR SILVEY:  That's why I didn't -- I

19   understood that point, clearly.  Yeah.

20             MR. SAVIT:  It was a technical legal point

21   only.

22             MODERATOR SILVEY:  Yeah.  Okay.

23             MR. SAVIT:  And that's where we would go.

24             MODERATOR SILVEY:  Right.

25             MR. SAVIT:  And where we -- frankly, I think

```
1    everybody is going with the current rule is if somebody
2    gets a notice, at some point they will want to challenge
3    the adoption of the current criteria --
4              MODERATOR SILVEY:  Uh-huh.
5              MR. SAVIT:  -- as being non-APA compliant.
6              MODERATOR SILVEY:  Yeah.  That's a good --
7    that's a point there.  I was going to say because that is
8    exactly the makeup of the current rule in terms of --
9              MR. SAVIT:  Right.
10             MODERATOR SILVEY:  -- the specifics.
11             MR. SAVIT:  Right.  But --
12             MODERATOR SILVEY:  I'm glad you said that.
13   You -- actually, I almost forgot that point that -- yeah.
14   Right.
15             MR. SAVIT:  I -- we certainly --
16             MODERATOR SILVEY:  Right.
17             MR. SAVIT:  I mean, I certainly was prepared to
18   do that --
19             MODERATOR SILVEY:  Yeah.
20             MR. SAVIT:  -- had my client received a
21   notice --
22             MODERATOR SILVEY:  Yeah.
23             MR. SAVIT:  -- that -- but they didn't receive
24   it.  They got off -- they didn't get a POV notice.
25   They -- you know, they had a PPOV.
```

1          MODERATOR SILVEY:  And so you were prepared --

2    you were prepared to do what now?

3          MR. SAVIT:  We would absolutely have challenged

4    the criteria as being adopted in a non-APA compliant

5    manual -- manner.

6          MODERATOR SILVEY:  Yeah.  But the -- see, yeah.

7          Well, we don't -- we can -- we'll talk about

8    that off the record because -- but the basis for the --

9    that would have been kind of ingenious to figure out how

10   to do that because the basis for the challenge to the

11   existing rule is long gone.

12         MR. SAVIT:  No.  But it's the criteria that

13   were adopted and which are not subject to rulemaking --

14         MODERATOR SILVEY:  Right.

15         MR. SAVIT:  -- criteria.  So we would argue

16   that the period in which you would challenge those

17   would -- that is not -- that's in the statute for

18   challenging rulemaking doesn't apply, number one.

19         And, number two, I would take a position that

20   there is a -- that a Court would call a pre-enforcement

21   challenge to those criteria unripe for review is fairly

22   high.

23         MODERATOR SILVEY:  So you would --

24         MR. SAVIT:  So the -- they only become ripe for

25   review if you --

1                MODERATOR SILVEY:  -- apply them.

2                MR. SAVIT:  If -- yeah, once they're applied.

3                MODERATOR SILVEY:  So you would challenge them

4  as final Agency action?  Or you would --

5                MR. SAVIT:  Absolutely.

6                MODERATOR SILVEY:  Okay.  Well, I'm -- you

7  know, this is worth something to me.  It's always good to

8  learn something here.

9                MR. SAVIT:  I --

10              MODERATOR SILVEY:  You understand what I'm --

11              MR. SAVIT:  I hope I didn't hand the playbook

12  to the opposing team.  But I think in the interest of --

13              MODERATOR SILVEY:  You all got -- this is

14  useful.

15              MR. SAVIT:  Seriously --

16              MODERATOR SILVEY:  Yeah.  Uh-huh.

17              MR. SAVIT:  -- in the interests of fairness,

18  that is final Agency action.

19              MODERATOR SILVEY:  Okay.

20              MR. SAVIT:  It would become challengeable once

21  again only after the notices were issued.

22              MODERATOR SILVEY:  Okay.

23              MR. SAVIT:  Notices were issued.

24              MODERATOR SILVEY:  I hear you.  Yeah.

25              MR. SAVIT:  And in this case, there's no

```
 1     opportunity to avoid that because you're proposing
 2     eliminating the potential pattern notice.
 3              MODERATOR SILVEY:  Okay.
 4              MR. SAVIT:  So it would just raise a tremendous
 5     amount of litigation.  And it would be relitigated every
 6     time you change the criteria.
 7              MODERATOR SILVEY:  Uh-huh.  Okay.  That's
 8     helpful.  I mean, this conversation is useful.  This --
 9     you know.
10              MR. SAVIT:  As much as that means to my income,
11     I'm still willing to give it up.
12              MODERATOR SILVEY:  Do you have any comments?
13              MR. MATTOS:  I have one or two questions, I
14     guess.
15              MODERATOR SILVEY:  Okay.
16              MR. MATTOS:  Well, I have one comment.  One,
17     one way is --
18              MODERATOR SILVEY:  They add a little levity
19     here.
20              MR. SAVIT:  Don't -- yeah.  Well, you know.  I
21     mean, I laughed at learned counsel.  I chuckled at
22     learned -- yeah.
23              MR. MATTOS:  Mild humor we have.
24              MR. SAVIT:  Right.
25              MR. MATTOS:  You said that the most bothersome
```

```
 1    component of this proposed rule is the elimination of the
 2    potential pattern part of the current rule.
 3              MR. SAVIT:  At least my -- to MARG, I believe
 4    it is.  And to everyone I've talked to, it is.
 5              MR. MATTOS:  And you concluded that we must not
 6    be -- MSHA must not be happy with the number we're
 7    getting on to pattern of violation.  And I just want to
 8    clarify that for the record, is MSHA would be very
 9    happy --
10              MODERATOR SILVEY:  -- if nobody --
11              MR. MATTOS:  -- if nobody made pattern
12    violations.
13              MODERATOR SILVEY:  True.
14              MR. SAVIT:  Well -- and let me just --
15              MR. MATTOS:  And --
16              MR. SAVIT:  Go ahead.
17              MR. MATTOS:  -- just -- I mean, just to -- I
18    mean, that is not --
19              We do have a District Manager back here who
20    would be very happy not to have any mines on that list.
21    And that's our goal is to not, but --
22              MR. SAVIT:  And I don't disagree with the
23    District Manager --
24              MR. MATTOS:  But really --
25              MR. SAVIT:  -- or the Assistant District
```

1    Manager I think is also back there, right?  Yeah.  There

2    he is.  So --

3            MR. MATTOS:  But this proposal and the items in

4    this proposed rule are -- were developed so that we would

5    get a more proactive approach to this from the mine

6    operators and putting out what the criteria are and where

7    you -- so you can see where you are against that criteria

8    at any point in time up-to-date.

9            A good operator would be monitoring that

10   religiously and getting with us to tell us, number one,

11   are there errors in the information?  Because, trust me,

12   we get -- as many citations as we issue in a year,

13   150,000 or upwards of that, there are mistakes made, or

14   the stage that these citations -- the stages they go

15   through; they're modified; they're issued; they're

16   modified.

17           They're issued to the wrong contractor, the

18   wrong operator.  There are a million ways to make

19   mistakes on these citations.  And that web tool is just

20   one more we have.  We constantly are notified by it;

21   there's a mistake here or a potential mistake.  And

22   sometimes we're right; sometimes we're not.  We'd like to

23   have 100 percent accuracy, but that will never happen.

24           But that web tool would -- does provide -- and

25   we get a lot of calls from operators saying:  There's an

```
 1    error in this.  Sometimes they're right.  Sometimes we're
 2    right.  But that is a good thing for all of us.  If we
 3    have a problem with the system, that's how we uncover it.
 4    We get notified of those.  We find some ourselves.  But
 5    we'd rather find them ourselves before they get to an
 6    operator.
 7              But the whole point is that it's to be
 8    proactive.  It's to have people monitoring this ahead of
 9    time.  And once you're getting to a point where, you
10    know, we have problems here; we have issues here; we need
11    to address some things -- that's what -- that's where
12    we're really trying to get.
13              So having said that, though, the approach --
14    and you've seen the approach that we have developed here
15    with proposals.  But -- and you're basically saying we
16    need to reopen the rule.  There's nothing in here that
17    you see that -- or suggestions for changes to this one
18    that would alleviate the concerns you've addressed here.
19              MR. SAVIT:  I don't see specific changes to
20    this rule, other than re-opening it and re-including the
21    potential notice -- the pattern notice.
22              Let me address a couple things that you said.
23              With regard to how -- I know MSHA would at the
24    operation's level be extraordinarily happy that it would
25    not issue anymore POV notices.  It would issue none in
```

1   the future and that everyone would comply.

2           However, when you look at the testimony that's

3   taken place and the answers to the questions posed by

4   Congressman Miller in the last several hearings that

5   Mr. Main has given, he has vowed over and over again that

6   he -- you know, he believes this tool is underused and it

7   should have been used more.  And he vows to use it more

8   in the future and -- etc., etc., etc.

9           The primary reason why it hasn't been used as a

10  final notice over the years has been that it -- the

11  potential pattern notification has been an adequate

12  incentive to operators to change their -- the way in

13  which they do their compliance or their safety and health

14  programs, if that's -- I don't want to get -- this isn't

15  for argument.

16          But the reason why there haven't been any --

17  very many pattern notices actually sent is because the

18  PPOV, or the potential pattern notice, is a tremendous

19  incentive for everybody to take corrective action.  And

20  the only reason why I concede to eliminate it

21  from achieved goal perspective, rather than some issue

22  about what the statute says -- now, I understand what the

23  statute says.

24          It also says that MSHA can promulgate rules to

25  implement that section of the statute.  And if MSHA

1    chooses to implement a rule or promulgate a rule with a

2    potential pattern notice in it, it can do that.

3    Nobody -- I don't think anybody would challenge its

4    ability to do that.  But all I was getting at was there

5    have been very few notices.  There has been a criticism

6    of that.

7            The primary reason why there's been very few is

8    the potential pattern notice.  And, therefore, I don't

9    see a reason to eliminate it, except to respond to

10   concerns from Congress that the Agency isn't issuing

11   enough pattern notices.

12           MR. MATTOS:  Thank you.

13           MODERATOR SILVEY:  Well, I don't know that -- I

14   won't even respond to that.  I do want to say do -- say

15   one other thing just for -- that for the operators who

16   have received under the current rule, the existing rule,

17   Potential Pattern of Violations, they are using -- they

18   are -- some of them are availing themselves of that

19   provision.

