# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OHIO COAL ASSOCIATION,** et al.,

   **v.**                            Case No. 2:14-cv-2646

**THOMAS E. PEREZ,** et al.,

       Defendants.

**and**

**MURRAY ENERGY CORPORATION,**  Case No. 2:15-cv-448
et al.,

                                 Judge Graham

       Plaintiffs,

                                 Magistrate Judge Deavers

   **v.**

**THOMAS E. PEREZ,** et al.,

       Defendants.

## ADMINISTRATIVE RECORD

### PAGES 01292-01515

# Statement of Thunder Basin Coal Co
# MSHA's Proposed Rule – 30CFR Part 104
# Pattern Of Violation (POV)

*Introduction* - Members of the panel, my name is Tim McCreary.  I am the Safety Manager at the Thunder Basin Coal Company in Wright WY. I want to thank you for the opportunity to address the panel concerning Thunder Basin's views on the proposed rule regarding Pattern of Violation or POV.

I'm fortunate to be working at Thunder Basin Coal.  That's because Safety is a core value at Thunder Basin.  We have a strong commitment to safety starting with the CEO of the company.  Thunder Basin implemented a Behavior Based Safety Process about 4 years ago.  We've seen over the past 30 years or so that more Rules and Regulations will only get you so far in terms of safety.  The Rule is only as good as the behavior that drives compliance.  For these reasons I don't believe Thunder Basin will be affected by this section of the Mine Act.

Having said that, we at Thunder Basin can't sit by when there are fundamental problems with this proposed rule that affect the very foundation of our society.

Proposed - Section 104.2          Pattern Criteria

This section states it would "specify the general criteria" that MSHA would use to identify mines with a pattern of violations.  MSHA has asked for comments on how the agency should obtain comment during the development of and periodic revision to, the POV screening criteria.

Obviously this tells us the Agency expects the POV regulation to be a moving target.  Since the latest "retooling" of the criteria, it's difficult to believe that the agency doesn't already have a desired criteria formula in mind.  The current rule has specific benchmarks in each category.  If the agency intends to adjust those numbers and formulas, there should be a public comment period prior to this being put into action.

AB73-PH-1D

Transparency has been touted as a cornerstone of this administration. This proposed rule is anything but transparent.

MSHA must normalize the formulas for each category. By using whole numbers cut offs to determine the weigh points, the size of the operations is overlooked. There must be a formula to normalize the equation to keep every size of operation on a level playing field.

As far as pattern of violation of the same standard is concerned; our largest citation category is 77.404(a) which is a catchall standard for mobile and stationary equipment. When no other standard fits, violations are written under 404(a). At a large operation with more than 400 pieces of mobile equipment, a quick glance by the standard number might indicate a pattern of repeat violations. But if you dig in a little deeper and read the description of the violation, they are nearly all written for totally different conditions. Does this truly reflect a pattern of violation? I don't think so!

MSHA needs to spell out specific criteria and allow for a public comment period on that criteria before a final rule is developed.

The proposed rule would eliminate the existing requirement in 104.3(b) that only citations and orders that have become final orders are to be used in the POV calculation. The agency states that due to the large number of contested citations and the time to process them, that only using final orders hinders MSHA's ability to enforce the Mine Act.

Let's be perfectly frank here, the agency intends to eliminate due process if this rule becomes final.

When George Mason forged out the Bill of Rights, he intentionally put in place what we know as the 5th amendment to the constitution. This amendment prevents individuals from being deprived of life, liberty or property without due process.

Due process extends to all persons and corporate entities to protect against abuse of government authority. Our system of justice has always worked on the premise that a person is innocent until proven guilty! I think the past 235 year history of our country proves that it's been an extremely important part of our constitutional rights. By allowing an

MSHA inspector to issue a citation or order without the possibility of due process as to validity of the citation or order, will allow the inspector to become the judge, jury and executioner for an operation that is nearing POV status! Inspectors are not right every time!

MSHA also needs to consider the reasons for the large number of citations under contest. I believe in large part that it's due to "regulatory creep". That is when inspectors in the field continue to stretch the reach of the regulation. The industry has done a good job over the years at eliminating violations and the inspectors seem to feel a need or pressure to write more citations. Therefore we find a stretch of the meaning of the regulation to find something to write.

Understanding that the Secretary has been given broad discretion to develop these rules, no one should ever believe that the congress had any intent to eliminate our constitutional rights in the process. Due process is a basic right of a democratic society.

MSHA must reinstate the provision that only final orders be used in determination of a Pattern of Violation.

Proposed - Section 104.3

The agency states in the proposed rule that all references to a PPOV or Potential Pattern Of Violation would be deleted. Recent months have shown this to be a very valuable tool for MSHA to have in their toolbox.

As MSHA stated in an April 12, 2011 press release, major reforms to the POV process have been implemented, "including a new screening criteria and a new review process that improves the agency's ability to identify problem mines".

Between November and December last year, the agency put 14 mines on a potential pattern of violation. 10 of those operations have made enormous improvements in their S&S rates. One operation had an 87% reduction. The least improved in this group showed an improvement of 39%. This is a tremendous success story! With these types of results, why wouldn't MSHA want to keep this tool?

Is MSHA's mission to improve safety in our nation's mines or is to close down mining operations?  A large underground mine might well be handed a "death sentence" if not allowed the notice of the potential to be placed on POV.   MSHA has proven that notifying mining operations of their "potential" is extremely effective.  The agency must keep the Potential Pattern Of Violation notice in the toolbox.

Although the current rule has some misgivings, it has recently proven its effectiveness.


Summary –
We appreciate the opportunity to share our views on this important topic. The POV tool could be crafted to be extremely effective in dealing with chronic and persistent violators of safety and health laws.

To be effective, the Final Rule needs to be transparent by involving all stakeholders on the "specific criteria".  It must afford mine operators due process and "fair notice" with opportunity to make meaningful improvements.

Thanks for your time and consideration in this matter.

# TRANSCRIPT OF PROCEEDINGS

IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )

Pages:     1 through 61

Place:     Charleston, West Virginia

Date:      June 7, 2011

# ANTHONY & ASSOCIATES, INC.

770.590.7570

ANTHONY & ASSOCIATES, INC.
770.590.7570

AB73-PH-2

IN THE MINE SAFETY AND HEALTH ADMINISTRATION

IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )


                        Charleston, West Virginia

                        Tuesday
                        June 7, 2011


        APPEARANCES


        MSHA Panel:  PATRICIA W. SILVEY, JAY MATTOS,
CHERIE HUTCHISON, ANTHONY JONES


        Speakers:

        CHRIS HAMILTON, West Virginia Coal Association
        JOHN GALLICK, Alpha Natural Resources
        BRIAN LACY, United Mine Workers of America
        KENNY MURRAY, Alliance Coal


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

```
 1                    P R O C E E D I N G S

 2                                        (11:31 a.m.)

 3          MODERATOR SILVEY:  Again, good morning.  My

 4   name is Patricia W. Silvey, and I'm Deputy Assistant

 5   Secretary of Operations for the Mine Safety and Health

 6   Administration.  I will be the moderator of this public

 7   hearing on MSHA's proposed rule for pattern violations.

 8   On behalf of Assistant Secretary Joseph A. Main, I would

 9   like to welcome all of you here today.

10          At this point, I would like to introduce the

11   members of the MSHA panel.  The Chair of the Pattern

12   Rulemaking Committee to my left is Jay Mattos; to my

13   right, Cherie Hutchison, who is with the Office of

14   Standards; and to her right, Anthony Jones, who is with

15   the Department of Labor Office of the Solicitor.

16          In response to requests from the public, MSHA

17   is holding public hearings on the pattern of violations

18   proposed rule.  This is the second of four public

19   hearings.  As all of you know, the hearings are being

20   held in tandem with the proposed rule on Examinations of

21   Work Areas.

22          The first hearing was held in Denver on June

23   2$^{nd}$; the third hearing will be in Birmingham, Alabama, on

24   June 9th; and the final hearing in Arlington, Virginia,

25   at the headquarters' office on June 15$^{th}$.
```

1                The Pattern of Violations proposal applies to

2    all mines, coal and metal/nonmetal, surface and

3    underground.

4                The purpose of the hearing is to receive

5    information from the public that will help MSHA evaluate

6    the requirements in the proposal and produce a final rule

7    that will improve health and safety conditions at mines.

8                As most of you know, the hearings will be

9    conducted in an informal manner.  Formal Rules of

10   Evidence will not apply.  The hearing panel may ask

11   questions of the speakers and the speakers, as I said at

12   the prior hearing, may ask questions of the hearing

13   panel.

14               Speakers and other attendees may present

15   information to the court reporter for inclusion in the

16   rulemaking record.  MSHA will accept written comments and

17   other appropriate information from any interested party

18   including those not presenting oral statements.

19               I assume that by now everybody has signed the

20   attendance sheets.  If you have a hard copy or electronic

21   version of your presentation, please provide the court

22   reporter with a copy.

23               The post-hearing comment period for the

24   proposed rule ends on June 30th.  MSHA must receive your

25   comments by midnight, Eastern Daylight Savings Time, on

1    that date.

2              MSHA is proposing to revise the Agency's

3    existing regulations for pattern of violations.  MSHA

4    determined that the existing pattern of violations

5    regulation does not adequately achieve the intent of the

6    Federal Mine Safety and Health Act of 1977, or the Mine

7    Act.  Congress included the Pattern of Violations

8    provision in the Mine Act so that operators would manage

9    safety and health conditions at mines and find and fix

10   the root causes of Significant and Substantial, or S&S,

11   violations to protect the safety and health of miners.

12   Congress intended that MSHA use the Pattern of Violations

13   provision to address operators who have demonstrated a

14   disregard for the safety and health of miners.

15             MSHA intended that the proposal would simplify

16   the existing Pattern of Violations criteria and improve

17   consistency in applying the Pattern of Violations

18   criteria and more adequately achieve the statutory

19   intent.  The proposal would also encourage chronic

20   violators to comply with the Mine Act and MSHA's safety

21   and health standards.

22             MSHA requested comments from the mining

23   community on all aspects of the proposed rule.  It's

24   particularly interested in comments that address

25   alternatives to key provisions in the proposal.  The

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    preamble discusses the provisions in the proposal and

2    includes a number of specific requests for comment.

3          The proposed rule would include general

4    criteria and would provide that the specific criteria

5    used in the review to identify mines with a pattern of

6    S&S violations would be posted on MSHA's website.

7          In the preamble to the proposal, MSHA requested

8    suggestions on how the Agency should obtain comments from

9    mine operators and mines during the development of, and

10   the periodic revision to, the specific POV criteria.

11         MSHA also requested comments on the best

12   methods for notifying mine operators and the mining

13   public of changes to these criteria.  In the Public

14   Hearing Notice, MSHA clarified its plans and stated that

15   it would provide any change to the specific criteria to

16   the public for comment via posting on the Agency's

17   website before MSHA uses it to review a mine for a

18   Pattern of Violations.

19         MSHA plans to review and respond to the

20   comments, revise as appropriate the specific criteria,

21   and post our response and any revised specific criteria

22   on the Agency's website.

23         And so to explain that, right now, you all know

24   that the specific criteria for patterns are posted on the

25   Agency's website.  And what we said in the Public Hearing

1    Notice was that before we make any changes to the

2    specific criteria, we would make that available to the

3    public on our website.  We would allow the public to

4    comment.  We would respond to the public's comments; and

5    then if we had to revise that specific criteria based on

6    comments made by the public, we would post the revised

7    criteria, as well as our response to the public comments

8    on our website.

9         So we ask for your comments on this proposed

10   approach to obtaining public input into revisions to the

11   specific criteria.  MSHA also requested comments on the

12   burden that monitoring a mine's compliance record against

13   the proposed POV specific criteria using the Agency's

14   website would place on mine operators.

15        As most of you probably know, we developed a

16   web tool to make it easier -- I know some of you know

17   because I know some of you came into Arlington and we

18   presented the web tool to you, but we developed -- in the

19   interest of transparency, we developed a web tool to make

20   it easier for mine operators to monitor their compliance.

21   We asked that commenters give us their reactions to the

22   web tool and if they would, include any detailed

23   rationale and supporting documentation for any comments

24   or suggested alternatives.

25        Under the proposed rule, to be considered a

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1  mitigating circumstance, the proposed rule would provide

2  that an operator submit a written safety and health

3  management program to the District Manager for approval.

4  In other words, if an operator used the web tool or some

5  other format and found that they were approaching the

6  parameters in the specific criteria, they could come in

7  to MSHA and submit a safety and health management program

8  as a mitigating circumstance to the District Manager.

9        MSHA would review the program to determine

10  whether the program's parameters would result in

11  meaningful, measurable, and significant reductions in S&S

12  violations.  MSHA would like to clarify -- because we've

13  gotten some comments on this and we got some comments at

14  the public hearing in Denver that the Agency did not

15  intend that safety and health management programs that

16  are referred to in this proposed rule be the same as

17  those referenced in the Agency's rulemaking on

18  comprehensive safety and health management programs.

19        Those are two different -- two different items

20  and that other rulemaking, MSHA had not -- the safety and

21  health management system rulemaking, MSHA had not gotten

22  to the proposed rule stage on that rulemaking.  MSHA

23  would consider a safety and health management program as

24  a mitigating circumstance in the Pattern of Violations

25  proposal when it includes measurable benchmarks for

1    abating specific violations that could lead to a Pattern

2    of Violations at a specific mine and addresses hazardous

3    conditions at that mine.

4            MSHA requested detailed information and data on

5    costs, benefits, and feasibility of implementing these

6    proposed provisions.  MSHA requested specific comments on

7    its estimates on numbers of mines affected, which are

8    likely to vary from year to year.

9            As you address the proposed provisions, either

10   in your testimony today or your written comments, be as

11   specific as possible about how the changes would affect

12   the health and safety of miners, and also be as specific

13   as possible in any suggested alternatives, including your

14   rationale.  MSHA will make available transcripts of all

15   the public hearings approximately two weeks after the

16   hearing. You may view the transcript on our website at

17   www.MSHA.gov or www.regulations.gov.

18           And we will now begin our testimony.  Please

19   begin by clearly stating your name and organization and

20   spelling your name, so that the court reporter will have

21   an accurate record.

22           Our first speaker is Mr. Bissett with the

23   Kentucky Coal Association.  Is he here?

24           We would now then move to Mr. Hamilton, Chris,

25   West Virginia Coal Association.


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    MR. HAMILTON:  For the record, my name is Chris

2    Hamilton.

3    And allow me to simply reference my

4    introduction earlier here today to incorporate as a

5    preface for my specific comments on this ruling if that's

6    all right.

7    MODERATOR SILVEY:  Can we go off the record?

8    (Off the record.)

9    (On the record.)

10    MR. HAMILTON:  As it relates to the West

11    Virginia Coal Association, who we represent and some of

12    the concerns we have as we continue to lose production

13    here in Central App.

14    And let me say, we at the outset recognize the

15    importance of the Agency's Pattern of Violations power to

16    effectively carry out what I think we would all envision

17    as the intent of the Mines Act, and that's to have the

18    ability to sanction some additional sanctions against

19    those operators that we feel are recalcitrant or

20    otherwise simply just not complying, not complying with

21    the law.

22    However, we do believe strongly that the POV

23    system should be (1) simplified; (2) transparent; (3)

24    fundamentally fair; and (4) uniformly applied before

25    changes to the current process are made; therefore, we

1   oppose MSHA's proposed changes to the existing POV

2   procedure for the following specific reasons.

3         First, MSHA's proposed rule in our view clearly

4   violates mine operators' due process rights and

5   principles of fundamental fairness.  The current POV

6   procedure requires that only citations and orders that

7   have become final will be used to identify mines with

8   potential POV issues.  MSHA's proposal would change this

9   approach and allow POV determinations to be made solely

10  off of violations that have been issued as opposed to

11  those that are final adjudication.

12        While we fundamentally agree in the purpose of

13  the POV power, we believe the extension of the rule would

14  leave an operator presumed guilty rather than innocent

15  until proven guilty and is, accordingly, unfair.  MSHA

16  believes that this change is absolutely necessary to cure

17  a large backlog of cases pending before the Federal Mine

18  Safety and Health Review Commission.  This, coupled with

19  MSHA's belief that only a small fraction of Significant

20  and Substantial violations are ever modified or vacated,

21  is the main reason for MSHA's evisceration of due

22  process.

23        Most troubling is the fact that MSHA itself has

24  contributed to the backlog of cases more than any other

25  single factor because of the substantial increase in

1    questionable citations issued by inspectors.

2             This proposed rule is nothing more than an

3    irresponsible attempt by MSHA to clean up some of its own

4    inconsistencies while leaving operators no chance at

5    being heard.  Given this lack of justification, the

6    current POV rule should not be altered.  MSHA should not

7    have the authority to end run such a constitutional right

8    of due process, no matter how busy they are or for any

9    other reason.

10            The Fifth Amendment's guarantee of due process,

11   at the heart of due process is an individual's right to

12   his or her property.  The Fifth Amendment of the U.S.

13   Constitution holds that no person shall be deprived of

14   life, liberty, property, or due process of law.   It

15   should not be punitive POV sanctions for violations

16   issued instead of final adjudications on contested

17   citations or orders and it is an absolute denial of this

18   right.

19            To constitute a due process violation, a party

20   must be deprived of a protected interest; and, if so, the

21   Court must determine what process is due.  Surely, the

22   shutting down of a mine operation and the economic

23   detriment that would attach would qualify for due process

24   and envisioned by the Fifth Amendment.

25            Congress was well aware of such dangers when

1    they passed the Mine Act and created a way for mine

2    operators to be heard.  All of this protection was

3    designed to prevent erroneous deprivation and though

4    slow, the current system prevents this deprivation.  In

5    fact, MSHA stated during the formal rulemaking process

6    for the current POV rule that in order to avoid

7    inequities regarding which mines are placed on a pattern,

8    the Agency must make ample provision for due process when

9    applying the broad framework.

10          MSHA will consider only final citations and

11   orders when identifying mines with a potential of

12   violations.  MSHA has completely changed its position

13   apparently in favor of inequities in the POV process.

14          Secondly, the POV rule must ensure that mine

15   operators receive adequate notice and a fair opportunity

16   to be heard.  With the current proposal, it appears that

17   MSHA would also have the current practice of full and

18   fair notice to operators.  Fundamental fairness requires

19   that operators be made aware of circumstances giving rise

20   to the issuance of a POV, thereby, giving the operator a

21   reasonable opportunity to address any condition that

22   might alleviate the situation altogether.

23          Even Secretary Main once commented on the

24   necessity of fair and adequate notice.  He once stated in

25   a letter to MSHA regarding the proposed version of the

1   current POV rule that: "All mines, which are under

2   review for potential Pattern of Violations shall be given

3   notice to that effect by the Agency. This notice is

4   designed to give operators the opportunity to take

5   concrete actions and improve the citation history at the

6   mine and to implement a remedial plan. MSHA should

7   evaluate these and similar company efforts to correct the

8   Pattern of Violations when the Pattern Notice Conference

9   is held."

10        It is well established that courts and

11   prosecutors are not allowed to suspend the rights of its

12   litigants just because they may be overworked. Likewise,

13   MSHA should not be allowed to do so. There has been

14   absolutely nothing to warrant the proposed changes to

15   this rule. It is nothing more than an attempt by MSHA to

16   enact administrative conveniences at the expense of mine

17   operator rights.

18        At a minimum, MSHA should provide a pre-

19   disposional hearing to operators. MSHA and the

20   commission should adopt a formal system that would

21   consolidate and expedite violations being contested in a

22   way that affords operators reasonable opportunity to

23   contest erroneous penalties.

24        Third, the potential for unchecked malfeasance

25   on the part of MSHA inspectors allowing MSHA inspectors

1   to write S&S violations that can be added to a POV

2   without a hearing is simply unfair in numerous other ways

3   as well.  For example, it may not have been considered by

4   many, but under this proposed rule if an MSHA inspector

5   truly wishes to place a mine operator on a POV, they can

6   accomplish this in just a matter of months.  Assuming

7   that there was just one inspector with a personal

8   vendetta against the mine, they could single-handedly

9   bankrupt a mine operator under the proposed rule as MSHA

10  has largely abandoned the conference system.  This

11  proposed system leaves no avenue to challenge those

12  citations and orders.

13        There being no safeguards with this type of

14  activity and to allow this loophole to exist is the

15  height of irresponsibility.  In fact, the only kind of a

16  safeguard available for this scenario is not much of a

17  safeguard at all.  MSHA may argue that a check on an

18  inspector with a personal vendetta against the mine is

19  the gravity of the harm requirement for writing an S&S

20  violation, which must be at the least reasonable

21  likelihood; however, should an inspector improperly place

22  the gravity of the harm as reasonably likely, there would

23  be no recourse for the operator before being placed on

24  the POV under the proposed rule because an operator would

25  not have been afforded a hearing on the improper gravity

1   mark before the violation is added to the POV.

2          The above concern is exasperated due to the

3   current adversarial relationship that exists today

4   amongst industry and MSHA inspectors and the inexperience

5   level of a number of MSHA new hires today.

6          And we heard from a representative from the

7   State of Illinois earlier, and I've heard the same from

8   representatives of our State Department of Mines here in

9   West Virginia, that many of the new hires joining the

10  ranks of the inspectors at MSHA do not meet the

11  qualifications to be hired as a state inspector.  And we

12  understand that many of the new hires at the Agency have

13  not even met the qualification and competence

14  requirements set forth in MSHA policy.

15         And, thirdly, it's been well documented that

16  there's a lack of training that a number of new hires

17  have received in preparation for their new

18  responsibilities and important work.

19         Another issue that I would simply raise is that

20  one of the screening criteria for POV determinations

21  involves a calculation using the inspector's on-shift

22  hours; therefore, shouldn't MSHA be using the on-shift

23  hours of all authorized representatives that frequent or

24  visit a mine site, including supervisors, assistant

25  District Managers, technical specialists, and even

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    District Managers since they carry authorized

2    representative cards.

3         Section 104 of the Mine Act requires all

4    authorized representatives to issue citations and orders

5    when they believe a violation exists.  So, again, we

6    would simply point out that we believe that all the time

7    for all authorized representatives ought to be used --

8    ought to be part of the calculation for POV purposes.

9         In conclusion, we would agree that the POV can

10   be a useful tool to ensure compliance with the Mine Act,

11   however, the proposed rule on the table now is simply too

12   far-reaching to be approved.  It is our position that

13   this is being posed as an administrative convenience for

14   dealing with a self-imposed problem and aims to destroy

15   basic civil liberties.

16        For the reasons stated here already, we would

17   respectfully oppose the implementation of this rule.

18        Now, in lieu of doing nothing, we would ask

19   MSHA to exercise its authority to establish an advisory

20   group of mine safety experts to determine -- to look at

21   this whole issue and others that surround it to determine

22   whether fundamental changes to the program are necessary,

23   and if so, how to make this a genuine workable tool for

24   the Agency and for the industry alike.

25        And I would remind the panel that last year,

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    there were a number of changes that were advanced before
2    Congress to make this program more workable, including a
3    rehab -- what was characterized as a rehab period for
4    operators who undergo a variety of safety initiatives to
5    improve their overall mine safety performance.
6            And there was also a means to more accurately
7    assess a mine's safety performance record known as the
8    Safety Performance Index that was also known as the
9    Grayson model, so that a mine's safety index and
10   performance in totality was factored into any program
11   that had with it the most severe enforcement sanctions.
12   It was a model developed by a professor, Dr. Larry
13   Grayson at Penn State University.  It was introduced
14   during several congressional hearings held on several
15   pieces of legislation moving from Congress a year ago,
16   and I think it was attested to by law that it would be a
17   more accurate instrument or barometer of measuring mine
18   safety performance.
19           So we would simply alternatively suggest that
20   you develop those safety enforcement principles and
21   enforcement and administrative tools through a
22   participatory process with all stakeholders within the
23   industry.
24           So that concludes my testimony.  I'm available
25   to answer any questions that the panel would have.


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1       MODERATOR SILVEY:  Thank you, Chris.

2           First of all, short of an advisory, you

3  recommended that the Agency withdraw the proposal and you

4  said that you would recommend that we form an advisory

5  committee.

6           I'm going to ask you the same sort of question

7  that I asked in the prior hearing.  Short of an advisory

8  group, would you have an alternative proposal that you

9  would make to the Agency for Pattern of Violations?

10       MR. HAMILTON:  Yes.  I would adhere to the

11  current final adjudicated violations as the basis -- or

12  citations as the basis for POV determinations and would

13  provide for a more detailed delineation of procedural

14  steps for operators to have an opportunity to discuss and

15  conference that record, as well as have an opportunity to

16  improve the specific conditions cited by MSHA when making

17  a POV determination.

18       MODERATOR SILVEY:  Can you put those in writing

19  and send them into us?

20       MR. HAMILTON:  Yes, I will do, yes.

21          And is the final comment the same as for the

22  preceding hearing?

23       MODERATOR SILVEY:  Yes, yes.

24          On your reference to the proposed legislation

25  last year, and I think probably some of you in the room

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   are familiar with that and you mentioned that safety

2   performance index.

3           Let me ask you something.  That model that was

4   in that proposed legislation, have you taken that model

5   and actually applied it to any real mines in the members

6   of the West Virginia Coal Association and, therefore,

7   data, have you taken that mine, and then taken one of the

8   mines in your group and applied that model to see how the

9   mines, how they come out?

10          MR. HAMILTON:  Yes.

11          MODERATOR SILVEY:  You have done that?

12          MR. HAMILTON:  Yes.

13          MODERATOR SILVEY:  And what happened?

14          MR. HAMILTON:  Based on the experience level

15  and competence of those that were involved in that

16  process, there was a general conclusion that it was a

17  more useful tool in accurately measuring a mine safety

18  performance, what mine health and safety professionals

19  would reasonably conclude as a more accurate instrument

20  or barometer for measuring mine health and safety.

21          Now, I don't have the data for the results to

22  give you, mathematically, but the general conclusion,

23  almost without exception, was that it was a far better

24  method of measuring mine safety in totality, real mine

25  safety versus, again, the mere issuance of a category of

1    MSHA citations.

2          MODERATOR SILVEY:  And I don't need to go to

3    the effort to recite to you the preamble.  I did some of

4    it in my opening statement, and I know you don't want to

5    hear it again, but a couple of things --

6          MR. HAMILTON:  I will incorporate that in my

7    written comments.

8          MODERATOR SILVEY:  What?

9          MR. HAMILTON:  That was my humor.

10         MODERATOR SILVEY:  Okay.

11         MR. HAMILTON:  And I apologize for that.

12         MODERATOR SILVEY:  That's all right.  No.

13         The -- a couple things, though, are worth

14   noting.  And the first being, you know -- and you all

15   probably know -- some of you know that we've got comments

16   on the issue that we propose to eliminate the final order

17   and we gave our rationale for doing that in the preamble.

18         You know, one of the things, though -- because

19   now you mention the proposed mine safety legislation, one

20   of the things that when Congress drafts the legislation

21   and that, you know, whether it passes or not, a lot of

22   times you will find what Congress said about that

23   legislation in the legislative intent and there's a

24   number of things in the legislative history to the 1977

25   Mine Act that goes to Congress's intent, and we

1   referenced that in the preamble to the proposed rule,

2   particularly when it comes to the concept of final

3   orders.

4         And as many of you -- some of you know that

5   that provision was put in.  Congress at the time thought

6   that they did not have the tool to appropriately deal

7   with what happened at the Scotia mine and the fact that

8   ventilation violations, violations, not final orders were

9   left to occur over and over and over again and that at

10   the time, MESA didn't seem to have the tool to deal with

11   these violations.

12         So I say that only as a point of reference.

13   The second thing is you mentioned in your testimony that

14   of all these questionable citations issued by the MSHA

15   inspectors -- and I will say that one of the things that

16   MSHA strives to do, it might not look like it to you all,

17   is to improve the consistency of enforcement, although

18   all of us here probably would admit to this and

19   particularly people who have been inspectors either

20   inspectors or for that matter examiners would note that

21   and you said some of that meant that whenever you have

22   the human element and have a particular standard, that

23   may be nine times out of ten, nine inspectors might see

24   it the same way; but that one time, there might be a

25   difference of interpretation in how an inspector might

1  see it, and that is why we try to minimize any

2  inconsistency, that might tend to be some inconsistency.

3       But on that note, just for everybody to know

4  that, we have -- we do issue a fair number of violations

5  and we've got statistics on that and the majority of the

6  violations are paid without contest.  Then a even smaller

7  percentage are -- sometimes they are modified, but the

8  percentage is quite small of the citations that are

9  modified, let's say from -- because that would be

10 significant in this case, no pun intended, but they are

11 modified from S&S, Significant and Substantial, to non-

12 S&S.  There's a pattern of S&S violations, but then an

13 even smaller percentage are vacated.

14      And when I say "smaller," I think less than 2

15 percent are vacated.  So overall when you look at it -- I

16 mean, we get all these comments to us about all of these

17 changes are going to be made.  And when you look at it,

18 the data will show that the vast majority are really

19 upheld if they are contested, upheld on appeal, but even

20 the greater majority are not contested at all.

21      Having said all that, if you would -- when you

22 were mentioning that legislation, that legislation had a

23 rehab period -- and I can't remember that proposed

24 legislation in detail -- but one of the things MSHA has

25 tried to do in this proposed rule is to -- and I

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1  mentioned that in my opening statement, but it's the

2  concept you talk about of rehab, that if a mine thought

3  the mine were approaching a Pattern of Violations, they

4  could come in with the safety and health management

5  program and that safety and health management program

6  would be aimed at the type of S&S violation that the

7  operator was approaching that looked like might be giving

8  rise to the pattern, and that's where MSHA -- and MSHA

9  has some experience under sort of that concept right now,

10 mines are coming in with -- I guess do we call them

11 safety and health plan --

12          MR. MATTOS:  Corrective action.

13          MODERATOR SILVEY:  Yeah.  Mines are coming in

14 with corrective action plans; and on the majority of the

15 corrective action plans, they've achieved just what you

16 talked -- the concept of rehab.  I mean, they've

17 significantly improved their S&S violations and the other

18 indices in the formula that we use to consider a mine for

19 pattern, which is really what we look to.  I mean, that's

20 really the purpose of the whole Pattern of Violations

21 provision is so that the mine is made safe, and I think

22 we are seeing some improvements in that concept.

23          MR. HAMILTON:  A couple comments.  I'm not sure

24 it's really appropriate here today to compare the early

25 '70s and Scotia and some of the findings of that to what

1    we're dealing with today.

2              MODERATOR SILVEY:  Well, I mean, I was just

3    going back to -- I mean, I was just going back to point

4    to something of a Pattern of Violations provision.

5              MR. HAMILTON:  I know.

6              MODERATOR SILVEY:  Do you have anything?

7              MR. MATTOS:  I have just a couple points of

8    clarification.