20           We have that in our procedures, a mitigating

21   circumstance, right?  They are, indeed, availing

22   themselves of that and are submitting corrective action

23   programs in the nature of safety and health management

24   programs aimed at the particular conditions at their

25   mine.  And so they are -- I'm sure we've gotten what?

1    Between the two phases that we have run the existing --

2    I suspect we've probably gotten at least ten.

3              MR. MATTOS:  Yeah.

4              MODERATOR SILVEY:  About ten.

5              MR. MATTOS:  Sure.

6              MODERATOR SILVEY:  I, to be honest -- and I

7    probably should have done that -- I have not looked at

8    some of them to see how they are constructed.  But we

9    have gotten about ten.  And for -- and, really, for the

10   most part, except for one, through those -- through the

11   implementation of successful ones, operators achieved

12   significant reductions in their -- in the target --

13             MR. MATTOS:  Correct.

14             MODERATOR SILVEY:  -- areas.  Is that right?

15             MR. MATTOS:  That's right.

16             MODERATOR SILVEY:  Yeah.  So, anyway, thank you

17   for your comment and testimony.

18             MR. CRUM:  Thank you.

19             MODERATOR SILVEY:  And if you have any -- as I

20   have said to many people and many times, if you have any

21   specific -- any additional specific comments meaning

22   specific comments with specific alternatives, specific

23   rationale for your alternatives, specific impact on

24   safety and health for miners, specific data on costs --

25   not general -- you know the difference between general

1   and specific -- please get back to us before the record

2   closes on June 30th.

3          I'm sorry.  I --

4          Did you have anything?

5          MS. HUTCHISON:  Huh-uh.

6          MODERATOR SILVEY:  No?

7          And, you?

8          MR. JONES:  I did.  Just for the record,

9   Mark --

10         MODERATOR SILVEY:  Oh, no.

11         MR. JONES:  -- you mentioned the economic

12  impact of the Dodd-Frank regulations?

13         MR. SAVIT:  Uh-huh.

14         MR. JONES:  Well, since those were promulgated

15  and enforced by the Securities and Exchange Commission,

16  that's a cost that's more accurately should be factored

17  to the FCC and not to MSHA.

18         MR. SAVIT:  As -- what I said was is a company

19  that didn't -- that wasn't a Dodd-Frank reporter that

20  made the announcement and had that happen to its stock

21  anyway.

22         MODERATOR SILVEY:  We are --

23         MR. SAVIT:  This is not a -- they're not a

24  Dodd-Frank reporter, so --

25         MODERATOR SILVEY:  I understand.  Okay.

```
 1              MR. SAVIT:  -- it's not -- I don't see where
 2    that goes.
 3              MODERATOR SILVEY:  Thank you.
 4              MR. SAVIT:  Okay.
 5              MODERATOR SILVEY:  Thank you very much.
 6              MR. SAVIT:  We can talk off the record after,
 7    if you --
 8              MODERATOR SILVEY:  Thank you.
 9              MR. SAVIT:  Thank you.
10              (Off the record.)
11              (On the record.)
12              MODERATOR SILVEY:  Our next person,
13    organization, is Matt Pedersen-Howard with Rio Tinto.
14              (Off the record.)
15              (On the record.)
16              MODERATOR SILVEY:  Good morning.
17              MR. PEDERSEN-HOWARD:  Hi, again.
18              MODERATOR SILVEY:  Hi.
19              MR. PEDERSEN-HOWARD:  I presented at your
20    public forum in Sacramento.
21              MODERATOR SILVEY:  I remember.
22              MR. PEDERSEN-HOWARD:  So don't worry.  I won't
23    overrun this time.
24              MODERATOR SILVEY:  Thank you.
25              MR. PEDERSEN-HOWARD:  Okay.
```

```
 1              MODERATOR SILVEY:  I appreciate that.

 2              MR. PEDERSEN-HOWARD:  I'll keep you on track.

 3              MODERATOR SILVEY:  Okay.

 4              MR. PEDERSEN-HOWARD:  So my name is Matt

 5   Pedersen-Howard.  I work for Rio Tinto.  I'm the Director

 6   of Health and Safety for Rio Tinto Minerals.  That's a

 7   division of the broader Rio Tinto Group.  We're a global

 8   mining company, one of the biggest in the world, as the

 9   Rio Tinto Group.  And our division, as it probably gives

10   away by the name, looks after the minerals division.  We

11   have, as it stands right now, borates and talc.  So the

12   U.S. Borax Group is one that's ours.

13              We operate, again even in our division,

14   internationally, in the U.S., Canada, Argentina, in

15   Europe, in France, Holland, Serbia -- we have a

16   development project there -- and in Australia, as well.

17   Rio Tinto operates in many more countries than that.

18              Our approach really in terms of health and

19   safety and environment and product stewardship

20   sustainability is along the lines of taking a

21   behavior-based approach.  We try and drive sustainable

22   and desirable culture through engaging our employees and

23   making sure that it's based on sound scientific

24   approaches, which I guess, you know, **in the same**

25   **situation that in MSHA,** and probably could never be in
```

1    that kind of situation in terms of how you would promote

2    desirable things in U.S. mining.

3            But I just thought I'd put that out there at

4    the front end recognizing the difference between how we

5    have operated and how you guys have to deal with certain

6    things.

7            Regarding the POV proposal, we do have a few

8    issues and a few concerns with that.  And we've also

9    submitted a counterproposal, actually, already on the

10   record.  So that's -- you already have that to look at.

11           But, essentially -- I mean, our issues and

12   concerns with the proposal, fundamentally, in our

13   viewpoint, any rulemaking or any pattern violation should

14   really be intended to improve the mine safety and health

15   in U.S. mining.

16           And I think that's probably one thing --

17   whereas, we disagree on a lot of things, that's probably

18   one thing that everyone in this room can agree upon is

19   that we want everyone to go home in the same way, if not

20   a better condition that they came to work in.  And that's

21   certainly something that we hold as a value.

22           And I know a lot of other mining companies

23   around the U.S. strive for that, as well.  And I think

24   that a lot of action has been taken in that regard.  So

25   just to make sure that we're clear on the purpose, this

1    should really be targeted at, you know, issues where

2    we're seeing violations, but also injuries because,

3    fundamentally, that's want we want to reduce.

4         To us, it's not about necessarily increased

5    violations or citations and how we deal with that.

6    What's the impact on the overall miner in the U.S.,

7    knowing improving our safety and health performance in

8    that regard?

9         So with that, I just made a few notes.  And I

10   haven't got anything, you know, formal to submit today.

11   But I produced a few notes to read off.

12        I still think the proposal is fairly

13   complicated, a lot of criteria in that proposal.  I know

14   that the web interface that you put together certainly

15   helps.  We've used that to review where we're at, you

16   know, on the pattern.  But I still think there's a lot of

17   detail in that that perhaps could be simplified further.

18        Fundamentally, there's a -- it's based on

19   citations.  And as you've probably seen -- in fact, you

20   made a note in the documents you have at the back -- you

21   had 80 -- 88,000 contested citations back in November.

22        So I guess the question I would have initially

23   is what is the reason why people are contesting

24   citations?  I have my own view on that.  But I think that

25   would be an interesting piece of information to get out

1    there.  I don't know if you have that data available.
2              MR. MATTOS:  When you say why they're
3    contesting --
4              MODERATOR SILVEY:  They --
5              MR. PEDERSEN-HOWARD:  Why are people contesting
6    citations?
7              MODERATOR SILVEY:  They contest it -- they
8    contest for a variety of reasons --
9              MR. PEDERSEN-HOWARD:  Absolutely.
10             MODERATOR SILVEY:  -- as you probably know,
11   some of which end up being no reason.  And the reason I
12   say that is because a few operators contest all.  So they
13   just make a decision to check the box and contest.  And
14   so there I can't get in their mines -- for those few who
15   decide to contest all, I don't know why.  Others decide
16   that they will -- at the end of the day if an operator
17   gets ten violations, they decide that they will pay the
18   nine.  And they will contest this one.
19             And obviously, for whatever reason, they
20   probably have a legitimate reason for contesting that
21   one.  They've gone through an affirmative thought
22   process.  So there are a number of reasons why operators
23   contest.
24             MR. PEDERSEN-HOWARD:  Certainly, speaking from
25   my experience and within our group, the subjectivity

```
 1    aspect regarding likelihood in negligence, which is the

 2    main driver between why we would contest a citation.

 3         And I guess the issue I have with basing any

 4    additional enforcement action on citations is that they

 5    are inherently subjective and particularly subjective

 6    when it comes to those two areas of assessment.  And the

 7    likelihood, obviously, drives the potential S&S, which

 8    clearly impacts what this would be looking at.

 9         So I think it's probably more broad-reaching

10    than POV.  But, obviously, POV is linked based on S&S

11    citations.  The subjectivity of that likelihood

12    assessment and negligence really has a huge impact on

13    whether we'll have disagreement around citation

14    assessments and probably I would speculate a large

15    percentage of why there has been so many contested

16    citations.

17         So I don't know if that's beyond the scope of

18    this.  But I certainly would welcome a clearer, more

19    consistent, and perhaps fairer approach to assessment and

20    whether it's for the guidelines so that inspectors have

21    somewhat a more broadly consistent approach to assessing

22    citations.  We've seen a lot of variation in how people

23    assess likelihood.  And, typically, we're not necessarily

24    in line with where we view that likelihood piece.

25         So the next question I would have is how do
```

1 citations correlate with injuries?  And it's sort of a

2 fundamental question that has based our thinking around

3 our proposal.  Are we seeing a correlation between mining

4 operators that are having the bulk of the injuries with

5 the bulk of the citations?  And I haven't seen any data

6 that so far supports that.

7       And drilling into that further, are we seeing a

8 correlation between the number of citations issued

9 against a particular standard with the potential to cause

10 injuries to certain -- in certain matters?  Does that

11 correlate to what we're seeing in terms of an injury

12 statistic standpoint in the U.S.?

13       And I haven't seen that data to support it.  I

14 suspect there's probably not as good a correlation as we

15 initially would think there would be between citations

16 and injuries.  So I don't know if you had that

17 information.