9              First, I don't want to get too far in the

10   weeds, but we're talking about the time we used to

11   measure the violations per inspection hour, and I have a

12   feeling that our friend Kenny back there in the audience

13   had a little something to do with getting that in your

14   testimony, but that's something that -- I appreciate

15   that.

16             MR. HAMILTON:  I tell you over the years,

17   there's been a lot of -- it seems like POV is a place to

18   maybe flush that out a little bit, but that's raised, all

19   mines have, you know, an inspector ratio of sorts, issues

20   of violation, you know, whatever, but that has

21   historically come up periodically.

22             MR. MATTOS:  But just to clarify, we do use the

23   supervisor's time and anyone who is an authorized

24   representative, we use their time.  We just don't use all

25   of their time.  I just wanted to clarify that.

1          MR. HAMILTON:  Is there a formula of some sort

2     that guides them?

3          MR. MATTOS:  It's the way they code their time.

4     If they're there for inspection activity, that time is

5     then included and it's there, some of it --

6          MR. HAMILTON:  Some or all may be part of it.

7          MR. MATTOS:  It's not, but that's something we

8     need to address.  I appreciate that.

9          The other thing that I wanted to clarify is we

10    have commenters talking about -- and the final order is a

11    big issue that we should only consider final orders.  We

12    currently look at citations and orders issued that are

13    not fined also; we do that today in the Pattern of

14    Violation screenings.

15         It's the current role of the hazard division in

16    one part of the division that we have them look at only

17    final orders; but in other parts, we look at citations

18    and orders issued regardless of whether they are final or

19    not.  I just wanted to clarify that for the record.

20         But in the beginning of your statement, Chris,

21    you said that the system needs to be simplified.  Were

22    you talking about the procedures that need to be

23    simplified, the formula needs to be simplified?  I mean,

24    you referenced the performance.

25         MR. HAMILTON:  You know, and that might be and

1  I'll expand on that more in the written comments. But

2  from what I understand from some of the individuals who

3  have inputted over the years -- and maybe it's that

4  institutional knowledge that's being carried forward

5  today where, you know, several years ago and I think we

6  may have made some effort to clarify that just a couple

7  years ago -- it was very difficult to understand and

8  follow procedures and protocol to try to understand how a

9  mine would ultimately become eligible and how they would

10 be notified and whether they would have an opportunity to

11 improve, and then what would follow would be a real

12 pattern.

13         So there was just a lot of confusion in trying

14 to, you know, really figure out what a mine had to do to

15 get on path.  You know, the big picture was clear, but

16 when you got down into the detail of actually attempting

17 to administer the program, that's where some of the

18 confusion, I believe, came.

19         MR. MATTOS:  Okay.  Because you also referenced

20 the need for transparency.  We have the web-monitoring

21 tool out there now.  Do you think that's enough

22 transparency, that web monitoring tool, or do you think

23 there's something else needed?

24         MODERATOR SILVEY:  Have you used it?

25         MR. HAMILTON:  Have I used it?  No, no.

1   Unfortunately, I don't have a mine.

2           MODERATOR SILVEY:  No.  I meant -- I understand

3   that.  I meant had you in terms of --

4           MR. HAMILTON:  No.  I'm not sure anyone is up

5   to the same level of knowledge and competency on what

6   does exist and how all the tools are integrated today.

7   So that could be a little bit of an issue.  I mean, just

8   being efficient and more transparent as opposed to the

9   traditional, you know.  We think we've just about got is

10  just principles that we embrace, the more transparent;

11  the more people can look and find out where they stand in

12  relationship with the others and the likelihood of

13  additional enforcement actions, I just think they're

14  better off.

15          MODERATOR SILVEY:  Well, we know a lot of

16  people have, in fact, used that web tool because we can

17  tell -- obviously, we can look and see how many hits we

18  get on it.

19          And how many do you think?

20          MR. MATTOS:  We were getting about 800 a week

21  when we first put it out.  I haven't looked recently.

22          MODERATOR SILVEY:  So we do know that people

23  are, in fact, using it.  And I think while people have

24  made some specific comments to us, in large part, people

25  have said they have found it useful.  That's why I asked

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   have you used it because it was in the interest of

2   transparency that we develop -- I say "we," Jay and

3   people develop a web tool -- and so, therefore, I was

4   just wondering.

5           MR. HAMILTON:  You know, there's just a lot of

6   concern -- I think first of all, there's just a real

7   solid appreciation for what's envisioned and what's

8   intended through the Pattern of Violations program.  I

9   mean, it is a tool that I think concerns everybody,

10  particularly regulating community more so.

11          So, you know, there's just -- it's the one

12  program that everybody is just overly concerned over how

13  it may be utilized and ensure that the transparency and

14  due processes is absolutely provided because there's just

15  a lot of concern over misuse, you know, the vendetta-type

16  inspector.

17          I mean, these are concerns that everyone has,

18  the good operators and the operators that are very

19  conscious about their safety efforts, as well as the

20  people that may not have that, you know, concern.  But

21  everyone wants to make sure we get this thing right and

22  that's the suggestion of, you know, taking a more

23  holistic approach on how you go about assessing basic

24  mine safety performance as opposed to just the one

25  category of violations that will always and forever be

1    somewhat subjective.

2                MR. JONES:  Has your Association done an

3    analysis of how many of your members could be potentially

4    affected by this Pattern of Violations provision?

5                MR. HAMILTON:  No.

6                MODERATOR SILVEY:  Okay.  Thank you very much.

7                MR. HAMILTON:  Thank you.

8                MODERATOR SILVEY:  Does anybody else wish to

9    make comments, provide testimony?  Somebody in the back

10   of the room?

11               MR. LACY:  Good afternoon.

12               MODERATOR SILVEY:  Good afternoon.

13               MR. LACY:  Brian Lacy with United Mine Workers

14   of America -- B-R-I-A-N, L-A-C-Y.

15               The UMWA generally supports the proposed rule.

16   Things that MSHA has proposed, which we support, include

17   elimination of initial screening criteria that MSHA has

18   used to provide an operator with advanced written warning

19   about an operation being vulnerable to a Pattern of

20   Violations.

21               The operator should have an ongoing awareness

22   of the conditions in their mine and whatever shortcomings

23   exist without MSHA having to notify them that they are

24   entering a Pattern of Violations.

25               Further, MSHA started a new webpage so mine

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1  operators can track their own history and whether they

2  meet the criteria for Pattern of Violations.

3          We also agree that simplifying the POV

4  procedures and making them more transparent would support

5  the posting on the web of a mine's record, which

6  indicates whether it meets the POV criteria. With MSHA

7  monthly updating this information, the mine operator will

8  be able to keep up to date on their POV assessment.

9          A critical change to proposed language concerns

10  the removal of the current limitation that MSHA only

11  consider final orders for the purposes of POV. The

12  problem with the current system that limits a POV

13  analysis to only the final orders is that it can take

14  years to resolve a contested citation. By the time the

15  citations become final, conditions at the mine may bear

16  no resemblance to what they were when the citation was

17  originally issued.

18          Further, only considering final orders

19  encourages a mine operator to challenge everything MSHA

20  issues to avoid being placed on a Pattern of Violations.

21  Recent Congressional hearings on the backlog of cases

22  pending before the Federal Mine Safety and Health

23  Administration attests to the problem, only considering

24  final orders has created. The UMWA believes that both

25  legislative history of the Mine Act and litigation will

1    support MSHA on this position.

2            We agree that the health and safety record of

3    each operation shall be reviewed at least every six

4    months to ensure that MSHA is keeping abreast of any

5    deterioration in health and safety conditions.  We

6    believe a quarterly review would be better, but agree

7    that a six-month review would be adequate considering the

8    other responsibility that MSHA has.

9            The UMWA agrees that when the mine has a

10   Pattern of Violations, a copy of the notice must be

11   posted on the mine bulletin board in order to make sure

12   that everyone at the mine is informed that their

13   workplace exhibits substandard health and safety

14   conditions.

15           Problems we see with the proposal include this

16   proposal anticipates having MSHA periodically revise the

17   POV criteria through informal administrative action.  The

18   UMWA opposes that.  Instead, we believe the Agency should

19   collect and consider the comments submitted to this

20   proposed rule to set criteria for purposes of the POV.

21   The criteria should be fixed at least until an

22   opportunity for public input on any changes that may be

23   warranted in the criteria.   A subsequent notice and

24   comment period should occur to allow public input should

25   the POV criteria be changed.


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    The UMWA holds reservations about using injury

2  rates as weighted criteria for consideration in a Pattern

3  of Violations.  Injury reporting depends on operator's

4  reports and the industry has long known about

5  underreporting of accidents and ,consequently, it would

6  not be a reliable statistic for consideration.  Covering

7  up accidents and underreporting seems to be commonplace

8  with some of the industry.  We recommend that fatality

9  rates be rated more heavily than injury rates.

10    The UMWA has reservations about a mine being

11  removed from a POV for mitigating circumstances.  Many

12  questions remain open regarding this issue, such as how

13  the presence of a mitigating factor is used to remove an

14  operation from POV status, if so, for how long; and does

15  MSHA contemplate using any sort of probationary status?

16  If an operation indicates it will pursue certain

17  mitigating practices, and doesn't, then will it be placed

18  back on the POV?  The union would at least ask the Agency

19  for clarification on what constitutes mitigating

20  circumstances and examples of such.

21    This concludes my testimony.  I'm here on

22  behalf of the UMWA to enter our position into the record.

23  I would ask the panel if they have any questions to

24  reserve those for our Department of Occupational Health

25  and Safety staff who will testify at the June 15, 2011

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    hearing in Arlington, Virginia.  Thank you.

2            MODERATOR SILVEY:  Thank you very much.

3            Just for the record, I do have a few comments

4    to yours.  But I've got to remember now, I do have to

5    remember that I'll ask those of the UMWA in Arlington.

6            You said they will be testifying?

7            MR. LACY:  Yes.

8            MODERATOR SILVEY:  So now I've got to remember

9    that I've got to do that.

10            I will say, though, to everybody because he

11    brought up a good point -- and I want everybody here to

12    know as to the issue -- I mentioned that in my opening

13    testimony -- of mitigating circumstances.

14            He said they oppose the mine being removed from

15    a POV due to a mitigating circumstance and that he asked

16    for some clarification there.

17            Well, the concept is that once the mine meets

18    the POV specific criteria, it's too late then to come in

19    as a mitigating circumstance.  The concept of mitigating

20    circumstance is that the mine operator saw that he or she

21    is approaching a Pattern of Violations.

22            So prior to meeting all the formal stuff for a

23    POV, then that mine operator would come into MSHA with

24    the safety and health management program to address the

25    conditions that the mine was seeing.  I don't know if

1    they have roof control problems or ventilation problems.

2    This program would address those types of S&S violations

3    that give rise to the pattern.

4           So as I just said, so it's not removing a mine

5    from POV consideration.  We intend that to come into play

6    before a mine would be considered for a pattern, so I did

7    want to clarify that for everybody.  I have a couple more

8    comments, but we will do with those in Arlington.

9           MR. LACY:  Thank you.

10          MODERATOR SILVEY:  Thank you.

11          MR. GALLICK:  John Gallick, G-A-L-L-I-C-K,

12   Alpha Natural Resources. The proposal does not contain

13   specific criteria, but rather seeks comment on how the

14   Agency should contain comments during the development of,

15   and periodic revision to, the POV screening criteria is

16   impossible to comment on criteria that have not been

17   shared in the proposal.

18          We believe the Agency should establish a

19   comment period by notice and comment rulemaking.  Section

20   104(e)(4) specifically requires that, "Secretary shall

21   make such rules as he deems necessary to establish

22   criteria for determining when a Pattern of Violations

23   exists."

24          The Office of the Inspector General also

25   specifically recommended that MSHA seek stakeholder input

1    on the POV screening criteria in its report dated

2    September 29, 2010, on page 3 and page 24.  MSHA has not

3    effectively done that in the proposed rule in our

4    opinion.

5          Section 104.2 of the proposed standard lists

6    only generic categories of the information that will be

7    reviewed, but does not quantify or explain how such data

8    will be applied to issue a pattern notice.  The proposed

9    rule also apparently anticipates that the criteria will

10   be fluid and subject to change without any established

11   method for notice and comment rulemaking on the core of

12   the rule, which are the criteria.

13         This approach totally fails to provide

14   operators with notice of the criteria and apparently is

15   intended to provide MSHA with the ability to change, or

16   worse, ignore the criteria in some situations.  It fails

17   to inform stakeholders on what is expected to avoid a

18   pattern notice and offers no comment on the specific

19   criteria before the rule would then become in effect.

20         The absence of the specific, critical criteria

21   from the proposal is of particular concern since the

22   proposed rule eliminates any potential for discussion of

23   the application of the criteria to a mine before the

24   pattern notice is issued to a mine operator.  It appears

25   that the rule anticipates an automated process for the

1    issuance of the pattern notice based on a mine operator's

2    monitoring of the criteria on the MSHA website. I am

3    comfortable as an employee of a large operator that we

4    can devote the resources to provide in-house monitoring

5    provided that the criteria are known and clear. I am not

6    comfortable with accepting this approach.

7         It is useful to be able to check the status of

8    each operation on the MSHA website, but the failure to

9    promulgate the actual criteria that an operator needs to

10    measure is a continuing problem. It is difficult to

11    reconcile this with the supposed consideration of

12    mitigating criteria provided for in the proposed rule

13    prior to the issuance of the notice. This would subject

14    an operator to the immediate withdrawal orders without

15    any opportunity for discussion of any means to avoid the

16    sanction or curtail its use prior to its application.

17         MSHA should reissue its proposal to include the

18    criteria that will be used in the POV process in one

19    rulemaking and to maintain a period for discussing

20    mitigating circumstances prior to an automatic issuance

21    of a pattern notice. This would be the most efficient

22    and transparent process to employ and would not adversely

23    affect the safety and health of miners. Rather, it would

24    allow for a period to correct any deficiencies before

25    subjecting a mine to this onerous sanction. For example,

1    the current criterion relies on the number of inspection

2    hours, and we believe those hours actually need to be

3    better defined.  I believe Chris spoke to that already.

4    Discrepancies have been noted in the current round of POV

5    letters on hours.

6              In similar fashion, S&S rates need to be

7    defined because in the latest round of POV letters, one

8    mine in an improvement plan had to go from a rate of 3.0

9    S&S per 100 hours to 4.88.  Yeah, they had to go up.

10   That obviously was an error, but it highlights the need

11   for promulgated criteria.  Promulgation of the criteria

12   itself would provide the transparency and simplicity that

13   is consistent with the Agency's and industries' goals.

14             Current 30 C.F.R. 104.3(b) states that only

15   citations, which have become final, shall be used to

16   identify mines with potential Pattern of Violations.  The

17   proposed standard change is the approach that has been

18   followed since 1991 to base the pattern notice review on

19   violations issued to make future POV determinations.

20             The use of violations issued to trigger a POV

21   sanction, absent a meaningful opportunity for prior

22   independent review or a hearing is of particular concern,

23   given the deletion in the proposed rule for any prior

24   ruling of an issuance of a pattern notice and the failure

25   to set out the prescribed process to avoid issuance of a

1    pattern notice by establishing a timeframe in which to

2    discuss mitigating factors referenced in the rules.

3              As no described criteria are articulated in the

4    proposal, it is vague and it fails to provide notice to

5    stakeholders how to avoid this notice sanction.

6              Couple this vagary with the absence of any

7    meaningful warning of the notice's impending issuance

8    renders it basically impossible to avoid.  Combining

9    these disturbing shortcomings with a pattern notice based

10   on enforcement action issued rather than final orders

11   denies stakeholders of due process and makes the

12   imposition of the pattern notice prone to error resulting

13   in enforcement actions that may well be turned out to be

14   invalid down the road.

15             The standard must provide an avenue for

16   expedited hearings on contested citations that are used

17   by the Agency to list an operation as a Pattern of

18   Violations.  Ideally, this expedited hearing would also

19   be coupled with the restart of meaningful management

20   conferences for all operations.  It is imperative that

21   operators know that prior to being subjected to the most

22   onerous enforcement tool in the MSHA tool box, they have

23   a right to make their arguments concerning citations that

24   the operator believes has been poorly evaluated.

25             I have carefully tracked the contests of my

1    company's contested citations, and I see the gravity

2    routinely overwritten.  I see resolutions where as many

3    as 50 percent of the S&S designations we receive are

4    deleted in litigation or settlement.  That does not make

5    one feel comfortable that relying on citations issued is

6    acceptable.  We agree with NMA's concerns expressed in

7    their comments on the unreliability of the application of

8    the criteria.

9           According to information released by MSHA's

10   Office of Assessments on January 31, 2011, almost 19

11   percent of the violations issued as Significant and

12   Substantial, which were litigated in fiscal years 2009

13   and 2010 were vacated or modified to non-Significant and

14   Substantial as a result of the litigation process.

15          Similarly, when Section 104(d) violations,

16   which alleged an unwarrantable failure to comply were

17   litigated in the same period, almost 33 percent of those

18   violations were either vacated or modified to Section

19   104(a) violations.  Clearly, relying on violations issued

20   to impose the punitive sanction of Section 814(e) of the

21   Mine Act could well result in erroneous application of

22   the pattern enforcement.

23          Further, we believe that any criterion that

24   takes into consideration Section 107(a) orders is

25   inappropriate.  First, imminent dangers may not be linked

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1     to occurrence of violations.  They often result from

2     natural events that cannot be controlled.

3           In addition, the elimination of a process where

4     an operator is given a chance to improve is contrary to

5     any concept of fairness.  It renders the POV solely one

6     of punishment, with no opportunity for redemption.  No

7     operator who gets the POV will get off in my view, absent

8     closing the mine.  That is not what the Agency or the

9     industry or labor should strive for.

10          That was my written comments.  I have some

11    extemporaneous comments based on your questions.  I want

12    to talk briefly about the mitigation process.

13          My concern there, and I heard what you had to

14    say, Pat, and my concern is this.  Until I have clearly

15    adjudicated any violations that are part of getting me to

16    the POV, I shouldn't have to present the mitigation

17    process because mitigation processes by definition -- and

18    I looked at them; you call them the health and safety

19    management.  But the ones that I've seen have required

20    the operator to do multiple extra examinations of

21    electrical cables via his chief maintenance foreman, for

22    example.  That is in one of the documents I have seen.

23          Those things are burdensome to the operator if

24    he is not, in fact, a pattern potential mine.  The only

25    way he'll know that is if his litigation is completed,

1   and if he fails, then his plan needs to go forward. And

2   if he's successful, then, obviously, he should not be

3   subjected to an extra burden of requirements the plans

4   will put on him.

5         We've all talked about this issue, the one-year

6   violation versus final orders. I mean, that's been back

7   and forth and I'm sure every hearing you're going to go

8   to, you're going to debate that. I look at it this way.

9   I'm sort of in the balancing of it. I like the idea of

10   using present day citations, that's what the mine looks

11   like in the last year, you know, versus final orders.

12   I'm dealing in final orders for 2007, 2008, 2009.

13         We may be doing much better now or much worse;

14   we may be shut down. We have mines shut down and we

15   still get a stack of orders, but the ultimate unfairness

16   of using last year's violation records without having a

17   litigation process in place is that it is essentially --

18   we are now essentially writing POV on the actions of a

19   few inspectors.

20         I'll give you an example. A mine had a

21   potential POV letter; they had the 90 days to improve.

22   They were given the opportunity to not necessarily

23   litigate, but to meet with the District Manager on the

24   violations that they believed were improperly written.

25   They were successful to the percentage they dropped off

1    the letter completely.  Had that interim step not been

2    done by the District Manager, and it's not in any rule,

3    had that next step of saying I'll meet with you and we'll

4    talk about the paper that you think was improperly

5    issued, had that not been available to that operator,

6    that operation would have probably gone to the next step,

7    which is POV.

8          It's very important that any operator -- if you

9    want to use the latest and newest violations over the

10   last year, which is the way I think the present system is

11   in place, then you have to provide means of adjudication,

12   whether it be management conferences as step one, which I

13   think is the first logical step one, and step two,

14   litigating in front of a judge, get expedited hearings.

15         MSHA has asked that solicitors file for

16   expedited hearings on cases in which they wanted to push

17   POV and was able to get them.  Basically, we're unable to

18   get -- we're almost unable to get expedited hearings in

19   today's world.  But I believe if you put it into a rule,

20   there would be no -- it would be part of the standard.

21   You're not on POV until you have your hearing on the

22   cases that you contested.

23         Percent of change, you know, the statistics are

24   all over the place.  But basically when you litigate --

25   we don't contest all violations.  So when you contest

1  them, you like to believe that at least we believe we're

2  right on the majority that we're contesting or else we

3  wouldn't have contested them. You know, let's take that

4  as a given. I know you can argue that point. The data

5  says one out of five S&S violations that are contested

6  and finally reach some settlement are reduced to at least

7  a 104(a) violation and non-S&S. Unwarrantable is 33

8  percent. That's a significant change.

9        Now, when you look at the total violations,

10  obviously, the percentage goes down because we don't

11  contest them. You know, for the 100,000 violations

12  written in the country, 30,000 contested or whatever. So

13  you know -- but when you're running that closely to a

14  pattern in a one-year window in a mine where you can

15  ratchet down the criteria to whatever number we have in

16  the rule, basically whatever number the administrator or

17  the assistant secretary or whoever does that, you know,

18  can ratchet down to whatever number, you want to make

19  sure that at least that operator has the ability to have

20  his day in court. It's only fair. It's only fair.

21        As far as the website tool, I think it's a

22  pretty good tool, Jay. I don't have any real problems

23  with it. We do use it. And I know that you've had, you

24  know, like any other thing, there's, you know, things

25  that will get better on it, but it does offer a tool to

1    look at numbers.  And, clearly, that's our goal to deal

2    with the issues before it would get to a POV level. But

3    you know if the violations are being written improperly,

4    we would like to have an opportunity to have a hearing

5    before we ever get there; before we ever get the letter;

6    before we have to go to litigation; before we have to

7    submit a health and safety plan; before we have to do any

8    of the additional above-the-law standards.  We want to be

9    able to say we feel that this was a fair adjudication and

10    that takes somebody -- that takes somebody to provide a

11    hearing.  That's my extra comments.

12         MODERATOR SILVEY:  Okay.

13         I want to just ask you one thing and that is --

14    and for everybody -- obviously, you know that from the

15    proposed rule, we advanced our position somewhat in the

16    Public Hearing Notice with respect to a specific

17    criteria, and that's the only thing I'm talking about.

18    And then the proposed rule, we had that statement, just

19    like you said in there that we were soliciting comment on

20    how we should obtain feedback from, and periodic revision

21    to, a specific criteria.

22         In the Public Hearing Notice, we said, you

23    know, today, if we were to stop things in time today,

24    we've got specific criteria on the website or I can refer

25    to it as the former.  Well, what we said in the Public

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    Hearing Notice is that we would -- before we review a

2    mine for a Pattern of Violation and before we make any

3    change to that specific criteria that we used to date,

4    before we make any change to it to review a mine, we

5    would post that criteria, the specific criteria, we would

6    take stakeholder input into it.  Then we would respond to

7    stakeholder input.

8              We might use some stakeholder input and revise

9    the specific criteria, but then we would post on the

10   website our response to the stakeholders, as well as any

11   revised specific criteria, we would post that on the

12   website before we would ever use it in the review of a

13   mine for a POV.

14             What's your response to that?  How do you see

15   that?

16             MR. GALLICK:  Well, I think it gets to the

17   point of posting and letting me know in advance what the

18   criteria are going to be, obviously.

19             MODERATOR SILVEY:  And allowing you the

20   opportunity to respond to comments.

21             MR. GALLICK:  Right.  My view is that my

22   comments and response on most public notices aren't --

23   I'll just say the percentage of our comments on changes

24   and my comments on changes are rarely accepted, so my

25   view is I would rather see it in a more formal

1    rulemaking.  I think it leaves the Agency with too much

2    latitude to establish a rule based on -- you know, you

3    can go as paranoid as saying do you find a mine you think

4    ought to be on pattern and make sure the criteria -- pick

5    that up or do you go saying different Agency leaders will

6    have different views of what is important.

7            You know, in previous conversations, we talked

8    about the legislation action on the Hill and, clearly,

9    when you were spending time talking to different

10   legislative people, obviously, some people were very

11   strongly driven towards citations, S&S, and various

12   things.  Others were driven more towards acts of

13   prevention, which are accident rates, which are severity

14   rates, that type of thing.

15           I would say that, again, when it's not in a

16   rulemaking, a person who is determining what the criteria

17   are going to be for the next cycles or next whatever,

18   that weight would be if I were sitting in that seat, I

19   would be weighing accident prevention stronger than

20   citable stuff.  Take another person, they're going to go

21   in the other direction.  You know, so that bothers me.

22   I can throw all the inputs in you want, but if you're

23   predisposed to believe that citations is the driving

24   force, you know, and I've heard people say -- I've heard

25   a lot of reasons why you could argue any of those points.

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   But if I'm predisposed to believe whatever I believe and

2   I am predisposed to believe what I believe, therefore I

3   would then say, no, I think I will stick with what I

4   believe.  Whereas if it's a rulemaking, it is what it is.

5           MR. MATTOS:  Just one comment on that as part

6   of this rule.  We really have to pay attention to the

7   Mine Act, as a pattern of S&S violations, so we really

8   have to keep that the core of what we're doing under the

9   current Mine Act.  That's just a comment.

10          But, John, you mentioned the example of the one

11  mine where S&S during the last go-round where it actually

12  could have gone up, and it would not have been a Pattern

13  of Violation.  And if I recall, that operation had some

14  unwarrantable failure citations or as it became final,

15  that's how they got on the list.  And --

16          MR. GALLICK:  Fortunately, it was not mine.

17          MR. MATTOS:  No, it was not yours.

18          But the reason I bring that up is this is the

19  second go-round with the formula of criteria that we are

20  using for patterns of violations.  And in each, there

21  arguably have been pluses and minuses, a couple of

22  minuses each time.

23          The example that mine shows, okay, the current

24  criteria probably needed some kind of loophole plugged in

25  that criteria.  So if we get another set of criteria and

1   we come out with them; we put them in a rule; we go and

2   we have another one of these operations where we need to

3   tweak this thing, we'll all be sitting here again, but

4   we'll be required to use that criteria.

5           So how would we get around that?  That's my

6   question.  It's a long-winded question.

7           MR. GALLICK:  It's a legitimate question.  I'm

8   not sure how you get around it.  But it seems to me that

9   there's no question rulemaking is slow, but because it is

10  a slow process, it gives people opportunity to think

11  about it and work on it.

12          And I look back -- when you asked the question,

13  Pat, the only similar action -- and I can remember, would

14  not be proposed in the proposed rule was when we were all

15  given the opportunity for your policy on tracking and

16  communications, and we all had only a short period of

17  time to write a bunch of comments.  And I can remember

18  putting pages and pages of comments on what I would

19  change.  I also remembered none of them were accepted,

20  but it was clear to me that the assistant secretary or

21  whomever had his -- just like I would've had -- had his

22  goal in mind of what he thought was needed and that's

23  what we got.

24          There wasn't an ability to sit down in a

25  roundtable discussion even and maybe when you make your

1   stakeholder thing, it can't be as antiseptic as written

2   comments back and forth, maybe you need to say some type

3   of roundtable.  I don't know what the answer would be

4   either, but some way of getting that give-and-take.

5   That's why I don't think that makes sense.

6          I would've liked to have thought that if we had

7   that type of thing on tracking communications, we would

8   have worked the section issues out more logically, but it

9   was like we wrote comments and we got on some date,

10  here's the final proposal.  That's my concern about what

11  you said.  You've got to have that back and forth give-

12  and-take.

13         MODERATOR SILVEY:  I hear you and I appreciate

14  that and that, obviously, communication and tracking is

15  not --

16         MR. GALLICK:  No, no.  I use that as an example

17  of the only one I remembered us doing that.

18         MODERATOR SILVEY:  That's illustrative.  I will

19  add since we're talking about it, the only problem with

20  that, not in defense of MSHA is that we were up against a

21  Congressional mandate with a timetable.  I mean, we all

22  know that.  Sometimes when you don't have the most

23  optimum circumstance, then you would sort of push to do

24  things that under other circumstances, you might engage

25  in another process.  I appreciate what you're saying.

```
 1          MR. GALLICK:  Right.  All I'm saying is I think
 2   you have to have that give-and-take, number one.  Number
 3   two, recognize that, unfortunately, this could be the
 4   same kind of pressure if we unfortunately have something
 5   go wrong in the industry and the political pressure,
 6   Congressional pressures, has all that happening.
 7          MODERATOR SILVEY:  Okay.  Thank you.
 8          MR. GALLICK:  Thank you.
 9          MODERATOR SILVEY:  Anybody else?  Yes?
10          MR. MURRAY:  Kenny Murray from Alliance Coal.
11          Just to -- not to beat a dead horse, but for
12   kind of a point of clarification on Mr. Hamilton's
13   remarks on supervisory time --
14          MODERATOR SILVEY:  Are you his --
15          MR. MURRAY:  I'm his follower.
16          MODERATOR SILVEY:  I'm just -- go on.
17          MR. MURRAY:  We've been talking about this for
18   a long time.  And as you well know, the expectations of
19   the MSHA top staff have indicated that the supervisors
20   should spend more time.  As a matter of fact, they're
21   mandated to spend time, more time, frequently underground
22   and onsite.  And we felt that whether they're there for
23   field reviews or conducting inspections, that Section 104
24   doesn't distinguish between administrative time, that
25   they have a clear obligation under 104 to issue a
```

1   citation if they're observed by -- I'm not talking -- any

2   card carrying representative has that obligation under

3   the Mine Act, therefore, his time should be counted.

4          You know, if he's there as a mentor, it

5   actually increases the amount of citations that get

6   written. I mean, maybe it's subconsciously or human

7   nature, but we think that it has an impact on total

8   inspector hours, and we think that's consistent with

9   104(a) of the Mine Act.

10          Thanks for the clarification, Mr. Mattos. The

11  other thing, the web tool that you talked about, it's

12  excellent.

13          MODERATOR SILVEY: You got one good review.

14          MR. MURRAY: As a matter of fact, internally,

15  we have our IT folks monthly, it comes out about the 15th

16  or 16th, it updates them for the previous month. They're

17  charged with graphically illustrating for each operation

18  and sending that to the responsible party. So we do use

19  it and we thank you for hearing our expressions.

20          MODERATOR SILVEY: And you use it as a

21  proactive tool?

22          MR. MURRAY: That's correct.

23          MODERATOR SILVEY: To be preventive.

24          MR. MURRAY: Yeah. We don't wait for the end

25  of the year or the end of the quarter. On the 16th, we're

 1    vigilant on what happened the previous month, so thanks

 2    for that.

 3            MR. MATTOS:  And that 25 percent reduction in

 4    assessments for that remark will be --

 5            MR. MURRAY:  But we appreciate that and we

 6    recognize your efforts on that.