18       MR. MATTOS:  I can answer that --

19       MODERATOR SILVEY:  Well, but you don't have to.

20       MR. MATTOS:  Well, I just -- one, there's a --

21 there's an issue with the injury data.  There are some

22 limitations to the injury data that don't allow us to

23 make a good analysis of that.  And that's something

24 that -- it's an ongoing problem.

25       MODERATOR SILVEY:  Although -- and I shouldn't

1    say -- I am going to say it.  You say how do citations

2    correlate with injuries?

3             Well, I'll just say one thing and then, as they

4    say, And if the thing speaks for itself -- if you were to

5    look on our website prior to April 5th, sadly to say,

6    2010, and saw all of the citations we had written for

7    ventilation and float coal dust for one particular mine

8    operation, then I think maybe some people would go back

9    and say that citations -- there is some correlation

10   between citations and injuries.  But, anyway, I don't

11   want -- I mean, you go on with your testimony.

12            MR. PEDERSEN-HOWARD:  But I would argue that's

13   one specific case.  And --

14            MODERATOR SILVEY:  That may be.  That --

15            MR. PEDERSEN-HOWARD:  -- and maybe not data

16   points.

17            MODERATOR SILVEY:  But I said -- but you asked

18   the question.

19            MR. PEDERSEN-HOWARD:  Yep.

20            MODERATOR SILVEY:  I said the thing speaks for

21   itself, didn't I?

22            MR. PEDERSEN-HOWARD:  In --

23            MODERATOR SILVEY:  So -- okay.

24            MR. PEDERSEN-HOWARD:  In one case.

25            MODERATOR SILVEY:  But --

1          MR. PEDERSEN-HOWARD:  But I think we probably

2    need to take a broader look to see if there's much of a

3    correlation is my --

4          MODERATOR SILVEY:  But you --

5          MR. PEDERSEN-HOWARD:  -- is my argument.

6          MODERATOR SILVEY:  -- you get my point, though,

7    I think.

8          MR. PEDERSEN-HOWARD:  Yeah.

9          MODERATOR SILVEY:  Okay.

10         MR. PEDERSEN-HOWARD:  The next question that I

11   would have is is severity rate the best measure?  And

12   that I guess is a moot point.

13         In our proposal, we looked at whether days lost

14   is a more meaningful or a better measure in terms of how

15   you would assess.  In fact, I would commend MSHA for

16   actually trying to incorporate an injury statistic

17   against, you know, just purely citations issued.

18         From our standpoint, again, we think there's a

19   little bit of a disconnect in the risk arena, you know,

20   in terms of where we see potential for injuries and how

21   that would occur around awareness perception, judgment,

22   and control.  And we just think there's a bit of a

23   disconnect in terms of how do you manage that from an

24   enforcement standpoint.  It probably comes back a little

25   bit to the discussion previously around the correlations

1   and the data.

2          In terms of our proposal -- I won't go into all

3   the details because it's clear we've already submitted

4   it, so I'm sure if there's any questions -- we were

5   looking at a fairly simple approach in terms of where do

6   people fit in terms of their injury rates; and if they're

7   in the lowest 8 percent in terms of injury rate in that

8   particular category and have the worst citation rates per

9   inspector hour in·that category, then they would be

10  considered for a POV.

11         Now, with that, we also believe that there's

12  probably a better model in terms of how a POV would be

13  utilized.  We -- from our standpoint, obviously with

14  sites that we want to improve, we see engagement in

15  helping them improve as being the best model.  Clearly,

16  it becomes more challenging from your standpoint to do

17  that.  But, again, connecting the engagement piece we

18  found to be more effective.

19         In terms of the proposal, again, it would be

20  based on a quarterly review for the previous 12 months'

21  statistics.  Again, threshold numbers would be posted on

22  the website, as you have, to try and provide that

23  clarity.  Any sites that meet one, but not both, criteria

24  would essentially be given a notice of some warning:

25  Hey, you know, you're in this area; you're close; you

ANTHONY & ASSOCIATES, INC.
770.590.7570

1 might want to consider looking at something to improve

2 citation rates or injuries.

3          And then parallel to, you know, some of the

4 approaches you would be taking with how do we manage

5 sites on a POV with increased inspections, maybe it's a

6 little bit more support in that area.  And then any site

7 that has been issued a POV gets expedited hearings

8 because it would be based on issued citations, rather

9 than being final orders.

10          So, therefore, if it's triggered a POV, is

11 there an avenue to then help expedite any issues?  And if

12 that subsequently turns out to be a successfully

13 contested citation, then it would take them off the POV.

14 The POV would be an ongoing process.  So, therefore, it

15 would be somewhat self-managing and the course of that

16 review would come up and assuming after a period of time,

17 you know, off that list, then clearly, you've made

18 sufficient improvement.

19          So again the proposals would do so.  I'll spare

20 all the details, a couple of pages.  So -- and,

21 essentially, that's all I -- so I don't know if you have

22 any --

23          MODERATOR SILVEY:  I do.

24          MR. PEDERSEN-HOWARD:  -- questions of me.

25          MODERATOR SILVEY:  With respect to your

1    proposal -- and like you said, you provided it, and I

2    don't want to get into the details of it.

3            But for everybody who has provided specific

4    suggested proposal alternatives, thank you for doing so;

5    because, quite frankly, whether we wholeheartedly are

6    with it or not, a lot of times it provides the basis for

7    a starting point or a basis for an idea about something

8    or -- and turning that idea into something.

9            But on the injury rates -- and maybe Jay will

10   say more than I will say about this.  Well, first of all,

11   let me ask him a question.

12           (Off the record.)

13           (On the record.)

14           MODERATOR SILVEY:  The reporting information is

15   used -- the reporting information under Part 50 is used

16   in calculating injury rates.  And I think in terms of

17   some of the things we have found recently and with

18   respect to -- with respect to the application of the PPOV

19   under the existing rule and some mines for the Part 50

20   data and going in and doing an audit of their reporting

21   data, that in some cases -- and, clearly, I'm not saying

22   this in every case.

23           I start my life from the premise that all

24   American companies start out in the day at the beginning

25   of every day to achieve -- with the goal of achieving

1 safety and health for their workers, whether it be in the

2 general industry or in the mining industry.

3 That's just my belief. And that's my personal

4 belief. So let me say that, since it's going to be on

5 the record.

6 And so -- but with that in mind, I

7 guess that -- you know, and so I say that for all the

8 operators in here to let you know that's my personal

9 feeling.

10 Now, and with that in mind, we know that there

11 probably -- there are some operators who, when it does

12 come to the reporting, that the data that are reported,

13 then this data are subsequently used to calculate the

14 injury rates, that sometimes the data are not always --

15 what's the -- what word should I use? Are not always --

16 we find later that it's not always accurate, for lack of

17 a better word.

18 So I think the only thing I would say to that

19 is that you're right. That's a -- that is one index.

20 And clearly we use it too. But that's probably one thing

21 that for it to be an all-out index, that's something --

22 that's just -- maybe that's just a point I want to make,

23 instead of saying anything else.

24 Would you add anything to that?

25 MR. MATTOS: Well, I was going to ask a

1    question on how we would deal with -- how do we deal with

2    like the limitations in the injury data that we have?

3    Some of it is just non-respondence to the injury

4    reporting requirements.  How do we overcome that barrier

5    because it is self-reporting?

6              MODERATOR SILVEY:  Yeah.  I was more talking

7    about what we found for a few operators who maybe didn't

8    report injuries or things that happened.  Then,

9    subsequently, we went in and did a Part 50 audit.  And

10   then people talked and said, On X date they had eight

11   ambulance run.  And that -- and, you know, when you say

12   ambulance, they went to the hospital.

13             So you know whatever happened was serious

14   enough for the person to go to the hospital.  But nothing

15   was reported.  So to -- candidly, that's what I

16   was talking about.  And Jay had another one.

17             MR. PEDERSEN-HOWARD:  Yeah.  I mean, there's

18   always that issue.

19             MODERATOR SILVEY:  Yeah.

20             MR. PEDERSEN-HOWARD:  But I would argue that

21   there's other avenues to deal with that issue.  I mean,

22   that's another fundamental issue, regardless whether

23   people aren't reporting accurately.

24             MODERATOR SILVEY:  But here, yours was -- yours

25   was -- that was part of it.

1             MR. MATTOS:  Yeah.

2             MODERATOR SILVEY:  Yeah.

3             MR. PEDERSEN-HOWARD:  Wouldn't the same issue

4    affect --

5             MODERATOR SILVEY:  Yeah.

6             MR. PEDERSEN-HOWARD:  -- the severity rate,

7    though?

8             MR. MATTOS:  Oh, yes.

9             MODERATOR SILVEY:  Yeah.

10            MR. MATTOS:  And it deals with all of the --

11   anything to do with the injury experience in the mines.

12            MODERATOR SILVEY:  Right.

13            MR. PEDERSEN-HOWARD:  And my comment was more

14   around is severity rate the best measure if we're looking

15   at injury rates.

16            MODERATOR SILVEY:  Does anybody else have any?

17   No?

18            MS. HUTCHISON:  No.

19            MODERATOR SILVEY:  Okay.  Thank you very much.

20            MR. PEDERSEN-HOWARD:  Thank you.

21            MR. MATTOS:  Thank you.

22            MODERATOR SILVEY:  Okay.

23            And, again, thank you for your specific

24   proposal.

25            At this point, I want to make a general

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   comment.  It doesn't matter that Mr. Pedersen-Howard

2   was -- is up here or not.  It sort of goes, though, to

3   part of his comments.  And he, in terms of -- and we've

4   heard that a lot, the subjectivity that is embodied in

5   our -- in the writing of our citations.

6           First of all, I would like to say

7   that we strive every day -- and it might not look like it

8   to you all -- to improve consistency.  And by me

9   saying -- in the application of enforcement.  And by me

10  saying improving consistency, to some extent the opposite

11  side of that is to reduce subjectivity to the extent that

12  we can.  Obviously, when you've got 800 or 900 or in

13  excess of a thousand inspectors, there's some amount of

14  subjectivity.  I will start by getting -- by just stating

15  that.