 7            MR. MATTOS:  Thanks.

 8            MODERATOR SILVEY:  Okay.  Thank you.

 9            Anybody else?  Anybody else?

10            (No response.)

11            MODERATOR SILVEY:  Well, if nobody else wishes

12    to present testimony, then I will bring this hearing to a

13    close.

14            Before I do, I want to again say that we at the

15    Mine Safety and Health Administration appreciate your

16    participation in this public hearing.

17            Again, I want to thank everybody who made

18    presentations, but I also want to thank the people who

19    attended the hearing and did not make a presentation.  We

20    appreciate that because that shows us you're interested

21    in the rulemaking.

22            All comments, as we stated earlier, are due by

23    June 30th, 2011.  MSHA will take your -- I ask again that

24    if at all possible, please be specific in any

25    alternatives that you might recommend to the Pattern of

1    Violations proposed rule.  MSHA will take your comments

2    and your concerns into consideration and develop a final

3    ruling.

4         We encourage you to participate and continue

5    participation in this rulemaking and the examinations of

6    work areas rulemaking, and in any future MSHA rulemaking.

7         At this point, this public hearing is

8    concluded.  Thank you very much.

9         (Whereupon, at 12:58 p.m., the hearing in

10     the above-entitled matter was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

CASE TITLE:          Patterns of Violations

HEARING DATE:        June 7, 2011

LOCATION:            Charleston, West Virginia

     I hereby certify that the proceedings and evidence are contained fully and accurately on the audio and notes reported by me at the hearing in the above case before the Department of Labor, Mine Safety & Health Administration.

Date: June 7, 2011

          ANTHONY & ASSOCIATES, INC.

DENYS SNODGRASS
(Official Reporter)

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

REQUEST TO SPEAK

Pattern of Violations

Hearing
Charleston, West Virginia

**June 7, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | Brian Lacy | UMWA | (304) 343-0259 |
| 2. | John Gallick | | |
| 3. | Kenny Murray | | |
| 4. | Chris Hamilton | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |

AB73-PH-2A

SIGN-IN SHEET

Pattern of Violations

Hearing
Charleston, West Virginia

**June 7, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | Frank Foster | Patriot Coal | 304-369-8150 |
| 2. | | 4 P | |
| ✓ 3. | KENNY MURRAY | ALLIANCE COAL | 859-475-3445 |
| 4. | DON MCBRIDE | STATE OF ILLINOIS | 618 521 4014 |
| 5. | Greg Ritchie | U.M.W.A | 304-294-4630 |
| 6. | ROBERT WADE | U.M.W.A | 304-448-3541 |
| 7. | Ronald Pauley | UMWA | (304) 881.3418 |
| 8. | ~~illegible~~ | | |
| ✓ 9. | Chris Hamilton | | |
| ✓ 10. | Brian Lacy | | |
| 11. | ~~John Gallick~~ | | |
| 12. | ~~Russell Harris~~ | | |
| ✓ 13. | ~~Frank Foster~~ | | |
| | John Gallick | | |

John Gallick
Alpha Natural Resources

## COMMENTS ON PROPOSED RULE ON PATTERN OF VIOLATIONS

This proposal does not contain specific criteria, but rather seeks comment on how the agency "should obtain comments on how the agency should obtain comment during the development of, and periodic revision to, the POV screening criteria." 76 Fed. Reg. 5719, 5720 (February 2, 2011). It is impossible to comment on criteria that have not been shared in the proposal. We believe that the agency must establish the POV criteria by notice and comment rulemaking. Section 104(e)(4), 30 U.S.C. § 814(e)(4), specifically requires that the ". . . Secretary shall make such rules as he deems necessary to establish criteria for determining when a pattern of violations . . . exists." The Office of Inspector General also specifically recommended that MSHA seek stakeholder input the POV screening criteria in its report dated September 29, 2010, pages 3, 24. MSHA has not effectively done that in the proposed rule.

Section 104.2 of the proposed standard lists only generic categories of information that will be reviewed, but does not quantify or explain how such data will be applied to issue a pattern notice. The proposed rule also apparently anticipates that the criteria will be fluid and subject to change without any established method for notice and comment rulemaking on the core of the rule which are the criteria. This approach totally fails to provide operators with notice of the criteria and apparently is intended to provide MSHA with the ability to change, or worse, ignore the criteria in some situations. It fails to inform stakeholders on what is expected to avoid a pattern notice and offers no comment on the specific criteria before the rule becomes effective.

The absence of the specific, critical criteria from the proposal is of particular concern since the proposed rule eliminates any potential for discussion of the application of the criteria to a mine before the pattern notice is issued to a mine operator. It appears that the rule anticipates an "automated" process for the issuance of the pattern notice based on a mine operators monitoring of the criteria on MSHA's website. I am comfortable, as an employee of a large operator that we can devote the resources to provide in-house monitoring provided the criteria are known and clear. I am not comfortable with accepting this approach. It is useful to be able to check the status of each operation on the MSHA website but the failure to promulgate the actual criteria that an operator needs to measure is a problem. It is difficult to reconcile this with the supposed consideration of "mitigating" criteria provided for in the proposed rule prior to the issuance of the notice. This would subject an operator to the immediate withdrawal orders without

AB73 - PH - 2B

any opportunity for discussion of any means to avoid the sanction or curtail its use prior to its application.

MSHA should reissue its proposal to include the criteria that will be used in its POV process in one rulemaking and to maintain a period for discussing mitigating circumstances prior to an automatic issuance of a pattern notice. This would be the most efficient and transparent process to employ and would not adversely affect the safety and health of miners. Rather, it would allow for a period to correct any deficiencies before subjecting a mine to this onerous sanction. For example, the current criterion relies on the number of inspection hours and we believe what those hours actually are must be defined. Discrepancies have been noted in the current round of POV letters.

In similar fashion, S&S rates need to be defined because in the latest round of POV letter one mine in its improvement plan had to go from a rate of 3.0 S&S/100 hours to 4.88. Yes, they had to go up. That obviously was an error but it highlights the need for promulgated criteria. Promulgation of the criteria itself would provide the transparency and simplicity that is consistent with the agency's and industry's goals.

Current 30 C.F.R. § 104.3(b) states that only citations and orders which have become final shall be used to identify mines with a potential pattern of violations. The proposed standard changes this approach that has been followed since 1991 to base the pattern notice review on "violations issued" to make future POV determinations.

The use of "violations issued" to trigger the POV sanction, absent a meaningful opportunity for prior independent review or a hearing, is of particular concern given the deletion in the proposed rule of any prior warning of the issuance of pattern notice and the failure to set out a proscribed process to avoid the issuance of the pattern notice by establishing a time frame within which to discuss mitigating factors referenced in the rules. As no proscribed criteria are articulated in the proposal, it is vague and fails to provide notice to stakeholders of how to avoid this onerous sanction. Coupling this vagary with the absence of any meaningful warning of the notice's impending issuance renders it basically impossible to avoid. Combining these disturbing short-comings with a pattern notice based on enforcement action issued, rather than final orders, denies stake-holders of due process and makes the imposition of the pattern notice prone to

error resulting in withdrawal orders and enforcement actions that may well be invalid.

The standard must provide an avenue for expedited hearings on contested citations that are used by the agency to list an operation as a Pattern of Violation mine. Ideally this expedited hearing provision would also be coupled with the re-start of meaningful Manager's Conferences for all operations. It is imperative that operators know that prior to being subjected to the most onerous enforcement tool in the MSHA tool bag they have a right to make their arguments concerning citations that the operator believes has been poorly evaluated.

I have carefully tracked the contests of my company's contested citations and I see the gravity routinely overwritten and I see resolutions where as many as 50% of the S&S designations we receive are deleted in litigation or settlement. That does not make one feel comfortable that relying on citations issued is acceptable. We agree with NMA's concerns expressed in their comments on the unreliability of the application of the criteria.

According to information released by MSHA's Office of Assessments on January 31, 2011, almost 19% of the violations issued as "significant and substantial" which were litigated in fiscal years 2009 and 2010 were vacated or modified to "non-significant and substantial" as a result of the litigation process.

Similarly, when § 104(d) violations, which alleged an "unwarrantable failure" to comply were litigated in the same period, almost 33% of those violations were either vacated or modified to a § 104(a) violation. Clearly, relying on "violations issued" to impose the punitive sanction of § 814(e) of the Mine Act could well result in erroneous application of the pattern enforcement.

Further, we believe that any criterion that takes into consideration Section 107(a) orders is inappropriate. First, imminent dangers may not be linked to the occurrence of violations. They often result from natural events that cannot be controlled.

In addition, the elimination of a process where an operator is given a chance to improve is contrary to any concept of fairness. It renders the POV solely one of punishment with no opportunity for redemption. No operator who gets the POV will get off in my view, absence closing the mine. That is not what the agency or the industry or labor should strive for.

Pattern of Violations
Proposed Rule Hearing
Charleston, WV
June 7, 2011

Brian Lacy
United Mine Workers of America
(UMWA)

The UMWA generally supports the proposed rule.  Things that MSHA has proposed which we support include:

- Elimination of initial screening criteria that MSHA has used to provide an operator with an advanced written warning about an operation being vulnerable to a pattern of violations.  The operator should have an on-going awareness of the conditions in their mine and whatever shortcomings exists without MSHA having to notify them that they are nearing a Pattern of Violations.  Further, MSHA started a new webpage so mine operators can track their own history and whether they meet the criteria for a pattern of violations.

- We also agree with simplifying the POV procedures and making them more transparent.  We support the posting on the web of a mine's record which indicates whether it meets the POV criteria.  With MSHA monthly updating this information, the mine operator will be able to keep up to date on their POV assessment.

- A critical change to the proposed language concerns the removal of the current limitation that MSHA only consider "final" orders for purposes of POV.  The problem with the current system that limits a POV analysis to only final orders is that it can take years to resolve a contested citation.  By the time the citation become final, conditions at the mine may bear no resemblance to what they were when the citation was originally issued.  Further, only considering final orders encourages a mine operator to challenge everything MSHA issues to avoid being placed on a Pattern of Violations.  Recent Congressional hearings on the backlog of cases pending before the Federal Mine Safety and Health Administration attest to the problem only considering final orders has created.  The UMWA believes that both legislative history of the Mine Act and litigation will support MSHA on this position.

- We agree that the health and safety record of each operation should be reviewed at least every six months to ensure that MSHA is keeping abreast of any deterioration in health and safety conditions.  We believe a quarterly review would be better, but agree that a six month review would be adequate considering the other responsibilities MHSA has.

- The UMWA agrees that when a mine has a pattern of violations, a copy of the notice must be posted on the mine bulletin board in order to make sure everyone at the mine is informed that their workplace exhibits substandard health and safety conditions.

1

AB73-PH-2C

Problems we see with the proposal include:

- This proposal anticipates having MSHA periodically revise it POV criteria through informal administrative action. The UMWA opposes that . Instead, we believe the Agency should collect and consider the comments submitted to this proposed rule to set criteria for purposes of a POV. The criteria should be fixed at least until an opportunity for public input on any changes that may be warranted in the criteria. A subsequent notice and comment period should occur to allow public input should the POV criteria be changed.

- The UMWA holds reservations about using injury rates as a weighted criteria for consideration in a Pattern of Violations. Injury reporting depends on the operator's reports and the industry has long known about under reporting of accidents, consequently it would not be a reliable statistic for consideration. Covering up accidents and under reporting seems to be commonplace with some in the industry. We recommend that fatality rates be weighted more heavily than injury rates.

- The UMWA has reservations about a mine being removed from a POV for "mitigating circumstances." Many questions remain open regarding this issue such as:

  How will the presence of mitigating factors remove an operation from POV status? If so, for how long?
  Does MSHA contemplate using any sort of probationary status?
  If an operation indicates it will pursue certain mitigating practices, but then reneges will it be place back on the POV?

  The Union would at least ask the Agency for clarification of what constitutes a "mitigating circumstance" and examples of such.

  This concludes my testimony. I am here on behalf of the UMWA to enter a position into the record. I would ask the panel if they have any questions to reserve those for our Department of Occupational Health and Safety Staff who will testify at the June 15, 2011 hearing in Arlington, VA. Thank you.

2

# TRANSCRIPT OF PROCEEDINGS

IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )

Pages:    1 through 57

Place:    Birmingham, Alabama

Date:     June 9, 2011

## ANTHONY & ASSOCIATES, INC.
### 770. 590.7570

IN THE MINE SAFETY AND HEALTH ADMINISTRATION

IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )


Birmingham, Alabama

Thursday
June 9, 2011


APPEARANCES


MSHA Panel:  PATRICIA W. SILVEY, JAY MATTOS, CHERIE HUTCHISON, ANTHONY JONES


Speakers:

TRUMAN CHIDSEY, Director of Corporate Safety Services, Vulcan Materials Company
RICK STEISKAL, National Aggregates USA, National Stone, Sand & Gravel Association
MARK ESLINGER, General Safety Manager Five Star Mining, Inc./Black Panther Mining, LLC
THOMAS WILSON, UMWA, International Health & Safety Representative
JAMES BLANKENSHIP, UMWA, Local 2245 President, Walter Energy Number 4 Mines of Brookwood, Alabama


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

```
 1                    P R O C E E D I N G S

 2                                              (12:30 p.m.)

 3           MODERATOR SILVEY:  Good afternoon.  My name is

 4   Patricia Silvey, and I'm the Deputy Assistant Secretary

 5   for Operations for the Mine Safety and Health

 6   Administration.

 7           I will be the moderator of this public hearing

 8   on MSHA's proposed rule for Pattern of Violations.

 9           On behalf of Assistant Secretary Joseph A.

10   Main, I would like to welcome all of you here today.  I

11   would like to introduce members of the MSHA panel.  To my

12   left, Jay Mattos, who is Chair of the Pattern Rulemaking

13   Committee; to my right, Cherie Hutchison, who is with

14   MSHA Standards Office; and to her right, Anthony Jones,

15   with the Department of Labor, Office of the Solicitor.

16           In response to requests from the public, MSHA

17   is holding public hearings on its Pattern of Violations

18   proposed rule.  This is the third of four public hearings

19   on the proposal.  The first hearing was in Denver,

20   Colorado on June 2nd; the second in Charleston, West

21   Virginia on June 7th; and the next hearing will be in

22   Arlington, Virginia on June 15th.

23           The Pattern of Violations proposal applies to

24   all mines, coal and metal and nonmetal, surface and

25   underground.
```

1      The purpose of this hearing is to receive

2  information from the public that would help MSHA evaluate

3  the requirements in the proposal and produce a final rule

4  that will improve safety and health conditions in mines.

5      As many of you know, the hearings will be

6  conducted in an informal manner.  Formal Rules of

7  Evidence will not apply.  The hearing panel may ask

8  questions of speakers, and speakers may ask questions of

9  the panel.  Speakers and other attendees may present

10  information to the court reporter for inclusion in the

11  rulemaking record.

12      The post hearing comment period for this

13  proposed rule ends on June 30th.  MSHA must receive your

14  comments by midnight, Eastern Daylight Savings Time, on

15  that date.

16      We ask that everyone in attendance sign on the

17  attendance sheet, and I think that everybody probably has

18  done that.

19      If you have a hard copy or a electronic version

20  of your presentation, please provide the court reporter

21  with a copy.

22      MSHA is proposing to revise the Agency's

23  existing regulation for Pattern of Violations.  MSHA

24  determined that the existing Pattern of Violations

25  regulation does not adequately achieve the intent of the

1    Federal Mine Safety and Health Act of 1977, or the Mine

2    Act.  Congress included the provision in the Mine Act so

3    that operators would manage safety and health conditions

4    at mines and find and fix the root causes of "Significant

5    and Substantial," or S&S, violations to protect the

6    safety and health of miners.  Congress intended that MSHA

7    use the Pattern of Violations provision to address

8    operators who have demonstrated a disregard for the

9    safety and health of miners.

10           MSHA intended that the proposal would simplify

11    the existing Pattern of Violations criteria, improve

12    consistency in applying the pattern criteria, and more

13    adequately achieve the statutory intent.  The proposal

14    would also encourage chronic violators to comply with the

15    Mine Act and MSHA's safety and health standards.

16           MSHA has requested comments from the mining

17    community on all aspects of the proposed rule and is

18    particularly interested in comments that are addressing

19    alternatives to key provisions in the proposal.  The

20    Preamble discusses the provisions in the proposal and

21    includes a number of specific requests for comment and

22    information.  MSHA asks that commenters be specific in

23    their comments and submit detailed rationale and

24    supporting documentation for suggested alternatives.

25           The proposed rule would include general

1    criteria and would provide that the specific criteria

2    used in the review to identify mines with a pattern of

3    S&S violations would be posted on MSHA's web site.

4            In the Preamble to the proposal, MSHA requested

5    suggestions on how the Agency should obtain comments from

6    mine operators and miners during the development of and

7    periodic revision to the specific POV criteria.

8            MSHA also requested comments on the best

9    methods for notifying mine operators and the mining

10   public of changes to these specific criteria.  In the

11   public hearing notice, MSHA clarified its proposal and

12   stated that any change to the specific criteria would be

13   made available to the public for comment via posting on

14   the Agency's web site before MSHA uses it to review a

15   mine for a Pattern of Violations.  MSHA would then review

16   and respond to comments, revise, if appropriate, the

17   specific criteria, and post the Agency's response and

18   enter revised specific criteria on the Agency's web site.

19           MSHA requests comments on this proposed

20   approach to obtaining public input into revisions to the

21   specific criteria -- to the specific Pattern of

22   Violations criteria.  As -- MSHA also requested comments

23   on the burden that monitoring a mine's compliance record

24   against the proposed POV specific criteria using the

25   Agency's web site would place on mine operators.

ANTHONY & ASSOCIATES, INC.
770.590.7570

```
 1              As many of you know, MSHA has developed a web
 2    tool to make it easier for mine operators to monitor
 3    their compliance.  In the interest of transparency, MSHA
 4    developed this web tool whereby mine operators could just
 5    put in -- or anybody, for that matter, any member of the
 6    public could put in a mine ID number and then the
 7    information would be populated on that mine to show a
 8    mine how close it was coming to approaching the Pattern
 9    of Violations specific criteria.
10              MSHA asks that commenters give us their
11    reaction to the web tool and include detailed rationale
12    and supporting documentation for any comments or
13    suggested alternatives.
14              Under the proposal, to be considered as a
15    mitigating circumstance, the proposal would provide that
16    an operator may submit a written safety and health
17    management program to the District Manager for approval.
18    MSHA would review the program to determine whether the
19    program's parameters would result in meaningful,
20    measurable, and significant reductions in S&S violations.
21              MSHA would like to clarify that the Agency did
22    not intend that the Safety and Health Management Program
23    referenced in this proposal be the same as that
24    referenced in the Agency's rulemaking on comprehensive
25    safety and health management program.  I think that some
```

1   members of the public have gotten that confused, but

2   those are two different safety and health management

3   programs.

4         The safety and health management program under

5   this proposal would be one that would be applicable to

6   the significant and substantial violations that a mine

7   would be experiencing at that particular mine. And to be

8   considered a mitigating circumstance, that safety and

9   health management proposal would have to include

10  measurable benchmarks for abating the specific violation

11  that could lead to a Pattern of Violations, and it would

12  also address specific conditions at that mine.

13        MSHA requested detailed information and data on

14  the cost benefits and feasibility of implementing the

15  proposed provision. As you address the proposed

16  provision, either in your testimony today or in written

17  comments, please be as specific as possible as how these

18  changes would affect the safety and health of miners. If

19  you have specific alternatives, provide your rationale.

20        MSHA will make available a transcript of each

21  public hearing approximately two weeks after completion

22  of the hearing. You may review the transcripts on

23  www.regulation.gov and on MSHA's web site.

24        We will now begin the testimony. Please begin

25  clearly by stating your name and organization and

1    spelling your name for the court reporter so that we may

2    have an accurate record.

3         Our first speaker today is Truman Chidsey with

4    Vulcan Materials.

5         MR. CHIDSEY:  Good morning.

6         MODERATOR SILVEY:  Good morning.

7         MR. CHIDSEY:  Let me apologize in advance.

8    I've been fighting a persistent cough; and, hopefully, I

9    can get through this without interruption.

10        My name is Truman Chidsey.  It's T-R-U-M-A-N,

11   C-H-I-D-S-E-Y.  And I'm the Director of Corporate Safety

12   Services for Vulcan Materials Company.  I appreciate the

13   opportunity to provide comments concerning the proposed

14   rule on the Pattern of Violations.

15        Vulcan Materials, based here in Birmingham,

16   Alabama, is the nation's largest producer of construction

17   aggregates, a major producer of other construction

18   materials, including asphalt and ready-mix concrete, and

19   a leading producer of cement in Florida.

20        Vulcan currently operates 255 active MSHA-

21   regulated facilities across the country.  Although Vulcan

22   fully supports the position that operators who repeatedly

23   violate mandatory safety and health standards should face

24   appropriate sanctions, MSHA's proposed rules contain

25   modifications to the existing regulations, which we find

1  objectionable.

2          MSHA has done a commendable job of creating a

3  POV single-source page on its web site, whereby an

4  operator can view the current potential POV criteria, as

5  well as view an evaluation of the mine's potential of

6  being considered for a potential POV.  However, Vulcan

7  believes that the specific POV criteria to be used for

8  selecting operators for POV should be detailed in the

9  proposal itself.  These criteria are not simply guidance,

10  but are intended to be binding criteria that will

11  determine whether mines are subject to substantially

12  increased enforcement.

13          It is essential that the criteria not be a

14  moving target, especially if the operators are expected

15  to monitor their own performance to avoid POV status.

16  Vulcan does not support the proposed rule in which the

17  current provision allowing for potential POV notification

18  of a facility has been deleted.  This notification allows

19  an opportunity for remedial steps to be taken, as well as

20  an opportunity for the operator to meet with a District

21  Manager to review the basis for a potential POV

22  designation.

23          If there are inaccuracies, irreparable harm can

24  come to operators erroneously placed into a pattern when

25  their operation's citation history doesn't warrant it.

1   As MSHA notes, Congress intended for the POV program to

2   apply to mine operators with a record of repeated S&S

3   violations who have not responded to the Agency's other

4   enforcement efforts.  Vulcan is concerned that the

5   proposed rule does not adequately reflect the legislative

6   intent that POV is intended for circumstances of repeated

7   violations by unresponsive operators, rather MSHA's

8   criteria based on multiple violations.  Thus, under the

9   current proposal, a facility can be placed in potential

10  POV status as a result of a single inspection with

11  multiple citations or as a result of one or two

12  inspections with few citations followed by one with a

13  large number of citations.  However, a facility is not

14  currently placed into full POV status unless it fails to

15  improve its performance over a period of time.

16          If there is to be no official potential POV

17  status under the proposed rule, the problem is that it

18  may be difficult, if not impossible, for a mine operator

19  to determine if a facility is threatened with POV status.

20  This is clearly not the Congressional intent of the POV,

21  and a revision of the rule should squarely address this

22  problem.

23          The most objectionable aspect of the proposed

24  rule is the elimination of existing requirements that

25  only citations and orders that have been become final are

1    to be used to identify mines with potential POV.  Vulcan

2    understands MSHA's preference to base POV status on

3    citations and orders issued as opposed to final orders

4    because there can be a substantial delay in the final

5    determination of a citation or a challenge by an

6    operator.  This delay hampers MSHA's ability to use POV

7    as a timely tool to address current problems.

8           However, it is essential to note that if

9    actions are to be based upon nonfinal orders, they may

10   not be punitive in nature without violating the

11   operator's due process rights.  The 14th Amendment

12   prohibits the Federal Government from depriving citizens

13   of liberty or property without the due process of law.

14   This means that actions that are punitive cannot be taken

15   without appropriate access to review.  But in seeking to

16   strengthen the justification to eliminate final orders,

17   MSHA cites statistical evidence that fewer than 1 percent

18   of citations are reversed based on 700,000 citations

19   issued from 2006 to 2010.

20          What MSHA does not provide, however, is the

21   percentage of contested citations that are vacated or

22   modified.  The number of citations that are vacated or

23   modified as a percentage of the total number of

24   violations assessed has much less relevance to this

25   process than the number of those that are reversed or

1    modified as a percentage of the number contested. MSHA

2    further neglects to take into account the number of

3    citations that are threatened and/or issued only to be

4    informally vacated or otherwise dismissed at the MSHA

5    field office level, which is a regular occurrence

6    throughout MSHA regions.

7         While there is substantial evidence that MSHA

8    is not always correct in their interpretation of

9    regulations, MSHA wishes to change the regulations in

10    such a way that does, in fact, assume that all citations

11    are correctly issued. The potential for mine operators

12    to be placed on a Pattern of Violations based on

13    citations that may be vacated or modified at a later date

14    should cause any reasonably prudent person to conclude

15    that this change to an existing regulation is unjustified

16    and unreasonable.

17         In summary, while Vulcan Materials Company

18    fully supports all efforts to improve the safety and

19    health of miners in this country, we feel that MSHA

20    already has the necessary tools at its disposal to

21    identify operators with a Pattern of Violations and to

22    address a pattern with appropriate enforcement action.

23    The proposed rule will only increase the potential for a

24    mine to be placed on a Pattern of Violations without

25    sufficient justification for doing so, rather than

1 improving the safety and health of our miners.

2    Thank you for an opportunity to provide

3 comments on this proposed rule.

4    MODERATOR SILVEY:  Thank you.  I have a few --

5 one -- a few questions and then maybe a comment or two.

6    With respect to the use of the single source,

7 you mentioned in your comments, the single-source page.

8 Have you used the web tool?

9    MR. CHIDSEY:  I have.

10    MODERATOR SILVEY:  You have?

11    MR. CHIDSEY:  I found it very useful, and I

12 think it's a good tool.

13    MODERATOR SILVEY:  So -- and now with respect

14 to what we said in the Public Hearing Notice, as well as

15 what I stated in my opening statement -- and I stated

16 that MSHA had re -- refined it -- excuse me -- its

17 position and that, as you know now, we have specific

18 criteria in the form of a formula on the web site.  And

19 that formula is then what becomes populated into one of

20 your mines if you -- if ya'll put in this identification

21 number.

22    But in the opening -- in the Public Hearing

23 Notice and the opening statement, we stated that before

24 we change that specific criteria and use that changed

25 criteria to review a mine for a Pattern of Violations,

1   that we would make it available to the public for

2   comment.  We would then review the comments, give a

3   certain period of time for comments, and we would make it

4   available on our web site.  We would then, as I said,

5   give a certain amount of time for comment.  We would --

6   we would then review the comments, and we would next put

7   on the web site our response to the comments.  And if we

8   made any revisions to the specific criteria, we would put

9   the revised criteria on the web site.  What -- what is

10   your reaction to that process?

11          MR. CHIDSEY:  As stated earlier, I feel that

12   that specific criteria should be put into the proposal

13   itself.

14          MODERATOR SILVEY:  And somewhere in your

15   testimony, you also stated that the -- when talking about

16   the deletion of the potential Pattern of Violations, that

17   mine operators should have the opportunity to get with

18   the District Manager and review any inaccuracies in the

19   data or something like that.

20          One of the things that we were seeking to do in

21   the proposal is that -- and, hopefully, the web tool

22   would allow operators to know if they were approaching a

23   Pattern of Violations.  And they could come into the

24   Agency with a -- a safety and health program as a

25   mitigating circumstance.  They could develop a

ANTHONY & ASSOCIATES, INC.
770.590.7570

1  comprehensive -- a safety and health program.  And they

2  could come in to the District Manager with that safety

3  and health program aimed at whatever the conditions were

4  that would lead -- giving rise to the pattern.  And the

5  District Manager would review that, and then they would -

6  - the operator would implement it, and hopefully -- in an

7  optimum situation, the conditions giving rise to the

8  pattern would be reduced through that, through that

9  safety and health program.

10       And, in fact, we are operating under that kind

11  of concept right now through corrective action plans.

12  The operators -- a number of operators have been

13  identified for a potential Pattern of Violations and have

14  subsequently submitted corrective action plans -- I guess

15  they're called "corrective action plans."  And then

16  they've made tremendous improvements.  I mean, Jay has

17  the specific numbers on that.  But I think, generally

18  speaking, that process has worked.

19       MR. CHIDSEY:  Maybe I misunderstood the

20  proposal.  My understanding was that that potential POV

21  status and notification was going away.

22       MODERATOR SILVEY:  The potential POV is going

23  away.  But I am just suggesting to you that the proposal

24  does contain an opportunity for an operator to have a

25  remedial process.  That's my only -- that's what I'm

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    saying.

2            Under the mitigating circumstance provision,

3    that does -- that does contain the concept of the

4    operator having an opportunity to remediate himself or

5    herself.  That's what I was suggesting.  And I think

6    under the -- it's the same concept under the existing

7    process, and I think it's working now.

8            The only other comment I have is that you -- in

9    your -- on page 2 of your comment, you say:  "MSHA

10   further neglects to take into account the number of

11   citations that are threatened and are issued only to be

12   informally vacated."

13           Can you explain to me exactly what you mean by

14   "threatened and are issued only to be informally vacated

15   or otherwise dismissed?"  I mean, give me an example.

16           MR. CHIDSEY:  Well, there's just a number of

17   times when an inspector makes the verbal comment that

18   he's going to write that as a citation.  We -- you know,

19   we get involved and contact the Field Office Supervisor

20   or the District Manager and explain the situation and --

21   and the inspector has communications with that -- with

22   those folks and does not end up writing a citation.

23           MODERATOR SILVEY:  Okay.

24           Actually, the citation is never written in that

25   situation, right?

1       MR. CHIDSEY: That's correct. Sometimes they

2  are written and that same process occurs and it's vacated

3  without going through the formal process.

4       MODERATOR SILVEY: But I guess I was -- by

5  looking at this, I was sort of -- figured if you said

6  "threatened," that a citation was never issued in that

7  situation.

8       MR. CHIDSEY: Well, I think -- you know,

9  "threatened" is a -- is a proper term.

10       MODERATOR SILVEY: Well, it may be a proper

11  term. It may be factually what happened. I guess my --

12  the only point I'm making is that under that situation,

13  the citation would never be taken into consideration for

14  a pattern because the citation would never -- that's my

15  point.

16       MR. CHIDSEY: I understand your point.

17       MODERATOR SILVEY: Okay. Thank you. Okay.

18  Thank you.

19       MR. CHIDSEY: Thank you.

20       MODERATOR SILVEY: The next speaker is Rick

21  Steiskal. Yeah, I was going to say Hendrix. Excuse me.

22       But you have to spell your name for the -- with

23  the National Aggregates USA and the National Stone, Sand

24  and Gravel Association. Thank you.

25       MR. STEISKAL: Good afternoon, everybody. My

1   name is Rick Steiskal.  It's R-I-C-K, last name is S-T-E-

2   I-S-K-A-L.

3            Welcome to the Southeast.  I hope it's hot

4   enough for you folks.