16          But in talking about these citations, I'm

17  hearing so much about that.  And you would -- one would

18  think that all of them citations are contested.  And then

19  after they are contested, you know, this large percentage

20  is vacated.  And then -- and some great percentage of

21  that -- of those are then changed significantly.  But --

22  and a matter of fact, just so people know, the vast

23  majority probably are not contested.

24          Or are they?

25          MR. MATTOS: 70 percent are not contested.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

```
 1          MODERATOR SILVEY:  Yeah, a large -- a large --
 2   even though in round numbers, in the last few years, that
 3   leaves a lot of them being contested.  But a large
 4   majority of them are not contested.  And then a de
 5   minimis amount -- a minuscule amount are vacated.  And
 6   then some -- I don't know what the percentage is -- some
 7   smaller percentage, fewer -- I think much lower than
 8   10 percent are changed.
 9          And for the purposes of this rule, I think the
10   change that we are looking at is the -- is any change in
11   the S&S designation.  If it's changed from S&S to
12   non-S&S, because the S&S violations are the ones that
13   form the basis for the Pattern of Violations.  Oh, I
14   think we had some data.  You're on that in the proposal,
15   actually, on there.  Didn't we?
16          MR. MATTOS:  Yeah.
17          MODERATOR SILVEY:  Yeah.  So we have some data
18   on that.  Yeah.  There, you can look at -- they're real
19   small numbers.  I don't even want to read them.  But
20   they -- over 700,000 from 2006 through 2010, with 3400
21   vacated out of 700,000.  And out of that same 700,000,
22   6,000 were modified from S&S to non-S&S.
23          So that's really -- that's quite a small
24   percentage.  But not saying that -- I mean, obviously,
25   anything we can do to improve the application of our
```

74

1     enforcement, that is a goal that we ascribe to.

2             Anyway, our next speaker is Jerry Glynn with

3     Texas Industries.

4             Yeah.  Hi.  How are you?

5             MR. GLYNN:  How are you?

6             MODERATOR SILVEY:  Okay.  Nice to see you.

7             MR. GLYNN:  Nice to see you, again, Ms. Silvey.

8             MODERATOR SILVEY:  Yeah, nice to see you.

9             MR. GLYNN:  My name is Jerry Glynn --

10    G-L-Y-N-N.  I'm with Texas Industries.  I'm their

11    Financial and Safety Manager for the Expanded Shale &

12    Clay Group.

13            Several of the items that Ms. Silvey has

14    already pointed out form the basis of what I was going to

15    say.  So you'll hear it again, but that's okay.

16            MODERATOR SILVEY:  That's okay.

17            MR. GLYNN:  That's one of the things I like

18    about the hearings.  I testified down in Sacramento --

19            MODERATOR SILVEY:  Right.

20            MR. GLYNN:  -- on the safety and health

21    management system.  And at the time, there was a lot of

22    vagueness in that proposal and continues to be some

23    vagueness in that proposal.  This proposal for the

24    pattern of violation contains, again, a certain degree of

25    vagueness.

1          And I think that because of the

2    inconsistency -- and you hear that word again -- within

3    the Agency to interpret the standards, that this ongoing

4    pattern of consistent inconsistency makes this a

5    dangerous proposal to all mine operators.

6          As we know, the industry is filled with a lot

7    of stories of good operators who have a history of good

8    Intron inspections, receiving multiple citations during

9    an inspection, multiple S&S citations -- when they've had

10   no history of such.  And an inspector will say:  Hey, you

11   know, we've been told, if we see it, we cite it.  And

12   that's the mentality.

13         So a plant that's had 20 years of good records,

14   all of a sudden, has a lot of citations.  That doesn't

15   mean that they're a bad operator.  And it could possibly

16   mean that all the other inspectors for the past 20 years

17   were incompetent.  But we know that's not true.

18         There are a lot of really good inspectors.  I'm

19   involved in the Rocky Mountain District, in the Western

20   District, and the South Central District.  And all the

21   inspectors, the majority that I have met, are good people

22   doing what they feel is the best job possible.

23         But there is an inconsistency in the

24   interpretation of the standards because I don't think

25   there's anybody on the panel who could say that all

1    inspectors understand and interpret the standards the

2    same way every time.  And we all understand that.

3           So to propose a Pattern of Violations that

4    would put possibly somebody on a POV, you know, based on

5    citations issued, as opposed to the final orders, is a

6    section of the proposal that, you know, deeply troubles

7    me.  And many people have written in and commented that

8    it is a violation of the due process of the Fifth and

9    Fourteenth Amendments.

10           MSHA has many tools available and the power to

11    protect the miners and, at the same time, preserve the

12    rights of the operators.  And one of the reasons that is

13    cited in the proposal is the backlog of citations that

14    are being contested as a basis as a justification for

15    violating this due process that is afforded every citizen

16    and most industries in the United States.

17           As we all know, there are times in this country

18    that situations come up that we disagree with.  For

19    example, here recently, I think a lot of people were

20    appalled at a certain religious group out of Kansas that

21    protest at military funerals.  We appall that.  It's

22    disgusting.  But the Supreme Court upheld their First

23    Amendment rights because the rights of the First

24    Amendment come above those of emotion.  And it is the

25    Constitution that is the foundation of this country.

1    And I have to say as a veteran of a foreign war
2  that before you put on the uniform, you have to take an
3  oath and part of that oath is that you swear to defend
4  the Constitution from all enemies, both foreign and
5  domestic.  And to me, there's nothing more important than
6  the protection of the citizens of the United States that
7  the Constitution provides.
8    And the Constitution and the intent of the
9  Constitution far outweigh the intent of the Mine Act.
10 And on that basis, that is why we oppose this proposed
11 Pattern of Violations rule.
12    Thank you.
13    MODERATOR SILVEY:  Thank you.
14    MR. MATTOS:  Thank you.
15    MODERATOR SILVEY:  That was very -- I would
16 just like to make a few points here in this solemn
17 period.
18    On a serious note, though, I would like to say
19 on behalf of the panel -- and this is for you and for
20 any -- and I'm sure there are others -- for any other
21 veterans in here, that we appreciate your service to this
22 country.
23    I think I -- and I take into consideration what
24 you said about the due process.  Granted, all Americans
25 are under the Constitution.  I will only make one point

```
 1    on that, and that is that in the preamble to the proposed
 2    rule and -- but you made your point very strongly.  And
 3    I'm going to acknowledge it, that we think the
 4    legislative history does not contemplate final orders.
 5              For everybody in here who knows it, we did do
 6    it in the existing rule.  What I mean is we exempted
 7    final orders.  Final orders -- I'm sorry.  Excuse me.
 8    That we required that only final orders be used in the
 9    existing rule.  But if when you -- and I don't have to go
10    to the preamble to see this.
11              As many of you know, those of you in the -- and
12    you know that, Mr. Glynn -- probably know that the --
13    much of the impetus behind the '77 Act was the Scotia
14    Mine disaster -- and in talking about Scotia, when you
15    look at the legislative history, Congress said that what
16    happened at Scotia was that violations were allowed to
17    exist over and over and over again and not -- and so when
18    you read the legislative history and it's -- and the
19    book, there are two books like this thick of the
20    Congressmen at that time who were debating this '77 Mine
21    Act.
22              And when you read it, you see very vividly that
23    when they were referring to Scotia, they were intending
24    that violations be the basis of Pattern of Violation --
25    of a Pattern of Violations.
```

ANTHONY & ASSOCIATES, INC.
770.590.7570

```
 1            Now, having said that, the point I want to
 2   acknowledge that you made, you said not even the Mine Act
 3   can override the Constitution.  So we hear you.  Thank
 4   you.  Okay.
 5            Okay.  Our next speaker is Mr. Butero, United
 6   Mine Workers.
 7            MR. BUTERO:  Hello, again.  My name is Robert
 8   Butero -- spelled B-U-T-E-R-O.  And as stated earlier in
 9   the previous testimony, as far as United Mine Workers
10   have submitted written comments on the previous
11   rulemakings and also the one here today, so I just want
12   to talk a little briefly about, you know, these
13   regulations and what they meant.
14            As you know, everybody points out that this
15   Pattern of Violations has been included in the Mine Act
16   since 1977 but, as we all know, basically has not ever
17   been enforced.  Maybe here recently there have been a
18   couple issues, but nothing has ever been really enforced.
19            And when people talk about that way back in the
20   early days, the passage of the Act, they always called
21   that basically the death penalty because they thought
22   once a mine got on the Pattern of Violations, that they
23   would never be able to get off of it.  But for years here
24   I've been hearing, you know, especially from the industry
25   that they want to target the bad operators and not go
```

1  after the good operators.

2          And, of course, their proposal is that, you

3  know, when they come to the -- when MSHA comes to the

4  mine site, they leave their ticket book at home until

5  they know they got a bad -- they got a problem child, and

6  then they try to deal with it.

7          This here proposal is meant to deal with the

8  problem children.  You know, as we have seen, you know,

9  through the years that if a company has shown this

10  reckless disregard for the mine health and safety, then

11  they should maybe get the death penalty and be put out of

12  business because they give us all a bad name.

13          And that's one of the problems that we've faced

14  over the last few years is we've had many people,

15  environmentalists, you know, many people that are looking

16  at us through this microscope.  And we do not need any

17  more disasters in the mining industry to be looked at.

18  So we should all be welcoming a way of trying to

19  eliminate this.

20          You say on your website that you have this

21  posting of you can fall into the Pattern of Violations or

22  not.  And if a mine operator is conscious of that, they

23  should know what's happening at their mine.  And as

24  Mr. Mattos stated earlier, you know, we want the

25  operators to be proactive.  And they should be proactive

1    from the minute they open their doors for business is

2    my -- as far as health and safety and not be waiting for

3    some kind of novice telling them, you guys are doing

4    something wrong.

5              They should be proactive in that step.  And

6    that's why we are against, you know, the novice to know

7    that.  They should be proactive from the beginning, and

8    they should be there to try to stay off of the Pattern of

9    Violations for doing things right.

10             And that's where this all comes -- as far as

11   the criteria is concerned, you know, we think MSHA, you

12   know, is a -- you've had the Act for over 30 years now.

13   And I think you have developed enough data to know what

14   constitutes a bad operator and what doesn't constitute a

15   bad operator.  And those are things that you should be

16   using to determine that, you know, what is there.  We

17   agree with, you know, the -- be included in it.