5            MODERATOR SILVEY:  It's the same in Washington.

6            MR. STEISKAL:  All right.  Well, it's what we

7   deal with this time of the year.

8            MODERATOR SILVEY:  Right.

9            MR. STEISKAL:  I'd like to take a moment to

10  discuss the current Pattern of Violations program.  I

11  have to give you some of my background so that you better

12  understand where my comments are coming from.

13           I'm an EH&S manager for Aggregates USA in the

14  Georgia division.  I oversee the activities of three

15  quarries and approximately 140 employees.  So we're not a

16  very large producer when it comes to nationwide.  But

17  Aggregates USA won the Sterling Award in 2011 as the

18  NSSGA member with the lowest total incidence rate for the

19  previous calendar year in the large producer category.

20  We're very proud of that fact, and we take safety as a

21  top priority.

22           One of our quarries takes approximately seven

23  to ten days to complete for an inspection, when the

24  others take approximately two, if only a single inspector

25  shows up.  So that lets you understand how long we do

1  spend with an MSHA inspector at our quarries a couple of

2  times a year.

3        The current pattern criteria:  (1) is 50 S&S

4  citations in a 12-month period; (2) 25 percent of issued

5  S&S citations are either high or reckless disregard;

6  (3) goes over elevated citations; and (4) its injury

7  severity rate is much greater than industry average.

8  Those criteria to me are unbelievable.  One percent of

9  mines fell into the original POV criteria?  Was it

10  designed to catch anyone?  With those being used to catch

11  America's worst mining facilities, I can't comprehend

12  what they must have been like to work in.

13        First, I applaud the Agency for wanting to

14  amend this regulation, because, as I have stated, the

15  above criteria is absurd.  However, I warn you with the

16  current proposal, I do not believe that this is the best

17  path forward.

18        I believe the greatest fault with the new

19  version of POV is the fact that operators have not been

20  provided with enough information about the criteria to

21  properly assess the new rule.  As everyone involved

22  knows, the most important aspect of the POV program is

23  being able to understand whether a Pattern of Violation

24  even exists.

25        MSHA has asked operators to comment on a

 1   program that is not fully developed or, if it is, then

 2   all the criteria have not been made available to the

 3   public.  I must admit that it is impractical, if not

 4   impossible, for us to comment on such a vague proposal.

 5   MSHA must act responsibly and repropose this rule and

 6   include the criteria it proposes to use in determining --

 7   to use in determining if the Pattern of Violation exists.

 8         Once this is done, the affected parties will be

 9   able to give much better criticism and analysis of how

10   this proposed rule may affect us.  First, MSHA must

11   remove the provision in the proposed rule where POV

12   status would be based on issued citations rather than

13   final orders.  Does the Department of Labor or Assistant

14   Secretary really believe that the intent of the Mine Act

15   should outweigh the intent of the Constitution?

16         Since this proposal removes the protections

17   guaranteed by due process, there's no guarantee that a

18   mine operator would not be unjustifiably -- would not

19   unjustifiably suffer from punitive sanctions for Pattern

20   of Violations status.  Citations must be able to

21   withstand the critical review in either a hearing or

22   alternative measures deemed suitable by the Secretary

23   before they can be used fully against the operator.

24         According to MSHA's web page, approximately 25

25   percent of all citations written from January 2008 to

1   December 2010 have been contested.  I realize some of

2   these are probably frivolously contested.  But

3   nonetheless, MSHA inspectors do make mistakes; computers

4   make mistakes; databases are fed bad data' and mistakes

5   have already been made in alerting an operator to

6   potential Pattern of Violations status.  With these facts

7   at hand, how can MSHA propose to remove an operator's

8   only available safeguard in this area?  If a mine is put

9   on POV status and it is not warranted, then the operator

10  may be irreparably damaged.

11          With many of today's mining companies being

12  public companies, potential damage increases

13  exponentially to those affected operators.  If this

14  situation were to actually play out, MSHA being a

15  Government entity can slip out the back door while a

16  wronged company is trying to retain people, fix its

17  reputation and its stock price while it's being beat

18  about the head and neck by the press.  MSHA needs to

19  explain how vacated citations and orders will affect

20  pattern of violation status. Operators have not -- MSHA

21  has not properly clarified in the proposal how it will

22  deal with the situation where issued citations and orders

23  that are part of the those that cause the POV status are

24  vacated while an operator is still under pattern of

25  violation status.

1          There must be a procedure implemented that will

2     cause a review of the outstanding citations and orders

3     that are vacated by the Agency in settlement or

4     litigation, and they may remove the operator if they no

5     longer meet POV criteria.

6          As the proposed rule is currently written, it

7     is unclear, confusing, and allows the Agency too much

8     discretion in determining POV status.  The only thing

9     consistent with MSHA is their inconsistency.  It is this

10    inconsistency that makes this proposal based on citations

11    issued versus final orders a very dangerous proposal for

12    all mine operators.

13         The proposed rule is seven items that would be

14    taken into account for determining the criteria for POV.

15    The problem is that we've been asked to provide comments

16    on the proposed rule without being privy to the fully

17    developed criteria.  I understand they will be numerical

18    when they are developed.  The proposed rule also states

19    an eighth factor called "mitigating circumstances."  This

20    deals with safety and health management programs.

21         MSHA has not made clear how it intends two

22    rule-makings to perverse, so it is difficult to

23    understand how this piece of the puzzle will be used

24    against operators -- will be used by or against

25    operators.  Sorry about that.

1        Under the same factor, MSHA also must define

2    "effective implementation."  How would MSHA improve the

3    management program and how would this program affect

4    pattern of violation status?

5        Things that I need -- I believe must be

6    considered before POV can be changed:  Inspectors.  In my

7    very short time in the mining industry, I've run into

8    some gems.  MSHA is hiring inspectors from all walks of

9    life, many with little to no practical mining experience.

10   I realize I am above-ground aggregates, so we probably do

11   not see the most qualified or educated inspectors.  Those

12   are probably reserved for underground coal anyway.  Many

13   of the inspectors that we see every six months have a

14   teaching degree, Coast Guard experience, or are an ex-

15   police officer.  I understand that they are trained for

16   six weeks at the mine academy and also spent time in

17   training with another inspector before their AR card is

18   issued.

19       However, just a year ago, the Inspector General

20   found that 56 percent of journeymen inspectors had not

21   completed annual refresher training.  I submit there is

22   too much at stake for operators to allow every sheet of

23   paper written by some of these inspectors to be treated

24   as if it were gospel.  POV is based on issued S&S

25   citations.  I've read that MSHA is working to change the

1 definition of S&S because it is too narrow.  How can MSHA

2 expect operators to provide substantial comments on a

3 proposed rule when the criteria provided is not only

4 vague, but the very tool you plan to use to assign POV

5 status to operators may be amended in the future?  Does

6 MSHA's reasoning for citations issued versus final --

7 final orders stem from the Agency's repeated complaints

8 about backlog in cases?  Is this the justification for

9 violating the due process for every citizen?  Having

10 one's day in court is the foundation of the 4th and 15th

11 Amendments and a cornerstone to our freedom and greatness

12 as a country.

13    I thank you for your time, your consideration,

14 and your continued to work -- and your continued work to

15 keep America's mines the safest in the world.

16    MODERATOR SILVEY:  Thank you.  I have a few

17 comments.

18    First of all, let me start from the last thing

19 first.  And I -- and I -- and maybe I'm not doing a very

20 good job.  But the safety and health management program

21 that's referenced in this proposal has nothing to do with

22 the safety and health management system rulemaking on

23 which we had public meetings last year.  The two -- and

24 maybe we need to think about coming up with a different

25 term now.  But the two are totally unrelated.

1          And some -- at one of the other hearings,

2     someone referred to it as a rulemaker and they referred

3     to it as a proposal.  It hadn't even reached the proposed

4     rule stage, by the way, because all we did was have -- we

5     did what, in fact, the President is encouraging and what

6     the mining public says to us all the time, which is get

7     early public input into rulemaking before you first --

8     put the first pen to paper.  And that's what we sought to

9     do with that safety and health management system

10    rulemaking.  But that's a separate entity, as I said.

11    Don't relate it to this one.  It's unrelated.

12          And, now, the more I -- I'm sitting here now

13    just thinking extemporaneously -- and you know what they

14    say, maybe that's not the best thing to do.  I'm thinking

15    out loud.  But we -- we may need to come up with a

16    different terminology for it.

17          Under the current pattern process, we use

18    "Corrective Action Plan."  That's really all it's meant

19    to be.  And it's a -- it would be a program developed by

20    the mine operator to address the specific items at that

21    mine that could lead to a Pattern of Violations, you

22    know, at a -- at an underground mine -- at an underground

23    coal mine; it might be ventilation issues or roof control

24    issues and nothing -- and nothing else.  At a surface

25    aggregate mine, it might be haulage accidents or

1  something else.  So that's what that program was meant to

2  be.

3          You know, an operator could use the web tool,

4  could see that he was approaching a Pattern of Violations

5  -- he or she was approaching a Pattern of Violations.  It

6  might be within a range of 10 percent; and if I get 10

7  percent more violations in either particular category,

8  then I'm going to be over the threshold for Pattern of

9  Violations and -- and come up with a program as to how I

10  could reduce these.  That was -- that is the intent of

11  that.

12          Now, I want to go back to your comment now on

13  the specific criteria because, obviously, we've heard a

14  lot of comment on that.  The specific criteria that we

15  are using today, that criteria on the web site, everybody

16  is -- when people say we have no -- we don't know what it

17  is; it's on the web site.  I probably cannot recite all

18  of it to you right now, but it's so many S&S violations -

19  - is it percentage or a number?

20          MR. MATTOS:  It's a rate of the industry

21  average.

22          MR. STEISKAL:  Yeah, the current is 50 in a 12-

23  month period.

24          MODERATOR SILVEY:  Okay.  So, anyway, that

25  criteria are on the web site.

1        As I advanced the proposal this morning, what I

2   did say to everybody is that before we -- if we were to

3   make any revisions to that criteria, which is up there

4   today, before we did that, we would make the -- the

5   revised specific criteria available to the public on our

6   web site, take comments from the public, and then if

7   we -- and put your -- put our response to your comments

8   on the web site.  And if we were to revise that criteria,

9   we would post the revised criteria.

10        So, you know -- so in terms of listening to

11   people saying they don't know what it is, that's one

12   thing to say you don't know what it is.  But it is up

13   there, the criteria.  And it will be up on the web site,

14   so you will know what it is.  Saying that now -- I will

15   say to you, saying that you want it into the proposal,

16   that's a different issue.  And I understand that.

17        So I -- but I'm -- I'm just trying to make it

18   clear so that everybody understands where the proposal

19   is.  And that's all -- I don't have any questions per se.

20   Those were comments.

21        MR. STEISKAL:  So if I may --

22        MODERATOR SILVEY:  Yes?

23        MR. STEISKAL:  -- the criteria is currently

24   found under 104(3), I believe it is, where there's 4 and

25   then "or the hundred per 12 months or the" -- I don't

1   know what the other -- injury severity measured greater

2   than, those six things are remaining the same, those six

3   criteria under the -- I think it was written in 1990.

4          MODERATOR SILVEY:  Well, just go on.

5          MR. MATTOS:  Those criteria actually were used

6   -- that set that is currently out there was used for the

7   first time in 2010, last year, last screening.

8          MR. STEISKAL:  Okay.

9          MR. MATTOS:  We had a slightly different set of

10  criteria that we used between 2007 and 2009.  And

11  probably need to clarify, too, the -- in the proposal --

12  what we did in the Preamble here, note that Congress

13  provided the Secretary with broad discretion in

14  establishing pattern criteria, recognizing that MSHA may

15  need to modify the criteria as experience dictates.

16          And our intent in coming up with this -- the

17  proposal to, in effect, notice and comment on the

18  criteria whenever we think it needs to be -- those

19  criteria need to be revised with our web establishing a

20  methodology by which we could revise these things as the

21  things changed.  All kinds of things can change.

22          They need to be -- the criteria will need to be

23  tweaked every now and then.  If we have to go pull the

24  notice and comment and rulemaking every time we need to

25  make a minor modification to those criteria, we could

1    have criteria that really are not working for us now, but

2    we're bound by regulation to use them every -- twice a

3    year, even though we know when we find out, if we find

4    out, a new modification.  So that's just one point of

5    clarification.

6            One thing, too, I need to clarify -- and

7    this -- Mr. Chidsey, it came up in your testimony also.

8    We currently do use citations and orders issued that are

9    not final in the current screening criteria.  We use a

10   combination of citations issued and those that are final.

11   Just a clarification.

12           I do have one question, and I made a note here

13   that we would need a procedure to address the citations

14   and orders that are issued, that are in contest, that you

15   contest.

16           MR. STEISKAL:  Yes.

17           MR. MATTOS:  Do you have any thoughts on what a

18   procedure like that might be to address that concern?

19           MR. STEISKAL:  I think if a -- if it is

20   contested and it makes it past the District Manager, that

21   that citation should not be used against the operator

22   until ALJ has heard it.  In the -- if the ALJ vacates, it

23   does not count towards the 50.  If the District Manager

24   vacates it -- if it gets that far and he decides to pass

25   it on, then so be it.

1       MR. MATTOS:  Thank you.

2       One issue we have right now is that there's a

3  25 percent contest rate.

4       MR. STEISKAL:  Approximately.  I found that on

5  your web page.

6       (Off the record.)

7       (On the record.)

8       MODERATOR SILVEY:  He was talking about -- you

9  were talking about if citations and orders were

10  contested, right?

11       MR. STEISKAL:  Yeah.  If an ALJ holds it up, I

12  think you should be able to count that.  But, you know, I

13  mean, that can be wishy-washy also.  I haven't had to go

14  past that yet on anything that I've contested.

15       You know, Aggregates USA's record is out there.

16  You can look us up.  We contested six in the last two

17  years and won six.  So it's usually very subjective and

18  stuff that I don't feel -- well, they agreed that it's

19  not a hazard to miners.

20       MR. MATTOS:  Thank you.

21       MR. STEISKAL:  Yes, sir.

22       MR. JONES:  I had a question.  You mentioned

23  that the specific numerical criteria was unbelievable.

24  Could you explain what you meant by that?

25       MR. STEISKAL:  We're a small quarrying

1    operation.  I can't imagine one mine having -- and I

2    realize some of the coalmines, MSHA inspectors live and

3    sleep with those guys.  50 S&S citations, I'd be looking

4    for a job.  My boss would be looking for a job.  Our

5    quarry managers would be looking for a job.  Our

6    experience is smaller quarries -- we have a couple that

7    make greater than three million tons a year.  But 50 in -

8    - in one -- at one spot, you know -- that's not company -

9    - that's just shocking to me.

10        MODERATOR SILVEY:  I understand.  I'll just say

11   that obviously when MSHA has to develop anything, some

12   people have noted that, you know -- we have to do it and

13   particularly now when you look -- this morning's rule was

14   on underground coal mine.  For this Pattern of

15   Violations, we've got to do our best.

16        And sometimes -- and that's what Mr. Mattos was

17   talking about when he went to the fact that sometimes the

18   criteria may need to be refined.  For a Pattern of

19   Violations, it's -- you've got to develop something

20   that's going to be applicable to coal and metal/

21   nonmetal, surface and underground.  And just like you

22   pointed out, small, big, you know, and all kinds of

23   conditions.  And, and so I hear what you're saying.

24        MR. STEISKAL:  You know, I disagree.  You've

25   given Aggregates the opportunity to set up their own

1   training.  Give Aggregates the opportunity -- break it

2   out.  Give us the opportunity to have our own rules.  You

3   have the different severity, severity measurements for

4   above-ground coal, underground coal, all those other

5   things.  You can have different criteria for each of the

6   different areas.

7         MODERATOR SILVEY:  Well, clearly you could.

8   And I don't want to -- you know, I'm not going to debate

9   that here.

10        MR. STEISKAL:  Yeah.

11        MODERATOR SILVEY:  You could have different

12   criteria.  But under this provision, we've got to also

13   look at what we thought the Congressional intent was.

14   And for the Pattern of Violation stated, we think that

15   Congress intended for us to develop a uniform rule.

16        And so, yet, all I'm suggesting to you is that

17   -- I hear your point, but this is what happens when you

18   do -- you try -- that's all I'm saying.

19        MR. STEISKAL:  Yeah, I understand.  You've got

20   to spread the peanut butter all the way to the edge of

21   the bread.

22        MODERATOR SILVEY:  Anyway, thank you very much.

23        MR. STEISKAL:  You have a good day.

24        MODERATOR SILVEY:  Does anybody else wish to

25   -- wish to make comment?

1            Okay, Mark.  Come on, Mark.

2            MR. ESLINGER:  You say that with disgust.

3            MODERATOR SILVEY:  No, Mark.  Please come on.

4            MR. ESLINGER:  I'll try not to quote this time,

5    okay?

6            My name is Mark Eslinger.  I'm the General

7    Safety Manager for Five Star Mining, Inc., and Black

8    Panther Mining, LLC.  Mark -- M-A-R-K -- Eslinger -- E-S-

9    L-I-N-G-E-R -- stating that the specific pattern criteria

10   will be posted on MSHA's web site gives no indication of

11   what the criteria will be.  The proposed section does

12   list the things that will be considered, but does not

13   give an indication of what the criteria will actually be.

14           Mine operators need to know what this criteria

15   will be that they will be judged against.  And to say it

16   needs to be modified down the road or could be changed as

17   to rulemaking is open-ended and you're changing the rule

18   down the road.  I think the mine operators deserve to

19   know exactly what the rule is, as far as Pattern of

20   Violations and know exactly and specifically what the

21   operator is being judged against.

22           I also believe that the citations and orders

23   used in determining whether a mine should be put on the

24   Pattern of Violations must be final.  You talked about a

25   25 percent contest rate.  When you're looking at POV, the

1    big things that are considered are like D orders, D

2    citations, S&S citations.  Well, obviously those are the

3    things that you're going to contest because, one, they're

4    high dollar and, second, they enter into the POV.  It's

5    not the mine operators' fault right now that it's running

6    so far behind, backlogged.

7          Just yesterday, I worked on a 2007 docket, 2008

8    docket, and two 2009 dockets.  Those are all out outside

9    the 15 months that's used for, you know, judging your

10   history.

11         MSHA in coal, at least, is taking away the

12   conferencing.  Conferencing is being denied.  You send in

13   a conference request and it's denied.  They've taken that

14   right away.  Conferencing was a very good tool.  It gave

15   a chance for the mine operator to sit down with somebody

16   in MSHA who was not the inspector and go through the

17   violation that was cited and discuss the parameters.  And

18   there's a lot of things to it.  You're looking at

19   negligence.  You're looking at the number of people

20   affected.  You're looking at whether it's reasonably

21   likely, unlikely, highly likely.  And you're looking at

22   the injury, whether it's fatal, permanently disabling,

23   lost workdays, and that kind of thing.  That's been taken

24   away from us.  You can't do that anymore.

25         So any time you get a citation that's S&S or a

1  D, generally you're going to ask for a conference and be

2  denied.  And you're going to get the assessment sheet and

3  you're going to check off on that sheet that, hey, we

4  want to contest those can go back in.  So now you're

5  dealing with the lawyers, and the only ones in MSHA

6  giving settlement is the District Manager and the

7  Assistant District Manager.  So it's bogging the system

8  down.

9          And if MSHA thinks that they're going to get

10  this thing caught up, I don't think this is going to

11  happen.  Because right now, the inspectors coming out

12  that are being trained are assessing things at a much

13  higher level than they used to be.  Moderate negligence

14  is like the default.  Instead of being low, they default

15  moderate to high.  They end up high negligence citations

16  now repeatedly.

17          When I was an inspector, high negligence was

18  reserved for situations where there was a need to say to

19  the operator, Look, this is a severe thing on the

20  negligence, and now it seems like you get high negligence

21  all the time.  I wish we could talk about the number of

22  citations like this guy talked about there.  If you've

23  got a large mine, 50 S&S shouldn't be, but it's not that

24  hard to get.

25          MODERATOR SILVEY:  Right.

ANTHONY & ASSOCIATES, INC.
770.590.7570

1      MR. ESLINGER: But the conferencing taken away,

2  it slows up this whole thing.

3      And another thing was a good teaching tool.

4  When an inspector came in, the conferencing officer would

5  say to that person, Hey, justify the number of people.

6  Why is it ten, or why is it five people? How is it high

7  negligence? Well, you have in your notes to support

8  that.

9      When we go before a judge, how are you going to

10  support that? And, generally, the level would come down

11  to a more applicable level, and sometimes the

12  conferencing would raise it. And now that's been taken

13  away from us. So, to say we're just going to -- whatever

14  is issued, we're going to use, I think, is really unfair

15  to the operator.

16      Now, when I was still in District 8 in MSHA, we

17  had this new inspector that got his AR card and he went

18  charging out and used 20-something pieces of paper in 2

19  days, most of which were Ds. And then the final result,

20  none of the Ds held up, and most of the violations didn't

21  hold up. There's some that held up.

22      But here, if you would take a young guy that

23  goes out and does that to a relatively new mine, I mean,

24  he's put that operator in a hurt if you cannot, you know,

25  wait until this thing sorts through the system.

1          So I think it's wrong that you're saying that

2    we're going to just use the one issued.  I do like the

3    tool right now where you can go onto the web site.  I've

4    used it.  I don't think that it's appropriate.  The

5    criteria that's being used, I mean, we have no input into

6    it.  But at least you can go in there and determine where

7    you're at in a situation at this point in time.

8          And then I'd like to say something about the

9    determination of 104(e)(1) Pattern of Violations.  If

10   you're a large coalmine, it's almost impossible to go

11   through a quarter without getting an S&S violation.  It's

12   almost impossible.  I've only seen it happen a couple of

13   times.  And the only way you're going to get off is if

14   MSHA wants you to get off.

15         I mean, you're going to make an attempt and

16   they're going to push down the violations.  Because right

17   now, there's some criteria out there that have been given

18   by headquarters and District Managers.  When you're like

19   a 103(i)(5)(A) spot mine and you get a permissibility

20   violation, it's S&S.  It takes the judgment out of the

21   hands of the inspector, but it makes an automatic S&S.

22   If you get a bare spot in a cable, it's S&S.

23         So, I mean, this issuing the higher paper has

24   been pushed up.  You're getting more and more of these

25   automatic S&S's.  It's really unfair to the operator, and

1  it goes to the criteria you're not going to be able to go

2  before the LJ, you know.

3       And one thing I'll say about contesting the

4  citations. When you get outside that history, we've got

5  to the point where we're just working on dollars. We

6  don't care what you mark. Because if it doesn't affect

7  the history, you know, other than somebody someday down

8  the road, somebody said: well, you had so many Ds and you

9  had so many this and that, you know. We're just looking

10  at the dollars.

11       Because we get that group out in Denver that

12  will say, well, we'll agree to lower the paper, but we're

13  not going to lower the money or we will only lower the

14  money a little bit. And we're saying, hey, we don't care

15  what you do with the paper because it's outside the

16  history. Let's look at the -- let's look at the

17  assessment. And the assessment in itself is unfair. If

18  you look at the assessment criteria, it goes up

19  exponentially. I mean, it starts out a couple of dollars

20  for every point and it goes up $3,000 for every point and

21  -- or more. And it's very arbitrary what the inspector

22  can select.

23       He can select -- he can make it highly likely,

24  and it bounces up the points considerably. So, see,

25  you've got to get in there and contest it. You have to

1   be able to be afforded that opportunity to contest it.

2   And you shouldn't have to be hit with that Pattern of

3   Violations on those occasions that you haven't been able

4   to contest.   That's the end of my comment.

5           MODERATOR SILVEY:   I'd like to just say

6   something about you mentioned that we got rid of

7   conferencing.

8           Basically, I think that probably in some MSHA

9   districts, both coal and metal and nonmetal, they do do

10  some form of conferencing.

11          However, on a pilot basis, we did have -- and I

12  see now the gentlemen have left because they were then --

13  in the metal/nonmetal, we had a pilot that was in the

14  southeast district, which would have been -- which would

15  have effectively applied to Georgia, his mine.   And two

16  coal districts, Districts 2 and 6.   I think they were 2

17  and 6 where the pilots were.   And we're doing an

18  evaluation of that right now to determine where we go

19  from those three pilots.

20          But what I found interesting -- now, you never

21  know people's motivation.   But it seems to me from

22  looking at the -- from review of what I saw so far,

23  percentage wise, a lot of the operators didn't avail

24  themselves of the conference process during that period

25  of time.   I think I must say that I think that the ones

1   who did said that they found it, you know, helpful,

2   useful.  But I don't think a lot did.  But we are

3   evaluating that on a whole, full-scale basis to determine

4   where to proceed.

5            MR. ESLINGER:  You know, I don't understand

6   this.  We had a conference thing in place for 25 years or

7   more.

8            MODERATOR SILVEY:  Yeah, I understand.

9            MR. ESLINGER:  Why do we got to run a pilot

10  program to look at it to determine if it worked?

11           MODERATOR SILVEY:  I'm saying --

12           MR. ESLINGER:  It worked.  And now that right

13  of conferencing has been taken away.

14           MODERATOR SILVEY:  Yeah.

15           MR. ESLINGER:  And, unfortunately, right now,

16  I'm fighting citations in 2007 and 2008, back when that

17  was still in effect.  And the safety technicians in that

18  were not trained to take notes because the safety

19  director could go and sit down with the conferencing

20  officer and they could bring up points back and forth.

21           Now, you've got to do it like you're an MSHA

22  inspector and you're going to court.  So now it's forced

23  the safety person to become like an MSHA inspector, and

24  he has to write out a series of notes of what's happened.

25           I mean, you -- you put us into a position of

1    battling legally everything that's being done.  And I

2    think it's detracting from the safety department.  But I

3    really think in this POV, you have to go after the final

4    paper.  And if you all can't get it done in a few months,

5    you know, that's MSHA's problem.  That's not the

6    operator's problem.

7            You know, we're willing to sit down in the next

8    day or next week and conference these citations and --

9    and move on.  And a lot of this contesting could be

10   overcome if you would give us a conference officer and

11   give us somebody reasonable with experience and go from

12   there.

13           MR. MATTOS:  One point just to clarify, Mark,

14   on your commenting on violations that are in contest

15   being outside that 15-month window or history.

16           Actually, we use the final order day in the

17   15-month history, so it's anything that becomes final

18   within that 15 months regardless of when it was cited.

19   So it, it never gets outside the history window.  Just

20   to --

21           MR. ESLINGER:  Can you explain that?  So if we

22   settle a D order, let's say, of 2007, okay.  And let's

23   say it's -- we come to an agreement and the judge signs

24   off on it today.

25           Is that part of today's history then or what?

1      MR. MATTOS:  It will be in the history for the

2  next 15 months, for civil penalty assessment purposes,

3  yes.

4      MR. ESLINGER:  So in other words, you're saying

5  that really on the S&S and D papers, we need to get that

6  moved down if we think it should be and not worry about

7  the dollar situation?

8      MR. MATTOS:  Well, the -- for civil penalty

9  purposes -- well, it doesn't make any difference if it's

10  a -- the history if it's an S&S or an order.  It's any

11  citation that's issued.  That becomes final.  So the

12  paper itself isn't -- unless it's vacated, it's going to

13  show up in history for that period of time.

14      MR. ESLINGER:  So, so, right now, for POV, if

15  you get a D order today, it's going to sit in history for

16  the 15 months, and then come 2 years down the road, if we

17  settle it, it still becomes a D; and then it goes back in

18  the history, and it goes back through it again?

19      MR. MATTOS:  It becomes -- in looking at final

20  orders under the current violations for Pattern of

21  Violations, we're looking at anything that became final -

22  - currently we're looking at a 12-month window.

23      The 15 months is for civil penalty assessment

24  purposes.  For Pattern of Violations, we're looking at a

25  12-month period now.  But for final orders, it's anything

1    that became final within the 12-month review period

2    that -- whenever we did the POV, regardless of when it

3    was issued.

4           MR. ESLINGER:  Okay.  I know it's 15 months on

5    your repeated violations and all that kind of stuff.

6           MR. MATTOS:  For civil --

7           MR. ESLINGER:  And 12 is for field --

8           MR. MATTOS:  Currently, it's 12.  In the

9    previous iterations, it was two year, a two-year window.

10   The last review, we did a one-year window.

11          MR. ESLINGER:  Okay.

12          MR. JONES:  I just wanted to clarify the record

13   on a legal point.

14          You mentioned about termination of POV notice.

15   The Mine Act specifies in 104E that POV is terminated

16   when the mine goes through a complete inspection without

17   an S&S.  And our regulations just restate the actual Mine

18   Act text on how a POV is terminated.

19          MR. ESLINGER:  Yeah, but I just want to make a

20   point.  In real -- you know, MSHA has been criticized for

21   not using this tool.  The reason they didn't use this

22   tool was it was a death penalty for the mines.

23          And I can remember sitting in District

24   Manager's meetings where they talked about it saying this

25   is a death penalty.  And that's one of the reasons that

1  they did not like to use POV and they resisted sitting

2  down and going through POV calculations.

3      MODERATOR SILVEY:  I -- we -- I understand.

4      MR. ESLINGER:  You understand?  Well, I mean,

5  he brought it up.

6      MODERATOR SILVEY:  I understand.  I understand.

7  Okay.  All right.  Thank you very much.

8      Does anybody else --

9      Mr. Wilson, Tom?

10      MR. WILSON:  Thomas Wilson -- W-I-L-S-O-N --

11  UMWA International Health and Safety representative.  I

12  rise in support of the UMWA International's previously

13  submitted comments, and I'd like to talk about a couple

14  of the points in there.

15      The UMWA agrees with eliminating initial

16  screening criteria that MSHA has used to provide an

17  operator with an advance written warning about a

18  operation being vulnerable to imposition of Pattern of

19  Violations procedures.

20      Operators should have an ongoing awareness

21  about their own health and safety practices and

22  experience and shortcomings in these regards.  They

23  should know when problems with their health and safety

24  program require more resources and/or attention.

25  Accordingly, there should be no need for the Government

1   to provide a specific advance warning about operation

2   substandard health and safety record and the heightened

3   enforcement attention that may follow.

4          We, thus, support eliminating what is now in

5   104.3, the provisions for determining when operations

6   meet a potential Pattern of Violation.  By removing this,

7   this would also remove the whipping post that operators

8   implement when they formally receive the advance notice

9   on the miners.

10          I have very little experience around Pattern of

11   Violations, but every time an advanced letter has, has

12   been issued, all of a sudden, there's fear tactics that

13   go out to all the miners trying to pit the miners against

14   MSHA.  And, again, I think operators should be on

15   continued notice to what may come if they don't provide

16   the health and safety.