18             One of the things that, you know, is kind of

19   a -- you know, a bad situation even from the -- you know,

20   our represented mines are probably some of the highest

21   cited mines in the United States.  And, again, when it

22   comes to the major disasters in fatalities and stuff,

23   the UMWA represented mines are not in that category.

24             So there is -- you know, so there is a -- why

25   is this happening where those mines, if you give it to

```
1    them like this, you have to enforce it equally across the

2    board and make sure everybody gets the same enforcement

3    of this where even this too won't work in weeding out

4    those bad operators.

5              And with that, I close my comments.

6              MODERATOR SILVEY:  You got anything?

7              MR. MATTOS:  Thank you.

8              MODERATOR SILVEY:  No?  Yeah.  Okay.

9              Thank you, Mr. Butero.

10             MR. BUTERO:  Thank you.

11             MODERATOR SILVEY:  Is there anybody else who

12   wishes to comment?  Anybody in the audience?

13             Well, I can't tentatively conclude this hearing

14   because I was notified that a representative of Thunder

15   Basin is coming at 1:00.  So we have to take a break till

16   1:00 because I have been given prior notice now.  So if

17   we can take a break until 1:00.

18             Now, I know what people usually do when we take

19   a break, but -- they usually leave.  But if some of you

20   don't have anywhere to go, if you would please come back

21   at 1:00 so he won't feel like we're here listening to

22   Thunder Basin, and he won't feel alone.  But you all can

23   tell him I said that too.

24             Okay.  Thank you.

25             (Recess was taken.)
```

1          MODERATOR SILVEY:  We will now reconvene the

2    Mine Safety and Health Administration's public hearing on

3    the Agency's proposed rule on Pattern of Violations.

4          Our next speaker is -- I know his last name is

5    Cleary.

6          Is it McCleary or Clear --

7          MR. McCREARY:  McCreary.

8          MODERATOR SILVEY:  McCreary --

9          MR. McCREARY:  Sounds good.

10         MODERATOR SILVEY:  -- with the -- you know,

11   I'm -- this is from memory -- with Thunder Basin Coal

12   Company.

13         MR. McCREARY:  That's correct.

14         MODERATOR SILVEY:  Thank you.  Come on down.

15         MR. McCREARY:  Okay.  I will.

16         COURT REPORTER:  Actually, sir, could you scoot

17   over one chair?

18         MR. McCREARY:  Okay.

19         COURT REPORTER:  Thank you.

20         MODERATOR SILVEY:  And if you would spell your

21   name for the court reporter, please.

22         MR. McCREARY:  McCreary -- M-C-C-R-E-A-R-Y.

23         MODERATOR SILVEY:  And your first name?

24         MR. McCREARY:  Tim.

25         MODERATOR SILVEY:  Tim.  That's -- I wasn't

1    sure.  Okay.

2              MR. McCREARY:  I'll bet you can spell it.

3              MODERATOR SILVEY:  Yeah.  Thank you.  Okay.

4              MR. McCREARY:  Members of the panel, my name is

5    Tim McCreary.  I'm the Safety Manager at Thunder Basin

6    Coal Company in Wright, Wyoming.  I want to thank you for

7    the opportunity to address the panel concerning Thunder

8    Basin's views on the proposed rule regarding pattern of

9    violation, or POV.

10             I'm fortunate to work at Thunder Basin Coal.

11   That's because safety is a core value at Thunder Basin.

12   We have a strong commitment to safety, starting with

13   the CEO of our company.  Thunder Basin implemented a

14   behavior-based safety process about four years ago.

15   We've seen over the past 30 or so years that more regs,

16   more rules will only get you so far in terms of safety.

17             The rule is only as good as the behavior that

18   drives compliance.  For these reasons, I don't believe

19   Thunder Basin will be affected by this section of the

20   Mine Act.

21             Having said that, we at Thunder Basin can't sit

22   by when there are fundamental problems with this proposed

23   rule that affect the very foundation of our society.

24             On the pattern criteria, this section states

25   that it would specify the general criteria that MSHA

85

1    would use to identify mines with a pattern of violation.

2    MSHA has asked for comments on how the Agency should

3    obtain comments during the development of and periodic

4    revision to the POV screening criteria.

5          Obviously, this tells us that the Agency

6    expects the POV regulation to be a moving target.  Since

7    the latest retolling of the criteria, it's difficult to

8    believe that the Agency doesn't already have a desired

9    formula for the criteria in mind.

10         The current role has specific benchmarks in

11   each category.  If the Agency intends to adjust those

12   numbers and formulas, there should be a public comment

13   period prior to this being put into action.  Transparency

14   has been touted as a cornerstone of this administration.

15   And this proposed rule is anything but transparent.

16         Also, MSHA must normalize the formulas for each

17   category.  By using whole number cutoffs to determine the

18   weigh points, the size of the operation is overlooked.

19   There must be a formula to normalize the equation to keep

20   every size operation on a level playing field.

21         As far as a pattern of violation of the same

22   standard is concerned, our largest citation category at

23   Thunder Basin is 77.404(a), which is a catchall standard

24   for mobile and stationary equipment.

25         When no other standard fits, violations are

1    written under 404(a).  At a large operation with more

2    than 400 pieces of mobile equipment, a quick glance by

3    the standard number might indicate a pattern of repeat

4    violations.  But if you dig in a little deeper and read

5    the description of the violation, they are nearly all

6    written for totally different conditions.

7          Does this truly reflect a pattern of violation

8    or repeat violations?  I don't think so.  MSHA needs to

9    spell out the specific criteria and allow for a public

10   comment period on that criteria before a final rule is

11   developed.  The proposed rule would eliminate the

12   existing requirement in 104.3(b) that only citations and

13   orders that have become final orders are to be used in

14   the POV calculation.

15         The Agency states that due to the large number

16   of contested citations and the time to process them, that

17   only using final orders hinders MSHA's ability to enforce

18   the Mine Act.

19         Let's be perfectly frank here.  The Agency

20   intends to eliminate due process if this becomes final.

21   When George Mason forged out the Bill of Rights, he

22   intentionally put in place what we know as the Fifth

23   Amendment to the Constitution.  This Amendment prevents

24   individuals from being deprived of life, liberty, or

25   property without due process.

 1         Due process extends to all persons and

 2    corporate entities to protect against abuse of government

 3    authority.  Our system of justice has always worked on

 4    the premise that a person is innocent until proven

 5    guilty.  I think the past 235-year history of our country

 6    proves that it's been an extremely important part of our

 7    Constitutional rights.

 8         By allowing an MSHA inspector to issue a

 9    citation or order without the possibility of due process

10    as to the validity of the citation or order will allow

11    the inspector to become the judge, jury, and executioner

12    for an operation that is nearing POV status.  Inspectors

13    are not right every time.

14         MSHA also needs to consider the reasons for the

15    large number of citations under contest.  I believe in

16    large part that it's due to regulatory creep.  That is

17    when inspectors in the field continue to stretch the

18    reach of the regulation.

19         The industry has done a good job over the years

20    at eliminating violations, and the inspectors seem to

21    feel a need or pressure to write more citations.

22    Therefore, we find a stretch of the meaning of the

23    regulation to find something to write.  Understanding

24    that the Secretary has been given broad discretion to

25    develop these rules, no one should ever believe that the

1    Congress had any intent to eliminate our Constitutional

2    rights in the process.

3          Due process is a basic right of a democratic

4    society.  MSHA must reinstate the provision that only

5    final orders be used in determination of a pattern of

6    violation.  The Agency in the proposed rule -- or the

7    Agency states in the proposed rule that all references to

8    PPOV, or Potential Pattern Of Violation, would be

9    deleted.  Recent months have shown this to be a very

10   valuable tool for MSHA to have in their toolbox.

11         As MSHA stated in an April 12, 2011 press

12   release:  Major reforms to the POV process have been

13   implemented, including a new screening criteria and a new

14   review process that improves the Agency's ability to

15   identify problem mines.

16         Between November and December last year, the

17   Agency put 14 mines on a pattern of violation.  Ten of

18   those operations have made enormous improvements in their

19   S&S rates.  One operation had an 87 percent reduction.

20   The least improved in this group showed an improvement of

21   39 percent in their S&S'.  This is a tremendous success

22   story.

23         With these types of results, why wouldn't MSHA

24   want to keep this tool?  Is MSHA's mission to improve

25   safety in our nation's mines, or is it to close down

1    mining operations?  A large underground mine might well

2    be handed a death sentence if not allowed the notice of

3    the potential to be placed on a POV.

4          MSHA has proven that notifying mining

5    operations of their potential is extremely effective.

6    The Agency must keep the Potential Pattern Of Violation

7    notice in the toolbox.  Although the current rule has

8    some misgivings, it has recently proven its

9    effectiveness.  We appreciate the opportunity to share

10   our views on this important topic.

11         The POV tool could be crafted to be extremely

12   effective in dealing with chronic and persistent

13   violators of safety and health laws.  But to be

14   effective, the final rule needs to be transparent by

15   involving all stakeholders on the specific -- truly

16   specific criteria.  It must afford mine operators due

17   process and fair notice with opportunity to make

18   meaningful improvements.

19         Thanks for your time and consideration.

20         MODERATOR SILVEY:  Thank you, Mr. McCreary.

21         One thing I wanted to say, and I wanted to say

22   it at the beginning.  And Mr. Glynn is gone now.  But in

23   response to one of the things he said -- and for those of

24   you who were here, and I think all of you who were

25   here -- he mentioned -- he made a reference to the safety

1    and health management system public meeting in

2    Sacramento.  And he referred to that as a proposed rule.

3         But I want to clarify for everybody because,

4    you know, then some people have made the leap to the

5    reference to safety and health -- the safety and health

6    management program in the Pattern of Violations proposal.

7    That would be a mitigating circumstance that a mine

8    operator could adopt and come into MSHA with to get it

9    approved with measurable benchmarks if a mine operator

10   felt he or she were approaching a Pattern of Violations.

11        Now, that safety and health management system

12   regulatory action that we started was in no way a

13   proposal.  We didn't propose -- and several people have

14   made references to the fact that that was vague and we

15   didn't know what you -- we didn't propose anything.  We

16   actually did what the President had said that he wants

17   agencies to do.  We sought the public's input into what a

18   meaningful proposal should look like.