17          Also, another critical change that would be

18   accomplished by this proposed rule concerns the removal

19   of the current limitations that MSHA only consider final

20   orders for purposes of POV.  Under this proposal,

21   citations and orders will be considered for possible POV

22   enforcement during the review period after the citation

23   and orders are issued, but while any legal challenges

24   remain pending.

25          The problem with the current system that limits

1  a POV analysis to only final orders is that it can take

2  years to resolve a contested citation. And by the time

3  such as a citation becomes final, the Health and Safety

4  Commission at the mine may bear no relationship to what

5  they are when they -- when the hazard was identified and

6  the citation first issued. Meanwhile, miners may be

7  exposed to extraordinary unhealthy and unsafe mining

8  conditions by a chronic and persistent violator of MSHA

9  regulations. This exposure to unsafe conditions must be

10  eliminated, and I believe this proposal does this. Thank

11  you.

12       MODERATOR SILVEY: Thank you. Thank you.

13  Thank you so much. Okay.

14       Does anybody else wish to make comment or

15  testimony?

16       Mr. Blankenship.

17       MR. BLANKENSHIP: James Blankenship -- B-L-A-N-

18  K-E-N-S-H-I-P -- UMWA Local 2245 President, Walter Energy

19  Number 4 mines here in Brookwood, Alabama.

20       I rise in support of the International comments

21  that were sent to the office earlier, and I just want to

22  make a few points about what I've heard today.

23       About the potential Pattern of Violation

24  notice, all that does is let them know that they'll

25  change it for a little while. It doesn't change it

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    forever.  They'll change their safety standards until

2    they get off of this, off the POV, and then it goes right

3    back to where it's at.  Operators should know already

4    what their health and safety standards are.  They

5    shouldn't need a letter from MSHA saying your potential

6    Pattern of Violations.  They should know it already.

7           I know it as a worker what they are.  They

8    should know it.  I know for a fact that operators contest

9    citations that they know were written correctly just so

10    that it doesn't become final rule so it gets tied up in

11    the two- or three-year system and doesn't count against

12    them.  I'm glad that's being taken away from them.  I'm

13    glad you're closing that loophole.  Some gentleman quoted

14    the Constitution.  It's been a long time since I was in

15    school, but nowhere in our Constitution do I see that it

16    gave an operator the right to injure or kill employees.

17           So close the loophole, make it fair and protect

18    the workers in these operations.  That's what MSHA's only

19    job is, is to protect the people who go underground,

20    whether they're salary, union, company, or whatever.

21           One other thing I want to bring up is having

22    criteria that is based on MSHA inspection hours helps

23    bring some fairness to the system.  Union representative

24    mines generally have better health and safety records

25    based, for example, on the number of fatality accidents.

1    Yet, they're often issued a disproportionately large

2    number of citations because of the Constitutional

3    provisions served to encourage miners to show inspectors

4    any and all violations.  This helps us to find and

5    correct problems before accidents occur.

6            Also, a disproportional high number of

7    inspection hours are devoted to the large unionized

8    operations.  It is important that such operations do not

9    get unfairly targeted for POV procedure just because

10   union miners and unionized operations may receive a

11   relatively large number of citations and orders when they

12   tend to be more attentive to their health and safety

13   practices.  That's true.

14           At Walter's Walter Energy Number 4, every day

15   we've got one, two, three, four inspectors, every day.  I

16   know living in Alabama that there are not the nonunion

17   operations like that.  Working in West Virginia, I worked

18   in a union mine.  I know that we got inspected a lot more

19   than the nonunion mines across the road from us.  I know

20   that for a fact.  No doubt about it.  We got more

21   citations because there was more hours put into it.

22           Another problem is how injuries are reported to

23   MSHA.  And it relies upon -- the company comparing the

24   health and safety records of various mines is unreliable.

25   Injury reports depends on operators' reports, but have

1    long -- but we have long known that chronic

2    underreporting -- some employers maintain programs that

3    serve to reduce the reporting of injuries.  Some simply

4    fail to report reportable accidents.

5            One recent and public example rose in

6    connection with the television show "Coal," which I

7    personally know a lot of those guys that work in the

8    coalmines.  On Spike TV, its first episode, a miner was

9    injured and carried away by ambulance, obviously missing

10   some work.  That subsequent employee in episodes

11   confirmed while the accident should have been a

12   reportable lost time accident, our review of the POV

13   monitoring for cobalt coal does not show any such

14   accidents were reported.

15           Underreporting is a frequent problem that

16   demonstrates the problem with relying on accident reports

17   to understand what an operation actually experiences and

18   measure for POV.  We, we suggest that fatality rates

19   should generally be weighed more heavily than injury

20   reports.

21           And if you look, even your own report earlier

22   said nonunion mines, there's a lot more accidents, a lot

23   more fatalities.  That should weigh a lot heavier than an

24   injury report.

25           In closing, I just want to say that I think

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    you're on the right track.  There's no reason for any

2    operator to be afraid of this, none whatsoever.  You

3    shouldn't be afraid of a State Trooper going down the

4    Interstate, going down 59 here when you leave here if you

5    abide by the law.  If you're doing 70, he won't stop you.

6    If you're doing 90, he'll stop you.  Same way in mining.

7    We all know what the law is.  We know what we've got to

8    do.  All we've got to do is do it.  We shouldn't fear

9    these inspectors, and this should never be a problem.

10        So simply what operators want is you not to do

11   this, but you let them do what they want to do.  Don't do

12   that.  Hold their feet to the fire.  Make them do what's

13   right.  And I appreciate it.  Thank you.

14        MODERATOR SILVEY:  Thank you.

15        Let me make just one -- with respect to your

16   statement that you know -- you said you know for a fact

17   that nonunion mines get inspected less frequently than

18   union mines.

19        Do you have data on that, or is it more what

20   you --

21        MR. BLANKENSHIP:  What I've talked and seen to

22   people -- talked to people.  I've got friends that work

23   at nonunion mines, and I talk to them a lot.

24        MODERATOR SILVEY:  But you don't have any --

25   you don't have any empirical data?

1          MR. BLANKENSHIP:  Not any data, but I can --

2    you could probably find -- I could probably find it.

3          MODERATOR SILVEY:  Well, if you do have

4    empirical data and can submit it to us, I would be

5    interested in that.

6          MR. BLANKENSHIP:  All right.  I'll do it.

7    Thank you.

8          MODERATOR SILVEY:  Okay.  Thank you.

9          MR. BLANKENSHIP:  Appreciate it.

10         MODERATOR SILVEY:  Okay.

11         Anybody else wishing to comment?  If nobody

12   else wishes to make a presentation, then I again want to

13   say that the Mine Safety and Health Administration

14   appreciates your participation in this public hearing.

15         I want to thank everybody who made

16   presentations, and I want to thank those of you who

17   attended the hearing and may not have made a

18   presentation.  As I stated in the hearing this morning,

19   that says to MSHA that you have an interest in this

20   rulemaking, and we appreciate that.

21         I want to again emphasize that all comments

22   must be received by June 30th, 2011.  MSHA will take your

23   comments, concerns, and your specific alternatives into

24   consideration in developing a final rule.

25         And I encourage everybody to continue

1    participating in this and any other MSHA rulemaking.

2              The hearing is now concluded.

3              Thank you very much.

4              (Whereupon, at 1:23 p.m., the hearing in the

5    above-entitled matter was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

## REPORTER'S CERTIFICATE

CASE TITLE:          Patterns of Violations

HEARING DATE:        June 9, 2011

LOCATION:            Birmingham, Alabama


I hereby certify that the proceedings and evidence are contained fully and accurately on the audio and notes reported by me at the hearing in the above case before the Department of Labor, Mine Safety & Health Administration.


Date: June 9, 2011

ANTHONY & ASSOCIATES, INC.


LISA BAILEY
(Official Reporter)

REQUEST TO SPEAK

Pattern of Violations

Hearing
Birmingham, Alabama

**June 9, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | Rick Steiskal | Aggregates USA | 478 972 4916 |
| 2. | TRUMAN CHIDSEY | Vulcan Materials | 205 298 3052 |
| 3. | Mark Eslinger | Black Panther | |
| 4. | Tom Wilson | UMWA | |
| 5. | James Blankenship | UMWA | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |

AB73-PH-3A

# ATTENDEES

SIGN-IN SHEET

Pattern of Violations

Hearing
Birmingham, Alabama

**June 9, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| ✓ 1. | TRUMAN CHRISEY | VULCAN MATERIALS | 205 298 3052 |
| 2. | Gary Brown | Carolina Stalite | 704 279 2166 |
| 3. | Shan Wilkerson | UMWA | 205 465 2201 |
| 4. | Phillip Whitlow | UMWA | 205 689-0042 |
| ✓ 5. | James Blaylock | N M WA | 205-242-3641 |
| ✓ 6. | Thomas F Wilson | UMWA International | |
| 7. | Mary Edge | JWR Walter Energy | 481-6936 |
| 8. | Otis L. Gibson | U M W A | 205 886-7302 |
| 9. | Rodney Bradley | Cliff. Res. | 492 2771 |
| 10. | Jim Starns | UMWA | 205-487-6235 |
| ✓ 11. | Mac O Eslinger | Black Panther Mining | 8L 745-2920 |
| ✓ 12. | Rick Steiskal | | |
| 13. | | | |

My name is Truman Chidsey and I am the Director of Corporate Safety Services for Vulcan Materials Company. I appreciate the opportunity to provide comments concerning the proposed rule on the Pattern of Violations.

Vulcan Materials, based in Birmingham, Alabama, is the nation's largest producer of construction aggregates, a major producer of other construction materials including asphalt and ready-mixed concrete and a leading producer of cement in Florida. Vulcan currently operates 255 MSHA-regulated facilities across the country.

Although Vulcan fully supports the position that mine operators who repeatedly violate mandatory safety and health standards should face appropriate sanctions, MSHA's proposed rule contains modifications to the existing regulations which we find objectionable.

MSHA has done a commendable job of creating a POV single source page on its website whereby an operator can view the current Potential POV (PPOV) criteria as well as view an evaluation of a mine's potential of being considered for a PPOV. However, Vulcan believes that the specific POV criteria to be used for selecting operators for POV should be detailed in the proposal itself. These criteria are not simply guidance, but are intended to be binding criteria that will determine whether mines are subject to substantially increased enforcement. It is essential that the criteria not be a moving target especially if operators are expected to monitor their own performance to avoid POV status.

Vulcan does not support the proposed rule in which the current provision allowing for Potential POV notification of a facility has been deleted. This notification allows an opportunity for remedial steps to be taken, as well as an opportunity for the operator to meet with a district manager to review the basis for a potential POV designation. If there are inaccuracies, irreparable harm can come to operators erroneously placed into a pattern when their operation's citation history doesn't warrant it.

As MSHA notes, Congress intended for the POV program to apply to "mine operators with a record of repeated S&S violations. . . who have not responded to the Agency's other enforcement efforts." Vulcan is concerned that the proposed rule does not adequately reflect the legislative intent that POV is intended for circumstances of repeated violations by unresponsive operators.

Rather, MSHA's criteria are based on multiple violations. Thus, under the current proposal, a facility can be placed into PPOV status as a result of a single inspection with multiple citations, or as a result of one or two inspections with few citations, followed by one with a large number of citations. However, a facility is not currently placed into full POV status unless it fails to improve its performance over a period of time. If there is to be no official PPOV status under the

AB73-PH-3B

proposed rule, the problem is that it may be difficult, if not impossible, for a mine operator to determine if a facility is threatened with POV status. This is clearly not the Congressional intent for the POV tool, and a revision of the rule should squarely address this problem.

The most objectionable aspect of the proposed rule is the elimination of existing requirements that only citations and orders that have become final are to be used to identify mines with a potential POV. Vulcan understands MSHA's preference to base POV status on citations and orders issued, as opposed to final orders, because there can be a substantial delay in the final determination of a citation or order challenged by an operator. This delay hampers MSHA's ability to use POV as a timely tool to address current problems. However, it is essential to note that, if actions are to be based upon non-final orders, they may not be punitive in nature without violating the operator's due process rights. The Fourteenth Amendment prohibits the federal government from depriving citizens of liberty or property without due process of law, and this means that actions that are punitive cannot be taken without appropriate access to review.

In seeking to strengthen their justification to eliminate final orders, MSHA cites statistical evidence that "fewer than one percent of citations are reversed," based on 700,000 citations issued between 2006-2010. What MSHA does not provide, however, is the percentage of *contested* citations that are vacated or modified. The number of citations that are vacated or modified as a percentage of the total number of violations assessed has much less relevance to this process than the number of those that are reversed or modified as a percentage of the number contested. MSHA further neglects to take into account the number of citations that are threatened and/or issued, only to be informally vacated or otherwise dismissed at the MSHA Field Office level, which is a regular occurrence throughout MSHA's regions.

While there is substantial evidence that MSHA is not always correct in their interpretation of the regulations, MSHA wishes to change the regulations in such a way that does in fact assume that all citations are correctly issued. The potential for mine operators to be placed on a pattern of violations based on citations that may be vacated or modified at a later date should cause any reasonably prudent person to conclude that this change to the existing regulation is unjustified and unreasonable.

In summary, while Vulcan Materials Company fully supports all efforts to improve the safety and health of miners in this country, we feel that MSHA already has the necessary tools at its disposal to identify operators with a pattern of violations and to address the pattern with appropriate enforcement action. The proposed rule only increases the potential for a mine to be placed on a pattern of violations without sufficient justification for doing so, rather than improving the safety and health of our miners.

Thank you for this opportunity to provide comments on this proposed rule.

# TRANSCRIPT OF PROCEEDINGS

IN THE MATTER OF: )
)
PATTERN OF VIOLATIONS )

Pages:    1 through 43

Place:    Arlington, Virginia

Date:     June 15, 2011

# ANTHONY & ASSOCIATES, INC.

770. 590.7570

IN THE MINE SAFETY AND HEALTH ADMINISTRATION


IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )


                         Arlington, Virginia

                         Wednesday
                         June 15, 2011


        APPEARANCES


        MSHA Panel:  PATRICIA W. SILVEY, JAY MATTOS,
CHERIE HUTCHISON, ANTHONY JONES


        Speakers:

        JOSEPH CASPER
        Vice President of Safety
        National Stone, Sand & Gravel Association

        LINDA RAISOVICH-PARSONS
        United Mine Workers of America

        JOSH NELSON
        Campaign Manager
        CREDO Action

```
1                    P R O C E E D I N G S

2                                        (9:30 a.m.)

3           MODERATOR SILVEY:  Again, good morning.

4           My name is Patricia W. Silvey.  I'm the Deputy

5   Assistant Secretary for Operations for the Mine Safety

6   and Health Administration.  I will be the Moderator of

7   this public hearing on MSHA's Proposed Rule on Pattern of

8   Violations.

9           On behalf of Assistant Secretary of Labor for

10  Mine Safety and Health, Joseph A. Main, I would like to

11  welcome all of you here today.

12          I would like to introduce the members of the

13  MSHA panel.  To my left, Jay Mattos, who is the Chair of

14  the Pattern of Violations Rulemaking Committee; to my

15  right, Cherie Hutchison, Regulatory Specialist in MSHA's

16  Standards Office; and to her right, Anthony Jones, who is

17  with the Department of Labor, Office of the Solicitor.

18  And I'd also like to introduce David Hershfield who is in

19  the audience, who assisted as economist on this project.

20          In response to requests from the public, MSHA

21  is holding public hearings on its Pattern of Violations

22  proposed rule.  This is the fourth public hearing on this

23  proposal.  The earlier hearings were in Denver, Colorado,

24  June 2nd; Charleston, West Virginia, June 7th;

25  Birmingham, Alabama, June 9th; and in response to a
```

1   request from the public, MSHA will hold an additional

2   hearing in Hazard, Kentucky, on Tuesday, July 12th.  We

3   will be putting a notice in the Federal Register

4   announcing the hearing.

5           The purpose of this hearing is to receive

6   information from the public that will help MSHA evaluate

7   the requirements in the proposal and produce a final rule

8   that will improve health and safety conditions at mines.

9           As most of you know, the hearing will be

10  conducted in an informal manner.  Formal Rules of

11  Evidence will not apply.

12          The hearing panel may ask questions of the

13  speakers.  Speakers may ask questions of the panel.

14  Speakers and other attendees may present information to

15  the court reporter for inclusion in the rulemaking

16  record.

17          MSHA will accept written comments and other

18  appropriate information for the record from any

19  interested party, including those not presenting oral

20  statements.

21          MSHA is proposing to revise the Agency's

22  existing regulation on Pattern of Violations, which

23  applies to all mines, coal, and metal and non-metal,

24  surface and underground.  MSHA determined that the

25  existing Pattern of Violations regulation does not

1    adequately achieve the intent of the Federal Mine Safety

2    and Health Act of 1977, or the Mine Act.

3           Congress included the Pattern of Violations

4    provision in the Mine Act so that operators would manage

5    safety and health conditions at mines and find and fix

6    the root causes of Significant and Substantial, or S&S,

7    violations to protect the safety and health of miners.

8           Congress intended that MSHA use the Pattern of

9    Violations provision to address operators who have

10   demonstrated a disregard for the safety and health of

11   miners.  MSHA intended that the proposal would simplify

12   the existing Pattern of Violations criteria, improve

13   consistency in applying the Pattern of Violations

14   criteria, and more adequately achieve the statutory

15   intent.

16          The proposal would also encourage chronic

17   violators to comply with the Mine Act and MSHA's safety

18   and health standards.  MSHA requests comments from the

19   mining community on all aspects of the proposed rule and

20   is particularly interested in comments that address

21   alternatives to key provisions in the proposal.

22          MSHA asked that commenters be specific in their

23   comments and submit detailed rationale and supporting

24   documentation for suggested alternatives.

25          The proposed rule included general criteria and

1    provided that the specific criteria used in the review to

2    identify mines with a pattern of S&S violations would be

3    posted on MSHA's website.

4         In the Preamble to the proposal, MSHA requests

5    suggestions on how the Agency should obtain comments from

6    mine operators and miners during the development of and

7    periodic revision to the specific POV criteria.

8         MSHA also requests comments on the best methods

9    for notifying operators and the mining public of changes

10   to these specific criteria.

11        In the public hearing notice, MSHA clarified

12   its proposal and moved its position a little further and

13   stated that any change to the specific criteria would be

14   made available to the public for comment, via posting on

15   the Agency's website, before MSHA uses it to review a

16   mine for a Pattern of Violations.

17        MSHA further stated that it planned to review

18   and respond to comments, revise as appropriate the

19   specific criteria, and post the Agency's response and any

20   revised specific criteria on the Agency's website.  MSHA

21   asked for comments on this proposed approach to obtaining

22   public input into revisions to the specific Pattern of

23   Violations criteria.  And I know that most of you know,

24   at least some of you know, that we have received a lot of

25   comment on the original proposal and then on the Agency's

1  proposed approach to the specific criteria that was

2  included in the public hearing notice.

3      MSHA also requested comments on the burden

4  that monitoring a mine's compliance record against the

5  proposed specific Pattern of Violations specific criteria

6  using the Agency's website would place on mine operators.

7  And as some of you know, I know you do, MSHA has

8  developed a web tool to make it easier for mine operators

9  to monitor their own compliance, and MSHA did that in the

10 interest of transparency and so that operators could --

11 you can take this web tool and an operator can put in his

12 or her mine ID number, and it populates the web tool and

13 shows an operator how an operator is with respect to the

14 specific criteria that's now posted on our website.

15     And from some of the other public hearings, I

16 did hear from members of the public that they found the

17 web tool very useful, and we can tell that it's being

18 used a lot.  At some point, I asked you about how many?

19 Did you remember how many people had used it?

20     MR. MATTOS:  It was about 800 a week.

21     MODERATOR SILVEY:  Eight hundred a week.  So

22 people are, and the operators are indeed using it; and as

23 I said, they did say they found it very useful.

24     Under the proposal, to be considered as a

25 mitigating circumstance, the proposed rule would provide

1    that an operator may submit a written safety and health

2    management program to the District Manager for approval.

3    MSHA would review the program to determine whether the

4    program's parameters would result in meaningful,

5    measurable, and significant reductions in S&S violations.

6          At this point, MSHA would like to clarify that

7    the Agency did not intend that the safety and health

8    management programs referenced in the proposal be the

9    same as those referenced in the Agency's rulemaking on

10   comprehensive safety and health management programs, and

11   in effect, the rulemaking on which we had three public

12   meetings last fall.  The comprehensive safety and health

13   management program rulemaking has not gotten to the

14   proposed rule stage.

15         Rather, what MSHA intended was MSHA would

16   consider a safety and health management program as a

17   mitigating circumstance under the Pattern of Violations

18   proposal when it (1) includes measurable benchmarks for

19   abating specific violations that could lead to a Pattern

20   of Violations at a specific mine, and (2) addresses the

21   hazardous conditions at that mine.

22         In effect, if an operator were monitoring using

23   the web tool to monitor his or her safety performance and

24   saw that they were approaching the statistics in the

25   Pattern of Violations specific criteria, they could

1    create a safety and health program aimed at the types of

2    violations that they were seeing that would give rise to

3    the Pattern of Violations and come into MSHA with that

4    program before the operator would be placed on a Pattern

5    of Violations.  They would come in with a program for

6    reducing S&S violations and the other types of criteria

7    that are included in the specific criteria that MSHA uses

8    to review a mine for a pattern.

9         And so far under the existing rule, mine

10   operators indeed who were notified of a potential Pattern

11   of Violations have come into the Agency with, under the

12   existing rule, a corrective action plan.  That's the

13   terminology I think it's called, a corrective action, and

14   they have indeed made significant improvements in safety

15   and health violations and other parameters in the

16   criteria.  They've made improvements at their mines.

17        MSHA requested detailed information and data on

18   the cost, benefits, and feasibility of implementing the

19   proposed provisions.  MSHA requested specific comments on

20   its estimates of numbers of mines affected, which are

21   likely to vary from year-to-year.

22        As you address the proposed provisions, either

23   in your testimony today or in your written comments,

24   please be as specific as possible.  We cannot

25   sufficiently evaluate general comments.  You may submit

1    comments following this public hearing.  Comments must be

2    received or postmarked by August 1st, and comments may be

3    submitted by any method identified in the proposed rule.

4            MSHA will make available a verbatim transcript

5    of this public hearing approximately two weeks after the

6    completion of the hearing.  You may view the transcripts

7    of all the public hearings on MSHA's website,

8    www.msha.gov and on www.regulations.gov.

9            We will now begin today's testimony.  If you

10   have a hard copy of your presentation, please provide it

11   to the court reporter.  Please begin by clearly stating

12   your name and organization and spelling your name for the

13   court reporter to make sure that we have an accurate

14   record.

15           Our first speaker today is Joseph Casper with

16   the National Stone, Sand & Gravel Association.

17           MR. CASPER:  Good morning.

18           MODERATOR SILVEY:  Good morning.

19           MR. CASPER:  My name is Joseph Casper --

20   C-A-S-P-E-R, of the National Stone, Sand & Gravel

21   Association.

22           NSSGA very much appreciates this opportunity to

23   comment on the proposal on revising the Pattern of

24   Violations rule.  We provide the following comments.

25           We believe -- and this is an application off of

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   written comments that we submitted in April.

2        We believe that this program should be

3   carefully crafted so that it targets those operators that

4   repeatedly fail to live up to their obligations to

5   provide miners with a safe place to work.

6        NSSGA is concerned that there are several

7   significant gaps in the proposed rule.  Currently, it's

8   impossible for commenters to thoroughly understand and

9   assess the proposal.  Therefore, NSSGA requests that MSHA

10  re-propose the rule to address these gaps and allow

11  operators a fair opportunity to comment on the fully

12  proposed POV program as a whole.

13       Following is a summation of some of our key

14  concerns.

15       The POV criteria should be specified in the

16  rule.  MSHA proposes to list its specific criteria for

17  POV status on the MSHA website but has not included

18  specific criteria for selection of operators.  NSSGA

19  believes that the specific criteria to be used should be

20  detailed in the proposal.

21       Also, it is essential that the criteria not be

22  a moving target, especially if operators are expected to

23  monitor their own performance in order to avoid POV

24  status and have that be the only way for the operators to

25  know exactly where they stand with the Agency as far as

1    POV action possibly is concerned.

2         Second, the POV criteria should be clear and

3    easy to access.  NSSGA agrees with MSHA's data goal to

4    provide clear, transparent, and accessible POV criteria;

5    however, we were struck that the proposal deletes the

6    current provision in POV allowing for notification of

7    proposed POV status.

8         Third, POV status should only result from

9    repeated violations.  As MSHA noted in the proposal,

10   Congress intended for the POV program to apply to mine

11   operators with a record of repeated S&S citations of

12   violations, who have not responded to the Agency's other

13   enforcement efforts.  We're concerned that the proposed

14   rule does not adequately reflect the legislative intent

15   that POV is intended for circumstances of repeated

16   violations by unresponsive operators.

17        Rather, MSHA's screening criteria are based on

18   multiple violations.  Thus, under the current proposal,

19   it's our understanding that a facility can be placed on

20   POV status as a result of a single inspection with

21   multiple citations, or as a result of one or two

22   inspections with POV citations followed by one inspection

23   with a high number of citations.

24        This is clearly not the Congressional intent

25   for the POV rule tool, and a revision of the rule should

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    squarely address this problem.

2          Under the current rule and screening criteria,

3    a single inspection with multiple citations can place a

4    mine under status.  However, a facility is not currently

5    placed under full POV status unless it fails to improve

6    its performance over time.

7          If there is no potential POV status under the

8    proposed rule, we see the problem as being that it may be

9    difficult, if not impossible, for an operator to

10   determine if it is threatened with POV status.  It is

11   difficult to comment on exactly how the criteria should

12   reflect the need to address repeated violations, as

13   opposed to multiple violations, without knowing what

14   specific criteria MSHA proposes to apply.

15         Fourth, if POV status is not based on final

16   orders, punitive elements violate due process rights.

17   NSSGA understands MSHA's preference to base POV status on

18   citations and orders issued as opposed to final orders

19   because there can be a significant delay in the final

20   determination of a citation or order challenged by an

21   operator.  This delay hampers MSHA's ability to use POV

22   as a timely tool.

23         However, it is essential to note that if

24   actions are to be based on non-final orders, they need

25   not be punitive in nature without violating the

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   operator's due process rights.  The Fourteenth Amendment

2   prohibits the Federal Government from depriving citizens

3   of liberty or property without due process of law, and

4   this means that actions that are punitive cannot be taken

5   without appropriate access to review.

6           This does not mean that MSHA can take no

7   actions prior to a final order.  Certainly, it can take

8   actions designed to protect miners from harm, and it

9   certainly has the discretion to increase the level of

10  scrutiny of a mine operation with repeated citations or

11  orders.

12          Fifth, if POV status is based on citations

13  subsequently vacated, POV status must be terminated.

14          The proposed rule calls for terminating POV

15  status only if an inspection of the entire mine reveals

16  no S&S citations.  However, because the proposal calls

17  for basing POV status on non-final orders, POV status

18  must also be terminated, it seems to us, if citations or

19  orders upon which the status is based are subsequently

20  reversed or reduced in severity.

21          Finally, remedial plans should not be confused

22  with comprehensive safety and health management system

23  programs.  MSHA indicates in the Preamble that a mine

24  operator finding that a mine is at risk of POV status may

25  submit a written safety and health management program to

1    MSHA for approval, and that such a program may serve as a

2    mitigating circumstance that may help the operator avoid

3    POV status.

4           NSSGA does not object to the concept of a mine

5    operator working with MSHA to develop a remedial plan to

6    address problems that could lead to POV.  However, NSSGA

7    is concerned that the language in the Preamble may

8    suggest that MSHA will require comprehensive safety and

9    health management systems that go beyond the particular

10   concerns underlying the potential POV status.

11          We support safety and health management systems

12   used and have testified so last fall here at MSHA.

13   However, we don't believe that a safety and health

14   management system should be mandated for the entire

15   operation if the basis for POV status is much more

16   limited than being operation-wide.

17          In summation, the proposed rule stands, it

18   seems to us, as a positive effort toward developing a

19   program that will be transparent and effective in

20   allowing the Agency to go after operators that aren't

21   committed to safety and health and compliance.  However,

22   we believe that more work needs to be done.  MSHA should

23   re-propose the rule and include specific criteria that it

24   plans to use as a basis for determining which operations

25   are placed on a pattern.

1        In particular, reasonable cost estimates cannot

2    be performed without an understanding of those specific

3    criteria.  Also a determination of an operator's POV

4    status must be based solely on those citations that are

5    fully adjudicated.

6        This closes our comments, and we appreciate the

7    opportunity to provide to you our feedback.

8        MODERATOR SILVEY:  Thank you.  I have a few

9    comments and a few questions.

10       As you stated, the proposal should not be a

11   moving target.  So I'd like to ask your response to the

12   approach that was proffered in the public hearing notice;

13   that is, that the specific criteria, as everybody knows,

14   the specific criteria that we use today to review a mine

15   for a Pattern of Violations is on the website.  Then

16   subsequent to putting it on the website, we developed

17   this web tool whereby a mine operator could monitor his

18   or her performance against that specific criteria.

19       Now, in the public hearing notice, we said

20   before we change that criteria, that specific criteria,

21   assuming that a year from now we were going to review a

22   mine for a pattern, before we made a change to it, we

23   would post it on the website.  We would take comments

24   from the public.  We would then evaluate the comments and

25   respond to the comments, post our response; and if we

```
 1    revised that specific criteria in response to some of the

 2    comments we got, then we would post the specific

 3    criteria.

 4            I mean, what's your response to that approach?

 5    I guess I say that because at one point, you said they

 6    should -- mine operators should know what the specific

 7    criteria are, and we -- and it was with that in mind,

 8    that we intended that operators, indeed, and the public

 9    know what the specific criteria are.

10            MR. CASPER:  Right.

11            MODERATOR SILVEY:  But what is your response to

12    that approach?

13            MR. CASPER:  We will develop a formal response

14    that I can provide you, and I can shortly after.

15            MODERATOR SILVEY:  Okay.

16            MR. CASPER:  That can be very helpful, and the

17    explanation is very helpful, and it's more clear to us

18    than it was when it was first put on the site.

19            MODERATOR SILVEY:  Yeah.

20            MR. CASPER:  So, thank you.

21            MODERATOR SILVEY:  The other thing I want -- I

22    do want and I made some statement about it.  I said at

23    one of the other public hearings a little bit jokingly,

24    but maybe not so jokingly, that we got to change the name

25    of this comprehensive safety and health management
```

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    program because people are confusing it with safety and

2    health management systems, indeed, that rulemaking that

3    we started but we have not advanced beyond the

4    preliminary stages of that rulemaking as all of you know.