19        That's why we had those public meetings.  And

20   we still have not moved to a proposal.  But as I said

21   earlier, the safety and health management program that we

22   wanted operators -- that operators could choose to adopt

23   under this proposed rule to be considered a mitigating

24   circumstance, that would be a safety and health

25   management program aimed to eliminate or to address or to

1    correct the S&S violations that gave rise to the pattern.

2              So that would be a safety and health management

3    program in a distinct specific area.  The safety and

4    health management system, as I've talked to a number of

5    you about, is clearly a proactive approach that many

6    companies have voluntarily adopted to deal with safety

7    and health in the entire place -- in the entire mine

8    and to involve all of the workers in the mine or the

9    plant, whatever it is, and so that they would infuse a

10   proactive approach to safety.

11             So I guess in a way, I just want to make sure

12   that people understand the two.  The two were never

13   intended to be the same.

14             One of the -- I guess two more things.

15             With respect to the 14 mines, Mr. McCreary, you

16   said that we had -- or that had been given Notice of

17   Pattern of Violations.  Just as a technical

18   clarification, they've been given notice of a PPOV, of a

19   Potential Pattern of Violations, under the existing rule.

20             And I do agree with you.  It is a wonderful

21   thing that those 14 -- that at least -- I don't guess

22   every number of them, but some great majority of them

23   achieved a tremendous improvement in the --

24             MR. McCREARY:  Ten of those.

25             MODERATOR SILVEY:  -- in the -- yeah.  And they

1  were significant improvements.  And, quite frankly, as

2  somebody said earlier, when -- initially, when pattern

3  was put in the '77 Act, some people referred to it as a

4  death knell.

5       But our whole goal is really the improvement of

6  conditions in -- safety and health conditions in mines

7  and not to be looking at ways that -- if mines could stay

8  off a pattern of violation by some objective indices,

9  that means that if you use the objective criteria or as

10 we have now the formula, this specific criteria, that

11 says that those are the most objective measurements for

12 determining whether they may be approaching a pattern.

13      So they are doing something right.  At least

14 some things are going the right way.  And those are the

15 things from the Agency's standpoint that we like to see.

16      And the only other thing I would say -- and

17 I've heard it -- and I hear you all -- that MSHA's

18 mission is not -- MSHA's mission is to improve safety and

19 health, not to close any mines.  But I hear everybody's

20 comment in terms of what everybody is saying.  And we

21 are -- the last point I'll make is on the due process,

22 because I know we're going to hear that until the record

23 closes.

24      On the due process issue, the only thing -- and

25 I said that earlier -- the only thing I would say to that

1   is, is when you -- with respect to what we did in

2   deleting the requirement that we use only final orders, I

3   think we did do a couple things that the Congress

4   intended us to do.  And those couple of things were to:

5   (1) look at the statute; and (2) sometimes if the statute

6   is not painting it clear on its face, then the next thing

7   you do, you look to the legislative history.

8           And I think we did look to the legislative

9   history.  And we included some of that legislative

10  history in the preamble.  And so -- and we tried to more

11  accurately reflect the legislative history.  But -- and

12  so I'm -- that's probably enough said.  But on that

13  point, I do hear everybody's point on that.

14          Would you add anything?

15          MR. MATTOS:  No.

16          MODERATOR SILVEY:  Do you want to add anything?

17  Okay.

18          Let me ask -- let me see did you -- oh.

19          I -- one other thing and -- because you weren't

20  here this morning.  You know the part that we put in the

21  public hearing notice that on the specific criteria, if

22  we make any change to it, we were going to post it on the

23  website and get input from stakeholders.

24          And then we would respond to -- we would

25  respond to the stakeholder input, and we would revise the

1    criteria, if appropriate, and we would post both of those

2    on the website -- the revised criteria, if we did revise

3    it, and our response to the stakeholder input.  I'm just

4    saying that to say we moved one step from where we were

5    at the time of the proposal.  Okay.  I think that's --

6    if -- I think that's all, if you --

7              MR. MATTOS:  I have one question.

8              MODERATOR SILVEY:  Okay.  Yeah.

9              MR. MATTOS:  If we ended up with a rule whereby

10   we were able to revise the -- we don't publish the

11   criteria and the specific criteria, just the general

12   criteria in the rule, and we go out with this kind of a

13   notice and comment type of scheme when revising the

14   criteria, if we were to revise the criteria and using

15   comments from the stakeholders, revise the criteria and

16   have those criteria out there with our web tool and --

17   for whatever period of time -- in other words, the

18   criteria would not take effect until the timeframe if

19   it's one year.  We're looking at the one-year window of

20   enforcement history.  You've got a --

21             MR. McCREARY:  Sure.  Twelve months.

22             MR. MATTOS:  You have a year in which to

23   monitor your --

24             MODERATOR SILVEY:  Your own record.

25             MR. MATTOS:  -- your own record.

1        MR. McCREARY:  Right.  Right.

2        MR. MATTOS:  Would that alleviate any of your

3   concerns on the --

4        MR. McCREARY:  Well, I guess I --

5        MR. MATTOS:  -- the transparency issue?

6        MR. McCREARY:  Well, I don't understand, I

7   guess.  Maybe you can explain to me what the logic is of

8   not having a specific criteria in the final rule.  Why is

9   that a later development?

10       MODERATOR SILVEY:  To be honest, the logic was

11  just that sometimes the -- based on our experience with

12  the specific criteria, there might be the necessity to

13  change it.  And this -- and that -- doing it that way

14  allows the flexibility to change.  But we do acknowledge

15  that we would want to provide stakeholders' input into

16  the change.

17       And that was why we moved from where we were in

18  the proposal to the fact that we would -- if we changed

19  it, we would post that changed criteria on the website

20  and allow stakeholders -- I don't know; I'm making this

21  up -- 30 or 60 days to provide comments --

22       MR. McCREARY:  Sure.

23       MODERATOR SILVEY:  -- then review their

24  comments and then publish a response to their comments --

25  whether we took this one; we rejected this one; we took

1    this one.  But the ones we took, we saw the necessity to

2    revise the specific criteria.  And so we would post the

3    specific criteria on the website.

4           And now Jay is asking -- but we wouldn't

5    make -- we wouldn't use that specific revised criteria

6    where -- which we've taken into consideration comments.

7    We would not use that until the passage of some time that

8    allows some operation under this revised criteria.

9           MR. McCREARY:  Sure.  Yeah.

10          MODERATOR SILVEY:  You --

11          MR. McCREARY:  I understand.

12          MODERATOR SILVEY:  Okay.

13          MR. McCREARY:  I guess I -- my thought would be

14   let's get it right the first time.

15          MODERATOR SILVEY:  Yeah.  Okay.

16          MR. MATTOS:  And I --

17          MR. McCREARY:  Let's not do it until we get it

18   right and do it the first time and be done.

19          MODERATOR SILVEY:  Well, I think, though, for

20   all of us who have looked at this, we found that there

21   can be some improvement.  Even the criteria that we

22   started under initially, we -- I mean, this is basically

23   the same concept.

24          People -- some of the people at MSHA when I go

25   back and tell them the kind of comments we are getting on

1 the proposed -- on this proposed rule, they will turn to

2 me and say, but isn't that the way -- isn't that the

3 manner in which we are operating now?  We didn't -- we

4 don't have the specific criteria, you know -- I mean,

5 that's their quick comeback to me.

6    We don't have the specific criteria in the

7 existing rule, do we?  And my answer to them is, no, we

8 don't.  And we've been operating that way for 30-some --

9 you know, in excess of 30 years with --

10    MR. McCREARY:  Well, the ones -- those 14 that

11 got potential notices in November and December, that was

12 based on specific criteria, wasn't it?

13    MODERATOR SILVEY:  I know.  But it's not in the

14 rule.  That's the point that they are making to me.  It's

15 not in the rule.  It was the formula that we just posted.

16 And that's their point.  There was no change.  The

17 specific criteria are not in the existing Pattern of

18 Violations rule.

19    It's just the general criteria that we would

20 use -- S&S violations are warranted for failures,

21 imminent danger, or the -- you know, stuff -- but the --

22 but so many -- for 50 percent or greater S&S violations

23 are in the top whatever on what -- eight unwarrantables?

24    I'm making it -- whatever it is.  That's not in

25 the existing rule.  And that's what they -- that's their

```
 1   comeback to me.  And I guess, theoretically -- I'm saying

 2   theoretically now -- I don't have necessarily the best

 3   answer in the world to that.

 4            MR. MATTOS:  What --

 5            MODERATOR SILVEY:  But you give somebody a

 6   second bite at the apple, and they are in -- and so

 7   now -- but you all are telling me now you want it.  While

 8   we didn't have it in the existing rule, you want it in

 9   this rule.

10            MR. McCREARY:  Well, then that --

11            MODERATOR SILVEY:  I hear you, though.  Yeah.

12            MR. McCREARY:  That's the transparent part.  We

13   know what the rules of the game are.  You know, it's --

14            MODERATOR SILVEY:  I know.  But I guess all --

15   and we want -- all I'm saying is from that respect you

16   don't know what the rules of the game are under the

17   existing rule.  That's all based on back to me --

18            MR. McCREARY:  Well, we do today -- what they

19   are today, what the rule is today, or what the --

20            MODERATOR SILVEY:  Yeah.  But you hear what I'm

21   saying.

22            MR. McCREARY:  -- the criteria is today.

23            MR. MATTOS:  One of our concerns is if we put

24   specific criteria into a rule and we got it exactly

25   perfect -- yep, we got it.  And those of us who have
```

1   struggled with coming up with the protocol for doing

2   that --

3           MODERATOR SILVEY:  Which is --

4           MR. MATTOS:  -- is --

5           MODERATOR SILVEY:  -- in large part, him.

6           MR. MATTOS:  -- is difficult -- no, don't tell

7   people that.

8           MODERATOR SILVEY:  Well, I mean, it's -- you

9   know?