5         We took -- we had public meetings and took

6    input into the public before we even started to develop a

7    proposed rule, which is what many of you have told us for

8    so many years.  So in any event, we -- the safety and

9    health management program provision, that would be a part

10   of a mitigating circumstance, where an operator could

11   come into MSHA as a mitigating circumstance, if the

12   operator felt like they were approaching a Pattern of

13   Violations, what they would do is develop a program aimed

14   at the specific conditions at the mine, the types of

15   violations -- I don't know, whatever they are, you know,

16   haulage violations or guarding violations or whatever

17   type, the types of violations at the mine giving rise to

18   the -- to leading to the pattern.

19        So we said that they could come in with a

20   program, whatever kind of program we want to call it,

21   corrective program, aimed at addressing those conditions.

22   So, you know, I want to sort of, kind of hope that people

23   see what we were talking about in doing that; and in many

24   ways, that could -- not in many ways.  That does.  That

25   provides a remedial approach.  That provides an

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    opportunity for the operator to remediate the conditions

2    at the mind.

3           MR. CASPER:  Thank you.  We appreciate that

4    kind of clarification, and to the extent that that kind

5    of program can be specific to the operation --

6           MODERATOR SILVEY:  Right.

7           MR. CASPER:  -- we think that would be very

8    helpful.

9           And to be candid, our concern on the safety and

10   health management system proposal, to the extent that we

11   had any basis for comment, was a fear that something

12   might come down in a one size fits all kind of approach,

13   the likes of which we think risks undercutting the cause

14   for managing effectively and successfully for safety and

15   health.  So thank you for that clarification.

16          MODERATOR SILVEY:  Yeah, those were two

17   different -- we didn't intend that, but we have gotten

18   comments.  So, you know, obviously that was -- there may

19   have been some confusion.

20          MR. CASPER:  Got you.

21          MODERATOR SILVEY:  Right.

22          MR. CASPER:  Thank you.

23          MODERATOR SILVEY:  I don't have any others.

24   Do you have any?

25          MR. MATTOS:  I just have one.

ANTHONY & ASSOCIATES, INC.
770.590.7570

1          MODERATOR SILVEY:  Okay.

2          MR. MATTOS:  Joe --

3          MR. CASPER:  Yes.

4          MR. MATTOS:  -- just -- I just want to make

5    sure I understand the distinction between repeat --

6    repeated violations and multiple violations.

7          MR. CASPER:  Well, we saw it that you had to

8    have repeated violations of the same standard in the

9    traditional POV approach, and we thought that that ought

10   to be the basis for going forward, as opposed to not

11   having a focus just on repeated violations.  Because then

12   it's a different kind of POV program than it was in the

13   past.

14         MR. MATTOS:  Okay.  I think -- I thought that's

15   where you --

16         MR. CASPER:  Yeah.

17         MR. MATTOS:  I just wanted to make sure.

18         MR. CASPER:  Yeah.

19         MR. JONES:  Have you or your members used the

20   POV web tool?

21         MR. CASPER:  I have looked it.  I don't know

22   that the members have.

23         MR. JONES:  What is your opinion of the web

24   tool?

25         MR. CASPER:  It looked helpful, but I'll tell

1   you, I -- the basis of it -- the basis of the success is

2   going to be based in part on it having completely

3   accurate information and the database --

4        MODERATOR SILVEY:  I think we heard from some

5   of your members who had used it.

6        MR. CASPER:  -- having accurate information.

7   We've had challenges with that in the past in terms of

8   database control.  So accuracy is critical, but the tool

9   itself -- and I sat at the run through -- was impressive

10  and it was smooth and user friendly.

11       It is a concern to us, however, that -- for an

12  operator to have to check that, I guess monthly according

13  to the proposal, still the claim of five minutes to do

14  that monthly is overly optimistic.  I think given what an

15  operator has to juggle in terms of checking for POV

16  status, it would necessitate spending more than five

17  minutes time, not that the tool isn't friendly.  It seems

18  to be a user-friendly tool and worked fine in the run

19  through, but that is a concern of ours.

20       MODERATOR SILVEY:  Yeah, we did hear from

21  members who have used it.

22       MR. CASPER:  Okay.  Good.

23       MODERATOR SILVEY:  Okay.  Thank you very much.

24       MR. CASPER:  Thank you.

25       MODERATOR SILVEY:  Our next person will be

1  Linda Raisovich-Parsons with the United Mine Workers.

2          MS. RAISOVICH-PARSONS:  Good morning.

3          MODERATOR SILVEY:  Good morning.

4          MS. RAISOVICH-PARSONS:  My name is Linda

5  Raisovich-Parsons, and I'm here today on behalf of the

6  United Mine Workers of America.  I appreciate the

7  opportunity to address the UMWA's thoughts on the

8  proposed rule for Pattern of Violations.

9          The UMWA generally supports the rule as

10 proposed by MSHA.  However, we have certain concerns

11 about the proposal, which I will discuss today.

12         The Pattern of Violations enforcement tool has

13 been at Section 104(e) of the Mine Act since 1977; yet,

14 MSHA's use of this tool has been virtually nonexistent

15 until very recently.  We encourage MSHA to maintain the

16 POV procedure that is easy for the mining community to

17 understand and for MSHA to enforce.

18         The recent online tool for monitoring whether a

19 mine meets the Pattern of Violations criteria is a step

20 in the right direction and will be a useful tool for the

21 mining community to monitor their mine's POV score.  We

22 commend MSHA for this effort.

23         UMWA agrees with the elimination of the initial

24 screening process and the written notice of a potential

25 Pattern of Violations currently required under 104.3 of

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    the Code.  Mine operators should have an ongoing

2    awareness of their own health and safety practices and

3    history of the day-to-day operations of their mine.  It's

4    not necessary for MSHA to forewarn them that they are in

5    trouble and could have a potential Pattern of Violations

6    forthcoming.  Any mine operator should be fully aware of

7    shortcomings in their health and safety program and be

8    aware of the need for more resources and attention.

9              The new POV webpage criteria screening is a

10   sufficient tool to permit the mine operator to monitor

11   their own POV criteria history.  Because the numbers on

12   this webpage are refreshed monthly, the industry can

13   access up-to-date statistics for their operations.  So

14   there's no reason for the Government to provide an

15   advanced warning.

16             With the new POV webpage, mine operators will

17   be able to identify the specific areas where their

18   problems lie from the criteria red-flagged in their

19   stats.  For this reason, the UMWA agrees with the

20   elimination of the written notice of a potential Pattern

21   of Violations, as proposed.

22             The UMWA also supports the Agency's removal of

23   the current limitation that MSHA only consider final

24   orders for purposes of a Pattern of Violations.  The

25   problem with the current system that limits the Pattern

1     of Violations analysis to only final orders is that it

2     could take years to resolve a contested citation.  By the

3     time such citation becomes final, the conditions at the

4     mine may bear no resemblance to what they were when the

5     hazard was first cited.  In the meantime, miners may have

6     been exposed to extraordinarily unsafe conditions by a

7     repeated violator, and the Agency is powerless to use

8     this enforcement tool until those challenged citations

9     become final.

10           The incentive for the operator to challenge all

11    S&S citations would be great in order to avoid at Pattern

12    of Violations.  In 1989, when the rule was originally

13    proposed to only consider final orders, the Union raised

14    this concern.  I personally testified in Denver,

15    Colorado, on November 8, 1989, predicting that if the

16    Agency limited themselves to final orders, that operators

17    would be encouraged to challenge all citations and orders

18    to simply avoid consideration for a Pattern of

19    Violations.

20           And now here we are, 22 years after I made that

21    prediction, with a major backlog of cases before the

22    Federal Mine Safety and Health Review Commission and the

23    first mine to be placed on a POV only recently.  I must

24    have been psychic or perhaps just using common sense.  If

25    there is a loophole to avoid a Pattern of Violations,

1    rest assured the industry will take full advantage.

2           Some may argue that the operator's due process

3    would be compromised by allowing MSHA to consider non-

4    final citations and orders for POV determinations.

5    However, I care to differ.  The plain language of the

6    Mine Act does not require MSHA to consider only final

7    citations and orders for it to use POV.

8           Secondly, the Mine Act includes many sections

9    that require an operator to immediately correct problems

10   MSHA identifies without exhausting challenge procedures.

11   Due process protections will still be available, just

12   later in time.

13          For example, a failure to abate an order under

14   Section 104(b) and an unwarrantable failure under Section

15   104(d) are issued on the basis of previous citations,

16   whether or not those citations have been challenged.

17          Likewise, an operator that disputes an

18   inspector's determination as to whether an imminent

19   danger exists, must immediately comply with the imminent

20   danger order and withdraw miners, though it still has the

21   right to challenge MSHA's issuance of the order.

22          The Senate Committee gave a fairly extensive

23   comparison between the unwarrantable and the POV

24   provisions in the legislative history of the Act.  It

25   explained that the violation setting into motion for the

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    unwarrantable failure sequence "must be of Significant

2    and Substantial nature and be the result of the

3    operator's unwarrantable failure to comply."

4          In comparison, it pointed out there is not a

5    requirement that the violations establishing the Pattern

6    of Violations be the result of the operator's

7    unwarrantable failure, only that they be of Significant

8    and Substantial nature.

9          The Senate Committee concluded its discussion

10   by pointing out that it is the Committee's intention that

11   the Secretary or his authorized representative may have

12   both enforcement tools available and that they be used

13   simultaneously if the situation warrants.

14         If an operator's challenge to the underlying

15   citations effectively blocks implementation of the POV,

16   the Secretary cannot use both enforcement tools

17   simultaneously as Congress intended.

18         Further, the Court is reviewing due process

19   issues to balance the private interest of the party,

20   claiming a deprivation of due process against both the

21   nature and importance of the Government's interest and

22   the risk of the Government making a mistake when

23   depriving due process and the consequences any such

24   mistake would entail.

25         When there is a compelling Government interest

1    at stake, such as miner's health and safety, as the Mine

2    Act's first purpose states, the Court finds that an

3    after-the-fact hearing satisfies due process.  The UMWA

4    believes that any due process concerns are adequately

5    protected by the Federal Mine Safety and Health Review

6    Commission and its judicial review procedures.

7          If the challenged citations are later reduced

8    to non-S&S or vacated, then it could be considered as

9    mitigating circumstances and the situation reevaluated.

10          Lastly, we recognize that the legislative

11    history granted the Secretary broad discretion in

12    establishing criteria for determining when a Pattern of

13    Violations exists.  However, the UMWA believes that the

14    Agency has gained sufficient experience over the 30 years

15    since the Act first became law to now set the criteria

16    and still satisfy the discretion Congress reserved for

17    the Secretary.

18          We believe that absolute numbers should not

19    control for the criteria.  For example, the record for

20    large mines should not be compared with the record of

21    small mines, or vice versa.  The experience of mines

22    should be compared to those of comparable mines and

23    viewed according to comparable inspection hours when

24    evaluating their health and safety records.

25          The eight criteria listed in the proposed rule

ANTHONY & ASSOCIATES, INC.
770.590.7570

1   represent appropriate factors for MSHA to consider for

2   purposes of POV, but further explanation of how these

3   criteria will be considered or weighted should be

4   established at the outset.  There must also be an Agency

5   commitment to apply the criteria in a consistent manner.

6   The Agency must also give consideration to circumstances,

7   which could create an unfairness in the health and safety

8   record for any given mine.

9          At union mines, a disproportionately higher

10  number of inspection hours are devoted to large unionized

11  operations.  At the union mines, a miners' representative

12  routinely travels with a MSHA inspector and points out

13  any violations that they may see and consequently union

14  represented mines are issued a disproportionately larger

15  number of citations compared to their non-union

16  counterparts where miners are often intimidated and

17  discouraged from pointing out violations.

18         Further, the injury statistics are not a

19  reliable gauge of health and safety at a mine because we

20  have long known about chronic underreporting of accidents

21  at many mines.  Our union mines make sure that all

22  accidents are reported and usually show a higher accident

23  rate than our non-union counterparts because of the

24  underreporting.

25         For this reason, we recommend that the fatality

ANTHONY & ASSOCIATES, INC.
770.590.7570

1    rates should be weighted more heavily than injury rates.

2    MSHA should also aggressively utilize its Part 50 audits

3    to determine whether operators are maintaining records

4    and reporting accidents and injuries as required.  When

5    underreporting is found, these miners should be targeted

6    -- these mines should be targeted for closer scrutiny for

7    a POV.

8           Further, when any information suggests that an

9    operator is covering up violations in an effort to

10   mislead MSHA, they should be given special focus.  The

11   impact inspections MSHA is currently conducting has

12   brought to light what goes on behind the scenes when it

13   is believed that MSHA is not looking.  The flagrant

14   violations of the law MSHA found at some of these mines

15   should be considered to give these mines special focus

16   for a POV.

17          Evidence such as what has been revealed in the

18   Upper Big Branch explosion and investigation which

19   indicates that advance notice of MSHA inspectors were

20   routinely provided by non-security and further that

21   miners were intimidated and threatened if they made a

22   safety complaint, provides a clear picture of how these

23   mines are operated.

24          When such information comes to light, MSHA must

25   give special consideration for these operations to be put

1   on a Pattern of Violations.

2          I appreciate the opportunity to testify today

3   and believe these regulatory changes are critically

4   important and necessary to restore to MSHA the powers

5   Congress intended it to have in Section 104(e) of the

6   Mine Act, but has been rendered ineffective by virtue of

7   restraints of existing regulations.

8          MODERATOR SILVEY:  Thank you.

9          MS. RAISOVICH-PARSONS:  Do you have any

10  questions?

11         MODERATOR SILVEY:  Yeah, I just have one.  With

12  respect to your specific -- your comment about the

13  criteria, you said the eight criteria are appropriate

14  factors but what was your comment?  But did --

15         MS. RAISOVICH-PARSONS:  Our concern is you're

16  given the flexibility to change that criteria; but as you

17  stated, when you answered the previous gentleman's

18  question, if that is, you know, if that's put out there

19  for the public to have some input into it, that's fine.

20         MODERATOR SILVEY:  Okay.

21         MS. RAISOVICH-PARSONS:  But, you know, for the

22  Secretary to just change the criteria, I don't think it's

23  fair to the mining community, and I don't think it's fair

24  to the operators or the miners, not to --

25         MODERATOR SILVEY:  Okay.

1          MS. RAISOVICH-PARSONS:  -- have the opportunity

2     to have some input into that.

3          MODERATOR SILVEY:  Okay.  But if the specific

4     criteria is put out, like I said --

5          MS. RAISOVICH-PARSONS:  Right.

6          MODERATOR SILVEY:  -- posted on the website --

7          MS. RAISOVICH-PARSONS:  Like the rulemaking.

8          MODERATOR SILVEY:  -- we will take comment.

9     Okay.  Okay.  That's all I had.

10          Did you have anything?

11          MR. MATTOS:  No.

12          MODERATOR SILVEY:  Okay.  Thank you.

13          The next speaker is Josh Nelson with CREDO.

14          MR. NELSON:  Good morning.

15          MR. MATTOS:  Good morning.

16          MODERATOR SILVEY:  Good morning.

17          MR. NELSON:  My name is Josh Nelson.  That's

18     N-E-L-S-O-N.  I'm a Campaign Manager with CREDO Action.

19          This proposal will change the way the Mine

20     Safety and Health Administration identifies mines that

21     demonstrate a pattern of serious violations.

22          The Agency would like to take citations that

23     are under appeal into account in such considerations

24     since appeals can take years to resolve.  In the time

25     that an appealed citation remains unresolved, miners are

1  subjected to dangerous working conditions that can result

2  in injury or death.

3         I wanted to take just a second to respond to

4  something that Mr. Casper said in previous testimony.  He

5  indicated that this rule would make it difficult for

6  operators to know if they're in danger of reaching POV

7  status.  There's a really simple solution to that.

8  Operators that follow all safety rules will not have this

9  problem.  So it's a really simple way to solve that

10 problem.

11        Further, this information, as has been

12 mentioned, is readily available on MSHA's website within

13 the web tool.

14        Coal Association lobbyist, Chris Hamilton,

15 argued at a hearing last week that taking pending

16 citations into account violates fundamental principles of

17 fairness.  I'd say the opposite is true.  Coal miners

18 deserve every protection possible.  Not taking viable

19 steps to reduce workplace injuries and deaths would

20 violate principles of fairness.

21        Taking all citations into account when

22 determining which mines are guilty of a Pattern of

23 Violations will reduce workplace injuries and save lives.

24 MSHA should move forward with this proposal immediately,

25 despite the objections of the coal industry.

1          Here's the bottom line.  No other industry or

2     profession in the world could get away with such a dismal

3     record of following the rules.  If a doctor was caught

4     breaking the rules multiple times, and it caused patients

5     to die, she would lose her license to practice medicine.

6     If a lawyer disregarded the rules governing his

7     profession and violated them over and over again, he

8     would be disbarred and would no longer be allowed to

9     practice law.  If anyone in this room got three or four

10    speeding tickets in a short period of time, putting the

11    lives of others at risk, we'd lose our driver's license

12    and no longer be allowed behind the wheel of a car.

13         Why should the coal industry be held to a

14    different standard?  The only adequate answer to this

15    question is that it shouldn't.  Mines that have

16    established a pattern of safety violations should be shut

17    down immediately and coal companies that own multiple

18    mines with poor safety records should no longer be

19    allowed to mine coal.  This is how it works in other

20    industries, and it is far past the time that the American

21    coal industry enter the 21st Century and start looking

22    out for the welfare of its employees.

23         Thank you for your time.

24         MODERATOR SILVEY:  Thank you.

25         Those are all the persons and organizations who

1    have signed up.

2              Is there anybody else who wishes to comment?

3    Anybody else who wishes to comment?

4              If nobody else wishes to make a presentation,

5    then I, again, want to say that the Mine Safety and

6    Health Administration appreciates your participation at

7    this public hearing.

8              I want to thank everybody who made

9    presentations, and I want to also thank those who did not

10   make presentations but who attended the hearing because

11   that suggests to us that you have an interest in the

12   rulemaking, and we appreciate that.

13             I want to emphasize that all comments, as I

14   said earlier, now must be received or postmarked by a new

15   date of August 1, 2011.

16             MSHA will take your comments and your concerns

17   into consideration in developing the final rule; and as I

18   mentioned earlier, we will have another public hearing on

19   July 12th in Hazard, Kentucky.  I encourage all of you to

20   continue to participate throughout this rulemaking

21   process and in all other MSHA rulemakings.  Thank you.

22             The hearing is now concluded.  Thank you very

23   much.

24             (Whereupon, at 10:15 a.m., the hearing in the

25   above-entitled matter was concluded.)


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

## REPORTER'S CERTIFICATE

CASE TITLE:        Patterns of Violations

HEARING DATE:      June 15, 2011

LOCATION:          Arlington, Virginia


        I hereby certify that the proceedings and evidence are contained fully and accurately on the audio and notes reported by me at the hearing in the above case before the Department of Labor, Mine Safety and Health Administration.


Date: June 15, 2011

                        ANTHONY & ASSOCIATES, INC.


                        TIMOTHY J. ATKINSON, JR.
                        (Official Reporter)

REQUEST TO SPEAK

Pattern of Violations

Hearing
Arlington, Virginia

**June 15, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | _Joseph Cooper_ | NSSGA | (703) 526-1074 |
| 2. | Linda Raisovich-Parsons | VMWA | 703-291-2424 <br> lparsons@vmwa.org |
| 3. | Josh Nelson | CREDO | 202-550-6175 <br> jnelson@credomobile.com |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |

AB73-PH-4A

SIGN-IN SHEET

Pattern of Violations

Hearing
Arlington, Virginia

**June 15, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | Manuel Quinones | Greenwire | 202-491-5606 |
| 2. | Walter E. Tharp | Irving Materials, Inc. | (311) 432-9604 |
| 3. | Tina Starzewski | Law office of Adele Abrams | 301 545 3520 |
| 4. | Joseph Casper | NSSGA | (103)526-1074 |
| 5. | Michael Heenan | Ogletree Deakins | 202-887-0855 |
| 6. | Dinah Choi | Ogletree Deakins | " |
| 7. | Gayle Cinquegrani | BNA | gcinquegrani@bna.com |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |

NATIONAL STONE, SAND & GRAVEL ASSOCIATION



*Natural building blocks for quality of life*

April 15, 2011

U.S. Mine Safety and Health Administration
Office of Standards, Regulations and Variances
1100 Wilson Boulevard, Room 2350
Arlington, VA 22209-3939

RE:    Proposed Rule, Pattern of Violations, RIN 1219-AB73

Dear Madam or Sir:

NSSGA is the world's largest mining association by product volume. Its member companies represent more than 92 percent of the crushed stone and 75 percent of the sand and gravel (or aggregates) produced annually in the U.S. and approximately 118,000 working men and women in the aggregates industry. During 2010, a total of nearly 1.9 billion metric tons of aggregates, valued at $17 billion, were produced and sold in the United States. The aggregates industry has demonstrated a steadfast commitment to worker safety and health, resulting in nine consecutive years of falling rates of injury and illness in the aggregates industry. This includes a continual decrease in number of fatalities amongst aggregates operator employees. Both are at historically low levels.

On behalf of the National Stone, Sand & Gravel Association (NSSGA), we provide the following comments on the proposed rule on Pattern of Violations (POV).

This program should be carefully crafted so that it targets those mine operators that repeatedly fail to live up to their obligations to provide miners with a safe place to work. Although the proposed rule takes several important steps toward this goal, there are a number of significant improvements that must be made before it is finalized.

NSSGA is concerned that there are significant gaps in the proposal. Currently, it is impossible for commenters to thoroughly understand and assess the proposal.
Therefore, NSSGA requests that MSHA re-propose the rule to address these gaps, and allow operators a fair opportunity to comment on the fully proposed POV program, as a whole. Also, this rulemaking should include public hearings. Following is the summation of primary areas of concern:

The POV Criteria Should Be Specified in the Rule

MSHA proposes to list its specific criteria for POV status on the Agency's website, but has not included specific criteria in the rule itself.

AB73-PH-4B

NSSGA believes that the specific POV criteria to be used for selecting operators for POV should be detailed in the proposal itself. These criteria are not simply guidance, but are intended to be binding criteria that will determine whether mines are subject to substantially increased enforcement. It is essential that the criteria not be a moving target especially if operators are expected to monitor their own performance to avoid POV status.

NSSGA notes that MSHA asks for comments on its projections of the number of mines likely to be subject to POV status under the new rule, and what the projected costs to the mining industry might be. It is impossible to make such estimates without knowing what the specific POV selection criteria will be.

<u>The POV Criteria Should Be Clear and Easy to Access</u>

NSSGA agrees with MSHA's stated goal to provide clear, transparent, and accessible POV criteria. Each mine should be able to immediately determine its potential POV status by viewing publicly available information on MSHA's website. We recommend that this information be collected in a single location, and that mine operators (and other interested parties) be able to view all of the relevant information at once by entering the mine ID number.

This will necessitate the creation of a computer program that can properly and accurately compile and display this information. We strongly urge MSHA to pilot any such program with the assistance of mine operators and other stakeholders, in order to ensure that the information and calculations it provides are accurate, timely, and usable. MSHA should also review the data quality control measures it uses for its data retrieval system, to ensure that the data provided are of sufficient accuracy and timeliness to allow mine operators and others to depend on the results. These data can have significant consequences for operators, and thus accuracy is essential. (We note that the necessity for accurate information also makes it unlikely that monitoring of this information will take only five minutes, because operators will likely review their own records and other MSHA data to verify it, especially if it is suggests that POV status is imminent.) If there is inaccuracy, irreparable harm can come to operators erroneously placed onto pattern when their operation's citation history doesn't warrant it.

Further, we are struck that the proposal deletes the current provision allowing for "proposed" POV notification of a facility allowing for remedial steps to be taken, as well as an opportunity for the operator to meet with a district manager to review the basis for a proposed POV designation.

<u>POV Status Should Only Result from Repeated Violations</u>

As MSHA notes, Congress intended for the POV program to apply to "mine operators with a record of repeated S&S violations" "who have not responded to the Agency's other enforcement efforts." We are concerned that the proposed rule does not adequately reflect the legislative intent that POV is intended for circumstances of repeated violations by unresponsive operators.

Rather, MSHA's criteria are based on multiple violations. Thus, under the current proposal, a facility can be placed into PPOV status as a result of a single inspection with multiple citations, or as a result of one or two inspections with few citations, followed by one with a large number

of citations. This is clearly not the Congressional intent for the POV tool, and a revision of the rule should squarely address this problem.

Under the current rule and criteria, a single inspection with multiple citations and orders can place a mine into PPOV status. However, a facility is not currently placed into full POV status unless it fails to improve its performance over a period of time. While this still does not necessarily capture mines that are repeated violators, it at least means that POV status is based on a series of inspections.

If there is to be no official PPOV status under the proposed rule, the problem is that it may be difficult, if not impossible, for a mine to determine if it is threatened with POV status. The preamble discussion imagines that a facility will be able to tell if it is close to POV status by reviewing MSHA's data. But how close is close? If POV status can be triggered by a single inspection, then no mine operator can feel confident that it is not threatened with POV status.

It is difficult to comment on exactly how the criteria should reflect the need to address repeated violations, as opposed to multiple violations, without knowing what criteria MSHA proposes to apply.

<u>If POV Status Is Not Based on Final Orders, Punitive Elements Violate Due Process Rights</u>

NSSGA understands MSHA's preference to base POV status on citations and orders issued, as opposed to final orders, because there can be a substantial delay in the final determination of a citation or order challenged by an operator. This delay hampers MSHA's ability to use POV as a timely tool to address current problems.

However, it is essential to note that, if actions are to be based upon non-final orders, they may not be punitive in nature without violating the operator's due process rights. The Fourteenth Amendment prohibits the federal government from depriving citizens of liberty or property without due process of law—and this means that actions that are punitive cannot be taken without appropriate access to review.

This does not mean that MSHA can take no actions prior to a final order. Certainly it can take actions designed to protect miners from harm, and it certainly has the discretion to increase its level of scrutiny of a mine with repeated citations or orders. Such measures are not punitive.

<u>If POV Status is Based on Citations Subsequently Vacated, POV Status Must Be Terminated</u>

The proposed rule calls for terminating POV status only if an inspection of the entire mine reveals no S&S violations. However, because the proposal calls for basing POV status on non-final orders, POV status must also be terminated if citations or orders upon which the status is based are subsequently reversed, or reduced in severity.

<u>Remedial Plans Should Not Be Confused with Comprehensive Safety and Health Management Programs</u>

MSHA indicates in the preamble that a mine operator finding that a mine is at risk of POV status may submit a "written safety and health management program" to MSHA for approval, and that such a program may serve as a mitigating circumstance that may avoid POV status. NSSGA does not object to the concept of a mine operator working with MSHA to develop a remedial plan to address problems that could lead to POV. However, NSSGA is concerned that the language in the preamble may suggest that MSHA will require comprehensive safety and health management programs that go beyond the particular concerns that underlie the potential for POV status.

The proposed rule stands as a positive effort toward developing a program that will be transparent and effective. However, more work needs to be done. MSHA should re-propose the rule and include the criteria that it plans to use, to allow operators and other stakeholders to comment on the proposed program as a whole. In particular, reasonable cost estimates cannot be performed without an understanding of the POV criteria that will actually be imposed. Also, determination of an operator's POV status must be based solely on those citations that are fully adjudicated. Also, we believe that this rulemaking should include public hearings.

Thank you for this opportunity to comment. If you have any questions, please feel free to contact me at (703) 526-1074.

Sincerely,

Joseph Casper
VP, Safety

Testimony of Linda Raisovich-Parsons
Representing the United Mine Workers of America
on the Proposed Rule for
Pattern of Violations
Arlington, VA
June 15, 2011

Good Morning/Afternoon. My name is Linda Raisovich-Parsons and I am here today on behalf of the United Mine Workers of America. I appreciate the opportunity to address the UMWA's thoughts on the Proposed Rule for Pattern of Violations. The UMWA generally supports the rule as proposed by MSHA, however we have certain concerns about the proposal which I will discuss today. The Pattern of Violations enforcement tool has been in Section 104(e) of the Mine Act since 1977, yet MSHA's use of this tool has been virtually nonexistent until very recently. We encourage MSHA to maintain a POV procedure that is easy for the mining community to understand and for MSHA to enforce. The recent online tool for monitoring whether a mine meets the Pattern of Violation Criteria is a step in the right direction and will be a useful tool for the mining community to monitor their mine's POV score. We commend MSHA for this effort.

The UMWA agrees with elimination of the initial screening process and the written notice of a potential pattern of violations currently required under 104.3 of the code. Mine operators should have an ongoing awareness of their own health and safety practices and history of the day to day operation of their mine. It is not necessary for MSHA to forewarn them that they are in trouble and could have a potential pattern of violations forthcoming. Any mine operator should be fully aware of shortcomings in their health and safety program and be aware of the need for more resources and attention. The new POV web page criteria screening is a sufficient tool to permit the mine operator to monitor their own POV criteria history. Because the numbers on this web page are refreshed monthly, the industry can access up-to-date statistics for their operations, so there is no reason for the government to provide an advance warning. With the new POV web page, mine operators will be able to identify the specific areas where their problems lie through the criteria red flagged in their stats. For these reasons, the UMWA agrees with elimination of the written notice of a potential pattern of violations as proposed.

AB73-PH-4C

The UMWA also supports the Agency's removal of the current limitation that MSHA only consider "final" orders for purposes of a pattern of violations. The problem with the current system that limits a pattern of violations analysis to only final orders is that it can take years to resolve a contested citation. By the time such a citation becomes final, the conditions at the mine may bear no resemblance to what they were when the hazard was first cited. In the meantime, miners may be exposed to extraordinarily unsafe conditions by a repeated violator and the Agency is powerless to use this enforcement tool until those challenged citations become final. The incentive for the operator to challenge all S&S citations would be great in order to avoid a pattern of violations. In 1989 when the rule was originally proposed to only consider final orders the Union raised this concern. I personally testified in Denver, CO on November 8, 1989 predicting that if the Agency limited themselves to final orders, operators would be encouraged to challenge all citations and orders to simply avoid consideration for a pattern of violations. And now here we are twenty-two years after I made that prediction with a major backlog of cases before the Federal Mine Safety and Health Review Commission and the first mine to be placed on a POV only recently. I must have been psychic or perhaps just using common sense. If there is a loophole to avoid a pattern of violations, rest assured the industry will take full advantage.

Some may argue that the operators' due process would be compromised by allowing MSHA to consider non-final citations and orders for POV determinations. However, I care to differ. The plain language of the Mine Act does not require MSHA to consider only final citations and orders for it to use POV. Secondly, the Mine Act includes many sections that require an operator to immediately correct problems MSHA identifies without exhausting challenge procedures. Due process protections will still be available, just later in time. For example, a failure to abate order under Sec. 104(b) and an unwarrantable failure order under Sec. 104 (d) are issued on the basis of previous citations, whether or not those citations have been challenged. Likewise, an operator that disputes an inspector's determination as to whether an imminent danger exists must immediately comply with the imminent danger order and withdraw miners, though it still has the right to challenge MSHA's issuance of the order.