10          MR. MATTOS:  But then something changes, and

11  we -- I'll -- this here is a hypothetical.  If we had put

12  the criteria into the current rule and then several years

13  ago we had a large increase in the number of citations

14  and orders being cited -- being issued.  Now, we go from

15  a handful of mines exhibiting a Pattern of Violations to

16  hundreds, just --

17          MODERATOR SILVEY:  We --

18          MR. MATTOS:  -- by virtue of the fact that

19  there has been a change outside of the rule.  Then we're

20  all back in the same room again going, Okay; we --

21  this -- we need to go redo the rule.  And that process

22  is -- you know, this process is a --

23          MR. McCREARY:  Well, my -- I guess one of my

24  concerns, or our company's concerns, is that if it's

25  a continuing moving target, that the Agency may always

1    want to have a certain amount of mines in POV and

2    continually craft that criteria to meet that target, if

3    you will, so that if we know what it is today, 20 years

4    from now, 10 years from now, it's not going to change.

5            We know what the rules are, we play better,

6    everybody improves, and POV just basically goes away, is

7    what I guess the hope would be, right?  Everybody

8    improves.  Those bad players that are either at some

9    point maybe out of business because they can't play

10   anymore or they've just improved, and they've come around

11   to running their operations safely.  So -- but --

12           MR. MATTOS:  What we have are two ends of a

13   spectrum here; a concern over identifying mines that are

14   exhibiting a pattern based on a formula that:  Wait a

15   minute; these mines aren't really exhibiting a pattern,

16   but the formula says they are.

17           MR. McCREARY:  Right.

18           MR. MATTOS:  And we don't want that.

19           MR. McCREARY:  Right.

20           MR. MATTOS:  But on the flip side, we -- you

21   know, we don't want to just have a formula that's going

22   to give us some mines because we want to have mines.  And

23   that's not where we --

24           MR. McCREARY:  Right.

25           MR. MATTOS:  That's not where we are.

1          MR. McCREARY:  Right.  And I hear that even

2    today on the impact inspections that -- you know, I hear

3    it from our local field office.  There's a good chance

4    that, no matter how good you are, some day you're going

5    to get an impact inspection because the list keeps

6    getting shorter of those people.  So --

7          MODERATOR SILVEY:  Now, I hear what you're --

8          MR. McCREARY:  -- is POV going to be the same

9    way?  That's -- no matter how good you play, you're going

10   to be on the list some day, is what my concern is.

11         MODERATOR SILVEY:  Well, I would like to say to

12   everybody -- and this is not just meant for Mr. McCreary

13   -- that in the proposed rule when we said that it would

14   provide a more transparent process, even though I've

15   heard comments to the contrary that -- I mean, obviously,

16   I've heard your views on that -- we intended that what we

17   included in the proposed rule be a more transparent

18   process.

19         We did include that specific criteria.  We

20   posted it on the website.  We then created this web tool

21   that people could monitor their own performance,

22   compliance performance, and know at any point in time

23   where they are/were.  And now we've moved, as I said, one

24   step further to if we make any change in that specific

25   criteria, we will make it available to stakeholders for a

1   review and comments.

2           And we then will review your comments and let

3   you know our response to that.  So all of that is in the

4   interests of transparency, just so you know.  But having

5   said all that, I still hear -- we still -- we hear your

6   comments.  Anything?

7           MR. MATTOS:  No.

8           MODERATOR SILVEY:  Okay.

9           MR. McCREARY:  Okay.  Thank you.

10          MODERATOR SILVEY:  Thank you.  Okay.

11          Is there anybody else who wishes to comment?

12  Anybody else?  Nobody else.  Okay.

13          (Off the record.)

14          (On the record.)

15          MODERATOR SILVEY:  I guess I'll just do what

16  I'm told, just -- you know.  If anybody here -- so you --

17  so you -- if anybody here hasn't signed the attendance

18  sheet, please do so.  I thought we said that this

19  morning.  But, anyway, you know, some things you just do

20  what you are told.  I think everybody has signed but

21  Mr. McCreary.  And I -- but --

22          MALE SPEAKER:  Well, he doesn't like to be --

23          MODERATOR SILVEY:  Yeah.  Okay.  I figured

24  that.  Yeah.

25          MR. MATTOS:  We have his name in the record.

1          MODERATOR SILVEY:  Yeah.  Okay.

2          Then if nobody else wishes to make a

3   presentation, again on behalf of the Mine Safety and

4   Health Administration, I want to thank you for your being

5   here at this public hearing.  As I stated this morning in

6   the other public hearing, I want to thank those of you

7   who came and presented testimony.

8          But I want to also thank those of you who came

9   and may not have presented testimony and may present it

10  later, may have presented comments to us already but did,

11  in fact, attend this hearing because what that says to us

12  is that you have an interest in this rulemaking.  And we

13  appreciate that.

14         And the public hearing forum is, indeed -- is

15  intended for people who both present and for those who

16  want to come and just be aware of all of the issues and

17  maybe want to present some additional things to us before

18  the record closes, because I have talked to several of

19  you who, indeed, said that you will be doing so.