The Senate Committee gave a fairly extensive comparison between the "unwarrantable" and the POV provisions in the Legislative History of the Act. It explained that the violation

2

setting into motion the unwarranted failure sequence "must be of a significant and substantial nature and must be the result of the operator's 'unwarranted failure' to comply." In comparison, it pointed out "there is not requirement that the violations establishing the pattern offense be a result of the operator's 'unwarranted failure' only that they be of a 'significant and substantial' nature." The Senate Committee concluded its discussion by pointing out that "it is the Committee's intention that the Secretary or his authorized representative may have both enforcement tools available and that they can be used <u>simultaneously</u> if the situation warrants." If an operator's challenge to the underlying citations effectively blocks implementation of the POV, the Secretary cannot use both enforcement tools simultaneously as Congress intended.

Further, the courts reviewing due process issues balance the private interest of the party claiming a deprivation of due process against both the nature and importance of the government's interest and the risk of the government making a mistake when depriving due process and the consequences any such mistake would entail. When there is a compelling government interest at stake such as miners' health and safety as the Mine Act's first purpose unequivocally states, the courts find that an after-the-fact hearing satisfies due process. The UMWA believes that any due process concerns are adequately protected by the Federal Mine Safety and Health Review Commission and its judicial review procedures. If the challenged citations are later reduced to non S&S or vacated, then it could be considered as mitigating circumstances and the situation re-evaluated.

Lastly, we recognize that the legislative history granted the Secretary "broad discretion in establishing criteria for determining when a pattern of violations exists", however the UMWA believes that the Agency has gained sufficient experience over the 30 years since the Act first became law to now set criteria and still satisfy the discretion Congress reserved for the Secretary. We believe that absolute numbers should not control for the criteria. For example, the record for large mines should not be compared with the records of small mines or vice versa. The experiences of mines should be compared to those of comparable mines, and viewed according to comparable inspection hours when evaluating their health and safety record. The eight criteria listed in the proposed rule represent appropriate factors for MSHA to consider for purposes of POV but further explanation of how these criteria will be considered or weighted should be

3

established at the outset. There must also be an Agency commitment to apply the criteria in a consistent manner.

The Agency must also give consideration to circumstances which could create an unfairness in the health and safety record for any given mine. At union mines, a disproportionately high number of inspection hours are devoted to the large, unionized operations. At the union mines, miners' representatives routinely travel with the MSHA inspector and point out any violation that they may see and consequently union-represented mines are issued a disproportionately large number of citations compared to their non-union counterpart where miners are often intimidated and discouraged from pointing out violations. Further, the injury statistics are not a reliable gauge of health and safety at a mine because we have long known about chronic under reporting of accidents at many mines. Our union mines make sure that all accidents are reported and usually show a higher accident rate than our non-union counterparts because of the under reporting there. For this reason, we recommend that fatality rates should be weighted more heavily than injury rates. MSHA should also aggressively utilize its Part 50 audits to determine whether operators are maintaining records and reporting accidents and injuries as required. When under reporting is found, these mines should be targeted for closer scrutiny for a POV. Further when any information suggests that an operator is covering up violations in an effort to mislead MSHA, they should be given special focus. The impact inspections MSHA is currently conducting has brought to light what goes on behind the scenes when it is believed that MSHA is not looking. The flagrant violations of the law MSHA found at some of these mines should also be considered to give these mines special focus for a POV. Evidence such as what has been revealed in the Upper Big Branch Explosion investigation which indicates that advance notice of MSHA inspections were routinely provided by mine security and further that miners were intimidated and threatened if they made a safety complaint provides a clear picture of how these mines are operated. When such information comes to light, MSHA must give special consideration for these operations to be put on a Pattern of Violations.

I appreciate the opportunity to testify today and believe this regulatory change is critically important and necessary to restore to MSHA the powers Congress intended it to have in Section 104(e) of the Mine Act, but has been rendered ineffective by virtue of the restraints of existing regulations.

4

# TRANSCRIPT OF PROCEEDINGS

IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )

Pages:    1 through 52

Place:    Hazard, Kentucky

Date:     July 12, 2011

# ANTHONY & ASSOCIATES, INC.
770. 590.7570

AB73-PH-5

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

IN THE MINE SAFETY AND HEALTH ADMINISTRATION


IN THE MATTER OF:                    )
                                     )
PATTERN OF VIOLATIONS                )


                         Hazard, Kentucky

                         Tuesday
                         July 12, 2011


         APPEARANCES


         MSHA Panel:  PATRICIA W. SILVEY, JAY MATTOS


         Speakers:

         WES ADDINGTON, Appalachian Citizens Law Center
         TONY OPPEGARD, Attorney, Lexington, Kentucky
         BILL BISSETT, President, Kentucky Coal Association


**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

```
 1                    P R O C E E D I N G S

 2                                      (10:00 a.m.)

 3             MODERATOR SILVEY:  Again, good morning.  My

 4   name is Patricia W. Silvey.  I'm the Deputy Assistant

 5   Secretary for Operations for the Mine Safety and Health

 6   Administration, and I will be the moderator of this

 7   public hearing on MSHA's Proposed Rule on Pattern of

 8   Violations.

 9             On behalf of Assistant Secretary of Labor for

10   Mine Safety and Health, Joseph A. Main, I would like to

11   welcome all of you here today.  I'd like to introduce the

12   other member of my panel, who is Jay Mattos, and he is

13   Chair of the Pattern of Violations Rulemaking Committee.

14             In response to requests from the public, MSHA

15   is holding public hearings on its Pattern of Violations

16   Proposed Rule.  This is the fifth hearing on the

17   proposal; and, as you know, these hearings are being held

18   in tandem with the hearing on the Proposed Rule on

19   Examinations.  The other hearings were in Denver,

20   Colorado; in Charleston, West Virginia; in Birmingham,

21   Alabama, and at our headquarters in Arlington, Virginia.

22             Transcripts of the hearings are posted on

23   MSHA's website.

24             The purpose of this hearing is to receive

25   information from the public that will help MSHA evaluate
```

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   the requirements in the proposal and produce a final rule

2   that will improve health and safety conditions at mines.

3            As most of you know, the hearings will be

4   conducted in an informal manner.  Formal Rules of

5   Evidence will not apply.

6            The hearing panel may ask questions of the

7   speakers and the speakers may ask questions of the panel.

8   Speakers and other attendees may present information to

9   the court reporter for inclusion in the rulemaking

10  record.

11           MSHA will accept written comments and other

12  information for the record from any interested party,

13  including those not presenting oral statements.  We ask

14  that everyone sign the attendance sheet.

15           MSHA is proposing to revise the Agency's

16  existing regulation on Pattern of Violations, and it

17  applies, as you know, to all mines, coal and metal and

18  nonmetal mines, surface and underground.  MSHA determined

19  that the existing Pattern of Violations regulation does

20  not adequately achieve the intent of the Federal Mine

21  Safety and Health Act of 1977, or the Mine Act.

22           Congress included the Pattern of Violations

23  provision in the Mine Act, so that operators would manage

24  safety and health conditions at mines and find and fix

25  the root causes of Significant and Substantial, or S&S,

1   violations to protect the safety and health of miners.

2            Congress intended that MSHA use the Pattern

3   of Violations provision to address operators who have

4   demonstrated a disregard for the safety and health of

5   miners.  MSHA intended that the proposal would simplify

6   the existing Pattern of Violations criteria, improve

7   consistency in applying the Pattern of Violations

8   criteria, and more adequately achieve the statutory

9   intent.

10            The proposal would also encourage chronic

11   violators to comply with the Mine Act and MSHA's safety

12   and health standards.  MSHA requested comments from the

13   mining community on all aspects of the Proposed Rule and

14   is particularly interested in comments that address

15   alternatives to key provisions in the proposal.

16            MSHA asks that commenters be specific in

17   their comments and submit detailed rationale and

18   supporting documentation for any suggested alternative.

19   The Proposed Rule included general criteria and provided

20   that the specific criteria used in MSHA's review to

21   identify mines with a pattern of S&S violations would be

22   posted on the Agency's website.

23            In the Preamble to the proposal, MSHA

24   requested suggestions on how the Agency should obtain

25   comments from mine operators and miners during the

6

1    development of and periodic revision to the specific POV

2    criteria.

3              MSHA also requested comments on the best

4    methods for notifying mine operators and the mining

5    public of changes to these specific criteria.  In the

6    public Hearing Notice, MSHA refined its position and

7    clarified its proposal and stated that any change to the

8    specific criteria would be available to the public for

9    comments, via posting on the Agency's website, before

10   MSHA uses it, to review a mine for a Pattern of

11   Violations.

12             MSHA plans to review and respond to the

13   comments, revise as appropriate, the specific criteria

14   and post the Agency's response and any revised specific

15   criteria on the Agency's website.  MSHA requests comments

16   on this proposed approach to obtaining an input into

17   revisions to the specific Pattern of Violations criteria.

18             MSHA also requested comments on the burden

19   that monitoring a mine's compliance record against the

20   proposed Pattern of Violations specific criteria using

21   the Agency's website would place on mine operators.  And,

22   as some of you know, MSHA has developed a web tool to

23   make it easier for mine operators, or quite frankly, mine

24   operators, miners, or any members of the public to

25   monitor a mine operator's compliance.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1          With this web tool, all a person would have

2    to do is go in, pull up the web tool, on MSHA's website,

3    put in a mine identification number, and, so, that tool

4    would then populate that mine and let one know how close

5    or how far away that mine is from the specific Pattern of

6    Violations criteria.

7          And I'd ask Jay right now, at some point

8    earlier, I know we had gotten a lot of hits on that

9    website.  Do you know now about how many?

10         MR. MATTOS:  I think about a thousand a

11   month.

12         MODERATOR SILVEY:  A thousand a month.  So,

13   people are, indeed, using that web tool.  And at some of

14   the other public hearings, we were told that people found

15   it useful, and, quite honestly, they have a few other

16   comments to say about it, too.  So, you know, obviously,

17   anybody can read the transcripts up to now, or the

18   comments, for that matter, to see what people had to say

19   about the web tool.

20         Under the proposal, to be considered as a

21   mitigating circumstance, the Proposed Rule would provide

22   that an operator may submit a written safety and health

23   management program to the District Manager for approval.

24   MSHA would review the program to determine whether the

25   program's parameters would result in meaningful,

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   measurable, and significant reductions in S&S violations.

2          And I would also, I guess I turn to Jay, for

3   the mines that have been noticed -- that have been

4   provided PPOV notices, most of them have submitted --

5   under the existing procedures -- we call it Progressive

6   Action Programs, but they have submitted them, all of

7   them have submitted them, and most of them have met their

8   times -- Is that right?  And, so, they have, indeed,

9   reduced their S&S violations then and whatever the other

10  parameters were for the specific criteria.

11         MSHA would like to clarify that the Agency

12  did not intend that the safety and health management

13  programs referenced in the Pattern of Violations proposal

14  be the same as that referenced in the Agency's rulemaking

15  on comprehensive safety and health management programs.

16  Some people got the two confused.  But the comprehensive

17  safety and health management program rulemaking has not

18  yet gotten to the Proposed Rule stage, and those were two

19  different concepts.

20         MSHA would consider a safety and health

21  management program under the POV rulemaking as a

22  mitigating circumstance when it (1) includes measurable

23  benchmarks for abating specific violations that could

24  lead to a Pattern of Violations at that specific mine;

25  and (2) when it addresses hazardous conditions at that

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   mine.

2          MSHA requested detailed information and data

3   on cost, benefits, and feasibility of implementing the

4   proposed POV Rule.  MSHA requested specific comments on

5   its estimates of the numbers of mines affected, which are

6   likely to vary from year-to-year.

7          As you address the proposed provisions,

8   either in your testimony or in your written comments,

9   again, please be as specific as possible, as we cannot

10  sufficiently evaluate general comments.  You may submit

11  comments following this public hearing.  They must be

12  received or postmarked by August 1, 2011.

13          MSHA will make available a verbatim

14  transcript of this public hearing approximately two weeks

15  after the completion of the hearing.  You may view the

16  transcripts on MSHA's website at www.msha.gov and on

17  www.regulations.gov.

18          We will now begin today's testimony.  If you

19  have a copy of your presentation, please provide a copy

20  to the court reporter and to the MSHA panel, if you have

21  a copy.  Please begin clearly by stating your name and

22  organization and spelling your name for the court

23  reporter to make sure that we have an accurate record.

24          Our first speaker today is -- and our first

25  speaker, I believe is also Bill Bissett with the Kentucky

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    Coal Association.  And, if he's not here, is Mr. Moss

2    here, David Moss, also with the Kentucky Coal

3    Association?

4              Okay.  Having heard neither Bill Bissett nor

5    David Moss, our next speakers will be Charles Scott

6    Howard and Leonard Joseph, representing Cumberland River

7    Coal Company.

8              MR. MATTOS:  Scott is not going to testify.

9              MODERATOR SILVEY:  Okay.

10             MR. MATTOS:  Leonard had some thing come up

11   this morning and couldn't make it.

12             MODERATOR SILVEY:  Okay.  Then, our next

13   speaker will be Wes Addington, Appalachian Citizens Law

14   Center.

15             MR. ADDINGTON:  My name is Wes Addington.

16   I'm an attorney with the Appalachian Citizens Law Center.

17   We're a non-profit law firm that represents working

18   miners on issues of mine safety and health.

19             I had previously submitted written comments

20   on the Proposed Rule on Pattern of Violations, and I

21   would like to add a few additional comments to my earlier

22   remarks.

23             The Law Center really applauds MSHA's work on

24   this Proposed Rule.  I do believe that it's long, long,

25   overdue.  For decades, MSHA has failed miserably to

1  implement the '77 Act and the Pattern of Violations

2  provision of Section 104(e).

3          Actually, the Agency took steps when they

4  promulgated the current rule, which made it much, much,

5  more difficult to place a mine on a Pattern of

6  Violations, and, then, that's why there were, you know,

7  after 33 years, there were no mines ever put on a Pattern

8  of Violations.

9          I mean, essentially this Act was passed the

10  year that I was born.  And up until this year, MSHA has

11  never used this authority, and that's a real travesty to

12  miners.  It's a great provision of the law.  It doesn't

13  seek to punish mine operators.  It seeks to go after the

14  worst of the worst, the most chronic violators.  And the

15  fact that, you know, it's just now being addressed is

16  disappointing.  However, I am very encouraged that it is

17  finally being addressed.  And I think MSHA is taking,

18  specifically, taking the right steps to currently correct

19  the problems with the current regulation.

20          Specifically, we support the Section 104.2

21  pattern, criteria -- the proposed rule on Section 104.2

22  Pattern of Violations criteria.  I think the combination

23  of the current Sections of 104.2 and 104.3, you know,

24  simplifies the rule and makes it much easier to

25  implement.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1          I think the most important portion of that is

2    the elimination of the current requirement in 104.3(b)

3    that only citations and orders that have become final are

4    used to identify the mine's Pattern of Violations status.

5    I mean, that current rule is just fully unworkable.  It's

6    unreasonable in its current form.  It, basically,

7    protects the most chronic violators.

8          You know, because I've noted in my written

9    comments that MSHA had said that on average a contested

10   violation takes 518 days to become final.  Well, since

11   then, I've also seen data that says the average

12   unwarrantable failure violation takes currently about 841

13   days from issuance to final order to become final.

14         I'll note that the mine at the Upper Big

15   Branch Mine, I believe had 48 unwarrantable failure

16   orders in 2009.  Well, 841 days is a ridiculous amount of

17   time to wait for MSHA to address immediate dangers.  I

18   think that the current rule would allow MSHA to evaluate

19   mines in a timely way, so as not to, you know, punish

20   mines for their activities years ago.

21         But, actually, look at what they're doing

22   currently, and, if they're -- you know, if they have 48

23   unwarrantable failures, they can take action immediately

24   to protect those miners, because, obviously, that can be

25   taken as a serious, serious, problem in that mine.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1           You know -- and as I noted in my written

2    comments, the argument that there's a -- by the industry,

3    that there's a due process issue by not requiring that

4    the citations be final orders.  It's really a ridiculous

5    argument.  It's not a serious argument.  It's just an

6    argument used to avoid implementation of the '77 Act.

7    The data shows that only about 3 percent -- in coal

8    mining, only about 3 percent of citations are vacated or

9    withdrawn, and that's the data from fiscal year 2009 and

10   2010.

11           Well, as I used in an example in my written

12   comments, the Ruby Energy Mine amassed 584 S&S violations

13   within a 24-month screening period.  And that criteria at

14   that time was only 20 S&S violations.  To think that if

15   the -- if the percentage of withdrawing or vacating

16   citations is only 3 percent, well, 3 percent of 584 would

17   never get them down to 20, not even close.  Even if the

18   S&S reduction rate, which I believe I've seen some stats,

19   you know, may be around 15 percent from reducing an S&S

20   violation down to a non-S&S violation.  I mean, it's not

21   even in the same ballpark.

22           And, you know, obviously, the -- and I know

23   the -- you noted in your opening remarks that a number of

24   these PPOV listed mines had improved their safety record

25   after being listed on the PPOV list.  Well, you know, a

1  mine that has 584 S&S citations in 2 years, there

2  shouldn't be any additional hand-holding and working with

3  them to try to reduce their amount of serious violations.

4  They should reduce it.  I mean, that's just a matter of

5  fact.  They're endangering miners currently, and it has

6  to be addressed immediately.  It can't be done over, you

7  know, over a process of the period of time for them to

8  change the culture.  I mean, that culture needs to be

9  either changed immediately or miners shouldn't be placed

10 in that kind of danger.

11        You know, that same mine incredibly had 78

12 elevated actions, which are you have the 104(b), 104(d),

13 107(a) types of orders and the screening criteria at that

14 time was only two.  So, under MSHA's PPOV screening

15 criteria, you know, if a mine had more than two elevated

16 actions within a two-year period, well, then, they would

17 qualify under that particular criteria.

18        To think that those 78 actions need to become

19 final before MSHA is allowed to take action is

20 unconscionable, honestly.  That's not what the '77 Act

21 intended.  That's not what Congress was working to

22 prevent, another situation like Scotia, where, you know,

23 violation after violation is amass.  Even if they're

24 corrected, after a while, the underlying culture of

25 ignoring safety and health until you're caught and forced

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    to correct those, I mean, that's what Congress is trying

2    to avoid, was an attempt to stop that kind of activity

3    going forward.

4           You know -- and like I said, MSHA really

5    didn't take any action on that until now, and I'm glad

6    they're finally doing it.  And dropping the requirement

7    that a citation and order had to become final to be

8    considered for a Pattern of Violation is a major step in

9    the right direction.

10          I mean, other areas of daily life, average

11   citizens don't get that benefit of the doubt.  I mean,

12   they don't get -- you know, if I drive 30 miles an hour

13   over the speed limit and get a speeding ticket every day

14   of my life, I don't get 781 days before -- or if it took

15   that long, if our process took that long, I wouldn't get

16   that long to continue to violate the law.  What if I got

17   a DUI every month and those didn't come up for trial for

18   781 days, do you think any judge in America would allow

19   me to continue to get those repeatedly without taking

20   some action against my right to drive.  It's unbelievable

21   that you would argue that we should, you know, just wait

22   this out and see what happens, when the data says what

23   happens is the vast, vast, majority of these citations

24   are upheld.  The industry really doesn't have a

25   legitimate argument that that's somehow a due process

1    issue against them.

2             We also support the increase in the frequency

3    of MSHA's review of a mine for Pattern of Violations at

4    least twice per year.  As I noted in my written comments,

5    I really think that MSHA could devise a system in which

6    much of that review could be done essentially in real

7    time, you know, whether it's weekly or even daily review,

8    in which, you know, a computer program could essentially

9    identify mines that are right on a pattern status with

10   real time data.

11            For example, after an inspection, and then

12   any other additional factors that are taken into

13   consideration as to whether they are placed on a pattern

14   could then be -- that could essentially cause that

15   process to begin.  I don't think that's an unreasonable

16   burden upon the Agency to do it that way.  I mean -- and

17   that, again, fits within the idea that if we have chronic

18   violators, the miners that are working in those mines are

19   being in danger every day that they're going to work.

20   It's an immediate emergency issue, and I think the review

21   system could be nimble enough, especially when you're

22   talking just about, you know, raw numbers, that if a

23   mine, you know, has a certain number of S&S violations,

24   if they have a certain number of elevated actions, that

25   that kind of data, you know, could be ran in real time.

1  MSHA could be alerted when a mine exceeds those criteria

2  and if there's any other more subjective criteria, it's

3  taken into consideration.  MSHA could do that as the need

4  arises.

5          And, on that same issue, I think the -- I

6  have looked at the web tool that you currently have for

7  the PPOV system.  I think that could be improved.

8  Currently, I think you can only search by the MSHA ID

9  number to look at those mines.  It would be nice and I

10  don't think it's unreasonable to think that MSHA couldn't

11  devise a search tool in which you could search for mines

12  that have exceeded the specific criteria or multiple

13  criteria.  And, essentially, so any individual, any miner

14  working at that mine to look and see how close their

15  operation is to a pattern status or how far away they are

16  from that status.  I think it could be improved in that

17  way.

18          You know, I think -- and I think also this

19  twice yearly review, obviously -- and, I mean, it's not

20  going to apply to most operators, so it's not like the

21  Agency would really -- if they could devise a way to

22  review a lot of this data in real time, it's not like

23  this is going to affect the vast majority of operators.

24  So, I don't think it would add a lot of -- it would

25  require a lot of extra resources for MSHA to do this.  I

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    think a lot of it can be automated.

2            As to Section 104.3 the Issuance of Notice,

3    you know, we do support the releasing of any records as

4    to a potential Pattern of Violation.  I mean, that's not

5    in the statute; that's not in the Mine Act.  That's

6    something that the Agency conjured up, I'm sure, at the

7    insistence of the industry, which has made it much more

8    difficult to ever put a mine on a Pattern of Violations.

9            You know, the complaint I have with language

10   in the Mine Act, you know, really mandates MSHA to notify

11   the operator whenever the Pattern of Violations exists,

12   not, you know, continuously warn them that one may exist

13   in the future, that they're headed down the wrong path,

14   etc.  Mine operators are sophisticated business people.

15   They know what's happening in their own mines.  They know

16   how many elevated actions they have.  They know how many

17   S&S violations they have.  They know if their mine is a

18   problem mine, if it's a chronic violator.

19           I think this rule goes a long way to end this

20   sort of handholding, and, really preventing mines from

21   ever being subjected to a Pattern of Violations scrutiny.

22   The whole idea behind that provision is once a mine is

23   placed on a pattern, then the actions that result from

24   that, and the sort of hammer that MSHA has in the Pattern

25   of Violations section, changes the culture of the mine.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1 If they don't change, then they're not going to operate.

2 They'll get withdrawal order after withdrawal order.

3         And, I think this reference to potential,

4 this idea that these citations should only be final, all

5 it does is just prevent that stricter scrutiny of the

6 most chronic violators. And I really don't understand

7 why, you know, the vast majority of the industry wouldn't

8 be for this rule. If they're not -- because, like I

9 said, it's not going to affect, you know, good operators.

10 It's only going to affect the worst of the worst, and

11 those are the mines where disasters happen. Those are

12 the mines that give the entire industry a bad name.

13         You know, I would note that as the -- as MSHA

14 has sort of stated that they do appreciate the comments,

15 but they also appreciate, you know, the attendees of

16 these public hearings. And I would like to note that

17 although there's been some comments submitted by industry

18 opposing this rule and also opposing the examination

19 rule, we're here in Hazard today and there's not any coal

20 operators in attendance, and there's not anyone from the

21 industry here opposing the rule. There's not anyone

22 sitting in the audience from the industry it appears, so

23 I think some of this opposition is really token

24 oppositions, the general opposition to any rulemaking.

25 So, I think it's a good rule. I think MSHA should

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

 1  implement it essentially as it's written, other than the

 2  few additional changes that I think are needed.

 3          And that essentially wraps up my comments.  I

 4  think this rule would go a long way towards finally

 5  addressing the worst of the worst and those chronic

 6  violators in the coal industry and go a long ways towards

 7  protecting the miners that are currently working in those

 8  mines.  And that's the most important part of all of

 9  this, is the, you know, the miners that have to work in

10  these kind of conditions.  MSHA should be protecting them

11  and I think this rule goes a long way towards doing that.

12  Thank you.

13          MODERATOR SILVEY:  Thank you.  I have a

14  couple comments and maybe a question.

15          On your two major comments, being MSHA's

16  proposal to remember the requirement that beyond the

17  final orders, the use of all the final orders in the

18  Agency's review of a mine for a Pattern of Violations,

19  and on the proposed Pattern of Violations process, the

20  PPOV process, the existing PPOV process we're not re-

21  proposing.  You proposed to eliminate that, too.  We've

22  got opposing comments, as I'm sure all of you know, on

23  those two, and you referenced that in your testimony.

24          We've got opposing comments on those two

25  provisions.  And to rephrase maybe what you said, you

1   thought that the existing final order provision was

2   unworkable, unreasonable, and it protects chronic

3   violators.  And we heard from them that it -- and you

4   made a reference to the Mine Act and to Scotia, which we

5   did in the Proposed Rule in the printout; and we've got

6   opposing comments that said it deprives -- that the

7   persons and organizations who oppose that portion, that

8   part of the proposal said that deprives them of their

9   Constitutional rights and that they said -- I think in

10  response to our reference to the '77 Mine Act, they said

11  that the Mine Act doesn't trump the Constitution.

12           I would only ask you, and not to put you on

13  the spot, but if you wanted to answer now or to, you

14  know, submit supplemental comments before August 1st, I

15  will ask you when you said that the arguments who

16  opposed, those who opposed this are not serious

17  arguments.  I would ask you if you have any additional

18  specific, for lack of a better word, arguments to make in

19  support of your position.  Which is, I might add for

20  everybody here, which is MSHA's position, too.

21           MR. ADDINGTON:  Yeah.  The reason I say it's

22  not serious is if operators that were contesting, you

23  know --  you know, a lot of these operators are

24  contesting virtually every citation that they're getting.

25  If they were serious that they believe this was a true

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    due process issue, which is that ultimately they could be

2    shown to be correct and that placing them on a Pattern of

3    Violations was unwarranted, because all the citations and

4    violations that MSHA noted somehow turned out to be

5    incorrect and they should never been on the Pattern of

6    Violations at all, if they were serious in that argument,

7    we wouldn't have the kind of data that we're seeing.  I

8    mean, you can't make that argument with the kind of data

9    that currently exists on these contested citations.

10           If the Commission were overturning, you know,

11   50 percent of citations, you know, if they were being

12   withdrawn or vacated, if, you know, a high percentage of

13   S&S citations were being downgraded to non-S&S, you might

14   have a due process issue there.  When it's 3 percent of

15   withdrawn or vacated, that's not even statistically --

16   it's negligible.

17           You know, you have to have a situation where

18   an operator was essentially one violation over the

19   criteria, and 3 percent -- you know, essentially, they

20   have to be one violation over the criteria, and then

21   there'd be a theory of, you know a 3 in 100 shot of

22   having that over -- it's just not -- it's not going to

23   happen.  I say this Ruby Energy, they had 584.  The

24   criteria was 20.  You know, they would have had to have

25   500-and-what-65 of those either downgraded or overturned

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    to fit below the criteria.

2          I mean, it's just not -- and the thing is, if

3    they're really concerned about the -- and it would be an

4    outlying case in which with the statistics that we have

5    now, it would be an outlying instance where a mine would

6    qualify for a Pattern of Violations and one citation or

7    two citations are ultimately overturned and that would

8    bring them back under the criteria.  That would be a

9    complete outlier.  I mean, I'm not a statistician, but I

10   think there can be an analysis that says essentially the

11   odds of that happening are very, very, small.

12         MSHA can deal with that under their criteria

13   proposals.  I mean, that's what I was talking about, the

14   subjective part of that, and they can take that kind of

15   instance into consideration.  And I don't think, frankly,

16   I don't think courts would look at that as a due process

17   issue.  There's lots -- I mean, I think currently MSHA

18   takes actions.  There's plenty of ways under the Mine Act

19   that MSHA can take a current action without waiting for

20   the underlying issue to make its way through the court

21   system before they take an action.  I don't think

22   operators, especially as the law is written, are entitled

23   to some, you know, date in court on every single citation

24   that they get when it comes to assessing whether they

25   qualify for a Pattern of Violations.  That's not the

1  intent of the pattern status, you know, immediate

2  situations, you know.  And that's part of the -- it's

3  part of the reason that they're contesting all of these

4  is they know that it avoids the stats.

5          MR. MATTOS:  Wes, one of the comments we're

6  receiving from a lot of folks involves they're suggesting

7  that we should have a specific Pattern of Violations for

8  any criteria in the rule itself, rather than publishing

9  what the criteria are; and then we've added a provision

10  in their behalf of notice of comments type procedure in

11  place, but you didn't speak to that.

12          Do you have any thoughts on that?

13          MR. ADDINGTON:  Yeah.  I didn't address that.

14          I think MSHA adequately could do it either

15  way and I haven't really taken a strong position on that.

16  I think the way it's currently written will work just

17  fine.  I think it gives the Agency the flexibility to

18  adjust the criteria to -- this is really in 33 years the

19  first time MSHA is going through this.  I think the

20  current way the Proposed Rule is written would allow MSHA

21  the flexibility to make sure that they're doing what the

22  Act intended and that is to sort of snag the most chronic

23  violators, the violators that get citation after citation

24  and violation after violation, and, you know, just

25  abating them, you know, when they're essentially required

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    to, but just keep the same, and they're really not

2    improving conditions in their mine.

3              I think the current framework, the way the

4    current rule is written, I think it allows MSHA the

5    flexibility to make sure they're snagging those people

6    and snagging, you know, essentially snagging the right

7    ones, and if they're not snagging the worst of the worst,

8    they can then amend that, I think, you know, through

9    internal criteria.

10             I think if they're, you know, the industry is

11   worried that they're snagging too many, you can also

12   adjust to that.  I think, you know, there's just a lot of

13   problems with publishing that as part of a rule, because

14   then, as we've seen with the current rule, it can make

15   the whole system unworkable and never used.  I think that

16   you have to hear on the -- I mean it's a remedial

17   statute.  You have to err on the side of miners on this

18   issue.  You have to err on the side of their health and

19   safety and protection, not -- and not have a situation

20   like we currently have where a mine -- the Agency cannot

21   jump through all the hoops that are required to ever

22   place, even the worst violator on a pattern.  So,

23   frankly, I think the current rules as written works just

24   fine.

25             MR. MATTOS:  Thank you.

1              MODERATOR SILVEY:  Okay, thank you.

2              Our next speaker is Tony Oppegard with

3    Appalachian Citizens Law Center.

4              MR. OPPEGARD:  I want to thank the panel for

5    giving me the opportunity to speak.  And, Pat, I'm not

6    with Appalachian Citizens Law Center.