20         And I want to emphasize that all comments must

21  be received postmarked by June 30, 2011, and MSHA will

22  take your comments and concerns into consideration as we

23  develop a final rule.  And I encourage all of you to

24  continue participation in -- throughout the rulemaking

25  process.

```
 1            And I would like to even say -- ask you at this
 2    point to encourage you to participate in any other MSHA
 3    rulemaking.
 4            And at this point the public hearing is
 5    concluded.   Thank you very much.
 6                (Whereupon, at 1:28 p.m., the hearing in the
 7      above-entitled matter was concluded.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## REPORTER'S CERTIFICATE

CASE TITLE:      Patterns of Violations

HEARING DATE:     June 2, 2011

LOCATION:       Denver, Colorado


       I hereby certify that the proceedings and evidence are contained fully and accurately on the audio and notes reported by me at the hearing in the above case before the Department of Labor, Mine Safety & Health Administration.


Date: June 2, 2011

                         ANTHONY & ASSOCIATES, INC.


                         ROGER MEYERS
                         (Official Reporter)

REQUEST TO SPEAK

Pattern of Violations

Hearing
Denver, Colorado

**June 2, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | MIKE CRUM | MARC | 202-457-6500 |
| 2. | MARK SAVIT | MARC/PattonBoggs | 303 298 1280 msavit@pattonboggs.com |
| 3. | MATT PEDERSEN-HOWARD | RIO TINTO MINERALS | matthew.howard@riotinto.com |
| 4. | Jerry Glynn | Texas Industries | JGLYNN@TXI.com |
| 5. | Robert Butero | UMWA | region4@umwa.org |
| 6. | Tim McCreary | Thunder Basin Coal Co. | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |

AB73-PH-1A

SIGN-IN SHEET

Pattern of Violations

Hearing
Denver, Colorado

**June 2, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | Roland Tallerico  *970 675 4335* | Blue mountain Energy Inc. | rtallerico@deserado.com |
| 2. | MARK SAVIT | MARG/ Patton Boggs. | *303 298 1280* MSAVIT@ Patton Boggs |
| 3. | MATT PEDERSEN- HOWARD | RIO TINTO MINERALS | matthew.hacard@riotinto |
| 4. | David Graham | TATA CHEMICALS | dgraham@tatachemicals.com |
| 5. | Rowdy Heiser | Solvay Chemicals | rowdy.heiser@solvay.com |
| 6. | Pete WYCKOFF | TVA | pswyckoff@tva.gov. |
| 7. | Bill Olsen | Mountain Coal Co | BOLSEN@ Archcoal.com |
| 8. | Bob Butero | UMWA | region4@umwa.org |
| 9. | Matt Winey | Twenty mile | winey55@hotmail |
| 10. | Hank McKay | Blue Mountain Energy | hmckay@deserado.com |
| 11. | Pat Sollart | TWENTY MILE | 970-896-2719 |
| 12. | Gary Leaming | Canyon Fuel Co. | 435-286-4436 |
| 13. | David Hales | San Juan Coal Co | 505-598-2153 |

SIGN-IN SHEET

Pattern of Violations

Hearing
Denver, Colorado

**June 2, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 14. | Bill York-Feirn | Colo Mine Safety + Traing Progam | bill.york-feirn@state.co.us |
| 15. | David M. Arnolds | Chevron Mining In | d.m.arnolds@chevron.com |
| 16. | Valerie Jackson | DOL/OWCP/DCMWC | Jackson.valerie@dol.gov |
| 17. | Ron Hockett | Twenty mile | 970-870-22708 |
| 18. | Hugh Thatche | Ogletree Deakins | hugh.thatcher@ogletreedeakins.com |
| 19. | Cole Wist | Ogletree Deakins | cole.wist@ogletreedeakins.com |
| 20. | Erik Dullea | Patton Boggs | edullea@pattonboggs.com |
| 21. | Brent Bailey | UMWA Local 1769 | abbailey@cut.net. |
| 22. | Tim McCreary | TBCC | tmccreary@archcoal.com |
| 23. | | | |
| 24. | | | |
| 25. | | | |
| 26. | | | |

# <u>Testimony of the Mining Awareness Resource Group (MARG) on the MSHA Proposed Pattern of Violations Rule June 2, 2011</u>

Good ~~Afternoon.~~ MORNING My name is Mike Crum. I am employed by FMC Corporation as the Safety Team Leader at the FMC Westvaco Mine and I serve as Chairman of the Mining Awareness Resource Group (MARG). MARG is a coalition dedicated to protecting its employees and the environment. MARG members includes FMC, Cargill Salt, Detroit Salt, Morton Salt, Mosaic Potash, Tata Chemicals (formerly known as General Chemical), and other mining interests that support our efforts. MARG seeks to ensure that laws and regulations are feasible, effective, based on sound science and implemented and enforced fairly. MARG represents its members in select matters which impact the mining industry before the federal agencies, the Congress, and the courts. MARG also serves its members by providing a forum for communication and the exchange of information and by creating coalitions to assist in achieving common goals.

Today, I present MARG's comments on the MSHA proposed rule on Patterns of "Significant and Substantial" (S&S) Violations. MARG seeks a transparent and fair rule for the use of MSHA's most severe civil enforcement tool: closure orders resulting from a "pattern" of S&S violations. Unfortunately, the proposed rule is

5170753

AB73-PH-1B

neither transparent nor fair, and is contrary to law and must be re-proposed.

The first fundamental problem with the MSHA proposal is that it withholds for future web posting the actual criteria the agency will use for pattern determinations. By not disclosing, proposing and adopting the criteria through notice and comment rulemaking, MSHA prevents a full analysis of the rule's impact and a meaningful opportunity for interested parties to comment on the proposal.

As a result, we believe that the proposed rule violates the Administrative Procedures Act (APA) and Mine Act rulemaking mandates. For example, Section 104(e) (4) of the Mine Act authorizes the Secretary to: *"make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists."* (emphasis added). By not disclosing the criteria and publishing them for comment, MSHA exceeds it authority and violates its Mine Act mandate.

Second, if adopted, the proposed rule will result in closure orders issued against employment sites before the employer has an opportunity to:

(1) discuss the alleged pattern with the agency;

(2) contest the validity of alleged citations or orders used to identify a pattern;

(3) address the accuracy of agency data used for pattern identification; or

5170753

MARG p. 2

(4) obtain judicial review of alleged violations constituting a pattern. .

The proposed rule, if adopted, will deny mine operators Mine Act Section 105 citation and penalty contest rights and due process of law, by permitting the use of contested violations to impose pattern closure orders. The contest provisions of the Act provide critical protections against improperly issued citations. MSHA's elimination of contest rights and the protection they provide is not authorized by the Mine Act.

In addition, the proposed rule will eliminate the current rule's notice of a proposed pattern, and the established opportunities to demonstrate to MSHA that the proposed pattern is based on erroneous data, a common occurrence in the overloaded MSHA data base. This current system has proven critical to prevent inapplicable and incorrect pattern enforcement and invalid mine closure orders. Further, contrary to the purpose of the Mine Act, the proposed rule's elimination of the notice of potential pattern will deny mine operators and their employees an opportunity to improve their performance, and thereby  their safety record.

If adopted, the proposed rule also will require mine operators, if they wish to gain future MSHA consideration of "mitigating circumstances" prior to pattern closure

5170753

MAR6 p3

order issuance, to submit "safety and health management programs" to MSHA for approval. By so doing, the proposed rule seeks to impose a new, substantive safety standard program mandate, bypassing the rulemaking provisions of the Act.

Separate and distinct rulemaking procedures have been announced at both OSHA and MSHA to determine if company safety program mandates should be required and, if so, what program mandates should be adopted through those separate rulemaking procedures. By seeking to adopt safety program mandates, through this unrelated Pattern rulemaking, MSHA engages in an "end run" around Mine Act Section 101 mandatory rulemaking for safety and health standards.

The very concept of determining whether there is a pattern of violations "which are of such nature as could have significantly and substantially contributed to the cause and effect of …mine health or safety hazards" requires the consideration of the circumstances surrounding the citations and possible hazards, including the impact of the safety program in place at the mine. Mandating MSHA advance approval of a safety program, as proposed in this pattern rulemaking, violates the agency's duty to consider the mine's safety program as a hazard "mitigating circumstance," regardless of whether MSHA knew of the program – let alone approved it – in advance. MSHA does not have authority to attach such a pre-

5170753

MARG P. 4

condition, with its associated mine operator burden, to the exercise of its statutory duty to evaluate the circumstances surrounding suspected violations, before issuing closure orders.

We understand the need for fair and equitable use of MSHA enforcement tools to achieve safety, as well as the need to reform the troubled MSHA enforcement system. We do not believe, however, that this flawed proposal will enhance safety nor comply with the mandates of the Mine Act, the APA and the due process protections of the Constitution. We urge you to revoke, revise and re-propose this rule.   Thank you for allowing me to testify on behalf of MARG.

MARG p. 5

Matthew Pederson Howard
Director of Health &
Safety
Rio Tinto Minerals

Rio Tinto Minerals
8051 E. Maplewood Avenue
Building 4
Greenwood Village, CO 80111
USA
T +1 303 713 5000
F +1 303 713 5769

April 4, 2011

**By Email to zzMSHA-comments@dol.gov**

Mine Safety and Health Administration
Office of Standards, Regulations, and Variances
1100 Wilson Blvd., Room 2350
Arlington, VA 22209-3939

RE:     Comments on Proposed Rule, Pattern of Violations, RIN 1219-AB73

Rio Tinto Minerals (RTM) is pleased to submit the following comments on the proposal of the Mine Safety and Health Administration (MSHA) to revise the existing regulation for Pattern of Violations. RTM, as a member of the Industrial Minerals Association – North America (IMA-NA), also endorses and incorporates the comments submitted by IMA-NA on the proposed rule.

Rio Tinto Minerals (RTM) is a Rio Tinto company – one of the world's largest mining and exploration companies. RTM is a leading supplier of borates and talc with 2,500 people working at 40 facilities throughout the world. RTM has locations not only in the United States, Canada and Mexico but also France, Argentina, Belgium, Italy, Spain and Australia. We supply nearly half the global demand for refined borates – key ingredients in fiberglass, ceramics, glass, fertilizers, wood preservatives and hundreds of other uses – and 25 percent of the global demand for talc.

Rio Tinto Minerals believes the current Pattern of Violations (POV) process is complicated and unwieldy. The criteria used to place a mine on pattern status are confusing for not only the public but also the mine operator. It is difficult for a mine operator to assess how close it is to being placed into pattern status and the process contains too much subjectivity.

Given the problems with the current POV process, RTM would recommend MSHA undertake a comprehensive review of the POV program as detailed below. We believe any effective POV program needs to have: (1) clearly defined criteria for POV status; (2) consistency in treatment if a mine is placed in POV; and (3) a reduction in subjectivity. In order to keep miners safe and avoid safety incidents that result in fatalities or serious accidents, POV criteria should be based on both the rate of citations and orders per inspection day and overall frequency rate of reportable incidents. That is, a mine operation should be placed on POV status because of both poor regulatory and safety performance. Such a standard would help ensure that POV status identifies chronic and persistent violators of the mine safety standards which result in injuries. RTM recognizes that violations and the significance of those violations will be an important step in determining POV status but the rate of citations is not indicative of injury rates. Rather, we believe violations

AB73-PH-1C

need to be balanced with a more transparent and consistent metric that relates directly to the safety of miners at a mine site, such as reportable injury rates.

**Criteria for Determination of POV Status**

The inspection process unfortunately has numerous opportunities for subjective and inconsistent application of standards. This subjectivity exists in every step from the gravity determination to the assessment process. MSHA's proposal appears to exacerbate this subjectivity by authorizing POV status on both S&S citations and withdrawal orders (regardless of the MSHA standard violated). MSHA's POV regulations should be revised to decrease, not increase, this subjectivity. MSHA should be adopting criteria that are straightforward, clear and transparent so both the mine operator, mine employees, and the public, know if a mine is close to being placed in POV status.

- On a quarterly basis, based on a 12-month rolling average, MSHA should rank mines based on both: (1) a mine's regulatory compliance rate (combination of S&S citations and withdrawal orders) per inspection hours and (2) reportable incident rate from the prior 12 months.

- The MSHA threshold rankings for citation rate/reportable incident rate by mine category should be publicly available and posted on the MSHA website (for example, the reportable incident rate threshold for surface metal/nonmetal mines in Q1 2010 was 3.75).

- Based on its ranking, a mine will be placed in "pattern of violations" status if, per inspection hour, its: (1) regulatory compliance rate is in the bottom 3 percent; and (2) reportable incident rate is in the bottom 8 percent. A mine meeting one but not both of the criteria will receive a "notification" letter and will be required to develop and submit to MSHA a plan to reduce the identified pattern.

- Any citations that give rise to POV status must qualify for an expedited review process. If any citation that gave rise to POV status is ultimately vacated, a mine site will automatically be removed from POV status.

**Actions after POV Status**

Once a mine is placed in POV status, there must be clear and consistent requirements for mine operations. MSHA must also establish a transparent process for removing a mine from POV.

- Once placed in POV status, a mine site will perform a two-hour safety stand-down for a complete inspection of the site and review S&S citations, withdrawal orders, injury records, and other relevant, identified safety information within 7days and meet with MSHA to report the results.

- A mine site will have 10-days to develop a violation, accident and injury protection program. If a site does not have a current accident and injury protection plan, MSHA will provide framework or guidance to assist the mine operator.

- A mine site must provide an additional 8 hours of safety training for every employee, including contractors, to cover the new violation, accident and injury protection program.

- For sites under POV status, the Secretary can authorize spot inspections by authorized representatives of all or part of such mine every 10 working days at irregular intervals. If after 6 months a mine under POV status demonstrates improvements in both citation rates and injury rates, spot inspections will be discontinued.

- A mine site will be removed from POV status after 12 calendar months if its regulatory compliance rate is no longer within the bottom 3 percent or its reportable incident rate is no longer within the bottom 8 percent.

- If a mine site fails to be removed from POV status after 12 calendar months, even if it shows improvement in both categories, the mine will remain on POV for another 12 calendar months. If the site does not demonstrate improvement in either category (citation rates and injury rates) and remains on POV after 12 calendar months, the site will also be required to have a violation, accident, and injury protection program approved by MSHA within 30 days. If MSHA and the operator cannot agree on a plan within such 30 day period, the mine will be shut down until a plan is approved and an expedited review of the plan will be permitted.

  *[Other options to conditions to consider for showing no improvement after 12 calendar months: Immediate 10-day closure of mine for assessment by MSHA under what conditions it is allowed to re-open; site will be subject to triple the inspections for the next 12 months; 8-hour hazard recognition training by a third-party expert plus another 8 hours on new accident reduction plan].*

**Top Performers Inspection Schedule**

- If a mine is ranked within the top 5 percent for both its regulatory compliance rate and reportable incident rate, and has not had a fatality in the preceding 12 months, inspections of the mine will be reduced to half for the next year (thereby allowing MSHA to focus their resources on mines with poor regulatory compliance and safety rates).

Rio Tinto Minerals appreciates the efforts of MSHA to improve the POV program and we understand that some of the elements of our recommended POV program cannot be implemented without Congressional approval. However, we

believe MSHA should begin a dialogue with Congress, mine operators, mine employees and the public so that these elements can be fully discussed. Such a discussion is especially critical, and warranted, by the dearth of specifics in MSHA's proposed POV rules.

Sincerely,

Chris Robison
Vice President Operations - Americas