7              MODERATOR SILVEY:  I stand corrected.

8              MR. OPPEGARD:  I'm just an attorney in

9    private practice representing miners and their families

10   in safety-related issues.

11             Now, back in April, I did submit comments

12   with Wes in conjunction with Appalachian Citizens Law

13   Center, and we stand by those comments.

14             To give some context to my comments, I just

15   want to comment briefly on my experience.  I've been

16   involved with safety issues under the Mine Act for more

17   than 30 years and I've represented coal miners in 105(c)

18   cases for about 25 years.  I worked for MSHA for about

19   2-1/2 years at headquarters, and I was the prosecutor of

20   mine safety violators for the State of Kentucky for about

21   4-1/2 years in the early 2000s, and, as part of that,

22   I've investigated accidents, investigated disasters.

23             The last five years I've been representing

24   families of miners in wrongful death cases.  So, that's

25   the context in which I'm going to make these forthcoming

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1  statements, and I'm going to probably go -- not probably,

2  I'm definitely going to make some comments that are

3  outside the scope of the rule, but I hope you'll bear

4  with me, because, again, I think this needs to be made in

5  some context.

6          Where I want to start with is I've read the

7  transcripts of the prior public hearings having to do

8  with the Pattern of Violations Rule and I've read a lot

9  of the comments, not all of them, but a lot of them, that

10 industry has submitted.  Because we're in Kentucky and my

11 focus is representing miners primarily in Eastern

12 Kentucky in non-union mines, I want to read in something

13 from the comments of the Kentucky Coal Association, Bill

14 Bissett, President.  This is how he answers comments.

15         "MSHA's new Proposed Rule on POV moves

16 everyone in the wrong direction.  It creates a further

17 exacerbating opinion that the Administration in

18 Washington, D.C. is trying to slowly bankrupt the

19 Appalachian coal industry by adding additional

20 regulations."

21         Now, seriously, that's the coal industry's

22 position that the POV Rule is an attempt to bankrupt the

23 coal industry.  It's an irresponsible comment.  It's

24 inflammatory.  It's nonsense.  And I think that needs to

25 be pointed out.  And because of these types of comments,

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    I want to comment on what I view the direction in which

2    the Obama Administration, under the leadership of Joe

3    Main, is taking things with regard to mine safety, and

4    I'll make these brief before I get on to the POV Rule

5    specifically.

6              I've got four instances in which I want to

7    give credit to Joe Main, credit to MSHA and the Obama

8    Administration for the way that MSHA is being run these

9    days.  First of all, has to do with miners' rights.

10   There is an emphasis on miners' rights now that has not

11   been seen in decades in D.C., and, specifically, with

12   regard to temporary reinstatement for coal miners who've

13   been fired from their jobs for complaining about safety

14   or refusing to work in unsafe conditions.

15             Now, Scott Howard, who testified in the

16   previous Work Place Examinations Hearing earlier this

17   morning, it's four years ago today that he testified in

18   front of an MSHA panel, including Pat Silvey, on the

19   Proposed Mine Seal Regulation.  It was an emergency

20   temporary standard, because of the Kentucky Darby

21   disaster and the Sago disaster, which involved faulty

22   construction of seals.

23             At that hearing, Scott had the audacity to

24   show a video of seals in the mine where he worked,

25   without identifying that mine, there were spewing water

1    leaking, an obvious safety hazard.  And we stated on the

2    record at that time that that was a protected activity

3    and we expected Scott to be protected by MSHA if he

4    suffered any type of discrimination or discipline.

5              Not surprisingly, about two weeks later, he

6    was disciplined by his employer for showing that video at

7    the MSHA Public Hearing.  And, to MSHA's shame, MSHA did

8    not accept that case for prosecution.  But that was a

9    different administration.  That was the Bush

10   Administration, where miners' rights was a dirty word, or

11   a dirty phrase.  And that was a case that MSHA should

12   have taken.

13             Wes Addington and I took the case,

14   represented Scott, and we won that case in front of an

15   Administrative Law Judge.  The case was not appealed.  It

16   was a no-brainer, a decision for the ALJ.  He had no

17   problem in finding that Scott was discriminated against

18   for having testified at this MSHA Public Hearing.

19             The point I want to make is what that has

20   caused Scott is four years of litigation and four years

21   of problems.  It was four years ago today he testified.

22   We've been in litigation the last four years with this

23   same company.  Five discrimination cases, and he was

24   fired May 16th of this year.  That's the fifth case.

25             And times have changed.  MSHA, within 11 days

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

```
 1   after Scott filed that discrimination complaint, MSHA had
 2   filed an Application for Temporary Reinstatement.  It's
 3   probably the fast, not probably, it is the fastest that
 4   MSHA ever, in its history, has filed an Application for
 5   Temporary Reinstatement on behalf of a miner.  So, we now
 6   have Scott back on the payroll.  And that's the way it's
 7   supposed to be done and that is the emphasis on miners'
 8   rights, which Joe Main is placing.  It's not an attempt
 9   to bankrupt the coal industry in Eastern Kentucky.
10          Now, the second place where I want to praise
11   Joe Main and MSHA is for the respirable dust rule, long,
12   long, overdue.  Someone is finally doing something about
13   it, or trying to do something about it.
14          The third is on the use of Section 108(a)(2)
15   under the Mine Act.  This is the most, the two most
16   effective, or the most powerful enforcement tools that
17   MSHA has in its toolbox, is Section 108(a)(2) where they
18   can go into federal court and seek an injunction against
19   an operator who has a Pattern of Violations that
20   jeopardizes miners' health and safety.  Never been used.
21   Never.  1977 it's been in the law.  Thirty-three years,
22   never been used until Joe Main came into office, and now
23   it's been used against Freedom Energy in Pike County,
24   Kentucky, and used successfully.
25          In part, it was never used because of the
```

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   Solicitor's Office in D.C. being afraid of its own

2   shadow, being afraid to take on the coal industry, and

3   being afraid that if we go in front of a federal judge,

4   we're going to lose because we haven't put this mine on a

5   Pattern of Violations, therefore, we can't use Section

6   108(a)(2).

7           I never looked at it that way, never thought

8   that was the right way to look at it.  And, indeed, when

9   MSHA finally had the guts to use it and go in front of a

10  federal judge, and that issue was presented, MSHA won.

11  Judge Supar said, "No, you don't have to be on a Pattern

12  of Violations to seek an injunction under 108(a)(2)."

13          And, then, finally we have the POV Rule.

14  This is a fourth example.  It's never been used, as Wes

15  said, in 33 years.  I don't think we should lose sight of

16  the fact that there's a human context to all of this.

17  Scotia is right up the road; it's the next county,

18  neighboring on Perry County here, Letcher County.

19  Twenty-six miners and mine inspectors killed in twin

20  explosions, March 1976.  That's why there is a POV Rule.

21  Because Congress looked at what happened at Scotia and

22  said, "This is outrageous."  You have a mine with

23  repeated violations over and over again.  They get cited;

24  they have to abate it.  Next time MSHA does that, the

25  same thing, cited, abated.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1          But nothing ever changes.  We need a stronger

2   enforcement tool.  So they put the POV in the Section

3   104(e) of the law, and they also put in the injunction

4   Section 108(a)(2).  But 33 years later, neither one of

5   them has ever been used.  MSHA's two most powerful

6   enforcement tools are laying idle in their toolbox.  It's

7   unacceptable.  And Joe Main has changed that.  So instead

8   of being praised for that, for finally doing what the law

9   says to do, you have the Kentucky Coal Association

10  saying, "They're trying to bankrupt us."

11         The Senate Committee who passed the Mine Act

12  and commented on it in the legislative history never

13  could have anticipated -- they would have been amazed if

14  they were all around today.  "It's 2011 and no one has

15  ever used this law that we gave you.  It's sat idle all

16  these years."  I think they would not only be dismayed,

17  they'd be disgusted.

18         Now, turning to the POV itself, I just want

19  to read the critical portion of the law.  "Section

20  104(e)(1):  If an operator has a Pattern of Violations of

21  mandatory health or safety standards in the coal or other

22  mine, which are of such nature as could have

23  significantly and substantially contributed to the cause

24  and effect of coal or other mine health or safety

25  hazards, he shall be given written notice that such

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    pattern exists."

2            Legally, the term shall is mandatory, it's

3    not discretionary.  Courts over and over again have held

4    that shall, "He shall be given written notice that such

5    pattern exists."  As Wes said, the plain language of the

6    statute supports the POV Rule with regard to not giving a

7    notice or written warning.

8            I think it's important to point out what that

9    statute doesn't say.  It doesn't say, "Send the coal

10   operator a warning letter and say you've been a bad boy

11   and if you don't become a better boy, then maybe we're

12   going to take some action two years down the road."  It

13   doesn't talk about a written warning.

14           Now, MSHA has the authority in the regulatory

15   process to "fill in gaps" in the statute, but MSHA does

16   not have the authority to do something in direct

17   contravention of what a statute says they have to do.  In

18   other words, they can't disobey the statute.  They can't

19   -- if the statute says you have to inspect all

20   underground coal mines four times a year, MSHA can't

21   issue a reg saying, "We're going to inspect them two

22   times a year."  That violates a statute.

23           In my view, the regulation that says we have

24   to send out a written warning to coal operators when we

25   think they may have a Pattern of Violations, violates the

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    statute.  A lawsuit should have been filed when that

2    regulation was implemented; and my belief is if a lawsuit

3    had been filed, that regulation never would have

4    withstood scrutiny; that the plain language of the Act, a

5    court would have said it violates the plain language of

6    the Act, and would have struck down that regulation.

7           Now, what's the result?  Since the early '90s

8    we've had this written warning.  The result is that no

9    one has ever been placed on a pattern.  And I think it

10   was an intentional cynical attempt by the Bush

11   Administration, the first Bush Administration, to help

12   coal operators, to ensure that no coal operator was ever

13   put on a Pattern of Violations.  That's exactly what it

14   accomplished.  That regulation was a gift to coal

15   operators, an undeserved gift to outlaws, knowing that if

16   we put this in, none of them are ever going to be put on

17   a Pattern of Violations.

18          Now, finally, we have someone doing the right

19   thing, saying this written warning never should have been

20   promulgated and wanting to delete it, and you have the

21   coal industry whining about it.

22          Now, they want "transparency."  Every

23   operator who submitted comments, they all use the same

24   buzzer, "We need transparency."  Why?  As Wes said, no

25   good coal operator has anything to fear about the POV

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   Rule.  It's the outlaws who are going to be affected by
2   it.  And this is a rule that should have been used dozens
3   and dozens of times since 1977.  Upper Big Branch should
4   have been placed on a Pattern of Violations, and Sago
5   should have been placed on a Pattern of Violations.
6   Aracoma should have been placed on a Pattern of
7   Violations.
8            I represent four of the widows and the sole
9   survivor of the Kentucky Darby Disaster.  They should
10  have been placed on a Pattern of Violations.  They had
11  something like 30 accumulations violations, and you all
12  know what I'm talking about.  Accumulations is just a
13  failure to clean up your mine, to clean along your belt
14  lines.  It means you're too sorry and you care so little
15  for the health and safety of your employees that you
16  can't get a guy with a shovel to shovel along the belt
17  line.  That's where an accumulations violation is.  They
18  had about 30 of them.  They should have been on a Pattern
19  of Violations.
20           Had Upper Big branch been placed on a
21  pattern, or had MSHA gone to court under Section
22  108(a)(2), maybe we'd have all these 29 miners who were
23  killed, maybe they'd still be alive.  And the same with
24  Kentucky Darby.
25           And I've seen families how disasters tear

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    apart families and damage families forever.  It's not

2    something that goes away in a year or two.  It destroys

3    families.  And isn't that what the Pattern of Violations

4    Rule is all about, is to prevent disasters.  But, yet,

5    you have these irresponsible comments from the Kentucky

6    Coal Association that what you're really trying to do is

7    bankrupt the coal industry.  No, I think the rule is

8    trying to prevent disasters and trying to prevent having

9    widows and orphans.

10          The other point about the POV is what I think

11   Wes addressed very articulately about final orders and I

12   don't need to go into that in any great detail.  But the

13   due process argument, I think it's a red herring.

14          And, Jay, you asked a question of Wes.  I

15   would just refer you to Representative Miller's comments,

16   and I think it covered very thoroughly why the due

17   process argument that's been raised by industry doesn't

18   have a leg to stand on.  It's a very good synopsis of why

19   that's a faulty argument.

20          And, again, I want to re-emphasize what

21   Representative Miller put in his comments about the 841

22   days that it takes for the issuance of an unwarrantable

23   failure citation to become a final order.  And, again,

24   that's about 2-1/2 years.  And, it's not realistic to

25   think that you can't count unwarrantable failures that

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    take 2-1/2 years to litigate.  You can't take them into

2    consideration when placing a company on a Pattern of

3    Violations.

4            Again, to re-emphasize what Wes said that the

5    Pattern of Violations is for the worst of the worst; it's

6    the outlaw operators who have that to fear.  And I read

7    the comments by some former MSHA inspector, I don't

8    remember his name, but who now works for industry, who

9    was bemoaning the fact that, you know, a Pattern of

10   Violations is a "death penalty" for operators.  He said,

11   "We used to sit around the MSHA office and talk about how

12   if we put someone on a pattern that," you know, "It was a

13   death penalty that would ruin their business, basically."

14           Well, first of all, you can get off the

15   pattern.  Once you're on, you can get off.  It may be

16   hard to get off, but it's not impossible like all these

17   industry commenters are saying, that it's impossible to

18   go 90 days without an S&S violation.  No, it isn't

19   impossible.  Because if you look at the data, plenty of

20   operators go 90 days without an S&S violation, if you

21   have a commitment to safety.

22           If you know you're on a pattern, why should

23   you get any S&S violations in the next 90 days?  Do

24   things right.  The operators that have to worry about

25   this law are those who don't care about health and safety

1   of their miners, who are willing to play Russian roulette

2   with their miners' health and safety.  And those

3   operators do exist.

4           I had a coal miner call me a couple weeks ago

5   and tell me that in the mine where he's working, the ATRS

6   doesn't reach the top.  So what do they have the guy

7   doing?  He's standing on the pod; they raise it; he's 2

8   or 3 feet from the roof, trying to put in a bolt, where

9   all he has to protect himself is his hard hat.  There's

10  no shield over him; there's no ATRS; and they've been

11  doing that for three shifts.  Those are the kind of

12  operators who don't care about miners.  All they care

13  about is getting the coal out of the ground, and those

14  operators very easily could have been killed, and they're

15  playing Russian roulette with their lives.  "Just do it

16  for a few more days until we get in lower coal and then

17  you'll be okay," instead of doing things the right way.

18          Those are the type of operators that have to

19  worry about being placed on a pattern, not your good

20  operator.  No operator with any decency would put a miner

21  in that situation, knowing that that person is risking

22  their life; that if the roof falls, he's probably going

23  to be killed or seriously injured.

24          I want to read one other comment from the

25  Kentucky Coal Association, and Mr. Bissett said, "Under

1   this new Proposed Rule," that's the POV Rule, "MSHA

2   inspectors would be given the power to shut down entire

3   or parts of an operation at his/her own discretion.  An

4   inspector could concoct enough citations or orders to

5   meet the criteria and establish a Pattern of Violations."

6           Again, irresponsible, reckless, nonsensical,

7   delusional comment.  He honestly thinks an MSHA inspector

8   is going to concoct violations with the specific purpose

9   of placing that mine on a pattern.  That's absurd.  Do

10  inspectors make mistakes?  Yes.  Do we have inspectors

11  who are concocting violations because they don't like an

12  operator?  I think it's hard to believe.  Has it ever

13  happened?  Who knows.  But enough that you could put a

14  mine on a Pattern of Violations?  It's ridiculous.

15  That's these types of irresponsible comments from the

16  coal industry.

17          Kentucky Coal Industry, by the way, has never

18  seen a safety regulation that it liked, ever.  Every

19  single safety regulation that MSHA or the State of

20  Kentucky has ever proposed in the last 40 years, the

21  Kentucky Coal Association has opposed.  It doesn't matter

22  how basic it is.  We ought to landmark Mine Safety Law

23  passed in Kentucky in 2007.  The industry opposed every

24  provision in it, including a seal provision.  They didn't

25  even want a company to have to certify that a seal was

1   properly built.  That was too radical of an idea for

2   them.

3           So, you take two examples in Mr. Bissett's

4   comments:  (1) that MSHA inspectors are going to concoct

5   violations that don't really exist; and number (2)

6   they're doing it to bankrupt the coal industry.  It's

7   part of the industry's mindset that they teach their

8   employees -- and Scott can tell you this -- that "the

9   inspector is your enemy, MSHA is your enemy.  MSHA is not

10  here to protect your health and safety.  MSHA is here to

11  shut your mine down and take your job so that your kids

12  will starve."  That's what miners hear.  That's what

13  they're taught, "When an inspector comes on the job, he's

14  your enemy."  And these are the kinds of people that

15  we're getting comments from.

16          I also read the comments, a very long thing

17  from Mr. Bumbico from Arch, the same company that's

18  discriminated against Scott for the last four years and

19  fired him, who says they have -- they're safety

20  conscious, but it's only on paper.

21          And I know in the first comments, Scott's

22  comment about potato salad -- I know it went over your

23  head, Pat, you probably don't know what he was talking

24  about -- but at the seal hearing in 2007, July of 2007,

25  after the Kentucky Darby widows had to summon up the

1  courage to talk about why they thought this rule was a

2  good rule, the then President of the Kentucky Coal

3  Association, Bill Caylor, got up and started complaining

4  about how every time there's a coal miner who gets

5  killed, it's on the front page of the news, but what

6  about the thousand people in the United States who die of

7  bad potato salad every year, that's what Scott was

8  talking about.  It's that lack of sensitivity that the

9  Coal Association brings to their comments.

10         So, in summary, Joe Main and MSHA are doing

11  what they're supposed to do by this rule.  This rule

12  should have been in place a long time ago, and kudos to

13  the Agency for finally doing the right thing.

14         You asked Wes, Jay, about whether the

15  criteria should be in the rule or whether, you know, it

16  can be policy.  I probably look at it a little

17  differently.  I think the criteria should be in the rule.

18  And the reason I think it should is specifically because

19  the next Republican Administration that gets in, if it's

20  not in the rule, they're going to change it to where a

21  POV is a worthless regulation again.  It's exactly what's

22  going to happen.  So, I think it should be in the rule so

23  that, you know, you're either going to have to rescind

24  that rule; they're going to have to go to Congress for

25  relief, rather than just doing something through policy.

1          And, again, I think the two major points I

2    want to make is, Number 1, we shouldn't have the written

3    warning.  There's no place in the rule for it.  It

4    violates the -- it violates the statute.  Number 2, the

5    due process arguments that industry are making are red

6    herrings, that this regulation will withstand judicial

7    scrutiny on a due process argument.

8          And, again, I think the whole purpose of the

9    rule is to prevent disasters, and not just disasters, but

10   miners from dying, one at a time, which is how most

11   miners die in this country, is one at a time.  A few

12   people know about it, and a few people read about it.

13         But I think this rule will prevent, help

14   prevent, those deaths, and that's what the Mine Act is

15   supposed to be all about.  The Mine Act doesn't talk

16   about coal production.  The Coal Association talks about

17   coal production, but the Mine Act doesn't.  It's an Act

18   to protect the health and safety of miners.  It doesn't

19   have as a goal that we produce X amount of tons of coal

20   per year.

21         So, I fully support this regulation and I

22   hope that MSHA will stick by it.  And if industry wants

23   to challenge it in court, then I think the government

24   attorneys are up to that challenge.

25         Thank you.

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1          MODERATOR SILVEY:  Thank you.  I'd just like

2     to make one comment.

3          As you noted, Tony, at the beginning of your

4     comments that your statement with respect to the miners'

5     rights, the respirable dust rule and Section 108(a)(2)

6     are beyond the scope of this ruling, so I'd just like to

7     note that for the record.

8          Thank you.

9          Our next person is Sam Petsowk with the

10    Appalachian Citizens Law Center.

11         Does anybody else wish to make -- provide

12    testimony?  Does anybody else wish to provide any

13    testimony?

14         If nobody else wishes to make a presentation,

15    then I would like to say on behalf of the Mine Safety and

16    Health Administration that we appreciate your

17    participation at this Public Hearing.  I want to thank

18    everyone who has made presentations.  And, as you've

19    heard me say a lot of times, for those of you who did not

20    present, but who attended the hearing, I want to say that

21    we appreciate that, because that says to us that you have

22    an interest in this rulemaking, and we appreciate your

23    interest.

24         I want to emphasize that all comments must be

25    received by MSHA by August 1, 2011.  MSHA will take your

1    comments and your concerns into consideration as we draft

2    the final rule.

3              I want to encourage all of you to participate

4    throughout the rest of this rulemaking and in all MSHA

5    rulemakings.

6              This Public Hearing is concluded.  Thank you

7    very much.

8              (Off the record.)

9              (On the record.)

10             MODERATOR SILVEY:  Again, my name is Patricia

11   W. Silvey.  And with me is Jay Mattos, who is Chair of

12   the Rulemaking Committee on MSHA's Proposed Rule on

13   Pattern of Violations.

14             I'd like to reopen the rulemaking record for

15   the public hearings on the Agency's Proposed Rule on

16   Pattern of Violations.  And, at this point, we have Bill

17   Bissett with the Kentucky Coal Association.

18             MR. BISSETT:  Thank you.  It's an honor to be

19   here today and to share these comments on behalf of the

20   Kentucky Coal Association.

21             The KCA would like to submit these comments

22   to the Mine Safety Health Administration regarding its

23   Proposed Rule for the Pattern of Violations, POV, under

24   30 C.F.R. Part l04.

25             In the current system established by

1    Congress, the POV process can only be established after a
2    citation order has been adjudicated and a potential
3    Pattern of Violations is affirmed.
4              The current process will be changed to allow
5    for a mine operator to be found guilty of a specific MSHA
6    violation before he or she has a chance for due process.
7    This lack of appeal would give MSHA absolute power that
8    creates a horrific legal quandary.
9              Under this new Proposed Rule, MSHA inspectors
10   will be given the power to shut down an entire, or parts
11   of, an operation at his or her discretion.  An inspector
12   can concoct enough citations or orders to meet the
13   criteria and establish a "Pattern of Violations."
14             After an operation uses its appeals process,
15   and an administrative law judge vacates a previous
16   citation or order, the company is still being punished as
17   having a previous status of POV.  In essence, the company
18   is treated as a guilty defendant before a final judgment
19   is issued.
20             Another damaging aspect of this Proposed Rule
21   is deleting the requirement for an operation to receive
22   written notice of MSHA's consideration that it might be
23   placed on POV status.  Currently, if an operation does
24   receive a letter stating MSHA has perceived a
25   determination that it is under consideration to be placed

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    on POV status, that operation then can evaluate and

2    correct those designated citations.  No prior

3    notification would further eliminate an element of

4    transparency by MSHA.  Let me repeat that sentence, "No

5    prior notification would further eliminate an element of

6    transparency by MSHA."

7             Unchecked federal authority will create a

8    heightened level of uncertainty throughout the mining

9    community.  Under the Proposed Rule, an operation that is

10   placed on POV status will find no mechanism in place that

11   allows them to dispute MSHA's findings.  Furthermore, a

12   90-day window is created in which any inspector that

13   might find any Significant and Substantial S&S violation

14   within that time frame can, or will, issue an Order of

15   Withdrawal for all individuals in a designated area and

16   order cessation of operations at that time.

17            In the current regulatory mindset of MSHA

18   inspectors, it is regarded that all mine inspectors view

19   most violations as S&S, regardless of the situation.

20   Hence, the likelihood that any operation could go 90 days

21   without an S&S violation is highly unlikely.

22            The Kentucky coal industry always sees a need

23   for improvement, but that commitment also needs a high

24   degree of transparency from the regulatory agencies that

25   monitor all activities.  The Fifth Amendment under the

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1   United States Constitution defines a level of checks and

2   balances and this Proposed Rule is viewed as an

3   encroachment on those individual and property rights.

4            This level of security afforded by the

5   Constitution is sometimes regarded as an alienable right.

6   The due process afforded to every individual would be

7   greatly diminished under this Proposed Rule.  The current

8   POV Rule allows for mediation during the process, and to

9   do away with that would empower the Executive Branch with

10  unchecked power.  This is unacceptable.

11           In conclusion, the mining community does

12  believe that more power should be allotted to the

13  Department of Labor.  The laws and regulations set forth

14  by the United States Congress are sufficient to maintain

15  and regulate all coal mining in the United States.

16           Coal mining had an unfortunate tragedy in

17  2010, but industry experts state that MSHA already

18  possesses the power to shut down a mine if an imminent

19  danger is deemed present.  And the current backlog of

20  cases currently being adjudicated is a greater hindrance

21  versus MSHA needing additional executive powers.

22           In Kentucky, we currently have more than

23  18,000 miners employed in our industry; and for every 1

24  job, 3 others are created indirectly.  The coal industry

25  in Appalachia has been drastically hampered by the

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1    federal regulatory uncertainty created during the last

2    three years by the Environmental Protection Agency.

3            Coal mining permits have been trickling

4    through, but most are still caught in a regulatory black

5    hole, which stifles production.  Ultimately, our goal is

6    a continued level of cooperation between the industry

7    employees and those regulators at the state and federal

8    level.

9            MSHA's new Proposed Rule on POV moves

10   everyone in the wrong direction.  It creates a further

11   exacerbating opinion that the Administration in

12   Washington, D.C. is trying to slowly bankrupt the

13   Appalachian coal industry by adding additional

14   regulations.  KCA believes this new rule is a major step

15   in the wrong direction.

16           Thank you.

17           MODERATOR SILVEY:  I have a few -- thank you.

18   I have a few comments.

19           First of all, let me say that your comments

20   relative to the Environmental Protection Agency -- and

21   I'm sure you would agree with that, too -- are beyond the

22   scope of this rulemaking, so I just want the record to

23   show that those comments are beyond the scope of this,

24   MSHA's Proposed Rule on Pattern of Violations.

25           Second of all, you mentioned the transparency

 1   by MSHA.  And with respect to transparency, MSHA intended

 2   to advance the concept of transparency in this Proposed

 3   Rule and in that I want to make two points.  One being

 4   that with respect to the specific criteria that the

 5   Agency would use to review a mine for a pattern, that

 6   specific criteria, and in the Public Hearing Notice we

 7   refined the process some, if you recall the Public

 8   Hearing Notice.

 9            That specific criteria would be posted on the

10   Agency's website.  And we said that before we made any

11   change to that criteria, we would put it on the Agency's

12   website; take comments from the mining public; review the

13   comments; respond to the comments; then, revise the

14   criteria as appropriate; and post any revised criteria on

15   the website.

16            Now, one of the reasons I said that was this

17   specific criteria is what MSHA uses, what MSHA used to

18   come up with this web tool that the Agency has posted on

19   its website right now, that mine operators can go into

20   this web tool and can determine if, according to that

21   specific criteria, they may be approaching the boundaries

22   of a Pattern of Violations, and they could come into MSHA

23   under a provision in the -- under the existing

24   procedures, as well as in the Proposed Rule, as a

25   mitigating circumstance.  They could come into -- with a

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1  corrective action program.  That's what we called it in

2  the existing procedures and under the Proposed Rule is a

3  safety and health management program to improve the

4  conditions that gave rise to the pattern.

5       What are your thoughts on that procedure?

6       MR. BISSETT:  Ma'am, I just stated my

7  testimony that I've read today, because I think that best

8  represents the interests of my member companies.

9       MODERATOR SILVEY:  Well, have you looked at

10  the web tool?  Have you, any of your operators, do you

11  know -- let me ask you, have you used the web tool?

12       MR. BISSETT:  Ma'am, I'm going to refer to my

13  testimony that I read today and stay with that.

14       MODERATOR SILVEY:  Well, let me ask you this,

15  then, all right.  Just like I asked you for the purpose

16  of your testimony being as useful to us as it could be --

17  okay -- and in terms of you to try conforming your

18  testimony to making it the most useful to us, if you

19  could, if you wanted to ask some of your member companies

20  have they used the web tool, and what do they think of

21  the provision of what we put in the Public Hearing Notice

22  about if we make -- I'm sorry; let me rephrase that.

23       Have they used the web tool, and what do they

24  think about using it to determine whether they may be

25  approaching a Pattern of Violations, and, therefore,

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

1  whether they might come into MSHA for a mitigating

2  circumstance.  If you would just ask them that.

3          MR. BISSETT:  I'd be happy to carry that.

4          MODERATOR SILVEY:  And if you have any answer

5  to that, if you would provide it to us before the record

6  closes.  Okay, thank you very much.

7          Okay.  If there are -- if nobody else wishes

8  to make a presentation, I want to say again that the Mine

9  Safety and Health Administration appreciates your

10  participation at this public hearing.

11          I want to emphasize that all comments must be

12  received by August 1st, 2011.  MSHA will take your

13  comments and your concerns into consideration in

14  developing a final rule.

15          This public hearing is now concluded.  Thank

16  you very much.

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

CASE TITLE:          Patterns of Violations

HEARING DATE:        July 12, 2011

LOCATION:            Hazard, Kentucky

      I hereby certify that the proceedings and evidence are contained fully and accurately on the audio and notes reported by me at the hearing in the above case before the Department of Labor, Mine Safety & Health Administration.

Date: July 12, 2011

                ANTHONY & ASSOCIATES, INC.

                EVELYN KELLY
                (Official Reporter)

ANTHONY & ASSOCIATES, INC.
770.590.7570

**ANTHONY & ASSOCIATES, INC.**
**770.590.7570**

## PRESENTERS

### Pattern of Violations

### July 12, 2011

### Hazard, Kentucky

| Name | Organization |
|------|--------------|
| 1. Bill Bissett<br>President | Kentucky Coal Association |
| 2. David Moss<br>Vice President | Kentucky Coal Association |
| 3. Charles Scott Howard &<br>Leonard Joseph<br>Coal Miners | Cumberland River Coal Company |
| 4. Wes Addington<br>Attorney-at-Law | Appalachian Citizens Law Center |
| 5. Tony Oppegard<br>Attorney-at-Law | Appalachian Citizens Law Center |
| 6. Sam Petsonk<br>Law Student/Clerk | Appalachian Citizens Law Center |

AB73-PH-5A

SIGN-IN SHEET

Pattern of Violations

Hearing
Hazard, Kentucky

**July 12, 2011**

| | Name | Organization | Contact Info. |
|---|---|---|---|
| 1. | Charles Scott Howard | Miner | 606 6333878 |
| 2. | Tony Oppegard | Atty-At-Law | 859-948-9234 |
| 3. | Leonard Fleming | U M W A | 606-855-7592 |
| 4. | Jimmy Newman | U. M W A | 606-832-4768 |
| 5. | Steve Sanders | ACLC | 606-633-3929 |
| 6. | Butch Oldham | U M W A | 270-821-2774 |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |